Martin, Michael David-8-10-04.txt

1

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE MIDDLE DISTRICT OF ALABAMA
3  NORTHERN DIVISION
4  GRAND JURY
5
6
7
8  IN RE:
9  GRAND JURY INVESTIGATION          CRC 03-0233
10
11
12
13        * * * * * * * * * * *
14
15        BE IT KNOWN that on Tuesday, August 10, 2004,
16  the testimony of MICHAEL DAVID MARTIN was taken before
17  the Grand Jury of the United States District Court for
18  the Middle District of Alabama, Northern Division, in
19  the Grand Jury Room, United States Courthouse, One
20  Church Street, Montgomery, Alabama; LOUIS V. FRANKLIN
21  and JOHN GIBBS interrogating.
22
23        * * * * * * * * * * *
24   .
25

2

1         MICHAEL DAVID MARTIN
2     The witness, having first been sworn to speak
3  the truth, the whole truth and nothing but the truth,
4  testified as follows:

Page 1

```
                    Martin, Michael David-8-10-04.txt
 5                       EXAMINATION
 6   BY MR. FRANKLIN:
 7        Q.   Mr. Martin, would you spell your full name
 8   and spell your last name for the record, please?
 9        A.   Michael David Martin, M-A-R-T-I-N.
10        Q.   How old are you, Mr. Martin?
11        A.   I'm 44.
12        Q.   And what do you do for a living?
13        A.   I'm self-employed.  I'm a private investor.
14        Q.   Prior to becoming self-employed, at some
15   point, did you work for an outfit called HealthSouth?
16        A.   I did.
17        Q.   Would you tell us what position you had and
18   how long you worked for that particular entity,
19   please.
20        A.   I began in 1989 as treasurer -- vice
21   president and treasurer, became CFO in 1997, and left
22   the company in February of 2000 as CFO.
23        Q.   Okay.  At some point while you were working
24   for HealthSouth, did there come a time when you were
25   approached about raising money to contribute to an

                                                              3

 1   entity called the Alabama Lottery Education
 2   Foundation?
 3        A.   Yes.
 4        Q.   Who approached you within HealthSouth's
 5   organization -- let me ask it this way.  At any point,
 6   did Mr. Scrushy approach you and tell you that he
 7   wanted this done?
 8        A.   Yes.
 9        Q.   Okay.  What did he tell you, as best you can
                               Page 2
```

Martin, Michael David-8-10-04.txt

10  remember? I know you can't remember verbatim; but as
11  best you can remember, what did Mr. Scrushy ask you to
12  do?
13      A.  He said that we needed to raise a million
14  dollars for the lottery and that he -- HealthSouth
15  could not give the money and he personally could not
16  give the money. So he asked us -- he wanted me to
17  help figure out a way to get the money to the -- the
18  lottery fund.
19      Q.  And did you then start trying or making
20  attempts to raise that money?
21      A.  Yes.
22      Q.  Now, you did not raise a million dollars, did
23  you?
24      A.  No.
25      Q.  At some point, you participated in efforts to

                                                                4

1   get $250,000, though; is that correct?
2       A.  That's correct.
3       Q.  Tell us what you did in an effort to get that
4   $250,000 and have it contributed to the Alabama
5   Education Lottery or the Alabama Education Lottery
6   Foundation.
7       A.  Well, at the instruction of Mr. Scrushy, I
8   contacted one of our investment bankers, UBS, and a
9   fellow by the name of Bill McGahan. He had directed
10  me -- Mr. Scrushy -- to get the money from them, the
11  full million. And I requested it from them.
12      Q.  Okay. Now, when you initially made this
13  request to Mr. McGahan, what did Mr. McGahan say to
14  you and you say to him?

                        Page 3

Martin, Michael David-8-10-04.txt

15    A.   He said that he would try to do it, he had to
16 check on it. And he came back to me and said his
17 company -- it was against his company's policy to do
18 it.
19    Q.   Did you relay that response to Mr. Scrushy,
20 Mr. McGahan telling you that he didn't -- he couldn't
21 do it because of company policy?
22    A.   Yes, I did.
23    Q.   And what did Mr. Scrushy say to you when you
24 delivered that message?
25    A.   Well, you need to tell them that they're

5

1 going to be fired if they don't raise that money.
2    Q.   Did you then go back and have additional
3 conversations with Mr. McGahan?
4    A.   I did.
5    Q.   In terms of the tone of the conversations you
6 had with Mr. McGahan after Mr. Scrushy sent you back,
7 how would you describe the tone of your conversation?
8    A.   Very harsh. I told him that they would be
9 fired and he would be F out of business.
10    Q.   Okay. Now, and I know you're uncomfortable
11 with using the word; but I would ask that you go ahead
12 and, as best you can remember, tell us what word --
13 harsh words you used.
14    A.   I told him he would be fucked and he would be
15 fired --
16    Q.   All right.
17    A.   -- if they didn't raise the money.
18    Q.   How many conversations do you think you
19 had -- and I know you don't remember the exact amount,

Page 4

Martin, Michael David-8-10-04.txt

20 but how many conversations do you think you may have
21 had with Mr. McGahan after he had told you that he
22 couldn't do it and you had relayed that message to
23 Mr. Scrushy and Mr. Scrushy basically sent you back to
24 Mr. McGahan?
25    A.   Between a half dozen and a dozen

6

1 conversations at least, maybe more.
2    Q.   All right.  At some point did Mr. McGahan
3 agree to raise some money for Mr. Scrushy to
4 contribute to the Alabama Education Lottery
5 Foundation?
6    A.   Yes.
7    Q.   Okay.  How much money was agreed upon?  And
8 tell us how that came about, please.
9    A.   Well, it was -- he had a customer, Integrated
10 Health Services, that owed him --
11    Q.   Let me stop you for a second.
12    A.   Okay.
13    Q.   When you say he --
14    A.   McGahan.
15    Q.   -- give us a name.
16    A.   Mr. McGahan --
17    Q.   Okay.
18    A.   -- had a customer, Integrated Health
19 Services, that owed him I think about $500,000, some
20 kind of banking fee.  So as opposed to he write the
21 check, he agreed to -- to -- what's the word --
22 forgive that amount that they owed him and then, in
23 turn, they wrote the check directly to the -- to the
24 fund.  And that was 250,000.

Page 5

Martin, Michael David-8-10-04.txt
25    Q.   All right.  After that -- well, let me back

                                                                    7

1  up.  Whose idea was it to use the debt of IHS or to
2  use IHS to do that?
3     A.   It was Mr. McGahan's.
4     Q.   Okay.  He gave that idea to you?
5     A.   Yes.
6     Q.   Okay.  And once the -- to put the ball in
7  motion, did at some point you receive or did somebody
8  send a check to HealthSouth for $250,000?
9     A.   They did.
10    Q.   Have you ever seen that check?
11    A.   I did.
12    Q.   Okay.  And how much was it again?
13    A.   $250,000.
14    Q.   When did you first see that check?
15    A.   When -- immediately once it arrived.
16    Q.   Okay.  Who gave it to you?
17    A.   Leif Murphy.  He was my assistant.
18    Q.   Okay.  He worked for HealthSouth?
19    A.   He was our treasurer.
20    Q.   At the time that you received that check,
21 your title would have been what?
22    A.   Executive vice president and chief financial
23 officer and board member.
24    Q.   And Leif Murphy, his title would have been
25 what?

                                                                    8

1     A.   I don't recall if it was vice president or
2  senior vice president or even group vice president,
3  but treasurer was his title.
                              Page 6

Martin, Michael David-8-10-04.txt

4   Q.   Was there some sense of urgency with respect
5   to getting that money from Integrated Health Services
6   to HealthSouth?
7   A.   Yes.
8   Q.   Did you have any conversations with
9   Mr. Scrushy about the urgency of getting that check to
10  HealthSouth?
11  A.   Yes.
12  Q.   What did he tell you about it? What did he
13  say to you in that regard?
14  A.   Well, in particular, there was an urgency
15  because he had a meeting with the Governor. And he
16  wanted to make sure that we did not directly -- or
17  Integrated Health Services did not directly mail that
18  check to the Governor, because Mr. Scrushy wanted to
19  personally hand that check to the Governor in this
20  meeting that created the urgency.
21  Q.   Okay. And did Mr. Scrushy tell you he wanted
22  to personally deliver that check to the Governor?
23  A.   Yes, he did.
24  Q.   And when you got that check, how long do you
25  think you held onto it before you gave it to the next

9

1   person?
2   A.   To Mr. Scrushy?
3   Q.   Yes, sir.
4   A.   I walked immediately over to his office and
5   handed it to him.
6   Q.   Okay. You don't remember what day that
7   occurred, do you?
8   A.   No.

Martin, Michael David-8-10-04.txt

9   Q.   Okay.  Do you remember about what -- what
10  year it was?
11  A.   It was in 1999.
12  Q.   Okay.  Do you remember -- give me a month as
13  close as you can remember.
14  A.   Sometime either late summer or early fall.
15  Q.   All right.  Let me ask it this way.  Has
16  there been any other occasion during the time that you
17  have employed -- been employed with HealthSouth that
18  you ever gave Mr. Scrushy a $250,000 check that was
19  supposed to be delivered to the then-governor of the
20  state of Alabama?
21  A.   No, sir.
22  Q.   That was the only occasion?
23  A.   That was the only occasion.
24  Q.   And your testimony is that you gave that
25  check to Mr. Scrushy with the understanding that he

                                                        10

1  wanted to personally give it to the then-governor, Don
2  Siegelman?
3   A.   That's correct.
4        MR. FRANKLIN:  All right.  One second.
5            (Brief pause)
6   Q.   Other than -- you've told us about the
7  conversations that you had with McGahan.  Are you
8  aware of anybody else from HealthSouth talking to
9  McGahan?
10  A.   Regarding?
11  Q.   The $250,000 check.
12  A.   I'm pretty sure that Leif Murphy talked to
13  him about it.

Page 8

Martin, Michael David-8-10-04.txt

14   Q.   Okay.  Did Mr. Scrushy talk to Mr. McGahan at
15 any point during the time that you-all were talking
16 back and forth?
17   A.   Yes.
18   Q.   And how do you know that?
19   A.   Because I was present.  After he declined to
20 give the money originally, Mr. Scrushy called him and
21 threatened to fire him also.
22       MR. GIBBS:  That's it.
23       MR. FRANKLIN:  Okay.  Any questions from
24 members of the grand jury?
25       MR. GIBBS:  Wait just a minute.

                                                              11

1            (Off-the-record discussion)
2                    EXAMINATION
3 BY MR. GIBBS:
4   Q.   Mr. Martin, you told us that Mr. Scrushy was
5 told -- or got some sort of a message about needing to
6 raise a million dollars.  Did Mr. Scrushy ever tell
7 you how that came about, who that came from or
8 through?
9   A.   Yes.
10  Q.   Can you tell me what he told you?
11  A.   It came through our lobbyist, Eric Hanson,
12 who was with -- I forget the name of his firm now, but
13 it came through Eric Hanson.
14       MR. GIBBS:  Okay.
15       MR. FRANKLIN:  That's all I have.
16       MR. GIBBS:  That's it.
17       MR. FRANKLIN:  Yes, ma'am?
18       GRAND JUROR:  Do you know why it was

Page 9

Martin, Michael David-8-10-04.txt
19  important to Mr. Scrushy to deliver that check to the
20  Governor himself?
21          THE WITNESS:  My impression was to -- to
22  influence the Governor; in particular, to receive a
23  Certificate of Need Review Board position.  But that's
24  my impression.
25          GRAND JUROR:  Okay.  Thank you.

                                                                12

1           GRAND JUROR:  Were you present when Scrushy
2   delivered the check to the Governor?
3           THE WITNESS:  No, ma'am.
4           MR. FRANKLIN:  Y'all give me one second,
5   now.  There is one question that I'm trying to
6   remember.
7                   (Brief pause)
8                   EXAMINATION
9   BY MR. FRANKLIN:
10      Q.  Let me digress just for a minute.  Were you
11  aware of an individual that worked for -- did you know
12  an individual who worked for HealthSouth whose name
13  was Jim Goodreau?
14      A.  Yes.
15      Q.  What was his position with HealthSouth?
16      A.  He was head of security and what people
17  consider Mr. Scrushy's bodyguard.
18      Q.  Okay.  And did he go everywhere that Scrushy
19  went all the time?  You always saw the two of them
20  together?
21      A.  Yes.
22      Q.  Did you ever have an occasion to have a
23  meeting with Mr. Scrushy and Mr. Goodreau wasn't