## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **CRIMINAL NO. 2:05-CR-119-F** |
| DON EUGENE SIEGELMAN, | ) | |
| PAUL MICHAEL HAMRICK, | ) | |
| GARY MACK ROBERTS, and | ) | |
| RICHARD M. SCRUSHY | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT SCRUSHY'S, SIEGELMAN'S, AND HAMRICK'S PRELIMINARY MOTIONS TO DISMISS AND CHALLENGE TO THE COMPOSITION OF PETIT JURY POOLS IN THE MIDDLE DISTRICT OF ALABAMA AND MOTIONS FOR DISCOVERY OF JURY RECORDS

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting

United States Attorney for the Middle District of Alabama, and hereby files its Response to

Defendant Scrushy's, Siegelman's, and Hamrick's Preliminary Motions to Dismiss and Challenge

to the Composition of Petit Jury Pools in the Middle District of Alabama and Defendant Scrushy's,

Siegelman's, and Hamrick's Motions for Discovery of Jury Records (hereinafter, collectively, the

"Motions to Dismiss" and "Motions for Discovery," respectively). In its Order of January 25, 2006,

this Court directed the United States to show cause why Defendants' Motions should not be granted.

Defendants' Motions to Dismiss should be denied without prejudice because they are not ripe for

adjudication and Defendants have not shown a prima facie violation of the Jury Selection and

Service Act, 28 U.S.C. §§ 1861-1871 (JSSA) nor the Fifth or Sixth Amendments to the Constitution.

Defendants' Motions for Discovery should be granted only in part because Defendants are entitled

solely to information on the jury selection process that is necessary for them to prepare or present

their Motions to Dismiss. To support its position, the United States avers as follows:

**I.    Defendants' Motions to Dismiss Should be Denied Without Prejudice**

Defendants have preliminarily moved to dismiss the second superseding indictment on the grounds that this Court has used an impermissible procedure to select the grand jury that returned the present indictment against them and will use the same improper procedure to select the petit jury that will determine their guilt or innocence. See Scrushy Mot. to Dismiss, at 1; Siegelman Mot. to Dismiss, at 1; Hamrick Mot. to Dismiss, at 1. Specifically, Defendants argue that this Court's Plan for the Random Selection of Grand and Petit Jurors (hereinafter, the "Plan") does not provide a process for selecting grand and petit juries that represent a fair cross section of the community because it results in the underrepresentation of African-Americans in this District's "jury wheels, pools, and panels." Scrushy Mot. to Dismiss, at 16; Siegelman Mot. to Dismiss, at 14; Hamrick Mot. to Dismiss, at 17. Consequently, Defendants assert violations of the JSSA, the Sixth Amendment, and the Equal Protection and Due Process components of the Fifth Amendment. See Scrushy Mot. to Dismiss passim; Siegelman Mot. to Dismiss passim; Hamrick Mot. to Dismiss passim. Defendants' Motions to Dismiss should be denied without prejudice because they are not ripe for adjudication and because Defendants have not yet carried their burden of showing a prima facie violation of the JSSA or the Fifth or Sixth Amendments. See United States v. Whiting, 538 F.2d 220, 221 (8th Cir. 1976) ("The burden of establishing a prima facie showing of discrimination or systematic exclusion in the selection of the jury array is on the defendant.").

To show a prima facie violation of the JSSA, the Sixth Amendment, and the Due Process component of the Fifth Amendment, Defendants must meet the Duren test and establish "(1) that the excluded group is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such

-2-

persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury selection process." United States v. Pepe, 747 F.2d 632, 649 (11th Cir. 1984) (citing Duren v. Missouri, 439 U.S. 357 (1979)).  See id. at 649 n.17 ("The test for a sixth amendment fair cross section violation applies in determining a violation of the statutory fair cross-section requirement."); United States v. Causey, No. Crim. H-04-025, 2004 WL 1243912, at *5 (S.D.Tex. May 25, 2004) (noting that a defendant must meet the Duren test to show a prima facie violation of the JSSA); United States v. Williams, 264 F.3d 561, 567-68 (5th Cir. 2001) (applying the Duren test to determine whether the defendant had established a prima facie violation of the Sixth Amendment or the Due Process component of the Fifth Amendment); United States v. Hawkins, 566 F.2d 1006, 1014 (5th Cir.) ("A claim of denial of [the Fifth Amendment] due process right requires a showing that the jury selection process tended to exclude or underrepresent some discernable class of persons and consequently to defeat a fair possibility for obtaining a truly representative cross section."), cert. denied, 439 U.S. 848 (1978),[1]; id. at 1014 n.14 (recognizing that the right to have a jury drawn from a fair cross section of the community is guaranteed generally by the Due Process Clause of the Fifth Amendment and specifically by the Sixth Amendment); Mitchell v. Morgan, 844 F. Supp. 398, 403 (M.D. Tenn. 1994) (holding that the Duren test applies to evaluate a claim of a violation of the Due Process Clause of the Fifth Amendment in the selection of a petit jury in a civil trial), aff'd sub nom. Thandiwe v. Morgan, 41 F.3d 1508 (6th Cir. 1994) (mem.) See also United States v. Clay, 159 F. Supp. 2d 1357, 1365 (M.D. Ala. 2001) (noting that the JSSA provides a remedy only for "substantial failures" of the Act and that these occur only when the

---

[1]See Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

"JSSA's goals of random selection of juror names or the use of objective criteria for determination of disqualifications, excuses, exemptions, or exclusions are frustrated"). Only after the defendant has established a prima facie case does the burden shift to the government to show that "a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." Duren, 439 U.S. at 367-68.

To establish a prima facie violation of the Equal Protection component of the Fifth Amendment, Defendants must show, akin to the requirements announced in Duren, that (1) the excluded group is capable of being singled out for discriminatory treatment, (2) that members of this group were substantially underrepresented on the venire, and (3) that the venire was selected under a practice providing an opportunity for discrimination. Cunningham v. Zant, 928 F.2d 1006, 1013 (11th Cir. 1991). See United States v. Tuttle, 729 F.2d 1325, 1327 n.2 (11th Cir. 1984) ("The prima facie case under the equal protection clause is 'virtually identical' to that under the sixth amendment and this court has often treated the threshold disparity requirement the same under both types of challenge.") (quoting Machetti v. Linahan, 679 F.2d 236, 241 n.6 (11th Cir. 1982), cert. denied, 459 U.S. 1127 (1983)), cert. denied, 469 U.S. 1192 (1985). Importantly, "to establish a prima facie equal protection violation a defendant must demonstrate intentional discrimination in the selection of venires." Williams, 264 F.3d at 569. "The necessary inference of intentional discrimination, however, can arise from 'an opportunity for discrimination in the operation of the jury selection system, coupled with a lesser degree of underrepresentation.'" Id. (quoting United States v. Fike, 82 F.3d 1315, 1321 (5th Cir. 1996), cert. denied, 519 U.S. 896 (1996), and cert. denied, 520 U.S. 1131 (1997), overruled on other grounds by United States v. Brown, 161 F.3d 256 (5th Cir. 1998)).

Defendants have not carried their burden of showing a prima facie violation of the JSSA or

the Fifth or Sixth Amendments. Defendants admit as much in their briefs as they base their Motions to Dismiss solely on "a good faith belief that the procedures currently in place in the Middle District of Alabama do not meet" the statutory and constitutional requirements. Scrushy Mot. to Dismiss, at 16. See Siegelman Mot. to Dismiss, at 14; Hamrick Mot. to Dismiss, at 17. As Defendants recognize in their briefs, a much greater showing is needed before they are entitled to any remedy under the JSSA or the Fifth or Sixth Amendments. See Scrushy Mot. to Dismiss, at 4 (noting that Defendant intends to amend his Motion to Dismiss after conducting discovery to "specify in detail the bases for Defendant's jury challenge"); Siegelman Mot. to Dismiss, at 4 (same); Hamrick Mot. to Dismiss, at 4 (same). See also Williams, 264 F.3d at 568-70 (denying defendant's jury selection claims under the Fifth and Sixth Amendments for failure of proof of underrepresentation based on systematic exclusion of a distinctive group). This Court should thus deny Defendants' Motions to Dismiss without prejudice and grant them leave to renew such Motions only if they can support them with evidence sufficient to satisfy their burden of proof on the statutory and constitutional claims. See United States v. Gruberg, 493 F. Supp. 234, 251 (S.D.N.Y. 1979) (denying without prejudice the defendant's motion to dismiss and for evidentiary hearing under the JSSA with leave to renew such motion after his review of the relevant discovery on the jury selection process).

In its Order ruling on Defendants' Motions, this Court should guide Defendants as to the showing they must make to support their claims. In particular, Defendants, in their supporting affidavit attached to their briefs, incorrectly state that the relevant comparison to analyze in determining whether African-Americans are underrepresented in this District is between the percentage of voting age African-American citizens in this District and the percentage of African-American citizens in particular jury pools and panels that have been selected in recent criminal cases.

See Scrushy Mot. to Dismiss, Exh. A, at 3-5 (comparing the percentage of voting age African-Americans in this District with the racial composition of four recent jury venires); Siegelman Mot. to Dismiss, Exh. A, at 3-5 (same); Hamrick Mot. to Dismiss, Exh. A, at 3-5 (same).  Contrary to Defendants' representations, it is well-settled law in this Circuit that the correct comparison to make under the second prong of the Duren test is "the difference between the percentage of the distinctive group among the population eligible for jury service and the percentage of the distinctive group on the Qualified Jury Wheel." United States v. Grisham, 63 F.3d 1074, 1078 (11th Cir. 1995), cert. denied, 516 U.S. 1084 (1996).  See Pepe, 747 F.2d at 649 ("The relevant comparison for sixth amendment fair cross-section purposes is the comparison between the percentage of the 'distinctive group' on the qualified wheel and the percentage of the 'distinctive group' among the population eligible for jury service.").  See also United States v. Forest, 355 F.3d 942, 954 (6th Cir. 2004) (rejecting defendant's comparison based on the total percentage of African-Americans in the population rather than the percentage who are eligible to serve on juries), vacated on other grounds by Garner v. United States, 125 S. Ct. 1050 (2005); United States v. Douglas, 837 F. Supp. 817, 821 (N.D. Tex. 1993) (ruling that "the percentage of African-Americans in the gross population of the division [] is irrelevant for Sixth Amendment purposes [because] the pertinent community for a fair cross section analysis is the pool of African-Americans in the division 'who are eligible to serve as jurors'") (quoting United States v. Brummitt, 665 F.2d 521, 529 (5th Cir. 1981), cert. denied, 456 U.S. 977 (1982)).

A selection plan that determines the population eligible for jury service based solely on voter registration lists (VRLs) is both constitutionally permissible and congressionally approved.  Pepe, 747 F.2d at 649 (rejecting statutory and constitutional challenges to jury selection plan that filled

master wheel exclusively from VRLs without supplementation from other sources). See 28 U.S.C.

§ 1863(b)(2) (permitting names of prospective jurors to be selected from VRLs); United States v.

Cecil, 836 F.2d 1431, 1445 (4th Cir.) ("The use of VRLs as the source for jury selection in federal

courts has been expressly sanctioned by Congress. . . ."), cert. denied, 487 U.S. 1205 (1988).

Defendants cannot object to the use of VRLs to determine the percentage of African-

Americans eligible for jury service on the grounds that African-Americans may be less likely to

register to vote than other distinctive groups.[2]  Congress has already considered this potentiality and

has approved the use of VRLs to determine those individuals eligible for jury service.  28 U.S.C. §

1863(b)(2) (permitting names of prospective jurors to be selected from VRLs).

> In so doing Congress obviously recognized that such use would necessarily exclude
> from jury service those individuals, whatever their race, color, gender, or age, who
> had not registered to vote, but it determined that this use of the voter registration list
> or list of voters would meet the constitutional requirement of a "fair cross section"
> of the community, since no cognizable group would be systematically excluded. ...
> The use of voter registration lists was chosen by Congress in part because it provided
> each qualified citizen with an equal opportunity to cause his name to be among those
> from which random selection is made, and also because it was the largest generally
> available random source that was frequently updated. . . . [T]o suggest . . . that the
> [JSSA's] use of voter registration lists violates the Constitution, simply goes too far.
> Of course voter registration lists are imperfect – Indians may not vote as much as
> non-Indians, Hutterites may not vote as frequently as Catholics, Swedes in the Sixth
> Division may vote more often than Germans, young people may vote less than old
> – but this does not render use of those lists unconstitutional, especially considering
> the alternative, which is to set up a complicated procedure that takes into account the
> voting habits of all groups in the community, regardless of their size, and then
> supplement voter lists accordingly.  No court has ever required this, and for good
> reason.  The procedures of the Act, despite its imperfections, achieve the goal of the
> Sixth Amendment: through random selection from voter lists, defendants are assured
> of a jury pool drawn randomly from a fair cross-section of the community. . . . [I]n
> adopting the voter registration lists as the "preferred source" of names for prospective
> jurors, Congress not only intended to provide a relatively large and easily accessible

---

[2]The United States expresses no opinion on whether African-Americans are more or less likely to register to vote than other individuals.

source of names, but one to which all potential jurors would have equal access and which disqualified jurors solely on the basis of objective criteria. . . . After all, the Constitution does not require that the juror selection process be a statistical mirror of the community; it is sufficient that the selection be "in terms of a 'fair cross-section'" gathered without active discrimination.

Cecil, 836 F.2d at 1445 (quotations and citations omitted).

Consequently, if Defendants cannot show an absolute disparity of greater than ten percent between the percentage of African-Americans on the VRLs (i.e., the percentage of African-Americans eligible to vote) and the percentage of African-Americans on the Qualified Jury Wheel, then their statutory and constitutional claims must fail. Grisham, 63 F.3d at 1078-79 (noting that the second prong of the Duren test automatically fails if the absolute disparity between the two relevant percentages is ten percent or less).

Even if Defendants can show an absolute disparity greater than ten percent, Defendants must still meet the third prong of the Duren test, namely that the underrepresentation of African-Americans is due to their systematic exclusion during the jury selection process. See Williams, 264 F.3d at 568 (discussing the requirements of the Duren test). To make such a showing, Defendants must do much more than point to the racial composition of a handful of venires. See id. ("Defendant must demonstrate not only that African-Americans were not adequately represented on his jury but also that this was the general practice in other venires."); id. (citing cases holding that underrepresentation on a single venire does not provide a sufficient sample to show systematic exclusion); United States v. Olaniyi-Oke, 199 F.3d 767, 772 (5th Cir. 1999) ("If it were required that every venire match the proportions of minorities in the community, that would be the antithesis of randomness, given the size of the sample."), cert. denied, 532 U.S. 985 (2001); United States v. McKinney, 53 F.3d 664, 671 (5th Cir. 1995) (noting that in a "truly random system," African-

Americans will be overrepresented on some panels and underrepresented on other panels), cert.

denied, 516 U.S. 901, and cert. denied, 516 U.S. 903, and cert. denied, 516 U.S. 970 (1995); United

States v. Guy, 924 F.2d 702, 706 (7th Cir. 1991) (holding that a defendant's "mere observation that

there were no African-Americans on a panel that was drawn from a population containing African-

Americans simply is not sufficient to demonstrate any systematic exclusion"); Whiting, 538 F.2d at

222 ("The fact that a single panel does not represent a cross-section of the larger community cannot

establish that the selection process was discriminatory.").

Defendants must show that the disparity between the percentage of African-Americans in the

population eligible to serve as jurors and the percentage of African-Americans in the Qualified Jury

Wheel is due to more than "statistical coincidence." United States v. Ashley, 54 F.3d 311, 314 (7th

Cir.) (rejecting defendants' Sixth Amendment claim for failure to show any reason for the disparity

in the relevant percentages of African-Americans), cert. denied, 516 U.S. 888 (1995). See Guy, 924

F.2d at 706 (noting the need to tie absolute disparity to a reason other than coincidence).

Importantly, Defendants cannot use as their reason for the disparity the failure of African-Americans

to register to vote. Cecil, 836 F.2d at 1448 ("This form of jury selection (i.e., by the use of VRLs)

cannot be described as systematically excluding classes that do not register in proportion to their

numbers; it is a process that comports with the need for efficient jury selection even though it may

not perfectly reflect population.") (quotations omitted).

Thus far, Defendants have failed to suggest any reason for any possible disparity between the

percentage of African-Americans eligible to serve as jurors and the percentage of African-Americans

on the Qualified Jury Wheel.[3] This Court has remedied the problems with the Plan identified in Clay. See Plan at ¶ 14(d) (describing process for the selection of persons excused or deferred from jury service); Clay, 159 F. Supp. 2d at 1371 ("In the wake of Clay's challenges to the Middle District of Alabama's jury-selection process, the court has changed or modified some of its jury-selection practices."). Absent a concrete showing from Defendants of a practice in the Plan giving rise to systematic exclusion of, or an opportunity for discrimination against, African-Americans, Defendants' claims under the JSSA and Constitution must fail. Placing the burden of making a prima facie showing on Defendants is proper because the Plan is cloaked with a presumption of validity. Thompson v. Sheppard, 490 F.2d 830, 833 (5th Cir. 1974) (concluding that a jury selection plan that identifies jurors in an objective, mechanical, and random manner from the entire voting list of a county is presumed to be valid), cert. denied, 420 U.S. 984 (1975). See Cecil, 836 F.2d at 1449 (noting that an approved jury selection plan represents the reasoned judgment of an impartial group of judges "with intimate acquaintance with the population involved and the constitutional and statutory requirements"). Unless Defendants can make their required showings after investigation of the relevant jury selection records, they are not entitled to an evidentiary hearing, much less dismissal of the second superseding indictment. See United States v. Royal, 100 F.3d 1019, 1026 (1st Cir. 1996) (conditioning a defendant's right to an evidentiary hearing on his ability to use discovery about the jury selection process "to show a factual dispute that, if resolved in his favor, would entitle him to relief"), aff'd after remand, 174 F.3d 1 (1st Cir. 1999); Gruberg, 493 F. Supp. at 251 (denying defendant's motion for an evidentiary hearing until he has made a more

---

[3]The United States further notes that Defendants have yet to make their required showing of a disparity greater than ten percent between the relevant percentages of African-Americans and in no way concedes that such a disparity exists in this District.

particularized showing after inspection of documents produced in discovery pursuant to the JSSA).

**II.     Defendants' Motions for Discovery Should be Granted Only in Part to Obtain Solely Information Relevant to Their Challenge to the Plan**

Defendants' requests for all records maintained by the district clerk in connection with the

selection of juries in this District are made pursuant to 28 U.S.C. § 1867(f), which provides:

> The contents of records or papers used by the jury commission or clerk in connection with the jury selection process shall not be disclosed, except . . . <u>as may be necessary in the preparation or presentation of a motion</u> under . . . this section, until after the master jury wheel has been emptied and refilled pursuant to section 1863(b)(4) of this title and all persons selected to serve as jurors before the master wheel was emptied have completed such service. The parties in a case shall be allowed to inspect, reproduce, and copy such records or papers at all reasonable times during the preparation and pendency of such a motion.

<u>Id</u>. (emphasis added).

Although the Supreme Court in <u>Test v. United States</u>, 420 U.S. 28 (1975) (per curium), stated

that "[t]his provision makes clear that a litigant has <u>essentially</u> an unqualified right to inspect jury

lists" from which his grand jury had been, and petit jury would be, selected, <u>id</u>. at 30 (footnote

omitted) (emphasis added), the opinion does not support Defendants' broad reading of it. Rather,

the Court's holding is limited to a defendant's "essentially . . . unqualified right" of production to

jury lists.[4]  Moreover, Section 1867(f) limits inspection (1) to only those materials "<u>necessary</u>" to

the preparation or presentation of a motion challenging compliance with jury selection procedures,

and (2) only at "<u>reasonable</u>" times. "To give the defendant an absolute right of routine access to all

materials would be an amendment to the Act." <u>United States v. Davenport</u>, 824 F.2d 1511, 1515

---

[4]Although the Supreme Court addressed a request for jury lists only, the Tenth Circuit, on remand, allowed the defendant "to inspect both the master and qualified jury wheels and the qualifying questionnaires returned by prospective jurors." <u>United States v. Test</u>, 550 F.2d 577, 581 (10th Cir. 1976) (<u>en banc</u>).

(7th Cir. 1987). See also United States v. Miller, 116 F.3d 641, 658 (2d Cir. 1997) (finding that the district court did not abuse its discretion in denying defense requests for disclosures that were not required under §1867(f) and were infeasible or irrelevant because a defendant's right to discovery under Test is only to "the extent necessary"), cert. denied, 524 U.S. 905 (1998). Consequently, since Test,

> [A]ll courts agree that a criminal defendant has an essentially unqualified right to inspect, reproduce, and copy jury lists. However, courts do not all agree on whether the essentially unqualified right to inspect, reproduce, and copy jury lists extends to personal identifiers such as the names and addresses of specific individuals included on those lists. Nor do courts all agree on whether the unqualified right to inspect extends beyond the master jury list absent a showing of need.

Causey, 2004 WL 1243912, at *10.

Numerous courts, in recognizing that Test does not mandate acquiescence to all discovery requests made pursuant to Section 1867(f), have applied the "necessary" limitation in holding that the "essentially . . . unqualified" right to inspect does not extend to all materials. See, e.g., Davenport, 824 F.2d at 1514-15 ("Test does not hold that completed juror questionnaires must be made available to defendants in addition to jury lists."); United States v. McLernon, 746 F.2d 1098, 1122-23 (6th Cir. 1984) (ruling that the defendants' "essentially . . . unqualified" right to inspection was satisfied by disclosure of the master lists from which the grand jurors were drawn and the relevant demographic information about the general pool and that the defendants were not entitled to questionnaires of the grand jurors who returned the indictments against them); United States v. Swan, No. Crim. 03-36-01-B, 2003 WL 21799915, at *1 (D.N.H. July 22, 2003) ("Courts facing [requests of disclosure of grand jury materials] generally limit the litigant's 'unqualified right' to grand jury lists and deny access to records that either reveal personal information of grand jurors or

pierce the secrecy of the proceedings."). See also United States v. Schneider, 111 F.3d 197, 204 &

n.4 (1st Cir. 1997) (noting that the JSSA treats access to jury questionnaires differently than

disclosure of juror lists and precluding inspection of questionnaires "solely to aid in the voir dire

process") (quotations and citations omitted); Causey, 2004 WL 1243912, at *14 (refusing access to

jury selection records used to select individual members of the special grand jury that indicted the

defendants while allowing access to the documents, including the juror qualification questionnaires,

that were used for determining qualifications, excuses, and exemptions for the purpose of compiling

the qualified wheel from which that jury was selected, with the exception of the questionnaires of

and any information about the individuals who served on that jury).

      In following the statutory prohibition against releasing any information that is not

"necessary" for an assertion of a claim under the JSSA, courts have also restricted access to personal

identifiers, such as names and addresses, included on the jury wheel lists, particularly any

information leading to the identification of the individuals on the grand jury that indicted the

defendant or to the identification of the prospective jurors of a future petit jury. See, e.g., In re Grand

Jury Investigation, 903 F.2d 180, 182 (3d Cir. 1990) (stating that a defendant is not normally entitled

to the names of the members of the grand jury that indicted him); United States v. Harvey, 756 F.2d

636, 642-43 (8th Cir.) (allowing access to data relating to the constituency and method of grand jury

selection, but not to the names and addresses of the persons on the master grand jury list), cert.

denied, 434 U.S. 831 (1985); McLernon, 746 F.2d at 1123 (upholding the refusal to give access to

the names, addresses, and demographics of the specific grand jurors who returned the indictments);

Causey, 2004 WL 1243912, at *13 (giving access to the master wheels from which the special grand

jury (SGJ) was selected and to the names selected from the master jury wheel for the purpose of

compiling a qualified jury wheel, but redacting from those lists the names, addresses, and other personal information pertaining to the individuals who served on the SGJ); United States v. Gotti, No. S4-02-CR-743(RCC), 2004 WL 32858, at *11 (S.D.N.Y. Jan. 6, 2004) (denying access to the names and addresses of the individuals on the Master List from which the grand jury was selected and also of those individuals on the grand jury); Swan, 2003 WL 21799915, at *1 (ruling that personal information, i.e., name, address, phone number, and the voting record of the individuals who sat on the grand jury that indicted the defendant, is not accessible under Test); United States v. Van Pelt, Nos. 92-40042-01-SAC through 92-40042-07-SAC, 1993 WL 23730, at *8-9, 11 (D. Kan. Jan.13, 1993) (the defendant's "unqualified" right does not extend to the list of the grand jurors who indicted him or to any materials pertaining to the selection of the prospective petit jurors in the case or the grand jury that returned the indictment, including any information by which the defendant could arrive at the identities of the grand jurors). "[J]ury lists from which the names of the actual jurors have been redacted are sufficient to comply with the Supreme Court's decision in Test because '[i]t is not the actual selection of the grand jury which would constitute the violation, but rather whether the jury was selected at random from a fair cross section of the community.'" Causey, 2004 WL 1243912, at *12 (quoting United States v. Nichols, 248 F. Supp. 2d 1027, 1034 (D. Kan. 2003), aff'd, 374 F.3d 959 (10th Cir. 2004)).

        In following the statutory limitation that only material "necessary" for an assertion of a claim under the JSSA may be disclosed, courts have required that a defendant show why the jury wheel lists are insufficient for determining whether there has been a "substantial failure to comply" with the JSSA before granting any discovery request for additional information. See, e.g., United States v. Hansel, 70 F.3d 6, 8 (2d Cir. 1995) (holding that the defendant must make a strong showing of

particularized need for disclosure of the names of the grand jurors); Davenport, 824 F.2d at 1515 (denying a discovery request because the defendant had failed to show why any records, other than the jury lists made public monthly, were necessary for preparation of the motion under the JSSA); Harvey, 756 F.2d at 642 (rejecting the defendant's request for additional information because he had failed to establish that the requested names and addresses on the grand jury master list were necessary to determine whether the master list represented a racial and economic cross-section of the community); Swan, 2003 WL 21799915, at *2 ("In order to avail himself of information pertaining to the voting record or personal information of a grand jury, a litigant should be required to make a particularized showing as to why the information is necessary to a potential challenge to the jury selection process."); Van Pelt, 1993 WL 23730, at *9 (proscribing further discovery because the defendant had failed to demonstrate that all the information he requested was necessary for the preparation of any challenge he might file).

Discovery of information relating to the jury selection process is also appropriate only at "reasonable times." For example, the court in United States v. Carlock, 606 F. Supp. 491 (W.D. La. 1985), denied the defendant access to certain requested materials because the inspection of those materials was not timely under Section 1867(f). In particular, the court, until the venire was assembled, denied access to the list of prospective petit jurors that would hear the case and to the materials to be used in selecting a petit jury from these prospective jurors. In so doing, the court followed "the long line of Fifth Circuit cases which hold that the trial court may withhold the list of prospective jurors until the time of trial." Id. at 492. See, e.g., United States v. Tucker, 526 F.2d 279, 282-83 (5th Cir.) ("28 U.S.C. § 1863(b)(8), which authorizes delayed disclosure of the jury lists when required by the 'interests of justice,' does not eliminate the court's discretion [as to the timing

of disclosure], and a showing of arbitrariness is required to reverse the trial court's decision."), cert. denied, 425 U.S. 958 (1976). The court also found untimely the defendant's request for access to the list of grand jurors who returned the indictment against him and to records used during the selection and empaneling of that grand jury. Carlock, 606 F. Supp. at 493. According to the court, such material was discoverable only when "the defendant demonstrates that he has inspected the materials pertaining to the master and qualified jury wheels for this division and that inspection of the materials pertaining to the list of grand jurors nonetheless remains necessary to determine whether the grand jury was selected properly." Id. See also Causey, 2004 WL 1243912, at *18 ("Because the focus in jury selection cases is on the source lists from which an individual jury is chosen and not the composition of any particular jury, some courts have held that defendants are not entitled to inspect, reproduce, and copy records used to select a specific grand jury under either the [JSSA] or Test, until after the defendant has reviewed the records otherwise made available to him and made a particularized showing that those records are insufficient to determine whether grounds exist to support a motion to dismiss the indictment.") (citations omitted) (footnote omitted).

The sensitive nature of the necessary "contents of records or papers used by the jury commission or clerk in connection with the jury selection process" is reflected in the criminal penalties in Section 1867(f) for unauthorized disclosure of the contents of any record or paper, namely, a fine of not more than $1,000, or imprisonment of not more than one year, or both. 28 U.S.C. § 1867(f). These criminal penalties underscore the importance of restricting access only to necessary information at reasonable times. Important policy concerns counsel strongly for limiting discovery to only that information, redacted of any personal identifiers, that is truly necessary for Defendants to prepare their motions under the JSSA. Ergo, the United States submits that

Defendants are entitled only to the juror identification number, race, and county of residence because that is the only information truly necessary for Defendants to make their challenge to the jury selection process in this District.

The identities of the grand jurors must be kept secret because "the disclosure of the names and addresses of the grand jurors could facilitate intimidation of or retaliation against the jurors." In re Grand Jury Investigation, 903 F.2d at 182. See also Gotti, 2004 WL 32858, at *11 ("the Government has an interest in maintaining the secrecy and sanctity of the grand jury proceeding"); Swan, 2003 WL 21799915, at *1 ("unbounded exploration of all records, particularly those records relating to the votes of a grand jury, invades the sanctity and secrecy of the grand jury process"). Similarly, disclosure of personal information about prospective petit jurors is unwise because "[i]f these completed judicial jury forms were released to defendants generally there would exist the possibility of substantial abuse of the information the forms contain, which could have serious consequences for individual jurors and the system." Davenport, 824 F.2d at 1515 (noting further that a defendant may be seeking the jury questionnaires for voir dire examination purposes instead of the requisite purpose of assessment and preparation of a jury-selection challenge).

This District's Plan reflects these policy concerns. In particular, Subparagraph 16(c) of the Plan provides that "[t]he names placed in the Qualified Jury Wheels shall not be made public except upon order of the Court for good cause shown." Subparagraph 17(b) provides that "[t]he names of grand jurors chosen and sworn shall not be made public unless the interests of justice require otherwise. No name of a grand juror shall be made public unless authorized by a written order of the Court." See also Subparagraph 18(b) ("The names of persons chosen to serve as grand jurors in this District shall remain confidential in the interest of justice unless otherwise ordered by the

Court."). Subparagraph 16(d) provides that the list of the potential petit jurors drawn from the Qualified Jury Wheel and their profiles shall not be made available to counsel until specified times. In particular, this provision provides that when jury selection occurs on a Monday, the most typical practice in this District in criminal cases, disclosure of the prospective petit jurors is to be made at 3 P.M. on the Friday before the Monday jury selection proceeding. Where jury selection occurs on a day other than Monday, the Plan calls for disclosure of the potential petit jurors at 3 P.M. on the day before jury selection. In this case, this Court, in deference to the parties' need to prepare for trial and to streamline the jury selection process, has already decided to give the parties earlier access to the list of potential petit jurors by making the venire list available at 3 P.M. on the Friday before jury selection scheduled for April 19, 2006, a Wednesday. Defendants are not entitled to this information at an earlier date.

In granting Defendants access at this time to all the materials they have requested, this Court would be acting contrary to the statutory restrictions, the Plan, and the longstanding interests and policies counseling against such a broad disclosure at this course of the proceedings based on Defendants present demonstrations of alleged violations of the JSSA and the Fifth and Sixth Amendments. Contrary to Defendants' assertions, the cases cited herein teach that a defendant simply does not have an absolute right of access to all materials relating to grand and petit jury selection at any given time. Defendants have particularized their challenge to the systematic exclusion of African-Americans. They have failed to offer any reason, much less make a strong particularized showing, as to why they need more than the necessary information from the 2001 and 2005 Master and Qualified Jury Wheels and the VRLs used to create them. In particular, the United States asserts that the only information to which Defendants are entitled at this time is the juror

identification number, race, and county of residence for those individuals on the VRLs used to create the 2001 and 2005 Master and Qualified Jury Wheels and on the 2001 and 2005 Master and Qualified Jury Wheels. This information is the only information presently necessary for Defendants to make their motions challenging the jury selection process because Defendants, to assert any statutory or constitutional claim, must first show an absolute disparity of greater than ten percent between the percentage of African-Americans eligible to serve as jurors and the percentage of African-Americans on the Qualified Jury Wheel. See supra (discussing the bright-line absolute disparity test for claims under the JSSA and the Fifth and Sixth Amendments).

Defendants have given no indication how any personal information, other than race, identifying any individual on any list is "necessary" to support their challenge, nor have they shown that the necessary demographic information cannot be provided without disclosing the names, addresses, and other personal information of the individuals on the lists. Defendants can certainly prepare their jury selection challenges once they have each individual's identification number, race, and county of residence as well as a description of the jury selection process utilized under the Plan. Disclosure of personal information about prospective and actual grand and/or petit jurors is unnecessary to achieve the purposes of Section 1867(f) and runs the danger of embroiling this Court and the parties in extra-judicial controversies of no moment to the instant proceedings. See Exh. A (attaching media accounts of allegations that Defendant Scrushy sought to influence jurors in the Northern District of Alabama).[5] If, after inspecting the limited materials, Defendants can make a particularized showing as to why more specific information is necessary to challenge the jury

---

[5]The United States offers no opinion on the merits of the description of the events recorded in the attached media accounts.

selection process, they can make a further request to the Court. See Royal, 100 F.3d at 1026 (conditioning a defendant's right to an evidentiary hearing on his ability to use discovery about the jury selection process "to show a factual dispute that, if resolved in his favor, would entitle him to relief"); Gruberg, 493 F. Supp. at 251 (denying defendant's motion for an evidentiary hearing until he has made a more particularized showing after inspection of documents produced in discovery pursuant to the JSSA).

The government is aware that 28 U.S.C. § 1868, quoted below, makes public all records and papers compiled and maintained in regard to the 2001 Master Wheel.

> After the master jury wheel is emptied and refilled pursuant to section 1863(b)(4) of this title, and after all persons selected to serve as jurors before the master wheel was emptied have completed such service, all records and papers compiled and maintained by the jury commission or clerk before the master wheel was emptied . . . shall be available for public inspection for the purpose of determining the validity of the selection of any jury.

28 U.S.C. § 1868.  Importantly, public inspection pursuant to this statute is for the sole stated purpose of evaluating a jury-selection challenge. The government contends that, at a minimum, this Court should circumscribe the public inspection of the records pertaining to the 2001 Master Wheel to ensure the privacy of the identities of the grand jurors who indicted Defendants. The policy of sanctity and secrecy of the grand jury, the need to protect the grand jurors from harassment and intimidation, and the adherence to the protective provisions of the Plan far outweigh any value to Defendants of knowing the grand jurors' identities at this time. Such limitation on discovery is particularly apropos because "'[i]t is not the actual selection of the grand jury which would constitute the violation but whether the jury was selected at random from a fair cross section of the community.'" Gotti, 2004 WL 32858, at *11 (quoting United States v. Nichols, 248 F. Supp. 2d

1027, 1034 (D. Kan. 2003)).

Accordingly, the Government requests that this Court grant Defendants' Motions for Discovery, but limit the discoverable information to only the personal identification number, race, and county of residence for the individuals on the 2001 and 2005 Master and Qualified Wheels and the VRLs used to create them. The United States asks this Court not to reveal the personal information of any individual on any of these lists. Of course, Defendants are entitled to a description of the process and procedures this Court uses to create the Master and Qualified Wheels and to select venires and grand and petit juries. Under no circumstances should this Court disclose information that would permit the revelation at any time of the identities of the grand jurors that returned the indictments against Defendants. The identities of the prospective petit jurors that will form the venire should be revealed only at the time designated by Order of this Court. The government further requests that all information conveyed by the Clerk or discovered otherwise from the Court's jury records and files shall be returned to the Court upon resolution of this jury selection issue; that Defendants bear all expenses, including any computer costs incurred, in gathering, compiling and providing this information; and that the United States be granted the same discovery given to Defendants. See Causey, 2004 WL 1243912 at *17 (placing on the defendant the cost of generating the requested discovery materials for his jury selection challenge). Finally, should this Court decide to grant Defendants access to more information than juror identification number, race and county of residence, the United States requests that this Court enter an Order prohibiting any party from using such material directly or indirectly in an attempt to contact or communicate with any prospective juror for this case, or any juror on the grand jury that returned the instant indictment.

**III.    Conclusion**

Defendants preliminarily move to dismiss the second superseding indictment, but have completely failed to carry their burden of establishing a <u>prima</u> <u>facie</u> violation of the JSSA or the Fifth or Sixth Amendments.  Consequently, this Court should deny without prejudice their Motions to Dismiss, permitting them to renew their motions if and when they can make their required showings.

Under the provisions of the JSSA, Defendants are entitled to discovery pertaining to the jury selection process in this District, but not to the extent to which they request.  Defendants are entitled only to that information necessary for them to make their jury selection challenges, and this information is limited, at the present time, to the identification number, race, and county of residence of the individuals on the relevant voter registration lists and jury wheels.  Not until Defendants overcome the ten-percent absolute disparity threshold should this Court grant them additional discovery.  In no event, should this Court grant Defendants access to information that could lead to the identification of those persons who served on the grand jury that returned the indictments against Defendants or who will compose the venire in this case.  Ergo, this Court should grant in part Defendants' Motions for Discovery.

Respectfully submitted this the 1st day of February, 2006

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY


/s/ J.B. Perrine
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7135
Email: jb.perrine@usdoj.gov

ASB-9077-E31J

/s/ Jennifer Garrett
Special Assistant United States Attorney
Assistant Attorney General
Office the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-8494
Fax:    (334)242-4890
Email: jgarrett@ago.state.al.us
ASB-4600-T77J

# EXHIBIT A



**The Seattle Times**

seattletimes.com

Friday, January 20, 2006 - 12:00 AM

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

# Scrushy denies paying boosters

### By Laurence Viele Davidson
*Bloomberg News*

Richard Scrushy, the HealthSouth founder acquitted during a 2005 accounting-fraud trial, is defending himself against a report he paid for positive stories in a black-oriented Alabama newspaper.



Fired HealthSouth CEO Richard Scrushy was acquitted by a mostly black jury.

Believers Temple Church secretary Audry Lewis claims Scrushy paid her $11,000 to write stories for The Birmingham Times to bolster his defense in the $2.7 billion accounting-fraud case.

Her boss, Pastor Herman Henderson, said in an interview that Scrushy donated about $25,000 to Believers Temple. Henderson said he was on retainer to organize the black community to support Scrushy, who faced a predominantly black jury.



BUTCH DILL / AP

Pastor Herman Henderson, left, said he was on retainer to organize black support during Richard Scrushy's fraud trial. Audry Lewis, right, said she was paid to write sympathetic stories.

Lewis visited the trial often and wrote several pieces for The Times, a 16,000-circulation weekly newspaper. Henderson was also in the courtroom and at Scrushy's daily news conferences.

Thursday, Scrushy said he never authorized any payments and even taped a conversation with Henderson in which the minister stated Scrushy didn't pay him for support. Money given Henderson was a church donation, Scrushy said.

"He's lying. I am shocked he calls himself a pastor," Scrushy said of Henderson in a statement. "My foundation donated to his church building fund and to a Katrina relief effort that his church sponsored. That's it. Period."

Scrushy said he gave Lewis money because he thought she was needy.

Henderson and Lewis said in an interview Thursday that Scrushy still owes them $150,000 for their services. They say they were paid through a public-relations firm, The Lewis Group, owned by the founder of The Birmingham Times, Jesse Lewis.

They provided documentation of the checks from The Lewis Group to The Associated Press.

Case 2:05-cr-00119-MEF-CSC    Document 114    Filed 02/01/2006    Page 26 of 32

"When I found out that Rev. Henderson was representing to people that he was somehow working for me through The Lewis Group, I called Mr. Lewis and told him in no circumstances did I want Rev. Henderson employed on my behalf," Scrushy said.

"Rev. Henderson has continued to dog me for money, even though I never asked him to perform any services for me."

An attorney for Scrushy, Donald Watkins, said the allegations and the request for more money "could be perceived as a shakedown."

Jesse Lewis did not return a phone message for comment.

Scrushy spokesman Charlie Russell said he paid Audry Lewis $2,500 for post-trial consulting work because they needed someone like her to give them a "roadmap to the black community and churches" so Scrushy could give speeches.

Russell said initially he gave Lewis the money because she was at the courthouse during the trial crying about not having enough money to go to a Detroit funeral. He said he made the business arrangement so that he could pay her way to the funeral.

James Lewis, chief executive of The Birmingham Times, said he didn't know Lewis was working on Scrushy's behalf. He said he would have preferred they run her articles as paid advertisements.

James Lewis is Jesse Lewis' son. They are not related to Audry Lewis.

Audry Lewis said she e-mailed the articles to Scrushy, who then edited them and made suggestions on what to write. Scrushy's spokesman Russell said "someone" on Scrushy's staff read Lewis' articles and made suggestions for corrections.

Scrushy attended his four-month trial flanked by black ministers. He was a guest speaker at several black churches during the case, including one attended by a juror.

U.S. District Judge Karon Bowdre removed one juror after he spoke at her church and donated $5,000. A church member called to complain about his appearance and donation, which sparked an FBI jury-tampering investigation. There was no determination of wrongdoing.

U.S. Attorney Alice Martin, who prosecuted the case, said the claims of Audry Lewis and Henderson, if true, do not appear to be a crime.

"If you want to pay someone to write favorable stories and can get a paper to print them, I don't know of any law it violates," Martin said.

Kelly McBride, who directs ethics programs of the Poynter Institute, which trains professional journalists, said the payments described by Audry Lewis are "a complete aberration" in U.S. journalism.

McBride said it is so unusual to be paid by a news source to write favorable stories that the allegations "are going to be on a lot of people's radar" and will be used as fresh ammunition by media critics.

Meanwhile, Scrushy faces a new federal trial on bribery charges in Montgomery, Ala.

The trial date in the new case, which alleges Scrushy tried to buy favors from former Alabama Gov.

Don Siegelman, may be set at a hearing today. Siegelman is also a defendant. Both pleaded not guilty.

Scrushy's son-in-law, Mike Plaia, who bought two TV stations in the Montgomery market, has said the stations will likely broadcast Scrushy's Christian devotional TV show.

The show was on television in Birmingham during Scrushy's first trial.

*Watkins, Martin and McBride comments provided by The Associated Press*

Copyright © 2006 The Seattle Times Company

2 of 10 DOCUMENTS

Copyright 2005 The Birmingham News
All Rights Reserved
Birmingham News (Alabama)

November 1, 2005 Tuesday

**SECTION:** BUSINESS; Pg. 1D Vol. 118 No. 206

**LENGTH:** 535 words

**HEADLINE:** Scrushy kin buying into capital TV market

**BYLINE:** MICHAEL TOMBERLIN News staff writer

**BODY:**

A company headed by Richard Scrushy's son-in-law is buying two low-powered television stations in the Montgomery area, where the HealthSouth Corp. founder faces bribery charges.

Venture Television LLC, headed by Mike Plaia, plans to purchase WAXC TV-64 in Montgomery and WETU TV-39 in Alexander City from Cable Video Productions Inc. for an undisclosed price.

Plaia's group bought a majority stake in WOTM TV-19 in Hoover just before Scrushy's fraud trial on 36 criminal counts got under way in Birmingham federal court.

WOTM immediately began airing "Viewpoint," a religion show hosted by Scrushy and his wife, Leslie, that also is shown on WB affiliate WTTO TV-21. WOTM also aired a 30-minute daily show devoted to the trial that prosecutors griped was tilted in favor of Scrushy.

Plaia said Monday the deal was in the works before Scrushy, acquitted in June on fraud charges in Birmingham, was charged in Montgomery.

"We began these conversations back in July. We signed an asset purchase agreement in September. We sent a press release out on Oct. 1. That was obviously well before any of this happened to Richard," Plaia said. "There is not any correlation to that at all."

Plaia said he would consider airing "Viewpoint" on the new stations if Scrushy wants to purchase the time.

"I would hope that Richard would want to increase his viewership there," Plaia said. "We get calls all the time at the station, people wanting copies of his show or wanting to take his show to a different level. That has been a very positive show and successful show for WOTM."

"Viewpoint" is produced at WOTM studios. The day after the indictment was unsealed in Montgomery, Scrushy held a press briefing at WOTM studios to respond.

Plaia said another trial show is also a possibility, though not necessarily one focused on Scrushy.

"There has been no discussions of doing anything like that in Montgomery," he said. "I haven't really thought about Richard. I've thought the Siegelman trial would be one of interest. There may be talks. It's very similar to the other trial, if there are sponsors and advertisers that would want to sponsor a show like that. Because at the end of the day, it just becomes an economic decision."

Plaia said the additional stations will expand the reach of Venture Television into markets such as Montgomery, Alexander City, Wetumpka and Scrushy's hometown of Selma.

"It's a very interesting model because there are a lot of synergies," Plaia said of linking cable channels across the state. "The challenge of a low-power station is to talk to some of the larger advertisers who are used to carriage elsewhere because we're really confined to our locale. To open up our economic model and be able to talk to a broader group of

Scrushy kin buying into capital TV market Birmingham News (Alabama) Nove

advertisers, we need more viewership, we need more households, we need more locations we can cover."

With the three stations now, Venture Television reaches around 360,000 households with over 1 million potential viewers.

Plaia said Venture Television is not affiliated with Scrushy and doesn't get financing from him.

"Richard Scrushy is not an investor, nor does he own any part of my media operations or ventures," Plaia said.

EMAIL: mtomberlin@bhamnews.com

**LOAD–DATE:** November 2, 2005



Close Window

JANUARY 20, 2006

NEWS ANALYSIS
By Brian Grow

# Richard Scrushy's "Amen Corner"

**While facing charges of corporate fraud, the HealthSouth CEO cultivated influential black church leaders, many of whom were in court to see him acquitted**

New details are coming to light about Richard Scrushy's financial ties to African-American pastors who supported the former CEO of HealthSouth Corp. during his successful courtroom defense here last year against criminal charges of accounting fraud at the chain of rehabilitation hospitals.

One of Scrushy's former supporters, Pastor Herman Henderson of Believers Temple Church, now alleges that he was hired by Scrushy to organize black pastors to attend the trial in federal court in Birmingham and provide public relations services. These services allegedly included writing favorable articles placed in *The Birmingham Times*, a local newspaper serving the black community.

In a group interview with BusinessWeek Online, Scrushy, his wife Leslie, and pastors from five local churches denied these allegations. Scrushy and his supporters said their relationship is based purely on their common Christian calling. The former CEO denied having entered into any contract with Henderson for PR work. Scrushy says Henderson is trying to extort money from him -- an accusation Henderson denies.

**TV SHOW.** The controversy comes as Scrushy prepares for his next trial, scheduled to start this spring, on charges that he bribed former Alabama Governor Donald Siegelman in exchange for influence over a state hospital-regulatory body. Scrushy has pled not guilty.

It isn't a secret that as Birmingham-based HealthSouth became enmeshed in controversy, Scrushy, the company's founder, cultivated ties with the city's African-American churches and clergy. After the company was raided by federal investigators in March, 2003, he began attending the predominantly black Guiding Light Church.

Not long after he was indicted in November, 2003, Scrushy and his wife launched an evangelical Christian talk show on a local cable station. During his trial on charges of leading a $2.7 billion accounting fraud last year, Scrushy was often joined at each day's proceedings by a group of pastors, many of them black, who became widely known as Scrushy's Amen Corner.

**MEN OF THE CLOTH.** In 2003, Internal Revenue Service records show that Scrushy's charitable foundation gave Guiding Light $1 million. The next year, as his trial date approached, the records show that the foundation donated more than $700,000 to religious groups, some of whose leaders joined the courthouse Amen Corner. The foundation's 2005 IRS records are not yet available. Scrushy was acquitted last June by a jury of seven black and five white members.

Bishop Jim Lowe, the leader of Guiding Light Church, which has benefited the most from Scrushy's donations, attended the six-month trial about once a week, but he said in a separate interview: "Scrushy never offered me any money to do any services for him."

Henderson, the 47-year-old pastor of Believers Temple Church, alleges that Scrushy hired him to win over the black community in Birmingham. Henderson says Scrushy last April also hired the Lewis Group, a public relations firm run by entrepreneur Jesse J. Lewis, as a conduit for funds paid to Henderson for organizing a prayer vigil, printing flyers, and arranging meetings with black leaders.

**"A LOT OF STORIES."** It isn't disputed that Henderson's assistant, Audrey Lewis, (who is not related to Jesse Lewis) wrote articles reviewed by Scrushy, which were placed in *The Birmingham Times*. The newspaper is edited by Jesse Lewis' son, James E. Lewis, Sr.

Documents obtained by *BusinessWeek Online* show that the Lewis Group wrote three checks worth a total of $11,000 to Henderson and his assistant. Henderson has demanded an additional $150,000 from Scrushy -- money the pastor says he is owed for past services. "We did a lot of the PR work and wrote a lot of stories," Henderson said in a separate interview.

Scrushy acknowledged in the interview that his foundation had donated at least $15,000 to Henderson's church, but he said the money was for a building project and a Hurricane Katrina relief effort. Scrushy denied that he had any financial relationship with Henderson related to the trial.

**TALE OF THE TAPE.** To prove his case, Scrushy played taped phone calls from last July which he alleges show Henderson admitting that he was never asked to do any work. But audio tape of the phone calls was muffled. Without the aid of a written transcript, the calls seemed inconclusive on this point.

"He stalked us wherever we showed up," Scrushy said of Henderson. Scrushy said in the interview that he repeatedly told Henderson that they had no agreement. Scrushy said that on Apr. 7, 2004, he turned down an unsolicited contract from the Lewis Group to organize a prayer vigil -- with much of the work to be outsourced to Herman Henderson.

Scrushy said he acted based on advice from his lead attorney, Donald Watkins. A note from Watkins on a copy of the contract reviewed by BusinessWeek Online says, "There is too much of chance that the government will use this event to ask for a mistrial."

**"COMMUNITY RELATIONS."** But three weeks later, Scrushy agreed to pay $20,000 to the Lewis Group for "marketing and public relations as discussed," according to a letter obtained by BusinessWeek Online.

Scrushy said he did review for accuracy "a few" of the articles written by Audrey Lewis and published in *The Birmingham Times*. Jesse Lewis of the Lewis Group declined to comment on Henderson's allegations.

Scrushy spokesman Charlie Russell acknowledged that last spring he gave Audrey Lewis $2,500 to attend a funeral in Detroit. In exchange, she agreed to provide "community relations" in Birmingham after a verdict in the Scrushy trial, according to a copy of a May 24, 2005, contract obtained by BusinessWeek Online.

**JUROR DISMISSED.** In a related development last week, a newly released transcript of an Apr. 19, 2005, off-the-record courtroom conversation involving the federal judge and lawyers in Scrushy's trial revealed that a complaint from a member of predominantly black Mt. Joy Baptist Church in Birmingham triggered an FBI investigation into alleged jury tampering.

Judge Karen Bowdre dismissed an alternate juror who attended Mt. Joy Baptist after it was discovered that Scrushy had donated $5,000 to the church. There was no finding of wrongdoing.

Scrushy said in the BusinessWeek Online interview that he donates to many churches and has preached in more than 50 in the last year. "We're just good people," he said. "We're givers."

**READER COMMENTS**

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **CRIMINAL NO. 2:05-CR-119-F** |
| DON EUGENE SIEGELMAN, | ) | |
| PAUL MICHAEL HAMRICK, | ) | |
| GARY MACK ROBERTS, and | ) | |
| RICHARD M. SCRUSHY | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2006, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to all counsel of

record.

Respectfully submitted,

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ J.B. Perrine
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:    (334)223-7135
Email: jb.perrine@usdoj.gov
ASB-9077-E31J