### EXHIBIT A

### DECLARATION UNDER PENALTY OF PERJURY OF EDWARD J. BRONSON IN SUPPORT OF DEFENDANT RICHARD M. SCRUSHY'S MOTION FOR ENHANCED JURY SELECTION PROCEDURES

I, Edward J. Bronson, declare as follows:

1.  I am a Professor Emeritus of Political Science at California State University, Chico.

2.  Counsel for Defendant Richard Scrushy have retained me for the purpose of making a recommendation to the Court as to whether, in my opinion, problems raised by the extensive nature of prejudicial pretrial publicity in the case of <u>United States v. Don Eugene Siegleman, et al.</u>, Case No. 2:05-CR-119-F require a change of venue or other remedy.

3.  <u>General Conclusions</u>.  My general conclusions are as follows:

   a.  There is a substantial amount of prejudicial pretrial publicity in the jury pool for the venue in which the trial is currently scheduled, the Middle District of Alabama.

   b.  While there is also substantial bias against Mr. Scrushy in the 23 jury-pool counties of the district, I do not believe that the prejudice meets the legal and social science standards necessary for me to recommend a transfer of the venue to a different district, at least based on the information available at this time.

   c.  However, to protect the fair trial rights of Mr.

Scrushy against bias arising from the media coverage, I believe it is essential that the Court utilize certain heightened voir dire procedures, described below.

## §I.  Qualifications.

4. General: Education, Employment, Research, and Testifying. I will begin by briefly reviewing my qualifications, and I have attached a curriculum vitae to this affidavit as ATTACHMENT 1.  After my undergraduate education, I received a J.D. from the University of Denver; an L.L.M. from New York University; and a Ph.D. in Political Science, emphasizing Public Law, from the University of Colorado.  As part of the study for my doctorate, I received training in various types of social scientific analysis.

5.  I have been employed since 1969 at California State University, Chico, where I have been a Professor of Political Science in the College of Behavioral and Social Sciences, now emeritus.  I have taught courses in Administration of Justice, Legal Analysis, and Constitutional Law.  In addition, I have taught at the University of Colorado as a Visiting Professor, and in summer programs at several law schools, including the University of San Francisco; the University of Santa Clara; the University of California at Hastings, Berkeley, and Los Angeles; the University of San Diego; California Western; and the University of Puget Sound (now Seattle).  I have been a Visiting Scholar at the University of Alaska and at the College of Micronesia, and in 1992 I was a Fulbright Scholar at the Center for Judiciary Studies, Ministry of Justice, in Lisbon, Portugal, where judges and public prosecutors are trained.

6.  In my research, dating back to 1968, I have studied the attitudes of jurors toward relevant issues of criminal justice, the effects of those attitudes on verdicts, and the way that various processes, including voir dire and publicity, affect jury behavior.  I have done research and published articles about these subjects, a number of which are set forth in the accompanying curriculum vitae.

7.  In addition, I have acted as a consultant on ways to improve the fairness of voir dire and jury selection.  I have testified and submitted pretrial and post-trial affidavits on these matters in many cases, have reviewed transcripts of voir dire as part of the preparation for drafting affidavits submitted for post-conviction relief and to testify on the efficacy of voir dire, and have lectured on voir dire and jury selection issues at various academic and professional organizations.  I have previously qualified as an expert witness in Alabama (Escambia County), and have consulted and submitted an affidavit in another Alabama case (Morgan County).  I have also testified by affidavit in one Eleventh Circuit case and in state cases within the geographic area encompassed by the Eleventh Circuit.

8.  <u>Venue</u>.  I have been studying and doing research on pretrial publicity for over 35 years.  I have published and presented research papers at various academic and professional meetings; done pretrial and post-conviction publicity analysis work for attorneys involved in hundreds of cases; made recommendations about the need for a change of venue or other remedy in many cases; developed, conducted, and evaluated surveys to measure the extent and nature of pretrial publicity; qualified and testified as an expert witness on change-of-venue motions in 114 cases, testifying in person 97 times and 17 times by affidavit; submitted several additional affidavits in post-conviction proceedings where the issue involved possible prejudicial pretrial publicity; and testified several times on the need to close various hearings (preliminary, competency, and venue) or seal various matters in high profile cases.  I am the author of the chapters on both venue and pretrial publicity in California Criminal Law Procedure & Practice, now in press for the ninth edition, published under the auspices of the University of California and the State Bar of California, and widely used by lawyers and judges.

9.  In addition, I have recommended <u>against</u> a change of venue in 146 previous cases (11 times in testimony).  In total I have testified in favor of a change of venue 105 times, substantially less often than the 146 times I have recommended against a change of venue.  I have testified for and consulted with state prosecutors opposing venue

changes, but only in six cases, far less often than I have consulted with defense counsel.

10. I have testified or consulted on the venue issue in such well-known cases as <u>United States v. McVeigh</u> (the Oklahoma City bombing), <u>Oklahoma v. Nichols</u> (the state's more recent prosecution for the bombing), <u>United States v. Skilling, et al</u>. (the Enron case), <u>People v. Richard Allen Davis</u> (the Polly Klaas case), <u>United States v. Kaczynski</u> (the Unabomber case), the San Francisco dog mauling case, the John Walker Lindh case (the American Taliban), the case of one of the men charged with the African embassy bombings (Mamdouh Mahmud Salim), the Orange County bankruptcy proceedings, <u>United States v. Cary Stayner</u> (the Yosemite Park murder case), and several other very well known cases, many of them in federal courts around the country. In such cases as that of the Unabomber and the American Taliban, I recommended against the need for a change of venue, despite the very high profile of those cases.

11. <u>Content Analysis</u>. I have previously qualified many times as an expert in various courts throughout the country on the content analysis of pretrial publicity, assessing its impact under both social science and legal standards. Content analysis is a technique used in social science and other areas to provide a scientific means of analyzing diverse material. I have done research in this area and presented professional papers. I have also often analyzed and testified about content analysis of other areas, particularly such matters as open-ended responses on survey questionnaires and in voir dire.

12. <u>Survey Analysis</u>. I have also qualified frequently on the conducting and critiquing of public opinion surveys. I have training and extensive experience in this area and have conducted research and presented professional papers in the field. I am a member of the American Association of Public Opinion Research, and have spoken at national meetings of this and other professional groups. I was a member of a four-person group that was commissioned to write standards for

venue surveys, which have subsequently been published after being adopted by the American Society of Trial Consultants.

13. <u>Jury Voir Dire</u>.  I have also done much research on voir dire procedures, published in this area, lectured on the topic at professional meetings, both for lawyers and social scientists, taught California Continuing Education of the Bar classes on the topic, and testified many times on it as an expert witness, both as a possible remedy for prejudicial pretrial publicity and as to its effectiveness in a particular case, both in pretrial and post-conviction legal contexts.

14. <u>Summary of Qualifications</u>.  I believe I am qualified as an expert on all aspects of issues related to the impact of pretrial publicity, including the use of social science techniques to do that analysis.  These include content analysis of media and survey responses, as well as survey research design and analysis.  I am also qualified on available remedies to cure prejudicial pretrial publicity, including voir dire and many others, and on whether there is a need for a change of venue.

## §II.  **The Standards for My Analysis.**

15.  <u>The Social Science and Legal Standards for Prejudice from Pretrial Publicity</u>.  I use both social science and legal standards in my analysis to assess the impact of prejudicial pretrial publicity.  The social science standards are a product of a substantial body of research on the topic.  The legal standard comes from the decisions of appellate courts in the venue area.

16.  For me an essential aspect of a fair trial is that the defendant begins the trial with his presumption of innocence intact.  Defendants can be and sometimes are acquitted in the face of heavily biased pretrial publicity.  Marion Barry and John DeLorean are classic examples -- national news programs showed secret recordings of their drug deals. There will always be cases where the prosecution overreaches or makes errors or where there is some unusual event that leads to an acquittal.  But

that is not a fair trial as we know it, situations where the defendant can only win acquittal by proving his innocence or when there is no case at all.

17.  <u>General Problems of Pretrial Publicity</u>.  In a major review of the social science research spanning over 30 years on the effects of pretrial publicity (PTP) on jurors' consideration of evidence and their ultimate decisions, the authors did a meta-analysis of 44 empirical studies, representing 5,755 subjects, conducted by dozens of scholars using a variety of methodologies.  They concluded that, "Subjects exposed to negative PTP were significantly more likely to judge the defendant guilty compared to subjects exposed to less or no PTP."[1]  The prejudicial impact was found at all three stages: pretrial, post-trial but prior to deliberations, and post-deliberation.

18.  The authors suggest that PTP leads to the development of a "story model," like the idea of an evidentiary prism, mentioned below.  The story model has been explored in a variety of modern work on memory.[2]  The model provides the means by which negative publicity provides not just isolated fragments of information, but a belief framework about the defendant's guilt.  Those exposed to PTP construct a story to make sense out of a particular event.  Once that belief is formed, it is very difficult to dislodge.  New information that is consistent with the story is readily absorbed, while inconsistent information tends to be rejected.

19.  The story of the case thus becomes the prism through which trial evidence and legal theories are viewed at trial.  If our story model leads us to believe that the defendant is guilty, then the credibility of prosecution witnesses is enhanced, and alibis or other defenses do not ring true.

---

[1] N. Steblay, et al., "The Effects of Pretrial Publicity on Juror Verdicts: A Meta-Analytical Review," 23 <u>Law & Human Behavior</u> 219 (1999).
[2] <u>See</u> some of the citations at <u>id</u>. 231.

20.  While developing a story model for jurors is important in trial litigation and a frequent topic at litigation training, at a fair trial the story develops at the trial, not during the preceding coverage of the case in the media.

21.  One author considered the issue of delay in a trial between the first exposure to evidence and to hearing contradictory evidence.[3] He noted several cognitive biases that research suggests are likely to arise as a result of the delay.  In particular, he noted that some people "fail to remember some information that is inconsistent with" their view of the case, and "'recall' information they have never heard before, simply because it <u>is</u> consistent with" their theme of the case.

> "[T]hese types of errors are likely to increase over time, as people are less able to recall specific events and come to rely more on their general and thematic knowledge about the events."[4]

22.  A review of the way memory works, based on themes or "schema," shows that "themes distort memory."[5]  Thus, it is likely that jurors hearing the defense evidence will not use the evidence in ways that conflict with their story model.  This is particularly troubling not just because of the powerful impact, but because of the great difficulty a voir dire questioner will have in discovering the information or attitude.

23.  The legal standards are those that have been laid out by the courts in many cases and more specifically by federal rule (FED. R. P. 21(a)).  Of course, since I have concluded that prejudice in this case does not warrant a change of venue based on the data available at this time, I will limit my discussion to those elements that may have biased potential jurors, requiring that voir dire procedures be sufficient to enable the Court

---

[3] D. Sherrod, "Trial Delay as a Source of Bias in Jury Decision Making," 9 <u>Law & Human Behavior</u> 101 (1985).  This is analogous to the delay between exposure to PTP and sitting as a trial juror months later.
[4] <u>Id</u>, at 102 (citations to studies omitted).
[5] <u>Id</u>.

and counsel to identify and exclude those whose fairness may have been tainted by attitudes they have formed primarily through prior exposure to media coverage.

## §III.  <u>The Pretrial Publicity in This Case</u>.

24.  I will briefly describe a few themes in the pretrial publicity that create potential bias in the jury pool and will require enhanced voir dire procedures to identify and explore.

25.  <u>The Birmingham Trial and Verdict</u>.  On December 31, 2005, the Montgomery Advertiser listed its top three stories of 2005.  Three of them included the defendants in this case.  One of the stories was the Scrushy acquittal "on charges he was the mastermind behind a $2.7 billion fraud to inflate company earnings."  The same story told us that, "Ironically, five of his chief financial officers were found guilty of the scam (and) implicated Scrushy..."  Ordinarily, one would assume that being found not guilty would not be damaging, but the tone of this brief note calls the acquittal ironic, notes that his five financial officers all testified against him, and calls the operation a "scam."

26.  We were also told that Scrushy is the "<u>ex</u>-CEO," and there is a theme picked up by respondents in the survey discussed below that, "He is guilty, the people below him all took the blame so he could get away with it;"  "I know he was guilty.  If his accountant was guilty, so was he.  If you're running a company you need to know what's going on.  I mean, I know what's in my checking account, I know where my money's going."

27.  Thus the acquittal is portrayed as somewhat illegitimate, and that perception could damage defendant Scrushy in this trial, by jurors either not giving him the same benefit of the doubt this time[6] or perhaps wanting to get even.

---

[6] While the comparison may be unfair, one is reminded of the <u>second</u> juries' decisions in the O.J. Simpson and Rodney King trials.

28.  Of special concern is my assumption that references to the fraud trial are inadmissible in this bribery case.  Exclusion of evidence is of little value, however, if two-thirds of the jury pool are already familiar with the Birmingham trial.  The coverage of the Birmingham trial was extensive and continuing in the Montgomery media.

29.  <u>The Bribery Case</u>.  A second of the three top 2005 stories listed was headed, "Siegelman, Scrushy indicted -- again."  Not only do we have this case tied to the fraud case (again), but Mr. Scrushy is tied to his co-Defendant, ex-governor Don Siegelman, and the indictment is for corruption charges of a "widespread racketeering conspiracy," even though Mr. Scrushy's alleged involvement is certainly less than widespread.  There has been extensive prejudicial coverage of this case in the media.

30.  <u>Prejudice from Coverage of Co-Defendant Siegelman</u>.  The third of the top stories concerns Siegelman's announcement to enter the Democratic primary race for governor.  The only fact cited about Siegelman in this short description is that he, Siegelman, "failed in an attempt to bring the lottery to Alabama."  This, too, connects to Richard Scrushy because his only role in the racketeering conspiracy charged in this case was to allegedly give bribe money to the governor to retire the debt with the failed lottery referendum.  Also, one of the very recent newspaper articles in the Advertiser (January 26, 2006) carried a headline, "Former aide: Scrushy made threats to get money for lottery bid," in which grand jury testimony was revealed detailing allegations about Mr. Scrushy's efforts to raise money to retire the debt associated with the governor's failed lottery plan by threatening a firm HealthSouth did business with to force it to give money to the governor.

31.  The joint trial with Defendant Siegelman (and two other co-Defendants) raises many problems for Mr. Scrushy, and one of them certainly is that he is a known Republican supporter, yet he is charged with raising money for a Democratic governor.  Jurors with strong political allegiances either way will be cross-pressured with these

Defendants in a venue where the party identification of the defendants is well known,[7] especially with the trial scheduled in the midst of a hot political campaign involving one of the Defendants.

32.  <u>Racial Issues</u>.  The racial issue can be a brooding presence in this case for jurors familiar with the media coverage.  On January 26, 2006, a Montgomery Advertiser headline reported that, "Scrushy challenges racial makeup of juries in Montgomery court."  While white people of course have standing to challenge the underrepresentation of blacks in the jury pool on purely legal grounds, that may not be known to lay readers who may assume the challenge is made because Mr. Scrushy wants more black jurors on his jury because they give him some tactical advantage.  That theory is made more credible because the newspaper reported in the same article that Mr. Scrushy was acquitted in his Birmingham trial by "[a] mostly black jury."

33.  An editorial in the Advertiser on January 23, 2006, strongly attacked Mr. Scrushy for paying a reporter large sums of money to manipulate black public opinion by writing stories favorable to Mr. Scrushy that appeared in a newspaper circulated in the black community.  A black Birmingham minister was also allegedly paid a substantial sum "to get him to persuade other black preachers to appear in court during the trial in an apparent attempt to affect the <u>majority black jury</u>" (emphasis added).  Mr. Scrushy's behavior was characterized as sleazy, and the editorial closed with the statement that, "We hope that there will be no similar blatant attempts to influence public opinion - and thereby potential jurors - in (this) case."

34.  White jurors may feel some antagonism toward Mr. Scrushy because of this coverage, especially because of the many stories about other apparent attempts by Mr. Scrushy to influence the black community, for example, by publicly joining a black church, by sponsoring and participating in a local religious television program with

---

[7] One respondent in the survey said to the interviewer, "Did the Republican Party put you up to this? Are you sure?!"

black pastors, and by the payoffs described above.  Black jurors, too, may feel some resentment upon learning of this apparent manipulation of the black community by Mr. Scrushy.

35.  Presumably, all of this coverage is inadmissible, and it is certainly potentially prejudicial.

36.  <u>Civil Litigation</u>.  While Richard Scrushy was acquitted of criminal charges in the Birmingham fraud trial, he still faces civil litigation stemming from the same fraud charges.  There has been a good deal of coverage of this litigation.  There is also a pending shareholder action to prevent Mr. Scrushy from divesting any assets, since he has been ordered to repay $47.8 million to HealthSouth for bonuses he received during the 1997-2002 period when the accounting fraud was carried out at the Birmingham-based medical services chain.

37.  Another article noted that ousted CEO Richard Scrushy was accused of trying to "pillage" the company of more than $100 million.  Other coverage reported the fact that HealthSouth settled for $100 million a suit brought by the Securities and Exchange Commission for accounting fraud at the medical services chain, exposed in March 2003.  The SEC's civil action accused both HealthSouth and fired CEO Richard Scrushy of overstating earnings by $1.4 billion since 1999.  After further investigation, that number grew to $2.7 billion over seven years.

38.  Material about the Birmingham case is inadmissible in this trial, but widespread knowledge about it and resentment, even anger, about the verdict can be prejudicial in this case.  The repeated references to the Birmingham verdict, the influence purchasing, the racial implications -- are prejudicial and inadmissible.

39.  <u>Salience</u>.  Cases are salient when they seem especially relevant to our lives.  Salience may arise because of propinquity -- it could happen to me, it happened near me or in a place I know or have been, it affects me,

people like me are involved, and other similar factors.[8]  Salience adds to our interest of the case, our personal and emotional involvement, our knowledge, and our retention.  It is the reason that editors put local stories on the front page.  While everyone knew about the Oklahoma City bombing, it had special salience to the people of Oklahoma.  They lived through it, identified with the local victims, and were suffused with coverage.  That is why I recommended a change of venue in that case, but recommended against such a change in another notorious case, that of the Unabomber.  While most residents probably knew about the Unabomber case in Sacramento where the case was filed and where two of the murders occurred, there was no sufficiently special salience to the case among those who lived in Sacramento as compared with other areas.  In my own research, I have found that pretrial prejudice in high profile cases often varies depending on feelings about the incident's closeness to home and how the crime resonated in the personal lives of respondents and in the local community.

40.  This case has some salience but not a great amount.  HealthSouth apparently plays a major role in the lives of many, especially public workers, and the ex-governor is certainly an important figure in Alabama generally and the Montgomery area specifically.  Many sites are named after Mr. Scrushy, from the Scrushy Parkway to the Richard M. Scrushy Building at the University of Alabama to the Richard M. Scrushy Campus at Jefferson State Community College to the Scrushy-Striplin    baseball field at Birmingham-Southern College.  While these sites are concentrated around Birmingham, he is well known in Alabama, as the survey results described below demonstrate.

41.  He has been covered not just in the local media, but also on national television, on the Internet, and in national magazines and

---

[8] E. Bronson and R. Ross, Gender and Salience As Factors in Jury Pool Bias: A Preliminary Investigation, California State University, Chico.  Discussion Paper Series, 1999, presented at the Southwestern Political Science Association, San Antonio, 1999; and E. Bronson and R. Ross, Justice in the Era of the High-Profile Defendant: Will a Change of Venue Help? California State University, Chico.  Discussion Paper Series, 1991, presented at national meeting, American Political Science Association, Washington, D.C. (1991).

newspapers.  Most of the coverage made him out as a cheater and a thief, or as the New Yorker characterized him, "a huckster."

42.  It is fair to say that there has been extensive coverage of Mr. Scrushy and the charges against him, and most of it has been very negative.

## §IV.  **The Survey**.

43.  At counsels' request, I designed a community survey to assess whether there was significant community bias in the Middle District of Alabama.  Around the country today, when a change of venue motion is being considered, it is almost always necessary to conduct a community survey, allowing a scientific measurement of possible community bias.  In California, where I often consult, the leading case on venue is the 1968 case of Maine v. Superior Court, 68 Cal.2d 375.  In Maine the court adopted the standards promulgated by the American Bar Association in its Reardon Report.[9]

44.  In Maine the court said that the first source of evidence on the possible need for a change of venue is "qualified public opinion surveys."[10] This was later defined as follows:

> We take it that the term "qualified" means only that the
> survey be well-conceived, impartially conducted and
> accurately recorded.  So qualified, a survey should be
> acceptable even when it is conducted (as it usually is)
> at the behest and expense of an interested party.

Corona v. Superior Court, 101 Cal. Rptr. 411, 418 (1972)

45.  In my judgment the survey conducted in this case meets the highest standards of survey research, measured by a whole range of criteria.  The methodology is well beyond what is required to demonstrate results that

---

[9] American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (1966).

[10]  The other two sources are opinion testimony and a review of the media materials.

are both reliable and valid.  I will enumerate some of these important elements, but there are others that I could have included.

46.  a.  <u>Reputation of the Survey Center</u>.  The survey was conducted by the Social Science Survey Center (SSSC) of Chico, California, headed by Professor Robert S. Ross, the former long-time chair of the Political Science Department at California State University, Chico.  I have worked with my colleague Professor Ross for many years on community surveys, academic research, and the preparation of papers for professional meetings. Professor Ross has taught classes in methodology for over 35 years, has conducted over 100 venue surveys, and has testified in 25 or so cases around the country.  From time to time, I have visited SSSC to observe the conducting of surveys, and I have talked to supervisors and interviewers about their activities, training, and knowledge.  I always consult with Professor Ross before and during a survey on methodology, analysis, and possible problems, and I did so on this survey.

47.  b.  <u>Methodology</u>.

1.  <u>Confidence Interval, Confidence Level, and Sample Size</u>. The confidence interval and the confidence level attained in the survey are appropriate, with 300 completed interviews.  There are three numbers or factors to consider in a representative random survey usually reported in newspaper or television opinion poll results.  For example, if you use a confidence interval of 5.7, and 47% percent of your sample picks a particular answer, you can be "sure" that if you had asked the question of the entire relevant population, between 41.3% (47- 5.7) and 52.7% (47+5.7) would have picked that answer.  Note that the bell-shaped distribution curve tells us that the results will tend to cluster around the 47% figure.

48.  The confidence level tells you how sure you can be.  It is expressed as a percentage and represents how often the true percentage of the population who would pick an answer lies within the confidence interval.  The 95% confidence level means you can be 95% certain.  Most social science researchers use the 95% confidence level.

49.  When you put the confidence level and the confidence interval together, you can say that you are 95% sure that the true percentage of the population with that opinion is between 41.3% and 52.7%.

50.  How confident and accurate you can be depends on the sample size.  Most venue surveys interview 300-400 respondents, and in this case the sample size was 300.

51.  For a confidence interval of 5.7% at a confidence level of 95%, a sample size of 300 is required.[11]  Thus the sample size used in this survey of 300 was a standard venue sample size, generating a confidence level ±5.7%.  Said another way, 95% of the time this sample size gives a result that is within plus or minus 5.7%.

52.  2. <u>Proper Sample. Random Sample</u>.  Randomized selection is the proper survey technique to give everyone in the universe being sampled (jury-eligible residents of the Middle District) an equal chance of being interviewed.  The proper sample means that in this survey only those who met the standards for the jury pool were interviewed.  I used the United States District Court-Middle District of Alabama's "Plan for the Random Selection of Grand and Petit Jurors," revised in 2001, which specifies registered voters from the 23 counties of the Middle District as the source of jurors.

53.  The survey used random samples from each of the 23 counties from samples obtained from Genesys Sampling Systems.  Genesys is a major provider of such samples, in this case using a system to randomly generate a list of homes to call from the voter registration rolls.  Calls were made during weekdays and weekends during the period of January 27, 2006 through February 5, 2006.

---

[11] The calculation is a little more complicated, since it assumes a 50-50 division.  There is a slight variation with respect to other types of responses to the questionnaire, with increasingly smaller sample sizes required as the division moves toward 60-40, 70-30, etc.

54.  The demographic breakdown approximates census data, indicating that appropriate techniques were utilized and a proper representative sample was being obtained.  Presumably, deviations observed in the survey were present in the jury pool as well.  Other standard survey methods were appropriately followed as well.

55. 3.  <u>Callbacks and Refusal Conversion</u>.  Callbacks and refusal conversion are techniques to assure as much as possible that respondents who are difficult to reach are in fact interviewed, making the sample as representative as possible.  Thus there were four attempts to reach people and attempts were also made to convert initial refusals into completed interviews.

56. 4.  <u>General and Survey-Specific Training</u>.  Interviewers received general training on interviewing plus additional training on possible difficulties with the particular survey.  For quality control, supervisors monitored the questioning to insure that protocols were being followed.

57. 5.  <u>The Survey Instrument</u>.  The survey instrument (questionnaire) used by the SSSC in this case conforms to the guidelines for venue surveys adopted and published by the American Society of Trial Consultants.[12]  In the interest of full disclosure, I note that I was one of the authors of the guidelines, which I also presented to the American Association for Public Opinion Research and the Midwest Association of Public Opinion Research in panels that I organized.

58. 6.  <u>Other</u>.  There are a variety of other standard procedures beyond those few listed above that skilled professional survey researchers

---

[12] <u>Guidelines for Survey Research in Connection with Motions to Change Venue</u>, updated 2002 from <u>Proposed Minimum Standards for Survey Research in Connection with Motions to Change Venue</u>, with S. Macpherson, E. Krauss, R. Dillehay. Court Call, Journal of the American Society of Trial Consultants, Spring 1998; republished as part of <u>Code of Professional Standards</u>, American Society of Trial Consultants, 2003; also printed in <u>Change of Venue</u>, in E. Krauss & B. Bonora (Eds.), with D. Logan. Jurywork: Systematic Techniques  (2nd ed.). Ch. 7. New York: Clark Boardman, 1999 rev.

utilize.  It is clear to me that the survey conducted here is not merely a proper one, but an exemplary one.

59.  <u>Survey Results</u>.  This survey was designed to determine the extent of community prejudice, if any, in the Middle District.  The questions in the survey generated several indices by which to measure possible prejudice.  The survey began by assessing the respondents' survey eligibility.  This was followed by a series of questions designed to determined name awareness of the Defendants, case recognition, case prejudgment, and other knowledge and feelings relevant to the issue of possible bias.

60.  <u>Name Recognition</u>.  At the beginning of the survey, respondents were asked if they recognized four names, Defendants Scrushy and Siegelman, plus two others, John Roberts (Chief Justice of the United States Supreme Court) and Troy King (Alabama Attorney General).  While just 42% recognized John Roberts and only 38.7% recognized Troy King, 68.3% recognized Richard Scrushy and 94.0% recognized Don Siegelman.  While recognizing the Defendants is not prejudicial as such, it is a necessary prerequisite to finding prejudice and demonstrates that the Defendants are well known to prospective jurors.  While such a finding is not unusual for a former governor and current candidate for that office,[13] it is strikingly high for a private citizen such as Mr. Scrushy, especially in light of the fact that his recent notoriety stems largely from his being charged with very serious crimes in two major federal cases.

61.  <u>Case Recognition</u>.  Case recognition was tested in two ways.  Respondents were first asked if they had read, seen, or heard about the recent fraud trial in Birmingham, in which Mr. Scrushy had been tried and found not guilty, and 73.0% indicated they were.  They were later asked about this case:

_____

[13]However, note the much  smaller number who identified the Chief Justice, despite the recent high-profile hearings in the United States Senate.

Currently Richard Scrushy is facing a second criminal
trial in Montgomery.  In this case, he is accused of bribing
the former Governor, Don Siegelman.  Siegelman is
charged with seeking bribes from Scrushy and others.
Have you read, seen, or heard anything about this case?

62.  Two-thirds of the respondents (66.7%) answered yes to this
question.  Cross-tabulating the results of the two recognition questions,
we learn that 79.7% of this representative cross-section of the jury pool is
already familiar with one or both of the two cases, and 59.7% is familiar
with both.

63.  While recognizing the case does not necessarily lead to
community prejudice generated from pretrial publicity, such case
familiarity is the means by which the respondent is exposed to prejudicial
coverage and usually indicates knowledge of prejudicial knowldge (as the
survey found in this case).  The high recognition rate[14] in this case is a
necessary if insufficient element of prejudice.

64. <u>The Birmingham Verdict</u>.  As previously noted, 73% (219) of
the respondents recognized the Birmingham trial and the not guilty jury
verdict in that case.[15]  The recognizing respondents were asked two
questions.  The first was as follows:

Some people think the jury was correct in finding him not
guilty, but others think the jury should have found him
guilty.  Which of the following describes your belief?

I think the jury was correct in finding him not guilty; or I

---

[14] Survey recognition rates in some venue cases on which I have consulted have been
as low as 20 percent.

[15] The question was:
    The first name on the list I read you was Richard Scrushy.  As you may
    know, he is the former head -- Chairman and CEO -- of the corporation
    HealthSouth.  Scrushy was recently a defendant in a criminal case in
    Birmingham.  He was charged with fraud in illegally inflating the value
    of HealthSouth stock by billions of dollars.  The jury found him not guilty.
    Have you read, seen, or heard anything about this?

think the jury was wrong, they should have found him
guilty.

65.  Almost three times as many respondents expressing an opinion
said they thought the jury was wrong (39.3%) as said they thought the jury
was correct (13.7%).  I have some concern that this widespread belief will
adversely affect the jury in this case.

66.  The potential bias in this case could arise because members
of the jury pool who have serious misgivings about the Birmingham jury's
failure to convict Mr. Scrushy in his recent fraud trial there may believe --
a belief that was fostered by media coverage -- that Mr. Scrushy cynically
bought his way out of a correct trial decision by improper means.  These
include media reports of his public religious performance in the period
before and during the trial by joining a predominantly black church, by
participating in a daily religious television broadcast, or by paying a pastor
and a journalist to show support for him.  These feelings could play out in
this trial in hostility toward Mr. Scrushy, in a diminution of his credibility,
in a feeling that this is payback time, or in other unknown ways.

67.  Those respondents who did not express support for the jury
decision (saying either the jury was wrong, who didn't know, or who
refused or didn't answer) were then asked, "Are you upset or angry that
the jury found Scrushy not guilty?"  About a fifth (19.6%) of those
respondents answered yes to this question, but among those who had said
the jury was wrong, 38% were upset or angry about the not guilty verdict.
Obviously, such members of the jury pool are especially problematic.

68.  Another means of exploring the impact of the jury pool's
attitude toward the Birmingham verdict on its potential bias in the
Montgomery trial is to cross-tabulate the answers given by respondents on
the correctness of the Birmingham jury verdict with a belief in the guilt of
Mr. Scrushy in the upcoming Montgomery trial.  As might be expected,
only 13% of those who thought the verdict was correct now believe Mr.
Scrushy is guilty of bribery, but 81% of those who said the Birmingham
jury was wrong also state that Mr. Scrushy is guilty of bribery.

Furthermore, 87.5% of those who are angry or upset about that fraud verdict state that Mr. Scrushy is guilty of bribery, compared with only 41.2% of those who don't say they are angry or upset who say Mr. Scrushy is guilty of bribery. Obviously, being upset with the Birmingham fraud verdict is highly predictive of saying Mr. Scrushy is guilty of bribery in this case.

69. <u>Prejudgment</u>. The next important element in measuring possible prejudice is the prejudgment of the case by the respondents from the eligible jury pool. The survey measured this with the following straightforward question put to all those who recognized the case:

> Based on what you have read, seen, or heard about the new case -- the current bribery case in Montgomery -- do you believe that Scrushy is <u>definitely guilty</u>; <u>probably guilty</u>; <u>definitely not guilty</u>; or <u>probably not guilty</u> of bribery?

70. Of those asked the question, 46.5% believed Scrushy is either definitely guilty (13.0%) or probably guilty (33.5%). Only 8% believed Scrushy is either probably not guilty (4%) or definitely not guilty (4%). With almost one-half of those who recognize this case believing that the Defendant is guilty, based only on media reports and before any evidence has been presented in court, it is clear that the Defendant faces an uphill battle in his forthcoming trial. For those prospective jurors, the presumption of innocence has been transformed into a presumption of guilt that he must overcome.[16]

71. <u>Open-Ended Responses</u>. After the recognition and prejudgment questions, respondents who recognized either the Birmingham case or this one were asked a simple open-ended question,

---

[16] While these recognition and guilt numbers are of substantial concern, they are not at the level that indicates such extreme bias that in my opinion would require a change of venue, and I have so recommended to counsel.

"What are your feelings about Richard Scrushy?"[17]

72.  The preferred means of analysis of such material is content analysis. Content analysis is a research tool devised to analyze large amounts of material in a manner that is objective, neutral, and systematic.[18]  It is widely used in the social sciences and elsewhere to investigate such areas as the interpreting of open-ended comments in a public opinion survey.

73.  In this case I did a simple breakdown of the comments, dividing the responses into five categories:  Negative personal comments, guilt-oriented comments, abuse of power and money comments, other negative comments, and positive comments.  The comments of some respondents were included in more than one category.

74.  <u>Negative Characterizations of Defendant</u>.  There were 32 negative personal comments about Defendant Scrushy in this case, some of them very inflammatory.[19]

75.  It is worth noting that these types of negative characterizations of a Defendant are, for reasons I will explore later, rarely seen in jury questionnaires or voir dire transcripts.  Yet it is clear those feelings are there and very dangerous for the Defendant.  That fact is an important reason supporting the need for substantially enhanced voir dire procedures to aid the Court and counsel in doing what is possible to discover these feelings.

76.  <u>Guilt-Oriented Responses</u>.  There were 52 comments reflecting a belief in Defendant Scrushy's guilt, often as a general belief about the Defendant, even more often about his guilt in the Birmingham case, sometimes in this case, sometimes directly, sometimes impliedly.

---

[17] Interviewers were instructed to record the responses to this question and also to record additional comments made in response to the closed-ended questions in the survey.  The analysis in this section includes both types of responses.

[18] <u>See generally</u> R. Weber, <u>Basic Content Analysis</u> (1985).

[19] In order to avoid generating additional publicity which might further compromise Defendant's right to a fair trial before an impartial jury, the specific comments of respondents have not been included in this report in this and succeeding paragraphs.

77.  For so many respondents to focus on Mr. Scrushy's guilt in response to a question that didn't ask about that is troubling.  It is also clear that for many respondents the two cases have merged, even though this case has nothing to do with the Birmingham trial.  Assuming that material about the Birmingham case is inadmissible in this trial, widespread knowledge about it and resentment, even anger, about the verdict can be prejudicial in this case.

78.  <u>Abuse of Power and Money Responses</u>.  There were 11 or perhaps more comments about how money and power corrupt the justice system, with Mr. Scrushy being a prime example of how that happens.

79.  <u>Other Negative Comments</u>. There were a few additional comments that were noteworthy.  Some dealt with punishment.  There were other miscellaneous comments, one relating to Mr. Scrushy's effect on HealthSouth and its hospital.  Just two comments referred to co-Defendant Siegelman, both negative in nature.

80.  <u>Favorable Comments</u>.  There were also 10 favorable comments about Mr. Scrushy, although some of these favorable comments were mixed.

81.  In sum, on balance the open-ended responses are quite negative.  They show strong and hostile feelings toward the Defendant and assumptions about his guilt.[20]

82.  <u>Case-Specific Closed-End Questions</u>.  Respondents who recognized either case were asked a series of case-specific closed-end questions.  I will summarize them below:

83.  Respondents were first instructed, "As you may know, the media have reported a number of things about these cases.  Some people may remember some things, while others may remember other things.  We're interested in what <u>you</u> may remember, even if you already told me

---

[20] I should point out that many respondents had no feelings or opinions or expressed vague sentiments.

in one of the previous questions." Each question was preceded by, "Have you read, seen, or heard if..."

84. The first question asked was if they knew that if, "prior to his Birmingham trial, Scrushy, who is white, got very involved in the Black religious community by, for example, joining a predominately Black church or by hosting a religious TV show?" 38.5% said yes.

85. In the next question they were asked if they knew if "Scrushy paid thousands of dollars to certain Black community leaders to get support for himself in the Black community during his Birmingham trial?" 40.2% said yes.

86. Next was whether they knew if "the Birmingham jury that acquitted Scrushy had several Blacks on it?" 29.3% said yes.

87. Next was if "it was recently reported that Scrushy pressured or threatened folks to contribute to Governor Siegelman's lottery campaign?" 20.5% said yes.

88. Just 4.2% said that they, family, or friends owned HealthSouth stock, and only 2.1% believed their pension plan or retirement plan owned HealthSouth stock. However, 25.9% said someone in their household had a pension plan with RSA -- Retirement Systems of Alabama. This probably indicates that most people are unaware of the holdings of their pension and retirement plans.

89. Demographic Questions. The rest of the survey dealt with information about the respondents, such as media exposure, age, political party registration, race and ethnicity, gender, and whether the person had previously been convicted of a felony. These data demonstrate that the random-digit-dialing system used to conduct this survey produced respondents that fairly reflected the jury-eligible population of the Middle District.

90.  <u>Cross-Tabulations</u>.  In order to test for the validity of the survey, I ran several statistical tests.  Rather than include them in this affidavit, I have attached the tables and explanations as ATTACHMENT 2.  In addition I have included in exhibit 2 a table that shows that, as measured by awareness of the case-specific closed-end questions, most respondents have substantial additional information beyond mere case recognition.  The most important finding from the cross-tabulations is shown in Table 6, the last table in the attachment.  It provides strong evidence to suggest that the pretrial coverage is prejudicial, and the more one has been exposed to it, the more one is biased toward believing the Defendant is guilty.

## §V.  <u>THE VOIR DIRE AND RELATED MATTERS</u>

91.  <u>Recommendations</u>.  I will first lay out the voir dire procedures I believe are necessary in this case to deal as effectively as possible with the biasing effects arising from the pretrial publicity as discussed and assessed above.  I will begin with a list of topics, then explain the reasons for the procedures, and then describe the details.  As I have noted, I do not believe a change of venue is needed so long as heightened voir dire procedures are used, or a higher level of bias is revealed in juror questionnaires or voir dire than I would expect, given the results of this study.

1.  Provide for expanded and thorough jury questionnaires to be mailed to the jury panel.

2.  No pre-instructing of members of the jury panel either as part of the questionnaire or before the voir dire on such matters as presumption of innocence, seeking a fair and impartial jury and jurors, making decisions only on the evidence at trial, etc.

3.  Allow partial attorney-conducted voir dire.

4.  Where appropriate, use open-ended questions.

> 5.  Utilize individual and sequestered voir dire for those panel members for whom there is any indication of a potential problem on the questionnaire or in response to voir dire questioning.
>
> 6.  Provide two additional peremptory challenges to each Defendant, or more if appropriate.

92.  Suggestions 3-6 are contingent on finding levels of bias and knowledge that are comparable to what I found in the community survey.

93.  <u>Problems in relying on voir dire</u>.  Extensive empirical research in social psychology has documented the degree to which attitudes and behavior are shaped and influenced by situational conditions.[21]  That is, characteristics of the <u>setting</u> often determine behavior more than do the personality characteristics of the person in that setting.  Prospective jurors answer questions in front of a group of strangers.  For half a century, social psychologists have been studying the topic of the independence of individual judgment in a group setting.  In one classic study, it was demonstrated that over one-third of the subjects asked to judge the length of a line went along with the majority, even when that majority was clearly and demonstrably wrong in its judgment.[22]  When the experimental stimuli are statements of opinion endorsed by authority figures, the proportion of agreement is much higher.

94.  Thus, the immediate environment exerts a powerful influence on what people say and do.  A special problem in voir dire is that questioning takes place in the courtroom, where the basic notions of justice and good citizenship are the prevailing ethos.  One is on one's best behavior.  It is not easy to tell the judge sitting up on the bench in black

---

[21] <u>E.g.</u>, T. Sarbin, "Contextualism: A World View for Modern Psychology, in J. Cole (Ed.) <u>Nebraska Symposium on Motivation</u> (1976).

[22] S. Asch, "The Effects of Group Pressure Upon the Modification and Distortion of Judgments," in H. Guetzlow, ed., <u>Groups, Leadership and Men</u>, Carnegie Press, 1951.

robes that one cannot do one's duty, cannot be fair and impartial, cannot follow the instructions of the court, and cannot be a good citizen.

95.  In my experience, it is almost unheard of for prospective jurors to make remarks as inflammatory and personalized as some of the survey respondents did in this case about Defendant Scrushy.

96.  <u>Open Voir Dire</u>.  The expressed attitudes of prospective jurors are also greatly affected, and can be modified, by what they learn about the beliefs and attitudes of other prospective jurors.  It is not uncommon for jurors to adopt what is called a "social desirability response set."[23] That is, prospective jurors will attempt to respond in what they may consider is a socially appropriate manner instead of by simply being truthful.  This social behavior pattern actually causes some people to modify their own answers to conform with those, which they have heard expressed earlier by other jurors.  The tendency to conform in a group has been well documented in the social psychology literature.  The effect of this tendency is that opinions given in public often differ from opinions given in private.[24]  It is difficult to educate jurors so that they understand that the purpose of voir dire is to get at jurors' real feelings, not to get people to say they are fair and impartial.  However, conducting voir dire with each prospective juror individually, out of the presence of others, leads jurors to be more forthright and revealing of their opinions;[25] the

---

[23] D. Marlowe. and D. Crowne, "Social Desirability and Response to Perceived Situational Demands," 25 <u>Journal of Consulting Psychology</u>, 109 (1968).

[24] <u>See</u> A.P. Hare, <u>Handbook of Small Group Research</u>, The Free Press of Glencoe, 1962, and studies cited therein.

[25]  At least three methods have been used to study the efficaciousness of various voir dire techniques.  One method is to administer a pre-test to subjects in order to determine their attitudes.  The experimenter then measures the extent to which different types of voir dire accurately disclose those attitudes.  (E.g., S. Jones, "Judge- Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor," 11 <u>Law and Human Behavior</u> 131 (1987).)

A second method is to compare voir dire transcripts of different processes, using as a criterion a count of the number of sustained defense challenges for cause, and to a lesser extent the guilt and penalty verdicts.  (E.g., M. Nietzel & R. Dillehay, "The Effects of Variations in Voir Dire Procedures in Capital Murder Trials," 6 <u>Law and Human Behavior</u> 1(1982); R. Christie, reported in M. Nietzel & R. Dillehay, <u>supra</u> 3-4.

problem of tainting other jurors with prejudicial information is also avoided in the sequestered setting.

97. In addition, voir dire is an unfamiliar and uncertain situation for prospective jurors. Courtroom proceedings are relatively formal social situations with which most people are unfamiliar. Because of uncertainty and unfamiliarity, people are highly susceptible to "social comparison information," indications from other persons about the appropriateness of their behavior, attitudes, and feelings.[26]

98. Basically, people ask themselves how they look in comparison with others before answering a question. For example, some prospective jurors will cover up certain feelings or opinions when questioned in a group voir dire situation. Others will consciously or not try to have their answers conform as closely as possible to those of other members of the group, especially answers of those who appear to be the most "respectable" members of the group. Still others will contrive to be seated or excused by adjusting their responses to the results observed during the questioning of other prospective jurors. Socially acceptable responses to voir dire questions are established early in the voir dire process. These responses appear continuously throughout the examination, so that less and less honest information is elicited from the venirepersons during standard group voir dire as the process continues.

---

A third approach is to compare juror disclosure during voir dire with what jurors really knew and felt. (E.g., D. Broeder, "Voir Dire Examinations: An Empirical Study," 38 Southern California Law Review 503 (1965); E. Bronson, The Effectiveness of Voir Dire in Discovering Prejudice in High-Publicity Cases: An Archival Study of the Minimization Effect. California State University, Chico. Discussion Paper Series, 1989. Also published as The Effectiveness of Voir Dire in Discovering Prejudice in High Publicity Cases: A Case Study of the Minimization Effect in 20th Anniversary Celebration Seminar. California Attorneys for Criminal Justice, 1993, presented as Does Prejudicial Pretrial Publicity Affect Jurors? at national meeting, Law and Society Association, Madison, 1989.

[26] E.g., L. Festinger, "A Theory of Social Comparison Processes," 7 Human Relationships 117 (1954).

99.  During voir dire, prospective jurors are often being questioned about delicate personal information, as well as about deeply held attitudes and moral values.  They often are questioned about highly emotion-provoking facts and complex legal issues.  Many times, jurors are asked their opinions about subjects that they have never examined or even thought about before.  The presence of a large audience hampers their performance of this unfamiliar task.[27]

100.  The psychological influences discussed above operate in standard group voir dire to mask or distort juror responses to precisely the kind of highly difficult questions that will be asked in this case.  Prospective jurors who are concerned about how they will be evaluated by others in the courtroom, or who are answering in a socially desirable fashion in order to obtain the Court's approval, are unlikely to admit to prejudice.  At the very least they tend to minimize prejudicial knowledge or attitudes, and to exaggerate their willingness and ability to put aside such prejudice.  Nor are they likely to concede confusion concerning the basic constitutional tenets that will govern this trial.

101.  The voir dire setting makes jurors highly sensitive about the expected consequences of their words and actions.[28]  The voir dire process may inhibit even the most conscientious jurors from responding frankly and openly.  Individuals are concerned about whether they receive approval or disapproval from others.  Thus, they devote considerable time and energy to trying to learn what factors will have a positive influence on how they will be received or evaluated, and they try to behave in a manner that will give a favorable impression.[29]  This is particularly true in the presence of a respected authority figure, such as the judge, who is often perceived as having a higher social status than the juror, especially in the courtroom.

---

[27] R. Zajonc, "Social Facilitation," 149 <u>Science</u> 269 (1965).

[28] For a discussion of the effects that perceived consequences have on attitudes and beliefs, <u>see</u> B. Collins & M. Hoyt, "Personal Responsibility for Consequences: An Integration of the Forced Compliance Literature," <u>Journal of Experimental Social Psychology</u>, 558-93 (1972).

[29] R. Arkin, et al., "Social Anxiety, Self-Presentation and the Self-Serving Bias in Causal Attribution," 38 <u>Journal of Personality and Social Psychology</u> 23 (1980).

102.  The courtroom is an intimidating place for most prospective jurors.  Most people, and therefore most prospective jurors, are uncomfortable speaking in front of groups, something they are asked to do during voir dire in a criminal trial.  Even if a portion of the voir dire is sequestered, the voir dire will be before a group that includes the lawyers and especially the judge, very high status people in the courtroom.

103.  If prospective jurors become aware of specific "qualities" that the court is looking for in a juror, such as being fair and impartial, they are likely to give the appropriate responses.  This phenomenon is what social psychologists have termed "evaluation apprehension," or heightened concern for what respected authority figures think of them.[30]  Prospective jurors learn the right answers not only through pre-instructions, body language, and their own knowledge and education, but their sense of what is appropriate for a juror in an American courtroom.  This is not to say that a significant number of jurors dissemble or ignore their oath;[31] it is to say that their responses are filtered through an internal prism.

104.  The problem is particularly intractable with pretrial publicity, a phenomenon I have studied.  Jurors know that they are supposed to be fair and impartial and that good jurors are not supposed to bring their biases and knowledge of the cases into the courtroom.  Those who previously missed that civics lesson quickly learn it during the voir dire, particularly the standard voir dire that is so common.  Even in high profile cases like this, it is not unusual to see preinstructions that focus on being fair and impartial rather than open and honest; to see the voir dire conducted almost entirely by the court rather than by attorneys;[32] overuse of closed end and even leading questions; very few follow-up questions;

---

[30] E.g., M. Rosenberg, "When Dissonance Fails: On Eliminating Evaluation Apprehension from Attitude Measurement," Journal of Personality and Social Psychology 28 (1965).

[31] Except perhaps for those who are trying to avoid service.  Preventing the learning process through which jurors learn what works and what doesn't is one reason to have some sequestered voir dire in trials that are expected to be long and difficult.

[32] Studies show that people and thus jurors are more likely to be forthcoming with those whose status is closer to their own -- attorneys rather than judges.

inadequate time allowed for questioning; little or no individualized and/or sequestered voir dire, even on sensitive topics such as pretrial publicity; and failure to grant challenges on prejudice related to pretrial publicity except under an unreasonably high standard.[33]  Good voir dire techniques are based on traditional research in social psychology and have been adopted routinely in difficult cases by many courts around the country.

105.  Even if it were claimed that it would be satisfactory to pick a jury from those who claim impartiality, I do not believe that should routinely pass constitutional muster.  As the United States Supreme Court observed in <u>Irvin v. Dowd</u>, 366 U.S. 717, 728 (1961):

> No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. (366 U.S. at 728).

106.  <u>The Inability of a "Fair and Impartial" Voir Dire Question to Protect the Fair Trial Rights of the Defendant</u>.  One often sees a well-meaning attempt made in cases where there is a concern about prejudice to protect the defendant's fair trial rights by asking prospective jurors a conclusory question such as, "Can you put aside whatever you may have read or heard about this case before you came to court, and render an impartial verdict based solely on the evidence you hear in court?"

107.  In the many voir dire transcripts I have reviewed over decades, it is rare to see more than a handful of prospective jurors acknowledge that they cannot be fair and impartial, even in a lynch-type atmosphere.[34]  I almost never use a fair and impartial question in venue surveys because there is so much pressure, even in an anonymous survey, for respondents

---

[33]  Sometimes it is argued that jurors should be seated unless they have "fixed" opinions about guilt.  In my opinion, the argument fails because it cannot be literally true.  No rational panelist could ever state that even in the face of overwhelming trial evidence of an airtight alibi or the like, he or she would not abandon his or her position on guilt.  But even a lower standard than a fixed opinion could make the trial unfair if it forces the defendant to prove innocence rather than being protected by the presumption thereof.

[34] <u>See</u>, e.g., E. Bronson, <u>supra</u>, note 25.

to give the socially desirable and "good citizen" response.  Those who perceive themselves or wish to be perceived as good citizens are reluctant to admit they cannot be fair.  The same "good citizen" impulse leads a number of respondents even in anonymous telephone voting surveys to claim that they are registered to vote when in fact they are not.[35]

108.  In addition to the social desirability pressure to give the "proper" response, there are other reasons not to rely on such assurances of fairness.  For many people in a case like this, the only fair and impartial verdict is guilty -- and perhaps the death penalty if the law allowed it.  Another problem is that prospective jurors may not know what attitudes and knowledge they have that would be improper and taint their verdicts.

109.  Many of us are unable to recognize our biases or our weakness in controlling them.  For example, most of us honestly think we can be fair in a dispute between our child and another child.

110.  It is important to note that by no means am I suggesting that jurors will lie, although of course that sometimes happens.  Often their true attitudes and feelings are as unknown to themselves as they are to the court and counsel.

111.  <u>Attorney-Conducted Voir Dire</u>.  It is my view that attorney-conducted voir dire is highly preferable in obtaining a fair and impartial jury to hear this case.[36]  The primary reason for my preference is my belief that prospective jurors are more likely to be candid about their views when the voir dire is conducted by an attorney.  Many scholars have believed, consistent with social-psychological theory, that the judge is seen by prospective jurors as an important authority figure, and that jurors will tend to be concerned about displeasing him or her.  Such a

---

[35]B. Silver, et al., "Who Overreports Voting?" 80 <u>American Political Science Review</u> 6, 13 (1986).

[36]Of course there is no need for voir dire, either court or attorney-conducted, on the routine objective questions about age, employment, etc.  These matters are most efficiently covered on a questionnaire, thus using no court time except to explore unresponsive or problematic questionnaire responses.

concern is likely to cause jurors to be less honest in their replies.[37]  The issue has been much debated, but with limited empirical investigation until the results of a sophisticated study were published.[38]

112.  The author of the study reported that subjects voir dired by judges were much less honest in their responses than those questioned by attorneys.  She believed that one reason for this difference is that individuals tend to disclose more to those whom they perceive as sharing status closer to their own, and,

> although attorneys' social status [in the courtroom] may be higher than that of most jurors, there is less of a discrepancy between jurors and attorneys than between jurors and judges.[39]

113.  <u>Use of Open-Ended Questions</u>.  Another barrier to eliminating bias or prejudice is that voir dire is often conducted with so-called fixed-response or leading questions.  A fixed-response question is one in which the answer is limited to a single response, such as yes or no, agree or disagree.  In social science research, such fixed-response questions are often asked to elicit factual information about a particular respondent.  Although leading questions can be useful to obtain factual

---

[37] At least three methods have been used to study the efficacy of various voir dire techniques.  One method is to administer a pre-test to subjects in order to determine their attitudes.  The experimenter then measures the extent to which different types of voir dire accurately disclose those attitudes.  (E.g., S. Jones,  "Judge- Versus Attorney-Conducted Voir Dire: An Empirical Investigation of Juror Candor," 11 <u>Law and Human Behavior</u> 131 (1987).)

A second method is to compare voir dire transcripts of different processes, using as a criterion a count of the number of sustained defense challenges for cause, and to a lesser extent the guilt and penalty verdicts.  (E.g., M. Nietzel & R. Dillehay, "The Effects of Variations in Voir Dire Procedures in Capital Murder Trials," 6 <u>Law and Human Behavior</u> 1(1982); R. Christie, reported in M. Nietzel & R. Dillehay, <u>supra,</u> at 3-4.

A third approach is to compare juror disclosure during voir dire with what jurors really knew and felt.  (E.g., D. Broeder, "Voir Dire Examinations: An Empirical Study," 38 <u>Southern California Law Review</u> 503 (1965); E. Bronson, E., <u>supra</u>, note 25.

[38] S. Jones, <u>supra,</u> note 37.

[39] <u>Id</u>., at p. 134 (citation omitted).

information about a juror's residence, age, or occupation, such questions are not useful to acquire more substantial information about a venireperson's attitudes. Such leading questions are designed to suggest or control the content of the response elicited. Thus, a leading voir dire question, such as, "Is there anything about the race of the defendant or the race of the victim in this case which would prevent you from being fair and impartial?" will inform the prospective juror that the "correct" answer is "no," and will provide a court with no information regarding the subtle impact of the juror's biases. Only open-ended questions, which require jurors to formulate their thoughts in a sentence or two, will allow counsel some means of penetrating stereotyped and socially desirable responses, that is, to separate those jurors without unfair prejudice from those who are merely <u>unaware</u> of their unfair prejudices. Accordingly, it is imperative that the voir dire includes questions that are non-leading and that require the prospective juror to respond with a few sentences rather than a single word.

114. One additional observation is appropriate at this juncture. Voir dire that includes non-leading questions can take <u>less</u> time than most customary voir dire. A single open-ended question that allows a prospective juror to speak a few sentences will reveal more information than numerous lengthy leading questions.

115. <u>Summary of Recommendations</u>. As noted previously, my suggestions for voir dire are as follows. (Most of the reasons for and details of these suggestions have already been discussed.):

1-2. <u>Expanded or supplemental questionnaires and not pre-instructing the panel members</u>. It is my understanding that the Court is already planning to send out supplemental questionnaires to jury panel members, a plan that should make the voir dire more efficient and more effective. I would only suggest that the questionnaires be of sufficient thoroughness to explore all avenues of potential bias, that counsel for both sides have enough time to review the questionnaires before the voir dire begins (which should allow time for stipulations as to some panelists), and that the introduction avoid such matters as telling panelists the purpose is to

get a fair jury, that the defendants are presumed innocent, etc., matters that might lead some panelists to downplay some attitudes and information. Instead, it would be preferable to instruct them that there are no right or wrong, answers, only complete and incomplete answers.[40]

---

[40] One federal case with which I am familiar, <u>United States v. Layton</u>, is worth noting. The trial court judge, the late Chief Judge Robert F. Peckham, introduced the voir dire process in a way designed to place the jurors at ease. (This refers to the voir dire, rather than a questionnaire, but the same principles apply). After the prospective jurors filled out questionnaires, the voir dire was conducted with each juror individually, out of the presence of others, resulting in a substantially greater number of cause challenges than might have occurred ordinarily. This was the criminal case arising from the Jonestown massacre. Jurors were forthright in revealing their opinions. Here is an excerpt from Judge Peckham's introduction to the voir dire:

> Ladies and gentlemen, I am going to briefly talk with you this morning . . . and then we will ask you your indulgence while we ask individual prospective jurors questions. You have already filled in the questionnaires . . . but it is necessary to ask additional questions. . . .

> The process we are about to begin is known as voir dire. I will ask you questions regarding your qualifications to serve. As I indicated, it will be done individually. . . .

> With respect to the questions that I will ask you individually, I want to emphasize that there are no right or wrong answers; that this is not the giving of a test; that I have no expectation from you as to what your answer ought to be; that you shouldn't in any way . . . feel that you should strive to give an answer that will be acceptable to me . . . .

> What this is all about is to get your honest, straightforward feelings when we ask you what they are, or straightforward answers as to your opinions or a factual response . . . . I emphasize that, because . . . it has been suggested by those who have studied the process that prospective jurors may feel that the authoritarian figure of the judge may play a role that is not really helpful to the process, and I can assure you that that's not my purpose. It will be a very informal atmosphere in which the questions are given to you . . . and your only obligation is to answer truthfully. There are no right or wrong answers. What is important is that you be as honest as you can . . . .

> What is most important is that you be as honest and forthright as you possibly can. Many of you will be excused from this jury. It should not be an embarrassment to you in any way . . . . It carries with it no disqualification . . . certainly no stigma. . . .

Of course, instructions on such matters as the presumption of innocence are crucial; I only suggest they be deferred until the voir dire is completed.

3. <u>Allow partial attorney-conducted voir dire</u>.  (See explanation above.) Only the attorneys are familiar enough with their case to propound useful and necessary follow-up questions, and even when a court allows follow-up questions to be submitted by the attorneys, the procedure lacks the flow necessary.

4. <u>Where appropriate, use open-ended questions</u>. (See explanation above.)

5. <u>Utilize individual and sequestered voir dire</u>.  This is only necessary for those panelists whose questionnaire responses or other factors make that useful and necessary and only for limited portions of the voir dire.

6. <u>Additional peremptory challenges for each Defendant</u>. Since the voir dire in this case is likely to show more bias against the Defendants than against the Government, given the prejudicial pretrial publicity and survey results; and since there are four joined Defendants with potentially competing interests forced to share peremptory challenges, it could be appropriate to award each Defendant two peremptory challenges. or perhaps more if warranted.  I will point out just one example of a potential conflict in the exercise of peremptory challenges that could arise in the case.  Defendants Scrushy and Siegelman have political identifications that are likely to be known to many potential jurors. Suppose it is discovered that a potential juror is a strong political partisan, either a Democrat or a Republican.  One Defendant might want to excuse that venireperson, while the other Defendant would want to retain that person.  The situation might reverse with another panelist. The Defendants' peremptory challenges would cancel each other out.

---

What we ask is that above all you be, again, honest and forthright in stating your opinions and feelings.

<u>United States v. Layton</u>, CR-80-416-RFP, N.D. Calif., July 1981, Trial Transcript at 933 et seq.

116.  I point out, however, that any decision on the issue of granting extra peremptory challenges can be deferred until later in the jury selection, although before the exercise of some or all of the challenges.

## §VI.  <u>Conclusion.</u>

117.  The content analysis of the media coverage of this case and especially the survey results demonstrate the need for some remedy for the impact of prejudicial publicity on prospective jurors in the current trial venue.  While I do not believe the prejudice rises to the level required for a change of venue at this juncture, it is my opinion that enhanced voir dire procedures be adopted in order to protect the fair trial rights of the Defendants in this case.

> I declare under penalty of perjury that the foregoing is true and correct, except as to those matters stated on information and belief, and as to those matters, I believe them to be true.

Executed on this thirteenth day of February 2006, at Chico, California.

_____

EDWARD J. BRONSON