IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. 2:05CR119-F |
| | ) | (WO) |
| RICHARD SCRUSHY | ) | |

**RECOMMENDATION AND ORDER OF THE MAGISTRATE JUDGE**

Defendant Scrushy seeks dismissal of the indictment against him because of alleged prosecutorial misconduct and undue delay in unsealing the May 2005 indictment returned against him.  (Def. Mot. to Dismiss, doc. # 132).  The court held an evidentiary hearing[1] on this motion on March 14, 2006.[2]  For the reasons which follow, the court concludes that the motion is due to be denied.

**FINDINGS OF FACT**

The first indictment in this case was returned on May 17, 2005.  That indictment charged defendants Siegelman and Scrushy in count one with conspiracy to violate 18 U.S.C. § 666(a)(1)(B) and (a)(2) and 18 U.S.C. § 1956(a)(1)(B)(I).  Count two charged Siegelman with a substantive violation of 18 U.S.C. § 666(a)(1)(B) and Scrushy with aiding and abetting in violation of 18 U.S.C. § 2.  Count three charged Scrushy with a substantive violation of 18 U.S.C. § 666(a)(2) and Siegelman with aiding and abetting in violation of 18 U.S.C. § 2.   At the evidentiary hearing, one of the lawyers for the government characterized this first indictment as one "addressing the statute of limitation

---

[1]References to this proceeding are indicated by the use of the abbreviation "Tr."

[2]The court has also carefully considered the government's response (doc. # 160) and the defendant's reply. (doc. # 200).

problem." (Tr. at 88)[3]  This indictment was sealed on motion of the government.  That

motion recites two reasons for sealing the indictment.  First, it notes that one of the

defendants "is presently being tried in the Northern District of Alabama" and requests

sealing the indictment "to prevent and preclude any undue prejudice to this defendant in

the ongoing trial." (Mot. to Seal at 1, doc. # 1).  Second, the motion recites that the

government is continuing to investigate "other criminal offenses committed by the named

defendants as well as other persons known and unknown at this time.  Public disclosure

of the instant indictment . . . would severely harm the investigative efforts  . . . "  (*Id.* at

1-2.)  The court sealed the indictment.  Scrushy was acquitted on June 28, 2005, on all

charges in the criminal case brought against him in the United States District Court for

the Northern District of Alabama.  The government, however, did not move to unseal the

May 2005 indictment.

The original indictment remained sealed until October 26, 2005, when the first

superseding indictment (doc. # 9) was returned.  That indictment added two defendants

and additional criminal charges against both Scrushy and Siegelman.  On November 3,

2005, the government moved to dismiss the May 2005 indictment (doc. # 31), and it was

dismissed the next day. (doc. # 35).

Well before the May 2005 indictment, however, Scrushy and his counsel were

aware that he was the subject of an ongoing criminal investigation.   On July 8, 2004,

prosecutors met with three of Scrushy's lawyers in Birmingham, Alabama, giving them a

---

[3]The acting United States Attorney testified that the only reason for the first indictment was to toll the statute of limitations as to those charges.  (Tr. at 129)

detailed explanation of the factual basis of the bribery charges against Scrushy arising out of Scrushy's appointment to the CON Board.  Scrushy's lawyers then explained why in their view the government's version of the facts and law was wrong.

Prior to the return of the May 2005 indictment, counsel for Scrushy entered into a 30 day tolling agreement with the government.  But that agreement was not renewed.[4]

On October 4, 2005, at the request of Scrushy's counsel, a meeting was held at the office of the United States Attorney for the Middle District of Alabama.  From the defendant's perspective,[5] the purpose of this meeting was to "discuss with the U.S. Attorney's office the case that they were investigating in an attempt to avoid an indictment of Mr. Scrushy."  (Tr. at 6.)  Arthur W. Leach, one of the defendant's counsel, explained,

> And frankly the purpose for the meeting was to try to gain some level of confirmation and comfort that it was not the United States government's intent to go after Mr. Scrushy and to try to figure out whether or not it was their desire to utilize Mr. Scrushy as a witness and to see if we couldn't come to some sort of understanding where Richard Scrushy wouldn't be charged  . . .

Tr. at 40.

---

[4]When asked why the expiration of this agreement did not put him on notice that the government might have taken some action against his client, one of the defendant's lawyers testified, "Because what I was concerned about, Judge, is that there was some way that they could pull Richard Scrushy in on an overt act of the conspiracy. In other words that perhaps those charges from a substantive standpoint were gone, which is kind of where my impression was, and that there might be some consideration of doing something with him in terms of either a conspiracy charge where there was an overt act or a RICO charge where there was a predicate act of the RICO or a RICO conspiracy where an overt act was within the five years."  (Tr. at 39-40)

[5]The government's perspective, though slightly different, is not inconsistent.  "It's my understanding they called and asked if there was a way to work something out towards a cooperation agreement and that was the purpose of the meeting."  (Tr. at 77-78.)

At the beginning of the meeting, government counsel explained their case against the defendant.  Counsel then engaged in what most likely was a spirited discussion about the facts and the law related to the government's position about the defendant's criminal liability.  Much of that discussion apparently centered around whose version of the facts was correct, each side believing their version of the truth was most worthy of belief.  During these discussions counsel for the defendant asked a government lawyer if a "charging decision" had been made.  Government counsel responded, "No."  (Tr. at 7, 9, 44, 127, 142).  There was no discussion about whether an indictment had been returned against Scrushy.

There is no dispute about the nature of the charging decision question or the negative response.  Instead, the differing perceptions and understandings of the lawyers about that discussion[6] has led at least in part to the present controversy about whether the actions of the prosecutors constitute misconduct sufficient to warrant dismissal of the indictment.  A brief review of the testimony of defense counsel Leach demonstrates how the differences arose.

> A.  I asked Mr. Pilger directly whether a charging decision with regard to Mr. Scrushy had been made and he told me no.
>
> Q.  Did he at any time, he or anybody else in that meeting on the side of the government, tell you that an indictment had already been returned in the Middle District of Alabama against Mr. Scrushy?

---

[6]There was also a telephone conversation on October 25, 2005, between Mr. Leach and Mr. Franklin, the acting United State Attorney, during which the same charging decision question was asked and the same negative response was given.  The next day, the first superseding indictment was issued leading to disclosure of the charges against Scrushy.

    A.   No, sir. And there was no discussion about, you know, any temporary decision or that they could reverse their decision, there was nothing along that line.

Tr. at 44 (Leach Test.).

    The next colloquy is an exchange between Mr. Leach, the witness, and Mr. Feaga, a prosecutor conducting the examination.  It demonstrates more particularly the basis of the misunderstanding about the charging decision question.

    Q.   So why not ask has my client been indicted instead of saying has a charging decision been made?

    A.   That was what I was asking.

    Q.   But you didn't ask it, and so my question is why is it not just as likely that the government misconstrued your internal need for information because you used the word charging decision and they are talking to you about what is going to happen to your client prospectively.  You know they can take him out of that indictment, and you know a superseding indictment was returned, why is it not just as likely that they were talking about a final charging decision and they were in good faith with you in there discussing the future of your client as it was they were trying to deceive you in some way?

    A.   Because words have meaning, Mr. Feaga, and an honest representation would be that there was no final decision made. If they had told me that there was no final charging decision made here then I would have been in the position that the antenna would have immediately gone up and I would have responded with a question, well, has a preliminary charging decision been made?  Do we need to parse this right down to the fine words in order to find out that there's a sealed indictment? Also as I say in the response, you know, the government could have gone back after that meeting.  I have no problem with the fact that at that meeting they may have been confronted with the fact that I am pushing on the sealing order. But the government could have collectively gone back and made the decision to unseal that and then give me the information and then I would have reassessed.  And I don't know, I may have talked with the government, I may not.  Our communications could have continued.

Tr. at 51-52.

The next exchange of interest is between Louis Franklin, the witness, and Mr.

Feaga who is conducting the examination.

Q.  Mr. Franklin, quite frankly the defense in this pleading has challenged
your integrity.  They have alleged that you deliberately misled them to gain
some advantage in responding to a question they made during the series of
meetings they had with the government, and I would like for you to tell the
Court whether or not you had any intention to mislead anyone when you
met with the defense.

A.  I can assure this Court that there was never any intention on my part or
any member of the prosecution team to mislead any of these Defendants
when we were talking to them.  We had as a real possibility to work out an
agreement, and we kept the door open at any time that these Defendants
called we would answer their call and we would agree to meet with them.
       In fact, during the last meeting that we had with defense counsel,
which was October the 25th, 2005, we were in the middle of discussing
what the proposed indictment would be that we would present to the grand
jury on the next day when they called and we had to stop and ask ourselves
do we have time to take this call and talk to these guys again, because they
haven't given us anything up to this point. And a decision was made based
on what we had promised in the beginning, and that is we would keep the
door open and we will talk to you. And if you brought forth information that
was worthy of working out a resolution of this case, then we would move in
that direction. We never got that. We never got in my opinion a serious
specific proffer that would warrant us to stop the direction that we were
heading in.

Tr. at 127-128.

Evident from these exchanges is the differing interests of the parties.  Scrushy's

lawyers were interested in insuring that their client had no exposure to criminal liability.

The prosecutors, on the other hand, were interested in a "resolution" of their case against

the defendant, but it seems obvious that any resolution in their mind likely did not

encompass freedom from criminal charges.

6

The views of the government lawyers about this conversation are premised on their understanding that their response to the charging decision question meant that no final decision had been made.  The facts support that view, but that does not mean their response to Scrushy's lawyer did not mislead.  The Alabama Rules of Professional Conduct, Rules 3.3 and 3.4 establish generally a lawyer's duty of candor to the courts and fairness to opposing parties and counsel.  Section 22 of the 1994 Code of Trial Conduct of the American College of Trial Lawyers is explicit.  "The conduct of a lawyer before the court and with other lawyers should at all times be characterized by honesty, candor and fairness."  Mr. Leach is entirely correct when he observes that words have meaning,[7] and the prosecutors should have known that their negative response to the charging decision question was likely to mislead.  The negative response did not demonstrate the candor and fairness in dealings with other lawyers which the court expects of counsel.

Nonetheless, the court does not find that the prosecutors intentionally misled Scrushy's counsel for the purpose of securing a tactical advantage or otherwise prejudicing the defendant.  This finding is based on the court's understanding of the purpose of the October 4, 2005 meeting as well as consideration of all of the facts.  Government counsel were not dealing directly with the defendant.  They were discussing with counsel a possible proffer with respect to the defendant.  It is also telling that defendant's counsel viewed the meeting in part as an opportunity to clarify some facts

---

[7]Some of the exchanges between counsel would have delighted Lewis Carroll.  "When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean--neither more nor less." "The question is," said Alice, "whether you can make words mean so many different things."   "The question is," said Humpty Dumpty, "which is to be master--that's all."  Lewis Carroll, THROUGH THE LOOKING-GLASS 94 (Random House 1965) (1865).

about which they lacked complete understanding.  (Tr. Sealed Hr'g at 4) Counsel's

testimony suggests that in the absence of this factual clarification, negotiations would not

be successful.  (Tr. Sealed Hr'g at 5-6) At the time of the meeting in October the

prosecutors were well aware that an indictment had been returned against Scrushy.

However, in their view the sole reason for that indictment was to insure that the charges

contained in that indictment survived the running of the statute of limitations.  The court

finds that in fact no final charging decision had been made regarding the defendant, even

though the court further finds that the prosecutors should have known that their responses

were misleading.[8]

        With these conclusions in mind, the court will now discuss issues and the law

applicable to the defendant's contentions regarding delay in unsealing the indictment and

the  prosecutorial misconduct claims.  The discussion will also include further findings as

necessary for resolution of all the issues.

_____

        [8]In his reply brief, Scrushy sets out the argument in this fashion: "The question presented is
whether it is appropriate for the Government to intentionally mislead defense counsel, who repeatedly
asked if a charging decision had been made.  A closely related question is whether it is appropriate to
mislead counsel and continue a dialogue when Government counsel knows the purpose of the inquiry by
defense counsel is to terminate discussions, or at a minimum reassess continued discussions, if a charging
decision had been made.  An appropriate question has to be asked, based upon the Government's
rambling response is whether truth and forthrightness ever even crossed the collected minds of
Government counsel.  One would think that, at a minimum, after the discussion on October 4, 2005,
when counsel for Mr. Scrushy specifically asked about a charging decision, that counsel for the
Government would reassess their position and either seek a limited on unsealing or present their dilemma
to the Magistrate Judge for resolution." (Scrushy Reply (doc. # 200) at 2-3).  Hyperbole is not a
substitute for analysis.  The tenor of the court's analysis of the facts shows that during this discussion on
October 4, 2005, counsel were not communicating because they were focused on their interests and did
not seek to understand the position of the other side.  There is no evidence which supports the assertion
that the government understood Scrushy's counsel's purpose in asking the charging decision question any
more than there is evidence to support the argument that defense counsel understood that a "final"
charging decision had not been made.

**DISCUSSION**

Defendant Scrushy raises separately his prosecutorial misconduct and due process delay in unsealing the indictment claims.  However, it is appropriate for the court to conflate the discussion of these claims.  Scrushy vigorously argues that the unsealing delay was an aspect of the misconduct by prosecutors leading to prejudice against the defendant.  Consequently, in view of the way in which the defendant frames the argument, resolution of the misconduct claim necessarily resolves the due process claim.

Scrushy contends that the government's intentional misleading of his counsel between May and October 2005 about whether a charging decision had been made caused his lawyers during repeated conversations with government lawyers to disclose facts about the charges contained in the sealed indictment.  "These conversations occurred for one reason and one reason only: because the Government attorneys told defense counsel that a charging decision had not been made  . . . "  (Def.'s Mot. to Dismiss (doc. # 132) at 10).  Scrushy argues first that with this "intelligence," the government, knowing his position as to key transactions and events, knew which witnesses he would call at trial.  Second, Scrushy argues that the government had a "road map to weaknesses in its case, and contradictions in the testimony of its witnesses . . . and, therefore, knew which witnesses it needed to reinterview and the facts it needed to revisit before unsealing the indictment."  *Id.*

Scrushy claims that the "critical component" of this "ruse" was the sealing of the May 2005 indictment.  As already noted, the government moved to seal the indictment to

protect the defendant from prejudice in the criminal trial in another district and to protect the government's ongoing investigation of other defendants and criminal charges.

FED.R.CRIM.P. 6(e)(4) provides:

> The federal magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. Thereupon the clerk shall seal the indictment and no person shall disclose the return of the indictment except when necessary for the issuance and execution of a warrant or summons.

However, securing the defendant's custody is not the only permissible reason for sealing an indictment.  In *United States v. Edwards*, 777 F.2d 644 (11th Cir. 1985), the Eleventh Circuit found that a Magistrate Judge had discretion to seal an indictment on motion of the government so as to toll the running of the statute of limitations.  "Tolling the statute of limitations on charges of conspiracy to import with intent to distribute thousands of pounds of marijuana is arguably required by the public interest and supported by sound reasons of policy."  *Id.* at 648-49.  Other circuit courts have reached the same conclusion that an indictment may be sealed for legitimate prosecutorial purposes and when the public interest otherwise requires it.  *See United States v. Wright,* 343 F.3d 849, 858 (6th Cir. 2003) (collecting cases); *United States v. Thompson,* 287 F.3d 1244, 1252 (10th Cir. 2002) (same).

Scrushy argues that when he was acquitted in the other criminal case, the government had a duty to inform the court that this reason for sealing the indictment no longer existed.  But Scrushy provides the court with no authority for this proposition. Two reasons supported the motion to seal, and there is no evidence that at the time of the

10

acquittal the government's investigation was not continuing.  Indeed, what authority the court has found is contrary to Scrushy's position.  *See United States v. Balsam*, 203 F.3d 72, 81 (1st Cir. 2000) (Government need not return to the Magistrate Judge as each new reason for continuing the sealing order arises); *United States v. Richard*, 943 F.2d 115, 119 (1st Cir. 1991) (same).[9]

Scrushy's core argument centers on the second reason for sealing the original indictment which he argues is pretextual.[10]  "Instead of investigating *other* crimes against the Defendant, it was merely using the grand jury for the primary purpose of strengthening its case against Defendant Scrushy, in direct contravention of Eleventh Circuit precedent."  (Scrushy Reply (doc. # 200) at 6).  Here is the black letter law from one of the cases on which Scrushy relies.

> To perform its public responsibility, a grand jury has broad investigative authority in determining whether a crime has been committed and in identifying the perpetrators.  A grand jury investigation is not complete until all clues have been exhausted and every witness examined.  "[T]he law

---

[9]Scrushy makes the argument that *United States v. Balsam*, 203 F.3d 72 (1st Cir. 2000), is "contrary to the spirit of FED.R.CRIM.P. 6(e)(4) as well as contrary to law in the Eleventh Circuit Court of Appeals." (Scrushy Reply (doc. # 200) at 9).  Of course, there is nothing in Rule 6(e)(4) which requires that the government keep a judge abreast of any change in the reasons for which an indictment was sealed.  The "contrary" law assertion is specious.  None of the cases cited by Scrushy stand for that proposition and none support it analogously or otherwise.  Moreover, suggesting that an indictment should be dismissed because the government did not inform the court that one of several independently sufficient reasons for sealing no longer existed exalts form over substance to a degree that indeed is contrary to the spirit of the rules which are designed to promote decisions on the merits and not technicalities.  *Cf. Conley v. Gibson*, 355 U.S. 41, 48 (1957).

[10]To the extent that Scrushy argues that continuance of an investigation is not a sufficient reason for sealing an indictment, the argument is fallacious.  *See United States v. Beasley*, 550 F.2d 261 (5th Cir. 1977).  *Cf. United States v. Lovasco,* 431 U.S. 783 (1977).  In *Lovasco* the court confronted the analogous issue of preindictment delay and held that prosecution of "a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."  *Id.* at 796.

presumes, absent a strong showing to the contrary, that a grand jury acts
within the legitimate scope of its authority."  When it is shown that a
subpoena might assist the grand jury in its investigation, the subpoena
should issue, even though the prosecutor possibly will use the information
procured for a purpose other than obtaining evidence for the particular
grand jury investigation.  Although the government may not use a grand
jury for discovery concerning a pending prosecution, it may continue an
investigation from which information relevant to a pending prosecution
"may be an incidental benefit."

*United States v. Alred,* 144 F.3d 1405, 1413 (11th Cir. 1998) (citations omitted).  *See also*

*United States v. Beasley*, 550 F.2d 261, 266 (5th Cir. 1977) (Government may not use

grand jury for the primary purpose of strengthening its case on a pending indictment or as

a substitute for discovery, although this may be an incidental benefit).  Scrushy argues

that the pretextual basis of the government's continuing investigation position can be seen

most clearly by comparing the charges in the original and first superseding indictment.

"There is no material difference in the factual bases of the two indictments with respect to

Defendant Scrushy."

    The original indictment (doc. # 3) charged Scrushy and defendant Siegelman in

count one with conspiracy to commit federal funds bribery in violation of 18 U.S.C. § 371

and § 666 and conspiracy to commit money laundering in violation of § 371 and 18

U.S.C. § 1956(a)(1(B)(I).  Count two charges that Siegelman, aided and abetted by

Scrushy, committed a substantive violation of 18 U.S.C. § 666(a)(1)(B) and 2.  Count

three charges that Scrushy, aided and abetted by Siegelman, committed a substantive

violation of 18 U.S.C. § 666(a)(2) and 2.

    The first superseding indictment (doc. # 9), returned on October 26, 2005, charges

Scrushy in counts three, four and five.  Counts three and four are essentially identical to counts two and three of the original indictment.  Count five charges that Siegleman and Scrushy aiding and abetting each other devised a scheme and artifice to defraud the State of Alabama of the honest and faithful services of Siegelman in his capacity as Governor and in carrying out that scheme placed in the United States mail on January 18, 2001, a CON Board appointment letter all in violation of 18 U.S.C. §§ 2, 1341 and 1346.

Obviously, there is a material difference in the first superseding indictment regarding Scrushy because there is nothing in the original indictment which legally or factually mentions the honest services mail fraud charge.  That said, the court recognizes that an argument can be made that Scrushy's no material difference argument is not specious because the mail fraud charge is premised on an act which was in furtherance of the conspiracy charge in count one of the original indictment.  There is no need for the court to delve into this type of argumentation.

The first superseding indictment is not just about Richard Scrushy.  It adds two additional defendants, Paul Hamrick and Gary Mack Roberts.  In addition to count five described above, it adds numerous substantive counts comprising violations of 18 U.S.C. §§ 1341, 1343, 1346,1512(b)(3) and 1951.  It also adds in count one a RICO conspiracy charge under 18 U.S.C. § 1962(d) and in count two a substantive RICO count.[11]

> While it is easy to say that the court's inquiry must focus on the primary
> purpose underlying the grand jury's involvement, there is a fine line
> between an improper "trial preparation" use of a grand jury and a proper

---

[11]Scrushy is not a named defendant in counts one or two.  However, he is mentioned as a participant in the racketeering acts which form the basis of part of the charges.

> "continuing investigation" use. This fine line is difficult to plot and, in most instances, determining whether a prosecutor has overstepped it will depend on the facts and circumstances of the particular case.
>
> To assist in the inquiry, courts have devised certain proxies. Thus, if a grand jury's continuing indagation results in the indictment of parties not previously charged, the presumption of regularity generally persists. *United States v. Gibbons*, 607 F.2d 1320, 1328-29 (10th Cir.1979). So too when the grand jury's investigation leads to the filing of additional charges against previously indicted defendants. *In re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1041 (3d Cir.1980). These are purposes befitting the accepted institutional objectives of the grand jury, and their presence bears convincing witness to the propriety of the prosecutor's stewardship. *See United States v. Sasso*, 59 F.3d 341, 351-52 (2d Cir.1995); *In re Maury Santiago*, 533 F.2d 727, 730 (1st Cir.1976); *United States v. Dardi*, 330 F.2d 316, 336 (2d Cir.1964).

*United States. v. Flemmi*,  245 F.3d 24, 28 (1st Cir. 2001).

Scrushy's rejoinder to the *Flemmi* line of argument is predictable; he attempts to distinguish *Flemmi* on the basis that in that case no new defendants were added to the superseding indictment.  Thus, Scrushy argues that *Flemmi's* establishment of a presumption of proper grand jury use when defendants are added to a superseding indictment is mere unpersuasive dictum.  He also argues that *Flemmi* requires a fundamental alteration in the character of the indictment before additional charges will support a conclusion that the grand jury was not improperly used.  Having discounted *Flemmi's* statements about the addition of other defendants, Scrushy turns the focus on himself and argues that "the character of the indictment . . . [must be] fundamentally altered as to the defendant objecting to the sealing of the indictment."  First of all, *Flemmi* requires that a comparison of indictments must be conducted "with an eye toward determining whether the new matter contained in the later indictment, assayed in a

14

practical, commonsense manner, demonstrates that the government's ongoing use of the grand jury was primarily for a proper purpose." *Id.* at 29. *Flemmi* concentrates on the sole defendant because the superseding indictment in that case did not add new defendants. However, there is nothing in *Flemmi* which requires a superseding indictment of the objecting defendant be fundamentally altered,   Indeed, were that the case, the following conclusion in *Flemmi* would make no sense.

> [W]hen the new indictment charges new crimes, adds new defendants, or otherwise works a major change in the prior indictment that is sufficiently analogous, for these purposes, to charging new crimes or adding new defendants, it adequately evinces the propriety of the prosecutor's purpose and thus becomes a safe harbor for the government.

245 F.3d at 29.

The point bears repetition. Changes or additions to a superseding indictment need not work any fundamental change to a particular defendant. As a matter of law, it is sufficient if the new indictment adds new defendants or crimes because it is entirely permissible for the government to use the grand jury to continue an investigation, even if new evidence about an already indicted defendant is uncovered incidentally. *United States v. Alred*, *supra* at 1413. *See also United States v. Scott*, 784 F.2d 787, 792 (7th Cir. 1986). The defendant has failed to show the substantial, irreparable, actual prejudice to him necessary to support dismissal of the indictment. *Edwards*, 777 F.2d at 649. He has failed to show that the primary purpose of the continuing investigation by the grand jury was directed to investigating him.

There are several different aspects to the defendant's remaining arguments. The

defendant contends that when his lawyers were "duped" into believing he had not been indicted, they revealed confidential and privileged information which was used by the government to strengthen their existing case against Scrushy.  The second aspect of the defendant's prejudice argument is that while the May 2005 indictment remained under seal, the government brought in numerous witnesses for interviews and reinterviews. Scrushy argues that the government's tactics in dealing with his lawyers "supports (sic) a strong inference that the Government's meetings with witnesses . . . were designed to strengthen the case which the Government had already indicted."   The court has already addressed this argument, but Scrushy further argues that the government tactics of trying to have counsel confirm the government's version of the facts rather than his version and suggesting that failure to do this would lead to indictment "supports an inference that the Government attorneys behaved in a similar manner with other important witnesses."

The court will first address the witness issue.  A fact finder certainly may make reasonable inferences based on the evidence.   However, an inference based on mere speculation is not reasonable. *Blackston v. Shook and Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir.1985).  The government stated during the hearing that between the May 2005 indictment and the October 2005 indictment over 100 witnesses appeared before the grand jury.  The result was a far different indictment.  Thus, the fact that so many witnesses gave testimony hardly supports an inference of government misconduct. Second, how the government treated Scrushy's lawyers is hardly an adequate basis for an inference that the government improperly dealt with or influenced witnesses. *United*

16

*States v. Heller*, 830 F.2d 150 (11th Cir. 1997), a case on which both sides rely, is

instructive.  Heller was a lawyer practicing in Miami.  He did not report as income any of

the funds which he received from clients and which he placed in his trust account until he

transferred the trust account money to his personal account.  He was convicted on three

counts of income tax evasion, 26 U.S.C. § 7201.  At Heller's trial his accountant testified

that he was unaware of Heller's accounting methods.  The problem with this testimony

was that prior to the trial two IRS agents met with Heller's accountant and admittedly

threatened him with prosecution for aiding and abetting Heller.  The record demonstrated

conclusively that the accountant's testimony was false.  Under these "unique"

circumstances, the court concluded that Heller had been deprived of an important defense

witness through substantial interference by the government.  830 F.2d at 154.  *Heller*

involves admitted threats made directly to a defense witness who was not a target of an

investigation.

Scrushy's situation is patently dissimilar.  It strains credulity to suggest that the

government's express disagreement with Scrushy's lawyers version of the facts

constitutes witness coercion or any type action subject to condemnation.  The prosecutors

here were dealing with Scrushy's lawyers, not the defendant or a witness.  And while the

court has already noted that lawyers should deal with each other on the basis of fairness,

respect and candor, there is no requirement that they be mild mannered when they express

their opinions and views to each other.  "[I]t is not improper and indeed totally consistent

with the duty of assistant United States attorneys to advise a witness that there exists a

serious doubt or question about that witness' testimony." *Beasley* 550 F.2d at 266.  It follows that giving such advice to a defendant's lawyer is equally proper.  And, suggesting that prosecution will occur is not a "threat" in the context of the discussions which were culminating between the lawyers in this case.  There is no evidence before the court that any witness was treated improperly, and the evidence which is before the court does not support such an inference.

The defendant claims that his counsel were duped into revealing confidential and privileged information at the October 4, 2005, meeting by the government's lying to them about whether a charging decision had been made.  During the hearing on March 14, 2006, the court closed approximately 20 minutes of the proceeding for the purpose of hearing testimony on this revealed information and how it prejudiced the defendant.  During that part of the hearing, counsel disclosed that at the October 4, 2005, meeting a good bit of the discussion centered on what the court will term a factual discrepancy.  Suffice it to say, counsel agree that the disclosure about that issue was not prejudicial.  The court concludes it is appropriate to unseal a short quotation from the sealed hearing.

> MR. Leach: I don't know if that particular aspect is going to be prejudicial, Judge.  I mean the fact that we have a dispute over the sequence of events runs more to the fact that I am trying to persuade them to not only listen to the proffer that I am giving them, but let's try to find the corroboration . . .

Sealed Tr. at 11.

Other than this, the only prejudice identified by the defendant's counsel was that by not telling him that an indictment had been returned, his client was deprived of the

opportunity to determine what discussions would occur between his lawyers and the United States.  Mr. Leach stated, "[a]nd that's really the key, I should have had time to go back and consult with my client."  Even assuming that this is prejudicial, it is not the kind of *trial* prejudice that would lead to dismissal.  In other words, the defendant has not shown that his defense has been impaired in any way.

There remains one concrete issue of alleged prejudice which the court must consider: the testimony of Loree Skelton.[12]  In the following colloquy, Mr. Leslie Moore, one of the defendant's lawyers, is testifying.

> Q.   What is it about Loree Skelton's grand jury testimony that you believe evidences any prejudice to your client?
>
> A.   I believe that she -- well, she changed her testimony from her original testimony in 2004 and her testimony in 2005 after our meeting when she was testifying about her relationship and her hiring of Tim Adams to put together a CON application on a PET Scanner.
>
> Q.   Okay.
>
> A.   In her original testimony she testified that Mr. Scrushy didn't know anything about that until after the fact. But in her 2005 grand jury testimony she testified that he was aware of it and she was doing it at his direction.
>
> Q.   Okay. And what information did you provide to the government on October the 4th that led to the production of that information?
>
> A.   I don't know what information was provided that led to that.

Tr. at 29.

-----

[12]According to the prosecutors, Skelton, a lawyer for HealthSouth responsible for corporate matters relating to the CON Board in Alabama and similar boards in other states, was called to testify because she "had information concerning Mr. Scrushy's relationship with Timothy Adams, a member of the CON Board who became employed by HealthSouth doing PET Scanner work."  (Tr. at 90).

19

This colloquy demonstrates that disclosures made during the October 4, 2005,

meeting were not the source for any changes in Skelton's testimony.  In addition to this,

Mr. Leach also testified about his concerns relating to Skelton's testimony.

> I can see of no reason why Loree Skelton was placed back in front of the
> grand jury in December and asked questions that would revolve around
> Richard Scrushy's participation in this process, specifically the two hundred
> and 50 thousand dollar checks and her knowledge and what was appropriate
> and inappropriate at HealthSouth because all that information was
> contained in the first indictment, the second indictment and ultimately in the
> third indictment.

Tr. at 62-63.

The following colloquy sheds further light on the position of the government about

Skelton's testimony.  Testifying is one of the prosecutors.

> Q.   And was she also asked questions about whether or not she knew
> anything about the two hundred and 50 thousand dollars and/or the two two
> hundred 50 thousand dollar contributions that were made by HealthSouth
> that we had discussed with Mr. Leach was part of our case on October 4th?
>
> THE COURT:  You are talking about her second appearance
> before the grand jury.
>
> MR. FEAGA:  Yes, sir.
>
> Q.   In both instances -- in other words, this is during her second appearance
> that she was asked questions about her relationship with Tim Adams; is that
> right?
>
> A.   She was asked questions about the relationship with Tim Adams.  She
> was asked questions about her knowledge of the two hundred 50 thousand
> dollars, but that had nothing to do with the meeting with Mr. Leach, that
> had to do with her having explained to us that the reason she didn't react to
> the corruption she was witnessing with Mr. Adams was in part because she
> didn't know that Mr. Scrushy had paid a five hundred thousand dollar bribe
> to get CON Board access.

Q.   Is there -- in fact, if the Court exams her testimony it will find that she, in fact, says in that testimony that had she known about that five hundred thousand dollars she would have had a very different reaction to what her involvement was with Tim Adams; is that right?

A.   That's right. There's another reason I believe the two hundred 50 thousand came up which was -- I wasn't at the first grand jury appearance, but my understanding is she had misspoken about when she was aware of interaction with Mr. Adams, and I think we were talking to her about that and trying to put it in relation to the two hundred 50 thousand dollars before we ever met with Mr. Leach.

Q.   Okay. So you are saying that another reason she came to the grand jury was to correct her earlier testimony?

A.   That was.

Tr. at 91-92.

It is now appropriate to look to Skelton's grand jury testimony.[13]  First, there is the question about Scrushy's knowledge of the hiring of Tim Adams to draft a CON Board application for a PET scanner or for any purpose.  At the time, Adams was a member of the CON Board and sometimes traveled to Montgomery, Alabama with Scrushy for board meetings.  During her June 2004 appearance before the grand jury, Skelton testified that Adams approached her about working at HealthSouth.  Skelton told Scrushy about this request and he later told her to follow up on it.  At a later time, Scrushy told Skelton HealthSouth would not be able to offer Adams anything.  She then decided to offer Adams the PET scanner opportunity.  With regard to the scanner application, Skelton testified that it was she and not Scrushy who offered Adams the PET scanner application

_____

[13]Pursuant to FED.R.CRIM.P. 6(e)(3)(E)(i) the court may disclose grand jury testimony in conjunction with a judicial proceeding.

work.

Q.     Okay.  But your testimony is, then, that Mr. Scrushy never knew that
Tim Adams was working on a Certificate of Need Review Board
application for HealthSouth on a PET scanner?

A.     I'm sure that he was told after the fact, because that would obviously
have an impact on what Mr. Adams could do in the future as it related to
HealthSouth cases while sitting on the board.

During Skelton's second grand jury appearance on December 7, 2005, she testified

again about Adams and a job for him at HealthSouth.

He (Scrushy) asked me to get Tim hooked up with Dr. Swaid, who
was the medical director at our HealthSouth Medical Center at the time, and
to get Swaid to call him and talk to him about getting – seeing I there was a
job for him down there.

Skelton testified she understood Scrushy wanted to "keep him (Adams) happy."

Skelton's testimony at the second grand jury session concerning obtaining a job at

HealthSouth for Adams is not materially different; it is more precise, but that is not

indicative of improper actions on the part of the government.  Skelton also testified about

the PET scanner application during the second grand jury session.

Q.     Okay.  Now, at some point in time, did you have occasion to become
involved with Mr. Adams in allowing him to write a certificate of need
application on behalf of HealthSouth?

A.     Yes, sir.

Q.     And that and was that also done with Mr. Scrushy's blessing?

A.     Yes, sir.

Q.     Would this have been part of the activities that you engaged in with
Mr. Adams that you were uncomfortable with, but were doing because you
knew Mr. Scrushy wanted to keep him happy.

22

A.     Yes, sir.

Of course, Skelton's testimony about Adams and the PET scanner application indeed did appear to change from her first to her second appearance before the grand jury. During the first session she testified that Scrushy did not know about the offer until after the fact.  At the second session she testified that the offer was with his "blessing."  But as Mr. Leach earlier pointed out, words have meaning and "blessing" is not necessarily "knowledge."  Skelton testified that Scrushy wanted to keep Adams "happy."  It is entirely conceivable that her offer of the PET scanner job to Adams was a mechanism to keep him happy which therefore equated to an imprimatur of a "blessing."  But, of course, this is mere sophistic quibbling.

The crux of the defendant's argument is that the change in Skelton's testimony demonstrates that the government impermissibly continued to investigate the charges it had already brought against the defendant in the original indictment and may have improperly influenced the witness.  The defendant's argument overreaches.  The government has a duty to insure that testimony presented to the grand jury is not false.  Put another way, the government's knowing use of false testimony would violate the defendant's constitutional rights.  *Giglio v. United States*, 405 U.S 150 (1972); *DeMarco v. United States*, 928 F.2d 1074, 1076 (11th Cir.1991).  Second, "[t]he fact that the witnesses' recollections varied as to one aspect of the meeting falls far short of establishing that the government knowingly presented false testimony to the jury, especially when the witnesses' testimony as to all other details of the meeting was

23

consistent."  *United States v. Lopez*, 985 F.2d 520, 524 (11th Cir.  1993).  *See also*

*Tennessee v. Street*,  471 U.S. 409, 414 fn. 5 (1985)("The differences between the two

confessions do not logically compel the inference that respondent's testimony was false;

for instance, respondent may have invented factual details out of whole cloth.

Nevertheless, the discrepancies do cast doubt on respondent's version of his

interrogation.").  So understood, the defendant's argument devolves into bootstrapping a

credibility argument into a claim of prejudice.  There is no evidence before the court that

the prosecutors in this case did anything improper with regard to witnesses before the

grand jury.

For the same reasons, Skelton's testimony about payments to the Lottery Fund do

not demonstrate prejudice arising either from the October 4, 2005 meeting or the

continuing investigation by the grand jury.  During her first grand jury appearance

Skelton testified about the first payment of $250,000.00 that she learned about through

inquiries from a newspaper reporter.

> Q.  Was this an unusual thing for a check of this size to be donated
> by HealthSouth and you not know anything about it?
>
> A.  No, sir.  A check of that size to be contributed wouldn't be
> unusual.  A smaller check, 5000, 1000 – normally I would have been in the
> middle of processing that.
>
> Q.  Okay.
>
> A.  But –
>
> Q.  Well, was a check of that size being contributed – that wasn't
> unusual?  I mean –
>
> A.  In '99?  Probably one check for the total amount, yes, that
> probably was.

During her second appearance before the grand jury, Skelton testified about these same checks. "[T]hese kinds of contributions would have to have his (Scrushy's) approval and authority to have a check cut for them." At her first appearance, Skelton's testimony about Scrushy's authority is less precise.

> Q. If someone wanted to get a contribution from HealthSouth Corporation, who within the organization would have the official responsibility of becoming involved in that besides you and/or Eric Hanson?[14]
>
> A. Mr. Scrushy.
>
> Q. Okay. And you would be the only three people?
>
> A. Not necessarily. I mean, there were many times that my office was totally bypassed. The reason that they would come to my office is because I had the PAC checkbook, political action committee. I don't – I don't know – y'all tell me if y'all know these acronyms.

The court is left with two conclusions about Skelton's testimony. A comparison of her testimony from her first and second appearances before the grand jury shows that her testimony is not identical. Her testimony at her second appearance is more focused and precise. The defendant argues again that Skelton's testimony demonstrates that the government was improperly using the grand jury to continue its investigation of him on the same charges. As the court has already noted, that argument at least in part is rebuffed by the nature of the first superseding indictment. Scrushy had not produced any evidence that the government misused the process and the fact that one or even several witnesses testified twice does not amount to proof of irregularity. The Supreme Court has flatly rejected the type of approach favored by Scrushy under which his mere allegation of

---

[14]Hanson was a lobbyist for HealthSouth.

irregularity is sufficient to place a burden of proof on the government.

> The court below was apparently of the view that a mere denial of such a solemn allegation by the grand jury puts its truth in issue, that the burden is upon the government "to support it with proof", and that failure to vindicate the authority of the grand jury is "fatal" . . . Were the ruling of the court below allowed to stand, the mere challenge, in effect, of the regularity of a grand jury's proceedings would cast upon the government the affirmative duty of proving such regularity. Nothing could be more destructive of the workings of our grand jury system or more hostile to its historic status.

*United States v. Johnson,* 319 U.S. 503, 512-513 (1943) (citation omitted).

The burden of proof remains on Scrushy and the inferences which he wishes the court to draw from the facts are insufficient to meet his heavy burden. This is so because the presumption of regularity in grand jury proceedings "generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enterprises, Inc*., 498 U.S. 292, 301 (1991) (quoting *United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor, J., concurring in judgment)). Scrushy has not presented the court with the requisite "particularized proof" that the continued grand jury proceedings constituted abuse.

## CONCLUSION

Scrushy's burden of proof on his prosecutorial misconduct claim is a heavy one, and he has not sustained it. He fails to show that the primary purpose of the continued grand jury sessions was to prepare trial against him. *See United States v. Rice*, 937 F.2d 614 (Table), 1991 WL 126769 (9th Cir. 1991). While the government's response to Scrushy's lawyer's charging decision question is reproachable, the defendant has not

26

demonstrated that he suffered any trial prejudice which approaches the level necessary to warrant the remedial action of dismissal.  Dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be used infrequently and only upon a showing of egregious, flagrant misconduct.  *United States v. Shelley*, 405 F.3d 1195, 1202 (11th Cir. 2005).  The defendant has not met this burden.  Finally, to the extent that the defendant separately contends that the delay in unsealing the original indictment deprived him of his rights secured by the Due Process Clause, the court's conclusions above demonstrate that this claim lacks merit.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to dismiss on the basis of prosecutorial misconduct be denied.  It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before April 10, 2006**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon

grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 27th day of March, 2006.


_____/s/Charles S. Coody_____
CHARLES S. COODY
CHIEF UNITED STATES MAGISTRATE JUDGE