**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

UNITED STATES OF AMERICA,

v.                                                                Case No. 2:05cr119-MEF

RICHARD M. SCRUSHY,
      Defendant.

**DEFENDANT RICHARD M. SCRUSHY'S MOTION**
**FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29**
**OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

COMES NOW Defendant Richard M. Scrushy, by and through his undersigned counsel of record and moves this Court for entry of an Order, pursuant to Fed. R. Crim. P. 29(a), granting him a judgment of acquittal as to each of Counts Three through Nine of the Second Superseding Indictment (the "Indictment") in the above-captioned matter. In support of this Motion, Defendant respectfully shows this Court the following:

**THE APPLICABLE LEGAL STANDARD**

Rule 29(a) provides in relevant part:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

In *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006), the Eleventh Circuit recently reiterated the well-established standard to be applied by a district court when considering a Rule 29 motion:

> In considering a motion for the entry of a judgment of acquittal, a district court must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.

(Internal quotations and citation omitted); *See also, United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (same); *United States v. Bradley*, ___ F. Supp. ___, 2006 WL 1061886 (S.D. Ga. 2006) ("To grant a Rule 29 motion for acquittal, the Court must conclude, after viewing the evidence in the light most favorable to the government, that a rational jury would have to have entertained reasonable doubt as to the defendant's guilt.") (internal quotation omitted). Notwithstanding the foregoing, a court considering a Rule 29 motion for judgment of acquittal may conclude that the testimony of a government witness is so lacking in logical basis that it may be disregarded as being incredible as a matter of law. *United States v. Kelley*, 412 F.3d 1240, 1247 (11th Cir. 2005) ("Testimony is inherently unbelievable …when it is so contrary to the teachings of basic human experience that no reasonable person would believe it beyond a reasonable doubt.") (quotation and original ellipsis omitted).

## ARGUMENT

**I.     Judgment of Acquittal Should Enter as to Each of Counts Three Through Nine Alleged Against Defendant Scrushy Because no Reasonable Juror Could Find Him Guilty on the Evidence Presented by the Government.**

**Counts 3 – 4**
**Federal Funds Bribery, 18 U.S.C. §§ 2, 666(a)(1)(B), (a)(2)**

This Court should enter judgments of acquittal on Counts Three and Four as to Defendant Scrushy because the Government has failed to adduce any evidence to support an inference that a *quid pro quo* existed with respect to the $500,000 in campaign contributions (contributions to the Alabama Education Foundation related to the lottery referendum) alleged in those counts and Defendant Scrushy's appointment to the state CON Board. That is, the Government has failed to present any evidence that suggests that Defendant Scrushy made the contributions in issue ***in exchange for*** his eventual appointment to the CON Board. In the absence of evidence of such a *quid pro quo*, particularly when the "currency" of the alleged bribe is a political contribution, 18 U.S.C. § 666 mandates an acquittal.

Section 666 provides, in relevant part:

**(a)** Whoever … —

**(1)** being an agent of … a State [receiving in any one year period, benefits in excess of $10,000 under a Federal program] –

**(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

**(2)** corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of

3

> value of $5,000 or more. . . (commits a crime against the
> United States)

Defendant Scrushy is charged in Count Three with aiding and abetting Defendant Siegelman's alleged violation of § 666(a)(1)(B), and in Count Four with violating § 666(a)(2). In short, Defendant Scrushy is alleged to have bribed Defendant Siegelman with the "corrupt" intent "to influence and reward" Siegelman in connection with his appointment to the CON board. Indictment at ¶ 51.

Although the law is not entirely clear on the issue, the Eleventh Circuit has indicated that in order to establish a § 666 violation, the Government must prove a *quid pro quo* between ***any*** allegedly corrupt payment and an official act performed in exchange. *See United States v. Paradies,* 98 F.3d 1266, 1289 (11th Cir. 1996) (in holding that there was no plain error by virtue of the trial court's failure to give a *quid pro quo* instruction as to § 666, Eleventh Circuit cites approvingly to *United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir.1990), *cert. denied*, 510 U.S. 1013 (1993) ("[t]he essential element of a § 666 violation is a 'quid pro quo.'").

Moreover, the Eleventh Circuit has rightly characterized § 666 as being a "bribery statute," *United States v. Castro*, 89 F.3d 1443, 1454 (11th Cir. 1996), and the United States Supreme Court has held, definitively, that "for bribery [under 18 U.S.C. § 201], there must be a *quid pro quo* – a specific intent to give or receive something of value ***in exchange*** for an official act." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999) (emphasis in original). And because §§ 201 and 666 are strikingly similar -- to establish § 201 bribery, the government must prove a corrupt payment of "anything of value" with the intent "to influence any official act", much as § 666 requires the government to prove a corrupt payment of "anything of value" with the intent "to

influence" a public official in connection with the business of a governmental entity -- the *Sun-Diamond quid pro quo* requirement no doubt also applies in the § 666 context.[1]

At least in this case, however, any debate as to whether a *quid pro quo* must be established with respect to <u>all</u> payments that form the basis for a § 666 charge is merely academic because the Government, in fact, has charged, and thus must prove, an express *quid pro quo* – contributions in exchange for CON Board membership – in connection with the alleged § 666 violations. Indictment at ¶¶ 49, 51.

Moreover, and more significant here, even if an express *quid pro quo* requirement does <u>not</u> apply, under § 666, to <u>every</u> corrupt payment falling within that statute's ambit, and notwithstanding the express allegation of a *quid pro quo* in the Indictment, such a requirement nevertheless applies unquestionably when the alleged corrupt payment, as here, consists of political contributions. Although the United States Supreme Court has yet to rule on this precise issue in the § 666 context – and there appears to be no circuit

---

[1] There is some debate among the circuits as to whether § 666 only prohibits bribery, or, instead, also prohibits illegal gratuities. As described by the Supreme Court in *Sun-Diamond*, the distinction between a bribe and an illegal gratuity is that a bribe requires an express *quid quid pro*, whereas a gratuity is "merely a reward for some future act that the public official will take (and may have already determined to take), or for a past act that he has already taken." *Sun-Diamond*, 526 U.S. at 405. In other words, a bribe is made ***to induce*** action, whereas "an illegal gratuity … is a payment made to an official concerning a specific official act (or omission) that the payor ***expected to occur in any event***." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) (emphasis added). The Second Circuit, for example, is one circuit that has held that § 666 covers both bribes and illegal gratuities, *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995). The distinction between illegal bribes and illegal gratuities has largely been mooted, however, in light of *Sun-Diamond*, which held that in order for the Government to prove either, it "must prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Sun-Diamond*, 526 U.S. at 414. However, even if the Government contends that § 666 covers illegal gratuities and that it has adduced proof on such a § 666 theory, a judgment of acquittal nevertheless must enter. This is so because, as will be discussed thoroughly below, the payment at issue was in the form of a political contribution, as to which the Government was required, but failed, to prove an express *quid pro quo*.

court law on point – the Court has ruled that under the Hobbs Act that a *quid pro quo* must be proved when the alleged corrupt payment is made in the form of a political contribution. *McCormick v. United States*, 500 U.S. 257, 273 (1991) (a political contribution can be the basis for a Hobbs Act extortion conviction "only if the payments are made ***in return for an explicit promise*** or undertaking by the official to perform or not to perform an official act.") (emphasis added). The Court's rationale for its holding in *McCormick* was straightforward: "To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation."

The *McCormick* rationale applies with equal force here, and, for that matter, to any federal criminal provision as to which political contributions are alleged to be part of the *actus reas*. Merely cultivating business or diffuse political interests by means of political contributions is not, and in this Democracy, never should be a crime. It is only when such contributions are made in direct exchange for an official act that they can form the basis for a crime.

Here, the government has failed to present any evidence that would support an inference by any rational juror that an express agreement, a *quid pro quo*, existed between Defendants Scrushy and Siegelman as to the contributions and the appointment to the CON Board. The evidence presented shows that Defendant Scrushy met with then-Governor Siegelman on June 29, 1999, a meeting that Loree Skelton characterized in her testimony as an opportunity to "get acquainted." (Tab 6, R-May 10, 2006 at 259). Ms. Skelton knew that because HealthSouth had supported Fob James for Governor

6

access to the Seigelman administration would be "nonexistent" without some effort to build a relationship. (Tab 2, R-May 10, 2006 at 256). The importance of building the relationship was clarified by Alva Lambert who explained that CON terms are inconsequential because the members serve at the pleasure of the Governor and when there is a change of administration all terms functionally expire upon the inauguration of the new governor. (Tab 1, R-May 1, 2006 at 42-44). Ms. Skelton contacted Eric Hanson who had known Governor Seigelman for a long time and the get acquainted meeting to establish a positive rapport was set. (Tab 6, R-May 10, 2006 at 257, Tab 13, R-May 11, 2006 at 126). As Ms. Skelton also testified, there were no plans to make any kind of Education Foundation or campaign contribution during that visit because it was the first meeting between Defendant Scrushy and Defendant Siegelman.[2] (Tab 13, R-May 11,

_____

[2] Nick Bailey testified that he had previously told investigators and had testified to the grand jury that this meeting occurred on July 14, 1999, and that after the meeting he saw a check for $250,000 which he thought had been signed by Defendant Scrushy. He admitted that he had informed the FBI that he knew prior to the meeting that Scrushy was coming with a check. (Tab 47, R-May 5, 2006 at 140-141). While on direct he indicated that there may have been two meetings, he conceded on cross that there was only one meeting where Loree Skelton, Eric Hanson, Richard Scrushy and the Governor were present. (Tab 49, R-May 5, 2006 at 123). Yet, the undisputed evidence shows that the meeting could not have happened on that date, and more particularly that the check could not have been present on that date. (Tab 37, R-May 2, 2006 at 185-187 (on direct), Tab 42, R-May 3, 2006 at 225-230 (on cross) Tab 45, R-May 4, 2006 at 288). Bailey would only concede regarding the IHS check that, "I will agree that it possibly was not there on the 14th." (Tab 42, R-May 3, 2006 at 230). Bailey was equally unyielding on the point that the check was not reported as a campaign contribution due to Richard Scrushy's desire that his wife not find out about his support for the lottery. When asked whether such a conclusion made sense in light of the fact that the check does not belong to Mr. Scrushy, Bailey's response was "It has not been determined and shown to me that it was not Mr. Scrushy's check. (Tab 45, R-May 4, 2006 at 285, see also, Tab 43, R-May 3, 2006 at 9). When the Court inquired whether there were any "written document, electronic documents or confirmatory memoranda," other than the checks and the appointment letters to support his testimony Bailey conceded that there were none. (Tab 45, R-May 4, 2006 at 281-282, see also Tab 44, R-May 4, 2006 at 276-277). He conceded that he was not an eyewitness to any meeting between Richard Scrushy and the

2006 at 126). Ultimately, the evidence shows, Defendant Scrushy arranged for two $250,000 donations, one from HealthSouth and one from IHS, to be made to Alabama Education Foundation. The central question is whether the government has established that these contributions were part of an illegal scheme or a bribery of Governor Seigelman. Viewed even in the light most favorable to the government the evidence wholly fails to establish any link to illegality.

No doubt, the jury could infer that around the time of the contributions that (a) Defendant Scrushy made it known that HealthSouth was interested in a seat on the CON

---

Governor. (Tab 44, R-May 4, 2006 at 274-275). He conceded that the Governor never told him that the payment was a bribe for the CON seat. (Tab 47, R-May 5, 2006 at 144). He would not state that the second check from HealthSouth was part of an effort to bribe the Governor. (Tab 49, R-May 5, 2006 at 128-132). He agreed that he did not know that Richard Scrushy did not want the CON seat or that Thom Carmen was the applicant for HealthSouth (see GX 3, Seigelman's 220). He further was unaware of the documents from the Governor's office that demonstrate these facts. (Tab 46, R-May 5, 2006 at 180). Bailey indicated that his memory had improved over time and that it was better during his testimony in 2006 than it was when he spoke to the FBI in June of 2003. (Tab 49, R-May 5, 2006 at 127). When the accounts of the meeting testified to by Loree Skelton (Tab 6, R-May 10, 2006 at 258-262), Jabo Waggoner (Tab 18, R-May 10, 2006 at 150-153) and Bailey (Tab 49, R-May 5, 2005 at 123-125) are compared, there can be no doubt that each witness is discussing the same meeting. The meeting date was June 29th because the HealthSouth flight records indicate that this is the only date it could have been (Scrushy Exhibits 100-102) along with the added confirmation that the meeting was logged into Senator Waggoner's calendar. (Scrushy Exhibit 113, see also, Tab 19, R-May 10, 2006 at 171-181). This combined with the fact that the IHS check was not written until July 19th and sent sometime after that date (Pickett at Tab 34, R-May 10, 2006 at 223, see also Leif Murphy's testimony Tab 29, R-May 9, 2006 at 304-308) confirms that the check could not have been in Montgomery during the first meeting whether it was on June 29 or July 14, 1999. Bailey testified on direct examination by Mr. Feaga that he was possibly wrong about the check being present and that he had made that decision by "reevaluating his memory and by thinking about it and by looking at the documents." (Tab 37, R-May 2, 2006 at 188). For these reasons, Bailey's testimony, at least on the point regarding the delivery of the check and the possibility of any "agreement" at that point, is "so contrary to the teachings of basic human experience that no reasonable person would believe it beyond a reasonable doubt[,]" *Kelley*, 412 F.3d at 1247.

Board.[3] and (b) that Defendant Siegelman was aware of Scrushy's desire to obtain the CON Board position.   This evidence must be taken in the context of the period in which it occurred.  Richard Scrushy supported Fob James.  (Tab 6, R-May 10, 2006 at 254-255). This is, of course, logical in that both Scrushy and Thom Carmen served on the CON Board under Governor James.  (Tab 4, R-May 2, 2006 at 86-87).  Governor Seigelman had attempted to reach out for Scrushy with regard to campaign contributions and did not get a return call.  (Tab 35, R-May 8, 2006 at 22).  Scrushy was targeted for contributions to include contributions for the Education Foundation.  (Id., see also Bill Blount's testimony which is not transcribed and his memo (Scrushy Exhibit 9) regarding targeting Scrushy for the Education Foundation).  Additionally, we know from Raymond Bell that Richard Scrushy was on the list for a CON seat during the transition period or shortly thereafter based upon a review of Seigelman Exhibit 220 and Bell's testimony.  (Tab 22, R-May 8, 2006 at 328-331).  Bailey testified that the Governor had a conversation with Eric Hanson in which the Governor told Hanson that since Scrushy had contributed $350,000 to the Fob James Campaign ". . . to make it right with the Seigelman campaign he (Scrushy) needed to do at least $500,000."  (Tab 40, R-May 2, 2006 at 162-166). There was no discussion of the CON seat.  There is no indication in the record whether this conversation predates the "get acquainted" meeting at the Governor's office.  Bailey

---

[3] We maintain that Bailey's hearsay recounting of Eric Hanson's characterization of alleged communications from Defendant Scrushy to the effect that he wanted a seat on the CON Board was improperly admitted under Fed. R. Evid. 801(d)(2)(e), and thus, should be excluded from the jury's consideration.  We incorporate our prior motions to exclude such evidence and point out to the Court that the government **never linked up** Eric Hanson to any alleged conspiracy.  Hanson's comment according to Bailey that "He told me he would see that Mr. Scrushy made the contributions and for us not to let him down" (Tab 48, R-May 5, 2006 at 171) is simply not the language of agreement and not the language of a coconspirator facilitating a bribe.

agreed with Mr. Feaga's parameters that it was between inauguration and the appointments to the CON Board. (Tab 40, R-May 2, 2006 at 162-163).

Critical testimony regarding the alleged bribery was provided only by Bailey.[4] He testified that upon seeing the check in the Governor's hand, Governor Seigelman and Bailey had the following exchange:

> **Governor: "He's half-way there." (referring to the $500,000 commitment).**
>
> **Bailey:"What in the world is he going to want for that?"**
>
> **Governor: "The CON Board."**
>
> **Bailey: "I wouldn't think there would be a problem with it."**
>
> **Governor: "I would not think so."**

(Tab 39, R-May 2, 2006 at 175-176).

Bailey admitted that he was not an eyewitness to any meeting between Richard Scrushy and Governor Seigelman. (Tab 44, R-May 4, 2006 at 274). Additionally, the mere fact that there was a contribution is not telling under these circumstances because Bailey readily admitted that every member of the CON Board had made such a contribution. (Tab 41, R-May 3, 2006 at 246). Additionally, the size of the contribution tells little of the relationship and legality of the payments inasmuch as Bailey admitted that Margie Sellers was supported for appointment to the CON Board by the Nursing Home Association which contributed a million dollars or more to Governor Seigelman. (Id.)(Bailey testified "It could have been more than that."). Bailey further testified that the chairman's position was not available because Governor Seigelman had already

---

[4] See footnote 2 above for more detail related to these events.

committed to Margie Sellers that she would be chairperson. (Tab 41, R-May 3, 2006 at 244-245).

One aspect of the government's case is built upon the fact that the IHS check was a "disguised payment". (Indictment Count 5 at ¶ 55(a)) The evidence has not bourn this theory out. Bill McGahan testified that he received a call from Mike Martin which was followed shortly thereafter with a call from Richard Scrushy and Mike Martin. (Tab 23, R-May9, 2006 at 145). Mr. Scrushy stated that:

> *"He wanted UBS to make a contribution to a cause in the state of Alabama, that it was a good cause, that other companies in the state were supporting it, that he (Scrushy) was supporting it and he wanted UBS to step up and support it too."*

(Tab 23, R-May 9, 2006 at 145-146). While McGahan stated that Martin called and put pressure on him to make the contribution, he also received calls from Eric Hanson. (Tab 24, R- May 9, 2006 at 148-149). McGahan characterized Hanson as polite and testified that Hanson brought up another client, IHS, as a source of the contribution. McGahan testified that **he told Hanson** that if IHS would make the contribution UBS would work with a sizable outstanding debt owed to UBS by IHS which was unrelated to HealthSouth. (Tab 25, R-May 9, 2006 at 187-189). Hanson returned the call and told McGahan that Dr. Elkins at IHS had agreed to make the contribution. (Tab 25, R-May 9, 2006 at 189-190). In McGahan's initial statement to the agents he got the entire transaction wrong, including the fact that he totally excluded Martin from any involvement. (Tab 28, R-May 9, 2006 at 248-249). He testified further that he did not

11

think the transaction was illegal and does not believe that he did anything wrong.  (Tab 27, R-May 9, 2006 at 240).

Mike Martin testified that he pushed McGahan who was the investment banker for HealthSouth to get the contribution.  (Tab 52, R-May 10, 2006 at 127-128).  He testified that the check was provided to the Education Foundation by way of a "circuitous route" and that he did not know if it was illegal but it looked bad, smelled bad and he did not like it.  (Tab 52, R-May 10, 2006 at 128-129).  He admitted that he did not know of any quid pro quo for the check and that he only knew that HealthSouth was trying to get in the Governor's good graces.  (Tab 54, R-May 10, 2006 at 6-7).  Martin testified that he was told that Mr. Scrushy wanted to have the check in hand so that he could deliver it during a meeting he was to have with the Governor.  (Tab 53, R-May 10, 2006 at 29).

Taylor Pickett from IHS testified to the other side of the transaction.  He related that he spoke to McGahan about a donation to a not for profit corporation.  (Tab 31, R-May 10, 2006 at 193).  Pickett met with his boss and CEO of the company, Dr. Elkins, who provided him a two-fold response.  First, he left the decision up to Pickett and second, he asked that Pickett run the not for profit corporation through legal counsel to be sure that it was valid.  (Tab 31, R-May 10, 2006 at 194-195).  After the corporation checked out he called McGahan back and said that they would make the contribution.  He stated that they put no stipulations on the transaction, that they agreed to pay the contribution and UBS agreed to reduce their bill.  (Tab 31, May 10, 2006 at 195-198)

Regarding Hanson and the contribution, when Bailey was asked to relate exactly what Hanson had said to him about the contribution and the CON Board his response was

that "he would see that Mr. Scrushy made the contributions and for us not to let him down." (Tab 48, R-May 5, 2006 at 171).

Even considering Bailey's testimony, there is no evidence in the record that even comes close to supporting an inference of the existence of any sort of express agreement as between Defendants Scrushy and Siegelman with respect to the effect of the contributions. Taking the above evidence on its face, and drawing all inferences in favor of the Government, as is required, no reasonable juror could conclude that Defendant Scrushy made the political contributions "***in return*** for an ***explicit promise***." *McCormick*, 500 U.S. at 273. The mere fact that Defendant Scrushy made the contributions accompanied by a desire for the CON Board appointment, which was made known to Defendant Siegelman, does not equate to an actionable *quid pro quo*.

The Government's § 666 case against Defendant Scrushy, therefore, is fundamentally flawed in light of the total absence of any evidence suggesting that Mr. Scrushy made the political contributions that lie at the core of § 666 allegations – and, indeed, form the crux of the entire case against him – as a *quid pro quo* for his appointment to the CON Board.

### Counts 6 – 9
### "Honest Services" Mail Fraud, 18 U.S.C. §§ 1341, 1346

For reasons similar to those set forth above, judgments of acquittal should also be entered as to each of the substantive "honest services" mail fraud counts alleged against Defendant Scrushy in Counts Six through Nine of the Indictment under 18 U.S.C. § § 1341, 1346. This result necessarily arises from the fact that the government has alleged as the basis for the "honest services" fraud the same failed *quid pro quo* theory – political

contributions in exchange for CON Board membership – that lies at the core of the § 666 charges.

In order to convict a defendant for mail fraud under § 1341, "the Government must prove that the defendants (1) intentionally participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme or artifice." *United States v. Lopez-Lukis*, 102 F.3d 1164, 1168 (11th Cir. 1997). Section 1346 merely adds gloss to § 1341 insofar as it defines a particular form of a "scheme or artifice to defraud" within the meaning of that provision: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." In turn, the Eleventh Circuit has described the deprivation of "honest services" as follows:

> The crux of this [honest services] theory is that when a political official uses his office for personal gain, he deprives his constituents of their right to have him perform his official duties in their best interest. Elected officials generally owe a fiduciary duty to the electorate. When a government officer decides how to proceed in an official endeavor-as when a legislator decides how to vote on an issue-his constituents have a right to have their best interests form the basis of that decision. If the official instead secretly makes his decision based on his own personal interests-*as when an official accepts a bribe* or personally benefits from an undisclosed conflict of interest-the official has defrauded the public of his honest services.

*Id.* at 1169 (internal citation omitted; emphasis added).

Here, the Government's theory of the case is that Defendant Scrushy engaged in a scheme to defraud by bribing Defendant Siegelman, thereby "depriv[ing] the State of Alabama of its right to the[ir] honest and faithful services … in their capacities as Governor of the State of Alabama and a member of the CON Board, respectively… by

means of hidden payments and financial relationship [i.e. the $500,000 in political contributions]." Indictment at ¶¶ 57, 58. Thus, as was true with respect to the § 666 counts, since the alleged scheme to defraud was implemented by means of two alleged bribes in the form of $250,000 political contributions made by Defendant Scrushy, the rationale of *McCormick* applies with equal force to the mail fraud counts; an express *quid pro quo* – which, in any event, the government has pled here – must be proven to protect otherwise innocent political activity. As the First Circuit ruled in an analogous honest services case where a lobbyist had showered gifts upon a state legislator:

> [W]here the difference between lawful and unlawful turns primarily on intent, and the lawful conduct is itself most unattractive, we think the jury needs to be told specifically that the defendant has not violated the bribery component of the Travel Act (*or committed honest services fraud*) *if his intent was limited to the cultivation of business or political friendship. Only if instead or in addition, there is an intent to cause the recipient to alter her official acts may the jury find a theft of honest services* or the bribery predicate of the Travel Act.

*United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996) (emphasis added); *see also United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999) ("[T]he courts have made clear that criminal inducement of a legislator to take particular action cannot be inferred from the legislator's acceptance of campaign contributions from interests urging the action."); *cf. United States v. Triumph Capital Group, Inc.*, 260 F.Supp.2d 444, 461 (D. Conn. 2002) (in denying motion to dismiss, court rules that honest services mail fraud counts involving campaign contributions are sufficiently pled, in part, because they "contain the necessary allegations of specific intent and also allege a *quid pro quo*.").

The facts as developed in this record clearly demonstrate that there is no basis for the charges. In addition to all of the evidence submitted regarding the bribery counts

above, the Court should also consider the following testimony: Alva Lambert testified that in all of his service Richard Scrushy was a good CON board member, that Scrushy was never reprimanded and that there was never an ethics complaint against him. (Tab 3, R-May 2, 2006 at 81). Mr. Lambert further testified that with regard to the two projects identified in the indictment, Richard Scrushy was not on the board at the time they were considered and Thom Carmen properly recused himself from consideration of those items. (Tab 5, R-May 2, 2006 at 97-98).

There has been no evidence linking Richard Scrushy to those mentioned projects in any way. In fact, the only evidence presented is to the contrary, in that Loree Skelton agreed that Richard Scrushy was long gone from the CON board by the time those projects were considered. (Tab 14, R-May 11, 2006 at 155). She recalled no conversation with Richard Scrushy about the projects, stating that any conversation about the projects would have been with Thom Carmen who was the board member at the time the projects were presented to the CON Board. (Tab 14, R-May 11, 2006 at 156-157).

The government alleges in the Indictment ¶ 59(e) and in the conspiracy count ¶ 55(e), that "Richard Scrushy and others would offer things of value to another CON Board member to attempt to affect the interests of HealthSouth and its competitors." This information relates to Tim Adams, a witness who the government did not call and again, the evidence in the record is contrary to the allegation. The only witness who could speak to these allegations was Loree Skelton and she countered every attempt by the government to show that Richard Scrushy was orchestrating anything with regard to Tim Adams.

With regard to the helicopter rides, it was established that Tim Adams only rode on the helicopter while Mr. Scrushy was on the board.  (Tab 11, R-May 11, 2006 at 256). Mr. Scrushy resigned in January of 2001 and the first item to be considered involving HealthSouth was in July of 2002, with the second and only other matter coming up in December of 2002.  (Id.).  For the entire period after Mr. Scrushy's resignation Ms. Skelton and Mr. Carmen rode to Montgomery to attend the meetings in a car without Mr. Adams.  (Tab 11, R-May 11, 2006 at 257).

With regard to a potential job with HealthSouth, Ms. Skelton testified that she initially ***did not try*** to get Adams a job.  (Tab 8, R-May 10, 2006 at 274).  Adams asked Richard Scrushy and Peck Fox, attorney for HealthSouth, about possible employment and Mr. Scrushy told Ms. Skelton to send Adams to Dr. Swaid, Medical Director at the HealthSouth Medical Center, who offered Adams a scrub nurse job in Dr. Swaid's practice, which Adams declined.  (Tab 8, R-May 10, 2006 at 275-278).  Ms. Skelton testified that Mr. Scrushy told her to relate to Adams that "we just weren't going to be able to find a position for him at this time, there wasn't anything available."  (Tab 9, R-May 10, 2006 at 303).  She further testified that Mr. Scrushy told her to "basically pacify him and keep him happy."  (Id.).

With regard to the payment of the fees related to the mobile PET scanner application, Ms. Skelton testified that she had agreed to pay Adams between $8,000 to $12,000 for his efforts.  (Tab 10, R-May 10, 2006 at 295).  When the vote was coming up on the rehabilitation hospital, Adams indicated that he did not think he would make the board meeting because he would miss several days of work.  (Tab 10, R-May 10, 2006 at 292-293).  Adams reminded Ms. Skelton that there was a balance outstanding on their

17

agreement regarding the CON application for work already done and they negotiated the balance of the fee at $3,000 and Adams did attend the meeting and voted in favor of the unopposed 38 bed rehabilitation project. (Tab 10, R-May 10, 2006 at 295-296). She admitted that she did not advise Mr. Adams on the propriety of the vote. (Tab 10, R-May 10, 2006 at 297-298). When asked if she had let any of the officials associated with the CON board know about Tim Adams financial relationship with HealthSouth, she testified that she let SHPDA Executive Director Alva Lambert know and that she told Lambert to put him on notice of the relationship between HealthSouth and Adams. (Tab 12, R-May 11, 2006 at 49-51). More germane to the charges in this case, Ms. Skelton testified that she could not remember a specific conversation where she related to Mr. Scrushy that she planned to give Tim Adams a contract to prepare the mobile PET scanner application. (Tab 15, R-May 11, 2006 at 165-166). She testified that she talked about the PET scanner application with Thom Carmen, not Richard Scrushy, and she did not recall whether she had that conversation with Mr. Scrushy or not. (Tab 15, R-May 11, 2006 at 167-168). Ms. Skelton agreed that by the time the rehabilitation hospital and the mobile PET scanner came up for consideration Richard Scrushy was not in the loop as to what was happening at the CON board. (Tab 16, R-May 11, 2006 at 173-174).

The government further alleges that Mr. Scrushy orchestrated Richard Scrushy's replacement by Thom Carmen on the board. There is simply no testimony to support this allegation. Alva Lambert testified that Mr. Carmen replaced Mr. Scrushy in both the James administration and under Governor Seigelman. He stated that Mr. Carmen was a competent selection for the board and that he acted appropriately during his terms on the board. (See Tabs 2-5).

Moreover, Counts Six through Nine must be dismissed because, even if the Court finds that the government has shown that Defendants Siegelman and Scrushy devised a scheme or artifice to defraud the State of Alabama of their honest services, the Court cannot find that the government has presented any evidence that the mailings charged in Counts Six through Nine were "for the purpose" of executing that scheme.

It is axiomatic that in a prosecution for mail fraud, while the government need not prove a defendant intended to use the mails, it must prove that a mailing was for the purpose of executing the alleged scheme to defraud.  *See United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648 (1974); *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151 (1944); *United States v. Toney,* 605 F.2d 200, 206 (5th Cir. 1979).  Mailings that occur after the scheme has come to fruition[5] or that are only collateral to the alleged scheme do not violate the mail fraud statute.  *Maze*, 414 U.S. at 400, 94 S.Ct. at 648; *United States v. Keenan,* 657 F.2d 41, 42-43 (4th Cir. 1981).  Only use of the mails that plays an "'integral' rather than incidental or tangential role in the fraudulent scheme" constitutes a violation of the mail fraud statute.  *United States v. Bosby,* 675 F.2d 1174, 1183 (11th Cir. 1982).

In Counts Six and Seven, the indictment charges that letters appointing and reappointing Thomas Carmen – a HealthSouth employee – to the CON Board were for the purpose of executing the alleged scheme to defraud.  Yet the government has not presented any evidence that Carmen was connected to the alleged scheme.  There was no evidence that Defendants Siegelman and Scrushy discussed Carmen's appointment or that

---

[5] Use of the mails to lull the victims or delay discovery of the scheme is an exception to this rule, but not one relevant to this case.  *See, e.g., United States v. Sampson,* 371 U.S. 75, 80, 83 S.Ct. 173, 136 (1962); *Toney,* 605 F.2d at 206.

Carmen acted dishonestly (or even dishonorably) at any time during his tenure on the Board. Therefore, any mailings appointing Carmen to the CON Board do not serve even an "incidental or tangential role" in the government's alleged scheme to defraud. *Bosby*, 675 F.2d at 1183. As such, they must be dismissed.

In Counts Eight and Nine, the indictment charges that two mailings – on August 2, 2002, and January 2, 2003 respectively – in which the CON Board notified HealthSouth that one of its projects had been approved were "for the purpose" of executing the alleged scheme. The government, however, has not proven any connection between these approvals and the alleged scheme. Again, assuming (just for argument) that the government has submitted sufficient evidence that Defendants Siegelman and Scrushy had devised an illegal scheme to place Defendant Scrushy on the CON Board, it has not submitted any evidence that the scheme involved Thom Carmen or that the alleged scheme continued past Defendant Scrushy's tenure on the Board. Defendant Scrushy resigned from the CON Board on January 17, 2001. Hence, the mailings charged in Counts Eight and Nine occurred long after the fruition of any alleged scheme. As such, they must be dismissed.

For the same reasons set forth above with respect to the § 666 counts, no reasonable juror could conclude that the alleged *quid pro quo* – contributions for board position – ever existed. The evidence does not support the conclusion that there was any scheme to defraud. It follows, therefore, that this Court should enter judgments of acquittal as to the substantive mail fraud counts.

**Count 5**
**Conspiracy to Commit "Honest Services" Mail Fraud, 18 U.S.C. § 371**

Finally, Count Five of the Indictment alleges that Defendants Scrushy and Siegelman engaged in a conspiracy to commit the honest services mail fraud alleged as substantive violations in Counts Six through Nine, all in violation of 18 U.S.C. § 371.[6] Section 371, in its essence, prohibits illicit agreements to commit Federal crimes; it is the agreement, accompanied by the requisite intent and an overt act, that constitutes the crime.

> In order to obtain a conviction for conspiracy under 18 U.S.C. § 371, the Government must prove (1) ***that an agreement existed between two or more persons to commit a crime***; (2) that the defendant knowingly and voluntarily joined or participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement. The knowledge requirement is satisfied when the Government shows a defendant's awareness of the essential nature of the conspiracy.

*United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006) (citation omitted; emphasis added). Here, the Government has wholly failed to demonstrate that Defendant Scrushy entered into an agreement with Defendant Siegelman (or anyone else for that matter) to commit honest services mail fraud, much less that he knowingly and voluntarily joined any such conspiracy. As a consequence, this Court should enter a judgment of acquittal as to Defendant Scrushy on Count Five.

---

[6] 18 U.S.C. § 371 provides in relevant part: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

The analysis of Count Five collapses into the same one used to determine the sufficiency of the government's evidence as to the § 666 counts, and, even more particularly, as to the substantive mail fraud counts that are the alleged objects of the conspiracy. This is so because the determination of the existence of a conspiracy, as is true with respect to liability under §§ 666 and 1341, rides on whether the campaign contributions that are at the center of this entire case can be characterized as illicit bribes. Of course, as we have already explored exhaustively, the political contributions can only be illicit if they were part of an illegal *quid pro quo*. And a *quid pro quo*, by definition requires an agreement: "payments … made **in return** for an **explicit promise** or undertaking…." *McCormick*, 500 U.S. at 273 (emphasis added). So, if there was no *quid pro quo* -- and there was not -- then not only must judgments of acquittal be entered as to Counts Six through Nine (not to mention Counts Three and Four), but also necessarily as to the Conspiracy count. In other words, without a *quid pro quo* there could not have been a conspiratorial agreement.

Again, the mere fact that IHS contributed to the Education Foundation at the behest of Richard Scrushy and that the contribution occurred during a time when Mr. Scrushy stated a desire for an appointment for HealthSouth to the CON Board, all of which may have been made known to Defendant Siegelman, does not equate to a *quid pro quo*. The HealthSouth check really does not matter in this equation because it was paid after the appointment. But even that payment, or the commitment to make the payment does not change the analysis. Logic, at least under the law as it stands today tells us this is so. Otherwise, political contributions made by individuals hoping for favorable executive or legislative treatment or for political appointments, which desires

are made known to the politicians to whom they are given, would be criminalized. Everyone from Cabinet appointees to Ambassadors, and even judges who must stand for election, would be in danger of being prosecuted for honest services fraud and conspiracy to commit it (and, where state politicians are the recipients of contributions, for § 666 violations) would this were the law. *McCormick* teaches us that such is not the case.

A careful review of the charged overt acts reveals the government has completely failed in its proof. Overt act 8(a) and 8(b)[7] relate to Thom Carmen's appointment and reappointment letters. There is no evidence that these acts had anything to do with any agreement between Richard Scrushy and Governor Seigelman. Overt act 8(c) has to do with the letter approving the 38 bed rehabilitation hospital which was taken up by the board 19 months after Richard Scrushy resigned. Again, there has been no evidence even linking Richard Scrushy to this project in any way. In fact, as outlined above, Loree Skelton testified that Richard Scrushy was out of the loop and that she took these matters up with Thom Carmen, not Richard Scrushy. The same can be said for overt act 8(e) which is the CON letter relating to the mobile PET scanner. This project was authorized even later than the 38 bed rehabilitation hospital, has not been linked to Richard Scrushy in any way and involved a piece of equipment that was deregulated only months after the vote. Neither of these projects were opposed by anyone. Overt acts 8(d) and 8(f) allege undisclosed payments going to Tim Adams and his subsequent votes or presence at votes relating to the two HealthSouth projects discussed above. First, Loree Skelton testified that she revealed the financial relationship to Executive Director Alva Lambert to put him

---

[7] The overt acts in Count Five are inexplicably numbered 8(a) through 8 (f).

on notice.  Next, there is no evidence that the **_Defendant Richard Scrushy_** had anything to do with the money that was paid to Tim Adams.

There was no _quid pro quo_ in this case.  Defendant Scrushy never made an express request, and Defendant Siegelman never made "an explicit promise" that the Education Foundation contributions would necessarily equate to a CON Board appointment.  For this reason, Defendant Scrushy did not agree to engage in an honest services mail fraud scheme, nor did he violate the honest service mail fraud provisions, 18 U.S.C. § § 1341, 1346, § 666.  Count Five should likewise be dismissed.

## II. Counts Three and Four Should be Dismissed Based on Multiplicity, or, in the Alternative, the Government Should be Required to Elect on which of those Two Counts it Desires to Proceed.

Count Three of the Indictment charges both Defendant Scrushy and co-Defendant Siegelman with violations of 18 U.S.C. §§ 2 and 666(a)(1)(B), based essentially on an allegation that Defendant Siegelman "corruptly solicited, demanded, accepted, and agreed to accept $500,000 from defendant RICHARD M. SCRUSHY, intending to be influenced and rewarded in connection with the appointment of defendant RICHARD M. SCRUSHY to the CON Board."   Indictment at ¶ 49.   Similarly, Count Four of the Indictment charges both Defendant Scrushy and co-Defendant Siegelman with violations of 18 U. S. C. §§ 2 and 666(a)(2), based on the allegation that "defendant Scrushy corruptly gave, offered, and agreed to give $500,000 to defendant DON EUGENE SIEGELMAN, Governor of the State of Alabama, intending to influence and reward defendant DON EUGENE SIEGELMAN in connection with the appointment of defendant RICHARD SCRUSHY to the CON Board."   Indictment at ¶ 51.   The Indictment appears to allege in this count that Defendant Scrushy was the principal, and that Defendant Siegelman was the aider and abettor. _Id._

It is apparent from the face of the Indictment that Counts Three and Four relate to the same transaction: the alleged solicitation and payment of $500,000 by Defendant Scrushy to influence and reward Defendant Siegelman "in connection with the appointment of defendant RICHARD SCRUSHY to the CON Board." *Id.* at ¶¶ 49, 51.

Defendant Scrushy now renews his pretrial motion to dismiss these counts and respectfully submits that Counts Three and Four are multiplicitous in that they charge him with a single offense in more than one count and expose him to the possibility of double punishment for commission of a single act: the alleged payment of a bribe to co-Defendant Siegelman. Further, to prosecute Defendant Scrushy as both a principal for allegedly paying a bribe and an aider and abettor for allegedly being solicited to pay the very same bribe is fraught with the probability of prejudicing Defendant Scrushy in the eyes of the jury by charging him with multiple crimes for the same transaction, as well as confusing the jury by charging Defendant as both a principal and an aider and abettor in regard to the same transaction.

The Eleventh Circuit succinctly summarized the rule governing multiplicity in *United States v. Glanton*¸ 707 F.2d 1238 (11th Cir. 1983):

> "Multiplicity" is the charging of a single offense in more than one count. *Ward v. United States*, 694 F.2d 654, 660-61 (11th Cir. 1983); *United States v. Hearod*, 499 F.2d 1003 (5th Cir. 1974). "[T]he test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932).

*Glanton*, 707 F.2d at 1240. *See also United States v. Pierce*, 733 F.2d 1474, 1476 (11th Cir. 1984) (citing *United States v. Sue*, 586 F.2d 70, 72 (8th Cir. 1978)).

In *United States v. Eaves*, 877 F.2d 943 (11th Cir. 1989), the Eleventh Circuit concluded that two counts of an indictment were multiplicitous because they charged payments on two different days relating to the same bribery transaction as two separate violations of the Hobbs Act, 18 U.S.C. § 1951(a). In reaching this conclusion, the Court noted:

> The concept of multiplicity arises from charging a single offense in more than one count.... The Supreme Court's articulation of this concept in the seminal case of *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed 306 (1932), distinguished between those offenses which by their nature are continuous and those which are *uno actu*. " '[W]hen the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie.' " 284 U.S. at 302, 52 S.Ct. at 181 (quoting Wharton's Criminal Law, § 34).

*Eaves*, 877 F.2d at 947 (citation omitted).

There are two significant ways that the Government's decision to charge Defendant Scrushy in two separate counts for the same transaction works to prejudice Defendant. In *United States v. Hearod*, 499 F.2d 1003 (5th Cir. 1974), the former Fifth Circuit identified the first as: "The principal danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." 499 F.2d at 1005 (citing 1 C. Wright, Federal Practice and Procedure § 145, at 336 (1969)). The Court in *Hearod* goes on to identify the second source of prejudice:

> The second hazard is that the repeated assertion of the details of a singular course of conduct in multiple counts will prejudice the defendant and confuse the jury by suggesting that not one but several crimes have been committed. *United States v. Ketchum*, 320 F.2d (2d Cir.), *cert. denied*, 375 U.S. 905, 84 S.Ct. 194, 11 L.Ed.2d 145 (1963).

*Hearod*, 499 F.2d at 1005.  *See also Sue*, 586 F.2d at 71 ("There are two principal sources of prejudice. The source relied on by Sue is that 'the prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several crimes…. The theory is that the jury's deliberations as to all counts (not just the mutiplicious counts) may be tainted by the multiplicity." (Citations omitted))

Here the potential for both types of prejudice is patent.  The Government has taken a single transaction and charged it two different ways. As a consequence, Defendant is facing two sentences for the same alleged act, "*uno actu*" within the meaning of *Blockburger*, and the jury will be psychologically impacted by the suggestion that Defendant Scrushy committed not one, but two crimes.

More directly, the Government's method of attempting to charge the same act as two separate crimes, which depends on a novel use of the aiding and abetting statute to charge that Defendant Scrushy aided and abetted Defendant Siegelman's solicitation of the alleged bribe while Defendant Siegelman aided and abetted Defendant Scrushy in the payment of the same alleged bribe is destined—and perhaps designed—to sow confusion into the jury's deliberations as to what is obviously a single transaction.  A straight-forward reading of  the criminal provision involved, 18 U.S.C. § 666 indicates that one subsection of the statute, subsection (a)(1), is directed at the "agent … of a State … government"  who, under part (B) of that subsection "corruptly solicits … anything of value … from any person…"   A second subsection of the statute, subsection (a)(2), is directed at the other end of the alleged transaction:  a person who "corruptly gives … anything of value …to any person…"   A straightforward application of the criminal statute, with no effort to double-punish, prejudice the Defendant by alleging multiple

crimes, or to confuse the jury, would have been to charge Defendant Siegelman alone in Count Three and Defendant Scrushy alone in Count Four of the indictment.

The Government has not chosen to follow that straight-forward course, and has instead obtained an indictment that contains charges in Counts Three and Four that are multiplicitous. Based on the foregoing authorities, Defendant respectfully submits that if there is not an outright dismissal of the case, this Court should Order the Government to elect which Count it chooses to proceed on and dismiss the remaining Count.

## CONCLUSION

WHEREFORE, Defendant Richard M. Scrushy respectfully prays that this Court enter an order, pursuant to Fed. R. Crim. P. 29(a), granting his motion for judgment of acquittal as to Counts Three through Nine, and enter judgment accordingly. Using the standard recently set out in United States v. Bradley, 2006 WL 1061886 (S.D. Ga. 2006), there is only one conclusion when the Court views the evidence in the light most favorable to the government and that is that a rational jury would have to entertain a reasonable doubt as to Defendant Scrushy's guilt on all Counts.

This 8th day of May, 2006

Respectfully submitted,

/s/ Arthur W. Leach
Arthur W. Leach
Terry Lucas Butts
Fred D. Gray
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35203
Phone: 205-822-4224
Fax: 205-824-0321

James K. Jenkins
Bruce Maloy
Maloy & Jenkins
25th Floor
75 Fourteenth Street, NW
Atlanta, Georgia 30309
Phone:  404-875-2700
Fax:  404-875-7857

Frederick G. Helmsing (HELMF6416)
Helmsing, Leach, Herlong, Newman &
Rouse, P.C.
P.O. Box 2767
Mobile, AL 36652
Phone:  251-432-5521
Fax:  251-432-0633
e-mail: fgh@helmsinglaw.com

Attorneys for Richard M. Scrushy

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of June, 2006, I electronically filed the foregoing Motion for Judgment of Acquittal with the Clerk of the Court using the CM/ECF system which will send notification of such to counsel of record.

/s/Leslie V. Moore
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35243
Phone: (205) 822-4224
Fax:    (205) 824-0321
E-Mail:  les.moore@lvmlaw.com