United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 1

23          Q.    And what happens, say, if what

** NOT OFFICIAL RECORD ** NOT OFFICIAL REC49D **

Page 42

**Lambert**
**May 1, 2006**

LAMBER~1

1  happened in this instance, if Mr.
2  Siegelman is not reelected as governor of
3  the state of Alabama, what happens to Mr.
4  Carman's position on the board?
5     A.    Again, he, as well as every
6  Certificate of Need Review Board member,
7  serves at the pleasure of the governor.
8  So terms are inconsequential.
9     Q.    Let me back you up just a
10  little bit.  Was, and if you know, Mr.
11  Scrushy on the board prior to his
12  appointment by Governor Siegelman?
13     A.    Yes, he was.
14     Q.    What happened to his
15  appointment after Mr. James, Governor
16  James, lost the election?
17     A.    It would have been in the same
18  status as all the other Certificate of
19  Need Review Board members at the time the
20  moratorium was issued.
21     Q.    In other words, it would have
22  expired?
23     A.    For all practical purposes.

        ** NOT OFFICIAL RECORD ** NOT OFFICIAL REC50D **

1     Q.    Okay.  Is this one of these
2  answers where you tell me technically?

**Lambert**
**May 1, 2006**

3      A.    Technically, but not
4   functionally.

5      Q.    Okay.  But functionally would
6   it have expired?

7      A.    At the time of the
8   inauguration.

**Lambert**
**May 1, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 2

15    Q.    And, again, the same caveat.  Tell me what

16          exhibit you're looking at when you start

17          referring to it.

18    A.    Okay.  You're correct, sir.  I just did not

19          look deep enough in the stack.  I have a

20          Government Exhibit #18A.  And that is the

21          minutes of the Certificate of Need Review

22          Board meeting December 18, 2002, when the PET

23          scan application by HealthSouth was

14

1    considered.

2    Q.    And does it indicate what CON -- if a

3          HealthSouth CON Board member was present when

4          that application was considered?

5    A.    It has an indication of who's present at the

6          board meeting.  It does not have an

7          indication as to if Mr. Carman was present

8          during the specific consideration of that

9          project.  Now --

10   Q.    I need you to explain that.

11   A.    It is likely that Mr. Carman -- and if my

12         memory serves me correctly -- and I will

13         refer to other exhibits -- it is -- it is

14         highly likely and probable --

15              MR. BUTTS:  Judge, object to the word

16                   "likely" on this subject.

17              THE COURT:  I'm sorry.  I couldn't hear

18                   you.

19              MR. BUTTS:  Object to the word

20                   "likely."

21              THE COURT:  Tell us what you know or

22                   what you recall from your presence

23                   at the meeting, Mr. Lambert.

16

1     the room.

2   Q.   Now, explain to us what that means and why

3        someone would -- well, I don't need you to

4        say why.  Just tell us what a recusal -- what

5        purpose does it serve and what it means

6        physically happened with Mr. Carman's

7        presence at those two meetings?

8   A.   A recusal is where someone in a

9        decision-making position determines that they

10       have a personal conflict of interest; and at

11       that determination, prior to deliberation --

12       the recusal is prior to any deliberation

13       whatsoever of a particular matter to be

14       decided -- announce that they're recusing

15       themselves and they're withdrawing themselves

16       from participation in that particular matter

17       for consideration.  And as a practice and

18       custom, members of the Certificate of Need

19       Review Board have physically removed

20       themselves from the remainder of the board to

21       give every indication that their recusal is

22       full and complete.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 3

81

3    Q.    Did you find Richard Scrushy to be a good

4          board member?

5    A.    Yes.

6    Q.    Did he ever cause you any problems or cause

7          you any trouble as a board member?

8    A.    No, sir.

9    Q.    Are you aware of any ethics complaint or any

10         complaint ever made against Richard Scrushy?

11   A.    I'm not aware of any.

12   Q.    And did -- was he ever reprimanded by you or

13         anyone else, to your knowledge, while he was

14         a CON Board member?

15   A.    No, sir.

16   Q.    So overall, he was a good board member?

17   A.    He was.  He tended to be a little busy and

18         miss a few, but he was a good board member.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 4

2    Q.   Do you consider Richard Scrushy to be a

3         first-class world leader in the health care

4         field?

5    A.   Certainly an innovator and a pioneer as it

6         relates to rehabilitation services and health

7         care services in general, yes.

8    Q.   Would it appear reasonable to you that he

9         would have been appointed not only by

10        Governor James, but the other governors

11        mentioned that appointed him?

12   A.   It would seem reasonable.

13   Q.   Did you find him well qualified to serve?

14   A.   Yes, sir.

15   Q.   All right, sir.  Now, do you recall if

16        Richard Scrushy ever submitted a letter of

17        resignation from the CON Board under Governor

18        James?

19   A.   He did.

20   Q.   And did he do the same thing later when he

21        was serving under Governor Siegelman?

22   A.   He did.

23   Q.   Do you know, of your own knowledge, any of

86

1    the reasons why he would have resigned either

2    of those times?

3            MR. FRANKLIN:  Objection, Your Honor.

4                It asks him for the mental

5                operations of Mr. Scrushy.  He

6                can't testify to that.

7            THE COURT:  If he knows.  Overruled.

8                Testify about what you know

9                from your conversations with this

10               gentleman.

11           THE WITNESS:  Thank you, Your Honor.

12   A.   I have no personal knowledge as to why he may

13        have resigned, personal knowledge.

14   Q.   You made a comment, I believe, either when

15        Mr. Kilborn was questions or Mr. Franklin,

16        you said Mr. Scrushy was busy.

17   A.   He seemed to be busy, missed a few board

18        meetings.

19   Q.   All right, sir.  Now, when Richard -- on both

20        of the occasions under -- when -- under

21        Governor Hunt -- I'm sorry -- under Governor

22        James and under Governor Siegelman when

23        Mr. Scrushy resigned, do you know who was

87

1       appointed to his -- to that position?

2   A.  Yes, sir.  I previously testified that it was

3       Mr. Thom Carman.

4   Q.  And Mr. Carman was a representative of what

5       specialty?

6   A.  At rehabilitation services.  He was vice

7       president for HealthSouth.

8   Q.  Did you find him well qualified to serve?

9   A.  I did.

10   Q.  Did he ever cause you any problems on the CON

11       Board?

12   A.  No, sir.

13   Q.  Did you ever know of any misconduct by him or

14       Richard Scrushy?

15   A.  No, sir.

16   Q.  All right, sir.  Did -- did you find

17       Mr. Carman to be a good board member?

18   A.  Yes, sir.

19   Q.  All right, sir.  Now, you testified that

20       there are nine members of that board.

21   A.  Right.

22   Q.  And Mr. Scrushy or Mr. Carman or any member

23       only has one vote; is that correct?

88

1    A.    That's correct.

2    Q.    Now, do you know, when Richard Scrushy

3          served, if he ever voted for any of his

4          competitors' projects?

5    A.    My personal knowledge is -- is that

6          Mr. Scrushy recused himself on his projects

7          and any competitors' projects.

8    Q.    And by recusing himself -- I know that

9          Mr. Franklin asked you to explain that --

10         that word, but I want to ask you this.

11         When -- when a -- when someone recuses, a

12         judge in a case, for example, or anyone on

13         any board recuses -- that simply means -- and

14         tell me -- I don't want to put words in your

15         mouth; but tell me.  That just simply means

16         that, look, I'm stepping out of this case for

17         whatever reason and not participating in

18         these proceedings?

19   A.    That's exactly what recusal is.

20   Q.    And did Mr. Scrushy do that every time

21         something came up involving HealthSouth or

22         one of his competitors?

23   A.    I don't know of any case where he did not do

89

1          that.

2     Q.   All right, sir.  And did Mr. Carman do the

3          same?

4     A.   He did.

5     Q.   Now, when we say that Mr. Scrushy and

6          Mr. Carman both recused, that means, of

7          course, that they did not vote?

8     A.   That's right.

9     Q.   And I believe you said that they also -- that

10         Mr. Scrushy would leave the room?

11    A.   That was the custom and practice of board

12         members of the CON Board was to physically

13         remove themselves.

14    Q.   Yes, sir.  And it was the custom and

15         practice; but it was not required by law, was

16         it?

17    A.   That's correct.

18    Q.   And it was just one more safeguard that

19         Mr. Scrushy and Mr. Carman did?

20    A.   That's right.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 5

17    Q.    Correct.  Thank you, sir.  Now, as to the

18          specific -- again, the 38-bed rehab hospital

19          and the PET scan where -- at the CON Board

20          meetings where those were approved where

21          Mr. Scrushy was not on the board at the time

22          and where Mr. Carman, who was with

23          HealthSouth, had recused and left the room,

98

1   was there any objection at all by any

2   competitor in the health care field or anyone

3   else to either one of those projects?

4 A. My recollection is that there was no

5   opposition.

6 Q. Thank you, sir. No one -- I want to be clear

7   on this. So no one on the board objected and

8   no health care entity or anyone else appeared

9   in opposition to the approval of either the

10   rehab hospital or the PET scanner?

11 A. That's correct.

12 Q. And, in fact, now you don't even -- today you

13   don't even have to go before the CON Board to

14   have a PET scanner approved?

15 A. That is correct.

16 Q. It's been deregulated, so now it's just a

17   matter of course. Now, let me ask you one

18   other thing here, Mr. Lambert.

19 A. Yes, sir.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 6

| | | |
|---|---|---|
| 13 | Q. | All right.  Prior to Governor Siegelman's |
| 14 | | administration, do you know who HealthSouth |
| 15 | | supported for the governor -- |
| 16 | A. | Yes, sir. |
| 17 | Q. | -- of Alabama? |
| 18 | A. | Yes, sir. |
| 19 | Q. | And who was that? |
| 20 | A. | Governor Fob James. |
| 21 | Q. | And did Richard Scrushy support the same |
| 22 | | candidate as HealthSouth? |
| 23 | A. | As best as I understand it, yes, sir. |

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

Skelton
May 10, 2006

255

Q.    Was there ever a time that Richard Scrushy
      supported a candidate that HealthSouth did
      not support?

A.    Not to my knowledge, no, sir.

Q.    Who did Richard Scrushy and HealthSouth
      support during the 1998 gubernatorial
      campaign?

A.    Governor Fob James.

      MR. LEACH:  Objection.

      THE COURT:  Overruled.  Proceed.  I
            think she has answered it; but
            because of the weather, in case
            there's some difficulty hearing,
            overruled.

Q.    And who won the gubernatorial race in 1998?

A.    Governor Siegelman.

Q.    What position was HealthSouth in as a result
      of Governor Siegelman winning the race -- or
      the election?

A.    I'm not sure I understand your question.

Q.    Let me ask it this way.  How would you
      describe HealthSouth's position at that time
      with respect to access to the Governor's

256

```
1           Office?

2    A.     Probably nonexistent.

3    Q.     And why was that?

4    A.     Because we had openly supported his opponent.

5    Q.     Did you have conversations with Mr. Scrushy

6           and Mr. Hanson regarding HealthSouth's

7           position after Don Siegelman had won the

8           election?

9    A.     I did with Mr. Hanson.

10   Q.     What conversation did you have with

11          Mr. Hanson about HealthSouth's position after

12          Don Siegelman had won the governor's race?

13              MR. LEACH:  Objection.  Hearsay, Your

14                  Honor.  And there's a real

15                  question of inferences in this

16                  line of testimony.  This is

17                  hearsay.

18              MR. FRANKLIN:  Let me ask it this way.

19              THE COURT:  Okay.  See if we can move

20                  on without taking this up at a

21                  side-bar.  Let's see if you can

22                  ask it in another way.

23              MR. FRANKLIN:  Okay.
```

257

```
 1   Q.   Did -- what did you communicate to Eric
 2        Hanson, or did you communicate to Eric Hanson
 3        any concerns you had for HealthSouth's
 4        position with respect to access to the
 5        Governor's Office?
 6   A.   Yes, sir, I did.
 7   Q.   Okay.  And what did you say to Eric Hanson?
 8   A.   I told him that I was concerned that we would
 9        not have a voice in this administration.
10   Q.   And without telling us what he said to you,
11        was he able to alleviate your concerns?
12   A.   Yes, sir.
13   Q.   Did you know of any relationship that existed
14        between Eric Hanson and the Governor at that
15        time?
16   A.   Yes, sir.
17   Q.   And what relationship was that?
18   A.   That they had been friends for some 20-odd
19        years.
20   Q.   Now, when you say for some 20-odd years --
21        well, that's okay.  At some point, did you
22        have an occasion to visit Montgomery to have
23        a meeting with the Governor and Mr. Scrushy?
```

258

```
 1    A.   Yes, sir.

 2    Q.   Do you recall when that was?

 3    A.   No, sir.  I'm sorry.  I don't.

 4    Q.   Give us your best guess as to when that

 5         meeting occurred.

 6              MR. LEACH:  I'll object to speculation,

 7                   Your Honor, unless she can tie it

 8                   down with some sort of document

 9                   or --

10              THE COURT:  I'll allow the witness to

11                   attempt to answer.  Overruled.

12    Q.   Go ahead, Ms. Skelton.

13    A.   I believe it was sometime in the summer of

14         1999.

15    Q.   Okay.  And who all was with you when you came

16         to Montgomery for a meeting between

17         Mr. Scrushy and the Governor?

18    A.   Jabo Waggoner and Mr. Scrushy and myself.

19    Q.   Do you recall whether or not there was more

20         than one meeting between the Governor and

21         Mr. Scrushy, Jabo Waggoner, and yourself?

22    A.   At that time?

23    Q.   Yes.
```

259

```
1    A.   No, sir.

2    Q.   And what was the purpose of the meeting?

3    A.   It was my understanding it was a

4         get-acquainted type meeting.

5    Q.   Okay.  The Governor had been in office since

6         January of that year; is that correct?

7    A.   Yes, sir.

8    Q.   And the first visit that you were a part of

9         did not occur until the summer of 1999; is

10        that correct?

11   A.   That's as best as I recall, yes, sir.

12   Q.   Did you actually participate in the meeting

13        that occurred on that day?

14   A.   No, sir.

15   Q.   Tell us who all was there, as best you can

16        remember.  Tell us how you traveled from

17        Birmingham to Montgomery, if that's where you

18        came from; and then tell us what happened,

19        please.

20   A.   I'm -- I'm not positive the mode of travel,

21        but I did come from Birmingham to Montgomery.

22   Q.   Were you traveling alone or were you with

23        other people?
```

260

A.   No, sir.  I was with Mr. Scrushy.

Q.   Anyone else?

A.   I believe Jabo Waggoner was with us, but I'm
     not certain.  He may have already been down
     there.

Q.   Okay.  And did you arrive in Montgomery at
     some point?

A.   Yes, sir.

Q.   And did you meet anybody here in Montgomery?

A.   We -- I was introduced to Nick Bailey by Jabo
     Waggoner when we were sitting in the
     reception area.

Q.   All right.  Other than Nick Bailey, was there
     anybody else present?

A.   The Governor's secretary sat out in the
     reception area.

Q.   Okay.  So that's Nick Bailey, the Governor's
     secretary, you, Jabo Waggoner, and Richard
     Scrushy?

A.   Yes, sir.

Q.   Other than those five individuals, was there
     anybody else present?

A.   Eric Hanson may have been there, but I -- I'm

261

1        not certain.

2   Q.   Okay.  Can you remember whether or not it was

3        more than one occasion in 1999 that you may

4        have traveled from Birmingham to Montgomery

5        and met with the Governor and Eric Hanson was

6        present at the meeting, also?

7   A.   No, sir.

8   Q.   So if he was there, would it have been just

9        that one time or could it have been more than

10       one time?

11  A.   Well, it could have been more than one time

12       if I wasn't there, but --

13  Q.   I want to focus on when you were there and

14       what you saw.

15  A.   Okay.  No, sir.  It would just be that one

16       time.

17  Q.   Once you-all were all together, was there a

18       meeting had with all of those people that you

19       just mentioned, or did particular persons in

20       the group have a meeting?

21  A.   Yes, sir.  Only Mr. Scrushy went into the

22       Governor's office.

23  Q.   What happened to the other people that may

```
 1          have been there upon your arrival or who may

 2          not have been there?  Just the people who

 3          were there, what happened to them?

 4   A.     We were left out in the reception area.

 5   Q.     And do you recall how long that meeting

 6          lasted, Ms. Skelton?

 7   A.     Maybe 30 minutes.  I'm -- I'm really not

 8          sure.

 9   Q.     And did you have any discussions after the

10          meeting with Mr. Scrushy as to how that

11          meeting went?

12   A.     Not that I recall specifically.

13   Q.     Do you recall how you traveled back to

14          Montgomery after the meeting was over?

15   A.     Again --

16                THE COURT:  Back to Birmingham?

17                MR. FRANKLIN:  I'm sorry.  Thank you,

18                Your Honor.

19   Q.     Birmingham.

20   A.     I believe it was via helicopter, but I'm not

21          certain.
```

Skelton
May 10, 2006

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 7

23          Q.    Was it important to HealthSouth to have a

1      position or a seat on the Certificate of Need

2      and Review Board?

3   A.  Yes, sir.

4   Q.  Why?

5   A.  Because we were the largest, if not one of

6      the largest, health care companies in the

7      state.  And it was -- it's a very important

8      process for orderly state planning and cost

9      effectiveness in delivery of health care

10      services.

11   Q.  Did you ever discuss with Richard Scrushy the

12      importance of HealthSouth having a seat on

13      the Certificate of Need and Review Board?

14   A.  I don't believe we just discussed it

15      specifically.

**Skelton**
**May 10, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 8

13        Q.   Other than Mr. Adams traveling on the

272

| | | |
|---|---|---|
| 1 | | helicopter from Birmingham to Montgomery, was |
| 2 | | there anything else about the relationship |
| 3 | | that you observed developing between |
| 4 | | Mr. Adams and Mr. Scrushy that gave you pause |
| 5 | | as attorney for HealthSouth? |
| 6 | A. | Yes, sir. |
| 7 | Q. | What else? |
| 8 | A. | Mr. Adams was constantly asking for a job |
| 9 | | with HealthSouth. |
| 10 | Q. | And did you think that was a good idea? |
| 11 | A. | No, sir. |
| 12 | Q. | And did you have discussions with Mr. Scrushy |
| 13 | | as to why you thought that was not a good |
| 14 | | idea? |
| 15 | A. | Not that I recall.  I may have.  I'm not -- |
| 16 | | I'm just not certain. |
| 17 | Q. | Okay.  Well, if you didn't talk to him about |
| 18 | | it, why not? |
| 19 | | MR. LEACH:  Well, I object to that just |
| 20 | | in terms of irrelevant mental |
| 21 | | process. |
| 22 | | THE COURT:  Sustained as asked. |
| 23 | Q. | If you thought it was not a good idea, what, |

273

```
1          if anything, did you do with that
2          information?
3     A.   I told Mr. Adams I would look into it and see
4          if we had anything available.
5     Q.   Now, as I understand your testimony, you said
6          you didn't think it was a good idea?
7     A.   Correct.
8     Q.   Okay.  Tell us why you didn't think it was a
9          good idea, first.
10              MR. LEACH:  Well, I object to the
11                   relevancy, Judge.  If it doesn't
12                   relate to the defendant on trial,
13                   what does it matter?
14              THE COURT:  I don't know that I heard
15                   the witness's testimony.
16                        Did you say that Mr. Adams
17                   asked you for a job --
18              THE WITNESS:  Yes, sir.
19              THE COURT:  -- with HealthSouth or
20                   asked Mr. Scrushy for a job at
21                   HealthSouth?
22              THE WITNESS:  I said that he asked me
23                   for a job at HealthSouth
```

274

initially.

THE COURT:  All right.  Ask your next question.

MR. FRANKLIN:  And I believe her testimony, Judge, was that she did not think that was a good idea; and I asked her why not.

MR. LEACH:  But the preceding question was that it hadn't been --

THE COURT:  I was not clear on what the facts were.  Now, with my understanding of what the facts are, assuming the jury was equally uncertain, I sustain the objection.

Ask your next question, and let's see how we move from here.

Q.  Did you attempt to get Mr. Adams a job?

A.  No, sir, not really.

Q.  What efforts, if any, did you put into his request?

A.  I'm not certain.  I may have gotten his resume and sent it to human resources, but I

275

```
 1              really am not certain if I did that or not.
 2        Q.    Were you the only person that he asked for a
 3              job --
 4        A.    No, sir.
 5        Q.    -- at HealthSouth?  Who else did he ask that
 6              you are aware of?
 7        A.    He asked Mr. Scrushy and also Peck Fox.
 8        Q.    After he had asked Mr. Scrushy, did you and
 9              Mr. Scrushy have a discussion about
10              Mr. Adams' request for working at
11              HealthSouth?
12        A.    Sometime after that, yes, sir.
13        Q.    Okay.  And what, if anything, did you do
14              after your discussion with Mr. Scrushy in
15              terms of Mr. Adams' request for a job at
16              HealthSouth?
17        A.    I -- I called Dr. Swaid and --
18        Q.    Let me stop you for just a second, because I
19              don't know who Dr. Swaid is.  So tell us who
20              he is and why you would be calling him, and
21              then go from there, please.
22        A.    Okay.  Dr. Swaid was the medical director at
23              our HealthSouth Medical Center at the time.
```

276

```
 1            And when Mr. Adams asked Mr. Scrushy whether

 2            or not he could find a job for him at

 3            HealthSouth, Mr. Scrushy instructed me to get

 4            him hooked up with Dr. Swaid down at the

 5            medical center and to see if he had anything

 6            available down there.

 7     Q.     Now, at the time that Mr. Adams is asking you

 8            for a job and asking Mr. Scrushy for a job,

 9            is he a member of the Certificate of Need and

10            Review Board?

11     A.     Yes, sir.

12     Q.     Was there anything about the possibility of

13            him working with HealthSouth that gave you

14            any pause?  And I mean with him being a

15            member of the Certificate of Need Review

16            Board and then wanting to work for

17            HealthSouth.

18     A.     Yes, sir.

19     Q.     And what was it?

20     A.     If he had become a full-time employee, he

21            would have to recuse himself.

22     Q.     From what?

23     A.     HealthSouth projects.
```

277

```
 1    Q.   Okay.  If he had continued his board
 2         membership -- and tell me if I'm getting it
 3         wrong.
 4    A.   Okay.
 5    Q.   He could continue to be a member of the
 6         board, but he would have to recuse himself
 7         from HealthSouth projects?
 8    A.   Yes, sir.
 9    Q.   All right.  Now, did you talk to Dr. Swaid
10         about Mr. Adams?
11    A.   Yes, sir.
12    Q.   And was Mr. Adams -- did he get a job or an
13         interview with Dr. Swaid?
14    A.   It's my understanding, yes, sir.
15    Q.   Was he offered a job?
16    A.   Eventually, yes, sir.
17    Q.   Did he accept that job --
18    A.   No.
19    Q.   -- with Dr. Swaid?
20    A.   No, sir.
21    Q.   Okay.  What job did Dr. Swaid offer him, as
22         best you can recall?
23    A.   As best I recall, it was a job as a scrub
```

278

```
 1          nurse.
 2    Q.    After he was not able to gain employment with
 3          Dr. Swaid, did he again seek employment with
 4          HealthSouth?
 5    A.    Yes, sir.
 6    Q.    What was the next thing that happened?
 7    A.    The next thing that happened was he said he
 8          wanted -- he was creating his own consulting
 9          health care business, and he wanted to know
10          if he could be considered to write CON
11          applications for you.
12    Q.    During the time that you -- and this is from
13          '99 to 2003, Ms. Skelton.  During that time
14          period, was there any other members of the
15          board that requested employment as much as
16          Tim Adams?
17    A.    As much as Tim Adams?
18    Q.    That's correct.
19    A.    No, sir, not as much as Tim Adams.
20    Q.    After he told you about the consulting
21          business, were you able to find him any work
22          at HealthSouth?
23    A.    Yes, sir.
```

279

```
1    Q.   What type of work was he offered at

2         HealthSouth?

3    A.   To write a CON application for a PET --

4         mobile PET scanner.

5    Q.   All right.  Tell us what a CON application

6         is, please.

7    A.   It's basically an application that you fill

8         out that you submit to the State that asks

9         all sorts of questions about what it is you

10        want and what the purpose of it is and how it

11        will basically serve to correct any

12        inadequacies in the health care delivery

13        system.  It's a very long, detailed

14        application.

15   Q.   Okay.  And did he write a PET application?

16   A.   Yes, sir.  Mobile PET.

17   Q.   Mobile PET application?

18   A.   Yes, sir.

19   Q.   Tell us what a PET scanner is, too, please.

20   A.   I think in probably simple terms, it would

21        be --

22   Q.   Please.

23   A.   -- like a nuclear MRI.  It scans the whole
```

1   body and it gives you a clearer picture.

2 Q. Okay.  Did HealthSouth pay him for writing

3   that application?

4 A. Yes, sir.

5 Q. And at the time that he was paid, was

6   Mr. Adams still a member of the Certificate

7   of Need and Review Board?

8 A. Yes, sir.

9 Q. Give us a time frame as to when that

10   occurred.  When did you -- when was he hired

11   and when was he first paid?

12 A. I believe he was hired in November of '98 and

13   first paid in February of '99, but I'm not

14   positive about those dates.

15 Q. And, now, the Governor would have been sworn

16   in in '99, Governor Siegelman.

17 A. Okay.

18 Q. And the board would not have been appointed

19   until July of '99.  So could it have occurred

20   in '98?

21 A. No, sir.

22 Q. All right.

23 A. I'm sorry.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 9

21      Q.    Did Mr. Scrushy ever communicate to you what

22            he wanted done with Mr. Adams?  And when I

23            say what he wanted done, what he wanted you

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

**Skelton**
**May 10, 2006**

1          to do with respect to Mr. Adams?

2    A.   Yes, sir.

3    Q.   What did he tell you?

4    A.   He told me to tell Mr. Adams we just weren't

5          going to be able to find a position for him

6          at this time, there wasn't anything

7          available.

8    Q.   Okay.  That's with respect to the job?

9    A.   Yes, sir.

10    Q.   Okay.  And did you have a conversation about

11         what Mr. Scrushy wanted you to do with

12         respect to Mr. Adams, not just about the job,

13         but all the other things that you told us

14         about that you had concerns about that

15         Mr. Adams and Mr. Scrushy -- their

16         relationship?

17    A.   He just said don't tell -- don't tell him

18         that; just basically pacify him and keep him

19         happy.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 10

17    Q.    All right.  Let's go back to the conversation

18          you had with him and the upcoming meeting

19          with respect to Government's Exhibit #14.

20          Tell us what happened in the conversation you

21          had with Mr. Adams.

22    A.    Mr. Adams indicated that he did not think he

23          would be able to make the board meeting

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

Skelton
May 10, 2006

293

```
 1              because he would miss several days of work.

 2     Q.    And what did you say?

 3     A.    I'm not sure.  I probably told him we

 4              wouldn't have a quorum, then.

 5     Q.    Okay.  And what difference would it make if

 6              you didn't have a quorum?

 7     A.    The project would be heard at the next board

 8              meeting.

 9     Q.    Did you reach some kind of compromise with

10              Mr. Adams with respect to his attending this

11              meeting?

12     A.    Yes, sir, I believe so.

13     Q.    Tell us what happened.

14     A.    Okay.  He asked me if we could pay his

15              expenses for him to fly back here so that he

16              could attend the board meeting.  And I told

17              him, no, that would not be appropriate.  And

18              then he wanted to know if any HealthSouth

19              jets or planes might be up in the area that

20              could pick him up and give him a ride.

21     Q.    And what did you say?

22     A.    I said, no, I don't -- I don't believe so.

23     Q.    Okay.  Why did you think it wouldn't be
```

294

```
 1              appropriate either to send a HealthSouth jet

 2              to get him or either HealthSouth pay his

 3              expenses to come back for the -- for the

 4              meeting?

 5                      MR. LEACH:  Objection, Judge.  That was

 6                      not the testimony.  The testimony

 7                      was whether there was a jet in the

 8                      area, not send a jet to get him.

 9                      So I object to the leading.

10                      THE COURT:  Rephrase your question.

11      Q.      Why did you think it not appropriate for a

12              HealthSouth jet to bring him from wherever he

13              was to the Certificate of Need and Review

14              Board meeting in Montgomery?

15                      And the second part of that question is

16              why did you think it not important -- or not

17              appropriate for HealthSouth to pay for his

18              expenses that he would incur in coming back

19              for the Certificate of Need and Review Board

20              meeting?

21      A.      The appearance of impropriety in doing so.

22      Q.      Okay.  What agreement did you reach or

23              compromise did you reach with Mr. Adams that
```

```
 1              allowed him to come back to the Certificate

 2              of Need and Review meeting?

 3      A.     He reminded me that we had made an agreement

 4              regarding the drafting of the mobile PET

 5              scanner application that the amount he

 6              charged would be commensurate with the price,

 7              and that he had done substantial work on it

 8              since he had received the $8,000 payment and

 9              suggested that we owed him more money for

10              that additional work.

11      Q.     So he attempted to renegotiate his fee?

12      A.     We -- we actually did agree to a range

13              initially.

14      Q.     Okay.  And what range was that?

15      A.     If I recall, it was between eight to 12,000.

16      Q.     And did you agree to pay for him -- pay him

17              additional money so that he would come back?

18      A.     I agreed to pay him the additional money that

19              I felt like he was owed for the additional

20              work he had done, yes, sir.

21      Q.     Did he leave -- and where was he?  Do you

22              know?

23      A.     I'm not certain.  I think Oregon, but I'm
```

296

1               really not certain.

2    Q.   Do you know whether or not he was working in

3           Oregon, or was he vacationing in Oregon or

4           what?

5    A.   He told me he was working.

6    Q.   Okay.  And did you agree to pay him the

7           money, the additional $3,000?

8    A.   Yes, sir.

9    Q.   And did he come back?

10   A.   Yes, sir.

11   Q.   Did he attend the Certificate of Need and

12         Review Board meeting on that day?

13   A.   Yes, sir.

14   Q.   Okay.  Do you recall what day in July it was?

15   A.   I can tell you it was the third Wednesday of

16         the month of July, but I'm not certain what

17         that date was.

18   Q.   And why is it the third Wednesday of July?

19         Why does that date kind of jog your memory?

20   A.   That's by statute.  They're required to meet

21         every third Thursday of the month.

22   Q.   Did Mr. Adams attend the Certificate of Need

23         Review Board meeting in July of 2002?

297

```
 1    A.   Yes, sir.

 2    Q.   Do you know whether or not he voted on the

 3         project that was pending before the board,

 4         the HealthSouth project for the 38-bed rehab

 5         hospital?

 6    A.   Yes, sir, he did.

 7    Q.   Did he vote in favor of or did he vote

 8         against it?

 9    A.   He voted in favor of it.

10    Q.   Do you know whether or not he disclosed to

11         anybody on the board that he had a financial

12         relationship with HealthSouth while he was

13         attending that meeting and voting on that

14         project?

15    A.   No, sir, I do not know.

16    Q.   During the time that you were the attorney

17         for HealthSouth, I believe it was your

18         responsibility to advise HealthSouth

19         employees with respect to the Certificate of

20         Need and Review Board here in Alabama; is

21         that correct?

22    A.   Yes, sir.

23    Q.   You didn't give Mr. Adams any advice, did
```

1          you?

2     A.   No, sir.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 11

1    Q.  Isn't it a fact that when Thom Carman went on

2        the CON Board in January of 2001, the

3        helicopter rides stopped?

4    A.  Yes, sir.

5    Q.  And the reason why the helicopter rides

6        stopped is because the CEO of the corporation

7        was no longer going to Montgomery?

8    A.  Correct.

9    Q.  When you rode to Montgomery, Alabama, with

10       Thom Carman, you got in a vehicle and you

11       drove, correct?

12   A.  Yes, sir.

13   Q.  So the only time that Tim Adams got rides on

14       the HealthSouth helicopter were for the

15       period of time that Richard Scrushy was on

16       the CON Board during Governor Siegelman's

17       Administration; isn't that correct?

18   A.  To the best of my knowledge, yes, sir.

19   Q.  And Richard Scrushy came off the board in

20       January of 2001, correct?

21   A.  I believe so, yes, sir.

22   Q.  And we don't have an application before the

23       board before July of 2002; isn't that

1           correct?

2       A.  As best I recall, yes, sir.

3       Q.  That's something, isn't it?

4       A.  Yes, sir.

5       Q.  And then December is the mobile PET scan?

6       A.  Yes, sir.

7       Q.  So that whole time, you are going to the

8           meetings with Thom Carman in the car,

9           correct?

10      A.  Yes, sir.

11      Q.  And is Tim Adams riding in the car to

12          Montgomery during that period of time?

13      A.  No, sir.

14      Q.  All right.  If Tim Adams had asked to carpool

15          with you, would you have recommended against

16          it to Thom Carman?

17      A.  Yes, sir.

18      Q.  And why is that?

19      A.  The same reasons as before.  I used that time

20          to be able to have conversations with him

21          about the projects and other things.

**Skelton**
**May 11, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 12

```
 6    Q.   Ms. Skelton, did you call any of those

 7         members?  I understand you weren't -- you

 8         weren't sure you were there; but did you call

 9         any of those people that I just mentioned,

10         members of the CON Board, Mark Wilkerson,

11         Alva Lambert?  Did you call any of them to

12         let them know about Tim Adams' participation

13         in that project?

14    A.   I probably let Alva Lambert know sometime

15         ahead.

16    Q.   Okay.  When do you think you let Mr. Alva

17         Lambert know about Tim Adams working for

18         HealthSouth?

19    A.   When?

20    Q.   Yes, ma'am.  When?

21    A.   I have no idea.

22    Q.   And what conversation did you have with

23         Mr. Alva Lambert about Mr. Adams having a
```

| | | |
|---|---|---|
| 1 | | financial relationship with HealthSouth? |
| 2 | | What did you tell him? |
| 3 | A. | I probably told him that Mr. Adams had been |
| 4 | | trying to get a job with HealthSouth for some |
| 5 | | time. |
| 6 | Q. | And what was Mr. Alva's response -- |
| 7 | | Mr. Lambert's response?  I'm sorry. |
| 8 | A. | I don't remember specifically. |
| 9 | Q. | Why did you have this conversation with |
| 10 | | Mr. Lambert? |
| 11 | A. | Just in general terms.  We're just friends. |
| 12 | | We just talk about things. |
| 13 | Q. | But you're the lawyer for HealthSouth; is |
| 14 | | that correct? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Okay.  And your conversation with -- with him |
| 17 | | is not only a friendly conversation, your |
| 18 | | conversation with him is as an attorney for |
| 19 | | HealthSouth as it relates to matters of the |
| 20 | | CON Board, though.  That is your testimony? |
| 21 | A. | Yes, sir. |
| 22 | Q. | Did you think there was something wrong with |
| 23 | | Mr. Adams having a financial relationship |

51

```
1          with HealthSouth and participating in the

2          meetings regarding projects for HealthSouth?

3               MR. LEACH:  Objection, Your Honor.

4                    He's leading his witness.

5               MR. FRANKLIN:  Judge, that's not a

6                    leading question.  Either she did

7                    or she didn't.

8               THE COURT:  Witness will respond yes or

9                    no.

10    A.   Yes, sir.

11    Q.   So are you telling me that you told him this

12         in passing, or are you telling me that you

13         told him this to let him know or to put him

14         on notice about Mr. Adams' financial

15         relationship with HealthSouth?

16    A.   Probably the latter, to put him on notice.

17    Q.   And did you discuss with him what should be

18         done about that?

19    A.   No, sir.

20    Q.   What actions, if any, should be taken?

21    A.   No, sir.
```

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 13

| | | |
|---|---|---|
| 8 | Q. | Now, in terms of why Richard Scrushy was |
| 9 | | appointed to the board, you don't have any |
| 10 | | firsthand knowledge of how that came to be; |
| 11 | | isn't that correct? |
| 12 | A. | Yes, sir, that's correct. |
| 13 | Q. | I mean, you were present at this meeting in |
| 14 | | Montgomery, but you weren't in the meeting |
| 15 | | with the Governor and Richard Scrushy; isn't |
| 16 | | that right? |
| 17 | A. | Yes, sir, I was not. |
| 18 | Q. | And you have characterized that as a |
| 19 | | get-acquainted meeting.  Did I understand you |
| 20 | | correctly on that? |
| 21 | A. | Yes, sir. |
| 22 | Q. | All right.  And can you explain to us what |
| 23 | | you meant by it being a get-acquainted |

126

meeting?

A.   It's my understanding that Eric Hanson was
     trying to develop a positive rapport with
     HealthSouth and Mr. Scrushy after the
     election.

Q.   All right.  Now, there was -- was there any
     indication, that you can recall, from the
     trip down there or after the trip that any
     check was delivered to the Governor on that
     day?

A.   No, sir.

Q.   All right.  Was there any discussion at any
     point that you can recall about bribing the
     Governor to get a CON seat?

A.   No, sir.

Q.   Did you see any checks in Mr. Scrushy's
     possession on that trip to Montgomery?

A.   No, sir.

Q.   Did you hear any discussion that there was a
     check to be delivered that day?

A.   No, sir.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 14

```
 7    Q.   Okay.  Now, when we talk about Phenix City

 8         and the mobile PET scanner, was Richard

 9         Scrushy even involved in the board at the

10         point that those two items were presented to

11         the CON Board?

12    A.   No, sir.

13    Q.   Mr. Scrushy was long gone from the board;

14         isn't that correct?

15    A.   Yes, sir.

16    Q.   You never had so much as a conversation with

17         Mr. Scrushy about those projects and what was

18         going on with the CON Board at that time;

19         isn't that right?

20    A.   At the July 2002 time?

21    Q.   Right.  At the time that they were being

22         voted on.

23    A.   Not that I --
```

156

MR. FRANKLIN: Objection, Your Honor.

I think his question was any

conversations about it. Are you

changing it?

Q. I'm talking about 2002, when it was presented

to the board, you didn't have any

conversations with Richard Scrushy about

those items; isn't that right?

A. That's -- not that I recall.

Q. Okay. And that's because what you would be

doing is you wouldn't be talking to

Mr. Scrushy, you would be talking to

Mr. Carman?

A. Yes, sir.

Q. And that's because Mr. Carman is the board

member at that time, correct?

A. Yes, sir.

Q. And what you're presenting to Mr. Carman is

not only the position in terms of whether

it's going to pass or not pass or whether

there's opposition, but you're also relating

to Mr. Carman that you must recuse.

A. Yes, sir.

157

```
 1      Q.   Okay.  And that advice was provided to

 2           Mr. Carman with the same formality that you

 3           used to provide it to Mr. Scrushy, correct?

 4      A.   Yes, sir.

 5      Q.   You prepare a document?

 6      A.   Yes, sir.

 7      Q.   And you let him know this is our project and

 8           you must recuse?

 9                THE COURT:  You need to verbally

10                    respond.

11                THE WITNESS:  Oh, I'm sorry.

12      A.   Yes, sir.
```

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 15

```
 5    Q.   All right.  You can't even recall one

 6         conversation specifically, can you, where

 7         Richard Scrushy told you to keep Tim Adams

 8         happy; isn't that right?

 9    A.   Yes, sir.

10    Q.   With regard to the relationship with Tim

11         Adams, Mr. Scrushy never told you to break

12         the law as far as Tim Adams was concerned,

13         correct?

14    A.   Correct.

15    Q.   And your perception would be that Mr. Scrushy

16         would be relying upon you as a lawyer in this

17         area to do things right with regard to

18         Mr. Adams; isn't that right?

19    A.   Yes, sir.

20    Q.   As you sit here today, can you recall a

21         conversation that you had with Mr. Scrushy

22         in which you told him, Mr. Scrushy, I am

23         thinking about giving Tim Adams the CON
```

166

application on this mobile PET scanner? Can
you recall that sitting here today?

A.   A specific conversation?

Q.   A specific conversation where you were with
Richard Scrushy and said that to him?

A.   Not specifically, no, sir.

Q.   You mentioned in your direct examination that
Tim Adams came to you and said, Loree, I'm
trying to set up a consulting business; if
you have some work, I'd be interested. Did I
get that right?

A.   Yes, sir.

Q.   Did you ever relate to Mr. Scrushy that Tim
Adams had told you he was setting up a
consulting business and he wanted to see if
he couldn't write PET scan applications or
whatever it was? Do you ever recall a
conversation like that?

A.   I'm not sure if I told him that or not.

Q.   Isn't it true that when Tim Adams told you
that, Richard Scrushy wasn't part of that
conversation; isn't that right?

A.   That's right.

167

```
1    Q.   Now, in your grand jury, you talked about

2         what you and I have just been discussing, Tim

3         Adams coming forward to you and you making

4         the decision to go forward with it.  And you

5         did share that information with someone at

6         HealthSouth, didn't you?

7    A.   Yes, sir.

8    Q.   And that was Thom Carman.  You talked to Thom

9         Carman about it?

10   A.   Yes, sir.

11   Q.   But you have no information to bring to this

12        jury that Thom Carman ever shared that

13        information with Richard Scrushy; isn't that

14        right?

15   A.   Not directly, no, sir.

16   Q.   Okay.  According to your grand jury, you

17        stated that you let Mr. Carman know that if

18        we engage Mr. Adams on this project, he's

19        going to have to recuse.

20             MR. LEACH:  Well, I'm not going to a

21                  specific page, but it is 51.  It's

22                  the 6.5.

23   Q.   Did you catch that?
```

168

A.  Yes, sir.

Q.  Is that right; that you explained to
    Mr. Carman, if we take this step, he's going
    to have to recuse?

A.  Yes, sir.

Q.  Okay.  My question now to you is, isn't it
    true that you never had that conversation
    with Richard Scrushy?

A.  I don't recall if I did or not.

Q.  Sitting here today, you can't tell this jury
    that you have a recollection of saying to
    Mr. Scrushy, Tim Adams is going to have to
    recuse if we take this step?  You don't have
    a specific recollection sitting here right
    now?

A.  As it relates to this PET scanner?

Q.  Yes, ma'am.

A.  No, sir, I don't have a specific
    recollection.

Q.  Now, when you took Tim Adams on as a
    contractor, did you believe that at that
    point, you had a responsibility to advise Tim
    Adams on his ethical responsibilities on the

Skelton
May 11, 2006

169

```
 1         CON Board?
 2    A.   No, sir.
 3    Q.   Okay.  In your mind, that responsibility
 4         still rested with Tim Adams; isn't that
 5         right?
 6    A.   Yes, sir.
 7    Q.   And Tim Adams had access to Mr. Wilkerson if
 8         he had any questions?
 9    A.   Yes, sir.
10    Q.   But even with that said, did Tim Adams ever
11         come to you and say, Loree, I'm not sure what
12         to do in this situation?  Did he ever have
13         that conversation with you?
14    A.   No, sir.
15    Q.   If he had come to you and said, Loree, I'm --
16         I'm in a dilemma, I don't know if I can vote
17         on this, would you have helped him?
18    A.   I probably would have referred him to his own
19         legal counsel.
20    Q.   All right.  But you would have -- you would
21         have facilitated that process if he had
22         brought it to you --
23    A.   Yes, sir.
```

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 16

```
 3    Q.   We saw the check request documents.  They
 4         have been tendered into evidence.  When you
 5         were making that request for the checks, did
 6         you have any conversations that you recall
 7         with Mr. Scrushy about that?
 8    A.   Not that I recall at that time, no, sir.
 9    Q.   When Tim Adams failed to provide what was an
10         adequate product to HealthSouth, isn't it
11         true that you didn't even bring that to
12         Richard Scrushy's attention?
13    A.   I honestly don't recall.
14    Q.   Isn't it true that by the time these events
15         are occurring, Richard Scrushy is not nearly
16         as much in the loop of CON business at that
17         point as he was during the time that he was a
18         sitting member on the board?
19    A.   Yes, sir.
20    Q.   And isn't it true that in the grand scheme of
21         things, the reason why Richard Scrushy
22         resigned the seat and Thom Carman took the
23         seat is because he was drawn in so many other
```

174

1          directions because of his responsibilities

2          there at HealthSouth?

3     A.   That was my understanding, yes, sir.

4     Q.   And wasn't it true, ma'am, that part of the

5          problem with regard to Mr. Scrushy sitting on

6          the CON Board is that he was missing a lot of

7          sessions?

8     A.   Yes, sir.

9     Q.   And wasn't that the same problem that was

10         occurring under Fob James?

11    A.   Yes, sir.

      Q.   And he resigned his seat at that point,

13         didn't he?

14    A.   Yes, sir.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 17

```
 1     Q.    Now, Senator, I believe you indicated that

 2           July the 14th was the day that you had the

 3           meeting with the Governor?

 4     A.    Right.

 5     Q.    Now, as I look at your calendar, Government

 6           Exhibit #50, I see it simply says one

 7           o'clock; and it looks like Montgomery and

 8           helicopter.  Tell us why that meant to you --

 9               MR. GRAY:  Objection.  Leading is the

10                   objection, Your Honor.

11               THE COURT:  Sustained.

12     Q.    Tell us what that means, Senator.

13               MR. GRAY:  Your Honor, it speaks for

14                   itself.  It has a date and it has

15                   helicopter.

16               THE COURT:  Overruled.

17     A.    It has one o'clock.  And I really can't

18           remember whether we left at one o'clock for

19           Birmingham or whether our appointment was at

20           one o'clock; but what this means, that we

21           flew on the company helicopter from

22           Birmingham to Montgomery for a meeting with

23           Governor Siegelman.
```

Waggoner
May 10, 2006

1    Q.  Now, you indicated that there was another

2        person, another employee from HealthSouth?

3    A.  Correct.

4    Q.  Would you tell us her name again, please?

5    A.  Loree Skelton.

6    Q.  What was the purpose of the meeting that you

7        had with the Governor on that day?

8    A.  I was not instructed as to the purpose.  All

9        I knew was that --

10              MR. GRAY:  Your Honor, we object

11                  because he doesn't know.

12              THE COURT:  As to the form of the

13                  question, sustained.

14   Q.  What did you understand the reason why you

15       were coming to Montgomery to meet with the

16       Governor on that day?

17   A.  I was not informed as to the purpose.  All I

18       knew was I was told we were leaving to go to

19       Montgomery to a meeting with the Governor,

20       then Governor Siegelman.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 18

| | | |
|---|---|---|
| 16 | Q. | All right. Did you, in fact, travel to |
| 17 | | Montgomery by helicopter for a meeting |
| 18 | | between Mr. Scrushy and the Governor? |
| 19 | A. | Correct. |
| 20 | Q. | Tell us what happened once you arrived at the |
| 21 | | Governor's Office, please. |
| 22 | A. | We were called into the Governor's main |
| 23 | | office. There's really two Governor's |

Waggoner
May 10, 2006

151

```
 1          offices, one big one and one smaller one.

 2          And all of us met, the four of us -- the

 3          Governor, Mr. Scrushy, Ms. Skelton, and

 4          myself -- for a few minutes and had, as I

 5          remember, small talk.  And then, as I recall,

 6          the Governor says, Would y'all excuse us for

 7          a few minutes; and they went to an adjoining

 8          office.

 9    Q.    Now, when you say "they," who do you mean?

10    A.    Governor Siegelman and Mr. Scrushy.

11    Q.    And where did you go?

12    A.    I can't recall whether we stayed in the

13          Governor's main office or we went back to the

14          waiting room, but we -- we did not go with

15          them.  We either stayed in the Governor's

16          Office or in the Governor's waiting room.

17    Q.    Okay.  I know this sounds kind of petty,

18          Senator; but when you use words like "we" and

19          "they," I need you to identify for the jury

20          and the record who you're talking about.  So

21          when you said "we" waited and "we" went

22          somewhere else, tell us who you're talking

23          about.
```

152

A.  Loree Skelton and I waited in either the
    Governor's Office or the waiting room.  And
    "they" being Mr. Scrushy and -- and Governor
    Siegelman.

Q.  Do you recall how long the meeting lasted?

A.  I'd say 15 or 20 minutes.  And that's just
    a -- a guess.  You know, we didn't wait real
    long.

Q.  And after the meeting was over, tell us what
    happened then.

A.  We went back -- we, Loree Skelton and I
    and -- and Richard Scrushy, got back on the
    helicopter and flew back to Birmingham.

Q.  Now, other than you, Loree Skelton, Governor
    Siegelman, and Mr. Scrushy, was there anybody
    else present?  I understand what -- what
    parties met, but was there anybody else
    present on the day that this meeting occurred
    other than the four people that you've
    identified?

A.  As I recall --

Q.  Yes, sir.

A.  -- there were only four.

```
1    Q.   And after the meeting was over, were there

2         any other individuals present other than the

3         four people that you have identified?

4    A.   No.

5    Q.   After the meeting was over and you-all left

6         the Governor's Office, where did you, Loree

7         Skelton, and Mr. Scrushy go?

8    A.   As I recall, the helicopter had landed on the

9         top of the Business Council of Alabama

10        building --

11             MR. GRAY:  Objection, Your Honor.

12                  That's not responsive.  He asked

13                  him where did he go.

14             THE COURT:  Overruled.

15             MR. GRAY:  He just said where.

16             THE COURT:  Overruled.

17             MR. FRANKLIN:  Thank you, Your Honor.

18   A.   We went back to the helicopter.

19   Q.   Okay.  And after you -- did you get on the

20        helicopter, get back in the helicopter?

21   A.   We did.

22   Q.   And then where did you go?

23   A.   Flew back to Birmingham.
```

Waggoner
May 10, 2006

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 19

16    Q.    Let me ask you this.  If you will look at

17          your calendar.  And as I understand it -- I'm

18          not one of these electronic folks, so I'm not

19          sure how this operates, but if you look on

20          the date -- and I think the date you're

21          saying was the 21st -- the 14th; is that

22          correct?

23    A.    The 14th.

172

1    Q.   Do you see that?

2    A.   Yes, sir.

3    Q.   And it says one.  And I take it, is that MTG?

4    A.   It's one o'clock, Montgomery.

5    Q.   And it's helicopter?

6    A.   Yes, sir.

7    Q.   Now, how many people, as you recall, was on

8         that helicopter when it left Birmingham?

9    A.   Three.

10   Q.   And who were those?

11   A.   Mr. Scrushy, Loree Skelton, and myself.

2    Q.   And, of course, that was several years ago,

13        isn't it?

14   A.   Seven years ago.

15   Q.   And is it possible that you may have been

16        mistaken about the date?  I'm not talking

17        about the event that occurred, but isn't it

18        possible you may be wrong about the date of

19        it?

20   A.   I don't think so.

21   Q.   Don't think so.  When you arrived in

22        Montgomery, was anyone else with you other

23        than the three people you've talked about?

173

1   A.   Only three of us.  The same three.

2   Q.   You know Mr. Hanson, don't you?

3   A.   Yes.

4   Q.   Isn't it a fact that he was on that

5        helicopter that day?

6   A.   I don't recall Mr. Hanson being on the

7        helicopter.

8   Q.   I think in your grand jury testimony, you

9        were asked.  And you didn't recall it then;

10       is that correct?

11  A.   That's correct.

12  Q.   And you still don't recall it today; is that

13       correct?

14  A.   That's correct.

15  Q.   Now, let me ask you -- may I see your

16       calendar, please?

17  A.   Sure.

18            MR. GRAY:  May I approach the witness?

19            THE COURT:  You may.

20  Q.   Let me show you -- do you see your calendar

21       for June 29th?

22            THE COURT:  Counsel, are we going to

23                make this an exhibit?

174

```
 1        MR. GRAY:  All right.  I would like
 2              very much to make it an exhibit,
 3              Your Honor.
 4        THE COURT:  Okay.  If you would,
 5              approach.  Mr. Franklin?
 6                  (Bench conference held outside
 7                    the hearing of this reporter)
 8        THE COURT:  I just remind counsel, I
 9              don't like things to be shown to
10              the jury unless they're admitted.
11              If there's no objection, you can
                show him, obviously, the exhibit
13              he brought with him.  We'll make a
14              copy of the pages that you show
15              him, and we'll substitute it after
16              you get through.  Give us some
17              numbers so we can refer to it for
18              the record.
19        MR. LEACH:  Scrushy #113.
20        THE COURT:  All right.  Any objection
21              to this exhibit being admitted and
22              published to the jury?
23        MR. FRANKLIN:  No, Your Honor.
```

175

THE COURT:  Governor Siegelman?

MR. KILBORN:  No, Your Honor.

THE COURT:  Mr. Hamrick?

MR. DEEN:  No, sir.

THE COURT:  Defendant Scrushy Exhibit
#113 will be admitted.  And a copy
can be substituted in lieu of the
original when this examination is
concluded.

Q.  (Mr. Gray continuing:)  Now, I show you what
has now been marked as Scrushy's Exhibit #113
and ask you what is that, that whole page?
Is this your calendar for the month of June?

A.  Yes, sir.

Q.  And what does it say for June the 29th?

A.  RMS, Governor, 1 to 1:30.

Q.  That refer -- and that refers to Mr. Scrushy,
doesn't it?

A.  It does.

Q.  And it's supposed to be to the Governor's
Office at 1:30; isn't that correct?

A.  That's correct.

Q.  Now, you didn't show the Government, when the

176

```
1        they interviewed you, that page, did you?

2   A.   I haven't looked at that page in seven years,

3        Mr. Gray.

4   Q.   And they didn't ask you to look at it, did

5        they?

6   A.   No, they didn't.

7   Q.   And when you appeared before the grand jury,

8        they did not ask you about that page, did

9        they?

10  A.   They did not.

11  Q.   Now that your remembrance has been

12       recollected, isn't it a fact the meeting that

13       you're testifying to did not occur on July

14       14th as you said earlier; but it occurred,

15       did it not, according to your own records, on

16       the 29th of June; isn't that correct?

17  A.   I think it occurred July the 14th, because I

18       remember flying on the helicopter.  And I

19       couldn't tell you what this meeting was about

20       on the 29th.

21  Q.   How can you explain -- how many times did you

22       fly in the helicopter in June and July?

23  A.   Oh, I couldn't -- you know.
```

177

1  Q.  Well, how many times --

2  A.  I was not in it but five times -- probably

3       five times in my whole life.

4  Q.  Okay.  How many times did you fly in the

5       helicopter during the month of July of '99?

6  A.  Once.

7  Q.  How many times did you fly in the helicopter

8       on -- in June of '99?

9  A.  I couldn't tell you if we flew on the

10      helicopter in June.  It's not noted.  I could

11      have driven and met them.

12 Q.  Well, tell the jury, if you will,

13      Mr. Waggoner -- and I'm not trying to be

14      funny about this.  Dates in this case are

15      very crucial to our client.  And I just want

16      to be sure from you -- and I thought -- and

17      that's why I asked you after your remembrance

18      had been refreshed, whether you could have

19      made a mistake on the date.  I don't think

20      there's any question about the meeting.  It's

21      just the date that I was trying to get

22      straight.  So isn't it possible, since you

23      indicated -- RMS would mean who?

178

A.   Mr. Scrushy.

Q.   And what would GOV mean?

A.   And the Governor.

Q.   Now, if you look back at your other exhibits,
     Government Exhibit #50 and the date being the
     14th, it's not that explicit except for the
     fact it talks about a helicopter; isn't that
     right?

A.   That's right.

            MR. GRAY:  Your Honor, we would like to
                call the witness's attention to
                Scrushy's Exhibit #100, which is a
                certification pursuant to Federal
                Rules of Evidence 902(11)
                certifying the records -- the
                official records of HealthSouth
                showing the helicopter, where it
                went, when and what dates, and who
                was on it.

                    And we'd like to move its
                introduction.  And it's Exhibit
                #100 to #102, Scrushy's exhibits.

            THE COURT:  Let me hear from the

Waggoner
May 10, 2006

179

```
 1              Government.
 2        MR. FRANKLIN:  We have no objection,
 3              Your Honor.
 4        THE COURT:  Governor Siegelman?
 5        MR. KILBORN:  No objection, Your Honor.
 6        THE COURT:  Mr. Hamrick?
 7        MR. DEEN:  No objection.
 8        THE COURT:  Mr. Roberts?
 9        MR. BAXLEY:  No objection.
10        THE COURT:  Without objection,
11              Defendant Scrushy Exhibits #100
12              through #102 -- is that right,
13              Mr. Gray?
14        MR. GRAY:  Yes, sir.
15        THE COURT:  Inclusive?  So it would be
16              three exhibits in all?
17        MR. GRAY:  #100, #101 --
18        THE COURT:  I mean, multiple pages but
19              three exhibits?
20        MR. LEACH:  Yes.
21        THE COURT:  -- are admitted.
22        MR. GRAY:  And #102.
23        MR. LEACH:  That's right.
```

180

```
1              MR. GRAY:  Yes, sir.

2    Q.   Now, on the date that you -- now, do you

3         remember whether or not you went to

4         Montgomery by helicopter on 6/29?

5    A.   I don't remember, sir.

6    Q.   You don't remember.  I show you Scrushy

7         Exhibit #100.  And do you see the date on

8         there?

9    A.   6/29?

10   Q.   Yes.

11   A.   Yes, sir.

2    Q.   And if you'll notice, under 1, the RMS, is

13        that Richard Scrushy?

14   A.   Yes.

15   Q.   And does it indicate that there were two

16        passengers?

17   A.   Right.

18   Q.   And I think your testimony earlier was that

19        you -- when you went, whatever date it was,

20        there were two persons and Mr. Scrushy; is

21        that correct?

22   A.   Right.

23   Q.   Now let me show you -- now let me show you
```

```
 1              Exhibit #101, page 2.  Do you see that date?

 2   A.   Yes, sir.

 3   Q.   And what date is that?

 4   A.   7/14.

 5   Q.   And does it indicate on there that you were

 6        on the plane?

 7   A.   It does.

 8   Q.   Were you on the plane that date?

 9   A.   Yes.  I was on the plane on 7/14.

10   Q.   Now, has your memory been refreshed at all as

11        to which one of those dates was the date --

12        now, let me do it this way.  Do you admit

13        being in Montgomery on both of those dates,

14        according to your calculations?

15   A.   Yes.

16   Q.   All right.  Now, on both of those dates --

17        was Mr. Scrushy with you on both of those

18        dates?

19   A.   I can't speak to June 29th.  I don't remember

20        the meeting.  I don't remember being here on

21        the 29th.
```

Waggoner
May 10, 2006

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 20

| | | |
|---|---|---|
| 10 | Q. | Let me ask you again, Mr. Waggoner, are you |
| 11 | | sure that Mr. Hanson was not on either leg of |
| 12 | | the trip when you came to Montgomery? |
| 13 | A. | I don't recall Mr. Hanson being on either |
| 14 | | leg. |
| 15 | Q. | Let me show you Scrushy's Exhibit #101, |
| 16 | | page 1.  And this is the flight log for the |
| 17 | | 14th -- I believe that's right -- on the |
| 18 | | 14th.  Do you see that? |
| 19 | A. | Yes, sir. |
| 20 | Q. | Okay.  Go down and see who were the |
| 21 | | passengers on that flight. |
| 22 | A. | It says me and Mr. Hanson. |
| 23 | Q. | Now, does that refresh your recollection that |

187

```
1          you and Mr. Hanson --
2    A.    No, it really doesn't.
3    Q.    -- was only on that date?
4    A.    I didn't recall him being on the flight.
5    Q.    But you don't have any reason to believe that
6          these records were falsified, do you?
7    A.    I have no reason to believe that.
8    Q.    So that since the record shows that
9          Mr. Hanson and yourself was on a leg of a
10         flight -- and that was on -- which one of
11         those dates was it?
12   A.    7/14.
13   Q.    7/14; is that correct?
14   A.    Yes.
15   Q.    Now is your remembrance refreshed to that
16         extent?
17   A.    I still don't recall him being on the flight,
18         but evidently he was, but I don't recall it.
19   Q.    Yes, sir.
20                   (Brief pause)
21   Q.    On that same exhibit, I don't know whether
22         you -- I'll show it back to you.  Does it
23         show anyone other than the two of you as
```

1    being passengers on that flight?   Is that

2    correct?

3  A.   That's all it shows.

4  Q.   It does not show Mr. Scrushy as being on that

5       flight, does it?

6  A.   No, it doesn't.

7          MR. GRAY:   Thank you very much.