United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 21

10    Q.    Mr. Bell, I'm going to show you on the

11          projection screen in front of you what has

12          been admitted as Government Exhibit #6A.   Do

13          you recognize Government Exhibit #6A?

14    A.    It looks like a letter generated out of the

15          appointment secretary's office, yeah.

16    Q.    And where were the initials that indicated

17          that you were the appointment secretary when

18          that letter was generated?   Where would they

19          be?

20    A.    On the bottom left hand.

21    Q.    Would you take your finger and just circle

22          that, please.   And the initials RB, whose

23          initials are those?

1    A.    Those are mine.

2    Q.    Okay.  What did you do with the letter

3          itself?  After the Governor has signed the

4          letter, what did you do with it?  How did you

5          get it to the person that it was intended to

6          go to?

7    A.    Sometimes I left them with him or

8          hand-delivered it; or I took them downstairs,

9          made a copy of them, put them in the file,

10         and put them in the outgoing mail.

11   Q.    Was it typical to mail letters that went to

12         the recipients?

13   A.    Typical, yes.

14   Q.    What would make it atypical?  Why wouldn't

15         you mail a letter that was intended for one

16         of the recipients?

17   A.    They would come to the Governor's Office and

18         meet with the Governor, or the Governor would

19         hand-deliver it, or he would be seeing them

20         somewhere or something.

21   Q.    Do you have any specific recollection as to

22         whether Ms. Margaret Sellers came to the

23         office to pick up her letter?

1    A.   No.  But I wouldn't be in the meetings

2         either, though, but no.

3    Q.   I'm sorry.  I didn't hear you.

4    A.   If I left the letters upstairs, I wouldn't be

5         in any meetings.

6    Q.   Who was responsible ultimately for making

7         the -- appointing people to the Certificate

8         of Need Review Board?

9    A.   Don Siegelman.

10    Q.   I'm going to show you what has been admitted

11         as Government Exhibit #6B.  Do you see your

12         initials on Government's Exhibit #6B?

13    A.   I do.

14    Q.   Do you have any reason to suggest why you

15         would not have mailed this particular letter?

16    A.   I don't have any reason.

17    Q.   And who would that letter go to?

18    A.   Mr. Richard Scrushy.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 22

8          THE COURT:  Defendant Scrushy -- I mean

9                  Defendant Siegelman's Exhibit #220

10                 is admitted.

11         MR. KILBORN:  And may I publish it on

12                 the screen, Your Honor?

13         THE COURT:  You may.

14    Q.   (Mr. Kilborn continuing:)  Mr. Bell, can you

15         see that document on the screen?

16    A.   I can.

17    Q.   And let's -- now, the document has -- has

18         some typing on it.  Is that your typing?

19    A.   I believe it is.

20    Q.   And it says CON Candidates at the top right

21         up here?

22    A.   Yes.

23    Q.   I messed it up.  You typed CON Candidates

328

1        there?

2   A.   I believe so, yes, sir.

3   Q.   And then the names over here that are typed

4        starting with, looks like, Carlton McCurry,

5        Carolyn Giardina, goes down to Dr. Stone,

6        Borden Ray, Jack Batchelor, and so forth, are

7        those the CON candidates whose names you

8        typed?

9   A.   Yes, sir.

10   Q.   And then I see Richard Scrushy's name on

11        there.  You typed his name?

12   A.   Yes.

13   Q.   Now, I counted -- if I counted right, I think

14        there are 12 on there.  Do you count 12?

15   A.   Yes.

16   Q.   Now, we don't know when this document was

17        prepared, do we?

18   A.   No, sir.

19   Q.   Do you have a judgment as to whether it was

20        prepared before or after Governor's Exhibit

21        #30?

22   A.   If I'm correct, this was the format either in

23        the transition office or right after.

329

```
1    Q.   Either in the transition office or right
2         after?
3    A.   Yes.
4    Q.   And do you have a recollection of --
5              THE COURT:  So would that precede
6                   Government's Exhibit #30 or would
7                   that be after Government's
8                   Exhibit #30?
9    Q.   Can you tell us?
10   A.   It would precede, if I'm correct, but I don't
11        know.  I'm guessing.
12   Q.   And do you have a judgment as to how -- how
13        far before or how long before Government
14        Exhibit #30, dated June 25, 1999, this would
15        have been prepared by you?
16   A.   The transition period is from November to
17        January.
18   Q.   '98.  November '98 to January '99?
19   A.   Yeah.
20   Q.   So that would be, what, six months before?
21   A.   Yes, sir.
22   Q.   Do you have a recollection of how it was that
23        as early as the transition team activity, how
```

1          it came that there were 12 potential

2          candidates for the CON Board that early?

3     A.   What you have to understand is the Governor

4          has about 5400 or 5200 appointments.  And as

5          soon as he's elected, he gets a flood of

6          letters that come in automatically.  And then

7          when the time comes to make the appointments,

8          others trickle in.

9     Q.   And in this case, he did get a flood of

10         people who wanted positions?

11    A.   I don't know if he got a flood on this

12         particular one, but I know he got a flood for

13         all of the agencies.

14    Q.   And did you say how many -- how many

15         positions?

16    A.   If I'm correct, over the four years as

17         governor, he should have 52 to 54.

18    Q.   52 or 54?

19    A.   Hundred.

20    Q.   Hundred?

21    A.   Yes.

22    Q.   All right.

23    A.   But none of them ever make all of them,

1                  though.

2        Q.   All right.  And you don't know what the

3             two -- do you know what the two asterisks are

4             by certain people's names?

5        A.   No, sir.

6        Q.   And do you know why Richard Scrushy had two

7             asterisks with a -- looks like somebody put a

8             star -- Governor Siegelman put a star by his

9             name?

10       A.   I don't know why he did that.

11       Q.   All right.  Would it be fair to say that

12            certainly prior to July of 1999, HealthSouth

13            had a representative either in the form of

14            Mr. Scrushy or Mr. Carman on Governor

15            Siegelman's radar screen for a board

16            appointment?

17       A.   That would be very safe.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 23

145

| | | |
|---|---|---|
| 2 | Q. | Did you receive a second phone call? |
| 3 | A. | I did. |
| 4 | Q. | Who did you receive the second phone call |
| 5 | | from? |
| 6 | A. | From Mr. Martin and Mr. Scrushy. |
| 7 | Q. | What was said during that conversation, as |
| 8 | | best you can recall? |
| 9 | | MR. LEACH:  Judge, I don't want to |
| 10 | | waive any objection.  Can I just |
| 11 | | have a continuing objection so I |
| 12 | | don't have to keep -- |
| 13 | | THE COURT:  You may.  Same response |
| 14 | | from the Government? |
| 15 | | MR. FRANKLIN:  Yes, Your Honor. |
| 16 | | THE COURT:  Same ruling by the Court. |
| 17 | Q. | Go ahead, Mr. McGahan.  You may answer my |
| 18 | | question. |
| 19 | A. | Mr. Martin and Mr. Scrushy called me.  I was |
| 20 | | in my office.  And I believe they were on |
| 21 | | speaker phone.  And after introductions, |
| 22 | | Mr. Scrushy said that he wanted UBS to make a |
| 23 | | contribution to a cause in the state of |

1          Alabama, that it was a good cause, that other

2          companies in the state were supporting it,

3          that he was supporting it; and he wanted us

4          to step up and support it, too.

5   Q.   And what was your response?

6   A.   My response was -- was one of indifference.

7          I didn't -- I knew it was going to be very

8          difficult to do what he was requesting.  I

9          didn't -- I tried to say things like, well,

10         we -- you know, we have a lot of work to do,

11         you know, that -- you know, I got my -- I got

12         my -- I got a large task ahead of me, you

13         know, those sorts of things.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 24**

22     Q.   My next question is did you want to make a

23          contribution to this entity?

**DUNN, KING & ASSOCIATES**
*Montgomery, Alabama*
*(334) 263-0261 or (800) 359-8001*

**McGahan**
**May 9, 2006**

147

1    A.    I -- I -- I did not, no.

2    Q.    So, why didn't you just say no?

3    A.    Because when a client calls for a request, my

4          thinking at the time was that I was hoping,

5          first of all, that it would go away.  I was

6          hoping perhaps they would get the money

7          elsewhere.  And, also, even if the answer

8          ends up being no, you want to give the

9          appearance at least that you thought about it

10         and -- and that you tried.

11   Q.    Okay.  During the time that you had worked

12         with HealthSouth and had deals with

13         Mr. Scrushy in the past, had you ever told

14         him no to anything he had requested of you?

15   A.    We -- we had told him no, yes.

16   Q.    Okay.  But when you told him no, was that in

17         the context of making a donation or some

18         other context?

19   A.    Some other context.

20   Q.    Would that be a professional advice that you

21         were giving Mr. Scrushy?

22   A.    Yes.

23   Q.    Did this request go away?  Did it end with

148

```
 1        that phone call, with you telling them we got

 2        a lot of work to do and so forth?  Did it end

 3        right there?

 4   A.   No.

 5   Q.   What happened next?

 6   A.   Well, over the next week to two weeks,

 7        Mr. Martin called me every day, or perhaps

 8        even more than that on some days, and -- and

 9        would ask me how I was doing on the donation,

10        how UBS was doing on the donation, what I was

11        doing to get the donation done.  And he

12        increased his pressure and his rhetoric

13        over -- over that time period.

14   Q.   How would you describe the increase in the

15        rhetoric?  Can you be a little more specific

16        than that, please?

17   A.   He -- he would use profanity and increase the

18        berating and the pressure and -- and yelling,

19        telling us that we -- or I -- had to figure

20        out a way to make the donation.

21   Q.   At its worse, give us an example of what

22        Mr. Martin said to you to pressure you into

23        making this donation happen.  At its worse,
```

1      what words did he use to you?

2  A.   Well, he used the profanity and -- in saying

3      that we were -- he said that you, meaning me,

4      was going to be fucked if I don't figure out

5      a way to make the donation.

6  Q.   Did you figure out a way to make the

7      donation?

8  A.   Ultimately, a donation was -- was made to the

9      cause.

10 Q.   Tell us how that came about, please.

11 A.   Well, around -- while Mr. Martin was calling

12     over these seven -- a week to two-week

13     period, I was also receiving calls from --

14     from another person who was inquiring about

15     the donation.  And --

16 Q.   Who was -- let me slow you down.  Who was

17     this other person that started calling you?

18 A.   Eric Hanson.

**McGahan**
**May 9, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 25

19    Q.    Mr. McGahan, before the break, we left off

20          with me asking you about a conversation you

21          had had with Eric Hanson regarding this

22          request for a $250,000 contribution -- or a

23          contribution.  Tell us about your initial

187

1          conversation with Eric Hanson as it relates

2          to your testimony today.

3    A.   Mr. Hanson called me and I spoke with him and

4          we -- he said that he was following up on the

5          request for the donation and wanted to see

6          where it stood.  He was polite.  And -- and I

7          told him that -- similar things that I was

8          telling Mr. Martin at the time, that this was

9          going to be very difficult for us to do, that

10         the size was out of the norm, and things like

11         that.

12   Q.   And when -- when you were saying us, who did

13         you mean?

14   A.   UBS.

15   Q.   At some point, was a decision made as to how

16         to raise the requested amount?

17   A.   Yes.

18   Q.   Tell us what decision was made?  What did you

19         do?

20   A.   Well, from -- I had another -- a second

21         conversation with Mr. Hanson.  And on that

22         call, he and were again discussing the

23         donation.  And I was lamenting to him that

188

1    this was going to be a difficult thing for us

2    to accomplish.  And it was decided on that --

3    in that conversation that Mr. Hanson was

4    going to go to another client of UBS's and

5    also of U.S. Strategies -- which is

6    Mr. Hanson's company -- and which is called

7    Integrated Health, and see if they would

8    provide the donation.

9         And it was suggested on the call -- and

10   I believe by me -- that Mr. Hanson could tell

11   Integrated that there was an outstanding fee

     at the time, that we would work with them on

13   the amount that they owed us, meaning UBS.

14   Q.  What was the outstanding amount owed to UBS

15   by this other company?  And I don't think you

16   mentioned the name of it, so I need you to

17   mention the company that you're talking about

18   first.

19   A.  I did.  Integrated Health Services.

20   Q.  Okay.  And where is that company located?

21   I'm sorry.

22   A.  In Maryland.

     Q.  Where?

189

1    A.    In Maryland.

2    Q.    How much did Integrated Health Services owe

3          to UBS at that time?

4    A.    Well, at that time, it was my understanding

5          that they owed UBS a million dollars.

6    Q.    Okay.  For what?

7    A.    There was a transaction that UBS had advised

8          Integrated on that had nothing to do with

9          HealthSouth.  It was a separate transaction

10         with a company called Nova Care.  Out of that

11         transaction, there came an obligation by

12         Integrated to pay a million dollars to -- to

13         UBS.  And, so, that was the transaction.

14   Q.    Okay.  A million dollars for a fee by a

15         company like UBS or the company that you used

16         to work for, Smith Barney, is that an

17         unusually large amount for the type of work

18         that you did for companies and the fees that

19         you would receive during that time?

20   A.    No, it wasn't an unusual amount.

21   Q.    Okay.  Keep going and tell us what happened.

22         Did IHS agree to make the contribution in

23         exchange for something that UBS would do?

1    **A.**   Mr. Hanson, after he and I spoke, he said he

2    was going to call Dr. Elkins, who was the CEO

3    of Integrated.  After that, he -- Mr. Hanson

4    called me back and said that he had spoken

5    with Dr. Elkins; that Integrated had agreed

6    to make the contribution and -- but that they

7    wanted UBS to work with them, which meant

8    reduce the amount of the fee that Integrated

9    owed to UBS.

10    **Q.**   And did UBS reduce a fee owed to it by IHS?

11    **A.**   Yes.

12    **Q.**   In what amount?

13    **A.**   It went from a million dollars down to

14    approximately -- or to $733,000.

15    **Q.**   And did that take care of the contribution

16    that -- contribution that was being solicited

17    by Mr. Scrushy and Mr. Martin?

18    **A.**   Integrated had agreed, my understanding was,

19    to make the contribution so that Mr. Martin

20    then didn't -- didn't continue yelling at me

21    after that.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 26

15   Q.   Okay.  And didn't UBS occasionally hold

16        investment conferences and things of that

17        nature?

18   A.   Yes.

19   Q.   And when -- just so the jury understands what

20        that is, that's a situation where HealthSouth

21        gets to present themselves to investors?

22   A.   Yes, sir.

23   Q.   Okay.  And when you would go out on these

228

```
 1              investor conferences, Mike Martin would be

 2              there?

 3      A.    He would.

 4      Q.    And you and he didn't just visit at the

 5              conference.  I mean, you spent time after

 6              work as well.

 7      A.    We did sometimes, yes.

 8      Q.    And you enjoyed his company during that

 9              period of time.

10      A.    We would go -- he would want to go out to

11              dinner or drinks usually prefaced around

12              business functions.

13      Q.    Okay.  And you did that?

14      A.    Yes, sir.

15      Q.    And you enjoyed his company?

16      A.    I went out with him, yes, sir.

17      Q.    And fair to say that throughout all these

18              interactions with Mike Martin, it is very

19              safe to say that Mike Martin was consistently

20              foul-mouthed?

21      A.    Pardon me, sir?

22      Q.    That he cursed a lot?

23      A.    He did.
```

1    Q.   Yeah.  I mean, in terms of people that you

2         see in a business environment --

3              MR. FRANKLIN:  Objection, Your Honor.

4              What relevance?  Other than to

5              paint this man's character, what

6              relevance?

7              THE COURT:  It's cross-examination.

8              Overruled.

9    Q.   Let's go right there.  I mean, it wasn't

10        unusual for you to hear Mike Martin using

11        foul language in all manner of circumstances;

12        isn't that right?

13   A.   Mike was a very colorful speaker.

14   Q.   Colorful meaning foul?

15   A.   He liked to use flamboyant language at times

16        to describe things.

17   Q.   Like during the course of your direct

18        examination, you said that Mike said to you,

19        if you don't do this, you will be F'd.  Now,

20        that word was a word that Mike Martin used

21        all the time; isn't that right?

22   A.   Mike did use that word.

23   Q.   So, in terms of how you were stunned when

230

1       Mike Martin said that to you, it wasn't quite

2       that uncommon, correct?

3  A.  Well, what Mike was doing over the course of

4       a week to two weeks, that -- it was the

5       repetitiveness, really, of the -- of the

6       verbal barrage, the -- how it had continued

7       over time and escalated.  That's what --

8       that's what was different.

9  Q.  Okay.  Early on in your direct examination,

10      you indicated to Mr. Franklin that you wanted

11      to say no to this request, correct?

12  A.  I believe I said that, yes.

13  Q.  Now, the reason why you didn't say no is

14      because you wanted the HealthSouth business;

15      isn't that right?

16  A.  They were an important customer.

17  Q.  Okay.  And in terms of getting this deal done

18      and trying to find a way to get this deal

19      done, you were doing it because you were

20      hoping that there would be more business down

21      the road; isn't that right?

22  A.  Yeah.  We didn't want to lose -- based on

        what we knew then, we didn't want to lose

231

1          **HealthSouth as a potential customer.**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 27

240

1    Q.   Am I correct in what was motivating you was

2         to try to satisfy a client so that you could

3         maintain a business relationship going

4         forward?

5    A.   I was -- and -- I was trying to satisfy a

6         client, yes, sir.

7    Q.   And is it -- is it correct to say that with

8         regard to this transaction, you don't view

9         yourself as any kind of co-conspirator or

10        anything along that line?

11    A.   Well, that's a legal terminology.  I just --

12         I don't believe that I did anything wrong.

13    Q.   Okay.  Do you believe that you are a person

14         who engaged in an agreement to do something

15         that the law forbids?

16    A.   I don't believe I did anything wrong, no.

17    Q.   Okay.  To your recollection, was there any

18         discussion at any point with anyone involved

19         in this transaction that even bordered on

20         illegality, in your view?

21    A.   Not that I know of.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 28

248

1   Q.   Okay.   Now, isn't it true that you initially

2        told the agents that to your recollection,

3        this transaction occurred not only in late

4        1997, but while you were still at Smith

5        Barney?

6   A.   I -- I -- I was thinking of another thing and

7        I -- I got it wrong.

8   Q.   Well, isn't that other thing that you were

9        thinking about was that this transaction was

10       tied to the Horizon CMS deal?

11  A.   I thought somehow they were together, yes,

12       and so I was mistaken.

13  Q.   Isn't it true that you told the agents at

14       that time that you believed that there was a

15       fee reduction in terms of what Soloman Smith

16       Barney would receive and that the

17       contribution was made that way?   In other

18       words, Smith Barney reduced their fee and

19       paid the contribution?

20  A.   I believe I did tell them that, yes, because

21       I had it mistaken.

22  Q.   Isn't it true you told the agents at that

23       time that there was no contact with Martin;

249

```
 1              in other words, the contacts with regard to
 2              this fee were all with Richard Scrushy.
 3     A.       I -- I did not recall the conversations with
 4              Mr. Martin at that time.
 5     Q.       So you had no recollection of any of these
 6              contacts that you've related to the jury with
 7              Mr. Martin at your first meeting with the
 8              agents?
 9     A.       I didn't in that meeting, no.
10     Q.       And isn't it true that you told the agents
11              that Mr. Scrushy, in this meeting, told you
12              that you were going to have to reduce the
13              Horizon fees and pay the 250,000?
14     A.       I -- yeah.  I believe that I did get it
15              wrong, yes.
16     Q.       Isn't it true that you also tied this
17              transaction to the sale of the nursing homes
18              from Horizon?
19     A.       I believe I did, incorrectly.
20     Q.       Isn't it true that you told the agents at
21              that time that you had no recollection of
22              ever talking to Mike Martin about this
23              transaction?
```

A.    I didn't recall the conversations with Mike
      at the time.

Q.    Answer my question.

A.    Okay.  I'm sorry.

Q.    Isn't it true you told the agents at that
      time that you had no recollection of ever
      telling Mike Martin anything about this
      transaction?

A.    I -- I don't have -- I -- I did not -- I
      think the answer is, yes, to your question,
      which is that I did not tell them that I had
      a recollection of talking with Mike Martin.

Q.    So at that point, your -- your --

            MR. LEACH:  Anytime you pick up that
                  gavel, Judge?

            THE COURT:  I'm sorry.  I didn't
                  realize what I was doing.  I was
                  just fidgeting.  I apologize.  Go
                  ahead, Mr. Leach.

Q.    So when you spoke to the agents on September
      the 11th, 2003, you told them that you hadn't
      told Mike Martin anything about this deal?

A.    I didn't remember it, so I didn't tell them.

1    Q.    But the answer to my question is, yes, that's

2          what you told the agents?

3    A.    Yes, sir.

4    Q.    Okay.  Did you tell the agents that you

5          didn't even deal with Mike Martin on this

6          transaction?  Let me rephrase that.

7    A.    Okay.

8    Q.    I want to be a little more precise.  Did you

9          tell the agents that you did not think you

10         had dealt with Mike Martin on this $250,000

11         transaction?

12   A.    I just didn't have a recollection of dealing

13         with Mr. Martin; so, therefore, that's what I

14         told them.

15   Q.    Okay.  Did you tell the agents that you did

16         not recall any conversations with Martin in

17         which he discussed the Alabama

18         contribution -- in which you discussed the

19         Alabama contribution?

20   A.    I -- I didn't -- again, I -- I don't believe

21         that I had a recollection at that time of

22         talking to Mr. Martin.  So the answer to your

23         question is yes.

252

1    Q.   And fair to say that when you're meeting with

2         these agents in September of 2003, you have

3         no incentive to cover up for Mike Martin; is

4         that correct?

5    A.   I don't have any incentive.

6    Q.   I mean, you were honestly trying to relate

7         the information as you recalled it at that

8         moment to the agents.

9    A.   I was.

McGahan
May 9, 2006

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 29

```
10      Q.   Okay.  In 1999, were you asked to get

11           involved in the delivery of a package from

1            IHS, Taylor Pickett, to HealthSouth?

13      A.   Yes, I was.

14      Q.   Would you tell us how you came to get

15           involved with it?  Just kind of give us some

16           background surrounding it.  What, if anyone,

17           asked you to do something?

18      A.   Because I had a very strong relationship with

19           Taylor Pickett, the sale that we made of

20           assets to Integrated Health Services took

21           close to six months; and so we worked

22           together on a day-to-day basis over that very

23           long period of time.  When something was
```

1              needed or there was a contact with IHS, it

2              wouldn't be unusual for me to be asked to

3              talk to Taylor Pickett about coordinating

4              something or getting something from a

5              Taylor.

6                  So the specific question in 1999, I was

7              asked to coordinate the delivery of a check

8              from Integrated Health Services.  And my

9              contact person was Taylor Pickett.

10    Q.    Okay.  Do you know how much the check was?

11          At the time you were asked to coordinate the

12          delivery of the check, do you know how much

13          the check was for?

14    A.    I don't recall specifically if I knew the

15          exact amount of the check.

16    Q.    Okay.  Did you do as instructed?  Did you

17          call Mr. Pickett and began talking to him

18          about the delivery of that check?

19    A.    Yes, I did.

20    Q.    Do you recall what day it was?

21    A.    I do.

22    Q.    What day was it?

23    A.    It was a Friday, July 16th.

306

Q.    Okay.  And was that your first contact with

2        Mr. Pickett?

3    A.    For this particular?

4    Q.    Yes.  For this -- I want you to focus your

5        testimony on the delivery of this item, an

6        item from IHS to HealthSouth.

7    A.    Yes, it was.

8    Q.    Okay.

9            THE COURT:  What date was that again,

10                Mr. Franklin?

11            MR. FRANKLIN:  The witness said the

12                16th, on a Friday.

13            THE COURT:  Friday, the 16th, of which

14                month?

15            THE WITNESS:  Of July.

16            THE COURT:  Of which year?

17            THE WITNESS:  1999.

18            THE COURT:  I'm sorry.  Go ahead.

19            MR. FRANKLIN:  All right.

20    Q.    In contacting Mr. Pickett, what instructions

21        did you give Mr. Pickett?

22    A.    Because it was a Friday and there was some

23        urgency in getting the check, I gave him

```
 1           delivery instructions to my personal

 2           residence for Saturday delivery.  If he was

 3           not able to get the check cut on a Friday

 4           afternoon, then he was to go ahead and send

 5           the check to my work address on that Monday.

 6     Q.    Now, you indicated there was some urgency

 7           surrounding the delivery of this check.  Who

 8           made it known to you that this was an urgent

 9           matter?

10     A.    Mike Martin was my supervisor, and he was the

11           person that asked me to coordinate the

12           delivery of the check.

13     Q.    Okay.  How did you let Mr. Pickett know where

14           to send it?  Was this a telephone

15           conversation, or did you do something else?

16     A.    We initially had a telephone conversation,

17           but then I sent him a facsimile and had

18           written on the facsimile my home address and

19           mailing instructions.

20     Q.    Did you send anything else to Mr. Pickett

21           regarding -- in your effort to coordinate the

22           delivery of this check?

23     A.    I did.  I believe it was the -- the articles
```

```
           of incorporation for some entity to do with

 2         the lottery, the lottery campaign.

 3    Q.   Okay.

 4              MR. FRANKLIN:  May I approach the

 5                  witness, Your Honor?

 6              THE COURT:  You may.

 7    Q.   I want to show you what's been marked for

 8         identification purposes as Government Exhibit

 9         #35.

10                  (Brief pause)

11              MR. FRANKLIN:  I'm sorry.

12    Q.   Mr. Murphy, do you recognize Government's

13         Exhibit #35?

14    A.   Yes, I do.

15    Q.   All right.  And what is it?

16    A.   This is the facsimile that I sent to Taylor

17         Pickett on July 16th of 1999.
```

Murphy
May 9, 2006

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 30

17   Q.   How was the check delivered to HealthSouth?

18   A.   It would have been sent by overnight courier.

19   Q.   And do you recall which courier?

20   A.   I don't specifically recall, no.

21   Q.   Do you recall whether or not it had been

22        delivered in the morning?

23   A.   No, sir.

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*

Murphy
May 9, 2006

312

Q.    Was it common to receive packages in the

morning and in the afternoon at HealthSouth?

MR. LEACH:  It's irrelevant what's

common.  He doesn't recall what

happened with this particular

item.

MR. FRANKLIN:  Let me ask another

question, Your Honor.

THE COURT:  Okay.

Q.    Mr. Murphy, had you ever been asked to

receive packages from companies outside of

HealthSouth at your home on the weekend?

A.    Yes, sir.

Q.    So this wasn't the first time, was it?

A.    It was not.

Q.    And would you also receive packages at

HealthSouth during the time you were working

at HealthSouth?

A.    Yes, I would.

Q.    This wasn't the first time that you had

received a package; is that correct?

A.    No.  It was a very common occurrence.

Q.    Okay.  Was it common to receive them in the

313

mornings or in the afternoons?

   MR. LEACH:  That's still irrelevant,

     Judge.  What's common as opposed

     to this situation is irrelevant.

   THE COURT:  I'll allow the witness to

     answer the question.  Overruled.

A.  I don't have a specific recollection of when

packages were delivered.

Q.  That's fine.  That's fine.  Is it your

recollection that once that package arrived,

you gave it to another person?

A.  Absolutely.

Q.  Beyond that, did you have any other

involvement with the delivery of that package

from IHS to HealthSouth?

A.  No, I did not.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 31

| | |
|---|---|
| 9 | Q. Let me direct your attention to 1999 and ask |
| 10 | you if you recall an incident where |
| 11 | Mr. McGahan requested a favor from you or |
| 12 | IHS. |
| 13 | A. I do. |
| 14 | Q. Tell us when in '99, as best you can |
| 15 | remember, and what happened, please. |
| 16 | A. In late June or early July of 1999, |
| 17 | Mr. McGahan called me and asked -- said he |
| 18 | needed some help with a situation, that he |
| 19 | had some pressure to make a donation to a |
| 20 | not-for-profit entity in Alabama and he was |
| 21 | not in a position to do so. |
| 22 | MR. GRAY: Objection, Your Honor. It's |
| 23 | hearsay, and we move to strike it. |

*DUNN, KING & ASSOCIATES*
*Montgomery, Alabama*

**Pickett**
**May 10, 2006**

1            THE COURT:  Response?

2            MR. FRANKLIN:  It's not offered for the

3                  truth of the matter asserted, Your

4                  Honor, only to get the witness to

5                  explain what he did.

6            THE COURT:  Overruled.

7   Q.  After your conversation with Mr. McGahan,

8      what did you do, Mr. Pickett?

9   A.  Just to continue with respect to the

10     conversation --

11          THE COURT:  Just answer the question.

12          THE WITNESS:  Oh, I'm sorry.

13   A.  After the conversation, I -- I went on to

14     investigate whether that was something I

15     would do.

16   Q.  Okay.  And what did you investigate?

17   A.  Well, I had indicated to Bill that I might be

18     in a position to -- to help him, but I needed

19     to think about it.  So I, over the next --

20     course of the next few days, I had a meeting

21     with my boss, the chief executive officer of

22     the company, Dr. Robert Elkins, and explained

23     to him the request that was being made.  And

195

1           his response to me was twofold.  First he

2           said, I'll leave the decision up to you.  And

3           the second part was, I recommend that you

4           check with our legal counsel to make sure

5           that we're dealing with a valid

6           not-for-profit in the state of Alabama.

7    Q.    Did you check with your legal counsel?

8    A.    I did.

9    Q.    And did you confirm for yourself whether or

10          not this entity that you were being asked to

11          donate to was a legitimate entity?

12   A.    Integrated's legal counsel informed me that

13          in fact it was a legitimate not-for-profit in

14          Alabama.

15   Q.    And did you agree at some point to help

16          Mr. McGahan with the request he had made of

17          Integrated Health Services?

18   A.    Subsequent to that, I called Mr. McGahan back

19          and indicated that we would in fact help him

20          out.

21   Q.    All right.  Did you put any stipulations on

22          what you would do for Mr. McGahan --

23   A.    No.

1    Q.    -- in terms of helping him out?

2    A.    There were no stipulations, no.

3    Q.    Okay.  Was there an agreement reached with

4          respect to how you would help him out?

5    A.    Yeah.  We have to go back to the first

6          conversation.  We left off with the

7          objection.

8              In the first conversation, when Bill

9          indicated that he needed help, I said to him,

10         well, what are you -- what are you talking

11         about in terms of dollars?  And he said

12         $250,000.  My response was -- I can't

13         remember exactly.  Either it was a very long

14         pause or basically, I said that there's no

15         way I can do that.  His response to me was --

16              MR. GRAY:  Your Honor, we're going to

17                   object to what his response was.

18              MR. FRANKLIN:  Well, Judge, I think

19                   this goes --

20              MR. GRAY:  The question was what

21                   happened.

22              THE COURT:  Response by the

23                   Government?

1          MR. FRANKLIN:  This would go to his

2              present sense impression as to

3              what he was being asked to do.

4              And he's -- I think what he's

5              explaining to the jury is his

6              surprise at the request that was

7              being made of him.

8          THE COURT:  Let's take this up at

9              side-bar.

10                 (Bench conference held outside

11                 the hearing of this reporter)

12          THE COURT:  You may proceed,

13              Mr. Franklin.

14          MR. FRANKLIN:  Thank you, Your Honor.

15   Q.   Mr. Pickett, would you go back to the

16        beginning of your testimony and tell us what

17        Mr. McGahan said to you with regard to the

18        favor he was asking of you when he called?

19   A.   He initially said it was something that he

20        would have trouble getting done.  And then

21        after I asked him about what it was he was

22        looking for, the $250,000, and I said that

23        wasn't something we could do, he -- his

198

```
 1        response was, what if I knock off $250,000 of

 2        fee that IHS currently owes us.  That would

 3        be the quid pro quo for the favor.

 4   Q.   Did IHS come to some agreement with respect

 5        to the $250,000 favor requested of it by

 6        Mr. McGahan?

 7   A.   After the diligence that I did internally, I

 8        came back to Bill, called him and said we

 9        would move forward with the favor he was

10        asking.

11   Q.   All right.  At some point, did you receive

12        information from anyone at HealthSouth

13        regarding this favor that was being asked of

14        you?

15   A.   I received the details, the payee

16        information, from Leif Murphy, who was an

17        employee of HealthSouth.
```

**Pickett**
**May 10, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 32**

200

| | | |
|---|---|---|
| 1 | Q. | What were you to do with the information that |
| 2 | | is on Government's Exhibit #35? |
| 3 | A. | This was the information I needed to process |
| 4 | | the check and -- and forward it on. |
| 5 | Q. | How much was the check? |
| 6 | A. | $250,000. |
| 7 | Q. | And did IHS cut a check in the amount of |
| 8 | | $250,000? |
| 9 | A. | Yes, we did. |
| 10 | Q. | And after the check was cut, what did IHS do |
| 11 | | with the check? |
| 12 | A. | The check was cut and returned to me; and I |
| 13 | | gave it to my administrative assistant, who |
| 14 | | would have mailed it. |
| 15 | | MR. FRANKLIN:  Okay.  Your Honor, at |
| 16 | | this time, I'd offer Government's |
| 17 | | Exhibit -- |

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 33**

4    Q.   Okay.  And just to make sure we get the dates

5         right, the check, which is Government's

6         Exhibit #21, which I'm putting up on the

7         monitor here, can you make out the date of

8         that?

9    A.   July 19th, 1999.

10   Q.   And assume the 16th was on a Friday, that

11        19th would have been the following Monday?

12   A.   That's correct.

13   Q.   And you think the checking by the legal

14        department would have been done Friday or

15        Monday, or you don't know?

16   A.   I couldn't tell you the date.

17   Q.   All right.  And is that -- that check is

18        consistent with the -- the date also on

19        Government Exhibit #22, I believe, is it not?

20   A.   That's correct.

21   Q.   And that's this date right here?

22   A.   Correct.

23   Q.   Okay.  And so, can we assume, then, that the

214

1       check was written on the 19th and then mailed

2       by your company on the 19th?

3   A.  It was certainly written on the 19th.  It

4       would have been mailed either the afternoon

5       of the 19th or the morning of the 20th.

6   Q.  Okay.  And assume the U.S. Mail to take at

7       least a day, maybe two to get the check to

8       Alabama.  Would you say it would be fair to

9       say that the check would not have been

10      received in Alabama until -- no sooner than

11      the 20th and maybe -- maybe later?

12  A.  I don't -- I couldn't tell you for sure the

13      check was U.S. Postal Service or overnight,

14      so I can't answer that question.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 34

3   Q.   Now, you cannot tell this -- these ladies and

4        gentlemen of the jury the specific date that

5        check was mailed?

6   A.   I cannot, no.

7   Q.   Or whether it was mailed or whether it was

8        sent by courier?

9   A.   I do not know.

10  Q.   But you do know it could not have been sent

11       before the 19th.

12  A.   That's correct.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 35

22

4    Q.    Okay.  Do you recall, as you sit here today,

5          whether or not Richard Scrushy was targeted

6          as someone that you should solicit money from

7          for Governor Siegelman's gubernatorial

8          campaign?

9    A.    Yes.

10   Q.    And did you solicit or attempt to get money

11         from Mr. Scrushy for the gubernatorial

.2         campaign?

13   A.    We attempted.  We called, but I don't

14         remember him ever taking our phone call.

15   Q.    And what time period was that?  I know you

16         were here in '97.  How long did you

17         participate in the fund-raising aspect of the

18         gubernatorial campaign?

19   A.    From '97 through November of ninety -- of

20             '98.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 36

4    Q.    So, an individual or a corporation could give

5          any amount that they were comfortable with?

6    A.    Yes.

7    Q.    All right, sir.  And the larger the amount,

8          the more it suited the fund-raisers.  Is that

9          a fair statement?  Wouldn't you --

10   A.    As long as it doesn't ruin the campaign

11         politically.  Because if somebody gives you a

12         huge check and it comes out in the press that

13         somebody is trying to buy an election, you

14         don't win the election.  So it's not in your

15         best interest to be a money-hungry kind of

16         person.  It's in your best interest to build

17         a coalition of folks who give dollars in

18         support of your initiatives.

19   Q.    All right, sir.  All right.  Well, certainly,

20         let's clear up any perception about that.

21         You're not saying that Richard Scrushy tried

22         to buy an election.

23   A.    No, I'm not saying that at all.

213

```
1    Q.   All right, sir.

2    A.   I'm saying the political landscape --

3    Q.   Right.

4    A.   -- is what you have to take into

5         consideration.

6    Q.   All right.

7    A.   Your question made it sound like we didn't

8         take into -- and it's -- you know, fund

9         raising is not an independent arm of the

10        campaign.  What happens in fund raising

11        affects other places just like what happens

12        in policy affects what happens in fund

13        raising.  They're all kind of interrelated.

14        And, you know, when a big check comes in like

15        that, you have to stop and say how does this

16        look to the public.  That's what we did.

17   Q.   All right, sir.  Now, let -- let me clear

18        that up, because I don't want any

19        perception -- well, perhaps I should ask it

20        this way.  Did you -- was there anything

21        illegal about the amount of money?

22   A.   No.  Like I stated before, there was nothing

23        illegal about that.
```

214

1    Q.    All right.

2    A.    You are right.  It's an unlimited amount that

3          they can give.

4    Q.    All right.  So whatever amount of money

5          Richard Scrushy may have raised, been

6          responsible for raising, or perhaps given or

7          had others to give, you see nothing

8          illegal -- there's nothing illegal about

9          that?

10   A.    There's nothing illegal about that, that I

11         know of, sir.

12   Q.    All right, sir.  And had it been illegal, you

13         guys wouldn't have taken it.

14   A.    Exactly.

15   Q.    All right, sir.  Now, you said that when --

16         you made the comment, I believe, that Richard

17         Scrushy committed to raise some money.  And

18         you were referring to the IHS check for

19         $250,000.

20   A.    Yes.

21   Q.    Did you personally ever talk to Richard

22         Scrushy?

23   A.    No, I did not.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 37

```
 7   Q.   Can you recall how many times you saw Richard

 8        Scrushy visit the Governor's Office?

 9   A.   Once, maybe twice.

10   Q.   Do you know when Mr. Scrushy -- or let me ask

11        you.  Were you -- did you physically see

12        Mr. Scrushy hand that check to the Governor?

13   A.   No, sir.

14   Q.   Do you know exactly how that check got into

15        the Governor's hands?

16   A.   No, sir, I don't know for sure.

17   Q.   Now, I want to ask you if early on when you

18        were talking to the investigators with the

19        United States and the State of Alabama, if

20        they had an opportunity to ask you questions

21        about this check.

22   A.   They -- they did and they have.

23   Q.   Did you tell them in early conversations that
```

**Bailey**
**May 2, 2006**

186

1       Richard Scrushy had visited with the Governor

2       and left, and it was after that meeting at

3       that you walked in and saw this check?

4    A.  Yes, sir, I did say that.

5           MR. LEACH:  Well, I object to leading

6                on this point, Your Honor.  Ask

7                that the witness testify in this

8                case.

9           MR. FEAGA:  Your Honor, I'm just trying

10               to get to a --

11          THE COURT:  Overruled.

12   Q.  Now, did you subsequently at some point in

13       time have an opportunity to think about this,

14       and did you subsequently come tell the

15       government investigation --

16          MR. LEACH:  Your Honor, he's leading.

17   Q.  Did you ever tell them anything different?

18   A.  Yes, I did.

19          MR. FEAGA:  I'm sorry, Your Honor.

20          THE COURT:  Counsel, give us an

21               opportunity to state objections

22               and rule on objections.

23                   I understand your objection,

187

```
 1              Mr. Leach, but I don't think that

 2              this is such an important part

 3              that he can't lay the foundation.

 4              I understand the nexus of your

 5              concern.

 6                   Lay the foundation to prevent

 7              the leading, Mr. Feaga.  The

 8              objection, for the record, would

 9              be sustained.  Let's move on.

10  Q.  Having told them -- well, let me just say,

11      what was the first time -- well, the first

12      time you discussed this event with federal

13      and state criminal investigators, what did

14      you tell them about the delivery of this

15      check?  Tell the ladies and gentlemen of the

16      jury.

17  A.  I did tell them initially that this check was

18      delivered that day by Mr. Scrushy.  And at a

19      later date after thinking about it and

20      looking at some documents, I'm not sure that

21      it was that day.  It could have been sometime

22      after then.

23  Q.  Now, did anyone with the United States or the
```

188

1    State of Alabama suggest to you that you

2    change the information that you had given us

3    about the delivery of that check?

4  A.  No.

5  Q.  How did it come about that you came to tell

6    us that you weren't sure about that date?

7  A.  Just reevaluating my memory and thinking

8    about it and looking at the documents.

9  Q.  So it was something you volunteered --

10  A.  That's correct.

11  Q.  -- to the United States?

12  A.  I did.

13  Q.  And to the State of Alabama?

14  A.  That is correct.

15  Q.  Now, this -- you said that Mr. Scrushy -- you

16    do know that he came to visit with the

17    Governor at some point?

18  A.  Yes.

19  Q.  And you said that it may have been one or two

20    times?

21  A.  Once, maybe twice.

22  Q.  And were you present to see him come make

23    those visits?

**Bailey**
**May 2, 2006**

189

1   A.   Yes, on one occasion for sure.

2   Q.   Now, if those visits predate the date on this

3        check, then is it possible --

4             MR. LEACH:  Objection.  Counsel is

5                  saying if those visits, plural;

6                  and that has not been established

7                  by the witness.

8             THE COURT:  Let him ask his question

9                  and then raise your objection.

10  Q.   If they predate the date on this check, then

11       it couldn't have been the day that he visited

12       with the Governor that he delivered it,

13       right?

14  A.   That's possible.

15  Q.   On the other hand, if he did visit with him

16       after the date after this check, then it

17       could have been -- you could be right that he

18       did deliver it then, right?

19  A.   That is correct.  And assuming the date on

20       the check is when the check was actually

21       produced.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 38**

18  Q.  Now, how much is that check for?

19  A.  250,000.

20  Q.  Now, let me show you something else, if I

21      can.  Have you seen this check since you saw

22      the Governor with it and before coming into

23      this courtroom?  Has it been shown to you by

181

1     investigators?

2   A.  This copy, yes, sir.

3   Q.  All right, sir.  And do you -- did you ever

4       tell them when you saw that check -- did they

5       ever ask you to look at the signature on it?

6   A.  Yes.

7   Q.  And what did you tell them?

8   A.  I actually thought it was Richard Scrushy the

9       first time I looked at it.

10  Q.  Okay.  I want you to look at it today.  Is

11      that the signature that you looked at when

12      you saw it at the Governor's Office?

13  A.  Yes, sir.

14  Q.  And you thought that was Richard Scrushy's

15      signature?

16  A.  I did.  I hadn't seen his signature before,

17      but it just looked like -- I glanced at it

18      and it looked like Richard Scrushy, so --

19  Q.  You don't in fact know whether it is or not?

20  A.  I don't.

**Bailey**
**May 2, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 39

16  Q.  Mr. Bailey, can you tell from the copy of the

17      check that you have in your hand what the

18      date on it is?

19  A.  July 19th, 1999.

20  Q.  Okay.  Now, when you saw the Governor, did he

21      have this check in his hand?  Did he have it?

22  A.  Yes, sir.

23  Q.  Okay.  Now, when the Governor showed you the

**Bailey**
**May 2, 2006**

176

1    check, what, if anything, did he say to you?

2  A.  He made a comment referring to Mr. Scrushy's

3      commitment to give 500,000 and he's halfway

4      there.

5  Q.  Okay.  And what, if anything, did you say to

6      him?

7  A.  I said -- I responded by saying, what in the

8      world is going to want for that; and his

9      response was the CON Board or the C-O-N

10     Board.

11 Q.  Okay.  And what did you --

12 A.  I wouldn't think there would be a problem

13     with it.  And he said, I wouldn't think so.

14 Q.  Now, what did you say -- now, if you could,

15     repeat that conversation.  You showed it to

16     him.  He said he's halfway there.  And what

17     did you say to him?

18         MR. LEACH:  It's been asked and

19             answered.

20         THE COURT:  Overruled.

21 Q.  What did you say when he showed you the check

22     and he said, he's halfway there?

23 A.  I responded by, what in the world is he going

**Bailey**
**May 2, 2006**

177

1    to want for that?  And the Governor said, the

2    C-O-N Board or the CON Board.  And I said, I

3    wouldn't think there would be a problem with

4    it; and he said, I wouldn't think so.

**Bailey**
**May 2, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 40**

4  Q.  Now, I want to ask you if you've ever heard

5      the name Richard Scrushy.

6  A.  Yes, sir.

7  Q.  And I think you already pointed him out in

8      here today, didn't you?

9  A.  Yes, sir.  I recognize Mr. Scrushy.

10  Q.  Do you know a fellow named Eric Hanson?

11  A.  Yes, sir, I know Eric.

12  Q.  Tell the ladies and gentlemen of the jury who

13      Eric Hanson is.

14  A.  Eric Hanson is a long-time friend of Governor

15      Siegelman, I think for probably 30 years

16      maybe, and an employee -- I don't know if he

17      still works for Mr. Scrushy, but he did at

18      the time.

19  Q.  Okay.  Do you know in what capacity he worked

20      for Mr. Scrushy?

21  A.  Governmental affairs is about the only way I

22      know to explain it.

23  Q.  And when you say to a jury of peers that

**Bailey**
**May 2, 2006**

162

1    somebody is in governmental affairs, what are

2    you telling them?  What do you mean by that?

3  A.  I think he maintains relationships between

4    Mr. Scrushy and his interests and

5    governmental officials.

6  Q.  Was he lobbying?

7  A.  I don't know that he was a lobbyist, because

8    he --

9  Q.  Consultant?

10  A.  A consultant, certainly.

11  Q.  Now, did you ever happen to be present when

12    Governor Don Siegelman -- and I'm talking

13    about after January the 19th, 1999.  Were you

14    ever present when he had a conversation with

15    Eric Hanson?

16  A.  Yes, sir.

17  Q.  Did you ever -- were you present when he had

18    a conversation with Eric Hanson concerning

19    money?

20  A.  Yes.

21  Q.  Would you relay that conversation that you

22    had with Don Siegelman -- well, let me ask

23    you.  Was it after he became governor?

**Bailey**
**May 2, 2006**

163

1   A.  Yes.

2   Q.  And I'm talking about when he was sworn in.

3   A.  That's correct.

4   Q.  And was this conversation before he made his

5       Certificate of Need Review Board

6       appointments?

7   A.  Yes.

8   Q.  Tell the ladies and gentlemen of the jury

9       about the conversation that you heard between

10      Eric Hanson and Governor Don Siegelman.

11          MR. LEACH:  Well, to the extent he's

12              eliciting Eric Hanson's side of

13              the conversation, that's clearly

14              hearsay.

15          MR. FEAGA:  Your Honor, it isn't.  We

16              are --

17          THE COURT:  He's not -- I'll hear your

18              response.

19          MR. FEAGA:  Yes, sir.  It is not

20              hearsay.  It would be our argument

21              that the facts of this are going

22              to establish that he was a

23              co-conspirator.

165

```
 1        THE COURT:  All right.  We do have a
 2             rule that objections are good as
 3             to all parties made by one.  The
 4             record is preserved.  The
 5             objection is overruled.  Let's
 6             move on.
 7        MR. McDONALD:  Okay.
 8   Q.  (Mr. Feaga continuing:)  Tell the ladies and
 9        gentlemen of the jury about the conversation
10        that you heard between Eric Hanson and the
11        Governor about money after Don Siegelman was
12        elected governor.
13   A.  The conversation between Eric Hanson and the
14        Governor referred to Mr. Scrushy's
15        commitment -- or Mr. Scrushy's contributions
16        to Fob James' campaign of at least $350,000.
17        And the Governor and --
18        MR. LEACH:  Objection, Your Honor.
19             Who's saying what?
20        MR. FEAGA:  We'll get there, Judge.
21        MR. LEACH:  It shouldn't just come in
22             as a dialogue, Your Honor.
23        THE COURT:  Let's try to tie down dates
```

166

1        and who are the parties to the

2        conversation and what those

3        parties said.

4            MR. FEAGA:  We've narrowed it down

5            judge to between January 19th of

6            '99 and the date of the CON Board

7            appointments, July 26, 1999.

8            MR. LEACH:  I don't think this witness

9            has testified to that fact.

10            MR. FEAGA:  Well, he wasn't listening,

11            Judge, because the witness did

12            testify to that.

13            THE COURT:  I believe I did hear him

14            say that as well.  So move on.

15    A.  The comments made by the Governor were that

16        Mr. Scrushy had contributed at least 300 --

17        to our knowledge, contributed at least

18        $350,000 to the Fob James campaign.  And in

19        order to make it right to the Siegelman

20        campaign, he needed to do at least 500,000.

21        That was the conversation that the Governor

22        had with Eric Hanson for Eric Hanson to relay

23        to Mr. Scrushy.

167

1  Q.  Now, the Governor had been elected, correct?

2  A.  Correct.

3  Q.  So what campaign was going on at that time

4      that Mr. Scrushy would have an opportunity to

5      make a contribution to?

6  A.  The lottery campaign.

**Bailey**
**May 2, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 41

5   Q.   What I'd like to know and I think the jury

6        wants to know is how did Mr. Scrushy control

7        the CON Board if he gets appointed to the CON

8        Board?

9   A.   I think the first step we took was to make

10       him vice chairman.

11  Q.   Great.  Does the Governor decide who the vice

12       chair is?

13  A.   No.  But his call to another member made it

14       happen.

15  Q.   All right.  That's great.  He called -- you

16       called Margie Sellers, right?

17  A.   That's correct.

18  Q.   We'll talk about that in a minute; but let's

19       just think logically for a second, shall we?

20       If Governor Siegelman wanted Mr. Scrushy to

21       have the most power on the CON Board, what

22       would he do?

23  A.   I don't know, Mr. McDonald.

**Bailey**
**May 3, 2006**

245

```
 1  Q.  He'd name him the chair of the board,

 2      wouldn't he, Mr. Bailey?

 3  A.  No.  He had already committed that to

 4      someone.

 5  Q.  Oh.  So if Mr. -- if -- if -- if the

 6      Government's theory is this, that Mr. Scrushy

 7      paid $500,000 to get on the CON Board, the --

 8      your -- your feeling is that Governor

 9      Siegelman couldn't just say, Okay, for

10      $500,000, you get to be the chair of the CON

11      Board, right?

12  A.  At the time these discussions could have

13      occurred, the commitment for chairman could

14      have already occurred.

15  Q.  Okay.  So --

16  A.  Now, wait a second, Mr. McDonald.

17  Q.  -- you don't know?

18  A.  No, I don't.

19  Q.  You don't know that's what happened; you're

20      just guessing, correct?

21  A.  No.  It's an educated guess.

22  Q.  Your educated guess is Governor Siegelman

23      could not have appointed Richard Scrushy to
```

246

```
 1    head the CON Board after getting $500,000

 2    because he may have already committed to

 3    Margie Sellers after the --

 4 A. I didn't say he couldn't.  I said he didn't.

 5 Q. He didn't.  Right.  Well, is that because

 6    maybe Margie Sellers paid him a million

 7    dollars to be the -- the head of the CON

 8    Board?

 9 A. Let me see.  Who was Margie Sellers

10    representing?  The Nursing Home Association?

11 Q. Yes.

12 A. It could have been more than that, yes.

13 Q. Okay.  All right.  So Margie Sellers, she

14    bought her way on the CON Board, too?

15 A. Don't know that.

16 Q. Well, but she might -- she might have bought

17    her way on the CON Board?

18 A. She might have done a lot of things.

19 Q. Okay.  Well, I want to make a list of all the

20    CON Board board members that have or could

21    have bought their way onto the board.  Can we

22    do that?

23 A. I suppose you could list all nine of them.
```

**Bailey**
**May 3, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 42

1   Q.   All right.  Now, let's talk more about your

2        recollection.  You gave an interview with the

3        FBI, the same thing that that exhibit was

4        attached to -- it's Exhibit #305.  And you

5        said, after that meeting, after Richard

6        Scrushy left, you walked into the Governor's

7        Office, correct?

8   A.   Correct.

9   Q.   And you were crystal clear that after Richard

10       Scrushy left the office, you walked in,

11       correct?

12  A.   I was clear that day.  That's correct.

13  Q.   After Scrushy, Richard Scrushy, left the

14       office and you walked in, you were crystal

15       clear you walked up to the Governor.  Isn't

16       that true?

17  A.   I was clear that day.  That's correct.

18            MR. McDONALD:  Your Honor, may I

19                 approach the witness?

20       THE COURT:  You may.

21  Q.   After Richard Scrushy left that day and you

22       walked into the Governor's office, you were

23       crystal clear Governor Siegelman got up.

**Bailey**
**May 3, 2006**

226

1    Isn't that true?

2  A.  Again, that day, I was clear of my

3      recollection.

4  Q.  And that day, you were crystal clear that

5      Richard Scrushy opened his coat pocket,

6      weren't you?

7  A.  No.

8  Q.  You weren't?

9  A.  You said Mr. Scrushy.

10 Q.  I'm sorry.  You were crystal clear that

11     Governor Siegelman opened his coat pocket,

12     correct?

13 A.  That was my recollection that day.

14 Q.  On that day, you were crystal clear that

15     Governor Siegelman reached into his coat

16     pocket and pulled out a check, correct?

17 A.  That's correct.

18 Q.  You were crystal clear that Richard Scrushy

19     opened that check up and he handed it to you,

20     correct?

21 A.  Governor Siegelman.

22     MR. McDONALD:  Did I say Richard

23          Scrushy again?

**Bailey**
**May 3, 2006**

227

1          THE COURT:  You did.

2    Q.  I apologize.

3    A.  I -- I understand.  I'm following you.

4    Q.  You were crystal clear Governor Siegelman

5         pulled a check out of his pocket and handed

6         it to you?

7    A.  Yes, sir.

8    Q.  You were crystal clear you looked at the

9         check that Governor Siegelman gave to you,

10        correct?

11   A.  That's correct.

12   Q.  You were crystal clear that you looked at the

13        amount on that check and it was $250,000,

14        correct?

15   A.  Correct.

16   Q.  You were crystal clear that you looked at who

17        signed that check, and you were crystal clear

18        Richard Scrushy signed that check?

19   A.  That's what I saw.

20   Q.  You were so crystal clear that that's what

21        happened that day, you went to a grand jury

22        on June 21, 2004, correct?

23   A.  That's correct.

**Bailey**
**May 3, 2006**

228

1  Q.  You were crystal clear that event happened,

2      that you raised your right hand, you swore to

3      tell the truth, the whole truth, nothing but

4      the truth, before you testified before that

5      jury on June 21, 2004, correct?

6  A.  That's correct.

7  Q.  You were so crystal clear that this $250,000

8      check signed by Richard Scrushy and given to

9      you by Governor Siegelman either on June 29

10     or July 14, 1999, was true, that you went to

11     a grand jury for a second time, correct?

12 A.  That is correct.

13 Q.  You were so crystal clear that this event

14     happened that you stood in front of a jury

15     just like this jury, you raised your right

16     hand, you swore to tell the truth, the whole

17     truth, and nothing but the truth, didn't you?

18 A.  The best I could remember it.  And that's

19     exactly what I did.

20 Q.  And you told that jury Richard Scrushy

21     delivered a check for $250,000 to Governor

22     Siegelman in Governor Siegelman's office on

23     July 14, 1999.  And guess what?  It wasn't

229

1     true, was it?

2  A.  I told them, as I'm doing today, to the best

3     of my recollection, that's exactly what

4     happened.  Whether it was that day or another

5     day, it happened.  There's no question about

6     that.

7  Q.  But there's no question about that, in your

8     mind, that it happened on some other day; but

9     what I'm asking you right now, Mr. Bailey, in

10    front of the same jury who heard the same

11    oath you have given time and time and time

12    after again, whether it was true when you

13    said on June 21, 2004, to that other grand

14    jury that Richard Scrushy gave Governor Don

15    Siegelman a check for $250,000.  Was that

16    true?

17  A.  To the best of my recollection, it was

18    absolutely true.

19  Q.  But it wasn't true, was it?

20  A.  I've told you over and over again, I swore to

21    tell the truth to the best of my

22    recollection.  And I'm continuing to do that,

23    Mr. McDonald.

**Bailey**
**May 3, 2006**

230

1  Q.  All right.  Mr. Bailey, let's -- let's --

2      let's see where we're getting sidetracked.

3      Will you agree today, Mr. Bailey, that the

4      check you claim that you saw was never there

5      on July 14, 1999?

6  A.  Will I agree that it was not there on the

7      14th?

8  Q.  Yes.

9  A.  I will agree that it possibly was not there

10     on the 14th.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 43

```
19  Q.  Did you ever talk to the Governor about

20      whether or not these contributions would be

21      disclosed?

22  A.  Yes, sir.

23  Q.  Did the Governor tell you anything?  And
```

9

1    don't say what he said; just say yes or no.

2  A.  Yes.

3  Q.  Okay.  What, if anything, did he tell you?

4  A.  Mr. Scrushy didn't want the money disclosed

5       until after the lottery PAC status had been

6       terminated because his wife didn't -- he

7       didn't want his wife to know he was

8       supporting the Alabama Education Lottery.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 44**

2            MR. LEACH:  May it please the Court.

3            THE COURT:  Yes, sir.

4                    CROSS-EXAMINATION

5   BY MR. LEACH:

6   Q.  Mr. Bailey, I'd like to get your agreement at

7       the outset that with regard to Richard

8       Scrushy, you were not an eyewitness to any

9       meeting that he had with Governor Siegelman.

10      Will you agree with me on that?

11  A.  And you mean by me -- by witness of the

12      meeting, was I included in the meeting?

13  Q.  That's precisely what I mean, sir.

14  A.  Then I will agree with you absolutely.  I was

15      not.

16  Q.  Am I understanding your testimony correctly

17      that everything that you have submitted with

18      regard to Richard Scrushy comes from

19      conversations that you had with persons other

20      than Richard Scrushy?

21  A.  That's correct, Mr. Leach.

22  Q.  With regard to the testimony that you've

23      submitted in this courtroom, you have no

**Bailey**
**May 4, 2006**

275

```
 1    evidence to tender that comes directly from

 2    this man, my client, sitting in this

 3    courtroom, Richard Scrushy; isn't that right?

 4         MR. FEAGA:  Your Honor, I'm going to

 5              object to the question.  It's

 6              inconsistent with the evidence

 7              that's been presented.

 8         THE COURT:  Overruled.  This is

 9              cross-examination.

10         MR. FEAGA:  Yes, sir.

11    Q.  Do you understand my question, sir?

12    A.  I -- I believe so, Mr. Leach, but if you --

13        if you wouldn't mind, ask me again.

14    Q.  Isn't it true that with regard to my client

15        right here, Richard Scrushy, you have

16        absolutely no evidence to tender this jury

17        that you got directly from him?

18    A.  Directly from Mr. Scrushy, no.  That's

19        correct.

20    Q.  With regard to the testimony that you have

21        submitted to this jury, specifically, the

22        statements that you have recounted from Eric

23        Hanson and from the Governor, I want to ask
```

276

```
 1    you whether you know of a single document
 2    that corroborates the testimony that you've
 3    presented here.
 4         MR. FEAGA:  Objection, Your Honor, to
 5              the form of the question,
 6              corroborates.
 7         MR. LEACH:  And what could possibly be
 8              objectionable about that?
 9         THE COURT:  Ask -- ask him if he
10              understands what corroborates
11              means.  And if he needs some
12              explanation, explain it to him, if
13              you would, Mr. Leach.
14  A.  If -- if you would, please.  I would
15      appreciate that.
16  Q.  All right.  Do you know of a single document
17      that in any way confirms the testimony that
18      you've given about statements from the
19      Governor or Eric Hanson involving Richard
20      Scrushy's contacts with the Governor?
21  A.  The checks, Mr. Leach.
22  Q.  All right.  I'm talking about the
23      conversations.  For instance, do you know of
```

277

1    an e-mail that was transmitted by the

2    Governor to Richard Scrushy confirming the

3    substance of what you have testified to in

4    this courtroom?

5  A.  No, sir.

6  Q.  Do you know of a note prepared by the

7    Governor and sent to Richard Scrushy or sent

8    to you, sent to Mr. Hamrick, that confirms

9    the substance of what you've testified about

10    in this courtroom?

11  A.  No, sir.

12  Q.  Was there ever a fax transmittal, either

13    coming from Mr. Scrushy going to the

14    Governor, from Mr. Scrushy to Mr. Hamrick,

15    Eric Hanson to the Governor, Eric Hanson to

16    you -- ever any kind of fax document that

17    confirms the substance of what you've

18    testified here?

19  A.  Not that I'm aware of, Mr. Leach.

20  Q.  During the course of your working for

21    Governor Siegelman, did you ever keep a

22    diary?

23  A.  No, sir.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 45**

```
 9          THE COURT:  Let me see if I can help

10                 you -- help you out, Mr. Leach.

11                 And correct me if I'm wrong.

12                   What I think Mr. Bailey is

13                 asking you -- I'm sorry --

14                 Mr. Leach.  What Mr. Leach is

15                 trying to ask you, Mr. Bailey, is

16                 outside of the checks and the

17                 letters of appointment, are there

18                 any written documents, electronic

19                 documents, any confirmatory

20                 memorandum of any kind that

21                 support what you say was the

22                 agreement about the appointment to

23                 Mr. Scrushy to that board?
```

**Bailey**
**May 4, 2006**

282

1           MR. LEACH:  That's it, Judge.

2    A.  Other than conversations, no, sir.

3    Q.  Thank you.  Since there is not a single

4    document to support the substance of your

5    testimony --

6           MR. LEACH:  He may as well object,

7                  Judge.

8           MR. FEAGA:  Object to the form of the

9                  question, Your Honor.  It

10                 mischaracterizes the earlier

11                 testimony.  Asked and answered.

12          THE COURT:  Qualify your question by

13                 saying, Since there is no --

14          MR. LEACH:  Documents to support the

15                 substance?

16          THE COURT:  Outside -- outside the --

17                 the checks --

18          MR. LEACH:  Okay.

19          THE COURT:  -- and -- and the letters

20                 for the -- for the purposes of the

21                 Government, so that we don't have

22                 to go through this formality every

23                 time.

**Bailey**
**May 4, 2006**

283

1   Q.  Excluding the checks and the letter.

2   A.  Yes, sir.

3   Q.  Since there's no single document that

4       supports your testimony, your recollection --

5   A.  Yes, sir.

6   Q.  -- will you agree with me that if the jury

7       does not believe your testimony in that

8       regard, you have nothing further to

9       contribute as far as Mr. Scrushy is

10      concerned?

11          MR. FEAGA:  Your Honor, I'm going to

12              object to the form of that

13              question.  That's a conclusion

14              this jury is going to have to

15              make.

16          THE COURT:  Sustained.

17  Q.  Isn't it true, sir, that on the very first

18      occasion that Richard Scrushy came to the

19      Governor's Office, you believed that Richard

20      Scrushy had a check in his possession that he

21      delivered to the Governor?

22  A.  That was my recollection, Mr. Leach, in terms

23      of an overall event.  Yes, sir.

284

1   Q.   And isn't it true, sir, that you believed on

2        that occasion that that check was signed by

3        Richard Scrushy?

4   A.   Yes, sir.  A -- a brief look at that check

5        did indicate to me that it was signed by

6        Mr. Scrushy.

7   Q.   And isn't it true, sir, that the reason why

8        you believed that that check needed to be

9        kept off the books was because you thought it

10       was Richard Scrushy's check as opposed to a

11       check from IHS?

12  A.   I said earlier why I was told the check was

13       to stay off the books until it could be

14       determined how to disclose it.

15  Q.   And what did you tell us?

16  A.   And what I was told by the Governor was that

17       Mr. Scrushy did not want his wife to know he

18       had contributed the $250,000 to the lottery

19       campaign.

20  Q.   All right.  And that made sense to you,

21       didn't it, sir, because you believed that the

22       check was signed by Richard Scrushy?

23  A.   It made sense to me for a number of reasons.

**Bailey**
**May 4, 2006**

285

1    Q.    Well, I'll take every one you've got.  Tell

2          me.

3    A.    There were others who wanted to contribute to

4          the lottery campaign, but didn't necessarily

5          want everyone to know.

6    Q.    All right.  Well, let's just focus on Richard

7          Scrushy for a moment.  Isn't it true, sir,

8          that the reason why that made sense to you in

9          this case, with regard to this check, is

10         because you believed that check was signed by

11         Richard Scrushy?

12   A.    No.  I believed what I was told.

13   Q.    All right.  Well, if the check is actually a

14         check from IHS and if the check is actually

15         not signed by Richard Scrushy, what in the

16         world difference would it make to Leslie

17         Scrushy that a check that came out of

18         Maryland is deposited in some account?

19   A.    I still assumed it was Mr. Scrushy's check.

20   Q.    Now that you know it was not Mr. Scrushy's

21         check, does it make sense any longer?

22   A.    It has not been determined and shown to me

23         that it was not Mr. Scrushy's check.

**Bailey**
**May 4, 2006**

286

1   Q.   You haven't looked at that check?

2   A.   Maybe he didn't sign it.  Maybe it didn't

3        come out of his personal account.  But he was

4        responsible for the check.

5   Q.   All right.  All right.  Wait a minute.

6        What -- what I'm trying to get to is this

7        whole idea about the fact that Leslie Scrushy

8        didn't want the world to know that that check

9        came from Richard Scrushy.

10            MR. FEAGA:  Your Honor, we object to

11                what he was trying to know.  We

12                ask the Court to please ask

13                counsel to formulate the question.

14            MR. LEACH:  That is a question.

15  A.   Mr. Leach, I didn't say Mr. Scrushy said it.

16       I didn't say Leslie said it.  I said the

17       Governor told me that and I believed it.

18  Q.   And now you know it's wrong?

19  A.   I don't know that it's wrong.

20  Q.   So you maintain to this day that that check

21       is Richard Scrushy's check?

22  A.   A result of Richard Scrushy.

23  Q.   All right.  Well, explain this.  Open-ended

**Bailey**
**May 4, 2006**

287

1    question.  Explain to me how that check

2    coming from IHS is going to embarrass Leslie

3    Scrushy or Richard Scrushy?  Explain that.

4  A.  I can't explain to you what may or may not

5    embarrass Mr. or Mrs. Scrushy.

6  Q.  Mr. Bailey, can't you see that that makes,

7    like, no sense?

8  A.  Mr. Leach, that's not my responsibility.

9        THE COURT:  Let's don't argue with the

10              witness.  Ask the question and

11              let's move on.

12  Q.  Did I understand you to testify yesterday

13    that you saw Richard Scrushy in the

14    Governor's Office once or maybe twice?

15  A.  I believe that's correct, sir.

16  Q.  All right.  Now, the thing that I want to

17    know is, can you tell me if both of those

18    occasions occurred prior to his appointment

19    on July 26, 1999.

20  A.  No, sir, I cannot confirm that.

21  Q.  Can you tell me the reverse; that is, that

22    one was before July 26th and one was after

23    July 26th?

**Bailey**
**May 4, 2006**

288

1  A.  Again, I can't confirm that.

2  Q.  Are you certain in your mind that one of

3      those meetings occurred prior to his

4      appointment to the CON Board?

5  A.  That is my recollection, yes, sir.

6  Q.  Can you tell this jury where the -- whether

7      the second meeting was within the same year?

8  A.  No, sir, I can't.

9  Q.  So it's possible that the second meeting

10     you're talking about could have been a year

11     or longer after this initial meeting that

12     we're talking about?

13 A.  Yes, sir.

14 Q.  From the outset of your cooperation with the

15     Government, it's true, is it not, that you

16     have always told the Government that Richard

17     Scrushy was present and the check was there;

18     isn't that correct?

19 A.  That was the best of my recollection.  And

20     when I began to remember that possibly it

21     wasn't on the same day at the same time, I

22     made that known and made it clear to the

23     Government.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 46**

20  Q.  Did you ever receive a bribe from Eric

21      Hanson?

22  A.  No, sir.

23  Q.  Can you tell this jury one thing that Richard

180

1     Scrushy got out of this appointment to the

2     CON Board?

3  A.  He got appointed.

4  Q.  Between the two checks, IHS and HealthSouth,

5     it was a half a million dollars.  Can you

6     point to any one thing that came as a result

7     of being on the CON Board?

8  A.  Other than being appointed and being made

9     vice chair.

10  Q.  Did you know, sir, that Richard Scrushy

11     didn't even want that position personally?

12     Did you know that?

13  A.  I didn't.

14  Q.  Did you know that Thom Carman was the person

15     who was nominated by HealthSouth for that

16     position?

17  A.  No, sir.

18  Q.  Did you know that there are documents from

19     inside the Governor's Office that validate

20     that?

21  A.  No, sir.

**Bailey**
**May 5, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 47

19   Q.   All right.   Now, with regard to this report,

20        January 27th, 2004, is this one of the

21        reports that you have in your possession or

22        have had in your possession at some time in

23        the past?

140

1  A.  I think so, Mr. Leach.

2  Q.  If you would, review it so that you can

3      satisfy yourself that it is in fact one of

4      the reports that you have or had in your

5      possession?

6  A.  Yes, sir, I have seen this 302.

7  Q.  With regard to this report, did you ever

8      indicate to the Government that there was

9      anything incorrect in this report?

10 A.  Regarding this report specifically, no, sir.

11 Q.  Okay.  Now, I'd like for you to look at the

12     bottom of page 1.  And you see the paragraph

13     that begins with, Bailey learned?

14 A.  Yes, sir.

15 Q.  Have you read that?

16 A.  Just now, yes, sir.

17 Q.  All right.  Tell me what you remember telling

18     the FBI about the fact that Richard was going

19     to bring the check himself to a meeting with

20     the Governor.

21 A.  That was my understanding from talking to

22     Mr. Hanson.

23 Q.  All right.  Does this report not indicate

**Bailey**
**May 5, 2006**

141

1    that you learned from Governor Siegelman that

2    Richard Scrushy was supposed to come and

3    personally deliver the check?

4  A.  That's correct.

5  Q.  All right.  So did you learn it from Hanson

6    or from the Governor?

7  A.  We both knew that.

8  Q.  Well, all right.  I don't know who both is.

9  A.  Siegelman, Hanson, Bailey.

10  Q.  Does this say Hanson right there?

11  A.  No, sir, it doesn't.

12  Q.  So at the time of this report, January 27th,

13    '04, did you tell the FBI that it was the

14    Governor or it was Hanson?

15  A.  I told the Government it was Siegelman.

16  Q.  Okay.  Thank you.  Now, I want you to go to

17    the top of page 2.  And my question for you

18    is as of January the 27th -- 27th, 2004, who

19    did you tell the FBI was present at this

20    meeting?

21  A.  Scrushy, Skelton, Hanson.

22  Q.  Okay.  The same ones from the last meeting;

23    isn't that right?  Is that your recollection?

**Bailey**
**May 5, 2006**

142

1  A.  That was my recollection.  And that is what's

2      on this report.

3  Q.  No Goodreau, correct?  Mr. Goodreau is not

4      reported here.

5  A.  That's correct, sir.

6  Q.  And you've also mentioned Jabo Waggoner in

7      the past.  He's not mentioned in this report;

8      isn't that right?

9  A.  That's correct, sir.

10  Q.  All right.  Come about halfway through that

11      paragraph and pick up with the sentence that

12      begins, In the meantime.  Do you see that

13      right there?

14          MR. FEAGA:  At this time, we'd like to

15              move for this entire exhibit into

16              evidence.  He's giving bits and

17              pieces.

18          MR. LEACH:  I object to that.  It's not

19              proper under 613 anyway.

20          THE COURT:  We'll take that up at the

21              appropriate time.  At this time,

22              objection overruled.

23  A.  In the meantime, Richard Scrushy?

143

1   Q.   Yes, sir.  Just read from that point and come

2        down, and then I want to ask you some

3        questions.

4                       (Brief pause)

5   A.   Just that paragraph?

6   Q.   Yes, sir.  We'll get to the other paragraphs

7        in a minute.

8   A.   Okay.

9   Q.   All right.  Is it fair to say that you

10       reported to the FBI on this occasion that the

11       Governor and Mr. Scrushy retired to a private

12       meeting in the Governor's office?  You did

13       tell them that?

14  A.   Yes, sir.

15  Q.   And that the meeting took approximately an

16       hour?

17  A.   Yes, sir.

18  Q.   And that after the meeting was over, you went

19       into the Governor's office?

20  A.   Yes, sir.

21  Q.   All right.  At which time, the Governor told

22       you that Scrushy was halfway there?

23  A.   Yes, sir.

**Bailey**
**May 5, 2006**

144

1    Q.   Didn't tell you it was a bribe; just said

2         that Scrushy was halfway there.  Isn't that

3         right?

4    A.   That's correct, sir.

5    Q.   Okay.  And then did he tell you that -- did

6         you then say, What in the world is he going

7         to want for that?

8    A.   Yes, sir.

9    Q.   All right.  And did the Governor respond, the

10        CON Board?

11   A.   That's correct.

12   Q.   And did you then respond, Well that shouldn't

13        be a problem, should it, question?

14   A.   That's correct, sir.

15   Q.   All right.  And then the Governor responded,

16        I wouldn't think so.  Is that correct?

17   A.   That's correct, sir.

18   Q.   And is that what your testimony was two days

19        ago, basically?

20   A.   Basically, yes, sir.

21   Q.   All right.  Now, my question to you, sir, is,

22        was January the 27th, 2004, the first time

23        that you related that information -- that is,

**Bailey**
**May 5, 2006**

145

1      that dialogue, to the FBI and the U.S.

2      Attorney's office?

3  A.  I cannot commit to you, Mr. Leach, that that

4      was the first time I discussed it with the

5      Government.

6  Q.  Was it in -- to your recollection, would it

7      have been around this time -- that is January

8      the 27th, 2004 -- the first time that you

9      related this information to the Government?

10         MR. FEAGA:  Objection, Your Honor.

11             Asked and answered.

12         THE COURT:  Sustained.

13         MR. LEACH:  It's a different question,

14             Judge.  I'm trying to get it close

15             in time.

16         THE COURT:  Sustained.

17 Q.  Can you give me any approximate date to this

18     report --

19         MR. FEAGA:  Objection, Your Honor.

20             Asked and answered.

21         MR. LEACH:  I didn't even ask the

22             question.

23         THE COURT:  Let him ask the question.

146

1           Ask the question.

2  Q.  In proximity to this report, January 27th,

3       2004, can you tell me the first time that you

4       related that information to the Government,

5       that dialogue?

6           MR. FEAGA:  Objection, Your Honor.

7               Asked and answered.

8           MR. LEACH:  Different question.

9           THE COURT:  One last time.  Let him

10              give them his response as best

11              that he can.

12  A.  Sometime before this report was produced,

13      Mr. Leach.

14  Q.  You can't give me an approximate time how

15      close?

16          MR. FEAGA:  Objection, Your Honor.

17              Asked and answered.

18  A.  I answered your question the best I can,

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 48**

171

```
12  Q.  Okay.  Did you ever have a conversation with

13      Eric Hanson where Eric Hanson said that

14      Richard Scrushy is trading a half a million

15      dollars for a CON seat?

16  A.  He told me he would see that Mr. Scrushy made

17      the contributions and for us not to let him

18      down.
```

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 49

14  Q.  All right.  Now, who did you say was present

15      at the meeting between the Governor and

16      Richard Scrushy on this occasion when you

17      spoke to the FBI?

18  A.  The meeting between the Governor and

19      Mr. Scrushy was just between the two of them.

20  Q.  Okay.  But who -- who -- who came to

21      Montgomery, is the question that I'm asking,

22      with Mr. Scrushy?

23  A.  I recall at this time that Eric Hanson and

**Bailey**
**May 5, 2006**

123

1       Loree Skelton accompanied Mr. Scrushy.

2   Q.  Okay.  Now, my question to you, sir, is do

3       you ever remember any other occasion where

4       Eric Hanson and Loree Skelton were with

5       Richard Scrushy in Montgomery?

6   A.  Any other occasion?

7   Q.  Uh-huh.

8   A.  No, sir.

9   Q.  All right.  You mention in your earlier

10      testimony that there's one, perhaps two

11      meetings.

12  A.  Yes, sir.

13  Q.  All right.  And you mentioned that Richard

14      Scrushy was at those meetings.  My question

15      to you is, do you ever remember any other

16      occasion where Loree Skelton, Eric Hanson,

17      and Richard Scrushy were together in

18      Montgomery except at that first meeting?

19  A.  I don't recall another one.

20  Q.  Okay.  Is it fair to say that at different

21      times, you have said that different people

22      were at the meeting?

23  A.  Yes, sir, that is fair to say, as I have

**Bailey**
**May 5, 2006**

124

1    tried to recall exactly who was there on the

2    day that we're talking about.

3    Q.  What other people -- just so the jury can get

4    a preview of this, what other people have you

5    said were at that meeting other than Eric

6    Hanson and Loree Skelton?

7    A.  Possibly Mr. Scrushy's security, Jim

8    Goodreau; and possibly Senator Waggoner.

9    Q.  Anybody else?

10   A.  Not that I recall.

11   Q.  Okay.  What did you tell the FBI on this

12   occasion about whether or not Richard Scrushy

13   had a check on this occasion which he gave to

14   the Governor?

15   A.  I told him the Governor showed me a $250,000

16   check after the meeting.

17   Q.  All right.  And did you on that occasion

18   indicate that he pulled it out of his coat

19   and showed it to you?

20   A.  No.

21   Q.  All right.  Did you relate to the FBI on this

22   occasion anything that was said by the

23   Governor to you at the time that he's showing

**Bailey**
**May 5, 2006**

125

1      you the check?

2  A.  Yes, sir.  That Mr. Scrushy was interested in

3      appointments to the CON Board.

4  Q.  All right.  Was there anything else on this

5      occasion that you related to the FBI?

6  A.  And that he was halfway there.

7  Q.  No, no.  That's what the Governor said to

8      you.  Anything else?

9  A.  That's correct.

10 Q.  Okay.  Fair to say, based on what you see in

11     this report and what you recall, that at that

12     time, you thought that the contribution was

13     Richard Scrushy's?

14 A.  Yes, sir.

15 Q.  Okay.  Is it fair to say that what you're

16     telling the FBI is that you believe that the

17     deal was struck right there at that meeting,

18     that I'm going to give you this money and

19     you're going to give me an appointment?

20     Isn't that what you're telling the FBI?

21 A.  I'm telling the FBI in my opinion and my

22     recollection, Mr. Scrushy delivered $250,000

23     the Governor's Office for appointments on the

126

1      CON Board.  That's what I said here.

2  Q.  And that he delivered it personally to the

3      Governor?

4  A.  That's what I said here.

5  Q.  All right.  And the evidence that you

6      provided to us the other day where, What does

7      he want for that; he wants the CON Board;

8      that should not be a problem, should it; I

9      wouldn't think so -- that was not related to

10     the FBI on June the 30th, 2003; isn't that

11     right?

12  A.  According to this 302, that is correct.

13  Q.  Well, and I want not only according to the

14     302, I want your recollection.  Isn't it your

15     recollection that that sequence of events was

16     not related to the FBI on that occasion?

17  A.  I believe if it had been, it would have been

18     on this document.

19  Q.  So your answer is no, it was not related?

20  A.  To the best of my recollection, it was not.

21  Q.  All right.  Now, this is on June the 30th,

22     2003, correct, this meeting?

23  A.  With the FBI.

**Bailey**
**May 5, 2006**

127

1        THE COURT:  With Mr. Scrushy or with

2             the FBI?

3    Q.  With the FBI.  I'm talking about this 302

4        that we're looking at right now.

5    A.  Yes, sir.

6    Q.  All right.  And in terms of your memory of

7        these events, would you testify to this jury

8        that your memory was better on June 30 of

9        2003 or better today?

10   A.  My recollection of these events are better

11       now than they were then, Mr. Leach.

12   Q.  Sir?

13   A.  My recollection of the events around the

14       delivery of this check is better now than it

15       was then.

16   Q.  Are you saying that it's better or more

17       accurate?

18   A.  More accurate.

19   Q.  Okay.  Now, flip to page 4 and come down four

20       paragraphs.  One, two, three, four -- come to

21       the fifth paragraph on page 4.  And if you

22       would, that's a fairly short paragraph.  Just

23       read that paragraph to yourself.

128

1              (Brief pause)

2    A.   Okay, Mr. Leach.

3         MR. LEACH:  Give me one second.

4    Q.   Now, what we're shifting into here is the

5         receipt of the second check from Mr. Scrushy;

6         is that correct?

7    A.   Yes, sir.

8    Q.   All right.  And is it accurate that on June

9         the 30th, 2003, your recollection of those

10        events was that that check was transmitted

11        sometime in May of 2000?

12   A.   Yes, sir.

13   Q.   All right.  And that you traveled with the

14        Governor to the HealthSouth headquarters in

15        Birmingham, Alabama; is that accurate?

16   A.   That was what I recalled, yes, sir.

17   Q.   And it's your testimony to this jury that at

18        that time, the Governor was receiving a bribe

19        from Richard Scrushy; isn't that right?

20   A.   He was receiving a fulfillment of

21        Mr. Scrushy's $500,000 commitment, yes, sir.

22   Q.   But are you saying it's a bribe or it's not a

23        bribe?

129

1   A.   I'm saying Mr. Scrushy committed $500,000.

2        This was the finalization of that commitment

3        of $500,000 for a seat on the CON Board.

4        That's what I'm saying.

5   Q.   Is it fair to say, Mr. Bailey, that you don't

6        know if it's a bribe or not?

7   A.   I'm not sure that's for me to decide,

8        Mr. Leach.

9   Q.   Well, you're a co-conspirator in this

10       conspiracy, are you not?

11  A.   Define co-conspirator.

12  Q.   You're involved in this process of an

13       exchange of official action for money, are

14       you not?

15  A.   I participated, yes, sir.

16  Q.   All right.  My question to you is, was the

17       second $250,000 a bribe or not?

18  A.   I believe it was the fulfillment of

19       Mr. Scrushy's $500,000 for seats on the CON

20       Board, yes, sir.

21  Q.   So surely this meeting involving this payment

22       of a bribe to the Governor of the State of

23       Alabama occurred on some side street in

130

1     Birmingham, Alabama, did it not?

2  A.  What meeting?

3  Q.  Well, the Governor met with Richard Scrushy,

4     didn't he?

5  A.  I wouldn't call Mr. Scrushy's office a side

6     street.

7  Q.  The meeting happened at the office?

8  A.  The meeting between Mr. Scrushy and

9     Mr. Siegelman?

10  Q.  Yes.

11  A.  As I recall, yes, sir.

12  Q.  So you came into the HealthSouth headquarters

13     and you went up to the fifth floor and you

14     went to Mr. Scrushy's office, where

15     Mr. Scrushy and the Governor of the State of

16     Alabama met; is that right?

17  A.  I wasn't invited into Mr. Scrushy's office.

18  Q.  But you saw it happen.  You saw them retire

19     into Mr. Scrushy's office.

20  A.  Yes, sir.

21  Q.  When Lanny Young was paying you whatever

22     amount of bribes that he paid you, were those

23     bribes paid in the Governor's Office?

131

1   A.   No.

2   Q.   Where would you meet Lanny Young to get your

3        money?

4   A.   I can't recall where Lanny and I met.

5   Q.   Isn't it fair to say that you're not going to

6        have a meeting in the office of the Governor

7        of the State of Alabama where you're going to

8        receive a check and have somebody like the

9        Governor witness the fact that you have

10       received something from Lanny Young?  Isn't

11       that right?

12  A.   Correct.

13  Q.   So, normally, when criminal stuff is going

14       on, it's not going to happen in an office

15       environment where you've got calendars, you

16       got appointments, you got people who can say

17       that it occurred.  Generally speaking, when

18       it's a bribe, it doesn't happen that way;

19       isn't that right?

20  A.   I can't say how bribes generally happen,

21       Mr. Leach.

22  Q.   Tell us about your experience.

23  A.   Specifically what's the question?

**Bailey**
**May 5, 2006**

132

```
 1        MR. FEAGA:  Your Honor, I'm going to
 2               object to the form of that
 3               question.
 4        THE COURT:  Sustained.  Let's move on.
 5   Q.  The meeting in Birmingham was on the
 6        Governor's calendar, was it not?
 7   A.  Yes, sir, I believe it was.
 8   Q.  It was a scheduled event that you
 9        participated in; isn't that right?
10   A.  I believe that's correct, sir.
11   Q.  Part of the normal course of business for the
12        Governor; isn't that correct?
13   A.  I believe that's correct, sir.
14   Q.  When you came to Birmingham, you went to the
15        CEO's office, it was clear that it was on
16        Mr. Scrushy's calendar, was it not?
17   A.  I'm not clear what was on Mr. Scrushy's
18        calendar, sir.
19   Q.  Well, he was there to receive you, wasn't he?
20   A.  Yes, sir.
21   Q.  It was clear that he was expecting you,
22        wasn't he?
23   A.  To the best of my recollection, he was
```

**Bailey**
**May 5, 2006**

133

1    expecting us, yes, sir.

2  Q.  How long did that meeting take?

3  A.  I would estimate an hour or so.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 50

71

2  Q.  No.  Just do you know what happened?  Do you

3      know if there was a contact made?

4  A.  I -- I don't recall when the contact was made

5      directly from Governor Siegelman to

6      Mr. Scrushy.

7  Q.  Isn't it true, sir, that on the first

8      occasion when the Governor tried to contact

9      Richard Scrushy, Richard Scrushy did not take

10     the call and Richard Scrushy did not return

11     the call?

12 A.  That does sound familiar.

13 Q.  Isn't it true you told the FBI that?

14 A.  Again, it sounds very familiar.

15 Q.  Is that a statement that's in one of the 302s

16     that you've got possession of?

17 A.  Yes, sir, it could be.

**Bailey**
**May 5, 2006**

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 51**

1   Q.   Okay.  Is that document familiar to you?

2   A.   No, sir.

3   Q.   All right.

4   A.   It is now, but I don't recall having seen it

5        before.

6   Q.   Okay.  I want to see if I can refresh your

7        recollection.  And the first thing I want to

8        do is I want to ask you to look at the second

9        page of that document, the last item that

10       I've highlighted for you.  In the course of

11       reviewing that document, did you read that

12       paragraph?

13  A.   Would you like for me to read it out loud?

14  Q.   No, no, no.  Don't read it out loud.  Read it

15       to yourself, please.

16  A.   Okay.  (Witness complies)  Yes, sir.

17  Q.   Okay.  My question to you is whether reading

18       that paragraph refreshes your recollection as

19       to certain individuals that were targeted for

20       large contributions.

21  A.   Yes, sir.

22  Q.   Okay.  And isn't it true that Richard Scrushy

23       was one of four individuals that was targeted

**Bailey**
**May 5, 2006**

56

1      for large contributions with regard to the

2      lottery foundation?

3  A.  In regards to this memo, yes, sir.

4  Q.  Well, and I want to talk about your

5      recollection as well.

6  A.  Okay.

7  Q.  Richard Scrushy was one of the persons you

8      were going after for large contributions?

9  A.  That's correct, yes, sir.

10 Q.  Okay.  And just so the jury understands how

11     this is done, when you're targeting someone

12     for a large contribution and the first call

13     is made to that individual, when it's

14     somebody big, when you're looking for big

15     money, who makes that call?

16 A.  Governor Siegelman makes most all of his

17     calls.

18 Q.  Okay.  And was there a certain dollar amount

19     that you were hoping to achieve with regard

20     to Mr. Scrushy and the lottery foundation?

21 A.  Yes, sir.

22 Q.  And how is that target established within the

23     fund-raising organization of the lottery

**Bailey**
**May 5, 2006**

57

```
1      foundation?

2  A.  A discussion took place between the Governor

3      and other individuals to come up with

4      targeted amounts for particular individuals.
```

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 52**

```
 6    Q.   All right, sir.  Well, let me ask you this,

 7         Mr. Martin.  Tell me what in the world it is

 8         that I -- that the check from IHS for

 9         $250,000 -- what do you consider illegal

10         about that check?

11    A.   Sir, it came in a circuitous route --

12    Q.   That's not the question.  The question is

13         what do you consider illegal?

14              MR. FRANKLIN:  Objection, Judge.

15              THE COURT:  Let the witness answer.

16    Q.   What's illegal about the IHS check?  You said

17         you saw it.

18    A.   I saw -- I knew what we had done.  I knew we

19         had pushed our investment banker to do

20         something.

21    Q.   But what is --

22              THE COURT:  Let the witness answer.

23              MR. BUTTS:  I'm sorry, Judge.
```

128

```
 1    Q.    Go ahead.

 2    A.    I knew we had pushed our investment -- our

 3          primary investment banker, Wall Street

 4          banker, to give the money.  They went to

 5          their upper -- their bosses.  And their

 6          bosses said we can't do this and --

 7               MR. BUTTS:  Now, wait a minute.  Judge,

 8                    that is not responsive to the

 9                    question.  He's testifying to

10                    something some boss said

11                    somewhere.  That's total hearsay.

12                    It's nonresponsive.

13               MR. FRANKLIN:  Judge, he asked an

14                    open-ended question.  We would ask

15                    that the witness be allowed to

16                    answer this question.

17               THE COURT:  To the extent that the

18                    witness knows the answer, you may

19                    do so, Mr. Martin.

20    A.    The -- so we threatened to fire them.  They,

21          in turn, forgave 250,00 that was owed to them

22          and got another company that only had -- if

23          it had one facility in the state of Alabama,
```

129

to write a $250,000 check to the education
lottery.

    I don't know if that -- I don't know if
that's legal.  I don't know if -- I don't
know if that's legal.  I don't know if it's
illegal.  But it sure smelled bad, looked
bad, tasted bad, and I didn't like it.

Q.  All right, sir.  It may have smelled bad,
tasted bad.  It might have been even a
purple-colored check that you objected to the
color of.  But you've just said that you
didn't know there was anything illegal about
IHS -- IHS writing a check for the
Educational Lottery Foundation; is that
correct?

A.  I'm saying that I didn't know if it was legal
or not.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 53**

29

Q.   Now, I believe you -- I believe you told us
     that -- that Mr. Scrushy had to have this IHS
     check in his hand for a meeting with Governor
     Siegelman; is that correct?

A.   That's what Mr. Scrushy related to me.

Q.   All right.  And he did not want the meeting
     to take place unless he had the check in his
     hand?

A.   I'm not sure I understand your question.

Q.   He -- what he wanted to do was he wanted to
     be able to have -- physically have that check
     and to physically give it to Governor
     Siegelman.  That was the push, wasn't it?

A.   Yes, sir.

Q.   All right.  And you were trying to speed up
     that process to get the check so he could do
     that, correct?

A.   I was trying to make sure the check arrived
     in time for him to do that because he related
     to me that that was very important.

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 54**

```
10   Q.   What was it about what you did in relation to

11        this case that -- that made you think you

12        might need immunity from prosecution?

13   A.   I was concerned about the -- the facts of the

14        case.

15   Q.   Well, what do you think that you did wrong?

16   A.   The -- we were making a contribution, it was

17        my understanding, in exchange for a spot on

18        the CON Board.  I was on the part of the

19        transaction of getting the contribution to

20        the campaign.

21   Q.   I thought you told the jury yesterday that

22        you were concerned that there might be

23        something unethical or immoral or illegal
```

```
 1              going on and you didn't want to have anything
 2              to do with it.  Did I hear that right?
 3      A.   That's correct.
 4      Q.   Well, if you thought that you were paying
 5              money to get a seat on the CON Board, you
 6              wouldn't even have to think about whether or
 7              not that was illegal, would you?
 8      A.   No, sir.
 9      Q.   You would know that was illegal, wouldn't
10              you?
11      A.   If the other side of the transaction, if it
12              was a quid pro quo, yes, sir.
13      Q.   Well, did you think it was a quid pro quo or
14              not?
15      A.   I was told that we needed to raise the money
16              so that we could be in the good graces of
17              Governor Siegelman.
18      Q.   Well, that's a little bit different.  Good
19              graces is okay, isn't it?
20      A.   We were taxing political support from
21              Mr. Siegelman.
22      Q.   Well, there's nothing at all wrong with
23              politically supporting Governor Siegelman, is
```

8

```
        it?

2   A.   The way that we went about it, to me, was

3        quite unusual.

4   Q.   Well, unusual isn't illegal, is it?

5   A.   I thought it was, at best, unethical; and I

6        wasn't sure whether or not it was illegal.

7   Q.   All right.  Well, unethical isn't illegal.

8        It may not be the best thing to do, but it's

9        not necessarily illegal, is it?

10  A.   I'll agree to that.
```

Martin
May 10, 2006

United States v. Richard M. Scrushy
2:05-CR-119-MEF
**TAB 55**

2    Q.   How do you know that?  How do you know it was

3         important to Scrushy to hand deliver that

4         check to the Governor?

5    A.   He came to me and he told me.  He was -- he

6         was -- he was very definite about that and

7         reminded me on a number of occasions that he

8         personally had to have the check and he

9         personally had to give it to Governor

10        Siegelman.

11   Q.   Other than handling the logistics of getting

12        the check delivered to HealthSouth, did Leif

13        Murphy have anything to do with this check,

14        this IHS check in Government Exhibit #21?

15   A.   No.

16   Q.   Do you recall when this check arrived at

17        HealthSouth?

18   A.   I think it was sometime in early -- in July

19        of 1999.

20   Q.   Okay.  Well, take a look at Government's

21        Exhibit #21 and tell us whether or not this

22        check arrived at or about the time that it

23        was drafted, the date on it, or whether it

358

1    was weeks after the date drafted -- the date

2    printed on the check.

3  A.   It was very close to the date that's printed

4       on this check.

5  Q.   Was there some sense of urgency about this

6       check when it arrived at HealthSouth?

7  A.   Yes.  There were a couple of things that --

8       that come to mind.  One is it specifically

9       needed to be made out to this Alabama

10      Education Lottery Foundation.  And that was

11      very important, that we had it made out -- I

12      guess so they could put it in the proper

13      account.  But the other thing that was

14      important was there was some time sensitivity

15      of getting that in Mr. Scrushy's hand in

16      order for him to be able to deliver it to

17      Governor Siegelman at a meeting that he had

18      set up, that was on his calendar.

19 Q.   And did you have that conversation with

20      Mr. Scrushy about a meeting that he had with

21      the Governor?

22 A.   That's correct.  As I said before, he

23      reminded me on more than one occasion that

359

```
 1        this was an important meeting and the check

 2        had to be delivered to us at HealthSouth so

 3        he could hand deliver it to Governor

 4        Siegelman in their meeting.

 5   Q.   When you first saw this check, in whose

 6        possession was it?

 7   A.   The check originally came to Leif Murphy.

 8   Q.   And did he give it to you?

 9   A.   That's correct.

10   Q.   And what did you do with it after he gave it

11        to you?

12   A.   I walked it over and handed it to

13        Mr. Scrushy.

14   Q.   After you handed it to Mr. Scrushy, did you

15        see this check again?  Well, when was the

16        next time you saw the check after you gave it

17        to Mr. Scrushy?

18   A.   It was -- it was recently.

19   Q.   After the investigation began?

20   A.   Yes.
```