**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

UNITED STATES OF AMERICA,

v.                                                                    Case No. 2:05cr119-MEF

RICHARD M. SCRUSHY,
      Defendant.

**DEFENDANT  RICHARD M.  SCRUSHY'S  MOTION**
**FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29(c)**
**OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

COMES NOW Defendant Richard M. Scrushy, by and through his undersigned counsel of record and moves this Court for entry of an Order, pursuant to Fed. R. Crim. P. 29(c), granting him a judgment of acquittal as to each of Counts Four through Nine of the Second Superseding Indictment (the "Indictment") in the above-captioned matter. In support of this Motion, Defendant respectfully shows this Court the following:

**Introduction**

The electoral process which our democracy has embraced since its founding depends on private contributions to finance political campaigns. The United States Supreme Court has held in the clearest of terms that the ability of candidates to seek contributions and the right of citizens to support political candidates with their contributions is essential to our democracy and, as a consequence, it is activity which is protected under the Constitution. *McCormick v. United States*, 500 U.S. 257, 111 S.Ct. 1807 (1991).  As the Seventh Circuit described this protected activity in *United States v. Allen*, 10 F.3d 405 (7th Cir. 1993):

> *McCormick* recognized several realities of the American political system. Money fuels the American political machine. Campaigns are expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises. It would be naïve to suppose that contributors do not expect some benefit—support for favorable legislation, for example—for their contributions. To hold that a politician committed extortion merely by acting for some constituents' benefit shortly before or after receiving campaign contributions "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of our nation."

*Allen*, 10 F.3d at 410-11 (quoting *McCormick*, 500 U.S. at 272). The conviction of Defendant Scrushy in this case, based on the activities that the Government proved at trial, does just that: "open[s] to prosecution … conduct that has long been thought to be well within the law." *Id.*

The testimony of Elmer D. Harris established beyond cavil that Richard Scrushy was undeniably engaged in this protected activity when he arranged for contributions sought by Governor Siegelman after a meeting in which both men discussed their differences and mutual interests. Mr. Harris had advised Defendant Scrushy:

> I told him essentially the same thing [that he had recently told Governor-elect Siegelman]. When we were talking about giving some contributions to the inaugural activities, you, Richard Scrushy, supported Fob James. Fob James lost the election. It's my assumption all the time that I am going to support whoever is in office. Don Siegelman is in office, I don't care whether you like him or you don't like him, you need to sit down with him and talk about whatever differences y'all have, solve them, get them out of the way so both of y'all can be helpful to each other.

(*Id*. at 20.)

The evidence in this case conclusively demonstrates that the political contributions at issue were entirely legitimate campaign contributions, made for the purpose of establishing a relationship with an elected official. Political contributions

2

which are not protected by the law are distinguished by the presence of a quid pro quo, which the Supreme Court has defined as "payments … in return for an explicit promise or undertaking by the official to perform or not perform an official act." *McCormick*, 500 U.S. at 273. Here, the Government's evidence failed to fulfill the Government's bold claim in their indictment that the contributions were a quid pro quo for the appointment of Defendant Scrushy to the CON Board.

Moreover, the evidence offered by Defendant in his case established two additional, and critical, facts: first, that the purpose of Defendant Scrushy's initial meeting with Governor Siegelman on June 29, 1999 was to establish a vitally important relationship with the newly-elected Governor after Defendant had publicly supported that Governor's opponent; and second, that Defendant Scrushy had no desire or intention to serve on the CON Board. The convictions in this case, obtained without any evidence of a payment in exchange for an explicit promise of a political appointment, will remake the entire electoral system unless they are overturned.

Since Defendant Scrushy neither sought, nor was explicitly promised a seat on the CON Board, any political contributions that were made were not only legitimate, but were protected political activity under the unambiguous holdings of the United States Supreme Court. *McCormick*, 500 U.S. 257; *United States v. Sun Diamond Growers*, 526 U.S. 398, 404-05, 119 S.Ct. 1402 (1997). The requirement of proof of a quid pro quo— "payments … made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," *McCormick*, 500 U.S. at 273—is what separates actions which are protected within our political system from actions which are violations of federal criminal statutes. While there are other reasons why the

Government's proof as to specific counts was insufficient, it is the absence of proof of this essential element, and affirmative evidence that no quid pro quo ever existed, that are fatal to the Government's proof in Defendant's case, and which require that this Court grant a judgment of acquittal to Defendant Scrushy as to all six counts on which he was convicted.

## <u>The Applicable Legal Standard</u>

This Court still has pending before it "Defendant Richard M. Scrushy's Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure," (Doc 413), which was filed on June 8, 2006 at the close of the Government's case in chief.  On June 9, 2006, this Court entered an oral Order reserving ruling on this motion, which is specifically authorized by Rule 29(b).  Thereafter, Defendant Scrushy offered testimony and evidence in his own defense.  On June 29, 2006, the jury returned a verdict of guilty as to Counts Four through Nine of the Indictment. (Doc. 438.)  On June 30, 2006, this Court entered a written Order permitting Defendant to file supplemental briefs in support of the Rule 29 motion for judgment of acquittal on or before August 4, 2006. (Doc. 443.)  Therefore, Defendant is filing this motion for judgment of acquittal pursuant to Rule 29(c) after the verdict as a supplement to his still pending motion pursuant to Rule 29(a) made at the close of the Government's evidence. [1]

The legal standard under which this Court must determine Defendant's motions under Rule 29(a) or (c) is the same:  this Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  The only thing that has changed by virtue of the post-verdict posture in which this

---

[1] Defendant Scrushy also adopts the grounds and arguments made by co-Defendant Siegelman in support of his Rule 29 motion.

case now stands is that this Court must now consider the evidence offered by the Defendant in his case. Defendant reasserts all of the arguments and authorities set out in his previously filed motion pursuant to Rule 29(a), (Doc. 413), and arguments made orally in support of that motion, and submits that this Court should enter a judgment of acquittal under Rule 29(a) based on the insufficiency of the Government's evidence without further argument or analysis. However, when this Court considers the evidence presented in Defendant's case as it is required to under Rule 29(c)—most notably the testimony of Defendant's witness Elmer D. Harris—Defendant respectfully submits that no reasonable jury could have found Defendant Scrushy guilty on any count of the Indictment.

Rule 29(c) provides in relevant part:

> A defendant may move for judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later…. If the jury has returned a guilty verdict, the court may set aside the verdict and enter a judgment of acquittal.

There is no substantive difference in the standard that a court is to apply in ruling on a post-verdict Rule 29(c) motion as compared with a pre-verdict Rule 29(a) motion. *See United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997) (applying same standard articulated under Rule 29(a) in considering Rule 29(c) motion). When determining a Rule 29(c) motion, however, a court must consider the totality of the evidence, and not simply the evidence presented by the Government, which is the case when ruling on a Rule 29(a) motion at the close of the Government's case. *See* Fed. R. Crim. P. 29(b) ("If the court reserves decision [on a Rule 29(a) motion], it must decide the motion on the basis of the evidence at the time the ruling was reserved."); *cf. United States v. Hammond*, 371 F.3d 776, 779 (11th Cir. 2004) (rejecting government argument that district court erred in

considering defendant's evidence in ruling on the reserved motion for judgment of acquittal) and *United States v. Thomas*, 8 F.3d 1552, 1558 n.12 (11th Cir. 1993) (when considering the sufficiency of the evidence on appeal if a defendant presents evidence in his case, the court will then evaluate all of the evidence, not merely that offered by the government). Simply put, this Court has the authority to grant Defendant's motion under either Rule 29(a) (taking into consideration only the Government's evidence in its case in chief) or under Rule 29(c) (taking into consideration all of the evidence in the case).

In *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006), the Eleventh Circuit recently reiterated the well-established standard to be applied by a district court when considering a Rule 29 motion:

> In considering a motion for the entry of a judgment of acquittal, a district court must view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt. The prosecution need not rebut all reasonable hypotheses other than guilt. The jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial, and the court must accept all reasonable inferences and credibility determinations made by the jury.

(internal quotations and citation omitted); *See also United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989) (same); *United States v. Bradley*, 428 F. Supp. 2d 1365, 1367 (S.D. Ga. 2006) ("To grant a Rule 29 motion for acquittal, the Court must conclude, after viewing the evidence in the light most favorable to the government, that a rational jury would have to have entertained reasonable doubt as to the defendant's guilt.") (internal quotation omitted).

**I.  THIS COURT SHOULD GRANT A JUDGMENT OF ACQUITTAL AS TO
COUNT FOUR, FEDERAL FUNDS BRIBERY, BECAUSE THERE WAS NO
PROOF THAT DEFENDANT'S POLITICAL CONTRIBUTIONS WERE MADE
WITH THE SPECIFIC INTENT TO OBTAIN APPOINTMENT TO THE CON
BOARD.**

As set out in detail in Defendant's previously filed motion pursuant to Rule 29(a),
(Doc. 413 at 4-6), in order to prove the Count Four charge of federal funds bribery under
18 U.S.C. § 666(a)(2) against Defendant Scrushy as charged in the Indictment, the
Government had to prove the existence of a quid pro quo.  The authorities cited in
Defendant's previous motion demonstrate that a quid pro quo is an essential element of
§ 666.  *See Sun Diamond Growers*, 526 U.S. at 404-05; *United States v. Paradies*, 98
F.3d 1266, 1289 (11th Cir. 1996); *United States v. Castro*, 89 F.3d 1443, 1454 (11th Cir.
1996); *United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990).  Moreover, the
Indictment specifically alleges the existence of a quid pro quo, that:

> defendant SCRUSHY corruptly gave, offered, and agreed to give
> $500,000 to defendant DON EUGENE SIEGELMAN, Governor of the
> State of Alabama, intending to influence and reward defendant DON
> EUGENE SIEGELMAN in connection with the appointment of defendant
> RICHARD SCRUSHY to the CON Board.

(Doc. 61 at ¶ 51.)

The Supreme Court has defined quid pro quo as "a specific intent to give or
receive something of value *in exchange* for an official act."  *Sun-Diamond Growers*, 526
U.S. at 404-05 (emphasis in orginal).  In the context of a Hobbs Act prosecution, the
Supreme Court has held that where the payment involves a political contribution, there
must be proof of a quid pro quo, holding that a conviction will be sustained "only if the
payments are made in return for an explicit promise or undertaking by the official to
perform or not perform an official act."  *McCormick*, 500 U.S. at 273.

As set out in the detailed analysis of the evidence in the Government's case in chief in Defendant's previous motion, (Doc. 413 at 6-13), as of the close of its evidence the Government had failed to submit sufficient evidence to allow a reasonable jury to conclude beyond a reasonable doubt that a quid pro quo existed. The testimony of all of the Government witnesses on this point (Alva Lambert, Loree Skelton, Jabo Waggoner, Raymond Bell, Bill McGahan, Lief Murphy, Taylor Pickett, Mike Martin, and Nick Bailey), viewed in the light most favorable to the Government, falls far short of establishing the existence of any "explicit promise or undertaking" in return for the contributions. Defendant persists in that argument and submits that for those reasons alone this Court should grant his Rule 29(a) motion and enter a judgment of acquittal as to Count Four.

In regard to Defendant's Rule 29(c) motion, when this Court considers all of the evidence, the basis for a judgment of acquittal is even more compelling. Since there was no testimony by any witness, nor any other evidence, as to any conversation or agreement between Defendant Scrushy and Governor Siegelman in which any explicit promise or undertaking was made as to the CON Board in exchange for the contributions, the Government's proof was necessarily circumstantial. While there is no requirement that the quid pro quo be verbally explicit, when proof is circumstantial, the *context* of the conversation in which the agreement was allegedly reached becomes critical. As the Ninth Circuit held in *United States v. Carpenter*, 961 F.2d 824 (9th Cir. 1992):

> When a contributor and an official clearly understand the terms of a bargain to exchange official action for money, they have moved beyond "anticipation" and into an arrangement that the Hobbs Act forbids. This understanding need not be verbally explicit. The jury may consider both direct and circumstantial evidence, *including the context in which a conversation took place*, to determine if there was a meeting of the minds

> on a quid pro quo. As we read *McCormick*, the explicitness requirement is
> satisfied so long as the terms of the quid pro quo are clear and
> unambiguous.

961 F.2d at 827 (emphasis added).

The testimony of Defendant's witness Elmer D. Harris established a number of important facts which demonstrate the context in which the key conversation between Defendant Scrushy and Governor Siegelman took place. Since the Government's proof, principally consisting of the testimony of Nick Bailey, relies on the theory that the quid pro quo was established in that meeting, the context of that meeting is crucial to the determination of the sufficiency of the Government's case on this count. The entire testimony of Mr. Harris, on direct and cross-examination, is attached to this motion at Tab 56.[2]

Mr. Harris, who was CEO of Alabama Power from 1989 until his retirement in 2002, (Tab 56, R-June 12, 2006 at 28), served as chairman of the 1998 transition team for Governor Siegelman. (*Id*. at 12.) During that transition, Mr. Harris solicited Defendant Scrushy for a cash contribution of $25,000 and an in-kind contribution of aircraft transportation for Governor Siegelman's January 1999 inaugural. Defendant Scrushy made both contributions. (*Id.* at 14.) Mr. Harris testified that he was aware that Defendant Scrushy had supported Governor Siegelman's opponent, Fob James, in the 1998 campaign, and that there were "some major issues that needed to be resolved" between the two as a result of the campaign. (*Id.* at 19-20, 40.)

---

[2] The excerpt of testimony on June 12, 2006 was provided to counsel as a "rough draft" and is not paginated or proofed for the final transcript, which is not available as of the filing of this motion.

Mr. Harris, who has worked with seven different governors of Alabama, (*id*. at 27), testified that he advised Governor Siegelman that "he needed to learn a lesson from George Wallace," and to seek out the people who did not support him and "get them on his side." (*Id*. at 21.) Specifically in regard to Defendant Scrushy, Mr. Harris testified:

> I said to Governor Siegelman that I am going to get some funds from HealthSouth, for example, for the inaugural activities. And I believe it is absolutely essential that you and Richard Scrushy get on the same wavelength. There's going to come a lot of things during this administration in which you need the support of all the business people, not selective business people. So why don't you, Governor Siegelman, talk to Richard Scrushy and see if y'all can't work out whatever differences you have.

(*Id.* at 19.)

Mr. Harris testified that he gave the same advice to Defendant Scrushy:

> I told him essentially the same thing. When we were talking about giving some contributions to the inaugural activities, you, Richard Scrushy, supported Fob James. Fob James lost the election. It's my assumption all the time that I am going to support whoever is in office. Don Siegelman is in office, I don't care whether you like him or you don't like him, you need to sit down with him and talk about whatever differences y'all have, solve them, get them out of the way so both of y'all can be helpful to each other.

(*Id*. at 20.)

As part of his duties as chair of Governor Siegelman's transition committee, Mr. Harris testified that he "concentrated … personally" on compiling a list of possible nominees to serve in the cabinet and on boards in the upcoming administration. He noted that it was "hard to get good people to come to Montgomery" to give their time to serve. (*Id.* 15.) Mr. Harris put Raymond Bell in charge of nominations for the various boards that the Governor would have to fill with appointments. (*Id.* at 15-16.) While Mr. Harris testified that he did not get into the specific names for the CON Board, (*id*. at 16), he

testified that he was aware of Defendant Scrushy's service on previous CON Boards under Governors Folsom, James, and Hunt. (*Id.* at 16-17.)  On cross-examination, Mr. Harris testified as to why he felt Defendant Scrushy should have an interest in the makeup of the CON Board:

> I would think he should be interested in who was on the board. That's why I told him if you don't want to serve go find somebody else that you believe can do a good job and go down there and tell the governor you are not going to serve and recommend somebody.… I think [Mr. Scrushy] would do what was in the best interest of the state and his business.… He has an obligation on both fronts, protect his business and do what is best for the State of Alabama.

(*Id.* at 67-68.)

More specifically, Mr. Harris testified that he discussed Defendant Scrushy's interest in an appointment to the CON Board:

> I told Mr. Scrushy that if you do not want to serve on the CON Board, and you can find another person that can do a good, effective job on the CON Board, then you go down there and sit down in Governor Siegelman's office and tell him that. If you can't find somebody else that can do a good job, Richard, I think you ought to evaluate that and take the board position yourself. It's tough to get good people down there, I have to go down there from time to time, and you ought not to hesitate to do that either.

(*Id.* at 18.)  Perhaps most critically, in this conversation Defendant Scrushy told Mr. Harris that *he did not want to be appointed to the CON Board*:

> He did not want to serve on the CON Board. He did not—he wasn't going to serve on the CON Board. He was going to tell Don Siegelman he wasn't going to do it.

(*Id.* at 18.) *See also id.* at 67.

The jury heard this testimony of Mr. Harris on these critical points, and the testimony was unrebutted. This testimony, which must be considered in ruling on Defendant's Rule 29(c) motion, establishes the context for the June 29, 1999 meeting

between Governor Siegelman and Defendant Scrushy in which, according to the Government on the basis of the Nick Bailey testimony, Defendant Scrushy agreed to contribute $500,000 in return for the Governor's explicit promise to appoint Defendant Scrushy to the CON Board.

The only inference that the testimony of Mr. Harris supports is that his entreaties to both Governor Siegelman and Defendant Scrushy to find a way to make up their differences had finally borne fruit.  There is no evidence that there were any meetings between Governor Siegelman and Defendant Scrushy prior to the meeting described by Government witnesses Lorree Skelton and Nick Bailey. As Loree Skelton testified, there were no plans to make any kind of campaign contribution, or deliver any check, during that visit because it was the first meeting between the two men. (Tab 13, R-May 11, 2006 at 125-26.)  Ms. Skelton testified, "It's my understanding that Eric Hanson was trying to develop a positive rapport with HealthSouth and Mr. Scrushy after the election." (*Id*. at 126.) According to Ms. Skelton, "It was my understanding that it was a get-acquainted type of meeting." (Tab 6, R-May 10, 2006 at 259.) Moreover, the only reasonable interpretation of all the evidence is that this meeting took place on June 29, 1999, a date which has a significant effect on the viability of the Government's key evidence.  *See* accounts of meeting in testimony of Loree Skelton, (Tab 6, R-May 10, 2006 at 258-62), Jabo Waggoner, (Tab 18, R-May 10, 2006 at 150-53), and Nick Bailey, (Tab 49-R-May 5, 2005 at 122-25).  This conclusion is corroborated by the HealthSouth flight records which indicate it is the only day that the helicopter could have made such a trip, (Scrushy Exhibits 113), and the confirmation that the meeting was logged into Senator Waggoner's calendar. (Scrushy Exhibit 113; *see also* Tab 19, R-May 10, 2006 at 171-81.)

In light of all this testimony, including the testimony of Mr. Harris that explains the reason why such a meeting between Governor Siegelman and Richard Scrushy would have occurred and that Defendant Scrushy did not want to serve on the CON Board, there is no basis that any reasonable jury could have inferred that *in this very first "get acquainted" meeting* that a conversation would have occurred in which there was an explicit promise of an appointment to the CON Board in return for a political contribution of $500,000. In the absence of any direct testimony as to any conversation to that effect between Governor Siegelman and Defendant in that meeting, which no one else witnessed, there is simply no reasonable basis to infer that such an event took place.

The only evidence that the Government offered to support such an inference is the testimony of Nick Bailey as to a single alleged conversation with Governor Siegelman, which Bailey claims occurred when the Governor showed him a check after the meeting, a check which Bailey believed was signed by Defendant Scrushy:

> Q [Mr. Feaga]: Okay. Now, when you saw the Governor, did he have this check in his hand? Did he have it?
>
> A [Mr. Bailey]: Yes, sir.
>
> Q: Okay. Now when the Governor showed you the check, what, if anything did he say to you?
>
> A: He made a comment referring to Mr. Scrushy's commitment to give 500,000 and he's halfway there.
>
> Q: Okay. And what, if anything, did you say to him?
>
> A: I said—I responded by saying, what in the world is going [sic] to want for that; and his response was the CON Board or the C-O-N Board.
>
> Q: Okay. And what did you—
>
> A: I wouldn't think there would be a problem with it. And he said I wouldn't think so.

(Tab 39, R- May 2, 2006 at 175-76.)

Ultimately, this is the single, slender reed that the Government's proof of the necessary quid pro quo element hangs upon. Even apart from the testimony of Mr. Harris that Defendant Scrushy did not want to serve on the CON Board, there are two key reasons why this testimony is not sufficient for a reasonable jury to conclude that Defendant Scrushy gave Governor Siegelman $500,000 in return for an express agreement that he would be appointed to the CON Board.

First, Bailey did not witness any of the conversation between Governor Siegelman and Defendant Scrushy. (Tab 44, R-May 4, 2006 at 274.) The statement that Bailey attributes to the Governor, "the CON Board," came, according to Bailey, in response to a direct question by Bailey which he testified was: "What in the world is going [sic] to want for that…" (Tab 39, R-May 2, 2006 at 176.) This is far from proof that, first, the conversation between the Governor and Defendant Scrushy touched on that issue or, more importantly, second, that there was a conversation that meets the standard of proof required to establish a quid pro quo: "a specific intent to give or receive something of value *in exchange* for an official act," *Sun-Diamond Growers*, 526 U.S. at 404-05 (emphasis in original), or an express agreement that "the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act." *McCormick*, 500 U.S. at 273. Taken at face value, even assuming that the conversation occurred as Bailey said it did, Bailey's version of the conversation indicates that Bailey was curious as to what a contributor of that amount might possibly be hoping for, or asking for support on, in the future. It does not support any conclusion or inference that Defendant Scrushy articulated a request for appointment to the CON Board,

14

especially in light of the testimony of Mr. Harris that Defendant Scrushy did not want the

CON Board appointment.  As the Ninth Circuit held in *Carpenter*:

> In our view, what *McCormick* requires is that the quid pro quo be
> clear and unambiguous, leaving no uncertainty about the terms of the
> bargain. We noted in *Montoya* that the explicitness requirement serves to
> distinguish between contributions that are given or received with the
> "anticipation" of official action and contributions that are given or
> received in exchange for a "promise" of official action.

961 F.2d at 827 (citing *Montoya*, 945 F.2d 1068, 1073 (9th Cir. 1991) (quoting

*McCormick*, 500 U.S. at 276) (Scalia, J., concurring)).

       In fact, assuming that the conversation occurred as Bailey related it, the mere

linkage in a conversation between Bailey (a political aide) and the Governor (a political

officer) of the subject matter of a political contribution and an appointment that might be

made in the future does not prove the existence of the requisite agreement between the

two events as a quid pro quo.  This is especially true in light of the historical relationship

between large contributors and appointments to boards in the State of Alabama, most

especially in a conversation between a political aide and a governor, where the political

aide was well aware that Margie Sellers had been promised the chair of the CON Board,

and that she had been supported by the Nursing Home Association, which had

contributed a million dollars or more to Governor Siegelman.  (Tab 41, R-May 3, 2006 at

244-45.)  Looking at the precise words that Bailey attributed to both himself and to the

Governor, this brief reference—which is the only insight that Bailey allegedly could

provide as to the supposed "explicit agreement"—falls far short of sufficient evidence on

which a reasonable jury could find the existence of a quid pro quo beyond a reasonable

doubt.

The Bailey testimony is not sufficient to sustain Defendant's guilt for another, even more compelling, reason:  the conversation that Bailey testified to simply could not have occurred as Bailey claims.  Taking Bailey's testimony at face value, two crucial events precipitated the Bailey-Governor Siegelman conversation: first, the meeting between the Governor and Defendant Scrushy; and, second, the Governor's supposed act of showing Bailey a $250,000 check that Bailey believed was signed by Defendant Scrushy. The critical statements in the conversation, as testified to by Bailey, simply do not make any sense without the presence of the check and the conversation occurring in the immediate aftermath of the meeting between the Governor and Defendant Scrushy.

If there is anything that is clear from the evidence in this case, it is the conclusion that the $250,000 check was not in existence at the time of the meeting between the Governor and Defendant Scrushy on June 29, 1999.  *See* detailed discussion of evidence in Defendant's rule 29(a) motion, Doc. 413 at n.2.  By way of summary, the only way to make sense of the testimony provided by the Government's witnesses (Skelton, Waggoner and Bailey) is that the meeting between Governor Siegelman and Defendant Scrushy occurred on June 29, 1999.[3]  The evidence is equally clear that the check in question, the $250,000 check from IHS, (Gov't Ex. 22), was not written until July 19, 1999 and was delivered sometime after that date.  (Testimony of Taylor Pickett, Tab 33, R-May 10, 2006 at 213-14 and testimony of Leif Murphy, Tab 29, R-May 9, 2006 at 304-

---

[3] The only other possibility is that the meeting took place on July 14, 1999, which Senator Waggoner seemed to believe. (Tab 17, R-May 10, 2006.) The likelihood that this date is correct is undercut by two pieces of documentary evidence: the HealthSouth helicopter logs, (Scrushy Ex. 100-102), and the June 29, 1999 entry in Senator Waggoner's appointment book, (Scrushy Ex. 113), as well as the testimony of Ms. Skelton. Even if the Court concluded that the testimony supported an inference that the meeting occurred on this latter date, the same devastating conflict between the date the check was issued and the testimony of Bailey concerning that check remains.

308.)    Quite simply, the evidence in the case conclusively demonstrates that it was physically impossible for the conversation about the check between Governor Siegelman and Bailey to have occurred as Bailey recounted in his testimony.

Bailey admitted he told investigators when he was interviewed that Defendant Scrushy had visited the Governor and that it was after that meeting that he walked into the Governor's office and saw the check.  (Tab 37, R-May 2, 2006 at 186-87.)  This statement would be consistent with the conversation and facts that Bailey related in his trial testimony concerning the check and Defendant Scrushy's alleged interest in the CON Board. The only problem is that the check did not exist at that point in time. Bailey's only explanation is that, as he testified on direct examination, "by reevaluating my memory and thinking about it and looking at the documents," (*id.* at 188), it was "possible" that the meeting between the Governor and Defendant Scrushy "predate[d] the date of the check," or that the meeting could have occurred after the date the check was written. (*Id.* at 189.)

Neither of these explanations wash.  If the meeting took place before the check was written, then Bailey's version of the supposed conversation with the Governor could not have occurred, not only because the conversation was predicated on the Governor supposedly showing Bailey the check but, more importantly, the statement of the Governor was supposedly based on the fact that the check for $250,000 showed that Mr. Scrushy was "halfway there" to fulfilling a commitment of a $500,000 contribution. (Tab 39, R- May 2, 2006 at 175-76.)  The second alternative offered by Bailey, that the meeting took place after the check was written, is impossible, because the check was

clearly written after the most likely date of the meeting, June 29, 1999, and after the Government's alternative date for the meeting, July 14, 1999.

The contradiction between the date of the check and the testimony of Bailey as to the only evidence that even arguably creates some sort of inference of a quid pro quo between the contributions and the CON Board appointment is not mere impeachment. Because the content of the conversation—the content that supposedly establishes the quid pro quo—so clearly hinges on the existence of the check in order to make any sense at all, the proof that the check did not exist on the date of that meeting brings the supposed Bailey-Governor Siegelman conversation squarely within the ambit of the holding of the Eleventh Circuit that testimony is inherently unbelievable if it is "so contrary to the teachings of basic human experience … that no reasonable person would believe it beyond a reasonable doubt. If a witness were to testify that he ran a mile in a minute, that could not be accepted, even if undisputed." *United State v. Chancey*, 715 F.2d 543, 546 (11th Cir. 1983); *accord United States v. Kelley*, 412 F.3d 1240, 1247 (11th Cir. 2005). As a consequence, in making its determination under Rule 29(a) or (c), this Court should conclude that the testimony of Bailey is so lacking in a logical basis that it must be discounted, and that no reasonable jury could rely on it in finding guilt beyond a reasonable doubt.

For both of these reasons—that the statements testified to by Bailey are insufficient to prove a quid pro quo and that Bailey's testimony is rendered  inherently unbelievable by the contradictory evidence concerning the date of the check—the Government's proof of the essential element of a quid pro quo fails.  The Government's proof here fails because of the requirement that the Supreme Court enunciated in

*McCormick*, that so long as our political system operates by requiring political campaigns to be financed by private contributions or expenditures, it is essential to distinguish between contributions that are legal and those that are prohibited by the law.  The line that the Supreme Court has drawn is between "campaign contributions with anticipation of favorable future action, as opposed to campaign contributions in exchange for an explicit promise of favorable future action."  *McCormick*, 500 U.S. at 276 (Scalia, J., concurring).  Put another way by the majority opinion in *McCormick*, the demarcation for contributions that are illegal is "only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."  *Id*. at 273.

> As the Fifth Circuit has held:
>
>> In order to convict a briber, the government must prove that the accused intended to bribe the official.  Intending to make a campaign contribution does not constitute bribery, even though many contributors hope that the official will act favorably because of their contributions.

*United States v. Tomblin*, 46 F.3d 1369, 1379 (5th Cir. 1995) (citing *Allen*, 10 F.3d at 411). The facts in *Tomblin*, in which the Fifth Circuit rejected a sufficiency argument as to evidence of a quid pro quo demonstrate how woefully deficient the Government's showing is in Defendant Scrushy's case.  In *Tomblin*, the defendant was attempting to coordinate business activities in Grenada for two Texas bankers who also sought assistance in bypassing regular channels to obtain approval for their takeover of a savings bank.  Tomblin and the bankers sought to do so by making a $50,000 campaign contribution to Nevada Senator Jacob "Chic" Hecht, and by paying travel expenses for the Senator's administrative assistant, and giving him a 10% share in the Grenada venture. Tomblin's statements, which were taped by the two bankers who had become

government informants, included a statement that the 10% interest would be split between the administrative assistant and the senator.  *Id.* at 1374, 1381 & n.20.

In the instant case the Government's evidence shows little more than that Defendant Scrushy caused a $250,000 contribution to the Alabama Education Lottery Foundation and a $250,000 contribution to the Alabama Education Foundation, an issue that Governor Siegelman was associated with, and that Governor Siegelman appointed Defendant Scrushy to serve as a member of the CON Board, a Board Defendant Scrushy had served on pursuant to appointments by three previous governors. The only evidence that the Government marshaled as to the requisite quid pro quo was the testimony of Nick Bailey, which on its face was insufficient to show the necessary "express agreement" and was so contradicted by uncontroverted evidence as to be "so contrary to the teachings of basic human experience … that no reasonable person would believe it beyond a reasonable doubt," *Chancey*, 715 F.2d at 546, that it should not—and cannot—be considered in finding sufficient proof of a quid pro quo.

In short, just as the testimony of Mr. Harris demonstrated, the only reasonable conclusion that the evidence in this case supports is that Defendant Scrushy, who had opposed Governor Siegelman's election, along with Governor Siegelman, who had his own differences with Defendant Scrushy as a product of the election campaign, had a mutual need to establish a relationship.  That need was consistent with the goal of Governor Siegelman to see that his administration was a success and the goal of Defendant Scrushy that his business continue to prosper in the State of Alabama under the administration of Governor Siegelman, notwithstanding his support of Governor Siegelman's opponent in the election.

That Defendant Scrushy *and* Governor Siegelman would subsequently heed the advice of Mr. Harris and meet to discuss not only their differences, but their mutual interests, is neither improper nor illegal.  Nor does the fact that Defendant Scrushy subsequently caused campaign contributions to be made, or that Governor Siegelman appointed Defendant Scrushy to a position on a board which Defendant did not seek, but was eminently qualified to fill, constitute a crime.  It does not constitute a crime because the Supreme Court has concluded that under our current political system of privately financed campaigns, such activity is absolutely protected so long as there is no "explicit promise of favorable future action." *McCormick*, 500 U.S. at 273.

The Government's evidence, viewed in the light most favorable to that evidence and accepting reasonable inferences and credibility determinations, would not support a reasonable jury's conclusion that the quid pro quo element was proved beyond a reasonable doubt.  For this simple, but important and clear reason, the Government's proof as to Count Four was insufficient as a matter of law, and this Court should grant Defendant's motion for judgment of acquittal.

**II. THIS COURT SHOULD GRANT A JUDGMENT OF ACQUITTAL AS TO COUNTS SIX THROUGH NINE, HONEST SERVICES MAIL FRAUD, BECAUSE THERE WAS NO PROOF THAT DEFENDANT'S POLITICAL CONTRIBUTIONS WERE MADE WITH THE SPECIFIC INTENT TO OBTAIN APPOINTMENT TO THE CON BOARD, THAT DEFENDANT DEPRIVED THE STATE OF HIS HONEST SERVICES ON THE CON BOARD IN ANY WAY, OR THAT THE MAILINGS WERE FOR THE PURPOSE OF EXECUTING THE ALLEGED SCHEME.**

Counts Six through Nine of the indictment charged honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346.  (Doc. 61 at ¶ 57-60.)  The "manner and means of the scheme" set out in ¶ 59 of the indictment alleges the payment of $500,000 to Governor Siegelman in return for Defendant Scrushy's appointment to the CON Board.

As set out in pages 14-15 of Defendant's previously filed Rule 29(a) motion, both the wording of the indictment and the applicable law require proof of a quid pro quo. *See United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996); *United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999); and *United States v. Triumph Capital Group*, Inc., 260 F. Supp. 2d 444, 461 (D. Conn. 2002). As a consequence of the Government's failure to offer sufficient evidence of the existence of a quid pro quo—the Government's failure to adduce any evidence of the requisite "payments … made in return for an explicit promise or undertaking by the official to perform or not perform an official act," *McCormick*, 500 U.S. at 273—the proof as to the honest services mail fraud counts likewise fails. For this reason alone, this Court should grant a judgment of acquittal as to Counts Six through Nine.

Additionally, as set out in pages 15-16 of Defendant's Rule 29(a) motion, the Government failed to prove that Defendant Scrushy committed any acts, or failed to take any action, that in any way deprived the State of Alabama of his honest services on the CON Board. To the contrary, the Government's evidence showed that Defendant Scrushy performed his duties on the CON Board properly, and that he had no involvement at all with the two HealthSouth projects that came before the Board, since they were considered after Defendant voluntarily resigned from the Board, and his replacement, Thomas Carmen, properly recused himself from consideration of those items. (Tab 3, R-May 2, 2006 at 81; Tab 5, R-May 2, 2006 at 97-98.) In fact, the Government's entire case demonstrated that, as a result of appropriate recusals in every case in which the interests of HealthSouth were implicated, neither Defendant Scrushy nor HealthSouth gained a single thing as a result of Defendant Scrushy's or Thomas

Carmen's presence on the CON Board. If Defendant Scrushy paid a $500,000 bribe for an express promise of an appointment to the CON Board, as the Government claims to have proved, then Defendant Scrushy got a very poor return for his very substantial investment.

Further, as detailed in pages 16-18 of Defendant's Rule 29(a) motion, a careful review of the Government's evidence shows that the Government failed to prove any improprieties concerning the relationship with Tim Adams, especially in light of Adams's failure to testify. As a consequence, the Government failed to provide sufficient evidence to support its allegations concerning Adams in ¶ 59(e) of the indictment, as well as ¶ 55(e) in the conspiracy charge in Count Five of the indictment.

Finally, as set out in pages 19-20 of Defendant's Rule 29(a) motion, a judgment of acquittal should be granted as to Counts Six through Nine for the additional reason that the Government failed to offer sufficient evidence that the specified letters were mailed for the purpose of executing the alleged scheme to defraud. *See United States v. Maze*, 414 U.S. 395, 400, 95 S.Ct. 645 (1974); *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148 (1944); *United States v. Toney,* 605 F.2d 200, 206 (5th Cir. 1979). Only use of the mails that plays an "integral" rather than "incidental or tangential role in the fraudulent scheme" constitutes a violation of the mail fraud statute. *United States v. Bosby*, 675 F.2d 1174, 1183 (11th Cir. 1982). As to Counts Six and Seven, the Government failed to offer evidence to support any finding that the appointment of Thomas Carmen to the CON Board was connected to the alleged scheme. As a consequence, the mailings appointing Carmen to the CON Board were not for the purposes of executing the alleged scheme to defraud. Similarly, the mailings upon which Counts Eight and Nine are predicated

simply notified HealthSouth that one of its projects had been approved by the CON Board. Since the Government failed to show any improper activity concerning this approval, and since the action occurred well after Defendant Scrushy left the Board and there was no proof that the alleged scheme involved Thomas Carmen, the mailings could not have been for the purposes of executing the alleged scheme.

For all theses reasons—the absence of proof of the essential element of a quid pro quo, the absence of any proof of any wrongdoing by Defendant Scrushy or anyone else vis-à-vis the CON Board, and the absence of poof that the mailings charged in the indictment were for the purpose of executing the alleged scheme to defraud—no reasonable jury could have returned verdicts of guilty as to Counts Six through Nine. As a result, this Court should enter an Order granting a judgment of acquittal as to each of these counts.

**III.  THIS COURT SHOULD GRANT A JUDGMENT OF ACQUITTAL AS TO COUNT FIVE, CONSPIRACY TO COMMIT HONEST SERVICES MAIL FRAUD, BECAUSE THERE WAS NO PROOF THAT DEFENDANT'S POLITICAL CONTRIBUTIONS WERE MADE WITH THE SPECIFIC INTENT TO OBTAIN APPOINTMENT TO THE CON BOARD OR THAT ANY OVERT ACT WAS COMMITTED.**

The conspiracy charge in Count Five of the indictment must fall for the same reasons, as set out in pages 21-24 of Defendant's previously filed Rule 29(a) motion. The Government failed to offer sufficient evidence to demonstrate that Defendant Scrushy entered into any agreement with Governor Siegelman. *United States v. Ndiaye*, 434 F.3d 1270, 1295 (11th Cir. 2006). There is no direct evidence of any agreement between the two. The circumstantial evidence that the Government offered failed for the same reason that its evidence failed to show a quid pro quo as to the political contributions. As discussed in detail above, in the protected area of political campaign

contributions, absent proof of "payments ... made in return for an explicit promise or undertaking by the official to perform or not perform an official act," *McCormick*, 500 U.S. at 404-05, the mere fact that Defendant Scrushy caused a contribution of $500,000 to be made and that Governor Siegelman appointed Defendant Scrushy to the CON Board does not show that a crime had been committed.

Additionally, as set out in pages 23-24 of Defendant's previous motion, the Government failed to offer sufficient evidence to prove any of the overt acts alleged in the indictment. The evidence completely failed to link any of these acts to any agreement between Defendant Scrushy and Governor Siegelman, or to any scheme to defraud, or, in fact, as to any wrongdoing at all.

This Court should grant a judgment of acquittal on Count Five because no reasonable jury could conclude beyond a reasonable doubt, based on the evidence presented, that Defendant Scrushy agreed to engage in an honest services mail fraud scheme, or that he violated the honest services provisions of 18 U.S.C. §§ 1341 and 1346.

## Conclusion

At the end of the day, the Government's prosecution in this matter collapses for want of proof of a quid pro quo. Defendant Scrushy never made an express request, and Governor Siegelman never made an explicit promise that the political contributions would be rewarded with the appointment of Defendant Scrushy to the CON Board. Instead, the evidence in this case shows that Defendant Scrushy did not seek the CON Board appointment, and that his meeting with the Governor and the subsequent contributions were for the legitimate and protected purpose of establishing good will with a political leader whose election Defendant had opposed, and with whom Defendant, for

the good of his business and the good of the citizens of the State of Alabama, had to establish a working relationship.

The Government's crusade to criminalize the activities of Defendant Scrushy in relation to this matter is contrary to, and forbidden by, the express holdings of the Supreme Court in *McCormick* and *Sun-Diamond*.  Those holdings protect the type of activity that occurred in the instant case for the simple reason that the Supreme Court recognized in *McCormick*:

> To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation.

500 U.S. at 272.

This case has already begun to reverberate among knowledgeable individuals in the political system. Unless the law as set out in the unambiguous holdings of the United States Supreme Court is both followed and enforced, no one will be able to contribute to anyone holding or seeking political office so long as they hope for any consideration of any kind from that individual at any time during his or her tenure without fear of the consequences suffered by Richard Scrushy in this case.  That simply is not the law of this land at this point in time.

Defendant respectfully submits that if for any reason, whether it be a question of ethics or simple politics, there is to be a change in the way that our Nation's electoral process is to carried out, that change must come from the Congress or the Supreme Court, not from the U.S. Attorney's office through a prosecution of protected political activity which, under current law, is specifically exempted from criminal prosecution.

For all these reasons, this Court should grant Defendant's motion pursuant to Rule 29(c), and enter a judgment of acquittal as to Counts Four through Nine.

This 4th day of August, 2006.

Respectfully submitted,

/s/ Arthur W. Leach
Arthur W. Leach
Terry Lucas Butts
Fred D. Gray
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35203
Phone:  205-822-4224
Fax:  205-824-0321

Frederick G. Helmsing (HELMF6416)
Helmsing, Leach, Herlong, Newman &
Rouse, P.C.
P.O. Box 2767
Mobile, AL 36652
Phone:  251-432-5521
Fax:  251-432-0633

James K. Jenkins
Bruce Maloy
Maloy & Jenkins
25th Floor
75 Fourteenth Street, NW
Atlanta, Georgia 30309
Phone:  404-875-2700
Fax:  404-875-7857

Attorneys for Richard M. Scrushy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of August, 2006, I electronically filed the foregoing "Defendant Richard M. Scrushy's Motion for Judgment of Acquittal Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure" with the Clerk of the Court using the CM/ECF system which will send notification of such to counsel of record.

/s/Leslie V. Moore
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35243
Phone: (205) 822-4224
Fax:    (205) 824-0321
E-Mail: les.moore@lvmlaw.com