United States v. Richard M. Scrushy
2:05-CR-119-MEF
# TAB 56

1

1      **ELMER D. HARRIS**, witness for the Defendant, having

2    been duly sworn or affirmed, testified as follows:

3                        DIRECT EXAMINATION

4    BY MR. HELMSING:

5           THE COURT:  Mr. Harris, you are kind of tall like me so

6    be careful when you sit down, there's a speaker underneath that

7    podium.  Be mindful of that.  And you can adjust yourself so you

8    can speak clearly into the microphone without injuring

9    yourself.  Mr. Helmsing, you may proceed.

10   Q.  Would you state your full name, please.

11   A.  Elmer D. Harris.

12   Q.  And how do you spell your last name?

13   A.  H-A-R-R-I-S.

14   Q.  Mr. Harris, I would like to begin by giving the jury some of

15   your background.  Can you tell us first, did you go to college?

16   A.  I did.  I went to Auburn University the first time, the

17   second time, and the third time.

18   Q.  Well, what did you get a degree in the first time?

19   A.  Well, the first time was electrical engineering and the

20   second time was a Master's in electrical engineering, and the

21   third time was associated with the Air Command and Staff College

22   where I got the Master's in business administration.

23   Q.  And what time frame was this?

24   A.  Well, the first time was '58 to '62, and then the '68 to '70

25   time frame, and then about 1970, '71 time frame.

2

1  Q.  Now, you have been the recipient, have you not, of six

2  honorary degrees?

3  A.  Yes, sir.

4  Q.  And from what institutions did they come?

5  A.  The Auburn University, that fine institution.  That would be

6  the University of Alabama in Birmingham, the Troy University

7  here in Montgomery, Faulkner University, Jacksonville

8  University, and let's see, one other here in Montgomery.

9  Q.  Huntingdon?

10 A.  Huntingdon, yes.

11 Q.  Now, can you -- when you finished your education what did

12 you do?

13 A.  Well, when I started, I started work with the Alabama Power

14 Company.  I spent the first year after high school trying to go

15 to college, couldn't find a way, didn't have the money, and then

16 Alabama Power gave me the opportunity to become a cooperative

17 education student at Auburn University.  I went three months and

18 worked three months and did that for five years to get that

19 first degree.

20 Q.  That was your degree in electrical engineering?

21 A.  It was.

22 Q.  And did you go into the military?

23 A.  I did.  I guess that was about 1962, I joined the Alabama

24 Air National Guard here in Montgomery.  And later went to U.S.

25 flight school at Webb Air Force Base, Texas.

1 Q. And how long did you serve in the Air National Guard?

2 A. About 25 years.

3 Q. And what was your rank when you finished?

4 A. I completed the Air National Guard and retired in the Air

5 Force as a Colonel, and later became Brigadier General in the

6 Alabama Air National Guard.

7 Q. All right. Now, you said that you began your work history

8 while you were actually attending Auburn, working on a co-op

9 basis I think they call it.

10 A. That's correct.

11 Q. Three months on and three months working. And that was with

12 Alabama Power Company?

13 A. That's correct.

14 Q. Can you tell the jury generally what you have done with the

15 Alabama Power Company from that time forward.

16 A. Well --

17 Q. Not in detail now, I know, but in general.

18 A. Starting out as a cooperative education student, which is

19 what I did for the first five years, and then after I graduated

20 from Auburn I came here to Montgomery and worked with the

21 Alabama Power Company. Did the rural engineering, serving new

22 houses all around this area. Following that is when I went to

23 Webb Air Force Base, Texas for flight school. Came back to

24 Montgomery after that and did some of the similar activities.

25          Later went to Birmingham and served in the engineering

4

1  department and several other areas in Birmingham.  Floated down

2  to Dothan and ran the Dothan district.  Went back to Birmingham

3  as the planning vice-president.  And then about late 1970 the

4  company asked me to be the chief financial officer.  I later

5  went to Georgia Power Company, stayed over there about five

6  years.  And came back to Alabama in 1989 as the president and

7  chief executive officer of Alabama Power.  Retired in 2002.

8  Q.  And what was your occupation at the point when you retired,

9  your job at Alabama Power Company?

10  A.  I was the chairman, president and CEO for the -- some or all

11  of the last few months while I was transitioning Charles McCrary

12  to come in as the chief executive of Alabama Power, which he is

13  today.

14  Q.  Just a minute, I am going to put this on.  Can you hear me

15  better?

16  A.  Yes, sir.

17  Q.  Can you tell the jury, Mr. Harris, what your current

18  occupation is.

19  A.  Well, I am chairman of the Public Policy Group in

20  Birmingham.  I am serving as an Honorary Counsel General to

21  Japan, and serving as the chairman of Harris, Payne and

22  Associates.

23  Q.  Now, what is the Center for Public Policy?

24  A.  Well, we are interested in revamping the Constitution of the

25  State of Alabama.  Revamping some of the educational facilities

5

1  of the state.  Like we need some higher education changes, for

2  example.  And the tax code is absolutely ridiculous.  We have

3  got so many taxes.  You have the same amount of money but we

4  need a better tax structure.

5  Q.  And the Constitution that you are working on is the current

6  Constitution that was enacted in 1901?

7  A.  Yeah.  I could put the U.S. Constitution in my pocket here

8  but the Alabama Constitution we would have to have a truckload

9  to come in here.

10  Q.  All right.  And you have served on, have you not, the board

11  of directors of AmSouth Bank Corporation?

12  A.  I have.

13  Q.  And what period of time did you do that?

14  A.  Well, it's probably about 1990 to about 2003.

15  Q.  All right.  Are you still a member of that board?

16  A.  I am not.

17  Q.  All right.

18  A.  I retired in 2003 shortly after I left the Alabama Power.

19  Q.  All right, sir.  Now, can you tell the jury a little bit

20  about the civic work that you have done.

21  A.  Well, I always had the policy at Alabama Power Company I

22  would be in the office 50 percent of the time and out of the

23  office, and that out of the office relative to civic work was a

24  large part of that.  The other part was customers and

25  governmental officials.  But civic work, everybody in the

6

1  world -- if you are a large company, everybody in the world is

2  going to ask you to be chairman of some fund raiser.  Doesn't

3  matter what it is, whether it's Red Cross or United Way or

4  education activities or whatever.  And I always tried to find a

5  way to say yes rather than find a way to say no.

6  Q.  All right.  Now, can you tell the jury generally how you go

7  about fund raising, whether it's for political candidates or for

8  some charitable endeavor or for whatever purpose.

9  A.  It really doesn't matter whether it's politics or charitable

10  contributions or civic organizations, you go about it about the

11  same way.  You have got to decide how much money do you need.

12  And then I always looked for lead gifts, how many lead gifts do

13  you need to get it started and meet your goal ultimately.  Who

14  do -- who has the ability to step up to the bar and put up the

15  lead gifts.  And then just as important as that is who do I get

16  to go talk to those lead potential givers.  It's got to be

17  somebody that they know, it's got to be somebody that they

18  trust.  So if you know how much you want and who the potential

19  lead givers are, and you get the right person to go talk to

20  them, you are going to succeed in the lead gift efforts.

21         And then you can put the rest together very, very

22  easy.  It doesn't matter whether it's politics or whether it's

23  charitable or whether it's civic or whatever you are raising the

24  money for, you have just got to be aggressive in that process,

25  you have got to challenge the people to give more than they

1    think they should give.

2    Q.  All right.  Now, when you get a request or anybody gets a

3    request from a politician or from somebody running for office,

4    or a charitable organization, for a specific amount of money,

5    you have really two choices, do you not?  One is to pay it

6    yourself or make the entire contribution --

7            MR. FEAGA:  Your Honor, I am going to object to him

8    leading Mr. Harris.

9            THE COURT:  Sustained.

10   Q.  Well, let me ask you, what are your choices?

11   A.  Well, my choices were always to raise the money.  Sometimes

12   I would give myself, sometimes I might not.  By far the majority

13   of the time I would give to whatever effort I was trying to

14   lead.  In fact, I'd say I can't even think of one that I

15   didn't.  But your choices are to get out there and organize it

16   first.  Don't go out there and ask somebody will you give me a

17   contribution for the Heart Fund.  Go out there and ask somebody

18   will you give me 50 thousand dollars for the Heart Fund.  You

19   have got to lay that amount down, and that amount needs to be a

20   little higher than they are expecting you to ask for.  Don't get

21   unreasonable in the process, but you have got to stretch people

22   a little bit in the effort to succeed.

23   Q.  Is there anything wrong with raising money in that -- in the

24   way you have described?

25   A.  Anything wrong?

1  Q.  Right.

2  A.  Heavens no.  If it is, I did something wrong, but I know I

3  did not.

4  Q.  Is that commonly done in political campaigns and raising

5  money for candidates for political office?

6  A.  Oh, absolutely.

7  Q.  All right.  Now, let me ask you, how did you first come to

8  know Richard Scrushy?

9  A.  I had heard of Richard Scrushy prior to going to Atlanta,

10  Georgia to be with Georgia Power Company when I left Alabama

11  Power for about five years.  And when I came back to Birmingham

12  as the CEO of Alabama Power I made it a point to meet, not just

13  Richard Scrushy, but Dowd Ritter with AmSouth Bank and every

14  other banker in this state that I could get ahold of, as well as

15  all of our large industrial customers.  And I found ways to get

16  to know those people, because if you don't have relationships

17  with people, if you don't build those relationships, people

18  don't trust you.  But if you go in before you ever need

19  something done, before you ever raise money or before you ask

20  them to do something for you, if they have some degree of

21  confidence and trust in you, then you are going to succeed in

22  that process.

23  Q.  All right.  And in that -- did you come to have a meeting

24  with Mr. Scrushy?

25  A.  Well, we -- I always met with our key folks in the customer

9

1  base, in the governmental base, and the charitable folks, I made

2  it a point to know.  That's why I stayed out of the office half

3  the time.  And yes, I got to know Richard Scrushy.

4  Q.  Did you have regular meetings with him?

5  A.  Well, he and I and everybody I met, like some of them just

6  like to talk periodically.  Richard and I adopted a philosophy

7  that we would meet periodically at HealthSouth, probably about

8  every two or three months and we'd just sit down for breakfast.

9  We wouldn't have any agenda, we'd just talk about whatever we

10  wanted to talk about.

11  Q.  And would that include the business of HealthSouth?

12        MR. FEAGA:  Object to leading, Your Honor.

13        THE COURT:  Overruled.

14  Q.  What subjects did you talk about during those breakfast

15  meetings?

16  A.  We talked about Health -- not just HealthSouth, we talked

17  about Alabama Power Company.  If there was something going on

18  that I wanted Richard Scrushy to know about Alabama Power

19  Company, I will tell him.  He would do the same.  Now, I was

20  very much involved in Alabama, but I was also very much involved

21  in Washington, D.C.  HealthSouth was very much involved in

22  Washington, D.C., as well as in Alabama.  And I would quiz him a

23  lot of times about what is going on in Washington.  What are you

24  doing?  What is taking place?  See, I was highly regulated out

25  of Washington, D.C.  If the right things are not done in

1   Washington, they could shut the waters off on all the

2   hydroelectric dams.  We have even had proponents that want to

3   tear the dams down, if you can think of a more ridiculous

4   scenario than that.  But we just had a general conversation

5   about anything that we wanted to talk about.

6   Q.   Did that include political matters?

7   A.   Sure.

8   Q.   When you say they could shut you down, you mean the Alabama

9   Power Company?

10  A.   Yeah.

11  Q.   Being high -- excuse me, being highly regulated.

12  A.   The Federal Energy Regulatory Commission regulates

13  everything we do on our dam system in the state, all three

14  hydroelectric systems.  If they say don't do something we can't

15  do it.  So we had an interest in protecting the interest of the

16  people of the State of Alabama in Washington, and yes, we had to

17  be involved in political activities.  We were involved.  I was

18  involved.  And I sent a lot of people to Washington, as well as

19  in Montgomery.

20  Q.   Now, how frequent were these breakfast meetings that you

21  had?

22  A.   Oh, we probably got together every two or three months.

23  Q.   And at no set time?

24  A.   No set time except breakfast.

25  Q.   By that I mean you would just call and schedule it on an ad

1  hoc basis every two to three months?

2  A.  One of us got ready to meet we would have the secretary call

3  the other one and set up a meeting and we'd show up.

4  Q.  All right.  Now, did you support Governor Siegelman in the

5  election for governor --

6  A.  I did.

7  Q.  -- in 1998 when he ran?

8  A.  Yeah.  I had worked with Fob James prior to that, and very

9  frankly, I had one tough problem with Fob James.  See, we had

10 just won the Mercedes-Benz project and I helped the State of

11 Alabama, Governor Folsom --

12        MR. FEAGA:  Your Honor, if I can I want to interpose an

13 objection to the relevance of this.

14        THE COURT:  Let's have a colloquy if you would,

15 Mr. Helmsing.

16 Q.  What were your reasons -- what was the reason you decided to

17 support Governor Siegelman in the '98 election?

18 A.  Well, I had had problems with Governor James.  Early on.

19 Later on, the last three years of his administration, he and I

20 worked very closely together.  Simply because I don't care if

21 it's Republican or Democrat sitting in that office, I have an

22 obligation to work with whoever that person is for the good of

23 Alabama Power.  It doesn't matter who is sitting in the office

24 of the President of the United States, I made it a policy, I

25 wanted to to know the President of the United States because

12

1  they had so much influence on what goes on within Alabama Power.

2  Q.  All right, sir.  And when Governor Siegelman was successful

3  in the '98 election did he ask you to play a role in his

4  transition team?

5  A.  Yes, he did.  He called me up on the telephone one day and

6  he said I would like for you to serve as chairman of the

7  transition team.  And I simply said well, governor, I have got

8  to check with one of my lawyers and see if there's any potential

9  violation of the Holding Company Act or any other statutes,

10  federal or state.  I checked in, the lawyer told me there's no

11  issue relative to that, I called Governor Siegelman back

12  immediately and said I will be glad to assist you as chairman of

13  the transition team.

14  Q.  And what are the duties of the transition team?

15  A.  Well, I made it very simple.  I don't like to make things

16  complex.  I boiled it down to three, I guess, main activities.

17  One is the inaugural activities itself.  And I put David Cooper

18  down in Mobile as the chairman of the inaugural activities.  And

19  the second one is the departmental reviews.  Go in and look at

20  every department, find out the substantive areas that Governor

21  Siegelman and his incoming team need to know to address either

22  immediately or later, go in and talk about and look at all of

23  those departments that you and the governor want.  And that

24  transition group went in and did certain of those departments

25  that they were interested in.  And the third leg is what I

1  concentrated on primarily.  I told Governor Siegelman I will

2  concentrate personally on helping you appoint the substantive

3  members of your cabinet and other needed activities prior to

4  inauguration day.  And when that inauguration day comes on I

5  told him I am going to leave and go back and run Alabama Power

6  Company and you can call me if you need me.

7  Q.  All right, sir.  So the transition team began when?

8  A.  Right after the election, be late November.

9  Q.  Of '98.  And continued until when?

10  A.  About January 21, 22, somewhere along in there, the

11  inauguration day, which is when I went back to Birmingham.

12  Q.  The transition team ended its term at the inauguration; is

13  that correct?

14  A.  That is true.

15  Q.  How is the transition team financed in the transition?

16  A.  I got out and raised the money for that.  It took well over

17  a million dollars to do the inaugural activities, those three

18  prongs.  Now, David Cooper and his team did all the inaugural

19  activities.  The only thing I did to help him out was to help

20  him raise the amount of money he needed to put on the various

21  inaugural events.

22  Q.  Did you ask Richard Scrushy for a contribution from

23  HealthSouth for 25 thousand?

24  A.  Just like I asked lots of other companies.  I asked Richard

25  Scrushy for a contribution, and if I remember it was 25 thousand

14

1  dollars.

2          THE COURT:  Mr. Harris, if you will wait until the

3  question is asked so the court reporter can get the question and

4  the answer.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Go ahead, Mr. Helmsing.

7  Q.  So you asked for 25 thousand dollars and you received 25

8  thousand dollars; is that correct?

9  A.  The best of my memory he gave the 25 thousand dollars.

10  Q.  All right.

11  A.  But I also asked him for a few other things.

12  Q.  All right, sir.

13  A.  One of the events that David Cooper wanted to put on was to

14  get the Alabama group here.  So I called my friend up in North

15  Alabama and they were out on concert.  He said I can get them

16  back if you will just get an airplane to pick them up.  I called

17  Richard Scrushy and said will you send your airplane and pick up

18  the group Alabama, bring them down here, and let them put on the

19  inaugural concert and then fly them back to their next event?

20  Randy Owens said that's the only way I can do it.  I said let me

21  see if we can't put it together.  And Richard Scrushy did that

22  fine thing for the State of Alabama.

23  Q.  Thank you.  Now, among the jobs of the transition board, was

24  it the responsibility to compile a list of possible candidates

25  to serve in state government?

15

1  A.  Yes.  As I said, that was what I concentrated on personally.

2  Q.  Did you find any difficulty in finding people to serve?

3  A.  Oh, absolutely.  It is hard to get good people to come to

4  Montgomery, Alabama and serve on -- in the cabinet and to serve

5  on boards.  It is very difficult to get them to give up their

6  position and come down here for a temporary period of time, but

7  you have to push them a little bit.

8  Q.  Are many of the positions on boards non-paying?

9  A.  Oh, yeah.

10  Q.  Now, did this include the --

11         MR. FEAGA:  Object to the leading, Your Honor.

12         THE COURT:  Let's let him ask the question.

13  Q.  Let me ask you this.  Did you have any role in selection of

14  the members of the CON Board?

15  A.  Only to the extent that I had all kinds of problems

16  determining what board -- boards needed appointments by Governor

17  Siegelman as he came into office.  I went over and met with Fob

18  James, he told me to get with his staff, which I did.  And they

19  helped put together -- it wasn't even anywhere, we had to find

20  it in every little nook and corner of the state.  Hopefully the

21  bill they pass this year, we have got to put it on the internet,

22  will solve that.  But by the time we got most of that put

23  together the inaugural activities were coming up and I told

24  Raymond Bell, Raymond, you are going to be the person that deals

25  with all of these boards, working with Governor Siegelman and

1   his team, so start putting some names down.  Put them down so

2   you are ready to evaluate these various board positions.  They

3   are not all put together yet but they will be shortly, so I said

4   to him.

5   Q.  And Raymond Bell, what was his position in the

6   administration?

7   A.  He was going to be the appointment secretary as soon as they

8   took office.

9   Q.  All right.  And did you give him Richard's -- Richard

10  Scrushy's --

11       MR. FEAGA:  Objection, Your Honor, to the leading.  He

12  is suggesting an answer with his question.

13       MR. HELMSING:  I haven't even goten the question out.

14       THE COURT:  Overruled.  Ask your question.

15  Q.  Did you give Raymond Bell Richard Scrushy's --

16       MR. FEAGA:  Objection, Your Honor.

17       THE COURT:  Overruled.

18  Q.  -- name as a possible candidate of the -- for the CON Board?

19  A.  I did not get into the specific names on the CON Board.

20  Q.  All right.  Now, are you aware of any prior service by

21  Richard Scrushy on the CON Board?

22  A.  Sure.  He had served several terms prior to Governor

23  Siegelman coming into office.

24  Q.  And under what governors did he serve, that you recall?

25  A.  Well, if I sit here and recall it's probably Folsom and

1   James and then probably went back to Hunt, would be my guess.

2   Q.  Now, did you have a discussion with Richard Scrushy with

3   regard to his serving on the CON Board in the Siegelman

4   administration?

5   A.  I did.

6   Q.  And where did that discussion take place?

7   A.  One of our breakfast meetings.

8   Q.  And what did you -- did Richard Scrushy want to serve on the

9   board?

10  A.  Well, when I walked in that morning --

11          MR. FEAGA:  Objection, Your Honor, to anything that

12  Mr. Scrushy said to him.

13          THE COURT:  Sustained.

14  Q.  Well, I am not asking you what he said to you, but did he

15  want to serve on the CON Board?

16          MR. FEAGA:  Objection, Your Honor.  He can't answer

17  that question without testifying to what Scrushy said to him.

18          THE COURT:  Sustained.

19  Q.  What did you tell Mr. Scrushy at that meeting with regard to

20  the CON Board?  What you told him, not what Mr. Scrushy said.

21  A.  I told Mr. Scrushy that if you do not want to serve on the

22  CON Board, and you can find another person that can do a good,

23  effective job on the CON Board, then you go down there and sit

24  down in Governor Siegelman's office and tell him that.  If you

25  can't find somebody else that can do a good job, Richard, I

1  think you ought to evaluate that and take the board position

2  yourself.  It's tough to get good people down there, I have to

3  go down there from time to time, and you ought not to hesitate

4  to do that either.

5  Q.  What was your impression as to whether Mr. Scrushy wanted to

6  serve on the CON Board?

7        MR. FEAGA:  Object, Your Honor.

8        THE COURT:  Overruled.

9  A.  He did not want to serve on the CON Board.  He did not -- he

10  wasn't going to serve on the CON Board.  He was going to go tell

11  Don Siegelman he wasn't going to do it.

12        THE COURT:  Let's don't say what he said.  Let's move

13  on.

14        THE WITNESS:  Yes, sir.

15  Q.  Now, were you aware -- or do you know how long that Richard

16  Scrushy served on the CON Board during the James administration?

17  A.  I do not.

18  Q.  Did -- do you know whether Richard Scrushy supported

19  Governor Siegelman in the '98 election?

20  A.  He supported Fob James.

21  Q.  You knew that?

22  A.  Yes.

23  Q.  Did you have any discussion with him with regard to the

24  relationship of him and HealthSouth to the Siegelman

25  administration?

19

1  A.  Well, along about the time we were raising the money for the

2  inaugural activities, well over a million dollars, not even

3  related to raising the money because I did that, Governor

4  Siegelman came in one day and I said I am going to ask --

5          THE COURT:  Don't tell us what Governor Siegelman said

6  but you can tell us what you said.

7          THE WITNESS:  What I said to --

8          THE COURT:  You can say in this Court what you said to

9  either Governor Siegelman or Mr. Hamrick or Mr. Scrushy or

10 Mr. Roberts, but don't tell us what any of them said to you.

11 A.  I said to Governor Siegelman that I am going to get some

12 funds from HealthSouth, for example, for the inaugural

13 activities.  And I believe it is absolutely essential that you

14 and Richard Scrushy get on the same wavelength.  There's going

15 to come a lot of things during this administration in which you

16 need the support of all the business people, not selective

17 business people.  So why don't you, Governor Siegelman, talk to

18 Richard Scrushy and see if y'all can't work out whatever

19 differences you have.

20 Q.  Now, did you have a conversation with Richard Scrushy about

21 the same matter?

22 A.  I did.

23 Q.  And what did you tell him?

24 A.  I told him essentially the same thing.  When we were talking

25 about giving some contributions to the inaugural activities,

1  you, Richard Scrushy, supported Fob James.  Fob James lost the

2  election.  It's my assumption all the time that I am going to

3  support whoever is in office.  Don Siegelman is in office, I

4  don't care whether you like him or you don't like him, you need

5  to sit down with him and talk about whatever differences y'all

6  have, solve them, get them out of the way so both of y'all can

7  be helpful to each other.

8  Q.  And why is it important for there to be good relations

9  between HealthSouth on the one hand and the state and the

10 governor on the other hand?

11 A.  Well, it doesn't matter whether it's HealthSouth or an

12 insurance company or a bank or utility, all of us have interests

13 in Montgomery, Alabama as well as many of us have interests in

14 Washington, D.C.  And sometimes the governor is going to have

15 small things that they will want you to do.  And you need to

16 be -- you need to know each another, you need to have confidence

17 in each other, you need to trust each other.  At the current

18 time I am helping Governor Riley and Patsy with the Helen Keller

19 fun raiser, where we are going to put Helen Keller up in the

20 Halls of Congress, her statue.  He asked me to do that and I'll

21 do it.  And we all ought to be doing that kind of thing to help

22 our state better.

23 Q.  Did Governor Wallace have a political position with regard

24 to people who did not support him in an election?

25 A.  He did.  Governor Wallace was the first governor I really

```
 1  started working with, and I worked with every one of them since

 2  then. Governor Wallace --

 3           MR. FEAGA:  Your Honor, can I object to the relevance

 4  of this?

 5           THE COURT:  What is the relevance, Mr. Helmsing?

 6           MR. HELMSING:  I think it ties in to what we have been

 7  talking about and how he developed his thinking on the

 8  relation -- necessity for a relationship.

 9           THE COURT:  Quickly move through this.

10           MR. HELMSING:  Okay.  We are not going to dwell on it.

11           THE COURT:  Overruled.

12  A.  Governor Wallace started winning the next election on the

13  night of the previous election.  He told me this personally.  He

14  said I always want to know who opposed me.

15           MR. FEAGA:  Objection, Your Honor, hearsay.

16           THE COURT:  Let's don't tell us what any other governor

17  said.  Let's just move on.

18  Q.  What did he do?

19  A.  I know he wanted to call the people that he -- that did not

20  support him, and I know he wanted to get them on his side, not

21  just within the administration, but future administrations.  He

22  always had higher political ambitions, as you know.

23  Q.  Did you recommend that same thing to Governor Siegelman?

24  A.  I told Governor Siegelman he needed to learn a lesson from

25  George Wallace.
```

22

1  Q.  Now, were you aware that HealthSouth had made -- or

2  supported education throughout the State of Alabama?

3  A.  Sure.

4  Q.  And did that include gifts?

5       MR. FEAGA:  Objection, Your Honor, relevance.

6       THE COURT:  Tie it to a time frame if you would,

7  Mr. Helmsing.

8  Q.  In the time frame of the late 1990s and early 2000.

9  A.  Mr. Scrushy and HealthSouth always supported education, just

10  like Alabama Power supported education, just like AmSouth and

11  other businesses supported education.  We all gave money to

12  education.

13  Q.  All right.

14       THE COURT:  Objection overruled.

15  Q.  Now, did you have a discussion with Richard Scrushy with

16  regard to the necessity of retiring the debt that was incurred

17  during the referendum, the get-out-the-vote effort in the

18  referendum with regard to the lottery in 1999?

19  A.  Somewhat indirectly from the way you have asked the

20  question.  But what I did have with regard to Richard Scrushy,

21  he asked me one day if I was going to give to the lottery

22  foundation.

23       THE COURT:  Don't tell us what he told you, Mr. Harris.

24  Q.  Okay.  Let me ask you this, you were aware that the state --

25  or are you aware that the state enacted -- the Legislature

23

1  enacted a lottery for education purposes in 1999?

2  A.  Sure.

3  Q.  And are you aware that the -- that there was a foundation

4  formed in order to get-out-the-vote and to support the passage

5  of that lottery in a referendum?

6  A.  Yes.

7  Q.  All right.  And are you aware that at -- after that

8  referendum was unsuccessful and the people of Alabama rejected

9  the lottery, that there was debt owed --

10 A.  Yes.

11 Q.  -- in the efforts to get-out-the-vote?

12 A.  Yes.

13 Q.  Now, did you have occasion to discuss that debt with Richard

14 Scrushy?

15 A.  I told Richard Scrushy that I was not going to personally

16 make a contribution to the lottery foundation, nor was I going

17 to permit Alabama Power to make a contribution to the lottery

18 foundation, very simply because we had a million three hundred

19 thousand customers and about 50 percent of them were for that

20 lottery and about 50 percent of them was against it, and I am

21 not about to irritate 50 percent of our customers.

22 Q.  All right.  Now, can you put a time frame on that?  Would it

23 have been in the spring of 2000?

24 A.  Probably sometime during the second quarter.

25 Q.  Of 2000?

1  A.  Yeah.

2  Q.  All right.  Now, where did the discussion occur?

3  A.  Occurred at one of our breakfast meetings.

4  Q.  And did you make a recommendation at that time to

5  Mr. Scrushy?

6  A.  I told him that you are different from the issues that I

7  face at Alabama Power.  You have got a totally different

8  customer base.  A lot of your customers are outside of Alabama.

9  If you want to make a contribution to the lottery foundation you

10  should do so.  My only suggestion to you is to look at the

11  lottery foundation itself, I hadn't looked at it lately, make

12  sure it's set up properly, which I think it is, so I told him,

13  because it was worked up by a major law firm in Birmingham.  And

14  there's an unlimited amount in Alabama that anybody can give,

15  doesn't matter whether it's an individual or a corporation.  You

16  can give a dollar, you can give a million dollars, you can give

17  whatever you want to give.

18  Q.  All right.  Now, did you -- in that discussion did you tell

19  Richard Scrushy -- let me ask you -- strike that out.  First of

20  all did you --

21        MR. FEAGA:  Object, Your Honor, to him leading.  He's

22  asking him did you tell him X.

23        THE COURT:  He struck the question.

24        MR. HELMSING:  I struck the question because I knew you

25  were going to object.

25

1          MR. FEAGA:   Thank you.

2  Q.  Did you -- what was your understanding of that debt so far

3  as to who it was owed to?

4  A.  I didn't know anything about the debt.

5  Q.  You didn't know anything about the debt.  Did you ever

6  discuss with Richard Scrushy that Governor Siegelman had

7  guaranteed the debt?

8  A.  I did not.

9  Q.  Did you know that he had guaranteed the debt?

10  A.  I did not.

11          MR. HELMSING:  May I have one minute, please, Judge?

12          THE COURT:  You may.

13          (pause)

14  Q.  Mr. Harris, do you think that it was appropriate for the

15  governor to appoint the CEO of HealthSouth to serve on the CON

16  Board?

17  A.  Absolutely.

18          MR. HELMSING:  That's all we have for right now, Judge.

19          THE COURT:  Governor Siegelman?

20          MR. KILBORN:  Yes, Your Honor.

21                        CROSS-EXAMINATION

22  BY MR. KILBORN:

23  Q.  Mr. Harris, my name is Vince Kilborn, I represent Governor

24  Siegelman.

25  A.  Yes, sir.

26

1   Q.   I would like to ask you a few questions.  Mr. Helmsing went

2   over some of your past experience, which I am not going to

3   repeat, but there are a couple of things of importance I do want

4   to bring out.  I counted on your curriculum vitae, which is your

5   list of things you have done in your life, I counted you have

6   been a member of approximately 37 boards of directors; is that

7   correct?

8   A.   That's probably about correct.  Far too many but I always

9   had -- as I said, I had the philosophy to try to find a way to

10  say yes and make a difference in the state rather than find a

11  way to say no.

12  Q.   And we appreciate that.  And I am not going to go over many

13  of them, but just for example, you served -- have served on the

14  board of Auburn University Foundation?

15  A.   Yes, sir.

16  Q.   And you served on the board of Alabama Business Council, as

17  a matter of fact you were chairman?

18  A.   I was.

19  Q.   Is that the primary business organization in the state?

20  A.   I believe it is.

21  Q.   And you served on the board of directors of Mercedes-Benz?

22  A.   I did.

23  Q.   Samford University Board of Trustees?

24  A.   I am still on the Samford board.

25  Q.   And The Southern Company, that's the big company that owns

1  all these power companies, isn't it?

2  A.  Well, The Southern Company owns a lot of companies, Alabama

3  Power, Georgia Power, Mississippi Power, Gulf Power and a few

4  others.

5  Q.  And I have also counted up on your honors, it looks like you

6  have got at least 38 honors and awards from just every

7  conceivable charitable and civic --

8  A.  You have got to understand now, probably in my lifetime I

9  have raised well over a half a billion dollars, and probably

10  closer to a billion.  And I always told my folks around me every

11  time somebody gives you an honor, it's for helping them raise

12  money.  They don't care about you, you helped them raise money.

13  Yeah, I got at a bunch of that because I helped a lot of people

14  raise a lot of good charitable monies and civic monies.  I just

15  got through with the Birmingham Rotary Club, raising them a

16  million dollars.

17  Q.  I would like to give you an award too.  And I think it's

18  true in your experience you have actually served seven different

19  governors of Alabama?

20  A.  All the way back to George Wallace.

21  Q.  You served --

22  A.  I got along with every one of them very deliberately, and

23  they didn't know if I was a Republican or a Democrat.

24  Q.  And that's George Wallace, Lurleen Wallace, Albert Brewer,

25  Fob James, Jim Folsom, and Don Siegelman and then Bob Riley.

28

 1  A.   And Governor Hunt.

 2  Q.   Governor Hunt, excuse me, I missed him.  And you were the

 3  CEO of Alabama Power Company.

 4  A.   Yes, sir.

 5  Q.   For how many years?

 6  A.   Started in 1989 for about the next 14 years.

 7  Q.   And you were the man basically that everybody sent all the

 8  electrical bills to.

 9  A.   I would hope so.

10  Q.   And all the checks to.

11  A.   I hope so.

12  Q.   And how many customers did you have, that you were in charge

13  of with Alabama Power Company?

14  A.   A million three hundred thousand.

15  Q.   Now, we have heard that Governor Siegelman called and asked

16  you to head up his transition team.

17  A.   He did.

18  Q.   How had you and Governor Siegelman known each other so he

19  would call you up to serve in such a position?

20  A.   I always made it a requirement on myself to know just about

21  all, if not all, constitutional officers, as well as the Senate

22  folks and leadership in the House.  When he became secretary of

23  state I met him.  He went from secretary of state to attorney

24  general to lieutenant governor to governor.  And I knew him

25  during that period of time, and I helped him and worked with him

29

1    for the good of the state.

2    Q.   So as you have told the jury you make it your business to

3    know these figures who have some control over or say-so over

4    what affects the power company and all the people you serve?

5    A.   I don't care if it's George Bush Senior or Junior or Bill

6    Clinton or who, if they permit me I am going to work with them,

7    and I don't know of any of them that did not permit me to do

8    that.

9    Q.   Have you worked with those presidents?

10   A.   I did.

11   Q.   That's including the current president?

12   A.   That's right.

13   Q.   Now, the transition team, what was the transition team?

14   A.   It was a group of individuals helping out in these three

15   areas, which would be the appointments, the departmental

16   reviews, and the inaugural activities.  We had various people

17   assigned to various functions.

18   Q.   And you were the head guy?

19   A.   That's correct.

20   Q.   Have you ever heard of a -- have you ever met or heard of a

21   guy named Jim Allen?

22   A.   I have read him in the paper.

23   Q.   The newspaper?

24   A.   I don't know him.

25   Q.   All right.  When you were the head of the transition team

30

1   did you ever know Jim Allen, meet Jim Allen or have anything to

2   do with Jim Allen or ask Jim Allen any questions or have him

3   tell you anything?

4   A.   Never saw him.

5   Q.   And if Mr. Allen claims he was a member of the transition

6   team, you don't know how he even makes that claim?

7   A.   If he was a member of the transition team I didn't put him

8   on.   I did tell the folks that were working, now you can go out

9   and help -- get people to help you, and if somebody got him to

10  help on a transition matter I didn't know anything about it.

11  Q.   All right.   Now, we talked about Richard Scrushy and I don't

12  want to repeat any of that.   I want to talk about Mack Roberts.

13  You know ultimately Governor Siegelman appointed Mack Roberts

14  over there to be the head of the Highway Department.

15  A.   Yes, sir.

16  Q.   All right.   Tell the jury how it came about to your personal

17  knowledge that Mack Roberts got to be appointed head of the

18  Highway Department.

19  A.   Well, we had a transition room where we did the

20  appointments.   And I reserved that room for these big boards

21  where you write with felt pens.   And I wrote the positions up

22  there in the cabinet and I told the transition team members if

23  anybody calls and wants to be considered for a particular

24  position you write their name down and bring them in here and we

25  are going to put them on the board and evaluate them.   Don't

1  tell anybody they will not be considered.  And we did that.

2  Now, what was your question?

3  Q.  Okay.  And what was your -- I am going to ask just a little

4  bit different question, lead into that.  What was your charge by

5  Governor Siegelman as far as who he wanted appointed or what

6  type person he wanted appointed to head these various

7  departments including the Highway Department?

8  A.  Find the best people you can and give me the best advice you

9  can, to which I said I will do that, but it is your decision so

10  you are going to have to live with these folks.  But I will give

11  you the best advice I can and I will try to get the best people.

12  Q.  And did you and the transition team try to do that?

13  A.  We did.

14  Q.  Did you do that?

15  A.  I believe we did.

16  Q.  All right.  And in your opinion was Mack Roberts the best

17  qualified man to be the highway director?

18  A.  Absolutely.

19  Q.  All right.  Now, did there come a time when there were more

20  than one candidate who seemed to be sort of rising to the top?

21  A.  When we got -- you are talking about the DOT job?

22  Q.  With the DOT or Highway Department as I call it.

23  A.  Used to be the old Highway Department, now it's upscale,

24  DOT.  We boiled it down very quickly to two candidates, one is

25  Mack Roberts, one is Ray Bass.

1  Q.  Who was Ray Bass?

2  A.  Ray Bass was a former highway director and a former DOT

3  commissioner, served with several administrations as I recall.

4  Q.  And was he in your opinion qualified to be highway director?

5  A.  Well, see I had worked personally with both of those two

6  guys.  I knew Ray Bass and I knew Mack Roberts.  I knew they

7  could do the job better than any of the candidates that we had.

8  Q.  And did you give Governor Siegelman any recommendations

9  between those two as to which way he should lean and why he

10 should lean in favor of one or the other?

11 A.  I told Governor Siegelman that you can't go wrong with

12 either one of these two guys, both of them know the DOT job,

13 both of them have served in the past, they have been there a

14 long time.  Now, if you want my recommendations as you told me

15 from the beginning, I would lean towards Mack Roberts.  In fact,

16 I would recommend Mack Roberts to you.  However, you know,

17 Governor Siegelman, this is a highly sought after position, not

18 from the standpoint of being in it, but once you get in it,

19 county commissioners seek you out, city council folks seek you

20 out, the average citizens seek you out, Senators seek you out,

21 House of Representatives folks seek you out, and you better be

22 prepared with making sure you appoint the right person.  Now,

23 Mack Roberts I told him had been in that job more recently than

24 Ray Bass, therefore, he has worked with those Senators and

25 Representatives and county and city folks more recently than

33

1    Ray.  That's why I give him the edge.  He is my recommendation

2    to you.  But now you go out and talk to some of these Senators

3    and Representatives and you make up your own mind, its perfectly

4    fine with me what you do.

5    Q.  And he ultimately took your recommendation for Mr. Roberts.

6    A.  He appointed Mack Roberts.

7    Q.  Now, I want to talk a little bit about the power of the

8    Senators.  Now, to back up a little bit, the Senators you are

9    talking about are all the state Senators in the state.

10   A.  Yes.

11   Q.  And I think there were 35 of them.

12   A.  That's true.

13   Q.  And why was it that the Senators would be keenly interested

14   in who was the highway director?

15   A.  Every one of them wanted to deliver something back to the

16   district.  Every one of them want to build a road.  Every one of

17   them helps control the budget of the DOT, that which doesn't

18   come from the federal government.  So it's very important to

19   work with the Senators and Representatives so that you have got

20   enough power base in the Legislature to do what you need to do

21   to make your administration successful.

22   Q.  And was it your feeling at the time and something you

23   relayed to Governor Siegelman that you thought Mr. Roberts had a

24   close association with these Senators?

25   A.  Absolutely.  He had worked with them more recently than

34

1    anybody else.

2    Q.  All right.  And, as a matter of fact, I think he had worked

3    with the Senators, Senator Barron, for instance, to help

4    organize the Senate as they say.

5    A.  Yes, he did.

6    Q.  And had you in the past had experience with selecting

7    appointees to boards or high public office like that?

8    A.  Sure.

9    Q.  Over the whole of your career?

10   A.  Sure.

11   Q.  And isn't it true that as a matter of fact you told Governor

12   Siegelman that it would be very inappropriate not to consider

13   the wishes of the Senators?

14   A.  Oh, absolutely.

15   Q.  Did you discuss that with him on more than one occasion?

16   A.  Sure I did.

17   Q.  About how many occasions did you and Governor Siegelman

18   discuss this preference for Mack Roberts?

19   A.  I don't know how many but it was a running dialogue, and

20   what is the best thing to do to be successful in the overall

21   administration with his goals.

22          MR. KILBORN:  Pass the witness.

23          THE COURT:  Mr. Hamrick?

24          MR. DEEN:  I have no questions, Your Honor.

25          THE COURT:  Mr. Roberts?

35

1                          CROSS-EXAMINATION

2   BY MR. BAXLEY:

3   Q.   Mr. Harris, did Ray Bass ever contact you when you were the

4   chairman of the transition team and tell you that he would like

5   to be the highway director?

6   A.   As I said earlier Ray Bass and I knew each other as well as

7   Mack Roberts and I knew each other.  Ray did call me and asked

8   me to help him become the next DOT commissioner.

9   Q.   All right.  Let me ask you that same question about Mack

10  Roberts, did Mack Roberts ever call you and tell you he was

11  interested in being director?

12  A.   Mack Roberts did not call me nor when I saw him around the

13  office of Governor Siegelman when he was working on helping to

14  organize the Senate, he never said anything to me about helping

15  him become the DOT commissioner.

16  Q.   All right.  And I believe I understood you to say when

17  Mr. Kilborn asked you that you didn't know Jim Allen?

18  A.   I did not.  Do not.

19  Q.   Never met him?

20  A.   No, sir.

21  Q.   At this time that you were chairman of this committee had

22  you ever heard of him?

23  A.   No, sir.

24  Q.   Well, as chairman of this transition team, if Jim Allen had

25  played any kind of role what so ever in getting Mack Roberts

36

1   appointed you would have known about it, wouldn't you?

2   A.  If I was involved in it, yes.  Now, if somebody else in the

3   transition team asked him to do anything, I didn't know about

4   it, and I knew almost everything that went on.

5   Q.  And you didn't know anything about Jim Allen being involved

6   in that recommendation.

7   A.  I did not.

8   Q.  I think that's all.

9        THE COURT:  Cross by the United States.

10       MR. HELMSING:  Judge, I have got one question if I

11  could, I would like to ask.

12       THE COURT:  I will let you take it up out of order so

13  we can get all the defense questions first.  You can ask it from

14  there, Mr. Helmsing.

15                    REDIRECT EXAMINATION

16  BY MR. HELMSING:

17  Q.  Mr. Harris, if the records of HealthSouth show that a

18  contribution of 25 thousand dollars to the Siegelman transition

19  foundation was made on November the 24th, 1998, would that be

20  consistent with your memory of it?

21  A.  Any time after that election we started raising the

22  necessary funds and I would expect that he would have a record

23  in HealthSouth records.

24  Q.  Right.

25  A.  If I remember correctly I asked him for 25 thousand, and I

37

1  believe he gave 25 thousand, if I remember correctly.

2  Q.  Yes, sir.  And that would have been in November of 1998 or

3  there abouts.

4  A.  November or subsequent thereto, I don't remember the date.

5        MR. HELMSING:  Thank you.  That's all we have, Judge.

6        THE COURT:  Cross by the United States.

7        MR. FEAGA:  Yes, Your Honor, thank you.

8                    CROSS-EXAMINATION

9  BY MR. FEAGA:

10  Q.  Good afternoon, Mr. Harris.

11  A.  Good afternoon.

12  Q.  Sir, I think when you first started testifying you were

13  asked some questions about something called the Certificate of

14  Need Review Board, do you remember those questions?

15  A.  C-O-N Board, yes.

16  Q.  Yes, sir.  That is a board, is it not, that regulates the

17  activities of health care providers and basically controls and

18  deals with the provision of health care in the State of Alabama;

19  isn't that right?

20  A.  It is.

21  Q.  There are in the State of Alabama other types of businesses

22  that are regulated and controlled by various governmental

23  institutions, are there not?

24  A.  Certainly.

25  Q.  In fact, sir, is it not true that with regard to the

38

1  provision of services for utilities there's an organization

2  called the Public Service Commission?

3  A.   That's true.

4  Q.   And would it be a fair statement to say that Alabama Power

5  Company as a company that provides utility services would be

6  vitally interested in the activities of the Public Service

7  Commission?

8  A.   Absolutely.

9  Q.   It's an important thing to you, right?

10  A.   Certainly.

11  Q.   Tell the ladies and gentlemen of the jury why the PSC is

12  important to Alabama Power Company.

13  A.   Public Service Commission sets the state rates for the

14  various categories, like your residence, like an industrial

15  customer, like a commercial customer.  They have the final

16  authority to set our rates, which is an important matter.

17  Q.   I mean in essence, I mean it goes to the very, you know,

18  life-blood of the company, right?  If they were to do some

19  things that were extremely disadvantageous to Alabama Power

20  Company it could cause the company endless problems, couldn't

21  it?

22  A.   Certainly.

23  Q.   So -- and the reason I bring that up is, I wanted to ask

24  you, the CON Board, with its ability to control and to regulate

25  the provision of health care services in the State of Alabama,

1  it would have the same sort of importance to a company like

2  HealthSouth, wouldn't it?  Wouldn't it be fair to say there's a

3  comparison there?

4  A.  It would be very important to the health company.  Just like

5  banking, the banking commissioner would be very important to the

6  banks.  And I can't tell you the number of calls I got on the

7  banking commissioner.

8  Q.  Yes, sir.  And the insurance commission.  And so

9  companies --

10  A.  Everybody supports their own needs, consistent with statutes

11  of the State of Alabama and America.

12  Q.  Yes, sir.  And so my point is that as the CEO of HealthSouth

13  Corporation Richard Scrushy would quite naturally have a strong

14  interest in what happens at the Alabama Certificate of Need and

15  Review Board and other Certificate of Need Review --

16  A.  He should have an interest, either himself or recommend

17  somebody else, or make sure that there's good people on that

18  board that will do an objective job.

19  Q.  I understand.  So, it would be fair for someone if they did

20  choose to do so to believe that he would have an interest in who

21  served on that board and what went on at that board.

22  A.  He should have an interest, just like I have an interest in

23  who the Public Service Commissioners are.

24  Q.  Yes, sir.  I understand.  Now, you were talking about

25  Richard Scrushy and Don Siegelman.  And you said that Richard

40

1   Scrushy had actually backed Fob James when Fob James ran for

2   governor against Governor Siegelman in 1998; is that right?

3   A.   He did.

4   Q.   And have you -- during any of the breakfast meetings with

5   him did he ever discuss with you how much he had contributed or

6   seen to it that was contributed to Fob James?

7   A.   He did not.

8   Q.   Would it surprise you if the figure was -- or someone that

9   represented him said that the figure was in the neighborhood of

10  three hundred and 50 thousand dollars?

11  A.   No, that wouldn't surprise me.

12  Q.   Okay.  Now, do you remember -- or isn't it true that at some

13  point that Scrushy, he was actively backing Fob James; isn't

14  that right?

15  A.   Sure, he was backing Fob James.  He wanted Fob James elected

16  and not Don Siegelman.

17  Q.   Do you remember it being reported -- do you remember a point

18  in time when he referred to Governor Siegelman as a Communist

19  while he was campaigning?

20  A.   I am familiar with that.

21          MR. HELMSING:  Objection, Your Honor.

22  Q.   The only reason I bring that up --

23          THE COURT:  Is there an objection?

24          MR. HELMSING:  Yes, sir, relevancy.

25          MR. KILBORN:  We do not object to that question, Judge.

41

1   Q.  The reason I bring it up, sir --

2        THE COURT:  Overruled.  Ask your next question.

3   Q.  The reason I bring it up is they didn't like each other, did

4   they?

5   A.  I don't know whether they liked each other or not.  I took

6   it that they had some major issues that they needed to solve.

7   Q.  Yes, sir.  And believe me, sir, I in no way, shape or form

8   mean to show any disrespect for your efforts to bring the state

9   together, and I don't by my question mean to imply that, but

10  what I am asking, you were there, and I think you just answered

11  my question, these two guys had some significant differences at

12  the point in time that you got involved in this transition team,

13  didn't they?

14  A.  They had some differences, I don't know how you would

15  characterize it.  But they had some differences and I was going

16  to do my best to get them together, because whoever the governor

17  is, every citizen of the State of Alabama needs to support that

18  governor, just like the President of the United States, and

19  unfortunately that's not always done in this country.

20  Q.  Right, sir.  And in this instance Richard Scrushy certainly

21  didn't support this governor when he was running for governor.

22  A.  I told you he opposed Governor Siegelman.

23  Q.  Yes, sir.  And --

24  A.  And he supported Fob James.

25  Q.  Yes, sir.  And now let me move on to that.  Then we come

1  forward and we have this lottery referendum that took place in

2  the state.

3  A.   Yeah.

4  Q.   Now, Alabama Power did not support that effort, right?

5  A.   We didn't support it because I was not about to irritate 50

6  percent of my customers.

7  Q.   I understand.  But my point being, you didn't support it.

8  A.   I did not support it.

9  Q.   All right.  And HealthSouth, do you know whether or not they

10  did?

11  A.   I have read in the papers where they did.

12  Q.   Yes, sir.  But at the time that this was going on and you

13  were having these conversations with Mr. Scrushy you never

14  solicited anybody to make any donation to the Alabama Education

15  Lottery Foundation, did you?

16  A.   I told Richard Scrushy your company is different from mine

17  and if you want to give to the lottery foundation you have a

18  perfect right to do that.

19  Q.   Yes, sir.

20  A.   There are no restrictions, you can give any amount of money

21  you want to, if you want to give it.  Governor Siegelman would

22  like for you to do that.  I am not going to do that because of

23  the customer base I have, but you don't have that problem.  If

24  you want to give a dollar, give a dollar.  If you want to give a

25  million dollars, give a million dollars.

43

1    Q.   Okay.  But my question to you was, did you solicit that?

2    And I want to ask you, do you remember getting a phone call from

3    a reporter named Eddie Curran?

4    A.   No.

5    Q.   Do you remember leaving him a message?  Calling back --

6    isn't it true that he called at some point in time?

7    A.   Relative to what?

8    Q.   Mr. Curran calling you and asking you if you had, in fact,

9    solicited any contributions from HealthSouth to the Alabama

10   Education Lottery Foundation?

11   A.   I didn't solicit contributions from HealthSouth, but I did

12   tell him now if you want to do it, you can give any amount of

13   money you want to.

14   Q.   Yes, sir.  I understand that you are -- that's what you are

15   saying.  What I am asking you though is, do you remember getting

16   an inquiry from Mr. Curran about whether you had solicited any

17   contributions?

18   A.   No, sir.

19   Q.   Okay.  But your testimony would be today that you didn't

20   solicit any.

21   A.   I didn't solicit it but I said if you want to do it you have

22   got a perfect right under Alabama law to give whatever amount

23   you want to.

24   Q.   Yes, sir.

25            THE COURT:  Mr. Feaga, slow down.  My court reporter is

44

1  good but he can't take down at this pace.

2        MR. FEAGA:  I'm sorry, Your Honor.

3        THE COURT:  I want a record.

4        MR. FEAGA:  Sorry, Jimmy.

5  Q.  Now, this was a conversation you were having with him while

6  there were still these significant gulfs and differences of

7  opinion between he and Governor Siegelman, right?

8  A.  Well, we worked on that now.  You have got to go back to the

9  inaugural time frame, which was '98, early '99 time frame.  This

10 would have been over in the year 2000, so we had about a year

11 and a half there that I had been pushing both of them.  And I

12 assume at some point in time they got together and talked

13 because they began working together a little better.

14 Q.  Okay.

15 A.  And I always had a policy, I don't follow behind people,

16 they either take my advice or they ignore it.

17 Q.  Yes, sir.  And what you are saying to the jury is that your

18 recollection is it was around the time frame of the year 2000

19 that they began to work together.

20 A.  No, I did not say that.

21 Q.  I'm sorry, I thought --

22 A.  I said that is the time frame I had the conversation with

23 Richard Scrushy about giving money to the lottery foundation.

24 If you want to do it, do it.  If you don't want to, don't do

25 it.  Now, you go back to the inaugural time period is when I

45

1 first started talking with Richard and Governor Siegelman about

2 y'all get your problems worked out and work together for the

3 good of this state.

4 Q.  I see.  So, if Richard Scrushy gave money prior to 2000 to

5 the Alabama Education Lottery Foundation you don't know anything

6 about that.

7 A.  Prior to 2000?

8 Q.  Yes, sir.

9 A.  I don't know when I read it in the paper but I read -- yeah,

10 prior to 2000 -- no, I didn't hear about him giving anything to

11 the lottery.  He gave to the inaugural fund, the amount of money

12 of 25 thousand dollars that I asked him for.

13 Q.  Yes, sir, I understand.  Well, that being the case, let me

14 ask you, I want to go back to these questions -- and you talked

15 about how you go out and you have been involved in a great many

16 charitable endeavors.  And you talked --

17 A.  Charitable, civic and political.

18 Q.  Yes, sir.  And you said that you go out and you raise that

19 money and you have got to be aggressive in your fund raising.

20 A.  Absolutely.

21 Q.  Let me ask you, have you ever in the course of raising any

22 funds ever contacted a company that does business with Alabama

23 Power Company and threatened them if they didn't make a

24 particular contribution that you wanted made?

25 A.  I have contacted a lot of people that work with Alabama

46

1  Power Company but I never threatened anybody.

2  Q.  Yes, sir.  Why not?  Tell the jury why you wouldn't do

3  that.

4  A.  I would not do it.

5  Q.  Why not, sir?

6  A.  That is not my style to threaten anybody.  If you are going

7  to get along with people -- you know, as I said earlier, most

8  folks didn't know if I was a Democrat or a Republican.

9  Q.  Yes, sir.

10  A.  And if I am going to get along with people, be they Democrat

11  or Republican, in the governor's office or in the presidency, I

12  have got to work with them.  I don't need to be harsh.  I don't

13  need to be threatening.  I need to try to pull people together

14  to get them to talking to each other, build up their trust in

15  each other so they can solve the problems.

16  Q.  Yes, sir.  And along that lines, have you ever disguised a

17  contribution that you made?  Made a deliberate effort to

18  disguise the payment that you made?

19  A.  Well, some of that is done all the time when you give to

20  political action committees.  And I work with the Business

21  Council of Alabama, I took the Progress Pac up from next to

22  nothing all the way up to millions of dollars to participate in

23  the political process.

24  Q.  Yes, sir.

25  A.  And a lot of pacs we raised funds coming into the Business

47

1    Council.  Now, if your definition of disguising is that, well

2    that is disguised, but I have never deliberately disguised

3    anything that was inappropriate.

4    Q.  Yes, sir.  And let me ask you, I would like for you if you

5    would to share with the jury why not?

6    A.  Why not what?

7    Q.  Why not?  Why won't Elmer Harris disguise a payment?

8    A.  I never had the need to do such a thing.

9    Q.  Yes, sir.  And if -- and that brings me sort of to an

10   important point I want to ask you about.  Have you ever made an

11   agreement with any of our governors that you have worked with,

12   and I think you said every one since Governor Wallace --

13   A.  That's true.

14   Q.   -- that you would give them money but only if they would

15   take a particular official action if you gave them the money?

16   A.  I told Bob Riley recently when he asked me if I would

17   support him, I said Governor, I will support you provided you

18   will straighten out that mess at Auburn University.  Now, if

19   that fits your definition, I don't know what that is.

20   Q.  Yes, sir.  No, I am with you right down the line on that,

21   it's kind of like --

22   A.  Auburn University has been in a mess for ages, something has

23   got to be done.

24   Q.  Yes, sir.  And who the next coach is going to be.

25           THE COURT:  Let's move on.

1  Q.  But what I am talking about is something that directly

2  affects your business, would you ever engage in a discussion,

3  and have you ever with any of these governors, where you have

4  said I will give you this money but only if you will take an

5  action that will benefit the financial interests of Alabama

6  Power Company?

7  A.  I have not.

8  Q.  No, sir.  And what I want to know -- I want you to share

9  with the jury, you have been sharing your wisdom with them, and

10  I want you to share with them, why wouldn't you do that?

11  A.  That is not my style.  I just absolutely wouldn't do that.

12  Q.  Do you think it would be illegal?

13  A.  I don't know if that's a legality, I am not a lawyer.

14  Q.  So it isn't a problem from your perspective that it might be

15  unlawful to give money to a public official in exchange for him

16  agreeing to take a particular official --

17  A.  At Alabama Power it would be illegal.  We couldn't do

18  anything to benefit a candidate or anything to benefit an

19  elected official.  Most of the time that goes over and it's

20  handled by the Ethics Commission.  If somebody benefits an

21  elected official the Ethics Commission decides whatever they

22  want.  If they want to submit it to the Attorney General for

23  prosecution, they submit it to the Attorney General and the

24  Attorney General does what he wants to do in the courthouse.

25  Q.  Yes, sir.  And along those same lines, let me ask you, you

49

1  said that you were not familiar with Jim Allen.

2  A.  That's true.

3  Q.  Now, if, in fact, he did serve on the transition committee

4  within the Department of Transportation, if, in fact, that's

5  true, then -- let me just ask it this way, you said you were not

6  aware of him having done so.

7  A.  That's true.

8  Q.  But can you state categorically to the jury that he did not?

9  A.  What I said to you is that if somebody else asked him to do

10  anything anywhere in the transition I was unaware of it.  The

11  gentleman never talked to me.  I never met the gentleman.  I

12  don't know if he did or he didn't, if somebody asked him, but I

13  was not aware of it, and I knew most of the things that went on

14  during the transition.

15  Q.  Yes, sir.  And with that in mind let me ask you, do you know

16  or did anybody tell you that Jim Allen had a meeting with then

17  candidate and subsequently Governor Don Siegelman in Birmingham,

18  Alabama where Governor Siegelman threatened his business

19  interests, did anybody tell you about that?

20  A.  No.

21  Q.  Did anybody tell you that he asked Mr. Allen to give him a

22  hundred thousand dollars during that same conversation for his

23  campaign?

24  A.  Well, let me tell you now, if any -- if I had picked up any

25  quid pro quo going on in the appointments process, I would have

50

1  been the first to take action.

2  Q.  Yes, sir.  And tell the jury why.

3  A.  That did not occur.  I didn't observe that anywhere.

4  Q.  Yes, sir.

5  A.  And I believe if it had occurred anywhere in that

6  administration in that appointments process I would have known

7  it.  And I didn't know anything about that.  If I had picked it

8  up it had been done, I would have left.

9  Q.  All right, sir.  And if you had -- why would you have left?

10  A.  I don't tolerate things like that.  But what I am saying to

11  you, I never saw it.  I don't believe it occurred under my

12  watch.

13  Q.  I understand.  Now, let me ask you, do you know anything

14  about -- and during these conversations that you were having

15  with Mack Roberts --

16  A.  Sure.

17  Q.  -- did he tell you anything about the fact that he had

18  gotten 71 thousand dollars from this fellow Jim Allen that you

19  didn't know anything about?

20  A.  I know nothing about that.

21  Q.  And did he say anything to you about the fact that he had an

22  agreement when he got -- with Mr. Allen that when he got into

23  office as the DOT director he was going to start buying a

24  product --

25  A.  I know nothing about that.

1  Q.  And did he say anything to you about the fact that he was

2  going to approve consultants that were going to be paying

3  Mr. Allen 35 thousand dollars a month in consulting fees?

4  A.  I know nothing about that.

5  Q.  And that's an interesting point, because you said you had

6  never heard of Jim Allen and I am wondering, in your experience

7  would you say that for a consulting engineering firm to pay an

8  individual 35 thousand dollars a month, that there would

9  normally be some reason for that?  That's a significant sum of

10  money to pay a consultant, isn't it?

11  A.  I don't know anything about that.

12  Q.  But I am asking you based on your business experience, isn't

13  that a lot of money, 35 thousand dollars a month?

14  A.  It's not a lot of money in some cases.  I have spent

15  millions of dollars doing things within Alabama Power Company to

16  get the job done for Alabama Power Company.

17  Q.  Yes, sir.

18  A.  Whether that's buying a generator or buying a turbine or

19  buying a distribution facility, you have got to do business and

20  get it done properly, correctly, but get it done.

21  Q.  Yes, sir.  But get it done within the bounds of the law,

22  right?

23  A.  I will always get it done within the bounds of the law.

24  Q.  And if I am hearing you right to say that your testimony to

25  this jury when you walk out of this courtroom you want them to

52

1  know that Elmer Harris, the president of Alabama Power Company,

2  would never offer or give money to a politician who was

3  demanding that money in exchange for an official act.

4  A.  I would never violate the law knowingly for any person or

5  anything.

6  Q.  And --

7  A.  And I don't believe that occurred under my watch in the

8  transition team.

9  Q.  Yes, sir.  Well, I understand.  But you have said you don't

10  know Jim Allen.

11  A.  That's true.

12  Q.  And Mack Roberts didn't tell you anything about the 71

13  thousand he got from Jim Allen.

14  A.  I don't know anything about that.

15  Q.  Now, do you know, sir -- I want to ask you a little bit

16  about -- you said you had followed the political career of

17  Governor Siegelman.

18  A.  I didn't follow his career, he was a public official.  I

19  made it a point to know the constitutional officers of this

20  state.

21  Q.  Yes, sir.

22  A.  I developed relationships with them.  There's no substitute

23  for relationships.  That's the way you build the trust, that's

24  the way you get things done.

25  Q.  Yes, sir.  I understand.  And let me ask you, do you know

53

1  who the people were that were closest to Don Siegelman in terms

2  of working directly with him in the various public offices that

3  he held?

4  A.  That is so general I can't answer that.

5  Q.  All right.  Let me see if I can be a little more specific,

6  and I apologize for that.  How about, do you know a fellow named

7  Nick Bailey?

8  A.  Nick Bailey?

9  Q.  Yes, sir.

10  A.  Yes, sir.

11  Q.  Okay.  And when is the first time -- isn't it true that Nick

12  Bailey worked with Governor Siegelman when he was lieutenant

13  governor?

14  A.  I believe that is true.

15  Q.  And he worked with him when he was governor; is that right?

16  A.  Yes, he did.

17  Q.  Okay.  And tell the ladies and gentlemen of the jury how

18  many times you saw Nick Bailey and Governor Don Siegelman

19  together?

20  A.  How many times did I see them together?

21  Q.  Yes, sir.

22  A.  Heavens, I don't know the answer to that.

23  Q.  Would it be a lot?

24  A.  Well, if you are working with somebody like my assistant at

25  Alabama Power, they were with me all the time.

54

1  Q.  Yes, sir.

2  A.  If Nick Bailey was his assistant they are going to be

3  together a lot.

4  Q.  Yes, sir.

5  A.  I can't answer how many times they were together.

6  Q.  All right.  But you knew Nick Bailey to be Governor

7  Siegelman's assistant.

8  A.  He is an assistant of some title.

9  Q.  Well, and you saw them together frequently but that didn't

10  surprise you because they were working closely together, right?

11  A.  I might have seen him around the office.  You have got

12  secretaries there that's working with the governor, and Bailey

13  had an office there, and any time I saw him it was in that

14  office.

15  Q.  Yes, sir.  I understand.  And how about Paul Hamrick, do you

16  know who Paul Hamrick is?

17  A.  Yeah, I see Paul sitting over here.

18  Q.  Yes, sir.  Who did you know Paul Hamrick to be?

19  A.  Say again now?

20  Q.  In relation to Governor Siegelman, who did you know Paul

21  Hamrick to be?

22  A.  He was -- I believe he was the chief of staff going into the

23  administration.

24  Q.  Okay.  Now, I asked you some questions earlier, sir, in

25  regards -- well, let me ask you before I leave that subject.  Do

55

1  you know of anyone that worked more closely within the offices

2  of lieutenant governor and governor with Don Siegelman than Nick

3  Bailey and Paul Hamrick?

4  A.  I don't know the answer to that.  I wasn't down there every

5  day.

6  Q.  I understand.

7  A.  I made it a point not to be in Montgomery every day.

8  Q.  Yes, sir.  You weren't there on a day-to-day, you had a

9  multi-billion dollar company to run.

10  A.  I have got more things to do than sit around somebody's

11  office.

12  Q.  And I think you said you sat on 35 boards?

13  A.  Yes.

14  Q.  So you just wouldn't have been around often enough --

15  A.  I was around as much as I needed to be around but not more.

16  Q.  All right, sir.  Not enough to observe the day-to-day

17  activities that were going on.

18  A.  I didn't try to observe the day-to-day activities.

19  Q.  That really wasn't your business, was it, sir?

20  A.  You are talking about the Governor of Alabama, it's not my

21  business to sit around the governor's office and observe his

22  activities, that would be ridiculous.

23  Q.  Yes, sir.  I understand.  I agree with you completely.  Let

24  me ask you, you said you didn't know a guy named Jim Allen.

25  A.  That's true.

1   Q.  Do you know a guy named Lanny Young?

2   A.  I have heard of him.  I have never met the gentleman.  I

3   wouldn't know him if he were to walk in the door.

4   Q.  I understand.  So he is kind of like Jim Allen, you didn't

5   know much about Lanny Young either.

6   A.  That's true.

7   Q.  Do you know of any reason why Governor Siegelman would be

8   taking 92 hundred dollars from Lanny Young?

9   A.  I don't know a thing in the world about that.

10  Q.  I didn't think so.  And sir, let me ask you, do you know any

11  reason why Governor Siegelman would be taking a 54 hundred

12  dollar four-wheeler from Mr. Young?

13  A.  I know nothing about that.

14  Q.  Do you know anything about why he would be asking Mr. Young

15  to buy 13 thousand dollars worth of mugs for him to give out as

16  Christmas gifts?

17  A.  I know nothing about that.

18  Q.  Do you know anything about why he would tell Mr. Young that

19  he was going to give a revenue ruling to Waste Management but he

20  was going to make those -- and I am sorry for saying this,

21  sir --

22          MR. KILBORN:  Judge, I have had enough.  That is not

23  the evidence and he knows it, and I object to that.

24          THE COURT:  Let him ask the question and then we will

25  see about your objection.  Ask your question, Mr. Feaga.

57

1  Q.  Do you know anything about why Governor Siegelman would say

2  to Lanny Young we are going to get that revenue ruling for you

3  but we are going to make those bastards pay?  Do you know

4  anything about that?

5  A.  Now, you and I know I tell it like it is.  I don't know

6  Lanny Young.

7  Q.  Yes, sir.

8  A.  So how would I know anything about what Lanny Young did or

9  didn't do?  I don't know anything about Lanny Young.

10  Q.  Yes, sir.  I understand.  And that's what brings me back to

11  Jim Allen, you don't know him and so how would you know

12  anything about --

13  A.  I do not know Jim Allen.

14  Q.  And you wouldn't know anything about what he did or didn't

15  do.

16  A.  No, I would not.

17  Q.  That's what I -- yes, sir.  I understand.  Now, I wanted to

18  ask you, sir, when you head up these endeavors to raise funds,

19  is it important to keep an accounting of what is going on, what

20  is coming in and what is going out?

21  A.  Well, I will tell you an example of that that might be

22  helpful to you.

23  Q.  Yes, sir.

24  A.  The inaugural foundation that I personally directed the

25  lawyers to set up, go set it up according to the laws of the

1  State of Alabama and any other law that's applicable.  I

2  directed another person to go get the Kassouf and Company in

3  Birmingham to serve as the CPA, and tell Kasseuf you will write

4  every check that comes out of that foundation.  And also tell

5  Kasseuf that you will be the recipient of the revenues coming

6  into it, and by the way, Kasseuf, when we get done, we are going

7  to audit that foundation, and by the way, if there's any money

8  left over we are either going to give it to the State of Alabama

9  or we are going to give it to a charity.

10  Q.  Now, Mr. Kasseuf is a CPA, isn't he?

11  A.  He is.  That's why I selected him to do that job.

12  Q.  Now, why?  Tell the ladies and gentlemen of the jury why it

13  was important to you that you keep an accurate accounting of

14  what came in and what went out.

15  A.  I wanted to make sure I didn't do anything that impacted the

16  reputation of Don Siegelman first, and secondly, that I did it

17  absolutely correct, and that's what we did.

18  Q.  In fact, we have had a governor prosecuted for misusing --

19  stealing transition funds in the past, haven't we?

20  A.  You are talking about Governor Hunt?

21  Q.  Yes, sir.

22      MR. KILBORN:  Your Honor, we are not going to try

23  Governor Hunt again.  It's irrelevant.  We are not going to try

24  anybody else.

25      MR. FEAGA:  Certainly not trying to try him.

59

1          MR. HELMSING:  I join in that objection.

2          MR. KILBORN:  Certainly beyond the scope of any direct.

3          THE COURT:  Sustained.

4          MR. HELMSING:  It has absolutely nothing to do with

5    this proceeding.

6          THE COURT:  Sustained.  Let's move on.

7    Q.  It's important -- is one of the reasons it's important is

8    that the public has a right to demand accountability from its

9    public officials when it's raising and spending funds?

10   A.  The ultimate accountability of the public is to vote

11   somebody in office or vote them out of office.

12   Q.  Yes, sir.  And one of the things that they rely on in order

13   to know who they want to support is --

14   A.  Who wants to support?

15   Q.  The public.  You are talking about the public has a right to

16   vote in and vote out public officials.

17   A.  Yeah.

18   Q.  What I want to ask you, have you ever heard of something

19   called the Fair Campaign Practices act?

20   A.  Yes.

21   Q.  And that act requires that public officials report --

22   A.  Yes.

23   Q.  -- monies that they take in, right?

24   A.  Yes.

25   Q.  And it requires them to report monies that they expend,

60

1  right?

2  A.  Over some reporting time frame, which I don't even remember

3  what the time frame reporting is.

4  Q.  I understand, sir, and I wouldn't expect that you did.  But

5  what I want to know is would you share with the jury why it's

6  important that those accountings that are made under the Fair

7  Campaign --

8  A.  Because the Legislature in its wisdom passed the Fair

9  Campaign Practices Act and that's what they put in the act.

10  They could have put something else, but when it passed the

11  Legislature and the Governor of the State of Alabama signs it

12  then we have got to honor it.

13  Q.  Yes, sir.  And do you think it would be helpful to people

14  when they are trying to decide who to vote for to know where

15  they are getting their money, who is supporting them, who is

16  giving them the money?

17  A.  Who is getting what money?

18  Q.  The politician in question.

19  A.  That's why you have disclosure forms.

20  Q.  Yes, sir.  That's what I am asking you about.  That's why

21  you have that disclosure so the public will know, and if those

22  disclosures aren't made the public won't know, will they?

23  A.  If they don't make them they won't.

24  Q.  I understand.  Do you know --

25  A.  That is a matter for the Ethics Commission to get into.

61

1  Q.  Yes, sir.  Do you know a fellow named Jerry Newby?

2  A.  Jerry Newby?

3  Q.  Yes, sir.

4  A.  Out here at ALFA Insurance?

5  Q.  Yes, sir.

6  A.  Yes, sir, I do.

7  Q.  Is he one of those business executives that --

8        MR. KILBORN:  We object, outside the scope.  Your Honor

9  has already ruled on this issue.

10       THE COURT:  Where are we going with this, Mr. Feaga?

11       MR. FEAGA:  Your Honor, I want to talk to him about --

12       MR. BAXLEY:  We ask for a side-bar, Your Honor

13       THE COURT:  Is this going to be relevant to -- well,

14  approach.

15         (At which time the following occurred at side bar:)

16       THE COURT:  The record will reflect that we are in the

17  presence but outside the hearing of the jury.  Where are we

18  going?

19       MR. FEAGA:  Sir, they asked him about whether or not he

20  had had any conversations with Richard Scrushy about helping

21  retire the debt of the AEF and I want to ask him -- he said he

22  had breakfast meetings with him, I want to ask him if he had any

23  breakfast meetings with Mr. Newby about retiring that debt.

24  Where I am going with -- I want to -- I think the Court knows of

25  evidence that Mr. Siegelman lied to Jerry Newby in order to get

62

1   ALFA to give a hundred thousand dollars, told him it was going

2   for educational purposes and wasn't going to have anything to do

3   with the lottery.

4        MR. KILBORN:  Your Honor, he already wanted to call

5   Mr. Newby to get into something that wasn't in the indictment.

6   Your Honor has ruled you are not going to permit that, as far as

7   what discussions were between Newby and anybody else about AEF

8   or anything else.

9        MR. FEAGA:  I think they have tried to put on evidence,

10  Your Honor, there was nothing wrong with the effort after the

11  AEF failed -- after the lottery failed, there was nothing wrong

12  with anything Siegelman did or Scrushy did after the referendum

13  failed, and so I want to get into this to rebut the inference

14  they have created that there was nothing wrong with what was

15  going on between Scrushy and Siegelman.  I think after the

16  lottery -- I think the fact that Mr. Siegelman lied to another

17  CEO in order to get a hundred thousand dollars for that effort

18  goes, one, to his motive for -- it goes to demonstrate that he

19  was, in fact, in basically a criminal state of mind.  He had

20  criminal intent.  And the reason is he was desperate to get

21  money, so desperate he would lie about it to people.  And so

22  when they talk about this second two hundred 50 thousand dollar

23  contribution to create the inference this was something that

24  came up after the lottery came down, I think the fact that

25  Mr. Siegelman is lying to other people to get the money is

63

1   important.

2         THE COURT:  Mr. Harris has already testified that he

3   didn't know anything about the debt to the Education Trust Fund

4   or to the lottery or the fact that Governor Siegelman had

5   guaranteed or not guaranteed the debt.  So unless he testifies

6   any differently about that, objection sustained.

7         MR. FEAGA:  Okay.

8         (At which time the following occurred in open court:)

9         MR. FEAGA:  It would be a convenient time, Your Honor.

10        THE COURT:  Ladies and gentlemen, let's take our

11  afternoon recess.  We have been going for almost -- a little

12  over an hour and a half, so let's take our recess at this time

13  so we can stay on schedule.  I instruct you not to discuss the

14  facts of this case nor allow anyone to discuss the facts of the

15  case with you.  Leave your notes in the courtroom.  We will take

16  about a 15 or 20 minutes recess.  If you will follow the

17  marshals.  Mr. Harris, if you will wait right here.

18        THE WITNESS:  Yes, sir.

19        (At which time, 3:03 p.m., the jury left the

20  courtroom.)

21        THE COURT:  You may step down, we will start back about

22  3:20.  Court will be in recess until about 3:20.

23        (At which time, 3:04 p.m., a recess was had until

24  3:28 p.m., after which, with the jury in the box, the trial

25  continued.)

64

1          THE COURT:  Please continue, Mr. Feaga.

2   Q.  Mr. Harris, I wanted to ask you, I was asking you if you

3   knew some people.  I talked to you about Jim Allen and Lanny

4   Young, I want to ask you, do you know a fellow named Eric

5   Hanson?

6   A.  Eric Hanson?

7   Q.  Yes, sir.

8   A.  Seems like I have met the gentleman, but that's different

9   from knowing him.

10  Q.  Okay.  And would -- isn't it true that Eric Hanson was a

11  lobbyist for HealthSouth and Richard Scrushy?

12  A.  I think that is correct, but I didn't deal with him directly

13  so I know nothing about what he did or didn't do.

14  Q.  Okay.  So, you wouldn't have any way of knowing what --

15  what, if any, involvement Eric Hanson had in conversations and

16  discussions that went on between Richard Scrushy and Don

17  Siegelman after Don Siegelman became governor in 1998-99?

18  A.  No, sir.

19  Q.  And how about a fellow named Mike Martin, do you know him?

20  A.  Mike Martin, what does he do?

21  Q.  CFO for HealthSouth.  Chief financial officer.

22  A.  I probably met him too, but I didn't know Mike.

23  Q.  You wouldn't have any idea whether --

24  A.  I met most of the folks around -- when I would go to a

25  company I would meet the top executives, but I don't know them.

65

1  Q.  And that's pretty much a common thing for somebody that's

2  doing the kind of thing you are doing, serving on 35 boards,

3  raising money and all sorts of different things --

4  A.  If they pay Alabama Power Company some money, which most of

5  them did, if I am the CEO I am going to meet their top people

6  and tell them I appreciate their business.

7  Q.  Yes, sir.  But you wouldn't have any way of knowing what

8  they were telling their subordinates to do.

9  A.  They being who?

10  Q.  They being the top officials that you would meet with, like

11  Governor Siegelman and like Richard Scrushy, you would have no

12  way of knowing what they were telling their close subordinates

13  to do.

14  A.  About what?

15  Q.  About anything.

16  A.  I wouldn't make a blanket statement, but as a general matter

17  I wouldn't know about their business activities.

18  Q.  I understand.  And how about -- have you ever met or do you

19  know a lawyer named Loree Skelton?

20  A.  Loree Skelton?

21  Q.  Yes, sir.

22  A.  Refresh me on what she does.

23  Q.  She was a lawyer for HealthSouth that used to go to CON

24  Board meetings with Richard Scrushy.

25  A.  I do not know her.

66

1   Q.   Okay.  You wouldn't have any way of knowing what

2   instructions Mr. Scrushy was giving to Loree Skelton.

3   A.   No.

4   Q.   Have you ever heard of a Senator Jabo Waggoner?

5   A.   Certainly.

6   Q.   Okay.  And who do you know Senator Waggoner to be?

7   A.   Senator Waggoner is a Senator up in Birmingham, a very good

8   friend of mine.

9   Q.   Yes, sir.  Do you happen to know whether or not he ever had

10  an employment relationship with HealthSouth?

11  A.   He did work with HealthSouth.

12  Q.   While Richard Scrushy was CEO?

13  A.   Yes.

14  Q.   Okay.  And do you know what his duties and responsibilities

15  were with HealthSouth?

16  A.   I do not.

17  Q.   Okay.  Well, if he were to have said that he was involved in

18  governmental relations but he was an internal guy at the

19  company, would that surprise you?

20  A.   No.

21  Q.   Would that maybe be consistent --

22  A.   Jabo is very interested in governmental issues, governmental

23  activities, governmental process, so it wouldn't be surprising

24  at all to me that he was interested in representing HealthSouth

25  on any matter, be it in the state or federal, but I never

1  observed him going to federal.

2  Q.  Let me ask you, if he was working -- you testified a lot

3  about your experience and how things are supposed to work and

4  how they work and what your expectations are, and you have

5  talked about your broad base of experience, what I wondering is

6  if Ms. Skelton was in charge of keeping up with contributions,

7  political contributions that were being made by HealthSouth, and

8  if Mr. Waggoner was in charge of governmental relations for

9  HealthSouth, would you find it odd that they wouldn't know about

10 a five hundred thousand dollar contribution that was made by

11 Richard Scrushy to Governor Siegelman's lottery?

12 A.  I don't know those people so I can't answer that question.

13 Q.  All right, sir.  And earlier you were talking about the fact

14 that you had had some conversations with Mr. Scrushy about the

15 Certificate of Need Review Board and Don Siegelman, generally,

16 is that --

17 A.  Yes.

18 Q.  You said that Richard Scrushy had told -- had indicated to

19 you or your impression was that he wasn't interested in being on

20 the CON Board; do you remember that?

21 A.  He didn't want to be on the board.

22 Q.  Right.  But now, that doesn't relate to the fact that he

23 wouldn't have had an interest in who was on the board, right?

24 A.  I would think he should be interested in who was on the

25 board.  That's why I told him if you don't want to serve go find

68

1    somebody else that you believe can do a good job and go down

2    there and tell the governor you are not going to serve and

3    recommend somebody.

4    Q.  Okay.  And so, of course, the person that he would recommend

5    would be somebody that he would think would act in a manner and

6    in a fashion that was consistent with the best interests of

7    HealthSouth and/or the best interest of health care in the

8    state, right?

9    A.  I think he would do what was in the best interest of the

10   state and his business.

11   Q.  There you go.  And as CEO of HealthSouth he would certainly

12   have an obligation and responsibility --

13   A.  He has an obligation on both fronts, protect his business

14   and do what is best for the State of Alabama.

15   Q.  Okay.  And so it wouldn't be unusual for him to want one of

16   his employees at the company to be on the CON Board.

17   A.  Absolutely not.

18   Q.  Okay.  So then if -- you talked earlier about a memorandum

19   that Mr. Raymond Bell had done, I think you talked about telling

20   him they needed to go out and get the best people they could and

21   make up a list.

22   A.  Sure.

23   Q.  So it wouldn't surprise you to find that Richard Scrushy is

24   on such a list.  It's been entered into evidence, I think it's

25   Government's Exhibit 30 in this case.

69

1   A.  If you want me to look at something I will be glad to look

2   at it, I don't know what you have got.

3          MR. FEAGA:  And I think this is a copy.  Kelli, can I

4   have the original?

5          THE CLERK: (complies)

6   Q.  I want to show you what is marked as Government's Exhibit 30

7   for identification purposes and ask you if you would look at the

8   second page, and more specifically this information right

9   there.  (complies)   You can look at all of it certainly.

10  A.  Memorandum to Governor Siegelman from Raymond Bell, Junior,

11  June the 25th, 1999, that was long after I left the transition

12  responsibilities, about six months, in fact.

13  Q.  Yes, sir.  Now, on that second page does it show that

14  Richard Scrushy has, in fact, recommended somebody to serve on

15  the CON Board?

16  A.  Well, if you will show me that particular point I will be

17  glad to comment.

18  Q.  Yes, sir.  Sure.  It's this one right here.  If you look out

19  here, see at the top it says supporter.

20  A.  Where it says Thomas Carman?

21  Q.  Yes, sir.  What does it say there, would you read that for

22  the jury, sir?

23  A.  Thomas Carman, executive vice-president, corporate

24  development, HealthSouth.

25  Q.  And who does it show as the supporters out in the other

70

1  column?

2  A.   Eric Hanson.

3  Q.   And who else?

4  A.   William Horton.

5  Q.   And does it show who Mr. Horton is?

6  A.   Senior VP and corporate counsel HealthSouth, Richard

7  Scrushy.

8  Q.   So it sounds like he acted on your advice, Richard Scrushy,

9  based on that memo.

10  A.   I would hope he would, that's why I gave it to him.

11  Q.   Yes, sir.  Now --

12         MR. HELMSING:  That's in evidence, isn't it?

13         MR. FEAGA:  It is.

14  Q.   Now, sir, I asked you some questions earlier about whether

15  you had any specific knowledge of any dealings between Governor

16  Don Siegelman and Lanny Young and Jim Allen, and I think you

17  indicated that you didn't have any knowledge of that.

18  A.   That's true.

19  Q.   And you had said that -- isn't it true that if you had

20  known -- I think you said if you had known of anything illegal

21  or wrong that was going on during this time frame you would have

22  walked away.

23  A.   That was going on in the transition, I had a responsibility

24  for the transition.

25  Q.   Yes, sir.

71

1  A.  I made sure the funds were received properly, disbursed

2  properly, audited properly, and the balance given away, and

3  anything else that went on.  Nothing was going to go wrong if I

4  had anything to do with it relative to that transition.

5  Q.  And if there had been something like that that had gone on

6  and you found out about it, you would have walked --

7  A.  I told you I would have walked away.

8  Q.  Yes, sir.  Would you have considered reporting that wrongful

9  activity to anybody?

10  A.  What do you mean reporting it?  I think it would have been

11  obvious if I had left the chairmanship of the Siegelman

12  transition in the middle of the transition, I wouldn't have to

13  report anything.

14  Q.  Yes, sir.  And people that know you, they would know that

15  about you, right?

16  A.  I would hope so.

17  Q.  So you would be the last person in the world --

18  A.  No, I wouldn't be the last person in the world.

19          THE COURT:  Listen to the question first before you

20  answer --

21  Q.  What I am getting at is  --

22          THE COURT:  Listen to me first.  You ask the question,

23  and then, Mr. Harris, if you will answer so we can keep a

24  record.

25          THE WITNESS:  Yes, sir.

72

1   Q.  What I am getting at is, if somebody was doing something

2   illegal or improper on your watch, you would be the last person

3   in the world they would want to tell about it, wouldn't you?

4   A.  I would hope so.

5           MR. FEAGA:  Kelli, can I see Government's Exhibit

6   220 -- excuse me, Siegelman Exhibit 220.  That's okay.

7   Q.  I did want to ask you, you indicated I think earlier on your

8   direct examination that on your watch, the transition, you don't

9   know of anything that went wrong, anything that was done that

10  was wrong.

11  A.  That's true.

12  Q.  But your watch ended on January the 19th.

13  A.  No, more like 21, 22 as I recall.  It was a little after

14  January 20th I believe, that particular year.

15  Q.  Okay.

16  A.  We can look up the date, I don't remember exactly.

17  Q.  I understand.  So it was no longer on your watch when and if

18  Richard Scrushy came down here and met with Don Siegelman on

19  June 29th, 1999.

20  A.  Wait a minute.  It's on my watch if I am trying to get the

21  two to work together, and they are meeting, that's exactly what

22  they should be doing.

23  Q.  Okay.

24  A.  And I don't care if it's Richard Scrushy meeting with

25  Governor Siegelman or Richard Scrushy sends one of his

1   representatives down there to meet with Governor Siegelman,

2   that's done all the time.  I sent people to Montgomery to meet

3   with the governor all the time, and I would personally stay in

4   touch with the governor, either in person or on the telephone or

5   otherwise.

6   Q.  Yes, sir.  But I thought you said earlier that the only time

7   you were covering -- when you said nothing went wrong on your

8   watch was during the transition.

9   A.  No.

10  Q.  Okay.  So you considered your watch to be --

11  A.  I am going to stay involved in the governmental activities

12  while I was president of the Alabama Power Company.  That was

13  indeed a responsibility of mine.  If the governor wanted some

14  help I am going to be there to help him.

15  Q.  Yes, sir.  Did he ask you to get him -- did he ask you for

16  any help in getting five hundred thousand dollars from Richard

17  Scrushy?

18  A.  Any help?

19  Q.  In getting five hundred thousand --

20  A.  He didn't ask me, but if he had asked me I would have sat

21  down with Richard Scrushy and I would have asked him for five

22  hundred thousand because I have sat down with Richard Scrushy

23  and asked him for five million dollars before.

24  Q.  For a political candidate?

25  A.  No, absolutely not, for the Business Council of Alabama at

74

1  the time I was in the chairmanship and the leadership and we

2  were trying to build up the Business Council of Alabama and make

3  it more effective to get rid of some of the trial lawyer

4  influence in this state inappropriately, and we accomplished

5  that.

6  Q.  Yes, sir.  Let me ask you, are you telling the jury

7  basically that you were running the governor's office the whole

8  four years he was the governor?

9  A.  Absolutely not.  I wasn't the governor, I wasn't running the

10 governor's office or any other office in state government.

11 Q.  Yes, sir.  That's what I am trying to get at.

12 A.  I will help them.

13 Q.  If they ask.

14 A.  Well, I might even go down and tell them what I think

15 whether or not they ask or not.

16 Q.  Yes, sir.  I understand.  What I want to know is, did

17 Governor Siegelman between January the 19th when he took over as

18 governor, and July 26th, 1999, during that time frame, did he

19 call you and say Elmer, I need you to help me get five hundred

20 thousand dollars from Richard Scrushy?

21 A.  Number one, I just said he did not do that.

22 Q.  Yes, sir.

23 A.  Number two, I said I told Richard Scrushy if you want to

24 give to that foundation you have got a perfect right to do it,

25 there's nothing illegal, you can give any amount of money you

75

1  want to, a dollar if you want to, or a million dollars.

2  Q.  Yes, sir.  But I thought earlier in your testimony you said

3  you did that in 2000?

4  A.  Well I did.

5  Q.  Okay.  So I am talking about between January 19th, '99 and

6  July 26th, 1999.

7  A.  July 26th, '99, the only thing I asked him for in that

8  period of time was the 25 thousand dollars for the transition,

9  and how about taking care of the group Alabama and getting Randy

10  Owens and his group down here to handle the inaugural activity.

11  Q.  Yes, sir.  And that would have been before January 19th,

12  '99, when Mr. Siegelman was sworn in as governor -- excuse me,

13  Governor Siegelman was sworn in as governor.

14  A.  That's true.

15  Q.  Okay.  I got you.  And you wouldn't have been present when

16  and if Richard Scrushy met with Don Siegelman on June 29th,

17  1999.

18  A.  No.

19  Q.  And you have no way of knowing what they talked about.

20  A.  I wasn't present.

21  Q.  And you wouldn't be there if they had another meeting on

22  July 14th, 1999, would you?

23  A.  If they had asked me to be there I probably would, but they

24  didn't ask me so I wasn't there.

25  Q.  I understand.  You would have been there if they had asked

76

1  you to be there.

2  A.  Yes.

3  Q.  But you would be the last guy in the world they would ask to

4  be there if they were discussing something illegal.

5  A.  I don't think that's true.  I had a lot of people asking me

6  to help them out in various projects and activities, and getting

7  people together, but I didn't knock them over the head, I tried

8  to get them together.

9  Q.  I hear you loud and clear, sir, but what I'm saying is you

10  said you would be the last person in the world anybody would do

11  anything illegal around, right?

12  A.  Ask your question again.

13  Q.  Yes, sir.  What I am asking you is if they met down there on

14  June 29th, '99 --

15  A.  Yes.

16  Q.  -- and/or July 14th, 1999 discussing buying or selling a

17  seat on the CON Board, you would be the last man in the world --

18  A.  You are asking me another hypothetical and I don't know the

19  answer to what they discussed that particular date.

20  Q.  My question is simply this, if that was going on you would

21  be the last man in the world they would want --

22  A.  I don't know if I'd be the last man in the world or not.  If

23  they had asked me to be there I would have been there.

24        MR. HELMSING:  Objection.

25        THE COURT:  Let's move on.

1  Q.  Yes, sir.  Now, one more thing.  If he had had another

2  meeting between July 19th, 1999 and July 26th, 1999 where a

3  check for two hundred and 50 thousand dollars from an out of

4  state corporation was delivered to Governor Siegelman in

5  exchange for a seat on the CON Board, and/or influence over the

6  CON Board, that Mr. Siegelman was about to make selection for on

7  July 26th, 1999, they wouldn't want Elmer Harris at that

8  meeting, would they?

9  A.  I don't know whether they would or not.  If they had asked

10  me to be there I would have been there.

11  Q.  I hear you loud and clear.  No further questions.

12        MR. FEAGA:  No further questions, Your Honor.

13        THE COURT:  Mr. Helmsing?

14        MR. HELMSING:  Mr. Harris, we have no further questions

15  and thank you for your testimony.

16        THE COURT:  Yes, sir.

17        THE WITNESS:  Thank you, Your Honor.

18        THE COURT:  Mr. Siegelman?

19        MR. KILBORN:  No questions of Mr. Harris.

20        THE COURT:  Mr. Hamrick?

21        MR. DEEN:  I am afraid to ask Mr. Harris any questions.

22        THE COURT:  Mr. Roberts?

23        MR. BAXLEY:  No questions, Your Honor.

24        THE COURT:  Any reason Mr. Harris needs to be under

25  subpoena?

78

1          MR. FEAGA:  None from the United States, Your Honor.

2          THE COURT:  Governor Siegelman?

3          MR. KILBORN:  No, Your Honor.

4          THE COURT:  Mr. Hamrick?

5          MR. DEEN:  No, sir.

6          THE COURT:  Mr. Roberts?

7          MR. BAXLEY:  No, sir.

8          THE COURT:  Any request that he remain under your

9   subpoena, Mr. Helmsing?

10          MR. HELMSING:  No, sir, he can be released.

11          THE COURT:  Have a safe trip back to Birmingham,

12   Mr. Harris, you are free to go.

13          THE WITNESS:  Thank you, Your Honor.

14

15

16

17

18

19

20

21

22

23

24

25