**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

UNITED STATES OF AMERICA,

v.                                                          Case No. 2:05cr119-MEF

RICHARD M. SCRUSHY,
      Defendant.

**DEFENDANT RICHARD M. SCRUSHY'S REPLY
TO UNITED STATES' RESPONSE TO DEFENDANTS' MOTIONS FOR
JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29
OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

COMES NOW Defendant Richard M. Scrushy, by and through his undersigned counsel of record and files this Reply to the "United States' Response to Defendants' Motions for Judgment of Acquittal Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure," ("Gov't Response") (Doc. 459):[1]

**Introduction**

In many respects the Government's Response to the Rule 29 Motions filed by Richard Scrushy and Governor Siegelman answer few of the issues raised by the Defendants in their motions. When this Court considers the testimony, rather than the Government's fanciful construction of evidence, which often includes evidence only attributable to Governor Siegelman, questions by Mr. Feaga that were ruled out by the Court or testimony that was specifically ***not attributed to either*** Defendant in this case, it

---

[1] As with Defendant's previously filed pleadings relating to his Rule 29 motions, Defendant Scrushy specifically adopts the arguments and authorities contained in the Response filed on behalf of co-Defendant Siegelman in this matter.

becomes clear that the Government actually has no evidence that Mr. Scrushy did anything that the law forbids. It is a fundamental necessity in America that campaign contributions be given Constitutional protection due to the public funding of our political process. It follows that the fact that there was a contribution and later an appointment raises no inference of guilt. However, the Government has predicated its entire case on this connection, labeling the initial contribution as "colossal" and therefore corrupt, which is simply ***not*** an evidentiary inference it is permitted to draw.

Next, the Government attempts to avoid the clear requirement as enunciated by the Supreme Court of the United States that there be an explicit quid pro quo in a bribery case. Clearly, its reason for doing so is that the evidence falls far short of establishing such an agreement between Richard Scrushy and Governor Siegelman. Its effort to dodge this legal requirement through slight of hand attempts to narrow the Supreme Court's legal findings on bribery cases to the specific statute under consideration in those cases must fail. As shown in more detail below the Supreme Court has dictated the legal requirements in bribery cases broadly rather than as they relate to specific statutes. The Government's interpretation puts every contributor who is subsequently appointed to a position in jeopardy once the prevailing political winds change, or if that individual for some reasons is unpopular with the Department of Justice, which is exactly what the Supreme Court has endeavored to eliminate.

The Government has ignored the protected status of the contributions in question. After not saying a word about whether the contributions were legitimate during the trial, the Government now attempts to cast them as illegitimate which is precisely the mistake the appeals court made that resulted in the reversal of *McCormick* before the Supreme

Court.   The testimony at trial from the Government's witness Nick Bailey clearly establishes that the contributions in question in this case were campaign contributions.

On the statute of limitations issue raised in the Governor's initial Rule 29(c) Motion, which Defendant Scrushy adopted, the Government again attempts to obfuscate the issue by alleging waiver.   There is no waiver here due to the Government's concealment of the facts necessary to reveal the issue.   Both parties moved for clarification of the charges through a bill of particulars which the Government objected to and the Court refused to grant.   The charges contained in Count 4 of the Indictment are beyond the statute of limitations and should be dismissed.

All of the remaining charges are predicated on the bribery.   Since the Government failed to prove the agreement by way of an explicit quid pro quo, the scheme alleged in Counts 5-9 also has to fail.   The Government never proved that there was a scheme, no one testified about who was involved, what the object of the scheme was, who the participants were or what acts were done in furtherance of the scheme.   The mailings alleged by the Government have no relation to the fraud that is alleged in the Indictment. The Government never proved any connection between Thom Carmen and the fraud as alleged.   The mailing alleged in each count all occurred after Richard Scrushy had left the board and the only evidence that was presented on these mailings and the transactions behind the mailings came from Loree Skelton who repeatedly testified that Richard Scrushy had nothing to do with the issues presented to the board in the time period the mailings occurred.   Due to the failure to tie Carmen to the fraud in any way, combined with the Government's reversal of fortune with regard to Loree Skelton's testimony, all of the remaining counts should be dismissed.

I.    **THE GOVERNMENT'S COMPLAINT REGARDING CITATION TO UNOFFICIAL TRANCRIPTS IS IRRELEVANT AND WITHOUT BASIS.**

Before addressing the merits of Defendant Scrushy's Rule 29 motions, the Government complains that Defendant's use of unofficial transcripts is somehow improper, concluding that "[t]his Court, therefore, should disregard Defendant's use of these unofficial transcripts and not rely on them in rendering its decision on the Motions." (Gov't Response at 5-6.)

The transcripts relied upon by Defendant Scrushy in his original motion pursuant to Rule 29(a), (Doc. 413), are hardly mysterious and unreliable documents that Defendant is seeking to use to improperly sway this Court's findings, as implied by the Government. Instead, these transcripts were produced by a certified court reporter who works in this District Court, and was permitted by this Court to be present to take down the testimony of witnesses who were germane to Defendant's case in lieu of daily transcripts which the Court's official court reporter was unable to provide.  The excerpts of these transcripts that Defendant quoted and relied upon in his initial Rule 29 motion were appended to that motion as TABS 1 through 55 and filed with this Court on June 8, 2006.  Similarly, the testimony of Elmer D. Harris on June 12, 2006 was appended to Defendant's motion pursuant to Rule 29(c), (Doc. 454), as TAB 56.  This testimony was taken down by this Court's official court reporter, and Defendant accurately noted in his motion that this transcript was a "rough draft" and not "paginated or proofed for the final transcript, which is not available as of the filing of this motion." (Doc. 454 at 9 n.2.)

Curiously, while lodging this complaint the Government fails to point to any inaccuracies in the transcripts in question, or otherwise dispute the accuracy and

completeness of the transcripts of the testimony attached to Defendant's motions. The Government had access to the portions of the transcript attached to Defendant's initial motion as filed with this Court.  Further, at the oral argument on Defendant's Rule 29(a) at the close of the Government's evidence, counsel for Defendant Scrushy offered the transcripts to the Court and because they were offered to the Court the Government also had a right to have access to them.  Rather than objectively examining the transcripts,[2] the Government simply cites 28 U.S.C. § 753(b) for the proposition that, "No transcripts of the proceedings of the court shall be considered as official except those made from the records certified by the reporter or other individual designated to produce the record." Defendant has never, nor does he now, assert that these transcripts should be "considered as official."  Instead, Defendant has offered the transcript excerpts as the most accurate representation of the testimony *that is available at this time* in order to assist the parties and the Court in focusing the review of the evidence in this lengthy trial.

While urging this Court to "disregard Defendant's use of these unofficial transcripts," (Gov't Response at 6), the Government unabashedly offers as a better source for the testimony of key witnesses, the *memory* of Government counsel for what the witnesses said:  "Upon information and belief, the United States recounts the following evidence…."  (*Id.* at 13.)  Thereafter, the Government seamlessly both quotes and represents the testimony of various witnesses without citation to any source, or even any reference to what day the testimony occurred.  (*See*, *e.g.*, *id.* at 14.) The Government does not explain how this is somehow a more reliable source of the actual testimony than the unofficial transcripts by a certified court reporter or the rough draft of this Court's official

---

[2] Defendant reiterates this offer to make these entire transcripts available to the Court and the Government for review.

court reporter. In fact, the Government's representation of the evidence based on the memory of Government counsel is less than reliable or accurate, in distinct contrast to the accuracy of the unofficial transcripts that Defendant has cited in his motions.[3]

Obviously, there are two other sources of accurate versions of the testimony of the witnesses: this Court's memory and, when it becomes available,[4] the certified transcript as completed by this Court's official court reporter. Additionally, to the extent that this Court reviews the transcripts and questions their accuracy in any way, the Court has its official court reporter at its disposal and can easily confirm any segment of the transcript in question. To the extent that there are significant disagreements as to what the testimony of any witness was, Defendant respectfully submits that given the length of the instant trial, the impending completion of the certified transcript, and the schedule currently set for Defendants' motions for new trial pursuant to Rule 33, this Court should await and make use of the certified transcript in making such determinations.

---

[3] As one telling example of the problem inherent with this process, at page 15 of its Response, the Government states as a fact: "During this conversation Defendant Siegelman told Hanson that Defendant Scrushy had given $350,000 to Defendant Siegelman's opponent and that *given that amount with interest*, it would take about $500,000 for Defendant Scrushy to 'get right' with Defendant Siegelman." (Gov't Response at 15.) The unofficial transcript by the certified court reporter indicates that the question which elicited the italicized portion of the information was objected to, and this Court sustained the objection. (TAB 57, R-May 2, 2006 at 168; *cf. id.* at 166) In other words, the Government's memory—and hence its representations to this Court in its written pleading—is clouded by testimony it wanted to elicit from this witness, but, in fact did not elicit from the witness as admissible testimony. Defendant respectfully submits that this is an excellent example of a circumstance where this Court cannot rely on the naked representations of the Government, but should instead look to the unofficial transcript, and, if the Court deems it necessary, confirm the actual testimony with its official court reporter.

[4] Defendant Scrushy has previously made arrangements with the Court's official court reporter for the transcription of a certified transcript of the entire proceedings in this case, and understands that Mr. Dickens is preparing such a transcript.

The Government's position on the transcripts is symptomatic of a central problem that the defense has had to confront throughout this litigation. The Government never wants to deal with precise information and evidence. At every turn, its positions and arguments are driven by a desire to deal only with its construction of the "facts" rather than providing specific and reliable reference to the actual proof at trial. While we recognize that the Government is entitled to every inference from the evidence, that standard requires that evidence exist upon which the inference is based. Until the certified transcript is available, Defendant respectfully requests that the Court use the source that is the most reliable source available at this time, which is the unofficial transcripts, subject to confirmation through the Court's official court reporter. Such a procedure, while less than perfect, is far more reliable and far preferable than reliance on the versions provided by counsel "on information and belief."

II. **THE GOVERNMENT'S CONTENTION THAT FEDERAL PROGRAM BRIBERY DOES NOT REQUIRE PROOF OF A QUID PRO QUO IS CONTRARY TO THE DECISIONS OF THE SUPREME COURT AND THE ELEVENTH CIRCUIT COURT OF APPEALS.**

In Section II-A-1 at pages 7 through 12 of its Response, the Government contends that, "Defendants argue that proof of a Hobbs Act quid pro quo is required to sustain a conviction under 18 U.S.C. § 666, where as here (they claim), the monies received by the agent of the State government were campaign contributions." (Gov't Response at 7.) The Government supports this contention primarily by a detailed discussion of the distinctions between the statutory language of the Hobbs Act, 18 U.S.C § 1951, which was involved in the Supreme Court's decision in *McCormick v. United States*, 500 U.S. 257, 111 S.Ct. 1807 (1991), and the statutory language in the federal program bribery statute, 18 U.S.C. § 666.

In doing so, the Government purposefully ignores the principle basis for Defendant Scrushy's argument that proof of a quid pro quo is necessary to establish a crime under § 666. As clearly set out in Defendant's Rule 29(c) motion, which specifically references Defendant's previously filed Rule 29(a) motion, Defendant's contention regarding the necessity of a quid pro quo is premised on the fact that § 666 is a bribery statute, and the Supreme Court in *United States v. Sun Diamond Growers*, 526 U.S. 398, 404-04, 119 S.Ct. 1402 (1999), explicitly held that a bribery offense requires proof of a quid pro quo. (*See* Doc. 413 at 4-5 and Doc. 454 at 7.) Defendant's argument under *McCormick* was related to the Supreme Court's recognition that campaign contributions are of special concern in criminal prosecutions because of their protected status due to the long-standing practice of requiring that political campaigns in America be funded by private contributions. (Doc. 454 at 1-4.)

By misrepresenting Defendant's argument, the Government's Response misleadingly erects a straw man to knock down and, more significantly, completely fails to respond to the principle legal rationale that supports the conclusion that proof of a quid pro quo is essential to a valid conviction for violating § 666(a)(2). In the absence of sufficient proof of a quid pro quo, this Court should grant Defendant's motion for a judgment of acquittal as to Count Four of the indictment.

In *Sun Diamond Growers*, the unanimous Supreme Court ruled that in order to establish a violation of 18 U.S.C. § 201(c)(1)(A), the gratuities portion of the federal bribery statute, the Government was required to submit sufficient evidence of a link between the thing of value conferred upon a federal official and a specific "official act" for or because of which it was given. The Court explicitly rejected the Government's

contention that conferring a thing of value upon a federal official by reason of the official's office would suffice for a conviction under § 201(c)(1)(A). 526 U.S. at 406-08. In reaching this conclusion, the Court first sought to "place § 201(c)(1)(A) within the context of the statutory scheme." *Id*. at 404. The Court explained that the statute sets out two crimes. The first, in §§ 201(b)(1) and (2), is bribery. The second, in §§ 201(c)(1)(A) and (B), is illegal gratuity. 526 U.S. at 404. The Court then proceeded to explain the difference between the two crimes:

> The distinguishing feature of each crime is its intent element. Bribery requires intent "to influence" an official act or "to be influenced" in an official act, while illegal gratuity requires only that the gratuity be given or accepted "for or because of" an official act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*Id*. at 404-05 (emphasis in original). The Court goes on to note that "the punishments prescribed for the two offenses reflect their relative seriousness…" with bribery carrying 15 years' imprisonment and illegal gratuity carrying two years' imprisonment. *Id*. at 405.

The next step in the reasoning is the conclusion that the federal program bribery statute, 18 U.S.C. § 666, is a bribery statute. In *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469 (1997), the Supreme Court rejected the argument of a defendant that the bribe must have affected federal funds in order to violate § 666. 522 U.S. at 60. In reaching this decision, the Court first reviewed the history of § 666. The Court noted that "[b]efore §666 was enacted, the federal criminal code contained a single, general bribery provision codified at 18 U.S.C. § 201." 522 U.S. at 58. The Courts of Appeals "divided

over whether state and local employees could be considered 'public officials' under § 201(a)." *Id.* (citations omitted). Due to this conflict, the Supreme Court explained:

> Without waiting this Court's resolution of the issue in *Dixson*, Congress enacted § 666 and made it clear that federal law applies to bribes of the kind offered to the state and local officials in *Del Toro*, as well as those at issue in *Mosely* and *Hinton*.
>
> As this chronology and the statutory language demonstrate, § 666(a)(1)(B) was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds.

522 U.S. at 58.

Decisions by the Courts of Appeals interpreting the operative language in various bribery and gratuities statutes have confirmed the Supreme Court's reference to the statutory language which is indicative of a statute which addresses bribery, especially when contrasted with illegal gratuities. In *Kummer v. United States*, 89 F.3d 1536 (11th Cir. 1996), the Court reviewed a sentencing issue under 18 U.S.C. § 1954, which outlaws the offer or promise, or the receipt or solicitation of any "fee, kickback, commission, gift, loan, money, or thing of value" to or by any individual responsible for any employee pension or benefit plan. The defendants in *Kummer* argued that they pled guilty under a plea agreement that contemplated sentencing under the Sentencing Guidelines relevant to an illegal gratuity as opposed to a bribe, and that the district court erred in sentencing them pursuant to the guideline applicable to bribes. Acknowledging that the language in § 1954 contained terms of art that were important in determining the difference between a bribe and a gratuity, the Eleventh Circuit summarized the differences:

> Although § 1954 does not use the term "bribe" or "gratuity," the courts have noted that the language "because of, or with intent to be influenced" corresponds with a "bribe/gratuity dichotomy." *United States v. Lopreato*, 83 F.3d 572, 575 (2d Cir. 1996). The "with intent to be

> influenced" language prohibits a bribe, which involves a quid pro quo. *Id.*;
> *see also United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993) (a
> bribe involves intention of the briber to gain a quid pro quo); *United States
> v. Muldoon*, 931 F.2d 282, 287 (4th Cir. 1991) (payer's *intent* to influence
> recipient's actions distinguishes bribe from gratuity). The "because of"
> language prohibits a gratuity, which involves no quid pro quo, but is a
> payment made "because of the act." *Muldoon*, 931 F.2d at 287.

89 F.3d at 1540. While noting that unlike other statutes prohibiting bribes and gratuities, § 1954 does not make a distinction between the two for sentencing purposes, the Sentencing Guidelines applicable to § 1954 do, in fact, make a distinction between the two. 89 F.3d at 1540, *citing* USSG § 2E5.1(a)(1) and (2). The Eleventh Circuit, citing the definitions of bribe and gratuity found in Application Notes 1 and 2 to USSG § 2E5.1, concluded: "Thus the Guidelines follow the distinction made in other statutes that a bribe involves a specific understanding that it will affect an official action—a quid pro quo." 89 F.3d at 1540.

Similarly, in *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998), a § 666 case, the Fourth Circuit focused on the phrase "corruptly" in the statutory language. Relying on its observation that "[a ] bribe requires that the payment be made or promised 'corruptly,' that is, with 'corrupt intent,'" 160 F.3d at 1013, the Court, after citing to numerous cases relying on the existence of a quid pro quo to distinguish bribes from gratuities, concluded:

> In sum, the line between a payment made "corruptly … with intent
> to influence" an official act and a payment made "for and because of" an
> official act is the same line that separates a bribe from an illegal gratuity.
> *Cf. United States v. Kummer*, 89 F.3d 1536 (11th Cir. 1996); *United States
> v. Lopreato*, 83 F.3d 571, 575 (2d Cir.), *cert. denied*, 519 U.S. 871, 117
> S.Ct. 187, 136 L.Ed.2d 125 (1996).

160 F.3d at 1013-14.

As the First Circuit concluded in *United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993), in discussing the appropriate Sentencing Guideline applicable to a conviction under § 666(a)(2), the language in the bribery guideline "seems virtually to mirror the statute of conviction here, which, among other things, criminalizes 'corruptly giv[ing] … anything of value to any person, with intent to influence" a decision of state or local government." 983 F.2d at 1159. In determining which guideline was appropriate, the Court observed, "[t]he essential difference between a bribe and an illegal gratuity is the intention of the bribe giver to effect a *quid pro quo*." *Id*., *citing Muldoon*, 931 F2d at 287.

In light of these decisions, the decisions of the Eleventh Circuit which presume that § 666 is a bribery statute and that, as a consequence, to sustain a conviction under § 666 requires sufficient proof of a quid pro quo, are unsurprising, and clearly indicative of where the parameters lie in this regard to § 666 as interpreted by the Eleventh Circuit. As cited in Defendant's initial Rule 29(a) motion, the Court's decision in *United States v. Castro*, 89 F.3d 1443, 1453-54 (11th Cir. 1996), clearly presumes that the conviction under § 666(a)(2) was a "bribery" conviction, noting that the evidence showed that the defendants paid kickbacks to a Dade County judge with the intent to influence the judge's decision to appoint them to represent indigent defendants in criminal cases.

Similarly, the Eleventh Circuit clearly presumed that § 666 requires a quid pro quo—which the Court defined as "simply a specific official act in exchange for a specific corrupt payment"—in *United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1996). The issue presented was whether or not the district court erred in failing to instruct the jury that a quid pro quo was required to convict under § 666. Since the defendant neither requested such an instruction in the trial court, nor objected to the failure to give such an

instruction, the Eleventh Circuit concluded that there was no plain error under Rule 52(b) because the trial court instructed the jury in language which set forth the offense using the language in the body of § 666. In reaching this conclusion, the Court cited with approval the language of the Seventh Circuit in *United States v. Medley*, 913 F.2d 1248, 1260 (7th Cir. 1990), that "[t]he essential element of a § 666 violation is a 'quid pro quo [.]" *Paradies*, 98 F.3d at 1289.[5] The Eleventh Circuit went on to assess the defendant's sufficiency challenge as to a 1990 payment to an Atlanta City Councilman, and held:

> [T]he evidence at trial was sufficient for a jury to find that Jackson accepted payments for his votes and his influence upon the City Council and the administration. Such a finding would satisfy any quid pro requirement under the statute.

98 F.3d at 1289.

---

[5] The Government expends much effort in its Response to distinguish the Seventh Circuit's holding in *Medley*, claiming that it is "a case upon which Defendants erroneously rely for the proposition that the Eleventh Circuit in *Paradies*, 98 F.3d 1266, adopted the Seventh Circuit's position that Section 666 has a quid pro quo element." (Gov't Response at 11-12.) That the Seventh Circuit has, subsequent to *Medley* and subsequent to *Paradies*, issued opinions in *United States v. Gee*, 432 F.3d 713 (7th Cir. 2005) and *United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997), that contain language that appears to contradict the same Court's language in *Medley* is of no moment to the Eleventh Circuit's reliance on *Medley's* language in the Eleventh Circuit's 1996 decision in *Paradies* which presumes that, just as *Medley* stated clearly, "[t]he essential element of a section 666 violation is a 'quid pro quo;….'" Moreover, *Agostino* simply held that it was not necessary to allege a quid pro quo in an indictment to overcome an objection to the sufficiency of the indictment. 132 F.3d at 1190. Perhaps even more tellingly, the Government's Response seems to misapprehend the significance of *Agostino's* statement that "the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666." 132 F.3d at 1190, as cited in the Government's Response at 11-12. *Sine qua non* is literally translated as "without which not," and is also defined as, "That without which the thing cannot be. An indispensable requisite or condition." Black's Law Dictionary (5th Edition). That is precisely Defendant's argument, and precisely what the Supreme Court held in *Sun Diamond Growers*: "for bribery there must be a *quid pro quo*." 526 U.S. at 404.

Significantly, the Government fails to address this argument head-on, instead seeking to obfuscate this critical legal point by arguing that Defendant is trying to import a Hobbs element into the bribery statute at issue in this case. The Government's failure to respond to Defendant's actual argument—that § 666 is a bribery statute and that bribery convictions cannot be sustained without sufficient proof of a quid pro quo, "a specific intent to give or receive something of value *in exchange* for an official act," *Sun-Diamond Growers,* 526 U.S. at 404-05 (emphasis in original)—is especially telling because it goes to the very heart of the sufficiency of the evidence in this case. Defendant respectfully resubmits that in deciding this motion under Rule 29, this Court must determine, in light of the law and the charges as found in the Indictment, whether or not the Government's evidence as to the existence of an explicit quid pro quo meets the requisite standard of sufficiency.

III. **EVIDENCE OF ANY ACTIONS IN RELATION TO THE POLITICAL CONTRIBUTIONS AFTER THEY WERE DELIVERED IS NOT RELEVANT TO THE SUFFICIENCY OF THE EVIDENCE AS TO DEFENDANT SCRUSHY'S INTENT TO COMMIT THE OFFENSE CHARGED IN COUNT FOUR.**

Just as the Government attempted to do in pretrial motions,[6] the Government's Response seeks to bolster the sufficiency of the evidence against Defendant Scrushy as to the Count Four conviction for federal funds bribery with arguments based on evidence that is relevant only to Governor Siegelman. At pages 16-17 of its Response, the Government argues at some length based on the alleged evidence of actions by Governor Siegelman relative to the second $250,000 political contribution from HealthSouth,

---

[6] *See* "Government's Response to Defendant's Motion for Severance," (Doc. 86 at 20)**,** where the Government argued that Governor Siegelman's intent in regard to the RICO allegations was admissible to prove Defendant Scrushy's intent to violate the statutes in which he was charged.

concluding with the assertion that "Defendants' efforts to conceal and disguise the payment of $500,000 from Defendant Scrushy to Defendant Siegelman are compelling evidence of ***their knowledge*** of the criminal nature of their activities and their intent to commit criminal offenses, including violations of Section 666." (Gov't Response at 17.)

First, the Government relies on its claimed evidence that "Defendant Scrushy was responsible for the circuitous, extortionate, and completely nefarious, manner in which the $250,000 IHS check was generated and the second non-disclosed installment of $250,000 from HealthSouth." (*Id*.)   At trial, Defendant never contested that the first political contribution of $250,000 came from IHS, nor did he ever contest that he procured that political contribution and caused its delivery to the Governor. Any efforts to cause another business (IHS) to make a political contribution for which the solicitor (HealthSouth) expects credit with the politician to whom it is given tells the jury absolutely nothing about the intent of Defendant Scrushy as it relates to the donee (the Governor's lottery campaign).  Further, it tells us nothing in terms of whether or not that contribution is to obtain the requisite quid pro quo required to render the contribution an illegal bribe under § 666. The process of involving individuals with significant business connections in soliciting contributions from their circle of associates which are thereafter treated collectively and credited to the soliciting company or individual is a practice deeply ingrained in our political process. Such a process is illustrated not only by the evidence regarding Margie Sellers and the Nursing Home Association (Tab 41, R-May 3, 2006 at 246) but also by the attached chart (Tab 62) from opensecrets.org which shows that the top contributors to President Bush's campaign originate with individuals and PACs associated with large corporations in situations where corporate donations are

limited.  The Government did not have any evidence that the "circuitous, extortionate, and completely nefarious, manner in which the $250,000 IHS check was generated" violated any law, and this evidence contributes nothing to the sufficiency of the evidence as to the violation of § 666(a)(2) which is presently before this Court in Defendant's Rule 29 motions.

Similarly, the evidence offered by the Government as to the alleged activities with the second $250,000 check after it was delivered to the Alabama Education Fund adds nothing at all to the equation concerning the sufficiency of the evidence against Defendant Scrushy. The Government's claim that "Defendant Scrushy was responsible for … the second ***non-disclosed installment*** of $250,000 from HealthSouth," (Gov't Response at 17), is deliberately misleading. First, and most obviously, the Government points to no evidence—because there is no evidence—that Defendant Scrushy had any knowledge as to any activities concerning the check once it was delivered.  If the check was, in fact, not disclosed, there is no evidence that Defendant Scrushy was responsible for any such nondisclosure.

Second, Defendant Scrushy was convicted on Count Four, a single, discrete offense:  a violation of  § 666(a)(2), relating to his giving $500,000 to Governor Siegelman in return for a seat on the CON Board.  (Doc. 61 at ¶ 51.)  Governor Siegelman was convicted of a different, discrete offense, which was charged in Count Three of the Indictment under § 666(1)(B). (Doc. 61 at ¶ 48).  These are two separate offenses and, with the exception of the requirement for a quid pro quo, they are completely independent of each other in terms of evidence relating to intent. Courts have repeatedly held that in regard to the evidence of intent in such independent offenses, it is

the intent of the charged person, not the intent of any other person in the transaction, that is controlling. In *United States v. Anderson*, 509 F.2d 312 (D.C. Cir. 1974), the D.C. Circuit rejected a defendant's claim relating to his bribery conviction based on the acquittal of the recipient of the bribe. Aside from observing that inconsistent jury verdicts are not self-vitiating, the Court held:

> The payment and the receipt of a bribe are not interdependent offenses, for obviously the donor's intent may differ completely from the donee's. Thus the donor may be convicted of giving a bribe despite the fact that the recipient had no intention of altering his official activities, or even lacked the power to do so.

*Id*. at 332 (footnotes and citations omitted). In *United States v. Evans*, 572 F.2d 455 (5th Cir. 1978), an unlawful gratuity and conflict of interest prosecution under 18 U.S.C. §§ 201(g) and 203(a), the Court rejected defendant's argument based on insufficient evidence, and noted:

> In evaluating his argument regarding intent, we focus specifically on Evans' mental state, for the giving and receiving of an unlawful gratuity are not interdependent offenses; the donee's intent may differ from the donor's.

*Id.* at 480 (citations omitted). *Accord Jennings*, 160 F.3d at 1016-17 ("Jennings is mistaken to focus on Morris's testimony that he believed he accepted gifts, not bribes, from Jennings. Under § 666(a)(2) the intent of the payor, not the intent of the payee, is determinative of whether a crime occurred."), *United States v. Campbell*, 684 F.2d 141, 148 n.1 (D.C. Cir. 1982) (holding in an unlawful gratuity case that "[t]he word 'probably' reflects the controlling nature of the defendant's intent, and the fact that the donor's intent may differ from the donee's.").

In short, the Government's reliance on evidence relating to any actions relative to the alleged concealment of the donations as evidence that can be considered in any way

against Defendant Scrushy in determining his Rule 29 motion for judgment of acquittal is both misleading and legally unsupportable.  To the extent that this Court finds any such evidence exists, it should ***not*** consider such evidence in determining Defendant Scrushy's motion.

## IV.    THE GOVERNMENT'S RESPONSE FAILS TO ACCURATELY IDENTIFY SUFFICIENT EVIDENCE THAT DEFENDANT SCRUSHY'S POLITICAL CONTRIBUTIONS WERE MADE WITH THE SPECIFIC INTENT TO OBTAIN APPOINTMENT TO THE CON BOARD.

The Government presents its version of the evidence as to Count Four at pages 12-16 of its Response. The Government introduces this discussion with the following statement:  "A review of all the evidence, as distinguished from the snippets of testimony referenced by Defendants, eviscerates Defendants' petition for this Court to overturn the jury's verdicts on Counts Three and Four."   (Gov't Response at 12.)   Defendant respectfully submits that the Government's representation of the evidence in this case is less than accurate and that, when viewed as a whole, the evidence fails to establish the existence of a quid pro quo as to the $500,000 campaign contribution and the appointment of Defendant Scrushy to the CON Board.

The first factual statement offered by the Government is that "[t]he facts also belie Defendants' attempt to portray the $500,000 from Defendant Scrushy as legitimate campaign contributions." (Gov't Response at 12.)  As set out in Section IV, *infra*, there is a compelling legal reason why this Court cannot rely on such a conclusion to deny Defendant's Rule 29 motions.  However, simply as a factual matter, the Government's representation as to "the facts" is not supported by the record.  First, the checks in question were made out to entities set up to fund the lottery campaign, an issue that Governor Siegelman was closely associated with: the initial $250,000 check was made

out to the Alabama Education Lottery Foundation. (Gov't Ex. 21.)  The second $250,000 was made out to the Alabama Education Fund. (Gov't Ex. 27B.)  The Government's star witness, Nick Bailey, who was perhaps as well-situated as any individual in the case to know what a campaign contribution was, testified the Governor was going to ask Defendant Scrushy to contribute to "[t]he lottery campaign."  (TAB 57, R-May 1, 2006.) Bailey also testified that: "I know I talked to [Eric Hanson], the Governor talked to him, at least the two of us talked to him about what the campaign contributions were for.  They were for the lottery campaign." (*Id*.)  The Government's summary of the facts is not supported by the actual testimony in this case.

The Government's next tack is to claim that Defendant's sufficiency argument is premised on a contention that the only way to prove a quid pro quo is by direct evidence, and that a quid pro quo cannot be proved by circumstantial evidence. (Gov't Response at 12-13.)  A fair review of both of Defendant's Rule 29 motions, (Docs. 413 and 454), shows that no such argument was made.  Defendant has consistently argued the closest to direct evidence of the quid pro quo is Bailey's version of the June 29, 1999 conversation between the Governor and Defendant Scrushy, and that Bailey not only was not present at the conversation, but that Bailey's version of his conversation with the Governor is so fundamentally contradicted by the fact that the July 19, 1999 check, (Gov't Ex. 21), upon which Bailey's version of the conversation was so clearly premised, did not exist at that date, and therefore that this Court cannot rely on this evidence to deny Defendant's motion for judgment of acquittal. At the same time, Defendant has consistently argued that the Government's circumstantial evidence of the existence of a quid pro quo is insufficient to deny Defendant's motions under Rule 29. Defendant has never argued that

the only way to prove a quid pro quo is by direct evidence, and the Government's misrepresentation of Defendant's argument in an attempt to discredit Defendant's real argument is disingenuous.

In regard to the Government's circumstantial evidence, the Government's arguments to this Court, just as its arguments at trial, continue to be focused on two central facts: that Defendant Scrushy gave a "colossal" campaign contribution to Governor Siegelman and that Governor Siegelman, shortly after the delivery of the July 19, 1999 check for $250,000, appointed Defendant Scrushy to the CON Board.  Such evidence might be persuasive absent one crucial fact: the $500,000 was a campaign contribution.  Campaign contributions are a special category under federal criminal statutes relating to bribery and illegal gratuities.  Based on the policy concerns inherent in the long-standing practice of funding political campaigns with private donations, the Supreme Court in *McCormick* unambiguously ruled that such contributions are protected activity, and cannot be prosecuted without proof of an explicit quid pro quo—"only if the payments are made in return for an explicit promise or undertaking by the official to perform or not perform an official act." 500 U.S. at 273.  In order for this protection to be meaningful, there can be no inference drawn from the mere existence of a campaign contribution and favorable action by the public official. As Circuit Judge Posner articulated this principle for the Seventh Circuit:

> For example, a legislator well known for his anti-smoking views, having received a generous donation from a cigarette company, might have muted his opposition to the industry's position. But the courts have made clear that criminal inducement of a legislator to take a particular action cannot be inferred from the legislator's acceptance of campaign contributions from interests urging the action. *McCormick v. United States*, 500 U.S. 257, 272 (1991); *United States v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993); *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir. 1993); *United States*

*v. Biaggi*, 909 F.2d 662, 695 (2d Cir. 1990), or from his acceptance of lobbyists' hospitality. *United States v. Sawyer*, *supra,* 85 F.3d at 741-42; *United States v. Woodward*, 149 F.3d 46, 54-55 (1st Cir. 1998).

In other words, since Defendant's conviction relates to the payment of a political contribution which is presumptively protected activity under *McCormick*, the contribution itself and the subsequent appointment to the CON Board do not support any inference of illegality. The evidence of that illegality—the existence of a quid pro quo—must come from other aspects of the Government's case in order for this Court to sustain Defendant's conviction. When that other evidence is considered—just as Defendant set out in his Rule 29(c) motion (Doc. 454 at 21)—the evidence of a quid pro quo comes up short.

After setting out its argument based on the improper inference based on the contribution and the CON Board appointment, (Gov't Response at 14), the next evidence the Government points to is contained in the following assertion, again with no specific citation:

> Bailey also testified that prior to Defendant Siegelman appointing Defendant Scrushy to, and making him vice-chair of, the CON Board. [sic] Defendant Siegelman told Bailey and [sic] that the basis for these officials [sic] actions by Defendant Siegelman were Defendant Siegelman's and Bailey's conversations with Hanson during which Hanson told them that Defendant Scrushy wanted these actions in exchange for the $500,000 to Defendant Siegelman.

(Gov't Response at 14.) A review of the actual testimony of Bailey on this point does not support the Government's representations. Bailey's direct testimony touching on this issue is found in three locations: his testimony on May 2, 2006 which is attached at TAB 57 to this Reply, and includes pages 161-69 of the unofficial transcript; second, his testimony later on May 2, 2006, which is attached at TAB 58 to this Reply, and includes

pages 192-97 of the unofficial transcript; and third, his testimony on May 3, 2006, which is attached at TAB 59 to this Reply, and includes pages 18-19 of the unofficial transcript. A review of this testimony shows that it establishes only the following facts relative to the Government's version of this testimony. First, Bailey testified that Eric Hanson was a long-time friend of Governor Siegelman, and Hanson worked as a consultant in governmental affairs for Defendant Scrushy. (TAB 57 at 165-66.) Second, Bailey testified that he was present, sometime after the Governor's election and prior to the appointment of Defendant Scrushy to the CON Board, at a conversation in which the Governor told Hanson that Defendant Scrushy had contributed $350,000 to the Fob James campaign, "[a]nd in order to make it right to the Siegelman campaign, he needed to do at least $500,000." (*Id*. at 168.) Bailey testified that Hanson was to relay that conversation to Defendant Scrushy. (*Id.*) There was no evidence that Hanson in fact conveyed the message. Bailey testified the next day, May 3, 2006, that Hanson told *Bailey* what Defendant Scrushy wanted from the Governor:  "To control the CON Board." (TAB 59 at 18-19.)  Finally, in additional testimony on May 2, 2006, Bailey testified that Governor Siegelman, on some unspecified date subsequent to the conversation concerning a $500,000 contribution, told Bailey "[t]o contact Margie Sellers regarding Mr. Scrushy being appointed as vice chair," and that Bailey told Sellers, "[t]hat the Governor wanted Mr. Scrushy appointed vice chair of the CON Board." (TAB 58 at 192-96.)  Most significantly, when asked if he knew why the Governor wanted Defendant Scrushy appointed vice chair of the CON Board, Bailey testified, "Because he [Defendant Scrushy] asked for it. (*Id*. at 193.) The remaining testimony by Bailey was to the effect that he "periodically" reminded the Governor of the conversation Bailey had with Hanson

that Defendant Scrushy "wanted [the CON Board] in return for his contribution." (*Id*. at 194-95.) This latter testimony was the subject of a motion to strike which was to be resolved after proceedings at the end of the day. A careful review of the testimony shows that it does not support the billing given to it by the Government in its Response: that the CON Board appointment was a product of "Defendant Siegelman's and Bailey's conversations with Hanson during which Hanson told them that Defendant Scrushy wanted these actions in exchange for the $500,000 to Defendant Siegelman." (Gov't Response at 14.) The contrast between the testimony as summarized from the Government's memory and the unofficial transcript is both striking and significant in terms of the determination this Court must make as to the existence of a quid pro quo. In the Government's version of the testimony, the conversation with Hanson in which the supposed quid pro quo was articulated occurred with the Governor and Bailey. The actual testimony shows that at best, according to Bailey, it was a conversation between Bailey and Hanson. Significantly, Hanson was not called as a witness by the Government.

Later in its Response, the Government returns to the Bailey testimony, when it addresses Defendant's argument in his Rule 29(c) motion, (Doc. 454 at 13-18), that this Court cannot rely on the Bailey testimony concerning the conversation between Bailey and the Governor on the day that Defendant Scrushy visited the Governor because the entire conversation, in Bailey's recounting, was predicated on the existence of a check that was not written until nearly two weeks later. The Government's Response to this argument is to claim that "the actual date of delivery, and the actual courier, of the IHS check had only a minimal and tangential bearing in the clarity of Bailey's memory of the

events surrounding Defendants' arrangement concerning the CON Board," concluding that:

> The jury could have reasonably found that Defendant Scrushy met with Defendant Siegelman on more than one occasion, and/or that Defendant Scrushy did not fly on the HealthSouth helicopter when Bailey saw Defendant at the governor's office, and/or that Bailey say Defendant Scrushy at the governor's office earlier than the date of the delivery of the IHS check and that a person other than Defendant Scrushy delivered the IHS [sic] between July 19, 1999, the date of the IHS check, and June 26, 1999, [sic] the date Defendant Siegelman appointed Defendant Scrushy to the CON Board.

(Gov't Response at 16.)

There are two fundamental problems with the Government's Response. First, while the Government gives lip service to the fact that the jury could have "reasonably found" one of the versions, the Government neglects to acknowledge that there must be *some* evidence to support any finding or inference. There is *no* evidence to support the Government's alternative versions of the Bailey testimony relating to the conversation with the Governor. For instance, on the question of how many times Bailey witnessed the Governor meet with Defendant Scrushy at the Governor's office, Bailey testified, "Once, maybe twice." (TAB 60, R-May 2, 2006 at 185.) When asked, "And you said it may have been one or two times?" Bailey replied, "Once, maybe twice." (*Id.* at 188.) When then asked if he was present "to see him come on those visits?" Bailey responded, "Yes, on one occasion for sure." (*Id.*) Thereafter, AUSA Feaga asks Bailey to speculate that if the visits [sic] predated the check, then the check could not have been delivered on the same day that Bailey saw Defendant visit the Governor at his office, to which Bailey replies, "That's possible." (*Id.*) The Court will recall that Mr. McDonald walked Mr. Bailey through each one of his statements to the grand jury and the FBI on the date of the

meeting and he always admitted that on the day he either testified or spoke to the FBI, he was "crystal clear" about his recollection. (Tab 42, pages 225-230). Bailey admitted that in spite of his efforts to say there may have been more than one meeting that he could not recall another meeting where the same participants were in Montgomery at the same time meeting with Governor Siegelman. (Tab 49, R-May 5, 2006 at 123). The Government asks this Court to lend its imprimatur to the Government's speculation as to what was "possible" based on "evidence" that may be present in their questions on direct examination, but is not found in, or supported by, the testimony of the witness. The jury's verdict may not be sustained based on the questions of the prosecutor; nor may it be sustained based on what the jury might have speculated. It must be based on evidence—testimony and exhibits—and the *reasonable* inferences that may be drawn from that evidence.

The second problem with the Government's Response on this point is that the testimony of Bailey as to what was said by the Governor immediately following his meeting with Defendant Scrushy just does not make any sense unless the check was present. That testimony is set out in pages 175-76 of the unofficial transcript which is found at TAB 39 in Defendant's Rule 29(a) motion, and quoted at page 13 of Defendant's most recent Rule 29(c) motion. The Government does not dispute this version of Bailey's testimony. (Gov't Response at 13-14.)[7] Just as Defendant pointed out

---

[7] However, the Government apparently cannot resist representing that "Bailey testified that on or about July 19, 1999 [the date on the IHS check, Gov't Ex. 21], he saw Defendant Siegelman in the Governor's office holding a check in the amount of $250,000 drawn on the account of Integrated Health Services (IHS), a Maryland corporation." (Gov't Response at 13-14.) The unofficial transcript of the testimony on this point does not support the Government's claim. A review of this testimony, (attached at TAB 61), demonstrates the only date that Bailey could place on the meeting was that it occurred

in his Rule 29(c) motion, the only thing that a reasonable jury could conclude from the

testimony of Bailey in conjunction with the testimony of Loree Skelton, (TAB 6), and

Senator Waggoner, (TAB 18), and the flight records of the HealthSouth helicopter,

(Scrushy Ex. 113), is that all three witnesses were talking about the same meeting in the

Governor's office, and that meeting occurred on June 29, 1999.  And, as Defendant

previously set out, if the entire testimony of Bailey as to his conversation with the

Governor is reviewed, that testimony makes absolutely no sense without the physical

presence of the check.  Coupled with the unrebutted proof that the check was not written

until July 19, 1999, Bailey's testimony as to his version of what the Government claims

establishes a quid pro quo is simply impossible, and cannot be relied on to deny

Defendant's Rule 29 motions. *United States v. Chancey*, 715 F.2d 543, 546 (11th Cir.

1983).  The Government cannot overcome this argument with speculation of what might

have happened; it must rely on its evidence.  And that evidence does not establish the

requisite quid pro quo. Perhaps most importantly, a simple reading of the testimony of

Bailey as to what he claims the Governor said does not reveal any "explicit agreement"

sufficient to meet the requirement of a quid pro quo.  The language recounted by Bailey

is language evidencing at most a request or a desire.  Otherwise, why would Bailey ask

the Governor whether it would be a problem to appoint Defendant Scrushy to the CON

Board, and why would the Governor reply that "he did not *think* so"?  Stated another

way, according to Bailey, if there was a quid pro quo it had to be in place at that time and

at that meeting.  Yet, the language used by the Governor, according to Bailey, indicates

no decision had been made even though the Governor had the power to appoint Richard

---

sometime prior to July 26, 1999, the date the Governor made his appointments to the
CON Board. (*Id*. at 172-89.)

Scrushy at that moment and on the spot. At a minimum he could have stated clearly to his confidant and close advisor that he had firmly come to that conclusion. He did not.

The Government asserts that "Mike Martin corroborated Bailey's testimony about the agreement between the Defendants (i.e., that Defendant Scrushy pay $500,000 to Defendant Siegelman and in return Defendant Siegelman would give HealthSouth membership on, representation at, and influence over the CON Board." (Gov't Response at 14.) The actual testimony of Mike Martin was hardly quite so clear.

The testimony of Martin at page 331 of the unofficial transcript which is found at Tab 63 reveals that Scrushy was pointing out the fact that in order to be in the "good graces" of the Governor, they (HealthSouth) needed to assist in raising money for the lottery campaign. "Good graces" is a long way from a quid pro quo. (Tab 63 R-May 9, 2006 at 331 and 343).

Similarly, the Government's representation as to Loree Skelton's testimony does not find support in the record. The Government claims:

> Loree Skelton testified that she was the HealthSouth employee responsible for CON Board matters and also was the key person for managing HealthSouth's political contributions. Skelton testified Defendant Scrushy never informed her about either of the $250,000 payments Defendant Scrushy made to Defendant Siegelman. Skelton also testified that having representation on the CON Board was important to HealthSouth because of the effect the CON Board had on healthcare providers in the State of Alabama.

(Gov't Response at 15.)

The Government has left out of their asserted facts a critical qualification from Ms. Skelton that Mr. Franklin received when asking this line of questions:

> Q: Was it important to HS to have a position or seat on the Certificate of Need and Review Board?

27

A.    Yes, sir.

Q.    Why?

A.    Because we were the largest, if not one of the largest, healthcare companies in the state.  And it was – it's a very important process for orderly state planning and cost effectiveness in delivery of health care services.

Q.    Did you ever discuss with Richard Scrushy the importance of HS having a seat on the Certificate of Need and Review Board?

A.    I don't believe we just discussed it specifically.

(Tab 7 R-May 10, 2006 at 265-266).  It is therefore clear that while Ms. Skelton may have had an opinion regarding the importance of the CON Board to the business interests of HealthSouth, that opinion was her own and was not derived from or shared with the Defendant in this case, Richard Scrushy.  Once again, the Government is attempting to draw an improper inference from statements made by a witness in open court that are specifically not tied in any way to Richard Scrushy.

In short, the Government's "brief recount of some of the evidence," (Gov't Response at 15), is neither accurate nor does it support the key issue before this Court: did the Government's evidence, direct and circumstantial, sufficiently prove the existence of a quid pro quo?  Defendant respectfully submits that, especially when the effect of the inference the Government improperly seeks to draw from the simple existence of the political contribution and Defendant's appointment to the CON Board is removed, the evidence is woefully short of the requisite proof of "a campaign contribution[ ] in exchange for an explicit promise or undertaking by the official to perform or not perform an official act." *McCormick*, 500 U.S. at 273. The Government's evidence failed to establish this "explicit promise" by anything more than rank speculation as to what may have been discussed and agreed upon.   That is not sufficient evidence to sustain

Defendant's conviction on Count Four, and this Court should grant Defendant's motion for a judgment of acquittal on this count.

## V.  THE GOVERNMENT'S ARGUMENT THAT THE PAYMENTS OF $500,000 WERE NOT LEGITIMATE CAMPAIGN CONTRIBUTIONS IS WITHOUT BASIS IN THE FACTUAL RECORD AND CANNOT BE CONSIDERED IN RULING IN DEFENDANT'S RULE 29 MOTIONS.

For the first time, the Government urges this Court to sustain Defendant's convictions on all counts of conviction based on the argument that the payments from Defendant Scrushy were not legitimate campaign contributions. In regard to the § 666(a)(2) violation in Count Four, the Government submits: "First, the statutes for which the jury convicted Defendants do not require the Hobbs Act's formulation of a quid pro quo element, especially so in this case where the payments from Defendant Scrushy to Defendant Siegelman were not remotely qualified as legitimate campaign contributions." (Gov't Response at 7.)  In regard to the remaining counts of conviction, Counts Five through Nine, the Government agues: "Reviewing the facts of the $500,000 in the light most favorable to the Government, there was no 'campaign contribution' meeting any protection or concern under *McCormick*." (Gov't Response at 29.)

There are multiple problems with this argument.  First, the Government makes this argument in a blatant attempt to convince this Court to ignore the requirement of proof beyond a reasonable doubt of the existence of a quid pro quo. (Gov't Response at 7, 9.) This argument is disposed of quickly by the same rationale as set out in Section II, *supra*, where Defendant sets out the law which ties the quid pro quo requirement to *Sun-Diamond Growers* and the fact that § 666 is undeniably a bribery statute. Defendant does not pin the necessity of a quid pro quo requirement on the fact that the contributions were campaign contributions; the fact that they were campaign contributions simply implicates

the significant policy reasons set out in *McCormick* that require special protection as to campaign contributions as an essential part of our Nation's political process.

Second, the Government is asking this Court to reject Defendant's Rule 29 relief based on the same faulty premise that the Fourth Circuit Court of Appeals employed in *McCormick*, and which led to the Supreme Court's reversal of the decision of the Fourth Circuit affirming the convictions in that case. The defendant in *McCormick* was convicted of one count of violating the Hobbs Act and filing a false income tax return relating to payments made to him as a legislator by a doctors' group seeking assistance with legislation relating to medical licensing of foreign doctors who had not passed the state licensing exams. 500 U.S. at 260-61. The Court of Appeals affirmed based on its conclusion that proof of a quid pro quo was not necessary to sustain a Hobbs Act conviction "where the parties never intended the payments to be 'legitimate' campaign contributions." *Id.* at 266. After listing seven factors to be considered in making the determination as to the legitimacy of the campaign contributions, the Court of Appeals concluded that "the evidence supports the conclusion that the money was never intended by any of the parties to be a campaign contribution." *Id.* The Supreme Court reversed for two reasons. First, the Court found that the conclusion of the Court of Appeals that "a *quid pro quo* is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution," was erroneous. *Id.* at 274. Second, as the Court wrote: "[W]e are quite sure that the Court of Appeals affirmed the conviction on legal and factual grounds that were never submitted to the jury.' *Id*. at 269. The Supreme Court explained:

> Neither did the Court of Appeals note that the jury was not instructed in accordance with the court's holding that the difference between legitimate

and illegitimate campaign contributions was to be determined by the intention of the parties after considering specified factors. Instead, the Court of Appeals, after announcing a rule of law for determining when payments are made under color of official right, went on to find sufficient evidence in the record to support findings that McCormick was extorting money from the doctors for his continued support of the 1985 legislation, and further that the parties never intended any of the payments to be a campaign contribution.

*Id.* at 269-70 (footnote omitted). Based on its conclusion that intent is always a question for the jury, and the seven factors relied on by the Court of Appeals presented an issue of historical fact, the Court held:

Thus even assuming the Court of Appeals was correct on the law, the conviction should not have been affirmed on that basis but should have been set aside and a new trial ordered.

*Id.* at 270 (citations omitted).

The Government never argued to the jury in Defendant Scrushy's case that they should convict because the payments in question were never legitimate campaign contributions. More significantly, this Court never instructed the jury, either as to the federal funds bribery charge in Count Four, (Doc.450 at 41-43), or the mail fraud charges in Counts Six through Nine, (*id.* at 26-29), that it was to include a determination of the legitimacy of the campaign contribution in reaching its verdicts on these counts. In short, the Government, with its argument based on the legitimacy of the campaign contributions, urges this Court to make the very same error that the Court of Appeals did in *McCormick*.

Finally, although it is of no moment in light of the fact that the jury was never asked to make its determination on any of the charges based on this theory, the evidence in this case does not support the Government's contention that these transactions did not bear the indicia of bona fide campaign contributions. In both instances the checks were

31

made out to political campaigns.  The first check, from IHS, was made out to the Alabama Education Lottery Foundation, which was for use in the get out the vote effort supporting the referendum to establish a state-wide lottery to provide funds for education. (Gov't Ex. 21.)  The second check, from HealthSouth, was made out to the Alabama Education Fund, which was created to retire the debt from the unsuccessful lottery campaign. (Gov't Ex. 27B.)  Both were related to the campaign on a political issue that was important to the administration of Governor Siegelman, and the testimony of numerous witnesses, including former Alabama Power President Elmer Harris, demonstrated that Defendant Scrushy was motivated to make peace with a Governor whose election he had opposed.  Such contributions are classic political contributions and just the type of activity that the Supreme Court deemed protected activity in *McCormick* so long as there is no proof of a quid pro quo for the contribution.

VI.    **THIS COURT SHOULD GRANT DEFENDANT A JUDGMENT OF ACQUITTAL ON COUNTS FIVE THROUGH NINE BECAUSE THERE WAS NO PROOF THAT DEFENDANT'S POLITICAL CONTRIBUTIONS WERE MADE WITH THE SPECIFIC INTENT TO OBTAIN APPOINTMENT TO THE CON BOARD, THAT DEFENDANT DEPRIVED THE STATE OF HIS HONEST SERVICES ON THE CON BOARD IN ANY WAY, OR THAT THE MAILINGS WERE FOR THE PURPOSE OF EXECUTING THE ALLEGED SCHEME.**

Defendant Scrushy argued in his previously filed motions that the wording of the indictment as to the mail fraud counts, coupled with the applicable law, require proof of a quid pro quo.  (Doc. 454 at 21-22; Doc. 413 at 14-15.)  Once again, the Government argues that the quid pro quo requirement does not apply, as it is a requirement of the Hobbs Act, and the reach of *McCormick* is limited to extortion prosecutions under the Hobbs Act.  Again, as set out above, Defendant's argument is not premised on the Hobbs Act requirement of a quid pro quo, but on the Supreme Court's unambiguous holdings in

*McCormick* and *Sun-Diamond* that where the prosecution involves either political contributions or the enhanced penalties implicated by a bribery prosecution, there is a common element required: the existence of a quid pro quo. The Government, so preoccupied with erecting its "Hobbs Act quid pro quo" straw man, completely fails to respond to this express argument of Defendant, and tries mightily to convince this Court (notwithstanding the clear allegations in its indictment of an explicit agreement) that there is no need to prove a quid pro quo in relation to these counts. Quite simply, as pled in the Government's indictment, the Government's theory is that the scheme to defraud was a bribe of $500,000 in return for a seat on the CON Board (which deprived the citizens of Alabama of the Governor's honest services in his appointment decisions), which seat was thereafter used to deprive the citizens of Alabama of Defendant Scrushy's honest services on that Board. Such allegations clearly require proof of a quid pro quo and, as set forth above, the Government failed to present sufficient evidence of the requite quid pro quo. For this reason alone, this Court should grant Defendant a judgment of acquittal on these counts.

From a more fundamental standpoint the counts in question must be dismissed because the Government never established the scheme to defraud. Normally, in such a case there is a witness who outlines the scheme, informing the jury of the participants and objectives of the scheme. Perhaps the Government thought it could rely on Loree Skelton, perhaps the Government intended to call Tim Adams. Regardless, there is no evidence in the record outlining the nature, objectives and participants in the scheme. Again the Governments proof comes down to arguing that a "colossal" campaign contribution followed by the appointment means that everything that followed was

illegal. The law mandates that there be evidence of crime. Here the Government's arguments and speculation are simply insufficient.

This Court should grant Defendant's motions for the additional reason that there was insufficient evidence to allow a reasonable jury to find beyond a reasonable doubt that Defendant Scrushy committed any acts that deprived the citizens of Alabama of his honest services on the CON Board. During the Defendant's time on the board there was nothing passed or considered for HealthSouth.

A review of the Government's statement of facts clearly reveals that there was absolutely no evidence presented in this case of what the scheme was, who the participants were or what objectives those involved in the scheme hoped to accomplish. Alva Lambert testified that in all of his service Richard Scrushy was a good CON board member, that Scrushy was never reprimanded and that there was never an ethics complaint against him. (Tab 3, R-May 2, 2006 at 81). Mr. Lambert further testified that with regard to the two projects identified in the indictment, Richard Scrushy was not on the board at the time they were considered and Thom Carmen properly recused himself from consideration of those items. (Tab 5, R-May 2, 2006 at 97-98).

There has been no evidence linking Richard Scrushy to the projects identified in the Indictment in any way. In fact, the only evidence presented is to the contrary, in that Loree Skelton agreed that Richard Scrushy was long gone from the CON board by the time those projects were considered. (Tab 14, R-May 11, 2006 at 155). She recalled no conversation with Richard Scrushy about the projects, stating that any conversation about the projects would have been with Thom Carmen who was the board member at the time the projects were presented to the CON Board. (Tab 14, R-May 11, 2006 at 156-157).

The Government alleges in the Indictment ¶ 59(e) and in the conspiracy count ¶ 55(e), that "Richard Scrushy and others would offer things of value to another CON Board member to attempt to affect the interests of HealthSouth and its competitors." This information relates to Tim Adams, a witness who the Government did not call and again, the evidence in the record is contrary to the allegation. The only witness who could speak to these allegations was Loree Skelton and she countered every attempt by the Government to show that Richard Scrushy was orchestrating anything with regard to Tim Adams.

With regard to the helicopter rides, it was established that Tim Adams only rode on the helicopter while Mr. Scrushy was on the board. (Tab 11, R-May 11, 2006 at 256). Mr. Scrushy resigned in January of 2001 and the first item to be considered involving HealthSouth was in July of 2002, with the second and only other matter coming up in December of 2002. (Id.). For the entire period after Mr. Scrushy's resignation Ms. Skelton and Mr. Carmen rode to Montgomery to attend the meetings in a car without Mr. Adams. (Tab 11, R-May 11, 2006 at 257).

With regard to a potential job with HealthSouth, Ms. Skelton testified that she initially *did not try* to get Adams a job. (Tab 8, R-May 10, 2006 at 274). Adams asked Richard Scrushy and Peck Fox, attorney for HealthSouth, about possible employment and Mr. Scrushy told Ms. Skelton to send Adams to Dr. Swaid, Medical Director at the HealthSouth Medical Center, who offered Adams a scrub nurse job in Dr. Swaid's practice, which Adams declined. (Tab 8, R-May 10, 2006 at 275-278). Ms. Skelton testified that Mr. Scrushy told her to relate to Adams that "we just weren't going to be able to find a position for him at this time, there wasn't anything available." (Tab 9, R-

May 10, 2006 at 303).  She further testified that Mr. Scrushy told her to "basically pacify him and keep him happy."  (Id.).

With regard to the payment of the fees related to the mobile PET scanner application, Ms. Skelton testified that she had agreed to pay Adams between $8,000 and $12,000 for his efforts.  (Tab 10, R-May 10, 2006 at 295).  When the vote was coming up on the rehabilitation hospital, Adams indicated that he did not think he would make the board meeting because he would miss several days of work.  (Tab 10, R-May 10, 2006 at 292-293).  Adams reminded Ms. Skelton that there was a balance outstanding on their agreement regarding the CON application for work already done and they negotiated the balance of the fee at $3,000 and Adams did attend the meeting and voted in favor of the unopposed 38 bed rehabilitation project.  (Tab 10, R-May 10, 2006 at 295-296).  She admitted that she did not advise Mr. Adams on the propriety of the vote.  (Tab 10, R-May 10, 2006 at 297-298).  When asked if she had let any of the officials associated with the CON board know about Tim Adams financial relationship with HealthSouth, she testified that she let SHPDA Executive Director Alva Lambert know and that she told Lambert to put him on notice of the relationship between HealthSouth and Adams.  (Tab 12, R-May 11, 2006 at 49-51).  More germane to the charges in this case, Ms. Skelton testified that she could not remember a specific conversation where she related to Mr. Scrushy that she planned to give Tim Adams a contract to prepare the mobile PET scanner application. (Tab 15, R-May 11, 2006 at 165-166).  She testified that she talked about the PET scanner application with Thom Carmen, not Richard Scrushy, and she did not recall whether she had that conversation with Mr. Scrushy or not.  (Tab 15, R-May 11, 2006 at 167-168).  Ms. Skelton agreed that by the time the rehabilitation hospital and the mobile

PET scanner came up for consideration Richard Scrushy was not in the loop as to what was happening at the CON board.  (Tab 16, R-May 11, 2006 at 173-174).

The Government further alleges that Mr. Scrushy orchestrated his replacement by Thom Carmen on the board.  There is simply no testimony to support this allegation. Alva Lambert testified that Mr. Carmen replaced Mr. Scrushy in both the James administration and under Governor Seigelman.  He stated that Mr. Carmen was a competent selection for the board and that he acted appropriately during his terms on the board.  (See Tabs 2-5).

Moreover, Counts Six through Nine must be dismissed because, even if the Court finds that the Government has shown that Defendants Siegelman and Scrushy devised a scheme or artifice to defraud the State of Alabama of their honest services, the Court cannot find that the Government has presented any evidence that the mailings charged in Counts Six through Nine were "for the purpose" of executing that scheme.

In a prosecution for mail fraud, while the Government need not prove a defendant intended to use the mails, it must prove that a mailing was for the purpose of executing the alleged scheme to defraud.  *See United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648 (1974); *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151 (1944); *United States v. Toney,* 605 F.2d 200, 206 (5th Cir. 1979).  Mailings that occur after the scheme has come to fruition[8] or that are only collateral to the alleged scheme do not violate the mail fraud statute.  *Maze*, 414 U.S. at 400, 94 S.Ct. at 648; *United States v. Keenan,* 657 F.2d 41, 42-43 (4th Cir. 1981).  Only use of the mails that plays an

---

[8] Use of the mails to lull the victims or delay discovery of the scheme is an exception to this rule, but not one relevant to this case.  *See, e.g., United States v. Sampson,* 371 U.S. 75, 80, 83 S.Ct. 173, 136 (1962); *Toney,* 605 F.2d at 206.

"'integral' rather than incidental or tangential role in the fraudulent scheme" constitutes a violation of the mail fraud statute. *United States v. Bosby,* 675 F.2d 1174, 1183 (11th Cir. 1982).

In Counts Six and Seven, the indictment charges that letters appointing and reappointing Thomas Carmen – a HealthSouth employee – to the CON Board were for the purpose of executing the alleged scheme to defraud. Yet the Government has not presented any evidence that Carmen was connected to the alleged scheme. There was no evidence that Defendants Siegelman and Scrushy discussed Carmen's appointment or that Carmen acted dishonestly at any time during his tenure on the Board. This is particularly important because Carmen would have had to carry the scheme forward since the evidence is uncontested that Richard Scrushy was off the board and had no contact with projects before the CON Board. Therefore, any mailings appointing Carmen to the CON Board do not serve even an "incidental or tangential role" in the Government's alleged scheme to defraud. *Bosby*, 675 F.2d at 1183. As such, they must be dismissed.

In Counts Eight and Nine, the indictment charges that two mailings – on August 2, 2002, and January 2, 2003 respectively – in which the CON Board notified HealthSouth that one of its projects had been approved were "for the purpose" of executing the alleged scheme. The Government, however, has not proven any connection between these approval letters and the alleged scheme. Again, assuming (just for argument) that the Government has submitted sufficient evidence that Defendants Siegelman and Scrushy had devised an illegal scheme to place Defendant Scrushy on the CON Board, it has not submitted any evidence that the scheme involved Thom Carmen or that the alleged scheme continued past Defendant Scrushy's tenure on the Board.

Defendant Scrushy resigned from the CON Board on January 17, 2001. Hence, the mailings charged in Counts Eight and Nine occurred long after the fruition of any alleged scheme. As such, they must be dismissed.

For the same reasons set forth above with respect to the § 666 counts, no reasonable juror could conclude that the alleged *quid pro quo* – contributions for board position – ever existed. The evidence does not support the conclusion that there was any scheme to defraud. It follows, therefore, that this Court should enter judgments of acquittal as to the substantive mail fraud counts.

## VII. THIS COURT SHOULD GRANT DEFENDANT A JUDGMENT OF ACQUITTAL ON COUNT FOUR DUE TO THE EXPIRATION OF THE STATUTE OF LIMITATIONS.

As Governor Siegelman clearly showed in his Rule 29 Motion for Judgment of Acquittal, which Defendant Scrushy adopted, the alleged conduct underlying Counts Three and Four occurred outside the five-year statute of limitations.[9] The alleged crimes were complete by July 19, 1999, and the indictment was not returned until May 17, 2005 – five years and ten months after the statute of limitations had expired. *See United States v. Yashar*, 166 F.3d 873, 879-80 (7th Cir. 1999). It is evident now that Defendants Scrushy and Siegelman never should have been indicted on Counts Three and Four, but, given the Government's conduct in this case, it could not have been evident sooner to either Defendant. Therefore, this Court is not barred from the considering the Defendants' statute of limitations defense.

In its response, the Government does not attempt to defend its artfully crafted indictment, which made it impossible for the Defendants to know there was a statute of

---

[9] 18 U.S.C. § 3282 provides the statute of limitations for 18 U.S.C. § 666.

limitations problem prior to trial. In both Counts Three and Four of the indictment, the Government alleged that Defendants Scrushy and Siegelman engaged in bribery "[f]rom on or about July 19, 1999, and continuing through on or about May 23, 2000." On its face, then, the indictment alleged that a crime had occurred within the statute of limitations.

Nor does the Government attempt to defend its adamant refusal to provide the Defendants with the facts that would have allowed them to discover the statute of limitations problem. Defendant Scrushy filed a motion for bill of particulars, in which he specifically requested the Government to clarify when the actions underlying Counts Three and Four occurred. Doc. 126, ¶¶ 4-5, 9-10. Had the Government done so, Defendant Scrushy would have known immediately that there was a statute-of-limitations problem. Instead, the Government objected to the motion as follows:

> Defendants have requested a plethora of information, including, but not limited to the names and identities of co-conspirators, **_exact dates, times, and places where they engaged in illegal activities,_** and a detailed description of the overt acts they performed as part of the charged conspiracies and honest services fraud schemes. Defendants are not entitled to a bill of particulars setting forth the United States' position on each of these requests because by so doing the United States would be revealing to defendants its trial strategies, theories, witness lists, and evidence it intends to introduce at trial.

Doc. 162, Government's Response to Defendants' Motions for Bill of Particulars (emphasis added). Instead of defending the conduct that successfully prevented the Defendant from discovering that the statute of limitations had run, the Government now argues that the Defendant has waived the defense and cites a series of cases that are inapposite.

The Eleventh Circuit and the other Courts of Appeals have repeatedly held that the defense of statute of limitations generally must be raised in a Rule 12(b) F.R. Crim. P. motion to dismiss prior to trial. *See, e.g., United States v. Ramirez*, 324 F.3d 1225, 1228 (11th Cir. 2003), *citing United States v. Oldfield*, 859 392, 397 (6th Cir. 1988). Filing such a motion prior to trial conserves the court's resources and avoids "sandbagging" the Government. *Id*. As the Eleventh Circuit noted in *Ramirez*, however, "there may be times when a statute of limitations defense cannot be raised before trial because the development of facts pertaining to that defense is necessary." *Id*. Due to the Government's obfuscation of the facts, that is to say that this is a case where the Government is sandbagged the Defendants in the hope there would be a waiver, this was one of those times where the issue could not be raised before trial.

The Government appears to concede that the Defendants could not have raised the defense pretrial because it also attempts to argue that the Defendants had to raise the defense before the jury had retired to reach a verdict. In so doing, the Government cites to *Ramirez*, which contains no such language. Instead, *Ramirez* merely decries waiting to raise the defense to gain "a strategic advantage . . . after jeopardy attached." 324 F.3d at 1228. Similarly in *United States v. Najjar*, 283 F.3d 1306 (11th Cir. 2002), the Court of Appeals rejected a defendant's attempt to manipulate the system by moving to withdraw his guilty plea after the statute of limitations had run. *Id*. at 1308-09; *United States v. Arky*, 938 F.2d 579 (5th Cir. 1991), upon which the Government also relies, merely stands for the unremarkable proposition that a defendant cannot raise a statute-of-limitations defense for the first time on appeal. *Id*. at 581-82; *accord United States v. Jockisch*, No. 04-14723, 2005 WL 344579 (11th Cir. Dec. 16, 2005) (cannot raise statute-

of-limitations defense for the first time on appeal).  Finally, in *Capone v. Aderhold*, 65 F.2d 130 (5th Cir. 1933), the Court of Appeals properly dismissed the defendant's attempt to "sandbag" the Government by moving to dismiss on statute-of-limitations grounds after trial when there was a possibility that the Government could have presented evidence to rebut the defense.  *Id.* at 131.

None of the situations described above is present here.  Defendant Scrushy could not have raised the statute-of-limitations issue earlier, although he tried to obtain the information that would have allowed him to do so.  Defendant Scrushy is not waiting to raise the issue for the first time on appeal.  Defendant Scrushy did not attempt to foreclose the Government from offering rebuttal evidence, as there simply isn't any the Government could offer.  Defendant Scrushy has not attempted to manipulate the system or "sandbag" the Government.  Instead, Defendant Scrushy is properly raising his claim *at trial* in the form of a Rule 29 Motion for Judgment of Acquittal, and thus he has not waived the defense of statute of limitations.  This Court can and should dismiss Count Four as to Defendant Scrushy because the conduct he allegedly committed occurred outside the applicable statute of limitations.

Wherefore, Defendant respectfully prays that this Court grant his motions for judgment of acquittal pursuant to either Rule 29(a) or (c), and enter an Order acquitting him of the convictions in Counts Four through Nine of the indictment, and for such other and further relief as this Court may deem just and proper.

This 25th day of August, 2006.

Respectfully submitted,


/s/ Arthur W. Leach
Arthur W. Leach
Terry Lucas Butts
Fred D. Gray
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35203
Phone:  205-822-4224
Fax:  205-824-0321

Frederick G. Helmsing (HELMF6416)
Helmsing, Leach, Herlong, Newman &
Rouse, P.C.
P.O. Box 2767
Mobile, AL 36652
Phone:  251-432-5521
Fax:  251-432-0633

James K. Jenkins
Bruce Maloy
Maloy & Jenkins
25th Floor
75 Fourteenth Street, NW
Atlanta, Georgia 30309
Phone:  404-875-2700
Fax:  404-875-7857

Attorneys for Richard M. Scrushy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of August, 2006, I electronically filed the foregoing "Defendant Richard M. Scrushy's Reply to United States' Response to Defendants' Motions for Judgment of Acquittal Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure" with the Clerk of the Court using the CM/ECF system which will send notification of such to counsel of record.

/s/Leslie V. Moore
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35243
Phone: (205) 822-4224
Fax:     (205) 824-0321
E-Mail:  les.moore@lvmlaw.com