RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

SEP 29  A 11: 00

UNITED STATES OF AMERICA,

v.

Case No. 2:05cr119-MEF

DON EUGENE SIEGELMAN and
RICHARD M. SCRUSHY,
        Defendants.

**DEFENDANTS  DON EUGENE SIEGELMAN'S AND RICHARD M. SCRUSHY'S
MOTION FOR NEW TRIAL PURSUANT TO RULE 33(a)
OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

COME NOW Defendants Don Eugene Siegelman and Richard M. Scrushy, by

and through their undersigned counsel of record and move this Court for entry of an

Order pursuant to Fed. R. Crim. P. 33(a) vacating their convictions and granting them a

new trial in the above-captioned case[1] because Defendants were denied their Sixth

Amendment right to a fair trial before an impartial jury due to jury exposure to extrinsic

evidence and jury misconduct.  In the alternative, Defendants move this Court for the

following:  permission of the Court pursuant to Local Rule 47.1 to conduct interviews

with all jurors in this matter; entry of an Order authorizing issuance of subpoenas

pursuant to Fed. R. Crim. P. 17(c) for certain e-mail records; entry of an Order preserving

computer records; and for an evidentiary hearing on this motion at which all jurors will

---

[1] Defendant Siegelman seeks a new trial only as to Counts 3 through 9 and 17.

be called to testify.[2]  In support of theses requests, Defendants respectfully show this Court the following:

1. This Court's primary responsibility in presiding over this trial was to protect the Defendants' Constitutional rights and to ensure that Defendants received a fair trial before an impartial jury.  To that end, this Court required each juror to take an oath that he or she would render a verdict in this case based solely on the law and evidence presented in Court.  Further, this Court repeatedly admonished the jury to: (a) consider only the evidence and law presented in Court; (b) refrain from soliciting or accepting any outside information that would in any way influence their deliberations; (c) not reach conclusions regarding the Defendants' guilt before hearing all of the evidence; (d) not engage in premature deliberations; and (e) once jury deliberations began, not engage in deliberations unless all jurors were present.

2. The jury's conscientious adherence to the Court's specific and repeated instructions was crucial to preserving the Defendants' Sixth Amendment right to a fair trial.  However, it now appears that at least two jurors violated their solemn oath and defied this Court's instructions by bringing extrinsic evidence obtained off the Internet into the jury room. If the other available evidence is authenticated, it would also demonstrate that two jurors predetermined Defendants' guilt and then maneuvered to obtain guilty verdicts long before the close of all the evidence.  This same evidence, if authenticated, would demonstrate that at least three jurors engaged in one-on-one

---

[2] Pursuant to this Court's June 30, 2006 scheduling Order, (Doc. 443), Defendants have until September 29, 2006 to file their Rule 33 motions for new trial.  The instant motion, which relates only to Defendants' request for a new trial on the basis of jury exposure to extrinsic evidence and jury misconduct, is being filed prior to the deadline for all Rule 33 motions.  Defendants specifically reserve the right to file additional grounds for new trials prior to the deadline set by this Court's June 30, 2006 Order.

deliberations outside the presence of other jurors and, in doing so, discussed extrinsic evidence.

3. Any one of the violations summarized above and discussed below would warrant a new trial. If proven, these violations relating to the jury's exposure to extrinsic evidence and other jury misconduct compromised the integrity of this Court's process and violated Defendants' Sixth Amendment right to a fair trial before an impartial jury.

4. Since their convictions, Defendants and their counsel have obtained and received various items of evidence relating to the jury's exposure to extrinsic evidence and jury misconduct. These items, and how they were obtained, will be set forth in detail below. They include: copies of published newspaper articles containing interviews with jurors in Defendants' case; a television interview with a juror in Defendants' case; affidavits of a juror's pastor, the juror's wife, and a juror in Defendants' case; and copies of what appear to be four e-mails between jurors that convicted Defendants and a transmittal letter that have been received in the mail by Defendants and their counsel over the past three weeks.

5. These items, individually and collectively, are substantial evidence demonstrating a significant pattern of exposure to extrinsic evidence and jury misconduct which led to the guilty verdicts returned against Defendants on June 29, 2006 in this case. Specifically, these items demonstrate that: the jurors had access and were exposed to extrinsic evidence in this case; at least two jurors violated this Court's instructions by conducting premature deliberations prior to the end of the Government's case-in-chief; at least two jurors violated this Court's instructions by deliberating apart from all twelve jurors who were deciding the case; and three or more jurors communicated by e-mail

apart from the other jurors, with two of those jurors engaging in dialogue indicative of an orchestrated effort to ensure that guilty verdicts were returned against Defendants Siegelman and Scrushy.

6. Attached to this motion as EXHIBIT 1 and hereby incorporated is a copy of a newspaper article published in The Montgomery Advertiser on July 1, 2006. This article, titled "Foreman describes deadlock," was written by Bob Lowry and based on an interview with [REDACTED] who is identified as the jury foreman. It was published on Saturday morning, two days after the jury verdicts were returned on Thursday, June 29, 2006.[3] The article indicates that upon being elected foreman, "[t]o prepare for the job, [REDACTED] went on the Internet." The article quotes [REDACTED] as stating, " 'I didn't look up anything about the case, but I Googled to see exactly what a foreman was supposed to do, what role I was supposed to play. A foreman is to guide the process, not take sides, but make sure everybody around the table has a chance to be heard.' " A later paragraph in the same article states: "Last Wednesday, [U.S. District Judge Mark] Fuller sent a note to the jurors asking about their progress. It was then that [REDACTED] sent a note saying some jurors had become 'lackadaisical' and some were no longer deliberating."

7. Attached as EXHIBIT 2 and hereby incorporated is a copy of a newspaper article published in The Decatur Daily News on July 2, 2006 titled "Juror: Siegelman jury

---

[3] This Court has previously ordered that the identities of the jurors in this matter are to remain confidential. In compliance with this Court's direction, Defendants' motion will not refer to any jurors by name except when this motion references published news articles where the jurors publicly disclosed their own identities by apparently consenting to the interviews upon which the news stories were based. Similarly, with the exception of such news stories, Defendants have redacted the names or other identifying information from this motion and all exhibits that are attached to this motion. Defendants will provide the Court *in camera* and the Government with unredacted copies of all exhibits. Defendants will also file under seal with the Clerk an additional copy of this motion with unredacted copies of all exhibits.

didn't fight," and written by Bob Johnson, who is identified as an Associated Press writer. This article quotes another juror, identified as ████████ " 'The evidence was overwhelming and compelling that the verdict [on Defendants Siegelman and Scrushy] was guilty on those counts,' ██████ said." Additionally, the article states, ████████ old ████████████████████████████ said reports that jurors were fighting and didn't get along were wrong."

8.  Attached as EXHIBIT 3 and hereby incorporated is a copy of a newspaper article published in The Auburn Villager on July 13, 2006.  The article is titled "Auburn jury foreman: 'Sell out' by governor was unacceptable," and was written by Jacque Kochak, Village News Editor. The article states in part: "Each juror received a notebook with 40 pages of indictments along with information ranging from the definition of reasonable doubt to the laws on bribery. They didn't have a road map ████ said, until one young juror he described as 'brilliant' got the ball rolling by creating a chart showing how each charge related to the others. 'Her organizational skills are what saved the whole bacon,' ██████ said." Later, the same article states:  "Three days later, jurors were no closer to a decision although by that time they knew the charges by heart. Two more days passed, and some of the jurors who had worked so hard for so long seemed to be losing interest. ██████ conveyed his concerns unofficially to a marshal, who went to the judge without ██████ knowledge."

9.  Attached as EXHIBIT 4 and hereby incorporated is a copy of a newspaper article published in The Montgomery Advertiser on July 13, 2006. The article is titled "Siegelman juror wants to talk shop with prosecutors," and is written by Mike Linn. In this article, Juror ████████ is quoted as stating that she wants to go to law school and

that she has contacted the U. S. Attorneys office "to get some questions answered about the process." The article indicates that Juror█████said she had no plans of discussing jury deliberations, but that she said, "I would like to hear the attorneys' perspective."

10. Attached as EXHIBIT 5-A and hereby incorporated is a Internet report dated July 20, 2006 12:17 am written by reporter Sally Pitts for WSFA 12 in Montgomery and titled "Government Corruption Trial Juror Speaks." Attached as EXHIBIT 5-B and hereby incorporated is a transcript of a video-taped interview of juror█████that appears to be a longer version of the interview on which the story in EXHIBIT 5-A is based. Attached as EXHIBIT 5-C is a DVD containing a copy of the original news story regarding the interview and a longer version of the same interview from which the story appears to have been excerpted. As set out in the transcript in EXHIBIT 5-B, the reporter asks█████"You couldn't watch any news. You stuck to all that?"█████responds, "I did. I saw one Iter [sic] – I did see one Internet article. So I'll confess." The next question is, "By accident?"█████responds, "It was – it was—yes, it was almost by accident. It was – after I saw the headline, I was oh, I wonder what that says. But I really did try very hard. I really wanted to not base my decision on anything other than what was entered in court."

11. Attached as EXHIBIT 6 and hereby incorporated is the affidavit of Stephen D. Hudson, dated August 9, 2006. This affidavit identifies the affiant as an individual who Juror A came to for counseling, along with his wife. [4]

---

[4] As set forth *supra* in footnote 2, this motion will comply with the Court's Order protecting the identity of any jurors who have not been publicly identified in published news accounts. In order to do so, Defendant's motion will refer to jurors "A" through "D" based on their chronological appearance in this motion, disregarding any references contained in news articles attached as exhibits.

12. Attached as EXHIBIT 7 and hereby incorporated is the affidavit of an individual identified as the wife of Juror A, dated August 9, 2006. In this affidavit, the wife of Juror A states that: "[Juror A] and I have talked with my minister and received prayer and counseling. [Juror A] told me that things were not handled right during this trial, from Internet communications among the jury to the pressure and intimidation from the Judge."

13. Attached as EXHIBIT 8 and hereby incorporated is the affidavit of Juror A, dated August 9, 2006. In this affidavit, Juror A states that: "I just wanted to get out of there and so did everybody else. It was very upsetting in there, and very tense. I was confused between all the evidence and other Internet stuff and information that some of the jurors brought in and was talking about. I don't think they should have done that." Juror A's affidavit goes on to say, "I don't know who brought it for sure. They were pulling stuff out of files and some were talking about having Internet information and talking about that too. So we considered everything that everybody brought and pulled out of the file." The affidavit also indicates that Juror A states, "I thought that the governor had put money from HealthSouth in his personal account. But now I know that ain't true."

14. Attached as EXHIBIT 9 and hereby incorporated is a second affidavit of Juror A, which is dated September 1, 2006. In this affidavit, Juror A states: "After [Juror B] told us so much law and legal procedures during our deliberations, all the jurors got on [Juror B] and questioned [Juror B's] knowledge of knowing too much. At this time, [Juror B] admitted that [Juror B] had searched the internet. After this, the entire jury

asked for a foreman's book although the foreman already had a copy of the foreman's book."

15. Attached as EXHIBIT 10 and hereby incorporated is a redacted copy of a five (5) page document.[5] Copies of this document were received by U.S. mail in envelopes postmarked on September 5, 2006, by various counsel for Defendant Scrushy[6] and Defendant Scrushy. Copies were also received by counsel for Defendant Siegelman.[7]

16. The mailing in EXHIBIT 10 contained a letter that states in full: "The enclosed e-mail shows that the jurors in the recent trial of Governor Siegelman and Richard Scrushy violated the Judges [sic] order by having communications and discussions outside of the jury room. You should subpoena their records so you have the whole picture." The letter is unsigned. Attached to the letter is what appears to be a copy of an e-mail dated "Monday, May 29, 2006 10:41PM." It appears to be printed from a Google G-mail account. According to the document, the e-mail was sent from Juror B to Juror C, whose e-mail address is likewise listed. The document indicates that the e-mail reads in its entirety: "**...need to talk…..!?**" The e-mail ends with the typed first name of Juror B. Also attached are three (3) additional pages which appear to be a printout of

---

[5] For purposes of this filing, Defendants have redacted all information from the documents relating to the e-mails that would identify the names or e-mail addresses of the individuals who were parties to the e-mails. Unredacted copies of these documents will be provided to the Court *in camera* and to the Government, as well as filed under seal with the Clerk.

[6] Attorneys Terry L. Butts and Arthur W. Leach. It is possible that attorney Frederick G. Helmsing, Sr. also received a copy, but that fact cannot be verified at the time of the filing of this motion, as Mr. Helmsing is currently out of the country.

[7] Attorneys Vincent F. Kilborn, III and David McDonald.

8

three pages from Myspace.com. Three of the entries have a picture and a message with the same name as the sender of the e-mail.

17. Attached as EXHIBIT 11 and hereby incorporated is a copy of another document. This document was received by U.S. mail in envelopes postmarked on September 15, 2006. It was received by mail by the same individuals listed in ¶ 15, *supra*. As with EXHIBIT 10, the document appears to be a copy of an e-mail. It is dated "Monday, May 29, 2006 11:38 PM." It appears to be printed from the same Google G-mail account as EXHIBIT 10. The address indicates that the e-mail was sent from Juror B to Juror C. The document indicates that the text of the e-mail reads in its entirety: **"I agree some of the kounts r confusing 2 our friends. Chek text.30/38 still off trac."** It ends with the typed first name of Juror B. Defendants respectfully submit that the numbers "30/38" correspond to the Juror Numbers of two of the jurors who deliberated on and returned guilty verdicts in Defendants' case.

18. Attached as EXHIBITS 12 and 13 and hereby incorporated are copies of two additional documents. Both were received together by U.S. mail in envelopes postmarked on September 21, 2006, by the same individuals listed in ¶ 15, *supra*. EXHIBIT 12 appears to be dated "Sunday, June 25, 2006 11:28PM." EXHIBIT 12 appears to be printed from the same Google G-mail account as EXHIBITS 10 and 11. The address indicates that the e-mail was sent from Juror D to Juror B. The document indicates that the text of the e-mail reads in its entirety: **"penalty 2 severe…still unclear on couple of counts against pastor & gov."** [8]

---

[8] Defendant Siegelman was the Governor of Alabama from January 1999 through January 2003. (Doc. 9 at 1-2, ¶ 1-c.) Defendant Scrushy is the Pastor of Grace and Purpose Church in Birmingham, Alabama.

19. EXHIBIT 13 appears to be dated "Sunday, June 25, 2006 11:48PM." The address indicates that the e-mail was sent from Juror B to Juror D. The document indicates that the text of the e-mail reads in its entirety: **"...stay focused...remember what judge said...have plans for 4th...right?"** The e-mail ends with the typed first name of Juror B.

20. Attached as EXHIBITS 14-A, 14-B, and 14-C and hereby incorporated are three of the envelopes in which the documents attached in EXHIBITS 10, 11, 12 and 13 were received. The other original envelopes and documents have been preserved and will be available for inspection by the Court or the Government.

21. Defendants respectfully submit that the news reports, affidavits, and e-mails in EXHIBITS 1 through 13 paint a disturbingly vivid picture of multiple levels of exposure to extrinsic evidence and juror misconduct in this case. Since Defendants are precluded by the provisions of Local Rule 47.1 from "interrogating jurors in civil or criminal cases" without "filing a formal motion therefor with the court and securing the court's permission," at this point in time this picture is clearly not the full picture. The full and complete facts pertaining to the nature and scope of this misconduct cannot be uncovered without the intervention of this Court.

22. Defendants respectfully submit, however, that these documents, *at a minimum*, demonstrate substantial evidence of the following:

   a.  extrinsic information was obtained by the Jury Foreman ███████ contrary to this Court's explicit instructions, from Internet research concerning the role of the jury foreman in leading jury deliberations, (EXHIBIT 1);

b.  a statement by the jury foreman that, if true, indicates there was an *ex parte* communication between this Court and the jury in a note to the jurors asking about their progress, (EXHIBIT 1); [9]

c.  a statement by the jury foreman that, if true, indicates that the jury foreman conveyed concerns "unofficially to a marshal" that that "some of the jurors ... seemed to be losing interest," and that the marshal "went to the judge without [the jury foreman's] knowledge," (EXHIBIT 3);

d.  extrinsic information was obtained by Juror ████████ contrary to this Court's explicit instructions, by using the Internet to read a news article apparently related to this case in some way, (EXHIBIT 5);

e.  extrinsic information was obtained from the Internet and possibly other sources that Juror A referred to in his affidavit as "Internet stuff and information that some of the jurors brought in and was talking about," and that "[some jurors] were pulling stuff out of files and some were talking about having Internet information and talking about that too," (EXHBIT 8);

f.  that, according to the affidavit of Juror A, the extrinsic information apparently included information that "the governor had put money from HealthSouth in his personal account," a conclusion which could not have been drawn from any of the evidence properly admitted in Defendants' trial, (EXHIBIT 8);

g.  that, according to the second affidavit of Juror A, another juror, Juror B, told the jury so much about "law and legal procedures during our deliberations," that

---

[9] On information and belief, no such note is currently a part of the record in this case.

the jurors challenged Juror B, who "admitted that [Juror B] had searched the internet," and thereafter, "the entire jury asked for a foreman's book," which the foreman already had a copy of, (EXHIBIT 9);

h.  that, if authenticated, the May 29, 2006 e-mails between Jurors B and C at 10:41 pm and 11:38 pm on a Sunday night demonstrate that prior to the close of evidence in the Government's case in chief—that is, before any Defendant presented any witness or evidence—at least two jurors, contrary to this Court's explicit and oft-repeated instructions, were conducting premature deliberations in this case and, even more disturbingly, were identifying two specific fellow jurors (Jurors 30 and 38) as being "still off trac" [sic] and expressing their mutual concern that "some of the kounts r confusing 2 our friends" [sic], (EXHIBITS 10 and 11); [10] and

i.  that, if authenticated, the June 25, 2006 e-mails between Jurors B and D at 11:28 pm and 11:48 pm indicate that after the jury began its deliberations in this case, contrary to this Court's explicit instructions,[11] that two jurors were deliberating outside the presence of the rest of the jury, specifically as to "the pastor & gov." and that Juror B, who is the same juror who Juror A states brought the extrinsic Internet research into the jury room, (EXHIBIT 9), was urging another juror to "stay focused" and reminding or querying the juror about "plans for 4th," (EXHIBITS 12 and 13); additionally, the reference of

---

[10] The affidavit of Juror A's wife, (EXHIBIT 7), indicates that Juror A has stated to her that there were "Internet communications among the jury."

[11] "[Y]ou shall not deliberate until all 12 of you have the benefit of being present and being able to hear the full discussion that each of you has to make about the evidence in this case." (Transcript of Proceedings, June 15, 2006, Volume XXXII at 78.)

Juror D in the e-mail to "penalty 2 severe" is further evidence of the jury's exposure to extrinsic evidence, as no evidence properly admitted in the case would have informed any juror of the possible penalties Defendants faced.

23. Defendants respectfully submit that when this Court carefully reviews the entire pattern of the events in light of the actual identities of the jurors involved, as set out in the unredacted version of Defendants' exhibits, the evidence supports a particularly disturbing inference that two of the twelve jurors, at a time prior to Defendants' opportunity to submit any evidence in Court, had concluded that Defendants Siegleman and Scrushy should be convicted and engaged in a pattern of communications and activities in direct violation of this Court's instructions to ensure that any jurors who disagreed with such a conclusion would, by any means necessary, eventually be convinced to return such a verdict.

24. As set forth in the next section of this motion, Defendants respectfully submit that the evidence in this motion requires that Defendants' convictions be vacated and Defendants be given a new trial before a jury that is not tainted by access to extrinsic evidence and a pattern of misconduct. Defendants also submit that this evidence mandates further investigation and an evidentiary hearing before this Court. Specifically, Defendants are requesting that the following steps be taken pursuant to appropriate Orders issued by this Court:

a. that Defendants be authorized by this Court, pursuant to the provisions of Local Rule 47.1, to conduct, through counsel, interviews of all jurors in this case;

13

b. that, should this Court not authorize such interviews, this Court conduct an interrogation of all jurors pursuant to the provisions of Local Rule 47.1, that such interrogation be *in camera*, under oath, and that counsel for all parties be permitted to participate;

c. that this Court enter an Order requiring Jurors B and C to preserve any computers that they used during their jury service in this case and that no deletions be made as to any information on those computers that relates in any way to this case or their jury service in this case, including but not limited to any history files relating to any trails created in the course of Internet searches or other computer activity during the relevant period;

d. that this Court enter an Order requiring all jurors (including alternate jurors who did not deliberate) in this case to provide to the Court, *in camera*, a list of all e-mail account addresses, all text-messaging account addresses, and all Internet Service Providers and phone companies providing text-messaging services which were in effect from the date of jury summonses until June 29, 2006;

e. that this Court enter an Order authorizing Defendants to issue subpoenas pursuant to Rule 17(c), using the information obtained in ¶ d, *supra*, to all Internet Service Providers and all telephone companies providing instant messaging or text-messaging services as to any of the jurors in this case, to produce all e-mail and text messages from any jurors relating to the subject

matter of this case from the date of summonses through and including July 31, 2006; [12] and

f. that this Court, after the parties have had reasonable time to investigate the materials obtained through interviews and/or Rule 17(c) subpoenas, conduct an evidentiary hearing at which all parties will be permitted to question all jurors under oath and subpoena any other witnesses that may have relevant information relating to the exposure of the jury to extrinsic evidence, e-mail or text-message communications between jurors in this case, and any other misconduct relating to the jury in this case.

### Argument and Citation of Authorities

The Sixth Amendment guarantees to every defendant the constitutional right to a fair trial before an impartial jury. Implicit in this concept is that the jury's verdict be based solely on the evidence, argument and law adduced in the courtroom and that its verdict be unaffected by extrinsic influences, duress, or misconduct by the jurors or anyone associated with the process. As the Supreme Court held in *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546 (1965):

> The requirement that a jury's verdict "must be based upon the evidence developed at trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. "The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law."

379 U.S. at 472 (quoting *Sinclair v. United States*, 279 U.S. 749, 49 S.Ct. 471 (1929)) (footnote omitted). Justice Holmes, writing for the Supreme Court in 1907, held:

---

[12] The extended date of July 31, 2006 is requested to obtain any e-mail or text-messaging traffic that might indicate continuing discussions as to interviews of jurors appearing in news accounts.

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

*Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556 (1907). In *Lowenfeld v. Phelps*, 484 U.S. 231, 241, 108 S.Ct. 546 (1988), the Court held, "Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." In 1915, the Supreme Court held:

> The conduct of the parties, witnesses and counsel in a case, as well as the conduct of the jurors and officers of the court, may be of such a character as not only to defeat the rights of litigants, but it may directly affect the administration of public justice.

*McDonald v. Pless*, 238 U.S. 264, 266, 35 S.Ct. 783 (1915).

Each of these fundamental principles and protections is not only implicated, but gravely endangered by the events that have occurred relative to the jury that returned the guilty verdicts in the instant case.

### The Jury's Exposure to Extrinsic Evidence

> In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

*Turner v. Louisiana*, 379 U.S. at 472-73.

In *United States v. Martinez*, 14 F.3d 543 (11th Cir. 1994), the Eleventh Circuit reversed a defendant's conviction for racketeering and extortion based on a claim that he was entitled to a new trial "because extrinsic influences entered the jury's deliberations, infecting the process and causing him prejudice." 14 F.3d at 546. Defendant showed that during a highly publicized trial:

16

(1) Juror Tomeny informed the other jurors that Martinez faced 160 years of imprisonment if convicted; (2) the jury used a dictionary to define terms arising during deliberations, including words with technical meanings; (3) the jurors watched news accounts on television; (4) Juror Tomeny became aware of the publicity surrounding her participation on the jury; and (5) jurors regularly brought newspapers reporting trial events into the jury room.

*Id.* at 550. The Eleventh Circuit held that in situations involving a jury's exposure to extrinsic evidence:

As a matter of established law, the burden of proving prejudice does not lie with the defendant because prejudice is presumed the moment the defendant establishes that "extrinsic contact with the jury in fact occurred."

*Id.* at 550 (quoting *United States v. Caporale*, 806 F.2d 1487, 1503 (11th Cir. 1986) and citing *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984); *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50 (1892); *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450 (1954); and *United States v. Spurlock*, 811 F.2d 1461, 1463 (11th Cir. 1987). The Eleventh Circuit went on to hold:

Once the defendant proves extrinsic contact, the burden shifts to the government to demonstrate that the consideration of the evidence was harmless. *Perkins*, 748 F.2d at 1533; *Caporale*, 806 F.2d at 1503; *Spurlock*, 811 F.2d at 1463. Again, as the Court unambiguously held: "The presumption [of prejudice] is not conclusive, but the burden rests heavily upon the government to establish, after notice to the defendant, that such contact with the juror was harmless to the defendant." *Remmer*, 347 U.S. at 229, 74 S.Ct. at 451.

*Martinez*, 14 F.3d at 550. The Eleventh Circuit described the factors to be considered in assessing the rebuttal case as:

In doing so we consider many factors including the heavy burden on the government, the nature of the extrinsic information, the manner in which the information reached the jury, and the strength of the government's case.

*Id.* (citing *United States v. Rowe*, 906 F.2d 654, 657 (11th Cir. 1990) and *Remmer*, 347 U.S. at 229). The jury's consideration of extrinsic evidence requires a new trial "if the evidence poses a reasonable possibility of prejudice to the defendant." *United States v. Awan*, 966 F.2d 1415, 1432 (11th Cir. 1992) (quoting *Rowe*, 906 F.2d at 656)). *Accord United States v. Pesserfall*, 27 F.3d 511, 515-16 (11th Cir. 1994.) It is the trial court's duty "to ensure that the jury verdict is in no way tainted by improper outside influences." *Rowe*, 906 F.2d at 656.

"Where there are allegations of extraneous information, outside influence or other jury misconduct, the decision whether to investigate rests in the sound discretion of the district court." *United States v. Darby*, 744 F.2d 1508, 1540 (11th Cir. 1984). However, "[w]here a colorable showing of extrinsic influence is made, a trial court, in the exercise of its discretion, must make sufficient inquires or conduct a hearing to determine whether the influence was prejudicial." *United States v. Barshov,*. 733 F.2d 842, 851 (11th Cir. 1984). "Upon receiving a colorable claim of extrinsic influence on [a jury's] impartiality, the trial court should investigate the asserted impropriety to determine initially if and what extrinsic factual matter was disclosed to the jury." *United States v. Sedigh*, 658 F.2d 1010, 1014 (11th Cir. 1981) (citing *United States v. Winkle*, 587 F.2d 705, 714 (5th Cir. 1979).[13] In *United States v. Caldwell*, 776 F.2d 989 (11th Cir. 1985), the Court addressed an issue concerning the procedures employed by the district court in responding to a report of extrinsic influence on a juror during trial. In concluding that the

---

[13] In *Sedigh*, the district court held a hearing at which the affiant alleging extrinsic evidence and the two Deputy Marshals in charge of the jury were questioned. 658 F.2d at 1014.

18

district court did not err by questioning the juror outside the presence of defense counsel

and immediately providing a transcript to counsel, the Eleventh Circuit stated:

> Examination of all of the cited authorities ... leads us to the
> conclusion that the cases fall along a continuum focusing on two factors.
> At one end of the spectrum the cases focus on the certainty that some
> impropriety has occurred. The more speculative or unsubstantial the
> allegation of misconduct, the less the burden to investigate.... At the
> other end of the continuum lies the seriousness of the accusation. The
> more serious the potential jury contamination, *especially where alleged
> extrinsic influence is involved,* the heavier the burden is to investigate.

776 F.2d at 998 (citations omitted) (emphasis added). In *United States v. Chiantese*, 582

F.2d 974 (5th Cir. 1978), the former Fifth Circuit wrote:

> We realize that in instances where the jury misconduct involves
> influences from outside sources, the failure of the trial judge to hold a
> hearing constitutes an abuse of discretion and is therefore reversible
> error. *United States v. Herring,* 568 F.2d. 1099, 1103-06 (5th Cir. 1978);
> *Richardson v. United States,* 360 F.2d 366, 369 (5th Cir. 1966). This is
> so because a presumption of prejudice arises when the outside influence
> is brought to the attention of the trial court, *Remmer v. United States,*
> 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), and it is
> incumbent upon the Government to rebut that presumption at a hearing.
> *Id.; Richardson v. United States,* 360 F.2d at 369.

*Chiantese,* 582 F.2d at 979.

Defendants respectfully submit that the factual showing in this motion as to the

jury's exposure to extrinsic evidence is substantial, not speculative, and, because it

involves allegations of extrinsic influence, involves the most serious type of jury

misconduct that can be raised.  Under these circumstances, Defendants respectfully

submit that the burden on this Court to investigate both fully and decisively is especially

heavy under the law of this Circuit, and that an evidentiary hearing is required.

A brief review of Defendants' proof in support of this motion demonstrates that

Defendants have shown the following facts which necessitate further inquiry by this

Court and, ultimately, a full evidentiary hearing. First, two jurors (Jury Foreman ████

and Juror ████ have stated in interviews to members of the press that they conducted

research on the Internet. Foreman ████ stated that he used the Internet "[t]o prepare

for the job" of jury foreman. (EXHIBIT 1.) Juror ████ stated that she accessed and

read a news article on the Internet which apparently related to Defendants' case in some

way. (EXHIBIT 5-B.)[14]  Second, the sworn affidavits of Juror A demonstrate that more

than one juror brought extrinsic information into the jury and discussed the extrinsic

information with the jurors. Juror A's August 9, 2006 affidavit states, "I was confused

between all the evidence and other Internet stuff and information that some of the jurors

brought in and was talking about." (EXHIBIT 8.) The same affidavit goes on to say, "I

don't know who brought it in for sure. They were pulling stuff out of files and some were

talking about having Internet information and talking about that too. So we considered

everything that everybody brought and pulled out of the file." (EXHIBIT 8.)  More

details are contained in the September 1, 2006 affidavit of Juror A, in which the juror

states:  "After [Juror B] told us so much law and legal procedures during our

deliberations, all the jurors got on [Juror B] and questioned [Juror B's] knowledge of

knowing too much. At this time, [Juror B] admitted that [Juror B] had searched the

internet.  After this, the entire jury asked for a foreman's book although the foreman

---

[14] Neither statement revealed what the jurors actually read on the Internet; whether
and how they shared that information with other jurors, and whether either juror
conducted any additional research on the Internet. The statements of the jurors beg for
answers to these questions, and this Court cannot properly assess the scope and prejudice
of the exposure to this extrinsic evidence without further investigation.

already had a copy of the foreman's book." (EXHIBIT 9.) [15] The August 8, 2006 affidavit of Juror A also supports an additional and clear inference that the extrinsic evidence went beyond any information relating to the topics already indicated (the foreman's role, the news article read by Juror ███ the "law and procedure" brought in by Juror B, and the "foreman's book") by referencing discussion of a matter which was not properly admitted in evidence during the trial in this case: the claim that "the governor had put money from HealthSouth into his personal account." (EXHIBIT 8.) Additionally, the August 8, 2006 affidavits of Juror A's wife and Mr. Hudson indicate that Juror A has discussed this matter with one or both of those individuals. (EXHIBITS 6 and 7.) As a consequence, these individuals may also possess details concerning the jury's exposure to extrinsic evidence. This information should likewise be investigated. Finally, the copy of the e-mail in EXHIBIT 12, if authenticated, demonstrates that at least two jurors (Juror B and Juror D) were aware of the penalties that Defendants faced. Since this information was nowhere submitted to the jury in the evidence admitted by this Court, that information was additional extrinsic evidence, and at least two jurors were exposed to it. This, too, requires investigation by this Court.

In sum, Defendant's showing that extrinsic evidence was obtained by one or more jurors and that it was shared with the other jurors is substantial—particularly in light of Defendants' inability to seek first-hand information by interviewing the jurors due to the

---

[15] These statements, too, raise substantial questions as to: the nature of the extrinsic evidence that was brought into the jury room; the content of the extrinsic evidence; the extent of the extrinsic evidence; the identity of the other jurors who brought it in; the source of the extrinsic evidence which was brought in; how many of the jurors were exposed to the extrinsic evidence; and the relevance of the extrinsic evidence to the charges against Defendants. All of these questions must be answered in order for this Court to determine if Defendants were deprived of their Sixth Amendment right to a fair trial.

preclusion of Local Rule 47.1. It is substantiated by the published admissions of two of the twelve jurors that convicted Defendants and the sworn affidavits of an additional juror that participated in those verdicts. Defendant's showing is neither vague nor speculative. The allegations, if proven true, are extremely serious and could well lead to the revelation of even more problematic types of extrinsic evidence that were brought into the jury room. Finally, Defendant's showing involves what the Eleventh Circuit and the Supreme Court have deemed to be the type of misconduct that poses the clearest and most harmful danger to the right to a fair trial: extrinsic evidence, evidence which does not "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner*, 379 U.S. at 472-73. Under the unambiguous guidelines of the Eleventh Circuit in *Caldwell, Sedigh, Barshov*, and other cases discussed above, Defendants respectfully submit that this Court has an immediate and heavy burden to fully investigate whether or not Defendants' jury was exposed to extrinsic evidence, as well as a critical duty "to ensure that the jury verdict is in no way tainted by improper outside influences." *Rowe*, 906 F.2d at 656. Under the relevant case law, this Court has ample discretion as to precisely how to conduct such an investigation. Defendants can only urge that this Court authorize procedures that are properly tailored to uncover the truth and establish each and every fact relating to any exposure of this jury to extrinsic evidence.

### Premature Jury Deliberations

In *United States v. Dominguez*, 226 F.3d 1235 (11th Cir. 2000), the Eleventh Circuit addressed a claim that a defendant was deprived of a fair trial because the jury

began deliberations before the Government finished presenting its case. Before finally

concluding that the district court did not abuse its discretion by denying a mistrial or

failing to take action in addition to questioning the juror twice and repeatedly instructing

the jury on the presumption of innocence and not to discuss the case until the evidence

was completed, 226 F.3d at 1247-48, the Court summarized the applicable legal

principles:

> Under the Sixth Amendment, every defendant in a criminal
> prosecution has a right to trial by "an impartial jury." U.S. Const.
> amend. VI. A jury's impartiality is endangered by colloquy among
> jurors about the case prior to the beginning of formal deliberations. *See*
> *United States v. Yonn*, 702 F.2d 1341, 1345 n.1 (11th Cir. 1983). The
> danger is that "such conversations may lead jurors to form an opinion as
> to the defendant's guilt or innocence before they have heard all of the
> evidence, the arguments of counsel, and the court's instructions." *Id.*
> That is why juries are typically instructed at the beginning of the trial
> and periodically throughout it not to discuss the case among themselves
> until permitted to do so at the completion of the evidence and closing
> instructions.

*Dominguez*, 226 F.3d at 1243.  *See also United States v. Resko*, 3 F.3d 684, 689-90 (3d

Cir. 1993) (discussing six reasons for the prohibition on premature deliberations in a

criminal case.)  The Seventh Circuit has concluded: "Admonishing the jury [against

premature discussions of the case] is a critical and important duty and cannot be over-

emphasized." *United States v. Wiesner*, 789 F.2d 1264,1269 n.3 (7th Cir. 1986).

As the Eleventh Circuit reiterated in *Dominguez*,

> [A] trial judge is vested with broad discretion in responding to an
> allegation of jury misconduct, and that discretion is at its broadest when
> the allegation involves internal misconduct such as premature
> deliberations, instead of external misconduct such as exposure to media
> publicity.

23

226 F.3d at 1246 (citing *Grooms v. Wainwright*, 610 F.2d 344, 347 (5th Cir. 1980);

1980); *Yonn*, 702 F.2d at 1344-45; *United States v. Williams*, 716 F.2d 864, 865 (11th

Cir. 1983); and *United States v. Cuthel*, 903 F.2d 1381, 1382-83 (11th Cir. 1990)).

In *Cuthel*, one of the defendants claimed he received an anonymous telephone call

the day after the jury convicted.   The caller, possibly a juror, stated that "we were

pressured into making our decision." This claim was supplemented by a letter sent to the

prosecutor by an alternate juror in which the juror expressed her views of the trial, the

lawyers and the defendants and, according to the defendants, indicated that the jurors

considered the merits of the case before deliberations. 903 F.2d at 1382.  One defendant

filed a motion to interview jurors pursuant to the Southern District of Florida's local rule

permitting juror interviews only upon application in writing. The district court, after a

hearing, turned down the request based on a finding that because defendant "provided no

colorable showing that any external influence had affected the jury's verdict," further

inquiry into the internal deliberative process was precluded by Fed. R. Evid. 606(b) and

that the motion "failed to demonstrate good cause under the Local Rule." 903 F.2d at

1382.   The Eleventh Circuit affirmed based on its view that Rule 606(b) precluded

inquiry in the absence of an allegation of jury exposure to extraneous information or

outside influences brought to bear on the jury and on the Court's conclusion that "[t]he

letter fails to state that the jury deliberated prematurely." In reaching this conclusion, the

Court held:

> No per se rule requires the trial court to investigate the internal
> workings of the jury whenever a defendant asserts juror misconduct....
> To justify a post-trial hearing involving the trial's jurors, the defendant
> must do more than speculate; he must show clear, strong, substantial and
> incontrovertible evidence ... that a specific, nonspeculative impropriety
> has occurred.  The more speculative or unsubstantiated the allegation of

24

> misconduct, the less the burden to investigate. We agree with the district court that the letter and the alleged phone call failed to show that the integrity of the trial process was impugned. There was no abuse of discretion.

903 F.2d at 1382-83 (internal quotations and citations omitted).

The record in the instant case establishes that this Court has a substantial duty to investigate whether or not premature deliberations occurred in Defendants' case. EXHIBTS 10 and 11 appear to be copies of printouts of e-mails between two jurors in this case. If authenticated, which can only be accomplished pursuant to this Court's authorization of subpoenas to the jurors' Internet Service Providers and a Court Order preserving all computer records on the computers of Jurors B and C, these two e-mails provide "clear, strong, substantial, and incontrovertible evidence," *Cuthel*, 903 F.2d at 1383, that two jurors were communicating by e-mail on May 29, 2006, prior to the conclusion of the Government's case in chief, and that the communication clearly concerned the merits of the case. Even more significantly, if authenticated, the two e-mails demonstrate that the two jurors were addressing an apparent concern that not only were some of the counts of the indictment confusing to other jurors but that two of their fellow jurors—specifically identified as Jurors 30 and 38—are "still off trac." (Exhibit 11.) These e-mails are evidence that two jurors are not only deliberating prior to the close of the Government's case but are in effect communicating with each other in an effort to influence the opinions of their fellow jurors. If authenticated, this evidence would undoubtedly establish that "the integrity of the trial process was impugned." *Cuthel*, 903 F.2d at 1383.

More importantly, at this juncture Defendants do not bear the burden of proving that this activity in fact occurred or that it deprived them of a fair trial. All Defendants

25

must do at this stage is to make a sufficient showing to this Court to trigger this Court's duty to investigate the allegations. This Court has broad discretion to determine the best method to investigate this apparent evidence of grave misconduct. Defendants have suggested that the most effective method would be the issuance of subpoenas for e-mail and text-messaging records and the preservation of computer records on the computers of the jurors involved, followed by a full evidentiary hearing. However this Court determines it is most appropriate to proceed, Defendants respectfully submit that, based on the evidence before this Court at this time, this Court *must* investigate, and it must do so in a thorough, decisive, and impartial manner.

### Jury Misconduct During Deliberations

As the Supreme Court held in *Lowenfield v. Phelps*, 484 U.S. at 241, "Any criminal defendant ... being tried by a jury is entitled to the uncoerced verdict of that body." In discussing whether or not a juror could give testimony to impeach a jury verdict he had participated in, the Supreme Court in *McDonald v. Pless*, 238 U.S. at 260-69, stated:

> Both of those decisions [*United States v. Reid*, 53 U.S. 361, 13 L.Ed. 1023, 1025 (1851) and *Mattox*, 146 U.S. at 148] recognize that it would not be safe to lay down any inflexible rule because there might be instances in which such testimony of the juror could not be excluded without "violating the plainest principles of justice." This might occur in the gravest and most important cases;...

*Id.* And in *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739 (1987), where the Supreme Court in a 5-4 decision concluded that juror testimony of alcohol and drug use during a trial could not be used to impeach their verdict, Justice O'Connor, writing for the majority, nonetheless stated:

> Finally, after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct. See *United States v. Taliaferro*, 558 F.2d 724, 725-726 (CA4 1977) (court considered record of club where jurors dined, and testimony of marshal who accompanied jurors, to determine whether jurors were intoxicated during deliberations). Indeed, in this case the District held an evidentiary hearing giving petitioners ample opportunity to produce nonjuror evidence supporting their allegations.

483 U.S. at 127.

Pursuant to the decisions of *Martinez, Cuthel, Domingez*, and other cases discussed above, it is beyond question that this Court has broad discretion to determine how best to investigate allegations of juror misconduct. Defendants respectfully submit that the final two exhibits submitted in support of this motion compel the conclusion that this Court must fully investigate this evidence in order to insure that "the integrity of the trial process was [not] impugned," *Cuthel*, 903 F.2d at 1383, in this case, and in order to protect Defendants' Sixth Amendment right to a fair trial before an impartial jury.

These final two exhibits, EXHIBITS 12 and 13, if authenticated, provide additional, incontrovertible evidence of grave jury misconduct. EXHIBIT 12 appears to be a copy of an e-mail from Juror D to Juror B. The date and time indicate that the e-mail was sent at 11:28 pm on Sunday, June 25, 2006. This was after the completion of seven days of deliberations, and five days before the jury returned guilty verdicts as to Defendants Siegelman and Scrushy after four additional days of deliberation. The day the guilty verdicts were returned, Thursday June 29, 2006, was the next to last working day prior to the July 4th weekend. This first e-mail states: "penalty 2 severe … still unclear on couple of counts against pastor & gov." (EXHIBIT 12.) If authenticated, this e-mail demonstrates that two jurors were ignoring this Court's instruction not to deliberate outside the presence of the other jurors and at least one of the jurors was

considering the severity of the penalties (contrary to this Court's instruction and clearly on the basis of extrinsic evidence as to what the penalties were).

The e-mail in response from Juror B, just ten minutes later that Sunday night, states: "...stay focused...remember what judge said...have plans for 4th...right?" (EXHIBIT 13.) If authenticated, this appears to indicate that Juror B was exhorting Juror A to "keep focused" and reminding Juror D to "remember what the judge said," while focusing Juror D on the question of what plans either Juror D or other jurors may have for the upcoming holiday, which presumably might be disrupted by continued jury deliberations if the jury did not reach verdicts prior to the weekend. Significantly, the juror who is exhorting Juror D is none other than Juror B. Juror B is the same juror who appears to have authored the e-mail on May 25, 2006 (prior to jury deliberations) expressing her concern to Juror C that some of the jurors appear to be confused by the indictment counts and that Jurors 30 and 38 are "still off trac." (EXHIBIT 11.) When this evidence is considered in light of the actual identities of all the jurors involved and all of the evidence that has been submitted in support of this motion, the evidence of misconduct, especially by Juror B, is particularly compelling.

The copies of the e-mails that have been submitted with this motion, if they are authenticated, in conjunction with the news accounts and affidavits in the other exhibits, paint a truly disturbing picture of grave jury misconduct. It is impossible for Defendants to further substantiate this evidence or to determine if other evidence of additional misconduct exists without this Court's intervention. Defendants have come forward with substantial, non-speculative evidence that indicates that specific improprieties occurred. Under these circumstances this Court not only should, it must investigate to determine

what occurred in regard to the jury in this case. Defendants respectfully submit that the appropriate methods to investigate all of the allegations in this case are the ones suggested in ¶ 24, *supra*: authorization of juror interviews, Court authorized subpoenas for e-mail records, Court-ordered preservation of the two jurors' computers, and an evidentiary hearing. How this Court proceeds is within this Court's broad discretion. Whether this Court proceeds, however, especially in regard to the allegations of jury exposure to extrinsic evidence, is not and should not be in question. The integrity of this Court's process and the protections of the Sixth Amendment are at stake.

### *Ex Parte* Contact Between Court and Juror

Two statements of Jury Foreman ███████ in published accounts raise the possibility of contacts between███████ and the Court or the Court and the jury, some of which Defendants believe are not currently part of the record in this case. These require additional inquiry to establish the relevant facts. An article published in The Montgomery Advertiser on July 1, 2006 states: "Last Wednesday, [U.S. District Judge Mark] Fuller sent a note to the jurors asking about their progress. It was then that ███████ sent a note saying some jurors had become 'lackadaisical' and some were no longer deliberating." (EXHIBIT 1.) A different article, published in The Auburn Villager on July 13, 2006 indicates that at a point in time during the deliberations, "some of the jurors who had worked so hard for so long seemed to be losing interest. ███████ conveyed his concerns unofficially to a marshal, who went to the judge without ███████ knowledge." (EXHIBIT 3.)

Without further information as to what communications, if any, occurred between Jury Foreman███████ and the Court and/or any deputy marshal, Defendants are unable

29

to determine if any issue is presented that would require a new trial. Under Fed. R. Crim. P. 43(a)(2), Defendants must be present at "every trial stage, including jury impanelment and the return of the verdict" unless their presence is waived pursuant to the provisions of subsection (c). The Supreme Court has cautioned that "[a]ny *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error." *United States v. U. S. Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864 (1978). *Compare United States v. Gagnon*, 470 U.S. 522, 528 (1985) (concluding that "the mere occurrence of an ex parte conversation between a trial judge and a juror does not constitute a deprivation of a constitutional right" to be present where conference was only a "short interlude in a complex trial" during which the trial judge assured juror, in the presence of one defendant's lawyer, that defendant's sketching of jurors reflected no danger) and *United States v. Watchmaker*, 761 F.2d 1459, 1466 (11th Cir. 1985) (holding any error under Rule 43 due to *ex parte* conversation between trial court and juror regarding deliberating juror's fear for personal safety rendered harmless by conduct of district court and immediate availability of transcripts of meeting).

The posture of the instant case, where the Jury Foreman has indicated that an *ex parte* communication occurred with the Court or through a deputy marshal, is that there is simply no record of what, in fact, occurred. As illustrated by the cases discussed immediately above, if such a communication occurred, a determination of the propriety of the communication and whether Defendants suffered any prejudice requires a fact-specific inquiry. Defendants respectfully submit that the evidence currently before this Court indicates that the matter should be investigated and a proper record be made as to

what actually occurred, including placing in the record any and all notes to or from the jury that are not presently in the record.

WHEREFORE, Defendants respectfully pray that this Court issue an Order authorizing the procedures requested in paragraph 24 of this motion, and, upon good cause shown at an evidentiary hearing, enter an Order pursuant to Fed. R. Crim. P. 33(a) vacating Defendants' convictions and granting them a new trial, and for such other and further relief as this Court may deem just and proper.

This 29th day of September, 2006.

Respectfully submitted,

/s/ Arthur W. Leach
Arthur W. Leach
Terry Lucas Butts
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35203
Phone: 205-822-4224
Fax: 205-824-0321

James K. Jenkins
Maloy & Jenkins
25th Floor
75 Fourteenth Street, NW
Atlanta, Georgia 30309
Phone: 404-875-2700
Fax: 404-875-7857

Frederick G. Helmsing
Helmsing, Leach, Herlong, Newman
& Rouse, P.C.
P.O. Box 2767
Mobile, Alabama 36652
Phone: 251-432-5521
Fax: 251-432-0633

Attorneys for Richard M. Scrushy

31

/s/Vince F. Kilborn, III
Vince F. Kilborn, III
David A. McDonald
Kilborn, Roebuck & McDonald
P.O. Box 832
Mobile, Alabama 34602
Phone: 251-434-0045
Fax: 251-434-0047

Professor G. Robert Blakey
Notre Dame Law School
South Bend, Indiana
Phone: 574-681-6626

Hiram Eastland
Eastland Law Offices
107 Grand Boulevard
Greenwood, Mississippi 38930
Phone: 662-897-0495
Fax: 662-453-2805

Attorneys for Don Siegelman

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of September, 2006, I personally filed the foregoing "Defendants' Don Eugene Siegelman's and Richard M. Scrushy's Motion for New Trial Pursuant to Rule 33(a) of the Federal Rules of Criminal Procedure" with the Clerk of the Court and I served a true and correct copy of the foregoing on Louis V. Franklin, Acting United States Attorney.

/s/Leslie V. Moore
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35243
Phone: (205) 822-4224
Fax:    (205) 824-0321
E-Mail: les.moore@lvmlaw.com