United States v. Don Eugene Siegelman
and Richard M. Scrushy
2:05cr119-MEF
# EXHIBIT 5-B

1

1

2

3

4

5        TRANSCRIPTION OF VIDEOTAPED INTERVIEW

6

7

8                              OF

9

10

11       ██████████████████████

12       TAKEN ON OR ABOUT JULY 19, 2006

13

14

15

16

17

18

19

20    Transcribed by:   Eleanor S. Pickett,

21                      Certified Shorthand

22                      Reporter and Notary

23                      Public

2

```
1        A.    I didn't want to put up with

2   that.  I decided not to watch it.

3        Q.    First could you state your

4   name and spell it for us?
```



```
7        Q.    First just tell us a little

8   bit about yourself.

9        A.    Oh, what do you want to know?
```

```
14  you know, I don't know what all else you

15  want to know.

16       Q.    Were you totally shocked to be

17  on this jury?

18       A.    I was very surprised.  You

19  know, with the -- you know, you just don't

20  know.  With all the people that are pulled

21  from and the juror pool being so huge and

22  everything, you just -- you just don't

23  ever think -- even when you get the
```

3

```
 1   summons, you're just there's just no way
 2   I'm going to get selected for this trial.
 3   So it was very surprising to be selected.
 4        Q.    Was it tough having to go
 5   through that, what was it, seven or eight
 6   weeks and to be, you know, Juror Number
 7   40?
 8        A.    You know, it was a long time,
 9   and I think -- actually I think the first
10   couple of weeks were some of the hardest
11   because you kind of have to get into a
12   rhythm of things.  And for the first
13   couple of weeks, you're just sitting there
14   thinking about everything that you're
15   missing on the outside and you can't go to
16   work and you can't see your friends and
17   stuff like that and you're busy and you're
18   tired, and it's all new and everything.
19   And so from there, you know, you're just
20   like, okay.  And then you kind of get used
21   to it.  And then you start to get to
22   really know the jurors and you become
23   friends with them.  And so then you look
```

4

```
 1    forward to going and seeing them and the
 2    people at the court and everything like
 3    that, so you kind of adjust to it.
 4         Q.   Yeah.  I was reading y'all
 5    actually went out to eat together after
 6    the verdict?
 7         A.   We did.  Especially in the
 8    first part of the trial, we heard so much
 9    testimony about Bud's and Sinclair's and
10    how every time the inner circle would go
11    to Bud's and Sinclair's.  And so we said
12    early that, you know, when this thing is
13    over, we're going to Sinclair's for dinner
14    and Bud's for a drink after this is over.
15    So when it was ended, we're like, okay,
16    we're going to do that, and we did.
17         Q.   So did it live up to all the
18    hype?
19         A.   You know, I have been to
20    Sinclair's before, so I knew what to
21    expect there, but I had never been to
22    Bud's before.  It was smaller than I
23    expected, but we had a good time.
```

5

1       Q.    Describe in a few words your

2   time on the jury.

3       A.    That's hard.  It was -- it was

4   interesting.  It was very -- it was

5   challenging.  And not just in terms of

6   being away from your family and being away

7   from work and everything like that, but

8   also it was -- it was a complicated case.

9   It required a lot of mental focus.  And so

10  it was -- it was kind of like going

11  through like a nine-week crash semester at

12  school where you really have to pay

13  attention, you know, and figure out what's

14  going on.

15      Q.    Was it tough because there was

16  so much evidence and so much testimony and

17  so many charges to keep up with it all?

18      A.    You know, it was -- it was --

19  I think, you know, when you're sitting in

20  trial, we don't have a copy of the

21  indictment.  We don't know exactly.  I

22  mean, they tell you at the beginning, but

23  you're so overwhelmed those first two

6

1   days, you know, first -- during opening

2   arguments and stuff like that, you really

3   don't know. And so you're hearing all

4   this evidence and all these people coming

5   in, and you're not always completely sure

6   how they all tie together or what's

7   important, what's -- I mean, you assume

8   everything is important, but it is kind of

9   hard to keep up with that. And then when

10  you go back into the deliberation's room

11  and you have the indictment, you have the

12  instructions from the judge, then -- well,

13  then it's overwhelming as well, but you

14  kind of -- you see where everything starts

15  to piece together.

16      Q.   Did you feel a tremendous

17  burden to come up with a verdict?

18      A.   I felt like it was our duty,

19  speaking for me personally. I felt like

20  it -- we were there to come up with a

21  verdict. It was important to me to come

22  up with a verdict because, you know, it's

23  kind of -- you know, you don't want to see

7

1    anything tie.  You know, football games,

2    baseball games, they all have contingency

3    plans so it doesn't go to a tie.  We

4    didn't want a tie.  We wanted to come up

5    with the verdict.  And, you know, our

6    instructions from the judge were to come

7    up with a verdict if we can, and I'm glad

8    that we did.

9         Q.    At one point your foreman came

10   out and called some of the jurors

11   lackadaisical.

12        A.    You know, we weren't --

13        Q.    But he came back and said we

14   can't come up with a verdict, but we want

15   to keep working.

16        A.    Well, you know, none of us,

17   other than the foreman, have seen that

18   note.  And so, you know, it's difficult

19   for me to comment on anything related to

20   that note because I've never seen it.  And

21   so I don't know what it said or exactly

22   what it was referring to.  So I really

23   can't really comment on that.  I think

8

1    that after -- after that time when we --

2    you know, we told the judge we had not

3    come up with a verdict, you know, and he

4    brought us back into the courtroom and

5    said I'm going to give you additional

6    instructions and then you're going to come

7    back tomorrow and tell us whether or not

8    you think future deliberations -- you

9    know, further deliberations would be

10   useful.  And I think at that point we all

11   decided, I decided, that, you know, our --

12   we're here to look at the evidence, look

13   at the law and come up with a verdict if

14   we can.  And we can do that.  And so I'm

15   glad that we all committed ourselves to

16   seeing the task all the way through.

17        Q.    Talk about that deadlock.

18   What were some of the issues?

19        A.    You know, you have twelve

20   people who come into -- come into a room

21   and they come from different walks of

22   life, they come from very different

23   backgrounds, a lot of different

9

1    experiences, a lot of different education,

2    and twelve intelligent people who all come

3    in and are tasked with looking at the

4    evidence that's presented to us, looking

5    at the law and saying are these four

6    people, each one of them, are they guilty

7    or are they not guilty.  And when you have

8    that number of people looking through all

9    of those issues, you don't automatically

10   sit down and agree.  It takes discussion

11   on the evidence, looking at things from

12   different points of view in order to come

13   up with what we eventually came up with,

14   which we feel is the correct verdict for

15   this case.

16        Q.   Were there specific charges or

17   what specifically contributed to the

18   deadlock?

19        A.   You know, I think a lot of

20   it -- it was a complicated case, and so we

21   didn't want to rush to a decision.  We

22   didn't want to take longer than we had to,

23   but at the same time, we really wanted to

10

```
 1    give -- you know, be thorough, look
 2    through all of the evidence, look through
 3    all of the testimony, evaluate everything
 4    carefully, look through -- you know, just
 5    the instructions on the law, you know,
 6    themselves were complicated.  And so --
 7    you know, and different people with
 8    different points of view, you know, when
 9    you first read something, you come to --
10    you have different initial reactions to
11    things.  And so the discussions between
12    the twelve of us were very important to
13    coming up with what that final verdict
14    was, and that doesn't happen right away.
15    And so I think that's where initially it
16    was just, you know, people taking their
17    time to really sort through the evidence
18    for themselves and look at the law for
19    themselves and come up with their decision
20    on what they thought.
21          Q.    Did you go ahead and take a
22    vote?  What were they split on?
23          A.    You know, each count we looked
```

11

```
 1    at individually.  And so you couldn't --
 2    you know, there weren't -- you know, I
 3    think there is some speculation that, you
 4    know, well, you know, six people are this
 5    way and six people are this way, or seven
 6    people are here and five people are here,
 7    and it really wasn't that way.  You know,
 8    you -- every count was different.  We
 9    looked at every count, not only just the
10    count itself, but also who it's related
11    to.  Each of those was an individual
12    discussion.  And so you couldn't just look
13    at it and go well all of us felt this way
14    on here, you know, and not on here.  It
15    was very different, depending on what
16    issue you were talking about.
17         Q.    How were you able to move past
18    that deadlock and come up with a verdict?
19    How were those people able to change their
20    mind?
21         A.    You know, I think that it was
22    a commitment to coming up with a verdict.
23    I think that was, you know, where we
```

12

```
 1   realized -- we really realized it was our
 2   duty to come up with something and to look
 3   at the evidence and look at the law and to
 4   decide based on those two factors and
 5   nothing else what was the correct verdict
 6   to come up with.  And I feel like up until
 7   that point, we really had -- we really
 8   tried very hard to look at those two
 9   things.  But I think with that final --
10   almost -- it was almost -- we kind of
11   felt after the judge's final instructions
12   to us we kind of had an out.  You know, he
13   gave us the -- you know, the instructions
14   to if -- you know, if you go back and you
15   discuss and you see that further
16   deliberations would be useless, then send
17   us a note and let us know.  And we all
18   kind of took that to be that we can -- we
19   can go home tomorrow if we want to.  We
20   can look at this and we can just decide,
21   hey, look, we have been discussing this,
22   we haven't come up with something yet, and
23   we can go home.  And I think almost that
```

13

```
 1   option to get out of there almost

 2   encouraged us to -- we had a different

 3   motivation for being there.  We realized

 4   it was our duty to do what the courts had

 5   selected us to do, and we all were

 6   committed to doing that.

 7        Q.   So you don't feel the holiday

 8   contributed to, okay, let's go ahead and

 9   come up with a verdict so we can go home?

10        A.   Not at all.  I mean, like, you

11   know, I feel we did not want to rush into

12   any decision whatsoever.  However, once we

13   came up with the verdict, we felt like it

14   was the right of the people, the

15   defendants, you know, their attorneys, the

16   prosecutors, the judge, for us to go ahead

17   and let them know what our decision was.

18   And so, you know, that really didn't

19   factor into our decision-making at all.

20        Q.   Your foreman had

21   said when questioning the five hundred

22   thousand dollar donation from Scrushy when

23   some fellow jurors doubted the evidence
```

14

 1   there, he pulled out a notebook where he

 2   had kept up with red e's for evidence.

 3   Can you tell me about that?

 4        A.    You know, everyone kept their

 5   own set of notes.  I kept -- you know, I

 6   have -- I have a few notes.  I am not much

 7   of a note taker.  But everyone kept up

 8   with their own set of evidence.  And so,

 9   you know, each of us had different reasons

10   for coming up with the, you know, ultimate

11   decision that we came up with.  Especially

12   in the counts where we found Don Siegelman

13   guilty and found Richard Scrushy guilty,

14   the evidence was overwhelming that -- as

15   it pertained to the law that they were

16   guilty on those counts.

17           And so I think a lot of people

18   had, you know, based on the notes that

19   they took, based on the evidence that was

20   entered in, based on our remembrances of

21   the testimony and all of those things,

22   there was no doubt that they were guilty

23   on those charges.

15

1      Q.    Any evidence stand out more

2    than other, more -- stick out more in your

3    mind, a particular witness?

4      A.    You know, we tried to look at

5    -- I tried, I can't speak for anybody else

6    on the jury, I tried to look at the

7    totality of the evidence.  And so I tried

8    not to make my decision just based on

9    okay, well, Nick Bailey came in here and

10   said this, and so I believe him or I don't

11   believe him.  It was more well, Nick

12   Bailey said this and Mike Martin from

13   HealthSouth came in and said this and Lori

14   Skelton came in and said this.  And so you

15   look at all of it.  We have these

16   different bank records that were entered

17   into evidence.  And so you try to look at

18   the whole picture and not base all of it

19   on just one particular person or one

20   particular piece of evidence.  You put all

21   of it together to look at all of it as it

22   relates to the charges.

23     Q.    An attorney, a particular

16

1    attorney stick out in your mind, did they

2    influence you in any way?

3         A.    You know, not really.  We were

4    very -- I was very impressed by all of the

5    attorneys.  You know, you kind of expect

6    after -- you know, it's like well, this is

7    the former governor of Alabama, you know,

8    and Richard Scrushy, you expect them to

9    have good attorneys.  And they were good

10   attorneys.  We were very impressed by --

11   you know, by the attorneys.  And the

12   prosecutors were good attorneys as well.

13   And so all of them, you know, were --

14   seems like they were very much committed

15   to their jobs and, you know, very capable

16   at doing what they did.

17        Q.    How did you feel after the

18   verdict?

19        A.    I was thrilled.  I was very

20   happy that -- I was happy that we came up

21   with a verdict after the length of the

22   discussions, the length of the trial,

23   especially after watching the news reports

17

```
1    after it was done and hearing all the

2    speculation that had gone on while we

3    were, you know, deliberating.  I was very

4    happy that we, you know, came up with --

5    came up with a verdict and came up with

6    what I feel was the right verdict.

7         Q.   So you're still confident in

8    the verdict?

9         A.   I am very confident in the

10   verdict.

11        Q.   While the verdict was being

12   read, did you look at the defendant?

13        A.   I did, yeah.  I did.  I wanted

14   to see -- I mean, like I tried every day

15   to look at everybody in the courtroom and

16   see who was there and, you know, see how

17   they were responding to the witnesses and

18   to -- you know, the -- whatever was

19   happening.  And so, yeah, I wanted to see

20   what their reactions were to -- to the

21   verdicts.

22        Q.   What was that?

23        A.   They were very -- you know,
```

18

```
1    they really kept a very blank face.
2    Hamrick, Paul Hamrick, showed more
3    emotion, you know.  You could tell he was
4    very thankful to have been found not
5    guilty and -- and same with Mac Roberts.
6    Richard Scrushy and Don Siegelman didn't
7    show a lot of emotion.  And so, you know,
8    it's difficult to -- you know, it's
9    difficult to guess what they were thinking
10   during -- when the verdicts were being
11   read.
12        Q.    Was it tough with these two
13   powerful men, was that a tough job for
14   you?
15        A.    You know, I tried not to look
16   at it that way.  You know, I think all of
17   us -- it didn't come up in deliberations.
18   I can't speak for what other people --
19   what they would enter into their minds,
20   what they were thinking, but it didn't
21   come up in the discussions.  It could have
22   been the person next door and -- or it
23   could have been, you know, the person who
```

19

```
 1    comes in and fixes your house.  We were

 2    looking at the evidence and we were

 3    looking at the law.  And it didn't factor

 4    -- it didn't factor into my thinking at

 5    all whether this was the former governor

 6    of Alabama or this was the former CEO of a

 7    large corporation in Alabama.  It didn't

 8    matter.  It didn't matter if -- our

 9    feeling was was that if the evidence

10    showed they broke the law, they're guilty,

11    regardless of who they were.  And if the

12    evidence showed they did not break the

13    law, they were not guilty, regardless of

14    who they were.

15         Q.     But you found them guilty.  Is

16    it disappointing to you that this was the

17    governor at the time, now former governor?

18         A.     It is disappointing.  Any time

19    you -- any time -- you know, I vote.  It's

20    important to me.  I like the political

21    process.  And any time you elect somebody

22    into office, you elect them with the

23    expectation that they will be looking out
```

20

1    for the best interest of the state as a

2    whole and not looking out for the

3    interest -- their personal interest and

4    not looking out for the interests of their

5    friends or close acquaintances.  And so it

6    is disappointing to see that someone would

7    take an elected position and use it for

8    their own personal gain or misplace the

9    trust that the people put in them when

10   they elected them into that office.

11        Q.    What would you like to see

12   happen now?

13        A.    In terms of the defendants?

14   That's not up to me.  You know, I

15   really -- I like to keep with -- you know,

16   I'll probably follow the case very

17   closely.  But that's a decision for, you

18   know, the judge, that's something that

19   their attorneys and the prosecution -- I

20   really don't know how that whole process

21   works.  And so, you know, I really don't

22   have a specific opinion as to what I think

23   should or should not happen to them.  I

21

```
 1   feel that the political process or the

 2   process by which they were convicted is a

 3   good process.  And so the process by which

 4   their sentence will be determined will

 5   also be a good process.  And I will be

 6   satisfied with whatever happens.

 7        Q.   Scrushy was found guilty on

 8   all counts?

 9        A.   Right.  Oh, he was guilty.

10   Based on the evidence, there was no

11   question whether or not he was guilty as

12   it pertained to the law.

13        Q.   When you were back there

14   deliberating, was there one charge more

15   than others that took more time that you

16   were more unsure of?

17        A.   All of the charges took a

18   significant amount of time.  We looked at

19   each one individually.  We looked at each

20   defendant individually.  And so there

21   really wasn't one that just kind of like

22   stumped us all.  You know, we -- it was a

23   lot of evidence.  And the charges,
```

22

1   especially, you know, the RICO charges,

2   were very complicated.  We tried to be

3   very organized in going through --

4   after -- you know, after -- initially you

5   kind of sit down and you're just shell

6   shocked.  You sit there and you're just

7   like we have all this evidence, we have

8   the law, we have the indictment, and

9   you're just like where in the world do we

10  begin.  And so we found it very necessary

11  from the beginning to try to keep things

12  as organized as possible.

13          Q.    And the charges you came back

14  on with Siegelman, can you talk about

15  those a little bit and why some guilty,

16  why some not guilty?

17          A.    Again, it's, you know, looking

18  at the evidence, looking at the testimony,

19  looking at what was -- what was entered in

20  in terms of documents and everything.  The

21  charges that Siegelman was found guilty

22  of, there was no question -- it was beyond

23  a reasonable doubt that he was guilty of

23

1   those charges.  And the other ones, it

2   wasn't the same standard.

3        Q.    Is there one piece of evidence

4   that was more incriminating to you?

5        A.    You know, I don't know if I

6   could put my finger on -- on a particular

7   piece of evidence or a particular, you

8   know, person who came in and testified.  I

9   think the totality of the evidence spoke

10  very strongly towards Don Siegelman's

11  guilt on the charges that we found him

12  guilty on.

13       Q.    And what evidence, or lack

14  thereof, to let these other two guys who

15  are cleared on all charges?

16       A.    I think it's just -- the

17  totality of the evidence didn't paint as

18  clear of a picture as it did for the

19  charges related to Governor Siegelman and

20  then the charges related to Richard

21  Scrushy.

22       Q.    It seems you took your job

23  pretty serious?

24

1      A.     I did.  I did.

2      Q.     You couldn't watch any news.

3   You stuck to all that?

4      A.     I did.  I saw one Iter -- I

5   did see one Internet article.  So I'll

6   confess.

7      Q.     By accident?

8      A.     It was -- it was -- yes, it

9   was almost by accident.  It was -- after I

10  saw the headline, I was oh, I wonder what

11  that says.  But I really did try very

12  hard.  I really wanted to not base my

13  decision on anything other than what was

14  entered in court.  And so I wanted to make

15  sure that there was -- I wanted to make

16  sure that when the verdict was reached at

17  the end, that I had confidence that the

18  verdict had been reached based on the

19  evidence entered in and the law and by no

20  other consideration.  So it was important

21  to me not to let any other consideration

22  come into my decision-making.

23      Q.     Early on there was some

25

1    bickering between attorneys.  Did that

2    play into your -- I mean, how did you feel

3    about that?  Some people said they were

4    acting like children.

5        A.    That is a big question.  You

6    know, a lot of people -- you know, it's a

7    formal proceeding, and it's an important

8    matter.  Any trial is important.  And so

9    you kind of expect a certain level of

10   decorum to be maintained by all the

11   parties involved, yet it did kind of break

12   up the monotony a little bit.  And so, you

13   know, it's not that it was a laughing

14   matter, but at the same time, you know, it

15   was -- it was my first trial, you know, as

16   a juror ever.

17       Q.    Was it disappointing to see

18   them behave that way?  It was interesting?

19       A.    It was interesting.  It was

20   interesting.  It was -- you know, it was

21   obvious that it was passionate to both

22   sides.  I was not one of the people who --

23   you know, I have heard speculation that,

26

1   you know, people that it was too personal
2   to the attorneys.  I didn't feel that way.
3   I don't feel like it was personal to the
4   attorneys.  I felt like they look their
5   job seriously, and I feel like anybody
6   takes -- I take my job seriously.  And so
7   I am passionate about my job, but not more
8   than I think I ought to be.  And so I
9   was -- it didn't make me look negatively
10  really on either side.  It didn't really
11  -- it didn't enter my decision-making
12  process.
13      Q.    You didn't get to watch the
14  news, so you didn't --
15      A.    No, I didn't.
16      Q.    -- see Siegelman's comments
17  every day that he was always saying this
18  was politically motivated.  Did you feel
19  that way?
20      A.    I did not.  I did not feel
21  that way.  I didn't feel like -- I didn't
22  feel that way.  I didn't feel like any of
23  the -- that didn't enter into our

27

1   deliberations, you know, in terms of -- I

2   don't attribute bad motives to the

3   government for bringing the case.  I don't

4   attribute bad motives to the defense

5   attorneys for, you know, defending who

6   they did.  I think they were doing their

7   jobs.  And so I did not go into it with

8   the expectation that it was politically

9   motivated.  I don't think that it was.

10          Q.   Has this changed you in any

11   way, this trial?

12          A.   I don't think you can walk

13   away from any nine-week experience without

14   being changed to a certain amount.  It was

15   a very interesting experience.  I enjoyed

16   it.  I didn't -- you know, like the first

17   couple of weeks were difficult for me to

18   adjust to.  But by the end, I really did

19   enjoy the experience.  It was very

20   stimulating, you know, intellectually, and

21   I -- you know, I made some great friends

22   off of -- I really feel like all of the

23   other seventeen jurors, I am friends with

28

1   every single one of them.  And so I

2   enjoyed that aspect of it.

3         Q.    You will keep in touch with

4   them?

5         A.    I will.  I will keep in touch

6   with them.  I think all of us are planning

7   on keeping in touch with each other.

8         Q.    The RICO statute was a big

9   focus on this.  Why the not guilty on

10  that?

11        A.    It's complicated.  It's a very

12  complicated case.  That's not the only

13  reason why.  You know, the evidence did

14  not clearly show the guilt beyond the

15  standard of reasonable doubt.  That's the

16  only reason I can give you why those two

17  charges were found not guilty in relation

18  to Governor Siegelman and in relation to

19  Paul Hamrick.

20        Q.    Anything you can think of I

21  did not ask you?

22        A.    You know, I don't know what

23  all else you --

29

1    Q.    Did you feel like some of the

2    jurors were tired?  I mean, you didn't see

3    that note, but reporters heard, you know,

4    what the foreman said.

5    A.    We were -- we were all tired,

6    but we were all committed to coming up

7    with a verdict.

8    Q.    What do you think he meant by

9    that, that word?

10    A.    You know, I -- like I said, I

11    haven't seen the notes.  You know, I'm

12    supposing that's a direct quote from the

13    note.  But not having seen it, I really,

14    you know, feel hesitant to comment at all

15    on what he meant or may not have meant by

16    that, not seeing what context it was

17    written in or any of that, I really don't

18    know.  But I can say that based on the

19    discussions that we had when the judge

20    gave us the option to go home and based on

21    the discussions that ensued from that, we

22    were all committed to coming up with a

23    verdict and coming up with the correct

30

```
 1   verdict.

 2       Q.    Ever any heated debates?  I

 3   don't want to say arguments, but --

 4       A.    Our discussions were lively.

 5   I mean, they weren't -- they were not --

 6   they were -- they were very lively, but

 7   they weren't personal.  That's -- you

 8   know, to me you can have a very, you know,

 9   engaging discussion on the issues, but it

10   wasn't a personal discussion.  And when

11   the door opened and the deliberations

12   ceased, we just went back to being

13   friends.  And so even though you may have

14   come from very different points of view

15   and have very different opinions, you

16   know, the commitment is to the evidence

17   and to the law, and it takes a long time

18   to figure out exactly what the evidence is

19   and exactly what the law is, especially

20   after that many weeks of testimony, just

21   trying to remember like, oh, yeah, we did

22   have somebody come in and testify on that,

23   didn't we, you know.  And so just
```

31

1    remembering all of that stuff, it takes a

2    fair amount of time and -- and we worked

3    really hard to make sure that our

4    decision-making -- and in the end, that's

5    what we decided, we wanted to come up with

6    a verdict that was only based on two

7    things, and that was the evidence and the

8    law.  And I really feel like we did that.

9         Q.    Were there jurors or one or

10   two jurors that felt strongly one way and

11   then turned and went completely the other

12   way after they went through all the

13   evidence?

14        A.    All of us felt very strongly.

15   All of us felt very strongly.  I think,

16   thought, all of us did not want to base

17   our decision, our ultimate decision, on

18   personal opinion.  It has nothing to do

19   with your personal opinion.  It has only

20   to do with what was entered into as

21   evidence and what does the law say about

22   that.  And we tried very hard.  And I feel

23   like in the end, the verdict that we came

32

1    to, we came to that because of our

2    commitment to following our instructions

3    and doing what we were supposed to do.

4        Q.    Do you feel all the jurors are

5    comfortable with the verdict now?

6        A.    Yeah, I really do.  I feel

7    very comfortable with the verdict.  You

8    know, just -- you know, you go out.  You

9    know, we went out to dinner afterwards,

10   you know, we went to Sinclair's and went

11   to Bud's afterwards, and we had said that

12   from the beginning that we were going to

13   do that, and we were happy to do that.

14   And, you know, of course, you do just sit

15   there and discuss, you know, like okay,

16   well, now that it's been, you know, like,

17   oh, what, three hours, how do you feel,

18   you know.  And we all I think are very

19   confident with the verdict.

20           And I think that one of the

21   reasons why we came up with the verdict,

22   and one of the reasons why I am so

23   confident about the verdict that we came

33

```
 1   up with is because as a group, as the
 2   twelve of us that ultimately were the
 3   deliberating twelve, we were very -- we
 4   were very committed to the truth and we
 5   started off every day by holding hands and
 6   asking God to give us wisdom to come up
 7   with the right decision.  And I think as a
 8   group our willingness to humble ourselves
 9   and ask God for his wisdom on these issues
10   led us to make the right decision.  I am
11   very confident that we made the right
12   decision on all of the issues that we --
13   that we discussed and decided.
14        Q.   Anything else?
15        A.   I don't have anything else.  I
16   don't know if you have any other
17   questions.
18        Q.   If you think of anything --
19        A.   I'm like why don't you come
20   and watch, you know, it's just like --
21   especially until deliberations start, you
22   know, we know less than what everybody
23   else --
```

34

```
 1        Q.    Did anyone try to discuss it

 2   with you, didn't know you were on the

 3   jury?

 4        A.    You know, every -- you can't

 5   help it, people know you're on the jury.

 6   You know, you can't disappear for nine

 7   weeks without people knowing that you're

 8   on -- I would love to discuss it with you.

 9   When this is over, we'll go get a bite to

10   eat or something like that, but until

11   then, I can't, you know.

12

13           END OF TRANSCRIPTION OF

14             VIDEOTAPED INTERVIEW

15

16

17

18

19

20

21

22

23
```

35

```
1                C E R T I F I C A T E
2
3
4    STATE OF ALABAMA)
5    JEFFERSON COUNTY)
6
7             I hereby certify that the
8    above and foregoing transcription of
9    attached DVD was reduced to typewriting
10   under my supervision, and that the
11   foregoing represents a true and correct
12   transcript to the best of my hearing and
13   understanding of said attached DVD.
14             I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action, nor am I in anywise
17   interested in the result of said cause.
18
19
20
21
22
23        COMMISSIONER - NOTARY PUBLIC
```