United States v. Richard M. Scrushy
2:05cr119-F

# EXHIBIT 22-A

# Courtroom Chronicles

## Join WSFA.com as we blog the government corruption trial of former Governor Don Siegelman and three other defendants.

« April 2006 | Main | June 2006 »

### Wednesday Afternoon Testimony

Mr. Paul Bowlin, the bureau chief of the Right of Way Bureau, is on the stand and being questioned by Mr. Franklin.

Bowlin has been with the DOT since 1960.  Bowlin says he first heard of Rainline in the mid-90s.  Bowlin was Highway Director in 2001 and he elected to stop using Rainline.  He said he had been in office a few months.

Bowlin says DOT had been looking at the cost and benefits of the product.  Bowlin says he doesn't remember anyone talking about Rainline not being a good product, it was always about the cost.

Bowlin says he received numerous complaints from asphalt pavers about the product.  Bowlin says he instructed his senior staff not to put Rainline in any more contracts.

Bowlin says he reconsidered the Rainline decision.  Bowlin says he doesn't remember exactly when a meeting with the governor happened, but at the end of the meeting the governor met with him briefly and the governor suggested that rather than taking the product out of the program altogether some guidelines should be established for the use of product.  Mr. Bowlin is paraphrasing the governor's comments.

Bowlin says when Roberts was still highway director there were comparisons made with other states about the costs of Rainline, the DOT commissioned the University of Alabama study about Rainline, and there was a committee set up.

Bowlin agrees when the actual funding for the research began, he was the one who signed the authorization.

Bowlin agrees when he became director Rainline was in wide use.  Bowlin says he and Roberts had no conversations shortly before Roberts retired about Rainline.

Bowlin says he was talking about the entire senior staff when he talked about conversations with Rainline.

Bowlin is asked if there was a product evaluation board and he says there was.  Mr. Franklin asks for a moment.

Bowlin is asked what position Vaughn had when Bowlin was director.  Bowlin says Vaughn was the assistant director.  Bowlin indicates Ray Bass was the chief engineer.

Bowlin says he does not recall that he talked to Bass about the decision to stop using Rainline.

Bowlin says after he talked to the governor he may have talked to Bass about the reinstatement of Rainline but he does not remember an exchange about Rainline.

Bowlin says he left the director's position in 2003 and went back to being bureau chief of the Right of Way Bureau.  Bowlin says he had not received a finished report in writing from the University of Alabama before he left office.  He says he did get a preliminary report.

Bowlin says the report factored in to his decision to stop using Rainline.

Bowlin says he has known Mack Roberts since the summer of fall of 1963.  Bowlin says they took scuba lessons together so they could inspect the footings of bridges themselves instead of hiring contractors.  Bowlin says he has always found it to be the case Roberts brings projects in on time and under budget.  Bowlin agrees Roberts is a good person who would not do anything to hurt the public interest.

The judge has a brief meeting and there will be a recess at this point for 15-20 minutes.

Mr. Franklin questions Mr. Bowlin.  Franklin is asking about Bowlin's stopping to use Rainline.  Bowlin agrees he stopped using the product because he thought it was the right thing to do.  Bowlin agrees there was no one else in the room when he met briefly with the governor.  Bowlin says he does not remember details about the meeting except the meeting was very brief.  Bowlin says he does not believe he told Siegleman Rainline was too expensive or had not been through the product evaluation process.

Bowlin recognizes the document but he says he can't honestly say he remembers it.  Bowlin says it is a document from Mr. Brown where Brown asked and Bowlin approved the continuation of the study of Rainline.

Bowlin says he does not know why the study was not funded prior to July 2001.  Mr. Franklin is wondering why Mr. Roberts did not get the funding for the study earlier when Rainline had been in use for at least 2.5 years when the study was started.

Mr. Franklin asks if the study should have been done before the state started laying down Rainline on

state roads.

Mr. Bowlin says he assumes since the product had been in use since the 1990s it had already been studied and tested.

Mr. Bowlin agrees he started using Rainline again after his meeting with Siegelman which Mr. Franklin earlier characterized as Bowlin being pulled into a private room.

Bowlin says Siegelman "did not" tell him to turn Rainline back on because Seigelman needed to get some more money from the Marcatos for the election.

Mr. Kilborn will question Bowlin. Mr. Bowlin says he did not perceive anything sneaky going on when Siegelman talked to him in private. Bowlin says he took it that the DOT should go back to using Rainline but that Bowlin should come up with some guidelines for its use. Bowlin agrees the meeting lasted about one minute.

The next witness is Steven D. Arnberg. Arnberg is 48 years old. He was born in Kansas and now lives in Montgomery. He has been in real estate since 1981. Arnberg says he came to know Jim Allen in the course of business. He says he knew Allen in the real estate development business. Arnberg says his financial dealing with Allen about June of 1997. They worked out of an office at Emerald Mountain.

Arnberg says he knew Mack Roberts because Roberts was working for Allen when Arnberg went into business with Allen. Arnberg says he saw Roberts in the office frequently. Arnberg says when he was introduced to Roberts he was told Roberts developed toll roads and bridges for Allen.

Arnberg says in 1998 he became aware Roberts was going to stop working for Mr. Allen. Arnberg says he helped Roberts sell his personal real estate and residence off Dalraida Road and buy a new residence.

Arnberg says Allen told him Roberts wanted to move to Emerald Mountain. Arnberg says he went to look at Roberts' house and told Allen he thought the house was worth between $95-100,000.

Arnberg says the house at Emerald Mountain was on the market for $191,000.

Arnberg says the anticipated lender told him that they could not make the loan for the house to Roberts. Arnberg told Allen this.

Arnberg had a meeting with Allen. Arnberg says Allen was on the phone, Arnberg left the room while Allen talked to the lender and when he came back in the loan was going to be approved. The final price on the house was $175,000.

Allen had agreed to buy Roberts' house for $98,000 and then someone else made an offer on the

Dailraida house for $93,000.  A lady ended up purchasing the house from Jim Allen.  Roberts put down $35,000 on the house in Emerald Mountain in December 1998 according to Arnberg.

Arnberg says he was not aware that Allen had paid Roberts a bonues of $71,000.

Arnberg says Roberts stopped working for Allen some time after the house was purchased.  Arnberg says he worked with Roberts on the purchase of another home in 2003.

After another sidebar, Mr. Franklin continues the questioning.  Arnberg is asked if Roberts drove a company car.  Arnberg says he doesn't think it was a company car but just a car owned by Mr. Allen.

Arnberg says Allen lost $5,000 on the Dalraida house.  Arnberg says there were no fees on the Emerald Mountain house, which normally would have been about $9,000 in real estate commission.  Arnberg says it is fair to say Roberts benefited by $16,000 on the reduced price of the house in Emerald Mountain.

Arnberg says he believes the second closing of the Dalraida house was in January of 1999 or December of 1998.  Arnberg says the real estate fee was not charged in this case either.

Arnberg says it was always understood Allen was going to buy the house in Dalraida so Roberts could get the house in Emerald Mountain.  The negotiations were between Roberts and Allen.  Arnberg says he only handled the paperwork.

Mr. McKnight will again question the witness.

The judge tells the lawyers it's not true that the court can't afford more than one wireless mic, but that the system can only handle one frequencey.

Arnberg is asked to look at a closing statement for the house on the Emerald Mountain property that was sold for $175,000.  There were loans against the property for $125,000.  The house was completed in the summer of 1997 according to Arnberg.  Arnberg says he knew Roberts had been looking into getting into the development for a while, but Arnberg did not know exactly how long.

Arnberg is asked to look at two documents.  Arnberg says he has not seen one of the documents before today.  As to the other, Arnberg says he is familiar with the form but he doesn't recognize this specific form.

Arnberg says the form looks like a deposit form for the Emerald Mountain golf course.  He says it may have been for a lot on the golf course on which someone could build a house.  Arnberg says in 1997 Roberts appeared to be out there looking.  Arnberg says there was no deposit put down.

Arnberg says he doesn't recall 100 percent that Roberts was putting his house up for sale around the

same time.

Arnberg agrees the Emerald Mountain house was on the market a while when Allen bought it.

One of the documents is the closing statement is for the house Allen purchased from Roberts in Dalraida.

McKnight says Roberts lived in Dalraida for 17 years, Mr. Allen buys the property for $98,000 and sells it for $93,000.

Arnberg says Allen bought the house in Dalraida, Roberts bought the house in Emerald Mountain and then Mrs. Teague bought the Dalraida house for $93,000.

Arnberg says he knew Roberts had children in college. Arnberg says he was not aware of the medical bills for Mrs. Roberts due to two life threatening surgeries.

Arnberg says it was hard to get into chit-chat at the office.

Arnberg says he was not aware that if Roberts completed four bridges, Roberts was entitled to a $1 million.

Arnberg says Roberts was a very good employee. Arnberg says he didn't work with Roberts but he knew Roberts was a "valueable person."

Arnberg says Mr. Roberts sold a house for $4,000 more than the market would bear. He perchased a house for $16,000 less than it was appraised for.

Arnberg says he can not say the Allen profited from the deal.

Arnberg says Roberts house was average size, price, and condition. Arnberg says Roberts sold an old house for a new house in a new subdivision no one had ever lived in. Arnberg says at the time there was not a golf course at Emerald Mountain. Arnberg says it was a four bedroom vs a three bedroom house.

Arnberg says its a pretty good deal when you don't have to put a house on the market but still get it sold. Arnberg says most everyone wants to own a house. Arnberg says the Dalraida house was put on the market for $103,000 that was eventually sold for $93,000. Arnberg says it was Allen's decision to sell at the lower price. McKnight asks Arnberg if larger houses come with larger payments and Arnberg says they do.

The next witness will be Mac Marcato. There is a motion from Kilborn to be argued before the witness can come in. The judge is going to let the jury leave while the motion is argued.

Posted by Helen Hammons on May 31, 2006 at 01:10 PM | Permalink | Comments (0)

# Rainline and More

Transportation Director McInnes will still be on the stand as things get started around 8:30 a.m. today.

Mr. Kilborn is questioning Mr. McInnes.  McInnes is being asked about a letter of July 25, 2003 and the Product Evaluation Board and something called the Product Advisory Committee allegedly formed by the Riley administration.

Mr. Kilborn shows a letter dated November 5, 2003 to McInnes.  The letter is from a Mr. Harper, assistant chief engineer, to a program director at the University of Alabama.

McInnes agrees the letter refers to a product advisory committee which authorized expenditure of continuing the study on profile pavement marking at the University of Alabama.  The cost over $134,000.

Mcinnes says prior to seeing the letter, he had no recollection of the specific committee.

McInnes is asked if he knew anything about a general agreement on July 7, 2003.  McInnes says he does not remember.

McInnes says hundreds of doucments cross his desk daily and he cannot remember them all.

McInness agrees if he approves something, Governor Riley goes along with it.

McInnes is asked if three weeks prior to the letter there was an agreement to continue the study of Rainline.  McInnes is asked if he shouldn't have waited until the study was finished to make a decision.

McInnes says the information they had that Rainline had no inherent safety factors over thermo-plastic led them to stop the use of Rainline.

McInnes says he did not review Rainline documentation before coming to trial.  McInness agrees Mr. Wilkerson formerly of the Federal Highway Administration was now retired.

Mcinnes says Gov. Riley did not know specifically about the committee.  Mr. McInnes says he has not talked to Gordon Brown from the Federal Highway Administration about the study.

McInnes says if the research study showed different results from before he would take that information into consideration as it concerns Rainline, but McInnes says that is only part of any consideration.

McInnes agrees since he was called to testify at the last minute he didn't have much time to prepare for his testimony.

McInnes says he did not check the status of the study last night.  McInnes says he does not know if Gov. Riley knows he's testifying.  This brings a strong "Mr. Kilborn" from the judge.

Mr. Franklin is now questioning Mr. McInnes.  McInnes agrees the University of Alabama is still studying Rainline.  McInnes says he has no information from the University of Alabama about the study which would now lead him to change his mind.

Mr. Franklin asks McInness about $71,000 which draws an objection which is sustained.  The $71,000 is in reference to the severance given to Mack Roberts by Jim Allen.

McInnes says he did read the letter prior to his testimony and he remembered what had happened.  McInnes agrees the governmnet did not ask him to review other documents prior to coming to court.

Mcinnes says Mr. Marcato and his daughter came to him on two or three occasions to make their case for Rainline to be used again by the state.

Mcinnes says at the time of the Marcato meeting he knew Marcato had the patent for Rainline.

McInnes is asked if he knew Crum Foshee had lobbied for the product Rainline and had been paid $800,000 for his efforts.  The judge rules the question outside the scope and Mr. Franklin decides he has no more questions.

We have been hit with technical problems.  Mr. Derickson a sports car driver and a former research engineer with the Department of Transportation is on the stand.

Derickson says he became familiar with Rainline in the early 1990s.  He says the product was tested and there were problems with durability of the product and that the product did not stay put when the pavement went through its normal heat cycle.

He has been talking about the similarities between Rainline and normal thermo-plastic.  He says there are glass beads in both Rainline and normal thermo-plastic.  Derickson agrees Rainline and products like it cost more than regular thermo-plastic.

Derickson is been asked about a document that appears to be a summary of a board meeting.  Derickson says the document has his name spelled wrong.  The date is January 2, 1996.  He says a statement on the document is not a statement he made.

He says he saw Rainline in demonstration mode and then in field testing where the product was having problems with durability and the DOT notified the makers of the product of the problem and as of

January 2, 1996 the problem had not been fixed.

Derickson says the document as to his alleged statements are "fabricated."

The witness says a test was set up in which they wanted four different manufacturers' products to be used in a performance evaluation at the test deck south of Montgomery on U.S. 231. The witness says the section to be put down would have been a one mile or one kilometer section for each one of the manufacturer's materials to be placed.

One of the manufacturers moved back to Europe, Spot Flex. There were three products left to be evaluated. One manufacturer could not get more than a quarter mile of their product down due to technical dificulties. The Aqua Light product was put down successfully on its entire mile of road. The Rainline people, according to Derickson, did not participate. He says he dealt directly with Mac Marcato. Rainline did not come and put down their product on the test deck.

Mr. Derickson wants to talk about what Marcato told him and the judge explains to him why that is not allowed.

Derickson left DOT in 2002 and he says at that time Rainline did not place or have much interest in doing any product type testing or evaluation.

Derickson says he did question why Rainline was used in contract work when the product had not been through a full evaluation. Derickson says "definitely not" when asked if he got a sound answer as to why Rainline was being used.

Derickson says the DOT deals with federal and state routes. Derickson says more than two-thirds of those roads will meet the average daily traffic count in a memo of 3,000 per day.

Derickson says the high performance products were to be used on roads with no lighting, rural areas, and curved road areas to enhance safety.

Derickson says Rainline was not put down with a focus on safety. He says the placement was based on traffic volume.

Mr. McKnight will now question the witness.

Derickson says initially he was intrigued by Rainline. He says the product did enhance visibility when it was raining and at night than othe products. He says however there were durability issues.

Derickson is asked to look at the document from January 2, 1996 meeting of the Product Evaluation Board. He says he remembers the issue coming before the board on multiple occasions.

This is the document that quotes Derickson as saying the product was "fully tested and approved."

He says he "knows for a fact he didn't say it." Derickson says he had no idea where the document formulated from. He says he reviewed the document and says it was not a product of the board and it was not composed by him. He says this is what he told the government.

On August 5, 2005 Derickson made a statement to a DOT special agent.

Derickson says DOT wanted to have more than one manufacturer for products available for contracts. He says DOT never wanted a sole source.

The witness agrees he had concerns about the durability of Rainline. Derickson agrees he did not state those concerns to Mack Roberts or Ray Bass. Bass was the chief engineer. Derickson says it was not normal standard practice but he took his information to the Product Evaluation Board.

Derickson says Roberts and Bass were not in his normal line of contact. He again says the information was brought to the board and the board wanted to see more testing after changes were made to the product.

Derickson agrees he wanted a higher job. He agrees he filed a complaint against DOT. Mr.McKnight asks Derickson about Mr.Roberts appointing an African-American to the position Derickson wanted. Derickson says that was not the basis of the complaint.

We're back from recess and Mr. Mcknight is still questioning the witness.

The witness identifies the document as an organizational chart.

Mr. Derickson is asked to tap the screen to show where his name is on the chart. He is listed in the Research and Development Bureau and his boss was a Mr. Brown, who was brought in to the bureau chief position.

Derickson agrees there were two assistant chief engineer's over Mr. Brown and then above them chief engineer Ray Bass.

The judge asks to see a document. McKnight says the document was procured by subpoena from DOT. The judge wants to have a brief sidebar.

Derickson says the document's first two pages show how the document was obtained.

The document itself is a grievance filed October 25, 1999 by Derickson. Derickson says he does not recollect the exact date without checking his records.

There is a complaint form that shows Derickson's job ttiles as assistant research and development engineer. Derickson claimed discrimination based on race. Derickson says his lawyer's told him that was the only category available to him based on the nature of the grievance.

Derickson says the information is correct and he agrees he signed it. Derickson says his signature shows he was in agreement with the form of the document.

Derickson agrees race was the discriminatory action taken. Derickson says it is probably true that Mack Roberts appointed Mr. Brown to the position above him.

Derickson said at the time Roberts and Ron Green had information on the complaint. Derickson says it had to do with the EEO material and it was a recommendation from counsel. Derickson says it had nothing to do with Green being an African-American.

Mr. McKnight says "Let's get to that detail."

Derickson agrees he wrote on the form his qualifications. Derickson says Mr. Brown had no background in research and was hand-picked.

"We might as well show everybody everything," says Derickson. Mr. Derickson reads from the document. In the document he states his qualifications over Brown. Derickson alleges in the document he was "secretly hand-picked." Derickson also says in the document he and other none black candidates were not considered. He alleges this was in part this was due to the lawsuit against the Department of Transportation and as a result the department wanted to have blacks in high positions.

Derickson says Brown was brought in under the auspices of the lawsuit. Derickson says Brown was "leapfrogged" over everybody. People with a lot more qualifications and experience.

McKnight says the document doesn't state anything about eligible black candidates. McKnight tells Derickson, "I'm sorry my question was so difficult."

Derickson is asked if he were the spokesman for the white employees of the Department of Transportation.

Derickson says the litigants who brought the lawsuit against the department wanted blacks put in higher positions.

The judge asks Mr. McKnight to move on.

Derickson agrees the document says his complaint was not upheld.

Derickson says Mr. Roberts was informed of some things and other things that employees did were not brought to Roberts as a normal course of events.

Derickson is asked why he told Wilkerson about his conclusions on Rainline and not Roberts or Bass. Derickson says that is "totally incorrect, my man." Derickson says again the conclusions were brought to the board. He says he doesn't know where McKnight got the information about Derickson going straight to Wilkerson but that information is incorrect according to Derickson.

Mr. Derickson is discussing something with the judge. June 23, 2005 is the date of a document Mr. Derickson is being asked about. It involves a meeting again with a DOT special agent.

Derickson is questioning Mr. McKnight and tells McKnight the counsel is "hard to predict."

Derickson is ready after reading part of the document. The judge asks Derickson if the document refreshes his recollection. Derickson denies he made the statement saying he did not tell Mr. Roberts or Mr. Bass because they were the ultimate decision making authority. Derickson says the investigator put that down based on the explanation he gave but that that was not exactly how Derickson put it.

Derickson says he did not contact Wilkerson, Wilkerson contacted him about Rainline problems. Derickson says Wilkerson asks how Rainline came to be accepted to be used.

Derickson says, "He's badgering me." This is in reference to the question from McKnight about Derickson not having a discussion with Bass or Roberts. Derickson says it would not have done that way. Derickson agrees he did not discuss thing with Mr. Roberts.

Mr. Kilborn is asking questions and Derickson agrees he was skipped over for promotion in July 1999.

As to the June 23, 2005 interview, Kilborn asks about the test deck. Derickson says he believes it was probably in the summer of 1999 the test deck was set up. Derickson says he is not sure if it was July when the tests were done.

Derickson says approximately 8-12 people set on the Product Evaluation Board. He said particular directors had interest on who was on the board and at other times they didn't. Derickson says without access to his records he can't say specifically how many board members there were in July 1999.

Derickson says "zero" board members were at the test deck with him because "that was not the board members' job."

Derickson says there were initally four high performance products to be tested.

Derickson says Viberline had problems of machinary and only got a quarter mile done. The company went home and Derickson says they did not bring anything back up to them.

Derickson says 3M was not in the work plan. He says 3M came to him with a wet weather marking system and they wanted to put down a demo strip, which Derickson says is different than a test strip. Derickson says it was not being evaluated for approval. Derickson says 3M came in after the fact. 3M was not considered to be a test section according to Derickson.

Spot Flex, according to Derickson, went back to Europe. Derickson says Aqua Light was evaluated.

Derickson says it was a sad situation after all the effort was put into the test deck.

Derickson says he can't say if the test deck was in operation before Mr. Brown "was annointed" to that position, the position above Derickson.

A March 15, 2001 document talks relates to another panel. Derickson says he was not in contact with this panel. Derickson agrees Wilkerson was from the Federal Highway Administration. Derickson says Mr. Bass was the chief engineer at the time of the document. Derickson says Harper was also above him. He is asked about a Mr. Lorentson, who was a burea chief in another area, Larry Lockett, a materials and test engineer, and Wes Elrod.

Derickson agrees he was not on the panel. He says he was not told about it. Derickson is asked to read the recommendation of the panel. The recommendation basically approves the continued use of Rainline and asks for continued testing.

Derickson agrees Wilkerson was on the committee. He says Wilkerson raised questions about the widespread use of Rainline.

Kilborn says Derickson was unhappy and got left behind by the "blue-ribbon" panel. Derickson denies this and says, "It's not anywhere near the truth and people shouldn't listen to crap like that," says Derickson.

Kilborn brings up Michael Brown and FEMA and asks Derickson if people should be qualified for the positions they take.

"I don't know what Michael Brown did..You go off the hearsay on the news..," says Derickson. The judge tells Kilborn to move on.

Mr. Kilborn asks the judge if Kilborn can go to the charts and the judge agrees Mr. Kilborn can move to the chart.

Kilborn is talking about flat striping with Derickson. Derickson is describing the high performance standard and agrees it is perferable in bad weather.

Kilborn is drawing and discussing the drawing he did in kindergarten.

"If it had looked like the drawing we would have disqualified it," says Derickson.

"I don't want to get an engineering degree in this," says Kilborn.

Kilborn and Derickson discuss the way the water is channeled on the high profile stuff and the reflective property of the high performance stripe.

Derickson reiterates he graduated from the DOT in 2002.

Derickson says when Rainline was first brought up for evaluation the cost of Rainline was only 1.5 times that of the flat striping.

Derickson agrees high performance striping should be used in certain circumstances for safety, but it should not be widespread on normal road conditions.

Derickson says the flat striping has pavement markers that are used and that profile makes the striping stand out and be reflective.  Derickson says the pavement markers are required when using flat striping.

Derickson is asked about the document that the statements that he said Rainline "had been fully tested and approved" were not made by him.

Derickson says Kilborn is intermingling things and to the best of his knowledge the complaint about Mr. Brown contained the truth.

Mr. Feaga has the witness and is asking questions.  Feaga says Derickson seems to "have a strong desire" to talk more about the complaint, about not getting promoted.

Derickson says the line of Mr. Kilborn's questions were "totally unrelated subject matter and about defamation to character."

Derickson is asked if he was familiar with the case Reynolds vs the State of Alabama and he says he was very familiar with the case.

Derickson agrees the complaint was about discrimination in the DOT against black employees.  The judge says with a raised voice, "This is not an issue in this criminal case."

Derickson says supposedly the pattern of discrimination was previous to the 1993 determination.  Feaga says he thinks it is a fair question that about who was in charge of the Department of Transportation.

Derickson says Roberts was director of DOT twice that he knows of. Derickson says one time frame was 1999-2003 and he believes in the 1993 time frame Roberts had another stint as director. Derickson says he believes Roberts was a long time employee.

Derickson agrees Roberts held high positions in the DOT as well as Bass. Feaga asks Derickson who could have done something about discrimination and Derickson says the higher ups.

Derickson says neither Roberts nor Bass came to him as an engineer and asked him about Rainline.

Derickson says Don Vaughn told him after Derickson expressed concerns and complaints about why Rainline was being bought that "that was the direct order from the director and that's the way it is."

Derickson continues to say it wasn't in the normal routing of his job to go to the director.

Posted by Helen Hammons on May 31, 2006 at 08:06 AM | Permalink | Comments (0)

## Another Week Begins

Things are scheduled to get started this morning around 8:30 a.m.

Mr. Courson from the DOT is on the stand. He distributes money to counties from both federal and state funds for roads. Mr. Feaga continues the questioning. Feaga is asking again about why highway projects don't get built. Courson says there are "numerous" projects that people would like built to help alleviate traffic problems.

We're having problems hearing Mr. Feaga again when he steps away from the podium.

Mr. Courson agrees he remembers the letter asking Jim Allen to build a bridge. The witness agrees the building got built. Mr. Feaga is showing Courson the map. Mr. Feaga is asking about January 1999. Siegelman was governor, Roberts was highway director.

Mr. Feaga wants to know from Courson what roads near the bridge were in existence at the time. Folks this is hard to describe so bear with me. Feaga is pointing to a road near a high school. The road in question is from Highway 43 to the high school. Courson says the project started in early 1999. Courson says the school couldn't get traffic to it without the road.

Mr. Feaga asks about another road and Courson says the road to the school gets built first. In question now is the Black Warrior Parkway. Courson says the Black Warrior Parkway was built by then, January 1999, to the best of his knowledge.

Feaga asks Mr. Courson to look at some documents. The judge tells Mr. Baxley he can look at the

documents before things continue.

Mr. Courson says one document is to initiate the design for the road to the school from Highway 43. The witness is asked about a 2010 master plan. He says he didn't have anything to do with it, but knew the plan had been in existence for years.

Mr. Feaga goes back to the charts. Jeff Deen is saying Mr. Feaga has picked up his chart. "You going to use a whole lot of it...I don't mind if you use a little of it."

The judge reminds lawyers they should only mark on their own charts not on other charts.

Chart WARS continues. Mr. Feaga has now got some paper to write on and all's well with the world as we continue.

Mr. Feaga returns to questions about Western Blvd. The letter says May 24, 1999 is the date the high school road agreement was executed. It was authorized by Roberts. Courson says the road provides access to the school. Mr. Feaga calls it #18.

Courson says there is another road from the high school over to Highway 171 also executed on May 24, 1999. Mr. Feaga calls this project #20.

Courson says project #21 is from Highway 171 around to the parkway and Feaga adds "to Jim Allen's bridge."

Mr. Feaga asks why #21 had to be built. Courson says the road was to provide access all the way around and it benefited the people of Tuscaloosa County, Northport, and Jim Allen's bridge.

Courson says he was not aware that Allen's bridge was losing money in March 1999 as describe by Mr. Rawls in earlier testimony.

Courson is asked if Mack Roberts eventually recused himself from these matters. He says, "Yes." Courson looks at a letter from June 29, 1999 as Mr. Feaga continues to write on his charts.

This letter shows Roberts recusing himself from further dealings with the projects.

Courson says the total construction costs were around $42 million for the projects approved on May 24. The witness says it was paid for with 100 percent by state dollars.

Mr. Feaga now asks about matching state and federal funds. Mr. Courson says the projects did not meet the federal requirements for matching funds. Courson says there would have been a delay if they had used matching funds. There are things involved like environmental clearance and public hearings and

other things the use of state funds does not require.

Courson says if the federal funds had been available other roads could have been built of around $140 million.

Courson says project letters are sent out to the county for execution and then returned to the state.  The witness says the project can not go forward without the letters.  It looks like Mr. Feaga is introducing the letters as a basis for the charges against Mr. Roberts.  Courson agrees all the letters introduced were executed and returned to the state.  They are all dated after May 24, 1999.

Mr. Feaga asks what would have happened if the Mitlary Road had been started and then for whatever reason hadn't been finished.  Courson says it would have been a "waste of money."

The witness is asked to read the recusal letter.  The letter was written to Gov. Siegelman.  Mr. Feaga introduces four more letters from November 24, 1999.  The judge again reminds Mr. Feaga not to lead.

Mr. Feaga annotates his charts after asking the witness the dates of the documents.

Courson says the letters talk about the county opening bids and asks for the state concurrence and award to the low bidder.  Courson says he had to concur before the county could award the contract.  Courson says he concurred, but not immediately.

The witness says he was made aware that the right of way acquisition had not been completed by November 24, 1999.  Courson says you can't spend state funds on public right of way.  Courson says the right of way had not been fully acquired.  Courson says there was considerable right of way left to be acquired not a small bit.

Courson says he went to the front office to notify the assistant transportation director the day before Thanksgiving.  A call was placed to Roberts by the asst. transportation director on the Southern Link radio and Courson could hear.  He says Roberts said there was a permit and the project needed to keep going.  According to the witness this was November 24, 1999 after Roberts had earlier recused himself from the project.

Courson says he was told to get the letters ready and get them signed and back to the county to authorize them to proceed with the project.

Courson says he would normally dictate letters to a secretary but he typed these letters himself.  Courson says he was told a Corps of Engineers permit was about to expire for the project.  He says they would have reapplied or gotten an extension and it would have delayed the project two or three months probably.

The witness is asked again to identify some documents by Mr. Feaga.  Courson says they are all

construction portions for the project including utility approval and other things that needed to be approved before the project could go forward.

After getting some more exhibits in the questioning continues.

Mr. Feaga asks if the Alabama Department of Transportation engages in interstate commerce and the witness agrees it does.

Mr. Feaga is back to the May 24 projects, #18, #20, #21.  Feaga is asking Courson who executed and approved the projects.  Courson answers Mr. Roberts.  Courson agrees Gov. Siegelman also signed on May 21, 1999 and Courson says the document was mailed on May 24.

Courson is asked about $71,000 being mentioned in a document.  Courson says it is not mentioned.  This I believe has something to do with project #18, but I am not sure.

There is a note on the project #18 about avoiding a conflict of interest but the note does not appear on the others says Courson.

Judge asks attorneys to approach the bench.

We're back.  Burke-Kleinpeter was the consulting and engineering firm that did the work on the road to the bridge according to Mr. Feaga and Courson agrees they are a reputable firm.

Courson says the documents do not reflect Burke-Kleinpeter was the contractor on the project.  Mr. Feaga would like a break.  He will be talking to Mr. Baxley during the break.

There has been a stipulation agreed to between the U.S. and Mr. Roberts concerning the interchange being built by Burke-Kleinpeter.    More on this later.

Courson is being asked how engineering firms are selected.  Courson says the transportation director selects the consulting engineering firm.  He says a selection committee makes a recommendation to the director and then the director picks one if the projects is administered by the state.

In a county project the county would have selected the engineering firm.

Courson is asked if he has heard of Tuscaloosa Testing Laboratories (TTL).  Courson says they were a sub-contractor for Burke-Kleinpeter to do testing on the Mitlary Rd. extension.  Burke-Kleinpeter would have been hired by the county for this project.

Mr. Baxley now has the witness.

Mr. Baxley says Burke-Kleinpeter was hired for the interchange with Highway 59 and this was during the James administration.

Courson says based on his experience the project was good for the people of Tuscaloosa County.

Courson agrees the cost would have been more if the project had been funded under a federal-state split.

Mr. Baxley says there is not a road it is a corridor. Courson agrees it is not unusual for it to be moved from the original plan. Courson says the eastern part was a state project while the western part was a county project.

Mr. Baxley is now asking about documents signed by Roberts in May 1999. Courson agrees the documents are for the entire route. #18 is the road to the school, #20 is from the school to Alabama Highway 171, and #21. All these were signed by Roberts.

Mr. Baxley asks about the "stink" with Steve Windom having a problem with the project. Courson says he was not aware of that issue.

Mr. Baxley now turns to the charges in the indictment.

Mr. Courson is asked to look at some documents.

One document concerns a document mailed to the Tuscaloosa County on May 23. The cost of this project was over $10 million. Another project concerning bridges for more than $4 million was document in another document and also one mailed in September. This was all part of the same project and this part was for over $13 million.

Courson agrees the project was good for the people of the area. Courson says he signed the agreement, the legal counsel signed it, the assistant director of transportation signed it Mr. Bowlin, the governor, and the head of the county project. Mack Roberts' name is not on the document.

Courson is taken through the other two documents and their signature pages. Bowlin signed two documents as assistant transportation director and the last document as transportation director. Roberts had retired.

Courson agrees Mr. Bowlin would not have signed a fraudulent document nor would Courson have signed a fraudulent agreement.

Courson is asked to review his grand jury testimony. Courson says he approved construction to start on the project.

Courson agrees Mack Roberts is a "doer" who wants to get things done.  Courson disagrees he told the grand jury that he and Bowlin discussed the project and called Roberts and told him "we" wanted to proceed with the project.

Courson agrees he was told to proceed.

Courson says to his knowledge there was no fraud involved.  Courson agrees people had been calling for the particular project for years.

Courson says he has been in the county assistance division 32 years and head of it 17 years.  Baxley is asking if Mack Roberts did more to help the county roads programs more than any other director and Courson says, "Yes."

Courson agrees the documents Feaga showed him before the break would not contain the name of the engineering firm.

"If it had been a company called Mickey Mouse and Donald Duck called the Mouse and Duck Company it would not have been in there would it?" asks Baxley.  Mr. Courson answers, "No"

Mr. Kilborn is up.

Mr. Courson is asked about a 2010 plan developed by the county and submitted to the state.  Courson agrees the county was looking into the future to plan where the traffic will be.  Courson agrees it is difficult to do and come up with a suggested corridor.

Courson agrees the plan is the general vicinity for the road and sometimes the plans are done away with in their entirety.

Courson agrees the work on the plan would have started in the 1980s.  Courson says the county and city engineers and planners sit on the board to develop the plan.  Courson says the Federal Highway Administration and the state usually look over the plan because a lot of times combined state and federal funds are used.

Courson agrees this project to the west of Tuscaloosa was a county project.  Courson agrees Tuscaloosa County felt the state owed them some money because the county had spent money on the Mercedes plant.

Courson says when he signed the agreement he was recommending the approval of the agreement.  Courson agrees he would not have recommended the project for approval if he thought something was wrong.

Courson says he started with the highway department right out of high school.  Courson agrees he has

not wasted money.

Courson says it was a legal project.

Courson is shown another document with a Tuscaloosa County resolution attached.  Courson says the county has to adopt a resolution into their minutes approving the agreement.  The date was September 9, 1998.  This was during the James administration.  Courson agrees for the high school road Tuscaloosa County was making resolutions during the James administration.

Another document with a revision to 9/9/98 resolution adds to the original resolution and Courson agrees it extends the road further from the school all the way to to U.S. Highway 82.

Courson says his best guess is March for the updated resolution.  Courson says this resolution gave the chairman the ability to enter into other agreements.

Courson agrees there was only a small distance left to cover to the toll bridge.  Courson agrees some school buses could not cross some of the bridges because the bridges were too old.

Courson says he has no evidence Siegelman's signature was not in the best interest of the people of the state of Alabama.

Mr. Feaga is back questioning the witness and the judge again asks Mr. Feaga not to lead.  Mr. Feaga says Mr. Baxley brought up federal matching funds.

Courson says he is not aware of any other county project being paid for entirely with state funds.  He agrees this was the largest in his career.

Courson agrees Roberts did not recuse himself in the conversation about going ahead with the project.

Mr. Feaga is asking if Courson knew about the $40,000 Allen allegedly paid to Siegelman.  Courson says he was not aware of it.  Now Mr. Feaga is asking a hypothetical involving Roberts and Allen and Siegelman and if Allen made made the contribution and got to pick the highway director would that change Courson's mind.  Courson says "yes" it would change his mind about things being illegal or improper with these projects.

Courson says he was not aware Allen gave Roberts $71,000 about 12 days before Roberts became highway director and Roberts said he would "get it done."  Courson says it would change his mind about the project if he had known this.

Mr. Feaga asks Courson if he knew that Roberts was trying to help the bridge builder by approving the project.  Courson says no.

Mr. Feaga says the defense opened the door about illegality and improper conduct questions.

Mr. Feaga asks about payment from Burke-Kleinpeter and whether or not that would have changed Courson's opinion of the project and he says, "Yes."

Mr. Kilborn asking questions.  Courson says he did not get any bribes and he would not have agreed to do so.

Mr. Baxley is up.  Courson agrees Burke-Kleinpeter was hired by the Tuscaloosa County Commission.

Mr. Vaughn an engineer for DOT.  Mr. Pilger is doing the questioning.  Vaughn went to Auburn and got a civil engineering degree.

Vaughn says he knows who Mack Roberts is.

The witness says he is familiar with the product called Rainline, the road striping product.

Vaughn says DOT first used the product in 1984.  He says the use became more widespread in 2000 when they started using the product exclusively.  The witness says the use in 1984 was on a trial basis.

Vaughn says when Butts was highway director Rainline was the alternative that could be used.  Vaughn says Roberts became highway director for the final time in 1999.  Vaughn says the DOT started using the product a lot more.  Vaughn says the product had not undergone the extensive tests required.

Vaughn is asked about a memo from and to engineers in DOT about Rainline.  The memo is dated February 9, 1999.

Vaughn says the memo was right after Roberts became Transportation Director but Vaughn does not know the exact date Roberts became director.

Vaughn says the first paragraph says Mr. Bass said to increase the use the Rainline striping.  Vaughn says at this point Rainline was not in wide use in Alabama.

ADT means Average Daily Traffic and with an ADT of 3,000 or greater Rainline was to be used on two-lane routes.  Vaughn says this covers about two-thirds of all the state routes in Alabama.

There is another guideline from December 20, 2000.  Mr. Baxley has an objection.  Mr. Pilger says he will lay a foundation and the judge withholds a ruling on the objection.

Vaughn says he is familiar with Mr. Roberts' signature.

Mr. Vaughn is looking at a document to refresh his recollection as to whether or not Rainline was the only product specified for use. He says "Yes."

Mr. Vaughn says the document said the Average Annual Daily Traffic exceeded 2,500 Rainline was required to be used except for lighted roads and city and county roads.

Mr. Vaughn says a February 9th memo meant Rainline was used "as a matter of course" on roads. Vaughn says he did not see people using their discretion not to use Rainline.

Vaughn agrees Roberts left office on July 1, 2001. Vaughn says the new director stopped the use of Rainline shortly thereafter. Vaughn says Bowlin was the new director and he stopped the use of Rainline because of a report from the Transportation Center at the University of Alabama.

Vaughn says DOT started using Rainline again a few months later. Vaughn says Bowlin asked him to develop a criteria for the use of Rainline on half of the resurfacing projects. Vaughn says Bowlin didn't tell him who indicated to Bowlin to turn Rainline back on. Vaughn says Bowlin did not indicate whether or not it was Bowlin's idea. Vaughn says the way it was brought to him, "it did not appear it was his idea."

Pilger asks Vaughn about product and process testing of products. Vaughn says DOT tests the products and processes before they are used. Vaughn says once the product is placed they continue to evaluate the product against the claims made by the company's assertions.

Vaughn says in this case they looked at durability and reflectivity of the product. The group that evaluates this is the Product Evaluation Board. Vaughn says he has been on the board. Vaughn says the board did not do a scientific review of Rainline.

Vaughn says he has been at the Highway Department since 1972. Vaughn says Rainline could not have been turned on without the approval of the highway director.

Vaughn says in his experience he has not seen a product used without some testing.

Vaughn says $42 million was spent on Rainline after Mr. Roberts came into office. Vaughn says Rainline was 2-to-2.5 times the cost of regular thermo plastic. Vaughn says he believes the regular cost would have been around $14 million.

The jury will get to eat outside the building so we will not be back until about 1:30 p.m.

Mr. Baxley is questioning Mr. Vaughn. Vaughn agrees the biggest proponent of Rainline was Ray Bass. Mr. Baxley asks if the government subpoenaed Mr. Bass. This of course brings an objection which is sustained.

Mr. Vaughn is asked to compare two documents. One document has two pages the other has pages three and four. The defense has an objection and all have been asked to approach the bench.

The judge apologizes to the jury for the interruption.

Mr. Baxley is asking Mr. Vaughn if the document is a DOT document. Vaughn indicates it is and it is admitted into evidence. The document shows it was approved by Ray Bass and then Mack Roberts. It was recommended by a Mr. Lorentson. Vaughn agrees this was normal procedure. The document had to do with road striping as well.

Now there is a comparison of Rainline striping and normal thermo-plastic striping. Vaughn agrees thermo-plastic is cheaper. Baxley says when striping first started out they used house paint. Vaughn says they used paint.

Vaughn says Alabama pays the lowest price per mile of any state for Rainline. Vaughn says Roberts strongly supported Rainline.

Vaughn agrees it is not unreasonable that since Roberts used Rainline in 1994 as highway director, Roberts believed in the product.

The memo is from Ray Bass to Mr. Roberts, Bowlin, engineers and others. The subject of the memo is Rainline Demonstration. According to Baxley, Mr. Bass brought in all the engineers for a demonstration after dark of Rainline. Vaughn agrees this happened. Vaughn agrees everyone went to Sinclair's for supper and then went to the demonstration. He acknowledges someone was there with a water truck, like the fire department uses. Vaughn is not sure if it was the Montgomery Fire Department.

Vaughn agrees everyone thought after the demonstration that Rainline was a good product. Vaughn agrees if Rainline lasted twice as long as the other striping there would be no difference in price. Vaughn says the University of Alabama did a study on the "effectiveness of Rainline." Vaughn says the study was authorized while Mr. Roberts was transportation director.

Vaughn agrees some people disagree with the results of the study.

Vaughn agrees there is no requirement for a study of the product. Vaughn is asked to look at the agenda of the Product Evaluation Board from March 1, 1993.

Under new business the second item is Rainline, PEB stands for Product Evaluation Board. Under the minutes of the board, the second order of business is Rainline and the minutes say the board decided to have the product field tested.

Now there is something about test sections of roads as described by Mr. Marcato in another document. Marcato handed out copies of the business plan and how Rainline would be installed for testing

purposes. Marcato according to the document told the Product Evaluation Board about the cost of the product.

Vaughn says he has met Mr. Marcato and Marcato lives in the Montgomery area. Vaughn says he knows Marcato has patents.

Mr. Vaughn is asked to look at a document he says he does not personally know where it came from.

Vaughn says after the demonstration by the company of Rainline he felt it was a good product but that no study as to the product's durability or scientific study was done. Vaughn says the people doing the demonstration had a financial interest in the product.

Vaughn says the Product Evaluation Board tried to have a test deck where three similar products were to be evaluated but Rainline said they would not participate in that evaluation since the striping was already in use around the state.

Vaughn agrees this would have been the first step in an engineering evaluation of the product. Vaughn agrees Marcato didn't show up.

Vaughn says the study was funded by the Research Advisory Committee. The study was from mid-2001 to 2003. Vaughn says he does not know when the actual funding for the report was established. This is the Alabama study.

Vaughn says at a regular PEB meeting the subject of Rainline came up and it was decided there was need to set up a test of the product since it was already in use across the state. Vaughn is asked about the relationship between Ray Bass and Crum Foshee.

Vaughn says the equipment to apply Rainline was proprietary and had to be bought by the stripers or leased. Vaughn says it was unlikely that contractors would tool up under Rainline and then go out and get another set of equipment for another product.

Mr. Kilborn was asking questions, there was a sidebar and now Mr. Pilger is back.

Vaughn says he was not aware that Foshee got $800,000 from Rainline or that Foshee paid for Ray Bass's retirement party.

Mr. Vaughn is asked if anyone told him what happened on October 16, 1998, at Siegelman's campaign offices in Birmingham, were the meeting between Roberts, Allen, and Siegelman met. Vaughn says he was not told.

Mr. Vaughn is asked why the regular PEB could not have taken up the Rainline issue. Vaughn says the

regular meeting they were told Ray Bass had mandated it be used.

Vaughn says the document says an experimental plan was being developed and Vaughn says it appears to be right that two years later they were just getting started with the evaluation. Vaughn says Aqua Light was not put down on any Alabama Roads to his knowledge.

Vaughn says his opinion of the decision to use Rainline is that Bass and Roberts both had the authority to make that decision but that after review of the University of Alabama he believes the high initial cost of the product did not warrant Rainline's use.

Mr. Baxley is asking about the minutes of the Product Evaluation Board from both 1993 and 1993. Vaughn says he remembers that as being correct.

Vaughn agrees that if the Rainline product lasted twice as long as the normal product the cost would be justified.

Both sides are now through with Mr. Vaughn today.

The prosecution wants to put Mr. Blount back on the stand to correct one part of his testimony from earlier in the trial regarding the bonds for G.H. Construction.

Mr. Blount is taking the stand after a sidebar. Mr. Feaga will do the questioning about the warehouses. Mr. Blount says he originally didn't remember the bonds as having been sold but now Mr. Blount says the bonds had been sold and the closing was scheduled for a Monday.

Mr. Blount says he would not have committed to the market if he didn't think the project was going through. Mr. Blount is now asked by Mr. Leach to identify a document.

The document is a memorandum from May 13, 1999 from Blount to Siegelman on Blount Parrish letterhead. Blount says the memo was to give Siegelman advise on how the lottery referendum should be run.

Mr. Blount says he was discussing parameters for fund raising for the Alabama Lottery Foundation.

Mr. Blount tells the judge, "Y'all have really gotten high tech over here."

Mr. Blount says they talked about corporate contributions and who should be contacted for contributions as well as "corporate do gooders."

Mr. Blount says the campaign should be designed to attract people not involved in political campaigns before.

Mr. Blount says this would really be a way to engage them and names Richard Scrushy. Blount says Scrushy had an interest in education.

Mr. Blount says they were targeting several people with a strong business background with an interest in education and agrees one of those was Richard Scrushy.

The director of the Department of Transportation is on the stand. Mr. McInnes. McInnes says he stopped the use of Rainline because it costs three times what the normal striping product costs.

Mr. Franklin is asking the questions. McInnes says by going back through DOT records and numbers from the Federal Highway Administration.

McInnes says he sent the numbers in a letter to a Mr. Carr. McInnes says Carr didn't believe the difference was that great. The letter was in or about July 2003.

McInnes says he had by then received the results of the study from the University of Alabama. McInnes says DOT had spent over $42 million on Rainline by the time the letter was written. Mr. Franklin is asking Mr. McInnes to do some calculations with a calculator. Franklin wants the $42 million divided by the number of miles of roads Rainline was used on. 12,497 point something being the number of miles. McInnes is also asked to divide the cost of regular striping of $14 million by the same number.

McInnes says Marcato asked him to reconsider the use of Rainline which McInnes did but decided not to start using Rainline again.

McInnes says the state of Alabama is not using Rainline today. McInnes says Rainline has not inherent safety value and it was too expensive.

Mr. Kilborn asks Mr. McInnes to calculate the cost of a child's life. Mr. Kilborn says the value of a child's life would be more than the cost of anything that could be calculated.

"There is no price to put on a life is it? "I think juries do it all the time,"says McInnes. Mr. Kilborn says there is no price to high to pay for Rainline if it saves lives and Mr. McInnes says, "Perhaps so."

Mr. McInnes agrees he has never built or designed or paved or put striping on a road. McInnes says he did not work for the Blount Foundation. McInnes says he has thirty years in business. Kilborn is trying to get Blount to agree he has "zero" experience in highway construction. McInnes agrees the Highway Director is an appointed position.

McInnes says he had two meeting with the Marcatos and they had questions. Mr. Kilborn says the Marcatos told McInnes there were "serious flaws" in the study. Mr. McInnes says he does not remember the specific words "serious flaws."

McInnes is asked about a letter he received from Rainline Corporation written by Marcato's daughter Jennifer. The letter is from June 2004. McInnes agrees the letter talks about "serious flaws" in the study.

McInnes agrees the letter talks about a 7 percent decrease over the cost of 100 million vehicles miles traveled. Night accidents are reduced by 20 percent according to the letter as well as a 21 percent in another set of circumstances.

Kilborn again reminds McInnes he doesn't have any highway knowledge which draws another objection from the prosecution.

McInnes says he sent the information to engineers.

McInnes agrees there is a graph showing Alabama paid less than other states. McInnes agrees there is also another analysis attached.

McInnes says he does not know that the Marcatos found mathematical errors in the University of Alabama report. McInnes says he doesn't know whether the letter talks about a piece of equipment used in the study being faulty.

McInnes says he does not have any personal knowledge of the $42 million figure used for Rainline cost. McInnes says he got the numbers from the Federal Highway Administration. Mr. McInnes says he did not ask how the numbers were calculated.

McInnes is asked if he knew Wilkerson from the Federal Highway Administration was on a panel of experts that had recommended the continued use of Rainline. McInnes says Wilkerson did not tell him. McInnes says he would have considered Wilkerson's opinion. McInnes says Wilkerson was qualified to make that decision about Rainline.

Mr. McKnight is now questioning Mr. McInnes for Mack Roberts. McInnes agrees with McKnight that safety costs in the highway business. McInnes says he has no knowledge of the cost involved in going from paint on the highway to its successor.

Mr. McInnes says he did not know the study was started by Mack Roberts. McKnight says the study was of no benefit to Roberts because it didn't come out until two years after Roberts resigned.

McInnes says he did not get complaints from road builders about Rainline. McInnes says he has no knowledge that Gov. Riley's contributors were road builders.

McInnes says he got a call this morning from the government and when he got back to Montgomery he was served a subpoena.

McInnes says he doubts he would have changed his mind about Rainline if he knew the study was flawed.  McInnes says the cost of Rainline being three times that of normal thermo-plastic would be a contributing factor in any decision.

"You're choosing money over lives aren't you Mr. McInnes? " asks McKnight I" would put down airport runway lights if that were the case," says McInnes.

McInnes says the University of Alabama did not benefit from the study.  McInnes says the study was in progress when he took the job. McInnes agrees he based his decision based in large part on the study.  McInnes says there was nothing prohibiting Roberts from funding a study on Rainline.

McInnes says the results of the study had been given to Don Vaughn and Wilkerson of the Federal Highway Administration and also to McInnes.  McInnes says that information was enough for him to stop using the product.

McInnes says he does not know where Jennifer Marcato got her information from that was put in the letter.  He says he does not know if she has any background or training that would give her special knowledge that would help her come up with the information she provided in the letter.

McInnes says he doesn't know if Jim Allen has any experience in building roads nor does he know of any road building experience Crum Foshee may have.

McInnes says he does not know what decision Wilkerson made in 2001 about Rainline.  McInnes says in 2003 Wilkerson was adamant about stopping the utilization of Rainline.

Mr. Franklin asks if the state of Alabama had saved $28 million instead of spending it on Rainline could the state have striped more roads and saved more lives.  Mr. McInnes says the state "certainly could have."

Mr. McInnes says he does not know Jim Allen.  Mr. McInnes is asked if Jim Allen had a financial interest with Mack Roberts.  Mr. McInnes says he does not know.

Mr. Kilborn is now questioning Mr. McInnes.  Kilborn asks if McInnes has ever seen Rainline tested.  McInnes says no.  McInnes says he has no knowledge of the Riley administration specifically testing Rainline.

McInnes is asked if the Product Evaluation Committee is still in existence.  McInnes says "yes" but he can not state who is on the committee.  McInnes says he does not know whether or not Rainline has been tested.

McInnes says Rainline has some glass beads in the paint mixture that reflect light.  Kilborn says he doesn't remember the portion of the film Mr. Kilborn is talking about.  McInnes says he has no idea

when Rainline use started in Alabama.

McInnes says there were specifications in the contracts about Rainline. McInnes agrees he doesn't know anything about the specifications and whether or not they were changed.

McInnes says he has no knowledge that the University of Alabama is still studying Rainline. McInnes says he does not know whether or not DOT has continued the contract with the University of Alabama for the study. McInnes says he has no specific recollection. McInnes says he does not know that money has been authorized for the study and he does not know why they would continue to fund the study.

Mr. Kilborn says its time to end for the day. Mr. McInnes asks if that means he has to come back and Judge Fuller tells him it does.

Prosecution says Marcato would be called as well as someone for the University of Alabama. Mr. Feaga says he has no way to predict when they will be through. There were all kinds of rumors going around this afternoon about when the prosecution might rest.

We'll meet again at 8:30 a.m. Wednesday.

Posted by Helen Hammons on May 30, 2006 at 07:55 AM | Permalink | Comments (1)

## Jim Allen One More Time

Good morning! We're about ready to get started.

Mr. Kilborn is doing the questioning for the defense. Allen is asked about his relationship with lawyer George Beck. Allen agrees he knew Beck's firm also represented Nick Bailey.

Allen agrees he said yesterday he was scared and had fears at the meeting with Siegelman in Birmingham.

Allen agrees the checks were dated November 2. These were the checks Allen says he gave to Siegelman.

Allen agrees it was a very busy time at Siegelman's headquarters. Allen says he doesn't recall what Siegelman was doing the day before the election.

Mr. Kilborn puts the map back up on the ELMO.

October 16, 1998 is the date in question. Kilborn is asking about Mitlary Road.

Mr. Kilborn is trying to pin down what roads were already completed and which ones were in progress.

Kilborn says there was no road to Tuscaloosa High School at that time.  Kilborn says the county wanted to build the road to the high school.

Allen says his fear was that there would be a free road built next to his toll road and this would eliminate his revenue.  Allen says there was a plan to put the road in a different location than Allen was going to put his road.

Allen says he wasn't afraid of the county commission because the commission had approved his project.  Allen says he was concerned DOT would get the other road built.

Allen says DOT could also just have gone around the bridge.  Allen says it would have cost the government about $40 million to build the project he was concerned about.

Allen agrees it is a complicated, lengthy process.

Mr. Pilger has an objection.  Mr. Kilborn makes it clear what he is talking about.

Mr. Kilborn says people like highways built past their business but don't won't one built next to their house and Allen agrees.

Allen gives another estimate for another road to be built.   Allen says it would take about $40 million and two or three years for the government to get things done.  Allen says it only took him 12 months to build his part of the road.

Allen agrees he feared if he didn't give Siegelman $40,000 he would lose business because DOT would go around his bridge.

Allen says it was his fear that Siegelman would do something to hurt his business.

Kilborn mentions reporter Eddie Curran and says if something like that happened reporters would be on Siegelman so fast he'd have to leave office with his pants on fire.

Allen agrees Marcato fired him in 2001.  Allen denies he told Marcato he was getting out of the bridge building business.

Allen says he does not remember Marcato's letter saying Allen had misrepresented himself to Marcato.

Mr. Kilborn gets the e-mail and shows it to Mr. Allen.  Mr. Kilborn acknowledges it is an e-mail and not a letter.

Mr. Pilger is objecting on hearsay. The judge asks Pilger if he filed a written objection per the courts order and Pilger says he did not. The e-mail is admitted.

Allen is asked to look at line four. "We've already discussed and agreed on numerous occasions that you have failed to market Rainline much to the detriment of Rainline."

The e-mail goes on to say Allen made representations that Allen would be getting out of the toll bridge business and get into Rainline.

Allen says these e-mail allegations are not true. Allen says he does not know why Marcato would lie in the e-mail.

The e-mail says Allen had told Marcato he would hire a salesman and Marcato had not seen a salesman. Marcato says he felt Allen violated his trust and later says the contract was a "total scam."

Marcato alleges in the e-mail he was doing Allen's job as well as his own. Marcato says Allen's actions were to the financial detriment to Rainline. Marcato says Allen owes him $2,375,000.

Marcato says he has been trying to settle this matter for a year.

Allen denies he lied and that the contract was a scam. Allen says he indicated to Marcato that he would be working through a third party, Crum Foshee, and when Marcato terminated the agreement Marcato hired Foshee. Allen says the e-mail was not what was in the agreement.

Allen says Marcato gets emotional but he doesn't won't to state that Marcato exaggerates the facts.

Allen is asked how many interviews he had with the FBI or the attorneys of the Attorney General's office or the government. Allen says he thinks about four.

Pilger objects. Mr. Kilborn says he understands how to ask a question. Mr. Kilborn gives Allen a copy of the first interview with the government. The date was October 5, 2000. Allen agrees he was represented by George Beck. He is also asked to look at two other interviews.

Kilborn goes back to the first interview with Long and Brennan. Allen agrees he was being questioned about the Mitlary Road and Allen's contact with the Tuscaloosa County commissioners. Allen agrees he said he had gone out and flown around the area. Allen says he doesn't remember anything about political contributions.

Allen is asked in the document if he paid money to Hardy McCullum, a probate judge and chairman of the Tuscaloosa County Commission. Allen says he doesn't know why that question was asked. Allen says the road project was a combined effort of Tuscaloosa County and the City of Northport.

Allen agrees it was not a Highway Department project and they did not hire engineers or anything.

Allen agrees he was also asked if he gave any money to Mike Richardson's father. Allen said according to the document he had not given anything.

Allen says he remembers discussing a threat was made to him. Allen agrees he said a threat had been made to him to kill his road project. Allen says the threat was made in a public place in front of people. Allen says the incident occurred at Shelton State around the same time Siegelman had a function there, but Allen says the two were unrelated.

Allen says the public official who made the threat was Commissioner Bobby Miller of the Tuscaloosa County Commission. According to Allen, Miller wanted the road to go through his wife's property and off of his brother-in-law's property. The commission kicked Allen off the project August 25, 1999.

Allen says according to the document. The governor was not involved. In the document Allen says this was a conversation between Miller and himself. Allen agrees his lawyer George Beck said to be careful but he does not know what Beck's intent was.

According to the document Miller said he didn't care if it cost the the county $50 million he was going to end the project.

Allen says the entire interview had to do with two county commissioners. Allen agrees he did not mention the conversation with Siegelman in October 1998 .

Allen says it was not the topic of the conversation and so he wasn't thinking about it.

Allen says Siegelman was standing over him and pointing at him in an angry manner and he agrees he felt abused and mistreated. Allen agrees it was burned in his mind.

Allen is asked why if it was so burned into his mind he didn't tell the government about it in his first interview. Allen again says that was because that was not the topic.

Allen agrees that in the second interview with FBI agents in the attorney general's office in February 2005, Allen said he gave the $40,000 to have a voice in the governor's office. Allen says according to the document that he and Mack Roberts discussed the conversation and they both had conversations about the contributions with Siegelman. Allen says he did not recall giving the checks to Siegelman at that time.

Allen agrees he talks about the $100,000 being reduced to $40,000.

Allen agrees the document says he gave $40,000 but it was not to benefit Roberts.

Allen says there are errors in the document, most likely a 302.

Allen is asked if on February 17, 2005 he said he couldn't remember who he gave the checks to and Allen agrees he couldn't at that time remember who he gave the checks to.

Allen agrees the document he is looking at says he met Siegelman with Roberts on several occasions.

Allen agrees in his February 17, 2005 interview he did not tell the government that Siegelman had told him if he gave $40,000 he could appoint the highway director.

Allen says the bottom of page three begins.  "Allen stated he resisted giving any amount of money ..."

Allen says he told them he was pressured.  Allen says he answered as they asked.  Allen says he told them about the $100,000 and the $40,000 and that he resisted.

Allen says the government didn't go further in that discussion.  Kilborn says Allen didn't wait to get specific in describing the incident involving Miller.  Allen agrees.

Kilborn is now having Allen read from February 22, 2005 interview.  Allen agrees he went to an apartment off of Monticello according to the document and at the Sheriff's Association and at a location at Forest Hills.  These were the locations Allen recalled meetings with Siegelman.  Allen agrees he did not tell them Siegelman shook him down for $40,000.

Allen says he did not tell any agent in interviews what he specifically testified to on yesterday.

Allen says he was not contacted by the government again.  There is an attorney proffer letter of August 11, 2005 to Mr. Feaga.

Allen says he understood this was an offer from his attorney to the government about what he knew about this issue.

Allen asks if the letter doesn't fall under attorney client privilege.  Kilborn says no it is between his attorney and the government.

The judge admits the letter after the sidebar.

The letter talks about the schedule for the grand jury appearance and a August 21 interview with agents at Maxwell.  Allen says he was aware that the offer was being made and he is aware of the information attached to the letter.

The letter describes the Siegelman event as described earlier.

Kilborn asks Allen if this was the first time he wrote about the description of the Siegelman meeting for anyone.

Allen says he does not know what "run this up the flagpole" as referenced in the letter meant. He says that was his lawyer.

Allen says again he does not know what his attorney meant. Allen agrees with Kilborn that typically it means run the flag up the pole and see what it does in the wind. Allen says he didn't see the cover letter and doesn't know what it means. The judge asks Mr. Kilborn to move on.

Allen shortly after the August 11, 2005 proffer got an immunity agreement. Allen is asked to look at the immunity agreement. Allen says he doesn't recall when his grand jury testimony was. Kilborn infers the immunity agreement was one day before Allen's grand jury testimony of August 22, 2005. Allen now agrees the immunity agreement was one day before the testimony.

Allen says he believed anything he stated or used in the trial it would not be used against him. Allen agrees his words would not be used to prosecute him for any crime.

Allen is asked if the prosecutors threatened him with possible criminal prosecution. Allen says the government told him was not a target of the investigation. Allen says he does not believe he committed any crime.

Allen agrees he entered into a settlement agreement with the government. Allen says he recalls the agreement entered into on March 28, 2006. Allen says he knew trial was set for May 1.

Allen says he settled any claims arising out of second superseding indictment of Dec. 12, 2005. Allen agrees he paid the state $843,000. Allen agrees he is immune from prosecution based on anything he says and he no longer has to worry about paying anything else.

Allen agrees the $843,000 was strictly from Rainline profits.

Allen is asked to look at the agreement. Allen says he was not under duress or undue government influence when he signed the document.

Allen agrees he denies any wrongdoing or liability for any money. Allen agrees the agreement refers to the indictment.

Mr. Kilborn is asking for the morning break, but the judge wants to forge ahead.

Allen is asked to look at a calculation of the initial number he thought he would owe. Allen says he was not involved in the calculation. He asked his attorney and accountant to calculate the numbers. The judge reminds Mr.Kilborn the witness has stated he didn't know anything about the numbers.

Allen is asked if he ever had to pay back the $40,000. He says he did not have to pay that. Allen says he was not involved in the agreement between the government and his lawyers concerning the money.

The judge is fighting a cold this morning. We're taking morning recess.

Mr. Pilger is back up to question Mr. Allen.

Mr. Baxley has an objection but the objection is overruled.

Allen is asked again about running it up the flagpole. Allen says he didn't know the specific people it was going to but it was his understanding that it would be going by other people.

Allen agrees the letter came about because Allen told his lawyers about Siegelman demanding $100,000 from him. Allen says his lawyers felt if he was going to testify he would need immunity. Allen says the lawyers created a proffer letter and sent it to the government.

Allen is asked about a civil agreement. Allen says he did not have the $40,000 he says he had already given the money to Siegelman. Mr. Kilborn has an objection. Mr. Pilger decides to move on.

Allen says he paid back his profit from the Rainline project. Allen says he got no state money from the Mitlary Road project.

Allen says he didn't have the checks at the time of the interview, the checks he says he gave to Siegelman. Allen agrees he had nothing at the interview to refresh his memory during the government interview.

Allen is asked to recall again the story about Miller and the threat. Mr. Pilger asks Allen if he learned from the Miller incident the some politicians don't care what it will cost to get what they want done. Allen agrees.

Allen is asked again about the road map and about rights of way. Allen agrees you have to secure the property either way.

Allen says the Tuscaloosa area has a good amount of hilly terrain. Allen says the mountain problems could impact both projects.

Allen is asked if there was newspaper coverage from Phillip Rawls about the Mitlary Road project.

Allen says he doesn't recall a specific article he just knows there was one.

Allen says again part of the reason he got out of the bridge business was because of what happened with Siegelman. Allen says he had lost Mr. Roberts and he decided to go in a different direction.

Allen is asked again about his contract with Roberts. Allen again says the $1 million bonus is only if there are four bridges done. Allen says there was one built that qualified under the contract.

Small blog break.

More objections. The judge tells Mr. Pilger to move on.

The judge keeps asking Mr. Pilger to move on. Then the judge says if it lays to foundation he will permit it.

Allen says he wrote nine checks to the PACs. Another objection overruled. Allen says he did not know a $40,000 check to Siegelman's political campaign would be illegal.

Allen says initially he was embarrassed by the whole Siegelman event and the interviewers did not ask him that specific question.

Allen says as he understands it now he did something wrong in paying the $40,000. Allen says it was embarrassing.

Allen says he didn't view it as bribery. Another objection as to a question about bribery.

Allen says at that time he did not view it as a bribery. Allen says he thought if he gave the checks above board to PACs there wasn't anything wrong with it.

Mr. Deen gets an objection sustained.

Allen agrees he was concerned about his business interests. Allen says he was concerned about the $20 million he had invested in his toll roads including the just completed bridge.

More objections.

Allen says Roberts came to him about the highway director's job. Allen agrees Roberts was in the room when the events with Siegelman transpired.

Allen agrees he paid $40,000 to pick the highway director and the Mack Roberts knew that. Allen agrees yet again that Roberts came to him about the job. Allen agrees about two weeks later Siegelman

called and spoke about Mack Roberts becoming the highway director.

Allen says Siegelman wanted his approval to appoint Mack Roberts. Allen says he assumes if he had not agreed he and Siegelman would have discussed it and that Allen would have been able to select someone else in accordance with the deal.

Allen is asked about "all Mack's big connection's in other states." This is in an e-mail from Marcato to Allen. Allen agrees the document was to terminate a relationship. It is dated September 29, 2001. Allen agrees Roberts had left the highway department in June or July.

Allen says he was probably not much use to Marcato at that time. Allen says he was not doing any more work on Rainline. Allen says he hired Foshee as a lobbyist and that was Allen's role in Rainline.

The judge keeps telling Mr. Pilger to "move on" as Pilger walks Allen back through his grand jury testimony.

More objections.

Allen says the road in blue on the map is the one he wanted built. The road that went to his bridge. the road was started under the Siegelman administration and just got finished this year according to Allen. This is the Mitlary Road Extension project in Tuscaloosa County.

Allen says he does not know the cost of the project. We're back to Burke-Kleinpeter, a civil engineering firm. Allen says Burke-Kleinpeter was involved in the road extension project.

Mr. Pilger decides he's finished.

Mr. Baxley is asking Allen questions now. Allen agrees he saw Siegelman in November and December to ask Siegelman to appoint Ray Bass. Allen says Roberts talked to him in mid-December about becoming highway director.

Allen is asked about the map again and the yellow road. This road was never built.

Allen agrees that Tuscaloosa County officials agreed the blue road was preferable to the proposed yellow road. (I'm going to try and get a copy of this map.)

Mr. Kilborn is asking questions. Kilborn says the right thing for the government to have done would have been to show Allen the checks to the PACs. Allen agrees.

Reporter Phillip Rawls will be the nest witness. Mr. Fitzpatrick. Rawls works for the Associated Press. He has worked for AP since 1979. Rawls says he cover everything from politics to a tornado.

Rawls says the AP is a news cooperative and the AP sends stories to various news outlets. Rawls says he now lives in Montgomery but once lived in Tennessee.

Rawls says he knows Mack Roberts. Rawls says he has met Jim Allen. Rawls says he knew Roberts when he was transportation director in several administrations.

Rawls is asked about a March 23, 1999 story. Rawls says he talked to Roberts on March 22nd but he does not remember the exact details of where the meeting happened. Rawls says he saw Roberts at a news event but he doesn't recall the exact circumstances.

Rawls says Roberts said the bridge wasn't doing the business it needed to be doing and that's what he put in the article.

Mr. Baxley questions Rawls. Rawls agrees in April he did another story about Jim Allen. Rawls says Allen told him it took about five years for people to change their driving patterns.

Rawls agrees Roberts talked to him in his interview about reducing traffic and improving safety. Rawls agrees there are a lot of mobile homes manufactured in the area. Rawls agrees Roberts talked about the impact of mobile homes on the roads clogging up the traffic.

The next witness will be John Frank Coursan. The witness is the county transportation engineer for the DOT.

The witness says his office administers funds to 67 counties in the state. Coursan says the counties receive federal funds administered by the state also various counties and cities received state grants to build roads. He's had his current job 17 years and been working for 37 years.

Coursan says he knows Mack Roberts. He says Roberts has about 40 years of service with the Highway Department. Coursan says they have seen a lot of roads being built.

Mr.Feaga takes us on a short history lesson of some Alabama roads.

Coursan agrees there are sometimes a shortage of funds to build roads. The witness says a delegation, county commissioners or representatives come and request funding.

Coursan says people always want to build roads, but there's a lack of funds to build roads. Coursan agrees people like Mr. Allen help to get roads built. Coursan agrees there is not enough money to build all the roads everyone wants built.

Mr. Feaga agrees he's at a breaking point. We're breaking early today as a courtesy to a juror with something to do. The judge reissues jury instructions about media coverage.

Reconvening time is 8:30 a.m. Tuesday morning.

The judge is again giving limiting instructions to the jury.  The jury is not to consider evidence from any of the witnesses today as evidence against Mr. Scrushy.

Posted by Helen Hammons on May 26, 2006 at 08:02 AM | Permalink | Comments (2)

## Jim Allen Still on the Stand

While we're waiting to get started, I just talked for a second to Richard Scrushy about the Enron verdict. Scrushy says he feels for the two guys that got convicted, but reiterated how the Enron trial was different from his trial in Birmingham.

More on that later.  Mr. Allen is back on the stand.  Mr. Pilger from the DOJ is doing the questioning.

Allen says when Siegelman asked for $100,000 he told Siegelman he had $20 million invested in bridges and didn't have that kind of money.

Allen says it takes a long time to recoup your investment in the toll bridge business and even to cover operating costs.

Allen says he was shocked at Siegelman's anger at the time.  Allen says he knew Siegelman was very upset.  Allen says he had invested a large amount of money in facilities and the Department of Transportation could have circumvented his roads and eliminated Allen's revenue from the bridges.

At the time of the episode Siegelman was running for governor.  Allen says he allowed Roberts to assist Siegelman in fund raising in 1998 for the campaign. Allen says he supported Fob James.

Mr. Allen is asked to look at a map showing a road going out of Tuscaloosa to the west of the city.

The map is of a road proposed to be built by 2010.  This was in 1995 and it did not get built.

A portion of the road did get built.

Allen says the map also shows the first phase of the Black Warrior Parkway.  Allen says he built the bridge.  This bridge and road are marked in red.  The blue road is another extension, Mitlary (sp) Road.

The blue road started in the James administration.  The red road was started under the Siegelman administration according to Allen.

Allen agrees he had concerns about a bridge being built by a competitor if he did not give the money to Siegelman. Allen agrees he had an economic concern.

Allen agrees Mack Roberts was in the room during the conversation and that Roberts was an employee of his when Siegelman made the comments about the $40,000 and naming a highway director.

Allen says he and Roberts were surprised at how they had been treated. Allen says a decision was reached to monitor the political polls to see what was happening before Allen would agree to give Siegelman the money. Allen says Roberts monitored the AEA polls. The day before the election it seemed according to the polls that Siegelman was going to win, according to Allen. Allen says he decided to pay the $40,000.

Allen says he paid the $40,000 in nine checks to various PACs. Allen says he was told by either Siegelman, Hamrick, or Bailey to make the checks out to the PACs. Allen says he personally handed the nine checks to Siegelman at an old shopping center in the Forest Hills area.

Allen identifies the nine checks he says he gave to Siegelman.

Allen is looking at the back of the checks. He says the checks were deposited to Colonial Bank in Hoover, Alabama.

Allen says all but one check is made out for $4,444.44. The other check is made out for $4,444.48.

Allen says the total amount was $40,000. Allen says he believes Mack Roberts was with him when the checks were delivered.

Allen says Roberts approached him during mid-to-end December of 1998 about being highway director.

Allen says he was asked by Siegelman to serve on Siegelman's transition team.

Allen says this was after he paid the $40,000. Allen says Mack Roberts was a member of the team as well.

Allen says they looked at the Department of Transportation issues.

Allen says during the transition team he favored Mr. Bass to be highway director. Allen says during the transition Crum Foshee worked with him as a lobbyist. Foshee had a relationship with Bass. Bass did not get the job.

Allen says Siegelman called him about Mack Roberts. Siegelman called to tell Allen he had selected Mack Roberts to be highway director and want to know if Allen approved.

Mr. Kilborn objects.  The judge reminds Kilborn about no speaking objections.

Allen says he felt Siegelman was keeping the agreement they had and was calling for Siegelman's approval.

Allen says Roberts took office on inauguration day.  Mr. Kilborn gets his objection sustained and then gets another one overruled.

Now Kilborn gets another objection sustained.

"I didn't want to be harmed.  I wasn't looking at the benefit...I wanted to be sure I was protected," says Allen.

Allen says the Roberts appointment allayed his fears.  "Mack Roberts is a friend and I didn't anticipate anything from him that would harm me."

Allen says Roberts took office on January 19th.  Allen agrees he closed out the employment relationship with Mack Roberts.  Allen paid Roberts $115,000, a vehicle worth about $10,000, and Roberts' regular pay for one or two weeks.  Allen says he deducted payroll taxes.

Allen agree the check was from United Toll Systems, Allen's technology company.  The check was for $71,000.

Allen says he talked to Roberts about Rainline, a road striping system that separates lanes and also goes on the edge of the road.  With Rainline, there was a raised service every couple of inches.  The light bounces back up into the driver's eyes and makes the striping more visible.

Mr. Marcato asked Allen to help promote the product.

Mr. Baxley is objecting but it is overruled.  At the time of the check, Allen says he did not have a contractual obligation with the Rainline product.  Allen says he had been having discussions with Mr. Marcato.

Allen says a verbal agreement was reached in January 1999, but the deal was finalized in March 1999.  All Allen remembers was this was during the middle of January.

Allen says he incorporated a company to deal with the Rainline product on January 21, 1999 after reviewing a document.  Allen incorporated Rainline Technologies Inc.

According to Allen, Roberts told him he liked Rainline and would use the product when he became highway director.

Allen is looking at an agreement between his company, Rainline Technologies and Rainline Corporation.

March 12, 1999 the agreement was finalized.

According to Allen, Rainline had only been used a few times before Roberts became highway director. Allen says all new construction or resurfacing projects included the use of Rainline.

Allen says he didn't make money before Roberts became highway director. Mr. Baxley is objecting, he wants the period of the indictment only covered which ends in 2003. The judge sustains the objection.

Allen agrees he broke off his relationship with Marcato in September 2001. Allen says gross receipts were $2.8-$2.9 million.

Allen says a third party was paid according to volume. Crum Foshee made about $800,000 according to Allen.

In February or March 1999, Hamrick asked Allen to make a presentation to the governor about Rainline.

Allen says he played a 3-4 minute video for Siegelman and Hamrick. Siegelman said he liked the product and knew Alabama was using the product.

Mr. Kilborn objects. The judge asks Mr. Pilger where he is going with the questioning. Pilger says this is a 701. Mr. Kilborn is talking again. The judge overrules Mr. Kilborn's objection.

Allen says he perceived Siegelman wanted him to know Rainline was being used at the Alabama Department of Transportation.

Allen says he was asked by investigators about Gov. Siegelman in 2005. Allen says he did tell them he had felt pressured when Siegelman asked for $100,000. Allen says he did not say specifically that Siegelman had said he could pick the highway director.

Mr. Kilborn objects. After Pilger explains what he is trying to ask, the judge says,"Well ask him that."

Allen says he answered the questions they asked. He says he didn't tell investigators because that's not what he was asked.

Allen is asked to look at his immunity agreement with the government.

Allen says he is looking at a settlement agreement from March 2006. Allen says he paid the government $843,820. These were his profits from Rainline. Allen says he made the check out to the Alabama Department of Transportation.

Allen says he hired Crum Foshee to represent Rainline in front of the Department of Transportation and in other states. Allen says marketing involved setting up relationships like the one he had with Foshee and contracting other departments of transportation.

Mr. Foshee went to DOT, according to Allen, to work with the chief engineer, Ray Bass, and Foshee worked with the testing labs. Foshee also met with the Federal Highway Administration and  Marcato put Rainline on some roads. Allen says he and Foshee were the marketing arm.

Allen says Foshee's relationship was with Bass. Allen says he had a relationship with Roberts. Allen says he made money through the marketing of Rainline and his relationships.

Allen says he wanted to stay out of the process so he turned it over to his attorneys and they calculated out his profit on Rainline after taxes, fees and expenses were taken out. Allen says he was asked to bring documents with him and he has the documents.

Allen says he negotiated the settlement with the Office of the Attorney General. Allen says the negotiation was not with anyone at the prosecution's table.

Mr. Pilger turns over the witness. Mr. Baxley will be up for the defense representing Mack Roberts.

Mr. Allen is asked about the Intermodal ...Act. Allen says the act encourages private-public partnership to build and maintain infrastructure in the country.

Allen talks about Emerald Mountain. He says it was built as a master plan community with its own fire department, shopping, etc. Allen says without the bridge the drive was a 20-30 miles and with the bridge it was about 4 miles.

Allen agrees after this other officials came to him about a bridge crossing the Alabama River, connecting Montgomery to Coosada, Prattville and Millbrook.

Allen says he hired Roberts as a consultant part time in early 1996. Later he hired Roberts full time in December 1996 as a regular employee.

Allen says he had been represented to him as someone who knew a lot about bridges.

Allen says he wanted Roberts' services full time. Allen agrees Roberts was working for others as well. Allen offered Roberts $100,000 a year. Allen says this was very cheap. Allen also offered Roberts a promise that if he worked with Allen and developed four bridges Roberts would be paid $1 million.

Allen says Roberts worked on two toll bridges - the Coosada are bridge and the Tuscaloosa bridge.

Allen agrees the agreement for the $1 million was in a written contract.

Allen agrees the two bridges Roberts worked on came in on time and under budget.  Allen agrees there are typically cost overruns in most of these types of projects.

Allen agrees he also got calls from officials in Tuscaloosa County.  Allen is looking at a document which has to do with the mayor of Northport, Alabama.

Mr. Baxley says he is old fashioned and not too familiar with the Elmo so he has made copies of the document for the jury.  The judge allows Mr. Baxley to hand the copies out to the jury.

Mr. Baxley asks Mr. Allen to read the letter from the mayor of Northport.

The letter talks about the rate of growth in the area and traffic gridlock.  The mayor says they have tried to locate state and federal funding but have not been able to procure additional bridge crossing funding.

The mayor says the area can't wait and he praises Allen's work on the Emerald Mountain toll road.  He asks Allen to build a toll bridge to ease the traffic in Northport.

The mayor says he believes Allen will find strong support in the community for this effort.

Allen agrees he accepted the offer and built the bridge.  Allen says he put in with reserves around $13 million.  Allen says he doesn't know what the final totals were.

Allen is asked about the original plan drawn in 1995 for 2010.  Allen agrees he put his bridge in a different place because Allen's placing made more sense.

Allen says he built the bridge and its approach ramp.  Allen agrees the county and the city built roads to connect to the bridge.

Allen is asked about U.S. 82 and U.S. 43 and Alabama 69 and Alabama 171.  Baxley's point seems to be all these roads are heavily traveled.

Allen says the roads do converge into one intersection.  Allen agrees this creates a bottleneck in Northport across from Tuscaloosa.

Allen agrees it made sense to build the bridge to the west to try to eliminate the bottleneck.

Mr. Baxley and Mr. Pilger agree to stipulate the bridge helped ease the traffic flow in that part of Northport in Tuscaloosa County.  The judge tells the jury they have to accept this as a fact.

Afternoon recess time.

There seems to be some question over an exhibit.

Mr. Allen is asked to read a letter from Tuscaloosa County community leaders to Gov. Fob James which praises the project. The letter states there was basically no one in the community who voiced opposition to the project.

Mr. Baxley asks Allen about the $40,000 worth of checks. Allen agrees Mack Roberts has never been authorized to sign Allen's firm's business checks.

Allen agrees he was part of the Siegelman transition team. Allen says Roberts was part of the transition team. Allen agrees there were three names originally thrown out for highway director - Ray Bass, Horsely, and Brown.

Allen agrees Mr. Bass had been in the highway department a long time. Allen agrees Mack Roberts was not one of the three finalists. Allen agrees he was pushing Ray Bass. Allen agrees he was satisfied Mack Roberts was working for his company. He wanted Roberts to help develop more toll bridges. Allen says Senator Barron and others were asking Roberts to be highway director. Allen agrees he did not call the governor and ask him to appoint Roberts. Allen agrees to start with Roberts had no interest in the job and told Allen during the campaign Roberts had no interest in the job.

Allen says it was his decision to pay the $40,000. Allen agrees Roberts was drawing retirement and would have to stop drawing his retirement if he went back to work for the state.

Allen says he told Roberts he would give him half the money from the one bridge finished under Roberts as a severance. Allen agrees he owed Mack Roberts for the work he had done.

Talk has turned to Marcato and Rainline. Allen agrees he went to California and Oregon to market Rainline. Allen agrees California and Oregon still use Rainline. Allen agrees Rainline is not a fraudulent product. Allen agrees it saved lives and he used it on his roads.

There is a meeting of the minds about another stipulation. Baxley says one of them says yes and one of them says no. So, no stipulation.

Allen says he believes in the product and chose to use it on his bridges and approaches. Allen says he has no connection with Rainline any longer.

Allen agrees the asphalt people are against Rainline. Allen agrees the initial price is higher but it lasts longer. Allen says he has the same product on some of his roads since 1994.

Allen agrees highway striping started with house paint. Th judge asks Mr. Baxley to move on.

Mr. Baxley wants to take the jury to view Rainline against another product. The judge says we'll take that up outside the presence of the jury.

Allen agrees he has seen the DVD that shows how Rainline works. Mr. Baxley wants to play the DVD for the jury. The government and Mr. Baxley are conferring over whether or not the DVD is the same video played for Gov. Siegelman by Mr. Allen.

The government is not going to object to the playing of the video.

The judge asks Mr. Baxley if he's going to play the video. Mr. Baxley says, "No sir. I'd erase it or something."

The video is now being played for the jury. It shows striping at night and during the day. It shows how the striping is put down. It shows a road without Rainline at night in the rain as well. Then the video shows Rainline on the side of the road during the day.

You can see a small difference during the day. Then there is a night video where the regular stripe disappears but you can still see the Rainline. This is according to Mr. Allen reviewing the video.

Allen agrees Rainline is wider and thicker than other common striping. Rainline is about 50% wider. Rainline has more reflective properties and makes noise when tires run over it according to Allen.

Allen agrees Alabama got a cheaper price than many other states on Rainline. Allen says he has seen Marcato's chart of prices comparing the price paid in Alabama to that paid in other states.

Allen says he does not know that Roberts used Rainline on some state roads as a test in 1994.

Allen is looking at a document that depicts prices paid for Rainline in Alabama and other states. These are sample bid prices for various states.

Allen agrees the only way he can get in trouble is to not tell the truth. Allen agrees he doesn't feel he hasn't done anything to need immunity.

Mr. Baxley is asking a hypothetical. "If the highway department sent a check to a Hunstville, Alabama contractor in the mail for $36,3000 and the contractor put down Rainline in that amount, do you believe that constitutes a fraud?" There is an objection from the government which is sustained.

Mr. Baxley is asking the judge if there is any way he can ask the question so it can be admitted. The judge tells Mr. Baxley unless the witness has personal knowledge of the events he's about to ask about, Mr. Baxley needs to move on."

Mr. Baxley asks if there was anything wrong with the adoption and use of Rainline by the state and Mr. Allen answers,"No."

Mr. Kilborn is now asking questions.  Kilborn asks Allen if he thinks he's ever bribed a public official.  "Not intentionally," answers Allen.

Allen agrees Roberts was a loyal employee and a good and faithful friend.  Allen agrees Roberts was with him when he met Siegelman in Birmingham.

Allen agrees he would not have done anything dishonest or illegal in front of Roberts.

Allen says he thought what was taking place at the meeting with Siegelman was inappropriate but Allen agrees he didn't think Allen was doing anything improper.

Mr. Pilger follows up on where Kilborn left off all of a sudden.  Allen says again he felt what the governor did was inappropriate.  Allen says he had supported Fob James in a small amount but he felt pressured by Siegelman.

Allen agrees Siegelman told him he could pick the highway director for $40,000.

Mr. Pilger now continues and goes back to the letter to Fob James.  Allen says he believes the letter was concerning the interchange.

Allen agrees the interchange connected Allen's bridge to the Black Warrior Parkway.

Allen agrees the state under Siegelman eventually built the blue road, another road.

Allen agrees a portion of the road that got built was an access road to a school.  Allen says it was possible the road could have gone on down and hit Allen's bridge.

Pilger asks Allen again about the checks which are dated November 2.  These are the checks Allen says he gave to Siegelman.  These were made out the day before the election.

Allen says his company signed Mack Roberts' checks.  Allen says the company that employed Mr. Roberts at the time of the check was United Toll Systems.

Mr. Pilger is saying the Mr. Roberts told Allen that Roberts was going to get Rainline done and Mr. Allen agrees.  Allen agrees his company gave Roberts the check for $71,000 in the same time frame.

Mr. Pilger now asks Mr. Allen about the $1 million bonus.  Allen says Roberts completed one that counted toward the contract.  Allen says after that he got out of the bridge building business and went

into the toll collection systems business.

Allen says there were several factors that influenced his getting out of the business. Allen agrees at the time he no longer wanted to build bridges after what happened in Birmingham. Allen says Roberts leaving also had an impact on his deciding to get out of the business along with another business opportunity.

Allen agrees again he had wanted Ray Bass to be highway director. Allen says Crum Foshee, who was a lobbyist for Allen, had a close relationship with Bass.

Allen says Rainline was on the test tracks for a number of years and also went through the testing laboratory and at first Rainline didn't pass the heat test and Marcato had to make some adjustments to the product.

Allen agrees asphalt people did not like Rainline because they could not put down the amount of asphalt they wanted to if they had to use Rainline.

Mr. Pilger and Mr. Baxley are conferring.

Allen agrees striping contractors and asphalt contractors are impacted by Rainline.

Allen says the striping contractors were given the equipment for their trucks. Allen says the asphalt contractors had to pay more to the striping contractors.

Allen says he agrees Rainline is a good product. Allen says an insignificant amount was put down on Alabama roads before Mack Roberts became highway director. Allen says after that the amount put down was substantial.

Allen is asked about a consulting fee he got from another company. Allen says he doesn't recall if Roberts knew about Allen's consulting.

Allen says now he thought he talked to Roberts about this consulting. Allen says he was paid $31,000 per month until Roberts left office by Burke-Kleinpeter.

Allen agrees he knew there was a study from the University of Alabama about Rainline.

The judge has counselors at the bench.

Mr. Allen doesn't have any direct knowledge of the question being asked as to the state stopping the use of Rainline at a time after Roberts left as highway director.

Allen agrees more Rainline was used in Alabama than anyplace else in the country.

Mr. Baxley will now come back to again question the witness.

Mr. Allen is asked to read from a document.  Allen agrees the master plan for the Black Warrior Parkway happened two years before Mack Roberts became highway director.  Allen agrees Roberts got none of the commission Allen got for Rainline.

Allen agrees he gave Roberts a severance package because Roberts had served him well and Allen believes he owed him.

Posted by Helen Hammons on May 25, 2006 at 01:38 PM | Permalink | Comments (0)

## Thursday' Testimony

We'll be starting in just a few minutes. Lee Miller is on the stand.  He was an attorney with the Alabama Department of Finance.

I do not know at this time why there was a delay in getting started of about 30 minutes.  I will hopefully find out later today and let you know.

Mr. Miller served as general counsel from January 1987 until he retired in September 1, 2003.  Mr. Feaga is doing the questioning for the prosecution.

Miller is asked about the latter part of 2000 and whether or not he became aware of warehouse projects to be built for the ABC Board and ADECA.

Miller says it had been discussed and he went to a meeting at ADECA.  Henry Mabry, Director of the Department of Finance, sent Miller to the meeting.  The meeting discussed the financing of the warehouse project.  Miller says he is unsure of the date of the meeting but believes it was before December of 2000.

Miller agrees he is aware of the lease to build the warehouses.  Miller agrees the meeting happened before the lease was executed.

Miller says he, Nick Bailey, staff attorney Eddie Davis, Lanny Young, and Fred Sempler were at the meeting to discuss the financing for the warehouse project.

Miller is looking at the lease agreement between the Montgomery Downtown Development Authority and ADECA.  Miller agrees his signature is on the document.  Miller says he reviewed most of the contracts presented for the finance director's signature and he approved the lease as to the legal form of

the document.

Miller says there are two signature lines for the Montgomery Downtown Development Authority, a signature line for the acting director of ADECA, an approval signature line for the director of finance, and a signature line for the governor.

Miller says after he signed it he would have sent it to the director of finance. Miller is asked about Ted Hosp, who served as a legal adviser for the governor.

Miller says Hosp sometimes signed the governor's name to documents. Miller says in every administration he'd worked under, the governor usually designates signature authority to people in the administration due to the volume of documents that need the governor's signature.

Miller says an employee of the governor's legal office was the notary. Kathy Faulk is the notary and she notarized Nick Bailey's signature. Miller says the notary did not work for Nick Bailey.

Miller is asked about Curtis Kirsch. Miller says Kirsch was an architect who did work on various state projects on and off for a number of years.

Miller says he discussed Kirsch with Mabry. Mr. McDonald objects as to hearsay. Miller says a contract between Kirsch and a state agency came to his office. Kirsch had been hired to design a pressurization system for a stairwell. Kirsch could not ever meet the standards of the Montgomery Fire Department and Kirsch had to have his services terminated.

Miller says when he got the contract he wanted Mabry to be aware of the difficulties that the state had had with Kirsch earlier so he would have all the information to make a decision on the contract.

Mr. McDonald is objecting and the judge quickly overrules the objection.

Miller says Mabry took the documents and a few days later Mabry told Miller he did not need to be concerned with who contracts were being awarded to.

Miller says he does not remember which agency the contract was with.

Mr. Feaga brings Mr. Miller back to the meeting in Bailey's office. Miller says it was a discussion about bonds and all the people were politically connected.

Mr. Deen objects and the judge overrules the objection.

Mr. Deen gets his next objection sustained when Feaga asks Miller why he thought Young was politically connected.

Then another objection and this one is overruled.

Miller says he based his thoughts that Young was politically connected because Young was a lobbyist.

Mr. Miller asks for some water. Mr. Feaga asks for a five minute break for Mr. Miller and the judge agrees and let's the jury leave the courtroom.

As to the 30 minute delay in things getting started this morning all we know is the judge apologized for the late start but did not elaborate.

Mr. Feaga is relating information regarding yesterday's testimony by Mr. Blount. Mr. Blount got back with the government and admitted he was wrong about the bonds having not been sold. Mr. Blount after checking says now the bonds were sold.

Mr. McDonald raises questions. Mr. Feaga says it strictly goes to the veracity of those who say the project was going on until the Eddie Curran story came out. Mr. McDonald says now he will hold his tongue.

Mr. Deen says there were differences in dates between Sempler and Blount. Mr. Deen says he agrees to a stipulation.

The judge says it would have to include some reference to Blount. Mr. Leach is talking but we can't hear his argument. The same goes for Mr. Baxley.

The judge says Blount will be allowed to be brought back in the normal flow of things for the limited purpose of what was just talked about.

The jury will now come back in.

Mr. Miller has suffered this week from a bout of vertigo during the week. Mr. Feaga tells Miller they can bring him back later if he needs that. Mr. Miller is ready to continue.

Mr. Deen is objecting again to the whole politically connected issue. The judge overrules the objection.

Mr. Feaga continues. Miller says he based his perceptions on making a differentiation between those politically connected and those just conducting normal state business.

Miller says when he walked in the room he felt the discussion was going to be with those with political connections. Miller says he did not go back and tell Mabry because Mabry had told him earlier it was not for him to worry about who was involved in projects.

Mr. Miller is looking at a document that he provided to the prosecution in his role as general counsel. The document is a report to the governor on the ABC/ADECA warehouse project. It is buy former Chief Justice of the Alabama Supreme Court, Torbert (sp).

The report is from May 4, 2001. Miller says the report indicates "the need for the warehouse facility appears to be well justified. The implementation of the project was a problem for Torbert and he indicated in the report the current implementation should be terminated. He questioned the qualifications of the construction manager and Torbert thought the 12% fee was too high and should be renegotiated according to Miller's reading of the report.

Miller says he was aware the former judge was being hired to do the report. Miller says he is not sure when he heard the judge was going to do the report. Millers says he remembers reading Mr. Curran's article. Miller says he believes it was all happening around the same time.

Mr. Miller is looking at a time line for ADECA/ABC warehouse project. Mr. McDonald would like a sidebar or a chance to question the witness before proceeding.

Mr. McDonald may question the witness about the document. Mr. Miller says he did not write the document nor does he know who wrote the document. Mr.Miller says he did not participate in any way in the preparation of the document. Mr. Miller says he did not rely on this document for decisions he made. Mr. Miller agrees all he did was turn the document over in a stack of documents.

Mr. Feaga is back with the witness. Mr. Miller says the document was provided to him as a result of his request to divisions of the Finance Department for records in response to the subpoena issued by the government.

Mr. McDonald is questioning again. Miller says he can't testify this is the complete document. Miller agrees he can't say whether the document is a draft or a final document.

The judge admits the record and overrules the objection.

Mr. Miller is looking at the document and is asked about Ram Garber. Garber worked in Mabry's office and in purchasing later for the Department of Finance.

Feaga goes to March of 2000. Miller says Garber was in and out of the office at times as a consultant but Miller says he does not know when Garber was hired.

Feaga now moves to the October 2000 entry. This entry refers to a Sherlock, Smith, and Adams report and a cost benefit analysis Mabry asks for.

Now November 2000. Dr. Mabry wants to know who owns the property. Miller says they had to buy some land to build the warehouse on.

December 8, 2000 entry.  Mr. Miller says he did not attend the meeting talked about.

End of December entry.  Indicates agreement signed by Mabry, Bailey and Ted Hosp.

February 2001 entry.  This entry indicates Nick Bailey was given invoices for work done or work that needed to be done.  Young is in the office with Bailey.  Garber asks questions and then decides the invoices look reasonable.  Garber worked for Mabry.

Miller says the document was created by Garber as indicated on the bottom of the page.

Small blog break.

Mr. Miller is looking at a fax that was faxed on February 28, 2001.  The date on the document is January 9, 2001.  Mr. Miller says he saw the document when he got it in response to the subpoena.  The document is addressed to Gov. Siegelman and is purportedly from Henry Mabry.

Miller agrees this is a report from Mabry to Siegelman recommending the warehouse project go forward.

Miller is asked about another document.  Miller says it looks like a signed version of a document.  Miller says this document is on letterhead of the finance director.  The previous faxed copy is not on letterhead.  This current document is signed by Mabry.  Miller says he recognizes Mabry's signature.

Miller agrees there is handwriting on the document that says, "Dated 1/10/01, Approved, Don Siegelman."

Mr. Feaga is going back to the lease.  Miller says it looks like Mabry's signature.

Miller says he worked for Mabry for four years.

Mr. Feaga is through for the moment.  Mr. McDonald is up.  There will be a morning recess before Mr. McDonald's starts asking questions.  The judge wants this one to be quick.

For people following Enron the jury will be back in shortly.  I talked to Art Leach a moment ago and he says the government did a great job prosecuting that case and he believes if Ken Lay gets convicted Lay only has himself to blame.  We'll let you know as soon as we hear the verdict.

The judge calls Mr. McDonald "Mr. Kilborn" which draws a laugh.  Mr. McDonald will question Mr. Miller.

McDonald and Miller agrees Miller's job was not to develop policy but to make sure the policy was

implemented legally.

Miller agrees he would not participate knowingly in any policy he was convinced violated the law.

Miller agrees he did not mean to imply that when the governor appoints members to boards the governor is not controlling the board.  Miller agrees the governor can't operate the state himself.  Miller agrees the governor does not micro-manage the operation of the boards.

Mr. Miller he does not think the executive branch of Alabama government was involved in a RICO conspiracy.

Miller says Mabry relied on his advice on some instances.  Miller agrees sometimes Mabry did not follow that advice.  Miller agrees the director had that prerogative.

Miller is asked about Torbert, the former Chief Justice of the Alabama Supreme Court.  McDonald is asking about the report Torbert authored.

Miller says he does not know who hired Torbert to do a report.  Miller says he would hire Torbert to represent him if Miller were ever charged with a crime.  Miller agrees he would not hire Torbert to write a report about him if Miller were charged with a crime.

Miller is reading from the report which says the facilities were inadequate and the rent was too high for the state of the facilities.  The facilities according to the report also were not technologically up to date.

Miller says David Bronner heads the Retirement Systems of Alabama and oversees millions of dollars in pension funds and builds numerous projects.  This has to do with the time line.

May 1, 2001 entry.  This talks about the attorney general beginning an investigation into the matter.  Torbert says he met with the attorney general and turned over documents on May 1, 2001.

**Enron's Lay, Skilling found guilty of conspiracy to commit fraud.  Lay convicted on all six counts.  Skilling guilty of securities and wire fraud in 19 of the 28 counts against him.**

Torbert says in the report the implementation of the project had been done incorrectly.  Miller says he was not involved in the review but he does recall Torbert coming by his office.

Miller says he doesn't remember the details of the conversation.  Torbert says in the report the project should be handled by the Department of Finance.

Miller agrees the problems of the warehouses had been debated for almost a year.

Miller says he didn't revue studies of how the state could save money on the project.

One entry says Bronner had interest in the warehouse project.  Miller says there were discussions to the effect that Bronner had an interest in the project.

On June 9, 2000 according to the document Ron Blount attended a meeting about the warehouse project.

Mr. Miller is asked to look at a document and is asked if the name Lanny Young is anywhere in the document.  Miller says there is no mention of Lanny Young.  This is the document from Mabry to Siegelman on which Siegelman wrote "approved" on the document.

Miller agrees most boards and large departments have their own attorneys.

Miller agrees he looks at documents to make sure they are legal documents.

December 21, 2000 lease agreement is again shown to Miller.  Miller agrees he signed the document as to proof of legal form.  Miller says he reviewed it do make sure the proper items were included in the contract.  He agrees he made sure it measured up to the law and if it had not he would not have signed it.

Mr. McDonald and Mr. Feaga are working to get an exhibit straight.  Mr.McDonald says he believes he was the culprit that got the pages out of order.

Mr. Feaga asks Mr. Miller about a document.  In the document Torbert says "In light of the attorney general's investigation" he did not believe he should continue with his report.

We're back to the memo on which Siegelman wrote approved.  Feaga asks Miller if there was a mention of a $9,2000 check written by Young to Siegelman.  Feaga asks about the $13,000 worth of mugs, Feaga asks about a BMW which draws objections from Mr. Deen.  The judge let's Feaga continue.

Miller says he does not see any of that in the document.  Miller agrees Nick Bailey continued to work for Siegelman after the project came to its end.

Mr. McDonald will come back to question Mr. Miller.  Thursday April 26, 2001 is the date on which Torbert got involved in the investigation.  On May 4, 2001 Torbert concluded his report.  Torbert says the attorney general was the best to investigate.  McDonald asks Miller if Torbert would have thought the investigation would have taken five years.  This of course brings an objection from the prosecution.

McDonald asks, "He didn't have 20 people and five years investigating this did he? " "No," answers Miller.

Miller is asked if someone obstructs an investigation does that make an investigation take longer and

Miller answers probably.

Jim Allen will be the next witness.

Allen says he now lives in Elmore County.  He says he attended college but did not graduate.  He says he started a kitchen cabinet business, sold it and then started a construction and real estate company.

Allen says he started in the toll bridge business in 1994.  He says he opened his first road in 1994.  He says he was building a development in Elmore County and build a bridge to connect with Montgomery. Emerald Mountain opened since December 1994.

Allen says when that bridge opened he was approached to build a bridge in Coosada in spring of 1998. The Alabama River bridge.

Allen says Northport came to him to build an outer loop around the city of Tuscaloosa to Northport and he did get involved in the project.  The Northport bridge in October 1998 was about two weeks from opening.

Allen agrees there was a newspaper article that came out about him.  The date was October 14, 1998.

According to Allen, Siegelman called Mack Roberts at Allen's office and asked them to come to Birmingham.  Allen says Roberts told him immediately about the call.

The newspaper article was from the Birmingham News.  The judge is looking at the article.  The judge says he doesn't intend to let the trial be run by newspapers and charts, however, he admits the article and overrules objections.

Allen says Roberts told him they were to meet Siegelman in Birmingham.  Allen says they traveled to Birmingham the next day.  Roberts had worked for Allen since 1996 according to Allen.

Allen says Roberts had worked with Siegelman to raise funds for the campaign.  Allen says they did not know what the purpose of the meeting was.  Allen says he thought they were going to be thanked for Roberts' help in 1998 in the campaign.

Allen says he supported Fob James.  Allen says the date was October 16, 1998.  Allen says they went into the lobby and were greeted by Nick Bailey and several other people who he does not remember. Allen says Roberts was with him the entire time.

Allen says it was an older home that had been converted into an antique dealership.  Allen says he and Roberts went into a parlor area where they met Siegelman.  There was no one else at the meeting.  Allen says Siegelman got upset and angry with him.  Allen says he and Roberts were sitting and Siegelman was standing. "He was pointing at me and said, "You have not helped me one bit in this campaign and I

am going to remember it."'

Allen says Siegelman wanted $100,000 and then then he asked for $50,000 and then Siegelman asked for $40,000. "If you give me $40,000 I'll let you pick the next highway director," Siegelman said according to Allen. Allen says he responded,"Okay, but I'll have to get a loan."

Allen says he and Roberts drove up in the car and then drove back. Allen says he asked Roberts what he thought of the meeting. Roberts says he had never been treated as such, according to Allen .

Lunch recess will be over an hour.

New Post.

Posted by Helen Hammons on May 25, 2006 at 08:36 AM | Permalink | Comments (0)

## More G.H. Construction Stuff and Mr. Blount is on the Stand

Mr. McDonald will cross Mr. Sempler.

Mr. Sempler says he has 24 years of experience and his expertise is on bonds and public finance.

Mr. Sempler is going into commercial development authorities and others. Sempler says the bonds are issued from public corporations. The bonds are tax exempt. The authorities issue bonds to get around the prohibition on debt. Bonds are issued for essential buildings. The leases are year-to-year and Simpler says it is not unusual across the U.S.

Sempler agrees authorities are used for such things as schools and to build the Alabama Supreme Court building.

Sempler agrees there was nothing out of the ordinary about the process that was started for the warehouses to be built.

Sempler agrees it takes someone with experience to lead people through the process.

Sempler went to college with Bill Blount. Sempler says for the most part his relationship with Bill Blount was on the up and up.

Sempler says the ABC warehouse was building out of space and he heating and ventilation was also a problem. They were paying over $7 per square foot for the lease. Sempler says he does not remember how big the building was. Mr. McDonald is going to show him a document to help refresh his memory. The new ABC building was going to be 155,000 square feet the ADECA building was going to be

231,000 square feet.  Sempler did not know what was being paid for ADECA.

Mr. Sempler says the construction cost for the ABC building was going to be over $5 million.  Sempler says the total cost would be $4 per square foot plus the state would own the building at the end of the 25-year period.

Mr. Sempler did what was called due diligence to compare what the state was paying versus what the state would have to pay with  the G.H.Construction project.

Sempler learned that the owner of the leased buildings was Mr. Aronov.  Sempler says he did not know Aronov and the governor were friends.

Sempler agrees he never had a conversation with Siegelman about G.H. Construction.  Sempler agrees his conversations were with Nick Bailey.

Sempler to look at December 21, 2000 original lease agreement.  McDonald wants Sempler to look at the signature page.  Sempler agrees Nick Bailey was acting director of ADECA at the time.

Sempler says he did not see Siegelman sign the document.  Sempler says all the signatures are required to execute the lease.

Sempler is asked to remember his grand jury testimony.  Sempler agrees he said that Nick Bailey executed the lease.  Sempler agrees all the other signatures were approving the form of the document.  The actual person who executes the document is Nick Bailey according to Sempler.

McDonald says there is a notary on the document and the signatory confirms the document was executed by Nick Bailey.  Sempler says the sworn statement by the notary indicates Bailey appeared before the notary to sign the document.  The only requirement was for Bailey's signature to be notarized.

The second notary about the Downtown Redevelopment Authority.

Sempler agrees there are no other notaries needed to execute the lease.

Sempler says the date on the lease is December 21, 2000.  The Montgomery Redevelopment Authority did not sign until February 14, 2001.  The lawyer for the Montgomery authority wanted some changes made.  Sempler agrees there was an addendum made to the lease.

Mr. Sempler agrees G.H. Construction was not done in the dark and there was no conspiracy.

Mr. Sempler says James Farrier, Nick Bailey, and a secretary of the Montgomery Redevelopment Authority signed the addendum to the lease and these are all that were required according to Sempler.

Mr. Sempler agrees there was a third agreement to make things cleaner. The lease was never signed according to Sempler and the document.

Sempler says it was never executed. Simpler again agrees he never discussed G.H. Construction with Siegelman and that Siegelman did not sign the addendum nor the third non-executed lease.

Sempler says timing, the project in general and who would do what were discussed during the kickoff of the project. Sempler says neither Siegelman nor Hamrick were at the meeting.

Sempler agrees everything with G.H. Construction was on the up and up. Sempler agrees he did not see any professional fees out of line with other bond issues he had worked on. Sempler says he can't speak to construction charges.

Sempler agrees he drafted the two construction management agreements under the direction of Nick Bailey. Sempler says he gave them a construction management agreement with blanks for fees to be negotiated between G.H. Construction and Nick Bailey. Sempler agrees in doing due diligence on the project he did not find any evidence that Siegelman was involved in the details of the G.H. Construction project. Sempler agrees he found no fraud or anything untoward about the project. Sempler agrees he would have pulled out if he had a whiff of anything wrong.

Mr. Sempler says he still believes this was a good project.

Mr. Deen is questioning Mr. Sempler now. Sempler agrees in the G.H. Construction project his client was the transaction itself and to the bondholders to whom the bonds are sold.

Sempler says he had the first conversations on the project with Bill Blount but Blount was not his client.

Sempler says Blount called around December 13th. Sempler says he has to prepare all the closing documents and federal and state law issues he has to give opinions on. Sempler agrees he was not working for the state.

Sempler says SIDA was not an option for this project. Sempler says it simply did not apply.

Sempler's job was to show the legal apparatus by which the project could be built.

According to Sempler the issuer of the bonds was the Montgomery Downtown Redevelopment Authority. This authority sold the bonds to Bill Blount and then Blount sold the bonds to investors.

In early January 2001 there was a meeting at Nick Bailey's office. Sempler says the meeting was in the building ADECA was in, in 2001. This office was not with the governor's office.

Sempler says Eddie Davis was the legal counsel for ADECA.  Sempler agrees it was Bailey's job to make sure it was good for the state.

Rolan Vaughan was an architect there at the meeting also.  Ram Garber was there also according to Sempler.  Garber was there in some capacity with the state.

Sempler says he is not sure where he met Lanny Young.  Sempler says he does remember testifying before the grand jury.  Sempler says his best recollection was it was at the time of the first meeting at Bailey's office but he cannot recall specifically where he met Young.

Sempler agrees it wasn't until he met Nick Bailey that he met Lanny Young.  Sempler was told Young was a consultant to G.H. Construction.  Sempler agrees he didn't have any responsibility for the state.

Sempler says Bailey asked for a construction management contract.  Sempler says he gave Bailey a sample contract with blanks but he told Young he didn't represent anybody.  Sempler says the contract came back to him with the blanks filled in.

Sempler says he wouldn't know what a good or bad rate for a construction manager would be.

Sempler agrees Hamrick was not at the meeting in Bailey's office.  Sempler says he knew Hamrick 13-14 years.  Sempler says he had no contact with Hamrick at all in this project.

Sempler says he saw Hamrick socially. Sempler says he would like to think that Hamrick would have called him if he had any questions.

Mr. Feaga is questioning the witness.  Sempler says it is his understanding the governor appoints the head of ADECA.  Sempler agrees the governor was ultimately responsible for making sure it was a good deal for the state.

Sempler says to be valid the document had to be signed by the governor and finance director.  Sempler says all three had the responsibility to sign the lease to make it valid.

Sempler says he does not know the notary who signed the lease.

Sempler says again he has done many projects with Bill Blount.  Sempler says $38,600,000 was the total cost for the lease.

Sempler says Blount has never paid anybody a construction fee.  Sempler says he does not know the percentages on any other deals.

Mr. McDonald is back.  McDonald asks Sempler if it is still his opinion that the G.H. Construction

project was good for the state of Alabama. Sempler says he thinks it was a good deal for the state. Sempler agrees that in 4.5 months of due diligence he saw no evidence of illegality in the project. Sempler agrees Siegelman did nothing improper with regard to this project.

Mr. Feaga is asking Sempler if Sempler knew G.H. Construction was a front for Lanny Young and that Siegelman was getting campaign and other things from Young would that change his opinion about the deal. Sempler says he would not have been part of the deal if the hypothetical were true.

"If I took off and flew around this courtroom today would that change your opinion on the laws of gravity?" asks McDonald. "Yes," says Sempler.

James D. Ramage III, President and CEO of First National Bank of Brundidge. The witness says he met Blount in the late 1970s through the Univ. of Alabama Alumni Association. The witness is the mayor of the city.

The witness agrees the bank loaned money to G.H. Construction. Blount called him about the ABC warehouse and told him it would be paid off through a bond issue. The bank made a loan on January 12, 2001. The loan was for $540,000. Mr. Feaga is back at his charts.

The bank required security from all the parties involved according to Ramage. He says they got guarantees of David Green and Brian Broderick as well as Bill Blount, an investment banker. Ramage says he believes he met Young with Blount in his office.

Blount called to ask Ramage to help Young refinance Young's house and land. Mr. Deen objects as to hearsay and Judge Fuller sustains the objection. Ramage says he believes he loaned Young about $560,000.

The loan was signed on March 19, 2001. Ramage says the loan was paid back but he had trouble getting it paid back.

Ramage says he had contact with AL-America bank in Birmingham. AL-America foreclosed on the loan and the Bank of Brundidge bought the property mortgage from AL-America.

Ramage says the bank paid over $1 million. Ramage says he sold the project for $1.9 million.

Ramage is asked to examine bank records.

Mr. Deen wants a copy of the records to review. Mr. Feaga says the defense should have the documents.

The notary says the mortgage was taken out March 8, 2001. On March 19, 2001 the bank loaned Young the $560,000.

The mortgage at AL-America bank was taken out on March 8, 2001. AL-America had a first mortgage and Ramage's bank had the second mortgage. The witness says the money was wired to the Banker's Bank in Birmingham for disbursement to Al-America.

The mortgage was $1,464,000.

Ramage says all of the necessary ingredients on doing a bond issue had been done. This is for G.H. Construction project. Ramage says Blount called in January 2001 about the loan. Ramage says Blount was supposed to provide the performance bond. Ramage says Blount said some of the first proceeds would be to pay the bank back. The prospectus listed the First National Bank of Brundidge.

Mr. Feaga says, "I think I'm confused." Mr. Feaga apologizes to the court and the jury.

The $560,000 loan on March 19th was to Mr. Young. The March 8 , 2001 loan to AL-America Blount did sign. The G.H. Construction loan was January 12, 2001. This loan was for $583,000. It started at $540,000.

Ramage says he understood with the G.H. Construction project he would be out in April or May 2001. Ramage says if Young got the land fill in Lowndes County he was to pay the banks off.

Ramage says on occasion the bank engages in commerce between states.

Mr. Kilborn is questioning the witness.

Ramage says he met Siegelman in 1966 of 1967. Ramage says he was helping Siegelman run for SGA president. Ramage says Siegelman helped Brundidge. Ramage says they worked on a Wal-Mart distribution center. There is an objection on relevance.

Ramage says he has files on Lanny young and his wife Kim. She is involved because it was a mortgage on their residence. She had to sign on the loan and an environmental indemnity form.

Ramage is asked to look at a borrower's affidavit. Ramage says the document is another affidavit to reaffirm the bank has a mortgage on the property.

Ramage says the property was foreclosed on by AL-America. The Brundidge bank bought the loan and then later sold the property.

Ramage says he knows who Beth Crain is. Mr. Kilborn asks Ramage if Young ever told him Beth Crain was his girlfriend. Ramage says no.

Ramage says he worked close with Young trying to get the bank's money. Ramage says he never met

Kim Young.

Now Mr. Deen will question the witness and he is going to move to a chart. Chart Wars continues.

Ramage says one loan in January 2001 was for G.H. Construction $540-580,000. Ramage says he didn't know Young was involved until later. Ramage says he had a note and a mortgage on 259 acres.

Ramage says later he had to fall back to Blount to get the bank's money back on G.H. Construction because there was no bond issued. Ramage says the bank got its money back in 2003.

Ramage agrees in March of 2001 Lanny young and his wife got the loan. Ramage says the bank had a mortgage on the property and worked with Young to try and help sell the property.

Ramage says AL-America had a first mortgage which the Brundidge bank bought. There were 900 acres and a house. Ramage says the property was sold for $1.9 million. Ramage says he got his money back in March 2004.

Ramage says he doesn't know Mr. Hamrick.

Mr. Feaga is back with the witness. Feaga wants Ramage's opinion of Lanny Young. "He's quite a character. He worked with us to try to get our money back." Ramage says Young was usually reliable.

Ramage says the bank is a national bank, The First National Bank of Brundidge.

Mr. Blount is on the stand. Mr. Feaga is asking about checks from Blount Parrish to Tillman and Young.

Mr. Blount is describing Sunbelt Environmental which he says handles tree limbs, rebar, non-hazardous waste, construction debris according to Blount.

Blount is asked to recount a conversation with Young. Volume Cap is the subject.

Blount says the federal government has a program for private companies to finance projects through bonds. The state does not loan money it just allows the private companies to go borrow money in the tax exempt market.

Back to the conversation with Young on July 27, 2000. Blount says he was trying to get private activity bond allocation for Sunbelt.

Blount says he has no knowledge of the meeting on September 8, 2000 at which approval for Sunbelt Environmental was given. Blount acknowledges he was undergoing treatment for cancer during this

period.  Mr. Feaga says and Mr. Blount agrees his memory of that period is not as good as it otherwise might have been.

Mr. Blount says he does not remember a memo.  Mr. Deen is objecting says Mr. Blount has already said the witness can not recollect.  The judge decides on sidebar, then Mr. Feaga says he can ask a different question.

Mr. Feaga asks Mr. Blount if the talk on the tape is about getting funding for Sunbelt Environmental. Mr. Blount says he was not getting funding, he was getting an allocation to go out and get funding. Blount agrees he was ultimately successful in attaining the allocation.

Blount agrees he signed checks from Blount Parrish to Tillman and Young.

Blount says today he does not remember specifically why the checks were written.  Mr. Blount does say it was not for lobbying or consulting.  Blount says that if he was going to hire a lobbyist it would not have been Lanny Young.

Blount is asked about G.H. Construction.  Blount Parrish was the investment banker for the project. Blount says they would have financed it, bought the bonds, and sold them to investors in the market.

Mr. Blount says they were less than two weeks away from finishing.  Blount says in March 2001 he believes.

Blount says he would not argue with Sempler's statement saying he learned the project would not go forward was April 25th.

Blount says the bonds were not in the market yet when they learned the project would not go forward. "I'm 99% positive the bonds had not gone into the market yet."

Blount says the preliminary official statement had been finished and was circulating.  "I do not argue we were ready to go to market."  Blount says he still believes they were more than one day away.

Blount says he met Young briefly at a function.  Blount says he was at a restaurant when he got a call from Siegelman and Siegelman told him Hamrick would call him back in a few minutes.  Hamrick asked Blount if he knew Lanny Young and Blount said he did.  Hamrick asked if Blount would meet with Young and help Lanny with a little problem.

Blount says he discovered Young had bought some property and built a house and Gov. Beasley was threatening foreclosure.  Blount says he thought the land and buildings had more value.  Blount says he talked to several banks over a period of time to see if he could help Young.

Blount agrees he signed on a loan on March 8, 2000.

"Could I ask the relevance of the past 20 minutes of this case?" asks Mr. McDonald.  The judge says, "Let's move on."  Judge Fuller overrules the objection.

Rolan Vaughn met Blount at Sinclair's to discuss the economic benefits of building new warehouses.  Blount says he still thinks G.H. Construction project was a good idea.  Young was at the meeting also.

Blount says he told the governor the project needed to go forward.  Blount says he had never used G.H. Construction before in any of his projects.  Blount says he used G.H. Construction because G.H. Construction was part of the project before Blount was part of the project.

Blount agrees the governor held a press conference and at the press conference Blount thought Siegelman was hurtful to him.  Blount says he thought the governor impugned Blount's integrity.  "He had two young people in the press office I referred to as Frick and Frack."

Mr. McDonald is questioning Mr. Blount.

Blount agrees he does due diligence on every project.  Blount agrees he concluded it was a good deal for the state.  Blount agrees it was an appropriate thing to do.

Blount agrees he told the governor to get rid of him or Lanny Young but the project needed to go forward.

Blount says it's fair to say he had several meetings with prosecutors.  Blount says he did not do anything wrong with G.H. Construction.

Blount says during due diligence he did not find that Gov. Siegelman had done anything illegal or improper.  Blount says he would have told them if he had.  Blount says he did not find out anything about Young bribing the governor.

Blount says Siegelman would eventually return his calls.  Blount agrees he didn't need Lanny Young to give him access to Siegelman or Hamrick or anyone in the governor's office.

Jeff Deen will now question Mr. Blount.

Blount says the July 27, 2000  phone call was taped without his knowledge.  Blount says the Italian restaurant call was in the spring of 2000.

Blount says he never talked to the bank in Birmingham.  Blount says he co-signed the note with AL-America on Young's house and property.  Blount agrees he felt his interest was protected due to the lien he would have on the property.  Blount says he did look at it as an investment.  Blount says he got no

return on the investment other then getting off the note.

Blount agrees he is an investment banker.

Blount says the company issues the bonds and guarantees them.  Blount says he doesn't borrow money from the bank, he borrows money from the market.

Blount says a hurricane helps out the company in Gulf Shores, Sunbelt Environmental.

Blount agrees there is a risk in a very simple way.  Blount agrees there is nothing wrong with Capitalism.

Blount says Hamrick didn't have any further conversations with him about Lanny Young's house problems.  Blount says Hamrick did not follow up on that conversation.

Blount says Hamrick didn't threaten him.  Blount agrees anything between himself and Lanny Young was between Blount and Young.

Blount says the tape refreshed his memory about what was going on at that time.  Blount says he thought the whole allocation process was a bad way to do things.  Blount says most of the bond lawyers and other companies like his were unhappy.

Blount says he would be shocked if he didn't call Hamrick himself.  Blount says he did call Mabry. Blount says he is sure he called Hamrick on the issue.  Blount says they felt like Ken Funderburk at Merchant Capital, a rival company, was managing the process.

Blount says he doesn't remember talking to Hamrick.  He says if the conversation hadn't been taped he probably would not have remembered it.

Blount is looking at the transcript of the phone call which was taped.  Blount says it was allocation not bonds and agrees he was explaining the process to Young during the phone call.

Blount again says he does not know why Blount Parrish paid Lanny Young but he does know it was not for lobbying or consulting.

Blount says he does not remember meetings about the G.H. Construction project other than the meeting at Sinclair's.

Blount says he seems to recall a meeting at Nick Bailey's office.  Blount says he thought they were going over specifics and trying to get the numbers straight about the costs.

Blount agrees Sempler was not acting in the capacity of Blount's lawyer.  Blount says he does not

believe anything was signed at that meeting.

Blount says he does not recall any conversations with Hamrick about the G.H. Construction project.

Blount says the Bank of Brundidge took a second mortgage on Young's house and property.

Blount says he did not have anything else to do with the Young loan after the loan was purchased by the Bank of Brundidge.

Blount says he was a guarantor of the G.H. Construction loan.

David Campbell will be the next witness.  Campbell currently lives in Nashville.  He guarantees construction companies, bonding.  He has been in the business 28 years.

Payment and performance bond guarantees a project will be built on time and at cost, according to Campbell.  He says he has done thousands of these worth over $100 billion.

Campbell says he worked for Gulf Insurance Group from 2000-2001.  Campbell says the G.H. project was submitted to Gulf Insurance Group by Brook Smith.

Smith death with Blount Parrish and G.H. Construction.  Campbell says the Gulf Insurance Group would issue payment and performance bonds for G.H. Construction.

Campbell says his company looked into doing business with G.H. Construction.  Campbell says this was the spring of 2001.  Campbell says the financial status of G.H. Construction was "substantially inadequate" for a project the size of the proposed project.

Mr. Campbell is looking at a document of the finances of G.H. Construction.  Mr. Perrine puts a document on the overhead.  The document had been faxed.

The fax was received on March 15, 2001 according to the fax date at the top of the document.

The document is the financial statement of G.H. Construction.   Campbell  says the net worth of G.H. Construction was $350,000 and the company had $31,000 in cash.  The project was well in excess of $10 million.

Campbell says the standard industry practice should have had liquidity of about 10 percent of the project which would have meant G.H. would have needed at least $1 million.

Campbell says,"It's a level of risk we wouldn't accept."  He was referring to financing a $10 million project with only $31,000 cash.

Campbell says Broderick and Green had construction experience but the company was a new company and had no operating history.

Campbell believed the information he received was accurate.

Campbell says they looked at the cost breakdown as well as Bill Blount's financial.

Campbell says they decided initially to decline to issue payment and performance bonds. Campbell says the company was asked by Brook Smith to restructure the project. Campbell says they put an architectural and engineering firm with good finances and experience would oversee the project and they would use Blount and his financial backing and then they decided to issue the bonds.

After the restructuring, G.H. Construction was removed from every critical function so all they would do is be contractor in name only, according to Campbell. G.H. would get money in the end.

Campbell says G.H. was a no-bid project.

Campbell says an analyst reviewed the file when the application was first received and it was on this recommendation that the company at first decided not to write the bonds. The memo was faxed March 23, 2001.

There is another document faxed on April 6, 2001. Rolan Vaughan was contacted to be used to take over from G.H. Construction. The fax contained resumes of Broderick and Green, the owners of G.H. Construction as related to Campbell.

There is also a cost breakdown for the ABC warehouse. The cost breakdown includes the monies G.H. Construction was going to receive. These were the numbers involved when Campbell's firm decided it could issue the bonds.

G.H. Construction was going to be paid $1,139, 137. The construction management fee was roughly 10 percent. Campbell says G.H. was to be the contractor in name only. They were just to receive the money at the end of the project according to Campbell.

The surplus building, or ADECA, building is talked about next. G.H. Construction was to get $644,751. G.H. was to get about 11 percent of the cost of the ADECA warehouse.

Campbell says the industry standard for construction management is between three and five percent. Campbell agrees G.H. Construction was to receive at least twice the standard.

Campbell says the bonds were issued, but they were never used or never paid for. The project never commenced according to Campbell.

Campbell says Blount gave a personal guarantee to Campbell's company if there was a problem with the construction project.

Campbell agrees that if his company had not neutralized G.H. the bonds would not have been issued.

The defense will not cross this witness.

The judge is again giving limiting instructions to the jury not to consider any of today's testimony as having anything to do with Mack Roberts or Richard Scrushy.

U.S. vs Gross 1981 and U.S. vs Diamond and others 1988 referenced for Mr. Baxley.

Miller, Phillip Rawls, Frank Corsan, Jim Allen, Snipes, Keith Andrews, Audrey Strickland, John Lorentson and another person are possible witnesses tomorrow.

The judge is asking to expedite witnesses if they are fact witnesses.

Friday will run from 8 a.m. to 11:30 a.m.

Posted by Helen Hammons on May 24, 2006 at 01:24 PM | Permalink | Comments (3)

## Wednesday Testimony Starts

Loretta Nelson who works in the Department of Revenue is on the stand.

She works in the office that maintains the records for hazardous waste fees and disperses the money from the fees.  Most of the money goes to the general fund and to Sumter County.

Mr. Kilborn requests a sidebar.

Ms. Nelson is talking about a spreadsheet containing data from September 1997 to May 2004.  This information is from the hazardous waste fee report.

The judge is looking at some documents, Mr. Kilborn is objecting as to relevancy.

The judge says the witness may be questioned about the exhibit prior to the revenue ruling of July 1999.  Otherwise the objection is sustained as to any testimony about any evidence occurring after January 20, 2004.

The hazardous waste fee reports were submitted by Chem Waste and have to do with the facility at

Emelle.  FY 1998 fees were  $4,515,000 according to Ms. Nelson.

Another objection from Mr. Kilborn is overruled.

Ms. Nelson says July 1999 was the time of the agreement between the Department of Revenue and Chem Waste.  Nelson says the rate changed from $41.60 to $11.60.  The FY 1999 tax collected was. $4, 583,000.  Chem Waste paid $3,331,000 in taxes in FY 2000.

In FY2001 the tax paid according to Nelson was $2,631,000.  FY2002 tax paid was $3,343,000.

From July 1999 - August 2002 Chem Waste paid $30 less per ton says the prosecution. The witness says she assumes they did pay less but she says there is no way for her to know that.

The judge tells Mr. Kilborn he will give Kilborn wide latitude on cross examination and then overrules an objection.

Nelson says Chem Waste paid less in tax in FY 2000 than they did in FY1999.  Nelson agrees her spreadsheet is from the hazardous waste fee reports submitted by Waste Management.

Another objection.  The judge is reserving ruling on a part of the objection until later in the trial.

Mr. Kilborn will question the witness.

Ms. Nelson says she has been with the Revenue Department 33 years.  She says she knew of Jim Hayes when Hayes was commissioner.

Mr. Kilborn has moved to the charts.  Mr. Kilborn is writing the difference in tax rates on the chart.

- First year up $68,000 even after the rate went down $30 ton.  This is FY1999.
- FY2000 the difference from FY 1999 was about $1.2 million less.
- FY2001 the tax went down from FY 1999 about $1.9 million.
- FY2002 the tax went down $1.2 million when compared to FY 1999.

Mr. Kilborn does some calculations and says the net decrease in fees was $4, 233,000 with a little help from Mr. Perrine.

Mr. Kilborn brings up the petition for refund in which Chem Waste dismissed a $4.62 claim against the state.  Ms. Nelson agrees according to Kilborn's figures the state came out ahead.

Mr. Kilborn says there was a decrease in hazardous waste tonnage across the country.  Ms. Nelson says she did not know this.

Prosecution objects there is no foundation, but judge lets Kilborn ask his hypothetical question.

Kilborn says with the tonnage going down for other reasons taxes would naturally decrease. Nelson agrees that with less waste there are less taxes.

Nelson agrees collections for the first year after the agreement were higher. Nelson says she does not know if there was a decrease in tonnage as well as a decrease in waste. Nelson says she goes on information reported by Chem Waste Management. Nelson agrees she doesn't know what the tonnage was.

Mr. Deen will now ask questions.

Deen asks Nelson to look at her documents. Deen says and Nelson agrees with the following.

- For FY1998 118,452 was the tonnage in all categories.
- For FY199 117,884 was the total tonnage in all categories.
- For FY2000 the tonnage was 110,672.
- For FY2001 total tonnage in all categories was 98,146.
- For FY2002 the total tonnage reported for all categories was 121,817.

The tonnage is for the Emelle land fill as reported by Chem Waste.

The judge says he is doing math in his mind at the moment.

The government comes back on redirect. Mr. Perrine is using Mr. Deen's chart and then uses his money chart from before. Nelson agrees more tons were disposed of in FY2002 than in FY1999.

Nelson agrees there were more taxes paid in FY1999 than in FY2002 by Chem Waste.

Nelson agrees there were only two months after the July 1999 agreement which were part of FY1999.

Mr. Kilborn is back. Nelson says she does not know what rate was supposed to be charged before the change. Nelson agrees the rate is currently the same now as it was then, the lower rate.

Pat Haigler is the next witness.

The judge is calling the lawyers to the front.

Mr. Feaga will question Ms. Haigler. Haigler works in the Finance Department in the division handling debt management.

Haigler says her division handles bonds among other things. She has worked for the state 20 years. She is a CPA.

Haigler says the State Industrial Development Authority gives grants to local entities for site prep for bringing business in. Volume Cap has to do with tax exempt bonds.

Haigler is talking about tax exempt bonds. The entity selling the bond is at a lower interest rate.

Haigler says tax exempt bonds fall into four categories. One of those is exempt facilities like landfills, airports, etc. Things that benefit the general public.

Haigler says in 2000 people had to hand deliver applications to the office. The applications were time and date stamped and placed in the order in which they were received. Haigler says there was more demand for Volume Cap than was available in 2000.

Small blog break sorry.

Mr. Feaga is talking to Ms. Haigler about the minutes of a meeting concerning Volume Cap applications.

There are numerous objections coming from the defense. I can't hear all of them. Mr. Kilborn's objection has been overruled.

Mr. Feaga is asking about the #4 application and he wants to know if #4 is next to receive an allocation. Mead Coated Board is the company next in line to receive the allocation. At the meeting Mr. Feaga is discussing the #4 allocation was funded. Application #5 was not funded. There was a note that another company would be allowed, the #13, would be allowed to move ahead.

Sunbelt was the #13 allowed to move ahead. The witness left her records in the witness room. She is going to retrieve the records and the jury will get their morning recess.

We're back Mr. Feaga is having the witness look at a document.

The witness says the name of the #13 company is Sunbelt Environmental.

The witness says #13 received allocation but #s6-12 did not receive allocations and would be rolled over to the next year.

Haigler says there is a letter attached to the minutes. The letter from Mead Coated Board. dated September 5, 2000, says that they agree #5 moving down the list. There is a letter from Merchant Capital, who represented #6-12, and says they agree that #s6- 12 can be passed as well. This letter is from Doug Sellers on September 5, 2000.

Haigler has a report from an access database that indicates that #4 and #13 were funded. Haigler says she knows several people that work at Merchant Capital. Haigler says she understands Ken Funderburk works with Merchant Capital.

Haigler says Funderburk was at one time the director of the Alabama Development Office (ADO).

The director of ADO is the president of the State Industrial Development Authority.

Funderburk was not ADO director at the time of the September 8, 2000 meeting.

Mr. Deen will question the witness.

Haigler says she started with the division in September 2000. Haigler says she houses the documents that have been talked about. The SIDA meeting took place in September 2000.

Haigler says the state gives allocations for people to issue bonds.

Haigler says there are four areas for allocation, plus a discretionary. Haigler says the federal guidelines allow bonds to be issued in the four categories.

The law establish what percent can be in each category, but the board can move money around. Haigler says she knows who Hamrick is. Haigler says Hamrick is not in the minutes or letters. Haigler says she has not heard of Hamrick trying to get anything done with the Dept.of Finance.

Haigler says the allocation program is based on a calendar year but allocations are made throughout the year. Allocations start January 1st.

Haigler agrees the applications are date and time stamped and placed in order of receipt.

Haigler is asked if there was a request for $10 million but only $7 million was available, the applicant could take the $7 million or money might be able to be transferred by the board to make the money match the $10 million.

Haigler agrees if the paperwork is fine whoever is first in line gets #1 etc.

Haigler agrees that around 1999, 2000 there was a big demand for the allocations.

Haigler agrees there was competition between groups.

#5 was Mead, represented by a law firm. #6, #7, #10 was Alabama Power represented by Merchant Capital.

Haigler says Sunbelt Environmental was a solid waste disposal authority for the city of Gulf Shores.

Haigler says #5 would be first in line next year for an allocation. Haigler says they all got allocations the next year.

Haigler agrees Hamrick had nothing to do with the allocations that were made to #4 and #13.

Haigler says the allocation is only good for 60 days. Haigler says there can be an extension up to 30 days. A second extension can be approved by the board of directors. If the money goes back to the authority, other allocations can be funded.

Mr. Deen says he is objecting to himself. Judge Fuller sustains the objection.

Mr. Feaga ran off to the charts without his mic again.

I think Feaga is asking about there not being enough money to fund the allocations. Haigler says more than $10 million was moved in to fund #4. Sunbelt got $3 million plus.

Haigler agrees without moving the money neither allocation could have been made.

The president of the authority making the allocation was James B. Hayes, who had been commissioner of the Department of Revenue. Hayes was acting director of ADO in 2000.

Mr. Kilborn is now asking questions.

Haigler says Mr. Hayes was absent from the meeting.

Mr. Feaga asks about the letter from Mead. Haigler says the letter was written to Hayes.

Fred Sempler will be the next witness.

Mr. Sempler is an attorney who has practiced since 1982. Simpler specializes in municipal bonds and public finance. Sempler is asked about a warehouse project.

Sempler says he was called about December 13, 2000 by Bill Blount. Sempler says he did some research about how to finance an ABC warehouse and another warehouse.

After the first of the year he attended a meeting in Nick Bailey's office. A lease dated December 21, 2000 is being talked about.

Mr. Feaga is at his charts again but moves back to the witness to have the witness identify the document, the original lease agreement for the financing of the proposed project. Sempler says the lease was executed on Dec. 21, 2000 by various state officials.

Mr. McDonald has an objection which is overruled.

Sempler says there is a spot for the governor to sign and there is a signature purporting to be that of Siegelman, a signature line for ADECA - Sempler says the signature is Nick Bailey's. There is a spot for the Finance Department - Henry Mabry.

Sempler says the lease has to be approved for legal form by the legal counsel for the Department of Finance. The lease was signed by Lee Miller. Sempler says he has no reason to believe the signatures are not those of the people alleged to have signed the document.

Sempler says he has a lot of experience with these types of documents. Sempler says he has never been there when the governor signed the documents. Sempler says he knows there has been a practice in government for someone to sign for the governor but he does not know this was the case this time.

Sempler says there was a meeting in early January 2001 in Nick Bailey's office. Bailey, Shane Bailey, Bill Blount, Eddie Davis, counsel for ADECA at the time, Rolan Vaughan, an architect, Ram Garber. Sempler says Garber worked for the state.

Sempler says Blount was the underwriter. $20,730,000 in bonds. Sempler says this was a kickoff meeting for the financing. Simpler says there was discussion of hiring a construction manager. Sempler says eventually G.H. Construction Co. was named the construction manager.

Sempler says David Green and Brian Broderick were identified as the owners of G.H. Construction.

Sempler says he had never heard of G.H. Construction before then. Sempler says Lanny Young was around and Sempler says he was told Young was a paid consultant for G.H. Construction.

Sempler brought two construction management agreements with him to court. Sempler says the total construction budget was a $16.6 million, this included the costs to build the building and to pay the construction manager. One building for the ABC warehouse and another building.

The ABC building had to have payment performance bonds to ensure completion of the project.

One was $9.5 million and the other was $7.1 million.

Sempler says there are other costs totally $4 million. Sempler says they had to have a debt service reserve fund of $1.5 million. Also, one building had a 12 month construction time so there was construction period interest of about $2 million. Sempler says there were fees for underwriter,

insurance, legal fees.

Sempler says the insurance was necessary to get the lowest possible interest rate.

Sempler says there was also another $2-300,000.  Sempler says his fee was $60-80,000.  Blount was to receive in the neighborhood of $200,000.

Small break.

The meeting was actually in January 2001 not in 2000 as may have been stated earlier.

Sempler says the buildings did not get built.  The original final closing date was April 26, 2001. Sempler says he found out it wasn't going to close on April 25 when he was trying to get some documents executed.

Sempler says the meeting at which he was supposed to have documents signed was canceled.

Sempler says he got an e-mail from Henry Mabry that no one was suppose to go forward with the financing until he heard back from Mabry.

McDonald objects and the objection is sustained.

Sempler says he had no prior information from anyone the project was not going to close.

Sempler says after the initial meeting most of his work was with attorneys including Sam Kaufman of the Montgomery Downtown Development Authority.

Sempler says he met with Blount several times.  Sempler says he knows who Jimmy Ramage is, the Mayor of Brundidge.  Sempler says Ramage's bank helped with funding.

Sempler says there was no indication from anyone that the project was not going to close. The bonds were sold and the documents were prepared, according to Sempler.

Sempler says he first learned of the project December 13, 2000.  Mr. Feaga is at his charts again. December 21, 2000 somebody signs the lease.

Sempler says the lease had to be signed by the individuals to bind the state.  The bonds could not have been issued without the signed lease.

Sempler says the lease executed on December 21 was not done until February 14, 2001.  Nick Bailey signed the amendment to the lease agreement.  In an attempt to make financing as clear as possible,

Sempler had created a new lease that was to happen on April 26. The new lease would supersede all other documents.

Sempler says ADECA, Finance, the governor, and legal counsel from Dept. of Finance would need to sign the new lease.

Sempler is asked about Curtis Kirsch. Sempler says he only knows about Kirsch through the papers.

The construction management fee was about 11%. Sempler says he does not know what the average fee is.

The first lease and the amendment were executed the third lease was never executed.

Talk is about a subpoena associated with contributions made by HealthSouth. The documents will be given to Mr. Leach on Tuesday. Documents are coming from HealthSouth.

New Post.

Posted by Helen Hammons on May 24, 2006 at 08:37 AM | Permalink | Comments (0)

## More Claire Austin

Mr. Kilborn continues his questioning. Talk is about a land fill and has to do with hazardous waste. Ms. Austin says she is not familiar with all the type's of waste.

Austin says Stalvy of Waste Management asked her to do a paper in early 97 or 98. This paper had to do with the Emelle land fill and the tax rate. Austin says the company wanted the tax rate lowered.

Austin said she had done some researcy before she went into business with Lanny Young. Austin says she did the research on why there was justification to lower the tax rate.

Austin says she went to the land fill well before she started working for Waste Management.

Mr. Kilborn is back at the charts. Kilborn draws a hole in the ground. Austin says her research showed the facility had 500 plus employees at one time and then the jobs went down to about 70 at one time. The facility was not making money. The tonnage was going down according to Austin because the land fill was taxed at a high rate.

Austin says the only thing she did was do the paper. She says she did not get hired by them. Austn agrees when Lanny Young started talking about the problem, she gave him the white paper she had prepared before the Austin and Young firm had come into existence.

Austin says she knew when the ruling was made and the tax was lowered.  She says she did not celebrate with them.  Austin says she doesn't know anything about bribes involving the tax reduction.

Austin says again Young got the checks out of her office.  She says the check was made out to him personally and Young cashed it at the bank.  Austin says she never discussed the issue with Young.  Austin says she discovered Young had taken the checks before she called Eddie Curran or the attorney general.

Austin says she turned the books over to her accountant.  Austin says her accountant suggested the audit.  Austin says Young told her Young and Siegelman were going to Mexico.

Austin agrees Siegelman was not complicit in the theft.  Austin says she does not know whether Siegelman actually went to Mexico.  All she knows she says is what she was told.

Mr. Deen is now questioning Ms. Austin.  Austin says Brazeal was a good lawyer and he set up the partnership.

Austin said she had clients with the Austin Group but that no clients were brought in to this partnership with Lanny Young.

Austin says the whole purpose was to do business with the Siegelman administration.

Austin says G-Tech hired two companies to work on the lottery at the same time.  Austin says she does not know for a fact that Joe Fein nand Siegelman did not get along.  Austin agrees Hamrick thought it was a good idea for one of the top Republican lobbyist to lobby for the lottery.

Austin agrees Bud's is like a neighborhood pub and people like to go there.  Austin says she went between 7-8 p.m.  Austin says she, Young, Hamrick were there and they bumped into the G-Tech people.

Hamrick called Lanny and Austin says she was on the speaker phone.  Austin says she had never experienced that before, someone from the governor's staff calling to say the Austin and Young firm would get the business.

Austin says G-Tech didn't want to keep Young but wanted to keep her on.  Austin says the firm also worked for 3M to try and get new digital license plates.

"No legislation to try and get more prisoners to make them?" asks Deen.  "No," says Austin.

Austin says she did nothing illegal to get the 3M business.  Austin agrees Austin and Young was in business to get clients to lobby for.

At Talladega, Austin says Hamrick wasn't at Talladega.

Austin says the Huntsville Airport Authority contract was an odd period and an odd dollar amount. Austin agrees Hamrick did not personally talk to her before she got this contract.

Austin agrees the CDG engineering contract had nothing to do with Hamrick.

Austin says she had Waste Management connections in Washington. Austin agrees Young had Waste Management contacts in Alabama.

Austin says she lobbied the Legislature for Waste Management. Austin says she did not hire a lobbyist in Mobile for the city council to do work for Waste Management.

Austin agrees lobbyist sell their access or relationships to government officials to get companies as clients. Austin agrees Young was a braggart and Austin says she told everybody that he was very close to the Siegelman administration and he could get whatever he wanted out of them.

Austin does not recall a dinner in Mobile in 98 at which Young picked up the tab at a steak house and she says she has not been there with Young and Bailey.

Austin is asked again about the Vintage Year. Austin says Hamrick came to the dinner by himself and stayed and ate. Austin says either Waste Management or Lanny Young paid for the meal. Austin said there was nothing wrong with Hamrick bumming a meal.

Austin agrees lobbyists take people to meals and write it off as an expense.

Austin says she saw Hamrick and Young together a lot and she met them in the lieutenant governor's office in 1995. Austin says she met Young through Hamrick.

Austin says she met Hamrick two to three months before she met Young. Austin agrees she took trips with Hamrick and others to Martha's Vineyard and Dauphin Island.

Austin says in the spring of 2000 she was pregnant and in November she had her baby. Austin agrees she would not have been out drinking during this time.

Austin says she went to places where other people drank while she was pregnant.

Austin says she was running Bill Pryor's campaign in 1998. Austin agrees Young had an airplane and flew her and Pryor on occasion. Austin says she does not recall that Hamrick was ever on the plane at the same time Pryor was on the plane.

Austin says she did not get mad at Hamrick when she broke up with Lanny Young because Hamrick had introduced them.

Austin says she respects what Hamrick does.

Austin says she does not remember hamrick's name being on any G.H. Construction documents that were in her office.

Austin says she didn't know about the $500,000 Young got from Waste Management at first.

Austin says it was a surprise.

July 12, 2004 Austin appeared before a grand jury.  Deen is asking her about her grand jury testimony. Austin says she does not recall making a statement that she might have been entitled to 50% of the $500,000.  Austin looks at the document ans now agrees she made the statement Mr. Deen read to her.

Austin agrees she knows Lisa Kardell.  Austin agrees Kardell also worked for President Bush, the father.

Austin agrees the National Governors'  meeting goes on every year in Washington.  Austin says 1999 was her first year and she went through 2005.

Austin says Kardell is a friend of hers.  Austin says she talked to Kardell but does not remember seeing Kardell when Kardell was here talking to the grand jury.  Austin says the government got Kardell's name through her.

Austin says the same players went to the NGA meetings in 1999 and in 2000.

Austin agrees there are alwyas dinners and meetings.  Austin is asked if the restaurant meeting she talked about in earlier testimony was in 2000 and not 1999.

Austin says Hamrick was also there in 2000 at a bar.  Austin says she was with Kardell and some other lobbyists and Hamrick came up and talked to them.

Austin says she called Hamrick on his cell phone in 1999.  Austin says she paid for everything by credit card, a firm credit card.  Lanny Young was not on the trip.

Austin agrees there should be a record of Hamrick's travel in 1999.  Austin says she doesn't recall seeing Nick Bailey but she assumes Bailey would be with the governor.

Austin says there should be a credential list from the NGA.  She says some people show up and do not have credentials.

Austin agrees Hamrick was not married in 1999. Hamrick did not have a wife who could use a debit card or writing checks and signing Hamrick's name to it.

Austin is asked if she and Kardell spoke before the grand jury meeting in 2004. Austin agrees she has talked to prosecutors within the last two weeks.

Austin says no one told her to bring up NAFTA in 1994. Austin says she had to deal with that issue with her clients.

Mr. Baxley is asking about CDG engineers. Austin says it is an Alabama regional firm. Austin agrees CDG does quality work and when they did work for DOT when Mack Roberts was the head of DOT the work was good.

Mr. Leach is up. Austin says she has never had a drink or meal with Mr. Scrushy and that she has had no type of consultation arrangement with Scrushy or HealthSouth. Austin says she has had no conversations with Scrushy about the possibility of working for HealthSouth. Austin agrees there were never any fee agreement divisions with regard to Richard Scrushy.

The U.S. is back up. Austin is asked if she knows who had access to Hamrick's check card or checks. Austin says again Young told her Young and the governor were going to Mexico. Austin says Young's secretary also told her Young was in Mexico with the government.

Austin says she didn't make an issue out of the $500,000. She just chalked it up.

Austin says the lottery was the campaign issue of Siegelman in 1998.a Austin says there were three different lottery companies that worked to try and get the lottery passed.

Austin says the governor would have had to sign the legislation for it to become law. In 1999 Windom was lieutenant governor according to Austin. Mr. Deen has an objection about scope.

Austin says she had a conversation with Hamrick and that the administration was recommending Austin and Young to G-Tech and G-Tech was going to give business to the firm.

Austin says Hamrick told her she should go into business with Young as did the governor.

We can't hear Mr. Perrine again.

The judge sustains some objections and tells the prosecutor to move on.

Austin is asked about Young's political contributions which draws an objection which is sustained.

There is a request for a sidebar.

The judge asks the prosecution to ask a question.  Mr. Deen is objecting again and the judge sustains the objectin.  We still cannot hear Mr. Perrine.

Mr. Kilborn asks Ms. Austin if she knows of an agreement.  Austin says she knows of no agreement.  Austin says she has no information Siegelman ever went to Mexico other than what Young and his secretary told her.

Austin says on some occasions Young could be described as a "liar."  Mr. Kilborn asks Ms. Austin, "You wouldn't believe Lanny Young on a stack of Bibles would you?"  Of course this brings an immediate objection which the judge sustains.

The next witness is Johnny Wade Hope.  Hope says he has lived in Montgomery most of his life.  Hope says he works in the legal division of the Alabama Department of Revenue.  He graduated from the Univ. of Alabama in 1968.  He also has a law degree.  Hope says he spent six years in the National Guard during Vietnam.

Hope says he has worked for the Revenue Department a total of 23 years.  Hope says he has worked continuosly for the department since 1985,

Hope agrees he is a merit system employee.  Hope says most employees with the department are merit system employees.

Hope says one of his duties deals with hazardous waste. Hope says anytime anything comes up that has to do with hazardous waste statutes he is the one people come to first.

Hope says there is no other lawyer that has worked on hazardous waste fees but himself since May of 1985.   Mr. kilborn would like a sidebar.

Mr. Hope is asked to look at the state statutes concerning fees for hazardous waste disposal.  Hope says Chemical Waste Management is part of Waste Manangement and owns the land fill in Emelle.  The fees are graduated based on the toxicity level of the waste, according to Hope.

Mr. Hope says there was a change to the way the fees were assessed at Emelle.  This issue that came up was the attempt to make a change from $41.60 to $11..  According to Hope Tom DeBray contacted him about making the change due to changes of environmental regulations.  Hope says he told DeBray that a revenue ruling could be issued if they agreed with the proposal.  Hope says he got the proposal and considered the request.

Hope says he sent the proposal to the tax division followed by more conversations with DeBray and more information from DeBray in March 1997 for the department to review.

The judge will let the jury have a recess.

The judge is asking if DeBray's revenue ruling was issued?  Hope says it was not.  Hope in response to another question says there was not a revenue ruling.

Revenue rulings are authorized by statute and in effect enters into a binding agreement.  A memorandum of understanding was more of an informal document, according to Hope.  Hope says he assumes the Revenue Commissioner has the authority to issue a memorandum of underdanding.

Hope says matters are sometimes settled and sometimes the attorney general is checked with.

Hope says neither of the revenue rulings in exhibits were adopted.  Hope says the memorandum from 1999 was signed and sent to Ellis Brazeal.

Mr. Kilborn is arguing about the petitioun of refund which incorporated many issues says Kilborn.

According to the prosecutor, Hope's advice was ignored.  Kilborn says the commissioner made a discretionary judgement that he saw as a benefit to the state.

Kilborn says there will be a lot of time spent debating in front of the jury on the change in the law.

Kilborn says the petition of refund was issued two years later.

The jury is still out and now so are we.

Hope is asked about the change in fees in 199/  Hope says he told the commissioner the change would have to be done by the Legislature.  When the issue came up again in 1999, Hope says he told Susan Kennedy, chief counsel for Dept. of Revenue, and the commissioner on July 15, 1999 that the change would have to be done by the Legislature.

Hope says the receptionist called him to the commissioner's office and Mr. Hayes and Ms. Kennedy was waiting for him.  Hope says Hayes was on the phone and Hayes told Hope there was going to be an agreement with Chem Waste to lower the tax rate fees.  Hope says he told the commissioner again that the statute had to be changed by the Legislature.

Hope says he told the commissioner that the commissioner should call ADEM and Hope says he offered to call ADEM if needed.  Hope says the commissioner told him not to call ADEM.

Hope is looking at an exhibit.  Hope says the memorandum of understanding was what the commissioner told him they were going to enter into with Chem Waste.

The prosecutor says Susan Kennedy is a co-conspirator.

Hope says the MOU allows a charge of $11.77 a ton.  The petition of refund was June 21, 1999 and the MOU was in July 15, 1999.

Hope says he did a cover letter to Waste Management's lawyer Ellis Brazeal.

Hope says the rate change went into effect on the same day July 15, 1999.

Hope says Commissioner Hayes signed the MOU.  Hope says the commissioner told him to fax the MOU to Ellis Brazeal the attorney for Waste Management as well as send a copy by mail.

Hope says the process took about three weeks.  Hope says he mailed the MOU to Mr. Brazeal at his office in Birmingham.

Mr. Kilborn is questioning Hope.  Hope is asked if Jim Hayes did anything illegal.  Hayes says he is not saying that nor is he saying that there was anything illegal about the MOU.

Mr. Kilborn says Hope was a lawyer for the Department of Revenue when the department went before the Supreme Court and lost a case against Chemical Waste.  Hope agrees.  Kilborn says the state took a horrible whipping.  Hope disagrees.  The potential cost to the state could have been $400 million.  Hope agrees the case ended in 1992.

Hope disagrees the case hurt his rebutation.  Hope disagrees that he failed to take some depositions.  Kilborn alleges Hope got his feelings hurt when Susan Kennedy got the chief counsel job.

Hope says the statute was a direct result of the loss in the Supreme Court.  Hope says Chemical Waste drafted the legislation and got it passed following the lawsuir.  Hope says the law has not changed since 1992.

Hope says the state had to change the statute to make it Constitutional.  Hope says he administered whatever the Legislature passed.

Hope agrees with Kilborn that the commissioner had the right to interpret the statute in the manner in which he did.

Chem Waste had filed a petition for refund in June 1999.  hope is looking at the petition.  He says he was not familiar with the document before July 15, 1999.

Hope says he had been told the petition for refund had been made but he had not seen it until July 15, 1999.

Sidebar time.

Kilborn says the MOU was a two part document in which Waste Management agreed to dismiss the $4.62 million claim against the state for excess tax and in return the rate was lowered from $40 + to $11 +.

Hope says he drafted the letter per the request of the commissioner.  Hope says he did not know anything else going on around it.

Hope says the commissioner was sent out to the land fill on July 13, 1999 to take a look at the land fill. Hope says he doesn't know that ADEM ever confirmed the treatment of hazardous waste.

Hope says ADEM sent a letter to Brazeal and referenced the type of waste talked about.  Hope says he is not sure it gave the Revenue Department the assurances it needed.  Hope says he does not believe Brazeal sent anything else.

Hope says he does not know anything about the workings over at ADEM.

Kilborn says Commissioner Hayes got out of paying Chem Waste $4.62 million.  Objections from the prosecution.

Kilborn says Chemical Waste Management had paid $4.62 million in taxes.  Kilborn says the petition was Chem Waste seeking to get that amount refunded.

Hope says Chem Waste was asking for a refund of monies Chem Waste didn't believed it owed.

Hope says the commissionerr is charged with administering the tax law.

Kilborn says in exchange the fee was reduced for the waste.  Hope agrees.

Jeff Deen is now saying,"To avloid confirming that I'm as dumb as I look I don't have any questions for you."

Hope agrees with proesecution that the commissioner ruled against Hope's advice on the subject.

Kathy Howard is the next witness.

Sorry folks the blog has to shut down a little early today.  See everyone in the morning.

Posted by Helen Hammons on May 23, 2006 at 01:25 PM | Permalink | Comments (0)

# Claire Austin on the Stand

We should be getting started shortly.   The judge is taking the bench and we're ready with Claire Austin on the stand.

Austin says she is a lobbyist and contracts with many firms.  Her firm is the Austin Grouup LLC since 1997.

Austin points out Hamrick to the jury.

She identifies all the other defendants.  Austin says she came to know Hamrick in Feb.-March 1995. Austin was the assistant finance director and Hamrick was Siegelman's chief of staff.  Austin says the lieutenant governor controlled the agenda in the Senate so she needed to have a close working relationship with the lieutenant governor's office.

Austin says during that time the office of the lieutenant governor were very powerful.  Austin says Siegelman had a lot of senators who would vote "lock, stock, and barrell" in support of the lieutenant governor's agenda.

Austin says she went to work for Jeff Sessions and continued to work with Hamrick.  Sessions was attorney general at that time.  Austin says Siegelman's team ran a pretty tight ship with regard to the Senate.

Austin says she had wo work closely with Hamrick.  Austin says she met Nick Bailey also while she was assistant finance director.  She says this was probably February 1995.

Austin says she met Siegelman around the same time of February - March 1995.  Austin says she met Lanny Young through Paul Hamrick in the spring of 1995.

Austin says she met Young in the lieutenant governor;s office.  She says she was going to see Hamrick on a legislative matter.

Austin says she saw Young a lot.  He was always at the State House.  Austin says Young was in the lieutenant governor's office and around the Legislature.  Austin says he was also out with Hamrick in the evening.

Austin says she saw Bailey and Young together.  She says Bailey was with Siegelman 24-7.  "He was with him all the time."

Austin says she saw Hamrick and Young on social occasions such as receptions in Montgomery or at a restaurant for dinner or a drink.  Austin says sometimes there were other people there who worked in

state government.

Austin says Lanny Young always paid for everything. "He always had tons of cash." Austin says Hamrick did not pay. Young always had a lot of 100 dollar bills according to Austin. Austin says Young loaned Hamrick cash on occasion.

Austin is asked about a profer agreement. In July 2004 Austin says she told the government she would tell the truth and the government said she would not be prosecuted if this was the case.

Austin says in January 1999 she went into business with Lanny Young. Austin says she had been talked to by Young and Hamrick about opening up a lobbying firm after the 1998 election.

Austin says she entertained the idea because after her time in Washington she felt it made sense to have a bipartisan firm. Ellis Brazeal drew up the papers. Austin and Young were going to be part of the firm and Hamrick was considering it before he was named chief of staff by Siegelman.

Austin says she believes Young was the one to bring in Brazeal. She says Brazeal was related to Hamrick.

Austin says the firm ended up being her and Young. Austin says Young had ties to Siegelman and Siegelman's staff including Bailey and Hamrick.

Austin says she had been around Montgomery for five years ans saw Young, Siegelman, Hamrick together. She says she had no questions that all three were close.

The firm was called Austin and Young Capital Resources. Austin says she was the managing partner of the firm. She says the partnership was 50-50 but Austin says she got 80 percent for some PR clients and others.

Austin says both were supposed to lobby but Young never registered to lobby. Austin says Young needed to register and file quarterly reports. If a lobbyist spends more than $250 on an elected official it has to be reported unless you can call it educational to learn something about a client.

Austin says since Young didn't register he got to play under a different set of rules and did not have to report. Also at that time if a lobbyist just lobbied the executive branch they didn't have to report.

Austin says Young told her the governor did not want Young to register.

Austin says Hamrick said the firm would be a good idea.

Austin says initially the firm was a good idea. Austin is asked about G-Tech, a company that operates

and runs lotteries.

Austin says the G-Tech officials were in Montgomery to meet with the governor and Hamrick. Austin says the same evening she saw three individuals from G-Tech at Bud's. Also there were Hamrick and Mabry and "Young.

Austin says she had talked to Doug Davenport who did government affiars for G-Tech and told him she would like to have G-Tech as a client. Austin says after the meeting happened with the governor, Hamrick called Young and Austin. Austin says she was listening on speaker phone. Austin says Davenport, Switzer, Siegelman, and Hamrick were in the meeting. She says there may have been others but she did not know. According to Austin, Hamrick called to tell Young and Austin G-Tech was going to hire their firm.

Austin says G-Tech paid $3,500 a month and the money was splint between Young and Austin 50-50.

Austin is talking about 3M. 3M did the sheeting for Alabama license plates and 3M also had a high tech license plate 3M was trying to get the state of Alabama to adopt.

Austins says she knew 3M officials were coming to town and were going to have meetings in the governor's office. She says she knows this because Young received a call from Hamrick to tell Young 3M was coming to town.

Mr. Deen is objecting saying Austin lacks first hand knowledge. Mr. Deen has another problem with Austin's knowledge and now the judge has asked to see the lawyers.

Judge Fuller is asking Ms. Austin to slow down her speech a bit. She does rattle things off pretty fast.

We're back to 3M. Austin says Hamrick called and told Young and Austin that the governor and Hamrick recommended 3M hire Austin and Young. She says within 30 minutes of the phone call 3M came to the office and hired them. She thinks this was around March. 3M paid a retainer of $3,000 a month which was split 50-50.

Austin says she was at Talladega at the 3M corporate box for a race on a Sunday afternoon. Austin says Siegelman was not in the 3M box but that she bumped into him outside the box. Siegelman told her he was glad she was working for 3M and "I got this client for you,"

Austin says she knew it was not the case Siegelman got the client for her. Austin says the client was gotten for Young. Austin says she did the work and Young got half the money.

Austin is asked about the Huntsville Airport Authority. She says the Huntsville Airport Authority became a client. Austin says in spring 1999, she was advised by Young the firm would be representing the airport authority. Young told Austin this was something the governor's office was doing for them.

Austin says it had something to do with Navastar.  Austin says it was for a 10 month or 18-month contract.  The retainer was an odd amount like $4,375 and was split 50-50.  Austin says she did not talk with Hamrick about this.

Austin says she talked to Siegelman when Navastar moved into the business park.  Austin says she attended the ceremony after meeting with the airport authority personnel.  Austin says she saw Siegelman and he said Siegelman told her "I am glad we could help you out."

Austin says she did a weekly report for the Huntsville Airport Authority like she did for all her clients but that Austin never heard a lot from them.

After the event Hamrick knew that Austin and Young represented the Huntsville Airport Authority.  Austin says Hamrick said, "We got this client for you."

Austin agrees both Hamrick and Siegelman told her they were responsible for getting the airport authority for Austin and Young.

Next up is CDG Engineers another client of Austin and Young.  Austin says they became a client in February-March 1999.

Mack Roberts was head of DOT at the time.  Austin says engineering firms are selected to do environmental work for the DOT.  CDG had applied to get the work but they were never selected.  Austin says CDG hired Austin and Young to try and get them selected to do the work for the DOT.

Austin says her firm was made up of two people.  Young focused on the executive branch of government which includes the DOT.

Young arranged meetings at the DOT with Mack Roberts and CDG and others according to Austin.

Austin says CDG finally got work with DOT in the spring of 1999.  CDG paid Austin and Young $2,000 per month again split 50-50.

Austin is being asked about Waste Management a client of Austin and Young.  Austin says Waste Management was the first client the firm got at the end of January of 1999.

Austin says Waste Management had a prior relationship with Young.  Austin says she knew people from Waste Management from Washington, D.C.

Austin says Waste Management did not really interview Austin and Young.  Tom Harrington worked in the operations side of Waste Management as opposed to the government affairs side of Waste Management.

Austin says she has known lobbyist Lisa Kardell for around 10 years.  She believes she met Kardell in around 1994.  Kardell was in government affairs.

Austin is asked about Kardell meeting Hamrick.  Austin says Kardell met Hamrick at the Capital Grill in Washington, D.C.  Austin says she was in D.C. at the Governor's Association meeting in 1999.  Austin says she introduced Hamrick to Kardell at the restaurant that evening.

Mr. Deen has his objection sustained.

Austin says she had seen Hamrick earlier and talked to Hamrick on the phone and told Hamrick to meet her and the others at the restaurant.

Austin says there were a lot of people from Alabama there.  Austin says the lobbyist know this and go to the meetings every year.

Austin says the corporations and lobbyists pay money to associations to be allowed into the meetings to smooze with the politicians and staffs.

Austin again says she called Hamrick to ask him to meet her and Lisa Kardell in February 1999 at the Capital Grill.

Austin says Harrington asked her to draw up the contract with Waste Management.  She said Austin and Young would be paid $10,000 a month.

Austin says most contracts like this are handled by the corporations that hire the lobbyist.  Austin says she came to learn that government affairs people normally handle this process for Waste Management and not through the operations division.  Harrington signed the contract.

Austin says in the spring of 1999 there was a meeting at the Vintage Year.  Two Waste Management officials, Young, Hamrick, Bailey, Siegelman, Brazeal and Austin were at the meeting according to Austin.

Austin says Young had previously told her they would be getting the contract for lobbying.  Austin says Johnny Crawford had represented Waste Management prior to the hiring of Austin and Young.

Austin says she did not arrange the dinner.  Austin says Young arranged the dinner.  Austin says she assumed Hamrick would be there.

Austin says there about 10 people or less at the meeting.  Austin says her business is all about who you know, what access you have, and what you can get done.  Austin says when the governor is there it is very impressive for the client.

We're at a breaking point for morning recess.

We're back and Austin is talking about the contract with Waste Management. Austin says Young and she were both to lobby and Young was to do business development for Waste Management. Austin says Young asked her to put business development in the contract.

Talk has moved to the Emelle land fill. Austin says when Young and Brazeal started working on the issue of the tax rate at Emelle they came to Austin in late spring of 1999 and asked her about the tax structure. Austin says she had done a sheet on this for Waste Management.

Austin says she thought Young was working on this under the current contract. Austin says this issue did pertain to the Department of Revenue which falls under the executive branch.

According to Austin, Young was successful in getting the tax rate reduced which was something the company had been trying to do for a number of years.

Austin says Lanny Young received $500,000 for the deal. Austin says she read about it in the paper. Austin says she got none of the money. Austin says she still represents Waste Management as a contract lobbyist. Austin says Young no longer represents Waste Management.

Austin says with regards to the contract they signed, she thinks Young's involvement with Waste Management ended in May 2001, but she can't be sure.

Austin says she saw Siegelman and Hamrick a lot. She says she also saw Nick Bailey. Austin says Bailey was with the governor at all times.

Austin says she saw Hamrick and Young socially . Austin says Young always picked up the tab.

Austin is asked about the legal counsel at the Revenue Department during the Siegelman administration. Austin says Young picked up the tab. "He was a man with a lot of cash."

Austin says from 1997-2001 she knew what kind of cars Hamrick drove. Austin says before the governor's race, Hamrick was driving a Honda. Then according to Austin, Hamrick had a BMW roadster and then a BMW hardtop sedan.

Austin says she represented Waste Management in 2001 and the company was approached by the governor for a contribution for the 2002 gubernatorial campaign.

Austin says Siegelman solicited funds on many occasions asking for large sums of money.

Austin says Waste Management gave money, $1,500, to Siegelman and gave two contributions of

$5,000 to one PAC and another $5,000 to another PAC.

Austin is asked to outline monthly retainers:

- G-Tech, $3,500 per month
- 3M, $3,000 per month
- Huntsville Airport Authority, $4,356 or $4,376 per month
- CDG Engineers, $2,000 per month
- Waste Management $10,000 per month

These clients were gotten in the first part of 1999 according to the prosecution because of Lanny Young's close relationships with Siegelman and Hamrick.

Austin says the money was split between her and Young 50-50.

The judge is reminding the jury about the use of charts and summaries and the weight they are to be given.

Austin says Austin and Young is no longer in business.  Austin says she parted ways with Young in May 2001.

Austin says a number of issues had come up and one issue had to do with a $10,000 check.  Austin says she was in her office around the spring of 2000.  Austin says she was interviewing someone for a job with the firm and she opened the desk drawer and found her checkbook for the firm was missing from her desk.  Two PAC checkbooks were also missing from her office.

Austin says Young had the authority to write checks on the account but Young should not write a check to himself and sign it himself.

Austin says she tried to go into Young's office, but the office was locked.  Austin said she called the RSA building manager named Randy.  Austin says Randy called her back and Austin said Randy sent someone to open Young's office and she found the checkbooks in Young's office.

Austin says she found a check written for $10,000.  Austin says she called Compass Bank and the bank verified Young had come in and cashed the check.  Austin says she tried to get in touch with Lanny Young but Young would not return jpages or phone calls.

Austin says she never after that discussed it with Young, but Austin says she did tell the accountant.  Austin says Young was owed money from the firm.  Austin says Young took some of the money he believed he was owed.

Austin says she asked for an audit of the books and Austin showed where Young had paid himself about

$2,000 more.  Eventually things got sorted out and Austin got the money she was entitled to  and Young got the money he was entitled to.  "It all got squared up," says Austin.

Austin is asked about G.H. Construction.  Austin says Young told her he was going to open a construction firm and needed more office space for four or five more people.  Austin says they did not have the office space.

Austin says Young told her he would be getting a state contract.  Austin says she told the attorney general's office and a reporter.  Austin says "It did not smell right."

Austin says she had several things happen to her in the course of her business with Young that led to  her concerns about the issue.  Austin says Eddie Curran at the Mobile Press-Register was the best investigative reporter in the state of Alabama and if anyone could find out what was going on he could so that's why she told him.

Austin says these events happened in the spring of 2001.  Austin says it was a couple of days or a week after her contact that Curran wrote the articles.  Austin says the attorney general's office took about a month do do something.

Austin again says she learned about the Emelle land fill from the newspaper.  The prosecution is finished at this time with Ms. Austin.

There is a sidebar before cross examination begins.  In fact the witness has left the witness chair for a moment.

Mr. Kilborn is now going to question the witness.  Ms. Austin says Tom Kelly is her lawyer.  Austin says she has no partners in her business.  Austin says she has relationships with lobbyists Steve Windom, Amy Herring, and one other.

Austin says she and Windom share some clients - GTL and a health concern.

Austin says she is not involved in the governor's race.  She says she just had a baby.

Austin says she worked for Sessions when he was attorney general and ran his campaign and she agrees she also ran Bill Pryor's campaign for attorney general.  Austin has worked also for two presidents.

Austin agrees she has rubbed shoulders in some pretty high places.

Austin agrees Lanny Young is probably the "biggest con artist she's ever run into."

Austin says there is one bigger con artist in Georgia.

Austin says she worked with Young 2.5 years.   Austin and Young were the only two partners in the firm.  Austin says she often did not go to her office when the Legislature is not in session.

Austin disagrees the partnership was like a marriage.  She says they talked to each other almost every day but did not always see a lot of each other.

Austin agrees Young stole the check books.  Mr. Kilborn says, "If you give back the money you robbed from a bank, you still robbed the bank."

Austin agrees she found out Young  got $500,000 from Waste Management through the newspaper. Austin says it didn't surprise her.  Austin says she wasn't a part of those conversations.

Austin says it wasn't honest.  Kilborn says Young crooked her out of half the $500,000.  Austin says,"It just happened."

Austin is asked why she didn't know what a thief Young was.  Austin says she thought Hamrick was going to be involved in the firm ans she thought there would be a great deal of success so that's why she agreed to partner in the firm.

Austin says,"It was probably the biggest mistake of my life forming a partnership with Lanny Young." Austin says she did not trust Young that's why she insisted on being the managing partner of Austin and Young.

Austin says Young could get things done with the administration.  Austin says Young told her the governor did not want him to be a registered lobbyist.

Austin says she had concerns about Young, especially after the first six months.

Austin is asked if she thought something was wrong with Young why didn't she call Bill Pryor.  Austin says she needed hard core evidence.

Austin says 2.5 years is not a long period of time.  Austin says there was one occasion she picked up the firm.  Austin says she was threatened by Young a year into her business.  Young told her the governor's office kept calling him and told him the attorney general's office needed to get off of Nick Bailey and the Bobo case or else the firm wouldn't get any more business.  Austin says she called someone in the attorney gerneral's office.

Kilborn wants to know why she would stay in business with Young.  Austin says the threat was not from Young but from the governor's office.  Austin says she probably called Jack Brennan.

Austin agrees she was sharing more than $11,000 a month in the partnership with Young.  Austin agrees

she was still working with Young even though she saw warning flags.

Austin agrees there was a taped conversation at the behest of either the FBI or the attorney general's office.  The conversation was between her and Young.  She says she was more than happy to cooperate.

Austin had told them she would cooperate with the government and she was also scared for her family.

Austin says she didn't know what someone like Lanny Young or Don Siegelman would do to her or her children.

Austin agrees she never got a personal threat from Siegelman.  Austin says Siegelman had plenty of people around him though.

July 12, 2004 cooperation agreement is being reviewed.  Austin is shown a letter addressed to her.  The letter tells her she is a witness of an ongoing federal investigation.  Austin says she had not done anything illegal at the time.

Austin says again she has not done anything illegal.  Austin says she does not know of any statements that would incriminate her.  She says she didn't participate in anyting illegal nor did she commit bribery.  Austin says the money and clients she got were all legal.

Austin says it was part of the deal.  Lanny said we were going to get business out of the governor's office, says Austin.

Austin says she didn't see anything wrong with Siegelman or Hamrick recommending clients.  Austin agrees at the given time was above board and I am telling the truth.

Austin says she wouldn't take money from a client if she wasn't going to do professional work for them.

Austin says she has never seen the agreement between Waste Management and Lanny Young.  Austin says she did not know about the agreement.  "He didn't volunteer it," says Austin.

Austin says again she met Young in 1995.  Austin says Young did not tell her about his bankruptcies nor did he tell her about forging documents to get a position with ROTC.  Austin says she knew about Young's company AWDS which was eventually sold.

fAustin says she has no knowledge of his bankruptcy.  Austin says Young didn't personnally tell her of anything in his past that raised a flag.  But Austin says everyone knew what Lanny was.  Austin says Young had total access to the lieutenant governor and was Hamrick's roomate and Young had a lot of cash.

Austin kept thinking Hamrick would be part of the firm. Austin says Young had the connections with the Siegelman administration and close friendships with the administration. Austin says it was smart business. Austin agrees Young was "Mr. Flash and Cash." Austin says Young boasted about his connections. Austin agrees Young's wife didn't know about his girlfriend.

Kilborn says Young was telling lies to his wife. Getting testy Austin says Kilborn's client told them going into business with Young was a good thing.

We're back to the Vintage Year. Kilborn is asking about a "Grip and Grin." Austin says you come in and shake hands and talk for minute and leave. Austin says Siegelman was there about 30 to 40 minutes. Austin says she didn't see anything wrong with that.

Austin says she never asked Siegelman if Young was for real.

Mr. Kilborn says he has about 30 minutes left. The judge and Mr. Kilborn decide this is a good time for lunch.

New post after lunch.

Posted by Helen Hammons on May 23, 2006 at 08:35 AM | Permalink | Comments (0)

## Siegelman vs Feaga

I promised to give more details on former Governor Don Siegelman's pointed accusation at prosecutor Steve Feaga during the noon hour on Monday, so here it is.

Gov. Siegelman: "Steve Feaga was the prosecutor that allowed false testimony to enter the Northern District grand jury that resulted in my false indictment in 2004. We saw him in the courtroom in Tuscaloosa and we're seeing him here at this trial, kind of behind the scenes, but he is the guy who is pulling the strings. This came from Bob Riley's campaign manager's wife and, so I don't know how much more clear I can say it. But you're seeing the results of politics 2006 at its worst."

When reminded by another reporter that his own attorney Redding Pitt had brought Mr. Feaga into the U. S. Attorney's Office for the Middle District, the governor said, "You can't blame Redding Pitt for something Steve Feaga did in 2004 when Redding Pitt wasn't the U.S. attorney in 2004.

I asked Governor Siegelman directly if he really believed Steve Feaga would put his career on the line for this and this is how the former governor responded:

Gov. Siegelman: "I think Steve Feaga allowed a lie to go before the grand jury in 2004 when he allowed Gerald Shockley, retired FBI agent and an investigator with the Attorney General's Office, to give false

testimony.  Mr. Feaga had in his possession the written opinion from Dr. Sorenson's legal adviser which said almost the opposite of what Mr. Feaga allowed to go before the grand jury in 2004 and that was the linchpin on which the government contended there was a conspiracy in 2004.  Without that false testimony that Mr. Feaga allowed to go before the grand jury, there would not have been an indictment in 2004.

Mr. Feaga was asked by reporters at the end of the day about Siegelman's accusations of politics 2006. This is what Mr. Feaga had to say.

Mr. Feaga:  " I got involved in this case in 2004.  But you know I think I told y'all at the beginning of this I was involved very much, I suppose, as lead counsel in the prosecution of the only other governor we had in this state, that was about what, 13 years ago, Governor Hunt.  I was accused of politics then. I've prosecuted, I don't know, 20-25 public officials in the last 20 years and every one of them has hollered politics, so you expect that to happen.  But my perspective on it is look, my job as long as I'm working for the taxpayers is to put evidence in front of juries and that's what I do .  Ultimately,  the jury will make the call here.  Any idea or allegation that this is politically motivated is absolute garbage, okay.  It's just not."

I asked Mr. Feaga about Governor Siegelman's allegations that Feaga had knowingly allowed false testimony to go before the grand jury in 2004 and that Feaga was "pulling the strings."

Mr. Feaga:  "Well I don't know what he's talking about.  But we're in a trial right now, so we'll get the chance to find out what the witnesses have to say about that."

Posted by Helen Hammons on May 23, 2006 at 12:01 AM | Permalink | Comments (0)

## Testimony Continues

Outside during the lunch break, Gov. Siegelman accused government prosecutor Steve Feaga of being the one "pulling the strings" behind the scenes of this case.  Siegelman asserts Feaga knowingly allowed false testimony into the 2004 grand jury proceeding against Siegelman.   This case did not move forward.

The governor has provided bulletin board material for the prosecutor's office.  It is important to note that Siegelman lawyer Redding Pitt appointed Mr. Feaga to his current position.

I'll put the direct quote from Siegelman on later tonight and will try to ask Mr. Feaga about the allegations.  It is extremely hard to believe that Mr. Feaga would put his career on the line in this way. More to come on this.

Mr. Kilborn is now questioning Mr. Harris about the rules of the Senate.

Mr. Harris agrees that a bill can be kept from being brought up out of order by one hand from the Senate floor.

Mr. Harris agrees that some Republicans voted for the bill on beer sales at Talladega including Senator Dixon and Senator Windom. Mr. Harris agrees some Democrats voted against it including Senator Bedford. There were five Democrats who voted against it.

The record reflects a vote of 17 for and 8 against according to Harris.

Harris says each bill has to be read three times in the Senate and three times in the House. The short title is read on the first two readings and the bill may be read on the third time or the reading of the entire bill may be waived according to Harris.

Mr. Harris says he can't say what the vote was in the House, but that the bill had to pass with a two-thirds majority.

Mr. Harris says he can't answer about Senator Dial's political disagreements with Gov. Siegelman.

Mr. Harris is staying away from political commentary.

Mr. Harris says he has no evidence of illegality involving the passage of the bill regarding the sale of beer at Talladega.

Mr. Harris says Siegelman operated the Senate under the rules and procedures he was required to operate the Senate by.

Mr. Fitzpatrick asks Mr. Harris about senators running the Senate. The senators adopt the rules under which they operate says Harris.

Harris says through the years the lieutenant governor got more and more power. Harris says the Senate set the rules. Harris says subsequently the power of the lieutenant governor was reduced.

Harris agrees Windom ran for lieutenant governor in 1998, the same time Siegelman was running for election.

Harris says Senator Freeman was the sponsor SB 36. Harris agrees Freeman ran against Windom and Freeman lost the race. Harris agrees Freeman was appointed to head ADECA.

Harris says a bill never assigned to committee would have never been introduced. Mr. Fitzpatrick is finished.

Sidebar time. Someone name Lisa Kardell is the next witness. Kardell is the director of government affairs fro Waste Management. She says she consults with government officials on environmental matters as part of her job as they apply to solid waste disposal.

She has been working for Waste Management 13.5 years. She says it is fair to say she is a lobbyist.

Kardell says she has met with governors she believes from all states.

Kardell says she deals now with chiefs of staff from the states she represents.

Mr. Deen objects to the question about what chiefs of staff around the country do.

She says she has contact with chiefs of staffs from each state two to three times a year over the past 4.5 years.

Deen is asking what the chiefs of staff of other states have to do with Alabama. The judge overrules the objection after asking Mr. Perrine if he can tie this to Alabama.

Kardell is asked what an "in house lobbyist" is. She says she is employed directly with Waste Management. This is in contrast to those lobbyist hired outside the company being lobbied for.

Kardell says the rules of interaction with public officials in each state are different. Kardell says where it is allowed, she provides meals for officials. The judge advises the prosecution to keep it relevant to Alabama.

Kardell is asked about two names of individuals who worked for Waste Management - Tom Harrington and Chuck C.

Kardell says Waste Management operates in 48 states.

Kardell says she has met Paul Hamrick once. She says the meeting was in a restaurant in Washington, D. C. She says Hamrick was in town for the Democratic Governor's Association meeting.

Kardell says Hamrick was the new chief of staff for Governor Siegelman and the meeting happened in February of 1999. She says it was the end of February.

Back to the charts we go for a moment. Kardell says she met Hamrick through Claire Austin. Kardell says she had known Austin for a few years. Kardell says she had a brief conversation with Hamrick about his new job and at the end of the conversation Hamrick allegedly told Kardell that Lanny Young was doing a good job for Waste Management in Alabama and Waste Management would regret if Waste Management ever let him go.

Kardell says Hamrick's comment was strange because Waste Management and USA Waste were merging and the new company was in the process of letting some contract lobbyists go.

Kardell says she told her boss the vice president for government affairs.  She said she wanted someone who was in government affairs that might involve Alabama.  She says she had concerns that their might be retribution if Young at some later time was let go.

Kardell said it was about five minutes into the conversation that lasted about that long that the comment was made.

Kardell says she was not sure how long after that Young remained employed by Waste Management.

The witness i asked to look at at document.  It is a letter from August 21, 2000 from Gov. Siegelman. The letter was addressed to the vice president of government affairs of Waste Management.

Governor Siegelman signed the letter.  Kardell says she receives letters from government officials. "Lanny Young is doing a good job for you in Alabama." says the letter at the bottom.  This portion is hand written below Siegelman's signature block. Young was still working for Waste Management at this time.  The judge wants the question restated after an objection.

Kardell says she typically does not get letters with comments about a contract lobbyist.

Kardell says she has not bought anything for an official in Alabama.

Kardell says Waste Management doesn't get letters from governor's with handwriting at the bottom.

Kardell says no other governor from Alabama has written Waste Management a letter like this.

Another sidebar.

Mr. Deen will now question the witness.  The judge has let it be known today will end at 3 p.m.

Mr. Deen is delving into the relationship between Austin and Hamrick.  Kardell says she didn't know anything else about the relationship between Hamrick and Young other than what Hamrick said at the meeting where she talked to Hamrick.

Kardell agrees the event in Washington, D.C. happened the 21-22 of February.  Kardell agrees it was the National Governor's Association meetings not just Democrats.  She agrees there is one meeting of all groups and then the following day the parties break out.

Kardell says she went to the bar of the restaurant in a lobby area and Claire Austin met her there.

Kardell says she probably had a glass of wine with dinner.  Kardell says Austin did not stay with her after the introduction and the conversation lasted 5-10 minutes and she doesn't recall what the man had on.  Deen is referring to Hamrick.  Kardell says she does not specifically know what the chief of staff in Alabama did in 1999.

Deen advises Kardell the chief of staff had an office in the basement of the Capitol.  Kardell says she has not seen Lanny Young lobby anyone in her presence.

Kardell says she didn't know Lanny Young was in business with Claire Austin.  Kardell says she knew Austin was doing work in Alabama but did not know Austin was specifically doing work for Waste Management.

Kardell says the comment from Hamrick about Young could have applied to Austin as well now that she knows Young was working with Austin.

Kardell says again Waste Management was reviewing the status of contract lobbyists.  Kardell admits Hamrick did not say anything about knowing what was going on inside Waste Management.

The judge is reviewing a proposed exhibit.  The government has objected on the grounds of relevance.  There is a sidebar.

The judge allows the exhibit in.  Mr. Deen is asking about checks written to gas stations, the state bar headquarters, etc.  I'm guessing by the dates of the checks Mr. Deen is trying to show that Mr. Hamrick was not in Washington on the date alleged.

Kardell says she has had conversations since that time with Claire Austin.  She says Austin has not told her about disagreements Austin had with Young over Waste Management.

Kardell says she is not a registered lobbyist in Alabama and she has not had a conversation with Governor Siegelman.

Kardell says she does not know if Young was registered or not.  She says she does not know what the rules are in Alabama.

Kardell says she asks for help on various projects for Waste Management if they can.  Kilborn agrees she does not ask public officials to break the law.

Kardell says Waste Management donates to charitable work across the country but she is not aware if the company supported the Alabama Education Foundation.

Kardell says she has not heard Claire Austin call Young a braggart.  Kardell says she is not familiar with the Emelle land fill.

The government is back on re-direct.

Kardell says the vice president of state government affairs didn't lobby the state of Alabama, but he traveled to all the states she says.

Kardell says she has met individuals in bar and restaurants and knows when people are being serious. She says she believes  Mr. Hamrick was being serious when he talked about Lanny Young.  Kardell says she has heard Young's name around Waste Management.

Kardell says she isn't sure when Austin started lobbying for Waste Management.  Kardell says Hamrick never said that Waste Management would regret it if Claire Austin was fired.

Kardell says the lobbyists knew Waste Management was letting some lobbyists go.

Kardell says the meeting with Hamrick happened on February 22, 1999.  Kardell says she does not know every person who might have had access to Hamrick's check book.

Kardell says it's a four hour flight from Washington, D.C. to Montgomery.

Kardell says Waste Management trains employees on what is legal and not legal.

I could not hear the prosecutor's mic.  There was something that now has to be taken up with the judge.

We'll have to find out after this is over what this line of questioning was about.  The prosecutor can't be heard.

Mr. Kilborn asks Ms. Kardell if Lanny Young could represent Waste Management from a jail cell. Kardell says no then Kilborn asks her if she knows that's where Young's going and she says she isn't sure.

Mr. Deen asked the witness about credential procedures for the NGA events.

Claire Austin will be the next witness for the government.

The government starts the questioning.  Austin lives in Montgomery 11.5 years and she is originally from Union Springs.  Austin graduated from Auburn in June 1985.  Austin went to Washington, D.C. to work for Russell Corporation in government affairs.  She lobbied and did promotional work at the federal level.  She worked there 4.5 years.

Austin says she did not lobby the executive branch.  This was 1984-85 to 1988.  The Department of

Commerce determined the limits on imports of goods from abroad.

Austin says Russell had 8-10,000 employees in Alabama and Russell would send items to Costa Rica to be sewn together.

Austin says from 1985-1985 had an impact on the textile industry.

Mr. Deen is objecting to relevancy.

Austin is asked about the importation of foreign good and the impact on textile companies.  She says many companies have gone belly up due to the foreign goods.

Austin says she worked for two years in the U.S. Labor Department and then for President Bush in 1988 in the campaign.  Austin says she worked on the inauguration committee and worked in the administration for 3.5 years and worked on the campaign in 1992.

After 1992, Austin says she worked for four years for a public relations firm.

Austin says she came to work for James in 1995 and then went to work for Sessions as attorney general and worked on Sessions campaign for the U.S. Senate in 1996.  She says she also worked for Pryor and in January 199 she started her own lobbying and government affairs business.

The judge says this is a good breaking point.

The judge is advising the jury the testimony heard may not be considered against Mr. Roberts or Mr. Scrushy.

Posted by Helen Hammons on May 22, 2006 at 01:14 PM | Permalink | Comments (0)

## Another Week Begins

Mr.. Phillip Jordan is on the stand.  He was the former probate judge in Cherokee County.  Mr. Fitzpatrick is questioning this witness for the prosecution.

Jordan says he became probate judge at the age of 26.  In Cherokee County, Jordan says he handled the tag buying process, wills and licenses and such and as chairman of the county commission.

In Alabama a probate judge does not have to have a law degree.

Jordan says he met Lanny Young in the mid 1990s.  Jordan says he met Nick Bailey when Bailey was part of the lieutenant governor's office.  Also, he met Paul Hamrick around the same time.  Jordan says

he met Siegelman when Siegelman was Secretary of State.

Jordan says he doesn't recall seeing any specific interaction between Hamrick and Young nor does he recall seeing Siegelman talking with Young.  Jordan says he has been at events where Young, Hamrick, and/or Siegelman were present at the same event.

Jordan says host government approval must be granted before a landfill is approved.

Jordan says it is his understanding Young received host government approval.  Jordan says Young would then need permission from ADEM.

Jordan says there was a contract with Young's company, he believes it was in the mid-to-late 90s.

Jordan is reviewing an agreement.  Jordan says the date on the document is 1998, but Jordan says he has not previously seen the agreement he is looking at.

Jordan reviews another document which is dated 1995 and is the contract between AWDS and Cherokee County.

Jordan says Young sold Young's stock and controlling interest to Waste Management.  Jordan says it would have been sold in 1998 or 1999.

Jordan says he had quite a few conversations with Lanny Young.  Jordan says Young called during the time in which Young was trying to sell to Waste Management.

Jordan says there were three main restrictions in the contract:

1. Before a majority interest in the landfill could be transfer to someone else, the Cherokee County Commission had to approve the transfer.
2. The service area and the county royalty fee were set.  The service area is defined as the area in which the company can serve.  Jordan says 12-15 counties could dump waste in the landfill.
3. The royalty fees benefit the county from the revenue generated from the landfill according to Jordan.  To change the service area or the royalty fees required county commission approval.

Jordan says Young approached him about possibly selling the stock.  Then Young had requests for modifying the service area.  Young told Jordan that he would get 5% ownership in the land fill if he got help according to Jordan.

Jordan says he accepted the offer from Young.  Jordan says  Young couldn't do the stock transfer to Jordan so Young offered Jordan cash - $100,000.  Jordan says he accepted that offer.

Jordan says Young wanted Jordan to support and assist getting the changes Young wanted through the county commission. Jordan says he thinks Young realized Jordan could guide him through the process of getting the changes approved. Jordan says he gave Young advice and told Young what he thought as the process moved forward.

Jordan says he doesn't remember conversations with Siegelman about the specifics of the contract.

Jordan says he had one conversation sometime after Siegelman was elected and before Siegelman took office. Jordan says Siegelman wanted him to serve on the transition team.

"We have a mutual friend involved in a project up there and anything you can do would be appreciated.," Siegelman supposedly said to Jordan in a late night phone conversation.

Jordan says he believed Siegelman was talking about Young because Young had requested approval of contract changes from the Cherokee County Commission. Jordan says he did not ask Siegelman who he was talking about.

Jordan says he met Paul Hamrick in the office of the Alabama Sheriff's Association in November 1998. Jordan says he traveled to Montgomery but he doesn't specifically recall who else was there besides Hamrick although he believes Siegelman and some of his folks were there.

Jordan says he and Hamrick went into a small office, juts the two of them. According to Jordan, Hamrick told Jordan that if Jordan helped Young some good things would happen for Cherokee County. Jordan says he told Hamrick he thought the changes would happen and eventually the changes were approved.

Jordan says Young started paying him after the contract changes were approved, but Jordan does not recall a specific date.

Jordan is reviewing documents. Jordan agrees after Dec. 1, 1998 Young started paying him periodically in cash, maybe once a month sometime longer. Jordan says he got from $1,000-$6,000 in an envelope. Jordan says they met different places including Etowah County. Eventually Young started paying Jordan by check.

Jordan is reviewing some more documents. Jordan says the documents of copies of the checks showing where Jordan was paid.

Jordan says sometimes Young did not pay him and so he had to call Young to get him to meet the agreement and pay the rest of the money.

Jordan says he sent messages so Young knew what he was talking about.

Jordan says he talked to Hamrick about Young. Jordan says the conversation took place sometime in 2000 when Jordan was picking up or setting out voting machines. Hamrick called Jordan on Jordan's cell phone to ask for help in another area and at the end of the conversation Jordan told Hamrick "he needed to light a fire under Lanny."

Jordan says he was talking about money Young owed Jordan but had not as yet paid.

Mr. Deen objects to the form of a question which is sustained.

Jordan says in the next couple of days he talked to Young and Young asked if Siegelman had called him and Jordan says he told Young that Siegelman had called.

Jordan is asked to compare copies of the checks he received and a chart of the checks that had been previously constructed.

Jordan says it is a partial reflection. Jordan says there is a check on the chart that he does not see in his copies. It is one for $7,000 dated in July.

Y"Young Mr. Fitzpatrick gives copies of additional checks to Jordan for review.

Jordan is asked how much money Young paid him in checks. Jordan is now told to ignore the chart.

Jordan says there is another check Young gave him which was not cashed for $9,000. Jordan says he tore that check up.

Jordan says he got between $20,000-$30,000 in cash. Jordan says he put the money in a safe deposit box.

Jordan agrees he was arrested and he had to forfeit the money he got from Young. Jordan says he gave the government back about $65,000. He says he got the money from Young and James ?.

Mr. Jordan is asked to look at the plea agreement he had with the Northern District of Alabama. Jordan says the agreement was made June 30, 2004. Jordan says he was sentenced to six months confinement in the federal prison, six months home confinement, and $3,000. Jordan says he didn't have to take any action because the commission was for the changes without his input. Jordan says he did agree to take action but never had to take it to get the money.

Jordan says Young thought he was making the check out to Darron, Jordan's brother, but made the check out to Darryl. Jordan says that most people who don't know his brother call him Darryl. Jordan says Young made the checks out to cover up the payments to Jordan.

Jordan says he asked Young to make some checks to Betty Kay Jordan because she needed some money so Jordan asked Young to make the check out directly to her.

Jordan says he has no idea who Billy Jordan is.

Jordan says he can only recall the lottery election between the 1998 and 2000 elections.

Jordan says after his conversation with Hamrick in which Jordan told Hamrick to "light a fire under Lanny Young" Jordan started again to get checks from Young.

Mr. Kilborn will now question Jordan.

Jordan is asked about the phone call from Siegelman.  Jordan agrees he had one phone call from Siegelman about the project.

Jordan says no person's name was mentioned and no particular project was mentioned.

Jordan says the Three Corners land fill project nor the name Lanny Young came up.

Jordan says there was no follow up on the phone call.  Jordan agrees the vote on the land fill was unanimous and Jordan did not vote.  Jordan says the request would have been approved without his agreement with Young.  Jordan says he did not discuss payment arrangements of the agreement with Siegelman.

Jordan says he also never discussed with Siegelman the money Jordan was being paid by Young after Siegelman became governor.  Jordan agrees Siegelman was not trying to get him to do anything illegal.

Jordan says Siegelman was not involved in the conversation with Paul Hamrick.

Jordan agrees he met Young in early-to-mid 1990s.  Jordan agrees he and Young had several discussions before the contract was signed.

Jordan says the Cherokee County land fill did not meet the requirements to remain open under new government guidelines and at some point waste had to be disposed of outside the county.

Jordan says a new landfill was necessary but should have been done without the bribe.

Jordan says Young never told him about Young's bankruptcies and financial difficulties.  According to Kilborn Young came out of bankruptcy about a month before the contract came before the county.

Jordan says Young approached him about taking money.  Jordan says it would be a lie if Young said it

was the other way around.

Jordan says Young shorted him about $30,000-$40,000.

Jordan says Young bribed commissioners Woodall and Abernathy.

Kilborn says he wants to show what a scoundrel Lanny Young was.

Jordan says he has no knowledge if Young threatened Larry Evans.

Jordan is asked if Young ever threatened land owners saying Young was part of the mafia. Jordan says he has no knowledge of this.

Jordan is asked about a Mr. Thomas, a probate judge in DeKalb County. Jordan says Thomas was taking the money for Jordan. Jordan says Thomas was deceased. Kilborn asks if Thomas was found at the bottom of a cliff about the time the investigation started and Jordan says, "Yes."

Jeff Deen questions Mr. Jordan. Jordan agrees he met Young about 1995 and the contract was around 1995. Jordan agrees he did not have a vote on the commission unless there was a tie. Jordan says he was involved in negotiation of the contract. Jordan says he was the only person at the courthouse every day and was the contact person.

Jordan says prior to the agreement, Hamrick did not contact him nor does Jordan have any knowledge of Hamrick contacting anyone else.

Jordan says the next change was around April 1998, which was the request to transfer ownership.

Jordan agrees the date was April 13, 1998 as he reviews a document concerning AWDS and USA Waste requesting approval of the majority of stock from one company to another.

Jordan says the agreement was before April 1998 but the payment was after. Jordan agrees the agreement was for $100,000. Jordan agrees Hamrick had nothing to do with the agreement with Young.

Jordan says he talked to other commissioners about the transfer.

Jordan says they had talked about the need for a land fill. Jordan agrees this would have been a money maker for the county. Jordan agrees one of the reasons to get a new land fill was to help with education in the county.

Jordan says the East Central Alabama Waste Disposal Authority, involving 12-15 counties,s was looking at sites to consider and there would have been competition from other counties.

Jordan agrees the money would stay in Cherokee County. Jordan says the state didn't get any of the money. Jordan says the commission was in favor of a land fill before Jordan met Young.

Jordan agrees from 1995-1998 commissioners were concerned about Young not developing his land fill.

Jordan says the commission came to determine if Young was going to own the land fill he wasn't going to develop it.

Jordan says the commission wanted to be sure whoever it was sold to knew how to run a land fill. Jordan says there was not an issue with Waste Management. Jordan says they knew Waste Management was as qualified as anyone to run the landfill.

Jordan says the land fill needed to be constructed, open, and operated.

Jordan agrees he had not accepted anything from Young prior to the vote. Jordan agrees he had an agreement but he did not vote and couldn't have voted unless there was a tie.

Jordan says the change of ownership was something that needed to be done and would have been done without a bribe. Jordan says it was going to happen.

Jordan says he attended a public hearing in November prior to the December vote. Jordan says there were probably some objections at that meeting on November 17, 1998, but Jordan doesn't remember any particulars.

Jordan says there was a tag meeting in Montgomery a couple of days later conducted by the Revenue Department.

Jordan says he was elected as a Democrat. Jordan agrees he stopped by the Alabama Sheriff's Association building and says he knew some of the governor's people would be there and he popped in hoping to see some folks.

Jordan agrees he was not summoned by Hamrick but ran into Hamrick in the building. Jordan again says Hamrick told him if he could help Lanny good things would happen for Cherokee County.

Jordan says he did not talk to Hamrick about his deal with Young.

Jordan says Hamrick did not influence Jordan's actions in Cherokee County. Jordan says he would have taken the actions he took without Jordan having run into Hamrick in Montgomery.

Jordan says to his knowledge Hamrick had nothing to do with events in Cherokee County.

Jordan is asked to look at a resolution about what was to be voted on. Deen says there was an amendment to a proposed contract. The waste company was to give a $3,000 scholarship for students and some computers. Jordan says the computers were provided to the schools in the county pretty soon after the agreement was signed. Jordan says the scholarship is given every May and this started in May 1999.

Jordan agrees Cherokee County and the waste company met their parts of the agreement.

Jordan says he had a package deal with Young.

Jordan is again asked about the phone conversation with Hamrick. Jordan again says the phone call was right before or after the lottery election.

Jordan says he feels the phone call was about the lottery. Jordan says he knew Hamrick was a policy man for the governor. Jordan says Hamrick was trying to get help with the lottery referendum.

Jordan says he mentioned "Young by name to Hamrick. Jordan says there was nothing to do with the land fill until the end when he told Hamrick to "light a fire" under Young. Jordan says the dates on the checks were after that. Deen says the next check came in February so it was "not a very big fire" since the phone call took place around October.

Jordan says he was elected three times. Deen is asking about Ms. Smith and the neighbor's cows getting out and Ms. Jones who had her neighbor's cows running about. Jordan agrees that if Smith voted for him and Jones did not he would probably take the phone call from Ms. Smith.

Jordan says he would probably help find out something. Jordan says if he knew the county commission was taking up the issue of cows on the lose he would still see what he could do and if the commission passed the measure and he were thanked by Ms. Smith for helping with the cow issue he wouldn't deny he had done anything but would ask per Mr. Deen if he could have some fried chicken.

Mr. Fitzpatrick is back with the witness for the government. Jordan is asked about the Siegelman call again.

"He didn't ask a question...He just made a statement," according to Jordan.

Jordan is asked if he knew how close Lanny Young and Siegelman were. Jordan said this was based on conversations with Lanny. "Lanny was kind of a braggart and he wanted you to know he had furnished the governor a plane and was contributing money...and was close to the governor."

Jordan says Young told him Young gave the governor access to the plane and stuff for the campaign.

Jordan says the conversations took place between 1995-2000. Young told Jordan Young was close to

Hamrick, college roommates.  Jordan says Young did not talk to him about giving money to Hamrick.

Jordan agrees the county commission wanted new ownership for the land fill.  Jordan says he didn't tell Young or Hamrick Jordan's help was not needed.

Jordan says he also did not tell Siegelman the county commission was going to vote to approve the change in ownership either.

Jordan says Siegelman did not tell him about any arrangements Siegelman had with Lanny Young.

Jordan says Hamrick did not mention a similar arrangement with Young.

Mr. Fitzpatrick is finished.

Mr. Kilborn is back.  Jordan says he had an official position with the Probate Judge's position.  Jordan agrees Siegelman had been working day and night to put transition together.  Jordan says he would not have told Siegelman about the agreement.

Jordan agrees the ADEM permit was granted but he was not sure of the date.

Jordan agrees he said Young was a braggart.  Jordan agrees "Young was often boasting and bragging.

Mr. Kilborn asks Jordan if he would believe Young on a stack of Bibles.  "I can't say he never told the truth," says Jordan.

Morning recess time for the jury.

For those following the agonizingly slow pace of this trial, Mr. Feaga from the government side of things says it is possible the prosecution could be finished presenting their case the end of this week. These things you have to take with a grain of salt, but let's hope the government does finish and this thing can move on.

Once the prosecution rests the judge will have to take up some standard motions asking for things like a directed verdict and other items related to the continuation of the trial as it concerns each defendant. This stuff is just normal procedure.

We anticipate there will be some argument from Mr. Blakey, who helped write the RICO statute, as to whether or not the government has met the requirements pertaining to RICO.  Mr. Blakey is a part of the Siegelman team.

More to come on those things.  We should be getting started again shortly.

Young Mr. Fitzpatrick presents his case in an easy to follow fashion.  Now Mr. Feaga will question the next witness.

Mr. Seelack (sp) is an attorney who has represented the Mead Corporation.  Mr. Feaga is asking about a faxed letter to the State Industrial Development Authority.

Mr. Deen objects to Mr. Feaga leading the witness and Judge Fuller sustains the objection.

The witness says the letter confirmed the discussion about projects being granted, moved up the list.

Mr. Deen is asking for limiting instructions.  Mr. Feaga says the witness can say he wrote the letter and wired the fax.  Mr. Feaga tells Judge Fuller he might want to read the letter.  Mr. Feaga says the letter doesn't say "so and so said this, or so and so said that."  The judge decides to read the letter.

The judge says that a limiting instruction will be given if needed but he is going to let the government establish what the witness knows.

The witness says the firms law firm is in Ohio.  We can't hear Mr. Feaga when he steps away from the podium.

Got back and there is a new witness., Norwood Kerr with the Alabama Dept. of Archives and History.

Kerr says the government records section works with state agencies to get records to the archives at the appropriate time.  Kerr is asked about an enrolled act covering alcohol sales at a speedway.

Mr. Kilborn is asking about the board of trustees on which Mr. Fred Gray is a member.

Kilborn says records are turned over to the archives at the end of the administration.  Kerr says Siegelman turned over his personal records although Kerr says he doesn't work in the area that handles that.

The witness is asked about the legal copy of the law dated Sept. 23, 1997.  The witness agrees it involved beer sales at Talladega.

The next witness is Mr. Pat Harris.  Harris is an attorney.  Harris is assistant secretary of the Alabama Senate.  It is a part time position.  He was elected to his first term in January 1991.  He is elected by the members of the Senate.

Harris says he advises senators on procedures and policies of the Senate and advises the presiding officer of the Senate.

Harris agrees he was serving in 1997.  Harris agrees there was a special session in August 1997.

Harris says this session was called by Governor Fob James.  Harris says the governor issues a proclamation listing a series of items requiring the Legislature's presence.

Harris says part of his job is to maintain the journal which records event of the session.

Harris says he has a certified copy of the journal for the session in 1997.  Mr. Harris says events are recorded as they happen.

Harris says the governor issued his extraordinary reason for the session on August 18th, this includes the 25 item call of items to be considered during the session.

Harris says none of the 25 items listed concern beer sales at Talladega.  Harris says Senator Freeman introduced a bill on beer sales for a golf course and for Talladega.

Harris says the draft of the bill goes to the Legislative Reference Service and puts it into a specific form required by the rules.  Harris says the bill goes to the well, or desk, the presiding officer gets the bill and assigns it to a committee with a notation in this case the Committee on Economic Expansion and Trade.

Harris says the presiding officer of the Senate at that time was Lt. Gov. Don Siegelman.  Harris says Siegelman would assign it to committee as per the rules.

Under the rules of that time, the lieutenant governor would determine the members and chairman of the committee.

SB 36 was sent to committee.  Harris says the committee amended the bill and August 19, it reports out of the committee with a favorable report.  Senator Freeman was the chairman of the committee.

Harris talks about importance of committee chairman.  Harris says the chairman sets the agenda and could just not put a bill on the agenda.  Freeman was later appointed by Siegelman to head ADECA.

The bill was placed on the calendar on the third legislative day.

On the eighth day of the session, Sen. Dial requested a suspension of the rules to bring the bill up out of order.

The rules were suspended ant the bill was taken out of order.  The desk called the bill up, addressed the amendment.  The amendments were taken off the bill.  Dial offered a substitute for SB 36.

Mr. Harris is asked to read from the journal.  The entry refers to two types of licenses, one for golf

courses and one for an international motor speedway.  The date was Sept. 3, 1997.

Dial's substitute took out the wording about golf courses and the substitute only applied to the speedway.  The bill passed the Senate 17-8.

Harris says the passage required two-thirds of members voting because the item was not on the call.

Senator Hill represented the area around Talladega according to Harris.  Harris says the bill went to the enrolling department and the bill was prepared for the House.  Harris says the bill passed the House and returned to the Senate for notification and signature.

Harris says a message is prepared for the presiding officer to sign the bill and then the Speaker of the House and then the governor.

Mr. Harris says it was possible for a bill not to be assigned to a committee at all. Senator Hill was up for election the next time , but Harris says he doesn't get involved in the election of the members of the Senate and couldn't say beer sales was a heated issue.  Harris says Hill was not reelected.

Mr. Kilborn passes to Mr. Deen for the moment after Mr. Fitzpatrick finishes.

Mr. Deen is asking basic questions about the Senate.  Harris says every four years the senators are up for reelection.

Harris says the pro tem of the Senate is elected and then they elect the assistant secretary.  The organizational session was 1995.  Michael Figures was elected pro-tem in the organizational session.

Harris says then some rules are adopted.  The rules are offered by members of the Senate.  Harris says he assumes there would be some "haggling" going back and forth.

"Republicans, Democrats or Methodists, you work for all of them?" Mr. Deen asks Mr. Harris.  Mr. Harris agrees.

Harris agrees the lieutenant governor got to select committee chairmen back then and appoint the members of the committee.  Harris says the lieutenant governor had discretion.

Harris says the committee members and chairmen are appointed for the four-year term.

The lieutenant governor presides over the Senate according to Harris.  Harris says the presiding officer can vote in the event of a tie vote.

The presiding officer can recognize who he wants to recognize and can thus prevent a member from

speaking absent some point of order under the rules at that time.  After a point of order, the member would be allowed to speak.

Harris again says the item is presented to a member of the Senate who forwards it to the Legislative Reference Service to be put in proper form.  Mr. Deen is going back through the process of the bill with Mr. Harris.

Harris says the notation can go as fast or as slow as the presiding officer wants them to go.

Harris agrees the bill had to do with alcoholic sales under two classifications - golf courses, and speedway, in its initial form.

Harris says the bill went to the proper committee.  Harris says there was nothing out of order about the procedure.

Harris talks about more requirements pertaining to the bill.

Harris says the Senate does not have to take up the listing of items in the call or take up matters of their own.

Harris says the Alabama Constitution allows the members of the Senate to control the Senate.  The Senate was not required to vote on the bills Gov. James wanted taken up.

Harris says he does not know the total number of bills taken up during the special session.  Harris says he does not have the entire journal on the stand.  Harris says the document he has is a limited part of the journal.

Mr. Deen makes the point that other bills were also introduced that had nothing to do with the call.  Mr. Harris says procedurally there was nothing wrong with the bill being introduced.

Mr. Harris says the presiding officer can't stop the reading of the bill.  Harris says there is not really a difference between an amended bill and a substitute bill.  Harris says items related to kegs was taken out by amendment.

Harris says he recalls there were only five members of the committee that considered the alcohol sales bill.  Harris agrees Sen. Dial represents an area near Talladega according to Harris.

Again Harris says there is nothing procedurally wrong about suspending the rules.  Harris says the only bills that can be suspended are bills that have had their second reading and is on the calendar.

Harris says senators decide what they are going to vote on or not vote on.  Harris says it's possible bills

could run out of time.  Harris says bringing up things out of order is not procedurally wrong.

Harris says the lieutenant governor can't object to a bill coming up out of order, only members of the Senate can object.  Harris says Dial's substitute bill received no objections fro coming up out of order.

Mr. Deen is trying to make the point some Republicans voted for SB 36 while some Democrats voted against the bill.

Mr. Harris agrees the Senate has no control over the House when it comes to the bill, procedurally.

Mr. Harris is being asked about governor's veto power.

Mr. Deen finishes by saying he hasn't mentioned Paul Hamrick during the course of this civics lesson.

New post time.

Posted by Helen Hammons on May 22, 2006 at 08:08 AM | Permalink | Comments (3)

## Kilborn vs Young Part II

Mr. Kilborn is continuing his questioning of Mr. Young.  He is questioning Mr. Young about Young's academic background.  Young is answering questions about ROTC.

Young says he became a 2nd Lieutenant.  Kilborn is asking Young if he submitted documentation of a forged master's degree?  Young says no it was a forged bachelor's degree.  Young says a CWO Jolley made it up.  Young says he knew about it and there was also a forged transcript.



Kilborn says Young submitted grades too low on the transcript to get what he wanted.  "What were you doing using the forged transcripts... for afternoon reading?

"What excuse can you give this jury today for forging documents to advance your career in the U.S. Army?

The year was 1998.

Young says he's answering questions honestly.

You stiffed your mother on the bank debt didn't

you?  No, sir I did not.

You don't still have a copy of that forged transcript do you?  No, sir.

Kilborn again says Young has lied to everyone Young's entire life.  Young says he's been answering questions honestly.

What is your story on this Honda motorcycle? asks Kilborn.

Young says he was called to the governor's office.  Siegelman told Young he wanted to buy a Honda motorcycle that cost between $9-10,000.  According to Young, Siegelman told Young to see Bailey about it.  Young says he gave a $9,200 check to Bailey and Bailey told him he needed cash so Young got a cashier's check and gave it to Bailey.  Young says it was all part of the agreement.

Young  says he knew the whole situation and agreement was wrong and did it anyway.

Young says it's possible Siegelman talked to him about Honda in Japan.  Young says his recollection is Siegelman told him Siegelman liked a motorcycle at a local dealership.

Young says to his recollection Siegelman didn't tell him that Honda wanted to give Siegelman a motorcycle.

Young says he doesn't recall Siegelman telling him that Siegelman told Honda no.

Young says it was his impression that Siegelman wanted to buy the motorcycle not that he had already bought the motorcycle.

Young says it wouldn't surprise him now that the motorcycle was bought Dec. 7. 1999 well before the conversation of January 19th-20th.

Young says Nick Bailey did talk to him about how they wanted the check.  Young says Nick Bailey came up with the amount of the check.  Young says he didn't know what the price of the motorcycle was, Young says he took Bailey's word for it.

Young says he doesn't know what happened to the $9,200.  Young  says the governor told him to get with Nick and Nick told him how he wanted the check delivered.

Young  says he received a check from Bailey for $10,300 or there abouts.  Young says Siegelman and Bailey were trying to make it look like a loan repayment.  Young agrees he did not have conversations with Siegelman about the check.

Young says he knew what they were trying to do.  "I suspected they were trying to cover up some things wrong and corrupt.

Young says he did cash the check.  Young says his attorney was Joe Espy.  "I wasn't going to turn the money down."

Young says his attorney said it was okay to cash the check.

Mr. Young is being made aware of his rights as regards attorney-client conversations by Judge Fuller.

Young says he called to asked how to title the 4-wheeler and was told to title the vehicle in Siegelman's name.  Young says the purchase was all one check to Ward's.

Young is reviewing a document which shows a Dec. 27, 2000 date that Young says he delivered the vehicle to the mansion.  Young agrees Siegelman was not there at the time but wanted the 4-wheeler at the mansion when Siegelman arrived.

Young is reviewing a bill of sale on which Young signed the name of Don Siegelman.

Young says he delivered the 4-wheeler to the mansion.  Young is asked if it made any sense to try and hide the purchase of the 4-wheeler by putting it in Siegelman's name.

Young says it was "not a very good one," referring at Young's allegation of cover up.

The note is dated Dec. 19th.  Young says it was after the quote when trying to explain why the note came before the 4-wheeler was delivered.

"You're not trying to say you got a thank you letter for a bribe are you?".

Young says he got many notes after things were done.

Young is asked if he knew the governor's notes are copied and sent to the state archives.

Young says there was no accident involving his children around this time.

Young says he doesn't recall if he delivered flowers or anything around Dec. 19.

Kilborn is bringing up the "Your are special" letter that was put on a plaque.

Young agrees around Jan. 20, 2000 he was involved with the Lowndes County landfill.  Young says other than some phone calls no.

Mr. Young says he made up the mug at the request of Siegelman. Young says Siegelman asked Young to see Mrs. Siegelman so she could pick one up.

Mr. Kilborn wants to know if Mrs. Siegelman was involved with the bribe of those mugs.

Kilborn is finished after asking if the jury should believe Mrs. Siegelman , "the beloved wife," was involved in a bribe.

Mr. Feaga is showing Young's plea agreement to Young. Young is asked to read a portion of the agreement of May 15, 2003.

Young is reading from the agreement. This portion denotes the motorcycle and 4-wheeler incidents.

In the document Young says he did things in exchange for help with his business.



Mr. Feaga is asking Young about one of his businesses. Young Manufacturing manufactured shirts.

Young says he employed 200-250 people and was in bankruptcy in 1994.

Chart Wars continues.

Mr. Feaga asks Young if he had to borrow money for his business and Mr. Young says he did.

Mr. Feaga list $250,000 as an example of money borrowed to start a business. Mr. Feaga adds another $250,000 for equipment and another $250,000 for raw materials. j Then Mr. Feaga adds another $250,000 for payroll. Young agrees these things all go into the cost of making the shirts.

Mr. Feaga says he should be able to go down this line because the defense went two hours on bankruptcy yesterday.

Mr. Deen and Mr. Baxley and Mr. Kilborn have objections.

Mr. Feaga now decides the t-shirts are selling for $1,10. If you make a million of them it makes $1 million 100 thousand or $100,000 profit.

Young says NAFTA destroyed the apparel business in the Southeast.  Young says he could bring things in cheaper from Guatemala, China, and Mexico.

Mr. Feaga says the shirts are now sold for $.60 because of NAFTA and Young still has all his expenses to meet, the $1 million.

Mr. Feaga continues to write on the chart.  He says as long as the t-shirt is $1.10 the finances are okay.  Feaga asks Young what happens when the price drops?  Young says his clients will no longer pay the $1.10 price.  Young says people had to be made redundant at the company.

Young says he gave the shirts to Siegelman.

Young says he had to personally guarantee his business notes.  Young says the creditors started looking at him to repay the loans the business could not pay.  Young agrees he went into bankruptcy.

Young says he then went to Guatemala and Mexico to visit plants.  Young says Hamrick and he pulled the labels off the hats so the AFL-CIO wouldn't know the hats they he gave out were not imported.

Young is asked to look at a t-shirt.  Young says the t-shirt is like the one they delivered to the hotel for a campaign event with union members.  Young says it has no label.  It was a foreign made shirt.

Young is looking at a t-shirt for another union Labor Day rally, Sept. 4, 1995.  Mr. Feaga says Kilborn says there aren't any t-shirts and asks Mr. Young if this shirt is another one of those t-shirts.  young says it is.

Another shirt from September 4, 1995.

Young is looking at a picture showing Dale Earnhardt and Don Siegelman.  In his hand Siegelman is wearing a driver's suit and holding a helmet.  The picture was taken near the garage-pit area.

Young says he got Siegelman access to this area of the speedway.

There is another picture showing Siegelman getting out of the race car, Dale Earnhardt's car.  Richard Childress is also in the picture taken at Talladega Superspeedway.

There is another picture of Miss Winston Cup Young and company, Siegelman and company, and Musgrove, then governor of Mississippi.

Mr. Feaga is concerned how is question about the youngsters will be interpreted.

Young is asked if the youngster in the picture were the ones who rode 4-wheeler's together.  Young says

they were.

Feaga says the picture was taken in happier times between Siegelman and Young and Young agrees.

There is another picture of Siegelman, Young, and Grant Lynch.  Feaga again refers to happier times.

"I'm looking at the picture, I don't see Louis Franklin in there do you?  Do you see Mr. Kilborn in there anywhere?" says Mr. Feaga.

Young agrees the photograph was taken before Young met with government prosecutors.  Young says he had not been charged when the pictures were taken.  Young says Mr. Franklin represents the government and will make a recommendation concerning Young's future.

There are some issues with checks.  The lawyers are going to confer about exhibits while the jury is on break.  There are some arguments being made in front of the judge.

Mr. Feaga is offering some exhibits.  He says questions have been raised as to cash available to Young to pay to people and Feaga says the evidence he wants admitted are important to the government's case to prove that Young had access to the cash.

Mr. Kilborn says they couldn't connect the payments to Siegelman.  Mr. Kilborn says if these exhibits are in, the defense has the right to get into money Young says he gave to other politicians.

Mr. Feaga argues that this is "smoke and mirrors."

Mr. Deen says that a 302 says Young says he gave Senator Sessions $5,000-$7,000 in cash through an intermediary.  Again these are Young's alleged allegations.

This is apparently about some checks.  Feaga says he wants to show Young had the money to spend. "It's just important to our case your honor."

The judge says he will let Feaga establish that Young cashed checks for cash, but unless he can say he gave X number of dollars to Siegelman, Bailey, or Hamrick

Mr. Leach says he made a change to a charge and tend it to a charge.  Leach says Franklin wanted some other changes.  Jurors are lay people judge and the charge has to be clear...

The judge agrees with Mr. Leach.  Now Mr. Franklin says he wants to be consistent in the charge.

The judge says the reason he changed the original proposed limiting instruction on behalf of Mr. Roberts was because one of the witnesses mentioned Mack Roberts at an antique shop in Birmingham.  This

witness on the other hand I have heard no reference to Mr. Scrushy. The witness could probably not identify Mr. Scrushy except for pictures he has seen. Mr. Leach will get his charge as requested as concerns Mr. Scrushy.

We're back to checks. Mr. Kilborn is arguing prejudicial effect. Feaga wants to put some checks in. Feaga says he can't tie the cash to Siegelman directly in regards to the questioned exhibits Feaga wants in.

Kilborn says Young has been bragging about paying off politicians. The judge says "We're not going to get into that."

The judge will not let the defense bring up alleged payments to other politicians not on trial in this case. Mr. Deen asks why this is not relevant? The judge turns the question around to Mr. Deen.

Mr. Deen says if he's making contributions to these politicians, Young wouldn't have the money Young bragged about having. Mr. Deen is clear he does not believe Senator Session got money not on Sessions' financial disclosure statements.

"We are not going to get into contributions to other candidates, whether they be Democrat, Republican, Independent or Communist Party, whatever party they are in," says Judge Fuller.

The judge tells Feaga he can establish Young has access to cash with regards to checks cashed for "cash."

Mr. McDonald says the concern is that if we start going down that road is essentially the burden of proof is transferred back to the defendants to prove the money was spent on other things than our clients. If we start talking about $75,000 cash..

The judge says there is nothing illegal about having $75,000 cash.

McDonald says the defense was not allowed to put the bankruptcy documents into evidence. Now the government says we need to get the checks in.

Hear me clearly Mr. McDonald, I have not said the checks are going to be admitted into evidence.

The judge stops the arguments and calls back the jury.

Mr. Young is asked what bank the checks are written on. Young says his bank is Compass. Feaga says they are all checks to cash. March 1998- March 16, 2001. There are 73 checks to cash. The total amounts according to Feaga is $71,400.

Mr. Kilborn says he noticed Mr. Feaga's math earlier, but there is a stipulation between parties that the

exhibits are checks written for cash between March 1999- March 2001.

The other checks testified to earlier from Colonial totaled $37,000 and were from 1998.  Mr. Feaga says these checks were also written for cash.

Mr. Kilborn objects and Mr. Feaga withdraws.  Mr. Feaga is finished.  Mr. Deen is questioning Mr. Young.  Young agrees he cannot tell from checks cashed for cash that any of that money went to Paul Hamrick.  Young says he has made payments to other people.  One contribution was to Claire Austin for a candidate of $7,500 according to Young.  Young says it may be prior to 1998.  Young agrees there is another candidate he gave $12,000 - $15,000 to but does not agree it was all in cash.  Young agrees he provided t-shorts, coffee cups for this other candidate who is not on trial in this courtroom.

Young says he doesn't recall taking an  y race-car drivers and owners where he paid cash for stuff.  Young says he took drivers to the Platinum Club.  Mr. Dean calls the Platinum Club "one of those hoochie-coochie places."

Young agrees and says,"And yessir your client was there with me too.  I paid for a limousine ride with your client and the ladies."

Mr. Baxley is questioning Mr. Young about Lowndes County.  Young says a county commissioner from Lowndes County about a road that led to a black cemetery and the paving had been stopped at the white houses and did not continue it to the black houses.  Young says he called Roberts and Roberts got the road finished properly.

Mr. Kilborn says there were two bankruptcies in 1992.  August and September of 1992, two business.  There was a personal bankruptcy in 1995.

Mr. Kilborn says NAFTA was implemented on January 1, 1994.  Kilborn is asking basically how NAFTA impacted Young's business bankruptcies when NAFTA was implemented on January 1, 1994.

Young keeps arguing NAFTA caused the decline of the textile industry.  Young says before NAFTA was implemented changes were already beginning.

Young says he doesn't know if any American workers were involved in making the t-shirt.

Young is looking at a t-shirt dated September 4, 1995 (event date).

Kilborn is asking Young about Mr. Lynch from the Talladega Speedway.  Young agrees Lynch and Siegelman became friends.  Young says he's not aware of a relationship between Siegelman and Lynch before he took Siegelman to Talladega.

Mr. Young is asked about the 4-wheeler and the governor's son.

Young says he never had a conversation with customs.  Young says he wasn't responsible for getting the t-shirts through customs.

Young says the then governor of Mississippi called Talladega to get credentials and Talladega told his office to get with Young.  Mr. Kilborn says "Two governors couldn't do it, but you could?"

Mr. Kilborn alleges Mr. Young cashed checks for cash to give the money to Young's girlfriend and keep the payments away from Young's wife.  Young does not agree with that.

Mr. Feaga is asking questions again. Something about NAFTA and 1992.  We could not hear the question.

Mr. Young is allowed to step down.

The judge reads his charge to the jury basically that the jury should not tie Mr. Scrushy in to anything said by Mr. Young concerning the other defendants.

The prosecution calls Tim Burgess to the stand.  Mr. Burgess resides in Cherokee County and serves as the Cherokee County administrator.  Burgess says he handles financial matters, custodian of records and budget matters.

Burgess prepares minutes of commission meetings.  Burgess says any action the commission is working on are contained in the meeting.  Burgess says there are no commission reporters but there are tape recordings of the meetings and they are prepared on computer and placed in a minute book, which is kept in the commission office.

Burgess says the meetings are approved at the next commission meeting.  Burgess says he was asked to bring documents.  Burgess says he has certified copies of commission meetings.

There are questions about exhibits.

The date of one of the exhibits is 04/13/98, another 12/01/98/, still another dated 12/01/98.

Mr. Burgess is looking at a Cherokee County resolution passed on 04/13/98.

Mr. Burgess agrees another document is also a resolution.  Burgess is asked to look at minutes of the Cherokee County Commission dated  04/13/98.

Mr. Fitzpatrick is asked to move things along by Judge Fuller.

Burgess reads from document about the landfill.  "Motion passed 4-0."

Burgess is not testifying on specifics contained in the minutes.

Mr. Burgess is asked about another document which deals with a contract modification to the "Three Corners" landfill.  The motion passed 4-0.

Mr. Deen will now question the witness.  Mr. Deen asks Mr. Burgess if he was asked to bring all the documents related to the landfill issue or selected documents. Burgess says he was asked to bring selected documents.

Mr. Burgess agrees there may be a document back at his office about a public hearing on the landfill. He says he was not asked to bring those records.

Mr. Baxley asks Burgess when he first came to Montgomery for this.  Mr. Burgess says he came May 2, yesterday, and today.

Mr. Burgess says he spent the night in the hotel and the government paid for that.  Burgess says he's not sure about whether the government is paying for his meals.

The judge gavels hard and is upset about some interaction between attorneys related to hotel bills.

The judge is reading some more instructions to the jury.  He instructs the commission meetings just talked about should not be used against Scrushy or Roberts.

Phillip Jordan will be the next government witness.  There will be a sidebar now.

The judge says, "The hay is in the barn."  Looks like we'll be moving on shortly.  Monday will start at 8 a.m. Monday.

Mr. Feaga says the government will not agree to any more stipulations with regards to witnesses.

Posted by Helen Hammons on May 19, 2006 at 08:38 AM | Permalink | Comments (1)

## Kilborn vs Young

Vince Kilborn has started questioning Lanny Young.

Young says he does not know whose custody he is in and Young is asked about his divorce.

Now Kilborn moves on to the charts.  Mr. Kilborn is doing some "housekeeping" with the charts.

Kilborn asks if he gave Siegelman $72,500 in t-shirts, caps, cash, etc in the lieutenant governor's campaign in 1994. Young agrees there were 1,000 t-shirts at $6 and 500 caps at $5.50. Total is a little over $58,000 and some cash and other things.

Young says he gave the items to Siegelman and that they were part of Young's personal assets. Young says the items went to the campaign headquarters. Young says that is the fair market value of that property in 1994.

Kilborn talks to Young about Young's bankruptcies. Kilborn says Young went in 35 days from being bankrupt to earning quite a bit of money by getting the Cherokee County Commission to approve the contract.

Kilborn is grilling Young about his assets. Young says he was a salesman. Young is reviewing documents that say his estimated monthly income was $0 from Raceday. The document says $0 in overtime and total take home pay was $0.

Young says he had not received any income since November 1994.

Young says this document was filed by the attorneys but Young agrees he signed it under oath. The document is a bankruptcy document. Now Young says he got money from his import company through his accountant.

Young says he does not recall if he filed an income tax return. Did you put this money on your income tax return for 1994 or 1995? "You are a tax cheat aren't you?" asks Kilborn.

Young admits he is guilty of filing false tax returns.

Do you take responsibility for being a criminal tax fraud artist or not? Young admits he was wrong.

Mr. Kilborn is asking Young about a Guatemala company and Young says he will have to get the information.

Young is looking at the document which shows his monthly expenses of $4,730 or $56,760 a year.

Young agrees income less expenses was $33,240. Young tells Kilborn he's not an accountant when asked about how much tax he would have paid on his income. Kilborn is working the charts. Kilborn says, "Like the political polls, let's put a margin of error."

Kilborn says 1994, Raceday Apparel, $90,000 in income. Kilborn has Young working the calculator on the stand.

Kilborn says Young paid Siegelman over 4.5 times what Young's finances would have been. Young agrees if you're looking at personal income that is correct.

Kilborn is now questioning Young about alimony. Kilborn brings up $3,000 in support a month or $36,000 a year. Kilborn says Young paid Siegelman twice what Young paid his children.

Kilborn is asking Young about other transfers of property within one year of the document. Kilborn says Young transferred assets to Siegelman.

Young agrees he sat down and went over the document carefully. Young agrees he took an oath. Young says there wasn't a place on the form to put political contributions.

Young did list a $3,8000 to his ex-spouse.

AWDS LLC was a company formed with Tillman. Young says he doesn't recall how much stock he had in the company. "It was prepared by an attorney in Birmingham."

Young says he got a contract in 1995 between AWDS and the Cherokee County Commission. Young agrees the bankruptcy petition was filed around February 1995.

"Ask a question, don't make speeches," says the judge.

Young says he does not know that amendments should be filed to the bankruptcy if new money or property comes in.

Young agrees he filed bankruptcy twice in 1992. "It was a process..it was something you have to do in business when you have so many trial lawyers chasing everything."

Young says he came to a point where he knew he was wrong. Young says when he met with his attorney he realized things were not right.

You didn't have to go to your attorney to know that bribing a Probate Judge was wrong?

Young says that he has admitted that he was wrong. Young says he went to his attorney, he and his attorney met with the government, and he decided to tell the truth.

Young says, "I'm a grown man. I know when thinks are wrong." Young agrees using the word "loan" on a check was "wrong."

Young agrees the word "hay" on the bottom of check payable to people related to Philip Jordan was wrong. :Have you ever bribed a judge before?" "You paid Jordan to get influence with the Cherokee

County Commission," says Kilborn.  Young first says he pleaded guilty to extortion and then agrees that the money was a bribe.

Kilborn is asking about Paul Thomas falling off a cliff a few days after the FBI came to see Thomas. Young says he did not talk to Philip Jordan about Thomas falling off a cliff.  Kilborn says Thomas fell off a cliff with a plate of table scraps in his hand.  Thomas apparently signed the back of one of the alleged bribe checks.

Young says he does not know whether or not Jordan will be here tomorrow.

"You stiffed all your vendors and your employees in your bankruptcy, isn't that true?" says Mr. Kilborn. Young says he did not.

Still on Cherokee County.  Established that Siegelman was presiding officer of the Senate .  Kilborn brings up Steve Windom.  Kilborn says the Senate took away Siegelman's power as lt. governor.

April 13, 1998 was the next big event says Kilborn.  Transfer of stock from AWDS to USA Waste. Kilborn says the measure passed without Jordan's vote.  Young says there are five people and four votes and I don't know who voted for it.

Young says Siegelman made phone calls for him to the Cherokee County Commission.  "Gov. Siegelman called the Cherokee County Commission...He called at my request...I  don't know the date he called," says Young.

Young is asked about an interview with government officials in 2001.  Young says he told the truth. Kilborn is asking about Charlie King, a commissioner in Lowndes County.  Young agrees he gave money to Mr. Rudolph an associate of Mr. King.  Young agrees he was trying to get a landfill in Lowndes County and gave the $10,000 to Rudolph.

Mr. Kilborn is asking Young about his statement.  Young agrees he did not tell the government he bribed Jordan, Siegelman, Bailey or Hamrick.  Young agrees he left it all out.

Young says he was covering up for friends.  Young says he didn't trust the government enough at the time and had not admitted to himself what he had done.  "You had a transformation, Is that right?"asks Kilborn.

Young says he doesn't know if he's had a transformation but he did realize he was wrong.

Young agrees he was supposed to disclose to the government everything he knew about criminal activity.

Young agrees he knew he had bribed a probate judge at the time and he did not tell the government.

Young says that he knew he was lying to the judge.  "At that time I had not revealed the checks to Mr. Jordan..." that's the truth.

Young admits he did not reveal all the crimes he participated in.

Young says every question to the best of my knowledge was truthful.  He did not tell them everything. "I hesitated, I denied it to myself early on...I'm here to tell one thing and that's the truth and no matter what you say about me today, that's what I'm going to say," says Young.

Young agrees he was looking at about 130 years in prison.  Young agrees he and his attorney tried to get the indictment dismissed, the one in 2004.

"I know that Mr. Glassroth filed some motions," says Young.

Young is reviewing a letter from Glassroth to the government.

Kilborn gets Young to admit Siegelman, Hamrick, Roberts, nor Scrushy had anything to do with Young bribing a judge.

Young is asked to look at his plea agreement.  Young says he doesn't recall being under oath.  Did you tell that judge the truth?  Yes, Mr. Kilborn I did.

Did you just sign something because the prosecution put it in there or did you sign it because it was true?  I signed it because my attorney said it was okay to sign it.

Did you sign this plea agreement because it was true? Young says his attorney advised him to sign it.

Young agrees he signed the plea agreement.  "I signed this agreement after meetings with my attorney.. I'm sorry I don't have the expertise to answer your question Mr. Kilborn," says Young.

Young says what's in the plea agreement is not his lawyer's fault.  He says he takes full responsibility.

Kilborn is referring to 2003 plea agreement.  Kilborn is reviewing with Young what could happen if Young is in violation of his plea agreement.

Young says he has not violated his plea agreement.

Kilborn asks if Young told the government about Talladega and Blount.  Young says he assumes that since the government hasn't charged him, Young has not violated his plea agreement.

Kilborn says Young didn't mention Cherokee County.  Young says the government did not talk to him

about a lack of cooperation.

Kilborn is asking about Young's transformation.  "I'm still the same person I was...It's not easy admitting what's you've done wrong."

Young says in 1994 he was in the importing sportswear business.  Young says 1994 during the campaign he had several conversations with Siegelman about what would happen if Siegelman took office.  Young is asked if he agrees with Bailey's term "absolute agreement."  Young agrees.

Young says Gov. Siegelman and he had conversations where Siegelman said that if I become governor there are going to be things I can do for you.

The agreement was supposedly reached in 1994 according to Young.  Young says he asked for $10,000 for a youth baseball facility...and some other things.

Young says he had conversations with Siegelman also in 1995-1996.  Kilborn wants to know if the youth baseball contribution was an illegal act.  Young just keeps saying, "I asked for things they provided them, when they asked things from me I provided them."

Kilborn asks Young if he wrote the absolute agreement down?  Young says no.  Young says he never wore a wire nor did he secretly tape Siegelman.

Young agrees he was not asked to tape record Siegelman but agrees he did tape Bill Blount.  "There were some tape recordings that were inadvertent."

Young says he was being extorted by people in Lowndes County.  Young says the recording was with his knowledge.

"After the investigation started Gov. Siegelman didn't want to call me anymore," says Young.

Young says he did not know Siegelman knew Mr. France before Siegelman knew Bailey.

Young says Siegelman couldn't get into the garage area before Siegelman was lieutenant governor.

Kilborn is going over the history of alcohol at Talladega.  Young says, "Bootleggers were doing well."

"Kilborn asks if people were getting drunk and driving drunk.  "It's still happening," says Young.

Young says the track wants to make money off the alcohol and it is a good deal for the state, county, and track.

"It was just a good deal, wasn't it?" says Kilborn.  "It was a good deal," says Kilborn.

The vote was passed by unanimous vote.

Young is looking at a Alabama Senate journal.  Young is asked if this is the legislation Young contends that he bribed Siegelman to get passed.

Young says he did not bribe any state senator that voted for the bill.

Young says it is his contention

Do you do anything without a bribe or do you bribe every public official?  Why did you have to bribe a judge.  "The judge came and asked for money and I gave it to him," says Young.

Young says he didn't have to bribe.  "People, staff members and elected officials asked me for things over a number of years and I delivered."

Waste Management was paying Austin- Young.  Young says he sold a company to U.S.A. Waste before he did business with Austin.

Young says the things he had before Austin-Young started in Feb 1999 were his.

The business broke up in May 2001.

Young says he did not take $10,000 out of the company without her knowledge.

Young says he does not recall if he told her about the $500,000 from Waste Management.

Young says the firm broke up because there were a lot of conflicts in the office.  "No, I didn't take any money to Mexico."

Young infers Austin came to him to get Democratic clients as she was a Republican.

Young says, "Mr. Brazeal is a fine, educated attorney."

Young agrees Brazeal was his attorney until the attorney general launched the investigation.

Young says Austin researched the revenue ruling.

Young says he set up a meeting with Nick Bailey.. Sidebar time.

We're back and we already have an objection.

Young agrees he had a meeting with Jim Hayes at the Department of Revenue. Young agrees he asked the Department of Revenue along with Mr. Brazeal to work with Brazeal and other state attorneys to work rapidly to get this resolved.

Young says he used his influence to get the meeting set up.

Young says he doesn't know if it was necessary to get the approval of ADEM. Young says he did not set up meetings with ADEM for this purpose. Young says it was handled by the Revenue Department.

Young says he does not have any evidence that there was anything immoral or illegal with regard to the Alabama Department of Revenue and this ruling.

Young is asked if he knows Eddie Curran. Young says yes but he has not talked to him since the first time they talked.

Young denies he left a message on Curran's answering machine nor has he called him.

Young says he thinks Mr. Brazeal called Curran. Young is asked if he knows Suzanne Smith.

Young says he had a conversation which was recorded and which Young has seen the transcript. Young is asked to look at the transcript.

Young agrees he has seen the document before.

Young agrees this conversation took place in August 2001. Joe Espy and Glassroth were his attorneys at this time.

Young says his attorneys did not know he was having this conversation.

Young is asked if he told her he was having the wool pulled over his eyes.

Young can't identify the transcript and the judge tells Kilborn to move on.

Mr. Kilborn...do not ask him another question about this conversation. Sidebar.

Young says he does not remember talking to Smith about G.H. Construction before the taped conversation.

Young agrees he has said G.H. Construction would have been a good thing for the state.

Young says he doesn't recall seeing a memo from Henry Mabry saying the project should be done.

Young is asked if he recognizes a letter he has been handed.  Young says he does not.  Young says he recognizes the content of the letter.

Young says owning builds equity and that's why it was a good idea.  Young says Nick or Shane Bailey approached him first.

Young says he was behind the organizing of G.H. Construction.  Kilborn asks if Young had ever set up another company to hide Young's ownership.  The idea of falsifying documents was not new to Young, he admits.

Young agrees he falsified tax returns.  This gentleman was a con artist and a crook.  This gentleman easily ,,,took it upon himself to falsify these documents.

Young says to be a project manager one had to be a contractor.  Young says he knew Mr. Green was not qualified.  Young says he's not sure when he learned about Broderick.

Young says he new a Ms. Easterling with the licensing board.  Kilborn alleges Young used a Ms. Crane's friendship with Easterling was used.

Young agrees Broderick and Kirsch falsified some documents, but Young says it went through normal channels.

Young says he was not the architect of falsifying documents with the state licensing board.  Young says the he was not the lone mastermind of submitting the false documents.  He agrees Siegelman nor Hamrick played a role in this.

Young disagrees that Easterling was offered an automobile.  Young says he does not know what Ms. Crane did in regard to an automobile for Easterling.  Young says he may have offered Easterling a job.

Young says he doesn't know who checked the financial statements and did the followup on the application.

Young says he had nothing to do with the contract review board.  Young says G.H. had to have a license.   The license was submitted says Young but he never met with that board.

Recess more to come.

Posted by Helen Hammons on May 18, 2006 at 01:40 PM | Permalink | Comments (1)

# Lanny Young Returns

We are going to be starting in a minute. The judge is in the courtroom. The transcript of yesterday's Bloung-Young telephone recording transcript is linked on the right side of this page.

The judge is taking up whether or not Young's bankruptcy filing

Mr. Feaga objects. He says there are a lot of allegations contained in the filing. He says the 500 pages are collateral.

Mr. Deen says the document goes to the witness' credibility. Mr. Deen argues Young testified he did things financial for Gov. Siegelman and the information goes to credibility.

The judge asks Mr. Deen if Young has denied the bankruptcy and Mr. Deen says Young has not denied the allegation.

Mr. Kilborn says the evidence will show he did not have the assets. The judge says,"Mr. Trump filed for bankruptcy protection and he seems to have done pretty well during his bankruptcy."

Kilborn says Young has filed a subsequent bankruptcy. One in August and one in September 92.

Mr. Kilborn would like a sidebar.

The judge says the document is marked for exhibit but not admitted.

The judge is asked to order some records to do with Chemical Waste Management. The judge tells the government to prepare the order and he will issue it.

Mr. Deen is asking that a bank statement from Paul Hamrick's account from 04/08/98 be admitted into evidence and it is.

Mr. Deen asks Mr. Young if he knows a Kim Young and Mr. Young says Kim Young is his wife.

Young is asked to examine a document.

Young is asked about a $6,000 payment to Paul Hamrick and Young agrees Hamrick paid $3,000. Young agrees Kim Young then wrote Hamrick a $1,000 check. Young has reviewed the check with his wife's signature on it.

There are arguments about the exhibit but the judge admits it into evidence.

IYoung is asked when he first started staying at a house with Hamrick.  Young says 1996.  Young is asked if he got sued by his landlord in 1994.  Young agrees Hamrick represented him in the suit.  Young agrees Hamrick was his friend.  Young agrees he probably didn't pay Hamrick to represent him.

Deen wants to admit the certified copy of the lawsuit against Young into evidence. The judge lets the document in.

Young says he moved in with Hamrick in 1996.  Young says he paid most of the rent.  Young is asked if he has some checks that show where he had rent.  Young says the government has all his records.  Then Young says he may have paid some rent and utilities to Hamrick with cash.

Young is asked about going to Bud's.  Young says that is the place they frequented the most.  Young is asked if he went to a restaurant in Mobile and "Young says he went with Siegelman and Young picked up the bill.

Young is asked if he and Hamrick picked up ladies at Bud's and took them home with them.  "Yeah, I'd say that happened."

Mr. Young is asked to review a plea agreement.  Young now says he wants to correct a statement he made earlier.  The judge says he will let Young correct his statement.

Young says Hamrick may have filed for him on the landlord case but Young says he was actually represented by James Anderson.

The document is the plea agreement.  Mr. Deen is asking about pleading guilty and Young says he has spoken to his attorney and members of the government.

Deen is asking about "substantial assistance to authorities."  Young says to him it meant he would answer government questions.  Young says he has hopes of a reduced sentence.

Count 1 is a conspiracy to numerous candidates for elected positions in the State of Alabama.  Young says he does not dispute that.  The agreement says the official was an official, a budget officer in the Department of Finance, acting head of ADECA...The official mentioned is Nick Bailey.  Young agrees this is the case.  Young agrees Hamrick is not mentioned at all.  Young says Hamrick is included in the "other officials" part.

Mr. Young is looking through the exhibit.

Missed a couple of things but am back until break.

Mr. Young is looking at something to do with the Cherokee County landfill.

The date in question is October 9, 1995. The talk is of Young needing help from Jordan on the landfill. Paragraph about what Young and Jordan agreed to do.

Young is asked if he sees anything about Paul Hamrick in the document. Deen says that is why he's going through the document paragraph by paragraph.

Mr. Deen is going to have Mr. Young look through the document having to do with factual evidence. Young says he depeneded on his attorney and he pleaded guilty to the charge on this. With regard to the Cherokee County landfill situation, in which Young paid the Probate Judge for help, Mr. Young says he does not recollect anything in that part of the document which refers to Hamrick in any way.

Young agrees he filed for bankruptcy in 92 and Young says,"There were two or three subsequent bankruptcies to clear things up. We had to bankrupt the company due to the loss of manufacturing."

These statements are in regard to a business bankruptcy in 1995.

There are again some questions about an exhibit. After review the judge is asking the relevance of the document. The judge sustains the government's objection.

Young is asked about a personal bankrptcy, as well as the business bankruptchy, in 1995. Young agrees there was a personal bankruptcy as well.

October 9, 1995 Young signed a contract with Waste Management. Deen admits the Waste Management contract into evidence.

Young is asked about an attorney representing the Cherokee County Commission. Young says this document has nothing to do with Waste Management.

Young agrees you have to have approval from the county and ADEM for the landfill.

Young says you have to have host government approval before ADEM can process an application. Young says the agreement does have to do with Cherokee County. Young says he was dealing with Jordan, the County Commission, and others.

Young says it took him nine t o ten months from the first meeting until the contract was signed. Young says he did not have a specific site picked out when he started.

Young says the document is a result of working on agreement for a site. Young says there were two attorneys from the law firm working on this. Young says the firm was Walston, Wells from Birmingham.

Young agrees there was a lady attorney at first. Young agrees Bill Pryor was a member of the firm at one time. Young says he trusted Dean Buttram's recommendation.

Young agrees there was no funnuy business in getting this contract. Young says he was not involved with Waste Management at the time.

Young says his firm operated only in Cherokee County. Young says after this period AWDS West operated and Young says he went out and picked up garbage on occasion.

Young says his firm made a contract with USA Waste around 1997-1998 to his recollection.

Young says other people invested in his company. Joey Tillman invested in the company. According to Young, Tillman owned 20-25 percent of the company and there were about 8-10 others.

Young agrees he was the point man.

Young says when the package actually got to ADEM there were some things Young and Brazeal did not agree with and on those occasions he got involved. Young agrees he did a lot of work to get the landfill project through. Young says he wants to make sure he tells the truth.

Young says to his knowledge, while dealing with various agencies to get approval for the landfill there was nothing illegal done.

Young agrees he lent $56,000 to Nick Bailey. Bailey was working for the lieutenant governor's office. Young says Bailey was a confidential assistance. Young says Hamrick was chief of staff and Young says he visited Hamrick in Hamrick's office.

In May 1996, Young agrees he bought an airplane a year after the bankruptcy. Young says in a future year, other investors in the plane did not do what they were supposed to do and the plane was repossessed.

We're moving to 1997 and Talladega.

It looks like we're going back to the charts. Mr. Deen is going through a history of the Talladega racetrack. Young says Siegelman is a NASCAR fan. Young agrees he had conversations with Siegelman about NASCAR.

Grant Lynch is the president or manager over the Talladega Superspeedway according to Young. Young agrees Lynch came to Young and told him Lynch needed help getting Sunday beer sales. Young says he spoke to Siegelman, Hamrick, and Bailey about the possibility of getting it done. Young agrees Gerald Dial probably sponsored the legislation.

Young says Hamrick facilitated a meeting with Mr. Lynch at the Capitol with Bailey and Siegelman. Mr. Deen is writing on his chart. I guess Trial by Charts continues.

Young says Dwayne Freeman may have attended the meeting as well. Young says all Hamrick did was set up the meeting.

Young says he does not have a date for the meeting. Young agrees the legislation was passed in 1997. Young says the meeting was about three months before that.

Young is asked if Hamrick's job was to set up meetings and Young agreed. Young agreed there was nothing wrong about setting up the meeting.

Young says he got passes to Talladega to the garage pit area. Deen says he is trying to find out what Young got for free or in return for the beer legislation getting passed.

Young says he has several credential, documents, pictures that suport his story. Young says Lynch met him at every race Young attended. Young says he can not tell Deen how Mr. Lynch may or may not testify. Young says if he went to the track now, he would have to buy tickets.

Deen is questioning Young about tickets he paid for that Young mentioned yesterday as renewing.

Young is being asked about a charity event and Young is not sure of the date.

Deen wants to know if 1998 was the time frame for the racing helmet Young says he got for Siegelman. Mr. Young is being shown an invoice that was paid 2/20/98 for a helmet.

Young says he is not exactly sure when the invoice was sent. Young says the helmet was sent before a race for Siegelman to use. The hlemet was sent from Charlotte. Young is unsure if this was in the sfall of 97 or spring of 1998.

Young says Siegelman was going to solicit donations from corporate donors for every lap Siegelman completed in the car.

Young is asked about the raising of money for a WWII memorial in Washington, DC. Young says he is aware that Siegelman was the chair for Alabama. Young says Siegelman's laps were part of this project.

Young says the Childress/Earnhardt people were coming to qualify for the race. Young says they wanted to raise Siegelman up as a NASCAR fan and get contributions for a worthy cause.

"That's what politicians do," says Deen. "They do that," says Young.

Mr. Young says he did not pay for the car that Siegelman drove in. Young says he did not have any money spent on the car. Young agrees he got the helmet and Young does not know where they got the suit from.

I had to take a lenghty blog break. Sorry, I'll try to get the info and catch you up if I can.

Mr. Deen is still questioning theMr. Young and they are now talking about a presentation to Jim Hayes. Young says he only made the first meeting. Young says he "used to think so" when asked about Mr. Brazeal as a lawyer. Young agrees there was a report prepared for the meeting with the Department of Revenue head. Young says Ted Hosp was not involved in this project.

Young says he hoped it was successful because he would make money on the project, the revenue tax ruling. Young agrees he made $500,000 on the project.

Young bought some land from Jere Beasley on which Young built a house. Young agrees he ran into financial problems because of several lawsuits and bad investments. In 2001 Mr. Beasley started foreclosure.

Young says he talked to Hamrick about Beasley foreclosing on the property. Young says he doubts that he asked Hamrick to call Jere Beasley. Young says he doesn't think he would have asked Hamrick to place the call because Hamrick and Beasley did not get along.

Young says Hamrick did not introduce him to Bill Blount. Young agrees Blount co-signed a loan with Young. "We had an agreement on what he would get for this," says Young.

Young says he's known Blount since the early 90s. Young says in 2000 he was a consultant for Blount. Young agrees Blount paid him for consulting. Deen says there were two checks.

Young agees he was still partners with Claire Austin. Young says he probably shared none of the $35,000 he got from Blount with Austin. Young agrees the money went into the Tillman-Young account. Young says he and Austin had agreements about different clients and neither got money from some of each other's clients.

The judge wants Mr. Deen to ask a question and let the witness respond.

Mr. Deen is moving to the bond discussion that was on the ttape from yesterday. Mr. Blount, an nvestment banker is on the tape as well as Mr. Funderburk.

Mr. Deen says most of the tape is a discussion about the bond market. "If that's the way you want to explain it, that is your interpretation that is fine," says Young.

Young is reviewing the transcript of the tape recording between himself and Bill Blount yesterday.

Young agrees he doesn't know anything about bonds.  Mr. Deen says Mr. Hamrick did not know anything about bonds.  Young agrees now Mr. Funderburk may have worked in the bond business.

Young says he does not know what Bill Blount's relationship was with Hamrick or Siegelman.

Young says he does not know what Hamrick knows about bonds.  Young agrees Hamrick got Funderburk who knew about bonds to call Blount.

Young agrees he got paid $35,000.  "He knew I had the access and the ability to get it done with the administration.  I got it done," says Young.

Young called Hamrick who called Funderburk who called Blount.  "And you charged $35,000?" says Mr. Deen.  "I did," says Mr. Young.

Young is asked about not wanting a highway coming through his property.  Young agrees he talked to Hamrrick about the problem.  Young says Siegelman and Mack Roberts came out to look at his property and agreed  Siegelman nor Roberts did anything for him in regards to stopping the highway.

Posted by Helen Hammons on May 18, 2006 at 08:44 AM | Permalink | Comments (0)

## Defense Starts Questioning Young

Mr. Hamrick's lawyers will start questioning for the defense after their charts are set up.  And of course everybody wants to meet with the judge.

The judge asks Mr. Deen if he is "getting close?"  Mr. Deen starts the questioning.

Young agrees that at one point he was best friends, "true friends", with Hamrick.  Young agrees he made a distinction between Hamrick and Siegelman, Bailey and others.

Young agrees he and Hamrick were friends for 10-12 years.

Young agrees he passed more money to Hamrick then Hamrick did to Young, but that money went both ways.

Mr. Young is being asked about the $25,000 for the car.

Deen is taking Young back to the check and the :for" remark that says "loan" on the car.  Young agrees it is from Young's personal account to Hamrick.

Mr. Young is now asked about bribing Phillip Jordan. Young says it was extortion. Mr. Deen is getting Young to admit the "for" statements on the bottom of checks written to Jordan allegedly for things like cattle, a hay pusher, etc are untrue statements. Young admits it was to hide what the checks were going for.

Young agrees he went with Hamrick to pick out the car. Young agrees he knew what the $25,000 was going for. Young agrees he did not ask for anything specific when he wrote the check that enabled Hamrick to lease the car.

Mr. Deen is asking Young about a meeting in Clanton with Brennan for the government and Young's attorney Mr. Glassroth, who Jeff Deen goes on to referr to as a fine Montgomery lawyer.

"Let's cut out the editorials and move on," says Judge Fuller.

Young agrees he said "no" to a Mr. Long from the government during a government interview in Clanton when Long asked him if Young asked for anything in return for the $25,000.

Young agrees he made bond in the federal system. Young agrees he was arrested near Boaz and the bond was revoked and Young agrees his wife went to Hamrick's house and got $500. Hamrick also brought Mr. Gilbert $500. Young says he has not paid Hamrick back.

In 2000, according to Deen, Trava Williams got people involved in stock deals involved in margin calls. Young says he had an account with Williams but Young did not know which of Williams' two firms he did business with. Hamrick paid back $3,000 of the $6,000 agrees Young.

Young agrees he is familiar with interview documents. Young agrees he was interviewed from 11:55 a. m. to 4:45 p.m, Nov. 6, 2001. Young agrees the main thing government officials wanted to talk about was Goat Hill. Young agrees he didn't say anything about Hamrick and Goat Hill.

November 12 at Days Inn at Clanton. from about 10-2. Young agrees it was a follow up statement to the first statement and mainly focused on G.H. Construction. Young says he believes it is correct he did not mention Hamrick in regard to G.H. Construction. Young again says in the statement that he didn't ask Hamrick to do anything for the car.

There were questions about Claire Austin and a personal relationship with Hamrick. Young replies, "They were friends."

November 19, 2001 interview. Mr. Franklin was at the interview. Young says he takes Deen's word for it that Young does not mention Hamrick.

May 8, 2002 interview with government. September 20, 2002 interview was conducted at Young's home. Mr. Young agrees nothing is mentioned about Hamrick.

Young says he doesn't recall if there was anyhthing in the documents about an "absolute" agreement.

April 2, 2003.  Young says he never stated Paul was involved in G.H. Construction.  Young agrees the car is not in the statement but also agrees there is a statement about cash.  Young says he would have to read the statement but that Bailey was one of the irst people to approach him about the project.

Young agrees G.H. Construction would have been a good project for the state.

Deen rattles off more statement dates from 2003, one in 2004, and then a jump until 2005.

October 10, 2005 testimony in front of the grand jury.  Feb. 22, 2005 is another interview date.

Young agrees there is always more than one person there.  On January 13, 2005 Young was taken to the Jackson County jail.  Brennan showed up at the jail according to Young.  Young says Brennan asked a lot of questions about Mr. Hamrick.  Young is asked if Young told Don Gilbert that the government said to Young if Young would give them something on Paul Hamrick he would get out of jail.  Young says he doesn't recall.

Deen says what he is showing Young is not a 302 but it is a summary by Brennan.

Young agrees he testified to the grand jury in 2005.  Deen is reviewing Young's work history.

Mr. Dean wants to know where the money is coming from for Young to invest in NASCAR shirts, etc.

Young says his agreement was with Sports Image.  He worked with Joey Tillman.

In 1992-93 time frame Young says he met Hamrick.  Young agrees he had no business interest with Paul at that time.

The judge finally asks Mr. Deen where he is going?

Young says he moved to Montgomery following Young's divorce.  Young says he came in 1993. Young eventually went to live with Hamrick for a while at two locations - an apartment across from Huntingdon and a house on Audobon Drive.

Young is asked about an address on a check from 1999 that still showed the Audobon Drive address.

Young says he and Hamrick went out and "We were two guys just out drinking beer."

Deen wants to know if Hamrick and Young went to NASCAR races before Young met Siegelman.

Young agrees when he met Siegelman that Hamrick was working on the campaign.

Young agrees he gave things to Siegelman like t-shirts.  Mr. Deen brings the charts up for Mr. Young to examine.

Judge Fuller sends Deen and the charts he just brougnt in front of Young back to the original position of the charts so everyone can see.

Young says that in 1994 the shirts would cost $6 each if Siegelman bought 1,000 shirts.  Young says he was paying about $36 a dozen for the shirts.  Young is asked if he has an invoice for the shirts donated.  Young says he has 1,000 AFL-CIO workers.  Young says he doesn't know that he has any receipts for ball caps.

Deen is bringing doubt as to what information is on Mr. Feaga's charts.  Deen says Young is just guessing.  Young says he doubts that there is any paperwork to back up his claims that he gave the shirts.  Young says their are people who got the shirts and can say so.

Deen brings up Young's 1992 bankruptcy, Chapter 11.  Deen says the bankruptcy document is a certified document.  The prosecution is objecting.

Deen says the bankruptcy petition shows how much his debt Young was in and whether or not Young could have been the biggest contributor to the campaign.

The judge says he will deal with this in the morning.

Talk now is of limiting instructions in reference to Mr.Scrushy and the testimony of Mr. Young.

The judge tells Mr. Leach and Mr. Franklin to work out the language and the judge will consider the instruction.

The government will call Burges and Jordan after Mr. Young.

The judge is now also talking about "Trial by Charts."  He is going to grant objections to charts which fall outside the August 1997 through January 20, 2003 time frame.

Mr. McDonald says Mr. Feaga has done a "fantastic" jobl in handling the witness.  "Mr. Feaga is essentially transcribing the witnesses testimony and putting it on the charts"  The judge agrees with McDonald.

"Mr. Feaga did not begin this plethara of chart marking.  I am afraid we are going to wind up with more charts going back to the jury room than exhibits," says the judge.

The judge says if the use of charts continues he might not allow any of the charts to go to the jury.

"Everfyone is guilty."   "It is turning into a recitation.," says Judge Fuller.

The judge will admit some of the government's exhibits and parts of others.

The group is going into chambers for the next conversation.

Posted by Helen Hammons on May 17, 2006 at 04:12 PM | Permalink | Comments (1)

## Afternoon with Lanny Young

Well, there's still a lot of ground to cover so the prosecution may be a while with Mr. Young although I don't have a good time table.

It is the consensus of opinion around the courthouse that Mr. Feaga has done a fine job of presenting the government's case with Mr. Young.

The transcript of the tape recording will be available on the blog  maybe tonight, but for sure by in the morning.

For his part Vince Kilborn called the events related by Lanny Young "bizarre."  Kilborn told the press during the lunch break that there were some things left out of the story. "What they leave out is in the Memorandum of Understanding, Waste Management ( I believe it may have been Chemical Waste) has a $4.62 million claim against the Department of Revenue.  They withdraw that claim in the MOU. Alabama picks up $4.62 million on July 15, 1999, the day the thing's signed."  I believe the agreement did not acltually go into effect until December, but am checking on this.

Apparantly Chemical Waste agreed not to file a lawsuit to get $4 million worth of what it claims were excess taxes that were paid to the state as a result of not changing some of the rates earlier.

Mr. Feaga is questioning Mr. Young.  Mr. Young is asked about a check made payable to Paul Hamrick in the amount of $6,000.  The $6,000 check was about 19 days after the Blount Parrish check.

Young says Hamrick told him that Hamrick needed $6,000 to cover with Hamrick's stock broker. Young says he gave him the money as part of the agreement to do things for each other.

Young agrees that Waste Management is a company that operates in interstate commerce.

Mr. Feaga going back to G.H. Construction.  Young says he set up and incorporated the company under

the names of two other individuals but that he was running the company. The company was to oversee the construction of two warehouses.

Brian Broderick and David Green were the men named. Broderick was a contractor in Montgomery. Green was a contractor in Birmingham. Young says Nick Bailey asked him to "cover it up that way."

Young says Siegelman knew Young was going to be involved in this project because "we spoke about it." Young says he also talked to Hamrick about G.H. Construction. According to Young, Paul called Nick and told Nick it was a good idea and we needed to have a press conference about it. Young says he told Hamrick a press conference was not a good idea right then.

Young says he met Hamrick at a lunch along with Kirsch and Bailey. Young says Hamrick asked him how the project was going. Young says at the time he, Young, was in the landfill business.

Young says he had not been involved in a project the size of G.H. Construction before.

Young says he was involved because, "It was an opportunity for me to make some more money." Young says he hoped to get 8-10 percent of the project total of around $21 million.

Young is asked if the agreement was one he had with Hamrick, Siegelman, and Bailey. Feaga is asking why Hamrick wanted Young to make money off of projects. "If I had money he would have access for money, if I had no money he would have no access to money," says Young.

Young says the same regarding Siegelman and Bailey. Mr. Young is looking at a document related to the Montgomery Downtown Development Authority and ADECA. It is a lease. This is the lease agreement needed to do the bond financing, the $21 million. Mr. Young agrees this has to be approved by the governor.

Mr. Kilborn is talking but we can't hear what he is saying. Mr. Feaga has agreed to establish the document with the witness. Mr. Young says it is a record of his business and it is a record that would have normally been maintained and he was a custodian of the record.

Young says he picked it the document up from Bailey and Bailey told Young to take it around to the various departments to get it signed.

The first signature on the agreement is Nick Bailey's signature according to Young's review of the document.

Young says he got the document and Nick asked him to go to the other offices to get it signed. Young says he went to see Mr. Mabry at the Department of Finance. Then Young says he went to the Legal Division and showed him the lease agreement, Lee Miller. Miller signed the document four days before Christmas in 2000.

The next signature is that of Ted Hosp, at the time the governor's legal advisor.   Young says he went into the office, Hosp made a phone call and then signed the document.

Young says he next met with Bill Blount to talk about financing for the construction.

Young is examining one of his own personal checks for $5,324.02 to Ward's.  Young says the check was for the purchase of a 4-wheeler.  Young says he parked the vehicle in a garage in a house adjacent to the Governor's Mansion.

Young says Nick Bailey had contacted him and the governor wanted a 4-wheeler for Joseph, Siegelman's son, to ride.  Young says Joseph and his son had riddent 4-wheelers together on a previous occasion.

Young says he was asked to do it and "I did it."  Young says he did not talk to th governor beforehand.  Young says he talked to the governor after the purchase and they talked about needing a tag.  According to Young, Siegelman talked to him about going to Riley Smith's and later told Young they had enjoyed the 4-wheerler at Riley Smith's.

Mr. Young is looking at documents related to the 4-wheeler, for example, a bill of sale and invoice.

The first document is a certificate of origination related to the trailer.  The trailer was purchased from Ward's.  The first name on the title to the trailer is that of Don Siegelman.

Another document is a certificate of origin for a 2000 Polaris 4-wheeler.  The last page of the exhibit is an invoice from Wards in Troy, Alabama.  The date on the invoice is December 14, 2000.  The date of the check is Dec. 27, 2000.  Young says he went to Ward's to get a quote and maybe other reasons related to his business.

The address on the invoice is that of the mansion.  Young says he talked to Bailey before Young went and got the quote.  Mr. Feaga says the quote was on Dec. 14, the lease agreement was signed on the 21st of December and the 4-wheeler was delivered on December 27th.

Mr. Young is asked to show a letter from Gov. Siegelman.  Young is asked to read the address on the letter and asked if he visited the governor at that address.  The address is Dec. 19, 2000.  The letter starts "Dear Lanny:"

The note is a thank you note for "your thoughtful gift."  "Thanks for all you do for me" is handwritten at the bottom of the letter.

Problems with the time line. I'll try to check it out later today.

Young says the Mobile Press-Register stories about G.H. Construction caused the collapse of the project.

The defense apparantly can not find a copy of an exhibit.  The judge tells the jury they can stretch if they want.  The defense has found their copy.

Mr. young is looking at a document from a Brett Shelton to Governor Siegelman on July 24, 2000.  Shelton is with the Talladega Superspeedway.  In the letter Shelton is telling the governor that the speedway will be in contact with "Lanny and Paul" to coordinate.

Young is now asked who the Paul is in the conversation with Blount that was played in the courtroom earlier.  Young says that Paul is Paul Hamrick, the same Paul mentioned in the letter.

Young is asked if the exhibits are records of his business.  Young is reviweing a letter from Gov. Musgrove of Mississippi concerning names and social security numbers for people attending a race at Talladega.

Young forwarded the info to Talladega and Young had to go sign and pick up credentials.

Young says the credentials were given out by NASCAR.  Young says when he asked for them he got them.

Young is reviewing a fax cover sheet from the governor's office dated 4/16/01.  It is a list of five people for non-vip, non-credentialed tickets.  The fax was from Ms. Firday in the governor's office - Young says he got the tickets.

Young is looking now at an update of the previous list.  The new list includes the governor, Bailey, Joseph and a friend of Joseph's, and others.  The reqauest is for 18 tickets "presidential."

Young says he got the tickets because the governor's office asked for them.  "When I called over there to get something done, I expected it do get done as well," says Young.

Young is looking at a document from 2/16/01 about seats at the racetrack.  Young says this was paid for by G.H. Construction.

Mr. Feaga is questioning Young about seeing Mack Roberts and Jim Allen with Gov. Siegelman, Hamrick, and Bailey in front of Siegelman HQ.

Young says he saw Roberts and Allen get out of their car and he asked Siegelman what the two were doing there.  According to Young, Siegelman said, "If they want the highway director's job they better have a sackful of money."

Young says there waa another conversation with Siegelman about Mack Roberts. Young says he got a telephone call from Nick Bailey in which Bailey said Siegelman was going to appoint Mack Roberts as highway director and Bailey said people associated with the campaign were not happy with the choice.

Young says he told the governor people would be disappointed with the choice. Siegelman says,"I made a deal with Jim Allen and I'm going to keep that deal."

Mr. Young is reviewing another document. This is another check to Colonial Bank in the amount of $9,200. Young says he wrote the check to get a cashier's check.

The check was written on January 20, 2000.

Young says at a meeting in the governor's office, Siegelman allegedly told Young that Siegelman was interested in a Honda motorcycle and for Young to work it out with Nick. Young says Nick Bailey gave him the amount. Young wrote Bailey a personal check and Bailey called him back saying Bailey could not take a personal check. Young says that is when Young got the cashier's check.

Young says he did not get a motorcycle. "This is for a Honda, I'm a Harley man." Young says he didn't have an interest in buying a motorcyle. Young says this was all part of the agreement.

Mr. Feaga says he has about another 30 minutes.

Young again says the date on the check was January 20, 2000. Young is now asked to look at something else. He is looking at a check from Nick Bailey payable to Young for $10,503.39

The date of this check is June 5, 2001. Young says it was after the G.H. Construction project fell apart. Young says he knew an investigation was underway.

Young says right after the investigation started he was called by Bailey and asked if Young could remember how he had paid the $9,200. According to Young, Bailey told Young, "If it's on one of your personal accounts you're going to have a motorcycle in your driveway tonight."

Young says this all was to cover up the $9,200. Young says his intention was to pay for the motorcycle for Siegelman, because the governor had asked for it.

Mr. Feaga says this would be a good time to recess.

The judge reminds all counsel to abide by the rules of evidence.

Mr. Feaga is going back through some checks with Mr. Young. One is a $3,000 check from Paul Hamrick to Young the date is in 10/09/2001.

Young says he talked to Paul Hamrick about the check. Hamrick told Young he had a check for him to come get. Harmrick told Young it was for Hamrick;s half of the stock Hamrick said he had bought with Young. Young says the check was to help cover up the $6,000.

Talk about another $1,000.

Another check for $500 from Young to Hamrick. There is another check to Harmrick April 4, 1998 for $1,500. Another check for $500 to Hamrick. young reiterates if he asked for something, Hamrick would do something for him.

Young says he was giving things to Hamrick because by our agreement, when I asked for something Hamrick would do it for him and vice versa. Young says the same goes for Siegelman and Bailey.

Mr. Feaga is going through more checks from Young or Tillman and Young. Young believes he cashed the checks and is verifying that with the documents. The checks appear to have been made out to cash. Most in 1998.

There is going to be a meeting at the bench.

Young agrees he provided Hamrick with at least $15,000 in cash over a 8-10 year period. This does notinclude the BMW money or stock money.

Young agrees he gave Harmrick cash in 1998. Young says he cashed the checks to get the money.

"Was the cash that was received for those checks, were the proceeds from those checks given to Mr. Hamrick or used for his benefit," asks Judge Fuller.

Young says he can't say that all the money from the checks being cashed went to Hamrick. Young says some of it did.

Mr. Feaga says he was just trying to establish that Young had the money available to give to Hamrick, not that Young gave all the money from these checks went to Hamrick.

Mr. Young is being asked about more checks and if the checks were part of the agreement.

Another check needs to be offered into evidence. This check is August 26, 1998.

Mr. feaga is making sure his charts have exhibit numbers on them.

The judge asks Mr. feaga to be sure to indicate for the judge which exhibits contain information not in the indictment. Specail reference is made to the 1994 t-shirt pages of Feaga's charts.

Mr. Feaga asks Mr. Young again about the helmet 11/13/1997.  Young says the run around the track happened in the fall of 1997,  Young says he purchased the helmet before the trip around the track, but the invoice wasn't received until later.

The judge is going to reserve ruling on the entering of the charts not already entered into evidence later.

Mr. Feaga is finished.  While the judge is dealing with some things we will create a new post.

Posted by Helen Hammons on May 17, 2006 at 01:17 PM | Permalink | Comments (1)

# Lanny Young Continues

Lanny Young will still be on the stand today.  We should expect at least a couple of more hours of questions from the prosecution if not more before Vince Kilborn gets his shot at Mr. Young.

I promised to keep the Scrushy faithful updated on Mr. Scrushy's scheduled appearance on TBN's Praise the Lord program.  Mr. Scrushy tells me that as of now the show has been moved to next week.  According to Mr. Scrushy another guest scheduled to be on this particular show could not make this show and so the show was moved.  I'll keep you informed as best I can on the appearance.

Mr. Feaga begins to question Mr. Young.  Feaga is asking Young again about events at the Talladega Superspeedway involving Gov. Siegelman driving around the track.  Feaga wants to know the number of the car Siegelman was driving.  Young says the car was #3 brought down from Charlotte in a separate hauler with support personnel.  Young says there was no cost.  The cost was picked up by the team itself.  Young says he had good will with the owners of the car.

Young says Siegelman was on the John Boy and Billy show and the Rick and Bubba show.  These were national syndicated radio shows.

Young agrees Siegelman was successful in the race for governor.  Young says he had a landfill in Cherokee County.  Young says he was in the process of being sold to USA Waste which became USA Waste Management.  Young says he'd paid part of the purchase price of the contract.

Young says there was an incentive if the Cherokee County landfill got an increased service area.

Young says there was also a change in the way the royalty fees would be paid to the county.  Young says the initial agreement with the county was for example $2 a ton for waste but this could be lowered if they brought in more tonnage.

Mr. Young is looking at an acquisition agreement.  "We would get $2 million if we could get the service

area increased."  Another $1 million could be earned in regard to the county fees.

Young is asked if Siegelman helped him with this.  Young says Siegelman called the Cherokee County Commission.  Young says Hamrick helped also with a phone call.

Young says he was successful in getting the rate reduction and expanded service area.  Young agrees he knows Philip Jordan who was probate judge and on the county commission.  Young agrees he pleaded guilty to paying money to Philip Jordan.

Young is looking at a memo of transaction where $2 million was deposited in Young's account.  Young says he was paid the $2 million by Waste Management.  The date of the deposit was January 29, 1999 according to the document.  Siegelman was governor and Hamrick was Siegelman's chief of staff at the time.

Mr. Deen would like the document authenticated which Mr. Feaga says he intends to do at a later date.

Young is looking at a document showing the deposit of $1 million into is account on 12/07/98 from Waste Management.

Young says the changes that allowed him to earn his money were approved in November of 98 by the Cherokee County commission.  Mr. Feaga says this happened in December and Mr. Young agrees he would not quarrel with that.

Mr. Young is asked to look at a check.  Young says it is his check which is drawn on a Compass Bank account.  The check is for $25,000 and made payable to Paul Hamrick.  The date is March 10, 1999.

Young says Hamrick asked Young for the check.  Young says Hamrick got a lease on a BMW.

"I gave it to him because they asked me for things and I asked them for things and I did it when they asked," says Young.  Young says this was part of the agreement.

There is an objection and the judge says, "Let's not start this day off like this."  The objection is sustained.

Young says he had several conversations with Hamrick about what would be done for Young in the event Siegelman became governor.

Young says Hamrick wanted Young to have access to money so that if one of the three - Hamrick, Siegelman, Bailey needed money, Young would have it.  Young says he wanted access to the governor's office. Young says he was giving Siegelman and Bailey things as well.

Mr. Young is looking at a check written on his account to Darryl Jordan for $7,000. This is some relative of Phillip Jordan according to Young. July 1999. The monehy was for Phillip Jordan Young says. On July 25, 1999 there was another $7,000 check. On 31 July 1999 another $6,000. On Feb 1, 2000 and Feb. 9, 2000 payment made to Betty Jordan. The first check was for $8,000 as was the second.

Jordan has pleaded guilty to accepting this money. Another check for $1,000 on Aug. 23, 2000. This check made out to Billy Jordan.

Jordan was also chariman of the Cherokee County Commission at the time the items needed for Young to get his $3 million of payments from Waste Management were approved by the county commission.

Young says he created a firm Austim and Young to lobby for Waste Management. Young says he did not register as a lobbyist with the ethics commission, but Claire Austin did register as a lobbyist. Young says he did not actually lobby the legislature.

Young says he had a conversation with Paul Hamrick about whether or not Young should register as a lobbyist. According to Young, Hamrick told him it probably wouldn't b e good if Young registered as a lobbyist. Young agrees he would have had to report clients and public officials.

The judge reminds Mr. Feaga not to lead the witness.

Young says he talked to Nick Bailey about whether or not to become a lobbyist but Young does not recall talking to Siegelman about this matter.

Austin and Young had a business relationship with USA Waste Management starting at or near the time Siegelman became government. Austin and Young was to be paid $10,000 a month.

Mr. Young says he had three or four agreements with USA Waste Management.

Mr. Feaga wants to establish a time frame.

Mr. Young is asked to look at a document. The document tells what fee he would get if he could get a tax decreased to $21 a ton. The document has to do with a subsidiary of USA Waste Management. Waste Management wanted to get the taxes lowered from $50 a ton to $21 a ton. Young would be paid $500,000 with the possibility of an additional $1.5 million being paid to Young.

Young says the State Revenue Department was the agency that could help with this matter. The date of the document is 06/29/1999/ Young says Siegelman was governor at the time and Hamrick was chief of staff. Bailey was an administrative assistant at the time according to Young. From January through June 1999, Young says he visited with Siegelman at least once a week. Young says he was seeing Hamrick weekly during this time as well. Bailey as well.

Feaga says Young gave Siegelman more than $250,000 in contributions and more than $200,000 in other gifts.  Young agrees.

Young says he was the biggest individual contributor to Siegelman.

Young says he had visited with "Don, Nick, and Paul" about getting this (Waste Management tax lowered) done.

Young says he had a proposal of what Waste Management wanted.  Young says he gave the document to Nick Bailey.  Young asked for a meeting with Young, his attorney, and the revenue commissioner.  Young says Bailey set up the meeting and this was part of the agreement.  Young says the meeting was the next day.

Youngsays he talked to the governor about the revenue ruling on the day before the ruling was signed and Siegelman told him, "We're going to get the revenue ruling you want but those bastards are going to pay for it."

$50,000 from Waste Management allegedly went to the Alabama Education Foundation.

Young is asked to look at a document.  The document is a fax cover sheet to Sandy at Waste Management corporate offices in Atlanta showing Governor Siegelman's resume was faxed to them.  This was at the request of Miller Matthews.  Young says Matthews was to receive a call from Siegelman asking for the $50,000 and Matthews wanted information on Siegelman before the phone call.

Young says he knows the governor called Matthews.  Young says he is not sure he talked to Siegelman about the call but he talked to Matthews.  The judge instructs the jury to disregard any information about Siegelman and the alleged call with Matthews.  The judge tells Mr. Young that he (Young) hasn't done anything wrong.  The judge says he will tell Young when Young has done anything wrong.

Young faxed the resume from Montgomery to Marietta, Georgia.

Young says he was represented by lawyer Ellis Brazeall, Mr. Hamrick's brother-in-law in dealings with Waste Management.

The judge is not going to let the document Young is looking at be published or read to the jury.

The judge is asking counsel to come to the bench.  It looks like the objection has been withdrawn to the admission of the document.

The memo of understanding is dated July 15, 1999.  Young is looking at a fax cover sheet having to do with this document.

Young says he invited Waste Management personnel down to dinner and he also invited the governor to dinners with Waste Management.  Young says he also asked Hamrick and Bailey to come to dinner meetings with Wast Management.

Young says,"When you're negotiating a multi-million contract it is very powerful to have people in those positions with us."

Asked if it helped, Young replied, "It got us over the hurdle."

A check from Brazeall's law firm for $500,000 was sent to Young.  This check is dated 07/26/99 and is the money promised by Waste Management for getting the tax reduced.

Mr. Deen apparantly refers to some of Mr. Feaga's comments as a "dig."  Mr. Feaga doesn't think referring to Hamrick;s brother-in-law is a dig.  The judge talks to Mr. Deen about how to state his objection.

Young is looking at a 09/07/99 check from Waste Management to the Alabama Education Foundation for $50,000.  Young says he was with the governor when the check was presented to the governor.

Young says there was a house across from the governor's mansion and they went in the back door because he had been advised the press was around.  Young says the Waste Management people and Young met with the governor and the check was presented.

Young is looking at another exhibit which is a note from Siegelman to Young dated 07/15/99.  Young is asked to hold the note up, which is mounted on a plaque of some kind.  "Lanny you are something.. I really appreciate your friendship and Iook forward to spending more time together. You are special." Don

The judge has a short meeting and we will be in recess until 10:20 to 10:30.

We're back.  Young is being asked again about the landfill in Cherokee County and who represented him.  Young says it was Brazeal.

Young says he met Hamrick 1992-1993.  Young is asked about G.H. Construction.  Young says there was a company formed called Goat Hill Construction in charge of construction management for those two projects.

in relation to that project following apart, Young says he believes it sometime in May of 2000 or 2001.

Young is asked if he had regular, frequent contact with Siegelman, Hamrick and Bailey.  Young is asked if he saw any conflict between Bailey and Hamrick.  Young says he did not see friction.  Young says he

did not see friction between Siegelman and Bailey either.

Young says Hamrick and Bailey were from the same county.

Young is examining a coffee mug. Now he's looking at something else. Young says it is a record of his business, the actual handwritten card we used to put the wording on the cup according to Young.

Young says he got the wording from Siegelman. The judge tells Mr. Feaga not to introduce parts of an exhibit.

"Thank you for helping Alabama believe in itself again. - Don Siegelman" According to Young this is the inscription on the mug.

Young is being asked to look at something else. It is an invoice for the coffee mugs. Young says he paid the invoice and the invoice is in the amount of $13,453. The date on the invoice is 12/27/99 according to Mr. Young.

Young is being asked about a check. The check is for $25,000 payable to Paul Hamrick. The note appears to say "loan." Young says it was not a loan. Young says Hamrick did not pay the money back and there was no loan agreement.

Young is looking now at a $10,000 check from Blount, Parrish paid to Tillman and Young.

Young says he called Hamrick to see if Hamrick could assist in getting bonds financed for Mr. Blount.

Sidebar called.

The date of the check is July 14, 2000.

Young says as a result of the check he called Mr. Hamrick and asked if Hamrick could help in getting Blount's bonds ifnanced.

Hamrick allegedly told Young he would get with the governor'r finance director Henry Mabry and Ken Funderburk. Young says he does not know where Funderburk worked at the time of the call.

Young says he talked to Blount about the results of the conversation. Young says the recording was taped and the recording accurately recorded the conversation. Young says he does not know exactly when the conversation was taped.

The name Milton McGregor comes up.

Young says he gave his knowledge and consent for the call to be recorded and it is okay with Young if the tape is played.

Mr. Young is asked by the judge if the tape was made after the check was received and Mr. Young says he is not sure. He is shown the check of 7/14/2000.

Mr. Young says now the conversation took place around 7/27/2000.

Mr. Dean is being allowed to asks questions of Mr. Young concerning the tape. Young says he does not know about the equipment attached to the phone. Mr. Young says the tape is the entire conversation between Young and Blount.

The machine was activated when the phone was picked up.

Young is now looking at a transcript of the conversation. Young says the transcript accurately portrays the conversation.

The tape will be played.

Young says he has talked to Hamrick and Hamrick has said the funding would be done and that Funderburk would call Blount.

Blount is not happy with the way Funderburk is approaching the entire thing.

We're going to have to get you caught up on the tape later.

Mr. Young is being shown a check for $25,000 to Tillman and Young. The check is dated 09/06/2000. The check is the one talked about on the tape with Mr. Blount.

Young considered the transaction with Blount Parrish to be concluded. Young says Tillman and Young is his investment business.

The judge wants to break for lunch.

We're going to start a new post.

Posted by Helen Hammons on May 17, 2006 at 08:32 AM | Permalink | Comments (0)

## More Lanny Young

Well if you missed the fireworks just before recess you might want to take a look at the post below this.

If this is a sign of things to come, the next day or so should be very interesting.

Mr. Feaga and Mr. Leach are engaging in some interesting conversations and the judge is trying to be a fair referee. Rock-'em Sock-'em Robots anyone?

Mr. Feaga is asking Mr. Young about things of value provided for Siegelman's campaign for governor.

Mr. Young says he owned a 414 Cessna. Young says he provided plane rides for Siegelman, Hamrick, and Bailey.

Mr. Young says there were five captain's seats on the plane. Young says he had to pay the pilot. Young says he did not have a charter license.

Mr. Feaga asks Mr. Young what the cost of operation per hour for the plane was. Including pilot, about $250 an hour according to Young.

Young says he sometimes was reimbursed for pilot and fuel by the state for Siegelman. For campaign purposes, Young says Siegelman was not charged.

Mr. Deen is objecting to the word "charter" since Young says he did not have a charter license.

The judge brings the guys forward once again.

Mr. Feaga asks Mr. Young if he ever charged Siegelman during the campaign for flying on the plane. Same question per Hamrick and Bailey. Young says, "No."

Young says he provided half of Nick Bailey's salary during the campaign. Young says he believes he was paying $19,000-$20,000 during the course of the campaign.

Young is looking at a check paid to the order of Champions Sports Group from Tillman and Young. Joey Tillman. Young says he does not know what check was for. Young is shown another check. This check is also a Tillman and Young check to the Environmental Campaign Fund in the amount of $10,000 dated 10/30/98.

Young says the check was a PAC fund payment. Young says the check was one of several that Nick Bailey would call and tell me to write to for the benefit of the Siegelman campaign.

This was during Siegelman's campaign for governor. There is another check payable to the Alabama Democratic Party in the amount of $20,000. Young says Nick Bailey asked for the $20,000.

Young agrees Tillman and Young is his company.

Mr. Feaga is asked to authenticate a document. It is a document from Mr. Young's business records. Young agrees he files it at or near the time he gets it. The document is a check (225) to Champions Sports Group in the amount of $162.18 for a racing helmet for then Lt. Gov. Siegelman. Young says he gave Siegelman the helmet at Talladega. Hamrick and Bailey were there as well as Richard Childress. Date was 02/20/1998. Siegelman had wanted to drive a car around the track to raise money for the WWII memorial in D.C. according to Young. This was to happen just before the Talladega Winston Cup race. Siegelman got to drive the car. Young says Siegelman was gearing up to announce a run for governor according to Young.

Young says he is fairly familiar with the racing business. Young says he was in the landfill and shirt business at the time. Mr. Feaga is near his charts again. Mr. Kilborn is objecting to something. Young is asked the value. Feaga asks if the ride would be worth more than $5,000. Young says,"Yes."

The judge talks to Mr. Feaga and then Mr. Kilborn objects again. The judge is asking Mr. Feaga to establish a proper foundation.

The judge asks Young if he can put a value on that opportunity for Gov. Siegelman. Young says no.

Talk is about exhibits. Mr. Kilborn is objecting and the judge is sustaining objections. We can't hear Mr. Kilborn's objection.

Another exhibit is accepted. This is the invoice for the helmet.

Mr. Young is looking at an invoice. One helmet ordered by Lanny Young for the Lt Governor of Alabama.

Check 7/21/98 for $2,052.75   payable to "Your Graphics are Showing." The check was for the screen printing, (colors, design of the shirts for the 98 campaign.) Another check written on 04/06/98 for $2,250 writtent to the same company for the same purpose.

Another check is being shown to "Young. This check is also made to the same company. The check on 09/10/98 and Young says the check was written for the same purpose. Check was for more than $800.

Mr. Feaga is back to the chart talking about the value of the shirt and whether or not the cost of screen printing was included in the cost of the shirt. Young says the screen printing cost was included in his $6 estimation of what each shirt would have cost if it had been paid for.

09/03/98 is the date of another check in the amount of $25,000. "It was my understanding it was to go to buy a Jeep vehcile to be given away for voting." Young says he can't remember talking to Siegelman, but he did discuss it with Hamrick and Bailey.

Young says the request came from Paul Hamrick. According to Young, Mr. Hamrick asked him to write the check.

Mr. Feaga is reading a list of checks. Young agrees he wrote the checks.

Mr. Young says he felt Siegelman would become governor and that Siegelman could then help him with his business.

Someone has a cell phone in the courtroom. The judge says leave or turn it off.

Mr. Feaga's mic is going dead again. It may have come back again.

Mr. Young says the checks are made payable to Nick Bailey and are each in the amount of $1,900.

Dates of checks are 01/12/98, 03/03/98, 04/09/98, 05/02/98, 07/02/98, 11/05/98, 06/08/98, 08/03/98, 09/01/98, 10/02/98, 02/04/98.

Young says Siegelman never wondered how Bailey was supporting himself while working on the campaign. There were 11 checks. $20,900. Young says he takes Feaga's word for it.

Young says he paid Bailey. "It was just part of everything else...to support Don becoming governor..I want him to become governor so he can do things that support me in business when he got in office. Young says he talked to Siegelman, Hamrick, and Bailey about this support in 1998.

Mr. Young is asked about a check of 08/31/98 for $5,000. Mr. Feaga writes this on the chart. Young says the check was made to AMANDA PAC. Young says he wrote it for the benefit of the governor's campaign. Young says he does not recall if he talked to Hamrick about writing checks to PACS. Young says he did talk to Bailey and Siegelman.

Can I call his campaign Siegelman Campaign your honor? asks Mr. Feaga. The judge says it's okay if it's okay with the defense.

There is a second check to an Environmental Campaign Fund. There is a third check from 08/31/98 for $5,000.

The account these checks are written on is Mr. Young's account.

Young is asked about more checks to PACS. The checks are writtent on the same date 10/01/98. The checks are for $5,000 each and there are six checks. The checks are written to different PACs.

Young is asked if he talked to Paul Hamrick about what would be done if Siegelman became governor

and an agreement. Young says the agreement with Hamrick was that Young would give whatever money was needed and if he became in a position to help me further my business he would do it. Young says Bailey and Siegelman promised the same thing.

The checks were written to Children PAC, Jeffco PAC, Environmental Campaign Fund, Stay PAC, AMANDA PAC.

Mr. Young is asked the date on another check. He says it looks like 11.02/98.

The check is for $1,140 to Your Graphics are Showing for screen printing. It goes on the chart as well.

Mr. Feaga's batteries are indeed dying.

Another check to Pro PAC dated 10/27/98.

Over the time of his relationship with Bailey, Young says the least amount of cash he gave Bailey was $5,000. Young says the least he gave Hamrick was $15,000. Young says he gave Hamrick $25,000 to buy a car. Young says he gave Harmrick $6,000 for stock. "Young says this was for the personal benefit of the individuals in exchange for helping Young out when he needed it.

Young says he gave Siegelman $9,200 to purchase a motorcycle. Young says he bought Siegelman a 4-wheeler and a trailer for Siegelman's son for $5,300-$5,400.

Young is being asked about coffee mugs.

Young says Siegelman called him about designing a cup to be given away for Christmas. Young says the cost would have been $13-$14 each. Young says there were about 1,000 mugs.

Young reads inscription on mug.

Mr. Feaga announces this is a good place for him to break for the day.

Siegelman's team has been trying to serve a subpoena to Young for certain documents to be brought into the courthouse. The judge is going to look at what McDonald is asking Young to bring. The judge is asking Glassroth, Young's attorney if he would like to be heard.

Mr. Deen asks if this is a speaking objection from Mr. Glassroth and the judge says, "I hope not."

Mr. McDonald will be allowed to serve the subpoena and is asked by the judge to bring the items in question.

I want to review my motion to sever.  It's clear Richard Scrushy has no part in this aspectr of the case. These are separate cases  we are not in the RICO case and we would like to go home today.

Mr. Leach's motion is denied.  Mr. Leach says there's a seat outside the window he would like to have.

Posted by Helen Hammons on May 16, 2006 at 03:34 PM | Permalink | Comments (0)

# Lanny Young Takes the Stand

There will be some motions taken up in just a few minutes.  This should take around 15 minutes and then we should see Lanny Young take the stand.  It should be an interesting afternoon.

The judge is talking to counsel about  Lanny Young's possible testimony.

Mr. Feaga tells the judge, "We got through Mr. Bailey, I think we can get through Mr. Young."

Mr. Baxley responds, "I'm not sure it's getting through.  I think they need to tell him.  It's not permissible for him to say,'To my understanding, I understand....."

"We are not going to have speaking objections," says Judge Fuller.  There is a tape the government has said they want to play.  Feaga says Mr. Young and Mr. Blount are the voices on the tape.  Feaga believes the tape's admissible.  Notify the court before that tape is going to be offered.

The motion filed yesterday afternoon related to other political candidates being mentioned.

"I can't imagine we would be finished with this witness's direct today anyway," says Judge Fuller.

Mr. McDonald says it is premature to be arguing this at this point and reminds the judge he has already ruled on a Motion in Limine.  "The government is trying to pigeon hole us..." says McDonald.

McDonald talks about "if Mr. Young gets into the plane ride.  The evidence will show that he was accompanied on these plane rides with Attorney General Bill Pryor."

"Mr. Young is a bit of a bolsterer a braggard who goes about telling everybody he has brought his way into every politician in Alabama... Jeff Sessions, Bill Pryor.. If it's cash contributions he has been making how can you tell it went to Gov. Siegelman.  How can you tell it didn't go to Jeff Sessions in a bag or Bill Pryor in a bag?  We shouldn't be having this debate until we see what the government brings in."

The judge agrees with Mr. McDonald that it will be taken up as necessary "at the appropriate time."

Lanny Young has been called to the stand.

Young says he resides in Montgomery now and has done so for about 12 years.  He is from Jacksonville.

Young served in the army and his family started a family clothing manufacturing business.  They made dress shirts, golf shirts and then moved to t-shirts, sweat shirts, etc.  "We didn't manuafacture the fabric.. We brought the raw fabric in and cut it to customer order."

Young says he was in the manufacturing business until 1993-1994.  Young says he went into importing.  Young says he imported golf shirts, t-shirts, etc.  He says he provided apparel for fans of Rusty Wallace etc.  He says he also did Fitipaldi.  The apparel was provide to another sports company and the stuff would be sold at tracks.  Young says the stuff was sold from a tractor-trailer, a 52-foot, vehicle.

Sports Image owned the trailer.  Young says he made his money by providing a certain number of shirts per week.  Young says there sometimes would be a special order and people like Kellog would need shirts.  Young says he knew what Sports Image would charge for the shirts and he would get his profit.

Young says gross sales for Earnhardt at an Atlanta race was over $1 million.  The stuff was sold out of six trailers on that occasion.  Young says he provided the knitware, shirts.

Young says he made money according to the sales

Young is asked if he knows Hamrick. Young says he does and points him out.  Young is asked if he knows Siegelman and then he points Siegelman out.  Young is asked about Mack Roberts and he points Mr. Roberts out.  Mr. Young says he does not know Mr. Scrushy personally.

Young says he met Hamrick at dinner with friends. Young says he met Hamrick first.

The judge has again reminded Mr. Feaga to call Governor Siegelman by the title governor and not Mr.

Young says he met Siegelman when he got a call from Hamrick and Hamrick asked him if Young would like to have lunch with Siegelman.  Young says he's not sure they had lunch.  This was 1992-1993.

The judge is giving Young some basic instructions.

According to Young, Siegelman asked him if he would be willing to provide t-shirts for the lieutenant governor's race.  Young says he provided shirts, caps, money for events.

Young is asked when he started providing things for the lieutenant governor's race.  Young doesn't recall the date, but recalls an event where he provided 1,000 t-shirts and 500-750 baseball caps.   Young says he believes it was in 1993.

Young says the cost of those items would have normally cost about $6 each or $6,000. Young says the caps would have cost about $5.50 each., or $2,750. The judge helps with the math. Young is asked if this was the first time he did this and Young says it was.

Mr. Feaga asks Young about Hamrick and Bailey.

Feaga asks Young how many items Young provided for the entire lieutenant governor's campaign. Young says a low figure of 7,500 shirts. Young says the high figure would be 12,000.

Young says he provided 2,500-3,000 ball caps. Mr. Feaga calculates $45,000 for the t-shirts at a minimum. $13,750 for the caps for a total of $58,750.

Mr. Young is given a t-shirt to examine. Young says the shirt is representative of the shirts he provided when Siegelman was running for lieutenant governor.

Young says the events took place in 1993. Young says he provided money. Another objection. Brief sidebar.

Mr. Kilborn wants a time frame established. Young says Siegelman was innaugurated in 1999. Young says Siegelman ran for governor in 1998. Young says Siegelman was elected lieutenant governor in 1994. Young says he doesn't recall a meeting with Siegelman prior to January 1994.

Young is being asked about contributions between January 1, 1994 and November 1994. He says he provided $5,000 in the form of a cash contribution. Young says he got the money from selling t-shirts. Young says there were three other occasions. Young says he had a sign made up and errected on a building. Young says the sign was around $2,500 for the sign. Young says there were two meet and greets. One in Montgomery and one in Anniston or Jacksonville. Young says it was $1,500-$2,000. The other one was $800-$1,000.

Young is asked about plane rides in 1994. Young says he doesn't recall the exact amounts paid for chartiering an airplane. Young says he now recalls two occasions at $2,000 each.

So far Feaga calculates a little over $72,000.

Feaga and the judge have an exchange. Feaga says,"In 25 years I've never had to call anyone governor in the courtroom." The judge says he hasn't had to sanction anybody for not calling someone governor.

Mr. Deen is objecting to the use of the term they in reference to Siegelman, Hamrick, Bailey.

Young is asked if he had conversations with Siegelman about what would happen if Siegelman became lieutenant governor. Young says they talked about what they could do for each other if Siegelman

became lieutenant governor.

Young says he met with Siegelman, Hamrick, and Bailey often.

The judge is instructing Mr. Feaga to specify who "they" is when asking questions.

Feaga is asking about statements made to Young by all three in relation to what Hamrick, Siegelman, and Bailey could do for him.  Young says he had been approached by the Talladega Superspeedway to see if Young could help him get the ability to serve alcoholic beverages on Sunday at the speedway. Young says he had conversations with all three as individuals and at one meeting he met with all three. Young says he brought Mr. Lynch down to an historical office in the Capitol.  Young says he believes this happened in 1997, but does not have a specific date.

Young says now it could have been 1996.  Feaga asks him if it was the year the legislation passed and Young says it was the same year.

Young says at a meeting at the speedway.  He met with Bailey, Lt. Gov. Siegelman and Grant Lynch.

Lynch was president of the speedway.  According to Young, Lynch was saying to the governor thank you for getting the legislation passed and the governor told Lynch that Young was responsible.

Young says the things he got from Talladega allowed him to show people a "very special time."  Young says he took Siegelman and Hamrick down to the track to meet Bobby Allison.  Young says he took Hamrick on a couple of more trips.  Bailey always accompanied the governor, except on the first occasion.

Young says he took all three to the track before beer sales passed.  Young says he only took Hamrick on about two occasions after the legislation passed.

Young says a weekend at the track is usually limited to large corporate sponsors.  Young says it would cost about $1,000 per person if it had to be paid for.

Young is now asked by Mr. Feaga about Young's agreement with the government.  Young agrees he has pleaded guilty to three felonies.

Young says he engaged in extortion with Philip Jordan at the time probate jndge of Cherokeel County,

Young says he is here to testify honestly about what he knows.  Young is asked if he has an expectation of a recommendation.  Mr. Leach and the judge agree to a sidebar.

The judge says there will be a break abour 3 or 3:15.

Feaga returns to the relationship between Siegelman, Hamrick, and Bailey. Young says when he was trying to get the Sunday beer sales he was good friends with all three. He says he saw Hamrick two to three times a week and the other two, two to three times a month.

Young says he shared an apartment or house with Hamrick. Young says generally Young would pay for drinks and dinner when he and Hamrick would go to dinner. Young says he does not recall an occasion when Hamrick paid for dinner or drinks.

Young now says both Hamrick and Bailey may have picked up the tab, but that Young picked up the tab 85-90% of the time. Young says he cannot remember Governor Siegelman ever paying for a meal when Young was there.

Young says, "It was just part of the agreement we had." Young says, "That was one of the things that I did."

Young is asked if Hamrick asked him to do other things. Young says he gave Hamrick cash on many occasions, he gave Hamrick money for a car, and he says he gave money to cover stock...

Young says Hamrick and he did not talk about the agreement. Young says he said they had an agreement when he asked them to do something and they did it.

Young says Hamrick told him that when Siegelman became lieutentnat governor Siegelman and Hamrick would be in a position to help Young personally to handle his business interests. Young says he continued to give all three things, including campaign contributions.

Deen objects saying Hamrick never ran for office.

Young says Hamrick was part of Siegelman's efforts to get elected lieutenant governor.

Young says he took items like t-shirts and such to the campaign. Young says the things were used by the campaign. Young says after the election Hamrick was working for the lieutenant governor. Bailey according to Young was also working for the governor.

Young agrees he was watching what was going on. Young says he likes to think the items he gave the campaign helped the campaign.

Young says he continued to provide all three things of value after the campaign. Young says he believes in 1996 he gave Bailey $55,000. Young says Bailey needed the money to cover cattle futures contracts. I gave him the money..it was an investment...if I needed something, I could call Nick and I would get it. Young says he believes this was before Talladega Superspeedway beer sales.

Young says Siegelman ran for governor in 1998. Young says he served in the same capacity. Young says he provided better quality stuff along with plane rides, cash, contributions to PACs. Young says at this time he did own an airplane.

Young is given a shirt and cap to look at. He says he provided items like these to the campaign in 1998. Another shirt has a 1995 date on it.

Young says the 1995 shirt was from a Labor Day event. Y"oung says he provided shirts because Siegelman asked him to do it and "I expected him to do what I asked him."

Young says Siegelman did mostly what he asked. young says the shirts would have cost about $8 a shirt and Young says he provided about 500 shirts.

As to the 1998 campaign for governor Young says he provided about 15,000 t-shirts for the entire race. If Siegelman had been charged for them the cost according to Young would have been about $6 each or $90,000.

Young says he also provided hats. He says he provided about 5,000. The cost would have been about $5.50 for each hat. The cost would have been $27,500.

Young says he provided shirts and jackets and leather jackets. Young says a normal windbreaker would have cost $50-60. Young says there may have been 25 provided. About $1,250 worth.

More objections and a sidebar.

The judge is going to let the jury take a break.

Art Leach is talking to the judge about irrelevant material. "We're at the point where everything Mr. Feaga says to the witness has got to go on the charts. Everything doesn't belong on the charts."

Mr. Leach is concerrned about, "Trial by chart."

Mr. Feaga says, "I've nver been at a trial where there have been so many objections...I have to be sure the jury is hearing...through the cacophany of objections."

"I know Mr. Leach thinks so because I'm trying to convict his client."

The judge says the charts that do not relate to the indictment will not be given to the jury. "I'm not looking for a response, let's take our recess."

We're going to make a new post.

Posted by Helen Hammons on May 16, 2006 at 01:15 PM | Permalink | Comments (1)

# Tuesday; Lanny Young at Some Point

Well it may be a big day today.  The witness many folks have been waiting to see and hear will be on the stand today at some point - Lanny Young.  Young is the man  at the center of the "When we wanted things from Lanny he produced and when Lanny wanted things from us we produced," alleged conspiracy which according to the prosecution was a criminal enterprise operating out of the executive branch of Alabama government under former Gov. Don Siegelman.

The Scrushy team has to be glad the focus will finally be moved off of their client to the former governor.  After all Siegelman is charged with 33 counts in the indictment far more than the number of counts against Scrushy.

Vince Kilborn is questioning Mr. Packard of the Secretary of State's office.  Kilborn wants to know if Packard is a lawyer, he says he is not.  Packard says he has appeared as a witness on campaign reporting in one other trial.

Kilborn is asking about AEF and the proper reporting of checks and a meeting with Murray of the U.S. Attorney's office.

Packard is now being asked about the letter of explanation.  Packard says he did not tell the government about the letter.  The letter should have been attached to the reports but Packard says the letter was probably put in the file when the reports were scanned.  The letter was copied to the attorney general at the time Bill Pryor.

Packard says the government "did not ask us to interpret the reports."  Kilborn says the letter would not have been mentioned if he had not mentioned it.

Packard says investigation of the letter was not part of his job.  Packard says the enforcement of the law rests with the attorney general.

Well the first objection is in and has been overruled.  Kilborn is going back down the line of whether or not the witness is an expert.

Kilborn is going back over some information from yesterday concerning what happens when a contribution check is returned by a campaign and the proper reporting of that process.

Packard agrees there is a box to be checked in the event a check was returned.  Kilborn brings up an attorney general's opinion that he says contradicts what Packard has said.

Kilborn asks Packard if he was 180 degrees wrong on Monday. Packard agrees. Packard agrees he had time to prepare for his testimony. Kilborn says Packard was emphatic in his wrong opinion on Monday. Packard says when the AG opinions were raised yesterday he went home and went to the AG's Web site and looked for other opinions. That's where he found the contradictory opinion to his testimony.

July 11, 1994 is the date of the letter from the AG's office. The AG letter says an unwanted or unsolicited contribution may be returned and should not be treated as reportable under the FCPA. Another portion says campaigns may report the information if they wish.

The judge has summoned the lawyers forward again.

Kilborn apparently got shot down. He has moved on to other questions.

Packard says he was hired to do the various duties of the election division. Packard says he was employed previously by Auburn and helped implement the Motor Voter Act.

Packard says he alerted Worley that he was being brought to court to answer questions. Packard says he assumes he was entitled to speak about his duties.

Letter from July 9, 2002 is being talked about and concerns the $730,789.29 plus contribution, March 9, 2000.

Kilborn moving exhibits around we're losing some of his sound in the process. This letter came before the Seagall letter mentioned yesterday.

The letter concerns also the payoff of the loan and is signed by Redding Pitt. Defense objects to the mention of Pitts' prior title.

Packard says the Alabama Democratic Party reported the information when they found out about it.

Packard agrees the reports have a spot for an amended report. Packard agrees there may be amendments and there are all kinds of reasons for amendments and late reporting does not mean that somebody is trying to hide something.

Mr. Packard is asked if he makes mistakes. He says he is not perfect. Packard says he is a first time candidate.

Packard is asked to review the original and amended reports. There is a difference of $290,000 between the two reports. Kilborn says the $290,000 is the amount that was reported late.

Kilborn's mic is low and hard for us to hear. He is over at the charts from yesterday. Packard agrees the

checks in question were put on the amended report.

Kilborn's back at his perch and we can hear again.  Packard is being asked again to compare the reports.  Kilborn is asking Packard to do some math which adds up to $290,000.

Kilborn says original report was wrong but 1.  The difference in contributions for 1999 was three checks totally $290,000 and 2.  the expenses of AEF were the $1,343 spent during the interim period.  Packard agrees.

Packard is getting asked about purposes of FCPA.  Packard says disclosure and transparency are good things.  Kilborn says politicians sometimes fight this notion of disclosure.  Kilborn goes on to discuss PACs.  Kilborn says PACs mix all the money up and you can't tell where the money came from.  Packard says PACs are legal in Alabama and agrees they are used all the time.

Kilborn moves on to after the referendum.  He says the purpose of full disclosure is satisfied if everything up until that election is reported. Packard says that is true if the committee is terminated.

Kilborn asks if the entity was modified to not make it a political entity would that be okay.  Packard says he's not able to answer that question.  Kilborn changes to example of a PAC changing to another type of organization.  Packard says residual funds can be used for any activity by the former PAC as long as the PAC is terminated.

Jeff Deen is questioning Packard now.  Packard says Hamrick's name is not on any of the reports in the Secretary of States office nor is he in the file.  Packard is asked if he has ever talked to Paul Hamrick about the reports or the IHS check.  Packard says he has not talked to Hamrick about that.

Packard says statements of organization for the PAC did not list Mr. Hamrick's name.

Art Leach is questioning Mr. Packard about PACs and the reporting requirements.  Packard says once the PAC raises or spends more than $1,000 they have to file a report and list amounts contributed over the amount of $100.  The PAC has to also list expenditures of more than $100.

The PAC schedule is the same as filed for candidates according to Packard.  Mr. Leach is focusing on a report and asks Packard if they indicate PAC, someone can go back and trace information from the PAC.  Packard agrees.

Packard says each individual report only covers new contributions for each report filed.  Packard says reports are permanent records of the state.  The Sec. of State keeps them for seven years and others are kept in the archives.  Packard says the reports since 1994 are on-line.

Packard agrees direct contributions are easier to find than discovering money back through PACs.

Leach says if a person wants to conceal a $250,000 contribution, the contribution could be broken up and given to several PACs. Packard agrees PAC to PAC transfer problem are a problem in Alabama.

Leach is pointing to a contribution of $250,000 from HealthSouth which is on the report and which Packard agrees is easy to find.

Packard agrees with Leach that individuals or corporations making contributions have no reporting requirements to the Sec. of State as long as the money came out of corporate funds for corporate contributions or just from the individual.  Packard agrees it is the responsibility of the campaign to report.

Packard says the penalty for not meeting reporting requirements is a misdemeanor.  Packard says he can only recall one case.

There is an objection from Mr. Feaga.  "I don't want to make the same mistake he made," says Mr. Leach referring to the prosecution.

The judge is asking how Mr. Leach's points are relevant.

The judge allows Mr. Leach to continue his questioning.  Packard says he does not know of a civil case.

Packard is asked if any HealthSouth money went to Gov. Siegelman.  Packard says no.  Packard agrees the money went to Alabama Education Foundation.

Packard says based on reports IHS check went to the Alabama Education Lottery Foundation not to Siegelman.

Packard agrees there is not of dime of any of the money that went to Gov. Siegelman.

There is going to be recess.

Art Leach still up. Leach now asking about PAC to PAC transfers.  Packard agrees the PAC to PAC transfers are unlimited.  Packard agrees it becomes very difficult and can obscure who is giving the money.  Packard agrees he sees quite a few of these in his business.

Mr. Feaga will now question Mr. Packard again.

Mr. Feaga is asking about a document that was retrieved from the computer.  It is a letter of July 17,2002.  The letter was sent from former legal counsel Charles Granger.  Granger is writing the letter to Richard Allen at the time chief deputy in the AGs office.

Mr. Packard says he was not aware of Granger's efforts to get the AEF to comply with the FCPA until Packard saw the documents.

We're now back to the Seagall letter. Parts of the letter are being read as selected by Mr. Feaga. Seagall admits in the letter there was a failure to report money as required. Seagall says in the letter people moved on to other pursuits and inadequate attention was paid...

Seagall copied the attorney general on the letter.

Packard says Seagall does not state for a fact why the report was not filed. Packard agrees Seagall was just giving what he thought not what actually happened.

Packard says there were individuals with the foundation who were still raising money. There is an objection about "somebody lied to Mr. Seagall" statement from Mr. Feaga.

Packard says the forms do not reflect unwanted or unsolicited contributions or returned contributions.

Packard says there is no indication the money was not solicited or unsolicited.

Packard is again agreeing it is difficult to sometimes track down PAC money.

Feaga is asking about the FCPA and making a contribution in someone elses name. The lawyers have been summoned again.

Packard says it is not permissible to make a contribution in someone elses name. Packard says the purpose of the act is transparency.

Mr. Feaga starts talking about Scrushy getting IHS to write a check which of course brings an objection from Mr. Leach and then brings a response from Feaga of "I thought I was asking it the way the court wanted it asked."

The judge sustains Mr. Leach's objections. Mr. Feaga gets the question in anyway without reference to Mr. Scrushy.

"In any event it is not proper to do that is that right," asks Mr. Feaga. "That would not be permissible," says Packard.

"If someone gives a $250,000 contribution to a PAC is the PAC required to give notification of that contribution?" Packard agrees.

Packard agrees it would be easier to track than if the donation was in someone elses name.

Packard is asked about disclosure of loans to influence an election. He says they have to be disclosed.

Packard agrees IHS had no obligation to report the contribution and there is nothing wrong with the contribution.

Feaga says that if IHS were funneling a bribe to Siegelman would that be illegal. After objections Packard is allowed to answer and he says he's not an expert but thinks so.

Feaga moves back to a letter about the FCPA about unsolicited or unwanted contributions. The letter is the same one from the AGs office in 1994.

The letter notes in portions not read earlier that if the money is deposited it needs to be reported, even if it is returned.

Feaga is now moving to an opinion of former AG Don Siegelman. We have another meeting with the judge.

Feaga is giving a document to Packard. Packard says the document is the opinion Packard was referring to yesterday. The opinion was written by then Attorney General Don Siegelman.

After another objection, Mr. Feaga is allowed to continue. Feaga asks what the date is on the document. The date on the document is April 16, 1990.

Packard reads from the opinion. Mr. Feaga is admonished by the judge to address Gov. Siegelman as Gov. Siegelman.

In the opinion, Siegelman says the contribution should be treated as a contribution on the day it is received.

Vince Kilborn back to question the witness. Talks of date check written, date check received, and date check deposited. Kilborn says the issue is was it received when the check actually got there or when the check was deposited. Packard agrees the check is received when the check comes in.

Kilborn then moves on to the unwanted and unsolicited opinion and Packard agrees the contribution does not have to be reported. Packard says there is not a conflict between opinions.

Packard says the opinion does not speak to how long a check could be held.

Packard agrees there is not a check from Scrushy to Siegelman.

Kilborn writes IHS on a chart. Chart Wars continue. Kilborn writes AEF on the chart. Kilborn draws a

stick man for Governor Siegelman and titles it Gov.  Packard is asked if IHS paid the check to AEF?  Packard says that is correct and that there was no payment to the governor.

Packard says the allegation that Scrushy paid Siegelman $500,000 is "not supported."  Kilborn draws a stick man representing Scrushy.

Scrushy is saying that if someone had investigated correctly they would have known there was no $500,000 payment from Scrushy to Siegelman.

Kilborn puts a block on his chart for HealthSouth.  Packard says the documents reflect HealthSouth paid AEF.

Packard agrees it is okay for someone to solicit contributions from friends or other businesses.  Packard says there is "nothing wrong with that."

Packard agrees making a contribution in someone elses name is not permissible.

"I mispoke on the hypothetical," says Kilborn.  There is another meeting between attorneys and the judge.

Art Leach is back up.  Leach is asking about soliciting campaign contributions for others.  Packard agrees that is not illegal as long as the information is reported.

Leach says PACs are specifically permitted to transfer money back and forth.  Packard agrees.  Packard agrees transfers can be difficult for someone to figure out.

The witness may step down but is subject to recall.

Chuck Granger is the next witness for the government.  Mr. Granger is an attorney.  Granger has been in private practice for 2.5 years.  He was an attorney with the Public Service Commision and then General Counsel to the Alabama Secretary of State.

Granger is asked about a letter from July 17, 2002.(261)  Granger says he is the author of the letter.  He says he sent the letter to Richard Allen, number two man in the attorney general's office.

Granger says he sent the letter because the Alabama Democratic Party had amended some disclosures to their campaign finance reports and there was some need to reconcile those disclosures... Granger says he had been in contact with Ted Hosp in the governor's office.

Granger says Redding Pitt was the first person to bring it to his attention.  Granger says he had gotten calls from reporter Eddie Curran as well.  Granger says Pitt told him there were going to have to be

some amendments.  Curran had been writing stories for sometime about the AEF and the Alabama Democratic Party.  Granger says some of the stories had to do about contributions not being reported.

Granger says he contacted the assistant legal advisor Ted Hosp to make them aware of the issue.

Granger says the Alabama Democratic Party amended its returns but the AEF did not amend the returns before the letter went out.  Granger says "Ted had their ear and they would relay my concerns to the appropriate people."

Granger says that was his only contact.  There is a lawfirm of Maynard, Cooper, and Gale also mentioned.

Granger says he sent the letter to the AGs office after following up with Hosp and after the Alabama Democratic Party filed their amended disclosures he took them to Hosp.  Granger says he believes the Democratic Party filing was in early July.  Mr. Feaga retrieves the document and Granger looks at a document to refresh his memory.

Granger says Siegelman's people did not correct the reports until have Granger sent the letter to the AG's office.

Art Leach questions the witness on the exhibit.  Granger admits the letter is not on Secretary of State letterhead. Packard agrees the letter is not signed and was printed from a computer file.  Granger is asked if he makes revisions to his work and Granger says he doesn't make too many corrections to a letter like this.  Leach asks if a signed copy should be on file with the Secretary of State's office and in the Office of the Attorney Gerneral.  Granger agrees there should be signed copies in those locations.

Mr. kilborn is now questioning Packard again.  Kilborn asks if Granger brought it to Ted Hosp's attention and Granger replies he did.  Granger is asked about a cover letter.  He says he has seen the letter and he knows who Bobby Seagall is.  Granger says he met Seagall in the mid-to-late 90s.

The judge is telling Kilborn to move on.

Granger agrees no criminal charges have been brought against the Alabama Democratic Party.

Granger says he thought the ideal thing was if they made a mistake they would be forthcoming about it and amend....

"Our job was not to perform an investigation," says Granger.

Granger agrees it took about 17 days, subject to check, after the Democratic Party filing for the Seagall.  Kilborn asks if he called Siegelman, Granger says no.

Granger says he met with Hosp in June and the stories started in May 2002.

Lunch recess until 1:30.

Judge says Young will have to refrain from saying, "I heard, I know,"

Lanny Young is after lunch.

Posted by Helen Hammons on May 16, 2006 at 08:40 AM | Permalink | Comments (1)

## Monday Afternoon Week III

Theresa Griswald of Colonial Bank, senior v.p. of loan operations is on the stand.  Mr. Feaga is doing the questioning.

She is looking at loan records as a normal course of business related to business entities.  She says the records she has are records from the Alabama Democratic Party.  The line of credit was taken out on August 23, 1999.

John C. H. Miller, chairman, and Giles Perkins, as the executive director.  Another conference on exhibits.  Packard says the groups would also have to disclose how the money was spent.  Packard asked specifically about AEF statements filed under FCPA.

Packard agrees these records are maintained and stored at or near the time it is received.

Period covered under first report was 45-day pre-election report. (23A)  Mr. Feaga at the charts again. Covers all contributions of the committee from the time the committee came into existence until about 45 days before the election.  The statment is that of the AEF.  Vote was Coctober 12, 1999.

Judge talking to both sides about exhibits again.  "We're talk about this at the conclusion of today, don't waste the jurors' time," Judge Fuller says to Mr. Feaga.

Line of credit, 23 August 1999 on behalf of Democratic Party.  John Miller and Giles Perkins signed for the line of credit.  Witness says line amount of line of creidt was $1 million.  The first time the line of credit was used was August 26, 1999 for $100,000 according to the witness.

It was deposited into the Alabama Democratic Party's non-federal account.  Another sidebar.  It really may be Christmas.

Back to the witness and the $1 million.  Judge getting testy about objections.  Witness says money went to Alabama Democratic Party non-federal checking account.

The checking account deposit was August 26, 1999.  September 3, 1999 there was a $300,000 draw on the Alabama Democratic Party line of credit.  Total now is $400,000 plus interest.  On September 29, 1999 there was another $300,000.  Total now $700,000.  The money went into the ADP non-federal account.

First Commercial Bank check of $730,789.29 is being shown to the witness.  Made payable to Colonial Bank.  The check was actually $40 more than owed on the line of credit.  March 9, 2000 is the date in question.

Witness says the payoff was processed.  Witness says she does not know how that money was generated.  She agrees she had no idea what First Commercial Bank did.  She says she also does not know what the Democratic Party did.  She does not know what responsibilities the Democratic Party had for reporting the money.

Judge reminds jury about charts and the reaching of conclusions based on what is presented on the charts.

Vince Kilborn asking the witness about Colonial Bank and how many banks Colonial  has in the state.  Griswald is asked about Miller being on the board of directors.  Bobby Lowder, Sippial mentioned among others.

Miller served as chairman of Alabama Democratic Party.  Witness does not know when Miller served as chairman of the party.  Witness agrees the board members are honorable and were not involved in any kind of conspiracy or criminal enterprise.

Kilborn says regarding the loan for Alabama Democratic Party it was not involved in a criminal enterprise.  The witness agrees.

"Let's keep political parties out of this case to the best extent possible," says Judge Fuller.

Witness says Miller would fall under the same credit standards of other customers.  Witness says bank was not worried based on federal loan regulations and criteria.  Witness does not understand a question.  Witness agrees federal examiners examine loan portfolios unnannounced.

Witness says she has no knowledge of federal agents questioning this loan.  Witness agrees loan was made to Alabama Democratic Party.

Witness says she was not invloved in the actual transaction.  Witness agrees the money didn't payoff Siegelman's personal loan.  Witness agrees Colonial Bank got the money to apply to the debt.  Griswald says the loan committee approved the loan but does not know who was on the committee.  Witness agrees loan was satisfied when it was paid off.

Fred Gray to question the witness. Witness says she has not met Richard Scrushy. Witness says the account was not in the name of Scrushy or HealthSouth and that neither HealthSouth nor Scrushy withdrew any money from the account.

Griswald says she has not seen his name on any accounts based on the documents. Griswald says there was nothing on any of the accounts that connected Scrushy or HealthSouth to the accounts. Names Pat Dye, Milton McGregor's name come up as "fine" board members of the bank.

Witness says she has no facts Scrushy bribed Siegelman for a seat on the CON Board or facts related to the indictment.

Steve Feaga is now asking about loan payoff from First Commercial. Witness acknowledges she does not know what happened at First Commercial bank that led to the money being paid off.

Judge tells witness she is released.

The next witness will be Ed Packard from the Secretary of State's office. Judge and lawyers meeting again. Packard is running against Sec. of State Nancy Worley.

The judge is back on the bench. Let's see how long we can go without a sidebar. Judge tells Feaga to work his questions so there can be a recess around 3 p.m.

Ed Packard has been sworn in. Parkard works in the Sec. of State's office. He has been working there approximately nine years. He works in the elections division. They cover FCPA among other things.

Talk of 1999 referendum election on the lottery. Packard says he was working in the Sec. of State's office at that time. Packard is asked if money taken in on either side of the lottery issue has to be disclosed under the FCPA. He says yes.

The report was filed on illegible date. It was signed on August 29, 1999. Packard can't be sure when it was filed. But he can says it was filed in August. He just can't read the date stamp.

Packard agrees report filed 45 days before the election. Packard says there is no disclosure of check from IHS in the amount of $250,000 in the report document.

Packard says contributions are considered received once a committee has the check in their hands, not when it is cashed. Kilborn objecting on foundation. Judge overrules objection.

The next report is the 10-to-5 day pre-election report. Filed October 7, 1999. 45-day report filed on 30 August according to new information. Feaga asks about IHS check and whether or not it was disclosed. Packard says it is not in the report. Packard is asked about an Hitachi check. Packard says there is no Hitachi check listed.

The next report is the AEF's annual and termination report. The annual report has to be filed by January 1, 2000 summarizing activity from 1999. The totals from earlier reports are included and itemized expenditures are added for the time after 10-to-5 day report.

Packard says there is not an IHS check listed and yes AEF would be required to disclose it and what it was spent for. Packard says he does not see an entry for that contribution. Packard agrees the report is a public record.

Judge asks Mr. Feaga to get to breaking point. Feaga says he is there and we are going on afternoon recess.

Baxley asking for another motion. This is another mistrial motion. There is also a motion for a hearing to do with the qualification of the witness from the Secretary of State's office Mr. Packard.

Both motions were denied by the judge. Recess taking a little longer because of extended hearing time. Things got a little hot in the courtroom.

Mr. Baxley is talking to the judge again. "The courtroom grapevine has reached my year that the government plans to call Lanny Young...in nearly every paragraph of every page of his grand jury testimony...he will answer every question 'it is my understanding' and those understandings are incorrect. He'll say it is my understanding about Rainline such and such...."

Mr. Baxley wants the government instructed to have Young stick to his recollection of the facts, not "his understanding."

The judge wants to see representatives from each party. We're on hold again.

The judge tells Mr. Feaga to proceed. Mr. Feaga reminds the judge "We need a witness." The judge says, "That will help."

Mr. Packard is back on the stand. Talk is back to whether or not the IHS check should have been on one of the 1999 reports. Specific talk now of end of year '99 report. Packard is being asked about IPSCO contribution, SCT for $15,000. Packard says he does not see contributions from either company listed. Nor does Packard see contributions from Hitachi and Oracle.

AEF reports admitted into evidence.

Packard describes a termination report, the last report filed with the Sec. of State's office which shows they have zeroed out their bank account and do not intend to have any further activity. Report filed in January 2000.

Packard is asked if there were any other reports filed in 2000.  Packard says there are none.

ALFA check Feb 14, 2000 was not reported according to Packard, nor the IHS, Kimberly Clark, etc.

Packard says there were not any reports in 2001.  Packard says the Secretary of State's office did get a report from AEF in 2002.

July 26, 2002 an annual report was filed for the year 2000 according to Packard.  Packard says, "It is filed late."  Packard says it is roughly 18 months late.

AEF reported beginning balance in 2000 of $288,656.98.  At the end of 1999, AEF showed a zero balance.

The late report includes contribution from Oracle for $10,000, report getting it January 24, 2000.

According to Packard the Alabama FPCA requires names and amounts of donations of more than $100.  Also, whether the contribution is a business or an individual and the address.  The report can also indicate if a contribution was returned.  There is also a place to put when contribution was received and how much the contribution was for.

Packard says the FCPA is a notarized document.  Packard says his office has no way to authenticate when contributions were actually received.

Packard is asked to review a form 4.  This is where information about non-direct cash contributions are listed.  On this form First Commercial Bank is listed $730,789.20. They're reporting March 9, 2000.

Form 5 is a list of expenditures over $100.  One expenditure for the state Democratic Executive Committee on March 10, 2000 in the same amount.

Packard says "it is hard to know" what the money goes to.  Packard says they are disclosing expenditures related to an election.

Packard is asked who filed the report in 2002.  Packard says the report was signed by Robert Seagall, current president of Alabama Bar Association.  He signed the document on July 26, 2002.  It was filed on July 26, 2002.

Contribution from HealthSouth reported received on May 23, 2000.  Contribution listed on report filed in 2002.

There was an amended 1999 report filed also on July 26, 2002.

The amended report has a mark in a box to show it is an amended report from 1999. This report states the ending balance for 1999 was $288,656.98. The original report showed zero balance.

Form 3, in-kind contributions, Kassouf and Company - $16,740. There is also one for $26,000 to Maynard Cooper.

On the amended form the IPSCO check is disclosed as well as IHS. The IHS contribution is reported as being received Nov. 5, 1999 as well as SCT check.

Packard is asked if check is properly reported on form. This has to do with dates previously established. Packard says no. Packard says there is no Kimberly Clark check on the amended 1999 report. Report indicates check gottedn on January 24, 2000.

Feaga is again asking about amended 1999 report. Packard says amended report is about 2.5 years late.

Feaga is asking about $5,000 Hitachi check. Packard says if it was part of two separate checks they should have been reported separately. The check dated 10 September 99.

At question is ALFA check on 2000 report filed late. February 14, 2000 is the date on the check.

Shore and Associates check is next at issue. Report says got check January 7, 2000.

Next issue is $250,000 contribution HealthSouth. Packard says the money was reported roughly 18 months late. There is another report for 2001 filed July 26, 2002,

Packard is reminded to tell what he knows not what he heard.

Feaga going through to make sure all exhibits are in that he wants in.

Until July 26, 2002 would anyone have been able to find out about a check from IHS for $250,000? Packard says nobody would have been able to get that information. How about HealthSouth $250,000? Packard says July 26, 2002 is the soonest anyone could have found out about it. Same with $100,000 from ALFA.

October 12, 1999 was when referendum election took place. Judge asks Mr.Kilborn to get to a stopping point by around 5:15. Kilborn asks the judge to let him know when the clock "gets to the right place."

Packard is asked if he's running against Worley. Packard agrees he is running in the primary. Packard agrees there is a Republican Beth Chapman running for the job also. Chapman has no opposition.

Packard says he was contacted a couple of weeks ago by prosecutors for the first time. Packard says the

first person he spoke to was a Mr. Murray.  Packard says they came with a list.  Packard says they did not ask for documents that might state why the reports were filed late.  Packard says there was a document in the file submitted with the amended reports, but he is not familiar with the letter because he was not asked to review the letter.

Packard says he met with the prosecution last Wednesday night and the prosecution did ask him to bring a copy of the letter of explanation with him.  Packard says he has the letter and Kilborn asks to see it.

The letter signed by Seagall refers to the three filings.  Packard presumes it was the cover letter, but it was not attached to the three reports which have been discussed today.

Letter admitted into evidence.  Packard tells the judge the letter should be kept with the reports.

Packard agrees he was not asked about the letter on direct examination.  Packard says no one asked for any explanation from me, but they did ask for information from Charles Granger, who was also at a meeting with the government.

The letter was written to then Sec. of State Jim Bennett.  The report is dated the same as the reports.

Kilborn is asking letter be read to jury.  "It appears those involved with the campaign gradually moved on to other pursuits and inadequate attention was given to reporting requirements."

Packard agrees to his knowledge the Secretary of State made no investigation or inquiries into the letter.

Packard says the law doesn't anticipate there not being a chairman or treasurer.  Packard says he doesn't see a problem with the lawyer filing the documents.  Packard is asked if there are rules and regulations as to what constitutes "received."  Packard says there is one attorney general's opinion on what "received" is.  Packard does not know who signed it or when.

Packard agrees opinion of attorney general is non-binding, but generally they go by the opinion.

Kilborn is asking about hypothetical on check the campaign decides they can't keep.  Packard says his opinion is that the check is received when the campaign gets it.

According to the AG opinion, according to Packard, the check is "received" when the check is in hand.  Kilborn bringing up hypothetical about Mississippi Casino money.

We're at a breaking point according to the judge and Mr. Kilborn.  The jury is being sent out.  More to come.

Prosecution to file motion to keep defense from bringin in alleged wrongdoing from other politicians

concerning contributions not related to this case.

Kilborn is saying many government witnesses have turned hostile and Kilborn says he needs to be notified.  The judge says he has allowed leading questions to only Ms. Skelton.  "I did not know what she was until you told me," says Kilborn to the judge.  The judge says it evolved.  Comments from McDonald about Josh Hayes.  McDonald is asking for making the "record clear."

McDonald says the witness was not just a custodial witness he was tendered as an expert witness.  McDonald requests that they have latitude in testing the extent of his expertise.  McDonald says the legal opinions rendered by this witness are not expert.

Mr. Baxley again asks for a mistrial on the grounds that MR. Roberts is not connected in any way form or fashion with MR.Scrushy and the lottery campaign and he is asking again for severance.

Baxlye says this witness has brought up contributions not reported that are not even charged in the indictment.  Baxley says he was not allowed to question the jurors about their feelings about ALFA because they haven't got a claim settled.  The tesimony about the $10,000 contribution from Leeburn who owns Seagrams Whiskey maybe two or three of these jurors are opposed to whiskey...All this is misleading and does not involve Roberts in any way.  It's prejudice... Judge denies mistrial.

The judge says at some point there will have to be some enforcement mechanism.. Then he tells the lawyers they're getting better.  I hope there's no other surprise witnessess that come on says Judge Fuller in response to Fred Helmsing.

Chcuk Granger may be called before Mr. Young tomorrow.  Lanny will be up.

"If frog's had wing's they'd fly.  Something tells me we are not going to be through with Mr. Young tomorrow.  Mr. Young is going to cover so much territory.

Posted by Helen Hammons on May 15, 2006 at 01:41 PM | Permalink | Comments (6)

## Week III

We're getting ready to start.  A notice to all the Scrushy faithful monitoring the blog.  Richard Scrushy confirmed to me this morning he is going to be doing a taping of Trinity Broadcasting Network's Praise the Lord show shortly.  He did not know yet when the show will be airing.  We'll find out after taping and let you know.

Mr. Morrow and the Brookwood vs. HealthSouth issue is on the table.  Terry Butts will do the questioning for the Scrushy team.

Butts is asking Morrow about two applications Brookwood filed - a parking deck and an MRI application, before the CON Board.  Julie Weller's name is brought up.  Butts says Weller said that HealthSouth's questions were legitimate.  Weller was the administrative law judge.

Butts asks Morrow if Scrushy recused himself from both votes related to the Brookwood projects Morrow says, "Yes sir."  Morrow agrees after Brookwood filed for reconsideration that Scrushy was not on the board and Dr. Stone was vice-chairman.  Morrow says he doesn't remember.

Morrow agrees Brookwood has objected to projects other than HealthSouth projects.  Morrow says the law is intended for "you to do this if you feel it is in your interest."

Morrow agrees Scrushy was not named on appeal of the MRI denial by CON Board.

Morrow agrees HealthSouth nor Scrushy could have had control over the board in the two instances involving Brookwood because Scrushy recused himself and did not have a vote.

It's around 8:54 and we have our first sidebar of the morning.  This involves the relevance of Mr. Morrow's testimony.

Looks like we're ready to start again.  That had to be the longest sidebar in this trial.

Judge Fuller tells the jury to disregard the testimony of Morrow.  Fuller tells them to "strike it from your memory."

Todd Beard from First Commercial Bank, corporate sales manager.  The witness is asked about business with Nick Bailey and Don Siegelman. He says he has conducted business with both men.  November 5, 1999 is the date now under discussion.  The witness says he engaged in a business transaction with Nick Bailey.

He says they opened up a checking account for the Alabama Education Foundation.  The witness says he got the articles and bylaws of the entity which tells him who is allowed to sign for and open an account for that entity.

The witness is looking at a statement for the end of November which shows the opening deposit and another deposit on the 9th of November.  The authorized signatory for the account was Nick Bailey.  Opening amount was $275,000 according to the witness.

Witness says the initial deposit was two checks totlaling $275,000.  Chart wars again.  Feaga using chart.  Writing date of November 5th -Ipsco Steel was payor of first check for $25,000.  The charting continues, the date on the check October 29, 1999.  The next column on the chart is date of deposit which was 5 November 1999.

The second check was from IHS for $250,000. The witness says that was all that was deposited on that day. The date on the IHS check was July 19, 1999.

The witness is asked to identify the IPSCO Steel check and the IHS scheck. Exhibit 28c has a third document, a new account deposit slip.

Beard is being questioned by Steve Feaga. Beard says there was more money deposited after 11/05/1999.

More arguments about government disclosure.

Another deposit was made 9 November 1999 according to the witness. The payor SCT Software Management Corporation. The check was for $15,000. Check dated 10/12/1999.

Another deposit was made of $25,000 from Kimberly Clark Corporation. the check was deposited January 20, 2000. The date of the check was October 13, 1999.

The next check was from Oracle Corporation. The date on the check was 12/02/1999. Baird says he couldn't make out the date of the deposit from the check. The check was for $10,000. The witness looks back at records and says the deposit was made of this check on July 24, 2000.

Feaga is asking about any other deposits before March 9, 2000. The witness says there are other deposits. Beard says there is a deposit for $5,000 from Hitachi Data Systems. The date on the Hitachi check is September 10, 1999. The check was deposited January 24, 2000. This date arrived out after some confusion.

Several more checks from Hitachi. Then a $100,000 check from ALFA the check dated February 14, 2000 and deposited on February 15, 2000.

Another check from Shore and associates for $5,524.55 Feaga is interested in anything deposited before March 9, 2000. This check was deposited January 24, 2000. The date on the check was December 24, 1999.

There's another January 24, 2000 check according to the witness. Feaga says that would be cleared up during the break.

Beard is looking at a promisory note to the bank for $730,789.29. The note was taken out March 9, 2000. The note was due June 9, 2000. This is referred to as a single-pay note. Signing for the Alabama Education Foundation was Nick Bailey. The bank looked to repayment sources of the Alabama Education Foundation. The secondary sources or guarantors were Don Siegelman and J. Mervyn Nabors.

The guarantee date was March 9, 2000.

The witness says Bailey told the bank the foundation had over $400,000 already to repay some of the loan.

Beard is asked about how much was in the account before the loan was signed for. The witness says on February statement there was $447,448.55 in the account. Statement was February 29, 2000.

The bank cut a check to payoff a loan at Colonial Bank for $730,000 plus. The witness says he delivered the check to Colonial Bank in Birmingham. The witness believes Nick Bailey is the one who asked him to deliver the check.

Mr. Feaga's mic batteries are dying.

We're still in morning recess. They were changing the batteries so we should continue to hear Mr. Feaga.

We can't here what's going up but Mr. Feaga is certainly animated as he stands in front of the judge. The judge is talking about trial exhibits and professionalism. Mr. Feaga was very animated standing in front of the judge. The judge tells both sides, to "avoid unneccesary bickering back and forth in front of the jury. We're going to be here until Chrismas if we don't." Judge Fuller wants both sides to advise the other side of exhibits the way they have been previously instructed.

The witness says the first time a payment was made on the loan (name of loan being argued between Feaga and defense) $440,000 debited from the AEF checking account on March 13, 2000.

Approximately $290,789.29 left to pay on the loan after the first payment according to the witness.

The witness says Siegelman signed the note as an individual, not as governor.

The next payment was made May 23, 2000. A payment of $250,000 was made directly credited to the loan balance. The payment was made with a $250,000 check from HealthSouth dated May 13, 2000, but the witness says the date is not entirely clear. HealthSouth check never went into AEF account.

Beard is reviewing a document showing the payment. Mr. Feaga keeps calling the loan the AEF/Nick Bailey/Son Siegelman loan. The loan balance after the HealthSouth payment was $40,789.29 according to Beard.

The witness is asked how the rest of the loan got paid off. Feaga wants to know if items were directly credited to the loan. The witness says Donald Leeburn - $10,000 on July 19, 2000, Bama Concrete - $12,500 applied January 2001, Skills Tutor.com - $5,000, applied on January 31, 2001, Alabamians for Economic Development - $13,500, January 31, 2001. Beard says that's all according to his records.

According to the witness, the loan note was retired on January 31, 2001. David Kassouf's name brought up. Witness asked if he talked to Kassouf and Baird says he did. Kilborn objecting. Objection sustained. Witness can only testify to what he said to Kassouf. Witness says he told Kassouf he could not release documents. Baird says he talked to governor's office he believes in March of '02.

Witness agrees he met with Mr. Feaga prior to coming to court. Witness is looking for "sticky" he had shown to Mr. Feaga.

On 3/15/02 Beard's sticky says he sent statements to Gina Friday from 11/99 to '01. Friday was an assistant to the governor. Beard says he got permission from Siegelman to release records to Kassouf directly from Siegelman in a conversation around this date. "Let's don't bicker says the judge," after another objection.

Beard says Siegelman knew what was beind discussed. Judge asking jury to recall instructions previously given on summary evidence.

Beard says Siegelman told him to give the information to Kassouf.

Beard agrees the loan was originally for 90 days but was not paid off at first. The note was extended for another three months until Oct 3, 2000 and then extended again.

July 3, 2000 notice sent from the bank to Gov. Siegelman at mansion address.

This was a notice for renewal. Feaga emphasizes extension notice sent to Gov. Siegelman.

A July 5, 2000 memo to loan committee about AEF and how the loan is going to be paid back. Feaga is asking about guarantors.

Beard says he talked to Mr. Nabors about the loan. Beard says he talked to Nabors and Siegelman at the same time. The conversation was about Baird getting some government business\ according to Baird.

Vince Kilborn to now question the witness for the Siegelman team. The witness agrees he works for an Alabama bank not a Boston bank.

Talk about $730,000 to the Alabama Education Foundation. Kilborn gets Baird to agree this was not a loan to Nabors or Siegelman.

Baird agrees the bank tries to get guarantees of loan and security. Baird agrees AEF was an Alabama corporation and had a board of directors. Baird says he knows the one who signed. Baird says he does not know that they were reputable people.

$730,000 went to payoff loan at Colonial Bank. The check didn't go to Alabama Education Foundation, Siegelman, or Nabors according to Kilborn and agreed to by Baird. Baird says Colonial debt was for the Alabama Democratic Party. Baird says the Alabama Democratic Party was a political entity. Baird says he doesn't know why the Alabama Democratic Party took out the loan.

Witness agrees Colonial was glad to get money. "They didn't say anything, they just took the money." "Bankers always like to get money don't they," asks Kilborn.

Witness agrees he talked to IRS agents. "They had big old badges big as hubcaps didn't they?" asks Kilborn. Witness agrees. Baird agrees he told agents everything.

Kilborn asks about a previous loan to AEF. The witness agrees a line of credit had been extended to AEF several months before. Witness agrees line of credit is like another type of loan. $350,000 limit initially then up to $400,000.

The witness says Nabors asked for the initial line of credit. Nabors had about $29 million worth of stock pledged to the bank at that time. The witness agrees Nabors had a very good relationship with the bank. The AEF had 13 guarantors. Siegelman was not one of them.

Kilborn going through some of the guarantors. Witness agrees he didn't need financial statements from most of guarantors.

Witness says one check for the line of credit paid it off. The check came from the Alabama Education Lottery Foundation. The $730,000 was the second loan made to the Alabama Education Foundation.

Witness agrees it was normal to rely on financial statements from a few of the guarantors instead of from all guarantors.

Witness agrees Bailey opened AEF checking account on November 5, 1999. Baird says he doesn't recall if Bailey gave him his title. Baird agrees Bailey was the only one authorized to sign checks on the account - not Siegelman, Hamrick, Scrushy, or Roberts.

Baird agrees again Bailey was the only one authorized to sign checks. Baird says he did not know Gina Friday was actually Nick Bailey's secretary.

Bailey was one who signed the note for the AEF. Bailey signed note as executive director. Baird says this is the first time he got involved in the political arena. Baird is asked if he is familiar with politicians getting supporters to guarantee notes for a campaign. Baird says he is not aware of that routine.

Chart wars. Kilborn at Feaga's chart now. Talking about IPSCO, IHS, and Software and Resource Management Inc. checks. The total of thse is $290,000. Kilborn writes on the chart in red.

Witness asked if Siegelman got any money out of AEF account?  Witness says no and that Siegelman did not benefit personally from the loan.

Witness says he is not aware of immoral or unethical actions from Siegelman in regards to his relationshp with the bank.  "The biscuits are getting cold so let's move along says the judge."

Fred Helmsing is now questioning Baird.  Witness agrees Scrushy had nothing to do with the establishment of the account.  Helmsing going back through checks.  Nothing new.

Feaga questioning witness again.  E-mail from Gina Friday about transfer of funds to Colonial Bank from AEF.  March 14.

Witness asked about what business bank was trying to get.  "Any type of business they could get us," says Baird.

Baird asked again about IHS and HealthSouth and ALFA checks and if checks were reported under FCPA.  Baird says he does not know.

Kilborn at it again.  Can't hear Kilborn.  Back to Feaga.  Can't hear him either now.  Witness has been released. Theresa Griswald will be the next witness.  Lunch is on.  Reconvening at 1:30 p.m.

Posted by Helen Hammons on May 15, 2006 at 08:38 AM | Permalink | Comments (1)

## Skelton Part III

Loree Skelton is back on the stand.  Art Leach is ready to go.  We're just waiting at the moment.  We should get started again soon.

We're up.  Talk about contract vs. full-time HealthSouth employees.

Skelton is asked if she considers Adams a contractor?  She says yes.  Skelton agrees that Adams should recuse himself during HealthSouth project considerations at the CON Board.

Skelton agrees it's important to have a good relationship with the governor's office in regard to new businesses coming to the state and with regard to getting legislation passed.

Skelton says before the helicopter Scrushy drove from Birmingham to Montgomery.  Skelton is asked if the car had leather seats.  Skelton says she believes so.

Skelton agrees HealthSouth got the helicopter after they became a $1 billion company.

Skelton is asked again about keeping Adams happy?  Did Mr. Scrushy ever say give Tim Adams the PET Scanner application?  No sir.

Skelton agrees she never had a conversation with Scrushy where Scrushy told her to "keep Adams happy."  Skelton agrees Scrushy never asked her to break the law.  Skelton agrees Scrushy would rely on her to do things right as regards Adams.

Skelton is asked if she remembers a specific conversation with Scrushy where she told Scrushy they should give Adams the PET Scanner application job?  She says she doesn't believe so.

Back to grand jury testimony.  Skelton says she talked to Tom Carman about the issue but she has no evidence Carman ever took the information to Scrushy.  Skelton says again she doesn't have a specific recollection of telling Scrushy Adams would have to recuse himself because Adams was working on the PET Scanner application.

Skelton says Adams never came to her about whether or not to vote on a specific matter.  Skelton says she would have referred him to his own counsel.

Leach is asking about the formality of the CON Board.  "It's more of a relaxed atmosphere," says Skelton.  Skelton agrees within a few meetings everyone knows everyone else.

Skelton agrees she would have told Lambert if Adams had come to her with questions about what to do.  Skelton agrees she believed Adams would do the right thing on his own.  She agrees she told the grand jury that.

Skelton agrees she never discussed with Scrushy the dollar amount of the first check to Adams prior to that check being issued.

Skelton says she doesn't recall whether or not she brought the poor PET Scanner application Adams produced to the attention of Scrushy.

Skelton agrees Scrushy left the CON Board because he had other duties and could not make a lot of the meetings.  Skelton agrees Scrushy resigned his seat on the James CON Board for the same reason.

Skelton agrees PET Scanners were about to be removed from the requirement to pass through the CON Board.

By March of 2003 the PET Scanner was deregulated.  Questions about quorum.  If there were not a quorum the project gets carried over to the next CON Board.  Skelton says there was no opposition to the PET Scanner.  Skelton agrees no PET Scanner was turned down by the CON Board.

Skelton says she did not have any obligation to tell anyone on the board about the HealthSouth financial

relationship with Adams.

Skelton agrees she does not ever know how much a CON Board member is drawing an application for a project to be presented to the board. Skelton says normal procedure is to recuse or abstain.

Skelton agrees she has high ethical standards to the board and to HealthSouth. Skelton agrees it doesn't matter who the CON Board member is.

Skelton says she "absolutely not" do anything illegal under federal law.

Skelton is asked again about checks to Adams. Skelton says she did not have any intention of doing anything that the law forbids in relation to those checks to Adams.

"There was one board member who was an architect who had drawn some plans for a specific project," says Skelton referencing whether any board member had done any work for a company with a project before the CON Board.

Skelton agrees the providers are usually area experts.

Skelton is asked about conflicts that are part of the business. Skelton says it's "extremely important" that providers be on the board because of their expertise.

Judge warns Leach he's beginning to sound like he's making closing arguments.

Skelton agrees that a check with Scrushy's name on it does not mean that Scrushy saw the checks. The checks are processed with an electronic signature.

Skelton agrees Scrushy was not on the CON Board in 2002 when the PET Scanner and Phenix City hospital were brought before the board. The hospital was brought before the board in July 2002.

Skelton going into details of Phenix City process and ten years of litigation at which time the project is unopposed.

If there had not been a quorum the project would have been carried over. Skelton says the Phenix City project passed unanimously.

Skelton agrees a 38-bed hospital is a smaller project on the HealthSouth screen.

Skelton agrees she never had a conversation with Scrushy about the Phenix City hospital and its passing in July 2002.

Skelton agrees she never had any conversation at the time about Adams traveling back to the July board meeting. Skelton says she doesn't believe she did and doesn't recall if she told Scrushy about Adams wanting to fly back to the meeting on a corporate jet.

Skelton agrees she did not talk to Scrushy much about CON Board issues.

Skelton agrees she did not know how Adams would vote when he came back and she does not recall it being part of her conversations with Adams.

Skelton agrees she believes she has done nothing wrong as related to PET Scanner and Adams.

Skelton agrees she did the detail work for the CON Board.

Skelton is asked about Jim Goodreau, the former head of security for HealthSouth. Goodreau usually went wherever Scrushy went but Skelton does not recall whether or not Goodreau was at the meeting with the governor.

Skelton agrees in a direct conflict the CON Board member had to recuse themselves.

Skelton says HealthSouth could not hurt their competition following the rules of the CON Board.

Skelton says she knows of people car pooling from Birmingham to attend CON Board meetings.

Skelton agrees the business interests of HealthSouth are many times tied up in the results of the CON Board.

Skelton agrees the CON Board only deals with new or expanding business interests. Skelton agrees the CON Board does not deal with existing facilities except in the case of relocation, expansion or that type of thing.

Skelton agrees there is no requirement for HealthSouth to report back to the CON Board except to report within 12 months of having a CON Board application approved. Skelton agrees there is no further reporting requirement.

Skelton asks if she can clarify something. "We are required to report data reports to the state...but it's not technically related to the CON." Skelton agrees the CON Board does not regulate HealthSouth's business.

Skelton agrees HealthSouth's candidate for the CON Board was Tom Carman and not Richard Scrushy.

Skelton has a document of analysis of various projects that were to come before the CON Board. It is an

example of a memo prepared for Carman/Scrushy.

Sorry there are going to be a few breaks.  Art Leach is through Louis Franklin is asking the questions.

Franklin gets Skelton to agree Adams was the only one paid by HealthSouth during the Siegelman administration CON Board to draft a CON Board application.

Skelton says from a diplomatic standpoint it would not have been smart to tell Adams straight out he could not have a job.

We're back to grand jury testimony from 6/25/2005.

Franklin asking Skelton about the "somebody gave me the date" of July 14th remark earlier.  Skelton says she is not really sure who told her the date.

Skelton can not find the information Mr. Franklin directed her to on page 44.

Skelton says that she can not see in the transcript where a prosecutor mentioned that date to her.

Sorry about the outage.

Art Leach back after Franklin finished with witness.

Questions again about July 14th date again.  Skelton agrees when she said "I'll have to take y'alls word for it" she was referring to prosecutors.

July 24,2003 meeting with FBI under discussion.  Another meeting on or around Dec. 5, 2005 with agents.  Skelton says she doesn't remember what she said about meeting at governor's office.

Leach gives Skelton 302 to refresh her memory.  Skelton says it refreshes her recollection and that she could not recall the day of the meeting with the governor during Dec. 5, 2005 meeting.

Back to 6/25 grand jury transcript.

Skelton agrees she just doesn't remember today.

Skelton agrees she didn't go to Scrushy and say "We're violating the ethics of the CON Board."  Skelton says she cannot remember the exact conversation with Scrushy.

Skelton agreed in 2002 when Scrushy was not on the board, she didn't spend too much time with Scrushy.  Sometimes she had more than one item to discuss in minutes.

Skelton agrees Scrushy relying on him.  Skelton sure she didn't tell Scrushy we are violating the ethical rules of the state of Alabama. Skelton agrees Scrushy never asked her to violate any law.

Skelton agrees the helicopter rides stopped because the CEO of the corporation was not going to Montgomery any longer.  Skelton agrees she would drive down with Carman.

When Scrushy came off the board in January 2001, there were no other applications until July and December 2002.

Tim Adams is not riding in the car with them during that time.

Back to grand jury mention of July 14.  Skelton agrees she met with prosecutors before she went in and gave her testimony  "briefly."

The meeting happened right outside the grand jury room.  Skelton agrees they would ask questions and gather information whether than tell them what they were going to asks.  She says some of the questions were the same inside and outside the grand jury room.

Skelton agrees they had notebooks with them.

Skelton agrees she had a conversation with Scrushy that they didn't want to get Adams a job.  No other offers were made as to full time employment.

Skelton says she didn't feel any obligation to report to the CON Board that Adams had ridden on the helicopter.  Skelton agrees it did not cost HealthSouth more to fly the helicopter with Adams on board than without Adams on board.

Back to the "keeping Mr. Adams happy" conversation.  Skelton believes this happens after Dr. Swaid didn't get back with Adams.

Skelton is asked if Scrushy asked her to do anything improper under the CON rules.  Skelton says not improper.

Skelton says she probably told Adams he wasn't going on the helicopter any more.  Skelton says Adams requested a ride with Carman and himself and typically she would tell him no.  Carman didn't want Adams in the car according to Skelton.

Sorry for the interruptions we're off until Monday.

I've been wondering what it is like to represent someone like a strong-willed ex-governor or CEO.

Dothan's Jim Parkman in response to questions after a speech in front of a West Coast legal audience this afternoon said CEOs as a breed can sometimes be "difficult people to deal with." He says it's just in the nature of people who rise to such positions to want to be in charge and in control. He says people in a CEO's position are often used to people "kissing their boots" and constantly telling them how great they are. Giving up control to anyone, even lawyers, is not easy for them to do.

Speaking of being in control, Parkman says jokingly that the reason he's not on this case in Montgomery is because he thought Governor Siegelman would steal the show. "I didn't think I could play second fiddle to a governor."

We needed to end on a laugh!

It's been a long week so everyone have a great break from the trial and we'll check back in at 8:30 a.m. Monday.

Posted by Helen Hammons on May 11, 2006 at 01:20 PM | Permalink | Comments (0)

# Skelton Still on the Stand

We'll be getting started shortly.

Questions about HealthSouth and Brookwood and a witness to be called. Talk from Feaga about impact of CON Board as an agency that can delay a health care provider's building projects. Feaga says the government is not going to say who was right or wrong. Feaga says the defense is trying to say the CON Board is a rubber stamp and the prosecution says the CON Board is not a rubber stamp.

More to come on a witness to come. Judge will take the matter up later, but has advised the sides to try to get together and work out a stipulation if possible.

Mr. Franklin will continue to question Loree Skelton.

Franklin is returning to testimony from yesterday. Talk of HealthSouth supporting Fob James in the 1998 governor;s race. Skelton says fund-raisers were held at HealthSouth for James probably in the spring of 1998. Approximately $325,000 was raised according to Skelton.

Skelton says she is not sure if she had a conversation about the money with Mr. Scrushy.

12/07/2005 grand jury testimony transcript being given to Skelton.

Kilborn objects saying the line of question is improper. The objection is overruled.

Skelton now says she had a conversation with Scrushy.

Skelton agrees she talked to Hanson about Siegelman and Skelton is now looking at a document.

The first exhibit is about a notice to CON Board members that had served under James.  The notice says people who want to continue to serve under Siegelman should let the office know.  Skelton faxed it to Hanson.  Another document was sent by Hanson as well.

Skelton says Hanson had asked her to keep him informed of CON Board matters because they wanted to try and keep Carman on the board.

Memo from Siegelman transition  about end of term of service on the CON Board "if you are interesting to continue to serve please notify me in writing...."  Memo faxed January 29,1999.

Second memo faxed Feb. 2, 1999.

Carman was executive vice-president of development for HealthSouth.  Served on the CON Board during James administration.

Raymond Bell refers in a responding letter to Carman saying "Thank you for your letter of January 6, 1999"

Skelton is asked about a conversation with Hanson.  Sidebar time again.

Skelton agrees she had said she was involved in the political contributions process.

Skelton says the funds from political fund-raisers were typically delivered by Scrushy.  Franklin is inquiring specifically about larger donations like the $325,000 for James.

Skelton is asked about amounts around $10,000 and she says it depended.12/7/2004 and 6/25/2004 are dates of Skelton's grand jury testimony.

Skelton says she does not recall date of meeting with Siegelman and Scrushy.

Transcript of grand jury testimony from 6/25/2004 is shown to Skelton.  Skelton reads document.

After reviewing the document.  Skelton says to some extent it refreshes her memory.

Art Leach is asking if Skelton was told a date or whether she knew the date?  "It looks as if I was told July 14th."

Leach is asking about an independent recollection of dates. Skelton doesn't have an independent recollection. Franklin says the testimony was given in front of the grand jury. "I wasn't at the grand jury to object," says Leach.

Franklin says, "No one from the government told you that date?" No sir.

Skelton now says she believed the meeting happened on July 14, 1999.

Leach objecting to PET Scan stuff being rehashed from yesterday.

Skelton is asked about when she talked to Adams about PET Scan application she says November 1999. Skelton is shown another document to refresh her memory. Now she says November 2001.

Skelton says she has seen the check request and vendor set up form.

Skelton looking at check request document and supporting documents.

Skelton says she requested $8,000 to Adams HealthCare Consulting LLC. The request was submitted on January 28, 2002 according to Skelton.

Skelton says she is familiar about payment procedures for vendors who do work for HealthSouth.

Skelton is asked if she talked to Scrushy about paying Adams for the work Adams was doing for HealthSouth.

A second check request was issued in July 2002 to pay Adams an additional sum. ($3,000)

Skelton agrees she paid Adams. Invoice Monday July 29,2002. Received by accounts payable on July 31, 2002

Skelton says she is not sure if she talked to Scrushy about the second payment.

Skelton is asked when she talked to Scrushy about the first Adams payment. "I can't remember a specific date I discussed it with him."

We're moving to December 2002. Skelton says the HealthSouth representative on the CON Board was Tom Carman. Skelton says the PET Scanner was a project in front of the CON Board in December. Skelton is asked if she told any members of the CON Board Adams had worked on the application. "I'm not sure I even attended that meeting." She believes it would have been the administrator of the medical center at that time. Skelton says Carman didn't participate although he was there because he worked for HealthSouth. Carman recused himself.

Franklin asks if Skelton called any members of the board to let them know about Adams financial relationship with HealthSouth.

Skelton says she probably called Alva Lambert but she doesn't have any idea when the conversation took place.

"I probably told him Mr. Adams had been trying to get a job with HealthSouth for some time..."Just in general terms.  We're just friends we talk about things," says Skelton.

Skelton was asked why she talked to Lambert, ""To put him on notice (about the financial relationship with Adams)."

Skelton says Alva Lambert did not take any action as a result of the conversation.

Skelton says Carman was aware of the financial relationship with Adams.

Skelton agrees she did the things for Adams to "keep him happy."

If you had known Richard Scrushy had given the governor two separate contributions of $250,000 would you have had a different reaction to Adams?

Skelton says she would have been more concerned about impropriety.  Skelton says the contributions came to her notice when Eddie Curran did a story about them.

The prosecution is finished.  The judge tells Mr. Leach, "You just stay right there."  We're going to morning recess.  Art Leach will question Ms. Skelton when we return.

Back. Skelton says she knows of no money passing from Scrushy to Siegelman.

Skelton agrees she has no record, calendar and cannot go back to get a specific date for the meeting between Scrushy and Siegelman.

Skelton agrees she doesn't have to account for her time by the minute and that is one of the things she likes about her job.

Leach is showing flight record from June 29 showing trip from Birmingham to Montgomery.  Skelton agrees RMS refers to Richard Scrushy and the document agrees with her recollection as to who was on the trip.

Skelton is shown July 14 flight record.  Skelton reads from document Jabo Waggoner is lead passenger.

Leach asks if this helps her recollection.  She agrees it doesn't help her recollection at all.

Referring to grand jury testimony again.  Leach wants to know "Who supplied you with the date of July 14th? It looks like someone in the grand jury," says Skelton.

Franklin wants the transcript in the record.  "I'm going to cross, he gets to re-direct," says Leach.

Skelton says her family is in the health care business. Skelton says her earliest memory of CON Board was late 80s, early 90s.  She became aware of CON Board issues through her family.  She worked for Hunt 1991-1992 where she got her first personal look at CON Board issues.

Skelton had a chance to go to HealthSouth before she got it in 1993.  She was interviewed for job by Tom Carman and then with Richard Scrushy in 1993 and got the job.

Skelton started immediately handling CON issues around the U.S.  Skelton agrees there are 33-36 around the U.S.  Skelton says she does not devote as much attention to the other states because Alabama is the home state of the company.  Skelton says she does have to pay attention in other states during times of expansion.

Skelton says other states have licensure and certification procedures that others handle.

Skelton agrees the CON Board procedure has not changed that much over the years.  Skelton agrees she is an expert on CON Board issues.  Skelton agrees she has more experience with CON Board issues than Scrushy.  She agrees Scrushy and others rely on her expertise.

Skelton agrees she attended most CON Board meetings.  Skelton provided materials to Scrushy or Carman normally in written form.  Skelton agrees there would be three to four items for consideration. Skelton agrees she would boil large documents down to make them easily understandable and she would meet with Scrushy or Carman and advise them on the issues and advise them also about recusal.  Skelton agrees if there was no direct competition with another company, they did not have to recuse themselves.

Skelton agrees Scrushy and Carman almost without exception followed her advise.  Skelton agrees she does not remember Scrushy voting against competitor to hurt them.

Skelton agrees HealthSouth did not control the CON Board.  Skelton agrees HealthSouth could not control the CON Board.

Skelton says she knows Scrushy was appointed to CON Board under four governors.  Skelton says she was not with HealthSouth when Gov. Hunt appointed him.  Skelton agrees her understanding that that is where Scrushy came to know about her work.

Skelton agrees Scrushy rely on her advise.  Skelton agrees the procedure has not changed.

Skelton agrees she is a stickler for details in regard for CON Board work. Reference is to grand jury testimony and Skelton agrees she was a stickler on the law.

Skelton says state health plan is the guidebook by which you would file your CON Board applications.

Skelton agrees she relied on the plan to tell if a project was appropriate or inappropriate.

Skelton agrees she was very meticulous and Carman and Scrushy relied on her because of this.

Skelton also reviewed projects which did not involve HealthSouth projects. Skelton agrees that at the board meeting Scrushy and Carman would basically present her analysis to the board.

Skelton agrees she was never paid by the state of Alabama.

Skelton agrees the plan wants to get health care providers to provide needed services.

Skelton says the "majority is done by consensus" as to the consideration of projects.

HealthSouth is the largest private health care corporation in the state. Skelton agrees HealthSouth is a place people want to work. Skelton agrees it is one of the few places in the state she can do this type of work.

Skelton agrees campaign contributions are a big part of her job. Skelton agrees HealthSouth wrote a lot of checks for political contributions and charity.

Skelton agrees she was the "traffic cop" of the checks for the most part. Skelton agrees sometimes she was bypassed by people like Waggoner and Scrushy.

Skelton is looking at a campaign contribution request for $5,000 from Jabo Waggoner for Bob Riley for U.S. Congress, dated Oct. 9, 1996. Next one a request from Waggoner 10/03/96 for David Skinner campaign for $250. Next, Oct 3, 1996 for Bill Williams campaign for Vestavia Hills City Council.

Skelton  looking at another exhibit. Request from Hanson for Scrushy for a contribution to Sen. Daschle. Another document a memo from Hanson to Skelton regarding political request. Date is May 30,2000. Hanson is advising the NRCC - $25,000, Governor's Republican and Democratic, $15,000 to both and $5,000 donation to Daschle's PAC and $10,000 corporate contribution.

Skelton says sometimes things were already approved before she saw them. Skelton says Hanson sometimes would go directly to Scrushy. She says in these cases she would prepare a check request , check.

Another document dated September 28,2000. Hanson requesting PAC contribution for Nancy Johnson of Connecticut. Skelton says sometimes she received verbal approvals from Jabo Waggoner or from Waggoner's assistant. Skelton says every contribution had to be approved by Scrushy. Skelton says others "took that authority, I'm not sure they had it."

Skelton says Jabbo Waggoner would submit requests sometimes without prior approval.

Another document. Request from someone who worked for Hanson for fundraiser and contributions for Dennis Hastert.

Fundraisers usually happened in the HealthSouth Conference Center. The one for Hastert was in a smaller room.

A fundraiser for Gov. James raised $325,000. Skelton says she did not attend the event. Skelton agrees the money is collected and turned over to the campaign. It is not all in one check from HealthSouth but a collection of money collected at the event.

Skelton says the fundraisers were "very" common. Skelton says it varied due to election years.

Skelton says there were also charitable fundraisers, but she didn't handle those.

Skelton agrees there was usually some event going on at HealthSouth. Skelton agrees HealthSouth did a lot for charities.

Skelton is referred back to Hastert stuff. Talk of Keep our Majority PAC, State Victory Fund, Hastert for Congress.

Skelton is now reviewing request for S.Dakota Technologies Summit related to Daschle. The request was $10,000. Skelton says this was approved and a check written.

Another multiple-page document. Another memo from Hanson. Request for National Republican Congressional Committee for $10,000; another for $5,000 for Congressman Bill Thomas. Skelton says to the best of her recollection these were also paid.

Another exhibit. This a memo from Skelton to Waggoner about requests that were discussed with Hanson. Skelton says some of the requests from Waggoner were rejected and others approved. Skelton says there were contributions to both Pittman and Monroe in an election among others. Skelton says it was not unusual for HealthSouth to contribute to both sides of the political process.

Back to Tim Adams. Skelton agrees it is fair to say people were constantly asking her about employment at HealthSouth. Skelton agrees she tries to help anyone she can. Skelton says she asks for

resumes and forwards them to the appropriate person in Human Resources to see if there are any openings for the person looking for a job. Skelton says she did try to steer people to jobs to help the applicant and HealthSouth. Skelton agrees she was present at times when requests came to Scrushy about jobs at HealthSouth. Skelton agrees it was common people came to Scrushy wanting contributions. Skelton agrees after a while some people came directly to her.

Skelton says sometimes she would call Hanson to find out about any previous relationships with people, groups that wanted contributions and then she would turn it over to Scrushy.

Skelton agrees Scrushy dealt with contributions and employment matters in a positive way. Skelton agrees that most of the time people were disappointed because Scrushy couldn't hire or contribute to everyone.

"Was Tim Adams kind of a pest?" asks Art Leach. Leach notes Skelton rolling her eyes as she responds yes. Skelton agrees Adams was a nurse looking for an executive position. Skelton thinks Adams was in his 40s. Skelton says Adams had not been an executive in health care or any field to her knowledge.

Skelton says Adams was a nurse, but she was not sure what type of nurse.

Turning to Scrushy appointment to Siegelman CON Board. Skelton agrees she was not surprised by Scrushy's appointment to CON Board. "I believe he was well respected as an expert in the health care field."

Skelton says Scrushy had been on the board about seven years.

Skelton says no one on the board had more years of experience than Richard Scrushy.

Skelton agrees the position on the board is uncompensated.

Skelton agrees she has no first hand knowledge of meeting between Scrushy and Governor Siegelman other than the fact she was on the trip. "It is my understanding that Eric Hanson was trying to develop a positive rapport..after the election."

Skelton says she can not recall a check being delivered that day or bribing the governor to get a seat on the CON Board. Skelton says she did not see Scrushy with a check, nor did she hear any discussion of a check on that day.

Skelton says she doesn't remember how Hanson got to the meeting.

Skelton says they waited in the open reception area of the governor's office - Scrushy, Waggoner and herself. Nick Bailey came out and Waggoner introduced her to Bailey. Someone came out and said the governor was ready to see Mr. Scrushy.

Skelton says Bailey would call her periodically after that day. She says it was not in relation to CON issues. Skelton agrees Bailey had never talked to her about Scrushy paying Siegelman to get on the board. Skelton agrees Bailey never talked to her about disagreement between Siegelman and Scrushy.

Skelton describes Bailey's mood at their meeting as "jovial."

Skelton says they waited about 5-10 minutes until someone came to get Scrushy to meet with Siegelman. Skelton says their meeting was brief and agrees it lasted maybe about 20 minutes. Skelton says Nick Bailey was not with Scrushy when Scrushy came out of the governor's office. Bailey had left the are according to Skelton.

Skelton says she first met Adams at the CON Board's first meeting. She says someone faxed her a list, press release about the members of the board. Skelton says she ran a bio check to find out the board members' experience, knowledge and which category the person fitted into. "The category would give you an indication of their knowledge of the process." Skelton believes Adams was a representative of the governor. Skelton says she did not know Adams prior to the CON Board.

Skelton says Adams would call or ask her to talk to him after they returned to Montgomery. Adams allegedly told Skelton he was extremely unhappy in his job. Skelton agrees this was a recurring theme. She doesn't remember specifically what she did for Adams when he asked for a job, but she believes she followed her normal routine.

Skelton says Adams talked to her on "numerous" occasions. Skelton says she saw Adams and Scrushy talk about a job only once. Skelton says she didn't have the intention early on in getting Tim Adams a job at HealthSouth. "The initial reason was we would lose two jobs on the board."

This has to do with having to recusal from CON Board votes on projects. Part-time HealthSouth employees only would have to recuse themselves on the specific projects they worked on.

Mark Wilkerson advised CON Board members on legal matters as well as to board members and Skelton as well.

Skelton says it was her impression that Adams was trying to use his position on the CON Board to get a position at HealthSouth. Skelton agrees she tried to pacify Adams and did not want him angry.

Skelton says Adams would drive to HealthSouth headquarters to get on the helicopter. Skelton says Adams requested to make the ride on the helicopter to come to Montgomery, even though he lived in Oneonta.

Skelton agrees she was not comfortable with Adams being on the helicopter. Skelton says Scrushy did not express to her that she was uncomfortable. Skelton agrees she met with Scrushy the day before.

Skelton says the helicopter ride was "20-30 minutes."

Skelton agrees 20-30 minutes was enough time to meet with Scrushy.

Skelton agrees she presented Scrushy a summary of project analysis. Skelton agrees she did this routinely. Skelton agrees Scrushy reviewed the document and Scrushy did not become less effective because Adams was on the helicopter.

Skelton says she doesn't recall a time when Scrushy offered Adams a job at HealthSouth headquarters. The scrub nurse job that Adams was offered was downtown at the medical center.

Skelton agrees Scrushy eventually took the Tim Adams problem and put it in her lap. Skelton agrees Adams became an interruption. Skelton agrees the situation was "uncomfortable" and she could see it was uncomfortable for Scrushy. "There are no scrub nurse positions at the corporate headquarters are there?" asks Leach. "No sir," says Skelton.

Skelton agrees she paid Adams $8,000 and the work was substandard on the application and "you had to be diplomatic" because Adams was a CON Board member. Skelton agrees the situation was "delicate."

Skelton agrees more work had to be done to get the application repaired and Adams did more work on the project to get it up to standard. Skelton agrees total payment would be between $8-12,000, well-below what was normally paid. This was after Leach said Adams was paid $8-12 million and everyone got a chuckle. "That's a lot of money."

Skelton agrees Adams was not hired for any other work. Skelton agrees a lot of people work on projects that no one ever knows about.

Skelton agrees there is no legal requirement that people leave the room. Skelton agrees there are times people recuse themselves and then do not leave in the room. Skelton agrees people are not allowed to participate in debate if they recuse themselves. Skelton says this is consistent since at least the time of Hunt.

Skelton agrees it was "absolutely not" her intent to violate the law. Skelton agrees HealthSouth CON Board members rely on her advice. Skelton agrees she had no conversations with Scrushy about CON Board projects presented to the board in 2002.

Skelton agrees she would be talking to Carman, who was the board member at that time. The conversations and instructions to Carman included recusal instructions.

Back to Tim Adams and his referral to Dr. Swaid. Skelton agrees Scrushy contacted her on the fifth floor and told her it was "bad idea to have Tim Adams working for HealthSouth." Skelton agrees there was no further offer of full-time employment for Adams.

Mr. Leach is at a "good breaking point." We're off for a while till about 1:15 p.m. or so. There will be some blog interruption time this afternoon. We're going to start a new post for the afternoon.

Posted by Helen Hammons on May 11, 2006 at 08:31 AM | Permalink | Comments (2)

## The Afternoon Begins

Judge giving instructions to the jury about testimony as it relates to Mack Roberts.

Jabo Waggoner is on the stand. Presently he is a consultant and Alabama State Senator. He has served in the Senate 1990 to the present. He served in the House from 1966-1983. He is a consultant primarily for health care companies. From 1990-2003 he worked for HealthSouth, Vice - President of Community and Public Affairs, representing HealthSouth at various events all as a public relations function.

Waggoner has his calendar from 1999 and he says it shows on July 14, 1999 he traveled to Montgomery with Loree Skelton and Richard Scrushy to a meeting. He says he believes the time was 1 p.m. but he can't be sure if that is the time he left from Birmingham or the time of the meeting. The meeting for Scrushy was to be with Siegelman.

There is a notation of helicopter on the calendar. Waggoner says they flew in the company helicopter from Birmingham to Montgomery.

Waggoner says he was not informed as to the purpose of the meeting. He says all he was told was that they were going to a meeting with the governor. "I was asked to accompany him quite often without knowing the purpose."

The governor, Skelton, Scrushy, and Waggoner met for a few minutes. "As I recall the governor said, Will you excuse us for a few minutes,' and they went to another office."

Waggoner says he stayed in the room with Loree Skelton in either the governor's office or the waiting room.

Waggoner says the meeting lasted "15 or 20 minutes. That is just a guess. We didn't wait real long."

Waggoner says he, Skelton, Scrushy got back on the helicopter and flew back to Birmingham.

Waggoner says there were only four people.

Waggoner says on the way back he did not inquire as to the purpose of the meeting.

As to how he initially first found out about going to the meeting, Waggoner says Mr. Scrushy's secretary would call Waggoner and tell him Mr. Scrushy wants you to go to Montgomery with him and that's the way it happened this time.

Kilborn is now questioning the witness.

Waggoner agrees he was an employee with HealthSouth until 2003. Then he served as a consultant and then parting from the company last year.

Waggoner says he has worked with various Congressmen such as Everett, Riley, etc. in the past.

Waggoner agrees he knows what a contributor can and cannot do.

Waggoner is asked if he would be the last person anybody including Richard Scrushy would bring if he was going to hatch a conspiracy in the state house. Waggoner agrees.

Waggoner says he would not have been a party to something illegal or immoral going on.

Waggoner agrees he never saw Scrushy bribe or attempt to bribe a public official.

Waggoner says, "I would not," work with that kind of person.

Waggoner says he has not seen Siegelman do anything dishonest or illegal.

Waggoner says "It's fair" to say that he and Siegelman have not always agreed on political issues.

Waggoner says he is aware Scrushy served on the CON Board for four governors.

Waggoner agrees Scrushy was highly qualified for the job.

Waggoner agrees the CON Board was "not to my knowledge" a controversial board.

Waggoner is asked about a local bill to allow Sunday beer sales at a local track. Objection.

Objection sustained. Waggoner is asked about meeting between Siegelman and Scrushy. "That would hardly be enough time for Governor Siegelman and Mr. Scrushy to hatch some conspiracy would it?

Problems again with scope of direct examination.

Waggoner agrees that as far as he knows there was no evidence that there was an agreement between Scrushy and Siegelman for a seat on the CON Board.

Fred Gray will now question the witness. Gray and Waggoner served in the Alabama House together. Waggoner says he has no evidence of a bribe. Waggoner says he has no evidence that Scrushy paid for a seat on the CON Board.

Waggoner agrees Scrushy never asked him to commit a criminal act nor has he seen Scrushy commit a criminal act.

Waggoner is asked if he knows Tom Carman? He says yes.

Gray is asking Waggoner to look again at Waggoner's calendar. Waggoner says three people were on the helicopter when it left Birmingham - Scrushy, Skelton, and Waggoner. Seven years ago.

Gray asks if he may be wrong about the date. "I don't think so."

Gray says, "Isn't it a fact that Mr. Hanson was on the helicopter?" Waggoner says he doesn't recall that.

Gray turns the calendar to June 29th. Judge asks Mr. Gray if Gray is going to make the calendar an exhibit. Mr. Gray says yes, a short minute happens, and the calendar is in.

"What is that?" asks Gray. "What does it say for June 29th? RMS, governor's office, 1:30."

Waggoner agrees the government did not ask him about that page.

Gray alleges the meeting was on the 29th of June. Waggoner says it occurred on July 14th. "I could not tell you what that meeting was about June 29th."

Waggoner says he was only on the helicopter five times in his life. Waggoner says he flew on the helicopter once in July and he doesn't know if he flew or drove in June.

Waggoner admits the difference between the notations on the calendar of July 14th and June 29th is the helicopter remark on the one on July 14th.

Gray is introducing exhibits concerning HealthSouth travel records.

Waggoner says he does not remember if he came to Montgomery by helicopter. Waggoner is shown a document dated 6/29 with the notation RMS and an indication of two passengers.

Gray shows one from 7/14 that indicates Waggoner was on a plane(?). Waggoner admits to being in Montgomery on both the dates. Waggoner says he doesn't remember a meeting. Waggoner agrees only that there was a meeting at some point.

Scrushy's name is not on the document from July 14th. Waggoner's name is.

Waggoner agrees when someone in politics wins their supporters are rewarded. Waggoner says he had no understanding as to the purpose of the meeting. "I was never told why."

Waggoner agrees they were going to see the governor. Waggoner was asked about being a lobbyist to which he replied emphatically, "No." He then admitted when he was in the period between his House and Senate terms he did serve as a lobbyist.

The HealthSouth security chief's name has been brought back up. Goodreau mentioned briefly.

"Are you sure Mr. Hanson was not on either leg of the trip to Montgomery?" Waggoner says he doesn't recall Hanson being on either leg.

Hanson's name is on a flight document from 7/14. Waggoner says he has no reason to believe the documents have been tampered with. Waggoner says he still doesn't recall Hanson being on the flight.

Waggoner agrees the document does not show Scrushy was on the flight.'

Mr. Franklin asks Waggoner if Waggoner was ever on the helicopter without Mr. Scrushy. Waggoner says one time on a trip to Alexander City with California Congressman Bill Thomas.

Charles Taylor Pickett Jr. is on the stand. He currently lives north of Baltimore. He is CEO of Omega Health Investors Inc. Prior to that he worked for IHS in the Baltimore area. IHS was primarily a skilled nursing company. IHS sub-businesses still exist but not under the name IHS. He served as CFO of IHS.

Pickett says from 1994 to 2001 he had a business relationship with Mr. McGahan. In late June or early July of 1999, according to Pickett, McGahan called him and said McGahan was under pressure to contribute to a non-profit entity.

"I had indicated to Bill I might be in a position to help him, but I needed to think about it."

Pickett says he took the matter up with his CEO and he was advised to check and see if the entity was a legitimate non-profit.

Pickett says he called McGahan back and told McGahan that Pickett would help.

Pickett says he said however in the first conversation he told McGahan there was not any way they could do a $250,000 contribution.

Had to take a break for a moment.

We're on IHS check cut for Mr. McGahan.  IHS filed bankruptcy in February 2000.  Pickett says by the fall of 1999 it was known IHS was in trouble.

Kilborn up and we're back to the IHS check.

Pickett says he found out about the request prior to the 16th of July.  Pickett says he got the fax with mailing instructions on the 16th.

Pickett agrees he checked with the legal department and he agrees he found out the non-profit was a legal entity.

Pickett says he did not read the Articles of Incorporation.

Check of July 19, 1999, a Monday.   Pickett says he couldn't say when the check would have been cut.

Pickett says the check was certainly written on the 19th.

Pickett couldn't say how the check was sent, USPS or overnight.

Pickett says February 2000 was the filing date of the IHS bankruptcy.  Picket says 5 of the 7 public companies involved in the industry filed bankruptcy.  IHS before that worth in excess of $3 billion.

Fred Gray to question Mr. Pickett.

Pickett agrees he has no facts that Scrushy bribed Siegelman to get a seat on CON Board, nor does he have facts that Scrushy committed any of the illegal acts in the indictment.

Pickett says the size of the request put him in the position he said no initially.

Pickett agrees his boss wanted to make sure the Alabama Education Lottery Foundation was legal.

Pickett agrees his people found it to be legal.  He does not necessarily agree or disagree that it was "proper."  Gray sends Pickett to a chart to write on it.

- June 29, 1999
- July 14, 1999
- July 16, 1999 - date of Fax, instructions
- July 19, 1999 - check authorized
- July 19, 1999(Yes Gray told him to write it twice)Check processed
- July ?

Pickett says McGahan contacted him in late June or early July but he couldn't give a specific date.

Pickett says he agrees check could not have gotten to HealthSouth before the 20th.

Pickett is asked to write amount of IHS debt.

Picket writes $2 million. $267,000 was written off. $250,000 is the amount paid to the Alabama Education Lottery. IHS netted $17,000.

Pickett says he doesn't know that IHS received a tax deduction.

Pickett agrees again he checked with his legal department.

Franklin back to question Pickett.

IHS voucher to get the check was marked "hot voucher" is that correct? Yes.

Do you think the check sat around after it had been processed? No.

Asterisk for July 14th on a chart. Chart WARS!!!

Franklin wants a 26 put behind the question mark of Gray's chart with an asterisks and LF for Louis Franklin.

Pickett says he did not call the governor or any conversation with the governor or any members of his staff.

Pickett is asked about a document from July 14th but Pickett cannot say if the document was executed. Pickett says his assistant would have brought it to his desk. It looks like this has something to do with the modification of an engagement agreement between IHS and UBS-Warburg.

Pickett is asked if the document correctly reflects the agreement. Pickett says yes, then Mr. Franklin withdraws the document since Pickett cannot say the document was actually executed.

Loree Skelton is the next witness. Skelton currently lives in Birmingham. Graduated from Samford and Cumberland School of Law. She has worked for HealthSouth since March 1993.

Skelton says before that she worked for Gov. Hunt as a deputy legal adviser and then legal adviser. 1991-1992 time frame.

She handles CON material throughout the country and has to keep up with what's going on in 30 plus

states.  Skelton says it is necessary to keep up with this because it impacts HealthSouth's ability to grow.

Skelton says she coordinated political contributions through Eric Hanson, U.S. Strategies, employed as both a lobbyist and consultant.  She says Hanson was there when she started.  Skelton says Hanson stopped working for HealthSouth around March 2003.

Jabbo Waggoner, Scrushy, and division presidents would have input into political contributions.

Skelton says HealthSouth had a PAC HealthSouth Rehabilitation Corporation PAC.  She says the name changed to HealthSouth Corporation PAC.  Skelton says the first name was there in 1993 when she started and she is not sure when the name changed but she knows it is now the second name.

Skelton says she used to keep the checkbook for the PAC.  She says she still has that checkbook.  The account has not been closed.

Skelton says it was important to coordinate political contributions through Eric Hanson, "Because Eric may be working on issues we did not know about and we needed to be sure he hadn't made a contribution already or made a contribution to an opponent."

Weather warning.  Apparently it's really coming down outside.

Skelton says the final authority for the contributions for 1999 was Mr. Scrushy whose title was CEO and chairman of the board.

Skelton says any amount had to be run through Scrushy, but there may have  been occasion that was not the case.

Skelton says to her knowledge Scrushy and HealthSouth supported the same candidates.

In 1998 Scrushy and HealthSouth supported Fob James.  Siegelman won the election.

Skelton is asked what position this put HealthSouth in with respect to the governor's office.  "Probably nonexistent because we supported his opponent."

Skelton says she talked to Hanson and told him she was concerned about not having access with the administration.

Skelton says she believes in the summer of 1999 there was a meeting between Scrushy and the governor.  She and Jabbo Waggoner accompanied Mr. Scrushy.

Skelton says she believes it was a "get acquainted type meeting."  She says she did not participate in the

meeting.

Skelton traveled with Scrushy, she says she is not sure if Waggoner was with them. Skelton says she was introduced to Nick Bailey by Jabbo Waggoner while they were sitting there. Skelton says the governor's secretary was there also. "Eric Hanson may have been there but I am not certain."

Skelton cannot say if there was another meeting with the governor at which she was with the group and she does not know if Hanson was at any other meetings.

Skelton says the governor met Scrushy. "We were left out in the reception area." Skelton says the meeting lasted about 30 minutes.

Skelton says she believes they traveled back to Birmingham by helicopter but she is not certain.

Skelton says she talked to Hanson about concerns on more than one occasion.

Skelton says she had no knowledge of HealthSouth making contributions in 1999 to the Alabama Education Lottery Foundation.

Skelton says she became aware of a donation in 2000, but did not know the exact time.

Skelton says she gave legal advice on CON Board matters to Richard Scrushy and Tom Carman. Tom Carman was her immediate superior and over corporate development.

Skelton says it was important to HealthSouth to have a position or seat on the CON Board.

Skelton says she doesn't believe she discussed a seat on the board with Scrushy specifically.

Skelton says she attended the CON Board meetings with Mr. Scrushy to advise him on any important legal issues he would need to be aware of.

Skelton says she knew who the members of the board were prior to the first meeting in 1999 because a pres release was sent out.

In 1999, Skelton says typically she and Scrushy would travel to the CON Board meetings along with Tim Adams another CON Board member.

Skelton is asked if the helicopter was some "army helicopter" or "something special." She says it was something special, a Sikorsky, opulent with nice leather seats. She says she believes there were always two pilots as a backup.

Skelton says she told Scrushy it wasn't a good idea to have Adams on the same helicopter. She says she usually discussed project analysis with Scrushy about projects which might come before the board and she didn't think this was right with Adams present.

Skelton says instead she would usually meet with Scrushy the day before. She says she can't be sure she discussed projects in front of Adams.

Skelton says, "Mr. Adams was constantly asking (me) for a job with HealthSouth." Skelton doesn't recall talking to Scrushy about Adams asking for a job.

Skelton says she told Adams she would look into it. She says she didn't think it was a good idea.

Skelton says she didn't really attempt to get Mr. Adams a job. She says she is not certain but she may have gotten his resume and sent it to human resources.

Skelton says Adams asked Mr. Scrushy and Pat Cox for a job. Skelton says she talked to Scrushy and called Dr. Swaid, the medical director at the HealthSouth Medical Center at the time. Mr. Scrushy instructed me to "get him hooked up at the medical center."

Adams was asking for a job at the same time he was on the CON Board. Skelton says Adams would have to recuse himself from the board when HealthSouth projects came up.

Adams was offered a job as a scrub nurse which he turned down. Skelton says Adams says he was going into the consulting business and Adams wanted to write the applications for HealthSouth for the CON Board.

Adams was allowed to write the application and according to Skelton was still on the CON Board.

Adams was hired in November 1998 and paid in 1999 according to Skelton. To help refresh her memory Skelton is given a document to review.

Skelton now says she began talking to Adams in November 2001 about writing the application and he got paid in February 2002.

Skelton says HealthSouth hired people from outside to write these applications. She says Adams had no experience in writing the applications but she says he had a lot of knowledge about the health care profession. She says she doesn't know what a scrub nurse does.

She says sometimes HealthSouth also wrote them internally. Skelton says in total Adams was paid $11,000 to write the application. Skelton says this was below fair market value. Most would cost $20-25,000. Skelton thought with Adams' experience the $11,000 was a fair price. Adams got $8,000 in Feb 2002 and $3,000 in July.

Skelton says he submitted the application in February but it was not ready to be submitted.  Skelton says Jeff Dance and Darryl F and Mr. Adams had to rewrite the application several times.

Skelton says the first document.  "Did not meet our standards."

Skelton says Adams thought he was going to miss a CON Board during the summer at some time.  Skelton says Adams would call to see if he needed to do anything else in regard to the PET scanner.

"I'm not positive but I think we were through with it at that point."

Skelton says HealthSouth had a project coming before the board in July.  The Phenix City rehabilitation hospital.  Skelton says the project was to be voted on in July and was on the agenda.

Skelton is asked about a document.  She says she doesn't believe this would have been submitted because it had "confidential" on it.

Skelton says Adams told her in a conversation he would not make the board meeting because he would have to miss several days of work.  Skelton says she thought she told him they might not have a quorum without him.  Skelton says Adams wanted for HealthSouth to help pay his expenses or provide travel for the meeting.  She says she did not think this would be appropriate.

"The appearance of impropriety of doing so," says Skelton.  Skelton says Adams reminded her of an agreement about the application and suggested HealthSouth owed him more money for his work.  Skelton says a range had been previously discussed - $8-12,000.  Skelton says she agreed to pay him for the additional work he had done on the application.  Skelton says she thinks Adams was in Oregon.

Skelton says Adams came back and attended the meeting.

Skelton is asked about the relationship between Adams and Scrushy.  "Mr. Adams was constantly asking for things.  To go to different events with Mr. Scrushy or to go hunting, air shows."

Skelton says Scrushy and Adams went to an air show she thinks in Oskosh.

Skelton says Scrushy served on the CON Board under Siegelman until 2001.

Skelton says she did not give advice to Scrushy about going to the air show with Adams.  Skelton says she quit giving advice  "because it didn't have any relevance."

Skelton says Scrushy told her to tell Mr. Adams we weren't going to be able to find a position for him as it related to a job.

Skelton says Scrushy told her to pacify Adams and "keep him happy."

Skelton says she was trying to keep Mr. Adams happy because "you wouldn't want him to use his position to the detriment of the company."

End of day coming.  Judge gives another weather report for the benefit of the jury.

Posted by Helen Hammons on May 10, 2006 at 01:20 PM | Permalink | Comments (3)

## Mike Martin Under Fire

Yesterday Siegelman attorney Vincent Kilborn promised there would be "Thunder and Lightning" today.  Let's see if it comes with former HealthSouth CFO Mike Martin, he of colorful language, on the stand.

The judge is on the bench.  Louis Franklin says he is not quite finished with Martin.

Franklin clears up status of Martin's plea agreement with U.S. Attorney's Office in Montgomery.  Martin will not be charged with a crime related to this matter.  Yesterday, there was some confusion about whether or not there was any kind of agreement with the local office.

Kilborn is first up for the defense.  Martin agrees he is immune from prosecution related to this case.  Martin says the agreement was made in 2004.  Martin says Louis Franklin signed off on the agreement.

Martin is asked why he needs immunity.  "I was concerned about the facts of the case."

Martin says he was part of the connection to acquiring a seat on the CON Board with the transaction.

Martin says he was told "We needed to raise the money so we would be in the good graces of Governor Siegelman."

"The way that we went about it was unusual...I thought it was at best unethical and I was unsure if it was illegal."

Martin says he doesn't know if he could say a bribe was being paid.  "What I was being told was if we assist in raising this money for the education lottery we would be assured a seat on the CON Board."

Martin says Scrushy is the one who told him this.

Martin says he did not talk or see Gov. Siegelman on the matter.  Kilborn gets Martin to agree he was in

charge of the financial matters for the company.  Martin says there were probably over 100 accountants.  "From 1997-2000 you were primarily cooking the books weren't you?" asks Kilborn.

That of course brings a pause in the proceedings.

Martin is being shown the information about his guilty plea.

"Let's get something clear up front, you are a convicted felon? "  Martin says yes.  Martin says he has spent one week in prison in Walker County.  He says he wore a green jump suit.  Martin says his first sentence was six months in home detention.

Kilborn equates Martin's home detention with that of Martha Stewart.  "Let's stay away from Martha Stewart," says Judge Fuller.

Kilborn goes through charges against Martin:  Fraud.  "I did that many, many times until I quit in 2000 when I couldn't convince Mr. Scrushy to abandon the fraud."

Time OUT!

Martin says he was facing 15 years for his crimes.  "That information was agreed to before it was filed.  There were a lot of crimes that were not put in the information, is that correct?"

Terry Butts has interrupted proceedings saying he needs to take up a motion outside of everyone's hearing.  We're on hold again while the parties discuss the issue.

We're back.  Martin is asked if he knows Jabbo Waggoner.  Martin says yes and agrees Waggoner worked at one point for HealthSouth.

Martin agrees Waggoner was opposed to the lottery.  Martin agrees Waggoner tried to stay away from anything having to do with the lottery.  Martin says Waggoner knew about it.

Kilborn questions a 302 from 2003 in which Martin allegedly says Waggoner called him about help with the $1 million contribution.  "What I said was that Jabbo Waggoner knew," says Martin.

Kilborn is asked to review 302, FBI interview summary.  "Mr. Waggoner was aware of this contribution, I have not seen this report and I did not say this."

Martin says, "I never said this to begin with so I don't know how I can deny it."

Martin says he believes the interview was over the telephone.  Martin is asked about agents Baker and Murray.  Martin says he thinks three people were on the phone.  Martin says he told the truth as best as

he knew it at the time.

Martin says he was personally opposed to it (the lottery) on moral grounds.  Kilborn asks if Martin held himself to a high ethical and moral standard.  Martin says yes.  Martin agrees if something didn't smell right he wouldn't want to get others involved.  However, Martin agrees he did get people like Leif Murphy involved.

"If you thought there might be something wrong with this why would you get someone else involved," Martin says Murphy didn't know what all was involved.

Martin says Murphy was handling the details and agrees Murphy got the check and delivered it to Martin.

Asked about his temper Martin says, "I do have a fiery temper."

Asked about his bad language he agrees he uses bad language but denies he likes to use the F* word.

"Have you ever threatened Leif Murphy?"  Brings objection from the prosecution and another sidebar.

We're back.  Martin agrees the U.S. attorneys may put in a good word for him in the Northern District.  Martin agrees he knows the government wants him to serve more prison time.

Martin agrees Scrushy wanted to have the check in his hand to give it to Siegelman because "he related to me it was very important."

Date on check in question is July 19.  Martin says, "It is my understanding he (Scrushy) had a meeting with Governor Siegelman where he delivered the check.   I would agree the check was in Mr. Scrushy's hand for the meeting with the governor."

Kilborn gets Martin to agrees that it is common sense that the check had to be delivered on or after the date of the check.  Martin asked about $3.375 million he paid back to government.

Kilborn asking about fees made by UBS.  Martin says he doesn't know that UBS made any money off of HealthSouth.

Martin agrees McGahan, Smith Barney may have made tens of millions of dollars from HealthSouth.

Martin says he is not sure how much went to which firms.  "Mr. McGahan's firms, I would say they made north of $10 million, less than $50 million somewhere in that range."

Martin says he thinks he knows how HealthSouth got the $250,000.

"It was my understanding the IHS owed UBS a banking fee and UBS and Bill McGahan forgave that banking fee and IHS wrote a check to the lottery campaign," says Martin.

Martin is asked about motivation.

Terry Butts will now question Martin.  Martin says he's employed with a private investment firm.

Martin again says he paid back $2,375,000.  He says he's not destitute, "but I'm on my way."

Butts is asking, "If there's evidence before this jury that you actually stated that a million had to be raised and there is evidence you never told that to that individual how would you explain that discrepancy?"  An objection is sustained.

Butts asks Martin how many conversations Martin had with McGahan about raising money for the lottery.  "A number of occasions."

Martin says, "Mr. Scrushy had told me to tell them he was going to fire them.  He's a New York investment banker and that's what he (McGahan) understood."

"Mr. Scrushy was very serious about this," says Martin.  Martin says he had threatened to fire them before as it related to the banking business.

"Is it a fair statement to say you just don't like Richard Scrushy?" asks Butts. "Well did you like Richard Scrushy?"

"As a human being I do.  It's taken some time, but I'm not taking on any ill will."

"Mr. Scrushy, if he fired me, he fired me because I wouldn't participate in the fraud any longer," says Martin.  Butts wants this stricken from the record.  Another meeting with the judge.

The judge is going to let the jury take their recess early and there are some things to take up. "We will be on break until I call you back, but it will not be sooner than 20 minutes."

The judge advises the witness that he should carefully and truthfully answer the questions asked but let the judge know if he cannot answer the questions without reference to the trial in Birmingham involving Mr. Scrushy.  Further on the judge tells Martin to  use something similar to this to advise the court.  "Say judge can I speak to the court before I answer further."

Franklin says he does not want the witness to be afraid to answer.  The judge is trying to keep out prejudice in the case.

Butts is asking the judge to make the witness aware that Scrushy was acquitted which Judge Fuller does.

Witness has been asked to leave the stand.

Butts is talking about Martin conference call with Scrushy and other businessmen in which Martin allegedly cussed out Scrushy.   Date some day in 2000, the day before Martin was fired.

Franklin says this does not go to Martin's truthfulness.  Butt's says it adds to the truthfulness of this.

Franklin says he doesn't have a problem with them asking the question but they are going to have to live with the answers. " I don't think they're going to get the answer they're expecting."

Butts agrees he does not want to open up the door to other questions from Birmingham.  Judge tells Butts to be very cautious.

Franklin believes the potential is out there for a mistrial. "Judge Fuller said, "The court would not be sympathetic to a mistrial due to self-promoting reasons."

"Whether or not this witness was terminated, resigned, fired or all of these, it is impeachment on a collateral matter,..Counsel will be stuck with whatever his response is..."

Mr. Butts continues.  Terry Butts asks, "While you were at HealthSouth did you threaten to kill a couple of people?"  Martin says, "Not seriously."

Martin says he paid $50,000 in fines.

Martin is asked if he knows the sentence of Thad McVay has been reversed.

Martin is asked again about the 302.  Butts calls Martin by the name McVay.

Butts asks Martin if he ever contributed to political campaigns.  Martin says he did.  Martin says, "I didn't see anything wrong with giving contributions in the political arena."

Martin says HealthSouth supported Fob James.  Martin says contributions within the guidelines are fine.

"Have you ever heard the term 'make up money'? "  "No," says Martin.

"If Richard Scrushy and HealthSouth and Fob James, do you Mr. Martin, see anything wrong, after the election, with Mr. Scrushy or HealthSouth giving money to Gov. Siegelman, if it were asked for by Gov. Siegelman."

Martin says that would be fine.  "If it's legal its legal."

Martin is asked if HealthSouth should have an interest with the CON Board.  Martin says it was important.

"It was told to me by Mr. Scrushy if we made the contributions and assisted with the $1 million, we would get a seat on the CON Board," says Martin.

Martin agrees it would be important for HealthSouth to have influence on the board, but Martin says he doesn't know how many people are on the board.  Martin says he is aware the HealthSouth had a seat on the board under four governors.

Martin agrees it is his understanding if a matter came up before the board involving HealthSouth, the person representing HealthSouth would have to recuse themselves.

Martin says he doesn't know for a fact  a ruling from the board can be appealed to a circuit judge.

Butts asks Martin if Scrushy ever mentioned the word bribe when talking about a donation to the education lottery fund.

Martin says he doesn't know if he were qualified to serve on the CON Board.  Martin says, "I thought it was important because we had operations around the state."

Martin says he doesn't know of anything HealthSouth got that it shouldn't have gotten from the CON Board.

Martin says he didn't know IHS had the largest nursing home in the state of Alabama, a 224 bed facility.

Martin says he is not aware of conflict between the nursing home industry to be a competitor with HealthSouth.

Martin says Health South had nursing homes at one time but, "we sold those nursing homes to Integrated Health Care."

Martin is asked about PACs.  "I mean that a PAC exist to give to politicians, make a gift to say a party, instead of a particular politician, so that's what I meant."

Martin agrees he knows a PAC can give to another PAC.

Martin is asked about trips with McGahan.  Martin says they traveled together only when they raised money and he said most of the time Scrushy was with them.  Martin is asked about a trip to New York

with McGahan.  Martin says that's where McGahan's office is located.  As to the relationship, "it was professional."

"I was uncomfortable about the way we were going about it," Martin says in reference to threats to UBS.  Martin says, "I felt it was unethical, and maybe illegal."

Martin says, "I was being instructed by the chairman of the board and my boss to do this and I was just following orders."

"I thought it stunk ...I thought it could be immoral and illegal."

"Could you have said Mr. Scrushy I'm not going to do it?"  "I could have," said Martin.

"Do you know who Loree Skelton is?"  She's an attorney who worked in our governmental affairs area.

Martin is asked if he could have asked Mr. Horton about the issue.

"He (Scrushy) told me that we needed to get them to contribute as much as they could of the million dollars, that they owed us and if they did not we would fire them," says Martin in reference to soliciting the contributions.

Martin says he didn't do a lot of calling business and soliciting contributions.

Martin says he was never at a meeting between Siegelman and Scrushy where the CON Board was discussed.

Martin is asked if he knew providers were required to be represented on the CON Board.  "I have already said it makes sense for HealthSouth to have a seat on the CON Board."

Martin agrees Scrushy was experienced in the health care field.

Martin is asked if he knew Eric Hanson was a lobbyist for HealthSouth and IHS.

Martin says raising money is fine if it's above board.

Martin says he does not know who either Paul Hamrick or Mack Roberts are.

Martin also says he doesn't know who Alva Lambert is.

Questions arise about Martin's relationship with Mr. Goodreau, head of security for HealthSouth.

Martin says he did not often have coffee with Goodreau and Scrushy. Martin says he may have on occasion had a cup of coffee with Goodreau.

Back to the check.

"Didn't Richard Scrushy tell you and Mr. Scrushy he did not want to be a member of the CON Board?"
"I don't believe that meeting occurred."

"Near the date of the July 19 check, weren't you in a meeting with Jim Goodreau when Goodreau called the governor's office and told them the check had been delivered and they could come pick the check up."

"Was Loree Skelton ad HealthSouth when your were there? Yes" Butts asks Martin if he knew if Skelton went with Scrushy to the CON Board meetings. Martin says he does not know who went with Scrushy to CON Board meetings.

Martin is asked if he was aware the meeting between Scrushy and Siegelman was before the check was delivered.

Martin says he doesn't remember any of Siegelman's campaign promises other than the lottery.

Martin is asked if Siegelman was responsible for bringing in Honda to the state?

Martin is asked if Scrushy told him that a good relationship with the governor would help get HealthSouth introduced to the auto companies coming into Alabama. Martin says it sounds like something Scrushy might say.

Talk of a Scrushy, Siegelman helicopter trip with businessman over Mobile Bay to help bring business to Alabama.

Talk about what type of services HealthSouth offered to treat on-the-job injuries. Asked if HealthSouth treated workers at five Ford Motor Company plants, "That's what we told people, but I don't know if it was true or not."

Asked about preventive care for 20,000 flight attendants for Delta. "Again that's what we told the investment community but I don't know if it was true or not," says Martin.

Martin is asked why access to major companies like the auto manufacturers was important. "So we could get their business."

Martin agrees it would be helpful to have a good relationship with Siegelman to get this business.

Martin says the company went out to get as much business as they could.

Martin agrees sometimes Scrushy went out to those meetings.

"I would answer that...it was important for HealthSouth to have a relationship with the governor."

Martin agrees Martin did not participate in any meeting in which Siegelman agreed to trade on his office.

Martin is asked if he knew Scrushy served on the CON Board under Gov. Folsom.

"I just don't recall, I just can't say."  Martin is asked about under Gov. James.  Martin says he doesn't know.

Martin is asked about support of HealthSouth for both Folsom and James. "I think we may have been putting our bets on all the ponies that were running."

Martin agrees HealthSouth didn't support Don Siegelman.  Martin says in the early days of the company the company would reimburse employees who gave political contributions to various politicians.  "We were told by Mr. Scrushy who to write the checks to."

Martin says the company reimbursement happened by way of bonuses.  This happened from the time Martin joined the company until around 1993.  HealthSouth eventually formed a PAC but he does not know when the PAC started.

Martin agrees money could have been given through the PAC.

"Did you see anything wrong with HealthSouth bribing the governor to get a good relationship?"

Martin says there would be something wrong with that.  "If there was an agreement where someone was going to receiving something in exchange for that contribution, that would be illegal."

"Was the IHS check a direct contribution?"

"We asked them (IHS) to break their policy...."

Martin, "It's about as indirect as it gets."

Martin says he doesn't know about Phoenix City facility.

Martin was asked how the approval process worked for money paid out by the PAC.  "The actual checks were written, needed to be signed by Jabbo Waggoner and Loree Skelton, they had to be independent of

the company.  They had to have the approval of Mr. Scrushy, number one, and myself number two."

Martin says he was aware financial disclosures had to be made regarding contributions.

Martin says Tom Carman was head of corporate development and agrees Carman sat on CON Board.

Martin is asked by Kilborn if he knew who the highway director was during the Siegelman administration.  No, answers Martin.

Martin agrees he doesn't know anything about the Department of Revenue.

"Isn't it true HealthSouth made a direct contribution to the Alabama Education Lottery Foundation?"

"I read it in the paper," says Martin.

"Isn't it true that HealthSouth supported education and tried to support education funding in Alabama?"

"I don't know."  Then Martin says to a similar question, "Yes."

Questioning is mixing in the second HealthSouth check.

"What in the world it is that the check from IHS for $250,000 what do you consider illegal about that check?"

"I knew what we had done.  We had pushed our investment banker to give the money.  They went to their bosses and they said they couldn't do that."

Butts says that is total here-say.

"We threatened to fire them."  "It smelled bad, tasted bad and looked bad," says Martin.  Martin says he doesn't know if it was illegal or not."

Martin agrees the IHS check was written on an IHS check.

"Have you ever made a contribution to a HealthSouth PAC?"

"I don't care if it was in a payroll deduction, or a check or if you brought it in your hat? Did you make a contribution?

Martin agrees if he made a contribution to a PAC it would go into a big pool of money.

"So if IHS had not wanted their name to show up on the check couldn't they have just given the money to a PAC?"

Martin asked about Tom Carman's appointment.  Martin says he doesn't recall.

Back to PACs.  Then questioning about who the governor of the state is.   We get into a civics quiz about the governors of Alabama.

Jabbo Waggoner will be next on the stand.

Posted by Helen Hammons on May 10, 2006 at 08:35 AM | Permalink | Comments (1)

## New Witnesses

Leif Murphy is on the stand.  He currently lives in Nashville.  Murphy has a degree in finance and has a Master's in business administration.

He worked for Wachovia starting in about 1994 in about mid-May, June.  He was a corporate banker.

He sold banking services to companies in the Southeast.  He said it would be close to an investment banker.

Murphy says he began working early August, September 1996 for HealthSouth.  He began as a treasury associate, which according to Murphy was the customer side dealing with banks, borrowing money.

He says he helped coordinate mergers and acquisition activity.  He came to know William McGahan, who worked initially for Smith-Barney.

1999 Murphy says he was promoted to group vice-president in business.

Murphy says Mike Martin was his boss the entire time he was at HealthSouth.  He says Martin was promoted to Executive Vice President and Chief Financial Officer, Murphy believes in 1998.  He says Martin was his immediate supervisor.

Murphy says he knows Mr. Pickett from Integrated Health Services business.

Murphy says, "I was asked to coordinate the delivery of a check and my contact person was Taylor Pickett."  Murphy says he doesn't recall the exact amount of the check.  Friday, July 16, 1999 is the date Murphy says he relayed the instructions to Picket.  Murphy says there was some urgency to deliver the check.  Murphy says Martin asked him to coordinate the delivery of the check.  Murphy says he sent Pickett a fax with Murphy's home address and mailing instructions.

Murphy says he also sent Pickett the Articles of Incorporation for the Alabama Education Lottery Foundation.

Murphy says he doesn't recall why he sent the Articles of Incorporation.  He says he got that information from Mike Martin.

Murphy says he sent the documents on Friday.  Murphy says he does not remember the specific day he got the check.  "I don't have a specific recollection of who I brought the check to but it would have been Mike Martin or whoever he designated."  Martin says he thinks if he didn't deliver the check to Martin, he might have delivered it to Waggoner.

Murphy says this wasn't the first time he was asked to receive packages at home or at HealthSouth.

Leach is objecting as to relevance.  "I don't have a recollection of when the package was delivered."

Murphy agrees he gave it to another person and that was the end of his involvement.

Murphy says he was expecting to receive the check. Murphy can't say for sure what was in the package.

Murphy is asked what he put in the package.  Murphy described same as before.

Art Leach questioning Murphy.

"You were never involved in any crime ever, is that correct,"  No.

Murphy agrees he did not believe he was involved in any criminal activity related to the check.  Murphy says he knew who Siegelman was.

Murphy agrees he sent a fax at Mike Martin's direction and Mike Martin never shared with him this was a nefarious scheme.

Murphy says he cannot say specifically when he got the FedEx but he agrees it was after the 16th because it had to have happened after the fax was sent.

Murphy says he assumes the package was a check.  Murphy agrees he does not know what he did with the envelope or who he gave it to.

Murphy says he has a recollection but cannot give the specific date.  Murphy agrees the earliest possible date would have been July 19, but he can not give the last possible date.

Murphy is asked about the spin-off of the nursing homes to IHS. Murphy says that is how he came to know Taylor Pickett. Murphy agrees that his relationship with Martin "on a sour note." Leach asks about a bar fight involving Murphy and Martin.

Franklin objects to stuff to do with the bar fight. The boys are back at the bench.

Leach asks again about colorful language all the time. "I wouldn't say he used it all the time."

Murphy says Martin used it on occasion. "I don't remember it being all too common."

Leach doesn't go further down the path.

Franklin asked about how long Martin worked for HealthSouth. Murphy says Mike Martin was closer to Richard Scrushy.

Murphy says Scrushy was the most senior and Martin the number two or close to it.

As far as corporate finance Murphy says there was no one higher than Martin.

Leach back again. Murphy agrees Martin was an employee of HealthSouth not of Scrushy. Murphy says being a founder doesn't make you more senior. Murphy agrees Tony Tanner was more senior in years than Martin.

The witness is released.

Mike Martin is the next witness. Franklin will start the questioning. Martin says he was born and raised in Birmingham. He graduated from college in 1983 from UAB.

He became a banker with HealthSouth 1983-1989. He worked as a credit analyst, loan officer, and vice president handling loans to health care companies.

Martin says one of his clients at AmSouth was HealthSouth Rehabilitation Corporation and he says he was asked by Scrushy in 1989 to join HealthSouth as vice president and treasurer. Martin says he held the position until 1997 when he became executive v.p. and chief financial officer. Martin says after he resigned as CFO in 2000 he was head of HealthSouth investments.

Martin says he was responsible for accounting, dealing with banks and investors, etc.

Martin agrees his salary and responsibilities grew while he was at HealthSouth. Martin says from 1998-1999, he believes his salary decreased because the whole executive team froze their salaries because the company was not making its earnings.

Martin says he reported the entire time to Richard Scrushy, chairman of the board and CEO.

Martin says his office was just down the hall from Scrushy in both buildings he and Scrushy had offices in while Martin was at HealthSouth.

Martin admits he pleaded guilty to securities fraud, false financial books and records and forfeiture. Martin agrees he had a plea agreement with the U.S. attorney's office in Birmingham and with the DOJ fraud office.

Martin says his responsibilities outlined in the agreement were to cooperate with the government ant tell the truth in regards to HealthSouth in return Martin says he was to get a downward departure at the time of his sentence.  Martin granted the motion.  Martin says he was facing a sentence of 15 years but received a sentence originally of six month home detention, all the money he made at HealthSouth among other things.

Martin says the government appealed his sentence and his sentence was vacated.  Martin says he was re-sentenced last fall to a week of incarceration and probation.  Martin says the government has appealed his sentence again before the 11th Circuit Court of Appeals and he does not know what will happen.

Martin says he worked for HealthSouth in the summer of 1999.  Martin says he was contacted by McGahan to make a donation to the lottery foundation.  Sometime in 1999 Martin says he was told by Scrushy that to get into Siegelman's good graces they needed to raise money for the education lottery campaign.

Martin says the donation was needed for a seat on the CON Board.  Martin says as a major hospital corporation that had dealings all over the state it was important to have some say so on the CON Board which governed the number of health care facilities in the state.

Martin says Scrushy came to him and told him that HealthSouth couldn't make the payment to the lottery campaign and he couldn't make it personally because his wife was opposed to it and the donation would not look good for HealthSouth.  Martin says Scrushy told him to have McGahan at UBS to make the contribution.

Martin says HealthSouth had helped McGahan build the business.

A short break.

Martin says he started talking to McGahan about getting a contribution from UBS by phone.  Martin says he told McGahan the request had come from Scrushy and Martin says he thought McGahan was going to try and get the money.

Martin says he had a number of conversations with McGahan and McGahan said he was working on it. Eventually however McGahan said the contribution would be against company policy and McGahan said he wouldn't be able to do it.

Martin says he told Scrushy and they both called McGahan to talk about the contribution. Martin says in the conversation Scrushy told McGahan that the McGahan team owed it to HealthSouth to give the contribution because of what HealthSouth had done for McGahan.

Martin says he told McGahan that Scrushy was threatening to fire him.

"I wanted Mr. McGahan to understand the severity and seriousness of this. Mr. Scrushy was going to fire them if they didn't make the contribution and I didn't want to fire them. I told Bill you're going to be screwed if you don't get this done," says Martin.

Martin says he told McGahan, "I told Bill he would be f* if he didn't make this contribution."

Martin says McGahan called him back with an idea how to get the money. "I'm going to forgive what Integrated Health owes us and I'm going to get them to write a check to the campaign."

Martin says "This is a one of a kind. I had never done this before or after."

Martin says he didn't want to handle the check because "it, first of all we had not supported the lottery and I was not personally in favor of supporting it. Secondly, we were asking one of our vendors to do something we did not want to publicly do.The way it was being done in this round about way was at best unethical..."

Martin says he told them to talk to Leif Murphy but Martin says he told them he didn't want to have anything to do with it.

"It was important to Mr. Scrushy that he hand deliver the check to the governor," says Martin.

Martin says Murphy had nothing to do with anything but the delivery of the check. Murphy says he believes the check arrived in early July 1999.

Martin says it was close to the date printed on the check. Martin says the check specifically be made out to the Alabama Education Lottery Foundation. Martin says there was some time sensitivity so that Scrushy could deliver the check at a meeting with the governor that was on Scrushy's calender.

Martin says Murphy gave him the check and Martin gave the check to Scrushy. Martin says he has never met Siegelman.

Martin says Eric Hanson was a lobbyist out of Washington and worked for U.S. Strategies and lobbied governmental officials on behalf of HealthSouth.

Martin is asked if he had conversations with Hanson about the check.  Martin says yes he had conversations with Hanson both before and after the check was delivered to HealthSouth.

Martin says Hanson was talking about Integrated making a contribution of $250,000 and Hanson was joking about the fact IHS had only one facility in the State of Alabama.

Martin says Hanson attended HealthSouth's annual retreat and Hanson was bragging about the fact he helped HealthSouth get a seat on the CON Board with the contribution from IHS.  Martin says he believes this happened in the fall of 1999.

Another break in the action.

Stop for the day.  Later.

Posted by Helen Hammons on May 09, 2006 at 04:13 PM | Permalink | Comments (0)

# After Lunch: McGahan Continues

We'll be getting started shortly.

Talk returns to Hanson.  McGahan says Hanson told him Hanson was following up on the donation and that Hanson was polite.

According to McGahan in a "second conversation with Mr. Hanson on the call, he and I were again discussing the donation...it was decided Mr. Hanson would go to another client of UBS and U.S. Strategies, Integrated Health.

McGahan said there was an outstanding fee from Integrated Health Services, located in Maryland, due to UBS.  McGahan says it was his understanding they owed UBS $1 million.  McGahan says there was a transaction with another company not related to HealthSouth.  McGahan says the large fee was not that unusual.

McGahan, "Mr. Hanson after he and I spoke said he was going to call Dr. Elkins, the head of Integrated."  According to McGahan, Hanson told him Integrated wanted to  work out something concerning the amount due and it was eventually settled at about $733,000.

"Integrated had agreed so that Mr. Martin didn't continue yelling after that," says McGahan.

McGahan is showed a message log.  He says it was prepared by his assistant.

Art Leach now has the witness for questioning about the log.  McGahan says he didn't keep logs in the same format when he was at Smith-Barney.

Leach is asking about destruction of the document.  McGahan says his assistant kept a copy of the document but he didn't keep one himself.

McGahan says he is not sure about the document retention policies.

Leach asks how the document made it to the courtroom.  "Everything of mine and my secretary's was turned over."

McGahan says he believes the document was given to the government after he left.  McGahan says he couldn't recall everything on the document without seeing the document.

"Could you put dates and times or would you have to have the document?" asks Leach.  "I would have to have the documents," says McGahan.

Leach argues the documents are not kept as a normal course of business, "according to the witness."

The judge says if the witness can identify the exhibit and tell the jury what it is the judge will let it in.

Franklin returns to questioning the witness.

Date of messages is July 7, 1999 according to McGahan.  "Mr. Martin called me at 10 a.m.," says McGahan.

Mr. Hanson and Mr. Martin's assistant also called according to the phone log Hanson is reviewing.

Hanson called left a phone number at 10:15 and Mr. Martin's assistant at 11:30.

McGahan says he represented HealthSouth from 1993-1999.

McGahan says Smith-Barney billed HealthSouth in the "millions of dollars."  "We would take money based on transactions...They would pay us based on the size of the transactions." When HealthSouth sold Integrated Health Smith-Barney was paid %5-7 million according to McGahan.

McGahan says he was concerned about the HealthSouth account.  "HealthSouth was a very significant company...They were a company that was growing so they paid out sizable fees when they did transactions, so based on the fees, yes."

McGahan says he was concerned about the relationship with HealthSouth because of "what Mike Martin told me."

McGahan shown agreement between UBS and Novacare and UBS and Integrated Health Services. The fee agreement for each was $1 million for services UBS provided. Art Leach is objecting to the series of documents and he says the documents relate to collateral issues.

Franklin says the relevance of the documents is McGahan agreed to reduce the fee and this is evidence for this.

Leach wants to talk to the judge. Sidebar called.

Franklin is asking about reducing the fee.

Once fee was reduced McGahan says he didn't get any more phone calls related specifically to that matter. Sometime in September he had a conversation with Scrushy. "It was apparent IHS was in dire financial stress."

The reimbursement change in the nursing home industry hurt IHS. McGahan says Scrushy was smart for selling when he did. "Can you believe they haven't cashed that check yet," Scrushy allegedly said to McGahan. McGahan says Scrushy was talking about the check Integrated wrote to the Alabama Lottery Fund. McGahan says Scrushy was talking about the people who received the check. McGahan says he and Scrushy talked about the bankruptcy happening around the end of the year. "I got to go get on it," Scrushy allegedly said to McGahan. McGahan says Scrushy was referring to making sure the check got cashed.

McGahan says his IHS contact was Taylor Pickett.

McGahan asked about amendment to an engagement letter modifying an agreement. This one reduced the fee from $2 million down to $1.733 on July 14, 1999. McGahan says UBS was paid the fee of $1.733 million.

McGahan says UBS was ultimately out $267,000 and that IHS didn't lose money.

Mr. Leach is objecting. Franklin is finished with McGahan.

Art Leach questioning. McGahan agrees he did not commit any conspiracies. Leach asks wasn't the original deal Novacare would pay $1 million and IHS would pay $1 million and McGahan says that is correct.

Leach says McGahan's supervisor felt the deal with IHS was undervalued and McGahan went back and

got the fee raised another million dollars. McGahan says his supervisor had a conversation with the head of IHS and the agreement was reached. McGahan agrees he wasn't sure UBS would get the money and one reason was IHS's money problems.

McGahan says in June, July the stock price was about $8 from $30. McGahan agrees people start to sell when stock starts going down.

HealthSouth had acquired those nursing homes to acquire something else and sold the nursing home part off according to McGahan.

McGahan says he and Mike Martin were business friends. McGahan says Mike Martin and he would spend time after conferences at dinner, drinks. "I went out with him, yes sir."

Leach says, "It wasn't unusual for you to hear Mike Martin using all kinds of language.." Leach says the F* word is one that Martin used all the time and McGahan agrees Martin used that word a lot.

McGahan says it was the repetitive verbal barrage over time. McGahan agrees he wanted to say no to the contribution. McGahan agrees he didn't want to lose HealthSouth as a potential customer.

McGahan agrees they got paid fees on bond transactions as well.

McGahan agrees HealthSouth took a lot of his time.

McGahan says he was paid more at UBS than at Smith-Barney.

McGahan says Scrushy never used the Mike Martin sort of terminology with him. "He did not."

McGahan says Scrushy was not on the F* phone call from Martin.

Leach asking about combined Scrushy, Martin phone call. McGahan agrees with his own earlier statements. McGahan agrees Mike Martin never related to him that Richard Scrushy was trying to bribe the governor of the State of Alabama.

McGahan agrees he wouldn't participate in illegal, criminal activity and to do so would hurt his position.

McGahan agrees everything he did was legitimate from beginning to end.

July 7, 1999 telephone sheet coming up again.

Is it your testimony the IHS deal was already done (the $250,00 contribution) ?

McGahan says, "I believe that at the time I ultimately had a conversation with Eric Hanson there was an additional $1 million due by IHS at that time."

McGahan says the IHS deal was going to happen after the call.  McGahan agrees deal couldn't have happened by June 29.

McGahan agrees he was trying to satisfy a client.  McGahan says, "I don't believe I did anything wrong."  McGahan will not agree to some of what Leach is arguing in reference to co-conspirators."

McGahan says he talked to FBI  in September 2003 and the summer of 2004 and he met with them 1.5 weeks ago.  McGahan says he hasn't seen notes made by the FBI.  McGahan says he hasn't gone over the report.  McGahan says his lawyer may have seen documents.  McGahan says he doesn't need to talk to his attorney.

McGahan says he didn't meet with anyone in Hawaii.  A conference call happened when McGahan was in New York.  McGahan agreed there was a meeting on September 11, 2003 at his lawyer's office.  McGahan says Mr. Baker, who is sitting next to the rail by the television set in the courtroom.  McGahan says he doesn't remember a Mr. Murray but does remember a lawyer, John Scott.

McGahan says he did answer a question about a meeting in 1999, but that he mistakenly said the meeting was in 1997.  McGahan says he had mixed up some times and dates.  He says he reviewed some documents and his attorney followed up with the agents.

McGahan says his change of thought was communicated to the FBI within about a week.

McGahan met with government again in 2004.

McGahan says he was mistaken.

We had to miss a few things, sorry for the interruption.

McGahan says the original request from Mr. Martin was for an amount in excess of $300,000.

McGahan says, "It was my idea ultimately."  This goes to the deal.  McGahan says he told Hanson "why don't you get Integrated to do this?"  McGahan says he told Hanson UBS would work with them on the fee.  McGahan says Hanson reported back to him about talking to Dr. Elkins and that McGahan also had a conversation with the CEO of IHS about the fee.

McGahan agrees he wanted to keep HealthSouth business.

McGahan says UBS did investment banking work for them after that time.  McGahan agrees he was

hopeful of other big deals. HealthSouth didn't make any major acquisitions after 1999 according to McGahan.

McGahan agrees his relationship with HealthSouth lasted into 2003. McGahan agrees he had previous dealings with Hanson and UBS had dealings with Hanson. McGahan says Hanson was a lobbyist who had a business relationship with IHS.

McGahan says afterword Hanson did some work for UBS.

McGahan says he was solicited for a specific amount from Scrushy but he doesn't recall but it was in excess of $250,000-$300,000.

Mr. Leach would like to look at his notes. We are going to recess.

We're back. Mr. Leach asking about conversation of check not clearing.

McGahan is asked if other people could have been a source of that information.

In reference to September 2003 meeting with the government, McGahan agrees he "got things wrong."

Leach is asking how McGahan remembers the F* conversation now but could not remember it back then.

"Colorful being colorful. He would be dramatic about the way he says things," McGahan says about Martin.

McGahan says his memory was refreshed by some documents he reviewed.

Leach is asking McGahan if he knew the FBI was going to talk to him. McGahan says he knew about a week or two ahead of time. McGahan says he didn't review any documents before his testimony.

McGahan is asked about the telephone log and documents related to Novacare and whether or not he remembered this stuff at the meeting. McGahan says he remembered some of the stuff a few days after the meeting.

Leach is finished. Vince Kilborn up.

Kilborn asks if McGahan ever talked to Siegelman or met with Siegelman about the matter. McGahan says, "No."

McGahan says he got the documents he reviewed after his interview with the FBI from his attorney. McGahan says the interview was at the attorney's office. One attorney, one associate paid for by his

former employer.

McGahan says he was not fired and did not quit under pressure.  "I did not resign under pressure."

"You just up one day decided to go to Hawaii," asks Kilborn.  "No," says McGahan.  McGahan says two agents and several government attorneys and he had two attorneys.  McGahan agrees this interview was a big deal.

"Much of it was wrong," says McGahan.

McGahan is asked how he could get it all wrong.  He says he got mixed up.  He says he did his best to get it correct.

McGahan says he "felt pressure in the meeting."  But McGahan says no one was putting pressure on him.  As to memory, "Sitting here today I wish it was better."

McGahan says he does not believe the FBI brought up they had documents.

McGahan is asked if he knew the investigation started by 2001.  He says he didn't.

McGahan says in March 2003 he realized he needed a lawyer.  "The events at HealthSouth," McGahan says helped him realize he needed a lawyer.  There has been an objection which may have come from the defense side.

The judge has returned to the bench.  You are to disregard any questioning of this witness in regard to him being a target.

McGahan says he doesn't remember what the cause was but that education was consistent with what he believes the cause was.

McGahan is shown a document purported to be a copy of the check from IHS dated 7/19/1999.

Franklin back.  The portion I got right was the conversation I had with Mr. Scrushy in the fall of 1999.  The conversation was allegedly about the check not being cashed among other things.

McGahan says Martin was working with HealthSouth throughout the period talked about.

McGahan says again Martin used colorful language.

Franklin asks McGahan about Martin's positions.

Did you think he was being entertaining or did you think he was serious?  No, I thought he was serious.  He was trying to make a serious point.  This again referring to the F* conversation.

McGahan says no one threatened him at the FBI interview.  McGahan says it was not normal what happened with IHS and HealthSouth.  "These were unique circumstances," says McGahan.

McGahan says he would not have participated if he knew it was some type of conspiracy.

McGahan says he worked 80-100 hours a week. He says he is nervous today.

Art Leach up again.  McGahan says he thought he had it right on Sept. 11, 2003.  McGahan says he was not intentionally giving a false statement.

Did the government at any time approach you and tell you you got your story wrong?  After I met with them, there was a weekend.  I met with my attorney the following Monday.  We looked at some things.

McGahan says he went to the government, the government did not come to him.  McGahan says some of the documents may have come from UBS.

Leach is finished.  Franklin asks for a sidebar before the calling of the next witness.  We'll start a new post.

Posted by Helen Hammons on May 09, 2006 at 01:13 PM | Permalink | Comments (0)

## William C. McGahan, Arrows Fly over Testimony to be Allowed

We'll have to see how far the judge let's things go here. It could get interesting.

Taking up matters without jury and without the witness.

Issues related to possible testimony of McGahan, Martin, and Murphy, all of whom have connections with HealthSouth.  Leach arguing about the scope of the conspiratorial agreement.  Disagreement is over who can be considered part of a conspiracy.

Leach brings up possibility of mistrial.

Judge says Murphy clearly not within conspiracy, but Martin is more difficult.

A lot of stuff being said, we need to see if it comes out in the trial.

Judge agrees with prosecutors.  "This is a close call.  A wise old judge asked me if I'd rather have the

ruling or the error."

"I'd rather have the ruling because there is no error,"says Franklin.

McGahan on the stand.  He currently lives in Hawaii.  McGahan grew up in Atlanta.  He now works in commercial real estate.  He's been doing that for 1.5 years.  Prior to that he was unemployed and prior to that he worked as an investment banker from 1989 to May 2003.  McGahan worked for two companies.

Worked first at Smith-Barney Harris until March 1999.  Later company known as CitiGroup.

McGahan says ,"I first met HealthSouth in 1993.  I worked with other people in my company to assist the company with their mergers."

McGahan says his responsibilities grew from 1993-1999.  In March 1999, McGahan went to UBS, a company he describes as one attempting to grow.

McGahan says the move was a lateral move in the same industry.  He says "it provided me a place I could help better serve my clients."

McGahan "HealthSouth was a health care service company.  One of the larger companies in the U.S. When I moved to UBS...after I moved, I called and let them know about my new company."

McGahan  agrees he knows Richard Scrushy from the time he was an investment banker as well as Mike Martin, who ultimately became CFO at HealthSouth.

McGahan says he had more contact with Martin than Scrushy.  McGahan "Sometime in late June or early July 1999 I received a call from Mr. Martin about a donation."

McGahan says Mr. Martin told him he would be receiving another call from Martin and Scrushy about a large donation from UBS to a cause in Alabama.

McGahan says he didn't remember the specific amount but said it was in the range of $250 - $300,000.

McGahan says he had been asked before for amounts from $5,000 - $25,000 to different causes.

McGahan says he received a second phone call.  Art Leach asks for a continuing objection.

McGahan - "Mr. Martin and Mr. Scrushy called me in my office.  Mr. Scrushy said he wanted UBS to make a donation to a cause in Alabama."  McGahan says Scrushy told him it was a good cause and other companies were supporting it and he wanted UBS to step up too.

McGahan says he hoped the issue would go away.

McGahan says he had told Scrushy no before in another context.

McGahan agrees the request did not go away. "Over the next week to two weeks Mr. Martin called me every day...He would ask me what I was doing to get the donation done."

"He(Martin) would use profanity and increase the berating and the pressure and yelling, telling us, I had to find a way to make the donation," says McGahan.

"He said you, meaning me, were going to be f* if I didn't find a way to make the donation," says McGahan.  McGahan says someone else was inquiring about the donation - Eric Hanson.

McGahan says Hanson was calling for HealthSouth.  Mr. Leach is objecting.

McGahan says the Hanson conversation took place after he spoke to Scrushy and Martin together.

McGahan says the conversations went on two-three weeks.  "The first conversation with Mr. Hanson was a few days after that." McGahan agrees it was about two-three days.

McGahan says he did not expect the call from Hanson.  He agrees he did not get a warning from anyone that Hanson was going to call. Mr. Franklin asks for a sidebar.

We're going to lunch after the sidebar with the judge.  There will be a little bit longer break.  1:15 p.m. is the planned reconvening time.

Leach arguing Hanson can't be tied to illegal activity or a participant in any conspiracy.  Franklin is bringing up Bailey's testimony in support of his cause. "Mr. Leach does this all the time.  He takes a snapshot and tells the court it tells the whole story," Franklin says.

"It happened over a period of time," says Franklin.

This is getting technically, legally heavy.

Judge reviewing notes he made of Bailey testimony as they relate to Hanson.

"The government wants to say Eric Hanson is an unindicted co-conspirator,"says Art Leach.

Franklin says he disagrees with Leach's interpretation of the evidence as it relates to Nick Bailey.  The judge asks Franklin what Hanson is doing as it regards this conspiracy.

McDonald says the only evidence about Hanson is a political contribution and "we are going to turn the political process on its head."

McDonald is saying political contributions and conversations between politicians and lobbyist do not qualify as a conspiracy."

The judge says the difference between contributions being a conspiracy and not is the illegality.

"How do we determine what is illegal conduct? That is the slice of ham this court has to deal with," says Fuller.

McDonald says Hanson is not on the prosecution's witness list presented to the defense.

The judge says the jury will have to deal with a significant amount of circumstantial evidence in this case.

Art Leach says Hanson is involved only in a political contribution not an illegality.

Franklin says," There is enough evidence there is a conspiracy and Eric Hanson is a part of it."

"If he broke the law he ought to be held accountable for it," says Franklin.

Kilborn asks, "Where is the evidence in all of this..This is skating on thin ice, judge."

"We do not have to call the witness," says Franklin. The judge says the government does not even have to indict Hanson.

"It's his spin or take on the evidence, " Franklin says of Leach.

The judge's ruling.  "There is sufficient evidence by the preponderance of the evidence that Eric Hanson participated in the conspiracy to raise the first $250,000 through Mr. McGahan and UBS for the benefit of Richard Scrushy."

Finally Lunch.

Posted by Helen Hammons on May 09, 2006 at 10:50 AM | Permalink | Comments (1)

## More from the Government

The judge is on the bench.  There are some issues to take up outside the presence of the jury.

Questions about testimony yesterday on IHS check from yesterday and other checks. The judge says he doesn't think there is anything warranting a curative instruction at this time.

Issues regarding HealthSouth case from Birmingham. The prosecution bringing up attitude of people toward Scrushy. Judge outlining use of good and bad character references in regards to Scrushy. Judge wants information kept on point in context of issues in this case. Judge says they will take issues up as they arise.

Margie Sellers is on the stand. Sellers lives in south Montgomery County and grew up in Birmingham. She says she is not employed at the moment. She says she has worked for Northport at home.

Worked around Nursing Home Association for around ten years. Served as Executive Director of Alabama Nursing Home Association. She was at one time chairman of CON Board. She says she met Siegelman when he was Secretary of State, but the working relationship began when he was president of the Alabama Senate.

Sellers is asked about role of president of Senate. She says the president sets the agenda. Sellers says she served on the CON Board 1999-2000, she seems unsure of exact dates but that it was during the Siegelman administration. She agrees it was early in the administration.

Sellers is asked about letter stating July 26,1999 was the date of her appointment. Sellers says she was approached by leaders of the Nursing Home Association because she had experience with the CON Board. She told them she would like to serve and also be chairperson of the board.

She says she received her appointment by letter to her home. She says Scrushy was appointed vice-chair.

"The night before our first organizational meeting Nick Bailey called me on the telephone and said that Richard Scrushy would like to be vice-chairman," says Sellers.

Sellers says she hasn't talked to Bailey since then. She says she does not remember the date of the first meeting of the board.

Sellers says there was an orientation meeting. Sellers says there were motions about her and Scrushy's positions as well as a discussion about ethics.

Sellers says she told the committee who had asked that Scrushy be vice-chair and there was no opposition.

September 15, 1999 first meeting of board according to exhibit. Sellers says she served on the board four years.

Sellers is asked about contact with Scrushy outside the meeting environment. She says she did receive a

call from Scrushy. Asked about the phone call, there is an objection. "Mr. Scrushy called me at home one night the night before a CON Board meeting and said he was concerned about a project, troubled by it and he wanted to be sure I was aware of it."

More objections and judge asks the government to narrow time frame down. Sellers says it was during the time Scrushy served on the CON Board. Letter showing Scrushy's date of appointment shown to Sellers. Sellers says she believes Scrushy was at initial board meetings.

Sellers is shown resignation letter of Scrushy. She says the conversation took place between July 26, 1999 and January 17,2001, based on letters.

She says the project was MRI for Brookwood Hospital. Sellers says she does not recall personally what Scrushy did at the meeting after the phone call.

Sellers says Scrushy "did not ask me to vote against the project. He said he was concerned about it."

Sellers is asked about ex-parte communication. Sellers says she didn't think about it at the time. She says the board was not meeting at the time she took the phone call. She agrees the Brookwood application was pending before the board.

Talk turns to what consists of a quorum. She says she doesn't recall what constituted a quorum. She says the staff attorney would tell them know how many members were needed for a quorum.

Sellers says she did not make any contributions personally to the Siegelman campaign or the education lottery campaign before her appointment to the CON Board.

Sellers says she told the board,"At that orientation I said I received a call from the governor's office and the Governor would like Mr. Scrushy to be the vice-chairman."

Sellers is asked who she was going to select before she received the phone call. The counselors have been summoned to the bench yet again.

We're back. Sellers is asked about MRI and whether or not permission was needed from CON Board. She says, "At that time, yes."

She says Scrushy said, "There was a discrepancy between what they said to the hearing officer and what was in their application."

She is asked if she saw Scrushy in a social setting. "My husband and I were invited to a party at his lake house." She says she also saw TIm Adams there.

Sellers is asked about who traveled together to CON Board.  Sellers says she knew sometimes Mr. Adams would come with Mr. Scrushy.  Asked if she knew about Adams relationship with HealthSouth, Sellers says no.

Another timeout.

The attorneys are back again from their meeting with Judge Fuller.

Sellers is being asked to review a document of minutes.  "According to the minutes of the meeting you showed me he recused himself."    Sellers says the Brookwood application was denied.

Sellers says Dr. Stone from Mobile was her choice to be vice-chair.

Defense attorneys are reserving the right to cross out of turn. "We have to establish a procedure before we can break it in the future," says Judge Fuller.

Fred Gray asks Sellers if she has any fact that Scrushy bribed for a seat on the board.  She says, "No." She was asked if she had any evidence Scrushy controlled the board and she says,"No."

Gray is off on a tangent about Sellers' family and also about what she thinks about history.

Sellers says she had received phone calls from other members but she "doesn't recall any specifics."

Sellers agrees there were discrepancies in the Brookwood application.  She again says Scrushy recused himself.

"Not in my opinion, no sir," answered Sellers about whether or not Scrushy controlled the board.

Sellers says the party was a birthday party for Scrushy or his wife.  Sellers says no board business was discussed.  Sellers agrees she knows of no criminal activities of Scrushy while he was on the board.

Sellers agrees she believes the board was a good and fair board.

Sellers agrees Scrushy conducted himself the same as other board members.  She agrees she did not bribe the governor to get her seat.  She says again she was interested in being chairperson.

Gray is going back through the appointment process.

Gray reiterates the members serve at the pleasure of the government and at any moment the governor could get them off.  "I suppose so," says Sellers.

Did Mr. Scrushy ever abuse the position of vice-chair?  No sir, answers Sellers.

Sellers says it was rare for Scrushy to serve as president because she didn't miss very many meetings.  "I may have had to recuse myself and that's when he would have taken over," says Sellers.

Sellers says there was a staff attorney present and that the staff attorney never told her of Scrushy doing anything wrong.

Sellers again says the board was very good.  Sellers says she had served on the State Health Coordinating Council under Guy Hunt's administration with Scrushy and from what she recalls, through limited contact, Scrushy was a good member.

Sellers says some of the leaders of the Nursing Home Association came to her.  Mary Ann Holt was one person who came to her about the appointment to the CON Board.  Talk has turned to the $500,000 to $800,000 to the Siegelman campaign.  Sellers says she did not work at the association  but she doesn't see anything wrong.

Sellers worked with Sonny Callahan, (Clinton phone call fame)

Talk has turned to Scrushy's recognition and his replacement Tom Carman.  Dr. Stone was moved to vice-chair.

Sellers is asked how well she knows Feaga.  Sellers says there is no personal relationship.  Sellers is asked about statements she submitted to FBI agents.  She says she went before the grand jury twice and she met with the agents once or twice  Sellers says she met with agents about 1-1.5 hours.

Sellers agrees she told the same story to the agents and to the grand jury both times.

Sellers says she didn't file any vouchers for expenses.

Sellers says she wanted to serve on the board because she had a long history of working with the CON Board and she was not working full time at the time and thought it would be interesting.

Sellers agrees she knows of no indictments of any board members for contributions to Siegelman.

Sellers is asked again if she has any evidence that would tend to prove that Mr. Scrushy bribed the governor to get a seat on this board. "No."

Vincent Kilborn to question Sellers.  Kilborn starts with talk about Callahan.

Sellers agrees nothing wrong with wanting access to government.  Contributions.

Sellers agrees she has no evidence Siegelman solicited a bribe.

Sellers is asked about qualification of board. She says they were "very qualified."

"I think we made sound decisions based on the information presented to us," says Sellers.

Sellers agrees Siegelman did not pressure or corrupt the board. "Gov. Siegelman never pressured me in any way," says Sellers. "I would not change anything," says Sellers.

Michel Nicrosi is asking questions representing Hamrick.

Sellers agrees Hamrick could have called her at any time about CON Board. Sellers says she doesn't remember Hamrick ever contacting her about the CON Board. Asked if Hamrick is still her friend, Sellers says, "Yes."

Louis Franklin back on the question of Feaga calling Sellers Margie and Gray referring to her as Maggie.

Sellers says she assumes Brookwood and HealthSouth may have been competitors but she doesn't know the inner workings of HealthSouth so she doesn't know.

Sellers agrees the call from Scrushy was not the same as calls from other board members asking about the agenda.

Sellers agrees with Franklin no one brought the relationship between Tim Adams and HealthSouth up before the board.

Asked again if the financial relationship should have been known, Sellers "I don't know. I guess it would. I guess he told the staff attorney...I suppose so."

Sellers says, "It sounds like a conflict to me."

Sellers says it is not okay to pay for access. Sellers is asked if she had private meetings with the governor about her selection and she says she did not have any meetings.

Sellers again agrees she did not know about the relationship between Adams and HealthSouth. According to the indictment, the allegation is Adams was paid two payments one for $8,000 and one for $3,000.

Letter from Health State Planning Agency to Loree Skelton, HealthSouth attorney at the time. Sellers says she doesn't remember having seen it before.

Sellers says it is an application but she doesn't recall having a discussion about this.

Sellers says, "I believe any applicant that receives their application would be to their benefit."

Kilborn says three providers are required to be on board and Sellers agrees.

Fred Gray is up again.

Sellers accuse providers recuse themselves when matters pertaining to them came up.

Sellers agrees a provider having a seat on the board did not affect how she voted.

Sellers says she has "no knowledge" of HealthSouth receiving anything they were not entitled to.

Sellers says she knew of no personal relationships between other members of the board and HealthSouth at the time she was on the board.

McGahan will be the next witness after the break.

Posted by Helen Hammons on May 09, 2006 at 08:41 AM | Permalink | Comments (3)

## HealthSouth Trial Joins This One

What role will information from the multi-billion dollar HealthSouth fraud trial, which concluded in June 2005, play in this trial?  It looks like we're fixing to find out.

For the record it must be noted that former HealthSouth CEO Richard Scrushy, a defendant in this case, was acquitted of charges in the Birmingham case.

However names given yesterday as possible witnesses in this trial, and court documents in this trial indicate the government is likely to try and connect the alleged bribery in this trial with the alleged climate of fraud at HealthSouth.

While both sides are prohibited under order from Judge Fuller from offering argument or evidence concerning the previous trial in Birmingham, "This prohibition does not apply to any evidence that is relevant to the charges in the present case."

Former HealthSouth CFO Mike Martin's testimony could be one link the government uses to try and make that connection.  FBI 302s, which are used to summarize interviews, may continue to be an important part of the trial.

In Martin's case, he may talk about a debt said to have been owed by Integrated Health Services to HealthSouth investment bank UBS-Warburg and that "may have been" forgiven in exchange for a $250,000 donation.

William C. McGahan, at one time the managing director of HealthSouth's primary investment banking firm - UBS Warburg, is a name also on the witness list.

McGahan would also likely testify about alleged arrangements where the money from a fee owed to UBS by IHS was instead allegedly diverted to pay for at least part, if not all, of the contribution.

Leaving the courtroom Monday, Scrushy attorney Art Leach called the prosecution's assertions that the government had established the fact bribes were paid in exchange for offices "utter poppycock." (For the uninitiated the term "poppycock" means nonsense.)

Scrushy started to rattle off the facts of the case involving IHS as he saw them before Leach yelled, "Stop" to Scrushy.

"What we told you in our opening statement was the IHS check goes in before it goes to the voters. HealthSouth is after the vote had occurred. That's the way it's going to be established. It's been established that way in the courtroom to this point. Those facts are not going to change."

Asked about Scrushy's roll with the IHS check, Leach told the media, "You're going to get it tomorrow."

It looks like things will be interesting over the next few days.

Posted by Helen Hammons on May 09, 2006 at 05:51 AM | Permalink | Comments (0)

# Raymond Bell

Louis Franklin will begin the questioning of Raymond Bell. Bell lives in Semmes, Alabama in western Mobile County.

Bell worked for Michael Figures and then worked for Siegelman while Siegelman was lieutenant governor in 1996. Started off working in the office.

Bell asked about Paul Hamrick and Nick Bailey. Bell gives their titles but says, "Don't quote me on that title."

Bell says he left lieutenant governor's office to work on 1998 campaign. Bell says he worked on campaign 6-8 months. Bell says he logged expenditures and contributions. This was done at an office in Montgomery. Bell says he worked for transition team before he went to governor's office. Bell says

he worked for Elmer Harris as appointments, letters of interests, resumes person.

Bell reads from memo saying people who wanted to be reappointed should reply to memo. As to CON Board, "I guess they were all terminated."

Bell says he participated in selecting new members for boards and he presented them to governor. Sometimes he took memos instead of files. Bell says he took memo for CON Board.

Bell is reading from memo about appointments to CON Board. Bell says he submitted to governor but Bell does not know if he(Bell) was present.

Memo shows candidates and supporters. Bell says there was a "lot of information" to put together. Bell says he also got letters from supporters. Bell says he condensed information for governor. Date June 25, 1999 on memo, but Bell says he can't be sure that was the date he gave the governor the memo.

Bell says it looks like nine could be appointed. Bell doesn't remember whether he discussed it with the governor. But he says governor would tell them they were selected or he, Bell, would draft a letter. Bell says Siegelman sometimes hand delivered appointment letters.

Bell agrees some appointees had to take oath of office. Bell says he doubts CON Board members needed an oath of office. Bell says a letter would have been sent out if appointment was before December 1999. Bell says he moved back to Mobile to practice law. Bell says he served Siegelman from MLK Day to December 30, 1999.

Bell says after governor signed, he made a copy, put copy in the file, and put the original in the mail. Sometimes the governor would deliver.

Bell says he doesn't know if Margie Sellers picked hers up or not. Bell says Siegelman was responsible for appointments to CON Board.

Appointment letters dated July 26, 1999. Scrushy, Tim Adams, Melissa Galvin, etc. members of CON Board.

Bell says Josh Hayes took his place when Bell left. Bell says Josh interned in governor's office and worked on campaign. Bell says Josh Hayes worked for constituent affairs.

Bell says appointment meetings happened in the governor's office inside the Capitol. "His conference room next to his desk and his chair."

Bell says attendance would vary but always the governor and Bell. Hamrick, Bailey, Host, Hayes among other attendees at times.

Bell says he gave his opinion if asked.  He says the meetings happened weekly in the beginning.  As the governor's schedule got busier, "we met when we could."

Bell says in all he worked with the governor about four years.  Bell says Hamrick was the "policy guy."

Bell says he remembers being questioned by government officials prior to coming to the trial.

Franklin says, "These lawyers do have copies of the 302s for this witness, I don't know why they say they don't.  I'm sorry your honor, it is an attorney general's report."

Lawyers have been called forward to see the teacher again.

Judge says discovery documents are in the millions of copies.  An agreement concerning documents has been reached.

Bell asked to refresh memory about Bailey and Hamrick.  "The governor used Paul as the go to guy for political policy and decisions."  Bell says the governor trusted Nick Bailey with his life.  Bell says Nick would drive and coordinate who was going to be with the governor.

Bell agrees Bailey's duties increased in the time Bell was there.  Bell says Bailey did all of the driving in the lt. governor's office as well as security.  When Siegelman became governor security was coordinated with Nick.

Bell says Bailey went to temporary head of ADECA.  "Better job than a chauffeur."

Bell being asked to read CON Board candidates from memo.  Governor would write on memo to make suggestions and send it back to Bell.

Bell says the letters of appointment were mailed from Montgomery, if the people did not meet with the governor.  Bell says he thinks they might also have sent out fax.  Bell says he would also have sent out hard copy.

Vince Kilborn questions Bell.

Bell says he went to Jones School of Law.  Bell is asked what kind of law he does.  Bell says he has served on the ethics commission.  Bell says he was nominated by Gov. Siegelman and stayed on the ethics commission five years.

Bell says the ethics commission reviews misconduct complaints about government officials.

Bell says the governor asked him to get some diverse energetic people.  Bell says governor sent entire

staff to ethics seminar.  Franklin objects.  Overruled.  Bell says entire staff at that time went.  Bell says seminars were broken up so he couldn't attest to whether or not Bailey went.

Bell says Bailey never told  Bell or the governor about bribes.  Bell is asked what he would have done if he had known about bribes.  Bell says he would tell the governor and the governor would have fired them.

Bell agrees he said the governor trusted Bailey with his life.  Bell is asked if Bailey should have been trusted.

The judge admonishes that any spectator who does not respect the court will be escorted from this courtroom.

Bell says he wouldn't go back to work for the state but he trusts Siegelman.

Bell says he's heard that the executive department has been characterized as an "enterprise" - a criminal organization.

Bell says if he had seen wrongdoing he would have alerted the governor and stayed away from it.

Bell says he was not part of a criminal organization.

Bell says the governor wanted good people.  Bell says he wanted diversity - "black people and women."

Bell says he doesn't remember who got appointed to CON Board.

Talk about minorities and supporters on CON Board.

Tom Carman.  Eric Hanson, Richard Scrushy, Norton recommendation on memo for Carman.  Memo dated June 25, 1999.

"It's obvious HealthSouth candidate was on the radar screen before June 19, 1999, July 19, 1999?"

Bell, it is.

Kilborn is showing paper with CON Candidates written at the top.  Bell agrees it is his typing.

Bell type CON Board members on paper - 12.  Don't know when document was prepared.  Bell says the format was in the transition office or right after.  Bell says it would precede government's exhibit 30, dated June 25, 1999.  Bells says it might be about six months before.

Bell asked about why there were 12 candidates. Bell says there were a flood of applications for positions. Bell is asked why governor put star by Scrushy's name.

Bell says he complained about his reporting job. Bell says he didn't like being responsible for the forms. Governor relied on him says Bell.

Bell says the opposition scrutinizes reports and there are penalties for getting the forms wrong. Bell says he thinks he "got it right."

Bell says he would review it with accountant and take to governor to sign. "Everybody's celebrating and that person is still doing those reports," says Bell, referring to what happens after the election.

Bell is asked to describe typical day of governor after inaugural. Bell says he would be out running or something about 4:30 a.m. Then Siegelman would eat breakfast, have meetings, traveled. Bell says Siegelman would leave voice mails at 1-2 in the morning.

Bell says he was not involved in fundraiser functions. Bell says Siegelman made a lot of calls because, "I got a lot of checks."

Bell is asked if Siegelman sold his office. Bell says, "No, sir." Bell is asked if Siegelman did any illegal act. "No, sir," replied Bell.

Bell is asked if Siegelman would trust staff to prepare documents. Bell says Siegelman signed documents "under his nose."

Bell is asked if governor's wife went by Allen as a last name sometimes. Bell says he read it in the paper but dd not have experience with that. Bell says he has never talked or met Scrushy.

Bell says no, he does not believe Scrushy bribed Siegelman to get on CON Board.

Jeff Deen to question Bell at this time.

Bell agrees his job was to coordinate different appointments and bring them to the governor's attention as well as be there himself.

Bell agrees a variety of people showed up at meetings. Bell says Hamrick was there occasionally.

Dean agrees Harmrick did not sit in on meeting when he was there for CON Board. Bell says Hamrick never asked him to appoint a particular person to board. "I don't remember anything like that no."

Bell says his office was next to Hamrick's office when Bell worked for Senator Figures. Bell says he

would see Lanny Young on legislative days and everyone goes in and out of coffee area.

Bell says he doesn't know anything about Lanny Young and beer sales at Talladega. Bell says his mother was from Talladega. Bell says he's never been to Talladega Racetrack. Bell says he talked to Young about race car driving once.

Bell reiterated Bailey coordinated governor's security. Bell says Bailey was the only security when Siegelman was lt. gov.

"We do it for football coaches," says Jeff Deen referring to trooper security. Bell and Deen talk about Hamrick's vehicle used on campaign trail. Bell agrees there was some jockeying for position by Bailey and Hamrick. "I think they both had their own direct line to the governor, I don't think they were friends."

Bell says Hamrick could not have fired Nick Bailey if he wanted to.

Bell says,"Both of them had their own line of communication with the governor."

Bell says his father and he have orchards and catfish ponds.

Bill Baxley questions Bell. Bell asked if Roberts is an honorable, honest public servant? An objection. Baxley sits down.

Fred Helmsing questions Bell.

Bell says decision was made on day before or day of letter. Bell agrees the decision is the governor's. Bell says transition list came over to the governor's office. Bell says he created a file, but would type up something more significant to meet with the governor.

Bell being asked about list of names which preceded June 25 list. Bell agrees it was his best judgment that it happened during transition. Bell says someone indicated to him they wanted to be on the board.

Bell asked if he knew Scrushy worked for earlier governors. Bell agrees he asked people to reapply for places they already had.

Bell agrees Scrushy is not on the list for consideration of appointment but as supporter of Carman.

Bell asked about moratorium on CON Board. Bell says he doesn't technically recall it. Bell says he does not know Mr. Scrushy. Bell agrees Scrushy is qualified. Bell agrees he knows of no evidence that Mr. Scrushy paid a bribe to the governor or no one else in connection with his appointment to the CON Board.

Louis Franklin back to asking questions.

Franklin admits exhibit and says no further questions.

Judge asks for next witness, Josh Hayes will be sworn.  Hayes took over from Bell as appointments secretary.  Hayes is a lawyer in Tuscaloosa.

Main job is too keep track of various appointments to boards and positions.  Talk to people on the phone, things like that.  Until April or May 2002.

Blog off. More tomorrow.

Posted by Helen Hammons on May 08, 2006 at 02:57 PM | [Permalink](#) | [Comments (2)](#)

## More from the Fund-raiser

Jeff Deen now questioning Cline about who owned house Cline and company were living in during lottery campaign.

Cline agrees Paul Hamrick had nothing really to do with fund-raising in campaign or during lottery campaign.

Hamrick was chief of staff but according to Deen had nothing to do with fund-raising for lottery.  Cline says that is not unusual.

Cline says Carter Wells was overseeing budget.   Cline agrees Hamrick did not come to fund-raising headquarters.  Cline says Hamrick could have been a distraction.

Cline says the governor knew what was coming in because it was on the board.

Cline agrees Nick Bailey handled most of the questions to do with fund-raising.

Cline shown memo again, exhibit 211 for you lawyers.  The memo is copied to Nick Bailey and the governor.  No indication of Hamrick.  Cline agrees Hamrick would have been out of this loop.

Memo says they are looking back to donors as far as 1994 when Siegelman was running for lieutenant governor.  Cline asked about contributions of Lanny Young.  Cline says all he knew was that Young was a potential contributor to the campaign.  Cline says he didn't know how much Young donated to the governor's campaign because he was asked not to be a part of that.

Cline says he has flown on Young's plane.  Jefferson-Jackson dinner the point of discussion.  This is a

large Democratic Party fundraiser.  Cline agrees he was introduced to Fant by Bailey.

Cline agrees Hamrick was the part of the campaign who made political decisions.  Cline says they tried to talk to Hamrick about the $250,000 check.  After difficulty, Cline says Hamrick said, "It  would be a bad idea."

Back to the "God complex."  Cline says Bailey changed once the governor got elected.  Cline says Bailey did not explain, he just directed.

Back to meeting with Jim Allen and Mack Roberts.  Cline says he is sure Paul Hamrick was not there.

Cline describes where Bailey's and Hamrick's offices were located.

Cline says he is not sure where budgetary matters were taken.  Cline says he didn't have to pass through Hamrick to get to the governor.  Cline says he had to get through Bailey a little more than most, but could usually get in touch with the governor.

Back to Bradshaw House fund-raiser.  Anthony Fant was introduced to Cline by Nick Bailey.  Cline agrees Hamrick didn't have anything to do with this.

We're back on Sinclair's, Bud's story.  "You'd never know who was going to show up," says Cline.

Cline says Bailey was sometimes there but not often.  Cline says Bailey and Hamrick didn't hang out all the time together but that Cline didn't know what their relationship was.  Cline says no one told him about alcohol sales at Talladega.

Talk of a fancy Mobile restaurant.  "we're not in Montgomery."  "I was not wearing silk stockings at the time,"says Cline.  Lanny Young picked up the $600 tab.

Cline says he did not know Bailey owed Fant money.

Bill Baxley begins the questioning.  Baxley clarifying that Cline was talking about Mack Marcato in 2002 election, not Mack Roberts.  As to Bud's, Sinclair's, Cline agrees Mack Roberts was never there.  Cline agreed Mack Roberts would bring lists of folks he thought might contribute.  Baxley asks if it's illegal to be in the company of Jim Allen.  Cline says, "No sir."

Cline agrees Jim Allen was not involved in $250,000 fundraiser.

Terry Butts will question. Terry Butts says,"I'm one of the heavier lawyers."

"To your knowledge during the 1998 gubernatorial campaign and during the education lottery fund-

raising campaign Richard Scrushy didn't to anything illegal, unethical or immoral?"

Cline says to the best of his knowledge, Scrushy did nothing of the sort.

Cline describing public policy campaign referendum. Talk turned to how money was to be raised for the lottery campaign. Cline says that he knew ultimately a PAC would be set up for that. Cline asked who the legal advisers were.

Butts takes Cline to a chart to write on. Talk turns to "focus sheet" for making phone calls. Cline is going to draw a sheet which shows things like name, address, phone, if call was made, target number, etc.

Cline says the name on the sheet comes from main fund-raiser or candidate. Candidate would indicate how much that individual might give or raise.

Cline asked about ALFA and says about $100,000 for the lottery campaign. Cline says you write down result of call.

Cline says if they agree to contribute, a letter is written and sheet goes in book, same as if someone says they will raise money.

Cline says it is not unusual for people to be asked to both raise and give money. Cline says a focus sheet would be used.

Butts asks Cline about saturation buy of TV time in 1998. Cline says $3-4 million on television to get people to vote for you as a candidate. "Your opponents are going to be slinging mud at you, especially in Alabama," says Cline.

Cline agrees TV time is expensive. Cline says direct mail, salaries, phone calls and other overhead.

Cline says $6 million for lottery. Butts asks how much Supreme Court raise costs. Cline states $1 million to $4-5 million, etc.

Cline says Scrushy wouldn't return calls in 1998. Cline says he does not know who Scrushy supported because some people supported one side or two sides. Cline says Scrushy was talked to in 1997 but money was not talked about and nothing ever came of it.

Cline says Siegelman said Scrushy should be targeted for lottery. Need $4-5 million.

Cline asked about other major contributors. Cline says he'd have to look at list. Cline says he doesn't know if ALFA supported lottery or wanted money disguised. "I just know they gave."

Cline is asked about Nursing Home Association. He says amount $500,000 to $800,000. Money was raised from nursing home owners across the state. Never one lump sum like the $250,000.

Nick Bailey handled PAC in 1998 campaign according to Cline. Cline giving definition of PAC.

Cline is asked if he gave any money to the Siegelman campaign. Cline says he has "no direct knowledge."

Turning back to lottery foundation talk of tapped out donors. Cline agrees new targets had to be established and one was Scrushy, another was Elmer Harris, Paul Bryant, Jr., "but that was Nick's deal."

Large contribution was $100,000. Colossal contribution was $250,000. Cline says he sits down and asks governor or Bailey if they want to take this amount of money from one person.

No limits for giving to foundation. Cline agrees it was intentionally set up that way. Cline says that "if it comes out somebody is trying to buy the election, you won't win the election."

Cline says fund-raising is not an independent arm of the campaign.

Cline says there is nothing illegal about the amount of money Scrushy raised or gave. Cline says he did not ever talk to Scrushy.

Cline agrees the problem he saw was because there was a problem between IHS, HealthSouth, Richard Scrushy and the Nursing Home Association. Cline agrees the Nursing Home Association was one of Siegelman's biggest contributors. IHS owns largest nursing home in Shelby County. Cline says he just knew they were out of the state and it didn't look right.

Cline says he doesn't know if IHS would have been a competitor to the Nursing Home Association. Cline says Siegelman was the "best governor this state ever had."

Pie and corn pone being talked about. Cline says nursing home industry supported Siegelman for a long time. "It was more than just the financial stuff. To have someone new step in and start to get stuff immediately didn't sit well."

Cline says he didn't have a problem with Scrushy or HealthSouth. Cline says he doesn't think IHS would have an interest at helping Alabama at the level of $250,000.

Cline says he does not know if Scrushy got anything for what he raised. Cline says he knows Scrushy ended up on the CON Board. "I said my piece to the governor and Nick and let it go."

"$250,000 in one check sets off alarm bells," says Cline. Cline states there was nothing illegal. Cline

agrees the health care and nursing home industries were at odds.

Butts argues that if money is broken up into smaller amounts and given to 100 PACs it would be hidden. Butts argues IHS didn't hide the money. Cline argues that if IHS calls the governor's office and says we want to give the check he may not have had a problem with it. Cline says no one called.

Butts says it's not illegality but political sensitivity. Butts says had IHS or Scrushy could have broken money down into individual PACs.

Cline says he gave to the check back to Siegelman and Bailey. Cline says Bailey and the governor said they were going to hold on to check. Jim Cunningham told Cline not to get in the middle of it.

Cline said they decided to stay away from Nick, but still trusted the governor. Cline says no one contacted IHS or Scrushy about check.

Cline says he knew Scrushy had been on the CON Board before Siegelman.

Cline says he only stayed a couple weeks after the lottery failed. "We knew there were debts."

Cline agrees there was nothing illegal about giving money to the lottery foundation. Cline agrees there was a debt and contributors were targeted.

Cline is asked again if IHS or HealthSouth or Scrushy did anything wrong in giving money to the lottery foundation.

Questioning ends from Butts going back to conflicts between health care and nursing home industry.

In response to Louis Franklin, Cline says Nick and the governor said they were going to give the check back and agreed that means both of the men lied to him but that he didn't know that at the time.

Cline agrees he trained and kept spotters around candidates to prevent quid pro quo during calls.

Bill David Smith was accountant of record for governor's campaign in 97-98.

Cline is asked whose responsibility it is to make campaign contribution reports. Cline says that responsibility ultimately falls on the candidate.

Franklin asks if the candidate or some other person was in charge. Cline says the candidate was in charge. If they couldn't get the candidate they got Bailey. Cline says "Gov. Siegelman" called the shots. Cline says Nick Bailey had not lied to him when he represented to Cline something the governor had said to Bailey. Cline says he would work for Siegelman again.

Cline goes back over Bailey's attitude, "whatever the governor said was right."

Cline says he discussed Bailey's attitude with Bailey only once. "It didn't get me anywhere."

Cline says Jim Cunningham said Bailey was "too far gone."

"Please do not tell us about the rumors," says Louis Franklin.

Cline says he doesn't think money was reported under FCPA. "I don't know if it was reported."

McDonald's back to question Cline.

Back to Boston account. McDonald says account was set up by Anthony Fant. Cline says, "The document says so." Cline agrees Siegelman didn't have anything to do with Boston account.

Cline is asked if it is normal for fund-raisers to want one-on-one time with candidate. Cline says he has no evidence of any wrong doing at any of those. Cline says, "Innocent until proven guilty."

Cline is asked if Bailey asked him to hold onto check. Cline says there were conversations, but any money used to pay it off had to be disclosed. "It had to be disclosed..which is why I was told to pretty much stay away from it."

Cline says he would not violate Fair Campaign Practices Act.

Cline says it is true that Bailey handled PAC contributions.

Cline says Bailey was trying to get so many things done at once, you couldn't get to him. He was too busy trying to make whatever he needed to happen, happen.

Cline says Bailey may not have told him everything he should have once the election was over. "It's a fair statement he went to hell in a hand basket," says Butts.

Raymond Bell will be sworn and then it will be afternoon recess. New post time.

Posted by Helen Hammons on May 08, 2006 at 12:58 PM | Permalink | Comments (0)

## Political Fund-raiser Cline on Stand

Cline is being asked to identify IHS check. Cline says the governor and Bailey said Scrushy was responsible for check. Cline said he was also told another $250,000 check would be forthcoming, but

that he, Cline, did not see the second check.

Cline says he had conversations about CON Board and told Siegelman he didn't feel Scrushy should be appointed because Scrushy didn't contribute to the gubernatorial campaign whereas the Nursing Home Association had.

Cline is asked about Claire Austin.  Cline says Austin was a lobbyist.  Cline says Austin hung out with the others after hours "sometimes."

Another objection, sidebar.

Cline asked about friction with Democratic Party.  Cline says he was called by Giles Perkins about money that had been deposited someplace in the Northeast.

Cline says checks that were supposed to be for the Alabama Democratic Party were being deposited in the Northeast. Cline told Siegelman he was an "idiot for doing it and it was bank fraud."  Cline says Siegelman told him, "I know, I know.  I just need to get it done."

Cline is asked about Mack Marcato. 2002.  Cline is not sure who was with him, but thinks it was with a lobbyist named Crum Foshee, but Cline doesn't know for sure.

Cline says he was at a fund-raising office in Montgomery.  Cline says he was working on re-election and Mack was working on some checks.  Cline says he was acting as a fund-raiser.

Cline says it was 2002 Siegelman re-election campaign.  Perkins was executive director of Alabama Democratic Party.  Cline says the checks were made out to a PAC and he took them to the PAC.

Cline was asked about Nursing Home Association checks.  Cline says the checks were from members of the association, not one check.

**Note:  A source close to the case says Loree Skelton's testimony if and when it comes "could be very interesting."**

David McDonald will apparently question Cline next.

David McDonald says his hero is Art Leach.

McDonald is opining about political campaigns and how components work together.  Examples - platform folks, public relations group, grassroots volunteers, and fundraisers.  Cline agrees he was a member of the fund-raising group.

Cline says the person who raises the most money does not always win, but has an advantage.

Cline says "call time" was primary means of raising money. Calling a targeted group of donors. Jim Cunningham was Cline's immediate boss.

Cline says governor or whoever has keeper close at hand to make sure the appearance of quid pro quo is avoided and the wrong words are not spoken by the candidate. Cline agrees he teaches candidates to be aggressive and focuses on "call time."

Cline agrees he represented underdogs in campaigns.

Siegelman campaign raised between $9-10 million in campaign against Fob James. Cline says he knows of nothing in the campaign done inappropriately.

Cline agrees he knew the campaign would move almost straight into Alabama Education Lottery Foundation campaign.

Cline's work on gubernatorial campaign got him a promotion within his firm.

Cline agrees he did not have as large a roll in the lottery campaign as in the campaign for governor.

Cline agrees different clients are fund-raised for differently.

Conversation turns to Nick Bailey and the "God complex." Cline says to him Bailey did whatever the governor felt needed to be done, like "We're God and we're going to get that done." Cline says it's not an uncommon phenomenon.

Cline says he did not talk to Siegelman about what Bailey asked, but Cline says he did talk to his boss.

Bailey would say, "This is what Gov. Siegelman wants done." However, Cline agrees he did not talk to the governor. Cline says the governor was unreachable at times and in those times Cline would talk to Nick Bailey.

Cline says he had no knowledge of Bailey trading money for favors. Cline agrees he was concerned about Bailey and money. McDonald says Bailey brought checks made out to the Alabama Democratic Party from Arkansas worth about $5,000 that Bailey had been holding onto for a year.

Conversation turns to Alabama Fair Campaign Practices Act. Cline says he does not know who was doing reports. Bailey said, "Don't worry about the lottery." Cline says they had nothing to do with it after the end of October. "Nick took the boxes and put them in storage." Cline says he "thought it was a final report meeting."

Cline asked to read document.  The actual date of the meeting Feb. 12, 2004.  (Might be from 302)

Cline says Bailey says he would handle the required disclosures.  Cline says he assumed Bailey would then take care of financial disclosures, whether or not Bailey hired someone else to do it but Bailey would be ultimately responsible for the timely filing of reports.

Cline agrees he had conversations about education foundation that would be used even if lottery failed.  A+ Foundation an example.

Talk turns to IHS check again.

Cline agrees he raised about $6 million for Education Lottery Foundation.

Cline agrees Siegelman was looking for large donations from large companies.

McDonald reminded by judge to "ask questions and let the witness testify."

Judge Fuller tells McDonald that McDonald tends to get a "little bit excited."

Cline agrees $250,000 check a large donation.  Cline agrees he did not know who wrote the check.

Cline agrees you investigate when you don't know the source of the check.  Cline says the governor said, "We need to talk to Paul about this."

Cline agrees you ask for as much money from a contributor as they can give.

Cline describes money solicitation process.  Cline is asked if sometimes a person will be asked to commit $25,000 and be asked to raise $25,000 from other sources.

Cline says he knew Richard Scrushy had agreed to help retire the lottery debt.  Cline says Nick Bailey kept telling him "don't worry about it."

Cline says he then called Cunningham because he didn't feel comfortable.  Cline says Siegelman was not at the meeting with Bailey.

Cline being asked to tell what is on fund-raising document.  The document shows how many calls were made and how much money was raised.

Cline says Siegelman was getting an 80% return on calls.

Cline says he is not aware that the lottery foundation had any requirement to pay Democratic Party debt.

However, Cline says paying off Democratic Party debt was of benefit to Siegelman in the advancement of his political career.  Party debt was $1.2 million.

Cline agrees Scrushy was not trying to hide any $250,000 payment.

Cline says he has no clues what Siegelman's motives are.  McDonald says Cline is a very good fund-raiser.  Cline says, "I am good at fund-raising."

Cline agrees team member sat with Siegelman during fund-raising and that Siegelman did not cross the line illegally while working with Cline's team members.

$34,000 an hour raised by Siegelman under the direction of Cline or people who worked for Cline.

Cline agrees there were no quid pro quo donations.

Cline says he has never seen the year end statement 1999 Democratic Party statement.

McDonald asking Cline about bank fraud.  Cline says he knew account was open, but he did not know where.  Cunningham supposedly tells Cline someone with a PAC was having money deposited in bank and Jack Miller was telling Cline it was bank fraud.  Cunningham allegedly told Cline to "Step away from it."

Anthony Fant was treasurer of Alabama Democratic Party.  McDonald asks if Fant opens account and deposits checks is that bank fraud?

Discussion over relevance. "Prosecution has brought into this case something that's entirely false,"says McDonald.  Franklin objects.  Judge calls a sidebar.

Judge warns jury to pay attention only to witnesses and documents in the case and to disregard comments from counsel.

Back to Fant.  Cline agrees Fant can open bank accounts.  Chairman at time was Jack Miller and chairman can authorize that type of transaction.

Cline says he didn't do any investigation, but there was only one name on party account, Anthony Fant.  Cline says Siegelman's name nor Nick Bailey's name was on the account.

Cline now lives in Missouri.  Cline lived in Washington, D.C. in March 2004.  McDonald asks Cline if he had any conversations at all with Mr. Pilger, DOJ, Public Integrity.

Cline says Agent Murray, Jack Brennan, and another woman came to his house.  McDonald agrees he

wasn't hard to find. Jack Brennan went to Washington, D.C. Murray according to Cline set up the meeting. Cline says he had no contracts in Alabama. Cline says he did "make them coffee."

Cline says,"I knew I had to talk to them."

The judge is starting lunch early to help the jury.

Talked to a few people during lunch. You know it's really easy to forget this trial is having an impact on a lot of lives.

Posted by Helen Hammons on May 08, 2006 at 09:34 AM | Permalink | Comments (0)

## Week II Begins

We'll most likely get a lot of CON Board stuff this week. If you're looking for fireworks it may happen if and when Loree Skelton makes an appearance. Skelton was a lawyer with HealthSouth responsible for corporate matters relating to the CON Board. In his opening statement Art Leach referred to Skelton briefly. Leach said in essence Skelton was one of the people Scrushy thought he could trust.

Skelton's grand jury testimonies came into play during a Motion to Dismiss brought by the Scrushy team on the grounds of prosecutorial misconduct.

If Skelton does take the stand, it will be real easy to ignite a flame. In contentious meetings last year between Scrushy's attorney's and prosecutors, words were being parsed including whether or not "blessing" = "knowledge."

The Magistrate Judge called the government's actions in response to Scrushy's lawyers questions about the charging decision on Scrushy reproachable but not prejudicial to Scrushy.

The judge has entered the courtroom.

Judge Fuller is talking with the attorneys. The issue is whether or not paperwork exists about when Bailey changed his recollection of events in regards to when Bailey saw the IHS check. Art Leach says this date is important to the defense. At question is a meeting or conversation with Feaga when this may have happened. Attorney Feaga says he never talked to Nick Bailey on the phone or alone. Leach says he was never provided with any date in this regard. Feaga is going to get together with others and see if they can come up with a date.

The judge has ordered the jury in.

Darin Cline on the stand.  An executive from St. Louis, Mo.  Paid political operative since 1994.  He's done fund-raising with Cunningham, Harris, Cline 1996-Oct 1, 2005.

Cline came to work in 1997-1998 in Alabama with Cunningham, Harris. The firm had a contract with Siegelman.

Cline is being asked about phone calls made by Siegelman.  Cline is describing the targeting process.  "Siegelman asked for the money, because he's the hardest to say no to."

Cline agrees Scrushy was targeted.  Cline says he can't remember Scrushy taking the phone call.

Around November 1998 Cline was promoted to partner.  Cline oversaw debt retirement at the Alabama Democratic Party.

Cline went to work after the election on the Alabama Education Lottery Foundation which was set up as a 501C4.

Cline says he started raising money from folks who had previously given to the campaign and had "call time" with the governor.

Cline worked first out of Monticello Apts and then to a house across from the Governor's Mansion.

Cline says they set up the lottery foundation in March or April.

Cline is describing call sheets.  Franklin is asking how the records were held.  Cline says he was responsible for the records.  Cline says the records are given to the client, in this case the governor at the end.

Cline says his firm did not do the election reports.

Cline says if the governor was not available, Cline would contact Nick Bailey.

Cline is questioned about Bailey's titles.

Talk has turned to a check from Integrated Health Services.  Cline says he was handed the check by Siegelman and Bailey and was eventually told by them that Scrushy had raised the money.

Cline says he and Siegelman and Bailey discussed holding the check because they weren't sure they should take a check that large ($250,000).  They also discussed talking to Paul Hamrick about the issue.  Cline says he also told his boss Cunningham about the problem.

Cline says they were afraid of a negative press story because the check came from out of state.  "It was the largest check we ever received."

Cline says Nick and the governor told him Scrushy raised the money for the check.  Cline agrees neither Scrushy's nor HealthSouth's name were on the check.  He says he held the check 6-8 weeks after he got it in July.

Cline says he was eventually advised they would not use the check and he placed it in a lockbox.

Cline says Bailey and the governor told him they were going to send the check back.

After the lottery ended, Cline was advised by Bailey his firm would no longer be involved.  The check had already gone back to the governor and Bailey according to Cline.  Cline says there was no discussion at that meeting about the check.

Questioning has turned to Jim Allen and Mack Roberts.  Cline says he knows they met with Siegelman in a private room.  Cline says there was also a fundraiser after the election with highway builders to retire gubernatorial debt.  Cline says he believes he saw the pair outside the Monticello Apts. but he's not sure where.

Cline says Roberts helped with "call time."  "Call time" is the time set aside to call donors.  Cline says Bradshaw House in Birmingham was also a location.  Cline says the Birmingham meeting happened before the Monticello meeting.

Cline says Allen said he would follow through on his commitment to raise money and Cline says he did receive checks which he deposited into gubernatorial campaign.

Cline says he hung out at Sinclair's and Bud's.

Blog timeout, sorry.

Talk has turned to Raymond Bell, who became the appointment secretary for the governor.  Cline says he knew Lanny Young.

Cline says at some point he talked to Paul Hamrick about the check but there was never a definitive "this is what we're going to do with the check."

Cline is asked what he thought about Nick Bailey.  Sidebar.  Cline says he felt "Nick Bailey had a God complex."  Cline says if the governor wanted something done, we went ahead and did it without question.

Cline is asked about time frame. Cline says,"Throughout the lottery campaign. Nick and the governor would tell me to do specific things. I would check with Jim Cunningham who was my superior. I was more afraid of Jim Cunningham than Nick Bailey and the governor."

Cline is asked whether or not he checked with the governor when Nick told him to do something. Cline says Bailey never lied to him about what the governor wanted. Cline says he came to that decision over time. Cline says he got to know the governor and Nick very well during "call time."

Cline says he didn't doubt what Nick was saying. "He never lied to me."

We need to start another post.

Posted by Helen Hammons on May 08, 2006 at 08:36 AM | Permalink | Comments (0)

# Art Leach Questions Bailey

Art Leach is requesting any paperwork from a meeting that happened between Bailey and federal government officials.

Questions are being raised about any material that has to do with changes to Bailey's testimony to the government that has not been disclosed. The judge has asked Bailey to leave the stand for a moment.

The judge has ordered the government to review its documents and turn over to the defense any correspondence, written or verbal, involving every agent, agency, investigator that has not already been turned over to the defense be turned over by start of court on Monday.

The prosecutors say they believe they have turned everything over, but will check.

The judge reiterates there will be no speaking objections. Art Leach says he wants the federal government not to get up and offer any stipulations.

The judge says,"I am trying the best I can to make sure everybody has a fair trial."

The judge says, "We will finish Nick Bailey's testimony today if we are here till midnight."

Art Leach is asking Bailey if he knew Scrushy was a philanthropist? Bailey says yes.

We're having more technical difficulties with hearing Art Leach's mic again. Hopefully it will be fixed soon.

Art Leach is talking to Bailey about people coming in to see the governor about doing business in the

state.

Leach asks Bailey what a political operative is.  Bailey replies, "Someone who understands politics."

Leach asks Bailey if he "traded his office?"  Bailey replies, Yes, sir.  Bailey is asked how he came to know that.  Bailey says they had an ethics seminar.

Leach is asking about the lottery and the training Bailey had regarding problems that could come about with the lottery referendum.

Leach asks Bailey if he was told that checks for the lottery foundation could not go directly to Governor Siegelman.

Bailey is saying he doesn't remember specific instructions.

Bailey is asked to read a letter that in essence talks about receiving checks from people for the foundation must be sent to the foundation.  Checks made out to an official must be returned.

Bailey agrees the situation with Scrushy was not unusual in that government would meet with people one-on-one.

Bailey agrees he was at times excluded from the room.

Bailey agrees that it was routine that the governor met privately with contributors.

Bailey agrees the fact that the meeting happened and the governor and the contributor were alone was not unusual.

Bailey is asked if he knew there was no campaign contribution limit when the money was given to the foundation, at that time.

Bailey agrees people were targeted for contributions for the foundation and that it was not unusual.

Leach is asking if there is anything unusual in the letter that Bailey hadn't known about before.

Bailey is asked about cap limits on contributions and is now being asked about a "Jim Pool" there seems to be some confusion over whom Jim Pool is.  Bailey may be confused.

Bailey is being asked about Bill Blount, an investment banker in Montgomery.

Leach asks Bailey if it wasn't true that Richard Scrushy was one of four people targeted for large

contributions for the foundation.  Bailey says, "Yes."

Bailey says Gov. Siegelman made most of his big contribution calls.  Leach asks Bailey what the target amount is for the individual and how is it established.  Bailey says the governor and others determine that.

Bailey agrees you don't tell contributors that they have been targeted for a certain sum.

Leach is now running a lottery time line starting with Siegelman's election in 1998.  Bailey says the first time the Legislature met after Siegelman was elected was late winter, early spring.  Bailey says Siegelman was sworn in January 1999.

Leach is showing Bailey a document dated February 22,1999.  Bailey says he has seen the article of incorporation.

Bailey is asked if it was passed by the legislature, Bailey could not remember but knew it was passed within a few months of the date.

Leach asks if it had passed by June 1999.  Bailey says to the best of his recollection, yes sir.

Bailey agrees he was active in the lottery foundation.

Bailey agrees as to the significance of June, July 1999 and that he was raising money and that Scrushy was not the only person targeted.

Bailey is asked about Margie Sellers and her relationship with the Nursing Home Association.  Bailey says he knew her as a contact.

Bailey is also asked about Elmer Harris and what he did for the foundation.  Bailey agrees the bottom line is bringing in the money.

Bailey says only about 5-10 people can raise more than $250,000.  Elmer Harris, David Cooper, Richard Scrushy, Paul Bryant, Jr. (Bailey says he doesn't remember his name as a target.)  Bailey says maybe Jere Beasley would have been targeted.  That doesn't make a lot of sense.

Leach says Scrushy did not take or return the first call from Siegelman.  Bailey says it sounds very familiar.  Leach asks Bailey if that is on the 302s, FBI summary documents of witness interview.

Bailey says there is usually more than one FBI agent when he is questioned.

Bailey is asked if these meetings are ever recorded.  Bailey says not to the best of his knowledge.

Bailey is asked about the presence of U.S. attorneys and representatives from Washington, D.C. Bailey is asked if these people take notes and he agrees they do.

Bailey is asked if the group questioning him has changed over time and he says it has.

Bailey is asked about people who questioned him initially including members of the attorney general's office.

Bailey says Long gets with his attorney and sometime himself to set up meetings.

There is talk of other officials. Leach is going through a list.

Bailey is asked about his IRS tax violations, unreported income and to the agreement to what will happen in those other tax years. Bailey is asked if he has filed amended tax returns. Bailey says he has.

Bailey says he has only filed one for tax year 1999.

Bailey is asked if he knew the government could forfeit his assets for the charges involved.

Leach is asking about illegal proceeds, bribes and the total dollar amount. Bailey says he keeps hearing about an amount of $200,000,

Bailey says he does not have an agreement with the government as far as the $200,000.

Bailey agrees he knows the government can seize assets.

Bailey says the government did not say they would ever go out and seize his car or bank account.

Bailey agrees none of his assets have been seized.

Bailey agrees he never had a conversation with Gov. Siegelman that Siegelman was going to trade on his office.

Bailey agrees Siegelman is as smart a politician as Bailey has ever seen or known.

Bailey says, "Siegelman knows how to get it done."

Leach is back on whether or not reports were generated for the vast majority of Bailey's meetings with federal officials. Bailey says he can not say, the government would have to say.

Bailey agrees now sometimes reports were not generated from meetings with assistant U.S. attorneys and agents that Bailey does not have in his possession.

Bailey is asked to recall how many times he met with the government since December '01.   Bailey says "at least two dozen, perhaps three.  Again I said approximately."

Bailey agrees he would meet with officials for up to two hours prior to giving testimony to the grand jury.  Bailey agrees he did review his testimony following his grand jury testimony.

Bailey is asked if he ever told the government he made a mistake.  Bailey says he had some reevaluation of events regarding Mr. Scrushy's initial check.

A short break in the action.  Sorry.

Bailey is asked if he examined any HealthSouth documents related to Scrushy.  He says no.

Then Bailey agrees he has reviewed documents with government officials prior to coming to this trial related to governments to HealthSouth.

We are in recess.

Missed a few things, but back now.

Leach talking about statement where he says to Bailey, "You repeatedly lied didn't you."  Bailey says, Yes, sir."

Bailey is asked to look at a document concerning December 21, 2001.  Bailey agrees he did not talk about the Alabama Education Lottery Foundation on that day.

Bailey is asked if he remembers things better that happened two weeks ago than those events that happened six months ago.  He agrees.

Leach asks Bailey if he believed events were true at the time he told prosecutors, etc. about them.

Bailey says he doesn't remember when he first started talking to government officials about Scrushy.

Leach is asking about 302s and when the earliest date of the 302s is that relates to Richard Scrushy.

Leach is questioning Bailey about events on June 30,2003 a meeting between Bailey, Long, and Baker.  The document is an FBI 302.  Others present included Bailey's attorneys, IRS, Jack Brennan, and Julie Weller.

Bailey agrees he told the government the governor and Scrushy met on July 19,1999.  Bailey says Eric Hanson and Loree Skelton were with Richard Scrushy at this time.  Bailey says he doesn't remember any other occasion when the three were together.

What other people were with them?  Bailey says Scrushy security and Senator Waggoner.

Bailey agrees he thought at that time the contribution was Richard Scrushy's and what he was telling the FBI that Scrushy delivered $250,000 .  Bailey says the exchange about "What does he want? An appointment to the CON Board.  Will that be a problem? was not in the 302.

Bailey says his recollection of events related to the check are better now than it was then.

Bailey says his recollection is "more accurate."

Shifting gears Leach is asking whether the second check for $250,000 was a bribe?  Bailey says that's not for him to decide.

The meeting happened between the Governor and Scrushy in Scrushy's office in Birmingham.

Leach is asking if the bribes Bailey received were paid to him in the governor's office.  Isn't it fair to say you are not going to have a meeting in the office of the governor and have the governor witness that you have taken money from Lanny Young.

Leach is giving his description of where bribes take place.

Leach says the meeting was on the governor's calendar and on Mr. Scrushy's calendar.  Bailey says to the best of his recollection Scrushy was expecting them.  Bailey says the meeting took about an hour or so.

Bailey says as he remembers the purpose of the contributions was for the CON Board.  Bailey says it's possible the digital hospital may have been part of the deal, but that he is not testifying it was.

Leach asks Bailey if he's aware the digital hospital was passed nearly unanimously by the legislature.

Bailey says he was not.  Bailey says he was not on a veto team.

Bailey is asked if a unanimous decision from the legislature means something is veto proof.  Bailey says he doesn't know that would make it veto proof.

Bailey is asked about meeting with government officials January 27,2004.

Leach is asking if there were other meetings that did not result in reports from June 30,2003 to January 27,2004.

Bailey says he has not seen one from during that time.

Bailey is asked if he has had this report in his possession.

Bailey says he has seen this 302.

Bailey is reviewing the January 27, 2004 document.

Bailey agrees he told the FBI the governor and Scrushy retired to a private office and the meeting took about an hour.  At this time the governor told Bailey according to the report, "Scrushy is halfway there." And Bailey asked, "What in the world is he going to want for that?"  The governor responded the CON Board.  Bailey:  That shouldn't be problem should it.  The governor ,"It shouldn't."

Leach is asking Bailey if this is the first time he related this story to the government.

There are objections coming from the defense.

Bailey says he first told the government,"Sometime, before this report was produced."

Lunch break.

We got mic problems again.

Reading lips, talk has turned to the Super Bowl and Bailey's attendance.

Thanks the mic is back.

Another discussion about what's in the FBI 302 from January 27,2004.

Now we're moving to grand jury testimony in June 2004.

Page 5, line 17.  in relation to Scrushy and the governor a meeting.

Bailey agrees Scrushy was the CEO of HealthSouth.

Bailey says in the report, "I believe it was in June 99."  Could it have been in July 99?  Yes, sir.

Leach is asking about what Bailey saw as far as document in preparation for a grand jury meeting.

Bailey is asked who was asking him questions.  He replies, "Mr. Feaga."

Leach is asking about Bailey's memory.  Bailey says, "Things change over time, memory changes over time."

Bailey says in the 302 Hanson, Scrushy and Skelton were there.

There is debate between Bailey and Leach about finding out if another person named Jim G  was at the meeting.

Leach is saying  Bailey says he believes Eric Hanson was there but that prior statements indicate Hanson was there.

He is asked about Hanson today.  "I can't for sure recall whether Hanson was there or not."

Was Loree Skelton there?  Bailey, "I believe she was."  Was the check there?  I believe it was.

Leach has gotten Bailey to say that his grand jury testimony is the same as his January 27, 2004 302.

Bailey agrees he handled the check on the meeting day.

Bailey is asked if Hanson offered to get him half a million dollars in exchange for Scrushy getting a seat on the CON Board  Bailey said Hanson made it clear.

Bailey agrees he has worked in the Siegelman campaign and that Eric Hanson is a lobbyist and that Hanson contacts people on a daily basis to get the desires of his client.  Bailey says it is routine.

Is it normal for a lobbyist to come to the governor and ask that his client be given a seat on a regulatory board.  Bailey says it's not unusual.

Bailey says Hanson made it clear what he wanted for the contributions but that Hanson didn't threaten him.

Leach asks Bailey if he knew Scrushy did not want a seat on the board.  Bailey said he did not.

Leach says Tom Carman was the one HealthSouth wanted for the position.

Leach is going back through whether or not Bailey knew about Scrushy's qualifications to be on the board.

Leach is asking more questions about whether Scrushy benefited personally from anything HealthSouth did.

Leach is grinding Bailey about whether or not he has memorized or scripted his testimony.  Bailey says, "As these questions become more and more repetitive, I'm learning them by heart."

Bailey says he is trying to do the best he can.

Art Leach just asked Bailey if he was on "medication"?

The judge has asked the attorneys to approach the bench.

The judge has told the jury to disregard Leach's question.

Bailey admits he has reviewed his testimony for this trial with Steve Feaga.  How long did it take," asks Leach.  Bailey, "Three or four hours."

Leach:  Was it a single meeting or multiple meetings.

Bailey:  A couple of days Mr. Leach.

We're retreading ground about the IHS check.

Leach asked Bailey if anyone has talked to him about the laws related to perjury.

Well the judge has had another conference.  Now we move on to the plea agreement.  Leach wants to know if perjury and false statements are covered in Bailey's plea agreement.

Mic problems again.  Art Leach we can't hear you!!

Leach is walking through the plea agreement and asking Bailey if Scrushy had anything to do with each count of Bailey's plea agreement.  Bailey is answering no sir.

Leach is now addressing sentencing as to state charges, RICO charges.

"Were you prosecuted for all the federal violations you committed?"  Prosecution is objecting.

Bailey answers he's not sure how to answer that Mr. Leach.  "Mr. Leach I am not aware of any other federal violations."

Have you ever talked about money laundering?

I don't recall a money laundering discussion.  Bailey say he may have heard some discussion about RICO.

Bailey says he understands the government will have input into any future sentencing.

Leach is asking Bailey about what sentence he faces without reduction?  Bailey says 30-39 months.

Leach is stuck on the 5K Downward Departure Motion.

Leach asks Bailey if anyone in the government has said they would or would not file a 5K motion.

Bailey basically says if he abides by the rules he would.

Art Leach is through.  The prosecution will not try to rehab Bailey at this time.

Most of the lawyers have left.  Judge dealing with some instructions with jury out of room.

Dealing with Mack Roberts stuff as related to Bailey's testimony.

Finished until 8:30 a.m. Monday.

Posted by Helen Hammons on May 05, 2006 at 09:08 AM | Permalink | Comments (2)

## Uproars, Sleaze and the Courtroom Life: Jim Parkman Talks to the Courtroom Chronicles



Jim Parkman is the kind of lawyer it's hard for people not to like, no matter what they think of his clients. The colorful and energetic Dothan lawyer is best known for his work as part of the defense team that won exoneration for former HealthSouth CEO Richard Scrushy in a $2.7 billion fraud trial.

I caught up with Mr. Parkman, the legal profession's equivalent of the Energizer bunny, by phone Thursday to get a few comments on the government corruption trial taking place in Montgomery and the courtroom process in general.

Asked his opinion of prosecution lawyers Louis Franklin and Steve Feaga, Parkman, who has done battle with both men, was overflowing with praise as to their professionalism. Parkman says the two are "very, very good lawyers...very, very professional." In fact Parkman likes both men and says, "Feaga is one of those guys that after the trial you want to just go up and hug him, that's how nice he is."

He says not to mistake the fact that Feaga is huggable with the impression that Feaga is a "soft" opponent. "He's not," says Parkman, "and I like that."

Parkman says having never had an incident in the courtroom with Louis Franklin or Steve Feaga, he was "very surprised" when he heard about Franklin losing his cool in the courtroom He says he "never saw that coming."

"Those uproars in the courtroom play into the defense's hand and their (the defense) saying it was politically motivated," says Parkman.

The Dothan lawyer says he has, on occasion, been known to lose his own temper in a courtroom. "I have lost my temper and I made the correct apology. I knew I was wrong. It ends up hurting you, that's not good."

"It shows the jury this is personal. Personal in this case equates to political and the prosecution is just feeding the defense with ammunition."

But don't think Parkman, because of his connection to Scrushy, was at all happy with Fred Gray's remarks during opening statements that led to Franklin's first explosion. "We've now gotten into personal stuff in the courtroom," remarks the usually affable counselor.

Parkman says opening statements are the time to present to the jury the facts and evidence you're going to show "not who you've represented in other cases. I've got plenty of cases I could tell the jury about, but that's not the purpose of opening statements."

The down-home lawyer says the way the prosecution should have handled Mr. Gray was to "politely stand up and object. The defense knows what you're objecting to." He says when you fly off the handle you're "letting people know you've got a problem with your case."

A lot of folks already have a perception that lawyers and politicians are sleazy, sometimes clients in a case like this can be hurt by that perception. With that in mind I asked Parkman about Fred Gray's repeated use of the phrase "It's Alabama Politics 2006" in Gray's opening statement and how a jury might take it. The attorney's reply was that it could be "dangerous" for the defense.

Although the defense meant in it's opening statement that the defendants are being attacked for political reasons, Parkman says, "What you're actually saying to the jury is that all Alabama politics is 'sleazy.' And, it fits the perception most people have of politicians and lawyers."

So how do lawyers get around the sleaze factor when they're in front of a jury? Parkman says emphatically there is only "ONE WAY, confront the jury with that fact. Admit it to the jury. Confront the perception head on. I'm the salesman. I'm the one that's got to convince them."

He says it's not a strategy or a ploy. He says you also tell the jury this and you tell them "I'm telling you this because I'm going to prove to you I'm telling you the truth." Parkman says being honest at the beginning pays dividends during closing arguments. The jury may not be sure about the case but they'll feel "he has been honest with us" and that can only help.

I asked Parkman if there was a line he would not cross in defense of a client. Does anything go in a courtroom?

"Absolutely not, anything does NOT go. There's nothing wrong with being a zealous lawyer. I don't believe I have ever done anything inappropriate, illegal. It's a fine line at times. You have to know the rules. I have a good faith basis for everything I do. I have a basis, not a guess or speculation." Parkman says when asked he can confidently tell the judge the basis for his actions.

As to this case, Parkman thinks the prosecution may have made a mistake. He says in general "you pick a few of your strongest counts and go with it. In a federal case one conviction does the job so why have 30 or more(counts). Pick 5-6-7-8 and let it go. Enron is a good example, they have six (counts) against Lay."

Parkman says too many counts can backfire on the prosecution. "If I was a prosecutor, that to me is very dangerous. It fits into what the defense says that it's obvious you've got a problem with them."

As to the defense and the relationships between lawyers when there are four defendants, Parkman says often, but not always, the "lawyers will get together and ask, 'Do we have a common defense?" He says the one thing he doesn't want is a surprise. He says each team doesn't have to employ the same strategy; but, if another team is "going to attack my client, let me know so I can be prepared."

I asked Parkman whether or not Mr. Scrushy would have wanted his wife, Leslie Scrushy, to know about a check(the second check from HealthSouth) Scrushy signed for the Alabama Education Lottery Fund, "It makes a lot of sense. He wouldn't want her to know and be upset about it. She's very religious. They're anti-lottery, I'm sure he didn't want his wife to see it...I'm sure she didn't approve of that kind of money going to a lottery fund."

Asked if a client is being hypocritical if they say they have moral objections about doing something then proceed to do it anyway, Parkman turns to the defense spin and says, "No, the key is the money is not going just for the lottery, it's going to fund education, it's not really two-facing."

As to the intense grilling Nick Bailey got from David McDonald, the lawyer who has grilled some witnesses himself, says not being in the courtroom he couldn't speak to specifics. He did say it's "important a jury know these things, know that the witness has been involved in a lot of bad stuff to benefit his own self. It can be very powerful."

Next we turned to a hypothetical:

If there was a prosecution witness that's struggling in life and he's in all kind of debt and borrowing money from God knows who and there's a client who says this witness was one of his best and dearest friends and agrees that he was with this witness a whole lot. Wouldn't it be odd that the client would have no idea of the difficulties the witness was having in his life?

Parkman went to a line I'm sure a jury's heard before: "Let's take something from the Bible if that's okay, Judas Iscariot. Judas hung around the other disciples a long time and they never knew what was going on. Parkman then added another element. How many times have you heard in a divorce, 'I was the last to know he cheated on me or I was the last to know she cheated on me'? Believe me, it can be done."

I of course missed this opportunity to ask Parkman if he was speaking from personal experience. After all, a story goes that at one time a friend of Parkman's had bumper stickers printed and passed around Dothan that read, "Honk if you've been married to Jim Parkman."

I did ask Parkman if he'd had any time to rest after the Scrushy trial in Birmingham. He says, "No, I haven't had a vacation. That's okay. I'm certainly enjoying it, it's fine." Parkman says he's working on "lots of cases."

He's off next week to the Tuscon-Phoenix area on a criminal case, a trip to L.A. (no, not Lower Alabama) to discuss the possibility of work on another criminal case and to a glitzy place far away from the landscape of Dothan, Alabama - Beverly Hills.. He's addressing the Beverly Hills Bar Association - the topic: Keeping it Simple: Presenting Complex Matters to Juries and Courts.

The Courtroom Chronicles will be checking in with the smooth-talker from Dothan on his West Coast swing next week - stay tuned. And as always, thanks Mr. Parkman for taking time out for the Courtroom Chronicles.

Posted by Helen Hammons on May 05, 2006 at 01:38 AM | Permalink | Comments (0)

## Back for a Few

Sorry to have to take a blog break, I'll try to limit this.  There will be one more minor one later today and then hopefully no others until sometime next week.

I will tell you wsfa.com's Courtroom Chronicles will have a story in the morning you won't want to miss.  No this is not a smoking gun.  Just some insight about the trial you won't want to miss.

Nick Bailey is now talking about what Lanny Young drinks.  Mr. Deen is acting up about Lanny Young allegedly wanting to go to Talladega to get beer sales passed.  There's been a lot of talk about why you fly from Montgomery to Talladega.

Talk continues about governor's agenda on beer sales at Talladega.

Nick Bailey, "I drive a Chevrolet," in response to are an you a fan of car #24 question.

Questions about Trava Williams a stockbroker.  Bailey is asked if Anthony Fant went to meet Trava Williams and Williams' AFF company.

Bailey agrees Williams was going to try and get business with the state.  Bailey says it is not correct that he sent Williams around to state agencies to see if Williams could get some business.

Questioning turns to the Alabama Peace Officers Annuity and Benefit fund.

Bailey agrees paperwork set on his desk for over a year.

Bailey being asked by travel agent Terry Merritt and his relationship to Bailey and Anthony Fant.

More meeting questions about meeting Young, Fant and Brazeal about Cherokee County landfill. Bailey says he arranged but did not attend the meeting.

Bailey agrees he owed Fant money at the time.

Bailey agrees Young borrows $100,000 from Anthony Fant in 1998 or 1999.

Bailey agrees he met Fant at a Gore campaign function in Birmingham and Fant ended up on the list of possible contributors to the Siegelman campaign.  Fant was head of Democratic Party for a while.

Bailey agrees all this had nothing to do with Paul Hamrick.

Questioning turns to the Cherokee County landfill. Bailey admits he knows nothing about a landfill in Cherokee County except the landfill is there.  "I haven't been there myself," says Bailey.  Bailey says he knows Phillip Jordan was probate judge and on the county commission.  Asked how he knows that, Bailey says he thinks he read it in the paper.

Another break.  The blog will be out of commission again for a while.  There are also some issues the judge wants to take up without the jury after the recess.

Sorry for the breaks today folks.  Hopefully things will be back to normal tomorrow.

Bailey is being asked about Kirsch and Bailey's relationship with him.  They are also talking about houses Bailey owned and the work Kirsch did.  Bailey admits that got him in trouble.

Bailey is being asked about his conspiracy with Kirsch and work being done on Bailey's house for state jobs.

Bailey says he was acting director at ADECA and had control of a $200 million budget. Bailey agrees it is one of the largest and gets a lot of federal money.

Bailey says his younger brother was hired as a division chief over Alabama surplus property. Bailey says his brother was 29 when he got the job.

Bailey is being asked by Deen about the G.H. Construction project.

Bailey says there had been a project kicked around for years. ABC warehouses leased from the Aronov family, friends of Gov. Siegelman. Bailey says Hamrick and himself discussed the fact that the Aronovs may be upset if they lost the leases. Deen says Hamrick told Bailey it would be better to wait until after the election. Bailey says he does not remember Hamrick saying that.

Bailey says he had made recommendations about different projects. Trooper re-roofing in 2000, Wallace State re-roofing, Snead State in Feb 2000, another project in May 2000, Cullman County Good Hope.

Projects from 1999-2000. Bailey asks if they were relatively large projects.

We're back to the qualifications of Curtis Kirsch. Bailey says he was told they could probably handle the project. Kirsch got D's and F's in college according to Deen. Bailey says he didn't check "Kirsch's report card."

Lanny Young was going to be put in charge of the project. Brian Broderick was going to be involved.

Bailey says he didn't know Kirsch had forged documents related to Broderick's qualifications.

Lanny Young's brother-in-law was also to be involved in the G.H. Construction.

Deen submits into evidence the file of Curtis Kirsch, architect.

The personnel file has been entered into evidence.

Bailey says he signed off on the recommendation to pay $300,000, $100,000 of which went to Anthony Fant.

Bailey says the warehouse deal was sometime between 1999-2001. Bailey was asked if he would accept 2001 and he said he would.

Bailey says there was never a cumulative $200,000 in margin calls.  Bailey admits he went to work with Anthony Fant and also went to Las Vegas on at least one trip with Fant.

Bailey says he doesn't remember the date of the trip.

Questions are asked about Donze.  Bailey says according to Kircsh Donze worked on the project.  Bailey was asked if he remembers hearing the governor say about Kirsch, "I wouldn't want him(Kirsch) building a dog house."  Bailey says no.

Bailey is asked if Paul Hamrick had anything to do with the Goat Hill project.  Bailey says "initially no."

Bailey is asked when he had a conversation about the G.H. project.  Bailey said on a number of occasions.  Bailey says Paul Hamrick knew about the payments from Young but can't give any specifics.  Bailey says he and Hamrick discussed the G.H. project.

Bailey says Hamrick would have something to do with ADECA projects being built.

Bailey says he reported to Hamrick about what was going on at ADECA.  Bailey says Hamrick never told him "don't get involved with Lanny Young" because Young was involved in the landfill.

Lanny Young had wanted the fees for the Emelle landfill reduced.  Bailey admits he asked Jim Hayes, Revenue Commissioner at the time, to "help him (Young) if you can."

Bailey says he doesn't recall Young paying him for anything 1999.  Bailey says Young and Claire Austin spent a lot of time together and were lobbyists.

Bailey agrees people came into the governor's office to lobby the governor all the time.

Bailey says he understands Young to be a representative of Waste Management.  "That was my belief." Bailey says he assumes "Lanny wasn't there on a volunteer basis." and Bailey says he is not sure Young didn't visit Hamrick.  Bailey admits he sent the report to Jim Hayes.  Bailey admits Hamrick had nothing to do with Bailey sending the report Young had given Bailey to Jim Hayes.

Bailey says he talked to Hayes to see what the status of Young's report was.  The recommendation came back approved.  Bailey says he had no knowledge of Hamrick talking to Hayes about the Waste Management report.

Bailey says he did not get paid for delivering the report.  Bailey goes back to his comments about the "general understanding" the group had with Young.

Bailey is back to the "it evolved over time."  Bailey cannot give information about a specific

conversation with Lanny Young and Paul Hamrick about the agreement that "evolved over time."

Bailey is asked about is agreement with Fant and Young. He says he did not have the same sort of understanding with them or with Young and Treva Williams.

The prosecution is objecting to more talk about Bailey's plea agreement with the government.

Bailey is being asked if the government did not charge him with some things such as charges under the RICO act. Bailey keeps reiterating all "he wants is a good recommendation."

Bailey is asked if he is still driving a Hummer? Bailey says he never had a Hummer. Bailey says he did not talk to the government about his brother and his brother's dealing with Kirsch.

Bailey is asked about a project at Wallace State in 1999. Bailey agrees he recommended Kirsch for the project.

Mack Roberts' attorney Bill Baxley says he "sees no need to question the witness."

Art Leach is up and Bailey agrees he has not attended a meeting between Scrushy and Siegelman. Bailey agrees he has relied on other people. Art Leach asks Bailey if he got any evidence directly from Mr. Scrushy. Bailey admits he has gotten nothing directly from Scrushy.

Another short interruption.

"Since there is not a single document to support your testimony, (you might as well object there -talking to the defense) your recollection, will you agree with me that if the jury does not believe your testimony in that regard you have nothing else..."

Bailey agrees he believes Mr. Scrushy had a check and it was signed by Richard Scrushy.

Bailey says the governor told him, Scrushy did not want his wife to know he contributed to the lottery campaign.

Talk is now of the IHS check. Leach says the check was not signed by Scrushy. Bailey keeps reiterating that the governor told him this. Bailey says the check was a "result of Richard Scrushy."

"i can't explain to you what may or may not embarrass Richard Scrushy," says Leach.

Bailey agrees he saw Scrushy once or twice in the governor's office. Bailey says he cannot confirm that the meetings happened before Scrushy's appointment to the CON Board, but his recollection is one happened before Scrushy was appointed.

Leach gets Bailey to agree the meetings could have been at least a year apart.

Leach asks Bailey when he realized he might be wrong about the meeting between the governor and Richard Scrushy.

Bailey says he tried to make it known to his attorney that he may have been unsure.

Bailey says he was at a meeting with the government at which Mr. Feaga was there and it may have been driving away from that meeting he realized he might be wrong about his recollection.

"In this district I started with Mr. Franklin and Mr. Feaga," says Bailey.  Bailey says he may have ended up with Hart when Hart was an assistant attorney general.

Leach is saying an FBI agent was Bailey's primary contact.  Part of Bailey's agreement with the government is that he has to come meet with the government when asked to by the government.

Leach wants to know more about meetings Bailey has had with the U.S. attorney's office.  Bailey says he has been to a half a dozen meetings lasting not more than half a day.

Leach asks about meetings leading specifically to testimony here, "not more than a half dozen."

From the time he started cooperating or not regardless of who was there at any meeting where assistant U.S. attorneys were present, Bailey says he had less than two dozen meetings.

Bailey says they have met at other offices associated with the government and at his attorney's office.  Bailey says he has met with the government at his attorney's office at least a half dozen times as well.

Bailey says "questions and answers" happened at his meetings.  Bailey says he saw reports of statements he had made and discussed them.  Talk is of FBI 302, a report prepared by FBI agents that summarizes what a witness has told them.

Bailey says if he is asked, he was able to get the 302s.  Leach wants to know how many 302s had anything to do with Mr. Scrushy.  At the time he was reviewing them Bailey says he believes the two or three documents he saw were accurate.

Bailey agrees he told the government 302s related to Scrushy were correct.

Bailey is asked if he has had transcripts of grand jury statements.  Bailey says he believes he has copy of his 302s in Birmingham.

Bailey says he brought up discrepancies with Feaga,

Mr. Leach has had enough for the day as has almost everyone else.  Remember to tune in tomorrow morning for an interesting blog exclusive to WSFA.

Posted by Helen Hammons on May 04, 2006 at 02:34 PM | Permalink | Comments (0)

## Questioning of Bailey Continues

Mr . McDonald gets Mr. Bailey to agree he had no guarantee of any position with the Siegelman administration when the alleged agreement with Siegelman and others was made in 1994.

Mr. McDonald is trying to establish when the alleged "agreement" happened.

McDonald is pounding on Bailey about the "absolute agreement" and what was discussed.  He got Bailey to agree that when the "agreement" started to evolve there was "absolutely no discussion about:

- whether or not Gov. Siegelman would be purchased a 2000 Honda motorcycle.
- the Emelle landfill
- the Talladega Superspeedway
- the Cherokee County landfill
- G.H. Construction
- 4-wheeler
- how the proceeds from Lanny Young would be divided.

Judge Fuller says he does not believe Mr. Bailey will be "able to articulate a date" as to when the alleged agreement started.

Judge Fuller is asking McDonald to get on with it and "do not cover this subject with these type of questions again."

McDonald gets Bailey to read from his plea agreement which basically states Bailey began to accept things from Young in exchange for which Bailey would "take care of Young" in Young's dealing with the state.

Questioning has now turned to the G.H. Construction project.

The state was leasing buildings from the Aronovs and it was believed the state would be better off with building its own warehouses in order to save money.  Bailey says he was not aware of a meeting between Siegelman and the Aronovs.  McDonald says the Aronovs stood to loose a lot of money if those warehouses were not leased.

Bailey says it was his idea to involve Lanny Young in the G.H. Construction deal.

A little earlier there was talk about the ability of Kirsch as an architect and Bailey said he couldn't comment about how good or bad the architect was.

McDonald is trying to convince people the G.H. Construction project was a good idea, but a bad idea in the way it was implemented. He did mention Siegelman and the Aronovs were friends to which Bailey said he didn't know that.

McDonald introduces a memo saying that it would benefit the case if the state constructed its own warehouse facilities.

Judge Fuller is clearly irritated at the number of interruptions by objection in court this morning as well as Mr. McDonald covering some of the same material. Fuller says he's already had to talk about these things "more than I wanted to" this morning.

McDonald tells Bailey he wants to try and move on "so I don't get shot going too long today."

Bailey agrees he had a large part of the responsibility for the G.H. Construction project. Bailey says his brother Shane worked for ADECA.

Another timeout. There is now an agreement between the defense and prosecutors that the G.H. Construction project "if properly implemented would have been a good idea for the state."

Bailey says he was one of the people who approved the payment of $330,000 for work to be done in the project. Bailey however does not know what actually was completed but when on what Lanny Young and Garber told him. "I still don't know today what was done and what wasn't." says Bailey.

McDonald is saying after there was a meeting that included Gov. Siegelman that agreed that the G.H. Construction project would save the state money that was the limit of Gov. Siegelman's involvement in that project.

Bailey said, "Yes, at that time."

We're back to the motorcycle again. Another question about exhibits.

Bailey is reading from an item that says he called his insurance company to have a motorcycle removed from the insurance policy but the company could not find insurance under his name for a motorcycle. The company sent Bailey a memo to that effect. Bailey says he "cannot conform" he ever did place insurance. Bailey does not deny he has told people in the past he purchased the motorcycle and purchased insurance on the motorcycle.

Bailey says "there is some debate whether I genuinely bought a part of Gov. Siegelman's motorcyle."

This goes with what the government is saying. McDonald may have lost the motorcycle battle at this point.

Bailey now does not dispute he paid for half the insurance on the motorcycle.

McDonald is pounding again. Mr Bailey goes back to the statement about the exchange of favors with Young. McDonald says Bailey was a founding member of the "absolute agreement" about Young.

Bailey agrees Siegelman and he did not discuss anything that could be considered unlawful or illegal.

Bailey says there was never any discussion of penalties for the favors.

Bailey agrees he never heard Siegelman say he was willing to do anything unlawful, illegal, or immoral for Lanny Young.

We're moving on to Jim Allen and a meeting with Siegelman. Bailey agrees he was not in the room. Bailey admits he was not in the room with Scrushy and Siegelman at their meeting.

Bailey agrees he was not in the room when Young met with Siegelman in 2000 but did talk to Young after the meeting.

McDonald is going back to Bailey's time around 26 years of age and to his income and work record.

McDonald gets Bailey to confirm he was around $55,000 in debt in 1994 before he started working for the Siegelman campaign. Bailey admits he got caught up in cattle futures and incurred the debt.

McDonald is charging Bailey's path into the campaign and Siegelman's staff.

McDonald is back to Kirsch paying mortgages for Bailey even after Bailey was making a decent salary.

He has another exhibit. We're getting into talk about margin calls. McDonald is probably boring the jury. He has forgotten the Parkman rule - Don't bore the jury!

McDonald is showing Bailey's account was short on one day $35,000 and needed to have money. There is another day September 12, 2000 where Young's account was short $69,800.

There is another day short around $25,000. Another date September 27 he is short $43,000.

Bailey says he had other stock he sold to cover some of the more than $220,000 in debt.

Bailey says his salary when he was with governor's office at the highest point was in the high 90s. Bailey says he started in the lieutenant governor's office in the low 40s.

Fuller asks McDonald how much longer McDonald will be and then decides its time to take a brief recess back in a moment.

There is going to a long break for lunch between 11:20 and 1:00 today.  So there will be no blog then.  I have something else scheduled for about a half hour at 1:30 today so I'll catch back up up around 2 p.m.

McDonald is asking about people other than Siegelman who had the authority to stamp or sign Siegelman's signature.  Bailey says the signature on the construction project document was not Siegelman's.

Had to take a phone call.  Out a minute.

McDonald is questioning Bailey about his debts again.  Bailey agrees the governor did not know he was engaging in high risk investments. "Not to my knowledge, no."

McDonald has shown that Bailey got $55,000 from Young in 1996 far before G.H. Construction was even a thought and the payment of $9,200 was in 1999 a year before the G.H. Construction project.

McDonald is hounding Bailey about a statement on FBI documents that said "I stopped Lanny Young from giving Governor Siegelman $9200 because I thought that it would be inappropriate."

McDonald and Bailey are at each other about who Bailey lied to.  Bailey challenges McDonald to read a list of people Bailey had lied to and then Bailey would stop him.  McDonald started with U.S. attorneys moved on to grand juries and then to members of the prosecution team.

Bailey told McDonald no matter how he asked the questions he was going to answer the same way. There was an agreement.

Well the judge has had enough.  McDonald is through.  After lunch Paul Hamrick's attorneys get their shot at Nick Bailey.

Posted by Helen Hammons on May 04, 2006 at 09:11 AM | Permalink | Comments (2)

## What's in a Statement?

Several times yesterday Nick Bailey was asked about statements in previous trials and hearings related to whether or not he had knowledge of Don Siegelman or Paul Hamrick being members of an unlawful

conspiracy?  Each time Bailey would say "no" but wanted to say and did that that statement from a 2004 trial in Tuscaloosa was only about that particular case and did not cover all situations.

Leaving the court yesterday, U.S. attorney Louis Franklin told reporters that everyone was getting bits and pieces of the testimony and not putting things in context.  He said the jury would have the entire context and basically told reporters to get the transcript and that would prove the point.

WSFA.com got the transcript from October 2004.  The transcript is the entire direct examination  by U. S. attorney Hart of Nick Bailey.

After being sworn Mr. Hart asks questions to establish Nick Bailey's background and his positions with the Siegelman office or campaign.

Before any talk of a specific conspiracy comes up, the judge asks Mr. Bailey the following.

"All right.  Mr. Bailey, do you have any knowledge that either the Defendant Siegelman or the Defendant Hamrick knowingly became members of a conspiracy, an unlawful conspiracy of any kind?

MR. Hart:  "I would object to the Court's question, Your Honor."

The Court:  "It's overruled."

The Witness (Nick Bailey):  No, sir.

After that it does go to talk about Dr. Bobo and his relationship with the Siegelman and Hamrick.  But the question was not directly about the Bobo case.

Nick Bailey may have construed the question that way, but that's not what the transcript shows.  There where also no more questions asked by anyone with the word "conspiracy" in them.

More to come.  I think they've opened our room now.

They have not let us into our area yet, so we'll continue for a moment.

Nick Bailey stuck to his stories yesterday and at time was a very good witness for the prosecution.  The defense did not "destroy" Mr Bailey as they had hoped, but Mr. Bailey did keep trying to qualify his answers and had clearly been through a lot in five years. Only the jury will decide who to believe. Attorney Vince Kilborn said yesterday that he did not believe anyone in the courtroom believed Nick Bailey because Bailey "lied to a federal judge, he lied to a grand jury, he lied to the federal prosecutors and he lied to Don Siegelman's wife."

As to Bailey's sticking to one story, the colorful Kilborn said, "I can say that it's dark out here all I want, and I can stick to the story that it's dark out here, but that doesn't make it dark out here."

U.S. Attorney Louis Franklin was still confident in his case and confident the evidence his team was showing was going to be good enough for the jury.

They have now let us in.  More to come.  I'll come back to this later.  Court is starting.

P.S. There was a comment about nothing being posted after lunch yesterday.  That is not true.  Please read the entire post from yesterday and you will see it ended at around 5.  Typepad has been having some problems, if you still can't see everything post again.

Posted by Helen Hammons on May 04, 2006 at 08:42 AM | Permalink | Comments (2)

## Bailey Continues, The Amen Corner is Here

Nick Bailey is back on the stand and we'll get started shortly. Meanwhile, I just had a conversation with one of the member's of Richard Scrushy's "Amen Corner."  This is a group of about 20 folks who came from Birmingham as part of a group called "Special Forces for Jesus."

Self-proclaimed Gospel rapper "Big Prophet" says his contingent is led by Pastor Conner and is comprised of "friends, spiritual supporters" for Mr. Scrushy.  Big Prophet says he has known Mr. Scrushy for 4-5 years and he says the charges against Scrushy are "trumped up" and an "attack from the enemy."  Prophet says he has an album out called "God's Love" and is on the radio in Birmingham on 95.7 FM Gospel Jam.

We knew there had to be an entourage here at some point.

Questioning has begun again and McDonald is talking to Bailey about a series of letters from the bank reminding Bailey of missing interest loan payments from the bank in 1992-93.

Discussion moves to whether or not Bailey talked to any members of the prosecution team during the lunch break.  Bailey says he did not. " When is the last time you have ever talked to a gentleman named Jack Brennan? "  Yesterday replies Bailey.  Bailey says he doesn't know who Brennan works for.  McDonald says Brennan does not live in the State of Alabama.  McDonald says Brennan is employed with the TVA and has taken a vacation due to a vendetta against Governor Siegelman.  Bailey says Brennan did not tell him Brennan was on vacation.  Bailey says he met Brennan in passing yesterday coming into the courtroom. Bailey says he last had a substantive conversation with Brennan sometime in 90 days.  Bailey says he has some problems remembering dates.

Brennan is a former FBI agent.  Bailey says they talked about some information not in the document of

crimes.  Bailey says "I can't talk"  "I can't swear to anything that was talked about."

McDonald is lashing Bailey not being able to remember a conversation within the last 90 days yet being able to remember specific conversations 10 years ago.

Bailey says he has not had a conversation about how much time Nick Bailey is going to get and prison never came up in talking with Jack Brennan.  McDonald has been directed to ask a question by Judge Fuller, "We are not going to bandy back and forth in this courtroom."

Bailey is being asked about Matt Hart.  Bailey says Hart is an employee of the government and he talked to him in Birmingham but he can't remember the date or substance of the conversation.  Hart helped bring the Bobo case against Siegelman.  Hart is an assistant U.S. attorney.

"There were a lot of things to look at...so yes we spent some time together," says Bailey in questioning about a meeting with federal government investigators and others.

It's chart time.  The chart is a schedule of meetings between Bailey and federal investigators.  The first meeting is December 21, 2001.  Bailey agrees he was a target of the investigator.  He had taken a number of bribes by then.  Bailey agrees he hired George Beck to defend him against those charges.  McDonald calls Beck "one of Alabama's finest attorney."

Bailey hired Beck in May.  Sometime between May and December there was a decision to meet with prosecutors.  Bailey says he knew it was a possibility the feds had something on him.  Bailey agrees he wanted to cooperate with the government so they would not bring charges against him.  Bailey agrees that if charges were brought he wanted to meet with prosecutors to minimize the charges to be brought against him.

McDonald says there was a court reporter who took down a transcript at the December 2001 meeting.  Bailey agrees there were at least a dozen people in the room who asked some very pointed questions.

McDonald says Bailey was asked at the meeting about Kirsch.  Bailey said he told them he was not involved with Kirsch.  But the government had the mortgage check.  Bailey was asked about work on his house from Kirsch and he said no and the government indicated Bailey was not telling the truth.  Bailey agrees he lied to the federal people also about his relationship with Young.

Bailey says attorney Hart wanted information "about our administration."

Bailey says Hart was "passionate in his questioning."  Bailey says he and his attorney went to talk about G.H. Construction and Hart started asking about other things involving Governor Siegelman.  "It was our understanding we were there to talk about the G.H. Construction  Company."

Bailey says Siegelman had limited knowledge of G.H. Construction.  Bailey says the government never

really got around to G.H. Construction.  "What he really wanted to know about was the motorcycle," says Bailey.

McDonald says in reference to allegations from Hart, Bailey said "No Mr. Hart I borrowed money from Mr. Young so I could buy a motorcycle from Gov. Siegelman."

McDonald is now saying the next meeting was June 2003.  He now is talking to Bailey about how much time Bailey might have to spend in jail and whether or not he thought about it.  Bailey says he hasn't had a good night's sleep since early 2001.

Bailey says he is not sure about any other meetings.  Bailey agrees his attorney was having conversations with prosecutors between those two meetings.  He says his attorney talked with them about the status of the investigation.

McDonald says plea agreement reach with government on June 23, 2003.  Bailey agrees he pleaded guilty to conspiracy with Lanny Young, taking money from Kirsch, one count of tax fraud about failure to report one of the bribes.

Bailey says he got a tax notice based on Eddie Curran's story in the Mobile Press-Register and he has paid the notice.  Bailey agrees he has not gotten notice of any prosecution in regards to the $100,000 he failed to pay taxes on.  "I didn't fully read the notice," says Bailey.  Bailey says he sent a check to the Alabama Department of Revenue and his attorneys will file appeal on the notice later.

McDonald is now talking to Bailey about telling the truth and testimony of October 4, 2004 in front of Judge Clemen, Chief Judge of the Northern District.  McDonald says Fuller is too "young and handsome" to be a chief judge.

Bailey says he met with different prosecution team members at different times in preparation for the Tuscaloosa trial.  Bailey says no one in the room participated in that trial.

Bailey agrees he had not been sentenced for crimes committed three years earlier.

McDonald is relating transcript material about a conspiracy with Gov. Siegelman and others.  Bailey says his answer was "No sir."

Bailey keeps saying there was a reason for his answer and McDonald says we'll take that up later.

McDonald says "Mr. Feaga was sitting in the front row of that trial."  Feaga rises and says no "I was sitting in the back of that courtroom."

Bailey says he stands corrected about there being no members in this courtroom that were at the trial in Tuscaloosa.  Franklin was also sitting in the back of that courtroom.

McDonald is hitting hard on Bailey's answer that Bailey had no knowledge of unlawful conspiracy involving Siegelman and Hamrick.  "In regard to that trial about Mr. Bobo, I said no."

We're in another meeting between the judge and attorneys.

We're back.  McDonald is asking about what happened in court on October 4, 2001 and who Bailey spoke to leaving the court that day.  McDonald goes back to Brennan working with both prosecuting teams.

McDonald asks if Bailey heard either prosecution team after his testimony in the October 4, 2004 say anything like "We better stop going after an innocent man."

McDonald is moving on now to a September 7, 2005 meeting.  He has changed his mind and we are going to take an afternoon recess at this time.

We're getting ready to resume.  Had a short conversation with a non-interested party who was in the courtroom who confirms suspicions in our room that Bailey has been looking at his attorney Beck during Bailey's testimony.

McDonald is questioning why Bailey hasn't served time for crimes committed in the past.  Bailey agrees he hope's to get a "good recommendation" for "telling the truth."

Bailey agrees the prosecutors will make a recommendation concerning his sentence.  McDonald says that one of Bailey's fears are that somehow members of the prosecution team will determine you have not testified truthfully.  Bailey says he is nervous but has no concerns that the prosecution team will find his testimony untruthful.

"I hope and believe when I tell the truth these folks will give me a positive recommendation to the court."  says Bailey.

McDonald is now moving on to the Certificate of Need board.  Bailey agrees McDonald has established him as a gofer for Siegelman.

McDonald says Siegelman directed Hamrick to handle the appointment to the CON Board.  Referring to Siegelman McDonald says,"It's like George Bush says, he's the decider."  Bailey agrees Siegelman made the ultimate decisions.

Bailey agrees he knows Scrushy was a very wealthy man and a philanthropist.  Bailey says he knew Scrushy had given a lot of money to the people of Alabama.

McDonald asks Bailey if he was involved in the health care field. Bailey says no and on other questions he says he hadn't given it any thought as to Scrushy's qualifications to be on the CON Board.

Bailey agrees that he knew Scrushy served on the board during the James administration but he didn't know about Scrushy's service under other governors.

McDonald is asking about Margie Sellers and her qualifications. McDonald asks about interviews Bailey had with the feds and discussions about who should be on the CNN Board.

Bailey says he never discussed qualifications. Bailey acknowledges he has no qualifications to determine who should sit on the CON Board.

Bailey agrees he was involved with Siegelman in the race against Fob James. Bailey agrees he knew Scrushy was a supporter of Fob James.

Questioning is turning to possible meetings between Scrushy and Siegelman. Bailey agrees he did not sit in on most meetings between the governor and those who went in and out of the governor's office although he was "generally aware" of who the governor was meeting with.

Bailey says there may have been two meetings but he is not swearing there were two meetings between Siegelman and Scrushy.

McDonald is asking about the date of the first meeting between Scrushy and Siegelman. Bailey says it was mid '99. "It was June or July."

Bailey says he has had discussions with the government about the date of a meeting with Scrushy.

McDonald says he's not accusing Bailey of any wrong doing in regard to the government showing Bailey calendars and flight logs and the date July 14, 1999. Bailey says the government has not asked him to say anything other than the truth.

McDonald said there's no dispute that Siegelman and Scrushy met. Scrushy says June 29, 1999 the government says the meeting was on July 14, 1999.

McDonald is showing a diagram that Bailey agrees is in his handwriting. Bailey agrees he was talking to federal investigators about the meeting. Bailey agrees he was asked to outline the governor's office on the day Scrushy met with Siegelman.

Names on the outline Richard, Loree (Skelton), Eric (Hanson). Also, Nick Bailey. McDonald asking about Bailey, Siegelman relationship "almost like a son."

Gina Friday was a secretary and her name was on the outline.  Maryland Roe the governor's secretary was seated near Scrushy.

The governor's security staff was also on the outline as well as another secretary.

The emergency siren is going off. The judge explains to everyone that "Every Wednesday at 3:30  the siren in Montgomery is tested.  That's a good thing."

Bailey agrees Scrushy went in the office to meet with the governor and everyone else stayed outside.  Bailey agrees after Scrushy left the office Bailey walked in.  "That day I was clear to my recollection."

McDonald to Bailey, "You were crystal clear Governor Siegelman opened his coat pocket and pulled out a check.  You are crystal clear Governor Siegelman pulled a check out of his pocket and handed it to you.  You were crystal clear that the amount on the check was $250,000.  You were crystal clear Richard Scrushy signed that check.  You were so crystal clear you went to a jury.  You were crystal clear you swore to tell the truth.  You were so crystal clear that this check signed by Richard Scrushy and given to Governor Siegelman you went to a grand jury for a second time.  You went to a jury and told that jury that Richard Scrushy delivered a check to Governor Siegelman's office on July 14, 1999... but it wasn't true was it."

Bailey says I will agree it was not there possibly on the 14th.

McDonald asks Bailey if he knew the check never hit Alabama until after July 20th.  McDonald says he has no evidence to contradict Fed Ex records that the check was not delivered until sometime after the 19th.

Asked about Siegelman thinking about appointing Scrushy to the board well before the meeting, Bailey responds, "Sometimes you borrow and shop before you buy,"

The second superseding indictment is brought to Bailey for review page 8 paragraph 19A.  Richard Scrushy did and would pay to Don Siegelman $500,000 in two disguised payments of $250,000.

Bailey says the checks were written to the Alabama Education Foundation.  Bailey says the purpose of the organization was to pass the governor's lottery.  Bailey agrees Siegelman's record indicates support of education in Alabama.

Bailey agrees the foundation started as the Alabama Education Lottery Foundation.

Bailey says he helped found AELF.  He says he assisted in the fund-raising in the lottery campaign.

Had to step out to take a call.  Just now coming back in.

Talk has turned to Margie Sellers and the CON Board.

Got any idea how much Alva Lambert paid for his position?

"What did Mr. Scushy accomplish once he got on the CON Board which was worth $500,000?"  Bailey says he didn't keep up with the actions of the CON Board so he couldn't say.

"Which conspiracy are we talking about," says Bailey.  Now Bailey says he believes the conspiracy began in 1994,  (Siegelman, Hamrick, Young)

How did Paul Hamrick introduce you to Lanny Young?  Primarily as a campaign contributor.

Bailey says he met Young in spring 1994.  Bailey says, "The conspiracy evolved over time ...when Lanny started giving us things in return for favors."

Bailey is adding information not asked for in his answers and has been admonished by the judge to simply answer the question about the plane.

McDonald is asking if Young even owned a plane in 1994.

Bailey agrees he has no evidence Young even owned an airplane.  Bailey says that "it started out salaries, gifts, and plane rides that evolved over time."

McDonald is asking about salary or money paid in 1994 became a basis of this alleged conspiracy. Bailey says he doesn't know of anything.

"If Paul Hamrick was paid a salary by Lanny it benefited Gov. Siegelman," says Bailey.  He says he does not know the amount.

McDonald is moving to 1995.  McDonald is asking about Young owning an airplane in 1995.  Bailey says no he doesn't have evidence.  Money, bribes anything in 1995. Bailey says he can't recall.

1996.  Any money from Lanny Young to Gov. Siegelman, bribes or otherwise? asks McDonald.

No.

1997 any bribes from Lanny Young to Gov. Siegelman.  "I'm not sure when any of these things occurred."

In 1998 I believe that was when my salary was paid by Lanny Young, says Bailey.  Lanny Young didn't report the payments to the federal government.  The reason I believe he did it was to conceal that

payment to me," says Bailey.

1999 any bribe? Not that I'm aware of.  2000? No.  Then Bailey says he believes January 2000 was the $9200 and the motorcycle.

More talk of 2000,2001,2002,2003. Bailey says No evidence of bribes.

Talk now turns to the "absolute agreement." This is the core of the conspiracy charges.

McDonald wants to know where the sketch is at that depicts the meeting that started the conspiracy. Bailey says it is not necessary to write anything down.

Bailey is attacking back.  "There is not a single e-mail in any shape or form that shows there was any conspiracy that you engaged in some conspiracy with this man to deprive the citizens of Alabama of honest services or other unlawful conduct," says McDonald.

We're back to the motorcycle.

There was talk about conversations between Siegelman and Bailey about the governor's wife being upset about the purchase of the motorcycle.  McDonald says Siegelman is doing what any husband would do and trying to make his wife happy.

Our provider went down again with problems from a denial of service attack.  We're at a break in the action with disputes over a bill of sale document among other things.

We're back again after another meeting.  Bailey agrees the bill of sale was signed in early 2000 when he gave the bill of sale to Gov. Siegelman.

McDonald is going more into what he says has been characterized by some as a "motorcycle cover-up."

Exhibit added showing check made out to Siegelman's wife.

Bailey agrees he had no criminal intent in making out the check to the governor's wife.

Bailey agrees he had no nefarious intent when he wrote the check out to Siegelman's wife because the governor asked him to.

Talk has turned to conspiracy between Bailey, Young, and Siegelman.  McDonald brings up Gina Friday who drafted a document.

"I have not organized that many conspiracies," says Bailey.

Bailey agrees he wrote the check at the direction of Gov. Siegelman.

Bailey is asked if fiery describes the Governor's wife.  Bailey says, "Yes sir."

Bailey is asked about Mrs. Siegelman's accident where she nearly bled to death.

The Judge wants to know where "we're going into this."

The U.S. has not made any allegation against Mrs. Siegelman.

The judge wants it kept to the 34-counts in this case.

McDonald says that the government's allegation's don't make sense.  They are accusing this man of a crime and I want to describe how absurd that is with what they have been through.

Bailey is asked about telling the government that it was Bailey's idea to get an ATV to get Lanny Young to buy a 4-wheeler for the governor's son.

Bailey says the governor did not say, "Nick get Lanny Young to buy a 4-wheeler."

McDonald asking about inventory  from the mansion.

Another discussion.  We're getting close to the end of the day and I think everyone is ready.

We're back to mansion inventory and a review when Siegelman took over from Fob James.  Bailey says there were a lot of items missing.  He agrees he is familiar with the inventory.

More arguments about documents.

First bill of sale from 2000 coming back up.  Shortly after the motorcycle was purchased.  Bailey agrees he bought part interest in the motorcycle for $9,200.

McDonald says Bailey had a meeting about what to do with what to do with the motorcycle Bailey had used to buy the motorcycle. The meeting was with Bobby Segall, president of Alabama Bar Association at the time.

McDonald says and Bailey agrees that George Beck, Governor Siegelman and Bobby Segall were at the meeting and that Bailey says he was going to buy 50% of the motorcycle.  McDonald says they agreed Bailey could buy the rest later if Bailey wanted.

Bailey agrees that bill of sale is one made at the meeting. Another document is shown signed by all parties finalizing the motorcycle sale from the governor to Bailey. Bailey agrees he lied to George Beck and Bobby Segall.

McDonald asks why the jury should believe anything Bailey says. Bailey says that if McDonald thinks Bailey would lie to cover his own ass McDonald does not know him very well.

Bailey says he lied to protect people. Bailey agrees he lied to Judge Clemen but that now he wants to tell the truth. "You can keep asking it because that's my last answer of the day too."

Did you lie to Chief Judge Clemen about the conspiracy. "In regards to the Bobo issue no."

Starting over at 9 a.m. more to come in due course.

Posted by Helen Hammons on May 03, 2006 at 01:11 PM | Permalink | Comments (4)

## Bailey Questioning by Defense

David McDonald is questioning Mr. Bailey for the Siegelman team. McDonald says Bailey has spent five years of Bailey's life being questioned by the defense. McDonald asks Bailey if he has been coached. Bailey says no. Bailey is asked if the testimony he has given to Steve Feaga was completely different than the testimony Bailey gave on Dec. 21, 2001. McDonald says we're going through every bribe you've ever taken.

Nick Bailey smarts off at McDonald, "Do you want me to write this down?" Bailey says he took $55,000 from Lanny Young. In 1998, Bailey took $19,000 from Young. Bailey says that was salary for the campaign. Bailey says he did not report it on his tax return and filed a false statement with the IRS.

Bailey says he needs his memory jogged. Bailey is asked about $20,000 in the year 2000.

Bailey is asked about meeting Young in cars and being given money in bags in amounts from $3,000 to $7,000 to $10,000 in cash. Bailey says this didn't happen.

McDonald asks if Bailey would like to see his plea agreement with the federal government after he asks Bailey if he got at least $100,000 from Young over time.

Questioning turns to architect Curtis Kirsch. Kirsch allegedly gave bribes to Bailey in the G.H. Construction project fiasco.

The defense gets Bailey to say Kirsch took over construction of property Bailey owned.

Kirsch according to a plea agreement Bailey pleaded to accepting over $21,000 worth of services from Kirsch.

Siegelman defense wants to enter plea agreement into evidence for the jury.  Paul Hamrick's attorney is objecting to something and there is another sidebar.

Bailey finds something in the courtroom amusing as he is sitting on the stand laughing as we all wait for the sidebar to end.

Exhibit has been admitted.

Exhibit shows Kirsch gave Bailey over $21,000 in the form of his services or services of others.  Kirsch also paid other contracting debts amounting to $17,000.  The defense also shows where Kirsch paid $1,000 in utility bills.  Bailey is being asked about mortgage payments of at least $1,000.  Bailey says there may be others.

Next up on McDonald's list.  Bailey's financial relationship with Jim Lane, who Bailey confirmed was trying to get a $400,000 contract with the state was renewed.

Bailey says Lane "loaned him $30,000."  Bailey says he has repaid this loan. Bailey was asked who helped him repay the loan.  He says he did not pay it back with money he earned from the state.  Bailey says neither Young, Gordan, Milton McGregor or Anthony Fant gave him any money to pay back this loan.

Bailey is asked about a $20-25,000 loan. Bailey says he can't say for sure he paid it back.  Bailey says he did not pay it back from his salary.

Bill Gordan works for Jim Lane.  Bailey says he doesn't recall Bill Gordan giving him a nickle.

Milton McGregor's name is coming up.  Bailey says he got 4 tickets to a Las Vegas show from McGregor.

Anthony Fant is the next name to come up on the "list."  Bailey says he doesn't remember how much money Fant gave him.  The defense mentions the sum $50,000 and Bailey says he can't argue with that at the moment.

Bailey says he benefited from $50,000 from Keith "Tack" Mims although Bailey says he didn't get the money directly.  Bailey agrees Mims gave a loan to Trava Williams on a real estate transaction where Williams bought real estate from Nick Bailey.

Bailey agrees he got about $200,000 in the form of bribes on which he paid no taxes.  In response to the statement "It's not a bad days work" from McDonald.  Bailey waits and then says,"I'm not sure what

you're getting at."  McDonald says he's talking about money made from other than "legitimate" work he was doing with the state.  Bailey responds,"It's all relative."

Bailey asks for a restroom break.

The court is back in session and the judge is reminding the jury to bring up any contact with persons related to the case outside the courtroom to talk to the marshals.  Something was brought up as to a possible relation of an individual mentioned by Nick Bailey but not named on the witness list.

Bailey is being questioned about Jim Lane again. He is now being asked about meeting with the FBI and the summary of events presented by the FBI.  Bailey is being asked about a meeting with the FBI on June 5, 2003.

McDonald returns to money from Lane given to Bailey.  Bailey says what he said back then was what he remembered back then was what he remembered back then and what he remembers now is what he remembers now.

McDonald says $70,000 given to Bailey from Lane and reads a description from FBI document that says Lane on at least three different occasion gave Bailey money in addition to borrowing money from Lane he got a salary from Lane during the campaign.

Bailey admits as true the following:

From Lanny Young he received:  $55,000 in 1996, $19,000 in 1998, $20,000 in 2000 (no taxes paid on any of that).  Bailey has admitted to getting over $100,000 from Young so there is more money not listed.

From Anthony Fant, Bailey admits he received $50,000. Bailey says he doesn't know whether or not he paid taxes on the money.

Curtis Kirsch paid Bailey as agreed to by Bailey's testimony:  $21,000 in cash and services, $17,000 in form of housing fix-up, another $1,000 for utility bills, $1,000 in mortgage payments other payments questioned.

Bailey agrees he got $20,000 from Lane and paid no taxes on one payment.

Bailey says the money he got from Lane for working on the campaign from Young should have been reported on the Fair Campaign Practices Act.  Bailey says the campaign disclosure responsibility belongs with the governor as an in-kind contribution.

The second $20,000 Bailey agrees he did not report on his tax returns from Lane.

Bailey is asked if he told Gov. Siegelman about the $55,000 he was given by Lanny Young. Bailey replied, "No."

Bailey asked about the $19,000 salary he got from Young says if he got paid during the campaign from Young Siegelman knew it. Bailey agrees Siegelman got none of that money and reaffirms that he never told Siegelman about the $55,000,

Bailey agrees Siegelman knew nothing of the more than $100,000 he received from Young except for the $19,000 salary part.

Bailey says he didn't tell Siegelman about the money he got from Fant and that Siegelman got none of it.

Bailey reaffirms he paid no taxes on the $21,000 he got from Kirsch nor did he tell the governor nor did Siegelman get a penny of the money. He agreed to the same on work provided by other contractors. The amount of work on Bailey's house was $17,000. Bailey also agreed the same as to the utility payments and mortgage payments.

As to the $30,000 from Lane Bailey admits he did not tell the governor nor did he give him any of the money. The same as to the around $20,000 paid in salary.

Mr. Bailey can you tell me what the difference is between an absolute agreement and a conspiracy?

Objection from prosecution. "I have to know the difference between agreement and conspiracy so I know how to talk to these good folks on the jury so they don't get confused," says McDonald. The objections was sustained. The question will not be answered.

McDonald gets Bailey to say he entered in the agreement with Siegelman, Hamrick and Young in 1994.

N ow McDonald is taking Bailey back to the start of his working life as a loan officer at a bank in Cullman making about $25,000 a year.

Bailey admits he was significantly in debt in 1992-93 even though he was only paying the interest on a loan from First Alabama Bank. Bailey then says he does not remember missing payments and then admits he got letters from a loan officer at the bank, Larry Holt, asking him to pay.

Bailey admits he was in the cattle futures market and he had lost at least $55,000. He put a mortgage on a family piece of property to pay the debts.

Bailey says he met Siegelman for first time in late 1993. Bailey says he thought the lottery was a great thing for Alabama.

"I got lucky and his driver got sick and I got to drive in the campaign," said Bailey.

"I like to think that I was (a part of the inner circle of the campaign." "I respect him a great deal and still consider him a friend," says Bailey.

McDonald says Siegelman treated opponents with respect.

Now McDonald is going into the facet of Bailey's job that involved helping to collect the business cards of people who wanted to help the governor. Bailey says that's a fair assessment. Bailey agrees he would take the pictures people wanted taken with the governor. "You were a gofer," says McDonald and Bailey agrees.

Bailey disagrees with the assessment that he had nothing to do with the policy direction of the campaign.

Did you enter into an agreement with that man that you were going to do anything illegal or improper? Judge asks McDonald to restate the question. "Did you enter into any agreement in any form whatsoever in 1994...that when you got into office was illegal or unlawful?"

McDonald had previously called Bailey a chief business card holder and tie straightener. Bailey asked if that included the title of chauffeur.

Bailey says he does not know if he reached agreement with Siegelman and others about performing anything illegal as regard to Lanny Young. Bailey says he can't say whether the agreement was 1994 or 1995.

McDonald infers Bailey may have been coached. "Did you Nick Bailey in 1994 ever reach an agreement  with this man who you stay you still love and respect that if he got elected to office he and you would do anything illegal as you define illegal? Response from Bailey no.

Lunch break coming. McDonald says he expects to have 1-1.5 hours left in the questioning of Bailey.

Posted by Helen Hammons on May 03, 2006 at 09:34 AM | Permalink | Comments (1)

## Here We Go Again

Everyone is in place and we're ready to go. Nick Bailey has taken the stand to resume his testimony and the judge has entered the room.

Steve Feaga is ready to start. Feaga starts with the meeting with Jim Allen and Mack Roberts. Bailey is not sure that he has seen the checks written by Allen. Bailey says he had no part in accepting those contributions.

Bailey says he opened a bank account and met with Mr. Scrushy at HealthSouth and picked up a check for $250,000. Gov. Siegelman was with Bailey. Bailey deposited the check in the account at First Commercial Bank.

Bailey says he does not know when the deposit happened. He said on questioning by Feaga that it was after the failure of the lottery referendum.

Bailey says a check from IHS and a check from Scrushy was not reported under the Fair Campaign Practices Act to the Secretary of State. Bailey says the governor told him Scrushy didn't want his wife to know he was supporting the Alabama Education Lottery.

The Scrushy defense team has stated previously Scrushy had a moral objection to contributing to the lottery himself.

Bailey says he worked at ADECA until the G.H. Construction project ended and then was pulled back into the governor's office.

Questioning has now turned to Rainline and after Mack Roberts was highway director. Baxley is objecting to the method of questioning. Another sidebar is underway out of our hearing range.

Questioning resumes Bailey is being asked about Rainline. Bailey says he was told by various people in road construction that the state could be using other products besides Rainline. Bailey says he talked to the governor who told him, "I will talk to Mack Roberts and he will take care of it."

Questioning has returned to Anthony Fant and Bradshaw House Galleries. Bailey says the governor's campaign owned stock in a Fant interest called ATII. Bailey said he was not sure the governor had stock in the company.

Bailey is asked if Eric Hanson told him what Richard Scrushy wanted from the governor. Bailey says "control of the CON Board." The prosecution has entered into evidence the check from HealthSouth dated 5/18/2000. He says he did not pick the check up but it was given to him by the governor. He did not participate in the meeting where the governor got the check. He did not make an endorsement on the check to deposit it. He can't recall if he had a deposit slip. Bailey says he saw Scrushy at Scrushy's office at HealthSouth. He has no recollection on the date the check was received. Bailey says he did not participate in any discussions with Scrushy about the check. Bailey says Siegelman went into the office with Scrushy.

The defense has turned Bailey over to the defense. There is a motion being discussed at the bench with the judge.

New post time.

Posted by Helen Hammons on May 03, 2006 at 09:04 AM | <u>Permalink</u> | <u>Comments (0)</u>

# Bailey Part II

Here we go again.  We're about 25 minutes or so before the resumption of testimony in this case.  Nick Bailey will be back on the stand.

As to the WWF confrontation that seemed ready to break out in the courtroom Tuesday between U.S. attorney Louis Franklin and Scrushy attorney Terry Butts.  Butts tells wsfa.com that if it had come to it, it would have taken him three minutes to end it.  As for U.S. attorney Louis Franklin, you have to give him credit.

Franklin was not looking to answer questions as he came out of the building yesterday but when cornered by the converging press, all of whom escaped their designated pen, Franklin admitted he was getting a bit frustrated at defense tactics,"They had been digging at us all day," said Franklin, "It just finally boiled over."

As for the defense, attorney Fred Gray representing Richard Scrushy, told wsfa.com "We are not trying to frustrate anybody."

Scrushy attorney Art Leach said yesterday he believes prosecutors will take about another hour with Bailey before the defense takes their turn.  Leach said he expects most if not all the rest of the day to be taken by the defense's questioning of Bailey.

Now as to Bailey. At times he was very believable on the stand yesterday, but at other times he sounded like he was unsure, especially about times and places and he even sounded on a few occasions as if he had been coached.

Bailey will be under fire after the prosecution gets through with him today.  Siegelman attorney Vincent Kilborn said yesterday the defense was going to "bury Nick Bailey."

This case is probably going to come down to believability.  The only people that may have a clue as to what the jury is thinking at this point are the attorneys who by now have gotten as much information as they can get their hands on about each juror.  Will the jury buy the argument the prosecution's witnesses are just trying to get themselves out of trouble or will they buy the prosecution's argument that there was a grand conspiracy run by a mafia like group headed by the former governor.  As to Scrushy, will they buy the story of 'it's just a campaign contribution" or will they believe Nick Bailey when he says there was a quid pro quo.  Who knows.  Stay tuned.

The scorecard from yesterday is simple.

The Prosecution:  +-  Picked up some points with Bailey's testimony.  Lost points on the same testimony.  Lost points for another explosion by an attorney, but how long will the jury remember that?

The Defense +-  I think folks have had enough of Art Leach's objections.  The strategy could backfire, even though Leach told wsfa.com yesterday he was below his objection ratio of 2-out-of-3 questions.  The defense was helped by Bailey's inconsistency with prior testimony and by the fact sometimes Bailey could not be specific about where and when events happened. They may have been hurt though by the things Bailey did remember clearly.

Stay tuned, more action to come shortly.

Posted by Helen Hammons on May 03, 2006 at 08:57 AM | Permalink | Comments (0)

## Nicholas Bailey Time

Nicholas Bailey is on the stand and we will be starting in just a minute.  During the lunch break former governor Don Siegelman, answering questions from the press, said U.S. attorney Louis Franklin was in Siegelman's words, "losing it."

Judge Fuller just said, "We're not going to lose our sense of humor."

Steve Feaga is starting the questioning.  Feaga is talking about Bailey's plea agreement with the U.S. government and he is asking Bailey if he understands the government will make a recommendation concerning sentencing in his guilty pleas already entered."

Bailey looking a bit nervous on the stand.

Feaga is now talking about the Fall of 2000.  Bailey says he saw Young "too often, frequently."  Bailey was asked about dinner meetings involving Young and who picked up the tab.  Bailey, after a long pause, said Young picked up the tab " because he wanted too."

Feaga is now asking about Bailey's duties and responsibility at ADECA.  Bailey says he oversaw over $200 million in grants.

Bailey says his opinion is Young contributed in excess of $250,000 to the Siegelman campaign in various forms.  Objections are over Bailey's knowledge.  Bailey says he flew on planes provided by Young.  Bailey says there were two or three donations in excess of $20,000 to the campaign.  Objection again to Bailey's knowledge.  Judge says Bailey was integrally involved in the campaign and could say based on firsthand observations about the contributions.  "Based upon what I saw and heard I have no reason to believe his estimate of $350,000 is wrong."  Bailey was talking about Lanny Young.

Feaga is asking Bailey what the government has asked him to do?  Art Leach is objecting.  His objection is overruled.  Bailey answers "to tell the truth."

Bailey is being asked about how he met Gov. Siegelman and what his duties were.

Bailey characterizes himself as both a friend and employee who spent more time with Siegelman than anyone else except Siegelman's wife and children during the 1994 campaign.

Bailey says he talked to Paul Hamrick and asked him whether or not Lanny Young was paying his (Hamrick's) salary and Hamrick told him Young was paying his salary."  Feaga is asking about campaign contributions from Lanny Young and Bailey says Young perhaps contributed over $100,000 to the campaign in funds, travel and other things.

Bailey says after a question he was a "confidential assistant" to Siegelman when Siegelman was lieutenant governor.

He is being asked by Feaga how often he saw Lanny Young.  Bailey's reply is every few days.  Bailey says he and Hamrick "ate, drank, and hung out with Lanny a lot."

Bailey said Young was with the governor at least once a week.  Bailey says Siegelman told him that he (Siegelman) knew that Young was a contributor to the campaign.

Questioning turns to the Talladega Superspeedway alcohol sales legislation.  Bailey says he talked to Hamrick about the legislation.  Bailey says he talked to Governor Siegelman about the legislation.  Specific date is August 1997 as told by Feaga, but Bailey says he can't be sure of the date.

Objections are overflowing in the courtroom, most of them are being overruled.

Bailey says Lanny Young told him, he wanted credit for the beer sales legislation at Talladega when the Bill passed.  Bailey says he was in presence of Siegelman, speedway officials, when Siegelman gave Lanny Young credit for getting the legislation passed.

Bailey says he traveled with Siegelman and sometimes Hamrick to the speedway with the assistance of Lanny Young.

Feaga has moved on to questions about 1998.

Bailey says he was paid $1900 a month by Young and was also paid by Jim Lane.  Bailey says this allowed him to work in the campaign.  Bailey says his duties were administrative, fund-raising.  He says he traveled with Siegelman to all 67 counties.  Bailey says he spent more time with Siegelman during the 1998 campaign than anyone.

Sorry we had a glitch in the system. Bailey has testified Young contributed about $250,000 in money, merchandise, transportation. He says Young told him that was how much he had contributed. After numerous objections the judge said he would allow testimony by Young as to Bailey's firsthand knowledge. The judge has ruled the prosecution needs to get specific about who "we" is in the conversation.

Bailey is now testifying as to his knowledge of the Cherokee County landfill situation. Bailey says he talked to Young who told him, Young want the administration to make calls for him to Cherokee County to help make the deal happen. He said he could not say he discussed this with the governor, but that Lanny Young brought Probate Judge Jordan to meet with Siegelman. He says he can not say for sure the Jordan met with the Siegelman, but he knows Phillip Jordan met with Hamrick in the lieutenant governor's office in 1995-1996.

Bailey does not often sound sure of himself and seems not to want to give or perhaps not know specific dates many events took place.

Bailey says after Siegelman became governor he served as "executive secretary."

Bailey says Lanny Young delivered him a report and "asked if I would discuss it with Jim Hayes (Revenue Commissioner) to see about a favorable ruling for Waste Management."

Bailey says Siegelman told him to "help Lanny." "The governor approached Jim Hayes and I and asked what we were discussing and the governor said 'help him if you can.'"

Bailey says he went with Lanny Young and the Governor to meet with Waste Management officials in 1999 at dinner in Montgomery and a sporting event meeting. The governor, Claire Austin at an event coordinated by Young and Austin. He also mentioned Chuck Compagnee (sp) of Waste Management and says Austin was also representing Waste Management.

Bailey says he, the governor, Young, and Hamrick had an agreement and understanding as to Young's access to the governor.

Talk has turned to fall of 2000 and Bailey's role as acting ADECA Director. Bailey says he administered over $200 million dollars in grants.

Bailey says he selected Lanny Young to build warehouses that would be great for the state. Bailey says Hamrick and Siegelman ultimately signed off on the Goat Hill Construction project which was ended when Eddie Curran started writing stories about the effort and raised questions of impropriety.

Bailey says the agreement to do things for Young lasted until at least 2001. When asked why, Bailey says "he helped us when we needed it." Bailey says he was given about $25,000 to invest in real estate.

Talk has turned to the motorcycle the governor wanted. Bailey says Siegelman ordered a motorcycle from Honda at a Detroit auto show and had it delivered to a Honda dealer in Montgomery. Bailey says the governor paid for the cycle with a personal check approximately in December 1999 before Christmas.

We're having a few lawyer conferences with the judge at the moment. We went straight into break from the mini-conference.

Questioning has resumed. Bailey is questioned about vouchers to pay Young for G.H. Construction project dated February 01.

Bailey says project ended in a short time after that.

Roughly $80,000 was the amount of one voucher according to Bailey.

Bailey is being asked about money Young owed to someone Anthony Fant(sp) of Bradshaw House Galleries, former treasurer of Alabama Democratic Party, in the amount of $100,000. Bailey says he asked Young to repay the debt and described the conversations as "not friendly."

Bailey is talking now about a check from Lanny Young to Bailey and another check from Bailey to Lori Allen in the amount of $9,200. The cashier's check from Lanny Young to Bailey was for $9,200. The check was dated January 20. Bailey says it was after Siegelman purchased the motorcycle. Bailey says he asked Young for the check. According to Bailey the governor and Lanny had a meeting at the capitol sometime between December when the governor bought the motorcycle and when the check was written. Bailey says Young told him he (Young was going to be a partner with the governor) on the motorcycle. Bailey says Young told him the governor asked him for $9,200.

Bailey says he "made the suggestion to Young" that Young give the money to him rather than directly to the governor.

Bailey says the governor asked him to make the $9,200 check out to Lori Allen, the governor's wife.

"I believe I gave the check to the governor's secretary," said Bailey.

"The governor approved the lease," says Bailey talking about the warehouse development project. Lease allegedly signed in December 2000.

Questioning now about 4-wheel vehicle delivered to governor's mansion in December 2000. Bailey says Young delivered the ATV to the governor's mansion according to Bailey. Bailey says the governor told him it would be good if Siegelman's son Joseph had a vehicle to ride with Lanny Young's son. Bailey says he then suggested it to Young and the vehicle was delivered. Bailey says he later told the governor the vehicle should be property of the state.

Bailey says Siegelman's legal adviser in December 2000 may have signed Governor Siegelman's name to a check related to the G.H. Construction project.

Bailey is being questioned about a check from himself to Lanny Young in the amount of $10,503 and some cents for "repayment of loan" plus interest. The check is dated June 5, 2001. Bailey says he found out about an investigation going on involving Lanny Young and Bailey says he wanted to help Young by repaying him. "I don;t think there was anyone in our administration that didn't know about it." (The investigation).

Bailey says he talked to Siegelman about the investigation and the plan was to say he borrowed money from Lanny to take part ownership of the motorcycle and then pay Lanny Young back the money he paid for the motorcycle but disguise it as a loan plus interest.

Oops! Steve Feaga just called Nick Bailey - "Lanny Young." Bailey said, "I've been called worse."

Sorry folks we've lost some stuff due to the gremlin in the courtroom.

Bailey talked of a $2,973.35 check he wrote to Siegelman on October 16, 2001 to "finalize the plan."

The check comment said "balance due on motorcycle." Bailey says the check payment occurred at law offices.

Now they are talking about Mack Roberts and Jim Allen and an agreement to make a $40,000 contribution. Bailey says Roberts and Allen met with Siegelman and then Bailey met with Roberts and Allen.

Feaga says Jim Allen was backing Fob James prior to the meeting and Bailey agrees with him.

Bailey says he was present at a meeting with Don Siegelman. At the meeting the governor allegedly met with Richard Scrushy consultant Eric Hanson. Bailey says the comments made by the governor were Scrushy had given $350,000 to the Fob James campaign and to make things right Scrushy needed to contribute at least $500,000.

Feaga says the prosecution has the timetable "narrowed down to between January 1999 and July 26, 1999."

The judge keeps overruling defense objections. Bailey says he saw Scrushy at the governor's office but he can't remember the date.

Bailey says he saw the check in the area of the governor's office and the governor told him Mr. Scrushy was "halfway there." Bailey says he asked the governor what Scrushy would want for that and the

governor told him a seat on the CON Board.  Bailey says Siegelman asked him if there would be problem with that and Bailey says he said, "I don't think so."

Check was dated July 19,1999.  Feaga mentions Scrushy was appointed to the board a week later.

Sorry we've missed some more stuff.  Bailey is being asked if he ever observed Scrushy at the governor's office.  Bailey says he did not physically see Scrushy hand the governor the check.

Bailey says it was after a meeting between Scrushy and Siegelman that Baily saw the check.

Art Leach is in one of his usual 2-out-of-3 question objection periods.

Bailey says he told the government initially that it was the day Scrushy met Siegelman that the check was delivered.  Bailey said he later changed his story and he isn't sure when the check was delivered.

Feaga raises the possibility the check was pre-dated.

Bailey agrees he is not sure when the check was actually delivered.

Feaga asks about instructions Bailey may have gotten from the governor relative to the Scrushy appointment.  Bailey says the governor told him to call Margie Sellers and tell her the governor wanted Scrushy to be vice-chair of the CON Board.

Art Leach is still objecting.  Bailey is asked about a bank account at First Commercial bank.  Bailey says he was requested to open the account by the governor "an Alabama Education Foundation Account." Bailey says he deposited a HealthSouth check to the account.

Posted by Helen Hammons on May 02, 2006 at 01:06 PM | Permalink | Comments (6)

## Day 2: Read Towards the End, More Fireworks

Alva Lambert is on the stand.  Lambert served as executive director of the State Health Planning and Development Agency.  He is continuing testimony from yesterday on the functioning of the CON Board and the cost of building hospitals and other medical projects.

Louis Franklin is questioning Lambert on the applications by HealthSouth for a rehab hospital in Phenix City and the request in another case for the PET scanner.  Franklin is asking about whether or not HealthSouth had a presence at the CON board hearings where these projects were approved.

Franklin is keying in on the role of Tim Adams and his being paid by HealthSouth and the necessity of Adams being present at a CON Board hearing on July 17,2002 to ensure a quorum.  Tom Carman, a

HealthSouth employee recused himself at the hearing due to conflict of interest. Franklin is also asking about another meeting in December 2002 at which Carman also recused himself and at which Adams was also present.

Adams abstained from the vote in both cases.

Vincent Kilborn is now questioning the witness about his candidacy for the Alabama Court of Criminal Appeals Place 3 and his experience as a lawyer. Lambert is current chief administrative officer of the CON Board a position held under James, Siegelman, and Riley.

Kilborn makes comments about Certificate of Need meaning a certificate of need. If the facility or equipment is not needed it shouldn't be built. Lambert says when the CON Board approves a project it is a "legal determination there is a need."

Kilborn is asking Lambert to talk about the activity on the board during the terms of both James and Siegelman. Kilborn gets Lambert to say the Siegelman board was a "good board" and exercised good judgment. "If you had smelled a rat in the woodpile, would you do something about it?" He was asked to ask the question in a different manner. Lambert says he would have "probably" thought it a duty to call the attorney general if he saw problems. Lambert says he never did that. Kilborn is definitely trying to say there could not have anything amiss or Lambert would have told someone.

Did you operate the CON board as a "criminal enterprise?" "No sir, not to my knowledge," says Lambert.

Kilborn: "Did it take a bribe to get a PET scanner through a CON Board?"
Lambert: "I've never seen one."

PET scanners no longer have to go through the CON Board.

Kilborn has asked Lambert if Richard Scrushy controlled the CON Board. "I saw no demonstration of control."(other then position as vice-chair)

Kilborn: Did Don Siegelman assert any influence on any decision of that board.
Lambert: He did not.

Louis Franklin has been objecting to some of the questions being asked as speculative.

Hamrick's attorney Jeff Deen asks Lambert about Lambert's calling in to talk radio and doing impressions of Bill Baxley.

Deen asked Lambert if he had any contact from Hamrick asking him to take any action or look out after anything when things were being voted on by the CON Board. Lambert says his only communication

with Hamrick had been budgetary.

Deen has been using the government's own indictment to try and show Paul Hamrick wasn't even working for the state when some of the alleged events related to the CON Board approval process were happening.  Franklin is objecting.  The judge has called for a short conference with the lawyers.

Scrushy attorney Terry Butts is now questioning Lambert and gets an instant objection from attorney Franklin when Butts mentioned that he(Butts used to be on the Alabama Supreme Court).

Judge Fuller yelled "STOP" and advised Butts to stick to the facts.  U.S. Attorney Steve Feaga said "we all have stuff in our background we could try and impress the jury with, like military service."

Feaga is a Colonel in the Air Force Reserve.

Butts also asks Lambert how he refers to the CON Board since U.S. attorney Franklin keeps referring to it as the "Con" Board.  Butts is trying to infer Franklin is trying to connected CON with criminal.  Lambert says he refers to it as a "C-O-N" Board.

Butts now asks about how the CON Board works when other hospitals or individuals have opposition to something up for the board's approval.

Butts reiterates that"no matter what influence or what vote" the CON Board makes.  "There is a legal remedy including going before a Circuit Court judge where the project is located."

Lambert agrees with Butts' statements.

Butts asks whether or not Scrushy was a problem for Lambert or if Lambert was aware of any ethics complaints against Scrushy as a member of the CON Board, Lambert says no.

Butts is now talking about Alabama politics and contributions of individuals who may be later appointed to the CON board.  Butts asks specifically about whether or not the current head of the board made contributions to Riley.  Lambert says he wouldn't find it unusual if he had.

Butts asks Lambert about Scrushy's and Carman's actions on the board.  Lambert says he did not know of any time when Mr. Scrushy did not recuse himself when HealthSouth related projects were brought up or when projects of his competitors were brought before the board.

**There are now more fireworks.**

U.S. attorney Louis Franklin takes objection to Butts' statement that "Mr. Franklin is a little exorcised about."(related to projects approved by the board.)  Franklin objects to Butts' conduct, Butts apologizes,

Franklin keeps yakking. Butts asks the judge, "Your honor he's still muttering over here. What do you want me to do?" Franklin gets in Terry Butts' face. The judge orders the lawyers to the bench and has a conference with Butts and Franklin.

Thing get so smoked up the judge orders a recess and they are going to have comments on the record but out of everyone's sight. More to come.

A little more information coming in on the fracas in the courtroom. Seems U.S. attorney Franklin called Terry Butts a "sleaze" when he got in Butts' face. Butts asked Franklin," Did you just say I'm a sleaze?"

The court is back in session.

Butts is continuing the questions about CON Board quorums and the such.

**Judge apparently took attorneys to the woodshed.**

Judge Fuller has now told the jury "you are instructed to disregard the confrontation between attorneys. This case has a lot of emotion involved. It is highly unusual and I assure you it will not do so in the future."

Attorney Franklin is now talking to Lambert about conflicts between Brookwood and HealthSouth. Brookwood applied to the CON Board to build a multi-million dollar parking deck. The case was litigated and Brookwood ultimately got to build the deck.

Attorney Franklin says he is trying to rebut the argument that Scrushy never did anything to harm his competitors.

Franklin asks about politics in Alabama and says "Would it be politics in Alabama if a governor accepted a $500,000 bribe and then appointed someone to the board?"

Lambert says he hoped it would not be accepted. Lambert said "it would be a crime."

Franklin is now asking if HealthSouth circumvented the CON Board by going to the Legislature to get things done. Butts objects, but Franklin says Butts asked a similar question about the Nursing Home Association and the judge let the question stand.

Lambert says the legislature passed an exemption for certain types of health services, a digital hospital. Lambert went on to say HealthSouth was the first to file for the exemption and to get a certificate of need under that exemption.

Franklin is now saying Tom Carman is a convicted felon.

Terry Butts now questioning Lambert again. "Did Brookwood oppose either the PET scan or the rehab hospital?" "It was without opposition," says Lambert.

Butts got Lambert to say there was nothing illegal about the action HealthSouth took in applying for the legislative exemption for digital hospitals.

Butts says Carman's conviction involved Saudi Arabia and not HealthSouth.

Mr. Lambert has been allowed to leave the stand.

The government has announced its intention to call Nick Bailey to the stand. He has been sworn in.

He will be questioned after lunch. TIME FOR A NEW POST!!!! See everyone after lunch!!!

Posted by Helen Hammons on May 02, 2006 at 09:08 AM | Permalink | Comments (1)

## Tuesday Preview, Monday Scorecard

Old habits are hard to break and the Scrushy and Siegelman defense teams stayed true to their usual form on Monday. The defense for both these men is in part based on the 'they trusted people around them and were let down' theme.

Then there's the tried and true defense of 'you can't trust these convicted felons who are going to come in here and badmouth our innocent client.'

This theory should get its first test today when former Siegelman executive assistant Nicholas Bailey takes the stand. U.S. attorney Louis Franklin upon leaving the courthouse on Monday seemed confident of his case, even after letting frustration get to him in regard to the Scrushy defense team's tactics. He had to have seen them coming on April 26 when the court was asked to let Gray join the team.

Anyway, this morning will open up with Alva Lambert finishing his testimony from yesterday about the structure and appointments to the CON board and then at some point during the day we will hear from Bailey.

After day 1 the scorecard from here:

**Siegelman and attorney Vincent Kilborn +:** Kilborn seemed effective using his down home style in connecting with the jury and this can only be a plus for the Siegelman team. He about blew it when he started talking about the Magna Carta and you could see people's eye's glaze over. Kilborn attacked the prosecution head on setting the stage for future testimony from folks who have already pleaded guilty and only stand to gain if their testimony helps the prosecution.

**Paul Hamrick, Michel Nicrosi, and Jeff Deen +-.** They came out about even yesterday. Hamrick's attorneys tried to distance their client from the other parties. Their argument was Hamrick was friends with a guy he'd been friends with for years and he didn't end the friendship just because Lanny Young was a head case.

**Mack Roberts and Bill Baxley +-** They also came out about even or even a little below. Baxley was emphatic in defending his friend but his over-the-top emotion may end up doing more harm than good. He is helped by the fact Roberts clearly had won the strong endorsement of several governors and was qualified to be head of the DOT.

**Richard Scrushy, Art Leach, and Fred Gray +** This team pulled their usual stunts and got the clearly frustrated Louis Franklin to seem a bit out of control. This played right into defense strategy of those 'big bad government guys that beat up on people." Unfortunately, their tactics work with juries and that's why they do them. But as Fred Gray said yesterday, "I was hired to use all my legal ability and that's what I did."

**Louis Franklin and the U.S. Attorneys** - Franklin is a stick to the facts kind of guy and he did a good job going through the charges. It seemed a little bland though. His frustration at his prime witnesses being called "liars and thieves" and then the antics of the Scrushy defense team made him lose it a bit. However, don't count Franklin out. It is one day and he seems confident in his case. He now has to make his witnesses believable and strike up some rapport with the jury.

**More to come.**

Posted by Helen Hammons on May 02, 2006 at 09:01 AM | Permalink | Comments (1)

# Opening Statements End with a Bang!!

Opening statements ended with a bang Monday as Scrushy attorneys Art Leach and Fred Gray brought out the frustration in prosecuting attorney Louis Franklin.

Leach started by telling the jury the federal government will "never, never" prove that Scrushy and

Siegelman had any type of agreement to exchange payment from Scrushy for a seat on the Certificate of Need or CON Board. Leach said Scrushy made two perfectly legitimate contributions to the Education Lottery Fund established by Siegelman.



Leach was sure to use his normal tactics of bringing up Scrushy's wife and kids. After this he made Franklin lose his cool by Leach rattling off his time as a prosecutor as well as the time Michel Nicrosi spent as a prosecutor. Franklin told the judge in his objection Leach needed to stick to the facts about what Leach intended to prove and not bandy titles about.

It didn't take long after that for the smooth-sweet-talking Jim Parkman to make an appearance, although he wasn't in the courtroom. Leach relayed the tried and true Parkman judicial theory of "even the thinnest pancakes have two sides."

After bringing a chuckle from the audience, Leach went on to reiterate that Scrushy served on the CON Board under three other governors along with Siegelman. Leach hammered home that HealthSouth should have a seat at the table of the CON Board due to its huge influence in health care.

The big bang was when Leach openly disputed the date that Scrushy allegedly met with Siegelman to get money and the seat from the governor. It was not July 14, 1999 like the government says. It was June 29, 1999, according to Leach who says he has aviation records to show who was where and when.

More on Leach in another post.



The BIG, BIG BANG was when Fred Gray introduced himself and started to talk about how he represented Rosa Parks. This sent Louis Franklin into a fit that would have done the Tasmanian Devil proud. He yelled at Gray something like "that's why you were added to this case!" Franklin reiterated that the attorneys should not be talking about titles. Judge Fuller slammed the gavel down and called the two lawyers to the bench for a lengthy conference.

Scrushy's teams and the other lawyers brought out the frustration Franklin had to be feeling after having his main witnesses repeatedly called liars and thieves. Just to rub in the salt, Gray kept repeating over and over again - Alabama Politics 2006. Franklin was tired of hearing that he had turned into a Republican from his family and he was obviously tired of defense lawyers.

Next up.  The first witness.

Posted by Helen Hammons on May 01, 2006 at 04:12 PM | Permalink | Comments (2)

## Mack Roberts

Bill Baxley representing Max Roberts is up.  Baxley says he is going to  probably refer to DOT as the Highway Department.

Baxley says he's proud to be representing Roberts.  "Mack Roberts was and is one of the most dedicated and honest public servants who has ever served this state."

Baxley talks about Roberts parents and his starting to work at the Highway Department in 1956.  "He worked his way up."

Baxley is giving the jury more about Roberts success as a highway project manager.  Baxley says Wallace chose Roberts to be assistant Highway Director and then Highway Director.  "Four governors called on Mack Roberts to be head of the Highway Department."  Baxley talks to the jury about honesty and expertise.

Baxley talks about how Roberts gave up money to come back and run the Highway Department under Guy Hunt.  Baxley is reminding the jury that Mack Roberts laid eyes on Richard Scrushy one time in his life.

Describing Roberts as a career public servant, he reminds the jury Roberts is not charged with RICO charges or conspiracies.  He is charged with 16 felonies about mail fraud, the former attorney general reminds the jury.

Roberts' attorney is trying to distance Roberts from the other defendants.  Mr. Baxley has wondered away from the microphone so we cannot hear what he's saying to the jury now.

We were able to pick up as he called the government "inept or incompetent" for indicting Roberts on charges that happened "after he's already left the department.  With a a raised voice, Baxley intoned, "We're saying it did not happen, people in Alabama have not been defrauded by Mack Roberts in any way!"

Posted by Helen Hammons on May 01, 2006 at 02:24 PM | Permalink | Comments (1)

## Siegelman Lawyer Comes Out Blazing

Sorry for the break in the action. With a little help from our friends in the U.S. Marshal's office we were allowed to move to the main courtroom until the sound problem could be fixed. Unfortunately, that meant no updates, but we'll try to catch you up and hopefully this afternoon will go better for the court. We all hope the sound issues have been resolved.

Vincent Kilborn made the opening statements for the Siegelman team and he wasted no time going straight for the jugular. Kilborn said the government was going to have to call a bunch of "con artists, liars and thieves" to try and make the government's case. This theme was played over and over in Kilborn's one hour monologue to the jury. Kilborn called former lobbyist Lanny Young a "dead man walking."

Siegelman's lawyer said Jim Allen had gotten a "free pass and absolute immunity and can say anything to anybody."

Kilborn wasted no time getting to the political campaign saying, "Our goal is to get out of here with an innocent verdict, go to the primary, and face the voters. I'm going to get an innocent verdict," said Kilborn with passion.

Government attorney Louis Franklin objected to Kilborn's opening statements saying, "I haven't heard this guy say anything about evidence yet." Judge Fuller overruled the objection.

Kilborn begged the jury to "return Don Siegelman to the people for their judgment." He went over his definition of reasonable doubt with the jury telling jurors "when you hear something that makes you hesitate...evidence of people trying to save their own skin...that's reasonable doubt."

"Y'all are going to hesitate so much you're going to leave skid marks to the statehouse," Kilborn said waking up some slumbering members of the audience.

Kilborn laid the blame for Siegelman's problems on those close to him, such as Nick Bailey. He said Bailey and others violated Siegelman's trust and "used the executive branch to line their own pockets."

Lanny Young was called a "con artist...When his lips are moving he's lying."

Kilborn kept trying to insert information about the length of sentences Bailey and others could face if they didn't please the government. Judge Fuller had to hold a sidebar with attorneys, complete with the "white noise" to keep anyone else from hearing what was being said.

That didn't slow down Kilborn who proceeded to get the information he wanted out to the jury. Although, the judge upheld Louis Franklin's objection, the jury heard what Kilborn wanted them to hear.

At times Kilborn almost sounded sorry for Nick Bailey. Siegelman's counsel talked about how many interviews Bailey, a key witness in the government's case, had with government agencies over a four-to-

five year period.  "They have beat on him and beat on him until they believed the story was right."

Kilborn took on Jim Allen over the allegations Siegelman had wanted $100,000 from him and that Allen had given Siegelman $40,000, the charge being Allen was then allowed to appoint the Director of the Alabama Department of Transportation.

Saying it made no sense, Kilborn said it made no sense to pay only $40,000 to get to appoint a DOT Director when the job had control of a budget of more than $1.7 billion.  Kilborn's allegation is that Mack Roberts had served other administrations as DOT Director and he was the most qualified man for the job.

Kilborn was all sure of himself.  He told the jury not only could the government not prove their case, but that he would prove that Siegelman was not guilty, quite a show of bravado.

Due to the Court coming back into session, Kilborn's comments about the Scrushy, Siegelman relationship will have to wait for a later post.

Posted by Helen Hammons on May 01, 2006 at 12:56 PM | Permalink | Comments (0)

## The Jury is In

Judge Fuller has left no doubt as this trial starts who is in control of the courtroom.  The judge is introducing Fred Gray to the jury and checking to see if the jury has any association with Gray or the other members of his law firm.  The judge has approved Mr. Gray.

The judge is now swearing the jury in.  The judge is giving his preliminary instructions to the jury.  Judge Fuller now says he expects the trial to last four weeks.

The judge has finished his instructions to the jury.  The prosecution will now present opening statements.  The judge admonishes the jury to not consider what is presented during opening statements as evidence.

Louis Franklin will present the opening for the U.S. government.  Unfortunately, we still cannot hear the argument presented to the jury.

The only thing that can be said at this point is Louis Franklin has now been replaced by Steve Feaga.  Franklin stuck pretty much to the indictment from what we could hear and told the jury  the government's witnesses and exhibits would help prove the case.

We will try to get some help from the judge at the next break which will come after the prosecution finishes their opening statements.

We did hear Feaga tell the jury the former Governor Don Siegelman "sold his office, sold your vote."

Posted by Helen Hammons on May 01, 2006 at 09:18 AM | Permalink | Comments (0)

## Getting Started

We're all set up and ready to go at the Federal Courthouse in Montgomery. In just a few minutes there will be a hearing about Fred Gray, who was just formally added to the Scrushy defense team last week. We have already seen Mr. Scrushy come into the courthouse.

There are still audio problems between the main courtroom and the overflow room which we are in.

We can only hear the judge at this time and not the attorneys.

The one thing that has been settled is that Mobile Press-Register reporter Eddie Curran will be allowed to stay and report in the courtroom, although he may be called as a witness in the case.

Judge Fuller and Art Leach are having an interesting discussion but we can only hear the judge.

The judge has explained the problems with the microphones to the attorneys and they are to decide how to best proceed so everyone can hear.

The jury will come into the court in about five minutes.

The judge has told Art Leach that he is disappointed Leach did not have his exhibit list ready. Judge Fuller told Leach he would need to have his exhibit list ready after lunch or "you will not be allowed to present any exhibits in this trial."

The judge said it will take him about 20-25 minutes to address the jury and then the government would have one hour and fifteen minutes to present their opening arguments. After that there will be another recess and then the Siegelman defense team will have an hour to present their opening arguments. We will post again when the jury comes in.

Posted by Helen Hammons on May 01, 2006 at 08:28 AM | Permalink | Comments (0)

# November 2006

**Sun Mon Tue Wed Thu Fri Sat**
                1    2    3    4

| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
|---|---|---|---|---|----|----|
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 | | |

# Archives

- November 2006
- June 2006
- May 2006
- April 2006

## Verdicts and Post Trial

- Completed Verdict - Siegelman
- Completed Verdict - Scrushy
- Completed Verdict - Roberts
- Completed Verdict - Hamrick
- Judge's Order on Rule 29, 33 Motions

# Government Corruption Trial

- 


## Recent Posts

- Afternoon Testimony Starting
- Lunch Talk
- More Juror Testimony
- Arrivals

- [Welcome Back!](#)

[Subscribe to this blog's feed](#)

# About Blogger

- [Helen Hammons](#)