United States v. Richard M. Scrushy
2:05cr119-F

# EXHIBIT 22-B

# Courtroom Chronicles

## Join WSFA.com as we blog the government corruption trial of former Governor Don Siegelman and three other defendants.

« May 2006 | Main | November 2006 »

### Scrushy Attorney Disappointed but Says It's Time to Move On



Scrushy lead attorney Art Leach says he knew sitting in the courtroom that "it was not good" when the jury returned a "guilty" verdict on former Governor Don Siegelman on count three of the second superseding indictment.

It's been a week of roller coaster emotions for Leach.  On the weekend prior to the verdict being announced he traveled home to New York where he surprised his parents with a party celebrating their 55th wedding anniversary.  Leach says the party came as a "complete surprise" to his parents but the "party was wonderful.  Dad cried and mom stood in silence."  It was an "incredibly difficult" weekend in regards to travel and in another way as he had to take his daughter Jessica, who spent two weeks with him here in Montgomery, back to Atlanta and drop her off.   Then came the verdict.

Jim Parkman, who helped defend Richard Scrushy in the HealthSouth case in Birmingham, says he was "shocked and stunned" when he first heard the verdict.  Parkman said earlier in the day, after learning a verdict was on the way, that he thought the defendants would all be acquitted.  "I guess I have to eat my words," says Parkman.

However, Leach says what happened Thursday is all part of the process.  "Look, we're part of the judicial system and we understand that the jury returned a verdict.  We disagree with it and we're very disappointed by it.  But, we understand how the process works and we've got to move on from here."  Leach says, "We are going to fight another day."

Moving on will include slowing down a bit and doing some evaluation of things.

"We've got to let the dust settle. We've got to evaluate the convictions, what was and was not passed upon by the jury and then we'll go to sentencing and after sentencing we'll move on to an appellate process with the 11th Circuit Court of Appeals.

There are a lot of issues that have been raised throughout the course of this case which we

will take up with the 11th Circuit and we will take up with the judge in motions. We believe that we will get a new trial and that upon a new trial Richard Scrushy will be vindicated. We are satisfied that Richard Scrushy is innocent of the charges that were returned by the jury today.

But in light of the various problems that we had in this case...We believe we will get it overturned and when it is reversed, we'll have a new trial and Richard Scrushy will be found not guilty."

Leach, who used to love trying RICO cases as a prosecutor, believes Scrushy should never have been in "this RICO case." Leach says the jury didn't return any verdicts with regard to the RICO or the RICO conspiracy, "that material is highly prejudicial to Richard Scrushy. We should have been tried separately." He believes the government has got a "real legal problem" on its hands with regards to not severing out Scrushy from this trial.

"He was tried in a case with all these other RICO charges when the only thing he was charged with had to do with the CON Board. It is prejudicial under the law to have him in a situation where he has to be tried with all these other counts. Now, on top of that, you have a jury that did not return any verdict with regard to the RICO or the RICO conspiracy and you have all this additional evidence that was put in that had no relationship to Richard Scrushy."

Leach contends there is also a legal standard that has to be considered.

"The government has got to make a connection between all of these charges and Richard Scrushy and they admitted during the course of these hearings that there was no connection. He should have never been in this trial."

As for Mr. Scrushy, he says he is very disappointed. "Many people don't know this. I took a lie detector test and passed it with flying colors. It's not right what happened here. We're very hurt for our family... there was no evidence to tie me to any of these charges... I intend to continue the legal process until we are fully vindicated."

According to Leach, there will be formal documents filed that have to do with all the appellate issues. He says the severance issue is the "most serious issue right now." There is also the issue of the jury challenge which is yet to be ruled on by the court. A similar challenge put forward in the Carmichael case was denied Thursday.

Judge Fuller is also yet to rule on the Rule 29 motions and the judge said in a late afternoon hearing that he would issue a written order concerning those motions and advising attorneys how to proceed with those matters. He also said actions would not be required prior to 30 days from today's date.

Leach and Siegelman RICO specialist Robert Blakey both asked the judge to stagger and give time to the Rule 29 motions, having to do with dismissal, and the Rule 33 motions, having to do with asking for a new trial. The government wants all the motions done at the same time but the defense lawyers say whether or not to do Rule 33 motions is a strategic decision.

Leach told Judge Fuller he also needed time to "talk to the client and the other lawyers as to what we're going to do." Mr. Leach requested the Rule 29 motions be done first and then a two-three week period be granted prior to doing the Rule 33 motion.

**Friday Judge Fuller issued an order** giving defendants until August 4, 2006 to file supplemental briefs on their Rule 29 motions. He is giving the United States until August 18th to file responses to the motions and then defendants have until August 25 to reply to the U.S. response to the defense's supplemental motions. "The Court will consider the briefs and then decide whether further oral argument will be necessary."

**The Rule 33 motions for a new trial must be filed** by the defense before September 29, 2006 with the government response due on or before October 13. Defendants must file their replies to the government responses by October 20, 2006.

During the same hearing Judge Fuller ordered the bail tickets for the defendants to be placed under seal until further order from the court. The judge also sealed the modified conditions of release. Mr. Leach asked if a letter of credit could be substituted at some point in the future. Fuller told Mr. Leach he had "no problem" with that and wanted to do whatever was "least costly to the client."

Reports indicate Scrushy may have been released on a $1 million bond and Siegelman on a $25,000 bond.

Another thing that will happen is the probation office has to conduct a pre-sentencing investigation and prepare a pre-sentencing report that is presented to the court. The report

- identifies applicable guidelines and policy statements,

- calculates the defendant's offense level and criminal history category,

- states the resulting sentencing range and kinds of sentences available,

- identifies factors relevant to the appropriate kind of sentence or the appropriate sentence within the applicable sentencing range and

- identifies any basis from departing from the applicable sentencing range.

Sentencing normally occurs about 90 days from the verdict.  The report has to be submitted at least 35 days before sentencing unless the defendant waives the minimum period.

Acting U.S. attorney Louis Franklin advises, "We can't tell you what sentence we will be asking for until we see a pre-sentencing investigation report.  We have to let that process work.  We'll wait for the report to come out and then we'll make our decision according to what's in the report."

Franklin says after the initial report is issued there is an opportunity for objection to the report.  He says then a final report comes out and is given to the judge.  Following this, there is a sentencing date when the prosecution gets to argue what the sentence should be.

Posted by Helen Hammons on June 30, 2006 at 05:38 PM | Permalink | Comments (5)

## Your Turn

It's over for two of the defendants, Paul Hamrick and Mack Roberts, but for Richard Scrushy and Don Siegelman a long process is just getting started.

The Chronicles will be shutting down shortly, but I just want to say again to those who helped make this first effort a great learning experience for me, THANK YOU!  A lot of people gave unselfishly of themselves to help me better understand the legal process.  People put up with incessant questions, phone calls, and cornering in and outside the courthouse.  You all gave freely of your time even when you didn't really have the time to give.  Most importantly, I had the opportunity to spend time with a lot of great human beings.  Wherever you path leads, I wish you all the best.

A special shout out to all the CSOs and marshals who put up with all the media craziness around the courthouse.  You folks usually passed the patience test I gave you on most days and I enjoyed getting to know you.  I'm sure we'll see each other again, and I must confess you probably will have to get on me again about chit-chatting in the hallway.

To regular readers of the Chronicles, you've seen or heard what has happened during the trial, **now it's your turn to chime in**.  Free-for-all Friday is here and it's time for your take on the verdict or anything else you want to say about the trial.  Just post your comments and others can respond.

Posted by Helen Hammons on June 30, 2006 at 04:16 AM | Permalink | Comments (69)

## Verdict Shortly

The verdict will be in shortly.  Attorneys have been told to be here at 1:45 p.m.

Everyone is coming in and we will be getting started shortly.  We are going to move to verdict forms in

a moment.

Posted by Helen Hammons on June 29, 2006 at 01:15 PM | Permalink | Comments (2)

## Another Day

It's a beautiful day outside and inside the building the jury is ready to get to work after breakfast. They didn't stop at mid-afternoon yesterday like they thought they would; so, for now, we just wait on word from them.

The jury should be returning from lunch sometime between now, 12:35 p.m. and 1 p.m.

Posted by Helen Hammons on June 29, 2006 at 08:19 AM | Permalink | Comments (4)

## More Instructions

.Judge Fuller will meet with the lawyers at 8:30 a.m. to go over his proposed instructions to the jury. The jury is scheduled to come in at 9 a.m.

The lawyers are in place for the most part. Richard Scrushy arrived with more members of his family today.

Well we're past our start time so we know the jury will probably not be in by 9 a.m.

The judge is on the bench and has given the supplemental instructions. The prosecution is not pleased with the court's instructions.

Mr. Perrine is arguing the judge needs to inquire of the jury to determine whether or not the jury was engaged in the process. The U.S. position is that there should be an inquiry of each juror to find out if they each are participating in the process before instructions.

Judge Fuller asks Mr. Perrine about how he should reach the decisoin. Mr. Perrine says the meeting should happen without lawyers with the jury to see where the jurors are at. Perrine says this would enable the court to proceed "more wiseley."

Without the jury being engaged in the process the instructions will not matter says Perrine again. Perrine says the inquiry should be on the record to determine if the jurors are engaging in the political process.

Mr. Blakey says they support the instructions except for one part of the instructions.

The judge says the court has no presumption the defendants are guilty or not guilty.

The judge says he will make a change requested by Blakey.  Blakey says the government's argument should not apply to this case.

Blakey says again the note indicates that some of the jurors had developed a "blanket reasonable doubt."

Blakey says the jury is not refusing to deliberate.  Blakey says there is reasonable doubt as to each count against the defendants.  Blakey says the instructions as now modified are perfectly adequate.  He says the judge should not intrude in the deliberations and push the jury in any direction.  Blakey says the government wants a mistrial.

Mr. Deen is now speaking for Mr. Hamrick.  Deen says the judge mentions the Magna Carta in the insturctions.  Deen says the jury sent back one note to the foreman a few days agao saying they were conscientious.  "It doesn't look like a total shutdown."  Deen says he is against questioning the jurors at this point by the judge.  Deen says he is satisfied with the instruction.

Mr. McKnight has a problem with page three of the instructions.  He says the judge in the first Allen charge mentioned the presumption of innocence, but it is not given in this charge.  McKnight says fairness requires this.  He requests the presumption of innocence be included along with the burden of proof expecially since it was given the first time.

Mr. McKnight says he objects to the government's suggestion of individual inquiry of the jury.

Mr. Leach is arguing that judges must be careful about the possibilty about dismissing any of the jurors.  First off I would say that the government's request has not been provided for us.  He is asking that the government provide him a copy right now.

The judge says he will get him a copy but that it will not impact the court's ruling.

The important part here is that in your response to the jury...what I would ask is that you redact the foreperson's name and ...make it part of the public record...

He asks the note go back to the jury.  He says the jury does not always know what's in the note.

Mr. Leach says there is a case where the court could inquire of a single juror. He says he doesn't believe it should happen at this point.

Mr. Leach is questioning the bottom of page four and the top of five.  He suggest to the court that the entire sentence be removed.  He says it will highlight dimension in the jury.  "It's obvious the jury is deliberating and has a difference of opinion."

Leach says he doesn't believe in the 11th circuit there is a discussion of inappropriate considerations. Leach says the rest of the charge is balanced and will assist them. Leach says the "inappropriate considerations" remarks will not help.

Leach suggest the judge insert "your evaluation of the evidence." Leach says if the jurors have evaluated the evidence and have reasonable doubt the insertion of the statement would help them.

The judge asks if this is not clarified on the bottom of page two. Leach says the jury will be focused on these instructions.

Mr. McKnight says the jury may be trying to swallow the elephent as a whole. He would like the jury instructed to consider each count for each defendant.

Mr. Perrine says remarks in the instructions about the possibility of selecting a new foreperson should be stricken from the instructions.

Perrine says the language as it is currently would "intimidate" the foreperson. Perrine says he does not want anything added to the burden of proof instructions. He says the jury has been "beat to death about reasonable doubt. He says he objects to the note being released to the press, he believes this would have a chilling effect on deliberations. Perrine says the government does not want a mistrial.

Perrine is still insisting on an inquiry as to the jury as to whether the jurors are following the courts instructions and deliberating. He says any further instructions are not needed.

Judge Fuller says the supplemental instructions will be written so the jury can be notified about one or more jurors not participating in the deliberative process. He will give the instructions with Blakey's amendment and with McKnight's presumption of innocence.

He is waiting on copies of the instructions for the jury.

Judge Fuller says the notes from the jury will remain under seal until the trial is over. They will be made available to the jury if requested.

The judge is reading the instructions. The judge says this is an important case but no more important. So far this is the same type of modified "Allen" charge as before.

He is advising the jury again about reasonable doubt and asking the jury to examine their positions. No juror is expected to give up an honest belief. He advises the jury it is their duty to agree upon a verdict if they can do so. He says the jury may be as leisurely in their deliberations as are requred. He reminds the jury each defendant is presumed innocent. He says the government has the burden of proof.

He is going back through the definition of reasonable doubt as he did last week. He tells them the verdict must be unanimous. He tells them it is up to them to reach agreement if they can do so. He goes back through asking them to reexamine their opinions. He advises them not to give up their beliefs and to "seek the truth through the evidence of this case."

He is asking each individual to make an individual determination of continuing to deliberate as their first act upon return to the jury room.

He tells the jury they may elect a new foreperson. He says this is not a reflection on the foreperson.

The judge says they may contact him without going through the foreperson if necessary as individuals.

He asks them to report back to him about continuing deliberations. He says they are not to indicate to him the numerical divisions. He says he wants to know if further deliberations will be benificial or would be "hopeless."

He reminds them to look at each count against each defendant seperately. He says the notes will be available to them if they feel they need them.

The postion I hold is a lifetime appointment, says Judge Fuller. He says he will be here with them as long as they need him to be there to guide them through the process.

We are now waiting on the jury to return with the answer about whether or not they can continue deliberations.

The lawyers have been called back in to court. This happened less than five minutes ago around 11:25 or so.

The note simply says the jury wants to continue to try to deliberate and see if they can work things out. Judge Fuller says he assumes the jury will go to lunch shortly. The note indicated the jury would like to keep trying until at least mid-afternoon. Everyone has left for lunch again for try #2.

The note from the jury signed by juror #7. The note will be under seal. "We do wish to continue for now some deliberations...We would ask for time through at least mid-afternoon to try this. Thank you"

I had to leave some of the note out.

Judge Fuller responds the court is encouraged by your commitment. Fuller says for them to continue their deliberations in his written reply.

We never heard from the jury for the rest of the day. The jury left between 4:30 - 4:45 p.m.

Attorneys I talked to saw this as a hopeful sign that discussions among the jury were moving forward and they were trying to come to some kind of agreement to at least continue deliberations.

Posted by Helen Hammons on June 28, 2006 at 08:01 AM | Permalink | Comments (2)

## Problems with the Jury

First, to those upset we could not update the blog during the hearing let me explain.  Our first responsibility is to our on air product.  When there is this much verbiage the on air machine has to be fed first.  Unfortunately, both cannot be done at the same time. The fact most of this action took place close to and during newscasts made this action more imperative.

Now on to the events of late this afternoon.

We got word the judge was calling the lawyers back to the courtroom.  There was a note from the jury.  The lawyers were advised to bring in the clients.

The lawyers entered the courtroom and met up with the judge.  We could not hear this.

Judge Fuller says upon beginning that counsel from both sides had the note and he was not going to read it.  He says the court had reviewed its options and there is a "potential" conflict with the jury.

The judge says he does not know if a juror has problems continuing to deliberate and he asks for comments from the attorneys.

Blakey speaks for Siegelman.  He says the foreman says in the note the jury is lackadaisical.  He seems to indicate there may be problems with three people.  Blakey says for the foreman to assume because people don't talk to him in his language they are not participating is a sign of the foreman's arrogance.  Blakey says the judge needs to find out the mind of the jury and not just what the foreman thinks.

Blakey says there needs to more communication through the jury and not with just the foreman

The judge says to talk about a mistrial is premature at this point.  Blakey says they like this jury and want another Allen charge

Mr. Deen, speaking for Mr. Hamrick, says he is concerned about the note from the foreman.  Deen says the jury can elect a new spokesperson or foreman.  Deen says the foreman is being coercive.

For Mr. Roberts, Mr. McKnight says he does not want interference with the jury except for instruction from the bench.  He says an inquiry is not needed and the judge says he is not going to conduct an inquiry.

McKnight says some of the jurors agree with the defense. "Obviously we didn't persuade the foreman, who has a different opinion it seems."

Fred Gray is speaking for Richard Scrushy. The judge has asked juror #7, the foreman not be discussed by name.

Mr. Gray says if you take the note in its entirety it is the opinion of one person and not that of the jurors as a whole  Gray says he thinks it might be the writer's personal opinion.

Judge Fuller asks if Gray wants him to inquire of the foreperson whether the opinion is that of the majority or the minority. Gray says the foreperson is not adequately interpreting some of the other jurors' positions.

The judge says he doesn't take the letter as if there is one person against the rest of the jurors. It doesn't indicate a verdict cannot be reached says Fuller

Now Mr. Butts speaks for Mr. Scrushy. Butts says as a possible solution to tell the jury that other members may also send the court notes if they so chose. Butts says if the court reporter would make available to the prosecution and defense the instructions given before and the modified Allen charge, it would give time for everyone to tweak the instructions before coming back in the morning.

Mr. Feaga says the U.S. believes that part of the problem relates back to the previous question and the instructions given by the court previously. Feaga says the note infers a few jurors will not deliberate. Feaga wants the judge to inquire of the foreperson.

Feaga says there is a danger with the note that if the court instructs them to go back again he believes the majority might feel like the court is telling them to give up on their position.

Feaga says the government is opposed to another Allen charge especially with an emphasis on the burden of proof. He says that message is to give it up. Feaga says the note says there are some jurors who won't deliberate.

The judge says if the jurors aren't participating because they've made their minds up that's participation in the court's mind.

The judge says if they have not made up their mind he is leaning toward another Allen charge and will instruct the foreperson to talk to the jury. The judge says declaring a mistrial will be his last resort.

Fuller says he wants to find out why they are not deliberating. He is going to bring the jury back in and have a discussion with the foreperson. He is going to remind them of their oath and give them another Allen charge or repeat the one he has already given and to find out today or tomorrow if the jury is

hopelessly deadlocked.

The judge says it is presumptuous to say the jury can't reach a verdict.

The government says it does not oppose an Allen charge that is only an "Allen" charge, but Feaga does not want additional material added. Feaga believes the foreperson and others are in the majority. Feaga says he believes the personal benefit question may be causing the problem.

Mr. Feaga says he does not want the judge to discuss the burden of proof again.

Blakey says it would be more effective to instruct the jury in the morning. Blakey says he does not believe the judge needs to talk to the foreperson or the jury. The judge is allowing the lawyers to speak from their table and we now can't hear them.

Art Leach says he does not want any discussion with the foreperson in open court. Leach says he is worried it would become too free wheeling. He says reasonable doubt is not a problem.

The judge says there is no particular problem identified in the note about a juror that would say the jury can't move forward.

Leach says to give two instructions with the "Allen" charge. Leach says again he does not want the foreperson to come in and speak to the court.

The judge says the jury may need to have the modified "Allen" charge back with them.

The judge says the ability to refer to it in writing may be of some benefit.

Leach says the judge could give a written response and that that would be in order. He says the judge could prepare it tonight and give it to them in the morning.

Feaga says the note says people will not deliberate. Judge Fuller is quoting from the note "and thus have shown no interest in continuing much discussion."

Fuller says this does not indicate they will not discuss it further.

Feaga says some people will not engage others on the facts. Feaga wants an inquiry with the foreman. Feaga says once the foreman is talked to the judge could then talk to the rest of the jury.
Feaga says Leach may be right about a reasonable doubt but he doesn't feel the judge should tell the jury to adopt the position of those who won't deliberate. Feaga again says bring the foreman in.

Feaga says if the court finds the jurors have a reasonable doubt that is fine, but he does not want another

instruction.  Feaga says the note says there are people who will not discuss things.

Blakey says the note says people from the beginning developed a blanket reasonable doubt.

Mr. Leach says making the inquiry will be clear reversible error.  Leach says the government needs to present authority as to this.  Leach says by making the inquiry it would tell those with reasonable doubt they are doing something wrong.

Leach again says he does not want inquiry of the foreman.

Feaga is citing his authority to Mr. Leach and the judge.  The judge asks Feaga to make his argument.  We can't hear Feaga well.  Feaga says he has confidence in the court.

The jury is coming in.  When the jury came in they were seated as follows:  whites on row one,  blacks on the middle row, and the back row was mixed.

The judge says he appreciates the effort of the jury.  He tells them he has received a note and he characterizes it as there is frustration among some about the participation of some members of the jury.

Judge Fuller says this is not unusual.  He reminds them of their obligations as a jury.  He is reminding them of their oath.  He says he is going to work on further written instructions to accompany them into the jury room to supplement instructions given earlier.

These will include the instructions from last week as well.  He is going to give this to them in the morning and instruct them further then. He is going to release them for the day.

Fuller says if any one has made up their honest assessment about whether a defendant is guilty or not guilty they are participating.  Fuller tells jurors whether people agree or disagree with them shouldn't matter.

However, Fuller says if they are not deliberating due to obstinance then the jury should follow the written instructions and continue deliberations.  The instructions will be given at 9 a.m. on Wednesday.

The judge says he wants them to make an "honest individual assessment" of whether or not they can reach a verdict and then the foreperson will report back to the court whether or not further deliberations would be beneficial.  The judge again reminds them again of their oath.  Fuller says to the jury if their individual assessment leads to a conclusion of not guilty - say so, or if the evidence leads to guilty - say so, and if there is a hopeless deadlock say so.

The attorneys have to be in the courtroom at 8:30 a.m.  The note is going to be placed under seal to preserve the identity of the foreman.

The U.S. is responding to the judge's instructions but we can't hear Mr. Franklin.  Kilborn is satisfied.  Deen is satisfied.  Leach says one phrase troubles him. That was when Fuller talked about obstinance with regard to a difference of opinion.  He says he is not sure Fuller said what he, Leach, thought he said.

Leach is asking for the charge on partial verdicts, the Allen charge, and the new charge.  Leach wants all this to go back to the jury.

Judge Fuller says he does not know if there will be time to take this up.  Fuller says give him a chance to formulate something tonight.  Judge Fuller says he will put what he said today in writing.

Leach tells Judge Fuller Feaga was holding a book in his hand and he wants the judge to read a certain part of the book.

At one point in this discussion the prosecution asked about the possibility of using alternate jurors.

Judge Fuller says he is not looking to get rid of anybody on the jury.  Fuller says there would have to be more cause.

Mr. Feaga is arguing something but we can't hear.  I believe he is arguing inquiry.

The judge says we will be better informed tomorrow.



Outside the courthouse prosecutors said they were ready to let events unfold.  As to the note, "I think out of deference to the court I am not going to comment on that right now," says Steve Feaga for the government.  "I think the court has indicated to us he is going to come up with some instructions tomorrow.  I don't want to do anything that would pre-suppose or pre-guess what the court is going to do.  I think commenting on that note right now probably would not be a good thing to do.  We said what we had to say about it up there in the courthouse and I think we should leave it there."

In response to further questions, Mr. Feaga says, "I think where we are right now is the court has indicated that he's going to formulate some instructions...and I think the best thing for the United States to do is to wait and hear what the court proposes to do and react to that tomorrow.  But we have confidence in the court and confidence in the process."

"We asked the court to make inquiry and he has asked us and the defendants to wait and give him a chance to formulate something for tomorrow and so that's what we are going to do," says Feaga.

Acting U.S. Attorney Louis Franklin says,"It's not a surprise right now.  It was a note that the juror's sent

to the judge and we really need to wait until tomorrow morning to hear what the judge proposes as to the appropriate way to handle it...I think they are reaching out to the court for some help and some instruction on how to handle things. We need to wait until tomorrow morning. We need to give the court a chance to come up with something that is legally appropriate to tell this jury as to how to handle this problem."

As to bringing in alternate jurors, Feaga says,"It's not so much we want to do that. What we're saying is we think that, what we urged the court to do was to make inquiry based on the note to help the jury in essence and then if it's determined that something like that is necessary by the court then that's certainly something the court can do. We're not urging the court to do anything other than to get to the bottom of the question to help the jury, that's all. And the court's asked us to wait until tomorrow and we're going to do that."



After prosecutors finished it was time for the Vince Kilborn show. He says he did not agree that it was time for a mistrial or time to replace jurors. He says the Siegelman team was "120% satisfied with exactly what Judge Fuller is doing." Kilborn says,"This jury is deliberating the way they are supposed to be deliberating. He's reminded them of their oath. He's going to come back and give some additional instructions in the morning and I predict this jury will follow those instructions and we will have a verdict."

Kilborn says he loved hearing about "reasonable doubt" from the note. "We spent half of our closing argument talking about reasonable doubt. Whether the government likes it or not that's the law of the United States of America. If there's reasonable doubt, they ought to acquit and the government should stop whining about the existence of reasonable doubt and instructions about reasonable doubt. It makes me mad that the judge talks about the key legal issues in the case and they get up and start whining. They ought to whine to the Congress if they want the law changed."

Kilborn says the jury will be able to reach an agreement "because the judge is going to give them instructions that he thinks will urge them into doing their duty and I am fully confident that they will do it. And he's going to remind them as he did today and as he did the other day that it is very important in the case of the government and the defendants it's been a long case, an important case, a trying case, an emotional case but there is no better jury in America that can decide this case other than this jury."

Kilborn says, "As the judge told them if they have made up their minds that there's reasonable doubt, it is not, not participating if they hold to that opinion and if there's reasonable doubt the law of the land says they must acquit and the law of the land also says that the jury must be unanimous."

As to the suggestion by the government that alternate jurors might be appropriate, Kilborn responds,"Yeah, I'll suggest that baloney! They helped choose this jury, now they don't like the jury.

Well that's too bad. They chose the regular jury of 12 people that are deliberating. The alternates are only to be substituted in extreme situations, which is not the case here. "

If the alternates come aboard they have to start brand new says Kilborn. "This jury of 12 good people is perfectly capable of making a decision in this case."

After being told he appeared to be getting "worked up" in the courtroom, Art Leach told WSFA's Eileen Jones, "Well my first response is when do I not get worked up?" This brought a laugh from reporters. As to the points he was trying to make, Leach says, "All we were talking about was the propriety of having communications with the jury. That is the most important thing here."



Regarding any inquiry directed at the foreman, the lawyer says, "The reason why I object to any inquiry is that the only basis on which there has been any communication is because some jurors believe that there is reasonable doubt in this case and that is not a basis on which there should be an inquiry. That is our position."

As for all the uproar, Mack Roberts' attorney David McKnight says, (It's)"just the jury going through the process they all go through. People have differences of opinions and they're working it out. I just think the lawyers should stay out of it and let the jury come to their conclusions."

McKnight says he doesn't believe it will be over on Wednesday. "I think the judge is going to let it play out like it should and I don't think it will be over tomorrow. But, I'm hoping we'll get a verdict this week."

He says disagreements within a jury are not unusual. "No, it happens a lot especially in a highly emotional case like this with deep-seeded feelings on each side and that's what makes the jury process great. People get to keep their opinions and hold on to their opinions and talk about different issues and that's why we have the greatest judicial system in the world."

Some observers believe the fact the prosecution was asking for the use of alternates may be because the prosecution feels the jury is weighted towards their side and believes the alternates would help bring back a guilty verdict. Judge Fuller has said he is not ready to discuss replacing anyone on the jury. Fuller said there is no basis to consider that based on what is known at this time.

Posted by Helen Hammons on June 27, 2006 at 08:34 PM | Permalink | Comments (8)

## Another Meeting

There is another meeting in chambers with Judge Fuller to take place shortly. We do not know what it is

about at this time.  Just a guess the meeting is at around 2 p.m.

The lawyers have gone into the meeting.  The clients do not have to be present.

The jury has gone home for the day.

Apparently a juror became ill and wanted to go home.  The judge talked to the lawyers and the lawyers talked to the juror.  The jury went home home early and will resume deliberations Tuesday morning at their normal time.

They are all singing from the same hymnal, both prosecution and defense agree the sick juror is what the conference was about and no one is saying anything else.

Can you believe this took an hour?

Posted by Helen Hammons on June 26, 2006 at 01:53 PM | Permalink | Comments (1)

## Wisdom from Unexpected Places

It is around 7 a.m., the sidewalk is already beginning to heat up and the humidity is on the rise as "Jeannie May" shuffles slowly up the sidewalk pushing here grocery cart and pauses to closely examine the ground near the post office close to the federal courthouse.

Covered in heavy clothing, even in the steam of a summer's morning, the short, black woman with cheeks like those of a chipmunk and a toothless smile, bends over slowly and picks some grass gently and places the blades into her plastic trash bag.

I walk up slowly to this lady that few people talk to or notice, and say,"Good morning."  She is surprised that someone stops and talks to her but quickly says,"Good morning," in return as I ask if she would mind talking to me for a minute.  She is amused that someone is interested in what she has to say but nonetheless asks me what my name is and wants to know if I am a social worker. Calmly she tells me she calls herself "Jeannie May."  She opines that some folks just call her the "bag lady."

For the record, I have no idea what her real name is and I am not sure that she is sure herself at times. She quickly asks me if my mother is still living.  I say,"Yes," and she tells me,"You are blessed to have your mother."

By now she has started pushing her cart with the wobbly wheel up the sidewalk.  I offer to help, but it is quickly apparent she wants no one touching her cart loaded with grass clippings and trash among other things.  She struggles with the weight of the cart but still does not want any help as the wheel sticks in one of those tiny sidewalk cracks which turns a buggy wheel into a doorstop.

We finally cross the street headed toward the federal courthouse and she stops to tell me her mother passed in 1985 and again that she misses her mother. She pauses and relates to me,"I didn't know much about my mother, who she calls "Betty Jane."

"Jeannie May" says her head is hurting, "it's a bad day," she says referring to the pain in her head and just as quickly she says she thinks a woman and a man are going to bring her another cart - without a bad wheel. She thinks she has been through two or three carts.

She pauses at the side of the church and tells me of an operation she had in 1971. Again, I have no way of knowing how true this is, but it is true for her. She stops again and bends slowly to pick up some trash. "I do my job in the morning...they throw things down for me to pick up." She does say the church needs to do a better job getting the bird poop off the sidewalk. But, she is happy about her work and I wonder where her joy comes from.

"Jeannie May" engages me in conversation about the state of the world, "The world changes, peoples changes, the clock changes," she says with a smile. "I thank God for everything he does for me. It doesn't matter how bad our problem is, he still loves us."

"Whoa," I say to myself. Did I just hear a woman who most of the world looks on with scorn give me the Bible lesson of the day? I was not in a very good mood when I decided to take the plunge and walked down the street to introduce myself and talk to this woman, and now the countenance on her face and the joy in her voice give me a peaceful calm.

I related to someone later in the courthouse how her words had stopped me in my tracks. I may never know all her story, how much is fact and how much is fiction. But, in reality, does it matter?

She says people give her clothing and she says she would like "a dark blue Catholic skirt" like one she used to have. She says she worked for 30 years and has a son in a North Carolina foster home. Her sense of time is definitely not in proportion to my time line as she shifts back and forth between now and yesterday. Are these memories or demons she wrestles with? Only God knows.

She says there is something wrong with her son's brain. Then she recalls she hasn't seen her social worker because the worker's sister had to have an operation, again this is all real in her world. "Jeannie May" says she used to be married at one time. She talks to me about thinking about getting a lawyer, but then says,"I don't trust them, I might lose."

Is that feeling from a past experience?

Again, she delivers her sermon,"It's a blessing. I got a lot to be thankful for. I thank God for everything he does for me."

One of the court security officers told me he believes people look out after her. She has been around for years. He says he can't remember any harm ever having come to her. She tells me she moves between the homes of three cousins. I know when this trial is over I have more to find out about "Jeannie May."

She decides she's had enough and goes to the dumpster near which she sometimes takes a nap and I return to the courthouse for another day of trial.

Think about it for a minute. We have a courthouse building that according to the GAO has ended up costing about $73,293,497. Imported marble was used and the building could have been a palace for an ancient king. And in its shawdow, a kind soul rests next to a dumpster and is filled with peace.

Inside this building, in this one trial, millions have been spent on both sides. The government in bringing its case and paying its lawyers has spent millions. At least two of the defendants in defending their individual cases have spent countless millions on attorneys and in at least one case a lot of money on multiple experts to deal with a jury challenge and a jury consultant.

We've heard about one witness getting $35,000 a month for something that has yet to be fully explained. We've heard about the cesspool that is politics in Alabama and one witness in particular boasted about throwing his money around as a standard way of doing business.

We've heard about how rough life is for a lot of people in this trial, and no doubt, it has been a strain on everyone. But for some, not as rough as they'd have you believe when compared to the struggles many people go through on a daily basis.

You would think with all this money floating around, the wisdom would be overflowing since many people in our society equate power, money, and/or status with wisdom.

I've spent a lot of my time talking to a lot of people involved in this trial. For most, the spin rarely stops. That's their job. And while I've enjoyed most of these conversations and learned many things about the legal system, none has taught me more that I needed to know than my conversation with "Jeannie May."

"He hath shewed thee, O man, what is good; and what doth the LORD require of thee, but to do justly, and to love mercy, and to walk humbly with thy God?" - Micah 6:8, KJV

People like "Jeannie May" are looked upon as fools. People like her don't belong to what famed lawyer Gerry Spence calls the Church of Uniformity. To most, she is not a "winner."

A lot has been said and done in this trial to get the "win." We will likely never know about all the shenanigans that have gone on behind the scenes on all sides both before, during, and probably after this trial.

True, the freedom of the defendants is at stake and lawyers on both side are entitled to vigorously present their best case.  The jury or the judge will have to decide things in one fashion or another.

But on a deeper level, no matter how much people in or close to this trial may talk about God, I bet "Jeannie May" gets her calls to God returned first.

Posted by Helen Hammons on June 26, 2006 at 12:38 AM | Permalink | Comments (16)

## Another Meeting with Judge

Ther lawyers have been called for a meeting with Judge Fuller at 10:30 a.m.  Don't know what it is about.

Okay, we can now talk about what happened at the courthouse today.  Apparently, there was someone someplace who thought they heard someone say they were going to go to a courthouse, not any specific courthouse and not necessarily one in Montgomery, and shoot people.

This came up in the meeting between Judge Fuller and the attorneys.  Judge Fuller gave the attorneys the option of going out the front or side door.  Most attorneys came out the front door as usual, but the Siegelman band and Louis Franklin went out the side door.

The jury is gone for the weekend.  More to come.

Posted by Helen Hammons on June 23, 2006 at 10:20 AM | Permalink

## Dynamite

Judge Fuller threw a little dynamite on the jury on Thursday as he issued a modified "Allen" charge and urged the jury to continue their deliberations.

An "Allen" charge, also known as the Dynamite Charge, is used in one way to get each jury to careflyy examine their positions and to dislodge people entrenched in one position or another.  It urges the jury to exercise reasonableness in the deliberation process and not to give up on the deliberation process.

The prosecution didn't want an "Allen" charge given without the court changing its ruling on a sealed motion filed by the government in response to instructions issued by the judge after a question from the jury on Friday dealing with whether or not Don Siegelman personally benefitted from a contribution to the lottery foundation.  Judge Fuller reminded prosecutors the ruling, "Is what it is."

For his part Richard Scrushy told the media outside the courthouse on Thursday he's seen it all before. "You know, I've done this before and I've been through the "Allen" charge before and it seems to be pretty effective... I believe in my heart that the majority of the jury is with us.  I just believe that in my

heart...I hope that's true.  I believe that and maybe if there's one or two hanging it up, myabe the judge's instruction will work favorably for us...We were for the "Allen" charge...we thought it was appropriate.  We agree with what the judge did.  We think it was the right thing."

As to what's happening with the jury, Terry Butts says, "I really think it's 11-to-1 or 10-to-2.  I don't know which way, but I really believe the majority of that jury has made up their mind and they've got one, maybe two, holdouts."

People inside the main courtroom yesterday noticed the jurors never made eye contact with the defendants but focused their attention mostly on the judge.

As to whether the jury will return a verdict anytime soon.  The smart people are not guessing.   One attorney told me "How the heck could anyone predict what is going to happen with a jury."

Posted by Helen Hammons on June 23, 2006 at 08:27 AM | Permalink

## Something's Shaking

There's something going on in the courthouse.  Lawyers are being called back in and the clerk is headed to the courtroom.

Lawyers were told to report to the courtroom.  From initial indications and sources, the jury has a question and there may be a note.

Don Siegelman has just arrived so we are simply waiting to get started.

The judge has entered the courtroom.  There has been a note provided to the lawyers.  The judge is saying the jurors have been unable to reach a unanimous verdict.  The judge is asking the lawyers if they want him to give a modified Allen charge.

We cannot hear what the prosecution is saying.  The microphone is not working.

Mr. Blakey is arguing an Allen charge is prejudicial.  We can barely hear.

Blakey suggests other options to Judge Fuller, but we cannot hear.  Mr. Blakey is suggesting that the judge simplify the case.  Mr. Blakey tells the judge if he would decide on the Rule 29s that would simplify the case as an alternative.  Now Blakey is asking the judge for a mistrial.  The judge denies the motion for a mistrial.  Blakey says he does not want an Allen charge.

Mr. Blakey again says no to the Allen Charge.  Mr. Deen says a modified Allen Charge is fine with him.  David McKnight is speaking for Mr. Roberrts.  Mr. Leach is reminding the judge of the jury

challenge.  Leach "endorses the idea" of a modified Allen Charge.

From the jury's note, they have been through all the counts.  "We await your further instructions."  The judge is going to give the approved modified Allen charge.

The judge says the jury will be given additional time to deliberate.  He will bring the jury in and remind them of the burdens of proof, reasonable doubt.  The jury is coming in.

The judge says he is going to remind them each defendant is presumed innocent.

He is going to remind the jury the government's burden is not beyond all doubt but beyond all reasonable doubt.

Mr. Feaga says the U.S. is very concerned about something.  I am led to believe this may be in reference to the denied motion the government offered under seal.

The judge says he has ruled and the ruling is what it is.

Reminder, the jury will continue to deliberate after the judge finishes with them.  The judge says he understands the jury is unable to reach a unanimous verdict.  He says he will now instruct them.

The judge understands the jury has conscientiously deliberated for five days.  He reminds them this is not unusual. Do not give up your convictions or give up on continuing to deliberate, the judge tells the jury. He is telling them to continue.

Judge Fuller says if they fail to reach a verdict, the case would have to be tried again and that would be at a big cost to both sides .  Any future jury would have to be selected in the same manner.  He basically reminds them no one is better able to decide the case than them.

The judge says if a majority are in favor of a conviction those that do not agree should reconsider their position.  He gives the same order as to those who feel there should be an acquital.

No juror is expected to give up an honest belief to the weight or effect of the evidence.  He tells them it is their duty to agree to a verdict if this is possible.  He reiterates that five days deliberation is not unusual.  He asks them to continue.

Judge Fuller asks the jury to remember each defendant is presumed to be innocent and the government bears the burden of establishing their guilt beyond a reasonable doubt.  He tells them it is not required the government prove their case beyond all doubt.  He reminds them a reasonable doubt is a real doubt.  He says reasonable doubt requires proof of such a convincing fashion that they would act on it in the most important of their own affairs.  If you have any further questions I encourage you to communicate with me, the judge tells the jury.

The jury will go home for the day after the judge releases them and return in the morning to continue deliberations.  The jury has left with the marshals.

**Judge Fuller gave the jury a charge similar to this 11th Circuit Modified "Allen" Charge**

Members of the Jury:
I'm going to ask that you continue your deliberations in an effort to reach agreement upon a verdict and dispose of this case; and I have a few additional comments I would like for you to consider as you do so. This is an important case. The trial has been expensive in time, effort, money and emotional strain to both the defense and the prosecution.

If you should fail to agree upon a verdict, the case will be left open and may have to be tried again. Obviously, another trial would only serve to increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried before you. Any future jury must be selected in the same manner and from the same source as you were chosen, and there is no reason to believe that the case could ever be submitted to twelve men and women more conscientious, more impartial, or more competent to decide it, or that more or clearer evidence could be produced.

If a substantial majority of your number are in favor of a conviction, those of you who disagree should reconsider whether your doubt is a reasonable one since it appears to make no effective impression upon the minds of the others. On the other hand, if a majority or even a lesser number of you are in favor of an acquittal, the rest of you should ask yourselves again, and most thoughtfully, whether you should accept the weight and sufficiency of evidence which fails to convince your fellow jurors beyond a reasonable doubt.

Remember at all times that no juror is expected to give up an honest belief he or she may have as to the weight or effect of the evidence; but, after full deliberation and consideration of the evidence in the case, it is your duty to agree upon a verdict if you can do so.  You must also remember that if the evidence in the case fails to establish guilt beyond a reasonable doubt the Defendant should have your unanimous verdict of Not Guilty.  You may be as leisurely in your deliberations as the occasion may require and should take all the time which you may feel is necessary.

I will ask now that you retire once again and continue your deliberations with these additional comments in mind to be applied, of course, in conjunction with all of the other instructions I have previously given to you.

Posted by Helen Hammons on June 22, 2006 at 04:02 PM | Permalink

# Another Hearing

There will be another hearing this morning at 10 a.m.  It is not believed this is on a major issue on the case but may have to do with an issue with an alternate juror.

The hearing is in chambers, so unless the judge issues something, we may not know exactly what is taking place.

The meeting lasted about 45 minutes and the judge asked that lawyers not discuss what took place in chambers.

Since the judge wishes it and attorneys are pretty much adhering to the judge's wishes there is nothing much to write on.

Posted by Helen Hammons on June 22, 2006 at 08:55 AM | Permalink

## Who Am I?

While we wait for the jury to come back in and since we haven't posted very much this week, I thought you might enjoy taking a guess at who some of the people involved with the trial are by a brief description.  I'll start out with one or two sentences on a couple and maybe add to them as the day goes on.  Each number is a different person, however, a person can appear as more than one number.

1.   I like to think of myself as the big dog, but in my house I'm actually number three.  You see my house is run by a 2-year-old chihuahua named Chico. Who am I?



2.  People suggest to me I might have worked in another occupation had I not become a lawyer.  This occupation involves churches.  Who am I?

3.  This trial has twice taken away one of my favorite planned vacations.  This vacation involves fish.  Who am I?

4.  I backed out of a parking spot during this trial and hit another lawyer on the same defense team.  Fortunately, the lawyer was not injured.  Who am I?

5. I like to make up and write funny stories.  I like to draw on my legal pad and then put the drawings up on the Elmo.  I like to call my dog a "Meth Lab" and have been known to object to myself in court. Who am I?

6.  I have climbed the summit of Mt. Kilimanjaro.  Who am I?

7.  I have taught in other countries outside the United States.  Who am I?

8.  I have two adopted children and the mountains, not the beach, are my place of refuge.  Who am I?

9.  I was an All-City point guard at Montgomery Academy.  Who am I?

10.  I had a liver transplant in 1987.  Who am I?

11.  The fathers of this pair of attorneys both were colonels in the Marine Corps.  Both colonels served in the Korean War?  Who are these attorneys?

12.  How in the world do I find time to do all this with eight children?

13.  I have something special that I purchased on 9/11.  Should I leave home without it, I am not reluctant to have someone go and get it for me.  Who am I?

14.  I am an artist and a sculptor in my spare time.  Who am I?

15.  I am taller than most people realize from seeing me in court.  My wife is always telling me I have a hearing problem.  Who am I?

16.  This pair has known each other since high school.  They traveled through Europe together in their younger years and now serve on different defense teams. Pictures anyone?  Who are they?

17.  My father was scheduled to hit the beaches of Japan in World War II with the United States Marine Corps.  The dropping of the atomic bomb probably saved my father's life and a quarter million others.  Who am I?

18.  This pair of familiar faces are both thespians.  One makes appearances inside the courtroom and the other appears frequently outside the courthouse.  Who are they?

Posted by Helen Hammons on June 22, 2006 at 08:12 AM | Permalink | Comments (11)

## Judge Fuller Advises Jury

**Apologies to all who could not access this story from earlier today.  There was a problem in the system and some folks could see it and others could not.**

Things got a little interesting at the courthouse today.  Lawyers received a call around 11:30 a.m. advising them Judge Fuller would hold a hearing at 1:00 p.m. in the courtroom.  The attorneys were not advised as to the purpose of the hearing.


Mack Roberts' attorney David McKnight (pictured left) was on the

treadmill when he got the call. Once inside the courthouse some of the defense attorneys huddled in the downstairs cafeteria for a quick pow wow before making the journey to the courtroom.

Judge Fuller wasted no time asking the jury to come into the courtroom.

Art Leach(pictured right) told WSFA that when you don't know why you're there and the judge turns to the marshal and asks the jury to come in "that'll make your heart skip a beat a little bit, wondering if he knows something we don't know."



Once the jury was seated the judge went quickly to work.

He started off by reminding the jurors of their role in the case and that this case was no more or less important than any other federal case.

The judge told the jury it the fact they were still deliberating on this case was not unusual. He advised the jurors not to "give up their honest beliefs...because others think differently or to simply get this case over with..."

"This is a complicated case," said Judge Fuller.

Judge Fuller advised the jury they have an option of delivering a partial verdict if necessary. However, he instructed the jury he was not advising them to do this "at this time."

Judge Fuller told the jury that if there were counts on which they had reached a unanimous verdict. "It would be your duty to make your finding on those counts."

The judge told lawyer Jeff Deen this was not an Allen Charge to the jury. David McKnight asked Judge Fuller how this charge came about and the judge told McKnight that he, Judge Fuller, believed he had not adequately advised the jury of this option earlier.

Defense lawyers seemed a bit perplexed at the charge agreeing they had not seen anything like this before without some communication from the jury to the judge. David McKnight told me that he took Judge Fuller at his word as to how this charge came about.

Judge Fuller did remind the jury that they could communicate with him at any time about any matter.

The judge overruled all objections from the defense.

Afterwards, all the lawyers except for those representing Richard Scrushy went on their way. Scrushy's team huddled up in a room to talk and coordinate a little extra research on the judge's charge.

Almost everyone you talk to says that this particular scenario is very, very unusual. Fred Helmsing told me he hadn't seen anything quite like it in 42 years of practicing law.



Jeff Deen told reporters outside the courthouse,"I don't know, I don't know what they were thinking. It may be that it's great for my client, it may not be - I don't know."

The guessing game will continue, the jury left around 4 p.m.

Posted by Helen Hammons on June 21, 2006 at 05:47 PM | Permalink

## The Wait Continues

The jury will continue to go about their duties this morning and eveyone will just have to cool their heels and let them get on with it.

Any slight movement in or around the courthouse sends things into an immediate state of confusion, such as the time late yesterday when in a matter of minutes Jeff Deen and Paul Hamrick showed up, followed shortly by Governor Siegelman and right on his heels Art Leach and Fred Gray.

It was just the routine appearance stuff that happens in cases but it sent most folks hurrying about. In this particular case I knew better, so I got to enjoy watching other mice scurry about for nothing. We media types are a strange lot.

I'll let you know if anything starts happening, until then everyone relax and have a nice day.

Posted by Helen Hammons on June 20, 2006 at 08:32 AM | Permalink

## Quiet Courthouse

The jury will get back to work today as they continue their deliberations in the government corruption trial.

I will leave the jury prognostication business up to others, it is clear from their actions that the jury has been paying attention.

There won't be a lot coming out of here until there is notice that the verdict is coming down.

he jury has gone for the day. The only event of the day was a motion by the prosecution concerning the answer the judge gave to the jury about a question on Friday.  The motion was sealed but it is our understanding the prosecution was not satisfied with the answer the judge to the question.  From various sources it is believed the judge denied the motion.

Verdict watch continues tomorrow morning about 8:30 a.m.

Posted by Helen Hammons on June 19, 2006 at 08:37 AM | Permalink

## The Jury Has a Question

It's day 33 of the trial and deliberations continued today, at least until jurors came up with a question for the judge. The question involved the "Alabama Education Lottery Foundation," which raised money to promote Don Siegelman's lottery campaign, and "The Alabama Education Foundation," which raised money to pay back any debts of the lottery campaign.

Jurors asked the judge if either of the two foundations benefited Siegelman personally.

Judge Mark Fuller made his ruling rather quickly (after about an hour-long hearing). He said because Siegelman was personally responsible for the debt, "The Alabama Education Foundation" could have benefit the former governor personally. But Fuller told jurors they would have to make up their own minds about whether the lottery foundation personally benefited Siegelman.

The question regards counts against Siegelman that come after the RICO conspiracy counts. That has some people in the courthouse wondering if jurors have already considered the RICO counts or  skipped them to consider these other counts. One thing is for sure, the question proves the jury is taking this case seriously, despite claims by the defense that "there was no evidence" and the trial was "a political witch hunt."

The jury continued to deliberate until around 2:00 p.m. then decided to call it a week. Since some jurors live outside the Montgomery area, they decided to go home early for the weekend. Deliberations will resume Monday morning. Helen Hammons should be back at blogging duty then. Thanks for logging on!

Don't forget WSFA 12 News will break into regular programming whenever a verdict is reached. This blog will then be updated as soon after as possible.

-Mark Bullock, WSFA 12 News

Posted by Mark Bullock on June 16, 2006 at 11:29 AM | Permalink

# The Jury is Deliberating

The jury is back from lunch. It took a while, but all the evidence was moved into the deliberating room and jury members have begun their discussions. The buzz around the courthouse is that the verdict will come quickly. But, of course, no one knows for sure. Some say today, some say tomorrow. Another reporter is predicting Monday or Tuesday.

When a verdict is reached, we have learned the judge will make phone calls to the attorneys, giving them 15 minutes to get to the courthouse. WSFA 12 News will provide live televised coverage of the verdict while it is being read. Since cameras are not allowed in the courthouse, we will transmit the verdict electronically so it can be read aloud on air virtually simultaneously.

WSFA 12 News has reporters stationed inside and outside the courthouse, along with our exclusive legal analyst, attorney Allen Woodard. This blog will be updated as soon after the verdict is read as possible.

Well, no verdict today. The jury left to go home about five minutes ago. They did not return to the courtroom and there were no other actions taken. They deliberated for approximately 4 hours. They will continue their discussions tomorrow.

Posted by Mark Bullock on June 15, 2006 at 03:02 PM | Permalink | Comments (44)

# If you can't donate, you can't participate

Scrushy's lawyers just finished their closing arguments. Now it's the prosecution's turn. Chief Prosecutor Louis Franklin told jurors that he won't comment on Fred Gray's recollections of the civil rights movement. But he will tell them that there's no evidence to prove claims that this case is politically motivated.

Franklin had one of the lines of the day when he told jurors what the case is "really about." He said, "If you can't donate, you can't participate." Franklin says this case proves that only rich people benefit from government because they're the only ones who can afford to make large campaign contributions.

Jurors are being told to simply look at the evidence. "Use your common sense, I'm begging you," Franklin said.

Franklin referenced something earlier in closing arguments, in which he says Siegelman's attorney, Vince Kilborn said Siegelman "apologized." Franklin says apologies don't cut it. He turned around and pointed at the defense attorneys' table saying, "that ain't good enough!" He told jurors they have to hold the defendants accountable.

Franklin says by having someone else cut the check, Healthsouth was trying to cover up its donation to

Siegelman's education lottery. He says it wasn't because Leslie Scrushy was opposed to lottery. It was because Scrushy knew it was a bribe.

Franklin says the prosecution has done a good job in presenting its case. He says individual witnesses may not have known about any alleged conspiracies, but when you consider all of the testimony as a whole, it becomes obvious.

The motorcycle is coming up again. Franklin is asking jurors, "when have you ever had to hire two lawyers just to purchase a vehicle?" He says the fact that two parties hired lawyers to help in the sale of a motorcycle by Siegelman to Nick Bailey meant there was some kind of cover up. Franklin says, "that's evidence talking to you."

Franklin says it is not necessary for the case to be proved beyond all possible reasonable doubt. He says he can't open up the defendants' heads and prove their intent. He says jurors have to look at their actions to determine their intent. He says jurors have to use their common sense.

Franklin is now talking about the case against former transportation director Mack Roberts. He says Roberts recused himself from the "Rainline" road project because he was too close to those involved. Then he got involved again. Franklin told the jury, "I want you to hold that against him." He accused Roberts of approving the "Rainline" project without consulting any other DOT officials.

Now attention is turning to the last of the four defendants, Paul Hamrick, Siegelman's former chief of staff. Franklin is reminding jurors about "the BMW." He also talked about the gifts and cash Hamrick received from Lanny Young, another prominent prosecution witness. He says Hamrick, Young, Bailey and Siegelman were "all friends." Everyone in Siegelman's administration was accepting gifts from Young. Prosecutors contend that  Young received government favors in exchange for his gifts.

Franklin is crediting a *Mobile Register* reporter who wrote a story about Young's gifts for sparking this entire case.

Franklin is dismissing the defense argument that dates on checks don't match up to the dates of alleged meetings. He says dates don't matter. What matters is that the checks made their way into the hands of then-governor Siegelman, according to Nick Bailey's testimony.

Franklin says, "there should be no doubt in your mind" as to the defendants' guilt. He is now thanking jurors for their time and attention. He says everyone has to answer for their crimes. He is asking the jury to keep their oath and consider the evidence and use their common sense. He says they should find the defendants guilty not because the government asked them to, but because the evidence proves it.

The judge is now instructing the jurors on the duty to deliberate. He says any verdict reached, guilty or not guilty, must be unanimous. He says jurors must each decide the case for themselves while also discussing it with fellow jurors. No matter their decision, jurors will not be required to discuss their

decisions with others, the judge says.

The judge has prepared separate verdict forms for each of the defendants. Each form has a place to indicate guilty or not guilty. Judge Fuller is reminding jurors he has "no feeling" as to whether the defendants are guilty or innocent. It is up to the jury.

The jury is being instructed that it should not begin deliberating, but should choose a foreperson and then take lunch. They are now being dismissed to the jury room.

Posted by Mark Bullock on June 15, 2006 at 10:15 AM | Permalink | Comments (26)

## Trial Day 32 - More Closing Arguments

Good morning from the federal courthouse in Montgomery. There's a new blogger at the keyboard today. This is Mark Bullock of WSFA 12 News. Helen Hammonds is off for the next couple of days, so I'll be filling in until Friday or until there is a verdict, whichever comes first. Bear with me. I'm new to the whole blogging thing. It took me a while to get the lap top computer connected to the wireless network, but I think I've got it figured out now.

This is trial day 32. We will hear more closing arguments today, first from Richard Scrushy's attorney, Art Leach. The other defense lawyers got their chance yesterday. The prosecution will then get a chance to rebut. The jury could get the case either this afternoon or tomorrow.

Leach is addressing the jury. He says no money ever went directly from Scrushy to former governor Don Siegelman. He says the prosecution never proved any quid pro quo relationship between Scrushy and Siegelman. He's also questioning the credibility of prosecution witnesses like Nick Bailey. Bailey testified that Scrushy donated a large sum of money to Siegelman and implied that the money was a bribe to get Scrushy a seat on the hospital certificate of need board. Leach is questioning Bailey's recollection.

Leach says Scrushy simply convinced UBS, Healthsouth's financial advisor, to make a donation to a worthy cause (Siegelman's education lottery foundation).

Leach says there is no evidence that Scrushy wanted to "buy" a seat on the CON board. In fact, Scrushy already had a seat on the board and resigned during the Fob James administration.

Leach is reminding jurors that it is their job to assume Richard Scrushy is not guilty. He says it is up to the prosecution to prove Scrushy's guilt.  He says the government is trying to make a silk purse out of a pig's ear and jurors should find Scrushy not guilty on all counts. He says this is "very serious business." You're talking about a man's future, a man's family. This is the most important day of his life.

Now Leach is attacking the prosecution's evidence. He says the government's first interview with Nick Bailey was in 2001, during which Leach claims Bailey lied. Leach says the government should have arrested Bailey. He is also asking why the government never put a wire on Bailey and sent him in to talk with Siegelman. Leach says there are no such recordings and not enough evidence to convict his client.

Leach is showing the jury a series of memos that have been introduced into evidence. He says the memos prove that Scrushy's actions were always on the up and up. He maintains there was never any corruption.

Leach is saying again, there is absolutely no evidence that Scrushy had any relationship with Siegelman, in which he tried to bribe the former governor. He is reminding jurors of testimony from a Healthsouth employee who said Scrushy and Siegelman were not friends.

Leach says even the prosecution agrees that there are questions as to when and where the check from Scrushy was presented to Siegelman. He says much of Nick Bailey's testimony was hearsay. This, he says, should place reasonable doubt in the minds of the jurors.

Leach says, in order to prove conspiracy, the government must prove a covert act. But he says testimony from a Healthsouth employee proves that Scrushy never tried to hide anything. Leach says he will now "yield to my colleague, Fred Gray."

Gray is well known for representing Martin Luther King, Jr. and Rosa Parks during Montgomery's civil rights movement. In this trial, he is representing Richard Scrushy.

Gray is beginning with a quote from the bible. He says the bible says "If you do the right thing, you won't be forgotten. If you do the right thing, you will be rewarded." He says in this case, the government has done "the wrong thing" and the jury can do "the right thing" by acquitting his client.

Gray is thanking the jury for sitting patiently and listening for more than six weeks. He says this is the longest jury trial he has ever been associated with. He says he is honored to represent Scrushy, "one of the most outstanding businessmen in this state."

Gray is reminding jurors of MLK's statement that men should be judged equally. He is quoting King saying, "injustice anywhere is a threat to justice everywhere." He told the jury "your verdict must be not guilty and that will be justice. Anything else will be injustice." Gray implied that Montgomery's past is full of injustices.

Gray says the government should be ashamed of spending millions of dollars to present such a case. He says prosecutors failed miserably to prove any of the charges in the indictment. He called the case "utterly ridiculous." He asks why the U.S. government, which is one of the most powerful governments in the world, is spending its time on people like Richard Scrushy.

Gray is telling jurors about his suit against the U.S. government regarding the Tuskegee syphilis study, which he says proves the federal government is not always right. He says the prosecution did not prove its case and the jury should hold the government accountable.

He says he will not call any lawyer in the courtroom a liar, "but what I will do is tell them they have a responsibility to prove beyond a reasonable doubt" that the defendants are guilty. He says the government did not do that. Gray says he doesn't care what the prosecutors say or do, they did not prove their case.

Gray is telling jurors who believe that Scrushy is innocent to fight for their convictions while in the deliberating room.

The jury is again hearing Gray talk about "Alabama politics 2006," a phrase he used in opening statements. Gray maintains the case was only filed to prevent Don Siegelman from winning the June 6th gubernatorial primary. Siegelman has also said this repeatedly.

He joked, if Siegelman had won the primary, the trial might have kept going until the November election.

Gray says the prosecution's case "just doesn't make sense." Why would the CEO of a large corporation subject himself to criminal prosecution for a PET scan and a few beds in a rehabilitation hospital in Phenix City. (These were the two Healthsouth projects approved while Scrushy was on the CON board).

Everything Scrushy did was legal, says Gray.  Jurors may not like what happened, but it was not illegal. He says jurors may not like the way politics work in Alabama, specifically political contributions, but that doesn't mean it's against the law. And it's the jury's job to follow the law.  He again asked for an acquittal of his client. He says

During opening statements, prosecutors objected when Gray made references to MLK and the civil rights movement. But he chose to do it again in his closing arguments. Gray concluded his statements by telling jurors that they could "fulfill Dr. King's dream" by finding Scrushy not guilty, even quoting King's famous speech, "free at last, free at last, thank God almighty, we're free at last."

This final statement caused quite an outburst in the overflow room. Fellow reporters and others who are watching the trial seem to feel Gray might have crossed the line. The room is a bit more crowded today than usual. Obviously, folks are interested in seeing the outcome of this trial.

We are now waiting for the prosecution's rebuttal. Some jurors have left the courtroom to use the restroom. More later.

Posted by Mark Bullock on June 15, 2006 at 08:45 AM | Permalink | Comments (3)

# Thursday Morning Schedule

When the jury returns on Thursday morning, the Scrushy team will get their turn at bat.

Art Leach and Fred Gray will have an hour of their own, plus seven minutes of unused defense time from other lawyers should they need it.

This will be followed by the prosecution's last chance with the jury.  The government will have around 52 minutes to present their final argument and to rebut what they have heard from defense lawyers.

The jury will still have to select a foreperson.

Unfortunately, I will not get to hear these arguments, which should be passionate on both sides.

WSFA's Mark Bullock will be keeping you up-to-date with event postings on Thursday and Friday.

Not knowing how quickly the jury will come back with a verdict, I want to again take the time to thank all the folks who have helped me in this new endeavor.  You all have been remarkable.  I've tried your patience on many occasions but every one of you endured it and helped make my job a lot easier and taught me a lot along the way.

God bless and keep everyone.

Posted by Helen Hammons on June 14, 2006 at 08:34 PM | Permalink | Comments (7)

# Mack Roberts' Defense

David McKnight will start closing for Mack Roberts.  McKnight says Roberts is not guilty of a single count in this indictment.

Shame on the government for bringing this action against Mack Roberts.  To come back with a verdict of guilty on one single count...would be an injustice...if you come back with a guilty verdict of one count..you might as well come back with a guilty on all counts.

McKnight says the standard for a guilty conviction is high because people's freedom is at stake. McKnight says the government hasn't come close to proving the case against Roberts.

McKnight says Mack Roberts had the "good faith" that is an absolute defense on the charges.  Roberts believed in Rainline.

McKnight talks about traveling to school and scooping up tadpoles and putting them in the sandwich

bag.  He says when he got home  there was so much silt in the sandwich bag you couldn't see the tadpoles..."you had to wait for the silt to settle."

"The government has been shaking the silt up...so you couldn't see the truth."

McKnight tells the jury he doesn't care which set of minutes the jury uses.  Mcknight says the government's meeting minutes are more favorable than the one's the defense entered.

But Mack Roberts wasn't even with the highway department at the time says McKnight.  McKnight says more silt is the federal matching funds not being used.  He says the director can pick and chose which products should be used.  Marcato says Rainline was fully tested according to McKnight.  McKnight says three or four witnesses told the government Rainline was tested but the government wanted to believe Derickson.

McKnight brings  up  "The United States wins its case when just is done to one of its citizens."  McKnight says that the prosecutors in this case has a motto that,"the U.S. wins when they get a conviction..."

McKnight tells the jurors they have more power than voters... he tells the voters they are the protectors of values and the constitution..."your the only people that can hold them to their burden of proof."

McKnight says this is whether they proved it beyond a reasonable doubt.  McKnight says he has a simple chart.

McKnight now talks about reasonable doubt - "it's like when you smell fresh baked bread."

Do you have any reasonable doubt that a bribe was paid to Mack Roberts?  "The only person who has said a bribe was paid was Mr. Feaga and what he says is not evidence."

"Who in their right mind trades $1 million for a $71,000 bribe.  It doesn't pass the common sense test."

"If the $71,000 is a bribe, it is the first bribe in U.S. history where they took taxes out."

McKnight says Lowell Barron had to talk Roberts into being highway director.  He says Elmer Harris recommended Roberts.  McKnight says if Allen had gotten to pick the highway director, the highway director would have been Ray Bass.

"If you're trying to funnel money to your buddy why would you set up a blue ribbon panel to study it?"

"Why would you discontinue it on highways, if you were trying to funnel money to your buddy?"  McKnight says Marcato says there was a $2.6 million reduction in crashes...thank you Mack Roberts for

putting Rainline on our roads...."

McKnight says,"Jim Allen didn't have an interest in Rainline until January." McKnight says Roberts had nothing to do with Mitt Lary road. McKnight says Swan said the road was a good project.

McKnight talks about the people who have known Mack Roberts for 40-50 years. "What did they say about Mack Roberts? He's a man of integrity...wouldn't be involved in a mail fraud scheme..wouldn't be involved in bribery."

McKnight says contrary to what Feaga said Allen was given immunity.

"This is Mack Roberts' day, the decision you make will live with him together. Don't give up what you know is right...you can't do 50 percent justice...it's not a compromise...Mack Roberts is not a criminal... the onlhy verdict you can give in this case is not guilty as to Mack Roberts."

Mr. Baxley is up. He tells the jury that they were reminded to keep the charges against the defendants separate. Mr. Baxley says a lot of people think something has to be going on if a person is charged. Baxley says the jury told McKnight before the trial started they believed an innocent person could be charged.

Baxley says, "This is the most frustrating case I've ever been involved in." Baxley says prosecutors have constantly said, "If you knew...would you still say so and say...I would bet you Mr. Feaga has told you that 45 times..."

Baxley says Jim Allen has a deal and cannot be indicted "nol matter what you call it." Baxley says Allen testified unequivocally that the reason he gave the $40,000 had nothing to do with Mack Roberrs... he testified he wanted Ray Bass to be highway director and on cross examination by Mr.Kilborn, Jim Allen said "the day before the election, I had no idea Mack Roberts would be highway director."

Baxley says he is baffled as to why the government brought the case. He talks about Barron's testimony.

Baxley says Lanny Young and the sackful of money story had nothing to do with Mack Roberts wanting to be highway director.

"Mack Roberts did not need Jim Allen to make him highway director....Mack Roberts had been chosen highway director by three governor's prior to this...Mack Roberts raised $250,000 for Gov. Siegelman... and Jim Allen had nothing to do with it...Mack Roberts did not need Jim Allen....I get doubly frrustrated...if the government had evidence...and even if it were true...(Mack Roberts) is not dharged with buying a job...he is charged with mail fraud...it wouldn't have mattered if all their theories were supported by the evidence...it doesn't amount to mail fraud on these charges."

Baxley says the government keeps implying stuff has been done wrong as regards to highway federal

funds.  Baxley says the government kept implying that the $71,000 was a bribe.  Baxley says this contradicted their own witness.

Baxley says if this severance package was illegal it was put out for the world to see.  He contrasts this with Mr. Feaga's statement about conspiracies not being hatched in the light of day.

Baxley says the government had someone from the ethics commission on the witness list but didn't call him.

They are going to break for the day.

Posted by Helen Hammons on June 14, 2006 at 04:45 PM | Permalink | Comments (0)

## Defense for Paul Hamrick

The defense for Paul Hamrick is next.

Jeff Deen is giving his closing argument and is talking about quid pro quo.  Deen says it is like a three legged school.  "Look at the agreement part...you only have two witnesses that talk about Paul Hamrick... Nick Bailey tells you it evolves over time...how can you have an agreement that keeps changing over time...Nick gets caught with his hand in the cookie jar...it goes back to sibling rivalries...Cain and Abel they didn't get along...Joseph, his brothers threw him down in the pit...now the government would say didn't Governor Siegelman know what was going on."

"When he got caught with his hand in the cookie jar he said you have to get Paul involved too."

"Noiw Lanny, he made 11 statements from Nov. 6, 2001 to July 2003...he's represented by a lawyer...he didn't say anything about this play for pay scheme...you don't see Paul Hamrick's name in there...in the two different federal indictments he was involved in...he was in the Jackson County day for 70 days and 70 nights....Jack Brennan shows up...Lanny gets out of jail shortly thereafter."

Mr. Deen shows a list to the jury of people who testified for the government to the jury and then a list that says something about Hamrick and his case.  He says he has highlighted them in different colors for how the testimony went.  He is doing this with charts.  We cannot see these charts.

Deen says Hamrick got indicted because he had the title "chief of staff."  He says Hamrick worked hard at his job.

"All you heard about CON Board...nobody mentioned Paul and the CON Board...he didn't get to ride on the helicopter, he didn't get to go to the lake house, he didn't get to meet the million dollar man.."

Deen goes to the DOT and says, "This is Tony Soprano's Disney Land."

"Who do you believe Jim Allen or Pennie Buckelew?"says Deen.

We took a break and Mr. Deen has started again.

Mr. Deen is talking about agreements.

In 1994  "We're going to be able to help you...sposnor a race car," says Lanny.  Lanny didn't get his race car team or his road looked into.

Deen is now talking about honest services fraud.  Deen is explaining also honest services of public officials.

"No evidence Hamrick had any knowledge of anything being put in the mail," says Mr. Deen.  He says as regards to faxes, Hamrick didn't send them...he didn't have anything to do with it personally...he has to be involved in the scheme...he didn't know it was being done.

On the Cherokee County count, Mr. Deen says Hamrick had to have specific intent and knowingly have been involved in that.  This was completed on Dec. 7th, so any kind of influence that had been done...he was a private citizen.  He didn't do any mail or wiring..."says Deen.

Deen says money was exchanged between Young and Jordan.  "Both of them testified and they both said Paul they never told Paul what was going on."

Deen says Jordan could only vote in case of a tie.  Deen says nothing shows nobody on the commission got involved.  Deen says the project was a good deal for Cherokee County.

Deen says Judge Jordan didn't call him about influencing him or anything....

Deen says there is nothing as to Hamrick influencing the Cherokee County Commission.  Deen says three people whose credibility could be questioned by you - referring to Bailey, Young, Jordan.

Deen moves on to Talladega and says Hamricks name wasn't on any documentation as testified to.  Deen says, "All Lanny can say is he wanted to take credit for it later at the track...The government doesn't call Grant Lynch...the burden's on them...how about 35 senators to testify  Paul Hamrick bugged me to death...if they had anybody who could say that Paul Hamrick had anything to do with that legislation they would have had them in here."

Deen makes a bad joke about a rooster and a "quid pro crow."

Deen has moved on to Emelle and the revenue deal. Deen says Hamrick didn't have anything to do anything with financial stuff. "The only evidence you have is Nick Bailey saying after it was done that he told Hamrick about it." Deen says it has nothing to do with Hamrick. Deen asks the jury if you could have a reasonable doubt about the lack of evidence. Deen adds more names to the list of people the government didn't have come in to testify.

"If the witness didn't agree with their theory of the case...they just ignored the facts," says Deen about the government.

Deen now moves on to the alleged meeting in Washington, D.C. between Hamrick and a Waste Management lobbyist.

Deen talks about Claire Austin being mad about money. Deen says when Austin turned information to Eddie Curran and then paraded Lisa Kardell out. Deen says if you believe the story, Kardell went to a bar in 1999, where she says she met Hamrick. "Not once did he ask Lisa Kardell to look around the courtroom and point out Hamrick," says Deen about Mr. Perrine.

Deen now talks about the debit card being used in Montgomery the same afternoon Deen was supposed to be in Washington, D.C.

Deen says Kardell was not some executive in Washington. Deen says then Austin says there were two times, one in 1999 and once in 2000.

Sorry folks the gremlin ate part of Mr. Deen's closing.

Deen says Hamrick didn't know Lanny was a "con" man. Deen says all this stuff of helping out with Lanny went through Nick. Who's in Talladega with Lanny? Nick...when there's anything screwy going on in this case who is there?

Deen says the wool was pulled over the governor's eye. Deen talks about Anthony Fant as a periperhal character. Deen says Lanny owed Fant money and Lanny was introduced to Fant by Nick. Deen says Fatn loaned Lanny $1000. Deen says Bailey was good at getting men to give him money.

Deen says the bill for the $100,000 was do in early 2001. Fant according to Deen starts pressuring for his money back. Deen says the G.H. Warehouse project going on at the same time. Deen calls it a dummy corporation.

Deen talks about stuff going through the mail with Lanny Young, Beth Crain, and Nick Bailey. Deen says Fant sued Lanny "just like everybody in the world has."

"Eddie Curran, the sly dog he is." Deen says unraveled G.H.

You guys want to go home, I want to go home.

New post.

Posted by Helen Hammons on June 14, 2006 at 02:48 PM | Permalink | Comments (0)

## The Defense Clolsing Arguments

The judge is telling the jury it was improper for the government to make statements about the credibility of the witnesses, he is reminding the jury that it is up to them to determine whether or not to believe any witness and is going through some suggested questions they may ask themselves about witness testimony.

Vince Kilborn says his greatest fear was that he would stand up to address the jury and a word would not come out of his mouth.

Kilborn now says he knows he's in the right place "with an Alabama jury I can trust.  I know I can trust you with my life...I know I can trust you with the most important case in Alabama history...we have gotten a Governor of Alabama charged with 33 counts for which he is not guilty...I know I can trust you because we stand on scared ground...People are dying right now in Baghdad...so we can have the greatest justice system in the world...You have set aside your lives...so we can see justice done...You will do your duty...and your duty in this case is a not guilty verdict...When we started this case it was cool, it was the spring time...I spent my birthday with you...I'm homesick..I want to go home..back to Mobile, where I came from...with the feeling I participated in the greatest verdict in the history of the state.. I just got to say thanks for your sacrifice...Outside military service, Your jury service is the highest most important thing you can do for your country,,,"

"Governor Siegelman, my client is an innocent man and I say that in front of you jurors...the place is full...the eyes are all on us...I say in front of everybody  Governor Siegelman is innocent...he is also human...he has made mistakes..you can't live life without making mistakes...his biggest mistake was to allow people to be close to him who were dishonest...he allowed Nick Bailey, who he trusted, to become dishonest and he didn't realize it until it was too late."

Mr. Kilborn goes on about the human experience and what people close to you do that you don't know about.

"The future of Don Siegelman doesn't belong to the government...it belongs to the voters...He is not a criminal...He is not guilty of what he has been charged with...the government has spent five years...I believe in my heart that...you are not convinced...I know where you came from...you bring all your human experiences and common sense right here...This case is not going to last much longer.."

"There are a few important rules...the government has the burden of proof..I want to put meat on the bones of that...All the defendants are considered innocent...the indictment means nothing...I told you this was a case of half truths...but you have seen the whole truth...the judge has told you...the most important thing in there is the definition of reasonable doubt."

Mr. Kilborn is going through reasonable doubt and preponderance of the evidence and clear and convincing evidence.

"They said a big chunk of their case was relying on Lanny Young and Nick Bailey...if Lanny Young is testifying in a case where they're trying to take a baby away from its mother and Lanny Young says he saw that mother slap that child, would you believe him?  Of course not..."

Mr. Kilborn now advises the jury to view testimonty from witnesses with felonies with caution.

Kilborn says Allen cut an immunity deal...The government"s key case is Young, Bailey, Allen.  If you don't believe in the whole house of cards collapses."

"They do want you to believe those witnesses and if you don't the case is over."

Kilborn moves to Lanny Young..."You wouldn't believe Lanny Young on a stack of Bibles...that he would lie to get a rank in the military...and the government ought to be ashamed for not bringing that out..he forged his transcript and his records and he...didn't even forge high enough grades..."

Kilborn says Young stole from his creditors and stiffed his employees, "he stiffed his parents, he stiffed his brothers and sisters and left them holding the debt."

Kilborn says Young didn't put his AWDS on his 1995 bankruptcy.

"He comes in and lies to his partner, Claire Austin, he stills her checkbook, he steals $10,000 out of her bank account..."

"Claire Austin is a good example...He is a good con srtist, he fooled her.  He lied to the IRS...who else did he lie to...he promises to tell the truth about the other misdeeds...gues what he left out..this bond issue, Talladega, and Phillip Jordan..how do you forget you bribed a probate judge..."

"He lies again when he gets indicted...he had to plead guilty a second time...and I think the coup de grace was he lied to his own pilot...talk about a con man...he steals the pilot's chekcs...and if his witness chair hadn't been nailed down, he probably would have stolen the witness chair."

"He knows what he's remembering...he knows where he's going next week with the prosecutors..."

Nick Bailey is a tragic figure according to Kilborn..."Nick Bailey was the perfect prey for Mr. Young..he succumbed to the gambling problem and the debt...and Young took the opportunity...This was all done behind Gov. Siegelman's back...Gov. Siegelman did not know what was going on..."

Mr. kilborn is now talking about a piece of evidence from a transcript. Mr. Franklin has an objection which the judge sustains. Mr. Kilborn says he "absent mindedly put it back up."

Somebody else has acted up in the courtroom, probably laughing. The judge reminds people "if you can't control yourself leave the courtroom."

"Did you ever agree to do anything illegal or improper?" and the answer was "no." Kilborn says of Bailey's testimony.

Kilborn says the governor didn't know Bailey was on the take from at least four different people. He sucked the governor in, he conned the governor.

Mr. Kilborn has a chart. We can't see it but Mr. Kilborn says it shows "the benefits of the absolute agreement."

Kilborn says,"If you're the lion you're going to get the lion's share right?"

Lanny Young got or was going to get $10.2 million total, according to Kilborn, as a result of the absolute agreement.

Siegelman got part of a motorcycle, and a 4-wheeler, $14,5000. That's what your governor got from this absolute agreement. "That dog don't hunt in Montgomery Alabama."

Kilborn says wrongs have been righted in Montgomery, Alabama. Kilborn says an all white jury found Dr. King innocent of trumped up tax charges....the lawyer was Fred Gray"

Kilborn says, "The motorcycle is a fraud...what the government didn't tell you...but what the evidence shows is that Gov. Siegelman went to Japan..about Honda...Honda wanted to give the motorcycle to him...and what did the governor say...I want to pay for it...He got a discount..I don't care if Gov. Riley gets a better deal if he wants a Honda..."

Mr. Kilborn shows the check to the jury with which the motorcycle was purchased on December 7th. Kilborn says Bailey decided he wanted to buy a part of the motorcycle. The bill of sell occurred in February.

"Now this business about Lanny Young...is bologna...The government couldn't get the story straight...at first they said the check was for the motorcycle...Bailey says he lied to his own lawyer..two lawyers aren't stupid enough to get involved in obstruction of justice...and after Eddie Curran had splattered it all

over the newspapers."

"This business with Lori Allen..infuriates me...Lori Siegelman is Don Siegelman's wife's maiden name...
she has always gone by that and it's not unusual...For the prosecutor to bring that lady into this court
makes me mad...they stuck that photograph up on the screen...and Mr. Feaga was just getting ready to
circle that beautiful smile right there until I objected..."

"Wife's are always wanting money for other things...she was mad because he spent the money...it's also
very comman and human experience...once the spouse...gets past it...somtimes it's over...it's a perfectly
legitimate deal...there wasn't anything to cover it up...you don't have to cover up..."

As to the 4-wheeler, Kilborn says the 40wheeler has gone from the mansion inventory to the state.

"Governor Siegelman did not get a free 4x4...it was properly put on the mansion inventory...people are
always giving governor's things..."

Mr. Kilborn talks about "absolute agreement." He says it was almost four years before the first act in the
absolute agreement. Kilborn now talks about the vote in the legislature about Talladega beer sales.
"Lanny Young, he can take credit of anything..."

Now he moves to Cherokee County. He says the only testimony was Judge Jordan, "and he's a pitiful
character," had a phone call with Siegelman in which Siegelman said "help him if you can."

"This was done in December..." Kilborn says the vote happened in April.

Kilborn says the tax lowering fror the Emelle land fill was a good decision for the state. The
government also said G.H. construction was a great project according to Kilborn. Kilborn says when the
thing fell about Blount called Siegelman up and told him to go forward with the project.."There's no
evidence" Governor Siegelman knew what they did."

"Siegelman should have been more careful with that Bailey guy...but it's not a crime," says Kilborn.

J"Jim Allen should have been indicted...he had the same law firm Bailey had...he said he was telling the
truth..."

"If he lied thien, and never brought any of this up...it was only when he got his immunity letter (Allen
changed his mind)"

"Allen said he did not believe it was a bribe...he did not believe he did anything wrong..." Kilborn says
when Allen admitted it wasn't a bribe, the government started trashing Allen.

"Allen's testimony that there was a bribe that took place...my favorite witness in the whole world said,"If he's lips are moving he's lying."

Kilborn relates asking Mar Marcato whether or not he had invented any thing that would make Jim Allen tell the truth.  Marcato he believes responded he didn't believe that would be possible.

Kilborn says Mack Roberts was the "best highway director ever."  Kilborn says Lowell Barron told Siegelman, Siegelman should appoint Mack Roberts.  Kilborn brings up Elmer Harris, "he was so important."

Kilborn keeps talking up Elmer Harris.  "If Jim Allen had bribed Gov. Siegelman, who is the last person you would appoint to be head of the transition team?"

Kilborn says Elmer Harris said he didn't know Jim Allen.  "It didn't happen on Elmer Harris' watch."

"They got so much mail fraud in this case your eyes get blurry looking at the instructions..you've got mail fraud falling out of the sky..."

Kilborn says he is sorry Gov. Siegelman scared Mr. Marcato.  He says that apparently that's the way you raise money..."You start out high and you come down low."

Kilborn says the government scared Mr. Marcato and others to death by the grand jury.

Kilborn is alleging the government has beaten Bailey into submission with their questioning.

Kilborn says the government is trying to cover up their tracks...."they can't put the check in the meeting..." This has to do with the Scrushy-Siegelman meetings.

"Scrushy didn't even want the job," says Kilborn.

Kilborn says not only the IHS check didn't get report it, but other checks didn't get reported.

Kilborn now asks the jury for a not guilty verdict.  "He's good in his heart...he tried to help the people of Alabama...this prosecution over five years was overzealous...it wasn't seeking the truth...the motorcycle was a good example of that...and now he's sitting here with his wife...the woman who almost bled to death in his arms...the government ought to be ashamed to say that thing..thank you for my client and myself and now I trust you with the life of my client...thank you."

New post.

Posted by Helen Hammons on June 14, 2006 at 01:43 PM | Permalink | Comments (1)

# Closing Arguments Soon to Come

Following instructions to the jury, closing arguments will begin.  The prosecution has two hours and then the order for the defense is Siegelman, Hamrick, Roberts, and Scrushy in that order.

Alll of the charts will be removed from evidence after closing, but the summary charts prepared and entered into evidence will be allowed.  This according to Judge Fuller.  Art Leach told WSFA Monday that he was confident the motion would be granted.  The judge has granted the motion by Scrushy, which can be read at the right.

The judge is now instructing the jury.

Judge Fuller says he felt it would be more efficient ant helpful to the jury to do jury instructions before the closing arguments.  He is explaining the order to the jury.  He tells the jury he doesn't believe they will have time to deliberate today, but he does want them to select the foreperson today.

Judge Fuller has said he expects these instructions to take 30-40 minutes.

Judge Fuller is explaining reasonable doubt and the term evidence.  Anything the lawyers say is not evidence in the case.  The judge says he has no opinion concerning the case.

He now explains direct vs circumstantial evidence.  Judge Fuller is talking about believing witnesses and earlier testimony by witnesses before this trial.

The judge talks about witnesses who may want to strike a good bargain with the government and about witnesses who have entered into plea bargains.  He urges the jury to be cautious when considering these witnesses.

The judge will now go over the charges in the indictment.  He advises the indictment is not evidence of guilt.

Posted by Helen Hammons on June 14, 2006 at 08:45 AM | Permalink | Comments (5)

# Wednesday Timetable

The timetable for Wednesday has become a little clearer.

I had heard Judge Fuller was going to charge the jury first and that has now been confirmed.  The jury comes in at 8:30 a.m.

As of the last accounts coming out of the courthouse from people close to the case, the judge said he expected the charge to take one hour.

We know the judge's proposed jury instructions document was around 52 pages long going into the charge conference yesterday.  From a government filing we know that there COULD be something in the instructions related to the honest services counts.

> The prosecution has asked the court to "Insert in the Court's proposed instructions on page 28 as the last sentence of the carry-over paragraph and on page 30 as the last sentence of the last paragraph, the following:
>
> "Public officials and public employees do not defraud the public of honest services if their intent was solely the cultivation of business or political friendship, but they can defraud the public of honest services if they act with an intent to be influenced or rewarded regarding their official acts."
>
> By submitting this proposed instruction, the United States in no way waives its objection to the Court's decision to give this additional charge that is not included in the Eleventh Circuit Pattern Jury Instructions."

We'll have to wait to find out what has ended up in the final instructions.

Following this the prosecution will get two hours for their closing arguments.  The defense will have 4.5 hours total for all defendants to put on their closing arguments.  It is expected the jury will be able to select a foreperson Wednesday as well.

As previously stated, Judge Fuller says this will all be done tomorrow.  The jury will probably begin deliberations Thursday, depending on how much of their allotted time each side uses on Wednesday.

As to counts three and four of the indictment, the names of Mr. Scrushy and Governor Siegelman will be removed from the "aiding and abetting"  portion of one count each.  Mr. Scrushy's name will be removed from that portion of count three and Governor Siegelman's name will be removed from that portion of count four.

Closing arguments can win or lose a case if jury members have followed instructions and not already made up their minds on the case.  In spite of the judge's instructions to jurors that what lawyers say is not evidence, lawyers on both sides will try for one final time to connect with the jury and lay everything out in a nice neat package which pulls everything together.

If past history is any indication we will probably hear a history lesson or two.  The arguments will be passionate and we've seen previews of some of the arguments already.

It makes no difference what anyone but the jury thinks at this point. For both the prosecution and defense, the 12 most important people in the world for a few hours will be those jurors in the jury box.

I only want three things - The mic to work, the lawyers to remember to put it on, and the lawyers to remember to turn it on.

Posted by Helen Hammons on June 13, 2006 at 05:31 PM | Permalink | Comments (3)

## Counts 3-4

It appears for all practical purposes Richrd Scrushy's name will be dropped from count 3 of the indictment and Gov. Siegelman's name will be dropped from count 4.

These counts have to do with "aiding and abetting" federal funds bribery charges.

In count three Siegelman is charged with having "solicited, demanded, accepted, and agreed to accept $500,000 from defendant Richard Scrushy, intending to be influenced and rewarded in connection with the appointment of defendant Richard Scrushy to the CON Board."

Scrushy's name would be removed from the section above that reads "aided and abetted by defendant Richard Scrushy."

The roles in count four are reversed in that in that count Scrushy is alleged to have been "aided and abetted by defendant Don Eugene Siegelman."

According to count four, "Scrushy corruptly gave, offered, and agreed to give $500,000 to defendant Don Eugene Siegelman, Governor of the State of Alabama, intending to influence and reward defendant Siegelman in connection with the appointment of defendant Richard Scrushy to the CON Board."

Art Leach says he's never seen this done before and is not sure the government can do this. However, "I am not in the practice of looking a Rule 29 gift horse in the mouth," said Leach to Judge Fuller.

Judge Fuller indicating during the morning hearing that he also had some difficulty with the fact that the $500,000 is "not separated out into two $250,000" payments.

In this morning's Rule 29 hearing Mr. Baxley argued that his motion for dismissal "should have been granted several days ago." In a new motion Baxley says three new points have been added (motion available at right).

Mr. Baxley's three points:

1. "The government repeatedly asked improper questions inferring defendants guilt" and according to Baxley the government asked "'spotted cow' questions over our objections to a series of witnesses.

2. Mr. Baxley alleges Judge Fuller has been "inconsistent on allowing questions outside the scope." Baxley argued that with several witnesses, including Bowlin, "we attempted to cross and were not allowed to do so. We had to call him back in our case-in-chief. We did not put up any evidence on Rainline..yet the government was permitted to bring up Rainline and the study(on Rainline from the Univ. of Alabama). Baxley says he's cited "sauce for the goose, sauce for the gander" but the court "made us eat the goose dry...didn't give us any sauce." He says the court wouldn't let the defense ask Jim Allen about the house. He says Allen's testimony would have been easy to rebut but "we weren't allowed to."

3. Mr. Baxley brought up what he called the "government's continuous speaking objections." He says the court admonished the prosecution "over and over." Baxley admits there "were a handful (of speaking objections) for our side but there was a deluge from the government's table."

Mr. Pilger countered Mr. Baxley's arguments by saying that the questions followed the rules and were "entirely proper." As to Jim Allen, Pilger says, "Jim Allen could have been called by Baxley." As to the speaking objections, Judge Fuller said as usual, "Let's move on."

As to Roberts and the Mitt Lary Road extension, Mr. Pilger said,"Even a project which helps people can't be done with the bribery and conflicts of interest we've proven in this case."

More to come later.

Posted by Helen Hammons on June 13, 2006 at 12:44 PM | Permalink | Comments (7)

## The defense rests

Elmer Harris takes the stand and is questioned by Fred Helmsing for Scrushy. Harris has been working for Alabama Power since he was in high school. He got his first degree at Auburn in electrical engineering in a cooperative arrangement with Alabama Power.

He served 25 years in the Air National Guard. He was a general in the Alabama Air National Guard.

He retired in 2002. His final job was chairman, president, and CEO of the company.

Mr. Helmsing is trying to impress the jury with Mr. Harris' qualifications.

The judge has ruled for the government in its motion to keep documents from HealthSouth concerning other contributions to charities and other organizations out of the trial. Shortly you can read the order at the right.

Mr. Harris is now describing how to raise money. He says you come up with a list of lead givers and you get the right person to go talk to them. He says you challenge the people to give more than they believe they should give whether it's politics or charitable.

Harris says he met with Scrushy every few months to talk about a lot of issues. The meetings usually happened over breakfast. Harris says they talked about anything they wanted to talk about including Alabama Power and HealthSouth.

Harris says Alabama Power had to be involved in political activity because decisions made in Washington, D.C. could shut down his business.

Harris supported Siegelman in 1998. He says he had real problems with Fob James. Harris says he supported Siegelman because of problems with Gov. James. Harris says he doesn't care if it's Republican or Democrat sitting in the governor's office, he has to have relationships with them because they can influence what goes on with Alabama Power.

Harris says Siegelman wanted him to serve as chairman of the transition team. Harris says he checked with his lawyers and they told him there was no problem with him serving Siegelman in that capacity. Harris says his job covered Innaugural activities, departmental review to see what issues in each department needed to be addressed and he concentrated personally on appointing the substantive members of the cabinet.

Around January 21 or 22 Harris says he went back to Alabama Power. He says it took over $1 million for the innaugural activities. Harris says he raised the money and he asked Scrushy for a contribution and Harris says he believes Scrushy gave $25,000 to the best of his memory. Harris says he also asked Scrushy to help getting the Alabama group there. Harris says he called Scrushy and asked if he would send his plane to get the group. Harris says Scrushy did this "for the state of Alabama."

Harris says it is difficult to get people to serve on boards in Montgomery. Harris says he told Raymond Bell to start making a list of people that might be considered for the CON Board. Harris says he did not get into specific names on the CON Board.

Harris says he is aware Scrushy served several terms under other governor's on the CON Board. Folsom, James, and Hunt administrations were mentioned.

Harris says he talked to Scrushy at one of the breakfast meetings about serving on the CON Board. The government has an objection.

Harris says he told Mr. Scrushy if he did not want to serve on the CON Board and if he could find another person who could do a good job Scrushy should go down and see the governor and tell him who that would be and if Scrushy could not find anyone, Scrushy should serve himself.

Harris says Scrushy did not want to serve on the CON Board.  Harris says Scrushy was going to tell Siegelman he was not going to do it.

Harris says Scrushy supported Fob James in the 1998 election.

Harris says he told Siegelman he needed to have a conversation with Scrushy and get any differences out of the way so there could be a good relationship.  Harris says he told Scrushy the same thing.  Harris says cooperation is vital between business and government to get things done in the state.

Harris is asked about Governor Wallace.  He says Wallace called people who did not support him after the election to get their support.  Harris says he told Siegelman he needed to learn a lesson from George Wallace.

Mr. Helmsing asks Harris about HealthSouth's support of eduction by HealthSouth.  Harris says like Alabama Power HealthSouth supported education.

Harris says with regard to Scrushy, Scrushy asked Harris if he was going to give to the lottery foundation.  Harris says he was aware of the debt related to the lottery get out the vote effort.  Harris says he told Scrushy he was not going to make a contribution to the Alabama Education Foundation.  Harris says half of his customers were for and half were against and he wasn't about to irritate 50 percent of his customers.

Harris says the conversation happened at the breakfast meeting.  Harris says he told Scrushy that since a lot of Scrushy's customers were outside the state, Scrushy didn't face some of the issues involved that Alabama Power had.  Harris says people or companies can give an unlimited amount on a referendum issue.  Harris says he told Scrushy to check the foundation out.

Harris says he did not know Siegelman had guaranteed the debt or personally signed for the debt.

Mr. Kilborn will now question the witness for Gov. Siegelman.

Harris agrees he has been on about 37 boards of directors.  Harris says he always tries to find a way to say "yes."  Harris was at one point chairman of the Alabama Business Council and the Mercedes board.

Harris says he got honors and awards because he has helped raise close to a billion dollars for various organizations around the state.

Harris served about 14 years as head of Alabama Power.

Harris says as head of the transition team he had told the governor he would send him names of people who were qualified to be highway director.  Harris says the list was quickly narrowed down to Ray Bass

and Mack Roberts. Harris says he told Siegelman that he couldn't go wrong with either one of these two guys who had served in DOT in the past. Harris says he told Siegelman personally he would lean toward Mack Roberts. Harris says he told Siegelman Roberts had worked with the county and city folks and legislators more recently than Bass, which Harris says gave Roberts an edge. Harris says he told Siegelman to go out and talk to people and make up his mind.

Harris says he had a running dialogue with Siegelman about bringing success to the administration. Mr. Harris will now be questioned by Mr. Baxley for Mack Roberts.

Harris says Ray Bass and he knew each other and that Bass called to ask for help in becoming the next director. Harris says Mack Roberts did not call him about becoming DOT commissioner.

Harris says he does not know Jim Allen. Harris says if anyone asked anyone else on the transition team to do anything with regard to Allen, he probably would have known it.

Harris says if he remembers correctly Scrushy was asked for and gave $25,000 to the innuagural fund. Harris says he does not remember the date.

Mr. Harris is now questioned by Steve Feaga for the government. Mr. Feaga asks about the CON Board and then about Alabama Power.

Harris says the PSC regulates the rate for Alabama Power. Feaga says the CON Board would have the same importance to HealthSouth that the PSC has for Alabama Power.

Harris says everyone supports their own needs. Harris agrees Scrushy should have an interest in what goes on at the CON Board.

Harris asays Scrushy should have an interst just like Harris has an interest in who is on the PSC.

Harris says Scrushy did not tell him how much he contributed to Fob James. Harris says it would not suprise him if Scrushy raised $350,000 to Fob James. Harris says he was not aware that Scrushy called Siegelman at one time a Communist.

Harris says the two men had differences that needed to work out. Harris says he was going to do his best to get them together.

Harris says Alabama Power did not support the lottery to avoid irritating 50 percent of the customers. Harris says he read in the papers HealthSouth did support it.

Harris says he told Scrushy if he wanted to give to the lottery foundation he had the right to do that. Harris says he told Scrushy Siegelman wanted him to do that.

Harris says he doesn't remember getting a phone call from Eddie Curran. Harris says he didn't solicit contributions from HealthSouth for the lottery.

Harris says he pushed Siegelman and Scrushy to work together.

Harris says when raising money he has asked for money from people who did business with Alabama Power but that he never threatened anyone, because he had to work with them.

Harris says disguising payments is done through PACs. But Harris says this is not inappropriate. Harris says he never had the need to do such a thing.

Harris says he told Gov. Riley he would support Riley if he fixed the mess at Auburn University. Harris says he has not given money to governors to get favorable action for Alabama Power. Harris says he doesn't know about the legality since he's not a lawyer. He says Alabama Power can't benefit an elected official or it goes to the ethics commission and possibly the attorney general.

Harris says again he does not know Jim Allen. Now Harris says he was not aware of Allen doing anything in the transition. Harris says he did not know about the meeting between Allen and Siegelman in Birmingham.

Harris says if he had picked up any quid pro quo going on in the appointment process he would have taken action. He says he would have known it. He says if he'd picked it up he would have left and he doesn't believe it happened under his watch.

Harris says he knows nothing about the $71,000 Roberts got from Allen. Harris says he knows nothing about the consulting fees paid to Allen or about the $35,000 a month Allen got paid for consulting.

Harris says he would not doing anything unlawful.

Harris says he made a point of developing relationships with all the public officials. Harris says he knew Nick Bailey and he agrees Bailey worked for Siegelman. Harris says he doesn't know how many times they were together. Harris says he knew Bailey was Siegelman's assistant and the times he saw them were in and around the governor's office.

Harris says Hamrick was Siegelman's chief of staff going into the administration.

Harris says it was not his business to sit around the governor's office every day and keep up with what the government was doing.

Harris says he knows nothing about the 4-wheeler to Siegelman or the coffee mugs. Harris says he does not know what Lanny Young did or didn't do.

Mr. Kilborn says he has had enough.  "That is not the evidence."

Harris says he would not know what Jim Allen did or didn't do.

Mr. Kilborn says Mr. Feaga has asked several questions which are "beyond the scope" and the judge agrees.  This happened after Mr. Feaga started talking about former Gov. Hunt and corruption.

Harris says the FCPA passed the legislature and it has to be honored.  Harris says disclosure is made.  He says that's a matter for the ethics commission to get into.

Harris is asked if he knows ALFA's Jerry Newby.  This brings an objection.  Judge Fuller is asking the attorneys to the front.

After a recess, Mr. Feaga continues to question Mr. Harris.

Harris says he knows of Eric Hanson but he knows nothing of what Hanson has done.  Harris says he has probably met Mike Martin but he does not know him.

Harris says he in general does not know about their business activities.  Harris says he does not know Loree Skelton.  Harris says he knows Jabo Waggoner and that Waggoner worked for HealthSouth.

Harris says Jabo is very interested in governmental process and activities.  Mr. Feaga asks if Harris would find it odd that Waggoner and Skelton wouldn't know about a $500,000 contribution.  Harris says he doesn't know them so he couldn't say.

Harris says he believed Scrushy should have been on the CON Board or gotten someone else.  Harris says Scrushy should protect his business and do what's right for the state of Alabama.

Harris says he had a responsibility to the transition and nothing was going to go wrong in this transition.  Harris says he would have walked away from the chairmanship if he had seen anything wrong.

Harris says if the two are meeting, Scrushy and Siegelman, that's what he wanted.  Harris says he encouraged Scrushy to meet with the governor.

Harris says he has sat down and asked Scrushy for $5 million before in trying to get rid of the trial lawyer influence in this state.

Harris says he was not running the governor's office, but he'll help them whether they ask or not.  Mr. Harris says Siegelman did not ask Harris to get $500,000 for the lottery from Scrushy.

Harris says he was not present at the meeting between Scrushy and Siegelman.

Harris says he has a lot of people asking him to help get people together.  Mr. Harris says Mr. Feaga is asking a hypothetical.  The judge gavels and gives his "let's move on."

Harris keeps saying if they'd ask me to be there, I would have been there.

Helmsing has no more questions and Harris leaves the stand.

Mr. Leach wants to enter a certification for a set of documents from HealthSouth which Leach says he has shown to the government.  Exhibit #118 is admitted.  The page shows the $25,000 Scrushy donated to the innaugural campaign.

Robert Childree will be the first witness for Paul Hamrick.  Mr. Childree is the comptroller.  Childree says he is aware of travel reimbursement payments.  He says he reviewed the period Jan. 19, 1999 to September 30, 1999.  During this time there were zero payments made to Paul Hamrick for out of state reimbursements.  Childree says there were two payments made to Nick Bailey.

He says the governor's office would request payment.

The witness is shown a document showing his certification of records.  It is supporting documentation for payment made to Bailey.  The voucher is the request for payment and the attachment is the supporting documentation for the voucher.

Childree says the date of the reimbursement was April 6, 1999.  Childree now is asked to look at a second one and identify it.

Childree says expense account forms are completed by the employee and it is signed by the employee and notarized.  Then the form is maintained in the governor's office and the letter from the governor's office acts as a request for payment.

Mr. Childree says Nick Bailey travelled from Chicago to Montgomery on 30 March 1999.  Another report shows Bailey going to Washington, D.C. February 19-22, 1999.  He was reimbursed $1526.27.

Mr. Feaga will ask questions for the government.   Feaga hints that Hamrick might not have been on official state business.  Feaga gives a hypothetical about someone travelling to Washington to make a threat to a business.  Childree agrees the person could have been in Washington.

Childree agrees with Michel Nicrosi that it would have been hard to have been in Washington D.C. when that person's debit card was used in Montgomery.

Mr. Deen calls Penny Buckalew to the stand.

Mr. Hamrick has rested.

Siegelman has rested.

Judge Fuller says the jury will have tomorrow off.  There will be a charge conference and more Rule 29 hearings tomorrow. The jury returns Wednesday at 8:30 a.m.  The judge says he expects the jury to chose a foreperson on Wednesday.  The judge says he plans to limit closing arguments and instructions to one day.  This will be Wednesday.

None of the defendants has any additional evidence to present.  The U.S. wants to enter a certified copy of the Product Evaluation Board for January 1996.

The exhibit is entered.  The U.S. has rested.

Court will start for motions at 10 a.m. on Tuesday.  Following this, there will be a charge conference between the lawyers and the judge.  I will be in the main courtroom for motions on Tuesday.

Regular trial coverage will resume Wednesday morning at 8:30 a.m.

Posted by Helen Hammons on June 12, 2006 at 01:39 PM | Permalink | Comments (2)

# Roberts' Defense Ending, Scrushy Team Up Next

The team for Mack Roberts will finish their defense this morning and then the Scrushy team will get their chance to do what Richard Scrushy claims he has wanted all trial long "a chance to put on our case."

Things are scheduled to start around 8:30 a.m.

The judge has entered the courtroom,  The judge wants to take up some matters.  Mr. Pilger wants to clarify how defense proceeds with its witnesses.  Mr. Pilger does not want the defense to cross and lead the witnesses.  The judge says the defendants will have to proceed like the prosecution with the defense witness unless and until they become hostile.

Mr. Leach is talking to the judge, however we cannot hear what he is saying.  It has to do with this same issue.

The government filed a motion over the weekend which seeks to exclude documents in the hundreds showing HealthSouth's donations and contributions to charitable and other organizations.  According to the government "evidence, however, of prior non-criminal conduct, especially the noncriminal conduct of a nonparty, to negate the inference of criminal conduct by the defendant is irrelevent."  I'll have the motion up shortly.

Mr. Bowlin is on the stand and being questioned by Mr. McKnight.

McKnight says he wants Bowlin to focus on Mitlary Road.  Bowlin has been with the DOT since 1960.

He was director for a year and a half after Roberts resigned.  He is now the bureau chief of the right of way bureau.

He agrees hs is familar with the Mitlary Road project.  He says he saw a copy of Roberts' recusal letter for the project.

Bowlin says it was a Tuscaloosa County road.  Bowlin says after Roberts' recusal he would try to raise questions with Roberts and Roberts would "just ignore me."

Mr. McKnight walks Mr. Roberts through project documents which Mr. Bowlin agrees Mr. Roberts did not sign.  Bowlin agrees Roberts would not engage in mail fraud or bribery.

Mr. Feaga wants to know if Mr. Roberts told Mr. Bowlin about the $71,000 he got from Jim Allen.  Mr. Feaga does this with some commentary and the judge reminds Mr. Feaga "not to comment on the evidence."  Mr. Feaga apologizes and moves on.  Mr. Feaga wants to know how unusual it was to start a road project and not finish it and Mr. Bowlin says "it would be very unusual for that to happen."

Questioning by Mr. Feaga about Crum Foshee brings and objection and a sidebar.

After the sidebar Mr. Bowlin agrees Foshee and Bass were friends and that Foshee represented several companies but would not call Foshee a lobbyist.

Feaga asks about the relationship between Roberts and Allen.  Mr. Bowlin says "beyond the fact they were business associates, I wouldn't know."

Mr. Bowlin is asked about Rainline.  Bowlin says he was peripherally aware but he has no exact knowledge about Roberts and Railine.

A question about the University of Alabama study on Rainline brings another sidebar.

Bowlin agrees he did terminate arrangement with Rainline, met with the governor, and changed his mind.  Bowlin says he saw preliminary report and the decision was made.  The completed report was not finished while Bowlin was director according to Bowlin.

Mr. Feaga says the Mitlary Road project costs about $40 million of state money.  Mr. Bowlin agrees that "if Mr. Coursan said that it's probably so."  This was in response to a question about

Mr. McKnight says May 24, 1999 is the project dates on the documents and this date is not in the indictment. Bowlin agrees the documents have nothing to do with Rainline.

Mr. McKnight asks about right of ways. Bowlin says it is not unusual for right of ways not to be acquired before a project begins. Mr. Bowlin says the University of Alabama study was started by Mack Roberts. Bowlin agrees every dollar of federal matching funds available were used while Roberts and Bowlin were directors at the DOT.

Mr. Bowlin is asked by Mr. Feaga if he likes Mack Roberts. Bowlin says he's a friend and agrees he doesn't want to see anything bad happen to Roberts.

Mr. Feaga tells Mr. Bowlin that Mr. Roberts directed him to ensure Burk-Kleinpeter was on the list of contractors that was forwarded to him from the committee that selected who got to work on the contracts. Bowlin says that never happened in regards to any contractor.

Mr. Kilborn has a question.

"If he thought you were a crook he wouldn't have appointed you either, would he," says Vince Kilborn. This brings a "watch your leading" to Mr. Kilborn from the judge.

Judge Fuller calls on the Scrushy team to present witnesses.

Dr. Craig Philpot is the witness. Philpot went to medical school at Emory. He is a gastroenterologist. His practice is in Birmingham. He has been practicing since July 1991.

Philpot agrees he served on the CON Board from 1995 until early 1999. Philpot served under Gov. Fob James. James appointed Philpot to the board and served on the board with Richard Scrushy. "He was an active member, a very useful member in terms of his knowledge with the board."

Philpot says Scrushy "conducted himself like every other CON Board member." Philpot says the board was "honest and above board and had the utmost integrity."

Philpot says Scrushy recused himself and removed himself from the room when HealthSouth issues came up.

Philpot says when there was a conflict between HealthSouth and other medical interests Scrushy would also recuse himself.

Philpot responds "no" when asked if Scrushy controlled the CON board. Philpot says he did not have any ex parte communication with Scrushy in regard to board matters. He says he never saw Sclrushy do anything illegal or unethical while on the board.

Philpot agrees Thom Carman took Scrushy's place and was a contributor to the board.

Philpot agrees he also served with a Dr. Weidman on the board and that he and Weidman travelled together to the CON Board. Philpot says he needed a definition of ex parte communication. "We didn't improperly discuss matters."

Occassionally another member would ride with them, according to Philpot. This was a Mr. Ray.

Mr. Philpot is now questioned by Mr. Feaga. Feaga asks if what goes on at the CON Board is important. Philpot says healthcare projects defined by statute come before the board and it is the board's decision whether or not projects go forward.

Philpot agrees the projects impact business of healthcare providers. Philpot agrees it has a significant impact.

Philpot agrees someone in the industry should have a strong interest in what goes on at the CON Board.

Mr. Feaga wants to know if it is possible for one member to try and control the CON Board. Philpot says if they wanted to do that they could try to do that.

Philpot says he never rode with Scrushy in the helicopter to the board meetings. Philpot says he was never offered money by Scrushy.

Mr. Feaga asks Mr. Philpot if he gave $500,000 to get on the CON Board. Mr. Philpot says he did not give $500,000.

Do you remember if Scrushy even had a helicopter during the time you were on the board. "I do not know...I do not know how Mr. Scrushy travelled."

Mr. Philpot agrees even if you have two seats on the board it could not have been controlled. Mr. Philpot says during his time there was too much integrity for that to happen.

Mr. Philpot says he does not know of any instance when Scrushy tried to control the board.

Mr. Philpot agrees the CON Board during the James administration took taking healthcare across the state as very serious business.

Mr. Feaga says people who serve on the CON Board should represent a variety of interests. Mr. Philpot agrees there is a wide cross section. Mr. Philpot agrees you want the best possible selection for the board. Mr. Feaga says it is important to the taxpayers and Mr. Philpot agrees.

Mr. Feaga says if only five people show up could you control the board. Mr. Philpot says if there was a recusal the board would dismiss because you wouldn't have a quorum. Mr. Feaga now says what about six. Mr. Feaga says then a representative steps aside and they were controlling one other individual would that control the board.

Mr. Philpot says he did not receive a call from Scrushy saying he was going to have a petition pending and told him he would have to recuse himself because Scrushy opposed the pettion because it was a competitors.

Mr. Leach is arguing this is not the evidence.

"Your honor there we go again with a speaking objection," says Mr. Feaga.

Mr. Philpot says if that had happened it would raise the question about someone wanting to control the board.

Mr. Leach asks how many unopposed CON Board applications that came before the board do you rememvber being voted down. Mr. Philpot says he doesn't recall one.. an unopposed application would be approved as long is it met regulations.

Mr. Leach says as to Feaga's hypothetical. If there was no opinion expressed and you were asked to just look at the application would you find that improper? No, says Philpot.

Mr. Philpot says he does not recall an issuee with five board members and a recusal. Philpot says both Scrushy and Carman would recuse themselves on their projects and the projects of competitors. If the application was Scrushy's he would leave the room. Philpot says it was not a standing rule, it was an unspoken rule.

Mr. Philpot said leaving the room was "going the extra mile."

Mr. Feaga says if another board member began to pester you about coming to work for you and you felt that person was trying to profit from that position what would you do.

"Your honor beyond the scope," says Mr. Leach. The judge sustains the objection.

Mr. Wideman is on the stand. He was an OB-GYN and graudated from law school on his 70th birthday. Wideman says he served on the CON Board under Forrest "Fob" James. He says he also served 5-6 months under Siegelman but the CON Board did not meet. "We did not get a thank you note either," says Wideman. This brings a laugh from Mr. Leach.

Wideman says he served on the board of the county hospital in Birmingham and was recommended to James by a friend. He served as finance chairman at one time for the Alabama Republican Party. He

says he has been on the state executive committee for the Republicans for a number of years although he did not run this time.

Wideman agrees Scrushy served on the board with him.  "He was an excellent member.  we were very happy to have him there."  Wideman says Scrushy "brought an expertise" to the board because of his awarenss of problems in the medical industry.  Wideman agrees Scrushy was knowledgeable.  Wideman says Scrushy got involved in discussions and voted like they all did.

Widelman says Scrushy would recuse himself and leave the room when a matter involving HealthSouth was before the board.  Wideman says Scrushy also left the room when the matter involved a competitor of HealthSouth.

"Richrd Scrushy couldn't control the CON Board," says Wideman.  "This board...had one objective in mind and that was to do a good job....There was no intra-board clique and the individuality of the members of the board was such I don't believe anyone could control that board."

Wideman says he did not see Scrushy do anything improper, unethical, or illegal.  Wideman says Scrushy was an active participating member of the board.  He says Scrushy was well prepared and had read the cases.  Wideman says because of Scrushy's experience he brought something to the board.  Wideman says Scrushy lost as many arguments as he won.

Wideman says the James board to him was the best because there were people from all over the state, both genders involved, a Mr. Kirksey, "who brought the element of the little man to the bord."

Wideman says the board wanted to act equitably.  He says the board would also review stuff from administrative law judges as well as people on both sides of a project.  Wideman says the group was obiective.  Wideman says he got paid zero.  He says it cost members to serve on the board, because in his case you had to cancel patients from the office.  He says other than being paid for gas and an occasional sandwhich they got nothing for being on the board.

Wideman says he carpooled almost every time to come to the meetings.  Sometimes with Philpot and sometimes with another person named Ray.  Wideman says the only thing inappropriate during the car pool to Montgomery was "some of the jokes."

Wideman says the chairman had some power.  The chairman could break a tie on a vote or cause a tie with a vote.  Wideman says he does not remember Scrushy being chairman.  Wideman says "no one could control this board."  Wideman says "it was not possible," for Richard Scrushy to control the board.

Wideman says the responsibilities of the vice chairman was to preside if the chirman was not there.  Wideman says the vice chairman was also an adviser to him.  This was Philpot at the time.  Wideman says he rode to Montgomery today with Philpot.

Wideman says the vice chairman is not in a position to control the board. "The word does not control this board. The only thing that controlled this board was God and his power to work through the people," says Wideman.

Mr. Feaga is now up. Feaga asks if Scrushy felt the board was important. Wideman says yes. Wideman agrees the board has a signficant impact on the ability of people to do business.

Wideman says there was not a lawyer who rode

Wideman says he has not observed Scrushy much outside the board. He says Scrushy was not a take charge kind of guy on the board.

Feaga asks if Wideman saw Art Leach go over and talk to Scrushy and then come back and ask other questions.   Wideman says he didn't see what took place.

Mr. Leach is bacdk up. "You do understand Richard Scrushy is my client? You do understand his Liberty is at risk? Do you understand I might consult with my client? " Wideman says he doesn't see that as unreasonable, although Wideman says he did not see Leach do this.

Wideman says everyone received the cases several days before the meeting and everyone of the members was involved. Wideman agrees Scrushy was not unusual in this regard.

Dr. McCorvey will be the next witness and will be questioned by Mr. Gray. He has lived in Montgomery 30 years and is an OB-GYN.

McCorvey says John Knight asked him to serve on the board when Jim Folsom was governor and he did not and then he was asked again by Knight when Siegelman became governor.

Mr. Gray asks Mr. McCorvey to describe who Knight was.

Mr. McCorvey says he refused the first time except he thought he was busy with his practice at that time. On the second time, McCorvey says he tried to slip out of it again but that Knight told him he needed to serve on the board to represent the community. McCorvey says he was appointed by Siegelman but never spoke to Siegelman about the appointment.

McDorvey says Scrushy was an excellent board member. McCorvey says Scrushy was just another board member. McCorvey again says Scrushy recused himself and left the room when a HealthSouth matter was before the board.

McCorvey agrees Scrushy did not control or attempt to control the CON Board. McCorvey says he and Scrushy never had an ex parte communication about board matters. He also agrees he never saw Scrushy do anything illegal or unethical. He says Scrushy was "always professional." McCorvey says

he made a contribution to the Siegelman campaign and participated in fund raising. McCorvey says he did not bribe Governor Siegelman to obtain a seat on the board.

Vince Kilborn has a question for Mr. McCorvey. McCorvey agrees he has given the best medical care he could give. McCorvey agrees he made the best decisions he was capable of during his four years on the board. McCorvey agrees the board represented the people of Alabama and he did not get paid.

Mr. Franklin asks the questions for the government. Mr. Franklin says McCorvey wanted to be appointed to the bard of trustees for Tuskegee. Frankilin says McCorvey made the request and he got back an appointment to the CON Board. McCorvey says that's where they thought he would be a best fit. McCorvey denies he was told by Knight if he didn't serve on the CON Board he could not expect an appointment to the Tuskegee board.

June 23, 2004 grand jury testimony is being brought up to Dr. McCorvey. McCorvey agrees he did say to the grand jury he didn't want the CON Board but the Tuskegee board. He agrees he got the CON Board.

Mr. McCorvey agrees the document referring to his testimony in front of the grand jury does say he could not expect to get the Tuskegee board later if he did not take the CON Board.

McCorvey says eventually he was appointed to the Board of Trustees at Tuskegee.

Mr. Gray asks Dr. McCorvey if the lawyers at the prosecution table were asking questions at the grand jury. McCorvey says he couldn't recall for sure. McCorvey says he was not asked about Scrushy at the grand jury but agrees he would have answered truthfully.

Mr. Franklin asks about the grand jury, Do you know anything about any agreement Mr. Scrushy had or did not have with Gov. Siegelman? I did not. McCorvey agrees he was not asked about the alleged agreement at the grand jury.

Mr. McCorvey agrees he does not have any evidence to refute charges that Scrushy bribed Siegelman for a seat on the CON Board.

Mr. McCorvey tells Mr. Gray he does not have any evidence to present that Scrushy bribed Siegelman to get on the CON Board.

Gen. Rendall Clark will be the next witness. He is a retired Air Force major general. He served almost 40 years. He was enlisted for seven years. It took about 33 years for Clark to become a general in the Alabama Air National Guard. He retired in 2001. His full time job from November 1994 until August 2003 he worked for HealthSouth as senior captain, chief pilot and eventually aviation manager. He supervised training, he flew and supervised pilots. He made sure all the flight requests were satisfied and approved and made sure maintenance and schedules were met.

Gen. Clark agrees Mr. Leach went over some documents with him prior to his coming into the courtroom.  The first document is Scrushy exhibit 100.  It is a flight request taken by the flight coordinator at the hangar according to Clark.  Richard Scrushy is requesting the flight.  The document shows departure date and leg to and froms.

Gen. Clark says page two is a flight record for the helicopter.  It was to the Business Council of Alabama in Montgomery.  Scrushy was always the lead passenger says Clark.  Clark says the number of other passengers and if possible the names of the passengers are put on the form by the pilot.

Clark agrees this document was created at the time of the flight.  Now to Scrushy exhibit 100 page 3.  Clark says this form is the same except for some new information June 29 from BCA to HealthSouth headquarters in Birmingham.

Clark agrees the forms indicate Scrushy travelled to and from Montgomery on the helicopter on June 29.

Clark agrees he is familiar with the helicopter.  Clark says the helicopter is not noisy.  He says there is special soundproofing and BOSE headsets for passengers that want to use them to cancel out other noise.  Clark says flight time is about 36 minutes.

Mr. Leach shows another exhibit that shows flights on July 14, 1999.  Clark agrees the document is a flight request.  Clark says  Eric Hanson and Jabo Waggoner were the passengers of this flight.

Clark says the helicopter went from Birmingham hangar to the corporate headquarters where it picked up Waggoner and went to Montgomery.

Clark says he can't read what Mr. Leach is asking him to read.  Then proceeds to read that a HealthSouth aircraft was bringing Hanson to the meeting.

Clark is shown another exhibit and Clark agrees July 14 was the date.  From Birmingham to Montgomery it was just Jabo Waggoner.  Scrushy was not on the form aand Clark says Scrushy would always be indicated as the lead passenger if he were on the flight.

From Montgomery to the BCA building there was Waggoner +1, which was Hanson.

The trip was made to the Montgomery airport to meet the Westwind, a HealthSouth plane, to pick up Hanson, according to Clark.

From the BCA building to HealthSouth Headquarters there was Jabo Waggoner plus one, Eric Hanson.

Based on his review, Clark says Scrushy was not on the helicopter on July 14, 1999.  Clark says the

helicopter was manufactured by Sikorsky. Alabama Power also had a Sikorsky helicopter according to Clark.

Clark says Scrushy was a take charge kind of guy and then adds Mr. Scrushy was a pilot. Clark says Scrushy flew as second in command on the Gulfstream and other planes. Clark says at one time there were nine HealthSouth aircraft. Clark says Scrushy had two float airplanes, although Mr. Leach is questioning the relevance of the questioning.

Mr. Feaga wants to try this case without Mr. Leach and then asks the counselors to get together.

Mr. Feaga asks if Mr. Scrushy flew himself to the lake house. Clark says yes. Feaga says Scrushy was fully capable of driving himself.

Clark says sometimes the crew would pick up with the engines running and may not know who is on the plane. Clark says it could be lax on the part of the pilots not filling it out.

Feaga says just because a person doesn't fly there doesn't mean he didn't get there some other way.

Clark says to Mr. Leach's question that as many as seven planes were used to take HealthSouth employees around the United States on business.

Clark says the float planes were ketp primarily at the lake. Clark says when Scrushy was travelling for HealthSouth he did not use the float planes. Clark says he flew the float planes with Scrushy on a recreational basis.

Clark says he knows the name Loree Skelton but is not sure he could recognize her. Clrak says she was not frequently on the aircraft and agrees that the pilots probably wouldn't know who she was.

Mr. Feaga says the float plane could land on land and Clark agrees.

The judge will take up the motion now presented by the government concerning HealthSouth documents and charitable and organizational contributions.

Mr. Leach says he has the documents in question. Leach wants the evidence in to rebut the government's argument that the $250,000 contributions were unusual.

HealthSouth has a long history in terms of their generosity and contributions. The issue here is not Richard Scrushy but HealthSouth. Leach says if it is a fact question the court has to allow it in.

The fact that it is probative and powerful for the witness should not keep the doucments out according to Mr. Leach.

The judge says he has now read the document.  Mr. Perrine says the judge has already stated on May 9 that evidence pertaining to collateral matters about "how philanthropic Mr. Scrushy has been."

Mr. Perrine says the judge previously said he did not want to open up evidence from Birmingham.  Perrine says the court, government, nor defense really want to go through that door.

Mr. Perrine says these documents are related to HealthSouth's character and not Richard Scrushy's.  Perrine says the court's prior ruling should stand.

Mr. Leach says this evidence does not open up any door to months and months of evidence from Birmingham.  He calls the government claims a "red herring."  Leach says the evidence he wants in was not presented in Birmingham.  Leach says the evidence rebuts what the government has put in front of the jury.  Leach says this directly rebuts an inference the government has tried to raise.  It puts the evidence about the $250,000 into perspective according to Leach.

Leach says if he was trying to get Scrushy in the government would have an argument.

Leach says the company wrote the check as opposed to Scrushy.  Leach says he has made no effort to include Scrushy contributions.  Leach says the witness Cline talked about colossal contributions and he wants to rebut that.

Perrrine says it is irrelevent.  Perrine says evidence the government wanted to enter was declared prejudicial.  He says now the documents will put Mr. Scrushy's character in play because the documents refer

"He's just argued a couple of points that have not been raised," says Mr. Leach.  "Is this evidence that shines an appropriate light?"

Leach says it puts the HealthSouth check in proper perspective in relation to other contributions.  Leach says it shows the $250,000 contribution was not out of the norm for HealthSouth.

Mr. Leach says he has at least one more witness and Mr. Deen will present Mr. Hamrick's case and then it will go to Siegelman.

Recess until 1:15 p.m.

Mr. Scrushy told the press as he left for lunch the government has not put on the case they said they would put on.  Scrushy says he could say one thing for certain, "If I had a choice between flying in the helicopter or drving in the car from Birmingham, I'd take the helicopter."

Scrushy says he doesn't want to see the jury endure more suffering by dragging this case on.

There are possibly one or two more witnesses for Scrushy and about probably 3-4 potential for Hamrick.  The Siegelman folks are holding what they plan to do close to the vest.  They told the judge the number of witnesses depended on what happens with other witnesses.

Tdoay the Hamrick team filed a supplemental motion for acquittal which is linked  at the right.   I'm still waiting for something from the judge on the motion discussed just before lunch.

New post time.

Posted by Helen Hammons on June 12, 2006 at 08:06 AM | Permalink | Comments (1)

## Missing Defense Motion

There have been several questions about why there is no motion posted for Gov. Siegelman.  The answer is simple, there was not a written motion filed.  I am still trying to find time to go thorugh the notes and give you a slimmed down version of events.  I know I promised it Friday or this weekend but I have now broken that promise and all I can say guilty as charged and sorry.

After a week that combined elections with this trial and very little sleep, I had to take the weekend off. I have put in trial time on most weekends, although you don't always see the impact on the blog.

As for the government, they have not filed and last I heard have not planned to file a written response to the motions.  I'm working on those notes as well.

One other non-important blog note for the curious.  I will be out of town at a conference on Thursday and Friday.  It always happens when things could be interesting that there is a conflict.  There is a good possiblity the defense could close their case quickly and that could mean closing arguments before the end of the week.

That said, there will be a blog those two days and it will most likely be done a lot better than I've been able to do it.  WSFA anchor/reporter Mark Bullock will be at the helm of the Chronicles.

I will be keeping up with things from Texas and chiming in on the action as time permits.

Finally, this project has been a learning experience you wouldn't believe.  To all those who have taken the time to offer suggestions and criticism, thank you.  I've made my share of mistakes and will probably make a few more before this ends.   The feedback I've gotten has and will continue to be invaluable for this and future projects.  Thanks for joining in the experience.

Posted by Helen Hammons on June 11, 2006 at 02:58 PM | Permalink | Comments (5)

# Judge Rules, Defense Begins

Judge Fuller has ruled that he will reserve judgment on the motions as presented by all the defendants and collectively and make his ruling at the appropriate time.

Mack Roberts' attorneys will begin to present their case.  Mr. McKnight is readay and the defense calls Jennifer Marcato.

Ms. Marcato is the daughter of Rainline developer Mac Marcato.   She says she filed a Freedom of Information Request from the federal government's FHA.  The request was for documents related to Rainline.

She identifies the document as one she got back from the government.  There is a document that shows Derickson indicated Rainline had been tested and the problems had been cleared up.

Mr. Feaga asks if Marcato was present at the meeting of January 2, 1996 at the meeting the document is from.  Mr. Feaga asks Ms. Marcato if the engineer says he did not write the minutes and that they are inaccurate, Marcato says she'd want to know why they were innacurate.

Marcato says testimony that says  Rainline was not put down on the test deck would be innacurate.

After a sidebar, Mr. Feaga shows sales figures for Rainline to Ms. Marcato.  The chart on the Elmo reflects the sales for 2001.  She agrees Rainline did 90 percent of its sales in Alabama in 2001.  In 2002 sales figures, Mr. Feaga asks if most of the sale of the Rainline thermoplastic occurred in the state of Alabama.

Ms. Marcato agrees she was working for Rainline  at the time she requested the document.  Mr. Feaga wants to know if Ms. Marcato knows about the University of Alabama study on Rainline.  Ms. Marcato says the sells have gone down for Rainline since the study.

Mr. Marcato says she wants the roads safer and would like the study corrected.

Ms. Marcato says she is not sure if there is a similar chart for the year 2000.  Mr. Feaga asks if Alabama was the state where the most thermo-plastic was sold in 2000.  Ms. Marcato says she doesn't know.

Ms. Marcato says she does whatever her father asks her to do.  She joined the company in 1998 and she just graduated from law school on Saturday.

Ms. Marcato agrees since the Rainline started selling in Alabama, that Alabama is the state where the most Rainline was sold.

Ms. Marcato says she is a compulsive notetaker.  She said she would be careful about spelling her own name.  Earlier in the trial Mr. Derickson said his name was misspelled.

Mr. MicKnight asks a couple of questions of Ms. Marcato and she is released from the stand.

State Senator Lowell Barron will be the next witness.  Barron says he has been the Senate pro-tem for about eight years.  He says he coordinates what bills will go to the floor and keeps committees functioning and keep the process going in the Senate.

Barron says he wa born and raised in North Alabama.  Barron says he was elected class president in high school.  He says he worked as a pharmacist and in 1966 he joined the Fyffe City council.  Barron says he went to the Senate in 1982.  Barron agrees he is in the 24th year of the Alabama State Senate.

Barron says he has know Mack Roberts since 1983.  In 1983 Barron took office and Senator Mitchum called him and asked him to support Roberts for highway director.  Barron says he told Mitchum he was supporting Ray Bass.  Barron says Gov. Wallace chose Ray Bass as highway director and made Roberts assistant director.  Barron says Wallace promised him a major road around Sand Mountain and he worked with Roberts on the road.

Mr. Barron says a conversation happened with Siegelman in November, December 1998.

Another sidebar.

In late November, early December Barron says they were in the organizational time of organizing the Senate.  According to Barron they had just been reelected and the question was "did we allow the lieutenant governor to do things they way they had been done for a number of years."  This was because a Republican lieutenant governor had been elected.

Objections are flowing and the judge is advising the witness to testify as to what he said not what the person on the other side of the phone said.  Barron says we (Gov and Barron) began working on the process to get enough senators to support their position, even though "2/3 were good people."

Barron says there are 35 senators and it takes 18 to organize.  Barron says late one afternoon around 4 or 5 he told Siegelman they were not going to win and help us organize without stomething else.  Barron says Siegelman asked him if he had any ideas and Barron says he told the governor someone that could help was Mack Roberts.

Barron says Siegelman was not impressed with the recommendation of Mack Roberts.

Mr. Baxley wants to overcome the prosecution's objections and his question gets another direction.  Mr. Feaga wants Mr. Baxley to stop this.  No the opposite your honor, I don't want them to object," says Mr. Baxley.

Mr. Barron says the impression was very strong that Mack Roberts had no interest in being highway director. He says that it was his strong impression that Siegelman did not want to appoint Roberts highwyay director.

Barron says he worked to get Roberts to change his mind about being highway director. Barron says it was obvious this man's credibility (Mack Roberts") was one who would keep his word. Barron says Roberts' credibility helped Barron get the Senate organized. Barron says he and other senators had to work hard to convince Roberts. Barron says he shook Jim Allen's hand one time at a reception. He says he didn't know anything until he read it in the paper about Jim Allen's participation in getting Roberts elected highway director.

Mr. Feaga is up. Barron again says he had no knowledge of any transfer of knowledge from Allen to Roberts.

Charles Swann is the next witness. Swann says the Mitlary Road project was a great project. Mr. McKnight is questining the witness. Swann was the city director of Northport.

Swann says the western bypass was important because U.S. Highway 82 is a major road that goes to Tuscaloosa and Birmingham and has a lot of traffic on it. He says it was built in 1952 and then it was considered a bypass. Northport was south of there.

Swann is describing various roads that had difficulty with growth. He says in the 70s all the roads were converging before traffic crossed the river bridge. Swann says people were having second thoughts about living in Northport. So in the early 90s we began to lood at another crossing,"says Swann.

Swann says another route was proposed to start on Interstate 59. Swann says to go anywhere or from anywhere in the area you have to go through Northport.

Swan says 40-60,000 vehicles came together at one point, including mobile homes, tractor trailers, school buses, etc.

Swann says he lobbied for state and federal funding from 1990-1996.

Tuscaloosa County, the City of Northport, and the City of Tuscaloosa were involved int eh planning for the western bypass. In 1992-1994 the city was still fighting for money to get a bypass and bridge. A January study showed the cost of the project at $75 million.

From 1990-1996 the city of Northport was having difficulty getting Monrgomery and Washington, D.C. to understand their problems according to Swann. Swann says the city wasn't getting any money.

Swann says they were looking at a public private partnership. In October 9, 1996 MPO resolution

supports the toll bridge and recognizes it as a replacement of the western bypass.

More talk about groundbreaking for the bypass. Jim Allen was at the groundbreaking ceremony.

Mr. Swann testifies originnally there were two bridges. He says the western bridge was brought in before the eastern bridge. Swann says the western bridge was brought in fast.

Mr. Swann discusses why it was important for the Mitlary Road project to go ahead after the bridge was built.

There was a recess and I've missed some stuff, sorry folks a couple of things to take care of.

Mr. Feaga is asking a witness, state Senator Perry Hand, if he knew Mr. Roberts had taken $71,000 in exchange for turning on the spiget for a project the state may not need when Roberts became highway director would that change Mr. Hand's feelings about whether or not Mr. Roberts was a man of good character.

Hand says he would have to have very strong evidence before that would change his opinion about Roberts.

Ron Green is the next witness. He is the director of persnonnel and compliance with the Department of Transportation. He says he went to work for the DOT in January 1988. He was the chairman of the Macon County Commission.

Green says he's known Roberts since 1989. He says he was the first African-American bureau chief in the DOT and he was promoted to that and another posistion by Mr. Roberts.

As executive assistant director, Green says sometimes he went with Roberts at a business and social level. He says Mr. Roberts is the "most honest person he has ever worked with."

Green says Roberts is a "morally strong person" and having worked with him he says Roberts has "strong ethics."

Green says Roberts wuuld not engage in a bribery scheme. He says Roberts was firm, compassionate and fair. Green says Roberts wanted the work force to reflect the population of the state of Alabama.

Green was the man Mr. Derickson says got the promotion over him.

Mr. Feaga will question Mr. Green.

Mr. Green tells Mr. Feaga he would stand by Mr. Roberts as long as Roberts was right.

Mr. Feaga asks Green if he knew Roberts took $71,000 and then helped somebody's company would that make Mr. Green have a different opinion of Mr. Roberts.

Mr. Green says the only way he believed that would be if he saw that happen himself. "If I saw that myself I wouldn't be sitting there today."

There were two more character witnesses.

The parties have stipulated as to facts about the 4-wheeler that the 4-wheeler was transferred to the Alabama Department of Transportatin as of sometime in 2001.

Rosemary Johnson is the next witness. She worked for the Highway Department for 13 years and worked for the state a total of 26 years. She says she met Roberts in 1991 when Mr. Hand was highway director. She worked with Roberts a total of eight years. She says she worked and interacted with Roberts every day. "He is a very good person, ethical, hardworking." She says Roberts would not engage in mail fraud or bribery. She agrees Roberts rendered honest and faithful service to the state.

Mr. Feaga says she has worked for other highway directors, including Mr. Hand and Jimmy Butts.

Feaga asked if she thought Mr. Butts was ethical? She says No, Mr. Butts was a different person.

The next witness is Dr. Meehan.

Looks like Richard Scrushy's team will be the next to go on Monday. Among those on the witness list: former Gov. Fob James, General Rendell Clark, Eric Hanson, Mr. Wilkerson and another attorney for the CON Board, CON Board members are also on the list. Witnesses are on the list but that does not necessarily mean they will be called to testify.

Posted by Helen Hammons on June 09, 2006 at 01:21 PM | Permalink | Comments (7)

## Hockey Gloves Off Update

We'll get the the important stuff over the weekend, but for now what has everyone talking is another outbreak in the courtroom.

Government prosecutor J.B. Perrine said in his rebuttal to arguments for dismissal made by Art Leach that the government had never said the meeting between Siegleman and Scrushy happened on July 14, 1999.

When Art Leach came back up to the plate, he rebutted that part of Perrine's argument by saying the government had in fact mentioned July 14th as the date of the meeting and that Mr. Franklin had used

the date in his opening statement to the jury.

At this point in the proceedings Mr. Franklin jumped up out of his chair like a jack-in-the box toy being popped out of its container and it seemed to many in the courtroom, including myself, he called Mr. Leach a "liar." Franklin then told the judge basically that Leach had to be stopped from making those kinds of statements. "We cannot let him lie to the counsel," said Mr. Franklin.

Mr. Leach responds with, "I would ask that counsel do something." Judge Fuller then advises both of them, "I'm going to hold both of you in contempt of court..."

Mr. Leach turned from the podium and took a deep breath. One has to think past memories of dropping the hockey gloves may have been going through his head at that point. But, Mr. Leach calmly returned to the podium and continued his argument of the motion before the court.

Meanwhile, the Scrushy contingent and David McDonald made the mad dash out of the courtroom to get the transcript and across the room Mr. Feaga reached over to Mr. Franklin and patted him on the back. The pat did not look like a that's the way to do it kind of pat, but more like one of consolation. It looked like Mr. Franklin was aware he had made a mistake.

Mr. Leach finished his argument and gave way to the government. Mr. Leach looked like he was going to let it go, but in the end came back after the government finished to make the point and read from the transcript. The date July 14, 1999 was used by Mr. Franklin in his opening statement of May 1st.

"In July there is a meeting where Richard Scrushy and Don Siegelman get together in a private meeting. They have this meeting and after the meeting Richard Scrushy leaves. Now, we know that this meeting occurred on or about July the 14th of 1999...," words of Mr. Franklin, May 1, 2006.

The judge admonished both parties again that what lawyers says is not evidence.

Although Mr. Franklin tells me he did not call Mr. Leach a "liar' directly, he syas "in essence" that is what he said. Mr. Franklin says he has to sit there every day and listen to stuff he knows is not what he has said. He says throughout the trial things are being misrepresented to the jury.

Franklin told me the evidence shows there was a meeting on the 14th but his issue is with what happened at the meeting. He says he knows the check could not have been there on that date and that he as not said the check was there.

From his side Mr. Leach had the following to say:

"I am greatly disappointed as a former Federal prosecutor of 19 years with Mr. Franklin's behavior in open court this morning. I am also embarrassed for my Department of Justice that Mr. Franklin, as the Acting United States Attorney on a case of national importance, would make an allegation which was

demonstrably wrong.

I am further disappointed that after proving through the transcript that Mr. Franklin was wrong that he made no effort to  correct his slander on the record or to correct his error with me personally.  Mr. Franklin's behavior is dishonorable and  inconsistent with the proud history of the Department of Justice.  He ought to be ashamed of himself."

I will try to get a response from Mr. Franklin, since I spoke to Mr. Franklin before I got this statement from Mr. Leach.

The outburst followed an impassioned argument by Mr. Leach in defense of his motion to dismiss.  Talking with both his hands and his mouth, Mr. Leach's voice ebbed and flowed like that of a Sunday preacher, rising and falling with each phase of the argument, as he pleaded with the judge to consider the arguments he was making.  We'll have more on specifics later but if you want to read the motion it is linked on the right side of this page.

The judge is taking things under consideration and wants everyone back at 1 p.m. Mr. Roberts' defense team will go soon thereafter.

Posted by Helen Hammons on June 09, 2006 at 11:43 AM | Permalink | Comments (2)

## More Motions, Children in the Courtroom

This morning  Paul Hamrick's attorney Jeff Deen will present the motion to dismiss argument written by attorney Michel Nicrosi to Judge Fuller.  Art Leach will then present his argument outlining the reason charges should be dismissed against Richard Scrushy.

The motions filed by both are available, minus attachments, on the right hand side of the blog.  I'll be in the courtroom to hear the arguments and over the weekend will be plodding through notes from yesterday afternoon and this morning and writing a recap of the Blakey, Eastland argument and government response from Thursday afternoon.  Also, the government response to this morning's arguments will get posted as well.

The normal operation of the Chronicles will resume after the Rule 29 motions finish, hopefully this morning.   Being optimistic testimony for the defense could start around the time of the normal morning recess, between 10-11 a.m.

The team for Mack Roberts will present their case first.  On the witness list for defense day 1 is Alabama State Senator Lowell Barron.  It is unknown at this time whether or not he will get on the stand today.

Let's hope all the children in the courtroom got the silliness about how to pronounce the names of their fellow lawyers out of their system yesterday.  As the grade school antics continued yesterday, Judge

Fuller indicated it might be time for all the attorneys to wear name tags. The only problem with that is this bunch would probably swap name tags with someone else and then argue they were being called the wrong name. This has been a long hard-fought case, tempers are short, but while these antics draw a laugh, they do not do justice to the men who are conducting themselves at times like they are back in elementary school. They are all better than this. End of sermon.

Posted by Helen Hammons on June 09, 2006 at 06:16 AM | Permalink | Comments (0)

## The Prosecution Rests?

The prosecution has two more witnesses to call and then they should rest their case today. The prosecution told Judge Fuller late yesterday the two witnesses scheduled for this morning were the only two they have left. The judge would like the jury to be dismissed by noon today and Rule 29 hearings to begin this afternoon.

As of late yesterday the judge indicated he wanted and expected the defense to start presenting its case on Friday.

Wendell Elliot is the witness. Mr. Feaga will do the questioning for the prosecution. He is a retired U.S. Deputy Marshal employed now with Russell Lands. He served for around 25 years. He is a security office at Willow Point. Elliot says he knows Richard Scrushy because he has a home in the secure area of the development. The witness says he also knows Don Siegelman and points him out.

Mr. Elliot brought a document with him to court. It is a copy of the Willow Point visitor log that is kept at the gate by security officers. Elliot says he recalls seeing Siegelman on September 29, 2001 A motorcycle arrived at the gatehouse with two riders at 9:53 a.m. according to elliot and his log. Mr. Feaga goes to the charts and an objection is heard in the background.

The witness says Siegelman and his wife were on the motorcycle and that Siegelman told him he was going to Scrushy's lake house to spend the night and would leave for Birmingham the next day.

Elliot says Siegelman did not ask him for any directions to the lake house.

Mr. Elliot says both Siegelman and his wife seemed happy.

Mr. Elliot is asked if he knew what kind of motorcycle Siegelman was on. Elliot says he does not know what kind of motorcycle Siegelman was on.

Mr. Feaga shows Elliot a picture of Mr. and Mrs. Siegelman on a motorcycle and asks Mr. Elliot if those are the same two people he saw at the gate. Mr. Elliot says it is the same couple.

Mr. Elliot says the Scrushy home is on Lake Martin. After an objection, the judge says this isn't about a house move on. Mr. Feaga was asking Mr. Elliot to describe the Scrushy house.

The judge is asking to see the attorneys.

Mr. Feaga now shows Mr. Elliot another photo which shows a motorcycle. Elliot says he can not testify that this picture is the motorcycle he saw Siegelman and his wife on.

Mr. Feaga is finished. Oops not yet. Mr. Feaga wants to show the log Elliot kept and where it shows the Siegelman entry and enter it into evidence.

It looks like Terry Butts will be the next to question the witness. Chart WARS. Mr. butts is going to the charts. Mr. Butts is asking the witness how long he has been waiting in the witness room which brings an objection.

Mr. Butts is writing on the chart. Mr. Elliot says the Siegelman's waved on the way out of the gate. He says he has not seen Scrushy and Siegelman together or the wive's together, nor has he seen them as two couples together.

Mr. Elliot says there is also a golf club and tennis courts and Russel Land's office. Mr. Elliot says at that time you had to come through the front gate. The witness agrees you can visit homes in the development like Mr. Scrushy's by boat without coming through the security gate.

Mr. Elliot agrees people came to the area. Elliot agrees heand his wife used to make some salsa that they gave to the Scrushy's almost every year.

Mr. Butts sits down and Mr. Feaga steps up. Elliot says Siegelman advised him he was staying at Scrushy's lake home. Feaga asks the witness again to describe the lake house. This brings an objection from Mr. Butts. The judge tells Mr. Feaga to stay away from the home and how big or small it is.

Mr. Feaga asks if Siegelman spent the night in the Scrushy home would that be a thing of value? Mr. Elliot says perhaps it would be.

Mr. Elliot is asked if Siegelman visited Scrushy at other times at the lake home. Elliot says there is another time on the log. This brings an objection from Mr. Butts and the judge sustains the objection and really doesn't want to hear anything else on the matter.

The next witness will be Gerald Smith. Mr. Smith is from Montgomery and runs Montgomery Honda/ Yamaha.

Smith says he has met Gov. Siegelman and points Siegelman out. Smith says he brought records with him today. The document is an invoice for a motorcycle. He sold the motorcycle on December 6, 1999

to Don Siegelman.

Mr. Feaga continues his charting.  Siegelman paid more than $12,173.25 for the cycle including tax.  Mr. Smith identifies a picture of the motorcycle he sold to Siegelman.  Smith says the normal retail price for the motorcycle was $14,699 plus taxes and fees.

Smith says he had a conversation with the manufacturer of the motorcycle before he sold the cycle to Siegelman.  Someone from American Honda called him and asked him to sell the cycle at a discount to Siegelman and then Honda would give Smith's business a payment.

Smith says he did not know why American Honda called him.  Smith says he sold the cycle at the requested price.  American Honda told him they wanted to just give Siegelman the motorcycle but that Siegelman wanted to pay for it.

Smith says he did not offer to give the motorcycle to Siegelman but did sell it to him at the discounted price.

Smith agrees Siegelman's status as governor helped him get a discounted price.

Smith says one of his employees delivered the motorcycle to the Governor's Mansion.  A week to ten days later Siegelman came into the store to shop for accessories.  On or about December 16, 1999.  Smith says Siegelman was shopping for accessories for himself and his wife.  Smith says Siegelman did purchase a helmet, which had to be ordered.  Smith says it was a top of the line helmet.  Smith agrees it was a maximum safety helmet.

On one occasion Smith remembers Mrs. Siegelman being with the governor.  Smith says on another occasion Siegelman and his son were in the store.

Smith says Siegelman was looking at a full size ATV designed for someone over the age of 16.  Smith says he did not sell them an ATV.  Smith says he explained to the governor he could not sell the ATV to someone appearing under the age of 16.  Smith says he understands that Ward's eventually sold the ATV to the governor.

Smith says there is in the industry a standard that anything over 90cc's should not be sold for use by anyone under the age of 16.

Mr. Kilborn is up after Mr. Feaga finishes.

Mr. Smith agrees American Honda's Mr. Pew was known to him because Pew use to work for Smith's dealership.  Smith agrees Pew mentioned Siegelman insists on paying for it.  Smith says the dealership made only about $250.

Mr. Kilborn says,"The motorcycle was not free, that's the point,"  This to an objection to a point.

Mr. Kilborn asks Smith,"Isn't it common that when husbands buy motorcycles sometimes wives get upset?"  This of course brings an objection whidh is sustained.

Mr. Smith agrees he was not called before the grand jury.

Mr. Feaga will re-direct.  Feaga wants to know if Siegelman ever said anything about the ethics law.

Mr. Feaga is finished.  The prosecution asks for a sidebar.

The judge says we are getting close to the end of the government's case.  He is going to send the jury on an early recess until 10:20 a.m.  He tells the jury they have been patient and attentive.

We're back and Mr. Bacley is up.  He is discussing an exhibit the government brought in yesterday to show to the court and not the jury.  It was an FBI 302 with attachments.  Baxley says the government said Baxley should have been ready for the Burk-Kleinpeter stuff based on this exhibit.  Baxley says neither a swami nor a fortune teller could tell they were going to offer what they offered yesterday. Baxley says other exhibits related to material in the Highway Department files was only made avalable to the defense last Friday and Sunday.

Baxley holds in his hand materials he alleges the government did not give him until the 6th week of the trial.

Mr. Perrine says the exhibits are the actual contracts that are summarized in 335 which was provided on the hard drive last year.

The government says it is satisfied their exhibits are in evidence.

**The United States has rested its case.**

**The jury has been dismissed.  They will return at 8:30 a.m. Friday.**

**Mr. Baxley is arguing his motion for Mack Roberts as the Rule 29 hearings begin.**

**Mr. Baxley says it is not the defendants burden to prove their case.  "Never can we allow federal prosecutors to make up the law as they go along," quotes Baxley.  They have made up the law by throwing out inference that absolutely go contrary to what their witnesses say.  Jim Allen unequivocally says Mack Roberts is innocent of these 16 charges.  They are trying to confuse the facts....**

Let me play devil's advocate," says Baxley. "Let's just say Mack Roberts wanted ot be Highway Director,...for the sack of argument let's say he wanted to be highway director, let's just assume then that because of the $40,000, Governor Siegelman

Even with those assumptions these 16 counts are due to go out with your honor. If it did, it may be some kind of crime, but it is absolutely not mail fraud. It is a convoluted bunch of jibberish and gobbeldy gook.

Baxley says 13 of the counts involve Rainline. In addition to the eventer, every witness that has taken the stand says Railine is a great product. They haven't begun to prove what is necessary to prove Mack Roberts is guilty of those 16 counts. Their own witness, Jim Allen, says he felt like he owed Mack...Mack made a decision I suspect he wishes he could take back after what has happened to him. The matter with Mack's severance package has nothing to do with these charges. Even if those facts were true, which they aren't,t they do not constitute a federal charge of mail fraud. Nobody got shortchanged.

"The inferences are not supported by the evidence," says Baxley.

Mr. Pilger says Roberts is accused of aiding and abetting. He says Roberts was present at the shakedown. Pilger says Roberts monitored the elections for Allen to see if they would agree to the shakedown. in conversation with Allen, they decided Allen would pay," says Pilger.

Mr. Pilger says the first person that comes to him and says Allen should pick him for Highway Director and after that Siegelman checked in with Allen and the job went to Roberts.

Mr. Pilger says the evidence has shown the Tuscaloosa Road project was to the west. A specific road to Allen's bridge is what got built, according to Pilger.

Pilger says no matter whether or not Allen's road is better or not the public has a right to know whether or not the people involved have bought the office. Pilger says Roberts took a role in it with Mr. Allen's decision to pay through Roberts' time as Highway Director.

Pilger says Rainline was not properly tested and Roberts came in and turned on the Rainline spiget to the tune of $42 million without proper testing. Pilger says Rainline was not a good product.

The judge wants Mr. Pilger to look at the indictment counts 21-33. "You've alleged Mr. Roberts caused certain checks to be deposited in the mail," says Judge Fuller. The judge wants to know what evidence supports this. Pilger says this is the Smuck issue as decided by the Supreme Court. "Has there been any evidence that these companies paid to Rainline or anything else during the course of the scheme," asks the judge. "Did she testify she received invoices from these contractors," Yes, sir, your honor replies Pilger.

**The blog will be offline this afternoon, I am going to sit in the courtroom to listen to the arguments on the rest of the motions and will be writing later tonight.  The filed motions will be available on the blog shortly.**


Posted by Helen Hammons on June 08, 2006 at 08:14 AM | <u>Permalink</u> | <u>Comments (12)</u>

# Wednesday Afternoon Week 6

Mr. Kilborn is questioning Mr. Moore.  Kilborn asks if there was a significant increase in the jump in volume with regards to consultants and engineers.  Moore says the Highway Department lost a large number of employees in the late 90s and he says to get the work done the department had to hire outside consultants and engineers to handle the work.

Mr. Moore is going back over a cocument on contracts.  Mr. Kilbonr is defining how Mr. Moore came up with his $16 million figure mentioned earlier today as an amount of contracts.

Mr. Moore says the database adds up all the contracts regardless of whose administration the contracts start or are amending under.  Mr. Kilborn has a question about a $3.9 figure.  Mr. Moore is doing some more calculating.

Mr.Kilborn says the original agreement on contract #356 started in the Siegelman administration but the contract was suplemented four times by the Riley administration.  Kilborn says there were eight agreements total under the contract and Moore agrees.

$3.912 million number is correct says Kilborn but that 80% of the money was added in the Riley administration and Moore agrees this is about right.  This is a Burk-Kleinpeter contract.

Moore says the Legislative Oversight Committee does not have to sign the contract, but they have to review  the contractt.  Moore says it is a committee of eight and meets once each month.  Moore agrees the committee approves or disapproves the contract.

Mr. Kilborn is finished.  Mr. Perrine is back for the government.

Mr. Perrine asks about he $16 inillion in contracts and the $12 million approved by Mack Roberts.  Moore says Mack Roberts was the Highway Director at the time.

Mr. Baxley says the project in Mobile was recommended by the committe to go only to Burk-Kleinpeter.  Mr. {Perrine asks Mr. Moore how many times Burk-K.einpeter was the only firm approved for a contract.  Mr. Moore says upon his review on the ones Burk-Kleinpeter got the contracts for they were the only ones recommended.

Mr. Moore has to be brought back into the courtroom for another question by Mr. Baxley.  Mr. Baxley says three consultant firms were to be selected not simply one.  Baxley says he believes he has made his firm.  According to the minutes, Moore says the minutes reflect three firms werre selected.

Mr. Baxley wants another question of Mr. Moore.  We couldn't hear that.  The judge says he wants Mr. Baxley to stand right there until he's sure he has no more questions for Mr. Moore.  Mr. Baxley is satisfied and Rose Lawler is called to the stand.

The witness works at Brewbaker Motors and has done so for 27 years.  Mr. Feaga is questioning the witness.  He's moving very fast.  This has to do with the lease of a BMW.  This has to do with the lease of a 1999 BMW to Paul Hamrick.  The term was 36 months according to the witness.  Ms. Lawler says she believes he turned the car back in at the end of three years.  The date was March 11, 1999.  This was when the lease was entered into.

Mr. Deen objects to Mr. Feaga showing her the check and allegedly leading the witness.  The judge tells Mr. Feaga not to lead.  The witness is shown the check.  The check is for over $24,000.  Jeff Dean  and Mr. Feaga are at battle over the exhibit.

The check is made payable to Brewbaker Motors.  Mr. Deen and Mr. Feaga get another warning from the judge, "We're not going to bicker," says Judge Fuller.  It's a bad sign the judge is talking to the lawyers about bickering again.

March 11, 1999 is the date of the lease.  Mr. Deen doesn't like the way Mr. Feaga is asking his question.  The judge asks Mr. Feaga to refer to the records.  The check is also written on March 11, 1999. Mr. Feaga puts the check on the overhead.

Mr. Deen is in a state of constant objection.  He is winning this with the judge as the judge keeps sustaining Mr. Deen's objections.

Mr. Deen says this is a "Please done't beat your wife type question."  Now Mr. Deen's objection is overruled.

Mr. Feaga is told by the judge, "Don't editorialize."  Mr. Feaga is asking the address on the check which is an Audabon Rd.  "Would you tell me if this was the phanton Hamrick that leased the BMW, excuse me your honor I apologize for that," says Mr. Feaga.

The witness says the capitalized cost was $47,622.09, which is the prices the vehicle would have sold for.  This was a 1999 model foru-door sedan BMW.  the witness agrees it was brand new.

Mr. Feaga is finished.

Anita Muller is being brought back in to testify.  She is being recalled to talk about nine checks.  She was originally called on June 1st.  She is with Colonial Bank.  She is asked about checks negotiated at Colonial Bank.  Mr. Feaga wants to know the branch of the bank the checks were negotiated out.  The witness says the checks were negotiated at the Perry Street branch of the bank.  The witness says the teller validation has the name of the branch.  Mr. Kilborn is objecting to Mr.Feaga leading the witness.  Mr. Feaga asks about a $44,444.44 check made payable to 21st Centrury PAC and is writen on the Black Warrior Parkway account.  There is another check to ALABEZ.  ALABEZ has an account at the bank.  Another check to the ECODEV PAC, one to Green PAC, one to Growth PAC and all these checks were deposited in the Perry Street Branch.  The date was November 2 and the deposits happened on the third.  There is another check to JDC PAC and the check was deposited on November 3, 1998.  The next check is made payable to Jefferson PAC.  Vision PAC received the next check.  Enviro PAC got the next one and it also was deposited on November 3, 1998.  All are from Black Warrior Parkway.

The witness says checks were deposited into the ECODEV account but not these specific checks.  The total amount was arund $89,000.

There is a check to the Siegelman account for $63,000 and written on 11/2/98 cleared on 11.03/98 according to the witness.

The witness says the checks were deposited in Montgomery but were processed in Birmingham.

Mr. Kilborn comes to the witness.  She says she doesn't know what the indictment is all about.

Mr. Kilbonr does not have the mic on so we can't hear what he's saying.  It was something about how much was in an account.

We now know through Mr. Feaga that Mr. Kilborn was asking about another PAC that he may have gotten confused with ECODEV.  Only Mr. Kilborn knows for sure which account he was referring to.

Mr. Feaga says there were two checks written out of ECODEV for a total of $89,100.

Mr. Franklin asks for a sidebar before the next witness.

The next witness is Candida Jumalon.  She lives in Boax and is an insurance agent at an Oneonta insurance agency.  She says she is primarily a costomer service agent.  She is going to look at records about an account of Gov. Siegelman.

Mr. Franklin is doing the questioning.  The witness says a document shows a request for a change of insurance on a 2000 Honda motorcycle.  She says the motorcycle was insured in Don Siegelman's name.  She says no one besides Siegelman owned an interest in that motorcyle according to her records.  She says there is an ability on the form to indicate someone else may have an interest in the motorcycle.  The form is dated December 7, 1999.  The purpose for the change to the policy was to let the company

know an addition was needed to the policy, according to the witness.

In the remarks section the address is changed to reflect the Perry Street address.  The witness says there is a place on the document ot list who has aparticular interest in the motorcycle on page 2 of the change request.  The witness indicates that section is blank.

The value of the motorcyle was $15,500 according to the witness.  Mr. Franklin again asks about where you  put additional interest information is put.  On the document she is looking at it does not indicate anyone else had an interest in the motorcycle.  The insurance period was a term of August 20 1999 to February 20, 2000.  This is a six month policy term and the change happened in December.  The witness says she has heard the name Nick Bailey.  Bailey was a customer of her agency.  He had an automoile policy with All State insurance.  The motorcycle was insured through Auto Owners.  The company she worked for was allowe to represent multiple companies.

The witness is asked about Bailey calling  to cancel motorcycle policy in February 2002.  She says there was no motorcycle insurance for Nick Bailey.  She says she could not find a phone number for Bailey so she sent him a lmemo.  It came off the Siegelman policy in December 2001.

The witness says she sent e-mails and there were possibly faxes to Marilyn Roe.  The witness is looking at an exhibit dated August 27, 2001.  Three checks were deposited in teference to Gov. Siegelman's policy.  Mr. Kilborn and Mr. Franklin are conferring over a document.

The witness received a check from a Siegelman Campaign Trust account for $441, another check from Nick Bailey, and another check from the Siegelman expense account.  The first check was for the Tahoe.  The Baily check was for half the insurance the last one was for half insurance on the motorcycle and another vehicle.

According to the file, the Tahoe was always paid for out of the campaign trust account.  The motorcyle was always paid out of the Don Siegelman expense account.

Mr. Franklin wants the time frame.  The motorcycle was added December 7, 1999 to an existing account for Gov. Siegelman.  The motorcycle was taken off the account on December 20, 2001.  The witness says Nick Bailey was never added as a person with an interest in the motorcycle.  The witness says there were several policy changes during that time.  She says there were 10 changes to the account in that time.  None of the changes added another person with an interest to the motorcycle testifies the witness.  This includes Nick Bailey.

Prior to August 2001, the witness testifies according to her records she never received a check from Nick Bailey to pay for half interest in the motorcycle.  The witness says according to her records the insurance for the motorcycle was mostly paid for through the expense account.

When the motorcycle was taken off Siegelman's insurance the name on the motorcycle insurances was

that of Siegelman according to the witness. Between December 1999 and December 2001, the witness agrees this did not change according to her records. The witness says during that time there was no additional interest added.

Mr. Franklin is allowed to show the witness part of a document that he will not enter into evidence. This concerns a premium basis. In this case it was for the motorcycle. The basis use was issued for a pleasure use by a 55-year-old operator. The witness agrees this did not change during the time she handled the policy.

Mr. Kilborn says the account was a direct bill account where the payment went directly to Auto Owners. The witness says she doesn't know if Bailey or Siegelman made any direct payments. The witness is shown a document and says Bailey called the agency. The witness agrees she never spoke with Siegelman.

The effective date the motorcycle was placed on the policy was December 7, 1999. Mr. Kilborn says the $12,000 check to Montgomery Honda was the sme day the policy was effective and the witness agrees it was the same day. A check from the Siegelman expense account has an annotation on it saying it is half the insurace. The $397 was the total insurance for the Honda. The witness agrees the check was accepted and payment was applied from Mr. Bailey's check.

Mr. Kilborn is showning the witness a leter the company sent to Bailey. Dated February 18, 2002. The witness says in the letter she could not find a motorcycle policy. The witness says on the date of the letter she did not talk to Bailey. According to her records, Bailey was not aware he had been cancelled. The witness says it was her impression that Bailey thoght the motorcycle was his.

The witness says she's seen on several occasions where several people are on an insurance policy.

The witness says Bailey was not listed as a name insured on the policy and would not be covered by the policy.

The witness says according to the note Bailey was calling for Don Siegelman to the insurance company. The witness says Bailey could have indicated his interest in the motorcycle during the phone call but did not.

The witness sasy she has the entire records for the duration of the policy. The refund for $355.53 went to the named insured of the policy - Don Siegelman.

Franklin wants to go through all the checks that were received in payment on the motorcycle insurance. Feb. 10, 2000 for #377 on the Siegelman expense account for Honda motorcycle insurance.

The witness is still on the motorcycle insurance.

The prosecution told the judge they have three more witnesses left.  That means very little in this trial.

Audie Ward is the next witness.  He lives in Troy, Alabama.

Mr. Ward is looking at a document depicting a 4X8 trailer that Ward's sells.  He says there is a certificate of a 4-wheel drive ATV.  He says he remembers the sell of the vehicle.  Ward says Lanny Young called him about purchasing an ATV.  Ward says they reached a price on the phone and Young came down to get the vehicle.  Later Ward found out it was bding purchased for Siegelman.

The ATV was 4700 and the utility trailer was $399.  Ward says there was a sell on at the time.  No special discount was offered to Mr. Young.  Ward says it was a very good price.  Ward says ATVs start at about $3500 and go up to around $7,000.  Ward says this particular ATV has an age recommendation.  No one under 16 was supposed to operate the vehicle according to Ward.  Ward says customers have to sign a piece of paper indicating they are aware the vehicle should not be ridden by anyone under 16.

Mr. Ward says the vehicle's bill of sale was done in Siegelman's name.  Ward says he can't remember having a conversation with Siegelman before the sale of the vehicle.  Ward says 2-3 months after the sale, he talked to Siegelman about some ATVs.  He says he doesn't remember anything about the conversation.  Ward says there were no other conversations with Siegelman.

Ward says this ATV had a 325cc engine.

The judge is going to let the jury go home for the day.  The government has two more witnesses and at some point tomorrow the jury will get to go home early.

Posted by Helen Hammons on June 07, 2006 at 01:52 PM | Permalink | Comments (1)

## Will it Ever End?

Judge Fuller has issued his order concerning the possible testimony of Gary Moore, Billy Stenson, and Kathryn Hornberger.  The judge will allow some of the testimony.  I'll post more about this later.  You can expect this to add some time to the trial.  How much is to be determined.

The testimony from Stenson is to the $71,000 given to Mack Roberts and more controversially about the financial status of Jim Allen's Tuscaloosa toll bridge.  The judge ruled the financial status is irrelevant to the trial.  He will allow the prosecution to try  and show the financial status was not publicly known.  Stenson and Moore are supposed to testify about Burk-Kleinpeter and the number of contracts they got and consulting fees paid to Allen.  The Court will permit testimony on both.

Professor Blakey is asking for reconsideration of  part  of the judge's order.  Mr. Baxley is presenting

information about the bill of particulars  Baxley says "we have been surprised at trial, we have been ambushed."  Baxley says the judge had assured them this would not happen.  "There has not been a shred of evidence that Mack Roberts knew Jim Allen had a contract with Burk-Kleinpeter."

The judge sticks to his order and the jury will now come in.  Billy Stenson is on the stand.  He is the chief financial officer for United Toll Systems which is Jim Allen's company.  Hereafter to be referred to as UTS.  UTS does not own any toll bridges according to Stenson.

Stenson says he does all of the accounting and is the custodian of records.  Stenson says he has been CFO since January of 2005.  He agrees he has access to records that predate 2005.  Stenson agrees he is familiar with Mack Roberts.  Stenson agrees he is familiar with the January 1999 payment to Mack Roberts from Allen's company.

Stenson looks at the check voucher and stub from the payment in the document presented by the government.  He is also looking at a page of the payroll journal.

Stenson says the document recaps the gross less withholdings for the Roberts payment.  The gross $114,817.29. The Social Security tax is $4,262.74.  The Medicare tax is $1,664.85 then the deduction for federal and state 37,889.71 leaving a net pay of $71,000.  Stenson agrees this was the amount given to Roberts. This actually cost the company 120,744.88 according to Stenson.

Mr. Stenson looks at the pay stub accompanying the check.  Mr. Perrine is doing the questioning.

Stenson says Mack Roberts had a contract with a Jim Allen company.  Stenson says Roberts was an employee on the date of payment.  Stenson says the $71,000 was the last payroll check Roberts got from the company.

January 6, 1999 Roberts was paid on a payroll check and Roberts was also paid on January 7, 1999.  On January 6, Roberts got a payment of his regular payroll check.  Roberts got the $71,000 on the 7th.

Stenson says if Roberts was a full-time employee for five years and is involved in the development of four toll bridges he would get $1 million.  Stenson says his understanding is that Roberts did not work the full five years.  Stenson agrees certain bridges were not included, but did include the Black Warrior Parkway bridge in Tuscaloosa.  Mr. Allen has built three bridges to date according to Stenson.

Mr. Perrine is at the charts.  Mr. Stenson says the last date on the payroll records concerning Roberts is January 7, 1999.  Stenson says the last regular payroll check was for around $2,500 on January 6, 1999.

Stenson is asked where Roberts went to work after he left Mr. Allen's employment.  Stenson says he does not know where Roberts went immidiately after he left the employ of Mr. Allen.  After objections from Mr. Baxley.  Mr. Stenson says that ultimately Roberts went to work back at the Highway Department.

Stenson says Jim Allen normally doesn't give performance bonuses to his employees. This is after a review of the company's records. Mr. Stenson says he has never gotten a bonus from Allen.

Stenson says he is familiar with Allen's company Environmental Business Consulting LLC and Burk-Kleinpeter. Stenson says TTL had an arrangement with EBC from 1999-2001. Mr. Stenson is looking at an agreement effective January 1, 1999 between EBC and Burk-Kleinpeter. There is another agreement between TTL and EBC dated January 10, 1999.

Under the contracts according to Stenson EBC was to provide consulting services for the two companies.

Stenson is asked about payments to Allen. Stenson agrees there were payments. Stenson says the first payment to Allen was made on April 30, 1999 for $30,000. Mr. Perrine writes this on his chart.

Stenson says the compensation from Burk-Kleinpeter was $200 per hour and a monthly retainer of $10,000.

Stenson is looking at a recap of invoices and payments received from Burk-Kleinpeter and TTL. Stenson says other companies paid EBC money. Stenson believes it to be two businesses.

Stenson says the contract ended in 2001. The last payment received was August 21, 2001. This payment was for $35,000. Stenson says the $10,000 a month retainer went to $35,000 in December 1999.

Stenson says Burk-Kleinpeter paid Allen $755,000 in the time period in question from 1999 to 2001. Mr. Deen objects to the charting of the witnesses testimony and the judge overrules him and says as usual, "Let's move on."

Stenson is now asked about TTL. TTL paid SBC $8,000 a month. Stenson says the last payment was September 19, 2001 for $100,000. Stenson says TTL paid SBC for this contract a little more than $751,000.

Stenson says 90 percent of the $1.5 million went to Allen. Stenson says he does not know when Roberts quit working for the Highway Department but Mr. Stenson does know Roberts left the Highway Department at some time.

Mr. Perrine asks for a brief sidebar.

Mr. Perrine is now talking about the Black Warrior Parkway bridge. Stenson says the bridge was losing $600,000 in 1999, $200,000 in 2000 and $200,000 in 2001. Stenson says that was not public record to his knowledge.

January 1999 to September 19, 2001 is the period at issue.  Mr. Stenson prepared a summary of payments to Allen during this time period.  The prosecutor is meeting with the defense.  After a brief sidebar,

Stenson says he was subpoenaed last Sunday.  Stenson says he doesn't know anything about Roberts possibly sending checks for Rainline or to Mitlary Road.

Stenson says the prosecution talked to him after Jim Allen tesitied in this trial.  Stenson says it was about a week before he got the subpoena.

Stenson is looking at agreements Allen had with Burk-Kleinpeter and TTL.  Stenson says he does not know the dates the contracts were actually signed.  "Neither one of them has a date signed."  Stenson says the first payment was the last day of April 1999 and Allen received backpay from January, February, March, and April.  Stenson says he has no knowledge that Mr. Roberts knew Mr. Allen had these arrangements.

Mr. Stenson is asked to read from the contracts.  He is reading a clause sayijg Burk-Kleinpeter expects Allen to abide by the law.  Stenson agrees both parties are warranting that there will not be any payments made in violation of the law.

Mr. Baxley now questions Stenson about Mr. Roberts severance package.  Stenson agrees he was not there at the time and does not know whether or  not this was a severance.  Stenson agrees had Roberts stayed he might have been able to build the bridges and receive the bonus.

Stenson says there was an agreement between Jim Allen and a Mr. Arnberg in regards to a severance package.  Baxley says Allen forgave $750,000 in debt for Mr. Arnberg.  Stenson agrees Arnberg did not become highway director.

Talk turns to the toll bridge losing money the first couple of years.  Stenson says his understanding was that Roberts was hired due to his knowledge of bridge building.  Stenson says he has no idea what Mr. Roberts knows something or not.  Stenson agrees he can't tell the jury that the severance package Roberts got had anything to do with Roberts going back to the highway department.

Mr. Perrine will redirect for the government.  Stenson says he assumes Roberts knew a lot about the work of the Highway Department.

Mr. Perrine is back at the charts this of course brings more objections which the judge overrules.  January 7, 1999 was the last check Roberts got from Allen's company.  Stenson says Burk-Kleinpeter changed the $10,000 to $35,000 in December 1999.

Stenson agrees the Burk-Kleinpeter payments happened after Roberts left the employ of Mr. Allen.  Mr. Perrine asks a hypothetical about Roberts orchestrating a payment of $40,000 from Allen to Siegelman.

The judge sustains the objection and Mr. Feaga and Mr. Perrine confer.

Stenson says Arnberg and Allen were partners in the construction company. The judge asks Mr. Perrine to move on. Stenson says Arnberg was not an employee of Allen. Stenson says from his review of the records no one else that has worked for Allen received a $71,000 payment.

Stenson agrees Allen took over the debt from Arnberg and this made Allen the sole owner of the company. Allen assumed the $750,000 debt. Stenson says the liabilities exceeded the assests. Stenson says he does not know what benefit Allen got from paying Roberts $71,000.

Mr. Stenson agrees Allen got $1.5 million in payments from BKI and TTL after Mr. Roberts left Mr. Allen's employ.

Mr. Stenson says Roberts is the only one who had a contract that maed him eligible for a $1 million bonus.

The next witness will be Gary Moore. After the recess Mr.Moore is being questioned by Mr. Perrine. Moore agrees Burk-Kleinpeter was awarded contracts by the Highway Department prior to Don Siegelman becoming governor. Moore says BKI got three contracts before Siegelman and 17 contracts after Siegelman became governor. Moore says Roberts approved 12 of the contracts.

Moore says he created the document he is looking at from the AL-DOT database. This is a summary of all the contracts BKI got under the Siegelman administration. $16 million is the value of the contracts approved by Mr. Roberts. BKI didn't get all the contracts that were approved.

The total amount of money was $12, 778,110.88 that BKI actually got of the contracts approved by Roberts.

The first contract was for about $251,000. Mr. Moore is explaining the summary of contracts he prepared from the DOT records.

Moore says the contract is not effective if either the highway director or governor do not approve the contract.

Moore explains the executed date column is the date approved by the governor. There were five approved on one day.

Moore is now looking at a document on the River Road project in Mobile. Moore says this contract is on his summary chart. Moore says this is the first contract approved by Siegelman and Roberts. After the highway director signs the contract it goes to the Legislative committee. this was then signed on 6 April 1999 by the governor.

Moore says June 30, 2001 was Roberts last day with the Highway Department.

Another contract was approved May 6, 1999 by the Legislative Oversight Committee. Sometime before May 6, 1999 Roberts had to approve the contract according to the witness. Moore states the governor also approved this contract.

Moore says he is familiar with TTL because the company has had several contracts with the Highway Department.

Moore says under Siegelman TTL got three contracts and Roberts approved all three.

Moore is asked to look at contracts between TTL and the Highway Department. The first contract was approved on March 4, 1999 by the Legislative Overshight Committee. This was approved on April 14, 1999 by the governor.

There was another contract approved on December 2, 1999. The governor approved this on February 9, 2000.

The value of the contracts was $15.5 million. Mr. Moore says the total acutually paid was about $8 million.

Moore says contracts for county projects paid for by the Highway Department had a specific procedure for using consultants.

Mr. Moore says once the director had chosen a consultant the county entered negotiations with the consultant and the director can approve or disapprove the fee.

Mr. Perrine is finished. Mr. Baxley is up. Mr. Moore agrees a contract was approved by several people before Mr. Roberts approved it. Moore agrees the contract goes to a committe on which both Democrats and Republicnas serve. Mr. Moore says all the other contracts on the summary sheet are approved by other people before Roberts approved the contract. The names are not all the same on all the contracts.

Moore agrees Burk-Kleinpeter did work for the Highway Department both before and after Roberts was highway director. Moore says Burk-Kleinpeter is being used right now and he agrees they are a large firm.

Mr. Baxley says some of the money BKI received came as a result of changes after Roberts had left the department. Mr. Moore says he can't differentiate between administrations on a contract. Mr. Baxley says not all the money for the contract was paid under Roberts. Moore tells the judge his summary only tells the total ammount paid on the contract regardless of administration.

Mr. Baxley asks Mr. Moore to look at another document and his questioning of withness brings an objection from the prosecution.  Mr. Baxley says Burk-Kleinpeter is being paid more on the same contracts now then they were being paid under Siegelman and Roberts.

Mr. Baxley requests a summary document for all Burk-Kleinpeter contrracts with the Highway Department be admitted into evidence.  The judge admits ths exhibit.

The judge and Mr. Baxley have an exchange about relevancy.

There was a letter sent from the chief of design to Burk-Kleinpeter that Mr. Moore got a copy of the letter and the contract.  There was also a copy to the Federal Highway Administration.

Sidebar.

Mr. Baxley is showing a document to the witness.  This document is mintutes from a March 18, 1999 document.  This is for the Consultant Committee.  The meetings happened in February and March 1999.  Mr. Perrine says Mr. Baxley is going through the back door and Judge Fuller sustains his objection.

After another objection Mr. Baxley asks if we can break for lunch.  The judge wants this to move on.  According to the minutes BKI was recommended as a company to provide services for projects 7,8,9.  Also according to the minutes BKI was recommended to the director for services for on-call inspection engineering services for division 4,5, and 6.

Mr. Baxley is walking the witness through the minutes and shows Burk-Kleinpeter was recommended to Mr. Roberts by the committee for several projects.

Mr. Baxley is ready and so is the judge to stop for lunch.

Mr. Baxley finished his questioning quickly on return from lunch.  Time for a new post.

Posted by Helen Hammons on June 07, 2006 at 08:53 AM | Permalink | Comments (2)

## It's not Getting Shorter

Judge Fuller has issued his order concerning the possible testimony of Gary Moore, Billy Stenson, and Kathryn Hornberger.  The judge will allow some of the testimony.  I'll post more about this later.  You can expect this to add some time to the trial.  How much is to be determined.

Professor Blakey is asking for reconsideration of  part  of the judge's order.

Posted by Helen Hammons on June 07, 2006 at 08:44 AM | Permalink | Comments (0)

# Election Day Testimony

As voters head to the polls today to vote in the primary election, another group of voters will continue to hear testimony in the government corruption case here at the federal courthouse. The jury can expect to hear from someone from the state's personnel department and perhaps the pilot for Lanny Young among others. The trial is scheduled to resume at 8:30 a.m. this morning and run until around 3 p.m.

In the afternoon press gaggle yesterday, the prosecutors said they have nine witnesses left to bring before the court. Steve Feaga says he's quit predicting how long that will take. The prosecution alleges that they can't get stipulations from the defense that would make this move any faster. We'll get started shortly.

Jackie Graham will be the first witness.  She is the state personnel director.  She is being questioned by Steve Feaga for the government.

The witness brought the personnel records of Don Siegelman.  The records show Siegelman became governor on January 18, 1999.  Mr. Feaga writes this on his charts.  January 19, 2003 is the date the records show Siegelman was paid initially about $94,654.  On April 1, 2001, which Mr. Feaga reminds us is April Fool's Day, Siegelman's pay was reduced at Siegelman's request due to proration to $88,786.80.

Graham goes through the dates with Mr. Feaga that Siegelman served in other positions except that of Lt. Governor whose office is not in the merit system.

"We smell a fire somewhere," says Mr. McDonald.  The judge sends the jury out and the judge asks for the problem to be investigated.  Asking questions it appears to have been some kind of electrical malfunction but no one knows for sure right now.  There's no flames or anything.

Ms. Graham was going through Paul Hamrick's positions when court was stopped.  Hamrick served in the governor's office from January 15, 1999 until January 30,2001.  Hamrick was paid $88,000 and then $90,000.

They are going back to Hamrick's very early years in government as a loborer and other jobs through the years.

Hamrick worked as a photo technician at one point and also as an executive assistant III among other jobs.  Mr. Feaga notes all the jobs on his charts.

Hamrick left state work on March 2, 1994 and returned when he worked in the governor's office.

Mr. Feaga is interested in everyone's age now and Ms.Graham is looking up dates of birth.

Mr. Feaga moves on to Nick Bailey. Ms. Graham says Bailey worked in tthe office of the governor starting on June 18, 2001. Bailey was employed on January 19, 1999 as the state budget officer at a salary of around $86,000. Henry Mabry, the finance director, hired Bailey.

Bailey was appointed acting director of ADECA in June 2000. Don Siegelman appointed Bailey to the position. Appointed as a confidential assistant to the governor on June 18, 2001. The same month Hamrick left the service of the state agrees Ms. Graham. $88,418.20.

Bailey was 31 when he was named budget officer.

James Hayes was appoointed commissioner for the Department of Revenue on January 19,1999. He made around $71,000. Hayes served until December 16, 1999 when he left to be the senior advisor to the governor. He was also paid around $71,000 for this position. May 1, 2000 he served as acting director of the Alabama Development Office. On July 16, 2001 Hayes was executive secretary and senior advisor until January 2, 2002 when he resigned.

The next name in question is Ted Hosp, who served as deputy legal advisor for the governor starting in January 26, 1999. On January 10, 2000 Hosp was appointed chief counsel. Eventually his pay changed to around $72,659 and on November 1, 2000 it was increased to $85,000 per year. October 1, 2001 it went to around $86,000 and in October 2002 his salary was raised to around $89,000. His employement terminated December 31, 2002.

Questioning has now turned to the name Susan Kennedy. On 07/06/1999 she became chief counsel for the Revenue Department at around $74,365. Ms. Graham says Kennedy stayed at that position until 06/22/2001 when she resigned. Kennedy was appointed by James Hayes. Hayes was appointed by Siegelman.

Ken Funderburk is the next name. On Feb. 10, 1999 he started his employment with the state as the director of the Alabama Development Office. He made aroun $104,300 and was appointed by Siegelman. He left on April 15, 2000. Ms. Graham says her records do not show that Funderburk was working there in July, August of 2000. Her records reflect he did not come back on the payroll.

Henry Mabry came to work for the state as finance director on January 19, 1999 and was paid around $71,000. He served until January 19, 2003. Mabry was appointed by Siegelman.

Next is a Mr. Garver who started work on May 1, 2000 for the state as an appointee of Gov. Siegelman. Garver worked in an unclassified position in the governor's office. This did not require Garver to go through the competitive process. He was paid around $70,000. He was assigned to finance according to Ms. Graham. He served until 2003 and did not work for the state after that according to Graham. His highest salary was $75,000 in 2002.

Mack Roberts is the next person mentioned. Siegelman appointed Roberts director of DOT on January 19, 1999. He left June 30, 2001. The day before he retired, Roberts used a personal leave day.

Roberts accured 480 hours of annual leave and more than 200 hours of sick leave. This is according to Ms. Graham and her records. Roberts was paid $30,700 for the leave. According to her records Roberts didn't use any sick leave.

Mr. Kilborn is now questioning Ms. Graham.

Graham says she was not asked to bring in the employment records of Wade Hope or John Derickson. Mr. Kilborn is making a comment about Feaga's comment about "nothing sinister" about

"There"s nothing sinister about growing old is there?" Asks Kilborn.

"My partner David McDonald over here, you think he's old enough to be in the governor's office? " Perhaps, answers Ms. Graham. Kilborn says, "You don't hold it against him because he looks young do you?" Ms. Graham answers no.

Ms. Graham agrees the governor's salary is set by law. Mr. Kilborn has made his way to the charts. Chart Wars continues. His marker went dry so he had to get another one and he now writes on the charts the $5868 Siegelman asked to have his salary reduced by due to proration. Graham agrees that was the amount of the reduction per year. Kilborn says $9,740 was the amount of the reduction in salary throughout the term. Graham says this appears to be right.

Mr. Kilborn has Ms. Graham read the letter Siegelman sent to ask for the reduction in salary. Graham says Siegelman could have asked to have his original salary reinstated at any time.

Graham agrees the state was in proration. Graham says the proration was in the education fund.

Graham says some of the salaries of various positions are set by the state and others are not.

Graham says some raises are based on performance and others are cost of living raises.

Mr. Kilborn asks Ms. Graham if she knew how old Bill Baxley was when he became attorney general. Ms. Graham did not know. Mr. Kilborn asked Ms. Graham if any other governor had cut their own pay and unexpectedly Ms. Graham says Bob Riley did during his administration. Siegelman also cut his own salary when he was secretary of state according to Ms. Graham's records. This was due to budget problems in his agency. There is a letter in state records to that effect. Siegelman cut his salary by 10 percent. Ms. Graham says she does not know any other secretary of state who did this.

Mr. Deen now has the witness. He asks Ms. Graham how long she has been the state personnel director. She has had the job since December of last year. Graham says the lieutenant governor's office

is not considered a merit system agency.

Graham agrees it is not unusual for someone to start at a lower level and then work their way up. Hamrick started in 1985 in his work with the state according to Deen. Graham agrees Hamrick started working as a laborer with ADEM in June 1985. Graham agrees Hamrick was around 20-21 years old. in 1987 Hamrick went to the Public Service Commission also as a laborer.

Hamrick was also a student aid at one point. In 1989, Hamrick became an executive assistant III.

In 1991-1993, Deen says Hamrick was working as a photography technician. Graham says this job started on March 4, 1991.

Mr. Deen is showing the witness a document that is an employee performance appraisal. The appointing authority gives the rating. This was May of 1993 and was Hamrick's appraisal. Deen shows Graham a document which Graham identifies as a document concerning a special merit raise for Hamrick. Hamrick took on duties of other positions and the letter was asking for a 10 percent increase.

Sidebar.

Mr. McKnight is asking Ms. Graham who sets the pay. Graham says Roberts pay was set by the state. Merit system calculation time started in 1957. Graham says he was in the merit system until he retired in 1986 for the first time.

Mr. McKnight shows that Roberts was a transit man starting in 1956. In November 1961 Roberts was an assistant project engineer. In January 1966 Roberts was a project engineer. February 25, 1993 Roberts was appointed highway director by Hunt. Folsom also appointed Roberts highway director in May of 1993. Another letter dated January 18, 1999 is from Siegelman appointing Roberts at a salary of $88,818 to be highway director. June 15, 2001 is the date of a resignation letter stating Roberts was going to retire June 30, 2001.

Mr. McKnight is asking Ms. Graham to verify Roberts worked as assistant to the highway director under three administrators. Ms. Graham finds some but not all documentation to that effect.

Mr. Feaga is back. Mr. Feaga says people expect state employees to do a full days' work for the pay they get. Mr. Feaga gets objected to by Mr. Deen. Mr. Feaga is asked to move on by Judge Fuller. Mr. Feaga asks if there was anything in the records to indicate Hamrick has a law degree. Graham says there is not anything to that effect in the records.

"Is there anything in ther about him getting a $25,000 check to buy a BMW?" asks Mr. Feaga.

Sandra Horne will be the next witness followed by John Sanzo, Lanny Young's pilot. Both sides are now in a dog teeing contest with each other. Someone needs to take all these dogs to the park.

Horne works for the Comptroller's Office.  The records she brought show Siegelman was in the Lieutenant Governor's office from 1/16/95 to 1/16/99.  Hamrick worked there from 1/16/95 to 1/14/99 and Nick Bailey from 1/16/95 to 1/16/99.  Siegelman was paid as a legislator so she doesn't have his salary.  Hamrick was paid  $2,592 bi-weekly to start and ended at $3,87 bi-weekly.  Bailey started at $1786 bi-weekly.  Siegelman was paid $12 a day as set by the Constitution.

Siegelman also  got travel expenses and $50 per diem per day.

Mr. Deen is now doing the questioning.  Ms. Horne says she maintains the database for the personnel payroll system.  Mr. Deen says Hamrick resigned from the position on May 8, 1998 and then went to work n the governor's office in January 15, 1999.  Horne agrees there is no record who Hamrick worked for in between those two dates in her records.

The next witness is John Sanzo, who was Lanny Young's pilot at one time.  As the never ending sidebars continue, we pause again.

Mr. Pilger will question the witness.  Sanzo says he works for a private airline and is also a pilot.  In 1996 Sanzo says he was a corporate pilot on an on-call basis.  Sanzo says he met Lanny Young in 1996 while he was a flight instructor in Gadsden.  Sanzo says Young told him he would be purchasing an aircraft and asked if Sanzo would be the pilot.  The 414 Chancellor Cessna which seats nine persons including the pilot.  Sanzo says the plane is not very fast.  Sanzo says the plane was very nice with leather seats.  Sanzo says Vodka and Rum and peanuts and cokes were kept in the plane.  Sanzo says he kept a flight journal for the aircraft.  This is a summary of the flight logs.

Mr. Sanzo says the lead passenger determines the destination of the flight and is someone the pilot can go to should something happen.  Sanzo says the lead passenger is the only one listed.

Sanzo agrees the summary is from October 1996 to October 1998 when Lanny Young owned the aircraft.  Siegelman, Hamrick, and Nick Bailey are the lead passengers involved.

Sanzo agrees He picked up Hamrick and two female passengers in Anniston for a trip to the Platinum Club.  Sanzo says Hamrick arrived in a limo.

Mr. McDonald says his cross will be at least 30 minutes.

Lunch will only be 45 minutes today.  Court will resume at 12:45 p.m.

The attorneys in this case are definitely driving Judge Fuller to the Advil bottle.  Out of the presence of the jury a good portion of the lunch break was taken up about discussions involving other politicians traveling on the Cessna with Siegelman and how the government was showing in summary documents the cost of the plane at $275 an hour and attributing the entire cost to Siegelman or one of the others.

Judge Fuller wants other politicians left out of this trial. Mr. Mcdonald argued that at times there were other politicians on the plane with Siegelman and the records the government was showing would show Siegelman as lead passenger plus three others but did not identify who the three others were. At one point McDonald told the judge, "Bill Pryor is all over this airplane."

Judge Fuller is trying to walk a tight rope with testimony about other politicians. The judge said Pandora's box is now open but it "was not the first case involving Pandora we've been dealing with."

Mr. McDonald was not happy with Judge Fuller and the judge responds. "I'm not thin skinned. Your cutting into my lunch time."

Mr. McDonald wants to get into Lanny Young's bankruptcy again also. McDonald says Young bought the plane eight months after a bankruptcy.

Jeff Deen gets into the action saying he does want to bring the other politicians in but not to accuse them of anything illegal. Deen says he wants to rebut the argument that the use of the airplane shows the guilt of a politician.

Mr. Pilger didn't get off the hook. Judge Fuller admonishes the prosecutor that "IIf you stick your hand in a hornet's nest, you've got to expect to get stung."

The judge is going to allow the defense to go in a limited way into some areas and not others. Mr. McDonald says he's got 30 minutes worth of questions. Any bets on how long this really takes?

Mr. McDonald questions Mr. Sanzo. Sanzo says Young had a private pilot's license and Young told Sanzo he was going to be buying an airplane. Sanzo agrees by June of 1996 he was Young's pilot. Sanzo was paid $500 a week.

Sanzo says Young was the owner of the aircraft, but shortly thereafter Young took on two partners - Baker and Tillman. Sanzo says he did not know what the cash transactions were.

In February 17, 2003, Sanzo met with Jim Murray from the FBI. Sanzo says he discussed with Murray the partners but he did not know how the partners came to meet each other. Mr. McDonald shows Sanzo the FBI 302, Report of Interview. Sanzo says after the bank repossessed the airplane that's when Sanzo knew Young had partners. Sanzo agrees he now knows Tillman had paid $100,000 cash for his one third interest and that baker paid $100,000 cash for a third.

Mr. Sanzo says the FAA shows Lanny Young as the owner of the airplane.

Mr. Sanzo will get to look at the flight logs. Sanzo says a flight log is not an FAA requirement. Sanzo

says a pilot log is relevant to a career the only thing necessary is to keep track of the hours of the aircraft.

Mr. McDonald and Mr. Sanzo will go through the logs.

Sanzo first fliew Siegelman on June 23, 1996. The plane flew from Gadsden to Montgomery and from Montgomery to Nashville to meet the President. There were three other people on the plane but Sanzo says he believes Nick Bailey was on the plane but can't remember if Hamrick was on the plane. Sanzo says he remembers there was a female on the plane also.

Sanzo says the government's Agent Baker, Mr. Pilger were at a meeting with him at which the government added up every flight Siegelman flew on the plane. Sanzo says Siegelman was on the plane about 47 hours and this corresponded with the flight log. $275 an hour is the cost per hour to rent the aircraft.

Sanzo agrees the 47 is every time Siegelman was on the plane even state business. Sanzo says the hours weren't split. The split being official state business vs. personal business. Mr. McDonald asserts it would be fair to split the hours. Sanzo says he could not tell which flights were and were not for personal use according to his records. Sanzo says there was minimal conversation about trying to separate the records.

Mr. McDonald says Sanzo did separate state and campaign business and Mr. Sanzo agrees. A trip on 10/01/1996 shows Siegelman was on a state trip with one person. Another trip on the plane on 10/10/1996 shows Siegelman on a campaign trip. Sanzo says he can't speak for Lanny Young but he does not believe the state or the campaign was actually billed.

Mr. McDonald is getting into hour the hours for the trip are allocated as per cost. Sanzo says the figure was based on the total hours. Mr. McDonald says there are numerous instances in the flight log that shows DS+2 or DS+3 and Sanzo agrees. McDonald says $275 was multiplied by 143. McDonald says all of the cost of the flight was being assessed to Siegelman. Sanzo says the calculations were the trip value. Sanzo agrees that on the document Sanzo is looking at that was prepared with help from the governor attributes the full cost to Siegelman. Sanzo agrees Bill Pryor was on the plane at times with Siegelman and at other times as a lead passenger without Siegelman. Sanzo says the plane was not chartered out. Sanzo says the aircraft was being used by these gentlemen at no charge.

McDonald now says he cannot say whether or not Pryor flew on the plane for free. Mr. Sanzo wants to review some of his prior testimony . McDonald says the testimony may be in the 302.

There is a debate over exhibits and we had a minor technical issue. Mr. Sanzo says there came a point at which the aircraft needed to have its engines overhauled. The plane was grounded to have this done and Sanzo could not fly. This went on for a while and Sanzo says he didn't get paid or have contact with Young. Sanzo says he heard in 1999 Young might file bankruptcy and Sanzo gave up on the civil proceedings he had started against Young.

Sorry folks, we had a few more technical problems and I had to stretch the legs for a minute.

Mr. Sanzo just tesified that his pilot fees were sent to Lanny Young but that Young never gave him that money which properly belonged to Sanzo.

The judge wants Mr. McDonald to move on.

Mr. Sanzo says Young misappropriated funds from him.  Sanzo says one of Young's secretaries told him about the checks being deposited and used by Young.

Mr. Deen now has the witness.  Mr. Deen asks Sanzo if he was still a pilot.  Mr. Sanzo says, "Yes."  At this point Mr. Deen sheds some light on his love life.  "I lost more girlfriends to musicians and pilots. I hate you guys!"  This of course brings a chuckle and then Mr. Deen then gets back to business.

Mr. Deen is going through some more documents.  April 23, 1998 is the first date Mr. Deen wants to ask about from the flight log.  Sanzo says Hamrick is mentioned there.  There is another entry for July 8-9, 1998.  Lanny and Paul on the ith and Paul by himself on the ninth.  Another date in August shows Lanny and Paul on the aircraft.  October 9, 1998 is another date and Sanzo agrees it was Hamrick by himself.  Another entry shows October 14-15.  Sanzo says if you audit the records you may find more (entries for Hamrick).

Sanzo says the total flight time is listed on the document the government prepared.  Sanzo agrees it was not divided in half.

Mr. Deen says the government document does not show all the trips taken by  others.  He shows another log where more flights are listed on which others were on.

The date now in question is April 23, 1998.  Mr. Sanzo says he does not took place on that flight and Sanzo says he does not know if Hamrick was working for the state then.

On July 8, 1998 the flight was from Anniston to Montgomery, to Birmingham, and back to Anniston.  This flight was Lanny and Paul according to the records.

Another flight to Cullman from Anniston and return involved Hamrick on 7/9/1998.  Another flight went from Anniston to Montgomery to Mobile and return.

10/09/98 shows a flight with Lanny and Paul from Anniston to Montgomery to BFM to Montgomery to Anniston.  Sanzo says he has no independent recollection about what the flight was about.

Another flight shows Anniston to Montgomery to Jack Edwards in Gulf Shores and return.   Another flight was with Lanny and Paul.

Sanzo says the seven flights shown by the government have nothing indicating the flights were campaign related.  Mr. Deen says there is nothing in the records that shows Hamrick and Nick Bailey on the plane together.  However, Mr. Sanzo says even though it's not on the record he can testify Bailey and Hamrick were on flights together at times.

Mr. Sanzo says he can't testify that the $275 per hour would cover all the operational cost of the aircraft.

Mr. SAnzo says he could talk all day about FAA regulations.  The judge says, "Please don;t."  Mr. Deen sits down.

Mr. Pilger is back up.  Mr. Sanzo says only a lead passenter is listed not all people on the flight.  Mr. Sanzo says he was asked to be conservative with the numbers he gave to the government for their chart.  Sanzo agrees he reviewed the charts from the government to make sure they were right.  The judge now asks Mr. Pilger to move on.  Mr. Sanzo says he went through the documents.  Sanzo agrees if there was doubt they left it off the chart.  Mr. Sanzo says the numbers can be inflated if he had more time to go through the documents as to the number of flights each person was on.

Mr. Pilger asks another question that sets Mr. Deen off and brings a stern "counsel approach" from Judge Fuller.

Mr. Sanzo says the pilot fees were removed from the document prepared by the government.  Sanzo says Siegelman usually flew with Nick Bailey or Paul Hamrick and on occasion Lanny Young.  Sanzo agrees these were Lanny Young's friends.

Mr. McDonald says the figure he is circling is the total for the flight.  Mr. Sanzo agrees the jury will be able to count campaign trips from the documents.  McDonald says the government document includes all trips including the campaign trips.  Sanzo says they were classified by Lanny Young as state trips.

McDonald says there needs to be a deduction from the amount for legitimate state business and Sanzo agrees.  Mr. McDonald asks Sanzo if someone is implying that there was a benefit to Siegelman of $46, 584 would this be incorrect and Sanzo says it would.

Sanzo says at least one of the planes owned by the state for the governor's travel was a plane he wouldn't fly in.

Posted by Helen Hammons on June 06, 2006 at 08:07 AM | Permalink | Comments (6)

## Afternoon Testimony Week Six, Monday

Sandy Parker from Merchants Bank is on the stand and being questioned by Mr. Feaga.

Mr. Feaga is asking about Merchant Bank records and Mr. Bailey's account. Parker says the first document is a check for $9,200 from Lanny Young which was deposited on January 4, 2000. Parker says a check processed out of the bank on January 22, 2000 was made out to Lori Allen.

Parker says there is a June 5, 2001 check for a little over $10,000 annotated with "paymentr of loan plus interest."October 25, 2001 bank statement of Nick Bailey is the issue a check paid on October 23, 2001. The check was written on October 16 and was written to Siegelman for $2,973.35.

James Miserino works for Sterne, Agee, and Leach. He is a cash management manager. The witness agrees there was an account in the name of Paul Hamrick at one time with the firm. The account was in 2000 and was capable of doing margin trades, which allows people to borrow money from the firm to pay for stock. The witness says in September 2000 the firm had occasion to demand money from Hamrick related to Hamrick's margin account. Accoding to the witness, Hamrick bought stock on margin and owed the firm $5,400. Miserino says a letter was sent to Hamrick.

The witness says the letter to Hamrick to deposit money in the account. The call went out on 09/12/2000. A check was received on 9/19 for $5,400.

The witness verifies a check was written on 09/18/2000. The check was returned for nonsuficient funds according to the witness. On 9/29/2000 a wire came  in.

Mr. Feaga is back at his charts writing for a minute. Mr. Feaga is finished.

Mr. Kilborn is up. Kilborn asks the witness if the government asked him whether or not Governor Siegelman had accounts at Sterne, Agee, and Leach.

Mr. Miserano is asked to recognize accounts of Governor Siegelman.

The witness says the first account is an individual account and there is another account in the name of Siegelman and Lori Allen.

The amount in the individual account in January of 2000 was $279,992.93. The witness agrees Siegelman could have taken money out of the account at any time.

In the joint account  as of January 2000 there was $1,111,756.80. The witness agrees Siegelman and his wife had access to the account to take money out.

Mr. Deen will now question the witness. The witness says he has worked for the firm for 10 years. The witness agrees he got a subpoena from the government for the records. Mr. Deen says from 1901 to the present he brought all the records from the accounts having to deal with Hamrick.

The document the witness is being asked about does not have a date on it. Trava Williams was the investment professional handling Hamrick's account. The agent opens and monitors the account.

There was $34,000 received on September 11. A margin call went out for $34,000. The papers he has doesn't have a year. The witness says he doesn't see in the account where the money was sent in.

Mr. Deen says that the witness should have something in the file related to the $34,000 or it's something somebody made up. Mr. Deen says he is not mad at the witness.

September 12, 2000 is the date of a margin call that went out to Hamrick according to the witness. This asks for the $5,340. The witness says in the file he has that is the first margin call sent out. He says the letters are mailed out.

The witness agrees Trava Williams was handling the account.

Mr. Deen wants to know if it's the practice at Sterne, Agee for letters to be sent out before an account was actually opened and then Mr. Deen sits down.

Mr. Feaga is back up. He didn't turn his mic on again. I did manage to hear him ask the witness if he was sure Hamrick had an account with Sterne, Agee and the witness said Hamrick did.

Mr. Feaga asked if the witness could find whether or not Siegelman took out $9,200 coming out of the account on January 20, 2000. The witness says he doesn't find it coming out of that account.

The witness says after looking through all his records he can't find where Siegelman got $9,200 out of his accounts. "I do not see that specific ammount in these statements. There is a deposit on 1.18 for $70,000."

The witness agrees one is not going to find the $9,200 coming from one of Siegelman's account.

The $70,000 was in the joint account. Mr Kilborn says if Siegelman needed $9,200 from the account Siegelman could have gotten to it. The witness agrees.

Mr. Deen asks the witness if he knows Trava Williams or Paul Hamrick. The witness says he does not know Williams or Hamrick. Is it legal to buy margins on an account before an account has been open?" Mr. Deen asks. The witness says that is not in his department so he doesn't know the answer.

The witness says he is not a stock broker. Mr. Feaga is back and is showing something to the witness and the witness agrees these are the documents from Sterne, Agee. I couldn't hear what Mr. Feaga said but Judge Fuller says, "'Let's don't editorialize."

The witness again says a letter was sent concerning the margin call to Mr. Hamrick's address.  Mr.Deen says he is not disputing the check bounced.  Mr. Feaga says if Mr. Deen will agree that Hamrick had an account at Sterne, Agee, Mr. Feaga will stopped the questioning right now.

The witness says he got a notice from SouthTrust bank the check bounced that was written on the 18th. After that, the witness says a wire was received into the account.

The witness agrees he did not fake or phony up the records.  The witness says the statement shows that the check bounced.  Then there was a wired received on the 29th for $5,400.

Mr. Feaga says "okie doke" and is finished.

Mr. Deen asks the witness if Trava Williams could give better testimony than the witness.  The witness says all he can testify to is to the records.  Mr. Deen asks where Trava Williams is.

Sidebar.

The witness says he does not know if Trava Williams still works for Sterne, Agee.

The witness says the letter was sent out because there was a margin call on the account.  Mr. Deen goes back to the $34,000 and the witness agrees someone had $34,000.

The next witness is Caleb Hopkins.  Mr. Feaga asks Hopkins if First Commercial Bank where Hopkins worked as a Loan Review Specialist is federally insured and Hopkins says it is.  Mr. Feaga said he was going to set a record with this witness and before I can get this typed, the witness is off the stand.

Another witness that works for Wachovia Bank is on the stand.  The bank used to be called SouthTrust before the merger.

The witness is asked about an exhibit.  She says it is the signature account for Hamrick's account signed on 1.21/98.  She says she does not know Hamrick.

The witness says there also are a series of deposits into hamrick's account for $500 08/27/98 from Lanny Young.  $200 in cash and two checks payable to Hamrick from Tillman and Young and from the Siegelman campaign.  A chedk for $1500 off of Young's account.  There was another check for $500 made on 03/3/98.

There is another deposit from Mr. Young into Hamrick's accout for $25,000.  The witness is now looking at another statement concerning Hamrick's account.  She says there was a deposit from Young to Hamrick's account for $6,000 and at the time of the deposit to the account on 09/27/2000 the account was in insufficient funds status.

There were six items that Hamrick was charged for because of insufficient funds.

At the time of the deposit there was less than $500 in the account according to the witness.  Mr. Feaga is writing again.

There was a wire transfer of $5,415 out of the account after the $6,000 deposit was made.  The witness says she does not know where the money was wired to.

Now the witness is looking at documents having to do with cash deposits made to Hamrick's account.

- First deposit was 4/30/98 for $500 and the last deposit is on  1/26/2001.  That is for $1,000.  The witness says the total is around $11,500.

She says it was a check for $24,919.50 written on Hamrick's account to Brewbaker motors.  She says there was a deposit into that account on 3/12/99 in the amount of $25,000.  The Brewbaker chedk was written on 03/11 but it did not clear until later.

There is another check dated 06/12/2001 for $10,503.  The witness says there is a deposit into Lanny Young's account for the same amount.

Mr. Feaga is showing the witness some more documents.

The judge is giving the jury about 15 minutes and is going to take up some issues with the attorneys.

We're back.  Mr. Feaga is asking the questions.

The witness says she went through the records of Crum Foshee and Associates and made a summary chart.  The witness agrees she was asked by the government ot make the chart.  Mr. Feaga is at his charts.  Mr. Feaga either does not have his mic on or he is not wearing it. I can't hear Mr. Feaga.

The judge is saying he will take up the charts issue later.

Michel Nicrosi is now questioning the witness.  I can't hear her either.  But the witness is looking at a binder of something.

I believe now Ms. Nicrosi is turning the mic on.  There are account histories of Hamrick's accounts at SouthTrust dated June 20, 1998 to December 1999.

The witness is asked abut the signature card.  The witness is now being asked about a checking account and the signature card is for that account according to the witness.

The witness agrees no one else can write checks on the account.  The judge is asking Ms. Nicrosi to redact the social security number on the document.  The witness agrees she sees GH plus a number on many of the documents in the binder.  The witness says she is not aware the subpoena for the records was in 2001.  Mr. Feaga says this line of questioning is outside the scope and the judge sustains Feaga's objection.

The witness is being asked to compare the signature on the checks with that on the signature card and give her opinion as to whether or not the signatures are the same.  The judge sustains Mr. Feaga's objection and the question does not get answered.  Mr. Feaga objects to questions about the use of the debit cards.  The witness says the debit card from SouthTrust could have been used at any place Visa is accepted.  The witness agrees it is an automatic debit from the account and that to make a transaction as a debit card the pin number has to be used.  The witness agrees the bank keeps up with the charges.

The witness is asked to look at a statement that lists debit card transaction that shows some check card without pin numbers.  The witness agrees some on can make a deposit into the account and take cash out at the same time.  She agrees this is called a "less cash" transaction.  The witness says all you see is the amount going into the account not the amount out.

The witness is continueing to verify deposits were made.  There are receipts for the deposits and less cash tickets.

The witness agrees customers can write checks to cash.  The witness agrees there can be a counter withdrawal.

The witness agrees that in certain situations the money can be followed.  There is a withdrawal on June 24, 1999 and a deposit on the same day.  There is a 4,000 of the $11,500 that was transferred from the savings account from the checking account.  The witness says a transfer could be conducted this way and there's nothing wrong with this.

The witness agrees you don't know where cash deposits come from.  The witness says if the less cash deposits totaled over $17,000 could that make up some of the money.  The witness agrees money could be redopsited or if there are over $11,000 in ATM withdrawlals there could be deposits from those withdrawals made into the aclcount.

Mr. Feaga asks the witness if she remembers all the what ifs Ms. Nicosi asked the witness.   "I didn't hear her ask if you could get cash by taking bribes," says Mr. Feaga.

Mr. Feaga is asking if you can see a $9200 check when it clears.  The judge tells Mr. Feaga to move on.  "If you have a live warm human body that knows what happened with the money and they told you what happened with it is that a way you can tell what happened to the cash?

Nothing farther your honor.  There is now another sidebar and the judge is not happy.  When they return

Mr. Feaga has no further questions for the witness.

Mr. Fitzpatrick is calling the next witness.  The next witness is Gail Traylor.  She is an examiner of public accounts and has lived in Montgomery since 1960.  She is director of the state audit division that audits state agencies every two years.

Traylor says her office prepares audit reports that are available to the public.  She says there is a compliance report every two years and does the Comprehensive Annual Financial Report for the state of Alabama and also audits the federal money sent to Alabama.

Traylor says her office is independent of the executive branch.  Mr. Fitzpatrick says the government is charged with showing as part of the indictment that the executive branch got more than $10,000 in federal funds.

Traylor agrees the governor, lt. governor's offices and that ADECA, ABC, and other agencies are part of the executive branch.  The State Contractors Licensing Board also falls under the executive as does DOT and the Alabama Development office according to the witness.  She is asked about the Certiticate of Need Review Board and the Alabama Department of Finance which she agrees are both under the executive branch.

Traylor says the documents she reviewed are called the single audit for 1997-1998.  The fiscal year starts in October.  Traylor says the executive branch received around $3.7 billion in federal funds for FY 1997-1998.  The next year the amount was more than $4 billion.  The next year was also more thanr $4 billion.  For FY 2000-2001 the amount is again more than  $4 billion.  The next year was more than $4 billion.  The next year was more than $5 billion almost $6 billion.

The witness tells Mr. Fitzpatrick her office purchases goods and services from other states.  She says the banks are insured by the FDIC.   The witness agrees the state sends some faxes between states.

Mr. Kilborn is walking the witness back through the numbers.  Mr. Kilborn is finished and the judge now wants to see the counselors.  The judge is giving limiting instructions to the jury.  The next point of discussion is the starting time.  The judge says the jury wants to come in at 8:30 and leave early.  Court will start at 8:30 a.m. and adjourn around 3-3:30 p.m.

Posted by Helen Hammons on June 05, 2006 at 02:00 PM | Permalink | Comments (2)

# Can You Believe, Week 6?

Believe it or not this trial is at the start of week six.  We'll hear more from Beth Crain today.  Vince Kilborn said coming into the courthouse this morning that the jury would not like Ms. Crain by the time her testimony ended today.  How far the judge will let the questioning of Lanny Young's former secretary and alleged girl friend go is yet to be determined.

We're having some connection issues today. Jeff Deen is questioning Beth Crain. Mr. Deen has asked Crain if she had a romantic relationship with Young starting in 1995? Crain denies comments she allegedly made to the government that she was "romantically involved for approximately seven years." Crain says she told the government Young was a special friend, just like Gov. Siegelman had said Young was a special friend according to Crain.

The judge has said he is only going to allow limited questioning in this are. Mr. Deen said the questions go to Crain's possible bias and to whether or not she might be part of the alleged conspiracy. He says the prosecutors inferred Crain and Hamrick had a relationship and he wanted to counter that.

Deen moves on. Crain says she started working for Young in 1997. She says she met Hamrick when she and Young came to Montbomery in the 97-98 time frame.

Crain says Nick Bailey did not work for Lanny Young.

Crain says she does not know whether Young was selling T-shirts in 1995. Crain says in 1997 she was not Young's main secretary.

Crain says she worked for Young until 2003.

Did Young make a bundh of money of the sell of the Cherokee County land fill? Crain says she's aware he made money and that Young purchased "over 1,000 acres of land."

Crain agrees Young got involved in racing and went into business with Claire Austin. Crain says there were other secretaries, Greta and Kelly.

Crain agrees she was in charge of Young's office in 1999-2000. "Were you also his confidant during this period?" There is an objection. Deen clarifies asking Crain if she talked to Young about personal problems and she said "sometimes."

The judge moves Mr. Deen on.

Mr. Deen asks Crain about checks Young may have made out to Paul Hamrick for rent, utilities, or food when Young lived with Hamrick. Crain says she had to go get the utllities cut back on at one point. Crain says she does not have the checks for that with her.

Crain is asked how many times she and Young went to Vintage Year. She didn't exactly recall. Crain agrees Hamrick paid at Bud's after they came back from Auburn.

From 1998-2002, Crain says she was paid by payroll check. Deen wants to know how much cash she

was paid by Young during this time frame.  She says she does not know.

Asked if she was trying to infer Friday she dated Hamrick, Crain says, ""No, I didn't date Paul."

Crain is being asked about checks made out to PACs for which she was then reimbursed.

Crain is asked if she knew about $30,000 given by Young to Judge Jordan.  She says she did not.  Crain says she did not give cash to Hamrick after she cashed a check.  She says she gave the money to Young.  She says she can't recall seeing Young hand any cash to Hamrick.

Crain agrees at the grand jury she said no she had not seen Young hand cash to Hamrick.

Crain says she can't remeber what floor on the RSA building she returned to with $500 cash.  Crain says she does not know the date and did not follow Young once he left the building with the money.  She says Young told her it was going to Hamrick.  Deen tells Crain that's not what he asked her.  The judge admonishes the attorneys to quit talking over the witness.

Crain agrees she said Friday Young did not shop at the Locker Room.  Now she says he may have gone on occasion, but he wasn't a regular customer.  She says she knew there was an account there because she had to pay the bill.  She says she never went with Hamrick to buy clothes does.  She says she has "been to the Locker Room before."

Crain says she does not know how much money Young got from the land fill.  Crain says she got the Prelude during the time frame after Young got the money from the land fill.

Young brought the car from Hamrick and Crain drove it as a company car.  She says she made payments on the car but can't remember who she paid.

Crain is asked about the minor league stock car races in Hampton, Virginia and near Memphis.

Crain says she went and says she stayed in Memphis but she can't recall where the track was.  Crain is asked about things marked in yellow in the back of her calender and she says there were nine races they were scheduled to attend.  She says she didn't recall.  She says she went on "multiple occasions."

Deen asked if Hamrick was the one who "jumped out and squirted the Windex on the window."  Crain says she is not sure what Hamrick's experience with being on a pit crew

"Was this kinda like boys with toys type of operation?"  The objection that followed was sustained.

Crain says she coordinated things for the pit crew.  Crain agrees the racing car business went  as Deen put it "kaput." but didn;t know when that was.

Crain says she made arrangements for seats at Talladega but she did not know how much the seats costs.

Crain agrees she never had anything to do with buying tickets at Talladega. Crain says the sky box is not fancy. She says since she has never sit in the grandstand she does not know if the seats in the sky box were better than the seats in the grandstands.

Crain is asked about G-Tech and whether or not there was an attempted recording by Young and Claire Austin of a conversation with G-Tech and their was a malfunction with the recorder.

"Is it fair to say if Claire Austin was upset about something you and the other secretaries would know about it? Crain says she might know.

Crain says she never knew Austin got mad about money. Crain says she did know the partnership broke up. Crain says Mr. Tillman was never around much.

Crain agees the farm had financial problems and she says she knew "Lanny met with Bill Blount" on occasion.

Crain is asked if Young knew anything about farming and she said, "Cattle." Crain is then asked by Mr. Deen what kind of cattle Young had on the farm and she answered "cattle."

Crain says she was not aware Young was in debt to the tune of $100,000 to Anthony Fant.

Talk moves to 2002 about Goat Hill Construction and a subpoena to Crain for some rectords Crain kept at her house. She agrees there were about 12 boxes of records at her house. Crain says the records were being stored there because there was not an office. She says Young did not ask her to take the records there.

Crain agrees she talked to Agents Baker and Long along with her lawyer about two months later.

Crain is being asked about the interview. She says she was not being paid by Brian Broderick. She says she was being paid by the companies Young owned. Crain says did the "majority of things in setting things up." Crain agrees she did most of the hands on work with scheduling and not with Lanny so that's what she meant when she told the agents "no" she was not working for Young.

Crain says the first time she heard about the warehouse project was when Shane Bailey came to the office and spoke to Young about it.

Jeff Deen asks Crain if she remembers being asked by the agents who formed Goat Hill Construction. She says she does not remember. Crain says she does not remember telling agents Young had no part in Goat Hill Construction. Crain says Young had a share in the Goat Hill Construction project.

Crain says she told agents "in the beginning, no." Deen shows her a document from December 17, 2002. Crain says that would still be her answer.

Crain says she does not remember what she told officers. Mr. Deen shows the witness the statement. Crain agrees now she said her involvement with Goat Hill was to prepare resumes for Broderick. Asked if her involvement was more than that she said "later on it was."

Crain says she did not go over with the prosecution what was in that statement.

Deen gives Crain a copy of the statement she can keep to refer to since she is having difficulty.

Mr. Perrine wants Mr. Deen to ask questions instead of making statements and the judge agrees.

Crain is referred to a question about the checkbook and her authorization to sign checks. The judge tells Deen to ask the question properly. Crain says the document refreshes her memory. She is reading to herself again. She says "I did have some dealings with the checkbook."

She says she was asked by Broderick to sign checks but she does not recall which checks. Crain says she does not remember if she bought tickets to Talladega.

Crain agrees she talked to agents about Goat Hill Construction. She turns to another page in the document.

Mr. Perrine is again upset at Mr. Deen's questioning/commentary. The judge calls for a sidebar. I'm surprised it took this long.

Crain says Nick Bailey was not involved as far as working. Deen says officers asked who all was involved and tells Crain, "When officers asked who all was involved you left out Lanny Young didn't you?" Crain says she doesn't know, "Whether she did or she didn't."

Mr. Deen sends Crain back to the document.

Crain says,"No, I did not mention Lanny or involvement in Goat Hill." Crain is asked about Young and Bailey. Crain says it's hard for her to recall.

As to the state licensing board and Goat Hill, she agrees she told agents her only dealings with the board was "mabe some faxes." She says it "may have onlyh been some faxes."

Mr. Deen says he wants to explore this. Crain agrees she knows someone named Easterly with the board. Crain says she doesn't recall Christi being there when resumes were prepared for the board.

Crain agrees she was preparing resumes.

Crain says she did not know where the resumes were going.  She says she did not know they were not true.  She says she was doing what Broderick asked her to do.

Crain says she met Broderick through Lanny around 2001.  Crain says she has no idea how old Broderick was.  Mr. Deen says Lanny was paying you wasn't he.  Crain says she was getting paid through different companies.  She says she can not answer if she was paid by G.H. Constructtion who Deen says was not in business yet.

Crain says she did say Easterly did not end up with the Prelude.  Crain says Eaaterly had a Ford Contour.  Crain says she did not encourage Broderick to hire Easterly.

Mr. Deen says this is a convenient place for him to break.

November 1, 2000 to November 30, 2000 is the date of the document in question.  Crain agrees the document was shown to her by the agents.  Crain agrees this was a document kept at her home.

Crain says she can't remember when she prepared the docuement.  She says she was instructed to format it by the previdous CDG invoice.

Crain says CDG did not contact her to do the invoice.  When she was asked if she was suspicious about Young wanting her to do invoices with CDG information on them, she says she did as she was instructed including typing the name of Mark Pew for the signature box.  Crain says she did not sign Pew's name.  Crain says she did not know where the bill was going.

Crain is being asked about architects on the G.H. project.  Crain says she filled out two invoices at Young's request on the G.H. project.  Crain says she doesn't remember anything about the other invoice.

Crain says she doesn't remember if she talked to Bailey about the invoices.  Crain is asked about an invoice which had to do with Crain's accounting firm.  Crain says she knew Mr. Denton came to the office, but she did not know why he came to the office.  Crain says she has seen the invoice but does not know who prepared the invoice.  Mr. Deen asks if she came to know this was the bogus invoice, which of course brings an objection.

Crain again says she did not know the invoices were fake.  "I prepared the invoices as I was instructed."

Crain agrees she said in a December 17, 2002 statement to agents that Bailey had turned the project over to Vaughn.

Crain says she never met Anthony Fant, but knew of him.  Crain again says she did not know Young owed Fant $100,000.

Crain says she does not remember if she wired the $100,000 to Anthony Fant.

Crain says she told agents she knew there was a wire and she prepared a document for that. Crain says no she was not charged with wire fraud. "I do not remember having anything to do with the wire itself."

Crain says she prepared a document that had the amount and the place the company the wire would be going to.

Judge Fuller agains asks Mr. Deen to move on which prompts Mr. Deen to request a sidebar. The judge does not like Dean's questions regarding Anthony Fant and wants things to move on.

The memo book is on again. Crain agrees the government looked through her book with her. She is being asked by Mr. Deen if the two pages are similar. Crain is asked to take two pages out of her calendar/memo book.

Deen is sliding the originals under the ELMO. The entry is concerning Hamrick attending a race. Deen makes note that part of the entry is in dark ink. Crain says she can't remember Lanny Young's phone number. Deen tells her to look and see if it's in there(in her book)? Which one do you want," says Crain. "How many you got in there?"asks Deen. Crain says she has four numbers for Young.

Crain agrees the book is a Daytimer from 1999-2001. Crain says this was a personal book. Crain says Young had a Daytimer of his own. Crain says she can't say if he still had one. Crain says she does not remember if she kept Young's Daytimer at her house.

Tuesday, June 15, 1999 is the entry concerning Hamrick and the question of whether or not he's going to a race.

Crain says it did not have anything to do with the Childress thing. Now questions turn to January 28. Deen wants to know who else's birthday is in the book. She agree's Lanny Young's birthday is in there and goes on to says so is Claire Austin's, Greta's, among others.

In February 2000, Crain says she gave Green an advance of $1,000 on payroll.

There is something about $81,000 for Lanny Young. Crain says she does not recognize the writing but agrees it was in her Daytimer.

Crain agrees there were no meetings concerning G.H. Construction that she set up that involved Hamrick.

Crain says she was helping keep some of Claire Austin's schedule. Crain says as far as G.H. goes she

was dealing mainly with Broderick and Green.

Crain says from G.H. Construction she can't remember who went to Talladega. Crain says she does not know what a Talladega renewal was.

$1,155 was paid for the tickets at Talladega. Crain says she did not have the books at her house. Crain says her handwriting is on the document. Crain says she does not remember talking to Broderick about this.

Crain agrees there is another time she was trying to get tickets for folks and says "no" Paul Hamrick's name was not on there.

Mr. Deen is finished. Mr. Kilborn is up next.

Crain says she did work for Tillman-Young, Austin-Young, Young Motor Sports, ADS, AWDS among other Young entities.

Crain says she first met Young in 1995-1996. Mr. Kilborn asks about Young's bankruptcy and gets an objection.

Kilbonr says there are annotations in Crain's book in 1999 about a bankruptcy and asks if it has anything to do with the one in 1995 which of course lights Judge Fuller's fuse, "Kilborn, Don't mention that again," says Judge Fuller.

Crain says Young had another two secretaries in the office - Kelly, Greta. Kelly went to Austin-Young in 1999. After that Crain was Young's sole personal secretary. Crain says there was an office on Scott Street, then there was an office in RSA when Young joined with Austin.

Crain says, "I would say I knew a lot." (about what went on in the office.) Crain says she answered Young's phone calls and met people who came into the office. Crain says the office in RSA was smaller.

Crain agrees she has not been charge with anything regarding G.H. Construction. "I've never been threatened by anyone," says Crain in response to questions about her relationship with the government.

Crain agrees G.H. Construction was a legitimate business. She agrees at the beginning she didn't know it was a sham company as Mr. Kilborn calls it.

Crain agrees she does not know about any fraudulent conduct anyone was involved in. She says no she does not know about bribes paid to Jordan. Crain says she does not know there were bogus checks paid to members of Jordan's family.

Crain agrees checks were made to a PAC on at least two occasions for which Young reimbursed Crain for the money. She says she does not remember if she was reimbursed by check or cash.

Crain agrees she said, "Money went different places at different times."

Crain says she did not keep a list of where the money went that Young wrote for cash.

Crain agrees Young had a house at the time of the subpoena she received for the records. Crain says she did not know there was an active investigation going on at the time.

Kilborn asks Crain if she went to visit Young while he was in prison. Crain says she does not remember. Then Crain says she took some documents Young's attorney wanted.

Crain says Young instructed her to do invoices. Crain agrees Young instructed her to do all the invoices.

Crain says she did as she was instructed and did not think there was anything suspicious.

Austin-Young began in 1999 and ran to 2001. Crain says she worked for a brief period for Claire Austin but didn't do much of her work.

Crain says she does not remember being there when Austin's checks were missing. Crain says she doesn't remember exactly about the $10,000, but she says she, Young, and Austin had a meeting about clients and that problem was resolved. Crain says she is aware Crain went to Mexico, but that Young took his children to Mexico. Crain says Young didn't take the $10,000.

Crain says she can't remember about paying the bills from the trip. Crain says "not to her knowledge" when she is asked about possibly being involved in the taping of phone convesations.

Crain says she is aware Young got $500,000 when the taxes were reduced on the land fill. Crain says she doesn't remember doing Young's tax return. Crain agrees her calendar combines her business and Young's business.

Mr. Perrine comes back for the government.

Perrine asks her to look at an entry in March of 1999. She says there is nothing there about the BMW for Hamrick in March 1999. She is asked about September 25, 2000 and stock margin calls.

Crain says she is not aware of anything related to the margin calls. Crain is asked about January 20, 2000 and whether or not there was an entry about Young giving $9,200 to Siegelman.

Perrine says, "Just because it's not in your appointment book doesn't mean it didn't happen."

Crain says "no" she did not keep record of the checks Young cashed for cash. Crain says on "multiple" occasions Hamrick called Young and Young cashed checks for cash.

Crain is asked about a January 13, 1999 check. Crain says she doesn't remember when Siegelman was innaugurated. Crain says Hamrick always dressed nice. Crains says "everyone" was dressed nice the night of the innauguration.

Crain says the Honda Prelude had well over 100,000 miles on the car. "Which car was nicer the Prelude or the convertible BMW Hamrick had? "Which car was nicer, the Prelude or the BMW sedan you and Hamrick rode around in in Birmingham?" "The sedan," answers Crain.

Questioning now turns to the pit crew of the minor league racing car Young owned.

Crain is asked about a June 1, 1999 fax and a newspaper article she faxed to Harrington, a Waste Management official. She says Harrington was the driver of the car and Lanny asked her to fax the stuff to Harrington.

Crain says the article was published in the Birmingham News, Sunday, May 30, 1999. Crain agrees Hamrick went to the race in Memphis. Crain is asked to circle a part in the article that talks about what Hamrick did for the motor sports team.

"Dealing with the legislature is good practice for standing in front of speeding race cars," he said. (This is from the article and is a quote from Hamrick.)

Crain is asked if Siegelman disassociated himself from Young after the G.H. Construction project failed. Crain agress both Siegelman, Hamrick, and Bailey disassociated themselves from Young after the project failed.

Crain says Young was the owner of G.H. Construction. Crain now says she never told investigators in December of 2002 Young was not involved in the project. Crain agrees she told investigators about the invoice.

Crain agrees she has an entry in December 1999 about the Winston Cup awards. Mr. Perrine asks Ms. Crain why her calender is marked in different colored ink on June 15, 1999. Crain replies, "Different pens."

Crain says Curtis Kirsch was an architect and she knows who Henry Mabry is.

Crain is asked if she "faked up" any of the entries in her book prior to showing it to prosecutors. She replies, "No." Perrine asks Crain if anyone asked her to put in a fake entry about her mom's birthday. Crain says, "No."

Mr. Deen objects to the form of a question. Crain says she knew Hamrick was chief of staff when Young says he gave Hamrick cash. Crain says she knew Siegelman was the governor and that Young made arrangements for the governor to be at Talladega.

The judge sustains another objection and again asks the attorneys to "let's move on."

Crain says Young got Hamrick the job on the pit crew and that at the time Hamrick was Siegelman's chief of staff.

Chris Hudgins is on the stand a fraud investigator from Region's Bank. Mr. Feaga asks about checks from Black Warrior Parkway. Mr. Hudgins says the Black Warrior Parkway has an account with the bank and agrees the checks cleared the banks. All the checks except for one were for $4,4444.44 the other was for $4,444.48.

Mr. Feaga has a document with a cover page and four additional pages to offer into evidence. Mr. Feaga puts the cover page up and it shows a Regions Bank document which has Mr. G.M. Roberts name on it. Mr. Feaga is asked by Judge Fuller to check with Mack Roberts to see if there is any personal inormation that needs to be redacted from the document.

Mr. Hudgins is asked to examine checks and copies of checks while Feaga redacts some information from the documents.

Mr. Feaga redacts account numbers from the documents he wanted to talk about earlier and Mr. Baxley agrees the account belongs to Mack Roberts and Mr. Baxley agrees that is Mr. Roberts' account.

Mr. Hudgins says one check could not be found by the bank, but the original checks include the check for $4,444.48 as does the bank statement.

Hudgins says two deposits were made in the account for the bank statement closing on January 22, 1999. There were two checks. One check was deposited on January 5, 1999 in the amount of $2,729.34 There was a check actually for $2,879.34 but $150 was given in cash. Mr. Feaga says he knows of nothing wrong with this check.

Another check from United Toll Systems, LLC for $71,000 was deposited also. This is the amount of Roberts' severance/pay from Jim Allen.

Hudgins says Regions used to be called First Alabama Bank. Hudgens says it is from a Mr. Holt to Nick Bailey on January 12, 1996 about Bailey's loan being paid off.

Hudgins agrees the bank found some records relating to the Bailey loan. The loan was a $55,000 real estate loan for which the bank received a check to pay off the loan.

The second letter, dated January 17, 1996, has a hand written note at the botom thanking Holt for his help.

Hudgins says in a letter to the government that the bank couldn't find one of the checks. Hudgens says bank records are retained for seven years. Hudgins says that sometimes checks are misplaced.

Mr. Feaga is finished.

Mr. Baxley says none of the $4,444.44 checks have nothing to do with the Mack Roberts account. Mr. Hudgins says, "No, sir." Mr. Baxley says he wanted to make that "perfectly clear."

Another check dated 30 December 1998 says left hand corner of check says Retirement Systems. The other check, the $71,000, was drawn on United Toll Systems LLC. Mr. Baxley wants to show and exhibit to the jury. Mr. Hudgins agrees the bottom part of another exhibit correlates with the check and the deposit.

There is a worksheet shown that says Net Pay, $71,000. Hudgins agrees there were not two checks for $71,000.

Mr. Feaga says the amount was actually $121,000 before taxes were taken out. The witness agrees he would not know if the check influenced Mr. Roberts after he became highway director.

Mr. Hudgins agrees the checks were written on Regions but deposited at Colonial Bank.

Lunch time for the jury. The judge gives his instructions and tells the jury he has another hearing at 1 p. m. Reconvene time is 1:45 p.m.

New post time.

Posted by Helen Hammons on June 05, 2006 at 08:08 AM | Permalink | Comments (3)

## Week 5 Concludes

Well, we're nearing the end of week five and there's no end in sight for this trial. Let's hope attorneys from both sides paid attention to Judge Fuller's admonition late yesterday to move things along. Start time is scheduled for 8:30 a.m. and scheduled to finish at noon.

Janice McDonald is still on the stand. She is from the Secretary of State's office and is the Elections Director. Vince Kilborn is doing the questioning.

Kilborn is walking through a finance report from the 1998 campaign. The total contributions reported were $9,323,980.80 in Siegelman's race for governor. He spent $7.702 million. S1,635,674.71 was the balance.

Kilborn is asking McDonald about Political Action Committees or PACs. McDonald agrees PACs are legal. She agrees there are many PACs in Alabama. McDonald says PACs must have a chairman and a treasurer and probably other members. Kilborn asks why people gives to PACs and the prosecution objects. The judge overrules the objection. McDonald says PACs collect money and disburse it however the committee decides. Mr. Pilger objects again saying Kilborn's question is beyond the scope. He is overruled again.

McDonald says on the statement of organization there is a place for the PAC to state its purpose and she says people want to contribute to PACs as advocacy groups and other reasons.

McDonald is referred to the chart from yesterday which shows eight PACs which give to ECODEV the ninth PAC. McDonald says this is permitted under Alabama's FCPA. Then the money goes to a candidate and McDonald says, "Yes, it's legal."

McDonald agrees that each PAC has to file reports with the Secretary of State's office. McDonald says it is not unusual not to know anything about the officers or stockholders of the company that are donating money to PACs.

McDonald is asked about the annual report from ECODEV through December 31, 1998. McDonald says you cannot tell who contributed by just looking at the summary page.

McDonald says she is not sure it is possible that you cannot trace the Black Warrior Parkway using these forms. McDonald says Mr. Pilger made the chart but Mr. Birdsong's name is mentioned as having made the chart.

McDonald says it is possible that you cannot trace the Black Warrior Parkway money exactly to the Siegelman campaign.

McDonald says her office does not audit reports.

Mr. Pilger will now re-direct. He goes back to the chart and asks McDonald if it is the purpose of PACs to take in money and then send it to candidates. She says it is.

For the date November 3, 1998 McDonald agrees 4there was  money contributed to the campaign from ECODEV. The total amount was $63,000. $40,000 allegedly came from Black Warrior Parkway.

McDonald is asked if someone wanted to hide a bribe if going through PACs would be a way to do it. Ms. McDonald says, "Yes."

McDonald says it is perfectly legal for an individual to donate directly to a candidate.  The name Johnny Crawford is brought up as to the PACs.

Ms. McDonald says corporations can only contribute legally $500 to a PAC per election.  McDonald says she doesn't recall how many elections there were in 1998.  McDonald agrees if there were nine elections there would be a $4,500 limit.

A sidebar is requested and granted.

Beth Crain is the next witness.  She was Lanny Young's secretary and alleged girlfriend.

Another sidebar as they wait for the witness.

Crain is now on the stand and she has recently graduated from nursing school and lives in Gadsden.  Mr. Perrine is doing the questioning.  Crain says she was Lanny Young's personal secretary. She says she met Young in 1995-1996 while she was working as a legal secretary.  Young was in the land fill business at the time according to Crain.

Crain says she changed jobs in 1997 when she went to work for AWDS a residential waste hauling company run by Young as a secretary.  This was in Marshall County.  In 1998 she came to Montgomery and worked for another Young company, ADS.  She did bookkeeping, scheduling, etc.  She worked there until 2002-2003.  Young had several other businesses according to Crain.  Crain says Young was a consultant with his company Austin-Young.  Crain says she did work for all the companies as executive secretary.

Crain says she became friends with Young.  Crain says she knew Paul Hamrick and points Hamrick out in the courtroom.  She says she met Young in 1997 through Lanny Young.  She says Young and Hamrick were friends.  She says she saw Hamrick at different places.  When she moved to Montgomery she went to dinner on occasion with Young and Hamrick, 1998-2002.

Crain is asked about Bud's and Sinclair's.  She says she went to these places multiple times with the pair.  She says at least 15 times.  She says Young paid the bills.  She says she can't recall Hamrick paying the bill.

She says she went to an Auburn game with Hamrick and three other people.  Crain says Hamrick had the tickets.  Crain says she met Hamrick in Birmingham on one occasion and had dinner she says Hamrick was driving a BMW at the time.  Crain says she had Hamrick's phone number.  Crain says Young Motor Sports was a ASA race car team.  Crain says ASA is a minor league stock car racing type operation. Crain says the driver for Young Motor Sports was Tom Harrington, who worked for Waste Management.  She says the car was #8 and the races were in various states.

Crain says Paul Hamrick worked on the pit crew as a window washer. Crain says she paid expenses out of Young's accounts for Young Motor Sports. Young paid all the expenses for the travel according to Young.

Mr. Deen objects to a newspaper article and the judge asks to see the article. Deen says it is hearsay. Mr. Pilger says it is a business record so it falls outside the definition of hearsay. Pilger says he will link up the date with other testimony in this case.

Deen says the reporter is the one who should be called in and be cross-examined. The judge sustains the objection as to relevancy and outside the scope but not as reference to hearsay. He tells Mr. Pilger to move on.

Crain says Young had another connection with racing. He knew Grant Lynch of Talladega Superspeedway. Crain says she obtained tickets for Hamrick, Bailey, and Gov. Siegelman. She says she met Nick Bailey when she moved to Montgomery. She says she met Bailey when Bailey came to "Young's office on a regular basis. She says she met Siegelman at a dinner and at his inauguration ball. She says she got the invitation through Young. It was held at the civic center in Montgomery. Crain says there was a ball at the Governor's Mansion afterwords. She says Bailey, Hamrick, and Young were all there.

Crain says she need information such as social security numbers to get the Talladega passes and seats for people. She says there were presidential box seating, private seating, next to the closed in boxed seats. This area required special credentials. She says Siegelman arrived with Bailey and guests and Siegelman sat next to her. There was another secretary from a Young company and former Mississippi Governor Musgrove was also there with his kids.

Crain says she is familiar with Richard Childress and he owned the Dale Earnhardt #3 car. Crain says Young brought Childress to Montgomery for a Richard Childress Day with the governor at the Capitol.

She says she met Childress on June 15, 1999 when he came to meet with the governor. She looked at her appointment book to find the date.

Mr. Kilborn and Mr. Deen want to look at the book. Mr. Deen says he won't object if the judge will give him a chance to whine later. Judge Fuller says he doesn't believe he has denied anyone that chance. The judge says they will be allowed to review the appointment book.

Crain says Claire Austin scheduled photographers for specific events. When asked what the photographer would do, Crain says,"Take pictures."

Crain says she has a notation to see if Paul Hamrick was going to a particular race. Crain says the dinner she met Childress at was at Bud's.

Crain agrees NASCAR has a end of year award's ceremony and Young and Siegelman went in December 1999. Crain says around December 3, 1999.

Crain says Young paid for the trip to the Winston Cup Awards in New York. Carin says Young called to ask her to call Carrie Kurlander with the governor's press office and give them a press release. Crain says she wrote the governor was the guest of Grant Lynch and a great friend of Dale Earnhardt.

Crain says she called Kurlander and eventually there was an official press release.

Crain says Young worked on the land fill at Emelle for Waste Management to get a fee changed. Mr. Deen objects as to Crain's knowledge. Recess.

The judge is a little peeved at something he saw on television this morning. I believe, after talking to sources, this may be a reference to a Siegelman ad that started running yesterday. The judge indicated there may be some limiting instructions coming for the jury.

We're back. Crain says the document she is looking at is a fax to Young's office from the governor's office. Crain says she submitted the information to Cynthia.

Sidebar again. The judge is talking about private information. Judge Fuller is asking the attorneys to redact social security numbers and children's names from documents.

The date on the fax is April 17, 2001.

Now Crain is being asked about her knowledge of G.H. Construction. She says she knew the company was to build warehouses.

Crain agrees she got the information from the governor's office for credentials and called Cynthia at the track to give the information and get the credentials.

Crain says she wrote down meetings in her appointment book between Young and Siegelman. She is asked about July 1999.

Crain says she has seen the document presented by Mr. Perrine at Young's office. The document is from the Department of Revenue, July 15. Crain says she knows Ellis Brazeal, who served as Young's attorney. Crain says she met the attorney at the office.

Mr. Deen is objecting concerning the witnesses knowledge of the document.

Crain says Young did work for Waste Management. She is asked to look at July 13, 1999. It says "confirm luncheon with governor." She says Young was going to meet with the governor. She says if

there was a change to the meeting she would cross trough it.  In this case there was a check mark to indicate Crain confirmed the luncheon with the governor's office.  On July 14 there is a notation to "remind Lanny of luncheon today."  This entry has a check mark as well.  There is another notation for Noon about the luncheon and a note to remind Young about pictures with Childress and children.

There is another "Lanny meeting with governor and Nick," annotation on the calendar for the same day.

Crain is asked to look at another document a cover sheet from Tillman-Young.  The fax is to Sandy at Waste Management.  The fax was sent August 12, 1999.  Crain says she was in the Montgomery office when the document was faxed.  Sandy was in Georgia.

"Sandy, Mr. Young will be calling you to inform you of the time Governor Siegelman will be calling."  Crain says she was instructed to write this on the cover sheet by Lanny Young.

Crain says the fax was Siegelman's bio and Lanny asked her to fax it.

Crain is asked to look at a check from Waste Management to the Alabama Education Foundation on 09/07/1999.  The check is for $50,000.  Mr. Perrine asks Ms.Crain to look at her appointment book for September 7, 1999.  There is an annotation for dinner with Waste Management's  Chuck Compagna, Lanny Young, and Don Siegelman.

Ms. Crain is asked about April 2001 articles by Eddie Curran about G.H. Construction.  Crain agrees she was getting Talladega passes for the governor and others during this time period.

Crain says Young gave Siegelman campaign contributions, t-shirts and things like that to pass out.  Crain agrees Young had an airplane and she would call the pilot and let him know who would be on the airplane.  Crain says she does not recall if she ever called the pilot to advise him Siegelman was going to be on the plane.  She says she called the pilot and scheduled that Mr. Hamrick would be on the plane.  She says she would tell the pilot where Hamrick would be flying.  Sometimes Hamrick went on business and other times for private reasons according to Crain.  She says it's possible this happened on more than one occasion.

Crain is asked how she met Randy Owens of the group Alabama.  Crain says she met Owens and escorted Owens and someone else to the governor's office.  She says she was there briefly while Owens met with the governor.  Crain says she met Henry Mabry at different restaurants.  Crain says she wouldn't say he went out with her and Young.

Crain says she went to Vintage Year for Mabry's birthday party.

Sorry short blog break.  Crain has testified Young wrote checks for cash.  Crain is asked about purchases at the Locker Room.  Mr. Deen is objecting to Locker Room comments being hearsay.  Crain says Young got bills from the Locker Room.  Crain agrees Young did not shop there but that Paul Hamrick

did shop there.  Crain says when she got calls from the Locker Room about a bill needing to be paid she told Young and then she went down to the Locker Room and paid the bill.

Crain says during this time she drove a Honda Prelude that had been previously driven by Hamrick. Crain says ADS paid for the vehicle and she started driving the vehicle.  Crain says Hamrick was driving a BMW convertible.

Crain is asked about Young's role in G.H. Construction.  She says Young was the owner.  She says Young would not be doing any of the construction work.  "Himself, no," says Crain.

Crain is asked about a conversation between Young and Bailey during which Crain was typing up an invoice February 6, 2001.

Crain is asked about another invoice drafted under the instruction of Young.  Young was also on the phone with Bailey at this time.  Bailey was telling Young what to put on the invoice according to Crain.

Crain says she is familiar with CDG Engineers who did work for Young's company in Lowndes County.

There are other documents Crain says she is not familiar with.  Crain agrees the only documents  she is familiar with has G.H. Construction on the document.

She is asked if she recognizes a signature on a document.  She identifies the signature as that of Lanny Young.

Crain says Fant called the office and after that she was instructed to draft a document by Young and it was regarding a wire transfer for money.  She says she did as she was instructed.

Now Perrine asks Crain to go back to her calendar.  The date in question is February 22, 1999 and it says "Claire in D.C."  May 20, 1999 is another date.  "Judge Jordan tags and titles."  This had to do with Young Motor Sports and a big rig in which the race car and tools traveled.  May 21, 1999 entry says, "Tom's helmet deliver by 12:00."  Another entry says "Leave for race in Virginia."  This is May 22, 1999.  Another entry for May 23 indicates a race in Hampton, Virginia.

Another entry is for June 11 that simply says "Memphis."  Crain says this is a race to which she and Hamrick traveled together.  July 15th entry regarding Childress.

September 2, 1999 lists a 9:30 conference call with Siegelman, Grant Lynch and Lanny Young. September 17, 1999.  "Get six Talladega tickets for Bobby Timmons."  Crain says Timmons wanted Young to get the tickets.

There is another entry for "Lanny, Siegelman" around the same time frame.

Now Crain is asked if she knew Hamrick well enough to call Hamrick on the phone.  She says, "Yes," and she says she had occasion to call him.

April 17, 2001 fax from the governor's office is brought up again and Crain is asked to review appointment book for April 17, "Call Gina and check on Tickets."  Crain says she is referring to a former secretary for Gov. Siegelman.

Now we move to November 6, 2000.  "Lanny Young meeting with Rolan at Sinclair's."  Crain says this meeting had to do with G.H. Construction.

Now, November 20, 2000.  "Meeting Governor Siegelman."  This meeting was for 10:15 a.m.  Young allegedly met with Siegelman.

December 10, 2000.  "Shane Bailey, Randall Smith."  Crain says Shane Bailey was Nick Bailey's brother but she doesn't know who Randall Smith was.  Crain says this business had to do with G.H.

There is another entry to fax G.H. Construction letter to Ellis Brazeal.  There is a note to follow up with the accountant for Young as well as a Lanny Young meeting with Bill Blount.  I missed the date on this one.

Now January 28, 2001.  This was Hamrick's birthday.  Now, January 29, 2001.  This entry says to call Mabry to confirm a meeting on January 31, 2001.

February 12 has a note to  follow up on G.H. Construction.  There is another entry for February 25, 2001.

February 26, 2001 was to check on American Express card for G.H. Construction.  February 27 involved Randall Smith.  Crain can't remember how he was involved.

For Lanny Young $21,237 is on a note with the calendar.  There is another document that show the same $21, 237.

Crain says differences between Claire and Lanny led to the break up of Austin and Young.

Crain says G.H. Construction fell apart once the investigation started.

Crain says Young had a lot of interaction with Siegelman and Bailey.  She says after the investigation started there was little or no interaction.  Crain agrees she met with investigators and the conversations was being recorded.  Then the recordings stopped when they went into questions she had not prepared with her attorney to answer.

Mr. Perrine is finished.  The judge has asked counsel to approach the bench.

Alright counsel let's settle down.  The biscuits are getting cold.  As you may or may not be aware this case is getting a lot of media attention.  The judge is advising the jury to make their decision on the evidence presented in this case only.  You must not be influenced at any way by any information, the judge tells the jury. He instructs the jury to notify the court about concerns they may have been compromised.

Because of the length and attention of the trial the judge says there is no way he can prevent the jury without sequestering the jury. The court's instruction is "You will avoid any media attention being any reporting or media attention of any time about this trial."

Mr. Deen does not want the prosecution to have further contact with the witness.  Mr. Feaga says there is no reason to instruct the prosecution to this.  "This is not Mr. Feaga's witness," says Mr. Deen.

The judge tells Ms. Crain she is not to meet with anybody until she comes back to court until Monday.  Jeff Deen wants the witness instructed not to read the blogs, "two of them I know of," says Deen.

The judge says he is most concerned about the jury reading the blogs.

Posted by Helen Hammons on June 02, 2006 at 08:08 AM | Permalink | Comments (2)

## Mrs. Marcato Continues Thursday Afternoon

Mrs. Marcato will be on the stand when the trial resumes this afternoon at around 1 p.m.  The blog may be down for a little while this afternoon but we'll take it as it comes.  See everyone after lunch.

Sorry for the late start. Mrs. Marcato is still on the stand.

Mrs. Marcato is asked if she and her husband gave this information that is in the document to their attorney who wrote the letter to the government.   Mr. Pilger believes he has the right to go through the document because the defense brought it in.

Mr. Pilger is now jumping ahead to when Roberts and Siegelman were in office.  He is asking about change orders.  Mrs. Marcato says the contracts "were not ours" so she doesn't know about the use of Rainline then.

Mrs. Marcato is turned back to the document (which we will try to get).  In the document Allen allegedly says he could be successful in Alabama because the Department of Transportation people did not like Marcato but liked him, Allen.  Mrs. Marcato says Allen felt he could be successful marketing Rainline in Alabama.

In March of 1999 the contract was signed between Rainline Corporation, Marcato's company, and

Rainline Technologies, Allen's company.  Mrs. Marcato agrees with this.

Talk turns to the fact after Allen's contract was terminated with Rainline, payments went directly to Crum Foshee instead of going through Allen.

The date of the new document is July 20,2001.  The document is a letter from Marcato to Allen about the termination of Allen and it is a request for Allen to sign papers.  Mrs. Marcato says she was unaware this was about the same time Roberts left the Highway Department.

September 2002 is when Siegelman called Marcato.  One month prior, Rainline Corporation quit paying Allen to the best of Mrs. Marcato's knowledge.

Mr. Kilborn questioned Mrs. Marcato briefly about the letter Mr. Marcato sent to Allen  in September saying that Allen had perpetrated a scam on Marcato by not living up to the contract that had been signed.  Mrs. Marcato had little knowledge of the letter but did agree they though Allen had not lived up to the contract.

Mr. McKnight is asking Mrs. Marcato to look at another document.  Mrs. Marcato agrees that prior to October 2000 some of Allen's duties had been terminated.  She says the termination agreement was in October 2001.

Mrs. Marcato agrees the government submitted questions for them to answer.  Mrs. Marcato says she doesn't remember how many questions there were.

Mrs. Marcato says contact with Roberts was not made after Roberts became Highway Director.

She agrees that in the letter from the Marcatos' attorney it stated that from September 1998 to 2004, Marcato had not contacted Roberts at any time until Marcato ran into Roberts at a gas station and that no, Mack Roberts was never mentioned in regard to payments.

Mrs. Marcato agrees that according to Mr. Allen, Allen and Foshee dealt with the state for the purposes of marketing.

Mrs. Marcato says the document item #10 says Allen was to handle the marketing in Alabama and other states.  Crum was Allen's man but the Marcatos according to the document were not aware of what the relationship was between Allen and Foshee.

Ms. Muller a researcher at Colonial Bank for the last nine years is on the stand.  12/07/1998 Lanny Young's account got a wire for $1 million from U.S.A. Waste Services.

Mr. Feaga wants to get some certification done with witnesses.  There is talk of a stipulation.  Sidebar.

The judge reminds Mr. Feaga not to wear the court reporter out because Mr. Feaga tends to "get on a roll."

Feaga doesn't have his mic on or it's not turned on.  Mr. Feaga is asking if checks cleared Mr. Young's account. Most of these are already in evidence and have been talked about earlier in the case.  The witness agrees a $3,000 check from Young to Hamrick cleared the bank.

The witness has already said other checks have cleared.  The witness agrees a $50,000 check was deposited into the Alabama Education Foundation account at the bank from Waste Management.

Sorry, we have to take a blog break.

Mona George from Compass Bank is on the stand.  She testifies the Siegelman expense account had around $3,000 in it on December 14, 1999.  She also testifies a check for Montgomery Honda came in around December 8, 1999.

January 13, 2000 to February 11, 2000 is the date on another statement of the account.

George testifies about a deposit on January 20, 2000 for $9,2000.  Mr. Feaga is at his charts to document this.  The check is to Lori Allen from Nick Bailey.  Bailey's account is at Merchant's Bank.

The balance on the account at the time was $3,078.23 at the time the deposit was made.  This was the balance on January 12, 2000.  There were no other deposits except for the $9,2000.  George testifies there were no other checks written before January 20, 2000 but there were checks written after that.

A check #903 cleared on January 25, 2000 for $5,940 so Mr. Feaga's assertion at this point is that that check would not have cleared without the deposit of $9,2000.

The $5,940 check was written by Gov. Siegelman to the U.S. Treasury for 4th quarter estimated taxes.

Sorry had to take another break.  Ms. George is still on the stand.  The court has taken it's afternoon recess and we'll be getting started again shortly.

Mr. Feaga continues to question Ms. George.  Now it is about a check from the Blount-Parrish account to Tillman and Young.  George says the Tillman and Young account is at Compass bank.  The check was for $10,000.  Another check on September 6, 2000 for $25,000 from and to the same companies.

Checks totaling $71,400 written on the Lanny Young personal account, 73 checks to cash May 1998 to March 16, 2001 are the question and Ms. George says the checks cleared and this is a legitimate financial transaction.

Ms. George continues to be asked about checks.   Now a check for %500,000 written on July 26, 1999 from Walston, Anderson, and Wells, LLP to Lanny Young.

Ms. George looks at January 23 to February 19, 1999 bank statement for Lanny Young. There was a $2 million wire transfer into Young's account from Waste Management, Inc.

Now checks written by Lanny Young to members of the Jordan family.  This is some of the money involved in the bribing of Phillip Jordan.

March 10, 1999 from Young to Hamrick is the next check and George says it cleared the bank.  The check was for $25,000.  December 2000 another check from Young to Hamrick.

January 20, 2000 there was a check written by Young which cleared his account.  Another check for $5,324 to Ward's.

Another check for $858.60 written by Lanny Young on January 13, 1999 to the Locker Room.

David McDonald will now question Ms. George.  McDonald says everything sped up a little bit and he's in the dust.  Ms. George says she is a district service operation manager for Compass Bank.  She says she does not remember the date of the subpoena she got.

George says she does not have a copy of the subpoena with her.  George says she does not remember which accounts of Gov. Siegelman were subpoenaed.

McDonald says he thinks all he heard about was Gov. Siegelman's expense account.  George says there was a campaign account she was asked to provide documents from.  George says she does not recall if any of the documents she was shown were from Siegelman's personal account.

George says she does not recall if there were documents presented today from the account of Don and Lori Siegelman.  George says she has been working for Compass 28 years.  She says it is not uncommon for people who bank at Compass to have several bank accounts.  George agrees that if someone wanted to know how much money Siegelman had in Compass Bank accounts to pay taxes with it would be fair to look at all the bank accounts.

George agrees a true picture of how much money Siegelman had available would have to include all his accounts.

George is asked to look at statements for an account.  George says the date on the first document is May 13, 1999 to June 14, 1999.  The ending balance was $342,652.49 according to George as she reads from the statement.  Another statement is dated June 15, 1999 to July 14, 1999.  The ending balance was a little over $648,000.  Another statement from July 15, 1999 to August 12, 1999.  The amount at the beginning of the account was $634,884.60, Withdrawals for $620,604.18  were made from the account.

There is a check to Sterne, Agee and Leach. This check was for $600,000. Another check is to Sterne, Agee, and Leach for $5,000. Sterne, Agee and Leach is an investment firm.

George agrees people move money out of checking accounts to other places to earn more money.

George agrees the bank looks at people's total assets not the balance in one single account.

McDonald goes to Mr. Feaga's chart and tells Mr. Feaga, "I am not going to deface it  Mr. Feaga."

Mr. McDonald says Siegelman had $1.2 million in those investment accounts.  "I've let him go on but he's arguing with the witness,"says Mr. Feaga.  "Y'all both have gone a long way.  Let's wrap this up," says Judge Fuller.

George agrees that one would not be able to tell how much money was available to Siegelman to put in another account to cover checks without looking at all the monies available.

Mr. Feaga is back at his chart.  With regards to this account if the $9,200 had not gone into the account the check would have bounced to the Treasury Department.  To this Ms. George agrees.

Have you ever heard of anybody selling two-thirds of a motorcycle? asks Mr. Feaga.

After letting Mr. Feaga go through a hypothetical about how the check arrived at the bank and who all was involved, the judge says that this is argumentative and beyond the scope of what the witness was called for.

Ms. George says the check was written to the Treasury Department on the 18th of January.  This check is for $5,940 and there was only $2,078.23 in the account.  George agrees Siegelman had reason to know he did not have enough in the bank to cover it.  Two days later the deposit is made to cover the check.

Mr. Feaga is asking about a check written for the motorcycle for $12,173.35.

Two years later Mr. Bailey gives Siegelman enough money to add up to $12,173.35 if added to the $9,200 check.

Mr. McDonald is asking if the bank has overdraft protection.

"There is nothing in the banks policies about adding money to the bank account?"says Mr. McDonald and Ms. George agrees.

Another check is presented to Ms. George.  The check is a check drawn on the Siegelman expense account to Jim Murray insurance for $377 on 2/10/2000 for motorcycle insurance.

Mr. Fitzpatrick will question the next witness, Mr. Merrin. He is with the law firm Walston, Wells and is the firm administrator.

Mr. Merrin is talking about a document signed by Phillip Jordan which has to do with a Cherokee County Resolution. Another document talks about payment of $1 million to Lanny Young.

The originator was USA Waste Services, Inc. The date was 12/07/1998 and for the amount of $1 million to Young.

Mr. Kilborn now has the witness.

Merrin agrees the law firm he works for is in Birmingham. Merrin says Bill Pryor use to be a member of the law firm. Mr. Brazeal was also a member of the firm agrees Merrin.

Merrin is shown a letter and he says he doesn't know anything about it except he is the custodian of the record. Merrin says he has no information that Lanny Young bribed Judge Jordan in order to get him to influence the Cherokee County Commission to pass the resolution that ended up in his firm's file. Merrin agrees his firm doesn't make it a habit to do business with people bribing judges.

Merrin says he has no information that Young gave information to Brazeal that Young had bribed a judge to get the $1 million from USA Waste.

Mr. Fitzpatrick is back with the witness.

Merrin agrees he has no knowledge or information about Lanny Young's business arrangements with anyone.

Janice McDonald from the Secretary of State's office is on the stand. Ms. McDonald says the document is for Don Siegelman from the 1998 campaign and include an original and amended report.

Ms. McDonald says this document is a PAC report for ECODEV PAC. McDonald says Black Warrior Parkway through the PACs. The PAC took in $4,444.44. The 21stCEN PAC took in money from the Black Warrior Parkway in the amount of $4,4444.44. The same for ALABEZ PAC, ENVIRO PAC (.48 instead of 44), GREEN PAC, GROWTH PAC, JDC, JEFFERSON PAC, VISION PAC.

McDonald says no where on the forms does it mention Jim Allen was the owner of Black Warrior Parkway.

Mr. Pilger goes through disbursements from the PACs. Many are disbursements to the Don Siegelman campaign around November 2-3, 1998.

Another break in the action for a sidebar. Ms. McDonald is asked about a chart that shows the results of the PAC records. The court says the records are voluminous and it is the court's discretion to enter into evidence the summary as well as admitting the documents themselves. The judge gives a charge to the jury on their eventual consideration of the chart.

The chart shows the Black Warrior Parkway and the contributions on November 2-3, 1998 and the expenditures from the PACs and their destinations. Money moves from other PACs to ECODEV PAC. Other money goes to the Siegelman campaign account. ECODEV PAC money went to Siegelman's campaign.

Ms. McDonald is directed to a page of the amended campaign finance report. Pilger says there should be an additional $3,500 on the chart and McDonald agrees. This has to do with ECODEV PAC.

McDonald says there is no indication anywhere that Jim Allen was paying $40,000 to the Siegelman campaign.

Mr. Kilborn will start cross in the morning on this witness.

Judge Fuller is giving the jury the standard charge of not using any of the testimony offered in the past two days against Richard Scrushy. The judge is asking the jury about voting next Tuesday. The judge is saying court would reconvene at 10 or 10:30 a.m. The jury would get no breakfast from the court that day says the judge. The judge is encouraging each juror to vote on Tuesday.

Court will run from 8:30 to Noon on Friday.

The judge is not happy with counsel from both sides. He lets the lawyers have it about the course of the trial today especially regarding the bank witnesses. The judge said if the lawyers kept dragging down the trial by talking about overdraft protection and whether or not a check would bounce he was "fixing to take unified control" of these witnesses. Judge Fuller let it be known sternly that the path the lawyers was taking involved irrelevant and inadmissible testimony. He wants the lawyers to stick to relevant testimony and "get this case moving along or we're going to be here until Christmas."

Three cheers for Judge Fuller. See everyone tomorrow at 8:30 a.m.

Posted by Helen Hammons on June 01, 2006 at 12:18 PM | Permalink | Comments (3)

## Thursday Moraning - Marcato?

Judge Fuller is expected to rule this morning on the motion concerning the possible testimony of Rainline developer Mac Marcato. At issue is a discussion Marcato had with Don Siegelman on the telephone on or around September 9, 2002.

Mr. Blakey get's his report card this morning and we should know something in just a few moments.

The judge has ruled the testimony is admissable.

Mac Marcato will take the stand. Mr. Pilger will do the questioning for the prosecution. Marcato says he lives in Pike Road and has lived in Montgomery 25-26 years. Marcato says he is a highway contractor who makes machines to do the painting with but his primary business is with Rainline.

Marcato says he makes all kinds of road striping and stripe removal equipment.

Marcato says he invented Rainline and got the patent for it and has patents in 17 countries. He owns and has always owned the company.

Marcato's company is Rainline Corporation. He says he has made a contribution to Siegelman but does not really know him.

Marcato says he wanted to donate $10,000 to Siegelman's campaign so he called Crum Foshee to find out what to do. Marcato says it was his understanding the money had to be given to political candidates through Political Action Committees.

Foshee came to Marcato's office where his wife wrote and signed the checks to three PACs and the checks were then taken to Siegelman, according to Marcato.

Mr. Marcato is asked to look at a document to refresh his memory on the date of the checks. The checks were written on 9/9/02. The amount of each check was $3,335.

Marcato says he got in the car with Foshee and they went into a house near the governor's mansion. Marcato says the room he was in was like a kitchen. Marcato says initially the governor was not there. Marcato says he didn't know anyone there but Foshee knew everyone. Marcato says the governor came in and they exchanged pleasantries, someone came in and got the governor and Marcato and Foshee left.

Marcato says about four or five days later he received a call at his office in Montgomery from Siegelman. Marcato says he didn't really think it was Siegelman, but it really was him. "We chatted, a few little pleasantries." Then according to Marcato, Siegelman said he was going into a meeting about Rainline. Marcato says he was hearing the criteria for Rainline was changing. Marcato says he wondered what the meeting was going to be about. Marcato agrees he had heard Bowlin had stopped the use of Rainline and then restarted it.

Marcato says Siegelman shifted the conversation and told Marcato as a businessman Marcato understood money had to come in so it could go out. Marcato says Siegelman told him Siegelman had to have money coming in because Siegelman had money going out. Siegelman said he was a

businessman too.

Marcato says Siegelman asked him for a $250,000 donation.  Marcato says he told Siegelman he must not know him because he didn't have that kind of money.  Siegelman then asked for $100,000 and Marcato says Siegelman seemed disappointed and then said bye.  Marcato says Siegelman didn't demand the money, but  Marcato says he felt pinched or put in the bind because you don't know what might happen.

Marcato says Alabama is the only state where Rainline is mixed with politics.  Marcato says he was shocked by the conversation and talked to his wife telling her she would not believe what had happened.  Marcato says he never gave anything else to Siegelman.

Marcato says Siegelman asked him for $250,000.  Marcato says he was angry and upset but it didn't last for just a minute.  He did not give Siegelman the money and Marcato decided it was best not to fool with Gov. Siegelman any more and give him anything else.  About a week later Marcato met with Bob Riley and gave him money.

Marcato is asked to look at a letter.  Marcato says the letter says as long as he tells the truth he won't be prosecuted for anything.  The date on the letter is November 30, 2004.

Mr. Marcato says he is not clear if he has seen the document he is now presented with.  Marcato says he can't say whether the document was a true version of minutes of a meeting at the DOT.  He says he doesn't know but that it "looks real official. The Highway Department ought to know."

Marcato agrees he testified in front of the grand jury.  After being shown is grand jurty testimony, Marcato says he said to the grand jury he "felt I was being shook down."

Marcato says Siegelman rolled right into asking for the contribution from talking about the Rainline meeting.

Mr. Pilger is having a little meeting with other government attorneys.

Marcato finishes by saying, "Yeah, I was shook down."

Mr. Marcato is now being questioned by Vince Kilborn.  Mr. Kilborn asks about Marcato and his inventions.  Marcato says he invents something almost every day.  Marcato says he might invent something while he's in court.

"You haven't invented any truth serum that would make Jim Allen tell the truth have you ?"asks Kilborn.  "I don't think anything would do that," says Marcato.

Kilborn tells Marcato to let him know if he does and "we'll have another trial."  At this point Judge

Fuller says sternly, "Mr. Kilborn."

Marcato says he invented Rainline by thinking about a KitKat candy bar after he was driving on 231 in the rain.

Mr. Kilborn is drawing again. Marcato says he noticed the broken lines on the road and that he could see the leading edge. He says it took a lot of work to get Rainline to work. Marcato says he applied for the patent in 1993.

Marcato says he got the product worked out in 1992 although it was not where he wanted it then.

Marcato says there is a new product evaluation board and you have to get put on the agenda. He says he presented it to the board in March, April 1993.

Marcato says he had found out the state of Alabama had discovered the problems with road striping and companies all over the country were trying to develop things for Alabama.

Marcato says the board jumped on Rainline. He says the second job was on 431. Marcato says he should have picked a road closer to Montgomery. Marcato says he also did a section by the Highway Department and it's been there nine years.

Marcato says Rainline is about 2.5 times more expensive, but it is also 2.5 times as thick and has more glass beads. Marcato agrees it is a good safety product that saves lives. Marcato says the federal government has a number $3 million that they associate with the death of a human being, but no you can't measure the life of a human being. Marcato says,"You don't know about the misses and close calls."

Marcato says it's extremely dangerous striping roads. "One summer we got hit 11 times in New Jersey." Marcato says there is an indication that the Rainline is going to last until the road is repaved. Marcato says they repave on about an eight year cycle.

Marcato says Rainline does have competitors. Marcato says he has a patent on the Rainline process not what the line looks like on the road.

Marcato says a company on the West Coast developed another way to do Rainline about six years ago so no one has to use his product. Marcato says the equipment to put down Rainline can be bought from other places besides his company.

Marcato says Rainline is used in 10 states and European countries.

Marcato says Oregon has a guy who has done a lot of in depth study on road striping. "But this guy is

really, really sharp.  Not saying Mr. Derickson is not sharp."

Marcato agrees you don't have to bribe a government official in Rainline to get them to use Rainline.

Mr. Marcato is shown the letter, or e-mail, he sent to Jim Allen.

"He disappeared one time for six weeks," says Marcato.  Marcato agrees he said Allen violated his trust.  Marcato agrees what Allen did was a "total scam."  Marcato says he doesn't know every word Allen said to the jury.  "The only way you can tell he is lying is if his mouth is moving," says Marcato.

Marcato says he contributed to Siegelman $2,500 for the 1998 campaign, but he didn't make a deal that the state would use Rainline.  Marcato says a friend of his told him to give to Siegelman.  Marcato says he met Siegelman at Monticello Apartments and gave him the check and they left.  Marcato agrees Siegelman didn't say he would use Rainline.  Marcato says Siegelman in 1998 didn't know what he did and no discussion of Rainline took place.

Marcato says he did not give to the lottery campaign nor was he asked to give to that campaign.  Marcato says the state was using Rainline in 1999.  Marcato says he gave no contributions to Siegelman in 1999.

Marcato says his wife sent Siegelman $250 after Siegelman called and talked to her and Siegelman seemed nice and like he would do a good job.   Marcato agrees his wife is the boss.

Marcato says the only agreement he had was the marketing agreement with Jim Allen but it was for marketing across the United States, except for a couple of states, not just Alabama.

Marcato says he was doing all the work and Allen "was getting all the money."

Marcato is asked about a letter from the government about his testimony.

Marcato says his corporate attorney told him he could not talk to the government without an attorney.  He says he doesn't know of anything he's done wrong but "you never know what someone can come up with."

Sidebar called.  The judge is going to start the morning recess a little early.

Mr. Kilborn will continue the questioning.

Marcato is asked to look at a document which he says he recognizes.  It is a letter from Marcato's lawyer to the government in March 2005.  Marcato says the purpose of the document was to cooperate with investigators, "a U-Haul trailer worth of stuff," was sent to the government and the government had

some more questions which the letter was attempting to answer.

Marcato agrees his lawyer was not in the grand jury room with him.  Mr. Pilger is objecting and the judge sustains.

Marcato says that he told the grand jury that at the end of the Siegelman conversation Siegelman said, "Send what you can."

Kilborn going back to Derickson.  Marcato says Derickson's hair is longer now than it use to be.

Marcato says the state put the business spec out in 1998 where Rainline could be put into contracts. According to Marcato, Rainline had been tested continuously since 1993.

Marcato says the original specification called for the inverted profile, but later they allowed an alternate.  Marcato says the state could always buy stuff from other people.  Marcato says his system is better and fast.

Marcato is asked to look at a series of specifications from 1998-2001 from the DOT concerning the profiled striping.

Kilborn is saying they modified the specifications.  Marcato says the original specification was changed because there were loopholes in the specifications that Marcato says he told the state about .  Marcato says some of the work was not as good as he wanted.

Marcato says they did change the specifications from inverted to just profile striping opening the specification up.

Marcato says other methods have problems, but there now is another method that will put it down just like Rainline.

Marcato says the state is using the same old thermo-plastic they've used.  Marcato says they are doing anything to make the roads safe in bad driving conditions.

Marcato says its a fact the Alabama Dept. of Transportation has a book called Alabama Crash Facts and during the four years Rainline was put down on the roads, the net loss in dollars dropped $2.6 billion. Since Rainline is starting to peter out the cost is going back up.

Jeff Deen is now questioning the witness.  He is asking about the September 9, 2002 contribution and the 1998 check for $2,500.

Jeff Deen has lost his question.

He's now found it. The question in the letter Marcato's attorney sent to the government concerns whether or not Marcato knew Hamrick. Marcato says he does not other than seeing Hamrick on television.

Mr. McKnight is now questioning Mr. Marcato.

Marcato is shown documents to identify. The documents are the patents Marcato holds. The first one is dated 8 August 1995 and the last one is 19 June 2001.

Marcato is asked if the last one has to do with the audible noise Rainline makes. Marcato says it is. Marcato is asked if he has brought things with him that he was asked by subpoena to bring.

Marcato has brought a sample of Rainline with him mounted on a board. Marcato says Rainline is on one end and standard striping is on the other end.

Marcato is asked to explain to the jury how Rainline works. Sidebar time.

Apparently the explanation won't happen. Marcato says he doesn't believe Roberts was the director in 1993 when Rainline was shown to the board. The project on 431 in Phenix City was the first real Rainline job according to Marcato. He says Roberts became director in 1993 but after Marcato had shown the product to the board.

Marcato says under Fob James and Jimmie Butts as director at DOT, the state approved the use of Rainline and the specifications were written. He says Butts wrote a letter.

Marcato agrees for a short time under Roberts the Rainline was stopped from being used on some roads. This was in the 2000 time frame.

On July 10, 2000 the director instructed the use of Rainline be stopped on "open graded friction" courses.

We can't hear Mr. McKnight when he steps away from the podium.

Marcato agrees Rainline was good for Alabama. Marcato says he hired Allen to market Rainline nationwide. "We didn't need Jim Allen in Alabama." Marcato says the big obstacle in Alabama had been overcome.

Mr. Pilger is back and asks Marcato about the hiring of Jim Allen. Marcato says Jim Allen approached him after Siegelman was elected but it was about three months before he could reach an agreement with Allen.

Marcato says he has no knowledge of when Roberts went back to the Highway Department during the Siegelman Administration.

Marcato says he does not know when the last check went to Allen.  Marcato says he couldn't get Allen to sit down and talk to him about anything so he quit paying him.

Marcato says Allen didn't do what he was supposed to do.  Marcato says he hired an attorney a long time before he fired Allen and looked at the possibilty of firing Allen.

Mr. Marcato gets into other areas and the judge has to remind everyone to answer the questions.

Another sidebar.

Mr. Marcato is asked now about the e-mail, letter he was asked about earlier in regards to Allen.

Marcato agrees he has immunity.  Marcato says the letter from the government got him more immunity than his lawyer had asked for.

In 1997 or early 1998, Roberts and Allen came to see Marcato along with Crum Foshee.  Marcato says he knew the state was looking into problems with pavement markings five years before that meeting. Marcato says he did not know until the meeting Allen and others were interested in Rainline.

Marcato is asked about Derickson's test deck.  Marcato says he put his striping down at the test deck. Marcato says in May of 1999 on Highway 231 below the truck stop.  Marcato says they did put the Rainline down.  Marcato says everyone doesn't show up on the same day because there would be chaos. Asked about Derickson, Mr. Marcato says, ""Mr. Derickson looked like he might be hot any given day."

Marcato agrees after Roberts left Bowlin turned Rainline off but then turned it back on.  Marcato says, "It was a mistake," this regarding Bowlin's turning Rainline off.

Marcato says he doesn't believe Aqua Light was used in Alabama.

Mr. Pilger is asking the court's indulgence for a moment.  Marcato says Alabama had the biggest volume in Alabama, but not the biggest money.

Marcato says the Governor of California did not call him nor did the governor of any other state. Marcato says no foreign government called to ask for money either.

Mr. Kilborn is asking Marcato about striping.

"If the governator were to call you about Rainline, he would want you to arm wrestle for it," asks Kilborn.  This of course brings a "move on" from Judge Fuller.

"You found out Crum Foshee was being cheated out of $50 ton didn't you?"  Marcato says yes and that he kept on paying Foshee because Foshee wasn't part of the problem.

Nancy Marcato, who kept the books for Rainline Corporation

*Attorneys please put the wireless mic on espcially if you plan to move away from the podium.  If at the podium please speak up!  Thanks!*

Mrs. Marcato agrees the company would go out of business if the company was not paid what it was due.

Mrs. Marcato says to the best of her recollection the last check to Allen was August 2002.  She says they started trying to terminate Allen in October of 2000.

Mrs. Marcato is asked about her husband and the phone call he received from Siegelman.  She says she doesn't remember where she was at the time.  She observed her husband was upset.  Mr. Marcato told her he got a phone call from Gov. Siegelman.  Mr. Marcato said to her Siegelman asked him for money.  Mr. Marcato told her Siegelman said Siegelman was going into a meeting about Rainline and then asked for $250,000 and then $100,000 and that Mr. Marcato told her he told Siegelman he didn't have that kind of money.  Also Mr. Marcato said to her, "I think he was trying to shake me down.  I think this could make a difference to what happens with our business."  This is according to Mrs. Marcato.

Mrs. Marcato is being asked about money received from Ozark Striping in the amount of $99,000.

Mr. Kilborn is now asking the questions.  Mrs. Marcato says they have been married 39 years.

Mrs. Marcato agrees there is nothing she or her husband could say that could incriminate them.

Mrs. Marcato says their attorney told them they needed a letter from the government before they met with prosecutors.

Mrs. Marcato was asked if the government was trying to put the fear of God into her.  Her reply, "Only the Lord can put the fear of God in me."

Mrs. Marcato agrees Alabama was buying Rainline almost three years before the conversation with Siegelman took place during which Siegelman asked for money.

Mrs. Marcato says she does not remember when the first sales of Rainline happened to the state of Alabama.

Mrs. Marcato is asked about a letter dated March 22, 2005 from the Marcatos' attorney to Agent Murray of the FBI in response to questions the FBI wanted answers to.

An answer in the letter refers to the Siegelman phone call.  Mrs. Marcato agrees the governor never told Mr. Marcato he would be put out of business if he didn't contribute.  "Not in those words," says Mrs. Marcato.  She says she does not know about any other phone calls from Siegelman.

Mrs. Marcato says after the phone call a memorandum was sent out reducint the use of Rainline.  "Mr. Pilger showed us the memorandum."

Mrs. Marcato says Rainline use was ended in the Riley administration.  She says they have made attempts to get Rainline reinstated.  She says the University of Alabama study is "flawed."

Mr. McKnight is questioning the witness and he has moved to the charts.

Mrs. Marcato now says they began to try to terminate the main contact Jim Allen's contract in October 2000.  This was a year before Roberts retired.  The conversation with Siegelman took place over a year after Roberts retired.

Mrs. Marcato agrees she sends invoices to contractors and then the contractors pay them directly the invoices do not go to the state.

We're going to lunch.

Posted by Helen Hammons on June 01, 2006 at 08:12 AM | Permalink | Comments (1)

# November 2006

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| --- | --- | --- | --- | --- | --- | --- |
|     |     |     | 1   | 2   | 3   | 4   |
| 5   | 6   | 7   | 8   | 9   | 10  | 11  |
| 12  | 13  | 14  | 15  | 16  | 17  | 18  |
| 19  | 20  | 21  | 22  | 23  | 24  | 25  |
| 26  | 27  | 28  | 29  | 30  |     |     |

# Archives

- November 2006

- [June 2006](#)
- [May 2006](#)
- [April 2006](#)

# Verdicts and Post Trial

- [Completed Verdict - Siegelman](#)
- [Completed Verdict - Scrushy](#)
- [Completed Verdict - Roberts](#)
- [Completed Verdict - Hamrick](#)
- [Judge's Order on Rule 29, 33 Motions](#)

# Government Corruption Trial

- 



# Recent Posts

- [Afternoon Testimony Starting](#)
- [Lunch Talk](#)
- [More Juror Testimony](#)
- [Arrivals](#)
- [Welcome Back!](#)

[Subscribe to this blog's feed](#)

# About Blogger

- 

  [Helen Hammons](#)