IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:05-CR-119-MEF |
| | ) | |
| DON EUGENE SIEGELMAN and | ) | |
| RICHARD M. SCRUSHY | ) | |

**UNITED STATES' BRIEF ON
EXTRINSIC INFORMATION**

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting

United States Attorney for the Middle District of Alabama, and Edward C. Nucci, Acting Chief of

the Public Integrity Section of the Criminal Division of the United States Department of Justice, and

hereby files its Brief on Extrinsic Information pursuant to the Court's Order of November 20, 2006.

The exposure of some jurors to a very limited amount of extrinsic information from the Court's

website was harmless to Defendants. That is, no reasonable possibility of prejudice to Defendants

arose from the exposure of some jurors to a copy of the unredacted second superseding indictment

(the "indictment") and information concerning the foreperson's obligations to preside over the jury's

deliberations (the "foreperson information"). Accordingly, Defendants remain entitled to no relief

under Federal Rule of Criminal Procedure 33 or otherwise.

I.       **The Extrinsic Information was Harmless**.

Assuming a procedural presumption of prejudice from the exposure of some jurors to

extrinsic information,[1] the totality of the circumstances must be evaluated to determine whether that

presumption is rebutted. United States v. Ronda, 455 F.3d 1273, 1299 (11th Cir. 2006). Factors to

---

[1]With respect, the United States, though acknowledging the Court's contrary ruling, does
not waive its argument that the presumption of prejudice does not apply in this case.

consider include, but are not limited to: "(1) the nature of the extrinsic evidence; (2) the manner in

which the information reached the jury; (3) the factual findings in the district court and the manner

of the court's inquiry into the juror issues; . . . (4) the strength of the government's case," id. at 1300;

(5) the "heavy burden on the government," United States v. Martinez, 14 F.3d 543, 550 (11th Cir.

1994); (6) the length of time the jurors were exposed to the material; (7) whether the jury discussed

and considered extensively the information; (8) when the material reached the jurors; (9) the number

of jurors exposed to the extrinsic information, United States v. Blumeyer, 62 F.3d 1013, 1018 (8th

Cir. 1995); and (10) the court's instructions to the jury.  United States v. Klein, 93 F.3d 698, 704

(10th Cir. 1996).  The legal standard is objective, "focusing on the information's probable effect on

a hypothetical average juror," because Rule 606(b) bars this Court from investigating the actual

effect the exposure had on the jury's deliberations.  United States v. Greer, 285 F.3d 158, 173 (2d

Cir. 2002) (citations and quotations omitted).  The trial court's "factual determination of whether

consideration of extrinsic evidence caused the defendant prejudice is committed to [its] large

discretion."  Ronda, 455 F.3d at 1301 (citations and quotations omitted).

> In Smith v. Phillips, 455 U.S. 209 (1982), the Supreme Court instructed trial courts that:
>
>> due process does not require a new trial every time a juror has been placed in a
>> potentially compromising situation.  Were that the rule, few trials would be
>> constitutionally acceptable. . . . [I]t is virtually impossible to shield jurors from every
>> contact or influence that might theoretically affect their vote.  Due process means a
>> jury capable and willing to decide the case solely on the evidence before it, and a trial
>> judge ever watchful to prevent prejudicial occurrences and to determine the effect of
>> such occurrences when they happen.

Id. at 217.  In addition, "while due process of law mandates that a fair trial be provided to the

[defendant], there is no constitutional right to a perfect trial."  United States v. De La Vega, 913 F.2d

861, 870 (11th Cir. 1990) (citations and quotations omitted).

Applying the relevant factors and legal principles to the present circumstances demonstrates that the exposure of some jurors to very limited extrinsic information from the Court's website was harmless to Defendants, and created no reasonable possibility of prejudice.

**A.      The Indictment was Harmless to Defendants**.

The totality of the circumstances reveals that the exposure of some jurors to the indictment from the Court's website was harmless to Defendants.  The only change to the indictment relevant to the present issue is a deletion of four words ("defendant RICHARD SCRUSHY and") in Count 3 and five words ("defendant DON EUGENE SIEGELMAN and") in Count 4.  On their face, the purpose and only possible effect of these two redactions was to confine the potential liability of each defendant to one of the two counts at issue, in accord with the verdict form returned by the unanimous jury.

Some jurors, however, exposed themselves to the unredacted indictment on the Court's own website during deliberations.  Initially, it is important to note that this was far from their first exposure to the unredacted indictment.  The Court did not finally order the redaction until the end of the trial, and all of the jurors were continuously and properly exposed to the unredacted indictment from the inception of their jury service until closing arguments.  During voir dire, the Court summarized the contents of that indictment to each venire panel.  Then, in opening statements, each party explained the unredacted indictment to the jurors.  Thereafter and throughout the trial, each side referred to the charges in the indictment, including Counts 3 and 4.  In fact, all exposure to the indictment prior to closing arguments was to the unredacted indictment, which simply charged Defendants jointly in Counts 3 and 4.  No reasonable juror would be affected, let alone prejudiced, in his deliberations by another exposure to the unredacted indictment, which had already been

explained and referenced numerous times by the Court and parties.[2]

Further, the Court specifically, repeatedly, and properly addressed any possible effect of either version of the indictment during the trial. At both the beginning and end of the trial, this Court properly instructed the jury in accord with the Eleventh Circuit's pattern jury instructions that the indictment was not evidence against any Defendant. See Eleventh Circuit Pattern Instr. 2.2 & 2.2 (Duty to Follow Instr.). Further, after closing arguments, the Court properly instructed the jurors that Count 3 charged only Defendant Siegelman and Count 4 charged only Defendant Scrushy. Moreover, the Court's verdict form made clear that Count 3 charged only Defendant Siegelman and Count 4 charged only Defendant Scrushy, and allowed conviction only upon that understanding by all twelve jurors.

And the jurors did understand the indictment properly. In fact, the jurors' first question to the Court during deliberations showed that they understood the Court's instructions on Counts 3 and 4, and that they could distinguish between Defendants Siegelman and Scrushy. They asked only whether a contribution to the AEF or AELF was a thing of value to Defendant Siegelman, and made no mention of Defendant Scrushy.

Where the trial court has properly instructed the jury on the purpose and contents of the indictment, as the Court did here, appellate courts have routinely held that submission of an unredacted indictment to the jury is harmless beyond a reasonable doubt, despite exposing the jurors to extrinsic information. See United States v. Bradshaw, 281 F.3d 278, 292 (1st Cir. 2002) (noting that the unredacted indictment's lack of evidentiary value weighed in favor of a finding of

---

[2]With respect, and acknowledging the Court's contrary ruling, the government does not waive its argument that the indictment was not extrinsic information.

harmlessness); <u>Klein</u>, 93 F.3d at 704 ("a proper covering instruction with respect to the indictment goes a long way toward curing any potential for prejudice created by giving the indictment to the jury") (citing cases); <u>United States v. Crossland</u>, 642 F.2d 1113, 1115 (10th Cir. 1981). <u>See also</u> <u>United States v. Haynes</u>, 573 F.2d 236, 242 (5th Cir. 1978)[3] (holding no abuse of discretion in submitting indictment without redacting eleven dismissed counts where trial court instructed the jury on the purpose of the indictment and counts). Thus, given the Court's comprehensive instructions and verdict form, together with the jury's demonstrated understanding of Counts 3 and 4, Defendants were not harmed from the re-exposure of some jurors to the unredacted indictment.

Other factors point to a finding that re-exposure of some jurors to the unredacted indictment was harmless to Defendants. Specifically, it did not reveal any facts not presented to the jury during the trial and properly charged in the redacted indictment and in Counts 5 through 9, which also detailed Defendants' conspiracy and scheme for Defendant Siegelman to sell Defendant Scrushy a seat on the CON Board. <u>See</u> <u>United States v. Gomes</u>, 177 F.3d 76, 82 (1st Cir. 1999) (affirming denial of the defendant's new trial motion based on jury's exposure to prior indictment containing charges on which he had previously been acquitted); <u>United States v. Cheyenne</u>, 855 F.2d 566, 568 (8th Cir. 1988) (finding jury's exposure to dictionary was harmless because the jurors were not exposed to facts not developed during trial).

Importantly, the indictment was brought into the jury room only by Juror 7, and not a third party, and was obtained by Jurors 7 and 40 only by accessing the Court's website, and not from a media outlet or outside source. The absence of contacts with potentially interested third parties also

---

[3]In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206 (11th Cir. 1981), the court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

supports a finding of harmlessness.  Cf. United States v. Console, 13 F.3d 641, 666 (3d Cir. 1993)

(applying an heightened level of scrutiny where the extrinsic material involved a juror's contact with

a third party).

Moreover, only a limited number of jurors were re-exposed to the indictment.  Only Juror

66 knew that Juror 7 had obtained the indictment from the Internet, and only Jurors 7, 66, 63, 29, and

5 knew that Juror 40 had done so.  According to the jurors, neither Juror 7 nor 40 showed the

indictment from the Court's website to another juror.  Juror 7 testified that he read the indictment,

Tr. Evid. Hearing, Nov. 17, 2006, at 120, but Juror 40 stated that she only had skimmed it once.  Tr.

at 83.  See De La Vega, 913 F.2d at 871 (noting that only one juror having read the extrinsic material

favored a finding of harmlessness).

Further, the amount of the jurors' consideration of the indictment was minuscule.  Juror 40

did not bring the indictment into the jury room, Tr. at 83, while Juror 7 brought his copy of the

indictment into the jury room only for the first two or three days of deliberations.  Tr. at 122-23.  The

jurors discussed Juror 40's downloading of the indictment (as opposed to any of its content) for, at

most, fifteen or twenty minutes toward the beginning of their nine days of deliberations.  Tr. at 61.

The jurors' limited re-exposure to, and discussion of, the indictment supports a finding of

harmlessness to Defendants.  See Blumeyer, 62 F.3d at 1018 (noting that the jurors' limited exposure

to and discussion of the extrinsic material weighed in favor of harmlessness); United States v.

Bolinger, 837 F.2d 436, 440 (11th Cir. 1988) (exposure of a limited number of jurors to extrinsic

information was reason for finding "the introduction of extrinsic evidence could not have been

prejudicial").

In addition, the jurors were exposed to the indictment at the beginning of their deliberations,

several days before they reached a verdict.  The passage of several days between the jurors' re-exposure to the indictment and the return of the verdict attenuates any effect the exposure would have had on a hypothetical juror.  This attenuation again favors a finding of harmlessness to Defendants.  See Console, 13 F.3d at 668-69 (finding no harm to the defendant where jury deliberated for additional two days after it was exposed to extrinsic information).

The motive precipitating the jurors' re-exposure to the indictment is another circumstance demonstrating harmlessness.  It is uncontested that both Jurors 7 and 40 downloaded the indictment only to aid their service as jurors and specifically because they wanted an opportunity to consider the complex, lengthy charges in depth.  Defendants are unlikely to suffer prejudice from a juror's actions from a neutral motive to be diligent, thorough, and organized, as opposed to any nefarious motive.  See United States v. Bassler, 651 F.2d 600, 603 (8th Cir. 1981) (finding no prejudice from juror considering extraneous information to aid deliberations).

Additionally, no harm arose from Juror 40's memorializing her thoughts on the indictment.  Juror 40's notes represented her private thoughts and "cannot be considered an 'extraneous' or 'extrinsic' influence" even if made outside, and then brought into, the jury room.  United States v. Connolly, 341 F.3d 16, 34 (1st Cir. 2003) (citing Bassler, 651 F.2d at 602); Carson v. Polley, 689 F.2d 562, 581 (5th Cir. 1982) (noting that "the internal mental reflections of a juror . . . cannot serve as the basis to impeach a jury's verdict").  Thus, jurors are to be expected to think about the case outside the jury room and to have thoughts that they should be able to share with their fellow jurors when deliberations resume.

Juror 7's notes in this matter are, moreover, particularly innocuous given that he used them only during the first two or three days of deliberations, and solely to organize the jury's discussions

-7-

and ensure that the charges against Defendants were discussed in a fair and impartial manner. See

De La Vega, 913 F.2d at 871 (concluding that jury's exposure to extrinsic information was harmless

because it was used only to structure the deliberations); McNair v. Campbell, 416 F.3d 1291, 1309

(11th Cir. 2005) (concluding that juror's reading of Bible passages and prayer was not harmful

because it only encouraged the jurors to take their obligations more seriously).

Perhaps most significantly, the evidence against Defendants at trial was overwhelming. The

greater the amount of evidence of a defendant's guilt, the less likely the defendant was prejudiced

from the jury's exposure to any extraneous material. Klein, 93 F.3d at 705 ("the most common

means of demonstrating the harmlessness of an extraneous contact is to show the existence of

overwhelming evidence of the defendant's guilt") (citations and quotations omitted). This Court has

already recognized that the government presented "substantial evidence" of Defendants' guilt during

the trial. Order, Doc. # 468 at 7 (Oct. 2, 2006). Such substantial evidence shows there was no

reasonable possibility of prejudice from jurors' consideration of extrinsic evidence. United States

v. Pessefall, 27 F.3d 511, 516 (11th Cir. 1994) ("substantial properly admitted evidence" of the

defendant's guilt supported a finding of no reasonable possibility of prejudice from jurors'

consideration of extrinsic evidence).

For specifics, the United States refers this Court to its Response to Defendants' Rule 29

Motions, Doc. # 459 (Aug. 18, 2006), which details the mountain of evidence proving Defendants'

guilt.[4] The overwhelming evidence of Defendants' guilt recounted under Rule 29 strongly supports

---

[4]Not the least of that evidence was the testimony of Nick Bailey and Mike Martin, who each stated unequivocally that Defendants had made and executed an agreement whereby Defendant Scrushy would give Defendant Siegelman $500,000 in exchange for HealthSouth having membership on the CON Board.

a finding that the re-exposure of some jurors to the indictment was harmless to Defendants. Bolinger, 837 F.2d at 440 (ruling that the strength of the government's case bolstered the district court's finding of harmlessness from jurors' exposure to suppressed evidence); United States v. Marx, 485 F.2d 1179, 1184 (10th Cir. 1973) (ruling that the jury's viewing of unadmitted exhibits was not prejudicial given the overwhelming evidence of the defendants' guilt).

The split verdict returned by the jury further shows that no harm arose from the jurors' re-exposure to the indictment. The jury convicted and acquitted Defendant Siegelman on seven and twenty-six counts, respectively; convicted Defendant Scrushy on all six counts against him; and acquitted the other two Defendants on all charges against them. The jury thus demonstrated that it individually and conscientiously considered the evidence against each Defendant on each count, and based its verdict solely on the evidence and law applicable to each Defendant. Many courts have held that the return of a split verdict indicates that the jury was not prejudiced by any outside information. E.g., United States v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990) (split verdict supported finding that "the jury reached a reasoned conclusion free of undue influence"); United States v. Gilsenan, 949 F.2d 90, 96 (3d Cir. 1991) (split verdict showed jury carefully delineated among the offenses and between the defendants, and not been influenced by extraneous matters).

Defendant Scrushy's argument that the jury's verdict was not fractured as to him misconstrues the jury's work. Though Defendant Scrushy was convicted on all counts against him, the jury certainly weighed the evidence against each Defendant individually, as shown by its conviction of Defendant Siegelman on all counts involving his conspiracy with Defendant Scrushy regarding the CON Board, but only on one other count in the indictment. Defendant Scrushy, therefore, cannot complain that the extrinsic information was more harmful to him than Defendant

Siegelman (or any other Defendant) solely because he was convicted on all counts charged against

him.

Other circumstances further show the absence of prejudice to Defendants. The Court, after

closing arguments, instructed the jury to decide the case solely on the evidence admitted during the

trial. The jury is presumed to follow this instruction, United States v. Lloyd, 269 F.3d 228, 241 (3d

Cir. 2001), and the jurors' testimony at the Court's hearing as well as the split verdict shows that

they did so. Cf. Smith, 455 U.S. at 217 n.7 ("surely one who is trying as an honest man to live up

to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain

matter"). The re-exposure of some jurors to the extrinsic information in no way shows that the jury

disregarded this instruction from the Court as the indictment (and foreperson information) did not

contain any facts not admitted during the trial. Moreover, during its deliberations, the jury asked

questions of the Court, indicating that it was taking its duties seriously. See Lloyd, 269 F.3d at 241

(noting that the jury's asking questions during deliberations showed that it was sedulously

performing its duties and that the defendant was not prejudiced from its exposure to extrinsic

information). Further, Jurors 7 and 40 accessed the extrinsic information from the Court's website

only after the Court had given each juror the URL to the Court's website for other purposes, and not

as a result of wholly uninvited or otherwise obviously prohibited access to the material.

In sum, a review of all the relevant factors and circumstances demonstrates that the re-

exposure of some jurors to the indictment was harmless. Such exposure would have no effect on

a hypothetical average juror in reaching a verdict, nor give rise to a reasonable possibility of

prejudice to Defendants. Consequently, Defendants are not entitled to any relief.

**B.    The Foreperson Information was Harmless.**

The totality of the circumstances demonstrates that Defendants were not harmed from some jurors' exposure to the foreperson information.  Juror 7's review of the foreperson information did not prejudice Defendants; rather, it could only make the jury's deliberations more conscientious and fair.  Juror 7 testified that he reviewed the foreperson information solely to ensure that he properly perform his duties as foreman.  Tr. at 120.  Courts have held that similar actions by jurors in other cases were not prejudicial.  For example, in De La Vega, 913 F.2d 861, the jury foreman, after the first day of deliberations, went to the library and checked out a book titled What You Need to Know for Jury Duty.  Id. at 869.  The foreman read the book, implementing its suggestions on how to organize the jurors on the next day.  Id.  A few days later, the foreman brought the book into the jury room and showed "some jurors a page in the book which outlined the organizational steps which he was following."  Id.  The book remained in the jury room for the foreman's reference, though no other juror read it.  Id. at 869-70.

Responding to the defendants' claim that they were entitled to a new trial based on the foreman's consideration of extrinsic evidence, the Eleventh Circuit held that no reasonable possibility of prejudice existed to warrant a new trial.  Id. at 870-71.  The Court stated that "solely the foreman read the book, and he found it useful only in providing a structurally logical framework for jurors to examine the reams of evidence presented over the course of the two month trial."  Id. at 871.  The Eleventh Circuit relied on Bassler, where the Eighth Circuit held that the defendants were not entitled to a new trial because a juror had used information from a library book on Roberts' Rules of Order to direct discussions in the jury room.  See id. at 870 (discussing Bassler, 651 F.2d at 601-03).

In this case, as in De La Vega and Bassler, no reasonable possibility of prejudice arose from

Juror 7's reading the foreperson information.  He used the information solely to organize the

deliberations, which occurred after a two-month trial involving complex issues.  The exposure of

other jurors to this information was very limited, as only Juror 7 read the information, see id. at 871

(stressing that no other juror read the library book), and only Jurors 22, 38, 66, 29, 16, and 68 knew

that Juror 7 had read this information.  Juror 7 did not bring the foreperson information into the jury

room. Tr. at 127.  Juror 7 accessed this information after the first day of deliberations, Tr. at 119-20,

and the jurors' discussion of Juror 7's reading of this information lasted, at the most, for only ten

minutes out of nine days of deliberations.  Tr. at 56.  The foreperson information was strictly

"procedural," see De La Vega, 913 F.3d at 870, and "could only have been used to 'aid the jury in

being conscientious and serious in attempting to deliberate in a fair and impartial manner.'" Id.

(quoting Bassler, 651 F.2d at 603).  The foreperson information was closely akin, if not identical,

to the Court's own instruction to the foreperson about his duties. Tr. at 121.  Defendants thus were

not harmed by the foreperson's reading again the same information that the Court had already given

him about his duties.

Other factors discussed supra also show that Defendants were not harmed from some jurors'

exposure to the foreperson information – the evidence against Defendants was overwhelming; the

jury returned a split verdict; the foreperson information contained no facts about the case; the Court

instructed the jury to decide the case solely on the evidence admitted during trial; no third-party

communication occurred in Juror 7's obtaining the foreperson information; several days passed

between the jurors' exposure to the foreperson information and the jury's returning a verdict; and

the jury asked questions of the Court during deliberations.  In sum, the totality of the circumstances

shows that, as with the indictment, no reasonable possibility of prejudice arose from some jurors'

exposure to the foreperson information.

**II.     Defendants are not Entitled to Any Relief on the Grounds of Juror Incompetency.**

In a recent pleading, Doc. #504 (Nov. 24, 2006), Defendant Scrushy intimates that he is

entitled to a new trial on the grounds of juror incompetence, i.e. the alleged inability of Juror 5 "to

read, write, and understand the English language with a degree of proficiency sufficient to fill out

satisfactorily the juror qualification form."  28 U.S.C. § 1865(b)(2).  See Doc. #504 at 3.  The

government notes initially that this is a wholly new argument.  As such, it is waived.

In the alternative, to expedite the Court's ruling and judgment in this case, and without

waiving the post-trial waiver in any manner, the United States responds now to this new theory.

Even reaching the merits, the record and well-settled precedent quickly readily refute this attack on

Juror 5 and the jury's verdict.

First, Juror 5 has already demonstrated to the Court during voir dire, which included

extensive questioning of Juror 5 by each Defendant, during the trial, and during his testimony at two

hearings, that he is competent to fully understand the proceedings in which he has participated.  To

suggest that Juror 5 is incompetent to serve as a juror ignores the actions and statements of Juror 5

before this Court.

Second, since Defendants do not even attempt to show any actual bias or prejudice from Juror

5's service as a juror, their claim automatically fails without further inquiry because they failed to

raise it at voir dire.

> Where the objection to a juror relates, not to actual prejudice or other fundamental
> incompetence, but to a statutory disqualification only, such disqualification is
> ordinarily waived by failure to assert it until after verdict, even though the facts

which constitute the disqualification were not previously known to the defendants.

United States v. Ford, 201 F.2d 300, 301 (5th Cir. 1953). See 28 U.S.C. § 1867. This trial waiver, which stands independent of Defendants' post-trial waiver, is wholly unexplained and unexcused, and completely bars the attack on Juror 5.

To the extent Defendants claim any impropriety regarding Juror 5's testimony, or this Court's questioning of Juror 5, at the hearing on November 17, 2006, the United States submits that Defendants' complaint is merely that Juror 5 did not give them the answers they desired. After counsel for Juror 5 met with counsel for Defendant Siegelman, who was expressly motivated to obtain an affidavit that would overturn Defendants' convictions, Juror 5 truthfully stated that his only knowledge of extrinsic material reaching a juror was that Juror 40 said she had gone on the Internet to look up the foreman information that the Court had already given the foreman, and later gave to each juror. Tr. at 135-38. Defendants cannot complain that the juror who was solicited in possible violation of the Local Rules has candidly informed the Court about the limited and innocuous nature of the extrinsic material reaching the jury. Nor can they complain that he further unveiled the bias of the attorney who had prepared his prior affidavits. Neither fact shows any misconduct, let alone the required prejudice Defendants have failed to address.

III.    **Conclusion**

This Court, properly solicitous of a defendant's constitutional rights, has afforded Defendants extraordinary procedures for their Rule 33 motions. Defendants, unlike the overwhelming majority of defendants convicted in this District, have received over four months to develop the grounds upon which they seek a new trial. In this time, they have at least skirted violation of this Court's rules regarding post-trial contact with jurors (and in their latest petition they have attacked the competency

of the very juror who provided affidavits).  This Court has nevertheless investigated their theories.

The United States submits that the record is now complete, and it shows under well-settled law that

Defendants' claims are meritless.  Accordingly, the United States respectfully urges this Court to

deny Defendants' Rule 33 motions and schedule a sentencing date.

      Respectfully submitted this the 1st day of December, 2006.

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

/s/ Louis V. Franklin, Sr.
Acting United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280

/s/ J.B. Perrine                              EDWARD C. NUCCI
Assistant United States Attorney              ACTING CHIEF, PUBLIC INTEGRITY
One Court Square, Suite 201                    SECTION
Montgomery, AL 36104
Phone: (334)223-7280                          /s/Richard C. Pilger
                                              Department of Justice, Criminal Division
/s/ Stephen P. Feaga                          Public Integrity Section
Assistant United States Attorney              10th & Constitution Ave, NW
One Court Square, Suite 201                    Bond Building - 12th Floor
Montgomery, AL 36104                           Washington, DC 20530
Phone: (334)223-7280                          Phone: (202)514-1412

/s/ Jennifer Garrett
/s/ Joseph L. Fitzpatrick, Jr.
Special Assistant United States Attorneys
Office the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-8494

**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CR. NO. 2:05-CR-119-MEF** |
| | ) | |
| **DON EUGENE SIEGELMAN and** | ) | |
| **RICHARD M. SCRUSHY** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted,

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY


/s/ Louis V. Franklin, Sr.
Acting United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
louis.franklin@usdoj.gov