IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA    RECEIVED
NORTHERN DIVISION

UNITED STATES OF AMERICA,        *        2007 APR 18 P 3: 37

V.        *        CASE NO: 2:05-CR-119-MEF

DON EUGENE SIEGELMAN and        *
RICHARD SCRUSHY
        *
DEFENDANTS.
        *

## BRIEF IN SUPPORT OF MOTION TO RECUSE AND MOTION FOR VACATUR OR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE

Comes now the Defendant, Richard M. Scrushy (hereinafter "Scrushy"), by and through the undersigned counsel and files this Brief in Support of his Motion for New Trial Based on Newly Discovered Evidence. This newly discovered evidence suggests that the trial judge, Honorable Mark E. Fuller, had a duty to recuse himself from presiding over the trial of this matter or at a minimum obtain a waiver from Scrushy of a potential conflict, yet failed to do so, contrary to Canon 3 of the Judiciary Policies and Procedures: Codes of Conduct, Title 28 U.S.C. Section 455.

In support of Scrushy's Motion, Scrushy shows the following:

### FACTS

1.    Scrushy was initially indicted on May 17, 2005, and in December 2005 the grand jury handed down the Second Superseding indictment that presented the

actual charges against Scrushy of Bribery in violation of 18 U.S.C. §666(a)(2), Conspiracy in violation of 18 U.S.C. §371, and Mail Fraud in violation of 18 U.S.C. §1341- 1346.

2.    The Honorable Judge Mark E. Fuller, Chief Judge of the United States District Court for the Middle District of Alabama was assigned the case and presided over the trial. Judge Fuller was nominated to the bench by George W. Bush on August 1, 2002. He was confirmed by the United States Senate on November 14, 2002, and he received his commission to the bench on November 26, 2002.

3.    On June 29, 2006, the jury returned a guilty verdict against Scrushy and Defendant Siegelman.

4.    Since the jury rendered its verdict, Scrushy has filed other Motions for New Trial, some of which remain pending. In particular is a challenge as to the selection of the members of the grand jury that indicted Scrushy. Additionally, there remains pending a request for further investigation and Motion for New Trial based on allegations regarding actions taken by jurors during their deliberative process and the possibility that extrinsic evidence was considered by the jury during their deliberations

5.    On Thursday, February 22, 2007, Scrushy and his counsel first learned of the possibility of business relationships of Judge Fuller which is the newly

2

discovered evidence giving rise to Scrushy's Motion for New Trial.

6.    From February 22, 2007 until April 17, 2007, counsel for Scrushy investigated the allegations that were first disclosed to them on February 22, 2007. Paragraphs 7 through 40 describe the facts learned by counsel for Scrushy, which is the basis for Scrushy's Motion.    Investigator Michael Magrino was hired by the Defense to investigate the accuracy of the allegations of newly discovered evidence.    See attached the affidavit of Michael Magrino listed as Exhibit 28 which is incorporated herein by reference as if fully set forth.

7.    According to Alabama's Secretary of State, Judge Fuller is the Registered Agent of Doss Aviation, Inc. a Texas corporation qualified to do business in the State of Alabama.    See attached Exhibits 1 and 2 which are incorporated herein by reference as if fully set forth.

8.    Upon information and belief, Alabama's Secretary of State does not have any filings by Doss Aviation, Inc. or Judge Fuller offering his resignation as the registered agent for Doss Aviation, Inc. [1]    See attached Exhibit 2 which is incorporated herein by reference as if fully set forth.

9.    Colorado's Secretary of State shows a filing of January 29, 1990, by Mark E. Fuller, then President of Doss Aviation, Inc. requesting a change of address for

---

[1]    Pursuant to Judiciary Policies and Procedures Code of Conduct, Canon 5(D) "a Judge should not serve as the executor, administrator, trustee, guardian, or other fiduciary, except for the estate, trust, or person of a member of the judge's family....."

the Texas corporation. See attached Exhibit 26 which is incorporated herein by reference as if fully set forth.

10. Colorado's Secretary of State reports that as of July 31, 1999, Mark E. Fuller owned 43.75% of the shares of stock of Doss Aviation, Inc. Further, it is indicated that Mark E. Fuller was the CEO/shareholder. See attached Exhibit 27 which is incorporated herein by reference as if fully set forth.

11. Maine's Secretary of State indicates that as of March 30, 2006 Judge Fuller was a shareholder and/or director for Doss Aviation, Inc, listing his address of record as One Church Street, Montgomery, Alabama, the address of the United States Federal Courthouse. See attached Exhibit 4 which is incorporated herein by reference as if fully set forth.

12. Maine's Secretary of State indicates that as of April 13, 2005 Judge Fuller was a shareholder and/or director for Doss Aviation, Inc, listing his address of record as One Church Street, Montgomery, Alabama, again the address of the United States Federal Courthouse. See attached Exhibit 5 which is incorporated herein by reference as if fully set forth.

13. Maine's Secretary of State indicates that as of March 26, 2004, Judge Fuller was a shareholder for Doss Aviation, Inc, listing his address of record as One Church Street, Montgomery, Alabama, again the address of the United States Federal Courthouse. See attached Exhibit 6 which is incorporated herein by

reference as if fully set forth.

14. Maine's Secretary of State reports that as of March 31, 2003 Judge Fuller owned 43.75% of the shares of stock of Doss Aviation, Inc. See attached Exhibit 7 which is incorporated herein by reference as if fully set forth.

15. Judge Fuller's Financial Disclosure for 2005 admits ownership of stock in Doss Aviation, Inc. and the receipt of distributions from between $100,001.00 and $1,000,000.00 during the year. The disclosure also states Judge Fuller's interest in Doss Aviation, Inc. is valued at between $1,000,001.00 and $5,000,000.00. See attached Exhibit 8 which is incorporated herein by reference as if fully set forth.

16. Judge Fuller's Financial Disclosure for 2004 admits ownership of stock in Doss Aviation, Inc. and the receipt of <u>income</u> from between $100,001.00 and $1,000,000.00 during the year. The disclosure also states Judge Fuller's interest in Doss Aviation, Inc. is valued at between $1,000,001.00 and $5,000,000.00. See attached Exhibit 9 which is incorporated herein by reference as if fully set forth.[2]

17. Judge Fuller's Financial Disclosure for 2003 admits he owns stock in Doss Aviation, Inc. and he received <u>income</u> from between $100,001.00 and

---

[2] This may indicate that the Judge is acting not as just a shareholder, but in a closer relationship with the company as an employee and/or officer.

$1,000,000.00 during the year.[3]   The disclosure also states Judge Fuller's interest in Doss Aviation, Inc. is valued at between $1,000,001.00 and $5,000,000.00.   See attached Exhibit 10 which is incorporated herein by reference as if fully set forth.

18.    On its official website, www.dossaviation.com, Doss Aviation, Inc. represents: "Doss Aviation, Inc. is a privately owned company with over 29 years experience in flight training, aircraft maintenance and modification, air traffic control, maintenance training, fuels and supply management, transient aircraft support services, airfield management and defense fuel support operations. Since our inception, we have performed a variety of services for the U.S. Army, U.S. Navy, U.S. Air Force, Defense Logistics Agency, the State Department and the Federal Aviation Agency." See attached Exhibit 11 which is incorporated herein by reference as if fully set forth.

19.    On or about August 31, 2000, the Department of the Air Force, which is an arm of the United States Government falling under the Executive Branch of the United States Government, as a department within the United States Department of Defense, awarded a contract to Doss Aviation, Inc. for Aircraft Maintenance and Towing reported to be for an aggregated total contract price of $14,197,436.11.  See attached Exhibits 3 and 12 which are incorporated

---

[3] Scrushy incorporates by reference that facts and matters asserted in footnote 2.

herein by reference as if fully set forth.

20.     On or about December 20, 2001, the Department of the Army, which is an arm of the United States Government falling under the Executive Branch of the United States Government, as a department within the United States Department of Defense, awarded a contract to Doss Aviation, Inc. for Maintenance of Rotary and Fixed Wing Aircraft and Ground Vehicles at Fort Bliss, Texas reported to be for an aggregated total contract price of $30,559,700. See attached Exhibits 3 and 13 which are incorporated herein by reference as if fully set forth.

21.     On or about August 30, 2002, the Department of the Air Force awarded a contract to Doss Aviation, Inc. for Helicopter Maintenance reported to be for an aggregated total contract price of $30,474,875. See attached Exhibit 14 which is incorporated herein by reference as if fully set forth.

22.     On or about November 4, 2003, the Department of the Navy, which is an arm of the United States Government falling under the Executive Branch of the United States Government as a department within the United States Department of Defense, awarded a contract to Doss Aviation, Inc. for aircraft refueling services reported to be for an aggregated total contract price of $5,190,960. See attached Exhibits 3 and 15 which are incorporated herein by reference as if fully set forth.

23.    On or about November 21, 2003, the Department of the Air Force began soliciting bids on a 10.5 year contract to train pilots and navigators for the Air Force. See attached Exhibit 16 which is incorporated herein by reference as if fully set forth.[4]

24.    On or about February 9, 2006, the Department of the Air Force announced that Doss Aviation, Inc. had won the bid on the contract referenced in Item 23 above  reported to be for an aggregated total contract price of over $178 Million, which included an initial one year $3.3 Million agreement, with nine additional one year options. See attached Exhibit 17 which is incorporated herein by reference as if fully set forth.

25.    On or about May 29, 2006, the Department of the Air Force announced that Doss Aviation, Inc. had been awarded the contract to train pilots and navigators referenced in Item 23 above. See attached Exhibit 18 which is incorporated herein by reference as if fully set forth.

26.    On or about March 15, 2006, the Department of the Air Force awarded a contract to Doss Aviation, Inc. for maintenance of aircraft at the Air Force Academy reported to be for an aggregated total contract price of $4,990,541.28. See attached Exhibit 19 which is incorporated herein by

---

[4] According to www.FedSpending.org DossAviation reported gross revenue for the year 2003 of $11,333,293.00, for the year 2004 of $23,828,933, for the year 2005 of $26,854,524, and for the year 2006 of $25,184,672(it is believed that this is not the entire amount actual for the calender year as the Government fiscal year runs from October to September)

reference as if fully set forth.

27.   Doss of Alabama, Inc. was incorporated in Alabama on or about September 23, 2002, with the incorporator being Mark E. Fuller. See attached Exhibit 20 which is incorporated herein by reference as if fully set forth.

28.   According to Judge Fuller's Financial Disclosure for 2003, Doss of Alabama, Inc. is a spin-off division of Doss Aviation, Inc. effective October 2002. See attached Exhibit 10 which is incorporated herein by reference as if fully set forth.

29.   Judge Fuller's Financial Disclosure for 2005 admits ownership of stock in Doss of Alabama, Inc. and the receipt of distributions of between $100,001.00 and $1,000,000.00 during the year. This disclosure also states Judge Fuller's interest in Doss of Alabama, Inc. is valued at between $250,001.00 and $500,000.00. See attached Exhibit 8 which is incorporated herein by reference as if fully set forth.

30.   Judge Fuller's Financial Disclosure for 2004 admits ownership of stock in Doss of Alabama, Inc. and the receipt of income of between $100,001.00 and $1,000,000.00 during the year. [5] The disclosure also states Judge Fuller's interest in Doss of Alabama, Inc. is valued at between $250,000 and $500,000.00. See attached Exhibit 9 which is incorporated herein by reference

---

[5] Scrushy incorporates herein by reference footnote 2.

as if fully set forth.

31.    Judge Fuller's Financial Disclosure for 2003 admits ownership of stock in Doss of Alabama, Inc. and the receipt of <u>income</u> from between $100,001.00 and $1,000,000.00 during the year.[6] This disclosure also states Judge Fuller's interest in Doss of Alabama, Inc. is valued at between $100,001.00 and $250,000.00, after the sale of some interest to Mark Jipson and Ellis Parker on May 1, 2003.   See attached Exhibit 10 which is incorporated herein by reference as if fully set forth.

32.    On its official website, <u>www.dossaviation.com</u>, Doss Aviation, Inc. references Aureus International and contains a link to Aureus' official website located at, <u>www.aureusinternational.com</u>.  See attached Exhibit 11 which is incorporated herein by reference as if fully set forth.

33.    On its official website, <u>www.aureusinternational.com</u>, Aureus International reports that, "For over 10 years Aureus International has been manufacturing, servicing and supplying flame retardant specialty garments. Our products have been designed with a sincere commitment to quality and service primarily for Medical Rescue Professional, Law Enforcement, Fire Fighting Departments and Government Agencies." . . . **"Aureus International is a division of Doss Aviation Inc., with corporate offices in Colorado Springs, Colorado.**

---

[6] Scrushy incorporates herein by reference footnote 2.

(emphasis added)  Doss Aviation has earned an enviable reputation through their thirty years of service to the Armed Forces and Government Agencies throughout the world." See attached Exhibit 22 which is incorporated herein by reference as if fully set forth.

34.    An Enterprise Ledger article dated April 3, 2005, states that "FBI agents, military and civilian pilots and medical professionals all over the world wear (Aureus International) products which are cut, sewn, inspected, bagged and shipped from its home in Enterprise."    See attached Exhibit 21 which is incorporated herein by reference as if fully set forth.

35.    The Federal Bureau of Investigation (FBI) is an arm of the United States Government falling under the Executive Branch of the United States Government as a department within the United States Department of Justice. See attached Exhibit 3 which is incorporated herein by reference as if fully set forth.

36.    FBI agents Keith Baker and James Murray were the primary investigators assigned to this case and presented the case to the United States Attorney's Office.

37.    At trial on May 1, 2006, the United States Attorney moved on behalf of the FBI to allow two representatives of the FBI be present throughout the trial of the case, showing the FBI's strong interest in a conviction of Scrushy.  This

motion was granted by oral order by Judge Mark E. Fuller as shown in item 390 on the United States District Court Docket Report for this case.

38.    Assistant United States Attorney Feaga, the lead prosecutor assigned to this case, is a colonel in the United States Air Force reserve for which Doss Aviation does substantial work and garners very significant operational income.[7] Assigned to Langley Air Force Base, Attorney Feaga is an assistant to Staff Judge Advocate Brigadier General Richard C. Harding, who is the principle legal adviser to the Air Combat Command and staff on all legal issues at Langley.    See attached Exhibits 23 and 24 which are incorporated herein by reference as if fully set forth.

39.    Doss Aviaion, Inc. has a presence at Langley Air Force Base providing fuel distribution services.  See attached Exhibit 25 which is incorporated herein by reference as if fully set forth.

40.    Upon information and belief, one of the many duties of the Staff Judge Advocate office at Langley Air Force Base is to review military contracts such as those granted to Doss Aviation, Inc.

---

[7] Scrushy has no personal knowledge as to whether or not Prosecutor Feaga had any knowledge of the connection between Judge Fuller, Doss Aviation and the United States Air Force. It is the position of Scrushy that had he known of these facts, he as a Court officer was bound by his ethical duty as such to reveal this fact.

## STANDARD OF REVIEW

The law through the years has changed and evolved with regard to the applicable standards in applying 28 U.S.C. §455(a) and Canon 3C(1) and their predecessors. It is Scrushy's position that there is no case law directly on point with the facts and matters raised herein and therefore this matter is a case of first impression requiring answer. Prior case law in the Eleventh Circuit on this matter by analogy, particularly, *Davis v. Board of Schools Com'rs of Mobile County*, 517 F.2d 1044, (1975), deals with judicial disqualification. In particular, the case involved the application of the then as amended 28 U.S.C. §455 which contains a two prong disqualification either " when his impartiality might reasonably be questioned" or "where he has a personal bias or prejudice concerning a party." The Court went into detail regarding both applications for disqualification stating:

> [8] [9] The office of the procedure under §144 is to disqualify a judge prior to trial on motion of a party. §455 is the statutory standard for disqualification of a judge. [FN11] **It is self-enforcing on the part of the judge. It may also be asserted by a party by motion in the trial court,** Rapp v. Van Dusen, 3 Cir. 1965, 350 F.2d 806, 809; through assignment of error an appeal, United States v. Seiffert, 5 Cir., 1974, 501 F.2d 974; Shadid v. Oklahoma City, 10 Cir., 1974, 494 f.2d 1267, 1268, by interlocutory appeal, as here, or by mandamus, *1052 Texaco, Inc. V. Chandler, 10 Cir., 1965, 354 F.2d 655.

> FN11. Compare American Bar Assn., 1972, Code of Judicial Conduct, Canon 3C

> The quoted language, supra, in §455 is new to the federal law of

13

disqualification and we must determine whether Congress intended to overrule the gloss placed on §144, and impliedly on §455, by court decisions that it applies only to conduct which runs against a party and not the lawyer, cf. United States ex rel. Wilson v. Coughlin, supra at 104; Giebe v. Pence, supra, at 943; see also, Annot. 23 A.L.R.3d 1416; and that disqualification results from extra-judicial conduct rather than from matters arising in a judicial context.  See United States v. Grinnell Corp., supra, 384 U.S. at 583, 86 S.Ct. 1698, 16 L.Ed.2d at 793; United States v. Board of School Commissioners, supra, at 81; Hanger v. United States, supra at 101; Mirra v. United States, supra at 787-88; Tynan v. Unites States, supra at 764-65; In re Union Leader Corp., supra, at 388-89.  See generally, Annot. 2 A.L.R. Fed.917.

[10][11] We find no suggestion in the legislative history that these decisions were being overruled or in anyway eroded.  **The new language was designed to substitute the reasonable factual basis reasonable man test in determining disqualification for the subjective "in the opinion of the judge" test in use prior to the amendment.  Cf. Kinnear-Weed Corp. V. Humble Oil & Refining Corp., 5 Cir. 1971, 441 F.2d 631, 635. It was also intended to overrule the so-called duty to sit decisions.  See Edwards v. United States, 5 Cir., 1964, 334 F.2d 360.  The abuse of sound judicial discretion test continues to obtain on appellate review. H.Rep. No.93-1453, 1974 U.S. Code Cong. & Admin. News pp. 6351, 6355**

[12] Construing §144 and §455 in pari materia we believe that the test is the same under both.  We thus hold that an appellate court, in passing on questions of disqualification of the type here presented, should determine the disqualification on the basis of conduct which shows bias or prejudice or lack of impartiality by focusing on a party rather than counsel.  The determination should also be made on the basis of conduct extra-judicial in nature as distinguished from conduct within a judicial context. **This means that we give §144 and §455 the same meaning legally for these purposes, whether for purposes of bias and prejudice or when the impartiality of the judge might**

**reasonably be questioned.** (Emphasis Added)

Another case that further clarified the application of law with regard to

disqualification within this Circuit was the case of *Potashnick v. Port City Const. Co.*, 609

F.2d 1101, (1980). In *Potashnick* the Court was dealing with the possible disqualification

of the Judge due to his prior connection to one of the lawyers who was actively participating

in the *Potashnick* case and in other prior unrelated dealings on behalf of the Judge. The

Court in analyzing the possible conflicts in the *Potashnick* case completed an in-depth

analysis of the law in that case as well as reciting very important principals of law with

regard to the application of disqualifications statutes and their public purposes. In so doing

the court stated:

> [3] **Clearly, the goal of the judicial disqualification statute is
> to foster the Appearance of Impartiality. Cf. E. Thode,
> Reporter's Notes to Code of Judicial Conduct 60-61 (1973).
> <u>This overriding concern with appearances, which also
> pervades the Code of Judicial Conduct and the ABA Code
> of Professional Responsibility, stems from the recognized
> need for an unimpeachable judicial system in which the
> public has unwavering confidence. As this court has noted,
> "the protection of the integrity and dignity of the judicial
> process from any hint or appearance of bias is the palladium
> of our judicial system."</u> United States v. Columbia
> Broadcasting System, Inc., 497 F.2d 107, 109 (5th Cir.1974).
> [FN8] any question of a judge's impartiality threatens the
> purity of the judicial process and its institutions.**
>
> [4] Because 28 U.S.C. §455(a) focuses on the appearance of
> impartiality, as opposed to the existence in fact of any bias or
> prejudice, a judge faced with a potential ground for

disqualification ought to consider how his participation in a given case looks to the average person on the street. **Use of the word "might" in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality**. Note, Disqualification of Judges and Justices in the Federal Courts, 86 Harv.L.Rev. 736, 745 (1973)

[5] In deciding that Judge Hand should have disqualified himself under 28 U.S.C. §455(a) on the grounds discussed above, we note that "(t)he issue of disqualification is a sensitive question of assessing all the facts and circumstances in order to determine whether the failure to disqualify was an abuse of sound judicial discretion." 1974 U.S. Code Cong. & Admin. News, pp. 6351, 6355. **The amendment of 28 U.S.C. §455 did not alter the standard of appellate review on disqualification issues; however, the new statute requires a judge to exercise his discretion in favor of disqualification if he has any question about the propriety of his sitting in a particular case. Under the prior version of §455, a judge faced with a close question on disqualification was urged to resolve the issue in favor of a "duty to sit."** See Edwards v. United States, 334 F.2d 360, 362 n. 2 (5th Cir.1964), Cert. denied, 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965). **The language of the new statute eliminates the so-called "duty to sit." <u>The use of "might reasonably be questioned" in §455(a) (emphasis added) clearly mandates that it would be preferable for a judge to err on the side of caution and disqualify himself in a questionable case.</u> In reviewing the exercise of judicial discretion in this case, we cannot ignore that the disqualification of a judge in any given case does not cause the delay or inconvenience which resulted in prior times. The growing number of federal judges, and the availability of rapid transportation to move those judges from place to place when necessary, make the decision to disqualify much less burdensome on the judicial system than in times past; any inconvenience which does arise is more than outweighed by the need to protect the dignity and integrity of the judicial process. Our desire to maintain an untarnished judiciary compels us to hold that Judge Hand**

16

**was required by 28 U.S.C. §455(a) to disqualify himself from the Potashnick case, and his failure to do so constituted an abuse of sound judicial discretion.**

Although the mandate of section 455 compels to us to disqualify Judge Hand in this case, we respect his willingness to participate in a proceeding from which any other judge would have recused himself with relief, if not delight. The record reveals the personal hardship imposed on the judge by the length and complexity of the case and the number of parties and witnesses involved. Judge Hand nevertheless tried the case fairly and efficiently, and, to his credit, none of the parties allege any bias or prejudice in his handling of the matter. The parties consistently refused the judge's repeated offers to disqualify himself, evidencing their confidence in his ability to dispense justice evenhandedly. Judge Hand's failure to disqualify himself in this case resulted from his natural reluctance to impose a trial such as Potashnick on one of his brethren. We note that there are only two judges on the bench in the Southern District of Alabama; if one of the two recuses himself from a case, the burden falls on the docket of his colleague. Judge Hand's determination to carry his share of the caseload is to be admired notwithstanding its unfortunate result in this case. Id.

Further clarification and defining of the law of disqualification was a question which proceeded all the way the to the highest Court of the land in the case of *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct 2194, 100 L.Ed.2d 855 (1988) The Supreme Court of the United States held:

1. A violation of §455(a)-which requires a judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned-is established when a reasonable person, knowing the relevant facts, would expect that a judge knew of circumstances creating an appearance of partiality, notwithstanding a finding that the judge was not actually conscious of those circumstances. To require scienter as an

17

element of a §455(a) violation would contravene that section's language and its purpose of promoting public confidence in the integrity of the judicial system. This reading of §455(a) does not require judges to perform the impossible by disqualifying themselves based on facts they do not know, since in proper cases, the provision can be applied retroactively to rectify an oversight once the judge concludes that "his impartiality might reasonably be questioned."
Id at 848

*Liljeberg* involved litigation dealing with Loyola University and another party. The judge presiding over the case was a trustee for Loyola. He attended a trustee meeting for the university and participated in discussions that later arose as facts in the litigation over which he was presiding. The United States Supreme Court held that the judge should have recused himself based on his knowledge of the case and the fact that he was acting as a fiduciary for Loyola University. The Court went on to address knowledge or lack thereof on behalf of the judge as well as financial interests in a case stating:

[1][2] Scienter is not an element of a violation of § 455(a). The judge's lack of knowledge of a disqualifying circumstance may bear on the question of remedy, but it does not eliminate the risk that "his impartiality might reasonably be questioned" by other persons. To read § 455(a) to provide that the judge must know of the disqualifying facts, requires not simply ignoring the language of the provision-which makes no mention of knowledge-but further requires concluding that the language in subsection (b)(4)-which expressly provides that the judge must *know* of his or her interest-is extraneous. A careful reading of the respective subsections makes clear that Congress intended to require knowledge under subsection (b)(4) and not to require knowledge under subsection (a).[FN8] Moreover, advancement of the purpose of the *860 provision-to promote public confidence in the integrity of the judicial process, see S.Rep. No. 93-419, p.

18

5 (1973); H.R.Rep. No. 93-1453, p. 5 (1974)-does not depend upon whether or not the judge **2203 actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew. As Chief Judge Clark of the Court of Appeals explained:

> FN8. Petitioner contends that § 455(a) must be construed in light of § 455(b)(4). He argues that the reference to knowledge in § 455(b)(4) indicates that Congress must have intended that scienter be an element under § 455(a) as well. Petitioner reasons that § 455(a) is a catchall provision, encompassing all of the specifically enumerated grounds for disqualification under § 455(b), as well as other grounds not specified. Not requiring knowledge under § 455(a), in petitioner's view, would thus render meaningless the knowledge requirement under § 455(b)(4). The requirement could always be circumvented by simply moving for disqualification under § 455(a), rather than § 455(b).
>
> Petitioner's argument ignores important differences between subsections (a) and (b)(4). **Most importantly, § 455(b)(4) requires disqualification no matter how insubstantial the financial interest and regardless of whether or not the interest actually creates an appearance of impropriety**. See § 455(d)(4); *In re Cement and Concrete Litigation*, 515 F.Supp. 1076 (Ariz.1981), mandamus denied, 688 F.2d 1297 (CA9 1982), aff'd by absence of quorum, *Arizona v. United States District Court*, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983). In addition, § 455(e) specifies that a judge may not accept a waiver of any ground for disqualification under § 455(b), but may accept such a waiver under § 455(a) after "a full disclosure on the record of the basis for disqualification." Section 455(b) is therefore a

19

somewhat stricter provision, and thus is not simply redundant with the broader coverage of § 455(a) as petitioner's argument posits.

**"The goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible. The judge's forgetfulness, however, is not the sort of objectively ascertainable fact that can avoid the appearance of partiality.** *Hall v. Small Business Administration,* 695 F.2d 175, 179 (5th Cir.1983). **Under section 455(a), therefore, recusal is required even when a judge lacks actual knowledge of the facts indicating his interest or *861 bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge."** 796 F.2d, at 802.

Contrary to petitioner's contentions, this reading of the statute does not call upon judges to perform the impossible-to disqualify themselves based on facts they do not know. If, as petitioner argues, § 455(a) should only be applied prospectively, then requiring disqualification based on facts the judge does not know would of course be absurd; a judge could never be expected to disqualify himself based on some fact he does not know, even though the fact is one that perhaps he should know or one that people might reasonably suspect that he does know. But to the extent the provision can also, in proper cases, be applied retroactively, the judge is not called upon to perform an impossible feat. Rather, he is called upon to rectify an oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary. If he concludes that "his impartiality might reasonably be questioned," then he should also find that the statute has been violated. This is certainly not an impossible task. No one questions that Judge Collins could

20

have disqualified himself and vacated his judgment when he finally realized that Loyola had an interest in the litigation. The initial appeal was taken from his failure to disqualify himself and vacate the judgment *after* he became aware of the appearance of impropriety, not from his failure to disqualify himself when he first became involved in the litigation and lacked the requisite knowledge. (Emphasis added) Id at 859-861

As to the issue of knowledge or the lack thereof, the judge in *Liljeberg* denied the motion to recuse on the grounds he was not involved and had no knowledge of the grounds for recusal. The Supreme Court retorted:

These facts create precisely the kind of appearance of impropriety that §455(a) was intended to prevent. The violation is neither insubstantial nor excusable. Although Judge Collins did not know of his fiduciary interest in the litigation. *868 he certainly should have known. In fact, his failure to stay informed of this fiduciary interest may well constitute a separate violation of §455. See §455( c). **Moreover, providing relief in cases such as this will not produce injustice in other cases; to the contrary, the Court of Appeals' willingness to enforce §455 may prevent a substantive injustice in some future case by encouraging a judge or litigant to more carefully examine possible grounds for disqualification and to promptly disclose them when discovered**. It is therefore appropriate to vacate the judgment unless it can be said **2207 that respondent did not make a timely request for relief, or that it would otherwise be unfair to deprive the prevailing party of its judgement. (Emphasis added) Id at 867, 868[8]

The United States Supreme Court further entrenched its position on recusal in *Liteky v. U.S.*, 510 U.S. 540, 114 S.Ct. 1147, when it stated: '[3] Subsection (a) the provision at

---

[8] It should be noted that the Judge in the *Liljeberg* was required to recuse himself

issue here, was an entirely new "catchall" recusal provision, covering both "interest or relationship" and "bias or prejudice" grounds, see *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)-but requiring them *all* to be evaluated on an *objective* basis, **so that what matters is not the reality of bias or prejudice, but its appearance**. Quite simply and quite universally, recusal was required whenever "impartiality might reasonably be questioned." Id. at 548.

## ARGUMENT

The recusal of the trial judge is required based on 28 U.S.C. §455 and Canon 3 of Judiciary Policies and Procedures: Codes of Conduct. 28 U.S.C. §455(a) and (b) is merely the codification of Canon 3C

### I.    28 U.S.C. §455(a) and Canon 3C(1)
####      Impartiality might reasonably be questioned

28 U.S.C. §455(a) and Canon 3C(1) each require disqualification generally where the judge's "impartiality might reasonably be questioned." Specifically, 28 U.S.C. §455(a) states, "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Likewise Canon 3C(1) dictates that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned . . ." This recusal is required if waiver is declined by a party after full disclosure under 28 U.S.C. §455(e). No disclosure or opportunity for waiver was ever presented to Scrushy.

The Judicial Committee on codes of conduct has issued some opinions that also bear

22

on the requirement that Judge Fuller recuse himself from participation in these proceedings, or at least a requirement that he sought waivers from all parties after full disclosure. In particular Advisory opinion No. 27 which dealt with the recusal of a judge based fact that his impartiality might reasonably be questioned where the judge was presiding over a class action complaint in which a drug store was one of the defendants. The judge's wife was the sole beneficiary of a trust which held a shopping center from which the drug store defendant leased space. The judge's wife did not manage the property, rather, it was managed by a real estate company. The drug store defendant paid rent to the trust which was described as substantial but barely exceeding five figures. In deciding in favor of requiring recusal, the Committee on Codes of Conduct reasoned:

> The canon is clear that a judge should disqualify in a proceeding in which his or her impartiality might reasonably be questioned. This is to be read in connection with Canon 2 which states, 'a judge should avoid impropriety and the appearance of impropriety in all activities.' For a judge to preside in a case involving a defendant which pays a substantial amount of rent which eventually is paid or credited to the judge's spouse as the sole beneficiary of a trust managed by the lessor as trustee would, in our opinion, be reasonably subject to the claim of an appearance of impropriety on the judge's part and to questioning his or her impartiality. Id.

Similarly, for Judge Fuller to preside in a case involving a Plaintiff which pays a substantial amount of money to a corporation for which he is a controlling shareholder, would reasonably subject him to a claim of an appearance of impropriety and the questioning

of his impartiality.  In the case at bar Judge Fuller, not his wife, personally receives the money from the United States government or as a direct result of his company's contractual arrangement with the United States.  It is far and away exceeding five figures per year so certainly it would be considered a very substantial income to him.

In the case at hand, the facts are even more heavily weighted to the side of disqualification due to the size of the government contracts, the very substantial incomes generated to the judge as a result of these military contracts, and the removal of one degree of relationship, more particularly, that being it is the judge not his wife in the present case who is garnering a financial benefit.

In Advisory Opinion No. 94 the Committee established facts requiring recusal.  The Committee referenced the aforementioned Opinion No. 27 and then went further by stating "[w]e also have said that it would create an appearance of impropriety for a judge who contracts with a party for the use of a service mark to hear cases involving that party . Compendium §2.11(b)(1997)  Committee on Codes of Conduct, Advisory Opinion No. 94

The Committee went on to state:

> Several factors can help to reconcile these opinions and assist in identifying when recusal is necessary: (1) When a transaction is standardized and generally available to all who qualify, it is not likely to require recusal. To the extent that the parties to the transaction are fungible, with either party able to go elsewhere, the power of each party over the other is diminished, and therefore so is the appearance of impropriety. (2) When, during the pendency of the litigation before the judge, a relationship has previously been structured and is not likely to be restructured or to give rise to controversy regarding the duties of the parties,

24

recusal is less likely to be required. The converse is also true.
When a relationship is being negotiated or is likely to be
renegotiated during the time a party is in court or there is a
reasonable possibility that the relationship may become the
subject of controversy during the pendency of the court
proceeding before the judge, it is much more likely to require
recusal.    (3) The size of the investment is a relevant
consideration in evaluating an appearance of impropriety. (4) It
is relevant to consider whether the transaction gave rise to a
personal and recurring relationship between the judge and the
party or whether it is an impersonal market relationship. (5)
Finally, it is necessary to consider whether there are any other
unique characteristics of the transaction that give rise to an
appearance of impropriety.   Id.

In declining to suggest recusal, the Committee pointed out that the judge in question

in that case was one of many with a fractional royalty interest in the companies in question

and the interests were fairly small in both amount and percentage. The judge would not have

had any direct contact with the party due to his fractional royalty interest, and the fractional

royalty interests are standardized within a particular community.

These arguments do not apply to the relationship of Judge Fuller and Doss.  In the

present case, the renewal and extension of Doss Aviation's contracts with the United States

was not a standardized transaction.  The relationship was in fact being renegotiated prior to

and during the trial process of Scrushy.  The size of the investment is without question

enormous.  The Judge gets an extremely large recurring check each year as a result of the

relationship of the parties as he is one of only a small number of owners of the companies

that contract with the government making his interest in these contracts very large.  It is also

notable that Judge Fuller is the registered agent for Doss, with the address for official mail to be sent to the Federal Courthouse in Montgomery, Alabama. Lastly, it is undeniable that this is truly a very unique situation. Albeit speculative on the part of Scrushy due to time constraints and resources, it is extremely doubtful that there is another Federal District Court Judge in the United States that owns a large if not controlling interest in a corporation that has or had contracts with the United States that total in excess of $258,000,000.00. Nor does Scrushy believe there is a United States District Judge that makes up to $2,000,000.00 annually as a result of his association with the United States government which is separate and apart from his responsibilities as a Federal Judge or his obligations on the bench.

Doss Aviation, Inc., Doss of Alabama, Inc. and the subsidiary company Aureus International do business with government departments, two of which, in particular, form the basis by which a reasonable person might believe Judge Fuller's impartiality as to Scrushy might reasonably be questioned. These relationships should, at a minimum, have been fully disclosed prior to trial in this matter, and Scrushy should have been requested to waive the conflict or request recusal.

### A.    Uniform supplier to the Federal Bureau of Investigation

The criminal case for which Scrushy was ultimately convicted was initiated by an investigation by the Federal Bureau of Investigations, and agents Keith Baker and James Murray. After this investigation by the FBI, the case was turned over to the United States Attorney's Office for prosecution. The FBI showed its interest in a conviction of Scrushy

by requesting and receiving permission for two agents to be present in the courtroom throughout the course of the trial, when normal procedure is to allow only one representative.

In addition, the FBI was the primary investigative agency on Scrushy's previous criminal case held in Birmingham, Alabama during the summer of 2005. FBI agents led the raid on Healthsouth and coordinated the secret recording of Richard Scrushy by a fellow employee as well as interviewing hundreds of witnesses. Several of their agents were present throughout the trial in Birmingham and many actually testified.

Aureus International, as a division of Doss of Alabama, Inc., markets itself by stating that it provides clothing for the Federal Bureau of Investigation. Judge Fuller, as an owner of Doss of Alabama, Inc. stands to gain financially by Aureus International's business relationship with the Federal Bureau of Investigation.

"We must continuously bear in mind that 'to perform its high function in the best way' 'justice must satisfy the appearance of justice' *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 108 S.Ct 2194, 100 L.Ed.2d 855 (1988) at 864

## B.    Military Contracts

Doss Aviation, Inc. of which Judge Fuller appears to be one of the controlling shareholders, if not the largest, garnered in excess of two hundred fifty eight million dollars ($258,000,000.00) in government military contracts since its inception. These relationships include contracts with the United States Army, Navy and most importantly the United States Air Force which have previously been outlined above.

27

On or about August 30, 2002, only one month after Judge Fuller's appointment to the Federal Bench, the Department of the Air Force awarded a contract to Doss Aviation, Inc. for Helicopter Maintenance reported to be for an aggregated total contract valued at thirty million four hundred seventy four thousand eight hundred and seventy five dollars ($30,474,875.00). Moreover, just prior to the beginning of the Scrushy's criminal trial, the Department of the Air Force announced, on or about February 8, 2006, that Doss Aviation, Inc. had won the bid on the contract referenced in Paragraph 24 above.

The Defendants' criminal trial started on May 5, 2006. Following the commencement of the criminal trial of Scrushy, the Department of the Air Force announced, on or about May 25, 2006 and just prior to the close of the Government's case in chief, that Doss Aviation, Inc. had been awarded the contract to train pilots and navigators referenced in Paragraph 24 above. The 10.5 year contract to train pilots and navigators for the Air Force, was far and away the largest contract Doss Aviation ever received from the United States military or from any other party for that matter, reported to be for an aggregated total contract price of $178,218,969.65. This contract is not a 10.5 year guaranteed contract, but is renewable from year to year. The fact that this is a renewable contract lends itself to the argument by a reasonable person that Judge Fuller has an ongoing incentive to keep the government pleased, although Doss was awarded the contract initially, this contract could always be rescinded.

The United States is contractually bound to Doss and it is in Doss's financial interest

28

to maintain these contracts with the United States. It is therefore in Judge Fuller's financial interest for the United States to keep these contracts with Doss. Certainly, Judge Fuller nor anyone else for that matter, would argue that his receiving millions of dollars as a result of his ownership in Doss Aviation would be considered an insubstantial financial interest. See *Liljeberg v. Health Services Acquisition Corp.*, supra. It is fair to say that the financial success of these companies depends largely on its business relationships with the United States Government, and this financial success is passed through to the owners of these corporations, including Judge Fuller

Additionally, Assistant United States Attorney Feaga, was a lead prosecutor assigned to this case, and was at all times during the prosecution of defendants a colonel in the United States Air Force reserve. Attorney Feaga took an active role in the prosecution of Scrushy and aggressively sought his conviction and confinement. In addition, Attorney Feaga was assigned to Langley Air Force Base, which upon information and belief, has a contract for fuel distribution services with Doss Aviation, Inc. (See Exhibit 25). While it is unknown to Scrushy if Attorney Feaga personally worked on any contracts with Doss Aviation, Inc., it is very likely someone within his office of Staff Judge Advocate with Langley Air Force Base did have involvement with the review, amendment and approval of these contracts. A reasonable man could come to the conclusion that Judge Fuller might be inclined not to rule against an attorney whose office had direct involvement with the review, amendment and approval of Doss Aviation, Inc.'s contracts.

Moreover, the Executive Branch of the United States Government, which includes both the FBI and the United States Military, certainly has taken a keen interest in the legal proceedings of Mr. Scrushy. As this Court may or may not know, the offices of Healthsouth Corporation were raided by the FBI on March 18, 2003, for alleged securities laws violations and falsifications of the company's books and records. This followed many other corporate scandals of the time for false reporting of income involving other well known companies such as Enron, Worldcom and Tyco just to name a few. The result of these scandals caused the creation of and act now commonly known as the Sarbanes Oxley Act for securities reporting and verification by company officials of their income reporting. As a result of this act Mr. Scrushy was indicted on October 29, 2003, on an eighty two (82) count indictment which contained within it charges based on the new Sarbanes Oxley Act, the first of their kind. One would certainly not view as speculative the Executive Branch's interest in Mr. Scrushy's case as evidenced by President Bush's visit to Birmingham, Alabama on Air Force On the day before Mr. Scrushy's indictment was announced. It appears that President Bush was attempting to persuade potential jurors in an attempt to influence them for the soon to come criminal trial of Scrushy in Birmingham. Mr. Bush appears to comment directly about Scrushy when he stated: ". . . And our confidence was shaken by the fact that some of our chief executive officers forgot what it meant to be responsible citizens. They didn't tell the truth. They didn't tell the truth to their employees. They didn't tell the truth to their shareholders. They betrayed the trust. We passed the laws, by the way, that are sending a

clear signal: 'If you betray the trust, there will be a consequence. We will hold you responsible for not telling the truth.' But the fact that some in corporate America betrayed the trust affected our confidence." He went on to state "first of all, as I mentioned, we passed new laws that say, 'If you're going to cheat, we'll hold you to account.' And if you noticed, some of those who behaved irresponsibly are now being held to account."

It was most surely embarrassing to the Government and the FBI when Mr. Scrushy walked out of the Birmingham Courthouse a free man. Especially, in light of United States Attorney Alice Martin's statement that the trial was a "defining moment" for Sarbanes Oxley and that all the evidence pointed toward Scrushy directing the massive earnings overstatement. A reasonable man seeing all of these facts in light of the government's loss in Birmingham could believe that the Executive Branch of the United States wanted to see that Mr. Scrushy was punished despite his acquittal of all charges in Birmingham. It is certainly not beyond reason that the Executive Branch tries or tried to influence governmental prosecutions in light of the recent firings of some eight United States Attorney's. Some of these attorneys have stated that they were fired for not indicting or investigating people that persons associated with the Executive Branch wanted indicted or investigated. Many people in the public and in Congress have gone so far as to call for the resignation of the United States Attorney General Alberto R. Gonzales as a direct result of the congressional investigation and scandal alleging undue influence on the justice system.

As has previously been discussed, both the FBI and United States Military are arms

31

of the Executive Branch of the United States. Unlike a United States Attorney, a Federal

Judge has a lifetime appointment and cannot simply be fired. If a Federal Judge enters

rulings unfavorable to the United States, there is generally no way for the Executive Branch

to injure or punish that Judge. In this instance, however, there is a remedy available to the

Executive Branch against Judge Fuller should they disagree with any of his rulings, that

being the denial or cancellation of Doss Aviation, Inc.'s military contracts.

## II.    Not Waived

Although much of the facts giving rise to this Motion are matters of public record, the

issues raised by 28 U.S.C. §455(a) can only be waived if the Defendant has actual

knowledge. In the current case, Scrushy did not have actual knowledge of even the

possibility of the facts giving rise to this Motion until late February 2007. Attorneys for

Scrushy spent the next subsequent weeks investigating the truth of these allegations, before

filing the current Motion.

In *U.S. v. Pappert*, 1998 WL 596707 (D. Kan.) the Defendant requested a new trial

based on the fact that the judge owned stock in G.E. Capital Leasing, who was one of 39

entities that lost money as a result of the Defendant's fraudulent copier leasing scheme. Only

after his appeal was final did the Defendant in *Pappert* learn of the Judge's stock ownership

in G.E. The Court stated that although the information was available through the judge's

financial disclosure statement, "Absent evidence that defendant and counsel actually obtained

that information, however, the Court finds that defendant's failure to raise this issue at trial,

32

sentencing or on appeal does not render it untimely." *Id* at 4.

28 U.S.C. §455(e) provides "No justice, judge, or magistrate judge shall accept from the parties to the proceeding a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification." Therefore, Scrushy asserts that the facts outlined in this Motion should have been disclosed pre-trial, at which time Scrushy would have been given the opportunity to either enter a waiver, or request recusal. It is the Defendant's position he would have requested such recusal, but was never given the opportunity. This evidenced by the fact that he had established a history of this through his request to the Honorable Judge Coody asking that he recuse himself in prior filings with this Court.

WHEREFORE, premises considered Scrushy respectfully requests, based on the foregoing argument and citation of authority, that your Honor recuse himself for the foregoing reasons from any further participation in these proceedings. Further, that an appropriate panel of Judges be convened from the Eleventh Circuit Court of Appeals to assign this matter to a new District Court Judge from outside the State of Alabama. In

addition, Scrushy requests any and all further relief to which the defendant may be entitled.

Dated this the 17th day of April, 2007.

Respectfully submitted,

JAMES W. PARKMAN, III
Attorney for Defendant Richard Scrushy
Parkman, Adams & White, LLC
505 20th Street North
Suite 825
Birmingham, AL 35203
(205) 244-1920
(205) 244-1171 FAX

R. MARTIN ADAMS
Attorney for Defendant Richard Scrushy
Parkman, Adams & White, LLC
505 20th Street North
Suite 825
Birmingham, AL 35203
(205) 244-1920
(205) 244-1171 FAX

WILLIAM C. WHITE, II
Attorney for Defendant Richard Scrushy
Parkman, Adams & White, LLC
505 20th Street North
Suite 825
Birmingham, AL 35203
(205) 244-1920
(205) 244-1171 FAX

34

## CERTIFICATE OF SERVICE

I hereby certify that I have filed the foregoing <u>BRIEF IN SUPPORT OF MOTION</u>

<u>TO RECUSE AND MOTION FOR VACATUR OR NEW TRIAL BASED ON NEWLY</u>

<u>DISCOVERED EVIDENCE</u> with the Clerk of the Court, UNDER SEAL, and have

forwarded a copy to all counsels of record.

Dated this the 17th day of April, 2007.

JAMES W. PARKMAN, III
Parkman, Adams & White, LLC
505 20th Street North
Suite 825
Birmingham, AL 35203
(205) 244-1920
(205) 244-1171 FAX

35