# APPENDIX D

Case 2:05-cr-00119-MEF-CSC     Document 552-5     Filed 04/18/2007     Page 2 of 3

(8) Dissolution of organizations formed pursuant to the Indian Reorganization Act of June 18, 1934; and

(9) Federal contributions to the States pending the placing of the lands of the Indians on the tax rolls of the States.

SEC. 3. The joint committee shall report to the Senate and House of Representatives, together with its recommendations concerning the matters referred to in section 2, not later than the beginning of the second session of the Eightieth Congress.

SEC. 4. (a) The joint committee, or any duly authorized subcommittee thereof, is authorized to sit and act at such places and times during the sessions, recesses, and adjourned periods of the Eightieth Congress; to require by subpena or otherwise the attendance of such witnesses and the production of such books, papers, and documents; to administer such oaths; to take such testimony; to procure such printing and binding; and to make such expenditures as it deems advisable. The cost of stenographic services to report such hearings shall not be in excess of 25 cents per hundred words.

(b) The committee is empowered to appoint and fix the compensation of such experts, consultants, and clerical and stenographic assistants as it deems necessary, but the compensation so fixed shall not exceed the compensation prescribed under the Classification Act of 1923, as amended, for comparable duties.

(c) The expenses of the committee, which shall not exceed $      , shall be paid one-half from the contingent fund of the Senate and one-half from the contingent fund of the House of Representatives, upon vouchers signed by the chairman or vice chairman. Disbursements to pay such expenses shall be made by the Secretary of the Senate out of the contingent fund of the Senate, such contingent fund to be reimbursed from the contingent fund of the House of Representatives in the amount of one-half of disbursements so made.

AMENDMENT OF CIVIL SERVICE RETIREMENT ACT

Mr. McCARRAN. Mr. President, on May 5, I submitted amendments intended to be proposed by me to the bill (S. 637) to amend the Civil Service Retirement Act of May 29, 1930, as amended. I ask unanimous consent that the amendments, together with a statement I have prepared, be printed in the RECORD.

The PRESIDENT pro tempore. Without objection, the amendments, together with the statement presented by the Senator from Nevada, will be printed in the RECORD.

There being no objection, the amendments, together with the statement, were ordered to be printed in the RECORD, as follows:

Amendments intended to be proposed by Mr. McCARRAN to the bill (S. 637) to amend the Civil Service Retirement Act of May 29, 1930, as amended, viz: On page 28, in line 25, strike out "sixty-two" and insert in lieu thereof "sixty."

On page 29, in line 3, strike out "sixty-two" and insert in lieu thereof "sixty"; in line 12, strike out "sixty-five" and insert in lieu thereof "sixty"; and in line 15, strike out "sixty-five" and insert in lieu thereof "sixty."

On page 29, following line 16, insert a new sentence, as follows: "Should such officer or employee so elect he may receive a deferred annuity beginning at the age of fifty-five years or thereafter, computed as above described, but reduced by one-half of 1 percent for each full month such officer or employee is under the age of 60 years when the deferred annuity starts."

On page 29, in line 12, strike out "sixty-five" and insert in lieu thereof "sixty-two";

and in line 15, strike out "sixty-five" and insert in lieu thereof "sixty-two."

STATEMENT BY SENATOR M'CARRAN

Mr. President, I call the attention of the Senate to the bill S. 637, calendar No. 144, the so-called civil service retirement bill, which has been reported from the Senate Committee on Civil Service. I wish to discuss briefly one phase of this proposed legislation.

It is axiomatic in all sound theories of retirement that employees should receive equal treatment for equal service. Our military retirement system, and most private retirement systems, give equal treatment for each year served, once the employee has served the minimum number of years entitling him to an annuity. Not to do so clearly constitutes discrimination; and the Federal Government should not be guilty of discrimination in its treatment of its employees.

Under the bill S. 637, such discrimination and inequity would be created. Employees who might have served exactly the same number of years would receive different retirement benefits depending upon the age at which they completed 10 years or more of service, and whether they are voluntarily or involuntarily separated from the service.

Let me give an example. Assume the case of three Federal employees, each of whom entered the service of the Federal Government in 1937, 10 years ago. Suppose one of those employees is today 60 years old, and that each of the other two is 59. Suppose further that one of the two employees who is 59 is involuntarily separated from the service, because of a reduction in staff, and that the other employee who is 59 finds that because of his wife's health he must leave the Federal service and go to one of the States in the West, which has a more favorable climate. Assuming that the employee who is 60 desires to take advantage of his retirement privileges, we find this situation: The employee who is 60 can retire immediately and begin drawing his retirement benefits immediately. The employee who is 59 and who is involuntarily separated from the service can begin drawing his retirement benefits in 3 years, when he is 62. The employee who is 59 and who retires voluntarily must wait 6 years, until he is 65, before he can begin drawing his retirement benefits.

This is not an equitable situation. Once an employee has served the minimum number of years, he should be entitled to the same rights for each year served, irrespective of whether he is voluntarily or involuntarily separated.

The discrimination I have referred to constitutes a definite advantage for those Government employees who, during the war, left old-line agencies for higher-paying jobs in temporary agencies. This class of workers, who constitute the migrant workers in the Federal service, are now being separated from the service, involuntarily, in large numbers; and when so separated, they receive treatment much more favorable than the executives who remained in the old-line agencies, where their experience and training made them invaluable during the war, and who now wish to leave Government service voluntarily.

Certainly the men who resisted the inducements of higher pay, and stuck to their guns in the agency where they could best serve the Government, are entitled to treatment at least as good as those who followed the lure of higher pay wherever it might lead them.

It is not fair to say to such men, who have proved their loyalty to their agency in each instance, that the Government will now attempt to coerce them to continue in service by denying them their well-earned right to equal treatment for equal work.

There is another element of discrimination involved, one not spelled out in the bill, but inherent in its provisions. In the old-line

established agencies of the Federal Government, an employee whose work has been excellent has virtually no chance to receive an involuntary separation except through connivance with his superiors. The lower grades of Federal employees, clerical help and other low-paid workers, are seldom in a position where such connivance is possible. On the other hand, executive personnel is often apt to be in a position to arrange a separation which will be technically involuntary, and thus avoid the discrimination which S. 637 makes between voluntary and involuntary retirement. Such an inducement to connivance should not be created by legislation, and such an opportunity for inequitable handling of retirement, as between employees in executive positions and those in lower grades, should not be permitted.

We all know that one of the problems in Government service is the slowness of advancement, particularly as an employee works toward the top. This is a discouraging factor, to say the least. An attempt to coerce employees in the higher grades to continue in the Federal service, by creating retirement disadvantages if they do not do so, is by no means a solution to this problem. It would be far more enlightened to encourage employees who have reached the retirement age or who are financially able to retire to do so, thus opening the way for promotions all down the line. Such a course of action would be helpful in opening up higher-paid jobs for our returning veterans, and would certainly be beneficial to the morale of workers in all grades.

There is one other obvious injustice in the bill S. 637, to which I wish to refer. I spoke earlier of the assumed case of a man who found that, because of his wife's bad health, he had to move to another State. Now, suppose that man is only 54 years old. If he had been able to work one more year, he would have been able to pick up a reduced immediate pension at the age of 55. However, under the provisions of S. 637, if he is voluntarily separated from the Federal service, he will have to wait 11 years, until he is 65 years of age, before he can begin to receive his pension. There is nothing fair about that.

The important cost factor in retirement benefits is the age at which employees are to receive annuities, whether current annuities or deferred annuities. The matters of inequity, to which I have called the attention of the Senate, are of minor importance by comparison. When we consider further that the removal of these inequities would result in simplification and much more efficient administration of the law the only possible conclusion is that the inequities in question should be removed. The question of some slight additional cost to the retirement system, in giving equal treatment to both voluntary and involuntary retirement, is one which can only be raised by him who is willing to contend that the Federal Government should treat its employees unfairly in order to save a few dollars. We would not tolerate that kind of a philosophy in a private employer; we should not tolerate it in the Federal Government. The burden of proof is on those who want to coerce employees to remain in the Federal Government at a time when every effort is being made to curtail Government expenditures.

Employees who have worked for the Federal Government under the retirement law approved January 28, 1942, have a vested right to receive their deferred pension at the age of 62, if they voluntarily separate themselves from Government service. This vested right has been recognized in the bill S. 637, section 8 of which continues this right for those persons who have already separated themselves from the service under the provisions of the 1942 legislation. It is neither moral nor ethical for the Federal Government to now raise the age limit of 62 for

those employees who have not left the Federal Government, and who do not do so by the time this pending legislation is enacted. The violation of a covenant does not become either moral or ethical simply because it is done by legislation.

The major purpose of the bill S. 637 is to liberalize retirement benefits. It is incompatible with that purpose to break a covenant already made with employees now working, and take away from them retirement rights which they now have. It would be far more logical to provide for the commencement of retirement benefits at the age of 60, irrespective of whether a person is voluntarily or involuntarily separated from Government service.

I have prepared two proposed amendments to the bill S. 637, which have been printed.

The first of these two amendments would do what I have just proposed: It would substitute the age of 60 years, throughout the bill, as the age at which retirement benefits are to begin. It would also cover the case of an employee who is forced to retire voluntarily at an earlier age than the retirement age, by permitting him to begin drawing a reduced annuity at the age of 55, or thereafter, computed on an actuarial basis.

I think this amendment is entirely equitable, and I should be glad to see it adopted. However, I do not intend to press it. Speaking frankly, I have been told that the offering of any amendments to this bill would result in defeating the bill, and I should not wish to be responsible for such an eventuation.

The second amendment which I sent to the desk, and which has been printed, was not intended to be offered unless the first amendment should have been defeated. Since I have decided not to press the first amendment, neither shall I press the second.

This second amendment treats only with the discrimination and equity between voluntary and involuntary retirement; and its sole effect would be to provide that an employee who has served the number of years entitling him to receive retirement benefits can begin to receive those benefits at the age of 62, regardless of whether his retirement is voluntary or involuntary.

Employees who left their jobs with old-line Government agencies, during the time when OPA and other war agency staffs were being recruited, and took positions with the newer agencies at salary increases ranging from one-third to 40 or even 50 percent above the salaries they were previously receiving, and who now face involuntary separation from the service as the wartime agencies are liquidated, are actually getting a special bonus when their agency ceases to exist, by being allowed the full deferred annuity at the age of 62, while those who stayed on the job in the old-line agencies are told they cannot receive a deferred annuity until they reach the age of 65. The migrant workers got higher salaries all during the war years, and they will get higher retirement benefits because of those higher salaries.

Both voluntary and involuntary separation, except for cause, should receive the same treatment in the Government's retirement system. No logical argument to the contrary can be offered, and no such argument was offered at the hearings on the bill S. 637.

I have made this statement to the Senate because I had already sent forward these two amendments, and they had been printed at my request; and I felt the Senate was entitled to an explanation of why I had prepared these amendments and what they were designed to accomplish. I felt, also, that the Senate was entitled to notice that I have decided not to press these amendments.

HOUSE BILLS REFERRED

The following bills were severally read twice by their titles, and referred, as indicated:

H. R. 84. An act to amend the Nationality Act of 1940, as amended;

H. R. 1467. An act to amend the act entitled "An act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes," of June 15, 1917, as amended, and the Alien Registration Act, 1940, to increase the penalties for violation of such acts;

H. R. 1566. An act to codify and enact into positive law, title 1 of the United States Code, entitled "General Provisions";

H. R. 1566. An act to codify and enact into positive law, title 4 of the United States Code, entitled "Flag and Seal, Seat of Government, and the States";

H. R. 1567. An act to codify and enact into positive law, title 6 of the United States Code, entitled "Official and Penal Bonds";

H. R. 2063. An act to codify and enact into positive law, title 17 of the United States Code, entitled "Copyrights";

H. R. 3064. An act to codify and enact into positive law, title 9 of the United States Code, entitled "Arbitration";

H. R. 2237. An act to correct an error in section 342 (b) (8) of the Nationality Act of 1940, as amended; and

H. R. 3190. An act to revise, codify, and enact into positive law, title 18 of the United States Code, entitled "Crimes and Criminal Procedure"; to the Committee on the Judiciary.

H. R. 239. An act to further perfect the consolidation of the Lighthouse Service with the Coast Guard;

H. R. 2054. An act to amend the act of April 14, 1930, to provide increased retired pay for certain members of the former Life Saving Service;

H. R. 2291. An act to amend section 20a of the Interstate Commerce Act; and

H. R. 2654. An act to authorize the Secretary of the Treasury to grant to the mayor and City Council of Baltimore, State of Maryland, a permanent easement for the purpose of installing, maintaining, and servicing a subterranean water main in, on, and across the land of the United States Coast Guard station called Lazaretto depot, Baltimore, Md.; to the Committee on Interstate and Foreign Commerce.

H. R. 1179. An act to aid in defraying the expenses of the Seventeenth Triennial Convention of the World's Woman's Christian Temperance Union to be held in this country in June 1947; to the Committee on Foreign Relations.

H. R. 1208. An act to provide compensation to persons performing the duties of postmasters at post offices of the fourth class during annual and sick leave of the postmasters; to the Committee on Civil Service.

H. R. 1237. An act to regulate the marketing of economic poisons and devices, and for other purposes; to the Committee on Agriculture and Forestry.

H. R. 1362. An act to permit certain naval personnel to count all active service rendered under temporary appointment as warrant or commissioned officers in the United States Navy and the United States Naval Reserve, or in the United States Marine Corps and the United States Marine Corps Reserve, for purposes of promotion to commissioned warrant officer in the United States Navy or the United States Marine Corps, respectively; and

H. R. 1371. An act to authorize the Secretary of the Navy to appoint, for supply duty only, officers of the line of the Marine Corps, and for other purposes; to the Committee on Armed Services.

H. R. 1412. An act to grant to the Arthur Alexander Post, No. 68, the American Legion, of Belzoni, Miss., all of the reversionary interest reserved to the United States in lands conveyed to said post pursuant to act of Congress approved June 29, 1938;

H. R. 1574. An act to amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads, and for other purposes," approved July 11, 1916, as amended and supplemented, and for other purposes; and

H. R. 3029. An act to provide for the acquisition of a site and for preparation of plans and specifications for a courthouse to accommodate the United States Court of Appeals for the District of Columbia and the District Court of the United States for the District of Columbia; to the Committee on Public Works.

H. R. 2161. An act relating to institutional on-farm training for veterans; and

H. R. 2368. An act to amend paragraph 8 of part VII, Veterans Regulation No. 1 (a), as amended, to authorize an appropriation of $3,000,000 as a revolving fund in lieu of $1,500,000 now authorized, and for other purposes; to the Committee on Labor and Public Welfare.

H. R. 2353. An act to authorize the patenting of certain public lands to the State of Montana or to the Board of County Commissioners of Hill County, Mont., for public-park purposes; and

H. R. 2573. An act to authorize the Director of the United States Geological Survey to produce and sell copies of aerial or other photographs and mosaics, and photographic or photostatic reproductions of records, on a reimbursement of appropriations basis; to the Committee on Public Lands.

LABOR LEGISLATION—ADDRESS BY SENATOR BALL

[Mr. BALL asked and obtained leave to have printed in the RECORD a radio address on the subject of labor legislation delivered by him on May 12, 1947, which appears in the Appendix.]

THE PLACE OF THE UNITED STATES IN INTERNATIONAL AFFAIRS—ADDRESS BY SENATOR HATCH

[Mr. HOEY asked and obtained leave to have printed in the RECORD an address on the place of the United States in international relations, delivered by Senator HATCH, at the University of North Carolina, May 5, 1947, under the auspices of the International Relations Club of the University, which appears in the Appendix.]

PROHIBITION OF ALCOHOLIC-BEVERAGE ADVERTISEMENTS—STATEMENT OF DR. CLINTON N. HOWARD

[Mr. CAPPER asked and obtained leave to have printed in the RECORD a statement relative to Senate bill 265, prohibiting the transportation in interstate commerce of advertisements of alcoholic beverages, made by Dr. Clinton N. Howard before the Committee on Interstate and Foreign Commerce on May 12, 1947, which appears in the Appendix.]

UNIVERSAL MILITARY TRAINING—EDITORIAL FROM THE CHICAGO HERALD-AMERICAN

[Mr. BREWSTER asked and obtained leave to have printed in the RECORD an editorial entitled "For the Sake of Peace and Safety," published in the Chicago Herald-American of May 5, 1947, which appears in the Appendix.]

IS CONGRESS ANTILABOR?—EDITORIAL FROM MAGAZINE AMERICA

[Mr. MYERS asked and obtained leave to have printed in the RECORD an editorial titled "Is Congress Antilabor?" from magazine America, for April 19, 1947, which appears in the Appendix.]

THE STATE DEPARTMENT'S BROADCAST TO RUSSIA—ARTICLE FROM THE NEW YORK HERALD TRIBUNE

[Mr. LODGE asked and obtained leave to have printed in the RECORD an article entitled "The Henry Wallace Affair," by John Crosby, published in the New York Herald Tribune of May 9, 1947, which appears in the Appendix.]