**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

UNITED STATES OF AMERICA,

v.                                                   Case No. 2:05cr119-MEF

RICHARD M. SCRUSHY,
      Defendant.

**DEFENDANT RICHARD M. SCRUSHY'S OBJECTIONS
TO MAGISTRATE'S REPORT AND RECOMMENDATION
<u>DENYING JURY CHALLENGE</u>**

COMES NOW Defendant Richard M. Scrushy, by and through his undersigned counsel of record and, pursuant to 28 U.S.C. § 636(b)(1), files these objections to the findings of fact and conclusions of law contained in the May 1, 2007 Report and Recommendation of United States Magistrate Judge Charles S. Coody, (Doc. 576), (hereinafter, "R & R").  In support of these objections, Defendant respectfully shows this Court the following:

**INTRODUCTION**

The jury challenge presented in this case pertains to the 2001 Qualified Jury Wheel (hereinafter, "QJW") from which the grand jury which indicted Defendant was selected, and the 2005 QJW from which Defendant's petit jury was selected.  The heart of the challenge is Defendant's claim that the jury system in both these periods failed to fairly represent the African-American citizens that live in the Middle District of Alabama.  While the statistical analyses as to the extent and precise causes of this underrepresentation can be debated and parsed in many ways, as the instant R & R and rulings of the District Judge and Magistrate Judge

1

in a contemporaneous jury challenge filed in the unrelated case of *United States v. Leon Carmichael, Sr.*, Case Number 2:03cr259-MHT[1] surely do, one fact is indisputable:  The jury system in the Middle District of Alabama has consistently and systematically produced juries that exclude over one-third of the African-American community that resides in this District. This pattern of exclusion of African-Americans has been in place continuously since at least the 1997 QJW, which this Court in 2001 found to be in substantial violation of the Jury Selection and Service Act. *United States v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001).  Defendant has submitted, and continues to submit, that this underrepresentation and the irregularities that have created it are a substantial violation of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* (hereinafter, "JSSA"), the Jury Plan for the Middle District of Alabama (hereinafter "Jury Plan"), the Sixth Amendment to the United States Constitution, and the equal protection clause of the Fifth Amendment. As a result, Defendant should be granted a new trial.

While the R & R of Magistrate Coody, as well as the Boyd R & R and Thompson Opinion have rejected these claims in both cases, each of these judges in this Court have acknowledged that there are significant problems with the jury system in this District. The first in time was Magistrate Boyd, who wrote in *Carmichael*:

> Notwithstanding this adverse Recommendation, this Magistrate Judge cannot ignore that the same evidentiary record which warrants denial of a new trial to these defendants also documents a compelling need for the Middle District of Alabama to examine, and undertake to remedy, administrative inaction and operational deficiencies which may undermine the integrity of and public confidence in, the District's Jury Plan.  For court personnel assigned to implement the Jury Plan, the *Clay* decision should have served, at the very least, to heighten an appreciation for the statutory and constitutional imperatives to ensure each criminal defendant's right to a jury which is at once

---

[1] Report and Recommendation of Magistrate Judge Delores R. Boyd, (Doc. 550), (hereinafter "Boyd R & R") and opinion of District Judge Myron H. Thompson, 467 F. Supp. 2d 1282 (M.D. Ala. 2006), (hereinafter "Thompson Opinon").

> representative of a fair cross-section of the community and of a fair selection process. That it did not is a fact underscored repeatedly and with unmistakable clarity from the testimony and exhibits adduced at the evidentiary hearing …. After addressing for almost a year the discovery issues, hearings, and legal analysis generated by this jury composition challenge, this court is constrained to add its voice to the chorus for operational changes which, if not undertaken, may burden the District with repeated litigation.

Boyd R & R at 100 n. 147.

Thereafter, Judge Thompson wrote in the same case:

> The court will adopt the magistrate judge's recommendation and reject the defendants' challenge to this court's jury selection process. However, while the defendants are not entitled to a new trial, it should not be overlooked that they have identified several undisputed violations of the JSSA and the Middle District's jury plan. It is also apparent that the defendants are narrowly shy of having satisfied the second *Duren* factor of a greater-than-absolute racial disparity.
>
> The court therefore adopts the magistrate judge's caution that there is "a compelling need for the Middle District of Alabama to examine, and undertake to remedy, administrative inaction and operational deficiencies which may undermine the integrity of, and public confidence in, the District's Jury Plan."

Thompson Opinion, 467 F. Supp. 2d at 1315. Judge Thompson thereafter recommends to the Court as a whole that the Administrative Office of the Courts be "immediately invited down to do a complete audit of the court's jury selection process,…." *Id*. at 1315.[2]

Magistrate Coody, in his R & R in the instant case, while clearly not as troubled by the evidence as Magistrate Boyd or District Judge Thompson, did indicate one area of concern:

> The magnitude of the undelivered and non-returned questionnaires, 34%, is regrettable at the least. During his testimony, the defendant's expert testified that it is possible at little cost to outsource obtaining better addresses for persons to whom questionnaires were not delivered or not returned. While not required by the JSSA or the District's Plan, securing or at least attempting to

---

[2] On information and belief, this audit process by the Administrative Office of the Courts has been initiated, but not completed. On information and belief, undersigned counsel understand that a committee has been appointed in this District to review the Jury Plan and/or jury selection system. Defendant respectfully reserves the right to seek leave to amend the record in this case when information becomes available from either of these undertakings that affects in any way the merits of this jury challenge.

> secure those addresses is wholly consistent with providing "all citizens … the opportunity to be considered for service on grand and petit juries … [as well as enabling them to fulfill their] obligation to serve as jurors when summoned …" 28 U.S.C. § 1861. The court should establish an internal policy which will insure that reasonable measures are undertaken that to the extent practicable the jury questionnaires are delivered to the citizens of this District.

R & R at 44-45. Although conspicuously absent from his 76-page R & R, during the evidentiary hearing, Magistrate Coody also expressed his assessment of the knowledge and training of the individuals in charge of administering the jury selection process in this district, stating: "It is abundantly clear that one, the Court staff don't fully understand either the plan or the operation of the computer program." (Transcript of proceedings at 369) (hereinafter, "T-" followed by the relevant page number). Finally, in concluding his R & R, Magistrate Coody quotes Justice Marshall's admonition that "[w]hen any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503-504, 92 S.Ct. 2163 (1972). While concluding that "this did not happen in this case," Magistrate Coody goes on to note:

> [T]his court has a duty to vigilantly insure that its system of jury selection is consistent with the strong statutory and constitutional policies prohibiting discrimination in the selection of jurors[citation omitted]. To fulfill this duty, the court, as it did following the decision in *Clay* should undertake a close review of that system to insure that the rights of the people of this district are protected.

R & R at 74-75.

The crux of the problem is that issuing opinions that identify significant problems with the jury system but do not have *consequences*, which include granting a new trial to the defendants indicted or convicted by juries that are selected through this admittedly flawed and dysfunctional system, and thereafter not following through on the Court's recognized duty to

ensure that discrimination is not continuing by this Court undertaking direct, active and hands-on supervision of the Clerk's Office simply will not address the problems that have been identified. The records in this case and *Carmichael* demonstrate beyond cavil that the Clerk's Office did not take the admonitions of Judge Thompson in *Clay* to heart, did not understand or faithfully implement the revisions to the Jury Plan designed to address the problems found by the Court in *Clay*, and continued to employ practices and procedures (and, by accident or design, adopt new ones) that undeniably continued to dilute the representation of African-Americans on the juries in this District, while disregarding or violating their duty under the JSSA, the Jury Plan, and the Constitution  to ensure fair representation of the entire community.

The hearings and evidence in this case, just as in *Carmichael*, paint a picture of a dysfunctional jury system which has had the over-arching effect of systematically excluding over one-third of African-Americans from the opportunity to serve on grand and petit juries in this District, that it has done so since at least 1997, and continued to do so as of the close of evidence in the instant jury challenge. Defendant submits that this process is contrary to the JSSA, the Jury Plan of this District, and the Constitution of the United States, and requires that he be granted a new trial before a fairly selected petit jury on an indictment returned by a fairly selected grand jury. Defendant therefore objects to the Magistrate's R & R to the extent that it finds otherwise as to each of these issues.

## I.  DEFENDANT OBJECTS TO THE FINDING OF THE R & R THAT THERE WERE NO SUBSTANTIAL VIOLATIONS OF THE JSSA AS TO THE 2001 QJW OR THE 2005 QJW.

The Magistrate denies all of Defendant's claims of substantial violations of the JSSA at pages 29-56 of the R & R.  Defendant objects to that ruling both as applied to his grand jury

which was drawn from the 2001 QJW and his petit jury which was selected from the 2005 QJW. Defendant addresses each of those claims in more detail in succeeding subsections.

### A. USE OF OUTDATED MAILING ADDRESSES

Defendant's evidence at the hearing showed that the use of outdated mailing lists by the Clerk in creating the QJWs resulted in an extraordinarily high number of "nondeliverable" jury questionnaires and "non-responder" jury questionnaires. The only JS-12 filed in this District as to either the 2001 or the 2005 QJW was filed on April 9, 2002. (Def. Exhibit 122.) It shows that out of 25,000 questionnaires mailed to create the 2001 QJW, 3,766 were returned as "nondeliverable" and 6,910 sent no response, and were classified as "non-responders." (*Id.*) This demonstrates that nearly 43% of the jury questionnaires in the first mailing for the 2001 QJW either were not received or not responded to. And, as the Magistrate found pursuant to the stipulation of the parties, out of the first mailing of 40,000 questionnaires sent out to create the 2005 QJW, 34% were either "non-deliverables" or "non-responders." [3] However, the R & R concludes that there was no authority "which indicates that the failure in this regard is a substantial violation of the JSSA or the Plan." (R & R at 43.)

Defendant objects to this finding on several bases. First, the R & R ignores the unrebutted evidence that many, perhaps as many as half, of the "non-responders" were in fact "non-deliverables," in that they were a product of outdated addresses. (T-621-623.) Second, the R & R ignores the unrebutted evidence based on Dr. Gundlach's analysis of census data that the proportion of African-Americans in the Middle District that were renters when compared to whites was 1.8, and the half life of mailing addresses of renters is one-third of home owners.

---

[3] The Magistrate noted that the rate of undelivered and non-returned questionnaires in relation to the creation of the 2005 QJW, at 34%, "is regrettable at the least." (R & R at 44). He recommended that the Court establish an internal policy to address this problem. (*Id*. at 44-45.)

As a consequence, the use of outdated mailing addresses contributes to the underrepresentation of African-Americans on the QJWs. (T-625-627; Def. Exhibit 1 at 27-30.)  Further, Defendant's unrebutted evidence showed that the out of date mailing addresses on the entire Master Jury Wheel (100,000 names) could be updated by a private service for no more than $350.00.[4] (T-627-628.) Dr. Gundlach's analysis, which was unrebutted by the Government, concluded that if the addresses were updated and a single follow-up letter was sent to non-responders (as was done prior to the 2001 QJW), the absolute disparity after the mailing of questionnaires would be reduced to between 5% and 6%, rather than the over 9% absolute disparity observed in the JS-12 filed on the 2001 QJW. (T-628-629.)  The Clerk's Office filed the JS-12 in April of 2002, and at least as of  that date, the data collected to complete that form showed both Jury Administrator Wanda Robinson (who collected the data) and Clerk of Court Debra Hackett (who reviewed and signed the form), that the 2001 QJW, as a product of the first mailing of 25,000 jury questionnaires, was 20.74% African-American, while the Middle District was (by the Clerk's figures) 30.0% African-American. (Def. Exhibit 122.) Further, that same data put the Clerk on notice that there was an extremely high rate (nearly 43%) of "undeliverables" and "non-responders." (*Id.*) As the R & R found, " [i]t is undisputed that the Clerk's office does not take affirmative steps to seek valid addresses for persons whose preliminary juror qualification questionnaires are returned to the Clerk's office or otherwise undeliverable." (R & R at 43.)

As the R & R correctly observes, "the JSSA only provides a remedy for substantial failures to comply with its provisions." (R & R at 30) (citations omitted). While equally correctly summarizing that "'the alleged violations must be weighed against the underlying principles of

---

[4]  Defendant's request for Court authorization to use such a service to demonstrate the number of address corrections it would yield (Doc. 147 at ¶ 12) was denied by the Magistrate. (Doc. 192 at ¶ 7).

the Act,'" and citing to *United States v. Gregory*, 730 F.2d 692, 698-700 (11th Cir. 1984) (R & R at 30), the R & R recognizes only two of the goals of the JSSA: random selection of jurors and determination of disqualifications, exemptions, and exclusions on the basis of objective criteria only. (*Id.*)  In doing so, however, the R & R overlooks the last portion of the holding in *Gregory*, which recognizes a third general principle:

> Mere "technical" deviations from the Act or even a number of them are insufficient if they do not frustrate the obtaining of jury lists that represent a fair cross section of the community and do not result in impermissible forms of discrimination and arbitrariness.

730 F.2d at 699.  *See also United States v. Davis*, 546 F. 2d 583, 589 (5th Cir. 1977) (holding that "[t]he major policy of the Act is that juries be 'selected at random from a fair cross section of the community") and 28 U.S.C. § 1861.

The failure of the Clerk's Office to use current mailing lists, send out follow-up letters, or, once on notice of a serious problem (high rate of "undeliverables" and "non-responders") and a problematic result (20.47% African in the QJW out of community that is 30.0% African-American), and their failure to take any steps to address either problem had a significant and direct effect on the underrepresentation of African-Americans on both the 2001 QJW and the 2005 QJW.  This is no mere technical violation of the JSSA; it goes to the very heart of one of the primary policies of the Act: that juries be selected at random from a fair cross section of the community.  When the QJW from which the juries are selected does not fairly represent the cross section of the community, it does not matter whether or not the juries are randomly selected from that QJW.  The deck is already stacked against the African-American community, and the resulting juries do not reflect a fair cross section of the jury. The R & R incorrectly denied Defendant's JSSA claim as to this violation.

## B. THE CLERK'S LIBERAL DEFERRAL PRACTICES

The R & R rejected Defendant's JSSA claim based on the liberal deferral practices of the Clerk.  (R & R at 39-42.)  There are a number of bases for Defendant's objection to this finding of the R & R.

First, despite the clear admonition of the Court in 2001 in *Clay* that the Clerk's policy of almost always granting deferrals "introduced a non-random element into the jury selection process, 159 F. Supp. 2d at 1367-68, and that this created a body of jurors who were "essentially self-selecting," *id*. at 1367, and that "[w]hite jurors requested [a deferral of service] at twice the rate of that of African-American jurors," *id*. at 1362, the Clerk continued this practice unabated throughout the entire 2001 QJW and into the 2005 QJW.  As the record in this case shows, and the R & R correctly held, "[t]he evidence shows that virtually 100% of the requests for temporary excuses are granted by the Clerk." (R & R at 39.) While the R & R finds that the Magistrate "does not give any credence to Dr. Gundlach's 'opinion' about whether the Clerk is complying with statutory requirements" (R & R at 40), curiously, the Magistrate thereafter fails to decide whether or not the Clerk's practice complies with the statute. (*Id.*)  Clearly the granting of "virtually 100% of requests" does not comply with a statutory standard that requires a showing of "undue hardship or extreme inconvenience."   28 U.S.C. § 1869(j). The same requirement is contained in ¶ 14(a) of the Jury Plan.  As the evidence in this case showed, the Clerk granted deferrals for the flimsiest of reasons and granted multiple deferrals to the same jurors for the same reasons without examining the jurors' past history of requests for deferrals. (Def. Exhibits 68-100 and 114-120.) The testimony of Jury Administrators Robinson and Myers and Clerk Hackett showed beyond any doubt that they were not even attempting to apply the

statutory standard. Defendant submits that the Clerk's deferral policy was a clear and substantial violation of the JSSA.

This practice, particularly in light of the notice that the Clerk's Office was provided in *Clay*, was not a technical violation of the JSSA for a number of reasons. First, as demonstrated by Defendant's evidence of jurors who received multiple serial deferrals for the virtually the same reasons, (*see*, *e.g.*, Def. Exhibits 114-120), jurors in the Middle District are essentially being allowed to opt in or opt out from jury service. In *United States v. Kennedy*, 548 F.2d 608 (5th Cir. 1977) the former Fifth Circuit held:

> That the introduction of predilections of prospective jurors affects the random nature of the selection process cannot be gainsaid. Surely a district would be in substantial violation of the statute if it selected all its jurors by randomly drawing names from the qualified wheel and allowing those selected to opt out at will.

548 F.2d at 612. While the R & R cites to the Boyd R & R and the Thompson Opinion to support its conclusion that the granting of virtually 100% of all deferral requests did not violate the "objective criteria" policy of the JSSA, the R & R does not rebut the argument that this policy impacts the equally important "random selection" policy of the JSSA, under the binding authority of *Kennedy*. Further, since Defendant proved, as the Magistrate correctly concluded, "that white jurors request temporary excuses at a rate of approximately twice that of black jurors," (R & R at 39), the granting of almost all deferrals created the large body of "previously deferred" jurors who were held in the deferral maintenance pool, which because of the different rate of deferral requests between whites and African-Americans contained a higher percentage of white jurors than the QJW itself. This set the stage for the further dilution of African-Americans by the violations of the 15% limit on previously deferred jurors. It also created a pool of proportionately whiter jurors which the evidence showed was recalled for jury service at a faster

rate than jurors who were summoned but did not serve,[5] thereby further diluting African-American representation on the resulting jury pools. As a result, the Clerk's deferral policy contributed to the violation of the fair cross section policy of the JSSA, and was therefore a substantial violation which requires a new trial.

At the end of the R & R, the Magistrate quotes from testimony from Dr. Gundlach regarding statistics as a tool, in which Dr. Gundlach concludes that no tool is perfect, in support of the Magistrate's conclusion that "we must do the best we can with what we have, an approach which apparently the defendants do not espouse when the jury selection process is involved." (R & R at 42 n. 52.)  Defendant has not ever argued that a jury system must be perfect. Defendant has argued, and will continue to argue, that a jury system must follow the statutes that apply to it, and that no court should continue to sanction—or ignore—practices and procedures which are in clear violation of those statutes and the Jury Plan and which have the admitted effect of diluting the percentage of African-Americans who have an opportunity to serve on juries in the Middle District.  The Clerk's deferral policy and practices—stubbornly and utterly unchanged from the practices criticized in *Clay*—are in violation of the unambiguous statutory standard for such deferral in the JSSA, 28 U.S.C. § 1869(j), and the parallel standard in ¶ 14(a) of the Jury Plan. This is not a question of "we must do the best we can."  It is a question of when this Court is finally going to require the Clerk to comply with the plain language of a statute that is an important part of the JSSA's function in ensuring the random selection of juries from a fair cross section of the community.

---

[5] *See* Thompson Opinion, 467 F. Supp. 2d at 1300 ("the average time between summonses of jurors who requested deferrals was seven months, whereas the average time between summonses of jurors who had been excused was 31 months").

## C.  THE VIOLATIONS OF THE 15% LIMITATION

Another substantial violation of the Jury Plan, and therefore the JSSA[6] occurred when the jury administrators violated ¶ 14(d)(ii) of the Jury Plan which imposes a limit of 15% of the total number of jurors "summoned for civil or criminal petit jury service."  As previously stated, Defendant's challenge pertains to both the grand jury which indicted him, which was drawn from the 2001 QJW, and the petit jury which convicted him, which was drawn from the 2005 QJW. The R & R denied Defendant's challenge based on the 15% limitation in both instances. (R & R at 31-34.)  Defendant objects to the Magistrate's findings on this issue and will address them individually.

First, the Magistrate finds that there could be no violation of the Jury Plan as to the selection of the grand jury because "[t]he fifteen percent limitation contained in the court's plan by its clear and definite terms applies only to the creation of jury pools for the selection of petit juries, not grand juries." (*Id*. at 31.)  In support of this finding, the Magistrate relies on the plain language of the Jury Plan, contending that there is no reason to look beyond this plain language. Based on this conclusion, the Magistrate further concludes. "With respect to grand juries, therefore, there is nothing inconsistent with the JSSA in the court's use of any number of deferred or excused jurors being selected to serve on a grand jury at the conclusion of the deferment so long as they are selected on a pure random basis." (*Id*. at 33.) Finally, the Magistrate rejects Defendant's argument that the limitation was enacted to ameliorate the problems that the Court identified in *Clay* by finding that this was "a remedial measure which arose in the context of problems relating to jury pools from which criminal petit juries were drawn, not grand juries." (*Id*.)

---

[6] A substantial violation of the Jury Plan constitutes a substantial violation of the JSSA. *United States v. Bearden*, 659 F.2d 590, 601 (5th Cir. 1981) (citing cases).

While superficially appealing, the Magistrate's argument is flawed in a number of critical ways. As the Magistrate indicates, "a court should look beyond the plain language only when the language expressed clearly an intent contrary to the plain language, or when absurd results would follow from implementing the plain language interpretation," citing *Alacare Home Health Servs., Inc. v. Sullivan*, 891 F.2d 850, 856 (11th Cir. 1990) (R & R at 32.) Both of those exceptions apply in the present circumstances. First, a careful review of the "Declaration of Policy" found in ¶ 2 of the Jury Plan, along with the language in ¶ 14(d)(ii) relied upon by the Magistrate indicates that the drafting of the Plan was less than precise when it used the term "jury" and that the absence or presence of the modifier "petit" or "grand" before that term cannot be relied upon as a demonstration of an unambiguous intention to exclude grand juries from the provision in question. In ¶ 2 of the Jury Plan, ¶ 2(a) speaks to the "right to petit juries" selected at random from a fair cross section of the community" and then goes on to state that "Petit juries for criminal matters and grand juries shall be selected proportionately by Division for the District at large." (*Id*.) The immediately succeeding subsections, ¶¶ 2(b) and 2(c), which address the Plan's policy relating to citizens' opportunity and obligation to serve as jurors and prohibition against discrimination in selection for service, respectively, specifically reference both grand and petit jurors or juries. Therefore, under the Magistrate's reasoning, the omission of a specific reference to grand jurors from the first part of ¶ 2(a) would evince an intent by the drafters of the Jury Plan to exempt grand juries in the Middle District from the key policies of the JSSA, random selection from a fair cross section. If the parallel language in the JSSA, 28 U.S.C. § 1861 is compared, it is apparent that the omission of a specific reference to grand juries from the first section of ¶ 2(a) was a mere oversight, as the Jury Plan's language (with the exception of the additional provision for district wide criminal petit juries and grand juries) in ¶¶ 2(a), (b) and (c)

closely tracks the language in the JSSA, which, significantly, *includes* grand juries in the policy relating to random selection from a fair cross section:

> It is the policy of the United States that all litigants in Federal courts entitled to a trial by jury shall have the right to *grand and petit* juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the Untied States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861 (emphasis added). Section 1862 thereafter provides:

> No citizen shall be excluded from service as a grand or petit juror in the district courts of the United States or in the Court of International Trade on account of race, color, religion, sex, national origin, or economic status.

Surely the drafters of the Jury Plan did not by this language evidence an intention to omit the randomness and fair cross section policies of the JSSA from the Middle District's Jury Plan, nor does the omission of grand juries from ¶ 14(d)(ii) evidence an intent to exclude grand juries from the provisions of the 15% limitation which was a product of *Clay*'s finding that, *inter alia*, the inclusion of a discretionary number of preciously deferred jurors contributed to "a non-random selection process that substantially violated the JSSA." *United States v. Clay*, 159 F.Supp.2d 1357, 1367 (M.D. Ala. 2001).

Second, the Jury Plan clearly intends that grand juries be selected subject to the same limitations and procedures as District-wide petit juries because the Plan's provision relating to the selection of grand jurors, ¶ 17, does not specify any  process for the selection of grand jurors that is different or apart from the selection of petit jurors. It is significant that the grand jurors are selected from the same QJW as petit jurors, that selection process is carried out by the same Jury Management System (JMS) computer program, and there is a complete integration of both selection processes. Jury Administrator Myers confirmed this when asked if she did anything

14

different when she created a pool for a grand jury as opposed to a pool that was going to be used to select a petit jury: "No, sir, not that I can recall. They are pulled District-wide just as the criminal juries." (T-386.) Additionally, if the Magistrate's reasoning were correct, then the other sections of the Jury Plan would not apply to grand juries or persons selected for a grand jury pool, most notably the remaining provisions of ¶ 14(d), which address service by persons excused or deferred. While ¶ 14(c) clearly authorizes the Clerk to "excuse or defer any person summoned for grand or petit jury service when it is determined that service by the person would entail undue hardship or extreme inconvenience," the language of ¶ 14(d) speaks first in terms of "person summoned for jury service" and thereafter prescribes the process for the selection of persons who have been deferred only in terms of selection on "a civil or petit jury." Consistent with the Magistrate's interpretation justifying a exception for grand juries from ¶14(d)(ii)'s 15% limitation, then under ¶ 14(d)(i), there would be *no* provision that authorized the selection of *any* previously deferred jurors for any grand jury pool. This is in direct conflict with the Magistrate's finding that the court could "use any number of deferred or excused jurors" on a grand jury "at the conclusion of a deferment so long as they are selected on a pure random basis." (R & R at 33.) Moreover, under the Magistrate's reasoning, the "plain language" of ¶ 14(d)(i) would mean that the inclusion of any previously deferred jurors in a grand jury pool would not be authorized by the Jury Plan. Since Defendant's grand jury was selected from a jury pool comprised at least 17% previously deferred jurors,[7] then an application of the Magistrate's statutory interpretation would prove yet another substantial violation of the Jury Plan by the inclusion of *any* previously deferred jurors, let alone the number actually in the grand jury pool.

---

[7] This reflects the *Government's* figure, based on their expert's more conservative definition of previously deferred jurors, which Defendant disputed. *See* Expert Witness Report of Government expert Stephen Elmore (hereinafter "Elmore Report") at Attachment X. The Elmore Report was admitted in the evidentiary hearing as Defendant's Exhibit 66.

Third, absurd results would follow from implementing the Magistrate's plain language interpretation. *Alacare*, 891 F.2d 850, 856 (11th Cir. 1990). If, as the Magistrate concludes, the Jury Plan does not put any limit on the number of previously deferred jurors on a grand jury, (R & R at 33), then the Jury Administrator could use the JMS computer function to include anywhere from 0% previously deferred jurors up to 100% previously deferred jurors, completely at her discretion. Since the deferral maintenance pool contains a significantly lower percentage of African-American jurors than does the QJW (Def. Exhibit 1 at 24; Thompson Opinion, 467 F. Supp. 2d at 1304)**,** the higher the percentage of jurors that are selected from the deferral maintenance pool, the lower the percentage of African-Americans on the jury pool. Therefore, if the Jury Administrator wanted to discriminate against African-Americans in the selection of a grand jury pool, all she would need to do would be to choose 100% of that grand jury pool from the deferral maintenance pool. By doing this, which the Magistrate concludes would be authorized by the Jury Plan and consistent with the JSSA, the Jury Administrator could, with one click of the mouse on her computer, take this District back to a process that replicated the very procedure condemned in *Clay*, where the number of jurors selected from a group of essentially self-selected, disproportionately white jurors was left at the discretion of the Jury Administrator. Such a process would be a substantial violation of the JSSA in two ways: it would vitiate the fair cross section policy, 28 U.S.C. § 1862 (which by its plain language applies to "grand and petit juries"), and would be contrary to the anti-discrimination provision in § 1863. *Clay*, and the provisions found in ¶ 14(d) of the Jury Plan were plainly intended to address the processes that resulted in the creation of jury pools that did not result in a random selection from a fair cross section of the community. To the extent that the Magistrate's parsing of the language of

¶ 14(d)(ii) in a vacuum seeks to exclude grand juries from the limitation adopted in the wake of *Clay*, the result would be both absurd and contrary to the JSSA.

Based on this deeply flawed interpretation of the Jury Plan, the Magistrate does not find it necessary to address Defendant's evidence of the significant violations of the 15% limitation found in ¶ 14(d)(ii) of the Jury Plan. Briefly summarized, Defendant's evidence showed that the jury administrators directly violated this provision of the Jury Plan in two ways. On five occasions during the life of the 2001 QJW, Jury Administrator Robinson manually transferred jurors out of the deferral maintenance pool and into the QJW. She did so as to 1093 deferred jurors. The JMS computer was unable to count these jurors when it attempted to apply a limit to the number of previously deferred jurors on jury pools selected after the manual transfers. (T-116; Thompson Opinion, 467 F.Supp.2d at 1303.) Thereafter, Jury Administrator Myers violated the 15% limit in four of the last five jury pools drawn from the 2001 QJW, with the percentage of deferred jurors drawn from the deferral maintenance pool ranging from 20.89% to 24.5%. (T-273-282; Thompson Opinion, 467 F. Supp. 2d at 1303.) As a result of these violations, even accepting the more conservative definition of the Government's expert as to previously deferred jurors, the 15% limitation was violated in 26 out of the last 44 pools selected from the 2001 QJW. [8] This included Defendant's grand jury pool, pool number 201040604, which contained at least 17% previously deferred jurors,[9] a clear violation of the Jury Plan's 15% limitation. (*Id.*) Moreover, Defendant's unrebutted evidence demonstrated that there was a statistical correlation between the number of previously deferred jurors in any pool and the underrepresentation of

---

[8] Again, this relies on the Government's more conservative figures. (Elmore Report at Attachment X.)

[9] Also based on the Government's more conservative figures found in the Elmore Report.

African-Americans. (Def. Exhibit 1 at 7-8.) As Judge Thompson summarized this same evidence in the *Carmichael* case:

> [T]he pool of deferred jurors continues to differ in its racial makeup from the qualified wheel, with the result that the defendants have been able to demonstrate a direct link between the inclusion of too many deferred jurors and the underrepresentation of African-American jurors in the pools.
>
> …[T]he violation of that limit is all the more troubling since it occurred in open contradiction to the jury plan and to the court's ruling in *Clay*…. It is significant that the plain violation of the 15% limit has contributed to the precise outcome that the limit was devised to guard against—increased underrepresentation of African-Americans in the jury pools.

467 F. Supp. 2d at 1304. While Judge Thompson writes that "[t]he question is a close one," he ultimately concludes that this violation was not substantial because "the jury administrators' control over the process is less egregious here than it was in *Clay*, when the administrators could ensure that previously deferred jurors would actually be included in the venires as a result of their preferential treatment." *Id*. Defendant respectfully submits that this conclusion is incorrect because the inclusion of too many deferred jurors affects the random selection of jurors by selecting too many jurors from a group of jurors that are disproportionately white (the deferral maintenance pool). Even if the selection of the specific previously deferred jurors from the deferral maintenance pool is done randomly, this affects the random selection of the jury pool as a whole because it is selecting those jurors from a group of jurors that was both self-selecting and different in racial make-up from the jurors in the QJW. That the effect is not as "egregious" as the effect found in *Clay* is of no moment, since any violation that has *any* impact on the randomness of the selection of juror names is substantial. *Davis*, 546 F.2d at 589. *See also United States v. Kennedy*, 548 F.2d 608, 612 (5th Cir. 1977) ("A departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation

independently of the departure's consequences in a particular case.").[10]  Moreover, because the inclusion of an excessive number of deferred jurors in violation of the Jury Plan had the effect of increasing the underrepresentation of African-Americans on the jury pools, the violation is substantial because it also violates the fair cross section policy of the JSSA.  The R & R incorrectly determined that Defendant's claim as to the selection process that resulted in the pool from which his grand jury was selected was not a substantial violation of the JSSA.

The Magistrate also denied Defendant's challenge as to the 15% limitation in regard to the 2005 QJW, based on his finding that "defendants presented no evidence that the Plan's 15% limitation was violated." (R & R at 33.)[11]  While there was no violation of the 15% rule, Defendant did argue that the decision by Jury Administrator Myers to include more previously deferred jurors in the jury pool that Defendant's grand jury was selected from, when contrasted was the next jury pool selected, demonstrates that the jury administrator can increase the underrepresentation of African-Americans by her discretionary decision as to the percentage of previously deferred jurors to be included in any pool. (Doc. 392 at ¶ 12.) The jury pool from which Defendant's jury was selected contained 29 jurors from the deferral maintenance pool (just under 10%). However, only three of these (10.45%) were African-Americans.  This contrasts with the composition of the jurors chosen for this pool from the 2005 QJW, which was 19.926% African-American. The overall racial composition of this jury pool was 19.0% African-American.  The inclusion of the 10% previously deferred jurors reduced the representation of

---

[10] The R & R also concluded, based on the analysis of the Boyd R & R as refined in the Thompson Opinion, that there was no violation of the randomness requirement of the JSSA. (R & R at 34.)  For the reasons set out above, Defendant objects to this conclusion.

[11] The R & R also discusses this issue at pages 46-49.  Defendant objects to the conclusions in that section relating to this aspect of the 2005 QJW also, for the reasons set out above.

African-American jurors in this pool by just over 0.9%. By contrast, the jury pool (Pool 201060405) selected immediately prior to Defendant's jury pool contained only 2% previously deferred jurors, and was comprised of 19.5% African-Americans. (Doc. 392, Exhibit B at ¶¶ 2-6.) To the extent that the Jury Plan permits the jury administrator to make a discretionary decision on the number of previously deferred jurors to include in any jury pool she selects,[12] thereby affecting the racial composition of the jury pools, the 15% limitation in ¶ 14(d)(ii) violates both the randomness and the fair cross section policies of the JSSA and is therefore a substantial violation which requires that Defendant be granted a new trial.

### D. THE "SCATTERING" VIOLATION

Defendant also argued that the JMS failed to comply with ¶ 14(d)(iii) of the Jury Plan in that the evidence showed that the computer did not randomly distribute the previously deferred jurors within the jury pool. The Magistrate rejects this argument for several reasons, all of which Defendant objects to. (R & R at 34-38.)

The Magistrate first rejects this ground based on his conclusion that ¶ 14(d)(iii) is applicable only to petit juries. Defendant objects to this conclusion for the reasons set out *supra* in Section I-C.

Dr. Gundlach's testimony and the evidence at the hearing established that the previously deferred jurors were not being randomly distributed in the jury pools. He reached this conclusion based on a statistical test to determine random placement, and found "significant clustering

---

[12] There was no evidence of any reason or purpose for the JMS software to allow these functions, which undeniably create an opportunity to discriminate. The 15% limitation was clearly intended to address the problems found in *Clay* by limiting the number of previously deferred jurors in any jury pool. This goal could be fulfilled by simply permanently setting the default on the JMS computer software at 15%, which would limit the number of previously deferred jurors as required by the Jury Plan, eliminate the opportunity to discriminate, and avoid negligent or intentional violations of the limit.

within the entire list of … the summons list as a whole, and then specifically among nine of those on that list [of 91 District-wide pools]." (T-593-600; Def. Exhibit 1 at 12-14.)  In regard to Defendant's grand jury pool, Dr. Gundlach found a cluster of previously deferred jurors toward the top of the list (seven out of the first ten jurors in the pool) and a second cluster toward the bottom of the list. (Def. Exhibit 37-B; T-600-603.)  Both Magistrate Boyd and Judge Thompson accepted Dr. Gundlach's conclusion "that the configurations of previously deferred jurors seen on the jury pools is highly unlikely to result from a statistically random dispersal of those jurors." 467 F. Supp. 2d at 1302.  Both judges, however, found that this did not constitute a substantial violation of the JSSA. *Id.* at 1302.   Magistrate Coody, however, rejects that conclusion, based on his contention that:

> Dr. Gundlach's scattering violation is premised on treating deferred or excused jurors differently from other jurors. In other words, the "incompletely implemented" randomization he described is observable only if jurors are separated into the sub-populations he described. But that separation and differential treatment is precisely what *Clay* decided and what the Court's Plan seeks to prohibit.

(R & R at 38.)  What the Magistrate appears to overlook is that the only way a statistical test can be used to determine whether or not one group is being randomly distributed among another group is to see how that first group is placed within the second, larger, group. The Magistrate conflates the test to determine randomness with the conclusion of nonrandomness. That is how a trained statistician measures for randomness, as Dr. Gundlach explained in his testimony describing the test he used. (T-594-595.)  The Jury Plan creates these two groups and segregates them, with the previously deferred jurors being maintained in a separate pool (the deferral maintenance pool), apart from the jurors in the QJW at large, and it does so in order to implement the limitations that were required by the Court in *Clay*, both as to the number of deferred jurors in any jury pool and the distribution of those jurors within the jury pool when

they are selected for a jury pool. The fact that a recognized statistical test looks at these groups separately in order to test whether the smaller group has been randomly distributed among the larger group in the ultimate creation of a jury pool is of no moment; it is simply a recognized method of statistical proof.[13] The method of statistical proof has no need to comply with the Jury Plan's prohibition of "separation and differential treatment;" it is simply a test to see if the clear requirement of ¶ 14(d)(iii) is being complied with. The unrebutted evidence in this case is that it is not.

Additionally, although the R & R does not reach this issue, Defendant submits that this constitutes a substantial violation of the JSSA. First, it clearly impacts on the randomness of the selection process, because by grouping previously deferred jurors in clusters at various points in the jury pool, the opportunity of those jurors to serve is impacted and far from random. Any violation that has any impact on randomness is a substantial violation. *Davis*, 654 F.2d at 589. And such an effect establishes a substantial violation independently of the departure's consequences in a particular case. *Kennedy*, 548 F.2d at 612. Additionally, because this violation relates to previously deferred jurors who constitute a group of jurors which is disproportionately white, the clustering also violates the fair cross section policy of the JSSA and therefore constitutes a substantial violation of the JSSA. For these reasons, the Magistrate erred in denying Defendant's challenge on this basis, and Defendant should be granted a new trial.

---

[13] If the Magistrate's analysis were correct, it would mean that it would be improper, for instance, to attempt to determine whether a school was integrated or segregated by counting the number of minority students and non-minority students (separating the two sub-populations) if such a measurement was being employed in an effort to insure integration of the school.

### E. "DOUBLE DRAW" POOLS

Also relating to the issue of compliance with ¶ 14(d)(iii), Defendant submitted evidence (T-595-598) and the Government's expert also noted in his Report (Elmore Report at Attachment XI)**,** that three of the pools selected from the 2001 QJW[14] in two, as opposed to one, draw had all of the previously deferred jurors selected in the second draw grouped together and consecutively in the jury pool. (T-595-598.) The Magistrate does not address this ground in his R & R. Judge Thompson found that:

> It is undisputed, however, that his dispersal of previously deferred jurors failed on three occasions during the life of the 2001 wheel when a need for additional jurors was identified after a pool had been drawn for a particular term, resulting in a second draw.

467 F. Supp. 2d at 1301. While recognizing that "litigants are not required to show that they were prejudiced by an impermissible jury selection practice," *id.*, citing *Kennedy*, 548 F.2d at 612, and concluding that "such a preferential grouping of a racially distinct subgroup of jurors violates the random-selection process is plain," *id.*, Judge Thompson nonetheless concluded that "the violation in the specific factual context of this challenge, was a technical one." *Id.* at 1302. This conclusion was based on the Court's finding that it was a result of a "software glitch," that the problem has reportedly been corrected (after the jury challenge), and there was no impact on any actual jury selected from the three pools. *Id.* All of these considerations are contrary to what Judge Thompson recognizes is the "settled law of the Eleventh Circuit," *id.* at 1301, set out in *Kennedy* that "A departure from the statutory scheme that directly affects the random nature of selection establishes a substantial violation independently of the departure's consequences in a particular case." Defendant submits that he has shown a violation of ¶ 14(d)(iii) of the Jury Plan, that the violation affects the random nature of selection and the fair cross section, and therefore

---

[14] Pools 202021004, 201040901, and 201050601. (T-598.)

constitutes a substantial violation of the JSSA.  The Magistrate's failure to rule on this issue was in error, and a correct application of the law to the facts as to this violation demonstrates that Defendant is entitled to a new trial.

### F.  VIOLATION OF ¶ 16(e) OF THE JURY PLAN

Defendant's evidence also showed that there was a clear and intentional violation of ¶ 16(e) of the Jury Plan, which provides that "jurors who are called but not needed or not chosen for actual service shall be deferred for one year and then placed back into the Qualified Jury Wheel." The undisputed evidence shows that Jury Administrator Robinson knowingly violated this provision by giving every juror a two year excuse, and that she never told anyone about this violation until it was discovered in the jury challenge process. (T-65-67.) Again, as Judge Thompson concluded in *Carmichael*:  "It is undisputed that instead of excusing such jurors from service for one year, the jury administrators were trained to, and did, excuse them for two years, in clear violation of the plan."  467 F. Supp. 2d at 1300.  Defendant also showed that jurors who were selected from the deferral maintenance pool received another summons in a much shorter period of time than jurors who were excused (which was exacerbated by a doubling of the excusal period for jurors affected by the ¶ 16(e) violation), and this contributed to a more rapid recycling of the jurors in the deferral maintenance pool than those jurors, including the excused jurors, who were held in the QJW. Since the jurors in the deferral maintenance pool were disproportionately white, the more rapid recall of these jurors contributed to the dilution of African-American underrepresentation on the jury pools. (Exhibit 1 at 24-26; T-529-531; Thompson Opinion, 467 F. Supp. 2d at 1300.)  This violation of the Jury Plan, and hence the JSSA, *Bearden*, 659 F.2d at 601, was substantial because it violated the randomness policy and the fair cross section policy of the JSSA.  The R & R failed to address this issue, and a correct

application of the law to the facts as to this violation demonstrates that Defendant is entitled to a new trial.

### G. FAILURE TO EMPTY THE QUALIFIED JURY WHEELS

Both the JSSA, in § 1863(b)(4) and ¶ 9(a) of the Jury Plan require that the jury wheel be emptied and refilled every four years. The Magistrate correctly concluded that "some persons who were placed in the 1997 QJW were somehow transferred to the 2001 QJW," and adopted Magistrate Boyd's analysis that since this involved "approximately five or six people" who never sat on a jury, there was no harm, and therefore no substantial violation. (R & R at 53.) The Magistrate further found that there was no evidence that any of these 1997 QJW jurors were selected on Defendant's grand jury pool. (*Id.*) The Magistrate also correctly concluded that ten jurors from the 2001 QJW were transferred to the 2005 QJW. Unlike the situation in regard to the grand jury pool selected from the 2001 QJW wheel, however, as the Magistrate found, juror participant number 100084263 was selected from the 2005 QJW for the jury pool in this case. That juror was not a qualified member of the 2005 QJW. Rather, that juror had been chosen from the 2001 Master Jury List and thereafter became a member of the 2001 QJW. That juror was never properly selected, or qualified for, the 2005 QJW. The Magistrate goes on to analyze the jury selection process in Defendant's case and conclude that since the juror from the wrong QJW was juror 267 on the jury list, that juror had no influence on the petit jury selection process at all, and "the defendants present no evidence to show that [the jurors improperly carried over from prior QJWs] were selected for jury service or in any detrimental way affected any jury selection process." Defendant objects to this conclusion of the Magistrate for the simple reason that the inclusion of all of these "carry-over" jurors on the QJWs and the additional inclusion of one of these jurors on Defendant's jury pool clearly impacted the randomness of the selection of

jurors from both QJWs by their mere presence. It is the clear and binding precedent of this Circuit that there is no need to show prejudice, as the substantial violation of the JSSA is established "independently of the departure's consequences in a particular case." *Kennedy*, 548 F.2d at 612. The Magistrate's conclusion is erroneous because it rests on a finding that Defendant failed to show a detrimental effect on his grand jury or petit jury, a showing that Defendant is not required to make under Eleventh Circuit authority.

### H. FAILURE TO COMPLY WITH THE DUTY TO SUPPLEMENT

The JSSA provides in § 1863(b)(2):

> The plan shall specify whether the names of prospective jurors shall be selected from the voter registration list or the lists of the actual voters of the political subdivisions within the district or division. The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title.

Curiously, the Jury Plan for the Middle District not only overlooks this statutory requirement, it directly contradicts the JSSA by specifically finding:

> To foster the policy and protect the rights secured by sections 1861 and 1862 of the Act, it is not necessary to resort to sources other than the voter registration lists. Accordingly, names of jurors shall be selected at random from the voter registration lists of the Counties that comprise the District.

Jury Plan at ¶ 5. In this regard, the Jury Plan itself is in clear violation of the JSSA.

More importantly, the evidence in this case shows that neither Jury Administrator Robinson nor Clerk Hackett fulfilled this statutory duty to supplement as to the 2001 QJW despite having actual notice that African-Americans were not being represented in fair proportion to their presence in the community. The testimony at the evidentiary hearing showed that the 2001 QJW was created from an initial mailing of 25,000 qualification questionnaires sent from a random selection of names from the Master Jury Wheel, which came from the voter

registration lists in the 23 counties comprising the Middle District.  In January of 2002, Jury Administrator Robinson began to collect the statistics necessary to fill out the JS-12, a form required  by the Administrative Office of the Courts which is, in the words of Judge Thompson, "presumably to document and guard against Sixth Amendment violations." Thompson Opinion, 467 F. Supp. 2d at 1308 n. 36. When that form was finally filed on April 9, 2002, after Clerk Hackett had reviewed and signed it, it showed that (according to the Clerk's own calculations) the QJW contained only 20.74% African-Americans, while the Middle District was comprised of 30.0% African-Americans. (Def. Exhibit 122; T-33-51.) Neither Jury Administrator Robinson nor Clerk Hackett took any steps in regard to this substantial underrepresentation of African-Americans on the QJW as revealed by the JS-12 filed on April 9, 2002.[15]  Moreover, Jury Administrator Robinson testified that during the time she held that position, her duties included meeting with the jury pools when they arrived and checking them in and that during this process she had observed that some of the pools appeared to have an unusually small number of African-Americans in them. (T-32.) When asked what she had done in regard to that situation, she testified, "I have not looked into the problem or discussed it with anyone." (T-32.)

It is clear that no steps were taken in the instant case to comply with the unambiguous mandate of 28 U.S.C. § 1863(b)(2), despite actual notice that African-Americans were substantially underrepresented in the 2001 QJW and the jury pools drawn from that QJW. The language of this statute and the legislative history relating to that provision shows that it was intended to impose an affirmative obligation to ensure a fair cross section of the community. *See*

---

[15] Nor was there any supplementation of the 2005 QJW.  It is noteworthy that, as of the close of evidence in this jury challenge, no JS-12 has been generated and filed by the Clerk's Office, despite the fact that, as of that date, the 2005 QJW had been in use since August of 2005, and at least fifteen District-wide pools had been drawn from it. Jury Administrator Myers testified that she was waiting for Ms. Hackett to tell her when to do the JS-12. (T-236-237.)

S. Rep. No. 891, 90th Cong., 1st Sess. 10-17 (1968) and H.R. Rep. No. 1076 90th Cong., 1st Sess. 4 (1968).  The Clerk's Office clearly failed to comply with this provision of the JSSA even though it was on actual notice that the fair cross section policy of the Act was not being fostered and the right to a fair cross section contained in § 1861 was not being protected.  The Magistrate's R & R does not directly address this issue, but its failure to find this was a substantial violation of the JSSA which entitles Defendant to a new trial was erroneous.

## I.  COMBINED EFFECT OF THE ADMINISTRATION OF THE JURY SYSTEM

The Magistrate also rejects Defendant's argument that the combined effect of the previously described violations of the JSSA, along with the substantial flaws in the JSSA software, the deficient training of both jury administrators,[16] and the complete and deliberate failure to employ a single procedure to verify that the JMS was selecting pools in compliance with the Jury Plan, constituted a substantial violation of the JSSA. (R & R at 54-56.)  The evidence in this case established each of these points beyond dispute. (*See, e.g.*¸ T-14-22; T-64; T-65-67; T-195-196; T-203; T-225; T-228; T-248; T-258; T-288-290; T-369; T-375; T-398-399; T-407; Thompson Opinion, 467 F. Supp. 2d at 1296-1297.)  The evidence also established that all of these factors had the effect of increasing the underrepresentation of African-Americans and compromising the randomness of the selection process, and that the complete absence of quality controls on the process or the work of the jury administrators kept the violations of the Jury Plan and the JSSA, and the resulting dilution of African-Americans on the jury pools, concealed from view or correction until the instant jury challenge.  Defendant submits that the combined effect

---

[16] Which clearly led to the Magistrate's statement that, "It is abundantly clear that one, the Court staff don't fully understand either the plan or the operation of the computer program." (T-369.)

of all these factors constituted a violation of the JSSA, and objects to the contrary finding in the Magistrate's R & R.

## II. DEFENDANT OBJECTS TO THE CONCLUSION OF THE MAGISTRATE'S R & R THAT HIS FAIR CROSS SECTION CLAIM UNDER THE SIXTH AMENDMENT SHOULD BE DENIED.

In pages 56 through 73 of his R & R, the Magistrate concludes that Defendant's fair cross section claim under the Sixth Amendment should likewise be denied. In essence, the R & R finds that Defendant failed to prove either the second (fair and reasonable representation requirement) prong or the third (systematic exclusion) prong of a prima facie case under *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664 (1979), as to both the 2001 QJW and the 2005 QJW. Defendant objects to these conclusions on the following specific bases.

### A. FAIR AND REASONABLE REPRESENTATION REQUIREMENT

In regard to this prong of the prima facie case under *Duren*, the R & R finds that Defendant failed to show an absolute disparity[17] of greater than 10% between the percentage of African-American citizens age eighteen and over in the Middle District (30.466%) and the representation of African-Americans on the 2001 QJW or the 2005 QJW.  (R & R at 59-70.)[18]

_____

[17] As the R & R notes at page 59 n. 66, Defendant has argued that a more accurate measure of underrepresentation is obtained by use of the relative disparity measure, which is especially appropriate in a community such as the Middle District where the minority population is nearly one-third of the community. (T-550-554.) The current authority in the Eleventh Circuit relies on the absolute disparity measure. Defendant persists in his argument that the measure that should be employed is relative disparity, and preserves this issue to present on appeal.

[18] To the extent that the R & R focuses solely on representation in the entire QJWs, it overlooks the fact that Defendant's challenge goes also to the *operation* of the JMS which includes irregularities that contributed to the underrepresentation of African-Americans on jury pools drawn from each of the two QJWs.  Where a challenge includes the systematic exclusion of a distinctive group *after* the creation of the QJW, then the focus should be on whether the jury venires reflect the percentage of the distinctive group, as explained by Judge Thompson in *United States v. Holstick*, 875 F. Supp. 2d 795, 798 (M.D. Ala. 1994). Defendant objects to the Magistrate's failure to consider this basis of proof of his Sixth Amendment claim.

In reaching this conclusion, the R & R relies in large part on Judge Thompson's analysis in *Carmichael* (quoted at length at pages 61-63 of the R & R) in which Judge Thompson concludes that Defendant failed to meet his burden of proof as to an absolute disparity of greater than 10% because Defendant's expert failed to identify the race of 546 jurors (out of 13,097) selected for District-wide pools from the 2001 QJW. There are a number of flaws in relying on this basis for finding that Defendant did not meet his burden of proving a prima facie case.

First and foremost is the simple fact that what is being assessed here is the sufficiency of a prima facie case. The proof of a prima facie case does not determine the ultimate issue; it simply shifts the burden to the opposing side. *Duren*, 439 U.S. at 368. The reason the race of these 546 jurors was not identified is that the only way the JMS captures data on jurors' race is when the jurors respond to their qualification questionnaires. For whatever reason, these 546 jurors were among the jurors who either did not identify their race or did not fill out this part of the questionnaire correctly. (T-48.) As the R & R notes, Judge Thompson concluded that there were two options for identifying the race of these 546 jurors that would lead to a "statistically defensible result:"

> [T]he first option would be simply to contact the non-identifying jurors and ask them their race, and the second option would be to obtain census-tract data and deduce the race of the non-identifying jurors from the racial makeup of the neighborhoods in which they live.

Thompson Opinion, 467 F. Supp. 2d at 1310 (footnote omitted). The second option would produce no more than a deduction of the jurors' race based on the racial makeup of the neighborhoods in which they live, which would rely on the assumption that all neighborhoods in the Middle District are racially homogeneous, *i.e*., segregated. And that deduction would then be lumped in with a far more reliable basis by which the overwhelming majority (nearly 96%) of the jurors' race was determined: written self-identification on a Government form. The first

option, which would fly in the face of the Magistrate's extensive precautions throughout this litigation to protect the names and addresses of all jurors, would put an insurmountable burden, both financial and time-wise, on Defendant by requiring him to use the mailing addresses of the 546 jurors to personally locate and interview all 546 jurors and ask them their race. Undersigned counsel has exhaustively reviewed written opinions in which the racial composition of QJWs and venires are discussed and has yet to find a single case where any court in the country has ever placed such a burden on a Defendant's statistical showing of a prima facie case, and neither Judge Thompson nor the Magistrate cite to any such case. Defendant submits that the reason such a burden has never before been placed on an defendant is that such a burden is inconsistent with the burden-shifting function of a prima facie case, and such a burden would be impossible to meet, thereby effectively precluding fair cross section challenges in every case except where the distinctive group was either completely excluded (and comprised more than 10% of the community) or the underrepresentation was so overwhelming as to subsume an adverse assumption of the effect of race on the unidentified jurors and still break the 10% barrier. Moreover, the fashion in which Defendant (and, significantly, the Government's own expert witness in this case, *see* T-544) computed these numbers is precisely the methodology employed by the Administrative Office of the Courts in the JS-12 form prescribed for the measurement of the representativeness of the QJW by the Clerk, and was used by the Clerk in this case. *See* Def. Exhibit 122 at 2 and T-48 and 50, indicating that the race of 1.82% of the QJW at that point was not known. This finding relies on an unprecedented, unfair and insurmountable burden on Defendant in making a prima facie showing as to the percentage of African-Americans represented in the QJWs and jury pools. As the Magistrate recognizes, "[b]oth the Constitution and the JSSA are concerned with fair representation and to reach that goal prohibit systematic

exclusion." (R & R At 59.) The burden placed on Defendant to identify the 546 jurors who failed to self-identify their race is utterly inconsistent with that primary goal of the Constitution and the JSSA.

Once this improper burden is removed, the evidence in this case, from both Defendant's expert and the Government's expert, clearly shows that Defendant made out a prima facie case as to the representation prong of a Sixth Amendment challenge. As summarized by Judge Thompson:

> [T]he parties agreed that the total number of African-Americans summoned to the 92 jury pools drawn from the 2001 wheel is 19.988% of the total number of jurors summoned. If this percentage is compared to the 30.466% of African-American representation in the relevant benchmark community—individuals age and citizenship-qualified for jury service in the 2000 census—then the underrepresentation of African-Americans in the venires is 10.478% above the 10% threshold, and, indeed, the magistrate so found.

Thompson Opinion, 467 F. Supp. 2d at 1308-1309 (quoted in R & R at pages 61-62) (*See also* Def. Exhibit 1 at 5-6; T-532-540; Elmore Report at Attachment X). Fifty-three of 91 District-wide jury pools underrepresented African-Americans by an absolute disparity of greater than 10%. Twenty-seven of the last 44 jury pools (when the violations of the Jury Plan were taking place), over 61%, had an absolute disparity of over 10%. (Def. Exhibit 14; Elmore Report at Attachment X.) Only *one jury pool* (out of 91) drawn during the entire 2001 QJW was comprised of more that 30% African-Americans *in a community that is comprised of 30.466% African-Americans.* (*Id.*) As a consequence, the R & R erroneously concluded that Defendant did not show an absolute disparity greater than 10% as to underrepresentation of African-Americans.

The Magistrate also finds that Defendant failed to make a showing of greater than 10% absolute disparity as to the 2005 QJW. (R & R at 60-61.) Defendant objects to this finding. First, the Magistrate relies on Defendant's analysis that showed the 2005 QJW was comprised of

21.84% African-Americans on February 15, 2005 for his conclusion that "[o]n this basis, the defendants fail to meet the second prong of the *Duren* test." (R & R at 60-61.) This finding ignores the simple fact that Defendant's challenge was not limited to the composition of the QJW, but included the composition of the jury pools that were drawn from that QJW and the effect of the procedures and practices of the Clerk's Office that further reduced the number of African-Americans actually drawn for jury pools. As Judge Thompson wrote in *Holstick*:

> If the challenge is to the alleged systematic exclusion of a distinctive group *after* the creation of the qualified wheel—for example, the contention that a distinctive group is being systematically excluded because of the process in which summoned jurors whose names are being drawn from the qualified jury wheel are being excused—then whether the qualified jury wheel sufficiently reflects the percentage of the distinctive group in the overall population eligible for jury service would not necessarily be informative; the focus should instead be on whether the jury venires reflect the percentage of the distinctive group in the overall population eligible for jury service.

875 F. Supp. at 798 (emphasis in original).

Thereafter, the Magistrate addresses Defendant's argument as to the 2005 QJW based on the jury pools drawn from the QJW as of the completion of the evidence in this jury challenge. Defendant's expert testified that, based on the process observed in the 2001 QJW where the underrepresentation of African-Americans increased over the life of the wheel due to the procedures used by the Clerk's Office, if the same problems were still present in the 2005 QJW, he would expect underrepresentation to increase as the 2005 QJW was used to select more pools. (T-549-550; Def. Exhibit 1 at 10.)[19] In addressing this ground (R & R at 61), the Magistrate

---

[19] The Magistrate also finds: "This opinion which is founded on no data is pure speculation." (R & R at 61.) The data on which this opinion was founded included his analysis of the 2001 QJW, which demonstrated a decline in the representation of African-Americans as the QJW was used over time and the observations of a decline in the percentage of African-Americans in the last five pools selected from the 2005 QJW prior to the close of evidence on this issue. (T-549-550; Def. Ex. 1 at 9-10; Doc. 392, Exhibit B at ¶¶ 3-6.) Defendant objects to this finding of the Magistrate.

inadvertently overlooked the supplemental evidence that he admitted which related to two additional jury pools, pool number 201060403 (the Scrushy jury pool) and pool number 201060405. (Doc. 392, Exhibit B at ¶¶ 3-6.) When this data is added to the data available at the hearing, it demonstrates that four of the last five District-wide jury pools selected from the 2005 QJW have all contained less than 20% African-Americans, an absolute disparity in excess of 10%. (Def. Exhibit 15; Def. Exhibit 1 at Appendix D; Doc. 392, Exhibit B at ¶ 3.) The jury pool from which Defendant's trial jury was selected, pool number 201060403, contained only 19% African-Americans, an absolute disparity of 11.466%. (Doc. 392, Exhibit B at ¶ 3.) Based on the unrebutted testimony of Dr. Gundlach regarding the trend he observed where the procedures of the Clerk's Office would increase the underrepresentation of African-Americans as the 2005 QJW was used for a longer period and the evidence relating to the last five jury pools drawn from the 2005 QJW, as well as the evidence that Defendant's jury pool contained only 19% African-Americans in a community comprised of 30.466% African-Americans, Defendant submits that the Magistrate's conclusion that Defendant failed to prove an absolute disparity greater than 10% as to the QJW was in error.[20]

The Magistrate makes two additional arguments, both of which Defendant objects to. First, the Magistrate attacks Dr. Gundlach's reliance on using the racial composition of the 91

---

[20] Obviously, the same argument that the Magistrate adopted from Judge Thompson relating to the jurors who failed to identify their race is applicable to the figures Defendant relies on in regard to the 2005 QJW. Defendant adopts the argument previously made in response to this analysis as it pertained to the 2001 QJW, and additionally submits that the burden would have been even more difficult to meet in regard to the 2005 QJW based on time constraints and the heightened concerns regarding the identity of the jurors in Defendant's jury pool, which precluded Defendant from access to even the juror participant numbers until the Magistrate entered an Order on Defendant's Second Motion to Supplement, (Doc. 373), on May 3, 2006. (Doc. 390).

District-wide pools as a measure of the representation of African-Americans over the life of the 2001 QJW, because, according to the Magistrate:

> Implicit in that approach is a claim that throughout its life a QJW must be maintained in a state where the absolute disparity between the percentage of African-Americans and whites is less than 10%. It is questionable whether this is attainable in the real world. But beyond that, the implicit claim raises serious practical and legal issues. As a practical matter, it is not at all clear how the requisite absolute disparity, once achieved, could be maintained without contravening the randomness requirement of the JSSA. As a legal issue, this non-remedial, seemingly race conscious approach raises serious, complex questions.

(R & R at 64-65) (citations omitted). Based on this analysis the Magistrate concludes, "these questions weigh on whether the longitudinal approach is legally permissible." (*Id.*)

Defendant submits that the Magistrate's choice of words reveals a fundamental, and troubling, perspective on the rights that the Sixth Amendment fair cross section requirement is intended to protect. The purpose of this requirement, and the same requirement in the JSSA, is to produce juries that are drawn at random from a fair cross section of the community, *not* juries that are drawn from a barely less than a 10% absolute disparity from a fair cross section of the community. The goal of the Constitution and the JSSA is fair representation of all segments of the community, not to devise or permit the continued perpetuation of a system that somehow over a period of years consistently underrepresents the African-American community by just less than the 10% absolute disparity countenanced by current Eleventh Circuit precedent. Defendant submits that the Magistrate, and this Court on review of the Magistrate's R & R, should be cognizant of the patterns that this jury challenge has demonstrated, and should be concerned with the fairness of the representation of African-Americans in the Middle District jury system. Certain evidence in this jury challenge on this point is not in dispute. When first created, the 2001 QJW contained only 20.74% African-Americans, as shown by the JS-12 generated by the

35

Clerk's Office. (Def. Exhibit 122.)  Over the life of the 2001 QJW, the Government's figures showed that the QJW contained 20.66% African-Americans. (T-692.) At the beginning of the 2005 QJW, the evidence showed that the 2005 QJW was comprised of 21.184% African-Americans. (R & R at 60.)[21] All of these figures reflect the representation of African-Americans in a jury system that continues to function *in a community that is comprised of 30.466% African-Americans.*  Moreover, these figures are measurements of the QJWs before any of the activities of the jury administrators and the JMS occur, which Defendant's evidence, as well as the Government's evidence (*see* Def. Exhibit 1 at 9 and 24-26; Elmore Report at Attachment X), demonstrate have the effect of further diminishing the presence of African-Americans on the jury pools drawn from the QJWs.  A single-minded focus on ensuring that representation is barely within the outer-most level of underrepresentation that the current law insulates from relief that includes a new trial to any defendant convicted by a jury selected from such a system simply misses the point.

More directly, the Magistrate's reasoning regarding the alleged need to continue to maintain "the absolute disparity," (R & R at 65), simply ignores the fact that the there is no authority for the proposition, suggested by the Magistrate, that once a QJW is created and barely slips by the 10% absolute disparity test, that nothing that occurs thereafter matters.  Such a conclusion would mean that the racial composition of subsequent supplementations to the QJW[22]

---

[21] It is also noteworthy that since the *Clay* litigation, this District has made *negative* progress in ensuring that African-Americans are fairly represented in the QJW. As Judge Thompson notes in *Carmichael*:  "The 1997 qualified wheel challenged in the *Clay* litigation, by contrast, showed an absolute disparity of 6.4% in the representation of African-Americans as compared to the general population, meaning that the 2001 wheel was a less accurate reflection of the community than its predecessor."  467 F. Supp. 2d at 1289.

[22] The evidence showed that after the initial 9,860 (from the first mailing of 25,000 questionnaires), the 2001 QJW was supplemented on various occasions, with a total of 22,229

would be utterly irrelevant to the question of whether or not the jury system met the fair cross section requirement of the Sixth Amendment or the JSSA.[23] Under such a standard, it would not matter even if subsequent supplementations were disproportionately white, thereby reducing the representation of African-Americans far below the 10% absolute disparity figure. It would not even matter if subsequent supplementations did not include a single African-American. That is not the law as it pertains to the fair and reasonable representation prong of the prima facie showing required under *Duren*.

Additionally, the Magistrate's reasoning once again overlooks, or seeks to insulate, events that occur after the creation of the QJW. In this case, that would include the violations of ¶¶ 12(a), 14(d)(ii), 14(d)(iii), and 16(e) of the Jury Plan and §§ 1863(b)(2) and 1869(c)(1) of the JSSA, all of which the evidence demonstrated had the effect of further reducing the representation of African-Americans drawn from the 2001 QJW. For this reason, the Magistrate's argument is gravely flawed, as confirmed by the holding in *Holstick*, 875 F.Supp. at 798 (approving of challenge based on alleged systematic exclusion *after* the creation of the qualified jury wheel).

Finally, contrary to the finding of the Magistrate that the only way to "maintain the absolute disparity" would be to contravene the randomness requirement of the JSSA, (R & R at 65), Defendant notes that it is relatively simple to ensure the fair representation of African-

---

questionnaires being mailed out after the initial mailing. The 2005 QJW was initially created with 17,137 qualified jurors from an initial mailing of 40,000 questionnaires and subsequently supplemented by the mailing of an additional 25,000 questionnaires in September of 2005. (Joint Stipulation of Defendant and Government dated February 9, 2007, Doc. 528 at ¶ 3.)

[23] Defendant continues to reference the JSSA's fair cross section requirement because all three decisions on these two jury challenges have applied a Sixth Amendment standard as to fair representation to the question of whether or not the jury system fails to foster the fair cross section policy of the JSSA, which Defendant objects to.

Americans so long as the jury system is maintained in compliance with the Jury Plan and the JSSA. First, that would require compliance with the statutory duty to supplement, 28 U.S.C. § 1863(b)(2) as soon as it was apparent (from generating the JS-12) that the QJW was substantially short of the fair cross section of African-Americans in this community, which is 30.466% (or at least spending $350 to update the mailing address and also following up on the non-responders). Second, it would require that the Clerk apply the statutory standard in administering deferrals. Third, it would require that the jury administrators comply with ¶ 16(e) of the Jury Plan by excusing jurors who are summoned but do not serve for only one year. Fourth, it would require the jury administrators to comply with the 15% limitation in ¶ 14(d)(ii) on previously deferred jurors in any jury pool. Fifth, it would require modification of the JMS software so that it would randomly distribute the previously deferred jurors in each jury pool, and thereby enable compliance with ¶ 14(d)(iii) of the Jury Plan. Contrary to the Magistrate's implication, it would not be necessary to somehow supplement the QJW with a "race conscious" approach. (R & R at 65.) Rather, it would only be necessary to start with a QJW that fairly represents African-Americans present in the Middle District (not just barely within the absolute disparity of 10% underrepresentation) and then follow the JSSA and the Jury Plan.

The second, and final, conclusion that the Magistrate reaches is that Dr. Gundlach failed to account for the effect of the fact that most civil trials occur in the Northern Division, and from there concluding that this failure "further demonstrates that the aggregating approach is not a reliable measure of the racial composition of the 2001 QJW." (R & R at 66-70.) Whether or not this process actually is occurring and affecting the composition of the District-wide jury pools in criminal cases, and there is no evidence to support such a conclusion save the speculation of the Magistrate based on his taking notice of the fact that the majority of civil trials take place in the

Northern Division, is of no moment.  The issue is, first, what is the composition of the District-wide jury pools and does that analysis show the pools drawn from the 2001 QJW are not fairly representative of the African-American community and, second, do these 91 pools comprise a statistically reliable sample of the 2001 QJW over time?  The evidence as to the first question is that 27 of the last 44 pools drawn from the 2001 QJW (more than 61% of the jury pools), the period in which the over-inclusion of previously deferred jurors was occurring, underrepresented African-Americans by an absolute disparity of more than 10%. (Def. Exhibit 14; Elmore Report, Attachment X at 2.) The evidence as to the second question shows that over the life of the 2001 QJW, the representation of African-Americans was either 19.966% (Defendant's expert's figure) or 19.988% (Government's expert's figure), an absolute disparity of more than 10%, and, significantly, that both the Defendant's expert and the Government's expert testified that this was an appropriate sampling method to determine the representation over the life of the 2001 QJW. (T-525; T-823.)

For all these reasons, Defendant objects to the findings of the Magistrate that Defendant failed to prove a prima facie case as to the reasonable and fair representation prong of the *Duren* test. Defendant submits that the Magistrate's conclusions on this issue are unsupported by the record or the law, and should not be adopted by this Court.

## B.  SYSTEMATIC EXCLUSION

The Magistrate also concludes that Defendant did not meet the third, or systematic exclusion prong, of the *Duren* test. (R & R at 71-73.)  In reaching this conclusion as to the 2001 QJW, the Magistrate relies on and adopts the findings and analysis of Magistrate Boyd and Judge Thompson that Defendant failed to demonstrate systematic exclusion. (R & R at 72.)  In addition, the Magistrate, relying on *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692, 534-535

(1975), *Duren*, 439 U.S. at 367, and *Eubanks v. State of Louisiana*, 356 U.S. 584, 586, 78 S. Ct. 970 (1958), draws the conclusion that a systematic exclusion must be "complete," "uniform," and "long-standing." (R & R at 72.) Defendant objects to these conclusions.

First, none of the cases cited by the Magistrate even begin to discuss what is necessary to prove a systematic exclusion, nor do they stand for the proposition that a process which results in underrepresentation of a distinctive group must be "complete," "uniform," and "long-standing." While each of those cases do use those terms, the Court used them to describe the procedure it was reviewing in each individual case. Each case simply found that the process or procedures which resulted in the underrepresentation in that case were sufficient proof that there was a "systematic exclusion" at work, and none of the cases discussed what was required for a prima facie showing in other circumstances or analyzed the concept in any fashion so as to suggest a test to determine the existence of systematic exclusion.

In fact, the cases which actually discuss what is necessary to prove *Duren*'s systematic exclusion prong are extremely few in number, most probably because so few jury challenges make it past the second prong of *Duren*. The few cases which actually do attempt to articulate a standard, however, stand in distinct contrast to the formulations relied on by the Magistrate in the instant R & R, as well as those used by Judge Thompson and Magistrate Boyd. *See*, *e.g.*, *United States v. Jackman*, 46 F.3d 1240, 1248 (2d Cir. 1996) (holding that third prong of *Duren* was met where clerk failed to follow procedure mandated by previous jury challenge decision because the underrepresentation was "quite obviously due to the system by which juries were selected."); *United States v. Rioux*, 97 F.3d 648, 658 (2d Cir. 1996) ("There is systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces."); *United States v. Warren*, 16 F.3d 247, 252 (8th Cir. 1994) (holding that defendant did not meet

systematic exclusion prong of *Duren* because, *inter alia*, "Nor has [defendant] shown that the administration of the juror selection plan is discriminatory."); and *Berryhill v. Zant*, 858 F.2d 633, 637-639 (11th Cir. 1988) (holding that "[f]actors outside the state's control may affect the makeup of the master jury list," but "[t]here is no dispute that this underrepresentation was the result of systematic exclusion; respondent does not dispute that the method of selection the commissioners used produced the demonstrated underrepresentation."). In *United States v. Green*, 389 F. Supp. 2d 29, (D. Mass. 2005), mandamus granted on other grounds directing district court not to implement portions of remedial order, *sub nom. In re United States of America, Petitioner*, 426 F.3d 1, 8 (1st Cir. 2005), the court indicated that for purposes of *Duren's* systematic exclusion prong, the court should determine whether the underrepresentation is "caused by happenstance (which is not actionable), or is it caused by official action or inaction of some sort (which may be actionable)[.]" 389 F. Supp. 2d at 51.

These decisions which, unlike *Duren*, *Taylor*, and *Eubanks*, actually articulate the reasoning behind a determination between a systematic exclusion and a non-systematic process, are far more helpful in guiding the decision as to whether or not the actions which resulted in the underrepresentation of African-Americans constituted systematic exclusion so as to meet *Duren*'s third prong. Defendant submits that the evidence here is clear: the underrepresentation in the Middle District was not due to happenstance, or outside forces beyond the Clerk's control. Rather, the underrepresentation was a product of a number of actions or inactions by the Clerk, all of which were an integral part of the system of jury selection in the Middle District, including: failing to update juror addresses and follow up with non-responders; failure to supplement either QJW when the initial mailing of questionnaires resulted in QJWs that contained only 20.74% (2001 QJW) or 21.184% (2005 QJW) African-Americans in a

41

community comprised of 30.466% African-Americans; failure to train and supervise jury administrators; failure to follow the statutory standard and granting nearly 100% of deferral requests; violations of ¶ 14(d)(ii) and (iii) of the Jury Plan; and violation of ¶ 16(e) of the Jury Plan. Defendant submits that the evidence in this case established that the cause of the underrepresentation of African-Americans was more than sufficient to meet the third prong of *Duren* by demonstrating systematic exclusion, and the Magistrate's conclusion to the contrary was erroneous.

Finally, in regard to the 2005 QJW, the Magistrate relies on his finding that since seven of the first thirteen jury pools drawn from the 2005 QJW: "had a disparity of less than 10% between the percentages of whites and African-Americans. It requires no extended analysis to conclude that a system which produces a majority of jury pools like these cannot be said to result in 'complete' exclusion over time." (R & R at 73.) First, the Magistrate apparently inadvertently misstated the absolute disparity test as "between the percentages of whites and African-Americans." Second, there is no legal authority requiring "'complete' exclusion over time." Third, this finding ignores the supplemental evidence as to two additional jury pools, which contained only 19.0% and 19.5% African-Americans, respectively, as well as the unrebutted evidence from Defendant's expert witness that the increasing incidence of jury pools which underrepresent African-Americans as the QJW is used over time was consistent with a recurrence of the pattern of increasing underrepresentation found in the 2001 QJW. While there was no proof of violations of the ¶¶ 14(d)(ii) and (iii) and 16(e) as occurred in the 2001 QJW, the jury administrator's discretionary choice as to the number of previously deferred jurors, the failure to update mailing addresses and follow up with non-responders, the failure to supplement a QJW which has only 21.84% African-Americans, and the failure to apply the statutory standard

as to deferrals continued into the 2005 QJW and were integral parts of the process that is now producing jury pools, including Defendant's, that had an absolute disparity as to African-Americans that exceeds 10%. Defendant submits that the evidence of systematic exclusion as to the 2005 QJW was more than sufficient, and the Magistrate's conclusion to the contrary was erroneous.

## III. DEFENDANT OBJECTS TO THE CONCLUSION OF THE MAGISTRATE'S R & R THAT HIS CLAIM UNDER THE FIFTH AMENDMENT's EQUAL PROTECTION CLAUSE SHOULD BE DENIED.

Defendant objects to the Magistrate's conclusions that his claim under the equal protection clause of the Fifth Amendment should be denied. (R & R at 73-74.)

In regard to Defendant's equal protection claim, the Magistrate finds that "there was no intentional discrimination in the operation of the jury selection system, and this claim fails." (R & R at 73.)  This finding overlooks a number of areas of evidence.  First, there was a prior judicial holding in *Clay* which put the Clerk of Court and the jury administrators on notice that granting almost 100% of deferral requests was creating a body of disproportionately white jurors in the deferral maintenance pool, and that any activity which increased the number of previously deferred jurors on any jury pool would cause increased underrepresentation of African-Americans.  They were also on notice of the changes in the Jury Plan, most notably ¶ 14(d)(ii) and (iii), which were intended to address the problem identified in *Clay*. Nonetheless, one jury administrator intentionally transferred 1093 previously deferred jurors out of the deferral maintenance pool with the express intention of moving the deferred jurors to a place where they would have a better chance at being called to serve (T-117); and the other jury administrator put more than 15% previously deferred jurors in four of the last five jury pools in the 2001 QJW. (T-275-285.) The JMS software permitted the jury administrator to use the DCHG function to move

43

the 1093 jurors and it also permitted the jury administrator to select the percentage of previously deferred jurors. Both of these functions, along with the knowledge that increasing the number of deferred jurors on a pool it decreased the representation of African-Americans, created an opportunity to discriminate. This constitutes a prima facie showing of an equal protection violation, which creates a presumption of discrimination, which the Government must then rebut by dispelling the inference of intentional discrimination and providing a legitimate explanation for the disparity. *Cunningham v. Zant*, 928 F.2d. 1006, 1013 (11th Cir. 1991); *United States v. Grisham*, 63 F.3d. 1074, 1081 (11th Cir. 1995). Since Defendant's evidence established a prima facie case as to his equal protection claim, and the Government did not produce any evidence to rebut it (save the bare denials of any intention to discriminate by the Clerk and the jury administrators), the Magistrate incorrectly denied Defendant's equal protection claim.

# CONCLUSION

For all of the foregoing reasons, Defendant respectfully submits that this Court, pursuant to its *de novo* review, should reject the conclusions of law and findings of fact contained in the Magistrate's R & R, and grant Defendant a new trial based on the grounds raised in this jury challenge, and such other and further relief that this Court deems just and necessary.

This 14th day of May, 2007.

Respectfully submitted,

Arthur W. Leach
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35203
Phone:  205-822-4224

/s/ James K. Jenkins
James K. Jenkins
Maloy & Jenkins
25th Floor
75 Fourteenth Street, NW
Atlanta, Georgia 30309
Phone:  404-875-2700

Frederick G. Helmsing
Helmsing, Leach, Herlong, Newman
    & Rouse, P.C.
P.O. Box 2767
Mobile, Alabama 36652
Phone:  251-432-5521

James W. Parkman, III
Richard Martin Adams
Parkman & Associates
739 West Main Street
Dothan, Alabama  36301
Phone:  334-792-1900

Attorneys for Richard M. Scrushy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of May, 2007, I personally filed the foregoing "Defendant Richard M. Scrushy's Objections to Magistrate's Report and Recommendation Denying Jury Challenge" with the Clerk of the Court using the CM/ECF system which will send notification of such to counsel of record.

/s/ James K. Jenkins
James K. Jenkins
Maloy & Jenkins
25th Floor
75 Fourteenth Street, NW
Atlanta, Georgia 30309
Phone:  404-875-2700