**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 2:05cr119-MEF |
| RICHARD M. SCRUSHY,<br>     Defendant. | |

**DEFENDANT RICHARD M. SCRUSHY'S SENTENCING MEMORANDUM,**
**MOTION FOR DOWNWARD DEPARTURE AND FOR A SENTENCE THAT, IN**
**THE EXERCISE OF THE COURT'S DISCRETION, IS SUFFICIENT, BUT NOT**
**GREATER THAN NECESSARY**

COMES NOW Defendant Richard M. Scrushy, by and through his undersigned counsel of record, and files this Sentencing Memorandum to assist this Court in the exercise of its discretion when imposing sentence upon him under 18 U.S.C. § 3553(a). This Memorandum also sets forth the grounds for a downward departure from the sentencing guidelines and requests that the Court impose a sentence, in the exercise of its discretion under 18 U.S.C. § 3553(a) that does not include a term of imprisonment. Such a sentence is "sufficient, but not greater than necessary, to comply with the purposes of sentencing and takes into account all the mitigating circumstances present in this case.

For the reasons stated below, Mr. Scrushy, mindful of the rancor involved in the litigation of this case and the collateral issues that have been associated with it from its inception, respectfully submits that after this Court dispassionately considers the facts and sentencing law applicable in this case, it should impose a sentence that does not include a term of imprisonment.

1

## INTRODUCTION

Mr. Scrushy believed, in good faith, that the contributions to the Alabama lottery campaign that lie at the core of this case were made for legitimate political purposes, and were no different in character than the hundreds of millions of dollars (if not more) that are contributed to candidates and political causes every year across the country. The conduct of Mr. Scrushy at issue in this case, particularly in light of the total absence of direct evidence of there having been an express *quid pro quo*, was no different in kind from that engaged in by upstanding citizens every day. He made a political contribution in hope of currying favor with an administration whose election he had not supported, much like people all across the country donate large sums to political parties and campaigns as a way to support the candidate or party of their choice or out of a sense of civic duty or due to devotion to their country and state and at times in part in the hope that they will obtain – but not with the express agreement that they will receive – appointed positions in government, access to express views, and assistance with legislation. *See, e.g.*, *The Bush Money Machine: Fundraising's Rewards. Pioneers Fill War Chest, Then Capitalize*, Washington Post, May 16, 2004, online at http://www.washingtonpost.com/wp-dyn/articles/A29142-2004May15.html

This article describes the typical process involved in campaign financing and the rewards in access and political appointments that are showered by office holders on those who contribute such political donations. Increasing access based on political contributions is a practice engaged in by politicians at all levels of government, including the Presidency, without facing prosecution or a prison sentence.

> For achieving their fundraising goals, Pioneers receive a relatively modest token, the right to buy a set of silver cuff

links with an engraved Lone Star of Texas (Rangers can buy a more expensive belt buckle set). Their real reward is entree to the White House and the upper levels of the administration.

Of the 246 fundraisers identified by The Post as Pioneers in the 2000 campaign, 104 -- or slightly more than 40 percent -- ended up in a job or an appointment.  A study by The Washington Post, partly using information compiled by Texans for Public Justice, which is planning to release a separate study of the Pioneers this week, found that 23 Pioneers were named as ambassadors and three were named to the Cabinet: Donald L. Evans at the Commerce Department, Elaine L. Chao at Labor and Tom Ridge at Homeland Security. At least 37 Pioneers were named to postelection transition teams, which helped place political appointees into key regulatory positions affecting industry.

A more important reward than a job, perhaps, is access. For about one-fifth of the 2000 Pioneers, this is their business -- they are lobbyists whose livelihoods depend on the perception that they can get things done in the government.

More than half the Pioneers are heads of companies -- chief executive officers, company founders or managing partners -- whose bottom lines are directly affected by a variety of government regulatory and tax decisions.

When Kenneth L. Lay, for example, a 2000 Pioneer and then-chairman of Enron Corp., was a member of the Energy Department transition team, he sent White House personnel director Clay Johnson III a list of eight persons he recommended for appointment to the Federal Energy Regulatory Commission. Two were named to the five-member commission.
. . .

The practice is not limited to one political party.  *See "President's Dinner, Bring the Lettuce*, Washington Post, May 11, 2007, online at http://www.washingtonpost.com/wp-dyn/content/article/2007/05/10/AR2007051002093_pf.html

Get ready, Goodrich.    Brace yourself, Bristol-Myers Squibb. If you haven't received the call already, a

Republican member of the House of Representatives is probably about to try to shake you down for big money.

It's springtime in Washington and lawmakers from both parties are once again hounding the political action committees of major corporations for huge donations. On the GOP side, this is done through the sale of tickets to the President's Dinner on June 13, an event so large that it has to be held in the Washington Convention Center.

House Republicans are taking nothing for granted. Their leaders last month sent out a 28-page instruction kit laying out exactly what rank-and-file members have to do to reach the dinner's multimillion-dollar goal. The kit includes a list of more than 225 companies, trade associations and lobbying firms that are proven benefactors of the National Republican Congressional Committee (NRCC), the House GOP's campaign organization.

. . .

Setting the sights high means a lot more pressure -- and in politics, a call from a sitting lawmaker is about as much pressure as can be exerted.

"When a member of Congress calls, particularly a senior member of Congress, we give that great weight," said Jeffrey H. Smith, head of lobbying at the law firm Arnold & Porter. "I don't think it's heavy-handed. It's the nature of politics these days." He added, "My impression is that many members are not a good deal more comfortable with it that we are."

. . .

A major selling point is that the more a donor contributes, the more access to Republican leaders he or she receives in return. Contributors who give or raise $100,000 are called "co-chairmen" and get to sit at the head table with President Bush. "Vice-chairmen" (who raise $50,000) sit at the head table but with House leaders. Table sponsors ($25,000 givers) do not sit at the head table, but do get a couple tickets to a presidential reception. And so on.

. . .

Democrats have a similar structure to their donor programs and, like the GOP, have had them for years.

. . .

House GOP lawmakers are encouraged to try to persuade PACs and individuals to sign up for programs that the NRCC conducts throughout the year, including the $4,999

> Leaders' Circle and the $50,000 Business Leadership Trust.
> As with the dinner, these donors receive more access to
> government officials the more money they contribute.

The above said, and much to Mr. Scrushy's disappointment, the jury disagreed with the premise of his defense.  And, although he maintains his innocence, and will vigorously pursue an appeal of his conviction after he is sentenced, Mr. Scrushy acknowledges that the Court will not consider, in any way helpful to him, his protestations of innocence when it sentences him.  However, he hopes that the Court will take into consideration when sentencing him the political context in which the contributions deemed to have been bribes occurred and the blurry line (and First Amendment interests implicated) between the lawful making of a contribution with the hope and expectancy of just currying favor or mending fences with the administration in office or of receiving an appointed position and doing so, unlawfully, in light of an express agreement from the elected official recipient that an appointment would be made in direct exchange for the contribution.  *See*, *e.g.*, *Buckley v. Valeo,* 424 U.S. 1 (1976) *(per curiam)*(finding violation of the First Amendment in regulations that placed a $1,000 annual ceiling on independent expenditures linked to specific candidates while upholding federal statutory restrictions on campaign contributions).

Nevertheless, accepting the jury's verdict – as he must, for the moment – Mr. Scrushy respectfully requests that this Court sentence him to a term that does not include imprisonment.  A sentence within this range is "sufficient, but not greater than necessary" to impose just punishment, protect the public, deter others and provide Richard Scrushy with correctional treatment in the most effective manner as required by 18 U.S.C. § 3553(a) and the specific statutory factors detailed in § 3553(a)(1) through

(a)(7).  It is a fair, just and reasonable sentence because (A) it reflects the history and characteristics of Mr. Scrushy – including his lack of criminal history, his ministry and undisputed philanthropy and good works, as well as his pre- and post-verdict public disgrace – considered in light of the nature of the bribery at the core of the case discussed above, *see* 18 U.S.C. § 3553(a)(1); (B) it complies with the purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); (C) it is available as a sentence the Court may impose, *see* 18 U.S.C. § 3553(a)(3)[1]; (D) it takes into consideration the advisory Sentencing Guidelines and Commentary, *see* 18 U.S.C. § 3553(a)(4)-(5); (E) it avoids unwarranted disparities, *see* 18 U.S.C. § 3553(a)(6); and (F) Probation has not recommended "restitution to any victims of the offense" because none exist, despite the government's argument to the contrary.

Each of these factors is addressed below, in order.

---

[1]  Since <u>Booker</u>, no provision of the guidelines is mandatory.  Hence, the restrictions in U.S.S.G. § 5C1.1(f) with respect to the components of any sentence and limits on probation imposed by Zone D, like all other provisions of the guidelines are advisory only.  <u>See United States v. Anderson</u>, 365 F. Supp. 2d 67 (D. Me. 2005) (imposing split sentence in case that would have required straight imprisonment under the zones in §5C1.1); <u>see also</u> <u>United States v. Winters</u>, 411 F.3d 967, 972 (8th Cir. 2005) ("We find no support for [the] argument that portions of the sentencing guidelines remain mandatory after Booker").

Moreover, none of the offenses of which Richard Scrushy stands convicted preclude imposition of a sentence of probation.  Hence, there are no limitations on this Court's discretion to impose a sentence that does not include a term of imprisonment.

## I.  THE HISTORY AND CHARACTERISTICS OF RICHARD SCRUSHY

### A.    From Respiratory Therapist to Entrepreneur and Employer of Thousands

Richard Scrushy, age 54, was born in Covington, Alabama on August 4, 1952 and was raised in a loving, modest Christian home with an older sister and a younger brother. His father worked for National Cash Register and his mother worked at the local hospital. The Scrushys attended the Methodist church, where Richard sang in the youth choir and participated in the Methodist Youth Fellowship. He was active in Boy Scouts and little-league baseball.  He started working as a young teen and has never stopped.  He has no criminal history.  He grew up in Selma, Alabama, where he attended George C. Wallace Community College between 1971 – 1972 after obtaining a GED.  He put himself through schools while holding down a job.

He moved to Birmingham, Alabama at the age of 20, in 1972, to attend Jefferson State Junior College, where he received an Associate Degree in Applied Science (Respiratory Therapy Technology) in 1974.  Also in 1974, Mr. Scrushy received a certificate in Respiratory Therapy from the University of Alabama, Birmingham.  Mr. Scrushy became a Registered Respiratory Therapist in 1977.

After he worked as a Respiratory Therapy instructor and program director between 1974 – 1979, and commencing in 1979, Mr. Scrushy was employed as a Regional Director of Respiratory Therapy in St. Louis, Missouri, by Lifemark Corporation, a hospital ownership and management company listed on the New York Stock Exchange.  He was eventually promoted to General Manager and Chief Operating

Officer, and was transferred to Houston, Texas, where he managed the ancillary contracting division.

After Lifemark merged with another company, he left its employ and moved back to Birmingham, at which time he founded AmCare, a predecessor to HealthSouth Corporation, which went public in 1986 and which eventually became the nation's largest provider of outpatient surgery, and diagnostic and rehabilitative healthcare services. As so many people who worked with him at HealthSouth describe him, Richard Scrushy was a visionary in his workHealthSouth remains a substantial company, based in Birmingham, Alabama, which, as of the filing of its latest Form 10-K/A, is "the largest provider of rehabilitative health care and ambulatory surgery services in the United States, with 978 facilities and approximately 33,000 full-and part-time employees." HealthSouth Corporation, SEC Form 10-K/A, Amendment No. 1, filed March 22, 2007, at 4, http://www.sec.gov/Archives/edgar/data/785161/000137886207000009/form_10ka-2006.htm

### B.    The Philanthropist

As will be detailed for the Court at sentencing, Richard Scrushy has been a committed philanthropist to small and large causes. His support of causes that helped people in need, particularly children has not just been limited to financial support. He has given generously of his personal time.

One of his philanthropic projects was *Dream on Wings*, an organization that takes children struggling against serious illnesses and their families on airplane rides. This was done with volunteer planes and people. Richard Scrushy supported this project with both money and personal time.

In Selma, Alabama where he grew up, he supported the community before, during and after the success of HealthSouth. He funded charitable projects including in particular a building addition to the public library. This is a gift that keeps on giving to young and old and exemplifies the type of contributions that Richard Scrushy makes to his community and its people.

Richard Scrushy has also supported the work of the Alabama Sheriff's Youth Ranches, which provides dramatic, solid and long-lasting benefits to the children who pass through that program. This program provides homes for abused, abandoned, and neglected school age children at four rural Ranches statewide.

His philanthropy is not limited to supporting established projects. As the letters that will be submitted to the Court attest, Richard Scrushy is someone who people can count on for financial, emotional and spiritual support in their time of need. He has provided spiritual support to seriously ill persons, who needed help and also took care of their basic necessities of life.

Richard Scrushy is someone who impresses people who meet him with his dedication to his family, his spirituality and his integrity. He reaches out to help those in need. And he rarely turns anyone away.

He has been a benefactor of Troy University serving on its Board of Trustees, co-chairing fund raising events to establish scholarships, and donating a million dollars to the institution. He has also served on the Boards of Trustees for Birmingham-Southern College, and the University of Alabama. For six years, he served as chair of the Alabama Sports Hall of Fame. He has actively supported United Cerebral Palsy, the Arthritis Foundation, Jefferson State Community College, Lawson State Community College, the

University of Alabama at Birmingham, Big Oak Ranch, the March of Dimes, and many others.

In sum, Richard Scrushy has been a committed philanthropist for many years. He has made many donations of time and money to a number of needy causes. His financial contributions total an amount that was much greater than the $500,000 political contribution that is the subject of this prosecution.

### C.    A Minister and Man of Good Works

In 2004, Richard Scrushy was ordained a minister. After a lifetime of hard work and success as the Chairman and Founder of a Fortune 500 company, and most importantly as a husband and father, he has found his true calling with his Christian ministries preaching and helping others.

Richard's ministry affects people from all walks of life. He is the pastor of Grace and Purpose Church, which also has a television ministry. He also is doing immensely needed work with Kingdom Builders International Ministries, which focuses on missions, evangelism, and education. Through these ministries, he provides financial support for orphanages and local churches in the United States, Africa and South America. His contributions allow local churches to provide social outreach services and simply to provide food, shelter and clothing to their communities.

In sum, Richard Scrushy's charitable activities with Kingdom Builders International Ministries provide food, shelter and clothing for thousands of needy children. His contributions are greater and more substantial than those of some entire countries. To accomplish what he has in this area requires not just financial support. It

requires countless and tireless hours of his time and energy. It requires a devotion and contribution of himself that few of us are willing or able to give.

A more detailed description of Richard Scrushy's work, through letters and pictures, will be presented to the Court at sentencing.

## II. SERIOUSNESS OF THE OFFENSE, ADEQUATE DETERRENCE AND PROTECTION OF THE PUBLIC

A sentence that does not include a term of imprisonment would be "sufficient, but not greater than necessary," 18 U.S.C. § 3553(a), to satisfy the public interest in incapacitation, retribution, and deterrence. First, § 2C1.5, the guideline that most closely addresses the crime, which the government alleged against Richard Scrushy – making a contribution for the purpose of being appointed to the CON Board – results in a sentencing range that does not require imprisonment.

Second, Richard Scrushy acted with little or no mens rea and poses no risk of recidivism. He made the contribution and agreed to sit on the CON Board at the express request of Elmer B. Harris, a respected business leader, the Chairman, President and CEO of Alabama Power Company, and a life-long Republican who served as the Chairman of then Governor-elect Siegelman, a Democrat, out of a sense of public duty and loyalty to the Corporation he headed and the citizens and state of Alabama. As he viewed it, "What is good for Alabama is good for Alabama Power."

It was Elmer Harris who persuaded Richard Scrushy to mend fences with Siegelman, whom he had opposed in the election. It was Elmer Harris who personally asked Richard to accept another term on the CON Board. After all, Richard Scrushy had served other Alabama Governors on the CON Board and during his previous term had

resigned his seat on the CON Board early because of the amount of work it took to be a diligent member of that Board. If Richard Scrushy so wanted to sit on the CON Board that he was willing to pay a bribe to do it, why resign early. It was Elmer Harris who recommended to Governor Siegelman to get to know Richard Scrushy and who recommended Scrushy for the CON Board. Richard Scrushy's motivation in making the contribution was based on the same motivations that drove Elmer Harris to serve as the elected governor's Transition Team Chair.

Third, Richard Scrushy has turned to the ministry, where there is zero chance that he will ever be tempted to or willfully commit another offense. Moreover, at his age and after the torment of the past several years and with the support of his wife, who is also a minister, the likelihood of recidivism is nil.

Lastly, every other circumstance in this case suggests that a sentence that does not include imprisonment is sufficient to comply with the purposes of sentencing and takes into account the mitigating circumstances of the case.

## III.   APPLICATION OF THE ADVISORY SENTENCING GUIDELINES, INCLUDING CONSTITUTIONAL CHALLENGES, AND REQUEST FOR A DOWNWARD VARIANCE

### A.   Constitutional Due Process, Confrontation Clause, and Jury Trial Guarantee Challenges under the Fifth and Sixth Amendments.

Mr. Scrushy objects to any and all determinations in the Presentence Investigation Report ("PSR") that are based on facts that were not charged in the Indictment nor necessarily found by the jury beyond a reasonable doubt. He also objects to findings to be made by the Court at sentencing on a preponderance standard on the basis of information that is not subject to confrontation and not sufficiently reliable to comport

with the rights guaranteed to him under the Indictment and Due Process Clause of the Fifth Amendment and the Confrontation Clause and jury trial guarantees of the Sixth Amendment.  *See e.g.*, *United States v. Booker*, 543 U.S. 220, 319 n.6 (Thomas, J. dissenting in part from the remedial opinion) ("The commentary to § 6A1.3 states that '[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.'  The Court's holding today corrects this mistaken belief.  *The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant*.) (emphasis added).[2]

In *Blakely v. Washington,* the Supreme Court held that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  542 U.S. 296, 303 (2004) (emphasis added).  *Booker* did not purport to vary this definition of statutory maximum.  Thus, the Fifth Amendment requires that any fact that increases the sentence, even if the ultimate sentence is within the range set forth for the offense under the United States Code, must be proved beyond a reasonable doubt.

Moreover, Mr. Scrushy objects to imposition of a sentence in a manner that applies a preponderance standard while giving the guideline calculation any presumptive weight of reasonableness; or that requires that a sentence below the guidelines be

---

[2]  Of course, the Supreme Court held, in the majority opinion in *Booker*, that under the Sixth Amendment, "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."  543 U.S. at 244.

justified based on extraordinary circumstances; or that gives the guidelines more weight that any of the other factors set out in 18 U.S.C. § 3553(a). *See Cunningham v. California*, __ U.S. __, 127 S.Ct. 856 (2007) (holding California sentencing scheme unconstitutional because it involved enhanced punishment based on judicial fact-finding, explaining that reasonableness requirement was not sufficient to comply with Sixth Amendment requirements); *See also Claiborne v. United States,* __ U.S. __, 127 S.Ct. 551 (*cert. granted*, Nov. 3, 2006) (question presented whether requiring that extraordinary circumstances attend a sentence varying substantially from the Guidelines violates the jury trial guarantees upheld in *Booker*); *Rita v. United States,* __ U.S. __, 127 S.Ct. 551 (*cert. granted*, Nov. 3, 2006) (whether it is consistent with *Booker* to accord a presumption of reasonableness to a within-Guidelines sentence).

The plain language of § 3553(a) gives no preference to the guideline calculation or to any of the other factors set out therein. *See*, *e.g., United States v. Hunt*, 459 F.3d 1180, 1184 -1185 (11th Cir. 2006) (presumptions, which are "burden-shifting tools" are not useful in discussing the weight to be given to the guidelines post-*Booker)*; *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005) ("To say that a sentence within the Guidelines range is "by itself" reasonable is to ignore the requirement that the district court, when determining a sentence, take into account the other factors listed in section 3553(a)"); *see also United States v. Reinhart*, 442 F.2d 857, 864 (5th Cir. 2006) (Guidelines are now "one sentencing factor among many"). Giving any one factor greater weight than the others is inconsistent with § 3553(a)*. See United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005) (presuming a Guidelines sentence comes dangerously close to pre-Booker practice held unconstitutional); *United States v. Zavala*,

443 F.3d 1165, 1170 (9th Cir. 2006) (Guidelines are one of several factors, not the "locus from which to deviate").

Although the Eleventh Circuit has rejected the constitutional arguments, Richard Scrushy hereby asserts his rights to these Constitutional protections in this Court – thereby preserving arguments for appeal – whose parameters in the sentencing context have not yet been resolved by the Supreme Court. *See United States v. Smith*, 480 F.3d 1277, 1281 (11th Cir. 2007) (rejecting Sixth Amendment challenge to preponderance standard at sentencing); *United States v. Thomas*, 446 F.3d 1348, 1355 (11th Cir. 2006) (rejecting Fifth Amendment challenge to preponderance standard at sentencing); *United States v. Baker*, 432 F.3d 1189, 1254 n.68 (11th Cir. 2005) (Court refuses to extend the holding of *Crawford v Washington.*, *541 U.S. 36*, 67 (2004) ("Where testimonial evidence is at issue, … the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.") to apply to sentencing proceedings: "Crawford does not address the use of hearsay, testimonial or otherwise, at sentencing, and we will not extend its holding to the sentencing context … without further guidance.").

### B.     Application of the Advisory Sentencing Guidelines

As this Court is well-familiar, post-*Booker*, the Sentencing Guidelines and their applicable Commentary are now advisory, and although they must be calculated for each defendant, their application is merely one of the statutory factors set forth in 18 U.S.C. § 3553(a) that a sentencing court must consider when imposing sentence, which sentence is ultimately reviewed for reasonableness.  As articulated by the Eleventh Circuit recently in *United States v. Crawford*, 407 F.3d 1174, 1178-79 (11th Cir. 2005):

> A sentencing court under *Booker* still must consider the Guidelines, and, such consideration necessarily requires the sentencing court to calculate the Guidelines sentencing range in the same manner as before *Booker*. In other words, as was the case before *Booker*, the district court must calculate the Guidelines range accurately. A misinterpretation of the Guidelines by a district court effectively means that the district court has not properly consulted the Guidelines. After it has made this calculation, the district court may impose a more severe or more lenient sentence as long as the sentence is reasonable, *see Booker*, 125 S.Ct. at 767 ("The courts of appeals review sentencing decisions for unreasonableness."), but the requirement of consultation itself is inescapable.

(Citations, brackets, and internal quotation marks omitted).

With the foregoing in mind, and in light of (A) the detailed factual recitation of the case set forth in the letter, dated May 3, 2007, from Arthur W. Leach to Ms. Jacquelyn P. Caple, Senior United States Probation Officer, attached hereto as Exhibit 1; (B) Mr. Scrushy's objections to "The Offense Conduct" paragraphs of the PSR, also set forth in the May 3, 2007 letter that is Exhibit 1 attached hereto, as well as in a letter from Mr. Leach to Ms. Caple, dated May 10, 2007, attached hereto as Exhibit 2; and (C) Mr. Scrushy's objections to the proposed application of various Guidelines provisions, as noted in the final PSR, as articulated in both the May 3, 2007 and May 10, 2007 letters, attached hereto as Exhibits 1 and 2, and in a letter dated May 10, 2007, from Carmen D. Hernandez to Ms. Caple, attached hereto as Exhibit 3,[3] Mr. Scrushy submits that a proper computation of the Sentencing Guidelines requires application of U.S.S.G. § 2C1.5.

Section 2C1.5 applies to cases involving a payment, offer, or promise or offer of anything of value to a person in consideration of procuring appointive office. This in fact

---

[3]    All of the objections, factual recitations, and legal arguments set forth in Exhibits 1, 2, and 3 are incorporated herein. The details of each of these objections, recitations and legal arguments will not be repeated here.

is the essence of the allegations of wrongdoing against Mr. Scrushy (i.e., that he made a contribution for the purpose of seeking appointment to the CON Board). Section 2C1.5 provides for a base offense level of 8 and no additional enhancements.

Section 2C1.5 renders a **Total Offense Level of 8**. Because Mr. Scrushy indisputably falls within **Criminal History Category I**, this Court should determine his Sentencing Guidelines Range to be **0-6 months**.

The foregoing 0-6 month range rendered by Mr. Scrushy's proposed application of the Sentencing Guidelines does not factor in the Specific Offender Characteristics provisions of Chapter 5, Part H, nor the Departures provisions of Chapter 5, Part K of the Guidelines that should be considered by this Court. Mr. Scrushy has argued the application of several of these factors in Mr. Leach's May 3, 2007 letter to Ms. Caple, Exhibit 1, and he will not repeat his detailed arguments here.

## IV.   DOWNWARD DEPARTURES AND CONSIDERATION OF § 3553(A) FACTORS

Following are the factors and circumstances, alone and in combination, that warrant a reduction from the guideline range. These include:

1.   28 U.S.C. § 994(j)

2.   18 U.S.C. § 3553(a)(1)-(7)

3.   Outside the heartland of the offense, USSG 5K2.0

4.   Loss amount over-represents the culpability of the defendant and the seriousness of the offense, USSG 5K2.0 and 2B1.1, comment (n. 15).

5.   Lesser Harms, USSG 5K2.11

6.   Aberrant Behavior, USSG 5K2.20

7.   Post-Offense Rehabilitation, USSG 5K2.0

8.    Employment Record, USSG 5H1.5

9.    Family Circumstances, USSG 5H1.6

10.   Civic, Charitable and Public Service, USSG 5H1.11

For all the reasons set out in part in Mr. Scrushy's factual recitation, the Court should impose a sentence that does not involve a term of imprisonment. Such a sentence would comply with the statutory mandate in 18 U.S.C. § 3553(a) requiring the Court to impose a sentence that is "sufficient, but not greater than necessary" to promote just punishment, protect the public, and provide the defendant with needed rehabilitation. It also would comply with Congress' directive, which is not fully implemented in the guidelines, that a defendant, who is a first offender and has not been convicted of a crime of violence or an otherwise serious offense should receive a sentence other than imprisonment. See 28 U.S.C. § 994(j).

**1.    Outside the Heartland and Upward Adjustment Overrepresents Seriousness of Offense and Defendant's Culpability**

As noted, there was no specific personal gain to Mr. Scrushy nor loss to the State of Alabama in this case, placing it well outside the heartland of bribery cases. In the main, bribery prosecutions involve both a personal gain to one or more individuals and a corresponding loss to the state or government. It is for that reason, that a specific offense characteristic with respect to the value of the benefit is included in § 2C1.1. Accordingly, it is clear that the Commission would have viewed as the ordinary or heartland case one where no monetary gain was received directly by either the person who provided the payment nor the one who received the payment.

For that reason also, were the Court to impose a 14-level enhancement from the loss table, the resulting offense level would both overrepresent the seriousness of the offense and Mr. Scrushy's culpability.  See e.g., United States v. Walters, 87 F.3d 663 (5th Cir. 1996) (downward departure where defendant did not personally profit from money laundering scheme); United States v. Broderson, 67 F.3d 452 (2d Cir. 1995) (Downward departure based on a "confluence of circumstances ... not taken into account by the guidelines," including loss overstated seriousness of fraud and defendant had not personally profited financially from his fraudulent conduct); United States v. Oakford Corp, 79 F. Supp. 2d 357 (S.D. N.Y. 2000) (downward departure of 13 levels granted where offense level would substantially overstate the seriousness of the offense as "each defendant personally realized only a small portion of the overall gain or profits of $15 million"); United States v. Hemmingson, 157 F.3d 347 (5th Cir. 1998) (downward departure where offense did not fall within the heartland of the money-laundering guideline; court applied fraud guideline in campaign contribution case where defendant convicted of interstate transportation of stolen property, money-laundering, and engaging in a monetary transaction with criminally derived property, and one of them was also convicted of making false statements to a federal agent.)

Hemmingson  is of particular relevance because it involved a campaign finance violation charged as a violation of the money laundering statute, which primarily targets large-scale moneylaundering, involving  the proceeds of drug trafficking or other types of organized crime.  Hemmingson involved the use of a conduit to conceal the infusion of corporate funds into a political campaign.   See also United States v. Krilich, 159 F.3d 1020 (7th Cir. 1998) (district court has discretion to depart down in bribery case

involving application of U.S.S.G. § 2C1.1 based on the application notes in the fraud guideline, which explain or limit the loss table and allow departure where loss overstates the severity of defendant's offense because § 2C1.1 incorporates the loss table).

**2.      Lesser Harms, U.S.S.G. § 2K2.12**

In this case, another reason for departing downward is U.S.S.G. § 5K2.12.  The political contributions made to AELF, with no specific financial gain to Mr. Scrushy certainly did not involve the harms that Congress sought to be prevented by the bribery statute.  At most, the conduct is more akin to that prohibited under 18 U.S.C. § 210, a misdemeanor that proscribes the offer or payment of money to procure appointive office. See United States v. Bernal, 90 F.3d 465 (11th Cir. 1996) (affirming downward departure for defendants convicted of violating Lacey Act and Endangered Species Act for attempted export of endangered primates to Mexico where court found that defendants' conduct did not threaten harm sought to be prevented by statutes as defendants did not intend to harm the primates but intended to use the gorilla for breeding purposes).

**3.      Post-Offense Rehabilitation, U.S.S.G. § 5K2.0, Civic, Charitable and Public Service, USSG 5H1.11, and 18 U.S.C. § 3553(a)**

Mr. Scrushy's post-offense rehabilitation, where the ministry, good works and charitable contributions are his main purpose in life also warrants a downward departure. See PSR at ¶¶ 57-58.  See also United States v. Clay, 2007 WL 968837, *2, __ F.3d __ (11th Cir. Apr. 3, 2007) (downward departure to 60 months from guideline range of 188 months reasonable in light of defendant's extraordinary post-offense rehabilitation); United States v. DeShon, 183 F.3d 888 (8th Cir. 1999) (radical lifestyle change revolving around daily counseling, good acts and attendance at church is appropriate basis for

departure.  In <u>Clay</u>, the Eleventh Circuit rejected the government's objections to such a departure explaining that "considerations of postoffense rehabilitation are appropriate when a district court evaluates the history and characteristics of the defendant and the need to protect the public from further crimes of the defendant. <u>See</u> 18 U.S.C. § 3553(a)(1), (a)(2)(C)." <u>United States v. Clay</u>, 2007 WL 968837 at *5.

Mr. Scrushy's contributions of his time and money are exemplary and extraordinary.  Indeed, because of his service and contributions, whole villages in Africa are able to send their children to school and feed and clothe them.  Additional information concerning this aspect of Richard Scrushy's life will be provided to the Court before sentencing.  Indeed, were Richard Scrushy to be sentenced to a lengthy term of imprisonment, a number of his charitable activities would necessarily cease to the detriment of many needy and deserving people.  This also is a factor that the Court should consider in determining an appropriate sentence.  <u>See</u> <u>United States v. Milikowsky,</u> 65 F.3d 4, 8 (2d Cir.1995) (affirming downward departure where defendant was " only individual with the knowledge, skill, experience, and relationships to run [business] on a daily basis" and where livelihood of a number of innocent people depended  entirely on defendant's personal involvement).

**4.    Aberrant Behavior**

Richard Scrushy is entitled to a downward departure based on aberrant behavior as he meets all the requirements for one.  Were the Court to grant such a departure, it would also allow Mr. Scrushy to continue his charitable good works. <u>See</u>  <u>United States v. Maese</u>, 146 Fed.Appx. 276, *281, 2005 WL 1995580, **4 (10th Cir. 2005)

(unpublished). In <u>Maese</u>, the 10th Circuit explained decision to affirm the downward

departure, in words t hat are relevant to Mr. Scrushy's case:

> The sentencing court here carefully considered the §
> 3553(a) factors and determined an eight-level departure
> would best serve the goals of sentencing by providing some
> supervision and punishment of Maese while also enabling
> him to continue to his community service work

<u>See also</u> <u>United States v. Peña</u>, 930 F.2d 1486, 1494-96 (10th Cir.1991) (approving

departure from 27 to 33 month range to probation with a condition of community

confinement where departure was consistent with § 3553(a) factors); <u>United States v.

Jones</u>, 158 F.3d 492, 501, 505-06 (10th Cir.1998) (approving departure down three levels

"because that was exactly the extent of downward departure required ... to reach ... a

sentence of probation with stringent conditions" where "the district court's explicit

concern [was] with maintaining the ongoing, and apparently effective, rehabilitative

counseling relationship [the defendant] had through his [current employer]"); <u>United

States v. Ribot</u>, 97 F.Supp.2d 74, 85 (D. Mass. 1999) (granting aberrant behavior

downward departure to defendant, in an embezzlement case, who had been law abiding

but also "made real and important contributions to the communities in which he has

lived"and otherwise met requirements for such a departure.)

5.    **Family Circumstances, 5H1.6**

Mr. Scrushy is the father of nine children, the five youngest ones are aged 14, 12,

7, 4, and 2 years of age.   All these minor children live with Mr. Scrushy and his wife.

The two older children, aged 14 and 12, live with Mr. Scrushy and his wife although he is

divorced from their mother because he provides them with the necessary and indispensable love and training that children, especially adolescents require.

Mr. Scrushy's wife would not be able to provide the care and nurturance that this children require. A downward departure for this reason is also warranted. The children are uniquely dependent on Mr. Scrushy for emotional nurterance. See United States v. Galante, 111 F.3d 1029, 1037 (2d Cir.) (upholding a district court's thirteen-level downward departure for a defendant with two young children, ages eight and nine, who was a caregiver and the primary earner for his family), reh'g in banc denied, 128 F.3d 788 (2d Cir.1997); United States v. Johnson, 964 F.2d 124, 126, 129 (2d Cir.1992) (upholding a ten-level downward departure for a defendant who held the sole responsibility for raising four young children ranging in ages from five months to six years).

## CONCLUSION

In summary, a sentence that does not include imprisonment is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set out in 18 U.S.C. §3553(a) and reasonable under all the circumstances of this case.


Respectfully submitted,


/s/ Arthur W. Leach
Arthur W. Leach
Terry Lucas Butts
Leslie V. Moore
2310 Marin Drive
Birmingham, Alabama 35203
Phone: 205-822-4224
Fax: 205-824-0321

_/S/ Carmen D. Hernandez_
Carmen D. Hernandez
717 D. Street, N.W., Suite 310
Washington, D.C.  20004
chernan7@aol.com
202-628-0090; fax: 202-628-2881

Dated:  May 29, 2007

## CERTIFICATE OF SERVICE

I hereby certify that I have this 29th day of May 2007, served copies of the above Memorandum by filing it through electronic filing with to Louis V. Franklin, Sr., Acting United States Attorney, One Court Square, Suite 201, Montgomery, AL 36104 and other counsel of record. .

_/S/ Carmen D. Hernandez_
Carmen D. Hernandez