# ARTHUR W. LEACH
### ATTORNEY AT LAW

75 FOURTEENTH STREET, NW                                                    (404) 786-6443
25TH FLOOR                                                               FAX (678) 624-9852
ATLANTA, GEORGIA 30309                                      E-MAIL: ART@ARTHURWLEACH.COM


MAY 3, 2007

**DELIVERED VIA EMAIL TO:**
**JACQUELYN_CAPLE@ALMP.USCOURTS.GOV**

Ms. Jacquelyn P. Caple
Senior United States Probation Officer
Frank M. Johnson Jr. Courthouse Complex
One Church Street
Montgomery, Alabama 36104

Dear Ms. Caple:

As directed in your letter of April 18, 2007 and Judge Fuller's Order of April 26, 2007
(Doc. 569), this letter is intended to reflect Richard Scrushy's objections to the Presentence
Report (PSR) provided to me electronically on April 18, 2007.

As will be set out in detail below, we take exception to the factual recitation as presently
composed in the PSR. Our intent is to provide the following overview of the facts followed by a
detailed analysis of the evidence at trial. We then will turn to specific objections by paragraph of
the PSR. Following the factual objections we raise objections to the guideline computation
followed by notice of our motions for downward departure.

Richard Scrushy acknowledges the jury's verdict in this case. Our continuing dispute
over the factual and legal issues in this case are for another court to review; however, for
sentencing purposes we submit the following factual statement. The tab references relate to our
Motion for Judgment of Acquittal (Doc. 413) and our reply brief (Doc. 460) and can be supplied

to you in the event that your office does not have access to the copies that were supplied to the Court at the close of the case.  Other cites are to an unofficial transcript which also can be supplied.

Overview of the Facts

It is well known that by 1999 Richard Scrushy was the long standing CEO and Chairman of the Board of Directors at HealthSouth.  Mr. Scrushy had grown that company from the four original partners, to a four billion dollar, Fortune 500 Company.  HealthSouth was the largest healthcare company in the State of Alabama and was a world leader in healthcare innovation. One of the many attributes of this corporate giant was its corporate philanthropy.  Not only did HealthSouth donate generously to causes throughout Alabama and the United States, it also donated time of its employees to including Richard Scrushy, Thom Carmen and Loree Skelton to the CON process.  Richard Scrushy also personally has given millions of dollars in donations to a wide array of causes in the State of Alabama.

By the time Don Siegelman was elected Governor, Richard Scrushy had served as a member of the CON Board pursuant to appointments by the three preceding Governors of Alabama. Due to the fact that he served on the CON Board for Governor Fob James, Richard Scrushy publicly supported Governor James in his campaign against Don Siegelman.  Governor James lost that election which put Richard Scrushy and HealthSouth in an uncomfortable position with Governor-Elect Siegelman.

Richard Scrushy's long time business associate, Elmer Harris, became head of Governor-Elect Siegelman's transition team upon the Governor's election.  As he testified at trial, Elmer Harris encouraged both Governor Siegelman and Richard Scrushy to mend their fences and work for the good of Alabama.   To facilitate this effort, Eric Hanson who was a lobbyist for

HealthSouth and a long time friend of Governor-Elect Siegelman, also worked to bridge the political differences between the two men.

Richard Scrushy willingly supplied support to the Siegelman transition team, including a $25,000 donation from HealthSouth intended to aid in the inaugural festivities.   At the Governor's request,  Richard  Scrushy agreed to provide a HealthSouth aircraft to fly the band "Alabama" to the inaugural to play for the celebration.   There has never been a claim that this was done for any quid pro quo related to the relationship between the Governor and Richard Scrushy.

Richard Scrushy did attend the meeting with the Governor on June 29, 1999 in Montgomery.   No check was exchanged on that date.   Since this was the first "in person" meeting between the Governor and Richard Scrushy, and due to the fact that the IHS check which constitutes one of the two contributions at issue in this case is dated well after the meeting, that check for $250,000 was not present on the date of this meeting.   Richard Scrushy subsequently agreed to raise $250,000 to assist in the get out the vote effort related to the lottery. That agreement was not in exchange for the Governor trading on his newly won office.   Eric Hanson was in the middle of the discussions regarding Richard Scrushy's fund raising effort for the get out the vote campaign.   The Government did not call Hanson as a witness at trial. Richard Scrushy declined to personally contribute and would not agree to permit HealthSouth to contribute to the lottery campaign due to his wife's objections to the lottery.   Even the Government's key witness, Mike Martin, supports these facts.  (R-May 9, 2006 at 345).

Richard Scrushy did, however, agree to raise $250,000 for the lottery fund, which he did through IHS.   After the lottery failed, Richard Scrushy agreed to contribute another $250,000 through HealthSouth because the contribution was targeted to retiring the debt amassed in the

failed effort to pass the lottery. Richard Scrushy respectfully denies having intended to bribe the Governor. He readily admits that he intended to build a relationship with the newly-elected Governor who may have served the state for up to eight years if he won re-election. Part of building that relationship was serving the new Governor. Scrushy did not want or seek the job on the CON Board. HealthSouth did not need Richard Scrushy's representation on the board and nothing was passed that benefited HealthSouth while Richard Scrushy remained on the board. Richard Scrushy respectfully denies having been involved in any effort to bribe anyone. He did not conspire nor commit honest services mail fraud.

<u>A Detailed Review of the Evidence from the Trial</u>

The evidence presented shows that Defendant Scrushy met with then-Governor Siegelman on June 29, 1999, a meeting that Loree Skelton characterized in her testimony as an opportunity to "get acquainted." (Tab 6, R-May 10, 2006 at 259). Skelton knew that because HealthSouth had supported Fob James for Governor, access to the Seigelman administration would be "nonexistent" without some effort to build a relationship. (Tab 2, R-May 10, 2006 at 256). The importance of building the relationship was clarified by Alva Lambert who explained that CON terms are inconsequential because the members serve at the pleasure of the Governor and when there is a change of administration all terms functionally expire upon the inauguration of the new governor. (Tab 1, R-May 1, 2006 at 42-44). Skelton contacted Eric Hanson who had known Governor Seigelman for a long time and the get acquainted meeting to establish a positive rapport was set. (Tab 6, R-May 10, 2006 at 257, Tab 13, R-May 11, 2006 at 126). As Skelton also testified, there were no plans to make any kind of Education Foundation or campaign contribution during that visit because it was the first meeting between Defendant Scrushy and Governor Siegelman. (Tab 13, R-May 11, 2006 at 126).

Nick Bailey testified that he had previously told investigators and had testified to the grand jury that this meeting occurred on July 14, 1999, and that after the meeting he saw a check for $250,000 which he thought had been signed by Scrushy.  He admitted that he had informed the FBI that he knew prior to the meeting that Scrushy was coming with a check.  (Tab 47, R-May 5, 2006 at 140-141).  While on direct examination, Bailey indicated that there may have been two meetings, he conceded on cross-examination that there was only one meeting where Skelton, Hanson, Scrushy and the Governor were present.  (Tab 49, R-May 5, 2006 at 123).  Yet the undisputed evidence shows that the meeting could not have happened on July 14, 1999, and more particularly that the check could not have been present on that date. (Tab 37, R-May 2, 2006 at 185-187 (on direct), Tab 42, R-May 3, 2006 at 225-230 (on cross) Tab 45, R-May 4, 2006 at 288).  Bailey would only concede regarding the IHS check that, "I will agree that it possibly was not there on the 14th."  (Tab 42, R-May 3, 2006 at 230).  Bailey testified that the check was not reported due to Scrushy's desire to conceal his support of the lottery.  When it was pointed out that the check was not signed by Scrushy, Bailey maintained that the check was not reported as a campaign contribution due to Scrushy's desire that his wife not find out about his support for the lottery.  When asked whether such a conclusion made sense in light of the fact that the check does not belong to Scrushy, Bailey's response was "It has not been determined and shown to me that it was not Mr. Scrushy's check."  (Tab 45, R-May 4, 2006 at 285, see also, Tab 43, R-May 3, 2006 at 9).  When the Court inquired whether there were any "written document, electronic documents or confirmatory memoranda," other than the checks and the appointment letters to support his testimony, Bailey conceded that there were none.  (Tab 45, R-May 4, 2006 at 281-282, see also Tab 44, R-May 4, 2006 at 276-277).

Bailey conceded that he was not an eyewitness to any meeting between Richard Scrushy and the Governor. (Tab 44, R-May 4, 2006 at 274-275). He conceded that the Governor never told him that the payment was a bribe for the CON seat. (Tab 47, R-May 5, 2006 at 144). He would not state that the second check from HealthSouth was part of an effort to bribe the Governor. (Tab 49, R-May 5, 2006 at 128-132). He agreed that he did not know that Scrushy had stated that he did not want the CON seat or that Thom Carmen was the applicant for the CON seat for HealthSouth (*see* Gov't Exhibit 3 and Seigelman Exhibit 220). Bailey testified he was unaware of the documents from the Governor's office that demonstrate these facts. (Tab 46, R-May 5, 2006 at 180). Bailey also testified that his memory had improved over time and that it was better during his testimony in 2006 than it was when he spoke to the FBI in June of 2003. (Tab 49, R-May 5, 2006 at 127).

When the accounts of the meeting testified to by Skelton (Tab 6, R-May 10, 2006 at 258-262), Jabo Waggoner (Tab 18, R-May 10, 2006 at 150-153) and Bailey (Tab 49, R-May 5, 2005 at 123-125) are compared, there can be no doubt that each witness is discussing the same meeting. The meeting date was June 29, 1999, because the HealthSouth flight records indicate that this is the only date it could have been (Scrushy Exhibits 100, 101 and 102) along with the added confirmation that the meeting was logged into Senator Waggoner's calendar. (Scrushy Exhibit 113; *see also* Tab 19, R-May 10, 2006 at 171-181). When these facts are considered with the undisputed fact that the IHS check was not written until July 19, 1999 and sent sometime after that date (Pickett at Tab 34, R-May 10, 2006 at 223; *see also* Leif Murphy testimony Tab 29, R-May 9, 2006 at 304-308), it is apparent that the check could not have been in Montgomery during the meeting between Scrushy and the Governor, whether it was on June 29, 1999 or July 14, 1999. Bailey testified on direct examination by AUSA Feaga that he was

possibly wrong about the check being present and that he had made that decision by "reevaluating his memory and by thinking about it and by looking at the documents." (Tab 37, R-May 2, 2006 at 188). For these reasons, Bailey's testimony, at least on the point regarding the delivery of the check and the possibility of any "agreement" at that point, is "so contrary to the teachings of basic human experience that no reasonable person would believe it beyond a reasonable doubt[.]" *United States v. Kelley*, 412 F.3d 1240, 1247 (11th Cir. 2005).

Ultimately, the evidence shows that Scrushy arranged for two $250,000 donations, the first one from IHS and the second from HealthSouth, to be made to Alabama Education Foundation. It is uncontested that both checks went to entities associated with the lottery campaign. It is uncontested that Scrushy never gave the Governor, personally, any money or thing of value associated with any of the charges in this case. It is also uncontested that Scrushy had absolutely nothing to do with the negotiation of either check. Scrushy did not determine what account the checks were deposited into or how the funds were utilized.

No doubt, the jury could infer that around the time of the contributions that (a) Scrushy made it known that HealthSouth was interested in a seat on the CON Board. and (b) that Siegelman was aware of Scrushy's desire that HealthSouth obtain the CON Board position. This evidence must be taken in the context of the period in which it occurred. Scrushy supported Fob James in the 1998 Governor's campaign. (Tab 6, R-May 10, 2006 at 254-255). This is, of course, logical in that both Scrushy and Carmen served on the CON Board under Governor James. (Tab 4, R-May 2, 2006 at 86-87). Governor Seigelman had attempted to reach out for Scrushy with regard to campaign contributions and did not get a return call. (Tab 35, R-May 8, 2006 at 22). Scrushy was targeted for contributions, including contributions for the Education Foundation. (*Id*.; see *also* Bill Blount testimony (which is not transcribed) and Blount's memo

(Scrushy Exhibit 9) regarding targeting Scrushy for the Education Foundation).  Additionally, the testimony of Raymond Bell establishes that Scrushy was on the list for a CON seat during the transition period or shortly thereafter, as is also shown by Seigelman Exhibit 220.  (Tab 22, R-May 8, 2006 at 328-331).  Bailey testified that the Governor had a conversation with Hanson in which the Governor told Hanson that since Scrushy had contributed $350,000 to the Fob James Campaign ". . . to make it right with the Seigelman campaign he (Scrushy) needed to do at least $500,000."  (Tab 40, R-May 2, 2006 at 162-166).  There was no discussion of the CON seat. There is no indication in the record whether this conversation predates the "get acquainted" meeting at the Governor's office.  Bailey agreed with AUSA Feaga's parameters that it was between inauguration and the appointments to the CON Board.  (Tab 40, R-May 2, 2006 at 162-163).

Critical testimony regarding the alleged bribery was provided only by Bailey.  He testified that upon seeing the check in the Governor's hand (after the "get acquainted" meeting set out above), Governor Seigelman and Bailey had the following exchange:

**Governor: "He's half-way there." (referring to the $500,000 commitment).**

**Bailey:"What in the world is he going to want for that?"**

**Governor: "The CON Board."**

**Bailey: "I wouldn't think there would be a problem with it."**

**Governor: "I would not think so."**

(Tab 39, R-May 2, 2006 at 175-176).

Bailey admitted that he was not an eyewitness to any meeting between Scrushy and Governor Seigelman.  (Tab 44, R-May 4, 2006 at 274).  Additionally, the mere fact that there was a contribution is not telling under these circumstances because Bailey readily admitted that

every member of the CON Board had made such a contribution.  (Tab 41, R-May 3, 2006 at 246).  Additionally, the size of the contribution tells little of the relationship and legality of the contribution inasmuch as Bailey admitted that Margie Sellers was supported for appointment to the CON Board by the Nursing Home Association, which contributed a million dollars or more to Governor Seigelman.  (*Id*.) (Bailey testified "It could have been more than that.").  Bailey further testified that the chairman's position was not available because Governor Seigelman had already committed to Margie Sellers that she would be chairperson.  (Tab 41, R-May 3, 2006 at 244-245).

One aspect of the Government's case is built upon the fact that the IHS check was a "disguised payment".  (Indictment Count 5 at ¶ 55(a))  The evidence at trial did not establish this claim. Bill McGahan testified that he received a call from Mike Martin which was followed shortly thereafter with a call from Richard Scrushy and Mike Martin.  (Tab 23, R-May9, 2006 at 145).  According to McGahan,  Scrushy stated that:

> **He wanted UBS to make a contribution to a cause in the state of Alabama, that it was a good cause, that other companies in the state were supporting it, that he (Scrushy) was supporting it and he wanted UBS to step up and support it too.**

(Tab 23, R-May 9, 2006 at 145-146).  While McGahan stated that Martin called and put pressure on him to make the contribution, McGahan also testified that he received calls from Hanson. (Tab 24, R- May 9, 2006 at 148-149).  McGahan characterized Hanson as polite and testified that Hanson brought up another client, IHS, as a source of the contribution.  McGahan testified that **he told Hanson** that if IHS would make the contribution UBS would work with a sizable outstanding debt owed to UBS by IHS which was unrelated to HealthSouth.  (Tab 25, R-May 9,

2006 at 187-189). Hanson returned the call and told McGahan that Dr. Elkins at IHS had agreed to make the contribution. (Tab 25, R-May 9, 2006 at 189-190). In McGahan's initial statement to the agents he got the entire transaction wrong, including the fact that he totally excluded Martin from any involvement. (Tab 28, R-May 9, 2006 at 248-249). He testified further that he did not think the transaction was illegal and does not believe that he did anything wrong. (Tab 27, R-May 9, 2006 at 240).

Martin testified that he pushed McGahan who was the investment banker for HealthSouth to get the contribution. (Tab 52, R-May 10, 2006 at 127-128). He testified that the check was provided to the Education Foundation by way of a "circuitous route" and that he did not know if it was illegal, but that it looked bad, smelled bad and he did not like it. (Tab 52, R-May 10, 2006 at 128-129). Martin admitted that he did not know of any quid pro quo for the check and that he only knew that HealthSouth was trying to get in the Governor's good graces. (Tab 54, R-May 10, 2006 at 6-7). Martin testified that he was told that Scrushy wanted to have the check in hand so that he could deliver it during a meeting he was to have with the Governor. (Tab 53, R-May 10, 2006 at 29).

Taylor Pickett from IHS testified to the other side of the transaction. He related that he spoke to McGahan about a donation to a not for profit corporation. (Tab 31, R-May 10, 2006 at 193). Pickett met with his boss and CEO of the company, Dr. Elkins, who provided him a two-fold response. First, Elkins left the decision up to Pickett and second, he asked that Pickett run the not for profit corporation through legal counsel to be sure that it was valid. (Tab 31, R-May 10, 2006 at 194-195). After the corporation checked out, Pickett called McGahan back and said that they would make the contribution. He stated that they put no stipulations on the transaction,

that they agreed to pay the contribution and UBS agreed to reduce their bill.  (Tab 31, May 10, 2006 at 195-198)

Regarding Hanson and the contribution, when Bailey was asked to relate exactly what Hanson had said to him about the contribution and the CON Board his response was that "he would see that Mr. Scrushy made the contributions and for us not to let him down."  (Tab 48, R-May 5, 2006 at 171).

There has been no evidence linking Richard Scrushy to the projects identified in the Indictment in any way.  In fact, the only evidence presented is to the contrary, in that Loree Skelton agreed that Richard Scrushy was long gone from the CON board by the time those projects were considered.  (Tab 14, R-May 11, 2006 at 155).  She recalled no conversation with Richard Scrushy about the projects, stating that any conversation about the projects would have been with Thom Carmen who was the board member at the time the projects were presented to the CON Board.  (Tab 14, R-May 11, 2006 at 156-157).

The Government alleges in the Indictment ¶ 59(e) and in the conspiracy count ¶ 55(e), that "Richard Scrushy and others would offer things of value to another CON Board member to attempt to affect the interests of HealthSouth and its competitors."  This information relates to Tim Adams, a witness who the Government did not call and again, the evidence in the record is contrary to the allegation.  The only witness who could speak to these allegations was Loree Skelton and she countered every attempt by the Government to show that Richard Scrushy was orchestrating anything with regard to Tim Adams.

With regard to the helicopter rides, it was established that Tim Adams only rode on the helicopter while Mr. Scrushy was on the board.  (Tab 11, R-May 11, 2006 at 256).  Mr. Scrushy resigned in January of 2001 and the first item to be considered involving HealthSouth was in

July of 2002, with the second and only other matter coming up in December of 2002. (Id.). For the entire period after Mr. Scrushy's resignation Ms. Skelton and Mr. Carmen rode to Montgomery to attend the meetings in a car without Mr. Adams. (Tab 11, R-May 11, 2006 at 257).

With regard to a potential job with HealthSouth, Ms. Skelton testified that she initially **did not try** to get Adams a job. (Tab 8, R-May 10, 2006 at 274). Adams asked Richard Scrushy and Peck Fox, attorney for HealthSouth, about possible employment and Mr. Scrushy told Ms. Skelton to send Adams to Dr. Swaid, Medical Director at the HealthSouth Medical Center, who offered Adams a scrub nurse job in Dr. Swaid's practice, which Adams declined. (Tab 8, R-May 10, 2006 at 275-278). Ms. Skelton testified that Mr. Scrushy told her to relate to Adams that "we just weren't going to be able to find a position for him at this time, there wasn't anything available." (Tab 9, R-May 10, 2006 at 303). She further testified that Mr. Scrushy told her to "basically pacify him and keep him happy." (Id.).

With regard to the payment of the fees related to the mobile PET scanner application, Ms. Skelton testified that she had agreed to pay Adams between $8,000 and $12,000 for his efforts. (Tab 10, R-May 10, 2006 at 295). When the vote was coming up on the rehabilitation hospital, Adams indicated that he did not think he would make the board meeting because he would miss several days of work. (Tab 10, R-May 10, 2006 at 292-293). Adams reminded Ms. Skelton that there was a balance outstanding on their agreement regarding the CON application for work already done and they negotiated the balance of the fee at $3,000 and Adams did attend the meeting and voted in favor of the unopposed 38 bed rehabilitation project. (Tab 10, R-May 10, 2006 at 295-296). She admitted that she did not advise Mr. Adams on the propriety of the vote. (Tab 10, R-May 10, 2006 at 297-298). When asked if she had let any of the officials associated

with the CON board know about Tim Adams financial relationship with HealthSouth, she testified that she let SHPDA Executive Director Alva Lambert know and that she told Lambert to put him on notice of the relationship between HealthSouth and Adams.  (Tab 12, R-May 11, 2006 at 49-51).   More germane to the charges in this case, Ms. Skelton testified that she could not remember a specific conversation where she related to Mr. Scrushy that she planned to give Tim Adams a contract to prepare the mobile PET scanner application.  (Tab 15, R-May 11, 2006 at 165-166).  She testified that she talked about the PET scanner application with Thom Carmen, not Richard Scrushy, and she did not recall whether she had that conversation with Mr. Scrushy or not.  (Tab 15, R-May 11, 2006 at 167-168).   Ms. Skelton agreed that by the time the rehabilitation hospital and the mobile PET scanner came up for consideration Richard Scrushy was not in the loop as to what was happening at the CON board.  (Tab 16, R-May 11, 2006 at 173-174).

The Government further alleges that Mr. Scrushy orchestrated his replacement by Thom Carmen on the board.  There is simply no testimony to support this allegation.  Alva Lambert testified that Mr. Carmen replaced Mr. Scrushy in both the James administration and under Governor Seigelman.  He stated that Mr. Carmen was a competent selection for the board and that he acted appropriately during his terms on the board.  (See Tabs 2-5).

With the above statement of facts in mind we respectfully submit the following specific Objections to The Offense Conduct as set out in the current draft of the PSR:

1. **Paragraph 18:** There is no evidence in the record to establish that Hanson "sought to broker an agreement between Seigelman and Richard M. Scrushy."   As set out above, there was specific testimony provided by Harris on this point.  Governor Seigelman had won the election and it was time to put the electoral differences to the side and work to advance the

State of Alabama.  The sentence as structured infers that there was an illegal agreement sought by Hanson, a fact which is not supported by the record.  The Government did not call Hanson as a witness to testify to prove this point and is not entitled to this inference, since there is no evidence to support it.

2.  **Paragraph 18:** The last sentence indicates that HealthSouth "was regulated by the State of Alabama CON Board.  There is absolutely no evidence in the record to support this statement.  The CON Board did not "regulate" HealthSouth in the State of Alabama.  Such an inaccurate characterization of the role of the CON Board is significant because if accurate, it would provide the critical element of motive which has been lacking throughout this case.  The evidence in the case showed that the CON Board in fact only approved certain use, or expansion of use, of hospital and treatment facilities.  For instance, an effort to expand the number of hospital beds or the addition of infrastructure to hospital or rehabilitation facilities like the adding of a wing or parking facility.  The CON Board did not regulate HealthSouth or any other Healthcare company in the State of Alabama beyond that limited approval process discussed above.

3.  **Paragraph 18, top of page 8:** The PSR states that "Scrushy communicated to Siegelman through Hanson and Nicholas D. "Nick" Bailey (longtime employee and Confidential and Executive Assistant to Siegelman during Siegelman's terms as Lieutenant Governor and Governor), that he wanted membership on, representation at, and influence over the CON Board."  As set out in the factual statement above, there is no evidence in the record to support this statement.  Scrushy had no communication with Bailey.  Hanson did not testify at trial.  Hanson's testimony came in only as co-conspirator hearsay and the particular information referenced above was part of the Government's theory of the case and appeared

in the indictment, but there was no testimony to this effect at trial.  The closest thing in the

record to the statement made in the PSR is found at page 343 of the transcript of May 9, 2006

in which Martin testified:

> Q: Okay. Now, did Mr. Scrushy tell you why it was important to get in the good
>
> graces of then Governor Seigelman?
>
> A: There were a number of occasions where Mr. Scrushy told me that it was
>
> important for us to be in the good graces of that governor, or any other governor,
>
> so that we could have influence **or** a spot on the CON Board. (Emphasis added).

4.  **Paragraph 18:** The PSR states: "Scrushy later called McGahan on speaker phone, with

Martin present, and threatened to fire McGahan and UBS if payment was not made to the

AELF."  There is no testimony in the record to support that the conversation about firing

UBS happened when Scrushy was on the phone with McGahan and Martin.  Martin's

testimony was to the contrary, in that he stated at page 351 on May 9, 2006 that this portion

of the conversation happened after the conversation with Scrushy.

> A:  In the meantime, after that conversation with Mr. Scrushy and myself
>
> ended, I told Mr. McGahan, you're – you know, you really need to get this –
>
> get this contribution because he is telling me – he being Mr. Scrushy – is
>
> telling me that he's going to fire you.

5.  **Paragraph 19:** The first sentence is unclear in that it states: "Around late June or

early July 1999, Hanson contacted IHS and McGahan spoke with IHS Chief Financial

Officer, Taylor Pickett.  McGahan advised Pickett of the proposal to reduce IHS's

debt to UBS in exchange for a $250,000 contribution to the AELF."  Is it the intent of

the PSR to state that after Hanson contacted IHS or that Hanson and McGahan

contacted IHS? The evidence did show that both McGahan and Hanson were involved in this contact, but at separate times. The import of this sentence is ambiguous and should be clarified.

6. **Paragraph 19:** The PSR states: "Siegelman later showed Nick Bailey the $250,000 check, dated July 19, 1999, and informed Bailey that the check was from Scrushy who was 'half way there.' Bailey asked Siegelman what Scrushy wanted in exchange for the check and, according to Bailey, Siegelman responded, 'the CON Board.'" As set out in detail above, this sequence of events is impossible. Bailey claimed that Scrushy was present shortly before these events and there is simply no way that the check was in Montgomery on the day that the only meeting with all of the stated participants occurred in Montgomery. Additionally, the precise statement is set out above and Governor Seigelman never told Bailey that he was accepting a bribe in exchange for the CON seat.

7. **Paragraph 21:** The PSR states, "Approximately November 1999, Scrushy discovered the $250,000 check had not yet been cashed. He also discovered that IHS was soon to be insolvent." The PSR then goes on to recount the manner in which the check was handled by Bailey and others. The evidence was uncontested that Scrushy had no role in the negotiation or handling of either check once they were possessed by the Governor or the people who worked with the Governor. We object to the linking of the sentences referenced above with the balance of the paragraph because it infers that there was such a connection when in fact there was none. Scrushy had nothing to do with the First Commercial Bank loan, and he had no connection to any loan the Alabama Democratic Party had with the Colonial Bank. Scrushy was not a

guarantor to any loan and was in no way responsible for the handling of the two checks once they were received by the Governor.

8. **Paragraphs 23 and 24:** These paragraphs deal with the reporting of the campaign contributions by Governor Seigelman. Such acts are not within the scope of any conspiracy that Scrushy was charged with or which the evidence in any way showed he agreed to participate in. As a consequence, they should not be included in this PSR. Scrushy had no role in such activities and the sentence in this case should in no way hold him accountable for activities that were not part of the charged conspiracy.

9. **Paragraph 25:** This paragraph reflects the alleged central motive of the case and completely supports what will be our motion for downward departure based upon the fact that this case is outside of the heartland of cases involving similar violations. The Government alleged that Scrushy assisted in the contributions to Governor Seigelman in order to gain some advantage on the CON Board. That advantage, as alleged, was not a matter of personal gain, but as also alleged, Scrushy was attempting to advance the business interests of HealthSouth through the CON Board. The evidence, as set out above, demonstrates that in light of the fact that HealthSouth was a four billion dollar company, the claimed advantages that were sought were not only miniscule, but from a sentencing perspective the advantages were virtually nonexistent. As such, they should merit a downward departure due to the obvious shortcomings in the Government's proof as to this important issue.

First, with regard to the Brookwood MRI, the PSR states that the discussion with the chairperson of the CON Board was a violation of ethical rules and operational procedures of the Board. However, the chairperson never lodged a formal complaint

and the testimony from Alva Lambert was that Scrushy never had an ethics complaint lodged against him during his terms on the CON Board for four Governors. Additionally, the PSR correctly points out that Scrushy recused himself from the vote on this issue and the board was free to vote as it desired, including the chairperson, who was only one of several votes.

Next, the PSR relies on the Tim Adams influence allegation having to do with helicopter rides intended to influence Adams. First, the Government did not call Adams at trial. All of the evidence before the Court came from Skelton, who did not support the Government's theory of the case even when viewed in the light most favorable to the verdict. The PSR fails to acknowledge that the meetings referenced in which Adams was present to make a quorum **all occurred after** Scrushy was off of the CON Board. The Government has no basis on which to say Scrushy was responsible for the actions of Skelton who affirmatively testified at trial that she did not recall **ever** consulting with Scrushy on any of these votes and that since Carmen was the member of the CON Board at the time of the votes, if she had spoken to anyone she would have talked to Carmen. Additionally, there is no connection between the helicopter rides, which occurred only while Scrushy was on the board and the votes in question because Skelton testified that the helicopter rides stopped when Richard Scrushy resigned from the board and from that point forward Skelton and Carmen drove to Montgomery for the meetings and Adams never rode with them. Finally, with regard to the CON application, Skelton said she did not consult with Scrushy about the application, the payments to Adams and that this was particularly

true with regard to the final $3,000 payment which, again, was made long after Scrushy resigned from the CON Board.

10. **Paragraph 26:** The PSR states, "On January 17, 2001, Scrushy resigned from the Board.  On January 18, 2001, pursuant to his agreement with Scrushy, Siegelman appointed Tom Carmen, Director of Corporate Development at HealthSouth, to fill Scrushy's vacant position."  There is absolutely no proof in the record to support the statement that the appointment with Carmen happened as a result of any illegal or improper agreement between Scrushy, Carmen and Governor Seigelman.  Like Scrushy, Carmen had served on the CON Board under Governor Fob James.  He was more qualified to sit on the board than Scrushy.  A conclusion such as this must be supported by **some** evidence.  There is simply no evidence in the record to support the statement.  Consequently, it should to be completely removed from the PSR.

CONSTITUTIONAL OBJECTIONS

As an initial matter, Mr. Scrushy objects to any and all determinations in the PSR that are based on facts that were not charged in the Indictment nor found by the jury beyond a reasonable doubt.  He also objects to findings to be made by the Court at sentencing on a preponderance standard on the basis of information that is not subject to confrontation and not sufficiently reliable to comport with the rights guaranteed to him under the Indictment and Due Process Clause of the Fifth Amendment and the Confrontation clause and jury trial guarantees of the Sixth Amendment.  See e.g., United States v. Booker, 125 S.Ct. 738, 798 n.6 (Thomas, J. dissenting).  As Justice Thomas explained:

> The commentary to § 6A1.3 states that '[t]he Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a

> case.'  The Court's holding today corrects this mistaken belief.  The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant.

Booker, 125 S.Ct. at 798 n.6 (Thomas, J. disenting in part from the remedial opinion).   In Blakely v. Washington, the Supreme Court held that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."   542 U.S. 296, 303 (2004). Booker did not purport to vary this definition of statutory maximum.   Thus, the Fifth Amendment requires that any fact that increases the sentence, even if the ultimate sentence is within the range set forth for the offense under the United States Code, must be proved beyond a reasonable doubt.

Moreover, Mr. Scrushy objects to imposition of a sentence in a manner that applies a preponderance standard while giving the guideline calculation any presumptive weight of reasonableness; or that requires that a sentence below the guidelines be justified based on extraordinary circumstances; or that gives the guidelines more weight that any of the other factors set out in 18 U.S.C. § 3553(a).   See Cunningham v. California, __ U.S. __, 127 S.Ct. 856 (2007) (holding California sentencing scheme unconstitutional because it involved enhanced punishment based on judicial fact-finding, explaining that reasonableness requirement was not sufficient to comply with Sixth Amendment requirements).   See also Claiborne v. United States, __ U.S. __, 127 S.Ct. 551 (cert.granted, Nov. 3, 2006) (question presented whether requiring that extraordinary circumstances attend a sentence varying substantially from the Guidelines violates the jury trial guarantees upheld in Booker); Rita v. United States, __ U.S. __, 127 S.Ct. 551 (cert.granted, Nov. 3, 2006) (whether it is consistent

with <u>Booker</u> to accord a presumption of reasonableness to a within-Guidelines sentence).

Although the Eleventh Circuit has rejected these arguments, Mr. Scrushy hereby asserts his rights to these Constitutional protections, whose parameters in the sentencing context have not yet been resolved by the Supreme Court. <u>See</u> <u>United States v. Smith</u>, 480 F.3d 1277, 1281 (11th Cir. 2007) (rejecting Sixth Amendment challenge to preponderance standard at sentencing) ; <u>United States v. Thomas</u>, 446 F.3d 1348, 1355 (11th Cir. 2006) (rejecting Fifth Amendment challenge to preponderance standard at sentencing); <u>United States v. Baker</u>, 432 F.3d 1189, 1254 (11th Cir. 2005) (refusing to extend <u>Crawford</u> protections to sentencing).

<u>Objections to the Guidelines Calculations</u>

1.     Selection of Applicable Guideline (Paragraph 32)

Richard Scrushy objects to the selection of U.S.S.G. § 2C1.1 as the applicable guideline.

The appropriate guideline is U.S.S.G. § 2C1.5, applicable in cases involving violations of 18 U.S.C. § 210, which makes it unlawful to pay, offer or promise anything of value to a person in consideration of procuring appointive office.  This in fact is the essence of the allegations of wrongdoing against Mr. Scrushy (<u>i.e.</u>, that he made a contribution in return for being appointed to the CON Board).  Section 2C1.5 provides for a base offense level of 8 and no additional enhancements.

2.     Specific Offense Characteristic (Paragraph 34).  U.S.S.G. § 2C1.1(b)(2)(A).

Richard Scrushy objects to the imposition of a 14-level enhancement under U.S.S.G. § 2C1.1(b)(2)(A), which provides for adding levels from the table in § 2B1.1 where the "value of the payment, the benefit received or to be received in return for the payment, or

the loss to the government from the offense" exceeds $5,000. In fact, none of the  money

contributed to the AELF triggers any of the three provisions of this enhancement as

addressed below in reverse order.

First, there was no loss to the government.

Second, Mr. Scrushy received no benefit of any monetary value as a result of the

contributions to AELF. That is, for example, no contract was let to Mr. Scrushy or

HealthSouth, no surplus property was sold to him below market value, and he received no

other thing of value. See U.S.S.G. § 2C1.1, comment (n. 2) (defining benefit received or to

be received). As noted earlier, Mr. Scrushy had served on the CON Board under previous

administrations and took no part in any votes where HealthSouth was concerned or where

any benefits to him or HealthSouth, directly or indirectly were under consideration.

Third, in this case, using the total amounts contributed to AELF as the "value of

the payment" is not appropriate because that amount does not reflect any benefit to Mr.

Scrushy above and beyond the good will that any corporate political contributor expects in

return for political contributions. The background commentary to U.S.S.G. § 2C1.1 states:

> Where the value of the bribe exceeds the value of the benefit or the
> value of the benefit cannot be determined, the value of the bribe is
> used because it is likely that the payer of such a bribe expected
> something in return that would be worth more than the value of the
> bribe.

U.S.S.G. § 2C1.1, comment. (backg'd). As is clear, the reason the Sentencing Commission

contemplated for using the amount of the contribution paid to AELF is because of the

likelihood that the payer expected something in return that would be worth that amount. In

this case, however, that likelihood is not present.

Moreover, the Commission did not include this commentary in the application

notes, which might require the Court to use it at least in calculating the guidelines as a first step in the § 3553(a) process. The Commission opted to include this notation only in the background commentary, which by its own terms provides information but does not "interpret or explain how [a guideline] is to be applied" and therefore is not authoritative or binding. See U.S.S.G. § 1B1.7 (background commentary provides information but is not binding); United States v. Sash, 396 F.3d 515, 523 (2d Cir. 2005) (same).[1] In essence, this is an acknowledgment by the Commission that its reasoning on this point should be left to be determined by the facts of the case. In cases, where the likelihood the Commission envisioned applies, a Court may opt to enhance based on the value of the payment. In those circumstances, as in this case, where the value of the payment does not reflect any actual benefit received or anticipated, the enhancement should not be applied.

Indeed, enhancing the sentence by 14-levels where in fact the likelihood the Commission envisioned for some cases does not apply would violate Mr. Scrushy's right under the Due Process Clause not to be sentenced based on inaccurate information. See

---

[1] Background commentary is not the type of interpretive commentary, which was deemed authoritative and binding for a correct application of the guidelines in Stinson v. United States, 508 U.S. 36, 38 (1993). See U.S.S.G. § 1B1.7 (which describes the different types of commentary and contrasts interpretive commentary of the kind considered in Stinson with commentary which "may provide background information, including factors considered in promulgating the guideline or reasons underlying promulgation of the guideline." See also United States v. Sash, 396 F.3d 515, 523 (2d Cir. 2005):

> We hold that Stinson, insofar as it establishes the binding nature of commentary, applies only to commentary that is interpretive or explanatory in nature. Stinson, therefore, would not render binding the commentary at-issue in this case, which merely provides "background information, including factors considered in promulgating the guideline or reasons underlying promulgation of the guideline." U.S.S.G. § 1B1.7; see also United States v. Hightower, 25 F.3d 182, 187 (3d Cir.1994) (stating that commentary that merely provides "background information" on a guideline is not binding).

United States v. Tucker, 404 U.S. 443, 447 (1972); Townsend v. Burke, 334 U.S. 736, 741 (1948) (defendant has right under the Due Process Clause not to be sentenced based on misinformation" or facts that are "materially untrue.").  It also would violate the principle of parsimony that Congress enacted into 18 U.S.C. §3553(a), which requires the least onerous sentence based on the nature and circumstances of the case and the other factors set out in 18 U.S.C. § 3553(a) (court "shall impose a sentence sufficient, but not greater than necessary" to impose just punishment).

3.     Role in the Offense (Paragraph 36).  U.S.S.G. § 3B1.1

Mr. Scrushy objects to imposition of a 4-level upward adjustment for being a leader or organizer.  Mr. Scrushy was asked to make a political contribution, which he did. He did not organize or lead a "federal funds bribery" as alleged in this paragraph and as set out in the detailed factual recitation of the facts that he has submitted herewith.

4.     Total Offense Level (Paragraph 41)

The total offense level should be 10.  If U.S.S.G. § 2C1.5 is applied, the total offense level is 8.

4.     Paragraph 66

Financial information concerning Mr. Scrushy's holdings is complex and being addressed by accountants. There is no attempt nor intent by Mr. Scrushy to withhold any information or otherwise fail to comply fully and completely with any and all reporting requirements.  Any additional or updated information will be provided as soon as it is available.

5.     Custody – Guideline Provisions (Paragraph 68)

Total offense level corresponds to a guideline range of 6 to 12 months, before any

departures or reductions pursuant to 18 U.S.C. § 3553(a). If U.S.S.G. § 2C1.5 is applied, the guideline range is 0 to 6 months.

      6.      Probation – Guideline Provisions (Paragraph 74)

Since <u>Booker</u>, no provision of the guidelines is mandatory. Hence, the restrictions in U.S.S.G. § 5C1.1(f) with respect to the components of any sentence and limits on probation imposed by Zone D, like all other provisions of the guidelines are advisory only. <u>See</u> <u>United States v. Anderson</u>, 365 F. Supp. 2d 67 (D. Me. 2005) (imposing split sentence in case that would have required straight imprisonment under the zones in §5C1.1); <u>see</u> <u>also</u> <u>United States v. Winters</u>, 411 F.3d 967, 972 (8th Cir. 2005) ("We find no support for [the] argument that portions of the sentencing guidelines remain mandatory after Booker").

<u>Downward Departures and Consideration of § 3553(A) Factors</u>

A number of factors and circumstances, alone and in combination, warrant a reduction from the guideline range. These include:

      1.      28 U.S.C. § 994(j)

      2.      18 U.S.C. § 3553(a)(1)-(7)

      3.      Outside the heartland of the offense, USSG 5K2.0

      4.      Loss amount over-represents the culpability of the defendant and the seriousness of the offense, USSG 5K2.0 and 2B1.1, comment (n. 15).

      5.      Lesser Harms, USSG 5K2.11

      6.      Aberrant Behavior, USSG 5K2.20

      7.      Post-Offense Rehabilitation, USSG 5K2.0

      8.      Employment Record, USSG 5H1.5

      9.      Family Circumstances, USSG 5H1.6

      10.      Civic, Charitable and Public Service, USSG 5H1.11

For all the reasons set out in part in Mr. Scrushy's factual recitation, the Court should impose a sentence that does not involve a term of imprisonment. Such a sentence would comply with the statutory mandate in 18 U.S.C. § 3553(a) requiring the Court to impose a sentence that is "sufficient, but not greater than necessary" to promote just punishment, protect the public, and provide the defendant with needed rehabilitation. It also would comply with Congress' directive, which is not fully implemented in the guidelines, that a defendant, who is a first offender and has not been convicted of a crime of violence or an otherwise serious offense should receive a sentence other than imprisonment. See 28 U.S.C. § 994(j).

1.      Outside     the     Heartland     and     Upward     Adjustment Overrepresents Seriousness of Offense and Defendant's Culpability

As noted, there was no specific personal gain to Mr. Scrushy nor loss to the State of Alabama in this case, placing it well outside the heartland of bribery cases. In the main, bribery prosecutions involve both a personal gain to one or more individuals and a corresponding loss to the state or government. It is for that reason, that a specific offense characteristic with respect to the value of the benefit is included in § 2C1.1. Accordingly, it is clear that the Commission would have viewed as the ordinary or heartland case one where no monetary gain was received directly by either the person who provided the payment nor the one who received the payment.

For that reason also, were the Court to impose a 14-level enhancement from the loss table, the resulting offense level would both overrepresent the seriousness of the offense and Mr. Scrushy's culpability. See e.g., United States v. Walters, 87 F.3d 663 (5th Cir. 1996) (downward departure where defendant did not personally profit from money

laundering scheme); United States v. Broderson, 67 F.3d 452 (2d Cir. 1995) (Downward departure based on a "confluence of circumstances ... not taken into account by the guidelines," including loss overstated seriousness of fraud and defendant had not personally profited financially from his fraudulent conduct); United States v. Oakford Corp, 79 F. Supp. 2d 357 (S.D. N.Y. 2000) (downward departure of 13 levels granted where offense level would substantially overstate the seriousness of the offense as "each defendant personally realized only a small portion of the overall gain or profits of $15 million"); United States v. Hemmingson, 157 F.3d 347 (5th Cir. 1998) (downward departure where offense did not fall within the heartland of the money-laundering guideline; court applied fraud guideline in campaign contribution case where defendant convicted of interstate transportation of stolen property, money-laundering, and engaging in a monetary transaction with criminally derived property, and one of them was also convicted of making false statements to a federal agent.)

Hemmingson is of particular relevance because it involved a campaign finance violation charged as a violation of the money laundering statute, which primarily targets large-scale moneylaundering, involving the proceeds of drug trafficking or other types of organized crime. Hemmingson involved the use of a conduit to conceal the infusion of corporate funds into a political campaign. See also United States v. Krilich, 159 F.3d 1020 (7th Cir. 1998) (district court has discretion to depart down in bribery case involving application of U.S.S.G. § 2C1.1 based on the application notes in the fraud guideline, which explain or limit the loss table and allow departure where loss overstates the severity of defendant's offense because § 2C1.1 incorporates the loss table.

 2. Lesser Harms, U.S.S.G. § 2K2.12

In this case, another reason for departing downward is U.S.S.G. § 5K2.12. The

political contributions made to AELF, with no specific financial gain to Mr. Scrushy certainly did not involve the harms that Congress sought to be prevented by the bribery statute. At most, the conduct is more akin to that prohibited under 18 U.S.C. § 210, a misdemeanor that proscribes the offer or payment of money to procure appointive office. See United States v. Bernal, 90 F.3d 465 (11th Cir. 1996) (affirming downward departure for defendants convicted of violating Lacey Act and Endangered Species Act for attempted export of endangered primates to Mexico where court found that defendants' conduct did not threaten harm sought to be prevented by statutes as defendants did not intend to harm the primates but intended to use the gorilla for breeding purposes).

      3.     Post-Offense Rehabilitation, U.S.S.G. § 5K2.0, Civic, Charitable and Public Service, USSG 5H1.11, and 18 U.S.C. § 3553(a)

      Mr. Scrushy's post-offense rehabilitation, where the ministry, good works and charitable contributions are his main purpose in life also warrants a downward departure. See PSR at ¶¶ 57-58. See also United States v. Clay, 2007 WL 968837, *2, __ F.3d __ (11th Cir. Apr. 3, 2007) (downward departure to 60 months from guideline range of 188 months reasonable in light of defendant's extraordinary post-offense rehabilitation); United States v. DeShon, 183 F.3d 888 (8th Cir. 1999) (radical lifestyle change revolving around daily counseling, good acts and attendance at church is appropriate basis for departure. In Clay, the Eleventh Circuit rejected the government's objections to such a departure explaining that "considerations of postoffense rehabilitation are appropriate when a district court evaluates the history and characteristics of the defendant and the need to protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(1), (a)(2)(C)." United States v. Clay, 2007 WL 968837 at *5.

Mr. Scrushy's contributions of his time and money are exemplary and extraordinary. Indeed, because of his service and contributions, whole villages in Africa are able to send their children to school and feed and clothe them. Additional information concerning this aspect of Richard Scrushy's life will be provided to the Court before sentencing. Indeed, were Richard Scrushy to be sentenced to a lengthy term of imprisonment, a number of his charitable activities would necessarily cease to the detriment of many needy and deserving people. This also is a factor that the Court should consider in determining an appropriate sentence. See United States v. Milikowsky, 65 F.3d 4, 8 (2d Cir.1995) (affirming downward departure where defendant was " only individual with the knowledge, skill, experience, and relationships to run [business] on a daily basis" and where livelihood of a number of innocent people depended entirely on defendant's personal involvement).

4.    Aberrant Behavior

Richard Scrushy is entitled to a downward departure based on aberrant behavior as he meets all the requirements for one. Were the Court to grant such a departure, it would also allow Mr. Scrushy to continue his charitable good works. See United States v. Maese, 146 Fed.Appx. 276, *281, 2005 WL 1995580, **4 (10th Cir. 2005) (unpublished). In Maese, the 10th Circuit explained decision to affirm the downward departure, in words t hat are relevant to Mr. Scrushy's case:

> The sentencing court here carefully considered the § 3553(a) factors and determined an eight-level departure would best serve the goals of sentencing by providing some supervision and punishment of Maese while also enabling him to continue to his community service work

See also United States v. Peña, 930 F.2d 1486, 1494-96 (10th Cir.1991) (approving departure from 27 to 33 month range to probation with a condition of community

confinement where departure was consistent with § 3553(a) factors); <u>United States v. Jones</u>, 158 F.3d 492, 501, 505-06 (10th Cir.1998) (approving departure down three levels "because that was exactly the extent of downward departure required ... to reach ... a sentence of probation with stringent conditions" where "the district court's explicit concern [was] with maintaining the ongoing, and apparently effective, rehabilitative counseling relationship [the defendant] had through his [current employer]"); <u>United States v. Ribot</u>, 97 F.Supp.2d 74, 85 (D. Mass. 1999) (granting aberrant behavior downward departure to defendant, in an embezzlement case, who had been law abiding but also "made real and important contributions to the communities in which he has lived"and otherwise met requirements for such a departure.)

      5.        Family Circumstances, 5H1.6

      Mr. Scrushy is the father of nine children, the five youngest ones are aged 14, 12, 7, 4, and 2 years of age.   All these minor children live with Mr. Scrushy and his wife.  The two older children, aged 14 and 12, live with Mr. Scrushy and his wife although he is divorced from their mother because he provides them with the necessary and indispensable love and training that children, especially adolescents require.

      Mr. Scrushy's wife would not be able to provide the care and nurturance that this children require.  A downward departure for this reason is also warranted.  The children are uniquely dependent on Mr. Scrushy for emotional nurterance.  <u>See</u> <u>United States v. Galante</u>, 111 F.3d 1029, 1037 (2d Cir.) (upholding a district court's thirteen-level downward departure for a defendant with two young children, ages eight and nine, who was a caregiver and the primary earner for his family), <i>reh'g in banc denied,</i> 128 F.3d 788 (2d Cir.1997); <u>United States v. Johnson</u>, 964 F.2d 124, 126, 129 (2d Cir.1992) (upholding a ten-level downward

departure for a defendant who held the sole responsibility for raising four young children ranging in ages from five months to six years).

CONCLUSION

In summary, a sentence that does not include imprisonment is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set out in 18 U.S.C. § 3553(a) and reasonable under all the circumstances of this case.

Thank you for your consideration and for preparing the preliminary Presentence Report.  If you have any questions or require additional information or clarification on any of these matters, please do not hesitate to call me.

Sincerely,

s/*Arthur W. Leach*

*Attorney for Richard M. Scrushy*