## ARTHUR W. LEACH
ATTORNEY AT LAW

| | |
|---|---|
| 75 FOURTEENTH STREET, NW | (404) 786-6443 |
| 25TH FLOOR | FAX (678) 624-9852 |
| ATLANTA, GEORGIA 30309 | E-MAIL: ART@ARTHURWLEACH.COM |

MAY 10, 2007

**DELIVERED VIA EMAIL TO:**
**JACQUELYN_CAPLE@ALMP.USCOURTS.GOV**

Ms. Jacquelyn P. Caple
Senior United States Probation Officer
Frank M. Johnson Jr. Courthouse Complex
One Church Street
Montgomery, Alabama 36104

Dear Ms. Caple:

Pursuant to our discussion during the meeting of May 4, 2007, this letter is to submit to you our suggested statement of facts to be incorporated into the Presentence Report. As you will recall, our primary objection to the facts as provided to you by the Government is that they are not grounded in the testimony elicited at trial. By now you should have our Motion for Judgment of Acquittal and the tabs that accompanied that motion. Additionally, you should have our reply brief for the same motion which includes additional tabs setting out relevant testimony at trial. Finally, you should have the complete unofficial transcript for the portions of the trial that we had transcribed. I set out below your Draft Report with strikethroughs and additions reflected in italics and bold which indicate our suggested revisions. Regarding paragraphs 19, 23 and 24, I include a more generalized objection in brackets along the line of what we articulated in our May 3, 2007 letter to you. We continue to assert the facts as reflected in our May 3, 2007 letter.

**The Offense Conduct**

17. From on or about January 16, 1995, to on or about January 18, 1999, Don Eugene Siegelman was the Lieutenant Governor of the State of Alabama. From March 31, 1996, to on or about November 3, 1998, Siegelman campaigned for Governor of the State of Alabama. On or about January 19, 1999, to on or about January 20, 2003, Don Eugene Siegelman served as the Governor of the State of Alabama. The State of Alabama was governed according to a Constitution and statutes providing for an Executive Department, headed by the Governor of the State of Alabama as the supreme executive and by a Lieutenant Governor. The Executive Department of the State of Alabama was comprised of various government agencies, including the Alabama Alcoholic Beverage Control Board, the Alabama Certificate of Need Review Board (CON Board), the Alabama

Licensing Board for General Contractors, the Alabama Department of Environmental Management, the Alabama Department of Finance, the Alabama Department of Transportation, the Alabama Department of Revenue, the Alabama Department of Economic and Community Affairs, the Alabama Development Office and other Alabama departments, agencies and authorities.

18. Upon Siegelman's election as governor in 1998, ***the governor-elect's chief of the transition team, Elmer Harris, sought to repair and foster a relationship between Richard Scrushy and the newly elected governor.*** Eric Hanson, primary government affairs consultant/lobbyist for HealthSouth Corporation (HealthSouth), sought to assist in establishing a relationship ~~broker an agreement~~ between Seigelman and Richard M. Scrushy, Founder, Chairman and Chief Executive Officer of HealthSouth. HealthSouth was a business established to sell medical products and services in the State of Alabama and elsewhere and ***was subject to the CON approval process for certain improvements, certain change of use or upgrades and certain new healthcare facilities and equipment*** ~~regulated~~ by the State of Alabama CON Board. After Siegelman was sworn in as Governor on January 19, 1999, Scrushy communicated to Siegelman through Hanson and Nicholas D. "Nick" Bailey (longtime employee and Confidential and Executive Assistant to Siegelman during Siegelman's terms as Lieutenant Governor and Governor), that he was ***interested in a position on*** ~~wanted membership on, representation at, and influence over~~ the CON Board. Scrushy contacted Mike Martin, Executive Vice-President and Chief Financial Officer of HealthSouth, and told him that ~~HealthSouth needed to contribute~~ ***he wanted Martin to find contributors*** to the Alabama Education Lottery Foundation (AELF), Siegelman's campaign platform for a state lottery to generate revenues to improve the quality of the state's public schools and advance college scholarships and pre-K programs. Scrushy advised Martin to contact HealthSouth's investment banker with UBS Warburg, William McGahan, and request that McGahan make the payment to the AELF from Warburg UBS. Martin contacted McGahan and initially requested $1,000,000. ~~Scrushy later called McGahan on speaker phone, with Martin present,~~ ***Scrushy and Martin called McGahan and in that converstion Scrushy asked McGahan to "step up" and make a contribution to a worthy Alabama cause. The precise testimony was: "He wanted UBS to make a contribution to a cause in the state of Alabama, that it was a good cause, that other companies in the state were supporting it, that he (Scrushy) was supporting it and he wanted UBS to step up and support it too." Later, and without Scrushy present, Martin again called McGahan*** and threatened to fire McGahan and UBS if payment was not made to the AELF. McGahan advised ~~Scrushy~~ ***Martin*** that he was unable to make the payment. Hanson, who also represented UBS, later contacted McGahan on Scrushy's behalf. Hanson proposed to have IHS, Inc., another company which he represented, make a payment of $250,000 to the AELF and, in exchange, McGahan would get UBS to reduce a $1,000,000 debt owed to UBS by IHS by $267,000.

19. Around late June or early July 1999, ***after*** Hanson contacted IHS, ~~and~~ McGahan spoke with IHS Chief Financial Officer, Taylor Pickett. McGahan advised Pickett of the proposal to reduce IHS's debt to UBS in exchange for a $250,000 contribution to the AELF. Pickett spoke with IHS legal counsel to ensure that the AELF was a legitimate

entity and IHS agreed to carry out the proposal. McGahan advised Martin that the proposal was accepted and Martin directed an employee with HealthSouth, Lief Murphy, to fax the AELF articles of incorporation to Pickett. On July 19, 1999, Pickett processed the $250,000 check and had it delivered to Murphy who in turn gave it to Martin. Martin personally delivered the check to Scrushy. *Nick Bailey testified that* Siegelman ~~later~~ showed ~~Nick~~ Bailey the $250,000 check, dated July 19, 1999, and ~~informed Bailey that the check was from Scrushy who was "half way there". Bailey asked Siegelman what Scrushy wanted in exchange for the check and, according to Bailey, Siegelman responded, "the CON Board".~~ *Bailey testified that Governor Seigelman and Bailey had the following exchange:*

> *Governor: "He's half-way there."*
> *Bailey: "What in the world is he going to want for that?"*
> *Governor: "The CON Board."*
> *Bailey: "I wouldn't think there would be a problem with it."*
> *Governor: "I would not think so."*

*[Defendant generally objects to the paragraph beginning at "Nick Bailey testified . . ." Defendant Scrushy submits that this sequence of events is impossible based upon the uncontroverted testimony at trial that the only meeting in Montgomery was the June 29, 1999, "get acquainted" meeting and the check was dated on July 19, 1999 and was therefore prepared and delivered after the only possible date for the meeting.]*

20. On July 26, 1999, Scrushy was appointed to the CON Board. According to Bailey, Siegelman instructed him to contact the Board chairperson and tell her that Siegelman wanted Scrushy appointed as vice-chair of the Board. Bailey delivered the message the night before the first organizational meeting and Scrushy was subsequently appointed vice-chair.

21. Approximately November 1999, Scrushy discovered the $250,000 check had not yet been cashed. He also discovered that IHS was soon to be insolvent. On November 5, 1999, Bailey took possession of the check and opened a checking account at First Commercial Bank in the name of the AELF. On February 29, 2000, the AELF obtained a loan, guaranteed by Siegelman and Merv Nabors, from First Commercial Bank in the amount of $730,789.29. The loan disbursement check was cut on March 9, 2000, and applied to satisfy a $730,789.20 debt of the Alabama Democratic Party (ADP) owed to Colonial Bank. On March 13, 2000, Siegelman directed Bailey to pay $440,000 on the loan (for which he was jointly and personally responsible) with First Commercial Bank by transferring monies (including the $250,000 IHS check) from the AELF checking account. *Richard Scrushy had nothing to do with the First commercial Bank loan and he had no connection to any loan the Alabama Democratic Party had with the Colonial Bank. Richard Scrushy was not a guarantor of any loan obtained by the Democratic Party nor any related loan and was in no way involved in the handling of the two checks once they were received by the governor or his office.*

22. In May 2000, Siegelman and Bailey met with Scrushy at the HealthSouth offices in Birmingham, Alabama. Following the meeting, Siegelman gave Bailey a check dated May 18, 2000, in the amount of $250,000 made payable to the AELF and drawn on an account with HealthSouth. On May 23, 2000, the check was applied to the AELF loan guaranteed by Siegelman and Nabors with First Commercial Bank. Siegelman's personal liability for the AELF loan was extinguished January 31, 2001, when Siegelman directed that the AELF's funds be used to retire the debt (the lottery referendum was defeated on October 12, 1999).

23. The Alabama Fair Campaign Practices Act mandates public disclosure of contributors and the amount of contributions. Siegelman failed to report the $250,000 checks cut by IHS and HealthSouth and placed in the First Commercial Bank AELF checking account in either the pre-election reports or the AELF termination report. On July 26, 2002 (after media questioned whether the ADP and the AELF had correctly reported their activities during the lottery campaign, after legal counsel for the Alabama Secretary of State had requested the AELF file proper reports over a six-week period, and after being notified that AELF had failed to file amended reports to reconcile its expenditures by the Alabama Attorney General by letter dated July 17, 2002), Siegelman directed the filing of an amended 1999 report and 2000 and 2001 reports which disclosed the receipt of the IHS and HealthSouth checks. *[Defendant objects to the entire paragraph as the above acts are not within the scope of any conspiracy that Richard Scrushy was charged with or which the evidence in any way showed he agreed to participate in and should not be included in his report. Richard Scrushy had no role in campaign reporting and the sentence in this case should in no way hold him accountable for activities that were not part of the charged conspiracy.]*

24. The 1999 amended AELF annual report reflected the IHS check was received on November 5, 1999, not in July 1999. The 2000 annual report reflected receipt of the $250,000 check from HealthSouth, AELF's receipt of $730,789.29 on March 9, 2000, the expenditure of that same amount on the following date to the State Democratic Executive Committee for the "Get Out the Vote" campaign and the $440,000 payment on the First Commercial Bank loan. *[Defendant objects to the entire paragraph as the above acts are likewise not within the scope of any conspiracy that Richard Scrushy was charged with or which the evidence in any way showed he agreed to participate in and should not be included in his report. Richard Scrushy had no role in campaign reporting and the sentence in this case should in no way hold him accountable for activities that were not part of the charged conspiracy.]*

25. Scrushy used his position with the CON Board to influence the Board's actions affecting HealthSouth and its competitors. Scrushy contacted the chairperson of the CON Board at her home to discuss a pending MRI application filed by Brookwood Hospital in Birmingham. Such communication between board members was in violation of the ethical rules and operational procedures governing the Board. The next day, Scrushy recused himself from the Board meeting; however, the Board denied Brookwood's application. Scrushy offered things of value to another CON Board member, Tim Adams, to influence Adams in favor of and as a benefit to HealthSouth. Scrushy offered

Adams rides from Birmingham to Montgomery, Alabama, on his helicopter and advised HealthSouth representative, Loree J. Skelton, to "keep Adams happy" so he would not use his appointment to the Board as a detriment to HealthSouth, particularly as it related to meetings regarding HealthSouth applications, when Scrushy would recuse himself. Adams requested a job at HealthSouth and at Scrushy's direction, Skelton made arrangements for Adams to meet the director of HealthSouth. Adams was offered a job as a nurse. Skelton also offered Adams a contract with HealthSouth to write a CON Board application for a PET scanner for which he was paid $8,000, while Adams was still a Board member. Adams was paid the $8,000 in spite of the inferior quality of his work. On July 29, 2002, Skelton paid Adams $3,000 to attend a Board meeting during which a HealthSouth application for a rehabilitation hospital in Phenix City, Alabama, would be on the agenda. Adams was needed for the quorum. Adams attended the meeting, created the necessary quorum and voted in favor HealthSouth's application. A letter notifying HealthSouth of the final order for the Certificate of Need for HealthSouth's Regional Rehabilitation Hospital was mailed from Montgomery to Birmingham on August 2, 2002. On December 18, 2002, HealthSouth's PET scanner application came before the Board. Adams remained in the meeting to make the quorum for consideration of the application. The Board approved the application and a letter notifying HealthSouth of the final order for the Certificate of Need for a PET scanner was mailed from Montgomery to Birmingham on January 2, 2003. *[Defendant Scrushy objects to all statements in this paragraph except that the mailing of the final orders occurred, for the reasons set out in our letter of May 3, 2007 to Ms. Caple. The evidence at trial does not support these allegations.]*

26. On January 17, 2001, Scrushy resigned from the Board. On January 18, 2001, ~~pursuant to his agreement with Scrushy,~~ Siegelman appointed Tom Carmen, Director of Corporate Development at HealthSouth, to fill Scrushy's vacant position. Siegelman reappointed Carmen to the Board on July 27, 2001, and Carmen remained on the Board throughout Siegelman's gubernatorial term. Carmen's letter of appointment was mailed from Montgomery to Birmingham, Alabama, on January 18, 2001, and his letter of re-appointment was mailed from Montgomery to Birmingham, Alabama, on July 27, 2001. *The jury returned mail fraud verdicts against Scrushy as to Counts Six and Seven of the Indictment relating to the two mailings referenced above.*

Thank you for your consideration of our objections, our additional facts and our proposed factual statement. I expect that Carmen Hernandez will be sending you additional objections relating to the guideline calculations submitted by the Government later today. If you have any questions or require additional information or clarification on any of these matters, please do not hesitate to call me.

          Sincerely,

          s/*Arthur W. Leach*
          *Attorney for Richard M. Scrushy*