**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 2:05cr119-MEF |
| RICHARD M. SCRUSHY,<br>        Defendant. | |

**DEFENDANT RICHARD M. SCRUSHY'S MOTION
FOR RELEASE ON BOND PENDING APPEAL**

COMES NOW Defendant Richard M. Scrushy, by and through his undersigned counsel of record, and, pursuant to 18 U.S.C. § 3143(b), files this Motion for Release on Bond Pending Appeal.  This Court should grant this motion because Defendant Scrushy meets all of the requirements of § 3143(b), namely: (1) that he poses neither a risk of flight nor a danger to the community; (2) that, as demonstrated below, the appeal of his conviction and sentence poses several "substantial questions of law or fact likely to result in" a reversal or new trial; and (3) that his appeal will not be interposed for the purpose of delay.

Defendant Scrushy is cognizant of the fact that this case has been hard fought, has occasionally resulted in personal rancor, and has resulted in extensive litigation of many issues.  However, at the end of the day, and setting aside the long history of this case, as to the issue of setting of bond for Defendant Scrushy pending appeal, this Court should consider only one question: Will Defendant Scrushy's appeal present "substantial questions" – defined as "close questions" or ones that "very well could be decided the

other way – that, if decided in his favor, would likely result in a reversal or remand for new trial?

And, though this Court, no doubt, is of the mind that any contentions of legal error that Defendant Scrushy might plan to raise on appeal do not amount to reversible error, Defendant Scrushy intends to present at least three issues on appeal, discussed in some length below, which, from the requistite objective vantage point, at least meet the "substantial question" standard set by the Eleventh Circuit: (1) that this Court failed to make sufficient inquiry into certain evidence that members of the jury improperly consulted with extraneous Internet materials during the course of the deliberations; (2) that the evidence was insufficient as a matter of law to establish the existence of an express *quid pro quo* as between Governor Siegelman and Defendant Scrushy so as to permit their convictions for bribery, mail fraud and mail fraud conspiracy to stand; and (3) that the 2001 Qualified Jury Wheel, from which Defendant Scrushy's grand jury was selected, and the 2005 Qualified Jury Wheel, from which his petit jury was drawn, and the pools drawn from each of these wheels failed to fairly represent the African-American citizens that live in the Middle District of Alabama in violation of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq*. ("JSSA"), the Jury Plan of the Middle District of Alabama, the Sixth Amendment, and the Equal Protection Clause of the Fifth Amendment.

**Argument and Citation of Authorities**

**I. THIS COURT SHOULD PERMIT DEFENDANT SCRUSHY TO REMAIN ON BOND PENDING APPEAL BECAUSE HE POSES NO RISK OF FLIGHT OR DANGER TO THE COMMUNITY, AND HE WILL BE PRESENTING "SUBSTANTIAL QUESTIONS" OF LAW AND FACT ON APPEAL.**

    **A.  The Legal Standard**

Title 18, United States Code, Section 3143(b), which governs release pending appeal, providesin relevant part:

(b)      **Release or detention pending appeal by the defendant --**

(1)     Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, *unless the judicial officer finds --*

    (A)    by clear and convincing evidence that *the person is not likely to flee or pose a danger to the safety of any other person or the community* if released under Section 3142(b) or (c) of this title; and

    (B)    that *the appeal is not for the purpose of delay* and *raises a substantial question of  law or fact* likely to result in –
       (i)     reversal,
       (ii)    an order for a new trial,
       (iii)   a sentence that does not include a term of imprisonment, or
       (iv)   a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer *shall* order the release of the person in accordance with section 3142(b) or (c) of this title….

(Emphasis added).

As summarized by the Eleventh Circuit in the seminal case discussing

§ 3143(b):

under the 1984 Bail Act, a court must find the following four factors in order to grant bail pending appeal: (1) that the defendant is not likely to flee or pose a danger to the safety of any other person or the community if

3

> released; (2) that the appeal is not for purpose of delay; (3) that the appeal raises a substantial question of law or fact; and (4) that if that substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed.

*United States v. Giancola*, 754 F.2d 898, 901 (1985). Therefore, under the express words of § 3143(b), if Defendant Scrushy meets his burden of proof in establishing the foregoing factors – a burden that he embraces, and, as shown below, he meets – then this Court has no discretion but to allow him to be released on bond pending disposition of his appeal in accordance with conditions set under 18 U.S.C. §§ 3142(b) and (c).

The resolution of a motion for release pending appeal most often depends – as it does here – on whether "the appeal raises a substantial question of law or fact." In *Giancola*, the Eleventh Circuit parsed the meaning of the term "substantial question" as follows:

> [A] "substantial question" is *one of more substance than would be necessary to a finding that it was not frivolous*. It is *a "close" question or one that very well could be decided the other way*. Further, there are no blanket categories for what questions do or do not constitute "substantial" ones. Whether a question is "substantial" must be decided on case-by-case basis.

754 F.2d at 901 (emphasis added; footnote omitted). Because even the Government would acknowledge that Defendant Scrushy is not a danger to the community, and because, as this Court has recently reiterated by virtue of its denial of the Government's Motion for Revocation of Bond (Doc. 540), Defendant Scrushy does not pose a risk a flight during the pendency of his appeal, this motion should be determined on the basis of whether Defendant Scrushy's appeal poses "substantial questions," within the meaning of *Giancola*, that are likely to lead to a reversal or new trial. And such is the case.

4

**B. Defendant Scrushy is Not a Risk of Flight, and he Poses No Danger to the Community.**

As alluded to above, a threshold consideration in relation to this Court's appeal bond determination is whether Defendant Scrushy is "likely to flee or pose a danger to the safety of any other person or the community if released" pending appeal. 18 U.S.C. § 3143(b)(1)(A). Both Chief Magistrate Judge Coody and this Court have found on several occasions that Defendant Scrushy, at least with certain conditions imposed on him, poses neither a danger to the community nor a risk of flight, most recently in connection with the Petition filed by United States Probation (Doc. 536), seeking modification of the conditions of Defendant Scrushy's post-conviction release pending sentencing and the Government's Motion for Revocation of Bond. (Doc. 540.) *See* Order, dated April 13, 2007 (Doc. 545), denying Motion for Revocation of Bond and modifying conditions of release (Chief Magistrate Judge Coody); Order, dated April 30, 2007 (Doc. 574), affirming in part and modifying in part Chief Magistrate Judge Coody's April 13, 2007 Order.

With respect to the danger to the community prong of this consideration, even the Government cannot seriously contest Chief Judge Coody's recent observation as to Defendant Scrushy: "I don't think he meets any -- anybody's definition of a danger." (Transcript of Proceedings, April 9, 2007, at 215.) The Government has never contended that Defendant Scrushy is a danger to the community, and its recent, unsuccessful motion to revoke his bond was based *only* on Defendant Scrushy's alleged risk of flight. *See* Transcript of Proceedings April 9, 2007 at 225 (Mr. Feaga: "What I'm saying is the United States is urging the Court to revoke his supervised release today. We believe that

he is a threat to flee the jurisdiction of this Court. ").; *see also* Motion for Revocation of Bond (devoid of any assertion that Defendant Scrushy poses a danger to the community).

Nevertheless, the Government will no doubt argue that, in light of the recent issues that arose with respect to Defendant Scrushy's trip to Florida in March 2007, he will present a greater risk of flight once a sentence is actually imposed on him. Such is not the case. First, as Defendant Scrushy testified at the April 9, 2007 revocation hearing, and as Chief Magistrate Judge Coody seemed to accept in denying the Government's Motion for Revocation of Bond (a denial affirmed by this Court), the confusion as to Defendant Scrushy's whereabouts during his March 2007 Florida vacation was the product of a miscommunication between him and his probation officer, who readily admitted both that he permitted Defendant Scrushy to travel to West Palm Beach and that he did not know where West Palm Beach was in relation to Orlando. Moreover, this problem was specifically addressed by this Court when it modified Defendant Scrushy's conditions of release so as to require him: (1) to wear or carry a GPS monitoring device, and (2) to "submit for approval by the Court a detailed, written itinerary that shall indicate precisely where Scrushy will be at all times during the time he is out of the Northern or Middle Districts of Alabama." (Order affirming in part and modifying in part Chief Magistrate Judge Coody's April 13, 2007 Order at 5-6.) There have been no further problems since the imposition of these conditions.

More fundamentally, perhaps, notwithstanding the fact that Defendant Scrushy had already been convicted as of the time of his March 2007 Florida trip, he returned to Birmingham from his trip on time, and he reported his arrival promptly to Probation. Moreover, with full knowledge that he faced the possibility of the imposition of a stern

sentence of incarceration – 25 years, if the Government has its way – as of the time that this Court considers this motion, Defendant Scrushy faithfully appeared in court on June 26, 2007 to be sentenced. This, more than any other evidence, demonstrates that the risk of flight calculus remains unchanged since the time that this Court last considered this issue.[1]

In the end, therefore, Defendant Scrushy poses neither a risk of flight nor a danger to the community, and thus, he satisfies the threshold condition of 18 U.S.C. § 3143(b)(1)(A).

**C. Defendant Scrushy's Appeal Will Present Several "Substantial Questions" of Law and Fact, Which, if Decided in His Favor, Likely Will Result in a Reversal or in an Order for New Trial.**

**1. The First Substantial Question:**

**Whether this Court Erred in Failing to Undertake any Investigation of Evidence Proffered by Defendant Scrushy Indicating, on its Face, that Certain Jurors Conducted Research on the Internet.**

As this Court is well aware, counsel for Defendant Scrushy obtained – and presented to this Court as exhibits to (1) his Motion to Reconsider Order Denying New Trial and to Supplement Record (Doc. 519) ("Renewed New Trial Motion"), and (2) his Motion to Supplement Previously Filed Motion to Reconsider Order Denying New Trial and to Supplement Record (Doc. 532) ("Motion to Supplement") – certain historical e-mail correspondence that, when considered with other evidence and if ultimately authenticated, establishes beyond any doubt that at least two of the jurors sitting in

---

[1] Indeed, if this Court sentences Defendant Scrushy to anything less than the 25 year term of incarceration sought by the Government, this risk of flight calculus would change, in favor of Defendant Scrushy. In as much as he appeared in Court with the prospect of an extraordinarily harsh sentence.

judgment of Defendant Scrushy conducted research on the Internet that effected their consideration of Defendant Scrushy's guilt or innocence. Additionally, based upon the affidavit of Juror 5, there is reason to believe that the internet research made its way into the jury deliberations. These e-mails were all brought to the attention of the Court in the new trial pleadings shortly after they were received by counsel.

Nevertheless, notwithstanding the fact that the proffer of these e-mails of itself, was more than sufficient to satisfy Defendant Scrushy's burden to make a "colorable showing of extrinsic influence" on the jury necessary to require this Court to investigate jury misconduct in this case, this Court has declined to undertake *any* such investigation. *See* Memorandum and Opinion, dated June 22, 2007 (Doc. 611) ("Order Denying Supplemental New Trial Motions") at 5-11. Under binding Eleventh Circuit precedent, this Court's failure to investigate Defendant Scrushy's "colorable showing" of jury misconduct – in the form of the newly discovered e-mails – constitutes an abuse of discretion as a matter of law, and thus, reversible error. Therefore Defendant Scrushy's appeal of this Court's failure to investigate necessarily presents a "*substantial question of law or fact* likely to result in … reversal" under 18 U.S.C. § 3143. For this reason alone, this Court should allow Defendant Scrushy's release on bond pending appeal.

### a. The Legal Standards Governing This Court's Duty to Investigate Alleged Extrinsic Influences on the Jury.

The Sixth Amendment guarantees to every defendant the constitutional right to a fair trial before an impartial jury. Implicit in this concept is that the jury's verdict must be based solely on the evidence, argument and law adduced in the courtroom and that its verdict must be unaffected by extrinsic influences, duress, or misconduct by the jurors or

anyone associated with the process. As the Supreme Court held in *Turner v. Louisiana*,

379 U.S. 466, 85 S.Ct. 546 (1965):

> The requirement that a jury's verdict "must be based upon the evidence developed at trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. "The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law."

379 U.S. at 472 (quoting *Sinclair v. United States*, 279 U.S. 749 (1929)) (footnote

omitted); *see also id.* at 472-73 ("In the constitutional sense, trial by jury in a criminal

case necessarily implies at the very least that the 'evidence developed' against a

defendant shall come from the witness stand in a public courtroom where there is full

judicial protection of the defendant's right of confrontation, of cross-examination, and of

counsel."). This fundamental principle and protections arising from it are not only

implicated, but gravely endangered by the events that have occurred relative to the jury

that returned the guilty verdicts in the instant case, and more specifically for the moment,

by this Court's failure to investigate those events. As explored more completely below,

this case involves Defendant Scrushy's repeated proffers of evidence of jury exposure to

the very sort of extrinsic influences that the Sixth Amendment prohibits.

A district court facing such proffers of evidence does have discretion to determine

whether and in what manner to investigate the issue. *United States v. Darby*, 744 F.2d

1508, 1540 (11th Cir. 1984) ("Where there are allegations of extraneous information,

outside influence or other jury misconduct, the decision whether to investigate rests in the

sound discretion of the district court."). However, the Eleventh Circuit has made it

abundantly clear that such discretion is not unfettered, and indeed, that when, as is the

case here, a colorable showing of extrinsic influence is made, a *district court has no discretion other than to inquire* into the nature and effect of that influence. *United States v. Barshov*,. 733 F.2d 842, 851 (11th Cir. 1984) ("Where a colorable showing of extrinsic influence is made, a trial court, in the exercise of its discretion, *must* make sufficient inquiries or conduct a hearing to determine whether the influence was prejudicial.") (emphasis added); *United States v. Chiantese*, 582 F.2d 974, 979 (5th Cir. 1978) ("We realize that in instances where the jury misconduct involves influences from outside sources, *the failure of the trial judge to hold a hearing constitutes an abuse of discretion and is therefore reversible error*") (emphasis added); *see also United States v. Rowe*, 906 F.2d 654, 656 (11th Cir. 1990) (it is "the court's duty to ensure that the jury verdict was in no way tainted by improper outside influences," and, in light of this duty, "the court *must* investigate the asserted impropriety upon *merely a colorable showing of extrinsic evidence*.") (emphasis added).

### b.  The Unexplored Evidence Proffered by Defendant Scrushy.

On December 21 and 22, 2006, shortly after this Court issued its December 13, 2006 Order (Doc. 518) denying Defendant Scrushy's Motion for New Trial Pursuant to Rule 33(a) (Doc. 467) ("Motion for New Trial"),[2] Defendant Scrushy and counsel[3] received anonymous letters, each containing what appear to be copies of two e-mails between jurors in this case.

---

[2] The Motion for New Trial was filed jointly by Defendants Scrushy and Siegelman.

[3] Defendant's counsel Arthur W. Leach, Terry Lucas Butts, and Frederick G. Helmsing received copies of the e-mails.

The first of the e-mails, copies of which were received in late December 2006, is dated June 25, 2006, and it was attached as EXHIBIT 23 to the Renewed Motion for New Trial. EXHIBIT 23 appears to be a copy of an e-mail sent on the Gmail account of Juror B to the e-mail account of Juror C at 10:09 p.m. Sunday night, June 25, 2006. This e-mail states in its entirety:

> ….judge really helping w/jurors…
>
> still having difficulties with #30
>
> …any ideas???
>
> keep pushing on ur side
>
> did not understand ur thoughts on statute
>
> but **received links**.
>
> [first name of Juror B]

EXHIBIT 23 (emphasis added).

The second of these e-mails, is dated June 25, 2006, and it was attached as EXHIBIT 24 to the Renewed New Trial Motion. EXHIBIT 24 appears to be a copy of an e-mail sent on the Gmail account of Juror B to the e-mail account of Juror C at 10:41 p.m., Sunday night, June 25, 2006, and it states in its entirety:

> I can't see anything we miss'd. u?
>
> **articles usent outstanding!**  gov & pastor up s---t creek.
>
> good thing no one likes them anyway.  all public officials
>
> r scum; especially this 1.  pastor
>
> is reall a piece of work
>
> **…they missed before, but we won't**

…also, keepworking on 30…

will update u on other meeting.

[first name of Juror B]

EXHIBIT 24 (emphasis added).

The verdict in this case was returned on Thursday, June 29, 2006, just four days after these e-mails.

Furthermore, beginning on February 21, 2007, Defendant Scrushy and some of his counsel received anonymous letters, each containing what appear to be copies of another e-mail between jurors in this case. This e-mail, also dated June 25, 2006, appears to have been printed from a Gmail account and sent from Juror C to Juror B, and it was attached as EXHIBIT 26 to the Motion to Supplement. The e-mail states in its entirety:

**Great info 4 r friends.**

% of prosecution increases dramatically.

Could not find that when I surfed it.

**Gov/Pastor GONE….**

EXHIBIT 26 (emphasis added).

> **c. Because this Court has Chosen not to Investigate Defendant Scrushy's More than "Colorable Showing of Extrinsic Influence," Defendant Scrushy's Appeal Necessarily Presents "Substantial Questions" Within the Meaning of 18 U.S.C. § 3143.**

If they are authenticated, the three e-mails between Jurors B and C now in question, all obtained after this Court had ruled on Defendant Scrushy's New Trial Motion, shed a new light – as distinct from the evidence adduced in connection with the Motion for New Trial – both on the nature of the extra-deliberation communications between jurors in this case and the improper extrinsic information that they had obtained

during deliberations.  More specifically, these e-mails reveal: (1) that at least Jurors B and C had accessed the Internet to obtain far more extensive extrinsic materials than previously admitted by them and than previously considered by this Court when it entered its Order denying Defendant Scrushy's New Trial Motion; and (2) that they considered this extrinsic information to be highly prejudicial to Defendant Scrushy.

First, the e-mails directly refute the testimony of these two jurors, given under oath at the hearing before this Court on the Motion for New Trial held on November 17, 2006, regarding their limited research on the Internet. (Transcript of Proceedings November 17, 2006 at 78, 123.)  The e-mails also corroborate testimony and evidence from other jurors that this Court, in its Order denying a new trial, found to have been unreliable.  The e-mails also corroborate the testimony of Juror 66 at the November 17, 2006 evidentiary hearing to the effect that Juror C had information about the indictment that he/she obtained from the Internet, which he/she read to the other jurors and discussed with them, (*id*. at 52-53, 54-55, 57), and that Juror B discussed information that he/she researched about the indictment and discussed a news article viewed on the Internet. (*Id.* at 59, 60-61.)  They also corroborate the affidavit of Juror A – effectively rejected by this Court in its Order denying a new trial – in which he averred that Juror B admitted that he/she "had searched the Internet," and that the same juror told the other jurors "so much law and legal procedures during our deliberations, all the jurors got on her and questioned her knowledge about knowing too much."  (Motion for New Trial, EXHIBIT 9 at 1; *see also* Motion for New Trial, EXHIBIT  8 at 2 ("I was confused between all the evidence and other Internet stuff and information that some of the jurors brought in and was

talking about….They were pulling stuff out of files and some were talking about having Internet information and talking about that too.")).

Second, considered in juxtaposition with each other, and in context, the new e-mails, if authenticated, prove that Jurors B and C accessed the Internet to obtain extrinsic information that is far more substantive and prejudicial to Defendant Scrushy than previously known. In the first of the three e-mails between these jurors, Juror B tells Juror C at 10:09 p.m. on June 25: "**did not understand ur thoughts on statue but received links.**" (EXHIBIT 23.) In the next e-mail, sent at 10:41 p.m. on that same day, Juror B tells Juror C, among other things **"articles u sent were outstanding!,"** and, in what must be construed as a reference to the prior acquittal of Defendant Scrushy on other charges in the Birmingham matter, **"they missed before, but we won't."** (EXHIBIT 24.) In the next e-mail, EXHIBIT 26, sent at 10:47 p.m., Juror C tells Juror B "**Great info 4 r friends. % of prosecution increases dramatically. Could not find that one when I surfed it. Gov/Pastor GONE….**" (EXHIBIT 26.)

This Court has dismissed the significance of these newly-discovered e-mails as being "merely cumulative of the exhibits before the Court prior to the December 13, 2006 ruling." (Order Denying Supplemental New Trial Motions at 10.) The Court further states that these exhibits, "if authenticated, are merely impeaching and do not warrant further investigation."[4] (*Id.*)

First, it is hard to fathom how hard evidence – *previously unknown to the Defendants and to the Court* – strongly supporting an inference that jurors accessed the

---

[4] *See also* (*id.* at 7:Given the scope of the Court's prior inquiry [which did not involve a single question relating to the authenticity of certain e-mails believed to be from Jurors B and C], the *only reason for a further inquiry would be to attempt to impeach the jurors' prior testimony*" (emphasis added)) .

Internet to read extrinsic articles can be characterized as being "merely cumulative." The e-mails (if authenticated), in fact, constitute new and materially significant evidence that Jurors B and C engaged in misconduct that should lead to a new trial of this matter. Moreover, that the Court further diminishes the significance of the new e-mails by further characterizing them as being "merely impeaching" is similarly difficult to understand. Central to this Court's denial of the supplemental new trial motions is its conclusion that it has already engaged in a thorough and sifting investigation, including questioning of Jurors B and C, in response to which they each acknowledged having accessed the Internet on a limited basis but denied conducting any other Internet research. Critical to the Court's conclusion that no further inquiry was warranted based on the new e-mails was its finding that Jurors B and C were credible witnesses, yet would the Court's view of their credibility not change if it were to learn, upon authentication of the newly-discovered e-mails, that, contrary to their sworn testimony, they had engaged in the sort of far-reaching Internet research revealed in the newly discovered e-mails? And if its credibility assessment were to change, in conjunction with its digestion of the substance of the new e-mails, would this Court not be compelled to order a new trial under the Sixth Amendment? *Cf. United States v. Bagley,* 473 U.S. 667, 676 (1985) ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is evidence favorable to an accused so that, if disclosed and used effectively, it may make the difference between conviction and acquittal.")

More to the point, however, for purposes of this motion and not to the end result, even without their having been authenticated, the e-mails in question undeniably make a "colorable showing" that the jury was exposed to prejudicial extrinsic evidence. As such,

Defendant Scrushy has thus met his burden to trigger a *mandatory* investigation by the Court, a point that the Court entirely ignores in the Order Denying Supplemental New Trial Motions. If the e-mails were to be authenticated, then Defendant Scrushy submits that they demonstrate beyond question that such extrinsic exposure occurred and prejudiced Defendant Scrushy to a degree that his convictions should be vacated. If the e-mails turn out not to be authentic, then a hoax has been perpetrated that should be addressed accordingly. Either way, because the e-mails are so powerful on their face, under the binding Eleventh Circuit authority of *Barshov*, *Chiantese*, and *Rowe*, this Court had no option other than to investigate their authenticity. Yet the Court has refused to investigate or authorize an investigation, and its failure to do so constitutes reversible error.[5]

The Court no doubt disagrees that it has committed reversible error by failing to investigate the authenticity of the newly-produced e-mails, but, it should nevertheless acknowledge that Defendant Scrushy's claim of reversible error on this account presents a "substantial question" – that is, "one of more substance than would be necessary to a

---

[5] Given the strictures of this Court's Local Rule 47.1 and the limitations under Rule 17, Defendant Scrushy was unable to independently investigate the issue of authenticity. Defendant Scrushy requested that this Court permit him to interview the jurors, that this Court obtain and have a forensic computer expert examine the computers of the relevant jurors, that this Court Order the Internet Service Providers and network providers to preserve records of jurors' e-mails and Internet searches, that this Court subpoena and examine *in camera* these records, and that this Court enter an Order authorizing Defendant to subpoena these records. *Yet, this Court refused each and every request designed to authenticate the copies of the apparent e-mails.* Moreover, during the evidentiary hearing on November 17, 2006, at which all twelve jurors were questioned, this Court did not ask a single juror to admit or deny that the e-mails in question were written or received by them, despite a specific request for such questioning. (Transcript of Proceedings November 17, 2006 at 16.)

finding that it was not frivolous… [or a] 'close' question or one that very well could be decided the other way[,]" *Giancola*, 754 F.2d at 901 – which, if decided in Defendant Scrushy's favor, will "likely to result in reversal," within the meaning of 18 U.S.C. § 3143(b)(1)(B). Accordingly, an appeal bond should be set for Defendant Scrushy.

> **2. The Second Substantial Question:**
>
> **Whether This Court Erred in Denying Defendant Scrushy's Rule 29 Motion for Judgment of Acquittal In Light of the Absence of Evidence of an Express *Quid Pro Quo* Necessary to Support his Convictions.**

The United States Supreme Court has held in the clearest of terms that the ability of candidates to seek contributions and the right of citizens to support political candidates with their contributions is essential to our democracy, and, as a consequence, it is activity that is protected under the Constitution. *McCormick v. United States*, 500 U.S. 257 (1991). It is in light of the sacrosanct nature of the right of the citizenry to engage in political activity that the Supreme Court has permitted political contributions to be the subject of criminal prosecution *only* when they are made as part of an express *quid pro quo*, that is when the contributions are made "in return for an explicit promise or undertaking by the official to perform or not perform an official act." *McCormick*, 500 U.S. at 273.

Here, as Defendant Scrushy has already argued extensively, both orally and in writing,[6] the Government's evidence failed to fulfill its bold claim in the indictment that the contributions attributed to Defendant Scrushy constituted a *quid pro quo* for his

---

[6] All argument and recitations of fact set forth in Defendant Scrushy's in trial Motion for Judgment of Acquittal Pursuant to Rule 29 (Doc. 413), and in his briefing in support of his post-trial Motion for Judgment of Acquittal Pursuant to Rule 29(c) (Doc. 454), are incorporated herein and will not be repeated here in full.

appointment by Governor Siegelman to the CON Board. Defendant Scrushy understands that this Court has denied his Rule 29 Motion for Judgment of Acquittal (Doc. 468), but the issue of the sufficiency of the evidence as to the existence of the requisite *quid pro quo* necessary to support his convictions in this case is certainly a "close question," not frivolous, and "one that very well could be decided the other way." *Giancola*, 754 F.2d at 901. Furthermore, if this issue were to be resolved in Defendant Scrushy's favor, then there is no doubt that his convictions would be reversed and that judgments of acquittal would be entered.[7] It is for this additional reason that this Court should grant this motion and permit Defendant Scrushy to remain free on bond pending the disposition of his appeal.

Without reiterating all of the exhaustive discussion on this issue already set forth in Defendant Scrushy's prior Rule 29 briefing, fundamentally, the Government's evidence failed to establish a *quid pro quo* for two main reasons: (1) no one witnessed the June 29, 1999 meeting where the alleged express agreement as between Governor Siegelman and Defendant Scrushy was made, and the only circumstantial evidence

---

[7] Each of Defendant Scrushy's counts of conviction is directly implicated by the *quid pro quo* sufficiency issue. The Supreme Court has expressly ruled that the *quid pro quo* requirement is an element of a 18 U.S.C. § 666 violation (federal funds bribery), which is charged in Count Four. *United States v. Sun Diamond Growers*, 526 U.S. 398, 404-05 (1997); *see also United States v. Paradies*, 98 F.3d 1266, 1289 (11th Cir. 1996); *United States v. Castro*, 89 F.3d 1443, 1454 (11th Cir. 1996). Similarly, Counts Six through Nine of the indictment, alleging honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, both as charged and as a matter of law require proof of an express *quid pro quo*. *See United States v. Sawyer*, 85 F.3d 713, 741 (1st Cir. 1996); *United States v. Martin*, 195 F.3d 961, 966 (7th Cir. 1999); and *United States v. Triumph Capital Group*, Inc., 260 F. Supp. 2d 444, 461 (D. Conn. 2002). Finally, the remaining count of conviction, Count Five, which charged a conspiracy to engage in honest services mail fraud, similarly required proof of an express *quid pro quo* because without such an agreement, there was a total absence of evidence of any other conspiratorial agreement under 18 U.S.C. § 371.

offered to prove the existence of *quid pro quo* – the testimony of Nick Bailey – does not, in fact, support even an inference of such an express agreement; and (2) even if it does support an inference of the existence of an express *quid pro quo*, Bailey's testimony is so lacking in logical basis as to justify its being entirely disregarded.

First, notwithstanding the uncontroverted evidence that Defendant Scrushy did not even want a seat on the CON Board in 1999, the only evidence offered by the Government at trial as to the existence of a *quid pro quo* was Bailey's testimony that he engaged in the following conversation with Governor Siegelman after the Governor supposedly showed him a check provided by Defendant Scrushy at the June 29, 1999 meeting:

> Q [Mr. Feaga]:  Okay. Now, when you saw the Governor, did he have this check in his hand? Did he have it?
>
> A [Mr. Bailey]:  Yes, sir.
>
> Q:  Okay. Now when the Governor showed you the check, what, if anything did he say to you?
>
> A:  He made a comment referring to Mr. Scrushy's commitment to give 500,000 and he's halfway there.
>
> Q:  Okay.  And what, if anything, did you say to him?
>
> A:  I said—I responded by saying, *what in the world is going [sic] to want for that; and his response was the CON Board or the C-O-N Board.*
>
> Q:  Okay. And what did you—
>
> A:  I wouldn't think there would be a problem with it.  And he said I wouldn't think so.

(May 2, 2006 Transcript of Proceedings at 175-76 (emphasis added)) .

Tellingly, Bailey neither witnessed nor testified about anything that he had heard directly from Defendant Scrushy, and indeed, his testimony fails to reveal the source for

the Governor's belief that Defendant Scrushy desired a seat on the CON Board.  In fact, Bailey's testimony fails to establish – and there is *no proof* otherwise – that the Governor and Defendant Scrushy even discussed the make-up of the CON Board during the June 29, 1999 meeting.  In the end, therefore, Bailey's testimony, can only stand for the proposition that the Governor *believed* that Defendant Scrushy wanted a seat on the CON Board as a consequence of his donations, a belief that was no doubt similar to that of many politicians who consider political appointments for campaign donors.  Crucially, evidence as to Governor Siegelman's *belief* as to Defendant Scrushy's desire to become a member of the CON Board is insufficient even to support an inference that Defendant Scrushy made the donations at issue as part of an express *quid pro quo*, that is, with "a specific intent to give or receive something of value *in exchange* for an official act," *Sun-Diamond Growers*, 526 U.S. at 404-05 (emphasis in original).

Moreover, the Bailey testimony is not sufficient to sustain Defendant Scrushy's guilt for another compelling, reason: the conversation that Bailey testified to having had with the Governor simply could not have occurred as Bailey claims.  Taking Bailey's testimony at face value, two crucial events precipitated the Bailey-Governor Siegelman conversation: first, the meeting between the Governor and Defendant Scrushy; and, second, the Governor's supposed act of showing Bailey a $250,000 check that Bailey believed was signed by Defendant Scrushy. The critical statements in the conversation, as testified to by Bailey, simply do not make any sense without the presence of the check and the conversation occurring in the immediate aftermath of the meeting between the Governor and Defendant Scrushy.

Yet, if there is anything that is clear from the evidence in this case, it is the conclusion that the $250,000 check in question was *not in existence* at the time of the meeting between the Governor and Defendant Scrushy on June 29, 1999. *See* detailed discussion of evidence in Defendant Scrushy's Motion for Judgment of Acquittal (Doc. 413 at n.2. Quite simply, the evidence in the case conclusively demonstrates that it was physically impossible for the conversation about the check between Governor Siegelman and Bailey to have occurred as Bailey recounted in his testimony.

Because the content of the conversation – the content that supposedly establishes the *quid pro quo* – so clearly hinges on the existence of the check in order to make any sense at all, the proof that the check did not exist on the date of that meeting brings the supposed Bailey-Governor Siegelman conversation squarely within the ambit of the holding of the Eleventh Circuit that testimony is inherently unbelievable if it is "so contrary to the teachings of basic human experience … that no reasonable person would believe it beyond a reasonable doubt. If a witness were to testify that he ran a mile in a minute, that could not be accepted, even if undisputed." *United State v. Chancey*, 715 F.2d 543, 546 (11th Cir. 1983); *accord United States v. Kelley*, 412 F.3d 1240, 1247 (11th Cir. 2005). Bailey's testimony as to the existence of an express *quid pro quo*, therefore, should be disregarded entirely.

At the end of the day, it is neither unusual nor unlawful for a politician to consider appointed positions for his political benefactors, and, likewise, for those benefactors to seek out such positions. The Supreme Court, of course, recognized this fact of political life in *McCormick*, and it is for this precise reason that evidence of an express *quid pro quo* – and not the mere possibility of such an express agreement – is a necessary

predicate to conviction on a bribery charge premised on campaign contributions.  Such evidence is entirely lacking here.

All the while recognizing that this Court has already disagreed with the foregoing analysis, Defendant Scrushy nevertheless submits that the sufficiency of the evidence as to the existence of a *quid pro quo* will certainly frame an issue on a appeal that is more than frivolous.  Indeed, at a minimum, it will necessitate just the sort of "close call" that the Eleventh Circuit has already held constitutes a "substantial question" mandating release on bond pending appeal under 18 U.S.C. § 3143.

> **3.  The Third Substantial Question:**
>
> **Whether the 2001 and 2005 Qualified Jury Wheels, from which Defendant Scrushy's Grand and Petit Juries and the Jury Pools Drawn from them Failed to Fairly Represent the African-American Citizens of the Middle District of Alabama, in Violation of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq*., the Jury Plan of the Middle District of Alabama, the Sixth Amendment, and the Equal Protection Clause of the Fifth Amendment.**

The final "substantial question" presented by Defendant Scrushy's upcoming appeal of his convictions arises out of his jury challenge relating to the 2001 Qualified Jury Wheel (hereinafter, "QJW") from which the grand jury that indicted him was selected, and the 2005 QJW from which his petit jury was selected.  *See* Defendant Richard M Scrushy's Preliminary Motion to Dismiss and Challenge to the Composition of Petit jury Pools in the Middle District of Alabama (Doc. 104) ("Jury Challenge Motion").  The heart of the challenge is Defendant Scrushy's claim that the jury system in both these periods failed to fairly represent the African-American citizens that live in the Middle District of Alabama.

Although the statistical analyses as to the extent and precise causes of this under-representation can be debated and parsed in many ways, as Chief Magistrate Judge Coody's R & R in this case and rulings of the District Judge and Magistrate Judge in a contemporaneous jury challenge filed in the unrelated case of *United States v. Leon Carmichael, Sr.*, Case Number 2:03cr259-MHT [8] surely do, one fact is indisputable: The jury system in the Middle District of Alabama has consistently and systematically produced juries that exclude over one-third of the African-American community that resides in this District. This pattern of exclusion of African-Americans has been in place continuously since at least the 1997 QJW, which this Court in 2001 found to be in substantial violation of the Jury Selection and Service Act. *United States v. Clay*, 159 F. Supp. 2d 1357 (M.D. Ala. 2001). Defendant has submitted, and continues to submit, that this under-representation and the irregularities that have created it are a substantial violation of the Jury Selection and Service Act, 28 U.S.C. § 1861 *et seq.* (hereinafter, "JSSA"), the Jury Plan for the Middle District of Alabama (hereinafter "Jury Plan"), the Sixth Amendment to the United States Constitution, and the equal protection clause of the Fifth Amendment. [9]

---

[8] (Report and Recommendation of Magistrate Judge Delores R. Boyd, (Doc. 550), (hereinafter "Boyd R & R")) and opinion of District Judge Myron H. Thompson, 467 F. Supp. 2d 1282 (M.D. Ala. 2006), (hereinafter "Thompson Opinion").

[9] The bases for the jury challenge are set forth in the Jury Challenge Motion and in Defendant M. Scrushy's Objections to Magistrate's Report and Recommendation Denying Jury Challenge (Doc. 580) ("Objections to R&R"), and are incorporated herein. The detailed arguments set forth in the Objections to the R&R will not be repeated here. Stated succinctly, Defendant Scrushy challenges this District's compliance with (1) the JSSA in light of (a) The Clerk's use of outdated mailing addresses, (Objections to R&R at 6-8); (b) The Clerk's liberal deferral practices, (Objections to R&R at 9-11); (2) the District's Jury Plan, and thus the JSSA, in light of: (a) The Clerk's violation of the 15%

While the R & R of Chief Magistrate Judge Coody, as well as the Boyd R & R and Thompson Opinion have rejected all of these claims in both cases, the salient consideration in terms of the appeal bond issue now before this Court is that each of these judges has acknowledged that there are significant problems with the jury system in this District.

The first in time was Magistrate Boyd, who wrote in *Carmichael*:

> Notwithstanding this adverse Recommendation, this Magistrate Judge cannot ignore that the same evidentiary record which warrants denial of a new trial to these defendants also documents a compelling need for the Middle District of Alabama to examine, and undertake to remedy, administrative inaction and operational deficiencies which may undermine the integrity of and public confidence in, the District's Jury Plan. For court personnel assigned to implement the Jury Plan, the *Clay* decision should have served, at the very least, to heighten an appreciation for the statutory and constitutional imperatives to ensure each criminal defendant's right to a jury which is at once representative of a fair cross-section of the community and of a fair selection process. That it did not is a fact underscored repeatedly and with unmistakable clarity from the testimony and exhibits adduced at the evidentiary hearing …. After addressing for almost a year the discovery issues, hearings, and legal analysis generated by this jury composition challenge, this court is constrained to add its voice to the chorus for operational changes which, if not undertaken, may burden the District with repeated litigation.

Boyd R & R at 100 n. 147.

---

limitation, (Objections to R&R at 12-20); (b) the computer failure to randomly distribute previously-deferred jurors within the jury pool (or, the "scattering" violation), (Objections to R&R at 20-22); (c) The Clerk's use of "double draw" pools, (Objections to R&R at 23-24); (d) The Clerks' violation of ¶ 16(e) of the Jury Plan – "jurors who are called but not needed or not chosen for actual service shall be deferred for one year and then placed back into the Qualified Jury Wheel" – by giving jurors a two-year excuse, (Objections to R&R at 24-25); and (e) The Jury Plan's failure to comply with the requirement of § 1863(b)(2) that the use of voter lists be supplemented by "some other source or sources of names…," (Objections to R&R at 26-28); (3) ¶ 9(a) of the Jury Plan and § 1863(b)(4) of the JSSA in light of The Clerk's failure to empty the jury wheel every four years, (Objections to R&R at 25-26); (4) the Fair Cross Section clause of the Sixth Amendment, (Objections to R&R at 29-43); and (5) the Equal Protection Clause of the Fifth Amendment.

Thereafter, Judge Thompson wrote in the same case:

> The court will adopt the magistrate judge's recommendation and reject the defendants' challenge to this court's jury selection process. However, while the defendants are not entitled to a new trial, it should not be overlooked that they have identified several undisputed violations of the JSSA and the Middle District's jury plan. It is also apparent that the defendants are narrowly shy of having satisfied the second *Duren* factor of a greater-than-absolute racial disparity.

The court therefore adopts the magistrate judge's caution that there is "a compelling need for the Middle District of Alabama to examine, and undertake to remedy, administrative inaction and operational deficiencies which may undermine the integrity of, and public confidence in, the District's Jury Plan Thompson Opinion, 467 F. Supp. 2d at 1315.  Judge Thompson thereafter recommends to the Court as a whole that the Administrative Office of the Courts be "immediately invited down to do a complete audit of the court's jury selection process,…." *Id*. at 1315.

For purposes of appeal, therefore, the real question will be whether the JSSA and Jury Plan violations (which are a subset of JSSA violations) are of a sufficient magnitude to justify an order of a new trial, and whether, more broadly, the failure of the jury system failed to fairly represent the African-American citizens that live in the Middle District of Alabama constituted violations of the Sixth Amendment and the Equal Protection Clause of the Fifth Amendment.  These are much more than frivolous considerations on the undisputed facts, and indeed, Judge Thompson has specifically found with respect to at least one facet of the jury challenge – the 15% limitation – that the "question is a *close one*."  Thompson Opinion, 467 F.Supp. at 1304 (emphasis added).  And it is because the issues presented in Defendant Scrushy's jury challenge are so close that Defendant Scrushy's jury challenge on appeal presents a "significant question," within the meaning

of 18 U.S.C. § 3143, such that this Court should allow for the release of Defendant Scrushy on an appeal bond pending his appeal.[10]

## **CONCLUSION**

WHEREFORE, for the above and foregoing reasons, Defendant Richard M. Scrushy respectfully requests that, pursuant to 18 U.S.C. § 3143(b), this Court grant him release pending appeal on the same conditions currently imposed on him in relation to his post-conviction release pending sentencing under 18 U.S.C. § 3143(a).

Dated: June 28, 2007.

Respectfully submitted,

/s/ Arthur W. Leach
Arthur W. Leach
Leslie V. Moore
3501 Lorna Road, Suite 3
Hoover, Alabama 35216
Phone:  205-403-9116
Fax:  205-988-9133

James K. Jenkins
Maloy & Jenkins
25th Floor
75 Fourteenth Street N.W.
Atlanta, Georgia  30309
Phone: 404-875-2700
Fax: 404-875-8757

Carmen D. Hernandez
717 D Street, N.W.
Suite 310
Washington, DC 20004
Phone: 202-628-0090
Fax: 202-628-2881

---

[10] As to the requirement of 18 U.S.C. § 3143(b)(1)(B) "that the appeal … not [be] for the purpose of delay…," given the substantial and legitimate nature of the issues that Defendant Scrushy plans to raise on appeal, as described above, there can be no doubt that his appeal will not be interposed for the purpose of delay.

Frederick G. Helmsing
Helmsing, Leach, Herlong, Newman
   & Rouse, P.C.
       P.O. Box 2767
       Mobile, Alabama 36652
       Phone:  251-432-5521

James W. Parkman, III
Richard Martin Adams
William White
Parkman & Associates
739 West Main Street
Dothan, Alabama  36301
Phone:  334-792-1900


Attorneys for Richard M. Scrushy

**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of June, 2007, I personally filed the foregoing "Defendant Richard M. Scrushy's Motion for Release on Bond Pending Appeal" with the Clerk of the Court using the CM/ECF system which will send notification of such to counsel of record.

/s/ Leslie V. Moore
Leslie V. Moore
3501 Lorna Road, Suite 3
Hoover, Alabama 35216
Phone: (205) 403-9116
Fax:     (205) 988-9133
E-Mail: les.moore@malaw1.com